UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
UNITED STATES OF AMERICA                            :        12 Cr. 626 (ER)
                                                    :
            - v. -                                  :
                                                    :
RAYMOND CHRISTIAN, et al.,                          :
                                                    :
                  Defendants.                       :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


GOVERNMENT'S OMNIBUS OPPOSITION TO
<u>THE DEFENDANTS' PRETRIAL MOTIONS</u>


                        PREET BHARARA
                        United States Attorney
                        Southern District of New York
                        One St. Andrew's Plaza
                        New York, New York 10007


ANDREW BAUER
PARVIN D. MOYNE
Assistant United States Attorneys
        -Of Counsel-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
UNITED STATES OF AMERICA                            :         12 Cr. 626 (ER)
                                                    :
            - v. -                                  :
                                                    :
RAYMOND CHRISTIAN, et al.,                          :
                                                    :
            Defendants.                             :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GOVERNMENT'S OMNIBUS OPPOSITION TO
THE DEFENDANTS' PRETRIAL MOTIONS

The Government respectfully submits this opposition in response to the pretrial motions (the "Motions") filed by defendants Glenn Thomas, a/k/a "Gucci," and James Williams, a/k/a "L-1" or "Big L," requesting a bill of particulars, arguing for severance, challenging the reliability of the Government's informant testimony, and requesting discovery and other miscellaneous relief.  Defendants Raymond Christian, a/k/a "Reckless," and Rashawn Vassell, a/k/a "Bash," (together with Thomas and Williams, the "Moving Defendants") have filed letters indicating, without more, that they wish to join the Motions.  For the reasons set forth below, the Government respectfully submits that all of the Motions should be denied.

**BACKGROUND**

A.      Offense Conduct

At trial, the Government anticipates proving that Raymond Christian, a/k/a "Reckless," Glenn Thomas, a/k/a "Gucci," Rashawn Vassell, a/k/a "Bash," James Williams, a/k/a "L-1," Kevin Burden, a/k/a "Kev Gotti," and others, conspired to commit, and committed, an armed robbery of individuals believed to possess narcotics, and in the course of the robbery conspiracy,

1

attempted robbery and robbery, caused the death of Jeffrey Henry, a/k/a "the Joker," in Newburgh, New York on December 15, 2010.

In particular, the Government will prove that on December 15, 2010, Jeffrey Henry was murdered at 54 Chambers Street in Newburgh, New York.  According to cooperating witnesses, on the date in question, Raymond Christian, a/k/a "Reckless," and others decided to rob Henry's house, from which it was known that Henry and others sold crack cocaine and marijuana. Christian then met James Williams, a/k/a "L-1" or "Big L," on Dubois Street in Newburgh and asked if Williams wanted to participate in the robbery.  Williams was a high-ranking member of the "G-Shine" set of the Bloods (Christian was a member of a spin-off gang known as "Star Status"), and a prominent drug dealer in the area.  Williams agreed to help Christian rob Henry's house, and Williams made some calls about recruiting additional people and getting guns in order to commit the robbery.

One of Williams's phone calls was directed to Kevin Burden, a/k/a "Kev Gotti," who operated a marijuana spot on First Street and was storing two guns, or "chains," for Williams. Thereafter, Williams sent two individuals from Williams's Bloods set – Glenn Thomas, a/k/a "Gucci," and Tyrell Whitaker, a/k/a "Bow Wow" – to Burden's house.  Burden led Thomas and Whitaker to the basement, where they retrieved the guns.  After Thomas and Whitaker left, Burden told a cooperating witness that they were "up to some bullshit."

Later that evening, as captured by street/pole cameras on First Street and Chambers Street, a group of seven individuals, including Christian, Thomas, Vassell, Whitaker, Eric Cromartie, a/k/a "Baby E," (who is now deceased), and two younger individuals - Laquavious Boykin, a/k/a "Quay Quay," and Anthony Baynes (Baynes has been prosecuted as a juvenile in the state for the instant robbery) – went together to Henry's house on 54 Chambers Street.

According to a cooperating witness, when they arrived at the target apartment, Baynes and Boykin, who did not have guns, stayed outside and served as lookouts.  The rest of the individuals – all of whom had guns and most of whom were wearing masks – went inside the apartment.  The apartment was a first floor apartment, with the front door to the apartment being the front door to the house (so the door to the apartment is the door to the street).

The robbers found several people in the apartment (but not Henry) and, although the victims did not have guns, the victims struggled with the robbers and one of the victims managed to get Christian's gun (and rip off his ski mask).  A gunfight then started between the victims and robbers.  During the struggle, Baynes (who came inside during the gunfight) was stabbed by one of the victims (he survived and went to the hospital, which led to his arrest).

During the gunfight, Jeffrey Henry returned home and heard the shooting.  While standing on the outside, he grabbed the front door and tried to hold it closed (presumably to trap everyone inside) while he called 911.  The Government has the 911 call, and the gunfire can be heard on the call.  Witnesses will state that Thomas and Whitaker were on the inside of the front door and tried to force it open.  When Henry resisted, they began firing both through the door and, whenever they were able to crack it open, out the door.  Based on the 911 call, it appears that after one of their shots hit Henry, he may have released the door.  A second shot also hit Henry (either before or after Henry released the door) and the robbers all ran from the apartment.  Their flight from the apartment was, again, captured by street cameras.  Henry stumbled a few steps from the apartment and collapsed, dying shortly thereafter.

According to cooperating witnesses, after the murder, at least some of the robbers returned to the marijuana spot on First Street covered with blood and requested that they be given garbage bags (presumably to get rid of evidence, such as bloody clothes or guns).

The police responded to the murder scene almost immediately and recovered, among other things, crack cocaine, numerous shell casings, a ski mask that had Christian's DNA on it, and blood samples from a wall that contained Baynes's DNA.

B.    The Indictment and Arrests

On August 15, 2012, a grand jury sitting in this District returned a four-count Indictment 12 Cr. 626 (ER) (the "Indictment"), charging Raymond Christian, a/k/a "Reckless," James Williams, a/k/a "L-1," Rashawn Vassell, a/k/a "Bash," Glenn Thomas, a/k/a "Gucci," and Kevin Burden, a/k/a "Kev Gotti" (collectively, the "Defendants").[1]

Count One charges the Defendants with conspiring to commit an armed robbery in Newburgh, New York, of individuals they believed to possess narcotics and narcotic proceeds, in violation of Title 18, United States Code, Section 1951.

Count Two charges the Defendants with committing, attempting to commit, and aiding and abetting the commission of an armed robbery at 54 Chambers Street, Newburgh, New York, on December 15, 2010, of individuals who possessed narcotics and narcotic proceeds, in violation of Title 18, United States Code, Sections 1951 and 2.

Count Three charges the Defendants with conspiring to distribute marijuana and crack, in violation of Title 21, United States Code, Section 846.

Count Four charges the Defendants with using a firearm, and aiding and abetting the use of a firearm, that caused the death of Jeffrey Henry in the course of the robbery conspiracy, the robbery, and the attempted robbery charged in Counts One and Two, in violation of Title 18, United States Code, Sections 924(j)(1) and 2.

---

[1]    After the defendants were arrested, the Government learned that Tyrell Whitaker was a juvenile at the time of the murder (although 19 now).  Accordingly, the Government filed a nolle prosequi removing him from the Indictment, filed a Juvenile Information against Whitaker, and has moved the Court to transfer him to adult status.

The defendants were all arrested on September 5, 2012, and have been incarcerated pending trial.

C.     Discovery

On September 13, 2012, the Government produced the first of multiple rounds of Rule 16 discovery in this case.  Each defendant received individualized discovery, including his rap sheet, his arrest paperwork, copies of any and all statements that he made to law enforcement agents, and information regarding his prior arrests by the Newburgh Police Department.  To all of the defendants, the Government produced a number of items, including (i) the audio recording of a phone call placed to 911 by Jeffrey Henry at the time of his murder on December 15, 2010; (ii) DNA reports relating to the investigation of the murder of Jeffrey Henry on December 15, 2010; (iii) crime scene photographs relating to the investigation of the murder of Jeffrey Henry on December 15, 2010; and (iv) evidence slips listing evidence seized in connection with the investigation of the murder of Jeffrey Henry on December 15, 2010.

The Government produced a number of additional materials in subsequent Rule 16 production.  For instance, the Government produced a video recording made on or about July 9, 2012 of a conversation between Kevin Burden and a cooperating witness.  In addition, in October 2012, the Government produced, among other things, CDs containing various video surveillance recordings from December 15, 2010 – including footage from pole cameras, the Fogarty Apartment Complex, street cameras in the vicinity of Broadway and Dubois Street, and St. Luke's Hospital.  In March 2013, the Government then produced additional December 15, 2010 recordings from these cameras.  As part of this production, the Government identified the street camera, file, and time stamp for the cameras that captured the defendants traveling to and from Henry's house on Chambers Street.

## ARGUMENT

### I.   THE MOTIONS FOR BILLS OF PARTICULARS SHOULD BE DENIED

Each of the Moving Defendants requests a bill of particulars, claiming that the nine-page

Indictment and the extensive discovery in this case are insufficient to allow them to prepare for

trial and plead double jeopardy in a future prosecution.  Each defendant seeks from the

Government variations on a theme of common particulars, of which he claims ignorance.  The

particulars sought by defendant James Williams, for instance, as to the robbery and narcotics

conspiracy charged in Counts One and Three are typical:

> (i)     The identity of the "others" alleged in each count of the Indictment.
>
> (ii)    The "other acts" alleged in each count of the Indictment.
>
> (iii)   A description of each overt act carried out by each member of the conspiracy, including members identified as "others", including but not limited to the date, time, place, persons committing the act, persons who witnessed the act or otherwise had knowledge of it, and, if applicable, the victim.
>
> (iv)    The circumstances under which Mr. Williams arranged for firearms. When (date and time), where (location), how did this happen, and who was present?
>
> (v)     When and Where, and with whom Mr. Williams sold or possessed with intent to sell (and which it was) crack cocaine (each occasion if there is more than one).
>
> (vi)    When, where, how Mr. Williams, and each of the codefendants, as well as the "others" not in the indictment, joined and/or withdrew from the conspiracy.

Williams Mem. at 7.[2]

Contrary to the suggestions of counsel, however, the Government has provided sufficient

information to "enable the defendant to adequately prepare for trial, to prevent surprise, and to

---

[2]    Williams requests a similar suite of particulars for the crimes charged in Counts Two and Four.

enable defendant to plead double jeopardy in the event of a subsequent prosecution for the same offense." United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987). Indeed, the Government has already provided much of the evidence sought by the defense in open court, in the factual proffer found herein, and in previous attorney proffers, as to what it anticipates cooperating witnesses will say at trial regarding individual defendants in the case. Accordingly, these motions for bills of particulars should be denied.

      A.     <u>Applicable Law</u>

It is well-established that the proper scope and function of a bill of particulars is to provide sufficient information about the nature of the charge to enable a defendant to prepare for trial, to avoid unfair surprise, and to preclude a second prosecution for the same offense. Fed. R. Crim. P. 7(f); United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990), United States v. Bortnovsky, 820 F.2d 574. "A bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accursed." Torres, 901 F.2d at 234 (internal quotations marks omitted).

If the information the defendant seeks "is provided in the indictment or in some acceptable alternate form," no bill of particulars is required. See Bortnovsky, 820 F.2d at 574; United States v. Morales, 280 F. Supp. 2d 262, 274 (S.D.N.Y. 2003). In other words, the defense cannot use a bill of particulars as a general investigative tool, United States v. Salazar, 485 F.2d 1272, 1277-78 (2d Cir. 1973), or as a devise to compel disclosure of the Government's evidence prior to trial. See United States v. Triana-Mateus, No. 98 Cr. 958 (SWK), 2002 WL 562649, at *5 (S.D.N.Y. Apr. 15, 2002) (citing United States v. Gottlieb, 493 F.2d 987, 994 (2d Cir. 1974)). "The Government is not required to disclose the manner in which it will attempt to prove the charges, nor the means by which the crimes charged were committed." Id.

"It is not enough that the information would be useful to the defendant; if the defendant has been given adequate notice of the charges against him, the government is not required to disclose additional details about its case." United States v. Payden, 613 F. Supp. 800, 816 (S.D.N.Y.) 1985.  Further, supplying evidentiary detail is not the function of the bill of particulars. See Torres, 901 F.2d at 234.  "[A] bill of particulars is not a general investigative tool, a discovery devise, or a means to compel the government to disclose evidence or witnesses to be offered prior to trial." United States v. Gibson, 2001 WL 460935, at *6 (S.D.N.Y. May 1, 2001); United States v. Strawberry, 892 F. Supp. 519, 526 (S.D.N.Y. 1995).  It is not the function of a bill of particulars to allow defendants to preview the evidence or theory of the Government's case. United States v. Taylor, 707 F. Supp. 696, 699 (S.D.N.Y. 1989); United States v. Persico, 621 F. Supp. 842, 868 (S.D.N.Y. 1985).

Therefore, "'the Government is not required to provide information that would, in effect, give the defendant a preview of the Government's case before trial.'" Id. (quoting United States v. Conley, No. 00 Cr. 0816 (DAB), 2002 WL 252766, at *4 (S.D.N.Y. Feb. 21, 20020)). In particular, "demands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied." United States v. Trippe, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001)(collecting cases); see, e.g., Torres, 901 F.2d at 233-34 (demands for whens, wheres and by whoms within charged conspiracy are improper attempts at general pre-trial discovery); United States v. Remire, 400 F. Supp. 2d 627, 633 (S.D.N.Y. 2005); United States v. Remire, 400 F. Supp. 2d 627, 633 (S.D.N.Y. 2005); United States v. Johnson-Guzman, No. 98 Cr. 350 (RWS), 1998 WL 730327, at *7 ("with respect to conspiracy charges in particular, since the Government is not required to prove exactly when or how a conspiracy was formed or when or how a particular defendant joined the scheme, and as

the circumstantial proof on the which the government usually relies to prove the existence of a scheme often does not reveal such details, the courts have consistently rejected demands for particulars as to the formation of a conspiracy or the entry into the conspiracy of a particular defendant or confederate.").

Under the relevant legal standard, the Government is not required to (a) "particularize all of its evidence," United States v. Cephas, 937 F.2d 816, 823 (2d Cir. 1991); (b) disclose the precise manner in which the crimes charged in the indictment were committed, see Torres, 901 F.2d at 233-34; or (c) provide the defendant with a preview of the Government's case or legal theory, see Muyet, 945 F. Supp. 586, 598-99. The ultimate test is whether the information sought is necessary, not whether it is helpful. See United States v. Trippe, 171 F. Supp. 2d at 240; Conley, 2002 WL 252766, at *4.

B.    Discussion

As a preliminary matter, the Indictment is pled with specificity: it details the date of the conspiracy and enumerates the date and general location of the robbery in Count One, as well as the date of the narcotics conspiracy in Count Three.  Moreover, the Government has produced extensive discovery in this case.  In particular, the Government has provided materials such as evidence vouchers, DNA reports, surveillance footage, and 911 recordings that together provide the defense ample notice as to the evidence they can anticipate at trial.

The Moving Defendants are not entitled to the information they seek, which is the kind of detail about the Government's case that is squarely foreclosed by case law and constitutes an attempt to disrupt the structured discovery system set forth in Rule 16 and 18 U.S.C. § 3500.  See Torres, 901 F.3d at 233-34 (demands for "whens" and "wheres" and "by whoms" within charged conspiracy are improper attempts at general pretrial discovery); United States v. Bin Laden, 92

F. Supp. 2d 225, 242 (S.D.N.Y. 2000) ("[R]equests, such as those made by the Defendants here,

for particulars as to when, where, how, and with whom each individual defendant joined an

alleged conspiracy have 'almost uniformly been denied.'" (quoting United States v. Wilson, 565

F. Supp. at 1438)). Indeed, to the extent that this information is not reflected in the discovery

previously disclosed to the defendants but is reflected in reports prepared or notes taken by law

enforcement officers, it constitutes Jencks Act material to which they are not yet entitled.

      The Indictment, the extensive discovery the Government has produced, and the factual

proffer set forth in this Memorandum provide, in sum, the Moving Defendants with ample

information to prepare their defense. In short, the Government has "identif[ied] with sufficient

particularity the nature of the charge pending against [t]he defendants, thereby enabling the

defendant[s] to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy

should [they] be prosecuted a second time for the same offense." Bortnovsky, 820 F.2d at 674.

Accordingly, the defendants' motion for a bill of particulars should be denied.

## II.   WILLIAMS'S MOTION FOR SEVERANCE SHOULD BE DENIED

      Williams (and thereafter, defendants Vassell and Christian, who joined by letter) move

for severance in this case. For the reasons stated below, the Government submits that severance

of any particular defendant from the others is inappropriate in this case.

### A.   Applicable Law

      In cases that involve multiple offenses and defendants, Rule 8(b) of the Federal Rules of

Criminal Procedure sets forth the standard which governs joinder of offenses and defendants.

United States v. Turoff, 853 F.2d 1037, 1043 (2d Cir. 1988). The Second Circuit has interpreted

Rule 8(b) to allow joinder of offenses and defendants where two or more persons' "criminal acts

are 'unified by some substantial plan or scheme.'" <u>United States</u> v. <u>Feyrer</u>, 333 F.3d 110, 114 (2d Cir. 2003) (quoting <u>United States</u> v. <u>Attanasio</u>, 870 F.2d 809, 8015 (2d Cir. 1989)).

Rule 14 of the Federal Rules of Criminal Procedure permits severance of properly joined charges, at the discretion of the trial court, to avoid prejudice to a defendant or the Government. The Supreme Court has made plain, however, that there is a "preference in the federal system for joint trials of defendants who are indicted together." <u>Zafiro</u> v. <u>United States</u>, 506 U.S. 534, 537 (1993). This preference reflects a settled precept in criminal law; "Joint Trials 'play a vital role in the criminal justice system,'" as "[t]hey promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" <u>United States</u> v. <u>O'Connor</u>, 650 F.3d 839, 858 (2d Cir. 2011) (quoting <u>Zafiro</u>, 506 U.S. at 537) (internal citations omitted). Therefore, any analysis of prejudice under a Rule 14 motion must be viewed through the lens of the strong presumption in favor of joint trials. As the Supreme Court has explained:

> Many joint trials – for example, those involving large conspiracies to import and distribute illegal drugs – involve a dozen or more codefendants…. It would impair both the efficiency and the fairness of the criminal justice system to require… that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally service the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability – advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

<u>Richardson</u> v. <u>Marsh</u>, 481 U.S. 200, 210 (1987); <u>see also</u> <u>United States</u> v. <u>Zafiro</u>, 945 F.2d 881, 886 (7th Cir. 1991) (Posner, J.) (joint trials reduce not only litigation costs but also "error costs," <u>i.e.</u>, the costs associated from depriving jury from making its determinations based on "the full

picture"), aff'd, 506 U.S. 534 (1993).  Thus, even where joint trials invite some prejudice to defendants, "[t]he risks of prejudice attendant in a joint trial are presumptively outweighed by the conservation of time, money, and scarce judicial resources that a joint trial permits."  United States v. Jimenez, 824 F. Supp. 351, 366 (S.D.N.Y. 1993); see also United States v. Guerrero, 669 F. Supp. 2d 417, 424 (S.D.N.Y. 2009).

Quite simply, there is a strong presumption that defendants who are indicted together will be tried together.  See, e.g., Zafiro, 506 U.S. at 537; United States v. Blount, 291 F.3d 201, 209 (2d Cir. 2002).  "This preference is particularly strong where… The defendants are alleged to have participated in a common plan or scheme."  United States v. Salameh, 152 F.3d 8, 115 (2d Cir. 1998).

Given this presumption, even if a particular defendant is somehow prejudiced by joinder, the issue under Rule 14 is whether that prejudice "is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials."  United States v. Lanza, 790 F.2d 1015, 1019 (2d Cir. 1986) (citation omitted).  It is not enough for a defendant to show that he "may have a better chance of acquittal in [a] separate trial[]." Zafiro, 506 U.S. at 540.  Thus, a discretionary severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilty or innocence," Zafiro, 506 U.S. at 539; see also United States v. Panza, 750 F.2d 1141, 1149 (2d Cir. 1984).  Consequently, "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial." United States v. Rosa, 11 F.3d 315 (2d Cir. 1993).

Indeed, the Supreme Court has instructed that even when the risk of prejudice is high, less drastic measures – such as appropriate limiting instructions – often suffice as an alternative

to granting a Rule 14 motion.  Zafiro, 506 U.S. at 53; see also Feyrer, 333F.3d at 114.  Courts

have repeatedly recognized that any potential prejudice caused by a joint trial can by effectively

mitigated by instructions to the jury that it must consider separately each individual defendant

and each charge, and only consider the evidence that has been admitted against each defendant.

See Zafiro, 506 U.S. at 540-41; United States v. Hernandez, 85 F.3d 1023, 1029-30 (2d Cir.

1996); United States v. Romero, 54 F.3d 56, 60 (2d Cir. 1995).

The presumption in favor of joint trials "is particularly strong where, as here, the

defendants are alleged to have participated in a common plan or scheme."  Salameh, 152 F.3d

88, 115 (2d Cir. 1998).  "[T]he cases are legion that there is a strong public interest in joint trials

where, as here, the defendants are… charged in the same conspiracy."  United States v. Pirro, 76

F. Supp. 2d 478, 483 (S.D.N.Y. 1999); see also United States v. Bin Laden, 109 F. Supp. 2d 211,

214 (S.D.N.Y. 2000) ("When more than one defendant is accused of participating in the same act

or transaction or series of acts or transactions, federal law expresses a strong preference for a

single, joint trial of all defendants.") (footnote omitted).

In such cases, especially, any claim of "prejudicial spillover" does not justify severance

because the supposedly "prejudicial" evidence would be admissible at a separate trial of the

moving defendant.  As the Second Circuit has recognized:

> [T]he fact that testimony against a codefendant may be harmful is
> not a ground for severance if that testimony would also be
> admissible against the moving defendant tried separately.
> Evidence at the joint trial of alleged coconspirators that, because of
> the alleged conspiratorial nature of the illegal activity, would have
> been admissible at a separate trial of the moving defendant is
> neither spillover nor prejudicial.

Rosa, 11 F.3d at 341 (citations omitted).  Rather, undue "prejudice" may occur "when proof

inadmissible against a defendant becomes a part of his trial solely due to the presence of co-

13

defendants as to whom its admission is proper.  This is an unlikely occurrence when all the defendants are charged under the same conspiracy count." <u>Salameh</u>, 153 F.3d at 115 (citation omitted).

B.     <u>Discussion</u>

None of the various bases asserted by James Williams (or defendants Vassell and Christian, who joined by letter) for severance provide any reason to sever Williams, or any of the other defendants, from one another at this time, as they are all properly charged with acting together during the course of the robbery conspiracy at issue in this case.

1.     <u>"Prejudicial Spillover"</u>

Williams argues that severance is appropriate because he would individually suffer prejudice by the introduction of evidence regarding certain conduct – such as the murder charge contained in Count Four or bad acts carried out during portions of the conspiracy that preceded his individual participation in the murder.  Accordingly, he maintains that there will be a "prejudicial spillover" at a joint trial because there will be some evidence introduced about co-defendants' acts in which they were not directly involved.

This is not a sufficient basis for severance.  As the Second Circuit has repeatedly held, "the fact that evidence may be admissible against one defendant but not another does not necessarily require a severance." <u>United States</u> v. <u>Carson</u>, 702 F.2d 351, 367 (2d Cir. 1983).  A defendant is not entitled to a separate trial merely because evidence of criminal activities of his co-defendants will be admitted at the joint trial, even where that evidence may be wholly unrelated to any charges in which the particular defendant is named.  Severance motions have been routinely denied under far more extreme circumstances than that present here.  See <u>United States</u> v. <u>Cardascia</u>, 951 F.2d 474, 483 (2d Cir. 1991) (no due process violation where defendants

forced to sit through a month of unrelated evidence of a separate conspiracy involving co-defendants).

In this case, the claims of "prejudicial spillover" are entirely illusory because the evidence of the criminal activities of the other members of the conspiracy is admissible against each defendant in a separate trial as proof of the existence of the charged criminal conspiracy and the nature, purposes, and activities of that conspiracy.  It is axiomatic that "[w]here a defendant is a member of a conspiracy, all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant."  Selameh, 152 F.3d at 111.  This rule is particularly appropriate in this case.  Williams played the critical, managerial role in organizing the robbery.  The fact that he was not present when the actual shooting took place is of no moment for this analysis.  Cooperating witnesses will testify that he knowingly and willfully joined this conspiracy, and was the one who arranged for the robbers to bring guns.  The shooting that occurred as part of that robbery is, therefore, admissible against Williams and the rest of the defendants.

Even in different circumstances, when testimony related to violent behavior unrelated to a particular defendant is at issue (which, to be clear, is not the case here), the Second Circuit has likewise found that a joint trial does not necessarily result in substantial prejudice.  See United States v. Spilleni, 352 F.3d 48, 55 (2d Cir. 2003) (rejecting a defendant's argument that substantial prejudice resulted from the failure to sever him from his co-defendant brother despite testimony "from prosecution witnesses [who] related in graphic detail [his brother's] violent and murderous criminal history, a history [the defendant] did not share").

Here, because all of the Government's evidence at trial will relate to the narcotics and robbery conspiracy – in which Williams and all of the Moving Defendants are charged – there is

no "spillover prejudice," because the Government is required to prove the existence of the charged conspiracy as well as those defendants' participation in it.[3]

Notably, this is not a case where the nature of the individual defendants' conduct varies widely, or where there are numerous counts that pertain to only some of the defendants.  Cf. Spilleni, 352 F.3d at 55.  The defendants' claims of spillover prejudice arise entirely out of claims that their conduct differs in degree from their co-defendants.  This claim rings hollow, especially in light of the fact that all of the defendants participated in the robbery conspiracy, and have all been charged in the same four counts.  There is simply no reason to believe that a properly instructed jury would be unable to distinguish the proof against each defendant and the role that defendant played in the conspiracy.

Similarly, Williams argues in his moving papers that there is relatively little evidence in the Rule 16 discovery produced by the Government implicating them.  His argument is, in essence, that he will be individually prejudiced because of the disparity of proof against him versus their co-defendants.  "It is well established that 'differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials.'"  United States v. Chang An-Lo, 851 F.2d 547, 557 (2d Cir. 1988) (quoting United States v. Carson, 702 F.2d 351, 366-67 (2d Cir. 1983).  Furthermore, the fact that one defendant played a comparatively lesser role in the charged conspiracy does not mean that

---

[3]     To the extent that any of the Moving Defendants can somehow identify evidence prejudicial to their case, then the Government submits that the alleged prejudice, if any, resulting from proof of acts committed by co-defendants is properly mitigated not by a severance, but by appropriate limiting instructions on particular pieces of evidence and jury instructions that guilty is individual, and that the jury should decide the guilt of a particular defendant based on the evidence pertaining to that defendant only.  See Zafiro, 506 U.S. at 538-39; United States v. Romero, 54 F.3d 56, 60 (2d Cir. 1995); Rosa, 11 F.3d at 342 (despite evidence of violent acts, including murder, committed by non-moving defendants, joinder was proper where [t]he trial court instructed the jury that it should consider the evidence as to each count of the indictment separately and advised it that the fact that it found any one defendant guilty on a given count 'should not control your verdict as to any other offenses charged'").

evidence showing the full scope of the enterprise cannot properly be admitted against the defendant.  Where, as here, each defendant is alleged to be a member of a drug and robbery conspiracy, "virtually all of the evidence admitted at a joint trial would be admissible against each separate defendant in a separate trial as acts of his co-conspirators in furtherance of the charged conspiracy." Jimenez, 824 F. Supp. at 368.

As a preliminary matter, the Government disagrees that there will be a significant disparity in the evidence presented against the various defendants in this case.  But more importantly, as the Second Circuit has held, the "quantity and quality" of the evidence against one defendant involved in a conspiracy with his co-defendants is not determinative of whether severance is appropriate.  See United States v. Casamento, 887 F.2d 1149, 1153, 1167-68 (2d Cir. 1989).  As in Casamento, in which "minor" defendants, against whom the direct evidence consisted of only a few tape recorded telephone calls, were properly tried as part of a multi-defendant trial, a difference in the amount of evidence against certain defendants does not carry the defendants' burden in overcoming the strong presumption against severance.

To the extent that Williams argues that he (and Burden) was not physically present at the robbery, and therefore was not involved directly in the charged violence, this argument ignores the fact that Williams played a crucial role – he was the organizer who recruited additional participants (such as Thomas and Tyrell Whitaker) and arranged to get the guns used during the robbery – in the conspiracy.  As the Second Circuit has made clear, overt acts of a defendant's co-conspirators in furtherance of the conspiracy are admissible against a defendant.  See United States v. Villegas, 899 F.2d 1324, 1347 (2d Cir. 1991) (severance properly denied where "all of the evidence as to each of the other defendants' acts in furtherance of the conspiracy" would be "admitted at a single-defendant trial because of the alleged conspiratorial nature of the illegal

activity"); Casamento, 887 F.2d at 1153 (activities of alleged co-conspirators would have been admissible in single-defendant trials and thus severance properly denied). There can be not "prejudicial spillover" where the proof that allegedly would prejudice the defendant would have been introduced in a trial against him alone. See Salameh, 152 F.2d at 116; United States v. Uccio, 917 F.2d 80, 88 (2d Cir. 1990).

Similarly, United States v. Rosa, 11 F.3d 315 (2d Cir. 1993), makes clear, moreover, that a conspirator may not obtain a severance on the basis of proof of the acts of his co-conspirators is fully admissible against him, even when the co-conspirators are alleged to have committed far more violent overt acts. In Rosa, the proof at trial established that members of a drug organization engaged in acts of violence, including murder, as a means of fostering loyalty and discipline within the organization. See id. at 325. The Second Circuit affirmed the denial of severance motions raised by two defendants who "personally were not charged with acts of violence," reasoning that it was uncontested that each "was an integral part of the conspiracy" and

> [e]vidence of the workings of the conspiracy would therefore have been admissible at the individual trials of [the two drug defendants] had they been tried separately. Since the evidence was that the Organization's routing modus operandi involved the use of murder and mayhem to exclude competitors from its retail drug spots and to maintain discipline among its members, the acts of violence performed by other coconspirators were chargeable to [the drug defendants] and their claims of prejudicial spillover must be rejected.

Id. at 343. As in Rosa, the fact that there is ample evidence that the Williams and the remaining defendants were members of a common conspiracy fatally undermines his severance motion. See also United States v. Nersesian, 824 F.2d 1294, 1304 (2d Cir. 1987) (where evidence sufficient to support conclusion that defendants participated in single conspiracy, government

"entitled to show the entire range of evidence of the conspiracy against each appellant" and separate trials unwarranted).

2.   <u>Bruton</u> <u>Issues</u>

Williams also moves for severance based on a contention that the Government's introduction of any of their co-defendants' statements will be prejudicial against him because they will violate his Confrontation Clause rights.  Specifically, Williams requests severance based on any "statements of co-defendants made to agents of the government it intends to offer at a joint trial."  <u>See</u> Williams Mot. ¶ 3.

The Government, however, will seek to introduce statements of co-defendants, if any, only after those statements have been redacted in conformity with <u>Bruton</u> v. <u>United States</u>, 391 U.S. 123 (1968), and its progeny such that the defendants will not suffer undue prejudice from a joint trial.  In <u>Bruton</u>, the Supreme Court held that the admission of a non-testifying co-defendant's confession, naming the defendant as a perpetrator at their joint trial, violates the naked defendant's Sixth Amendment right to cross-examination, notwithstanding a jury instruction that the statement can only be considered against the defendant who made it.  In <u>Richardson</u> v. <u>Marsh</u>, 481 U.S. 200 (1987), however, the Supreme Court held that redaction of the co-defendant's confession to eliminate any reference to the defendant is sufficient to eliminate any <u>Bruton</u> problem.[4]  The Second Circuit has consistently held that the introduction of a co-defendant's confession with the defendant's name replaced by a neutral noun or pronoun does not violate <u>Bruton</u> or the Confrontation Clause.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Alvarado</u>, 882

---

[4]   Subsequently, the Supreme Court has provided examples of proper redactions.  The Court in <u>Gray</u> v. <u>Maryland</u>, 523 U.S. 185 (1998), found that statements redacted so as to leave blanks or the word "delete" created a <u>Bruton</u> problem, because the "redacted confession with the blank prominent on its face '<u>facially</u> incriminat[es]' the defendant."  <u>Gray</u>, 523 U.S. at 196 (emphasis in original).  But the Court suggested that the statement "Me, deleted, deleted, and a few other guys," could appropriately be introduced as "Me and a few other guys."  <u>Id.</u>

F.2d 645, 651 (2d Cir. 1989) (discussing how statements may be redacted to comply with <u>Bruton</u>

and <u>Richardson</u>), overruled on other grounds, <u>Bailey</u> v. <u>United States</u>, 516 U.S. 137 (1995).[5]

The decision in <u>Crawford</u> v. <u>Washington</u>, 51 U.S. 36 (2004), generally barring out-of-court

testimonial hearsay, does not change this result.  Indeed, the Second Circuit has specifically

rejected the proposition that <u>Crawford</u> modifies <u>Bruton</u> or <u>Richardson</u> in the context of a

severance motion.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Lung Fong Chen</u>, 393 F.3d 139, 150 (2d Cir. 2004)

("we see no indication that <u>Crawford</u> overrules <u>Richardson</u> or expands the holding of <u>Bruton</u>);

<u>see also</u> <u>Haymon</u> v. <u>New York</u>, 332 F. Supp. 2d 550, 559 n.4 (W.D.N.Y. 2004) ("<u>Crawford</u> gives

no indication that <u>Richardson</u> and its progeny have been abrogated in any way."); <u>United States</u>

v. <u>Cuong Gia Le</u>, 316 F. Supp. 2d 330, 338 n.8 (E.D. Va. 2004) (rejecting argument that

"<u>Crawford</u> overruled <u>Bruton</u> and its progeny" because "[s]uch a revolutionary change in criminal

procedure jurisprudence was not announced in <u>Crawford</u> and it cannot be assumed that the

Justices intended to overrule <u>Richardson</u> <u>sub silencio</u> [sic]").

Given that any co-defendant statements will be properly redacted to conform with

<u>Bruton</u>, the request for severances on this ground should be denied.  In addition, the Government

will request that the Court issue a limiting instruction to the jury, when any such statement is

offered only against the defendant making the statement and not against any other defendant.

Accordingly, the potential introduction of a co-defendant's statement, in redacted form and

---

[5]   For example, in <u>United States</u> v. <u>Tutino</u>, 883 F.2d 1125, 1135 (2d Cir. 1989), the Second Circuit
affirmed a conviction based in part on a statement of a co-defendant that was redacted so that it
referred to "others," "other people," and "another person."  The <u>Tutino</u> Court held that a "redacted
statement in which the names of co-defendants are replaced by neutral pronousn, with no indication
to the jury that the original statement contained actual names, and where the statement standing alone
does nto otherwise connect co-defendants to the crimes, may be admitted without violating a co-
defendant's Bruton rights." <u>Id.</u>

accompanied by a proper limiting instruction, does not provide any basis for severance from the other defendants.[6]

### 3.  The Mere Potential that a Defendant's Position at Trial Will Be Antagonistic to Another Defendant is Not Grounds for Severance

Williams also argues that severance is appropriate because his defense at trial may include defenses antagonistic to his co-defendants.  In United States v. Zafiro, the Supreme Court held that the mere fact that the defenses of two defendants may conflict does not establish prejudice sufficient to require a severance.  506 U.S. at 539-40.  The Second Circuit has similarly concluded that "an adversarial stance by a codefendant clearly does not, alone, require trials to be severed.  Were this true, a virtual ban on multidefendant conspiracy trials would ensue since co-conspirators raise many different and conflicting defenses."  Cardascia, 951 F.2d at 484-85. To obtain a severance on the ground of antagonistic defenses, a defendant must show that the conflict is "so irreconcilable as to be mutually exclusive."  Id.

Thus, "[a] simple showing of some antagonism between defendants' theories of defense does not require severance."  United States v. Carpentier, 689 F.2d 21, 27-28 (2d Cir. 1982); see also Casamento, 887 F.2d at 1154 (2d Cir. 1989) (mere "fingerpointing" by one defendant seeking to shift the blame to his co-defendant is not the sort of antagonism that commands a severance). The mere existence of conflicting defenses or the fact that co-defendants seek to place blame on each other is not the type of antagonism requiring severance. See United States v.

---

[6]  The Government will be in a position to advise the Court and the defendants of proposed Bruton redactions to statements it intends to introduce at trial as we get closer to the trial date, and it is clear which defendants will be proceeding to trial.  Defendant Glenn Thomas requests that the Government disclose these statements by September 11, 2013, almost two months before trial.  The Government opposes such a request, and instead proposes a more practical deadline that it discloses such Bruton statements by October 10, 2013, which is almost four weeks before trial.  This will still allow the defense ample time to make whatever Bruton motions it may wish to file.

<u>Villegas</u>, 899 F.2d 1324, 1346 (2d Cir. 1990); <u>United States v. Alvarado</u>, 882 F.2d 645, 656 (2d Cir. 1989).

Williams provides no support for his claims that antagonistic defenses will arise at trial. Simply put, the conjectural, speculative arguments submitted by Williams regarding the potential for antagonistic defenses do not carry the defendants' burden, and are insufficient to warrant severance.  As such, these defendants' motions for severance should be denied.

4.   <u>Death penalty issues</u>

As the Government has informed the defendants and the Court, we will not be seeking the death penalty against Raymond Christian, James Williams, Glenn Thomas, Rashawn Vassell and Kevin Burden in connection with the December 15, 2010 murder of Jeffrey Henry. Accordingly, there will be no prejudice associated with the empaneling of a "death eligible" jury or the procedures of a capital trial.

5.   <u>Conclusion</u>

For all these reasons, the Government submits that a severance is inappropriate in this matter.

III.   <u>NO ADDITIONAL DISCOVERY IS WARRANTED AT THIS TIME</u>

Citing almost exclusively to boilerplate language from statutes and cases, all Moving Defendants argue that the Government should produce additional miscellaneous materials as discovery at this time.  Contrary to their representations, however, the Government has met its discovery obligations and any further production would be untimely.  Accordingly, for the reasons set forth below, the Moving Defendants' assorted motions for additional discovery should be denied.

A.     Brady, Giglio, and § 3500 Material

The defendants have requested disclosure of exculpatory information pursuant to Brady v. Maryland and information that goes to the credibility of the Government's witnesses at trial pursuant to Giglio v. United States.  The Government believes it has fully complied with its discovery obligations in this case, and will continue to do so.  The balance of the Government's Giglio material for any trial witnesses will be produced in compliance with the Court's anticipated scheduling orders related to trial dates in this case.  Accordingly, no further order is necessary and the motions should be denied.

Pursuant to the Due Process clause of the United States Constitution, the Government has a duty to disclose favorable evidence to the accused where such evidence is "material" either to guilty or to punishment, see Brady v. Maryland, 373 U.S. 83, 87 (1963), even if the evidence is only in the possession of the investigating officers and not in the direct possession of the prosecutors, see Kyles v. Whitley, 514 U.S. 419 (1995).  Favorable evidence includes evidence that tends to exculpate the accused, see id., as well as evidence that is useful to impeach the credibility of a government witness.  See Giglio v. United States, 405 U.S. 150, 154 (1972).  As the Second Circuit has explained, Brady and Giglio material must be provided by the Government "in time for its effective use at trial."  In re United States (U.S. v. Coppa), 267 F.3d 132, 146 (2d Cir. 2001).

As stated in the Government's discovery letters to defense counsel, the Government has produced Brady material and is not aware of any additional Brady material in this case.  The Government does, however, recognize its continuing obligation to disclose all such material, and to make a diligent search for any relevant material that may be in the possession of the "prosecution team," including investigating agents and officers.  The Government will continue

to provide timely disclosure of any additional <u>Brady</u> material if and when any such material comes to light.  Courts in this Circuit routinely deny specific requests for <u>Brady</u> material where, as here, the Government has made a good-faith representation to the court and defense counsel that it recognizes and has complied with its disclosure obligations under <u>Brady</u>.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Gallo</u>, 1999 WL 9848, at *8 (S.D.N.Y. Jan. 11, 1999) (denying defendant's motion to compel production of purported Brady material based on Government's representations that "it is aware of its obligations under <u>Brady</u>… and will produce any <u>Brady</u> material to the defense well before trial"); <u>United States</u> v. <u>Perez</u>, 940 F. Supp. 540, 553 (S.D.N.Y. 1996) (same).

Specifically with regard to impeachment material, the courts in this Circuit have repeatedly refused to compel disclosure of impeachment or <u>Giglio</u> material well in advance of trial, and defendants have provided no particularized basis for early disclosure here.  <u>See</u> <u>United States</u> v. <u>Nixon</u>, 418 U.S. 683, 701 (1974) ("need for evidence to impeach witnesses is insufficient to require its production in advance of trial"); <u>Gallo</u>, 1999 WL 9848, at *7-8 (denying defendants' motions to require the early production of <u>Giglio</u> and § 3500 material); <u>United States</u> v. <u>Mejia</u>, No. 98 Cr. 4, 1998 WL 456257 at *1 (S.D.N.Y. Aug. 5, 1998); <u>United States</u> v. <u>Gutierrez-Flores</u>, 1994 WL 558034, at *3 (S.D.N.Y. Oct. 11, 1994).  There is similarly no basis for the defendants' request for lengthy advance disclosure of prior statements of the Government's witnesses.  The law is clear that the Government is under no obligation under the Jencks Act, 18 U.S.C. § 3500 et seq., to produce prior statements of its witnesses until after each has testified on direct examination.  The Jencks Act provides in pertinent part:

> In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

24

18 U.S.C. § 3500.  Courts in this Circuit have consistently held that the district court lacks the power to mandate early production of Jencks material.  See, e.g., United States ex rel. Lucas v. Regan, 503 F.2d 1, 3 n.1 (2d Cir. 1974); In re United States, 834 F.2d 283, 287 (2d Cir. 1987).  And courts in this District have routinely found that providing this information as little as one day in advance of a witness's testimony is sufficient to avoid unnecessary delay.  E.g., United States v. Ruiz, 702 F. Supp. 1066, 1069-70 (S.D.N.Y. 1989) (approving government agreement to provide impeachment material along with 3500 material on day before witness testifies), aff'd, 894 F.2d 501 (2d Cir. 1990).  Nevertheless, the Government will respectfully comply with the Court's order regarding early production of Jencks Act material in this case.

Accordingly, the motions regarding Brady, Giglio, and §3500 material should be denied.

B.      Rule 16 and 404(b) Material

The Moving Defendants also make boilerplate motions for Rule 16 discovery and disclosure of evidence of incidents that the Government seeks to introduce at trial pursuant to Federal Rule of Criminal Procedure 404(b).  The Government respectfully submits that it has produced Rule 16 discovery.  The Government, of course, understands that its Rule 16 obligations are ongoing.  With regards to 404(b) disclosure, the Government will provide 404(b) notice in advance of the November 4, 2013 trial in this case, on whatever schedule is set by this court.  The Government respectfully suggests that it make its 404(b) disclosure by October 7, 2013.  That would give the parties, and the Court, four weeks to address any motions *in limine* with regards to the listed (if any) 404(b) incidents.

C.      Witness List

Defendant James Williams requests the Government's witness and expert witness list.  See Williams Mem. at i, 21.  This request is premature.  The Government has not yet determined

which witnesses or expert witnesses it will call or which exhibits it will seek to introduce trial. Instead, barring specific safety concerns (or, of course, our Brady obligations), the Government expects to provide defense counsel with the names of our trial witnesses during the week before the trial is to begin.

In United States v. Cannone, 528 F.2d 296 (2d Cir. 1975), the Second Circuit held that a defendant is entitled to a Government witness list only if he makes a "specific showing that the disclosure [is] both material to the preparation of his defense and reasonable in light of the circumstances surrounding his case." Id. at 301-02 (abuse of discretion for district court to grant defense motion for witness list supported by only general statement of need).

It is axiomatic that disclosing the identities and whereabouts of potential witnesses poses the risk of witness tampering, witness intimidation, subornation of perjury and tailoring of testimony – particularly here where there is evidence of violence by certain defendants.  Because Williams has failed to make a particularized showing of need, and because, in any event, there are compelling reasons for the Government to shield the identities of many potential witnesses in the matter until the production of witness statements prior to trial, Williams' request for a still earlier production of a witness list should be denied.

Williams also seeks notice of any expert testimony it may intend to produce at trial.  The Government does presently intend to offer at trial the expert testimony of a medical examiner and a ballistics examiner.  The Government has yet to determine the identities of the particular experts it intends to call, but expects to do so by October 7, 2013 – one month before trial - and agrees to make formal disclosure by that time.

D.    Co-Conspirator Statements

Defendant Williams also requests all forms of statements made by any co-conspirator that the Government may offer at trial pursuant to the co-conspirator hearsay exception under Federal Rule of Evidence 801(d)(2)(E).   The motion should be denied.

In order to admit a statement under Rule 801(d)(2)(E), the court must find that: (a) there was a conspiracy; (b) its members included the declarant and the party against whom the statement is offered; and (c) the statement was made during the course of and in furtherance of the conspiracy.  Bourjaily v. United States, 483 U.S. 171, 175 (1987).  The party offering the statement must prove these preliminary facts by a preponderance of the evidence.  Id. at 176. The Supreme Court has made it clear that the proffered allegedly hearsay statement may itself by considered in making the Rule 801(d)(2)(E) determination.  Id. at 181; United States v. Padilla, 203 F.3d 156, 161 (2d Cir. 2000); United States v. Broussard, 80 F.3d 1025 (5th Cir. 1996).

The Supreme Court has made clear that the order of proof and general conduct of the trial are within the district court's discretion; the Court may admit declarations by alleged conspirators prior to the time that all of the requirements for admissibility have been established by independent evidence. Bourjaily, 483 U.S. at 176 n.1; United States v. Perez, 658 F.2d 654 (9th Cir. 1981).

The Government respectfully requests that, at the conclusion of all of the evidence at trial, the Court determine whether a preponderance of the evidence establishes all of the prerequisites of admissibility of the co-conspirator statements that have been received into evidence and explicitly so rule.  See United States v. Stanchich, 550 F.2d 1294 (2d Cir. 1977); United States v. Hewes, 729 F.2d 1302 (11th Cir. 1984); United States v. Cerone, 830 F.2d 938 (8th Cir. 1987).

27

Williams cites no authority for the proposition that the Government must particularize the co-conspirator statements that it intends to offer at trial.  The Government should not be required to provide such a list, which would prove truly unfeasible.

IV.   WILLIAMS'S CHALLENGE TO THE RELIABILITY OF INFORMANT TESTIMONY SHOULD BE DENIED

Finally, James Williams requests that the Court prohibit the Government from calling witnesses "who have been paid and/or assisted by a combination of payment and other consideration from testifying."  In the alternative, Williams requests that the Court "hold a pre-trial reliability hearing at which cooperators shall be made available for examination by counsel, to permit the Court to decide whether their testimony is sufficiently reliable."  Williams suggests this is appropriate because other courts have held that such hearings are appropriate "where unreliable cooperating witnesses are propounded as witnesses."  (Williams Mot. at iii).

Williams's baseless requests should be denied in their entirety.  Contrary to his suggestion, the Government's cooperating witnesses have not been paid.  There is similarly no evidence that any cooperating witness is "unreliable."  Most importantly, any such challenge to a cooperating witness's reliability is precisely the type of questioning reserved for cross-examination, when the defense is free to ask a cooperator about the benefits he hopes to receive from the Government, what incentives exist to lie or tell the truth, and similar lines of questioning.  To permit a "pre-trial reliability hearing" would give the defense an extra, unwarranted opportunity to examine the Government's witnesses in advance of trial.

A.   The Government's 5K Letter Does Not Carry the Guarantee of the Benefit of a Sentence Reduction

As a preliminary matter, the defendant has failed to prove or show the cooperating witnesses are compensated in any way.  Similarly, Williams concedes, as he must, that he has no

knowledge of any cash payments being made by the U.S. Attorney's Office or the Federal Bureau of Investigation Officers to the cooperating witnesses. Def. Motion at 33, fn 20.  That is because – simply put – there was no such payment in this case.  As such, Williams's argument fails, on its face, at the outset.

The defendant tweaks his argument, then, suggesting that when he receives a cooperation agreement with the Government, a cooperating witness is "compensated."  The argument is meritless.  It is only "upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense" that the court <u>may</u> depart from the guidelines." U.S.S.G. § 5K1.1.  In other words, it is only if the Government determines that the witness provided substantial assistance that it will write a 5K letter.  And even then, the court may consider – but is not required to apply – a downward departure from the sentencing guidelines.

The "government has 'a power, not a duty, to file a motion when a defendant has substantially assisted.'" <u>United States v. DeFeo</u>, 327 F. App'x 257, 258 (2d Cir. 2009) (quoting <u>Wade v. United States</u>, 504 U.S. 181, 185 (1992)). "The government has broad latitude over whether to move for a downward departure based on cooperation." <u>United States v. Garcia</u>, 95 CR. 902 SAS, 2000 WL 489703 (S.D.N.Y. Apr. 25, 2000) (citing <u>Wade v. United States,</u> 504 U.S. at 185; <u>United States v. Brechner</u>, 99 F.3d 96, 99 (2d Cir.1996)). "In the absence of an agreement a district court has an extremely limited role in reviewing the government's refusal to move for a departure." <u>United States v. Garcia</u>, 95 CR. 902 SAS, 2000 WL 489703 (S.D.N.Y. Apr. 25, 2000); s<i>ee</i> <u>United States v. Novellano</u>, No. 99–1483, 2000 WL 236477, at [*]1 (2d Cir. Feb. 15, 2000); <u>United States v. Leonard</u>, 50 F.3d 1152, 1157 [*]243 (2d Cir.1995) (in reviewing a prosecutor's decision whether to make a motion pursuant to section 5K1.1 the court should

differentiate between defendants who have cooperated pursuant to a plea agreement and those who have not).

Therefore, because there is no guarantee of a downward departure, Williams's argument that cooperating witnesses receive compensation is unfounded and the pre-trial reliability hearing to evaluate cooperator's testimony should be denied.

> B. The Government's Payment of Case-Related Assistance, Nevertheless, is not a Due Process Violation

"Even though compensation for testimony can be troubling, it does not follow that the use of such an arrangement renders such testimony constitutionally inadmissible *per se.*" United States v. Levenite, 277 F.3d 454, 461 (4th Cir. 2002) (quoting In Hoffa v. United States, 385 U.S. 293, 311 (1966). "The established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury." Hoffa v. United States, 385 U.S. at 311; *see also Anty,* 203 F.3d 305, 312 (4th Cir. 2000) (noting the importance of protecting the defendant's right to cross-examine); United States v. Wilson, 904 F.2d 656, 659 (11th Cir.1990) (same); United States v. Cervantes-Pacheco, 826 F.2d 310, 313-16 (5th Cir.1987) (en banc) (citing Hoffa and discussing procedural safeguards to protect against abuses).

Courts have routinely recognized need for grants of immunity, plea agreements, and sentencing leniency as appropriate tools in the criminal justice system due to the barriers the government faces in obtaining relevant and truthful testimony.  See, e.g., United States v. Levenite, 277 F.3d 454, 461-62 (4th Cir. 2002).  Moreover, "the method of payment is properly a matter for the jury to consider in weighing the credibility of the informant." United States v. Harris, 210 F.3d 165, 167 (3d Cir. 2000) (citing Hoffa v. United States, 385 U.S. 293 (1966)).

Similarly, courts in this district recognized that "the use of government informants does not by itself constitute a violation of a defendant's due process rights." Pastor-Alvarez v. United States, 1999 WL 325367 (S.D.N.Y. May 20, 1999) aff'd, 242 F.3d 366 (2d Cir. 2000) (quoting Hoffa v. United States, 385 U.S. at 311).  "It does not follow" that simply because an informant "had motives to lie," that "his testimony was untrue, nor does it follow that his testimony was constitutionally inadmissible." Id., see also United States v. Cuellar, 96 F.3d 1179, 1182–83 (9th Cir.1996) (holding that use of testimony of an informant who "got paid a ton of money" by the government did not violate defendant's due process rights), cert. denied, 520 U.S. 1109 (1997).

C.   Cross-Examination is a Sufficient Guarantee of Reliability

Williams argues that the right to cross-examination – as described by the Supreme Court in Hoffa v. United States, 385 U.S. 293 – is inadequate as a safe guard, or test, for an informant's truthfulness. (Def. Mot. at 19).  The defendant rests his argument on studies that reveal jurors tend to believe cooperators and jurors afford undue credibility to criminal informant testimony resulting in wrongful convictions. (Id.)

Williams again fails to cite any case law to support his position.  In 1966, the Supreme Court of the United States ruled in Hoffa that cross-examination is a sufficient and adequate tool to test the credibility of informants.  This safeguard has been in place for decades (and frankly much longer than Hoffa), and is honored by every court (as far as the Government can tell) in this country.  Since Williams has not cited any legal authority to the contrary, his request must be denied.

D.   The Government is not Required to Provide Corroboration for its Cooperating Witnesses

Williams also argues that all testimony given by a cooperating witness must be corroborated by independent facts.  (Williams Mot. at 15-16).  Yet again, the defendant's

assertions are unsupported by case law or statute.  As is regularly observed by courts in this

district – during their near universal instruction to juries, and in other contexts – "a conviction

may be sustained on the basis of the testimony of a single accomplice . . . Any lack of

corroboration goes to the weight of the evidence, NOT to its sufficiency, and a challenge to the

weight of the evidence is a matter for argument to the jury.'"  United States v. Gordon, 987 F.2d

902, 906 (2d Cir.1993).  In short, a pretrial reliability hearing before a judge would improperly

remove the case's merits from the ultimate finder of fact: the jury.  As such, Williams's motion

should be denied.

> E.  The Admission of Cooperating Witness Testimony Does Not Constitute Undue
> Prejudice to the Defendant

The defendant argues that the Rules of Evidence obligate the Court to screen out unfairly

prejudicial, harmful, confusing or otherwise unhelpful evidence.  Federal Rule of Evidence 403

provides, "evidence may be excluded if its probative value is substantially outweighed by the

danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of

undue delay, waste of time, or needless presentation of cumulative evidence."  Specifically,

Williams analogizes that Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993),

supports his request for a pre-trial hearing to test an informant's reliability because informants

are similar to expert witnesses because they are compensated. (Def. Mot. at 27).

Again, the Government's cooperating witnesses in this case are not compensated, and

there no evidence to suggest otherwise.  And again, the defense has provided no authority to

support its argument.  Daubert, as the Court knows, relates to the admissibility of scientific

knowledge by expert witnesses, and not lay witnesses. 509 U.S. at 590.  In Daubert, the Court

held that "a trial judge must determine at the outset, pursuant to Rule 104(a) whether the expert

is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand

or determine a fact in issue." Id. at 592-93.  Testimony given by the cooperating witnesses, on the other hand, is dramatically different.  It is not scientific knowledge - "the adjective scientific implies a grounding in the methods and procedures of science . . . the word knowledge connotes more than subjective belief or unsupported speculation. Id. at 590.  Accompanied by no authority to support its position that a cooperator's testimony regarding facts surrounding a robbery and murder should be treated like an expert's opinion based on scientific knowledge, Williams's argument must be denied.

> F.  The Defendant's Power to Grant Immunity

Finally, Williams requests the power of use immunity if and when he determines it is necessary, arguing that the Government's ability to seek such immunity provides them with an unfair advantage over the defense.  This purely hypothetical argument, like the rest of Williams's arguments, is meritless.

The Second Circuit has made clear that the Government "is under no general obligation to grant use immunity to witnesses the defense designates as potentially helpful to its cause but who will invoke the Fifth Amendment if not immunized." United States v. Ebbers, 458 F.3d 110, 118 (2d Cir. 2006); see also United States v. Turkish, 623 F.2d 769, 774 (2d Cir.1980) (discussing difference between prosecutorial powers and obligations and those of a defendant); United States v. Praetorius, 622 F.2d 1054, 1064 (2d Cir.1979) (refusing to require the government to confer use immunity absent "extraordinary circumstances").

To be clear, the "ability to give immunity to one witness but not another is a potentially powerful tool for a prosecutor, particularly in light of the prosecutor's ability to create incentives for witnesses to invoke the privilege against self-incrimination." United States v. Ebbers, 458 F.3d 110, 118-19; see also United States v. Dolah, 245 F.3d 98, 106 (2d Cir.2001), abrogated on

other grounds by <u>Crawford v. Washington</u>, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177

(2004). As such, a "court may order the prosecution to choose between forgoing the testimony

of an immunized government witness or granting use immunity to potential defense witnesses if

the defendant makes a two-pronged showing." <u>United States v. Diaz</u>, 176 F.3d 52, 115 (2d

Cir.1999); See <u>United States v. Horwitz</u>, 622 F.2d 1101, 1105-06 (2d Cir.1980); <u>Dolah</u>, 245 F.3d

at 105. "First, the defendant must show that the government has used immunity in a

discriminatory way, has forced a potential witness to invoke the Fifth Amendment or has

deliberately denied immunity for the purpose of withholding exculpatory evidence and gaining a

tactical advantage through such manipulation." <u>Ebbers</u>, 458 F.3d at 119 (quoting <u>United States v.</u>

<u>Diaz,</u> 176 F.3d 115.) "Second, the defendant must show that the evidence to be given by an

immunized witness 'will be material, exculpatory and not cumulative and is not obtainable from

any other source.'" <u>United States v. Diaz</u>, 176 F.3d 52, 115 (2d Cir.1999) (quoting United States

v. <u>Burns</u>, 684 F.2d 1066, 1077 (2d. Cir. 1982).

  Since the Government has, at this time, identified no witness that it intends to immunize,

it is literally impossible for Williams to meet the two-pronged test described by the Second

Circuit establishing the use of grant immunity. As such, the defendant's motion should be

denied. If and when this motion becomes grounded in anything more than pure hypothetical – in

other words, if the Government does identify such a witness (acknowledging, of course, that it

has no intention of using immunity in way that could be even argued as "discriminatory"), and if

and when Williams seeks to provide use immunity to a defense witness of his own – then

Williams can file such a motion at that time.

<u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully submits that the Court should

deny the Motions in all respects.

Dated:  White Plains, New York
        July 31, 2013

                          Respectfully submitted,

                          Preet Bharara
                          United States Attorney


                    By:     /s/ Andrew Bauer
                          Andrew Bauer
                          Parvin D. Moyne
                          Assistant United States Attorneys
                          (212) 637-2354 / 2510