

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 31, 2014

**BY ECF / ELECTRONIC MAIL**

The Honorable Edgardo Ramos
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

      Re:    **United States v. Raymond Christian, et al.,**
                  S3 12 Cr. 626 (ER)

Dear Judge Ramos:

      The Government respectfully submits this letter in response to the defendants' various briefs, filed throughout the last week, with regards to the Government's notice of certain evidence that the Government may seek to introduce at trial of charged and uncharged crimes, wrongs, or acts committed by the defendants pursuant to Federal Rule of Criminal Procedure 404(b). The Government also takes this opportunity to respond to defendant Raymond Christian's motion, filed earlier today, seeking the preclusion of expert witness testimony.

    **I.**    **The Defendants' Arguments to Preclude Evidence**
                 **Regarding Narcotics Trafficking, Gun Possession,**
                 **Robberies and Gang Activity Are Meritless.**

      On July 7, 2014, as directed by the Court and pursuant to Federal Rule of Criminal Procedure 404(b) ("Rule 404(b)"), the Government submitted its Notice of certain evidence that the Government may seek to introduce at trial of charged and uncharged crimes, wrongs, or acts committed by the defendants. The defendants have each responded by stating, in varying forms, their objection to much of what the Government disclosed. For the reasons stated below, among other reasons, the defendants' objections are without merit and should be rejected.

      A.  Prior Robberies and Other Violent Acts

      The defendants are all charged with participating in one robbery and act of violence, relating to the robbery of the house at 54 Chambers Street from which Jeffrey Henry and others sold crack cocaine and marijuana. In its Rule 404(b) disclosure, the Government noticed that that it intended to offer evidence of other robberies committed by the defendants. The

defendants each objected, but mainly on the grounds that they want more detail about these robberies. As a preliminary matter, the Government notes that since Tuesday, July 15, 2014, when the Government turned its 3500 material over early, the defendants have had full notice of each of the robberies and acts of violence that the Government expects to elicit through its witnesses. Nevertheless, below is list of particular acts of violence that the Government expects to elicit at trial through cooperating witness testimony. [1]

The Government notes that the below list is incomplete insofar as it does not include each and every act or transaction that resulted in a particular defendant's arrest by the City of Newburgh Police Department ("CNPD"). The Government has already produced the CNPD arrest reports relating to those arrests. As with the acts listed below, the Government expects to elicit evidence at trial testimony about those acts described in the CNPD arrest reports. Furthermore, this list does not include general, unspecific statements made by cooperating witnesses – for example, (i) that a cooperating witness has seen a defendant sell narcotics in the past or (ii) that a cooperating witness had seen a defendant possess firearms in the past – regarding the defendants.

|   | **Date** | **Location** | **Defendants Involved** | **Description of Act** |
|---|---|---|---|---|
| 1. | 2010 | City Terrace | Raymond Christian | Christian and a cooperating witness ("CW-1") robbed an individual of a couple hundred dollars and a phone because Christian, who pulled out a gun, was looking for a "come up" |
| 2 | Summer 2010 | At a party in Newburgh | Raymond Christian | Christian, CW-1 and Tyrik Legette robbed someone from outside Newburgh. Christian took out two guns, and robbed the victim of a few hundred dollars and jewelry |
| 3. | Summer 2010 | After the same party in Newburgh | Raymond Christian | After the above party, Christian and CW-1 pulled a gun on a new victim, stealing a few hundred dollars |
| 4 | 2010 | The "Heights" in Newburgh | Raymond Christian | Christian went with at least three others, including Legette, to rob an individual named "Smurf." When the victim refused, one of the robbers (not Christian) shot at him. |

[1] The Government notes that the Court, and defense counsel, not treat this list as binding in any way on the Government. The Government is still in the midst of preparing for trial, and this list is simply a reflection of the Government's expectations as of this date. The list should not be used to later impeach a Government witness or claim that the Government misled the defendants in any way. Instead, the list is intended to further moot defense counsel's objections.

| | Date | Location | Defendants Involved | Description of Act |
|---|---|---|---|---|
| 5 | 2009/2010 | Chambers Street | Raymond Christian | At a party, there was a fight and Christian pulled out a gun and shot in the air. |
| 6. | 2009/2010 | Vails Gate | Raymond Christian | At a party on Vails Gate, there was a fight.  The fight moved outside.  Shots were fired, so Christian pulled out a gun and started shooting at a car. |
| 7. | 2009/2010 | City Terrace | Raymond Christian | Christian shot at a rival gang member, Quiotis, a member of the Crips, as he drove through.  Legette was also there with Christian. |
| 8. | 2009/2010 | Newburgh | Raymond Christian | Christian shot at a drug dealer named "Perry" after Perry was bragging about how he would not run if shot at. |
| 9. | 2009/2010 | City Terrace | Raymond Christian | Christian shot "Little Homie" after chasing him through the streets of Newburgh.  After Christian shot, he asked CW-1 to hide the gun for him. |
| 10. | 2010 | Lander and Carson Street | Raymond Christian Glenn Thomas | Christian pulled a gun on a cooperating witness ("CW-2") in an attempt to extort CW-2 because of a dispute regarding CW-2's son (who sold drugs).  After CW-2 told Christian to put the gun away, Christian handed the gun to Thomas. |
| 11. | Late 2010 | First Street | Tyrell Whitaker | Whitaker and Kevin Burden lured a local ecstasy dealer to their weed spot at 260 First Street.  When the victim arrived, they attacked him, and took approximately 150 ecstasy pills that they later resold. |
| 12. | Mid-2000s | Clark and Ann Streets | Glenn Thomas | Thomas robbed a cooperating witness ("CW-3") at gunpoint of narcotics and cash. |
| 13. | Late 2010 | Carson Street | Glenn Thomas | At the direction of James Williams, Thomas robbed an individual named "D-Block" at a dice game.  Thomas struck the victim in the head with a gun. |

As the Government noted in its 404(b) Notice, each of the events listed above should be admitted as direct evidence of the conduct charged in the Indictment. First, evidence concerning these incidents is admissible to establish the formation and background of the criminal relationship between members of the charged conspiracy – and, in particular, the defendants and the cooperating witnesses. Second, the robbery evidence above is also direct evidence of the narcotics conspiracy insofar as a number of these robberies were of drug dealers, resulting in the theft of drugs and money. Even the robberies of non-drug dealers, which resulted in the recovery of cash, were an important source of income to supplement the defendants' drug business. Third, all of the incidents involving firearms are direct evidence of one of the elements of the 924(c) charge, namely that the defendants' possessed at least one firearm <u>during</u> the charged period. And fourth, it is important to note that evidence of a robbery committed by a particular cooperating witness with a specific defendant will necessarily be adduced as part of that witness's <u>Giglio</u>-related testimony. For each of these reasons, evidence concerning the above violent incidents is admissible.

In addition, the robberies and shootings also go to the defendants' "opportunity" to commit the charged narcotics conspiracy and gun charges, as they had a greater opportunity to distribute crack cocaine and other drugs after having robbed dealers of the substance (or money). <u>See</u> Fed. R. Crim. P. 404(b).

    B. <u>Gang Membership</u>

As the Government stated in its motion in limine, each of the defendants was affiliated with Newburgh street gangs during the charged conspiracy of 2008 through September 2012. Glenn Thomas was a member of the Bloods (after previously being a member of the Crips). Tyrell Whitaker was a member of the Bloods and the Ashy Bandits, a neighborhood gang. Raymond Christian was friendly with the Bloods, but formed his own gang, Star Status, during the conspiracy period. The defendants argue that evidence of such gang membership – which will come largely through the testimony of the cooperating witnesses (the "CWs"), as well as Christian's own statements on his Facebook page – would be prejudicial to their clients and is otherwise not germane to the charged offenses. The defendants are wrong.

The testimony regarding defendants' membership in various Newburgh gangs speaks to their relationship with certain of the Government's witnesses. Some of the Government's witnesses will testify to themselves being members of the Bloods, Star Status or Ashy Bandits, and that their membership to their knowledge of and relationship with the defendants. In that regard, the defendants' gang involvement helps explain "how the co-conspirators came to interact with each other, and renders more plausible their joint participation" in the charged conspiracy. *United States* v. *Lasanta*, 978 F.2d 1300, 1307 (2d Cir. 1992); *see also United States* v. *Romero-Padilla*, 583 F.3d 126, 130 (2d Cir. 2009) (*per curiam*) (although evidence of defendant's previous plans with a co-conspirator to import narcotics into the United States through Mexico and the Dominican Republic "did not concern the charged conspiracy, it was relevant background evidence inasmuch as it corroborated the charge that [the co-conspirator] and [defendant] were partners during the charged conspiracy").

This evidence also explains the defendants' relationships of mutual trust with the Government's witnesses and their other co-conspirators.  The evidence is being offered to show the existence of the illegal relationship between and among the defendants, as well as the Government's witnesses, and not to show the defendants' propensity to commit crimes or some other impermissible purpose.  *See United States* v. *Barret*, No. 10-cr-809 (KAM), 2011 WL 6704862, at *12 (E.D.N.Y. Dec. 21, 2011) (admitting evidence of defendants' membership in gang "to help the jury understand the historical development of the illegal relationships and levels of trust among the co-conspirators, and the conspiracy itself" but excluding references to gang murders that took place prior to the charged conspiracy).  Further, the Second Circuit has held repeatedly that corroboration of Government witnesses is an appropriate, non-propensity purpose for admitting other acts evidence.  *See, e.g.*, *United States* v. *Everett*, 825 F.2d 658, 660-61 (2d Cir. 1987) ("Under Rule 404(b) evidence of 'other crimes' has been consistently held admissible to corroborate crucial prosecution testimony.") (citations omitted); *United States* v. *Williams*, 577 F.2d 188, 192 (2d Cir. 1978) (holding that other acts evidence is admissible "for corroboration purposes, provided that the corroboration is direct and the matter corroborated is significant").

In addition, the Government's witnesses will themselves acknowledge their own gang affiliation; thus, the proffered evidence is also admissible because the witnesses will need to acknowledge their gang affiliation as part of their own criminal conduct.  It is incumbent upon the Government pursuant to *United States v. Bagley*, 473 U.S. 667 (1985), and *Giglio v. United States*, 405 U.S. 150 (1972), to apprise the defendant of these acts, and the Government is permitted to elicit the witness's testimony about the uncharged crimes "to avoid the appearance that it [is] concealing impeachment evidence from the jury."  *United States v. Coonan*, 938 F.2d at 1561 ("since the witnesses were participants in the events about which they testified, it was appropriate for the prosecution to elicit testimony during direct examination that exposed details damaging to their credibility"); *see United States v. Louis,* 814 F.2d 852, 856 (2d Cir. 1987) (proper for the Government to elicit testimony from accomplice witness regarding his prior conviction).  Only if a witness is permitted to testify openly about the circumstances of his own criminal conduct, including his prior interactions with the defendant, can the jury make a well-informed evaluation of the witness's credibility.  *See United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990).

The Government also notes what has been transparent from all of its disclosures – both in its 3500 materials, as well as various motion practice:  The defendants' connection to the Bloods gang is a crucial, and inextricably intertwined, aspect of the charged murder.  James Williams, a/k/a "L-1," was a high ranking member of the Bloods.  Kevin Burden, a/k/a "Kev Gotti," was also high ranking within the Bloods.  When Raymond Christian approached Williams about robbing 54 Chambers Street, Williams called upon Whitaker and Thomas – two younger members, without high status – to participate.  Thomas had recently turned Blood, and had done so "under" Williams.  That meant that Williams was in a position, due to their respective roles in the gang, to instruct Thomas to get guns and participate in the robbery.  Similarly, Whitaker viewed Burden as a "mentor" within the Bloods, which is why Whitaker was able to get Burden's gun to use in the robbery.  In short, it was entirely *because* Thomas and Whitaker were members of the Bloods that they participated in the robbery, a fact that cannot simply be omitted from the Government's case.

C. <u>Glenn Thomas's Prior Drug Sales</u>

As this Court is no doubt aware, the Second Circuit takes an "inclusionary" approach to the admission of other act evidence, under which "evidence of prior crimes, wrongs, or acts 'is admissible for any purpose other than to show a defendant's criminal propensity.'" *United States* v. *Paulino*, 445 F.3d 211, 221 (2d Cir. 2006) (quoting *United States* v. *Pitre*, 960 F.2d 1112, 1118-19 (2d Cir. 1992)).   The Second Circuit has routinely approved the admission of prior misconduct evidence with respect to the issues of a defendant's knowledge, intent, and absence of mistake, where those issues are in dispute. *See, e.g., United States* v. *Thomas*, 54 F.3d 73, 81-82 (2d Cir. 1995); *United States* v. *Oshatz*, 912 F.2d 534, 542-43 (2d Cir. 1990).

Given this authority, Thomas's 2007 narcotics trafficking in the same narcotics charged here – crack cocaine – prior to the commencement of the charged conspiracy in 2008 is particularly probative of his "opportunity, intent, preparation, plan, knowledge, and identity." Thus, the Government should be allowed to offer evidence of this prior narcotics trafficking to prove, among other things, Thomas's knowledge and opportunity (as well as lack of mistake or accident if Thomas, despite defense counsel's representations, furthers such a defense).   Further, the proffered evidence should be admitted to complete the story of the charged conduct. *See, e.g., United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994) ("evidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense").

As the Government has previously stated, Thomas was a member of the Crips in 2007, turned Blood sometime after 2008, and thereafter began conspiring with his co-defendants.  That said, in the city of Newburgh, the Crips and Bloods grew up together, went to school together, and sold crack together.  There was no rivalry between the gangs.  Although Thomas's gang allegiance changed, that did not result in a corresponding change in his source of income trafficking in crack cocaine.  He began to conspire with new persons who were affiliated with the Bloods, but he continued to sell in the same area of Newburgh, to the same drug customers. Evidence of these 2007 drug sales, therefore, is important to establish Thomas's knowledge and opportunity to continue his drug sales during the life of the charged conspiracy.

II. **Defendant Raymond Christian's Motion To Preclude The Testimony Of The Government's DNA Expert, Daniel Myers, is Meritless**

On July 31, 2014, Defendant Raymond Christian moved to Preclude the Expert Testimony of Daniel Myers filed (the "Christian DNA Br.").   The Government respectfully submits this opposition to Christian's motion.

The Court should deny the defense's motion.  The Government has provided more than sufficient expert notice and further, Mr. Myers, a 14-year veteran of the New York State Police Laboratory in that agency's DNA analysis department, who has testified and has been qualified as an expert in DNA analysis at least 10 times, is more than qualified to testify about the DNA analysis conducted in this case by the NYS Lab.

A. **Relevant Background**

   Almost two years ago, in September 2012, the Government provided in Rule 16 discovery DNA reports prepared by the New York State Police Laboratory (the "NYS Lab") in this case. The reports were prepared by Daniel Myers, a forensic scientist and DNA analyst of the NYS Lab, and Mr. Myers' name appears as the preparer of the reports.

   In relevant part, the reports set forth Mr. Myers' conclusions about the DNA testing in this case. In particular, the reports also set forth Mr. Myers' conclusion, after conducting a DNA comparison analysis of the DNA found on the ski mask used by one of the robbers against the DNA of Christian, that Christian was a major contributor to the DNA on the ski mask. That ski mask was left at the robbery and murder scene by the robbers.

   On March 21, 2014, at the request of the defense, the Government provided the underlying DNA file of the NYS Lab relating to the DNA testing that was conducted in this case. That file including, among other things, the underlying data generated from the DNA testing equipment used in this case, upon which the DNA reports are based.

   On June 2, 2014, the Government provided a letter to the defense stating, among other things, that it intended to call Daniel Myers, a forensic scientist at the NYS Lab and that his testimony would relate to DNA in general, the DNA testing in this case, and in particular, the DNA reports that had previously been provided to the defense close to two years ago. At the time the Government did not have a copy of Mr. Myers' curriculum vitae.

   On July 2, 2014, at the request of the defense, the Government provided internal protocols of the NYS Lab relating to DNA testing at the NYS Lab.

   On July 28, 2014, the Government, after receiving Mr. Myers' curriculum vitae (the "Myers CV"), provided it to the defense. (*See* Exhibit A of the Christian DNA Br.) The Myers CV set forth, among other things:

   i.  Mr. Myers' educational background (e.g., his Bachelor of Science Degree in Biochemistry, obtained in 2000.

   ii. Mr. Myers' work experience – that he has been a Forensic Scientist and DNA Analyst at the NYS Lab for the past 12 years, and before that he was a Senior Lab Technician at the NYS Lab.

   iii. Mr. Myers' training and skills – that, among other things, he has conducted case work in DNA analysis, extraction and kinship analysis, and seratology analyses.

   In addition to the above, the Government proffers that Mr. Myers is expected to testify, in connection with his qualifications and experience as a forensic scientist and DNA analyst at the NYS Lab, that during his career (i) he has conducted DNA analysis of numerous items of

evidence in hundreds of cases; and has (ii) testified as a qualified DNA expert approximately ten times.

Further, in connection with the DNA testing conducted in this case, Mr. Myer is expected to testify, among other things, about (i) his familiarity with the DNA testing done in this case and the DNA testing procedures at the NYS Lab; (ii) the fact that the NYS Lab is accredited to conduct DNA testing under standard and generally accepted practices; and (iii) that the NYS Lab undergoes external and internal audits and is in compliance with all regulations and standards.

### B.  Discussion

The Court should reject the defense's request to preclude the testimony of Mr. Myers. The defense has had more than sufficient notice of the substance and underlying bases of the Government's DNA expert's testimony and of his qualifications.  The Court should similarly reject the defense's request that the Court order that Mr. Myers be "deposed" prior to trial or that the Government be limited to calling Mr. Myers as its last witness.

Rule 16 provides that upon the request of the defense, the Government must provide "a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial  . . . The summary . . . must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."  Fed. R. Crim. P. 16(a)(1)(G).    Here, the Government's notice has been more than adequate.

First, the Government has provided adequate expert notice of the substance of the Government's expert's testimony. The defense has had the DNA laboratory reports, *prepared by* Mr. Myers, for close to two years.  Those reports set forth a more than adequate and detailed summary of the substance of Mr. Myers's expected testimony.  Moreover, the Government has provided a significant amount of material relating to the bases of his testimony.  As noted, the Government provided the DNA file, and data upon which the DNA reports prepared by Mr. Myers are based, to the defense.  Therefore, it cannot be said that defense has no notice of the subject matter of the Government's expert's testimony or the bases for that testimony.

Second, the Government has provided sufficient notice of Mr. Myers' qualifications.  For one, the defense is wrong that the Myers CV is insufficient to give them notice of Mr. Myers' qualifications.  Indeed, the defense ignores that on its face the curriculum vitae describes in detail Mr. Myers's qualifications.  It sets forth, among other things:

    i.    Mr. Myers's education – he has a Bachelor of Science in Biochemistry

    ii.    Mr. Myers's work experience – he was been an employee of the New York State Police Laboratory for about 14 years, and for 12 of those years has been a "Forensic Scientist" and "DNA Analyst"  at the NYS Lab.

    iii.    Mr. Myers's training and skills -- he has done training and has skills in "DNA analysis/mixture/kinship analysis;" "mixture and kinship analysis," has done

"serological analysis" and has done casework in "DNA extractions/mitochondrial technical review."

All of the above describes Mr. Myers experience as a forensic scientist and DNA analyst sufficiently for Rule 16 purposes.

Moreover, even if the Myers CV could be seen as insufficiently detailed, the Government, through this Opposition, has supplemented Mr. Myers's qualifications, mooting the defense's motion.  As noted above, Mr. Myers has conducted DNA analyses, during his long career at the NYS Lab, of numerous of items of evidence in hundreds of cases.  Indeed, as set forth on his curriculum vitae, he has done DNA extractions and kinship analyses relating to the World Trade Center.

<u>Third</u>, Mr. Myers' testimony about DNA in general and the testing done in this case is admissible as expert testimony under Rule 702 of the Federal Rules of Evidence.  That rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may  testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In making the determination whether expert testimony would assist the trier of fact, the trial court makes "a common sense inquiry" into "whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having specialized understanding of the subject involved in the dispute." Fed. R. Evid. 702, Advisory Committee Note (quotation omitted); *see also United States* v. *Locascio*, 6 F.3d 924, 936 (2d Cir. 1993) (quoting same).  Before admitting expert testimony under Rule 702, a trial court must also determine that the proffered expert testimony "rests on a reliable foundation." *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 592, 597 (1993).

A "trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular testimony is reliable." *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, 152 (1999). The object is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same of level of intellectual rigor that characterizes the practice of the expert in the field." *Id.* at 152.

The Second Circuit has routinely held that expert testimony that helps to explain "a complicated morass of obscure terms and concepts" is proper. *United States* v. *Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (expert testimony explaining "sophisticated aspects" of the tax system

proper); *United States* v. *Bilzerian*, 926 F.2d 1285, 1294 (2dCir. 1991)("[I]n complex cases . . . expert testimony may help a jury understand unfamiliar terms and concepts.").

Here, the proffered testimony of a forensic scientist and DNA analyst of an accredited DNA testing agency, who participated in the testing and analysis of the DNA in this case, falls comfortably within the ambit of admissible Rule 702 evidence.  Mr. Myers is expected to explain to the jury what DNA is, how DNA testing is conducted, the DNA testing done in this case, and his conclusions related to that testing.

Fourth, the defense is wrong that the remedy for the alleged late disclosure of Mr. Myers' curriculum vitae is preclusion.  Even if there was a late notice violation related to the curriculum vitae of Mr. Myers – which the Government does not concede – the remedy is almost always an adjournment.  Federal Rule of Criminal Procedure 16(a)(1)(G) requires the Government to provide the defendant, upon request, "a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial  . . . The summary . . . must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."  Fed. R. Crim. P. 16(a)(1)(G).  The determination of whether an expert disclosure is sufficient under Rule (a)(1)(G) , as well as the determination of any sanction for insufficient disclosure, is generally left to the discretion of the trial judge.  *See, e.g., United States* v. *Hatch*, 514 F.3d 145, 165 (1st Cir. 2008).

Exclusion of testimony is almost never an appropriate sanction for a violation of Rule 16's expert disclosure provision.  *See, e.g., United States* v. *Ganier*, 468 F.3d 920, 927-28 (6th Cir. 2006).  Rather, a continuance is generally the appropriate remedy.  *See, e.g., United States* v. *Tin Yat Chin*, 476 F.3d 144, 146 (2d Cir. 2007).

Nevertheless, an adjournment is unnecessary here.  To the extent the defense wants to take issue with Mr. Myers' qualifications as an expert, it can do so on cross-examination of the witness at the time the Government offers him as an expert at trial.

Finally, nor should the Court countenance the defense's alternative request that the Government be limited to calling Mr. Myers at the end of the Government's case.  The defense has proffered nothing to support that request, except a vague allusion to "3500" in its possession that it claims, but will only disclose in an *ex parte* setting, undermines the reliability of the DNA testing in this case.  (*See* Christian DNA Br. at 4).  On this point, the Government objects to any ruling on the preclusion of testimony of a Government witness without an opportunity to be informed of the facts upon which the defense bases its motion.  Barring circumstances such as witness safety or other extraordinary circumstances, such a matter should be aired and argued in a public setting in open court, and the defense has offered nothing of why it should be otherwise.  Moreover, by defining the material as "3500," at best the defense believes itself to be in possession of material to impeach the reliability of the DNA testing in this case – such matters go to the weight of the evidence and not its admissibility.  *See FDIC* v. *Suna Assocs., Inc.*, 80 F.3d 681, 687 (2d Cir.1996) (citing *Daubert* for proposition that "publication ... does not necessarily correlate with reliability"); *McCullock* v. *H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir.1995)( "[d]isputes as to the strength of [an expert's] credentials, faults in his use of ... a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility

of his testimony.").  Ultimately, the burden of proof is on the Government, and as such, the Government should be allowed to call its witnesses in the order it deems fit in order to present its case.

In closing, the Government notes that, contrary to the defense's assertions, it has not just met, but far exceeded, its disclosure obligations (from an expert notice perspective) in this case. Mr. Myers' DNA reports – and Mr. Myers' identity as the analyst – were turned over almost two years ago.  The underlying data was turned over almost two months ago.  A copy of the NYS Lab's protocols and procedures was turned over one month ago, despite the fact that our 3500 disclosure deadline was weeks later (and even so, it is not clear that the Lab's general policies and procedures fall within those obligations.)  That Mr. Myers's CV was not disclosed until this week (the same day that the Government first received it) is not grounds for preclusion.  The Government estimates that Mr. Myers will testify on Thursday, August 7, 2014.  That leaves the defendant with ten full days – more than enough time – to examine his credentials.  And almost two years to examine the substance of his testimony.  As such, the Government respectfully requests that the Court deny defendant Christian's request in its entirety.

Respectfully submitted,

PREET BHARARA
United States Attorney

By:__/s/_____
    Andrew Bauer
    Kan M. Nawaday
    Assistant United States Attorneys
    Southern District of New York
    (212) 637-2354 / (212) 637-2311

cc:    David Greenfield, Esq. and Anthony Strazza, Esq. (by email)
       George Goltzer, Esq. and Ying Stafford, Esq. (by email)
       Don Buchwald, Esq. and Josh Dratel, Esq. (by email)