E81Qwhi1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     UNITED STATES OF AMERICA
3              v.                              12 CR 626 (ER)
     RAYMOND CHRISTIAN a/k/a
4    "Reckless"
     GLENN THOMAS, a/k/a "Gucci"
5    TYRELL WHITAKER, a/k/a "Bow Wow"
                   Defendants
6    ------------------------------x
                                              New York, N.Y.
7                                             August 1, 2014
                                              2:30 p.m.
8

9    Before:
                         HON. EDGARDO RAMOS
10                                            District Judge

11
                             APPEARANCES
12   PREET BHARARA
          United States Attorney for the
13        Southern District of New York
     ANDREW BAUER
14   KAN M. NAWADAY
          Assistant United States Attorney
15

16   DAVID S. GREENFIELD
          and
     ANTHONY STRAZZA
17        Attorneys for Defendant Christian

18   LAW OFFICES OF DON BUCHWALD
          Attorney for Defendant Thomas
19   DON D. BUCHWALD

20   KELLEY DRYE & WARREN LLP
          Attorney for Defendant Thomas
21   LEVI DOWNING

22   GEORGE ROBERT GOLTZER
          and
23   YING STAFFORD
          Attorneys for Defendant Whitaker
24   -- also present--
     S.A. Andrei Petron - FBI
25
```

E81Qwhi1

```
 1              (In open court)

 2              THE COURT:  Good afternoon, everyone.  Please be

 3    seated.

 4              THE DEPUTY CLERK:  In the matter of United States v.

 5    Christian, et al.  Would the parties please advise state your

 6    name for the record.

 7              MR. BAUER:  Andrew Bauer and Kan Nawaday for the

 8    government.  I will let you know that Special Agent Andrei

 9    Petron from the FBI will be joining momentarily.

10              THE COURT:  Very well.

11              MR. GREENFIELD:  David Greenfield and Adam Strazza

12    representing Raymond Christian seated in the box closest to

13    you.

14              MR. GOLTZER:  Ling Stafford and George Goltzer on

15    behalf Mr. Whitaker present in the jury box.

16              MR BUCHWALD:  Don Buchwald and Levi Downing for

17    Mr. Glenn Thomas who is present in the jury box.

18              THE COURT:  Good afternoon to all of you.  Everyone

19    can be seated.

20              This matter is on for the final pretrial conference.

21    I take it that the parties anticipate that there will not be a

22    plea between now and Monday morning?

23              MR. GOLTZER:  That's correct.

24              THE COURT:  In that event, I have reviewed the

25    parties' pretrial submissions and motions in limine.  What I
```

E81Qwhi1

1    want to do first is go over the mechanics of how we will pick

2    the jury.

3            In that regard, I had my chambers email to all counsel

4    the venire form that I propose to use with the voir dire.  We

5    will get to that in a moment.

6            There has been a request for additional peremptory

7    challenges by the defendants; specifically, Mr. Christian has

8    asked that each defendant be essentially granted six peremptory

9    challenges for a total of 18, which would be eight over what

10   the rules allow.

11           Mr. Bauer, do you have a view as to the peremptory

12   challenges, the number of them?

13           MR. BAUER:  Your Honor, our office takes no position

14   on the specific requests.  Our only request is that if your

15   Honor is inclined to grant these additional peremptories, that

16   the government be awarded the proportionate amount in return.

17           THE COURT:  Mr. Greenfield, why 18?

18           MR. GREENFIELD:  Your Honor, we just honestly picked a

19   number out of the hat.  We were talking about it the other day.

20   The last time Mr. Goltzer and myself had a question like this

21   arise, the numbers that we used were 16 and 9 which I think

22   breaks out just about to 10 and 6.  So that really would be our

23   request at this point.  Mr. Buchwald and Mr. Goltzer join in

24   our request.

25           THE COURT:  OK.  Now, this does not appear to me to be

E81Qwhi1

1  a case where there are going to be terribly conflicting

2  defenses as amongst the defendants and without revealing any

3  defense strategy.  Am I completely off base with regard to that

4  assumption?

5         MR. GOLTZER:  Your Honor, this is a matter of tension

6  in terms of strategic judgment as opposed to a conflicting

7  defense entirely, so I think your Honor is three-quarters

8  right.

9         THE COURT:  OK.  What I would propose to do is I would

10  propose to give each defendant one additional peremptory for a

11  total of 13 and give the government one additional peremptory

12  for a total of seven and those additional three peremptories

13  can be used individually.  Did you have a view as to whether or

14  not you would use the balance or the first ten individually or

15  as a group?

16         MR. GOLTZER:  I think what we will try to do is use

17  them as a group.  We will do our best to use them as a group.

18         THE COURT:  Very well.  Just in terms of the rounds, I

19  would propose to have a total of seven rounds where the

20  government would use its one peremptory per round.  And the

21  defendants would have two peremptories in the first four

22  rounds.  And then one peremptory in round one, one in round six

23  and the three individual peremptories in round seven.  OK?  So

24  for the defendants it will be two, two, two, two, one, one,

25  three.  And for the government it will be one.  All right?  So

E81Qwhi1

1    that with a total of 20 peremptories -- let me ask this next

2    question:  Do we need more than two jurors above the 12?

3                MR. GOLTZER:  Yes.

4                THE COURT:  How many?

5                MR. GREENFIELD:  I would suggest four, Judge.

6                THE COURT:  It's only expected to be a three-week

7    trial, correct?

8                MR. BAUER:  Yes, your Honor.

9                THE COURT:  Does the government have a view as to the

10   number of jurors?

11               MR. BAUER:  I think more than two might be appropriate

12   but maybe not four.  How about we say three so we have 15?

13               MR. GOLTZER:  We take the view that what can go wrong,

14   generally does.

15               THE COURT:  Especially in August.

16               MR. GOLTZER:  Right.

17               THE COURT:  OK.

18               MR. GOLTZER:  It hardly seems a great burden to go to

19   four instead of three because that way we are very sure we have

20   them.

21               THE COURT:  So we have 20 peremptories, and we want to

22   wind up at the end of the day with 16, that would be a total of

23   36 jurors that we would put in the box, so to speak, to strike

24   from.

25               MR BUCHWALD:  I think you need a few extras for the

E81Qwhi1

1      challenges for the alternates.

2              THE COURT:  What I propose to do is just pick from the

3      pool, and when we are done with all of the challenges for cause

4      and all of the peremp2tories, the last 14 or the last 16 will

5      be the jury.  The first 12 of those 16 will be the actual

6      jurors and the other four the alternates.

7              MR BUCHWALD:  I hear you, your Honor.  Generally, when

8      it's ten and six, we then each get two or we each get one for

9      the alternates, so, I'm not sure what your Honor intended with

10     respect to that.  But generally there are additional

11     peremptories.  When you start with the normal ten and six,

12     there are then additional challenges that each side has, either

13     one or two apiece for alternates.

14             MR. GOLTZER:  For per seat.

15             MR BUCHWALD:  Per side.  So, if we're being given

16     additional challenges, then however many we're being given a

17     total, you'll want to add to the 36, if my math is right.

18             THE COURT:  Well, again, is there an objection with

19     just proceeding with one pool and having the last four jurors

20     numerically that remain be the alternates?

21             MR BUCHWALD:  No, your Honor, but then we are not

22     really getting three additional.  Ordinarily, we would have

23     ten.

24             THE COURT:  I see what you're saying.

25             MR BUCHWALD:  We would need more for the alternates.

E81Qwhi1

1          THE COURT:  You're saying you're entitled to more.

2          MR BUCHWALD:  That's right.

3          THE COURT:  Theoretically, no, because you're not

4     entitled to the three additional I gave you, but Mr. Nawaday?

5          MR. NAWADAY:  I believe Mr. Buchwald is correct under

6     Criminal Procedure Rule 24.  It's my understanding that if

7     there are one or two alternates, each side gets one additional

8     peremptory challenge.  And if there are or four alternates,

9     each side gets two additional challenges.

10          THE COURT:  Does that assume ten peremptories?

11          MR. NAWADAY:  That does assume ten peremptories, but

12     the way I am reading the rule that the alternate juror

13     selection and peremptories relating to those jurors is separate

14     from the peremptory challenges you get for the regular jurors.

15          MR. GOLTZER:  Our position is based upon your Honor's

16     prior ruling for which we are very grateful there would need to

17     be 40 in the struck panel because there would be two

18     peremptories for the government and two for the defense in

19     addition to the 16 that your Honor has already provided under

20     rule 24.  So there's a total of 20 under Rule 24 that you've

21     exercised your discretion favorably there still remain two and

22     two for the government and the defense.

23          THE COURT:  So 40.

24          MR. GOLTZER:  Right.

25          THE COURT:  How many does the government get?  Eight

E81Qwhi1

1    peremptories, seven plus the one or six?

2            MR. BAUER:  Seven plus the two is seven for the

3    regular juror pool and two additional for the alternates, total

4    of nine.  And the defense would have 13 plus two.

5            MR BUCHWALD:  15 and 9.

6            THE COURT:  15 and 9, right.  So a total of 40 in the

7    box.  OK.  And the last four will be the alternates.  The way

8    that I propose to do it is once we get them situated, there

9    will be potential jurors 1 through 40.  I go through with the

10   very first one each of the questions in the Part One of the

11   voir dire form.  Then with each subsequent juror, I simply ask

12   them if they have any affirmative responses to that part of the

13   form and we go right to those questions.

14           As challenges for cause become evident and as jurors

15   are being challenged for cause and are stricken for cause, we

16   immediately replace that empty chair with another person from

17   the venire and that person is questioned concerning part one of

18   the form.

19           In that fashion, once we get through 1 through 40,

20   ostensibly clean jurors, if you will, at that point I will go

21   to the Part Two of the form.  We have 40 people in the box.  I

22   ask each juror each question in Part Two, and presumably that

23   process will not yield any for cause challenges.  If they do,

24   we replace that person; but assuming that they don't, once we

25   go through Part Two of the form asking each potential juror

E81Qwhi1

1    each question, at that point we exercise the peremptories.  OK?

2    Very well.  Any questions on that?

3              MR. GOLTZER:  No.

4              THE COURT:  I do have a normal trial day, which is to

5    say, I start at 9:30, I break at 5:00.  I have one break mid

6    morning; one break mid afternoon.  I ask that the lawyers be

7    here by 9:00 a.m. each day in the event we need to address any

8    issues, and there are always issues that we need to address.

9    If I see that the jury is getting heavy-lidded at some point in

10   the afternoon, I may have an additional brief break in the

11   afternoon.

12             No speaking objections.  So if you have an objection,

13   stand, say what the basis of the objection is, whether it's

14   hearsay or asked and answered.  Don't argue.

15             Also, don't make any discovery requests in front of

16   the jury.  So, if someone proffers a document, don't stand up

17   and say, "Your Honor, I've never seen this before, I demand it

18   be provided," nothing like that.  If you have an objection and

19   you want to be heard at side bar, I'm happy to hear you at side

20   bar.  So, that covers sort of the nuts and bolts.

21             MR. GOLTZER:  Five days a week Judge?

22             THE COURT:  Four days.

23             MR. GREENFIELD:  Judge, can I address one thing?  We

24   call it Buchwald day, 9:30 to 2:30 or 3:00.  Would you consider

25   that with a very small break for lunch?  Judge Buchwald, Don

E81Qwhi1

1   Buchwald's wife used that --

2           THE COURT:  There are several of my colleagues that

3   use that day.

4           MR. GREENFIELD:  It would be helpful for us in

5   preparation for the next day.  That's why I suggest it. we

6   didn't have a chance to talk about it before, but I think it

7   would be helpful in a case like this.

8           THE COURT:  Does the government have a view?  I've

9   never done it.  I would be disinclined; but if there is a

10  strong movement afoot...

11          MR. BAUER:  Judge, first of all, I'm shocked to hear

12  that Don Buchwald is married to a Judge.  I've never heard that

13  before.

14          Second of all, your Honor, I am concerned about the

15  duration of the trial.  It's August, and I think it is going to

16  be tough to seat 40 jurors to begin with who don't have

17  vacation schedules.  To the extent we're extending closer to

18  Labor Day, it is going to be even more of a problem.  I

19  understand Mr. Greenfield's request, but I think your

20  inclination to do the full day given when this trial is

21  starting makes the most sense.

22          THE COURT:  Mr. Buckwald.

23          MR BUCHWALD:  As far as duration, the fact that the

24  day doesn't longer, there's no lunch break.  There is a

25  morning -- 15 or 20 minute break at one point.  There is no

E81Qwhi1

```
 1    lunch break.  And, in fact, the number of pages of transcript
 2    are the same because you don't have a lunch break.  You don't
 3    have a second short -- usually there's a ten, 15 minute break
 4    morning and afternoon and the lunch break.  So there is one 20
 5    minute break at some point, unless somebody has to go to the
 6    bathroom.  I think your Honor is probably familiar with the
 7    pros and cons of it.
 8              THE COURT:  Right.
 9              MR BUCHWALD:  It often is better for the jurors
10    because you can get certain jurors who are delighted to hear
11    they can get to their office at 3:30 and accomplish something.
12    I find it is better for all of the lawyers because they could
13    prepare, and particularly the older lawyers.
14              MR. GREENFIELD:  There are three of them.
15              MR BUCHWALD:  Three CJA attorneys here who are all
16    over the hill.  It is of tremendous advantage because you can
17    actually prepare and get some sleep, but -- I take it
18    Mr. Bauer's office is probably split on what they prefer and
19    what they don't, but it doesn't cause the trial to be longer.
20    In fact, everybody is better prepared.
21              THE COURT:  As somebody with gray hair, I was going to
22    suggest we start at noon, but instead, I will defer to my
23    colleagues.
24              MR. BAUER:  Your Honor, I've had positive and negative
25    experiences with abridged trial day.  Two concerns -- I think
```

E81Qwhi1

1    Judge Karas calls it a more efficient trial day.

2            One concern is starting on time.  It sounds all well

3    and good, but if we are not going to start exactly at 9:30 and

4    the start time doesn't begin until 10:00, it is certainly not

5    efficient.

6            The other thing is most judges who sit that schedule,

7    sit the full five days.

8            THE COURT:  Right.

9            MR. BAUER:  Which I am not sure what your availability

10   is.

11           THE COURT:  Well, here are a couple of points:  First

12   of all, I start on time.  I start at 9:30.  I expect the

13   lawyers to be here at 9:30.  I will tell the jury from the very

14   beginning that I will make sure that we are the not wasting any

15   of their time.  So, I absolutely will start at 9:30 every day.

16   I absolutely will end at 5:00 every day.  If I say 15 minutes

17   per break, I'm on the bench 15 minutes later.  If I say an hour

18   and 15 minutes for lunch, I'm on the bench an hour and 15

19   minutes later.  So, I make sure that everyone is conditioned

20   from the very first day to make sure that we do not engage in

21   any sort of time creep.

22           What I have thought because of the month is, I had not

23   planned on sitting on Fridays.  However, I will endeavor to sit

24   at least half day on Fridays; maybe not the first week, but the

25   subsequent weeks so that we use that time as much as we can.

E81Qwhi1

1   So, yes, let's just go with the regular day.

2             MR. GOLTZER:  And not the 8th; we're not sitting on

3   Friday?

4             THE COURT:  Correct.  Correct.  OK?

5             Now to the motions in limine.

6             MR BUCHWALD:  Your Honor, with respect to the voir

7   dire questions --

8             THE COURT:  Yes, sir.

9             MR BUCHWALD:  -- I had filed what we called -- I'm

10  trying to remember the name of what we called it --

11  objections/proposed alternatives to the government's proposed

12  jury voir dire, which, for the most part, appears to have been

13  rejected, although I think perhaps one or two of the objections

14  have been granted because I don't see the government's

15  proposals.

16            THE COURT:  You should assume -- and this would be an

17  accurate assumption on your part -- that we have received all

18  of your proposals; we have received all of your objections; and

19  what is reflected in what I have given you is my determination

20  as to whether I will accept or reject the recommendations.

21            MR BUCHWALD:  That's fine, your Honor.

22            MR. GOLTZER:  In case the record wasn't clear, may it

23  just reflect that we both, the other lawyers join in

24  Mr. Buckwald's applications to the extent that they have been

25  ruled upon by the Court.

E81Qwhi1

1            THE COURT:  OK.

2            MR BUCHWALD:  May we for purposes of the in limine

3    motions -- I know we didn't always follow up with letters

4    saying we join, but may a motion by one be deemed to be a

5    motion by all if it is applicable to the other defendants.

6            THE COURT:  It would appear that all of the motions

7    are applicable across the board, so...

8            MR BUCHWALD:  Thank you.

9            MR. BAUER:  The government WITH voir dire I had two, I

10   think, relatively non-controversial additions.  One is when you

11   list the law enforcement agencies involved paragraph 14 --

12           THE COURT:  Yes.

13           MR. BAUER:  -- I think the New York State Police

14   Department should be listed as well.  They played a fairly

15   large role in our investigation, and it's the New York State

16   lab that's tested all of the drugs.  So, unless you have an

17   objection, I would add them to that.

18           THE COURT:  No.  Absolutely.  It is not, by the way,

19   to give anyone any proper respect.  It is simply to advise the

20   venire that there may be numerous state police officer

21   personnel that testify.

22           MR. BAUER:  In fact, your Honor, our proposed voir

23   dire did not have the New York State Police in there as well.

24   So, it's a thought in hindsight.

25           The other is just Part Two, when you ask about

E81Qwhi1

```
 1    publications, what I've seen many of your colleagues do is just
 2    publications either in print or online considering the reality
 3    of how people read their news these days.
 4              THE COURT:  OK.  That's question 53.
 5              MR. BAUER:  Correct.
 6              THE COURT:  I should advise the parties that I just
 7    finished a civil case this morning and charged the jury just
 8    before lunch.  So, what has been handed to me is a note from
 9    that jury; and depending on how long this goes, we may need to
10    take a short break so that I can deal with this.
11              So, anything else on the voir dire form?
12              MR BUCHWALD:  With respect to the names of the
13    lawyers, if you could add on behalf of Mr. Thomas, Levi
14    Downing, who will also assist in the representation of
15    Mr. Thomas.
16              THE COURT:  What's the name?
17              MR BUCHWALD:  Levi, L-E-V-I.  Downing, D-O-W-N-I-N-G.
18              THE COURT:  Will Mr. Dratel be with us or not?
19              MR BUCHWALD:  He will be, yes.  He was unable to be
20    here this afternoon.
21              THE COURT:  There is also a placeholder at question 19
22    for places, addresses, etc.
23              MR. BAUER:  Yes.  The government, your Honor, has put
24    together a draft of that document.  I handed it to defense
25    counsel before today's proceeding.  I've asked them to weigh
```

E81Qwhi1

1    in, and what I would propose to the Court is that as we send it

2    to your chambers, I guess it will be hard to do it by the end

3    of the week or end of today, but perhaps over the weekend so

4    you will have it first thing Monday morning.

5              THE COURT:  How voluminous is this list?

6              MR. BAUER:  Three pages.

7              THE COURT:  Three pages of?

8              MR. BAUER:  Names and places, really, the places are

9    just streets in Newburgh and the names of law enforcement

10   officers and persons of interest in Newburgh.

11             THE COURT:  Very well.  The sooner you can get that to

12   us, the better.  Obviously, we will be working through the

13   weekend to be ready for Monday morning.  So I would ask defense

14   lawyers to please take a look at what the government has

15   provided and get your comments back to them, so they can get

16   their comments back to us.  And no later than midday Sunday,

17   OK?

18             MR. BAUER:  Yes, your Honor.

19             THE COURT:  Anything else on the voir dire form?  OK.

20             Let's get to the infamous Kevin Burden tape.  Now, as

21   I understand it, the government believes that this document is

22   admissible pursuant to Rule 804(b)(3) of the Federal Rules of

23   Evidence.  The defendants object, and they assert that none of

24   the grounds or none of the elements of 804(b)(3) apply in this

25   case.  Which one of you gentlemen wanted to take the lead?

E81Qwhi1

1          MR BUCHWALD:  One comment.  Your Honor, if I might, I

2     think Mr. Goltzer will take the lead on the 804(b)(3), but if I

3     might make it clear that our objection is also on confrontation

4     clause grounds.  Specifically, in a situation where, number

5     one, the government controls the availability of the witness

6     here, Mr. Burden, Mr. Burden is somebody who has already pled

7     guilty.  He can be immunized without prejudice to a potential

8     prosecution of Mr. Burden.  He may still have a continuing

9     Fifth Amendment right until he appeals.  That may well be the

10     law, but the government can overcome that.

11          THE COURT:  How?

12          MR BUCHWALD:  By immunizing him.

13          THE COURT:  But they don't have to.

14          MR BUCHWALD:  No, they don't, but it is within their

15     power to do it.  In other words, they're the ones, unlike

16     certain situations, where they control his availability.

17          So what we have here is the government creating the

18     situation initially of putting their government agent, Mallory

19     at this point in time of the tape is a government agent for

20     purposes of analysis.  They put the government agent in the

21     position of questioning or eliciting information from Burden.

22     They create the situation.  They're creating the situation for

23     the purpose of prosecution; not for any other purpose.

24          It's not a situation where there is public emergency

25     or something like that, that they have to take care of.

E81Qwhi1

1    They're putting in the government agent to elicit information

2    for the purposes of prosecution.  If this kind of thing is

3    allowed, we're always going to have situations where the

4    government doesn't try to interrogate a target of

5    investigation.  The government will use the undercover calls to

6    some other person and will try to elicit from that other person

7    negative information about their true target.  And that's what

8    we're going to have.  It creates, it seems to me, a paradigm of

9    a confrontation clause issue.

10           I realize this isn't going within the parameters of is

11   this testimony or not testimony.  It's the language that's

12   arisen up to now for purpose of confrontation clause analysis,

13   but that's what we're going to create here.  We know what

14   prosecutors will do if this is permitted under the

15   confrontation clause.  We are going to have a series of

16   situation, right, where you go to the weakest link, the person

17   who is the dumbest, you ply them with alcohol and marijuana --

18   I think that is going to go to one of Mr. Goltzer's argument as

19   to why this isn't reliable.  You do whatever you can, not for

20   purposes of getting anything incriminating on them, but so that

21   they'll say something bad about the guy who they want to use it

22   against.  Then you'll put in that tape -- not

23   cross-examinable -- you'll put that in in order to convict

24   somebody who will not have the opportunity cross-examine

25   because you in your discretion choose not to exercise the

E81Qwhi1

1    ability to force that person to testify.

2            So we want above and beyond the 804(b)(3) arguments --

3    and we'll hear the analysis in a minute -- we believe there is

4    a separate confrontation clause violation that is created by

5    the admission of this tape.

6            MR. GOLTZER:  May it please the Court, should I

7    proceed?

8            THE COURT:  Did you want to take care of the

9    confrontation clause issue first, Mr. Bauer?

10           MR. BAUER:  It's taken care of pretty easily, your

11   Honor.  There is no confrontation clause issue.  The Supreme

12   Court has ruled upon it.  I think Mr. Buchwald is arguing

13   apples and oranges.

14           Mr. Buchwald seems to be arguing a policy concern that

15   if this is allowed, it will open a Pandora's box.  It has been

16   allowed for many years.  This has been a practice that law

17   enforcement and prosecutors have relied upon for years.  So, I

18   am not entirely sure what he thinks is going to happen if you,

19   Judge Ramos, allow this tape in and how that is going to change

20   the landscape of law enforcement.

21           804(b)(3):  There is a reason for the rule, and the

22   reason to exclude hearsay generally is because there is no

23   guarantee of trustworthiness in this case; but 804(b)(3)

24   contemplates such a scenario where something is trustworthy and

25   the witness is unavailable, and so there is no confrontation

E81Qwhi1

1     clause issue, and it falls entirely into the question of

2     whether hearsay should be allowed.  And there's a specific rule

3     which applies here, and the government argues that it is

4     entirely applicable, and that the statement is trustworthy.

5     Mr. Goltzer is about to tell you why he thinks it's not.  But I

6     see no confrontation clause issue here, your Honor, and I'm not

7     sure Mr. Buckwald could point us to any legal authority to

8     suggest there is

9          THE COURT:  I agree.  I don't think that there is any

10    confrontation clause issue here.  The type of circumstance

11    under which Mr. Burden has been taped has been acknowledged b

12    certain courts and the Second Circuit to be non-testimonial of

13    an individual who is not in custody who is making a statement

14    to someone who he believes to be a friend, shall we say, does

15    not raise confrontation clause concerns.

16          Moreover, Mr. Buckwald, I have to say, I don't quite

17    understand the concern that you raise.  The situation that you

18    describe where the government goes after the least culpable

19    person of a conspiracy and attempts to get information from

20    them, that's just garden-variety investigation and prosecution.

21    Moreover, it is available through 804(b)(3) because that person

22    in addition makes inculpatory statements.  So you don't have, I

23    think, the fear; there isn't the danger that someone who does

24    not face jeopardy is going to be free to give a lot of

25    inculpating statements about other people.  So

E81Qwhi1

1          MR BUCHWALD:  I wasn't meaning least culpable.  What I

2     was meaning was least intelligent.

3          THE COURT:  Well, with the least intelligent and less

4     culpable, the most vulnerable low-hanging food, if you will,

5     that's what law enforcement has done time immemorial.

6          MR BUCHWALD:  We're dealing here with a situation

7     where it's a given that this is not co-conspirator statements

8     by the person who is being taped, which is where I believe all

9     of those cases -- that's the rubric that is coming in on all of

10    those cases, not on declaration against penal interest that

11    Mr. Bauer refers to and the plethora of cases that your Honor

12    has referred to because there is traditional statements in

13    furtherance of a conspiracy.  In any event, I've been heard.

14         THE COURT:  Very well.  804(b)(3), Mr. Goltzer.  You

15    can remain sitting as long as you speak directly into the

16    microphone so we can all hear you.  We have to be disciplined

17    about that in keeping our voices up in this room.

18         MR. GOLTZER:  I actually think better when my feet are

19    moving.

20         THE COURT:  Very well.

21         MR. GOLTZER:  Let me just add a punctuation point to

22    Mr. Buckwald's argument.  Just for the record, I expect that

23    the ruling would be the same.

24         To the extent that Mr. Buckwald has mentioned a

25    manipulation of the process of immunity, the defense might

E81Qwhi1

1    raise a due process argument under the Fifth Amendment as well

2    because what Mr. Buckwald quite sagely mentions was that the

3    government could, if it wished, give somebody derivative use

4    immunity so he could be called as a witness and the defense

5    would have a right to confront and cross-examine.

6           While the statements are not viewed as traditionally

7    testimonial, there is an irony here.  The most reliable

8    statement that Mr. Burden ever made didn't implicate anybody

9    else; it simply implicated himself.  It was in front of a court

10   when he pled guilty under oath, and he said, "I gave someone a

11   gun for use in a different crime."  That statement would not be

12   admissible against any of these particular defendants because

13   that is very much testimonial.

14          Now, the government is going to tell you that it was a

15   reliable statement and it corroborates the tape, but it really

16   doesn't corroborate those portions of the tape that implicate

17   anybody else.

18          So, the real nub here, once we get past issues of

19   unavailability that were raised by Mr. Greenfield and

20   Mr. Buckwald in their respective submissions, once we get past

21   that, we come to that portion of the analysis which speaks to

22   circumstantial guarantees of trustworthiness that permit one to

23   introduce against these other defendants particular portions of

24   the tape-recording.

25          There is some new information that we had received

E81Qwhi1

1    which will bear on this -- and I think the government will

2    agree with it.  The government mentioned in its memorandum that

3    a prospective witness by the name of Spongebob, who is going to

4    be testifying at the trial, which would obviate our concerns in

5    terms of confrontation, I am now told that Spongebob is not

6    going to be testifying; that the witness who we thought was

7    Spongebob, a gentleman by the name of Mr. McDermott who will be

8    testifying, is, in fact, not Spongebob; but Spongebob is

9    somebody named Pop.

10          In Mr. Strazza's submission -- in fact, may I ask the

11   government if that is correct?

12          THE COURT:  Sure.

13          MR. BAUER:  Sure.  Your Honor, again allow me to

14   actually clarify this.

15          As Mr. Goltzer proceeds forward, I did confuse

16   Spongebob with Mr. McDermott in my submission.  Mr. McDermott

17   will be testifying that he was at the house 261st Street when

18   Mr. Whitaker came to the house.  It was Mr. McDermott who

19   opened the door and saw him in bloody clothes.  He then tells

20   Mr. McDermott to get a garbage bag, and he went and -- and then

21   Mr. Whitaker -- actually, I think I reversed that.

22   Mr. McDermott helped Mr. Whitaker get a garbage bag and then

23   Mr. Whitaker went downstairs.  Downstairs is where Spongebob

24   lived.  He also goes by the name of Poppy.  Most people know

25   him as Poppy.  Kevin Burden and Jamar Mallory called him

E81Qwhi1

Spongebob because he had funny teeth, like Spongebob the

cartoon character.

He lived downstairs.  So it's entirely consistent that

McDermott would have seen the bloody clothes, and then he went

downstairs.  And Spongebob was down there waiting.  And I

believe what Burden says is Spongebob kind of snuck up on

Mr. Whitaker and didn't say much.  So, they're not opposing in

any way, but I -- to accept Mr. Goltzer's invitation, let me

clarify that Spongebob will be testifying, Mr. Whitaker will be

testifying -- Mr. McDermott will be testifying, but

Mr. McDermott will be testifying to very similar information to

what Spongebob would have testified to if we had been able to

locate him.

MR. GOLTZER:  I want to thank the government for

making that known to us.  After we received were served the

3500 material, nothing that I said should have been taken as

criticizing the government.  If mr. Bauer says he was confused,

I accept that.

Mr. Strazza cited a case called *United States v. Lang*

in his memorandum.  And Lang stands for the proposition that

even if something is to be admitted under 804(b)(3), it has to

be something that falls within the personal knowledge of the

declarant.

Obviously, with respect to this one particular issue

Burden and Mallory are repeating what somebody told them, and

E81Qwhi1

1      that certainly would -- reliability aside, it doesn't fit

2      within the rule of *United States v. Lang*, and that particular

3      portion involving the allegation of Mr. Whitaker somehow had

4      blood on his clothing shouldn't come in for that particular

5      personal knowledge reason.

6              There are other reasons as well, even if Spongebob is

7      going to testify that it shouldn't come in.  There is a very

8      substantial reliability problem here.  This is not an automatic

9      rule where somebody makes an admission, "I had a gun.  I gave a

10     gun to somebody" and then he tells a story about other people.

11     The presumption, if you will, under the case that we've all

12     cited, *Williamson* is that accomplice statements are unreliable

13     because what people often do is they mix truth with falsehood.

14     That's the rule, generally when people make post arrest

15     statements, it's a common practice.  It's

16             paramount from the tape itself that that's what's

17     going on here.  You've got Burden and Mallory both going to

18     very great lengths to distance themselves from the unfortunate

19     incidents at 54 Chambers when Mr. Henry was killed.  "They

20     questioned me.  I really didn't know anything about it.  We

21     weren't on point.  We had nothing to do with that.  We didn't

22     know what anybody was going to do.  We were sitting home doing

23     something else.  We had the kids.  We don't know anything about

24     that.  I wouldn't have given my gun away to do something like

25     that."

E81Qwhi1

1          But what the government wants to do is bring in a

2     statement by Mr. Burden and by Mr. Mallory to somehow

3     corroborate unreliable testimony.  The government quite

4     correctly cited cases that said that you have to look at all

5     the facts surrounding the circumstances.  You look at

6     reliability of the facts, you look at the reliability of the

7     declarant.  You look at the reliability of the statement, in

8     connection with all the other evidence in the case.

9          Let's talk about Mr. Baynes.  Baynes, which the

10    government says is CW-1, and he is going to testify in a way

11    consistent with the tape about Mr. Whitaker, Mr. Thomas and

12    about Mr. Christian.  Baynes is somebody who was a chronic,

13    habitual liar by virtue of their evidence.

14         Baynes was questioned at a hospital on December 15 for

15    hours.  He was questioned several times.  And when they call

16    Baynes to the stand, Baynes is going to tell the jury he lied

17    through his teeth.  And we're going to count up the number of

18    lies Baynes claimed he told; scores upon scores of lies.

19         He is going to say, "I didn't know who the other

20    people were.  There were people I didn't recognize.  I was

21    standing outside.  I never went to the apartment.  I didn't

22    know what happened.  I got shot by a group of strangers.

23         "Wait a minute.  Now, I'll tell you the truth.  I did

24    go into the apartment, but I was only supposed to be a lookout.

25         "Wait a minute.  I'll tell you the truth.  X, Y and Z

E81Qwhi1

1    were shooting.  I didn't have a gun.

2              "Wait a minute, that's not good enough.  I'll change

3    my story again."

4              He changes his story again and again and again and

5    again, all within the matter of 24 hours.  Finally, he admits

6    that he went in because he was worried about his friend's

7    brother, and he was stabbed inside the apartment.  He never

8    mentions during that period of time Mr. Thomas or Mr. Whitaker.

9              It is not until May 11 of 2011, just about six months

10   later, that he first mentions people known as Bow Wow and

11   Thomas after originally having told the police that he couldn't

12   recognize anybody but certain other people.

13             THE COURT:  Baynes, is it you're talking about?

14             MR. GOLTZER:  Yes.

15             THE COURT:  Is he the guy on the tape with Burden.

16             MR. GOLTZER:  No, that's Burden.  Burden is not going

17   to be a witness.  But I'm talking about the corroborating

18   circumstances.

19             THE COURT:  Right.

20             MR. GOLTZER:  So the government has argued in its

21   memorandum in support of the notion that there are

22   corroborating circumstances, "We have informants who are going

23   to testify that Bow Wow is involved.  We have informants who

24   are going to testify that Thomas was involved."  But those

25   people carry tremendous amounts of baggage into this case,

1    Judge, and there are no corroborating circumstances

2    demonstrating their reliability.  It was only after six months

3    when the police were already targeting those people that he

4    changed his story and cut a deal with Orange County.

5         Now, it's even better.  Mallory is their other major

6    informant who is on the tape.  Mallory is plying Burden with

7    alcohol.  They then smoke grass together.  They're getting

8    drunk together.  They disagree on what happened.  They disagree

9    on who gave who a gun.  That's on the tape itself.

10        Burden says in response to Mallory, "Uh-uh, I didn't

11   give him a gun; you did."

12        That's the last thing that Mallory wanted to hear.

13        Now in the latest submission from the government, he

14   suddenly remembers something different from what he told them

15   in the earlier proffers.  Now he didn't give the gun to

16   Whitaker; he gave the gun to Thomas.  It's totally filled with

17   ambiguity, with contradiction, with vagueness, with competing

18   recollections; hardly something that one would classify as

19   circumstantial guarantees of trustworthiness.

20        So, if you are going to allow anything in that is

21   truly against anyone's penal interest, it's the notion that "I

22   had a gun and I gave it to somebody," but you can't permit them

23   to implicate our clients when you can't find that there is

24   reliability here.

25        The notion that there was blood, for example, on

E81Qwhi1

1   Whitaker's clothing, when you look at Baynes' 3500 material and

2   all the other 3500 material in the case, there is no way

3   possible that there was blood on Whitaker's clothing.

4   Whitaker, according to every piece of evidence in the case,

5   never came into contact with anybody who was bleeding and was

6   not himself bleeding.  So, they can testify today until

7   tomorrow when I get a chance to cross-examine him or

8   Ms. Stafford gets a chance to cross-examine him that he had

9   blood on his clothing, but they shouldn't hear it on a tape

10   which I can't cross-examine, which is double hearsay to begin

11   with.  That's got to be out.

12          Implicating anybody as to who picked up the guns

13   shouldn't happen.  There's 3500 that says, for example, that a

14   woman brought guns.  There's 3500 material that says

15   Mr. Whitaker allegedly had a .38 caliber chrome revolver.

16   There is conflicting testimony that it was somebody else who

17   had the chrome revolver; that it was Mr. Whitaker who had a .9

18   millimeter.  It's all over the place, Judge.  And we won't be

19   given a fair trial, quite frankly.

20          In this case where it's going to be close evidentiary

21   questions and close factual questions -- and this is a triable

22   case, Judge -- and these men are risking a lot by going to

23   trial, but there are real issues here.  Putting this tape in

24   will deny them a fair trial.  It's pure hearsay, and it's not

25   subject to the exception.  And, I don't know, I maybe the other

E81Qwhi1

| | |
|---|---|
| 1 | lawyers may want to talk about the other pieces that they want |
| 2 | to put in, but it seems like pure character assassination when |
| 3 | they're talking about Bloods and other drug sales.  That's just |
| 4 | pure character assassination. |
| 5 | But I'm primarily concerned and I think Mr. Buckwald |
| 6 | is primarily concerned about these guns.  When you look at the |
| 7 | guns, it's all over the place as to who was firing and who |
| 8 | killed people. |
| 9 | THE COURT:  Let's try to stay focused, Mr. Goltzer. |
| 10 | MR BUCHWALD:  One other point.  The government writes |
| 11 | in its 804(b)(3) analysis that the government is unaware of any |
| 12 | prior inconsistent statements by Burden.  He's the person who's |
| 13 | statements are being he elicited by their agent Mallory.  But |
| 14 | the 3500 material makes clear Burden is quoted by one of their |
| 15 | witnesses as saying it's Kev Gotti -- that's Burden nickname -- |
| 16 | so 3507-27, the 3500 material from David Evans, who is one of |
| 17 | their cooperators who is testifying.  "Kev Gotti told Fuzzy" -- |
| 18 | that is the nickname of the witness that -- "J-Mark and L1 |
| 19 | shot" -- referring to Joker -- "both of them." |
| 20 | The government's theory is not that either J-Mark -- |
| 21 | J-Mark is Mallory himself -- and L1 is defendant Williams who |
| 22 | has been severed -- that they were the people who shot Joker. |
| 23 | That's entirely at odds with the government's theory now and |
| 24 | entirely inconsistent with what they are trying to elicit from |
| 25 | Burden on this tape. |

E81Qwhi1

1    Burden nowhere -- I don't know if your Honor has had

2    an opportunity to listen or to watch the tape, it's on video,

3    and see the plying of liquor and the smoking of marijuana --

4    Burden is constantly resisting the words that Mallory tries to

5    put into his mouth.  There is only one -- after Mallory five

6    times is referring to Gucci, you know Gucci coming, Gucci

7    coming, and Burden is resisting that.  And finally the fifth

8    time, Burden utters the words Gucci, Bow Wow and Gucci.  Your

9    Honor, I think that it simply doesn't meet the test of

10   reliability.

11          THE COURT:  Let me go to Mr. Bauer, unless,

12   Mr. Greenfield, you wanted to add anything.

13          MR. GREENFIELD:  Mr. Strazza.

14          THE COURT:  Again, if I could ask you to focus right

15   now so that we have some structure to this argument.  It

16   appears as though we are addressing the trustworthiness aspect

17   of the three-part requirement of Rule 804(b)(3).

18          Do you want to speak to that?

19          MR. STRAZZA:  Well, the only thing I want to add that

20   hasn't been said already, Judge, was that the portion where it

21   was clear that Mr. Burden didn't recall what Mr. Mallory was

22   trying to pull from him, and at one point he even says, "I'll

23   refresh your recollection with this" and he goes into the whole

24   version.  That was the only thing that wasn't mentioned by

25   co-counsel here that I just wanted to add.

E81Qwhi1

1          THE COURT:  So, Mr. Bauer, there appear to be a number

2     of attacks on the trustworthiness of the statement.  One is

3     obviously the circumstances, the use of alcohol and marijuana,

4     and I guess the government's view that corroboration will come

5     from these cooperating witnesses who counsel indicate are

6     inherently untrustworthy.

7          MR. BAUER:  Yes, your Honor.  A number of points.

8     First a all, a couple small things to get out of the way.

9     There was no smoking marijuana.  They were drinking alcohol and

10    smoking cigarettes.  That's number one.

11         Number two, I heard a lot of what Mr. Goltzer in

12    particular was saying as arguing -- arguing about the

13    unreliability of our witnesses.  It was good to see a preview

14    of his jury address, but I -- you know, I am not sure that it

15    goes to the admissibility, but rather the weight, attacking the

16    credibility of our witnesses on other things that they are

17    going to be testifying about.

18         Judge, as to trustworthiness, the first point, and

19    most important point -- because is a lot of the cases that we

20    cite and a lot of the cases that defense counsel cite deal with

21    witnesses getting on the witness stand and summarizing what

22    somebody -- an out-of-court declarant who is unavailable said

23    to them.

24         We don't have that.  We have a video.  We have his

25    actual words, actual words of Kevin Burden to offer.  So it is

E81Qwhi1

1    inherently reliable, and it is an important point to not forget

2    about is -- and I will address the was the Mr. Mallory trying

3    to ply answers out of Mr. Burden.  The jury is going to see

4    exactly how it went down, and --

5            THE COURT:  But are they really?  Because what has

6    been proffered is six snippets of what I understand to be

7    several hours long conversation, correct?

8            MR. BAUER:  Right.  These are excerpts.  I mean, your

9    Honor, we'd be here all day.  They talk about totally

10   irrelevant and, frankly, inappropriate things on the call or on

11   the recording.  So this is an effort to (A) streamline, but (B)

12   also to square our proffered evidence with 804(b)(3) because

13   the statements have to be against penal interest, so when

14   they're talking about women or what they did the night before,

15   those are not statements against penal interest.  So we made an

16   effort to focus only on those.

17           I think the most common objection that defense counsel

18   have is that Mr. Burden and Mr. Mallory both professing their

19   ignorance of what was going to happen with the Joker at 54

20   Chambers Street, saying that that doesn't square with our

21   theory or, I'm sorry, they were saying they were not on point,

22   they were not on point and that doesn't square with our theory.

23           I'm not sure if they're being obtuse or just missing

24   the point.  That is exactly what our proof is going to be.  At

25   the time that L1 called up Mallory and said, "We need the guns

E81Qwhi1

1   -- I'm going to send some young boys over to get the chains" is

2   what he said, Mallory and Burden didn't know what it was for.

3   They were all part of the Bloods.  They shared guns, and they

4   had a pretty good idea it was going to be either a robbery or a

5   shooting.  But they were not on point.  No one is going to

6   testify they were on point.

7          THE COURT:  What does that mean, not on point?

8          MR. BAUER:  On point means they didn't know what was

9   going to happen.  They had an idea it was going to be a robbery

10  or a shooting.  They didn't know anything about Joker.  They

11  didn't know about 54 Chambers.  They didn't know how many

12  people they were rolling with, a term Mr. Burden used.

13          It's entirely consistent with our theory, what

14  Mr. Mallory is going to say.  So that was their most common --

15  the one I think each defense counsel had argued in their

16  various submission.  I suggest to you that that is entirely

17  consistent with our theory and the other proof in the case.

18          The other thing that they've said is that Mr. Mallory

19  reluctantly or both were pulling admissions out of Mr. Burden.

20  And, for sure, there are times when Mr. Burden -- where

21  Mr. Mallory is saying things like "let me refresh your memory"

22  and suggesting what he remembered.

23          Mr. Burden was not a passive participant in this

24  conversation, your Honor.  Just reading the transcript alone,

25  you can see that.  And the fact that they pushed -- that he

E81Qwhi1

1    pushed back, Mr. Mallory said, "And then you gave him the

2    guns," Mr. Burden says, "No, no, no.  I didn't give the guns.

3    I gave them to you and you gave them the guns."  It's those

4    exact types of interchanges that show just how genuine the

5    conversation is.  He's not passively saying, "Oh, yeah, I guess

6    that's right, I did."  He's saying, "No, no, no.  You got that

7    wrong, Mr. Mallory and I'll explain why."

8          He also -- on at least one instance where Mr. Mallory

9    is saying, "Do you remember this?"  And Mr. Mallory goes ahead

10   and summarizes part of the story?  Mr. Burden doesn't just say

11   "yeah;" he says, "Yes, I remember that exactly."  That is not a

12   passive participant.  He is adopting what Mr. Mallory just

13   said, when he says "I remember it exactly."

14         So it's, frankly, laughable to suggest he is plying

15   information out of him.  It is how the conversation worked,

16   and, sure, Mr. Mallory had an initiative when he went there

17   that day; it was to talk about the Joker murder.  That's why he

18   was bringing up the conversation.  But Mr. Burden jumped right

19   in and talked about it with him.

20         Your Honor, as to the point about Tyrell Whitaker and

21   the blood on his clothes, Mr. Goltzer is incorrect, that there

22   is no -- that there will be no evidence that Mr. Whitaker came

23   into contact with anybody who was bleeding.  As the proof will

24   come out, Mr. Whitaker was one of the shooters of Jeffrey

25   Henry.  The shooting happened around a door, as you know, your

E81Qwhi1

1    Honor, so I don't think -- I don't the think the government's

2    theory is that Mr. Whitaker got blood on him from that

3    shooting, but after -- and your Honor is going to hear the 911

4    call that Mr. Henry makes.  He gets shot once, he's screaming,

5    and then he gets shot a second time and the screaming stops.

6         At that point you hear voices behind him, two voices.

7    One of the voices the cooperators have identified as Mr. Thomas

8    and Mr. Whitaker.  One of them says, "Let's get out of here"

9    and the other one says, "Check his pockets."  And somebody

10   grabbed the phone and hangs up the phone.  So somebody came in

11   very close contact with Jeffrey Henry who was bleeding from

12   many parts of his body.  I don't know that it was Mr. Whitaker,

13   but to suggest it was impossible that he came in contact with

14   somebody who was bleeding, that is just not accurate.

15        Judge, Mr. Goltzer, in attacking the credibility of

16   our witnesses, was trying to suggest that there are a number of

17   factual inaccuracies in the excerpts we picked out.  I see

18   none, and I think the evidence will bear that out.  There are

19   no factual inaccuracies or inconsistencies with our evidence.

20        Mr. Goltzer was focusing on Anthony Baynes.  Anthony

21   Baynes is not part of this conversation.  Mr. Mallory is.  And

22   Mr. Mallory is -- he will be testifying, and, for sure, he is

23   going to testify about how his story has changed over time.

24   That is not uncommon for cooperators, but that does not suggest

25   that this statement is unreliable.  In fact, his testimony will

E81Qwhi1

1    square entirely with what Mr. Burden said on this video.

2              Judge, let's not forget what we are here for.  We can

3    pick apart what happened during this video, and I welcome it

4    because I, frankly, think that there are no falsities here.

5    But let's not forget what we are here for.

6              When Mr. Burden made a statement, was it one that a

7    reasonable person in a declarant's position would not have made

8    unless believing it to be true?  And he says, "I gave he gun to

9    you, Mr. Mallory and you gave it -- you gave it on.  I knew

10   they were on something, but I didn't know what."

11             These are all statements that he would not have made

12   but for truth.  Mr. Goltzer said that it's not uncommon for

13   people to mix in truths and falsities.  There are no falsities

14   here, your Honor.  The evidence will bear that out.

15             I hear a lot of objection because defense doesn't want

16   this video in, but I don't actually see anything that is not

17   trustworthy.  Again, the fact that it's a recorded statement of

18   Mr. Burden is by itself, standing by itself trustworthy.

19             THE COURT:  Mr. Goltzer.

20             MR. GOLTZER:  It isn't George Goltzer who says that

21   people mix truth and falsehood.  It's the Supreme Court of the

22   United States that said that.  And it's the Supreme Court of

23   the United States that said that as a warning.  And what the

24   government is doing is misstating the policies behind the rule

25   as the rule was written.

E81Qwhi1

It is not a question of weight.  It is a question of foundation.  The rule says specifically, before you can introduce the statement implicating a third party or exculpating a third party, there have to be specific circumstantial guarantees of trustworthiness.  That is a matter of foundation.  And we have pointed to several weaknesses in the circumstantial guarantees of trustworthiness alleged by the government.

The government says the tape is consistent with my theory, and I am going to have somebody testify to my theory. We say there are inherent problems with the people that you are going to have testify, and there are inherent problems with the conversations on the tape, and that the only thing that is against anybody's penal interest on the tape that has any indicia of reliability is the statement "I had two guns and I gave them to somebody."  That's it.

As far as implicating anybody else, there is a tremendous conflict in the evidence.  There are inherent problems on the tape.  The two guys can't agree what happened. One of them is getting drunk.  That's the antithesis of circumstantial guarantees of trustworthiness.  Each of his witnesses is impeachable and will be impeached.

The identification of voice that he talks about is laughable.  When the jury hears the tape and a witness swears under oath "I know who they are," they are not going to accept that in a minute.

(Continued on next page)

E81dchr2

1              THE COURT:  I'm sorry.  What was the last part?

2              MR. GOLTZER:  I'm not going to accept it for a minute.

3     We've listened to those tapes, and there is no way you can

4     accurately identify anybody's voice except for Mr. Henry's on

5     that tape.  They're going to suggest that Mr. Whitaker bent

6     down and took the phone out of his pocket.  When there is no

7     evidence of that?  Nobody is going to testify to that?  And

8     when the police come in and tell you how they found Mr. Henry,

9     they will tell you that they had to open up his clothing,

10    before there was any blood that was showing, really, and the

11    phone was on the ground.  So there is no way anybody would have

12    come into contact with Mr. Henry.

13             It is not a question of weight.  That's a whole

14    different issue.  The Congress of the United States, in the

15    Advisory Committee and the Rules Committee, that adopted the

16    Federal Rules of Evidence, were very careful to have very

17    limited exceptions to the hearsay rule when people were

18    unavailable.  And when the rule was adopted, prior to Crawford

19    v. Washington, one of the reasons for keeping hearsay out was

20    the notion that you couldn't cross-examine it.

21             And Crawford has -- the testimonial notion have

22    changed some of that, but it makes it even more important that

23    the reliability factor be counted.  Because there is a whole

24    number of cases that preceded Crawford that talked about

25    reliability and whether something was a firmly-rooted exception

E81dchr2

1    to the hearsay rule, and I think those cases are going to come

2    back.

3              Because Mr. Buchwald is entirely correct in terms of

4    what the government has been trying to do.  One of the

5    firmly-rooted exceptions was a co-conspirator statement.

6    That's not what this is.  A dying declaration.  There is no

7    such thing in this case.  This is an inculpatory statement, by

8    an unavailable third party, that is impeachable, unreliable for

9    many reasons both internally and externally.  And the

10   government is trying to turn it into a run-of-the-mill

11   evidentiary question when it is a critical evidentiary issue in

12   a murder case having to do with their burden that they haven't

13   met.  And it is not enough to say I have witnesses who are

14   going to testify.

15             THE COURT:  Well, I mean, it sounds to me,

16   Mr. Goltzer, like you are at least implicitly conceding two

17   branches of the three-part test, that he is unavailable and

18   that the statements that he makes are against penal interest.

19             MR. GOLTZER:  I am not conceding that he is

20   unavailable.  I think that there are arguments that have been

21   made by my co-counsel that suggest that he hasn't been properly

22   rendered unavailable.  And while I am not addressing that, I am

23   not conceding it.

24             MR. BUCHWALD:  Let me add just add one more.

25             We have subpoenaed him.

E81dchr2

1          THE COURT:  OK.

2          MR. BUCHWALD:  His attorney has accepted service.  I

3    understand the attorney has said that he would invoke his Fifth

4    Amendment rights.  But he is under subpoena, and we are hopeful

5    that the government will decide, in fairness, that they should

6    immunize him because the conviction would stand.

7          THE COURT:  Let me cut to the chase on that.  I don't

8    imagine -- first of all, I can't make the government immunize

9    him.  Neither can you.  And the government -- I would assume,

10   Mr. Bauer, is the government going to immunize Mr. Burden?

11         MR. BAUER:  No, your Honor.

12         THE COURT:  So if he invokes his Fifth Amendment

13   privilege, he's unavailable.

14         Now, what if he testifies?  What if he talks to his

15   lawyer and decides he wants to testify?

16         MR. BUCHWALD:  Then there are less problems under the

17   Confrontation Clause.

18         THE COURT:  There are no problems under the

19   Confrontation Clause.

20         MR. BUCHWALD:  Then there are no problems under the

21   Confrontation Clause.

22         THE COURT:  OK.

23         MR. GOLTZER:  It still doesn't admit the tape because

24   then it becomes bolstering.  It's bolstering, your Honor.

25         THE COURT:  It depends on what he says.  Using the

E81dchr2

1    tape, depending on what he says, could be impeachment.

2            MR. GOLTZER:  The Court asked me whether I was

3    conceding that the statements were against his penal interest,

4    and the answer is no.

5            What I am suggesting is that the analysis required by

6    the higher courts is that each portion of the statement be

7    parsed to see if any part of the statement can be construed as

8    being against penal interest.

9            And the only part of the statement that could possibly

10   be construed as being against his penal interest, even though

11   he's using it to minimize his culpability, is the statement

12   that says I had two guns and gave them to someone.  But as far

13   as the -- one gun.  I'm sorry.  One gun.  One gun.  That's

14   right.  It is inconsistent.

15           But he had a gun.  He admitted he had a gun on a

16   particular day.  That, it seems to me, could be fairly

17   construed as a statement against penal interest.  Everything

18   else, no.  It is not against his penal interest.  Everything

19   else is collateral to that, and is not corroborated by

20   circumstantial guarantees of trustworthiness on this record.

21           THE COURT:  OK.  I think I understand your

22   corroboration issue.  It has to do with what the government has

23   proffered concerning the cooperating witnesses and the defense

24   view that they are inherently impeachable and inherently not

25   able to be relied upon and also the circumstances of the making

E81dchr2

1    of the tape.

2              MR. GOLTZER:  Let me give you an example, if I may, of

3    what might be considered corroborating circumstances --

4    circumstantial guarantees of trustworthiness.  For example,

5    let's take the notion that Mr. Whitaker arguably had a .38

6    caliber revolver that was chrome in color.  If the government

7    had a signed confession by Mr. Whitaker which said on

8    December 15, 2010, I had a .38 caliber chrome revolver and he

9    signed it, and there was a photograph taken by somebody with a

10   telephone from the inside of the apartment that had

11   Mr. Whitaker taking from Mr. Burden a -- or from anybody a .38

12   caliber chrome revolver, I couldn't stand here and say there

13   weren't circumstantial guarantees of trustworthiness.  But when

14   you have self-dealing informants who gave inconsistent versions

15   of events, you can't use that to corroborate what's on a tape.

16   It is just not circumstantial guarantees of trustworthiness by

17   any stretch of the imagination.

18             THE COURT:  OK.

19             MR. BAUER:  Judge, I will let the record lie but for

20   one thing.  What we haven't done during this whole discourse is

21   actually dig into the words --

22             THE COURT:  Yes.  That's what I wanted to get to next.

23   I wanted to get to the second part.  What are the statements

24   and are they inherently inculpatory?

25             MR. BAUER:  Judge, I would like to focus on Except 4.

E81dchr2

1    I passed it up to Ms. Miller.

2              What the exhibit would be that we contemplate

3    offering, it is a revised version of these excerpts, as

4    reviewed by Jamar Mallory.  And as you can see, on the bottom

5    of each page he has initialed them.  He has reviewed them and

6    verified their accuracy.

7              Excerpt 4, while I think they should all come in, I

8    think excerpt 4 is the most important, and I can't imagine what

9    is not against penal interests here.  So if you look at the

10   first part that Kevin Burden says:

11             "Next thing you know, you go downstairs on the porch

12   and come back like, 'come here.'  You like, 'Son, you still got

13   that scat, right?'

14             He talks about how he's got that scat.  We all can

15   read, so I'll just kind of summarize.  And he says:  "I ain't

16   got it right now anyway; it's at my baby's mother house."

17             Right there he's talking about owning a gun, your

18   Honor, and storing it at his baby's mother's house.

19             And then, his next thing that he says, he says:  "I

20   just got the scat."  And then, "They about, they got a jux,

21   some nice jux lined up."

22             "Jux" is slang for robbery.  So now he's saying that

23   he knows that the gun request is about a robbery.

24             And then he says, in the next one, "We got the black

25   joint, I has this chrome joint."

E81dchr2

1          Entirely consistent with what Mr. Mallory is going to

2     say.  Mr. Mallory is going to say there was a black gun hidden

3     a baby stroller on the second floor.

4          THE COURT:  I'm sorry.  Where are you reading now?

5          MR. BAUER:  The bottom of -- the first page of excerpt

6     4.

7          THE COURT:  OK.

8          MR. BAUER:  He has the black joint -- "We got the

9     black joint, I has this chrome joint."

10          Mr. Mallory has -- there is a black gun up on top of

11     the second floor of the house, and Mr. Burden had the chrome

12     gun, which was being stored at his baby's mother's house.

13          "They came later on," and they're hunting them down

14     for the scats.

15          And then Burden says again that his little brother --

16     or her little brother came and brought it in a plastic bag.

17          Entirely consistent with what Mr. Mallory is going to

18     say and, by the way, has said since the outset of the case.

19          And then they have this little interchange about I

20     gave it to you and you gave it to them.

21          And then Mr. Mallory says, "I don't remember."

22          And Burden says, "I gave it to you."

23          And then he says, "You gave the scat to Bow Wow.  I

24     gave the scat to you, and then I went in the weed spot.  Bow

25     Wow went, Bow Wow went straight upstairs, and I see him goin

E81dchr2

1    upstairs, and I came in right behind them."

2              Now, "upstairs" is consistent because upstairs is how

3    you get into 261st Street.  That is the house they are talking

4    about.

5              "And then I was like, 'Who's gone hold my scat?'

6              And then Burden, at the bottom, says that Mallory

7    said, "Oh Gucci or somebody was gonna."  And he says, "Hell no.

8    If ain't my drop, I not given them my scat out there."  And

9    then that's when Bow Wow says he'll take it.

10             Entirely consistent with multiple witnesses who are

11   going to say that Burden and Bow Wow were close.  Bow Wow

12   was -- saw Burden as a mentor, a big brother, and Bow Wow came

13   to that house regularly, which is why he came there with the

14   bloody clothes, by the way, because he trusted Mr. Burden,

15   Mr. Burden trusted him.

16             THE COURT:  OK.

17             MR. BAUER:  And then if you go to the third page, he

18   says, We didn't know how much, how much they was rollin, to

19   tell you the truth.  And that's entirely consistent, too, your

20   Honor.  He didn't know how many people were going to be there.

21   They didn't know where they were going.

22             "All I knew was Bow Wow and Gucci.  That's all I knew.

23   So I was like let them handle theirs."  Which is -- it is an

24   explicit statement that he's giving guns to two people to let

25   them go handle theirs, which he stated earlier was a jux.

E81dchr2

1        So, your Honor, I mean, we can dig into all of these

2   excerpts, but excerpt 4, as you can tell, is probably the most

3   important to the government, and, luckily, I think it is also

4   replete with both trustworthiness and statements against penal

5   interest.  And I am just not sure how it could possibly be kept

6   out given the factors of 804(b)(3).

7        MR. GOLTZER:  What puts the -- what clearly poses the

8   problem that the government can't overcome is their very own

9   submission, page 10 of their -- and may I quote it very

10  briefly?

11       "In yet another hallmark of trustworthiness, the

12  government points out the back-and-forth between Burden and

13  CW-1" -- Mallory -- "with regards to whom between them --

14  Burden or CW-1" -- Mallory -- "handed the guns to Whitaker and

15  Thomas.  As will be clear in CW-1's 3500 material" -- that's

16  Mallory-- "CW-1 originally told the government in

17  January 2012" -- two years later, Judge, not one year later --

18  "that Burden went downstairs" -- "that **Burden** went

19  downstairs" -- "with Thomas and Whitaker and handed them both

20  guns.  And in his conversation with Burden in July 2012, he

21  suggests the same sequence of events.  Burden then pushed back,

22  stating no, Mallory went upstairs and Mallory handed over a

23  gun.  Mallory then agrees.  That conversation (along with

24  subsequent conversations with the government) served to refresh

25  Mallory's recollection, who is now prepared to testify" --

E81dchr2

years later, by the way, I say parenthetically -- "who is now

prepared to testify that after Williams texted about the guns,

he went upstairs and retrieved Williams' black .38 caliber

firearm from outside his apartment and thereafter handed that

gun to Thomas.  This variance among versions of the story will

surely be a subject of cross-examination for CW-1.  But it also

serves to show the genuine, trustworthy nature of Burden's

recorded statements.  And, to be clear, this was not an effort

by Burden to shield himself from responsibility.  He clearly

stated that the 'Chrome 38' was his," and that they were going

to use it to do a robbery.

        MR. BAUER:  Judge, defense counsel is focusing on the

wrong person here.  He is focusing on Mallory.  The focus is on

Kevin Burden.  The focus is on whether what he was saying when

he said it, did he believe it to be true.

        MR. GOLTZER:  How he did it.

        THE COURT:  Gentlemen, I need to go upstairs and

respond to a jury note.  I will be back as soon as I can.  It

could be 15 minutes or so.  So, please, hang tight because we

do need to finish this today.

        MR. GOLTZER:  I just need the heads up when you come

back, or do it whenever you would like.

        THE COURT:  When I come back.

        THE CLERK:  All rise.

        (Recess)

E81dchr2

1           (Time noted at 4:30 p.m., defendants present)

2           THE COURT:  OK.  So we are all back.  I do apologize.

3   I can't promise you that it won't happen again because the jury

4   may want to be done with their work before 5 o'clock.

5           But where were we?

6           MR. GOLTZER:  I think I had just read to your Honor

7   from page 10 of the government's submission in opposition to

8   our motion to preclude, where it became apparent that

9   Mr. Mallory was changing his testimony in an attempt to conform

10  to that which appeared on the tape.  But it's still very

11  clear -- and Mr. Downing explained it very clearly; I'm

12  grateful to him for it -- that there is still a major

13  contradiction between the most current version of Mr. Mallory's

14  testimony and what's on the tape.

15          Mallory now says I gave the black gun to Mr. Thomas,

16  which he got from L-1, Mr. Williams, not from Mr. Burden.  And

17  he's telling Burden, who he is going to say that Burden gave

18  the .38 caliber silver or chrome revolver to Mr. Whitaker, but

19  Mr. Burden is still saying no, you gave the gun to Bow Wow.  So

20  there's that inherent contradiction that still remains even

21  though this impeachable witness is trying to conform his

22  testimony to what he thinks will be on the tape.

23          It's convenient because that sort of supports the

24  government's theory that the tape is in some way reliable.  But

25  the declarant is not reliable.  And the problem with the notion

E81dchr2

```
 1    of corroborating circumstances is you have an informant who is

 2    trying to refresh the recollection of a guy who is drinking on

 3    the tape for two hours.  And the informant, if he was a

 4    reliable human being, would remember what happened and wouldn't

 5    have to have his recollection refreshed much, much later.

 6           If I handed you a gun, Judge, I would remember it

 7    correctly.  I wouldn't have to have my recollection refreshed

 8    that Don Buchwald handed you the gun.

 9           So the government misapplies the rule.  The government

10    isn't properly separating the corroborating circumstances from

11    the statement itself.  The statement can say anything.  It

12    doesn't mean it is corroborated reliably.  And what's missing

13    here is the reliable corroboration.

14           MR. BAUER:  Judge, I'll just say what I said before

15    and then I would be happy to move on to the rest of our agenda.

16           I think they are focusing on the wrong person,

17    Mr. Mallory, when we should be focusing on Mr. Burden and what

18    he said and whether what he said he thought was true at the

19    time.

20           To the extent that there is a discrepancy between

21    which gun Mr. Mallory gave, I would hesitate to call it a major

22    discrepancy when the entire thesis of the point, which is that

23    they had guns at the house.  L-1 called to get them.  Bow Wow

24    and Gucci came over.  That was entirely consistent.  So I would

25    hesitate to call that major, I think, given the entirety of
```

E81dchr2

1    especially excerpt 4, it is entirely trustworthy.

2              MR. GOLTZER:  Judge, I have to focus on Mallory as far

3    as the corroborating circumstances are concerned because you

4    are going to find that Burden is unavailable.

5              THE COURT:  OK.  I have read the parties' submissions,

6    and I think I believe I understand the parties' positions.

7              Let me tell you where I come down.  I think, first of

8    all, that the government has sufficiently established that

9    Mr. Burden is unavailable.

10             I think -- well, with respect to whether or not these

11   statements are against penal interest, I've read these excerpts

12   many times.  They are not English as far as I understand it, so

13   I have to depend on the government's translation of these

14   statements.  If their translations are accurate, then I believe

15   that they will establish that these statements are against

16   Mr. Burden's penal interest.

17             With respect to the corroboration, I do believe that

18   if the government's witnesses testify as has been indicated, as

19   has been proffered, that ultimately the tape will be admitted.

20   However, I want to reserve decision until we've heard from

21   competent witnesses as to what these words mean and what the

22   testimony of the cooperating witnesses are.

23             Just because -- by the way, it is also my view, just

24   to give you my thoughts on it, that just because cooperating

25   witnesses are subject to impeachment and just because they can

E81dchr2

1     be, you know, impeached in a variety of different ways does not

2     mean that they are unable to give corroboration to the facts as

3     admitted to by Mr. Burden on these tapes.

4            So subject to further testimony of the government's

5     cooperating witnesses, the government's motion will be granted

6     and the defendant's motion denied.  But it will be subject to

7     that additional testimony.

8            MR. GOLTZER:  Do you think there won't be reference to

9     it in opening?

10           THE COURT:  Yes.  It ought not be referenced to in

11    opening.

12           MR. BAUER:  That's fine.  We won't open on it.

13           Just in terms of mechanically, your Honor, the plan

14    was to show Mr. Mallory the video and admit it through him.

15           So I guess what I would propose, in line with your

16    ruling, is that the government elicit the version of the facts

17    from Mr. Mallory and then take a short break, either at a

18    sidebar, or otherwise for the parties to check in with your

19    Honor to make sure that those corroborating circumstances have

20    been met.  But it will be somewhat realtime is my point,

21    because the plan was to show it to the very witness who I think

22    you are suggesting you want to hear.

23           THE COURT:  When do you propose Mr. Mallory will

24    testify?

25           MR. BAUER:  So the plan is Anthony Baynes is going to

E81dchr2

1    be our first cooperate witness.  We think he will get on by the

2    end of the first day, and then Mr. Mallory was going to be our

3    second witness.  We figured -- I think our guesstimate was, you

4    know, without knowing exactly how long Mr. Baynes will be

5    cross-examined --

6              THE COURT:  Sound like a lot.

7              MR. BAUER:  It sounds like a lot.  So let's say

8    Thursday would be our estimate for Mr. Mallory.

9              THE COURT:  Very well.

10             MR. BAUER:  So if it is OK with your Honor, what I

11   would suggest is I ask Mr. Mallory the questions about what had

12   happened, then take a brief break for the parties and the Court

13   to check in.

14             THE COURT:  OK.

15             MR. GOLTZER:  Does your Honor expect that we will get

16   to openings on Monday?

17             THE COURT:  Well --

18             MR. GOLTZER:  You know better than I do.

19             THE COURT:  It is my hope.  Obviously, we are going to

20   work our way through a lot of juror.s, I believe it is a

21   three-week trial.  It is an August trial.  It is a trial that

22   involves a murder.  So there will be a lot of questioning that

23   will need to be done.  I hope to be done on Monday, but I can

24   foresee a scenario where we don't have a jury until Tuesday

25   midday.

E81dchr2

1          MR. GOLTZER:  Can we agree, if it is agreeable to the

2     Court, that we will not open on Monday, in view of that

3     estimate, and we can plan on a Tuesday opening so that they are

4     not bifurcated?

5          THE COURT:  Yes.  If we get to a point in the day

6     where it appears as though all the parties won't be able to

7     open, we can certainly do that.

8          MR. GOLTZER:  Thank you.

9          MR. BAUER:  Thank you, your Honor.

10         So, I guess along those lines, then, your Honor, is it

11    fair to say that it's OK with your Honor that we not have any

12    witnesses ready for Monday but rather for first thing Tuesday

13    morning?

14         THE COURT:  I can't imagine that we will have

15    witnesses to put on -- that we will have time to put any

16    witness on on Monday.

17         MR. BAUER:  OK.  Thank you.

18         THE COURT:  OK.  Next.  The government's motion to

19    preclude the cross-examination regarding the law enforcement

20    witnesses.

21         Mr. Bauer.

22         MR. BAUER:  Yes, your Honor.  I was going to hopefully

23    streamline this a bit, which is that some of the officers for

24    whom we had submitted will not be testifying, or we don't think

25    will be testifying.  So I don't think we need to use the

E81dchr2

1    Court's time.

2              So what I would suggest is that we go through each of

3    the subsections that the government laid out, and then I could

4    advise whether or not that section is not necessary.

5              THE COURT:  OK.

6              MR. BAUER:  So Section 3 is necessary.  Detective

7    Frederick and the two Officer Lahars will be testifying.  So,

8    your Honor, I don't think that we need to make additional

9    argument unless your Honor disagrees with regard to number 3.

10             THE COURT:  All right.  And number 3 concerns --

11             MR. BAUER:  I'm sorry.  It is on page 21, the

12   preclusion of cross-examination regarding the conviction of

13   Thomas Douglass.

14             THE COURT:  OK.  And those officers will not be

15   testifying?

16             MR. BAUER:  They will be testifying.

17             THE COURT:  OK.

18             MR. BAUER:  So that's why we should come to a ruling

19   on this point for number 3.

20             THE COURT:  OK.  And does someone want to speak for

21   the defense with respect to that category?

22             MR. BAUER:  Your Honor, the government's argument is

23   pretty much the same for each of these.  There have been no

24   adverse credibility findings.  The underlying events are

25   irrelevant and would otherwise be prejudicial.

E81dchr2

1          (Pause)

2          MR. GREENFIELD:  Your Honor, if I might address some

3     of these witnesses?

4          I don't think we have enough information with regard

5     to some of these witnesses yet as to where we are going as to

6     credibility and their trustworthiness.  If it turns out during

7     the course of trial that one of these witnesses may have done

8     something in the course of this investigation which puts his

9     credibility and trustworthiness into question, then I think the

10    Court might want to reconsider any ruling it made now.

11         I would just ask the Court to hold in abeyance any

12    such ruling on any of these three witnesses until we proceed

13    further into the trial.

14         THE COURT:  These are motions in limine, and motions

15    in limine are always subject to reconsideration, you know, in

16    light of the testimony as it might develop at trial.  So that I

17    think goes without saying.

18         However, based on the government's proffer that the

19    officers that would be testifying here are merely witnesses,

20    and witnesses only to the extent that they were present before

21    Mr. Douglass left a particular event and did not otherwise --

22    or were not otherwise found to have provided any false

23    testimony and there was no adverse credibility finding as to

24    their testimony, I don't see why this would be fair ground for

25    cross-examination.  So the government's motion is granted with

E81dchr2

1   respect to this category of evidence.

2           MR. GOLTZER:  May I have one caveat, Judge, very

3   briefly?

4           THE COURT:  Sure.

5           MR. GOLTZER:  The government mentioned a no

6   credibility -- adverse credibility finding, and I accept their

7   representation.  If, however, the government learns that there

8   were statements given by any of these witnesses that were not

9   subjected to credibility findings, that were consistent with

10  the false statements made by the defendant in the case, then

11  that would be Brady and we should get it, because it would go

12  to the honesty and veracity of the witnesses who are testifying

13  here.

14          Am I clear on that?  Did I make myself clear?

15          THE COURT:  Are you saying that if Officer Douglass

16  provided a statement which was thereafter determined to be

17  false --

18          MR. GOLTZER:  Which was consistent -- which was

19  supported by other means, falsely, even though there were no

20  adverse credibility findings, we should get that.

21          THE COURT:  OK.  I don't know how you find that one

22  officer lied about a particular fact and other officers who

23  testified about it or gave evidence about the same fact

24  consistently did not lie.  So I guess I don't know that the

25  scenario that you propose is possible.

E81dchr2

1        MR. GOLTZER:  It is not unheard of for police officers

2   to falsely corroborate each other.  So the guy who was a

3   defendant filed a false insurance claim as to how the accident

4   occurred and one of the witnesses in this case falsely

5   corroborated his statement, even though there are no adverse

6   credibility findings, it would be a good faith basis for us to

7   impeach the officer with an act of dishonesty.

8        THE COURT:  OK.

9        MR. GOLTZER:  That's our <u>Brady</u> request, if they find

10  out about that.

11       THE COURT:  OK.

12       MR. BAUER:  I'm not sure it is <u>Brady</u> or if it is

13  <u>Giglio</u>, your Honor.  But we made reasonable efforts to get

14  information with regards to these events.  I'm not sure when

15  and how we might find additional statements by the officers,

16  but I will -- I absolutely agree with the fundamental premise

17  of Mr. Goltzer, which is that if we find anything regarding the

18  witnesses' credibility, statements that would otherwise allow

19  them to be impeached, then we will turn them over

20  expeditiously.

21       THE COURT:  OK.

22       MR. BAUER:  So moving on to number 4.

23       THE COURT:  Right.

24       MR. BAUER:  OK.  Number 4 does apply because Detective

25  Pete Frederick will be testifying.  Again, I will -- it is the

E81dchr2

1   same argument from the government.

2              THE COURT:  OK.  Gentlemen?

3              (Pause)

4              MR. BAUER:  Judge, maybe we can streamline this whole

5   process.  It is the same basic argument.

6              So the government, we would move your Honor to grant

7   our motion for numbers 4 in our motion.  Number 5 does not

8   apply because the officers involved -- or Officer Anthony

9   Guidice is likely not testifying.

10             Number 6.  Detective Steven Bunt is likely not

11  testifying, at least not as a government witness.

12             And then 7.  Number 7 does apply for Peter Frederick.

13             As I said, it does not apply for number 8.  That was

14  Anthony Guidice, as I had said.

15             And it does apply for number 9, Kevin Lahar.

16             The government would move the Court to grant the

17  government's motion to preclude cross-examination on the

18  subjects at issue.  And the government is happy to concede that

19  should defense counsel wish to revisit this, then they can at

20  any point as the particular officer's testimony nears.

21             THE COURT:  OK.  The government's motion is granted

22  with respect to all of those categories of cross-examination.

23             OK.  Next, 404(b).  Now, as I understand it, there are

24  two categories of 404(b).  One category the government, I

25  believe, asserts is not 404(b) evidence, really, but evidence

E81dchr2

1    of the underlying charges.  Is that correct?

2            MR. NAWADAY:  That's correct, your Honor.  I think it

3    is fairly clearly set forth in the government's papers that the

4    evidence of the robberies that we expect the cooperating

5    witnesses testify about, that these defendants participated as

6    well as the gun possession -- of the gun possession --

7    instances of gun possession by these defendants are all,

8    frankly, direct evidence of the charged conspiracy, the

9    narcotics conspiracy, as well as the 924(c) charges.

10           And the reason for that is, first, for the 924(c)

11   charge relating to carrying a gun in connection with narcotics

12   trafficking, we have to prove that these defendants carried

13   guns.  So the fact that we will have Mr. Baynes, for example,

14   who will be testifying about seeing a gun that Mr. Christian

15   carried, without being present, but Mr. Christian in carrying a

16   gun during a robbery of a drug dealer, those are all direct

17   evidence of the fact that Mr. Christian carried a gun in

18   furtherance of a drug transaction.

19           THE COURT:  Are those incidents within the time period

20   alleged in the Indictment?

21           MR. NAWADAY:  It is within the time period alleged

22   with respect to the 924(c) count as well as the time period

23   alleged with respect to the narcotics conspiracy count.

24           THE COURT:  OK.  Gentlemen?

25           MR. BUCHWALD:  There is one instance, your Honor --

E81dchr2

largely a couple, but one I would like to address first, which

has to do with what again is proffered testimony from a witness

by the name of Daniella Williams, who, as I understand it, will

testify that at some point Mr. Christian was extorting her for

the protection money so that he wouldn't hurt her son, who he

was angry at because her son had a white mother -- namely her.

And so she was threatened, I gather, by Mr. Christian to pay

$400 whenever she saw him.  And on one occasion she saw him and

he had a gun and he -- she asked, Why do you have a gun?  And

he then handed the gun to who the government claims is

Mr. Thomas.

        That's all we know from the 3500.  But it seems to me

it has nothing to do with anything except perhaps to show

propensity that sometimes Mr. Thomas has a gun.  They already

and separately tried to put in evidence about Mr. Thomas' gun

possession, the instance where Mr. Thomas has already been

convicted and sentenced by your Honor for gun possession in

February of 2011, which I'll separately address.  But certainly

if that was coming in -- and we don't think it should -- there

is no need for this, and all it does is show propensity.  It

has nothing to do with the underlying charges.  It is just,

"Wow, this guy has a gun."

        THE COURT:  Mr. Nawaday, with respect to that

particular incident?

        MR. NAWADAY:  Your Honor, with respect to that

E81dchr2

1   particular instance, we still submit that it is direct evidence

2   of the possession of a firearm in furtherance of a drug

3   conspiracy because it shows -- because Ms. Williams will also

4   testify that she saw the defendant dealing drugs during this

5   time period.

6              MR. BUCHWALD:  Christian.

7              MR. NAWADAY:  Christian.

8              MR. BUCHWALD:  Not Thomas.

9              MR. NAWADAY:  Right.  But we can't separate out the

10  facts of what actually happened and pretend that your client

11  wasn't there.  She has to testify honestly about who was there.

12  That is number one.

13             And number two.  It also proves -- it goes towards the

14  404(b) line of argument.  It shows identity.  It shows

15  something offered for propensity.  It shows that Mr. Christian,

16  "Reckless," and Mr. Thomas know each other.

17             THE COURT:  OK.  I think that that can come in as

18  evidence of the government's case in chief as to the charged

19  gun count.  So the government's -- or, rather, the defendants'

20  motion in that regard is denied.

21             Now, what about the actual 404(b) evidence?  Talk to

22  me about Thomas' crack sales from 2007.  Isn't that -- why

23  should those come in?

24             MR. STRAZZA:  Your Honor, I don't mean to interrupt,

25  but before we move on from all of the evidence of the prior

E81dchr2

1    uncharged crimes, are we separating it between that and the

2    404(b) stuff?  How do you want to address that?

3              THE COURT:  The government indicates that some of the

4    crimes that have been referred to as 404(b) are actually direct

5    evidence of the charges in the Indictment.  So I want to

6    separate those out.  And it appears to me, based on the

7    submissions that have been made, that the government has

8    established that those arguably are direct evidence.

9              MR. STRAZZA:  So I guess I'll just note my objection

10   to that.  I wanted -- the government made a submission last

11   night --

12             THE COURT:  OK.

13             MR. STRAZZA:  -- with respect to specific instances

14   and --

15             THE COURT:  So go ahead.  Absolutely.  Make your

16   record.

17             MR. STRAZZA:  With respect to all of the incidents in

18   general, we submit that the prejudicial effect outweighs the

19   probative value.  But with respect specifically to incidents

20   number 4, 5, 6, 7 and 8, we submit that the reasons the

21   government provided -- namely, four reasons -- are not met.

22             And I guess we can go one by one, if you want, or I

23   can --

24             THE COURT:  Please.  Absolutely.

25             MR. STRAZZA:  OK.  So with respect to incident number

E81dchr2

1    4, it notes that Mr. Christian went with at least three others

2    to rob an individual named Smurf and then when the victim

3    refused, one of them, who was not Mr. Christian, shot at him, I

4    don't see how that would go towards any -- to establish any

5    narcotics conspiracy.  I don't see how the firearm in question

6    there relates to any narcotics conspiracy.  It's not Giglio

7    material for any of the witnesses who are going to testify at

8    this trial.  And I don't see how it establishes a relationship

9    between any of the co-conspirators here.

10             THE COURT:  OK.  Mr. Nawaday.

11             MR. NAWADAY:  Yes, your Honor.  With respect to each

12   of these shootings, first, again, these are instances in

13   which -- through, actually, I believe it is the testimony of

14   Mr. Baynes, because he was present and was told about these by

15   Mr. Christian -- actually, I think he was present at most of

16   these shootings, so it goes to the fact that Mr. Christian

17   possessed a firearm during the period that he was trafficking

18   in narcotics.  So that's number one.  That's why it's direct

19   evidence.

20             Two.  On the prejudicial point.  There is nothing more

21   prejudicial about these specific instances and these

22   shootings -- if anything, they are less prejudicial than the

23   facts of the present case.  So, for instance, one, there is a

24   fight -- and this is instance number 5 on page 3.  There is a

25   fight at a party.  He pulls out a gun and shoots in the air.

E81dchr2

1            And, third, this is <u>Giglio</u> with respect to Mr. Baynes.

2    He's present at these shootings.  He's there while it occurs.

3    And, also, it also shows the mutual trust between the

4    cooperating witness and Mr. Christian.  It shows how they know

5    each other.  It shows they trust each other, enough that

6    Mr. Baynes is right next to Mr. Christian during shootings.

7    And Mr. Christian trusts Mr. Baynes to be next to him.  And

8    that -- frankly, that's part of their history.  That's why they

9    trust each other.  They don't just show up on the day of the

10   murder of Mr. Henry to suddenly first meet and suddenly engage

11   in a very serious crime.

12            THE COURT:  OK.

13            MR. STRAZZA:  And I just want to be clear.  Is it the

14   government's position that Mr. Baynes was present during each

15   and every one of the instances that I specifically mentioned?

16            THE COURT:  I don't know.

17            Mr. Nawaday.

18            MR. NAWADAY:  From my recollection -- I can confirm

19   this -- that he was there for number 5, for number 6, number 7,

20   number 8 --

21            MR. STRAZZA:  The only one I mentioned was number 4.

22            MR. NAWADAY:  Number 4, I would have to check.  That

23   may be one in which it was relayed to Mr. Baynes by

24   Mr. Christian as an admission of what had occurred.

25            THE COURT:  OK.

E81dchr2

1          MR. STRAZZA:  One final point, your Honor.  I won't

2     beat a dead horse.  But it is our position that just because

3     Mr. Christian -- or it may show that Mr. Christian had a

4     firearm at this specific period in time, it has nothing to do

5     with the facts, as I see them here, it has nothing to do with

6     any involvement in a narcotics conspiracy, and I think there

7     has to be a nexus there for the 924(c) count.

8          MR. NAWADAY:  Your Honor, it is one of the elements

9     that he possessed a gun in furtherance of a narcotics

10    conspiracy, absolutely.  Our other proof will show that during

11    this time period he was dealing drugs.  So I think this is

12    evidence that tends to show that he possessed a gun and it was

13    in furtherance of his narcotics conspiracy.

14          In addition, I believe some of these -- the instance

15    number 8 on page 3 relates to a shooting or shot in the air of

16    another rival drug dealer.

17          THE COURT:  OK.  So I do grant the government's motion

18    that these incidents can come in in their case in chief as

19    direct evidence of the charges in the Indictment.

20          Mr. Buchwald.

21          MR. BUCHWALD:  Your Honor, they proffer evidence of a

22    robbery of someone at a dice game.  I forget who it is to be

23    elicited from.

24          That's number what?

25          MR. NAWADAY:  13.

E81dchr2

| | |
|---|---|
| 1 | MR. BUCHWALD:  Number 13.  And I don't know what it |
| 2 | has to do with other than I guess it shows that he has a gun. |
| 3 | Is that what it is offered for?  To show propensity to have a |
| 4 | gun? |
| 5 | It has nothing to do with narcotics.  Nothing to do |
| 6 | with -- unless the dice game is going to involve interstate |
| 7 | commerce.  I doubt it. |
| 8 | MR. NAWADAY:  Your Honor, again, it's to prove that he |
| 9 | did possess a gun during the conspiracy period.  We will have |
| 10 | other evidence that he was a drug dealer during that period. |
| 11 | In addition, under a 404(b) analysis, it shows |
| 12 | identity insofar as it's at the direction of one of the |
| 13 | co-conspirators in the charged murder conspiracy. |
| 14 | James Williams is L-1.  He's the individual who |
| 15 | directed Thomas and Tyrell Whitaker to go to the cooperating |
| 16 | witness Jamar Mallory and Kevin Burden to get guns the night of |
| 17 | the shooting of Mr. Henry. |
| 18 | THE COURT:  OK.  Very well.  That also will be |
| 19 | admitted. |
| 20 | I have to run upstairs because there is a flurry of |
| 21 | notes from the jury, unfortunately. |
| 22 | Is it possible to keep the defendants here? |
| 23 | THE MARSHAL:  Yes, your Honor. |
| 24 | THE COURT:  I do apologize. |
| 25 | (Recess) |

E81Qwhi3

1          THE COURT:  Where were we?  Did anyone else wish to

2     speak with respect to the so-called 404(b) evidence that the

3     government is alleging can come in under as evidence of its

4     case in chief?

5          MR. GOLTZER:  I have a matter if everybody else is

6     finished.

7          THE COURT:  I'm sorry?

8          MR. GOLTZER:  If everyone is finished, I have a matter

9     to discuss.

10          MR BUCHWALD:  There are other pieces.

11          THE COURT:  Right.  So if anyone else wishes to be

12     heard, I'm happy to hear you.

13          MR. GOLTZER:  Your Honor may recall when we were

14     litigating the adult/juvenile litigation, there was an open

15     case of misdemeanor possession of drugs against Mr. Whitaker,

16     and I have a laboratory report.  He was arrested on August 12

17     of 2010 with six glassine envelopes of heroin, according to the

18     laboratory report, item 2A.1 is one glassine envelope of heroin

19     with one one-thousandth of a gram.  Now, a gram is one

20     Sweet-N-Low pack.  So this is one one-thousandth of a

21     Sweet-N-Low packet, and there were six of those.  Mr. Whitaker

22     is not charged with a narcotics conspiracy, nor could he be.

23     He is not alleged to have done this with anyone, and prejudice

24     substantially outweighs any probative value of his possession

25     of an amount of heroin that is absolutely consistent with

E81Qwhi3

1     misdemeanor personal use.

2            If your Honor likes, I will hand up the -- so it does

3     nothing but paint him as either an addict or a dealer when he's

4     not charged with a drug conspiracy, and, most critically, there

5     is nothing in this particular arrest that would lead anyone to

6     believe that it was concerning activity on that date as opposed

7     to his own individual possession.  So there is really nothing

8     that this does except bring out his propensity and prejudice

9     him in the context of this particular case.  So I think the

10    application to admit it should be denied.

11           THE COURT:  Is there an application to admit that

12    evidence?

13           MR. GOLTZER:  It was mentioned in the memorandum.

14           MR. NAWADAY:  Yes, your Honor, there is.  I think the

15    broader point, which I'd like to start with, and I think

16    Mr. Goltzer is making is the fact that Mr. Whitaker is not

17    charged in a narcotics conspiracy.  He is not.  In fact, he

18    cannot be charged in the narcotics conspiracy as charged in

19    this indictment because a juvenile can't agree to do something

20    with somebody else.

21           THE COURT:  OK.

22           MR. NAWADAY:  That said, an element of the 924(c) drug

23    count, basically the 924(c) possession of a firearm in

24    furtherance of a drug conspiracy charge, in that count

25    Mr. Whitaker is charged and can be charged.  One of the

E81Qwhi3

1    elements is proving that he carried a gun -- we have to prove

2    that he carried a drug in furtherance of drug conspiracy.  So

3    we do have to present evidence in order to prove the 924(c)

4    drug count against Mr. Whitaker that he was carrying a gun in

5    furtherance of a drug conspiracy.  So we do have to present

6    evidence that Mr. Whitaker was dealing drugs during the

7    conspiracy period.

8                Our evidence will show that -- and we are planning to

9    introduce that specific instance of the conduct relating to

10   Mr. Whitaker's possession of heroin.  Cooperator will testify

11   that they had seen Mr. Whitaker selling both crack cocaine and

12   heroin during the charged conspiracy period.

13               THE COURT:  When did this incident take place?

14               MR. NAWADAY:  That incident took place, I believe, in

15   2010, which is within the conspiracy period of the narcotics

16   conspiracy and the period in which it is alleged that

17   Mr. Whitaker possessed a firearm in furtherance of a narcotics

18   conspiracy.  That period is 2008 to 2012.

19               MR. GOLTZER:  I just wanted to alert the Court to an

20   issue that we are going to be researching over the weekend.  I

21   am unaware of any evidence -- and I've mentioned this to the

22   government.  Having reviewed the 3500 material, I am unaware of

23   any evidence at all that Mr. Whitaker allegedly possessed a

24   weapon other than the weapon that he allegedly possessed during

25   the robbery on December 15.

E81Qwhi3

1          If that is the case, there would be concurrent counts,

2     number one, and there should be an election made.  We're not up

3     to that Rule 29 motion.  But the count as alleged, and the

4     statute as written, requires that the narcotics conspiracy,

5     which is involved with the alleged possession of the weapon, of

6     the 924(c), be one that is chargeable in a federal court.

7     Mr. Whitaker is not chargeable.  Now, I have to determine -- we

8     have to determine over the weekend whether the conspiracy is

9     the conspiracy or the defendant that has to be chargeable.  We

10    are going to take the position that it's the defendant.  So

11    because Mr. Whitaker is not chargeable, we don't think that

12    924(c) count can stand, and we will have more to say about it.

13    If that count falls, clearly, this shouldn't come in.  If the

14    count doesn't fall, then I know what the Court's ruling is

15    going to be over my objection.

16          THE COURT:  Correct.

17          MR. NAWADAY:  I will leave what Mr. Goltzer just said

18    to the side, but, in addition, the evidence of Mr. Whitaker's

19    narcotics trafficking during the period 2008 to 2012 is also

20    relevant to show his relationship with the other defendants and

21    co-conspirators in the case.  The evidence will show that

22    Mr. Whitaker was dealing drugs, crack cocaine and heroin, with

23    certain of the other co-conspirators and cooperating witnesses

24    in the various areas of Newburgh that will be the subject of

25    the evidence of the case.

E81Qwhi3

1          MR. GOLTZER:  Of course, this particular incident

2     involving a miniscule amount of heroin in somebody's pocket

3     doesn't do that at all because there is no allegation that

4     anybody else was involved.  I just wanted to make that clear

5     for the record.

6          THE COURT:  It also raises an issue that I -- I don't

7     know if the parties have given any thought to, but whether

8     there should be some sort of limiting instruction when some of

9     this evidence comes in concerning Mr. Whitaker.

10          MR. GOLTZER:  Well, there should be limiting

11     instructions I think when the evidence -- the jury should be

12     told very clearly that Mr. Whitaker is not charged with being a

13     member of a narcotics conspiracy.  The government is offering

14     it for limited purposes and the government should propose what

15     those exact limiting purposes are.  In addition, there should

16     be a limiting instruction, for example, if the Court is

17     permitting evidence of other crimes of violence or gun

18     possessions by co-defendants of Mr. Whitaker, that is 404(b)

19     evidence and not evidence of a conspiracy, we would request an

20     instruction that the jury be told this evidence is not

21     admissible against Mr. Whitaker.  I assume other defendants

22     might have the same request at appropriate times.

23          THE COURT:  Right.  I would ask the defense to provide

24     me with proposed limiting instructions along those lines.

25          MR. NAWADAY:  Your Honor, unless there are other

1    instances --

2               MR BUCHWALD:  We've stated our objections in the

3    letter including the 2007 drugs, the gun possession for which

4    he was convicted, and that arises out of February 28, 2011, so

5    we are not conceding those.  We think all it does is show

6    propensity.

7               MR. GOLTZER:  I had raised the same issue with respect

8    to a robbery that Mr. Whitaker allegedly committed in late

9    2010.  I put it in my letter raising an objection under 403.

10   It's on page 3.  I spoke to the government about this not too

11   long ago.  As I read the 3500 material, I had only noticed

12   reference to this particular act in one cooperator's 3500

13   material.  The government advised me that it was, in fact, in

14   two cooperators' 3500 material.  I could be wrong.

15              My recollection -- and, again, it was a quick perusal

16   of that particular witness -- and there is a point I'm making.

17   Under the Supreme Court's decision in *Huddleston v. The United*

18   *States*, before the government can introduce evidence such as

19   this, there has to be a rational basis, at least by a

20   preponderance, for which a jury could find that it actually

21   happened.  My recollection of the 3500 material -- and maybe

22   the government wants to make a proffer to contradict it -- is

23   that it is claimed that Mr. Whitaker made a phone call to set

24   somebody up, and then it was the other person who ripped him

25   off.  And from my reading of the 3500, I wasn't prepared to

admit a sufficient foundation under *Huddleston* because it

seemed very, very thin.  Now Mr. Bauer may have more

information.

MR. BAUER:  Your Honor, just to add clarity to that.

Both Mr. Mallory and Mr. McDermott.

THE COURT:  I'm sorry, both Mr. Mallory and?

MR. BAUER:  Mr. McDermott are going to testify about a

robbery that Tyrell Whitaker did with Kevin Burden at 260 First

Street in late 2010 where they called an ecstasy dealer from

Newburgh, invited him over to the house under the guise that

there was going to be -- they were going to buy some ecstasy;

and when he got there, both Mr. Burden and Mr. Whitaker

physically assaulted him, stealing approximately 150 ecstasy

pills.  They then split up the ecstasy pills, and Kevin Burden

actually sold those ecstasy pills to Jamar Mallory for Mallory

to resell while Whitaker took his -- presumably to resell, but

I don't think we actually know what he did with them.  We did

assume a large quantity, 75 or so ecstasy pills, are greater

than personal use.  That's the evidence we're talking about.

It's far from thin.  We have two cooperators who are going to

testify almost identically on the incident.

MR. GOLTZER:  If the proffer is accurate, then under

*Huddleston* it comes in, but I didn't see that in the 3500

material.

THE COURT:  Very well.  Anything else?

E81Qwhi3

| | |
|---|---|
| 1 | MR. BAUER:  Judge, just to be clear, what we still |
| 2 | have left to do, it sounds like for Tyrell Whitaker, it sounds |
| 3 | like the way we left it is Mr. Goltzer is going to do some |
| 4 | research over the weekend, but unless we hear otherwise from |
| 5 | Mr. Goltzer, are we all concluding that the evidence of |
| 6 | Mr. Whitaker's drug trafficking comes in or did I miss that? |
| 7 | THE COURT:  Well, the Court's ruling is that it comes |
| 8 | in.  Again, this is all subject to revisiting. |
| 9 | MR. BAUER:  Then I think the -- |
| 10 | MR. GOLTZER:  Does that include the one-thousandth of |
| 11 | a gram of heroin? |
| 12 | THE COURT:  It does. |
| 13 | MR. BAUER:  So, I think that leaves the Glenn Thomas |
| 14 | 2007 crack sales, which I think Mr. Nawaday can speak to. |
| 15 | THE COURT:  OK. |
| 16 | MR. BAUER:  And I believe the only other thing is |
| 17 | Mr. Goltzer had raised an argument about participation, the |
| 18 | defendant's participation in various Newburgh gangs. |
| 19 | THE COURT:  OK. |
| 20 | MR. NAWADAY:  Your Honor, this evidence of Glenn |
| 21 | Thomas' crack sales from 2007, they are outside the conspiracy |
| 22 | period that is charged, so it would have to come in under Rule |
| 23 | 404(b).  Our argument of why it should come in is set forth on |
| 24 | page 6, for example, of our reply papers.  In brief, that |
| 25 | evidence shows that Glenn Thomas had an opportunity to have |

knowledge of how to deal crack cocaine and about the specific

areas in Newburgh where crack cocaine was typically sold.

Those purchases of crack cocaine that we want to prove up in

2007 occurred in and around these same areas that we will have

evidence showing that crack sales were done in Newburgh during

the conspiracy period.

THE COURT:  Let me ask you this, Mr. Nawaday.  I mean,

I don't know the evidence in this case.  I haven't seen the

3500 material.  Do you, strictly speaking, need this?  Isn't

there going to be -- it sounds like there is going to be plenty

of evidence from plenty of cooperators that Mr. Thomas during

the periods actually alleged in the indictment sold drugs,

stole drugs, etc.

MR. NAWADAY:  To be fair, your Honor, there will be

evidence during the conspiracy period from cooperators saying

that Glenn Thomas sold drugs in these specific areas of

Newburgh, but it is the government's burden, and, frankly, we

like to have as much evidence as we can.  We think that under

Rule 404(b) such evidence of other crack sales that occurred in

a similar area of Newburgh by Mr. Thomas just one year before

shows his knowledge and opportunity and his intent to deal in

crack cocaine in those areas during the charged conspiracy

period.

THE COURT:  I know that I got a letter from one of the

defense lawyers who -- and I don't know whether it was

E81Qwhi3

1   Mr. Thomas' lawyer, I don't remember offhand -- who said "To be

2   clear, there will be no defense based on the various areas for

3   which 404(b) can be admitted."

4           Was that you, Mr. Buchwald?

5           MR BUCHWALD:  Yes.

6           THE COURT:  Are you Mr. Thomas' lawyer?

7           MR BUCHWALD:  Yes.

8           THE COURT:  Now, in light of that proffer,

9   Mr. Nawaday, I think that what I will do with respect to that

10  line of inquiry, I will deny it without any prejudice to the

11  government to revisit at the appropriate time.  So you should

12  not open on that topic.

13          MR. BAUER:  Absolutely, your Honor.

14          I think the next matter is the gang affiliation.

15          THE COURT:  OK.

16          MR. NAWADAY:  I think we set that forth in the

17  admissibility of gang association/affiliation in our papers.

18  It goes to the history and relationship between these

19  defendants and the cooperating witnesses in the case.  That's

20  how they know each other, that's how they trust each other, and

21  for those reasons, we do believe that it is admissible.

22          In addition, the cooperating witnesses will have to

23  testify about their own gang affiliation.  So we will have to

24  draw that out in our direct examination, as we are allowed to

25  do, to pull the sting on any Giglio.

E81Qwhi3

1              MR. GOLTZER:  We take a different position.  Perhaps

2    the best argument that it shouldn't come in is the fact that

3    Mr. Christian is not alleged to be a Blood.  He's alleged to be

4    in a different group.  So there is no concerted gang activity

5    which is part and parcel of the indictment in this case.  There

6    was no robbery or shooting because of gang situation.

7              The government has already proffered substantial

8    evidence that these people knew each other.  There is going to

9    be a lot of testimony about how they knew each other.  There is

10   going to be drug dealing testimony about how they knew each

11   other.  There are going to be -- the Court's ruled on a tape

12   that show how they know each other.

13             Gang evidence is extraordinarily inflammatory because

14   jurors have preconceived notions about gang activity that isn't

15   necessarily accurate and that is inflammatory.  The cases we

16   cited where gang evidence was admitted had to do with violent

17   actions induced by the membership in a gang.  The other

18   circuits routinely held that your membership in a gang didn't

19   mean that you were more inclined to commit a crime as an

20   accomplice with somebody else in the gang.

21             That's not this case.  This case is entirely

22   different.  And the fact that their witnesses may or may not

23   have been in a gang shouldn't impact upon our clients.  They

24   are entitled to a fair trial under different rules of evidence.

25             If their witnesses committed acts or have a status --

E81Qwhi3

1    by the way, I don't think that their witnesses' mere membership

2    in a gang is something that ought to come out to impeach them.

3    I don't care if he's a Blood or a Crip or a Latin King.  People

4    join gangs for a variety of reasons.  If they committed immoral

5    and vicious acts as members of a gang because they were in a

6    gang; for example, if a gang said we're having a fight with

7    MS13 on First and Landers Street, that should come in.  But

8    absent that, we have a robbery charge, we have gun charges,

9    there are discrete charges that have nothing to do with a gang.

10   And to introduce the evidence of a gang based upon the

11   authorities we've cited in my memorandum, we are denied then a

12   fair trial and due process.

13            MR BUCHWALD:  Your Honor, in that regard, if I might,

14   I believe the government concedes that Mr. Thomas was not a

15   Blood.  He was a Crip or associated with Crips at the time, for

16   example, of the 2007 cocaine sales that are now excluded.  He's

17   wearing Crip uniforms, Crip regalia.  He is in jail then from

18   that time, except the three days, straight through until

19   September of 2010, right?  So, he's in jail from 2007 to

20   September of 2010 except for two days in March of 2008.  He is

21   then in jail again from February 28 of 2011 for the gun charge

22   until today.  The only time he is not in jail is from September

23   of 2010 to February of 2011, at least at the beginning of which

24   we know he's a Crip and not a Blood.

25            Now they say he switched.  He became a Blood, and that

E81Qwhi3

anyway Crips and Bloods get along great, and they deal drugs

together.  It really makes no difference if he's a Crip or if

he's a Blood.  He's either in dealing in drugs with these

people or he's not, and all of these labels -- Crip or Blood or

associated with what Crips do -- is prejudicing the jury, so

that from day one, when they hear this in the opening, these

guys are Bloods, our guys are way behind the eight ball, and I

think it deprives them of a fair trial unnecessarily. this is

not an enterprise case.

THE COURT:  I'm sorry, this is not a?

MR BUCHWALD:  This is not an enterprise case.  They're

not claiming that this was a Blood-induced-kind-of-thing; that

they're doing this for the community of the Bloods and the

proceeds are going to support all the Blood activities as

occurs in the Latin King cases or the Bloods cases that your

Honor may be familiar with from White Plains.  There, the

notion was that the proceeds, the beneficiaries are the whole

group.  This has nothing to do with that.

THE COURT:  Let me ask, does the government alleged

that Mr. Thomas was at one point a Crip and one point a Blood?

MR. NAWADAY:  Yes, your Honor.  That's part of the

proof.  That is going to be part of the testimony.

THE COURT:  What about with respect to Mr. Christian,

was he part of more than one gang over the period of the

indictment?

E81Qwhi3

1          MR. NAWADAY:  He is.  We will be eliciting, we intend

2     to elicit, if allowed to, evidence from Mr. Baynes that

3     Mr. Christian was a member, a founding member of a gang called

4     Star Status and was friendly with the Bloods.  Mr. Baynes was a

5     member of Star Status.

6          And to Mr. Goltzer's point that the charged conduct

7     had nothing to do with gang activity, we anticipate that

8     Mr. Baynes will testify that part of the reason the motive for

9     the stash house robbery at 54 Chambers Street was that

10    Mr. Christian wanted a way for Star Status, the members of Star

11    Status to get some quick money and drugs so that they could

12    sell more drugs on Deboise Street in Newburgh.

13         So, the whole gang-affiliation proof is inextricably

14    intertwined, we believe, with the direct proof in this case

15    both as to the relationship between our witnesses and the

16    defendants and also how the crime came about that is charged.

17         THE COURT:  So Mr. Christian is not alleged to be part

18    of any gang other than Star Status?

19         MR. NAWADAY:  Star Status, and I believe Mr. Baynes

20    will testify that before that, they were part of another gang

21    called Black Flag.

22         THE COURT:  Black Flag?

23         MR. BAUER:  Black Flag.  And then they were friendly

24    with the Bloods that Mr. Christian hung out often with James

25    Williams, another Blood.  There is also going to be evidence,

E81Qwhi3

we expect and testimony from Ramon McDermott, and part of his

testimony is hearing admissions from certain of the defendants

that were made at Bloods' meetings.

So that fact, the fact that these are Bloods'

meetings, we don't see how that can be separated out from the

direct proof of a conspiracy and our direct proof in the case.

THE COURT:  What about with respect to Mr. Whitaker?

Is he alleged to have been a member of a gang?

MR. NAWADAY:  Yes, he was initially an @Ashoe Bandit

and we will have we expect testimony from David Evans that

Mr. Whitaker was an @ash shoe Bandit, and afterwards

Mr. Whitaker became a Blood with Mr. Evans.

THE COURT:  Given the fluid nature of the membership

of each of these defendants in these various gangs, how

important can that affiliation be?  They are going from one

gang to another and forming different alliances.  It doesn't

seem as though gang affiliation was a particularly strong

factor in their criminal activity.

MR. NAWADAY:  Your Honor, I respectfully disagree.  It

was because some of the acts we are seeking to admit, for

example, I believe one of the shootings that Mr. Baynes will

testify about with respect to Mr. Christian, it related to a

Crip who they were beefing with, that Star Status was beefing

with at the time.  So it wasn't so fluid that gang affiliation

didn't matter.

E81Qwhi3

1          Plus, the gang affiliation point goes to the mutual

2     trust among all of these people.  For example, we expect

3     testimony from Mr. Evans and Ms. Williams, who is part of a

4     group called 550.  550 means that you're not a Blood, but

5     you're friends with the Bloods, and Ms. Williams was a close

6     friend with the Bloods.

7          Both Ms. Williams and Mr. Evans will testify about

8     being in Bloods' controlled areas of Newburgh, in close

9     proximity to, for example, Mr. Whitaker, and seeing

10    Mr. Whitaker deal drugs.  The only way that they're allowed to

11    be there is because of the gang affiliation.  Just you and I

12    can't be there.  We'd be kicked out.  But it's because of that

13    affiliation that they're allowed to be there, and that's why

14    it's important to tell the entire story of what occurred in

15    this case.

16          MR. GOLTZER:  You know, if Mr. Christian's alleged

17    motive was to get money for a group that Mr. Thomas and Mr.

18    Whitaker weren't members of, then the Court is absolutely

19    right, the conspiracy is either an agreement among these three

20    people to commit a particular crime, or not.  They either went

21    to Chambers Street and did particular criminal acts or they

22    didn't.  They either committed acts because they knew each

23    other or they didn't.

24          The fact that they're gangs is hardly central or

25    probative.  In other words, the prejudice substantially

E81Qwhi3

1     outweighs the probative value.

2           If What they want to do is call a witness, for

3     example, to talk about Newburgh is the cesspool of gang

4     activity with discrete territories, then they're going to be

5     convicted before we even get to the evidence and the crimes

6     that are alleged.

7           THE COURT:  When Mr. Henry, was it, was shot, were

8     these three guys in the same gang?

9           MR. NAWADAY:  At that time, Mr. Christian was in Star

10    Status which was friendly with the Bloods.  Mr. Whitaker and

11    Mr. Thomas were in the Bloods.  In addition, we believe the

12    evidence is going to show that before the robbery,

13    Mr. Christian and Mr. Baynes went to see James Williams, L1,

14    who was a leading member of the Bloods at the time, and L1

15    assisted them in recruiting more robbers, who were other Bloods

16    who included Mr. Whitaker and Mr. Thomas.

17          THE COURT:  Can the story of this conspiracy and these

18    crimes be told without reference to the gang affiliation?

19          MR. NAWADAY:  Your Honor, I think it is almost

20    impossible to tell that story because the way these people know

21    each other is through their gang affiliations.

22          MR. GOLTZER:  They know each other through living in

23    the same neighborhood.  It's very easy for a group to know each

24    other because of that.  Mr. Whitaker and these guys knew each

25    other from the neighborhood.  They grew up together.  They

1    lived in the same area.  They hung out with the same people.

2    That's why they trusted and knew each other.  It's not

3    complicated.

4          MR. NAWADAY:  And to that, your Honor, again, I don't

5    think that it can be that we can't go into our witnesses' gang

6    affiliation.  I mean, it would be dishonest not to do that.

7    That is how our witnesses know these people.  Our witnesses are

8    going to testify about their gang affiliation.  The jury is

9    going to be left with this impression that somehow these Bloods

10   were with these random people committing crimes.

11         THE COURT:  OK.  I am very troubled by the extent to

12   which the gang affiliation will need to be discussed, but I do

13   believe that the government is entitled to elicit this

14   testimony.

15         So the defendant's motion will be denied, the motion

16   to preclude the defendants' affiliation with the Newburgh gangs

17   during the time that they allegedly committed the charged

18   crimes.  I find that such evidence may provide relevant context

19   for the relationship between the co-defendants, and I do find

20   that in the context of this case the probative value outweighs

21   its potential prejudicial effect.  And, moreover, there is some

22   portion of the government's argument that because the

23   cooperating witnesses will be testifying about their gang

24   affiliation, it is and does constitute Giglio material.  So

25   although it is a close case, I will deny the defendant's

E81Qwhi3

1    motion.

2            What remains, the motion to preclude the expert

3    testimony by Mr. Meyers.

4            MR. GREENFIELD:  Yes, your Honor.  Rule 16(g) was

5    specifically enacted because on occasion an expert's testimony

6    carries great weight.  The rule said that we're entitled to

7    receive notice of the witness' testimony along with a written

8    synopsis of what the testimony would be and a copy a CV.

9            The government told me on June 2 of this year that we

10   would be getting a CV a day or two after June 2.  We didn't

11   receive that CV until July 28, this past Monday.  It provides

12   very little information.

13           THE COURT:  It's a very spare CV.

14           MR. GREENFIELD:  To be honest, the CV that I received

15   for the medical examiner's testimony was five or six pages and

16   quite impressive.  I need to at least conduct some

17   investigation into the proprieties witnesses himself being

18   offered as an expert, and I need to have more of a written

19   notice as to what his full statement will be; not just his

20   conclusions that are contained in the reports dated January 21,

21   January 31, and July 7 or 8, all of 2011.

22           THE COURT:  Presumably, all he will testify to is

23   those conclusions, correct?

24           MR. GREENFIELD:  Well, which tests he conducted, what

25   were the circumstances of the tests.  Did he do the cuttings?

E81Qwhi3

1    Did he do the swabbings?  Those all come into question in this

2    case, Judge.

3            I would like, if the Court allows, not today, maybe on

4    Monday, I would like to present to the Court ex-parte a basis

5    for what I am saying now which would be a significant part of

6    our defense at trial, and I don't want to go into it in front

7    of the government.  It involves defense strategy.

8            THE COURT:  I am happy to review whatever you want to

9    put before me.  I will be a little busy Monday, but as soon as

10   I can get to it, I will.

11           Let me ask you this, Mr. Greenfield:  Did the

12   government provide you with the report and with the notice of

13   the expert witness within the time period called for by the

14   rules?

15           MR. GREENFIELD:  I'm sorry, Judge?

16           THE COURT:  Did the government provide you with the

17   information that they were required to provide in a timely

18   basis?

19           MR. GREENFIELD:  I'd say no.  I mean, I've gotten the

20   reports and the conclusions of this particular witnesses.  I

21   think the witness should also conclude in his report "I did the

22   following tests, I took the following procedures to get to my

23   conclusions."  And, no, they didn't provide that.  What tests

24   they did; under what circumstances they did it; did they do the

25   cuttings; were they done in a laboratory, or were they done

E81Qwhi3

1    elsewhere?  Those are issues that I think are now open based on

2    the 3500.

3              THE COURT:  OK.

4              MR. GREENFIELD:  So I would at least ask the Court not

5    to preclude testimony.  That's really not what I'm seeking.

6    I'm truly seeking, your Honor, to push back in time so I can

7    investigate the proprieties of his report, as well as consult

8    with my expert based on recently found information in the 3500.

9              THE COURT:  Mr. Nawaday, I saw the CV, so-called.  It

10   was more of a synopsis of a résumé.  What happened here?

11             MR. NAWADAY:  Your Honor, first, insofar as the CV, we

12   provided it when we received it.  Second, we do think the CV is

13   sufficient to show what our expert, Mr. Meyers', credentials

14   are.  I think the difficulty that -- or what Mr. Greenfield's

15   pointing out is the reason it's sparse is because he's been

16   working at the same place for the past 14 years.  Our expert

17   has been working at the New York State Police Laboratory for 14

18   years.  12 of those years -- and it's set forth on his CV -- 12

19   of those years he was a forensic scientist and DNA analyst.

20             We've supplemented what he was doing during that time

21   in our reply papers.  He's reviewed and analyzed DNA from

22   numerous items in hundreds of cases in his career.  We set

23   forth that on page 7 of our reply papers that were filed -- it

24   was filed last night.

25             So, respectfully, I think the CV does set forth

E81Qwhi3

1    sufficient detail about what his credentials are.  For the past

2    12, years he's been a forensic scientist and DNA analyst at the

3    New York State Police Laboratory conducting DNA analysis at an

4    accredited facility.

5         THE COURT:  I suppose at a very sort of general level,

6    it says what he's been doing for the last 14 years, but as I

7    recall, there were like four or five lines to his CV, correct?

8         MR. NAWADAY:  Your Honor, there was more than that.

9    Again, Rule 16 doesn't speak to how extensive the credentials

10   have to be.  I think it has to just set for what they are and

11   what his educational background is.

12        THE COURT:  But, for example, it doesn't indicate what

13   his duties involve, what types of examinations he conducts.

14   There may just be one kind -- I don't know.  I don't know the

15   answer.  But certainly having read his CV, I was still up in

16   the air as to what he would exactly testify to, but there is

17   some additional detail that is provided in the letter that was

18   submitted yesterday.

19        MR. NAWADAY:  Insofar as what he testified to, that's

20   a separate question, your Honor.  We provided these laboratory

21   reports in 2012.

22        THE COURT:  Right.

23        MR. NAWADAY:  Almost two years ago.  So they know

24   this -- and these were laboratory reports that this witness

25   prepared.  In addition to that, we provided all the underlying

E81Qwhi3

1   data and DNA files to the defense in March of this year at

2   their request.  So, they've had the data, which, frankly, I

3   think was thousands of pages of materials, which included the

4   data from the equipment that was used to do the testing in this

5   case.  So they have the substance and bases upon which this

6   witness will be opining in court when we call him.

7            So, to that extent, we have provided the substance, a

8   great summary of what he is going to be testifying about, his

9   conclusions, and the basis for his conclusions.

10           I understand, you know, Mr. Greenfield's point that

11   the CV came this week, but it's there, and I think it

12   sufficiently shows was his credentials are, and he can voir

13   dire the witness when the witness testifies.

14           THE COURT:  When do you propose to call Mr. Meyers if

15   you are in a position to say.

16           MR. NAWADAY:  Your Honor, we were hoping to call him

17   this Thursday -- not this Thursday, I apologize -- the coming

18   Thursday, which is August 7, and we have made travel

19   arrangements for him, understanding that if things get delayed,

20   then he will have to come the following week.

21           THE COURT:  OK.

22           MR. NAWADAY:  But he will not be one of the first

23   witnesses.  He will actually come after --

24           THE COURT:  But he will be in the first week?

25           MR. NAWADAY:  We are hoping he is in the first week.

E81Qwhi3

1    We are hoping he will come after the first two cooperators.

2              THE COURT:  OK.

3              MR. GREENFIELD:  Your Honor, I would ask the Court to

4    impose upon the government to push him back in point in time to

5    give me an opportunity to conduct whatever investigation my

6    investigator can conduct regarding his CV and also to -- that's

7    basically it, Judge.

8              THE COURT:  I'm sorry, what was the last part.

9              MR. GREENFIELD:  That was basically it.  I thought I

10   had said that.  Your Honor, I would ask you push him into the

11   second week, any time in the second week.  Or third week, or

12   whatever they want.

13             THE COURT:  The application is denied.  I do find that

14   preclusion of the evidence, first of all, is not warranted on

15   the facts.  The government did appropriately disclose his

16   identity and his background.  This was the sum and substance of

17   his proposed testimony.  You've had his report and the backup

18   for the report for some months and the reports for some years.

19             Accordingly, the government will be entitled to call

20   Mr. Meyers when it wishes, but it might see clear to pushing it

21   back to address some of the defendant's concerns.

22             MR. NAWADAY:  Your Honor, we will consult with

23   Mr. Meyers and see what his schedule is.  I recollect that he

24   had a vacation plans the second week.  I will see when that is;

25   and to the extent we can accommodate Mr. Greenfield, we will

E81Qwhi3

1    endeavor to do so.

2              THE COURT:  Very well.

3              Anything further?

4              MR. BAUER:  Two things, your Honor, that I think --

5    one is quick.  Your Honor signed a search warrant last night or

6    yesterday afternoon authorizing the government to search the

7    phone that agreement Christian had on him at the time of his

8    arrest September 4, 2012.

9              The government was able to download the contents of

10   that phone this morning.  It's fairly miraculous that we were

11   able to do it so quickly.  The report is 2500 pages long.  So

12   we have not had an opportunity to review the report.  A lot of

13   it is going to be meaningless data, but there are a number of

14   text messages, a number of photographs, a number of other chats

15   that we are going to look at.

16             We produced copies, the same copy that we have, we've

17   produced that to defense counsel, and we have made

18   representation to them that at this point, we are not seeking

19   to introduce the evidence yet until we have a chance to review

20   it, hopefully over the weekend.  So I would suggest that we

21   table a conversation of that, of the phone's admissibility

22   until we know whether we want to actually offer it, but I

23   wanted to put that out there now.

24             MR. GREENFIELD:  This is Rule 16 material.  They have

25   this telephone in their possession since the date of arrest

E81Qwhi3

September 12, 2012.  They decide the day before we get here today to first look at the phone?  They gave us two CDs full of documents, God knows what else, tell us go view it over this weekend when we're preparing for openings, preparing for cross-examinations, preparing for some expert that we have to prepare for.  They should be precluded flat out.  They had it.  They dropped the ball.  Case closed.

MR. GOLTZER:  We join the motion to preclude.

MR BUCHWALD:  So do we.

MR. BAUER:  Your Honor, I would ask --

THE COURT:  I'll take it under advisement.  It's not being offered.

MR BUCHWALD:  Can we ask the government be directed to -- as soon as, if and when they find any connection to either of the other defendants on that telephone, that we be advised immediately; not at the end of the analysis of the 2500 pages, but that as soon as they get such a connection that we be advised via email.

THE COURT:  Well, I mean, you know, we're starting the trial on Monday, so anything that has to be done has to be done immediately.  I don't know beyond that what more I can order them to do.  Obviously, they proceed at their peril if they come two Fridays hence and say we want to introduce one page from these 2500 pages.

MR. BAUER:  Understood, your Honor.

E81Qwhi3

 1           The last order of business -- and perhaps your Honor

 2     will elect to do this on Monday, although I think today is

 3     probably the better day to do it -- each of the defendants have

 4     been offered plea agreements by the government.  Some have been

 5     offered multiple plea agreements.  They have rejected those

 6     offers, but I would ask your Honor to allocute the defendants

 7     that they received those plea offers, they consulted with their

 8     lawyers and that they have knowingly rejected those offers and

 9     are voluntarily proceeding to trial.

10           MR. GOLTZER:  I object to the form of the allocution

11     requested by the government.  I think it is standard practice

12     appropriate for the Court to inquire of counsel whether counsel

13     has fulfilled their obligations and imparted plea offers to the

14     defendants, and that's all that need be asked.

15           THE COURT:  OK.

16           MR. BAUER:  I'm not sure what the actual obligation

17     is, your Honor, but I do know that most judges in this

18     district, as far as I know, although they are more experienced

19     than me at that table, allocute the defendants, not just the

20     defense counsel.

21           MR. GOLTZER:  There is a privilege involved that

22     adheres to the defendants both in terms of privilege against

23     self-incrimination and the attorney-client privilege.  Counsel

24     have professional obligations, and we represent to the Court

25     that any plea offers extended through counsel have been

E81Qwhi3

1  communicated to the defendants, and that there have been

2  discussions, and the defendants have elected to go to trial.

3            MR BUCHWALD:  Agreed.  Same representation.

4            MR. GREENFIELD:  As we do also, your Honor.

5            MR. BAUER:  Your Honor, Mr. Nawaday is suggesting one

6  solution to this concern is you can ask counsel the question

7  that I had proposed, and then simply ask the defendants whether

8  they agree with what their lawyers had said.

9            THE COURT:  I know that it is the developing practice

10  of some of my colleagues, because of recent Supreme Court cases

11  where defendants, after choosing to go to trial and losing and

12  receiving substantial sentences, thereafter complained that

13  their attorneys did not properly instruct them and did not

14  properly convey the contours of the offers; and because of that

15  failure on the part of counsel, that they received ineffective

16  assistance.

17            MR. GOLTZER:  There are constitutional implications to

18  what the government suggests.  Because of the severity of the

19  case, I want to be very precise in the record that I am making.

20  Our clients are under no obligation to answer questions from

21  the government, or, most respectfully, from your Honor, and we

22  decline to have them do so.

23            THE COURT:  Let me put the question in that event --

24  at this time, I am not foreclosing the possibility that I would

25  ask the defendants directly -- but, Mr. Goltzer and

E81Qwhi3

```
 1    Mr. Buchwald and Mr. Greenfield, has the government made plea
 2    offers to your clients?
 3              MR. GOLTZER:  Yes, they have been communicated to the
 4    defendant.
 5              THE COURT:  And what is your pleasure in light of the
 6    offers that have been made?
 7              MR. GOLTZER:  The defendants have asked for a jury
 8    trial, as is their right.
 9              THE COURT:  OK.  Mr. Buchwald?
10              MR BUCHWALD:  The same as Mr. Goltzer.
11              MR. GREENFIELD:  That is accurately stated.
12              THE COURT:  I take it all three counsel are
13    specifically requesting that the Court not inquire of their
14    clients that same type of question that I just placed to you?
15              MR. GOLTZER:  Yes.
16              MR BUCHWALD:  Yes.
17              MR. GREENFIELD:  Yes, your Honor.
18              THE COURT:  OK.
19              MR. BAUER:  Your Honor, I guess I will leave it for
20    now.  Perhaps we will consult some people in our office what
21    our office's position is now that they've declined.  Just to
22    make the record complete, I think I should put on the record
23    what the plea offers were.
24              MR. GOLTZER:  I object to that.  It is inappropriate
25    under Rule 11 to involve the Court to that extent in that
```

E81Qwhi3

1     process.

2             Number two, if these defendants are found guilty at

3     trial, this Court will be involved in an independent sentencing

4     process.  Totally irrelevant to that sentencing process will be

5     the nature of the offers that were made or not made to these

6     defendants.  What the government seeks to do by way of policy

7     is to foreclose the defendants' rights, should they feel they

8     have the right, to make a 2255 motion later on.

9             There are very strict procedures that we are obliged

10    to follow.  I am not suggesting that Mr. Whitaker or any other

11    defendant on behalf of himself is going to attack counsel for

12    not making a plea known to them.  If they do, and the defense

13    counsel are ordered to respond by the Court, defense counsel

14    will truthfully respond.

15            That's all the government is entitled to.  They are

16    not entitled to come into the camps of counsel.  They are not

17    entitled to sully the record by telling the Court at this stage

18    of the proceeding what the plea offers were or weren't.  It's

19    inappropriate.  We are here to try a case.

20            THE COURT:  Well, I don't know necessarily, and I

21    haven't thought about this, so this is likely something that we

22    should not do this afternoon, obviously.

23            MR. GOLTZER:  We're taken by surprise too, by the way.

24            THE COURT:  I'm sorry?

25            MR. GOLTZER:  I'm taken by surprise by the government

E81Qwhi3

1    wanting to put the offers on the record.

2         THE COURT:  I don't know necessarily that the

3    government simply making a record of what the offers were

4    implicates the judge or the Court in the plea bargaining

5    process.  They are simply seeking to make a record.

6         MR. GOLTZER:  I don't know.  I just said it because it

7    seemed like the right thing to say.  I could be wrong.

8         THE COURT:  I don't know that you are.  But I don't

9    think that simply placing the offers that were made on the

10   record implicates the Court.  Certainly, given the recent

11   pronouncements of the Supreme Court, the government would seem

12   to have a very important interest in making very clear what the

13   offers were, so that there is not a challenge down the line

14   concerning what the offers were and what the responses to those

15   offers were.

16        MR BUCHWALD:  The government could do that, your

17   Honor, by submitting something in writing to be sealed before

18   your Honor sees it and to be made part of the record.  That

19   will not contaminate your Honor and involve your Honor in this

20   plea process.

21        Part of the purpose of what they want to do, we

22   believe, is let's let the judge know, for example,

23   hypothetically, the guy was offered 20 years.  It's the message

24   of if he gets convicted, you ought to give him more than 20.

25   And that's what's achieved here.  And that's wrong.  That's

E81Qwhi3

wrong with what those colleagues of yours who have chosen to go

through this process and have things put on the record, I

believe that they are acting improperly when they do that.

        But that's what's achieved.  If they want to make a

record, they can submit what the plea offers were, have it

sealed right now.  Your Honor can order it sealed, be part of

the record, and your Honor wouldn't see it until after

sentencing.  If your Honor was curious after sentencing, your

Honor might look at it after sentencing, but then there isn't

any of this contamination.

        MR. GOLTZER:  I wish I'd thought of that.  He's

smarter than me.

        THE COURT:  Well, I do understand that counsel's

argument.

        Mr. Bauer?

        MR. BAUER:  Judge, I will come to your defense by

saying that I don't think you will be contaminated simply by

hearing the pleas.  I think that is -- we are not talking to a

jury.  We are talking to a member of the bar, but, your

Honor --

        THE COURT:  I can also imagine what the pleas have

been, so...

        MR. SKWRAO:  Your Honor, what I will also say is the

purpose of -- even if -- even if the defendants aren't inquired

of here today, the purpose of putting the plea offers on the

E81Qwhi3

1  record, on the public record is that so it is now public what

2  those offers were so that they cannot claim later that they

3  were oblivious to these offers and they never heard about these

4  offers.

5      Mr. Goltzer is exactly right, that is our interest.

6  Our interest is to avoid litigation later with them attacking a

7  conviction by saying they were oblivious to plea offers.  So

8  even if you don't ask if they heard me or if they agree with

9  what their lawyers had said, it will be on the record, and that

10 way it will be something for us to point to later.

11     THE COURT:  So let's do this:  Why don't we think

12 about this.  If the government wants me to engage in the

13 colloquy, they should provide questions that they want me to

14 ask and authority for my ability to do so because if we do it

15 we need to do it before jeopardy attaches, I would imagine.

16     MR. BAUER:  I would think so, your Honor.

17     THE COURT:  We would do it before we swear the jury.

18 So, there is some time between now and then, but let's get our

19 respective legal positions in order.

20     The defendants were not prepared to address this

21 issue, so let's give them an opportunity to gather their

22 thoughts and authorities.

23     MR BUCHWALD:  One other from a housekeeping

24 standpoint, your Honor.  I was at the MCC today from 12:30 to a

25 little after maybe one minute to 1:00.  They wouldn't accept

E81Qwhi3

```
 1   the clothing because there was no one there to accept it.

 2   Nobody came down from R&D.  Legal would not interfere.  They

 3   say they couldn't do it.  So we are going to bring the clothing

 4   back Monday morning and ask that the marshals let them change

 5   here because I can't get to the MCC over the weekend.  They

 6   won't take it over the weekend, in any event.  So just to let

 7   folks know, we will have clothing here on Monday morning, and

 8   we will try to be here at 9:00 so that they can change before

 9   9:30.

10           THE COURT:  The record should reflect that I am facing

11   the marshal.

12           THE MARSHAL:  Your Honor, that is not the way it

13   usually goes.  You submit an order, we'll send it over to them,

14   and they'll accept the clothes.  We have done this several

15   times.  MCC cooperates completely.

16           THE COURT:  Well, I know that I signed an order to

17   that effect.  I don't know whether it made its way to the MCC,

18   but defense counsel did submit an order which I executed.

19           MR BUCHWALD:  They just wouldn't take it.  We had the

20   order.  We had the clothes.  Nobody would come down and take it

21   from us.

22           Mr. Whitaker is at the MDC, so it is just not going to

23   be possible to do it.  The clothing that will be brought in

24   will be brought in by counsel, will be made available to the

25   marshals.  We have always been accommodated by the marshal
```

E81Qwhi3

1  service on the morning of a trial so that we didn't have to

2  delay.  Obviously, the clients can't be in front of a jury in

3  prison garb.

4         MR. GREENFIELD:  We have not heard from our client's

5  family whether or not they were able to deliver it this

6  morning, but we will ask for the same courtesy of the marshals

7  if they refuse acceptance.

8         THE COURT:  Well, I am certainly happy to accommodate

9  whatever safety-related concerns the marshals have.  Obviously,

10  the Court's interest in this is that we are able to proceed to

11  jury selection as early as possible without any undue delay.  I

12  know that I did sign the orders.  These lawyers have been

13  around this court for many, many years.  They are very well

14  respected, and I don't imagine that they are telling us

15  anything that is not accurate.  I will leave it up to them to

16  make additional efforts and to the marshals to be as

17  accommodating as you can.

18         MR BUCHWALD:  Thank you.  And I apologize to the

19  marshals.  I know it is –– it's not their job.  We tried to get

20  to the MCC.  I was there for half an hour, calling the legal

21  department.  I tried calling the warden's office.  They simply

22  wouldn't bring anybody downstairs.  They said it's a prison.

23  It's hard.

24         THE COURT:  Mr. Bauer, anything to add?

25         MR. BAUER:  I think we've done more than enough here

E81Qwhi3

1      today.

2              THE COURT:  OK.  First of all, it's 20 after 6:00.  I

3      want to apologize and thank the marshals for accommodating the

4      court and the parties, and I know you should have been home

5      along time ago.  So thank you and thank you all for being so

6      patient.

7              MR. GOLTZER:  We want to thank your Honor for giving

8      us as much time as needed.

9              THE COURT:  That is what I'm here for.  If there is

10     anything over the weekend, you can send emails to chambers, and

11     we will get to them as soon as we can.  Thank you, folks.  See

12     you Monday morning.

13              (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25