E859chr1                        Trial

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA
 3              v.                          12 CR 626 (ER)
     RAYMOND CHRISTIAN a/k/a
 4   "Reckless"
     GLENN THOMAS, a/k/a "Gucci"
 5   TYRELL WHITAKER, a/k/a "Bow Wow"
                 Defendants
 6   ------------------------------x
                                         New York, N.Y.
 7                                       August 5, 2014
                                         9:17 a.m.
 8

 9   Before:
                         HON. EDGARDO RAMOS
10                                       District Judge

11
                          APPEARANCES
12   PREET BHARARA
          United States Attorney for the
13        Southern District of New York
     ANDREW BAUER
14   KAN M. NAWADAY
          Assistant United States Attorney
15
     DAVID S. GREENFIELD
16        and
     ANTHONY STRAZZA
17        Attorneys for Defendant Christian

18   LAW OFFICES OF DON BUCHWALD
          Attorney for Defendant Thomas
19   DON D. BUCHWALD

20   KELLEY DRYE & WARREN LLP
          Attorney for Defendant Thomas
21   LEVI DOWNING

22   GEORGE ROBERT GOLTZER
          and
23   YING STAFFORD
          Attorneys for Defendant Whitaker
24   -- also present--
     S.A. Andrei Petron - FBI
25
```

1              (In open court; jury not present)

2              (Case called)

3              (Defendants present)

4          MR. BAUER:  Your Honor, I guess while we're waiting

5    for the jury there's one, I think, a minor issue -- we might as

6    well front it now -- which was the photograph of Glenn Thomas

7    the one that your chambers was copied on, an e-mail copied on.

8    Mr. Buchwald had objected to what I'll propose Government

9    Exhibit 202 is.  I'm holding it up here.  It's a picture of

10   Mr. Thomas.

11         THE COURT:  The surly picture?

12         MR. BAUER:  He also objects to the fact he's wearing

13   darker clothing, which is alleged to have been worn during the

14   night of the murder.

15             We endeavored to accommodate his concerns.  I found

16   the other picture that we had of Mr. Thomas, which is this one.

17   If you're straining to see it, because it's really hard to see,

18   he is wearing white clothing but it's difficult to see.  For us

19   it's not about the surliness.  It's not about the clothing.

20   It's about the ability of the jury to see the picture.  So I

21   think Mr. Buchwald objects to this.  But rather than do it in

22   front of the jury we plan on using this picture, the more

23   surly, dark-colored, darker clothing, picture.

24         MR. BUCHWALD:  I do object, your Honor.

25             This photo to is simply for the purposes of their

1   charts in the sky when they put up all the names.

2          THE COURT:  Yes.

3          MR. BUCHWALD:  That's the only purpose of it.  And

4   given that that's the only purpose of it -- there is no

5   question both of these portray Mr. Thomas.  There's no reason

6   to be using the one that has dark clothing which is what is

7   described by witnesses was being worn on December 15 of 2010.

8          THE COURT:  So Mr. Bauer, there will be no testimony

9   from any government witness indicating that they were shown an

10  array that included the surly picture and that they picked that

11  particular picture as depicting Mr. Thomas?

12         MR. BAUER:  Well, your Honor, we took these

13  photographs from our binders of photographs that we did show to

14  witnesses.  I don't remember which witness saw which one of

15  those but I think --

16         MR. BUCHWALD:  The one we inquired about, we said

17  where is the photo of the array, that was shown to Daniella

18  Williams, who is going to be one of their witnesses.  And

19  Mr. Bauer found it and e-mailed it to us.  And it includes the

20  light colored -- the one where --

21         THE COURT:  Can I see that?

22         Ms. Miller, can you get that second picture.

23         Is there going to be any dispute, Mr. Buchwald, that

24  this is Mr. Thomas?

25         MR. BUCHWALD:  No.  With respect to either one, there

E859chr1                          Trial

1      won't be a dispute that's Mr. Thomas.

2              The question is which one is going to be sitting up on

3      the board, which serves no purpose other than as a

4      demonstrative aid to remember who is who.

5              THE COURT:  I don't think that the picture -- the less

6      surly picture is so obscure that you can't tell that it's

7      Mr. Thomas.  And there being no assertion by the government

8      that this particular photo, the surly photo was the one that

9      was actually picked by a potential witness in this case, I

10     don't think that the government will be prejudiced by using the

11     photograph in which Mr. Thomas is wearing light-colored

12     clothing.  So if there is no dispute otherwise that's the one

13     that will be used.

14             MR. BUCHWALD:  Thank you.

15             THE COURT:  I propose to open up the doors and let the

16     jury in.  So let's do that.  Unless there's anything else.

17             (Jury selection follows)

18             (A jury of twelve and four alternates was impaneled

19     and sworn)

20             THE COURT:  Everyone, please be seated.

21             Ladies and gentlemen, I'm going to give you some

22     initial instructions now and then we'll begin with opening

23     arguments.

24             You are now a jury.  And there is no higher function

25     in our legal system.  From now on whenever you enter or leave

E859chr1

the courtroom as a jury the parties and the audience will rise

the same as they do for me because you are every bit as

powerful and important as any judge.

Let me introduce or reintroduce you to some of the

people who are here in the courtroom.  As I told you before, my

name is Judge Edgardo Ramos.

You've already met the defendants and their attorneys,

Anthony Strazza, David Greenfield, Don Buchwald, Joshua Dratel,

Levi Downing, Ying Stafford, and George Goltzer; and the

prosecution team, Assistant United States Attorneys Andrew

Bauer and Kan Nawaday, who will be assisted by Special Agent

Andrei Petron of the FBI and Lia McInerney, a paralegal with

the U.S. Attorney's Office.

My courtroom deputy is actually Ms. Jasmine Rivera.

She's not here.  She'll be joining us later this week.

However, you will be dealing for the most part over the next

few days with Ms. Miller.  So if you have any questions or

difficulties she's the person to consult.  Ms. Miller is also

my law clerk and her job is to help me to research any legal

issues that may come up from time to time during the trial.

We have a court reporter here.  We will have two

throughout the course of the trial and you'll see them tag

teaming in and out throughout the course of the day.  Their job

is to take down everything that's said throughout the trial so

there's a verbatim record of what happened.

1          Now, with respect to the role of the jury.  In the

2     American system of justice the judge and the jury have separate

3     roles.  My job is to instruct you as to the law that governs

4     the case.  I will give you some instructions now and others

5     from time to time during the trial.  At the end of the trial, I

6     will give you detailed instructions about the law you will need

7     to apply when you deliberate.  Your job as jurors is to

8     determine the facts based on the evidence presented at trial.

9     You are the only triers of fact and your decisions on the

10     factual issues will determine the outcome of this case.  You

11     must not take anything I may say or do during the trial as

12     indicating what my opinion is or what your verdict should be.

13     It's not my job to have such an opinion and if I did it

14     shouldn't influence you in any way.

15          Now you must pay close attention to all of the

16     evidence presented.  Evidence consists of the testimony of the

17     witnesses, exhibits that are admitted as evidence, and

18     stipulations agreed to by the attorneys.

19          A stipulation is simply an agreement between the

20     lawyers about facts or testimony.

21          Certain things are not evidence in the case and you

22     must not consider them as evidence.  For example, statements

23     and arguments by the lawyers are not evidence.  They are simply

24     arguments in which they will tell you what they think the

25     evidence proves and how they think you should analyze the

E859chr1

1    evidence.

2            My statements are not evidence either.

3            Questions by the lawyers are not evidence.  Only the

4    answers given by the witness are evidence.  For example, if a

5    witness is asked:  It was raining that day, wasn't it?  And the

6    witness says:  No, it wasn't.  Then, based on that question and

7    answer, there is no evidence in the case that it was raining

8    that day no matter how convinced the lawyer sounded when he or

9    she was asking the question.

10           Objections to questions are not evidence.  The lawyers

11   are obligated to make an objection when they believe evidence

12   being offered is improper under the rules of evidence.  You

13   should not be influenced by the objection or by the court's

14   ruling on it.

15           Any testimony that I exclude or strike or tell you to

16   disregard is also not evidence and you must not consider it.

17   If I instruct you that some evidence is only to be considered

18   for a certain purpose, you must follow that instruction.

19           And, of course, anything you may see or hear outside

20   the courtroom is not evidence and should be disregarded by you.

21   You are to decide the case only on the evidence presented here

22   in the courtroom.

23           In deciding the facts of the case, you will have to

24   decide the credibility of witnesses; that is, how truthful and

25   believable they are.

E859chr1

1          Now, how do you decide what to believe and what not to

2     believe?  You are going to listen to the witnesses, observe

3     them, and then decide just as you would decide such questions

4     in your everyday life.  Did they know what they were talking

5     about?  Were they honest, open, and truthful?  Did they have a

6     reason to falsify or exaggerate their testimony?  Is there any

7     reason to think they might be mistaken about what they're

8     telling you?  How did their testimony square with the other

9     evidence in the case?

10          Sometimes it's not what a witness says but how he or

11    she says it that may give you a clue as to whether or not to

12    accept that witness's version of an incident or an event as

13    credible or believable.  So, what the witness says, the way the

14    witness says it, and the rest of the evidence in the case will

15    play important roles in your reaching a judgment as to whether

16    or not you can accept the witness's testimony as reliable.

17          As the trial proceeds, you may have impressions of a

18    witness or a subject but you must not allow these impressions

19    to become fixed or hardened because if you do, in a sense, you

20    foreclose consideration of the testimony of other witnesses or

21    other evidence that may be presented after the witness you

22    heard.  This would be unfair to one side or the other.  A case

23    can be presented only step by step, witness by witness, until

24    all of the evidence is before you.  So, please remember that

25    there may be more -- that there may be another side to any

E859chr1

1   witness's story and there may be more to come on any given

2   issue.  I cannot emphasize too strongly that you must keep an

3   open mind until the trial is over.  You should not reach any

4   conclusions until you have all of the evidence before you.

5          Now, in order to ensure that you decide the case only

6   on the evidence and that you not be influenced in any way by

7   anything that might occur outside the courtroom, I must give

8   you a specific set of instructions.

9          First, do not discuss this case with anybody while the

10  case is going on.  That includes even friends or members of

11  your own family.  You may tell your friends and family that

12  you're a juror in a case and that it is expected to last three

13  weeks or so.  But don't tell them anything else about the case

14  until after you've been discharged.  Not discussing the case

15  includes blogging, twittering, tweeting, MySpace, Facebook,

16  LinkedIn, and the like.

17         My instructions to you not to discuss the case also

18  includes not discussing it even amongst yourselves while the

19  trial is going on.  You will have the opportunity and indeed

20  the duty to discuss the case amongst yourselves later on.  But

21  that can happen only after all of the evidence is in and the

22  case is given to you to discuss and decide in the jury room.

23  Not talking to each other about the case includes not texting,

24  e-mailing, creating a Facebook group, or doing anything along

25  those lines.

E859chr1

1          Next, you are not to read anything in the newspapers

2     or anywhere about this case should that occur.

3          Also, you are not to listen to or view any reporting

4     about this case if it should be broadcast on TV, over the

5     radio, or the internet.

6          Now, I know that many of you use cellphones,

7     BlackBerries, the internet and other tools of technology.  You

8     also must not talk to anyone about this case or use those tools

9     to communicate electronically with anyone about the case.

10    Again, this includes your family and friends.  You may not

11    communicate with anyone about the case on your cellphone,

12    through e-mail, BlackBerry, iPhone, text messaging or on

13    Twitter, through any blog or website, through any internet

14    chatroom or by way of any other social networking websites

15    including Facebook, MySpace, LinkedIn and YouTube.

16         Next, you are not to read anything in the newspapers,

17    on the internet, your cellphones or anywhere else about this

18    case.  And you are not to listen to or view any reporting about

19    this case if it should be broadcast on TV, over the radio or on

20    the internet.

21         Next, don't do any research or any investigation about

22    the case on your own.  Do not go to visit any place you may

23    hear described during the trial.  Don't do any research on the

24    internet or in the library or any other reference source.

25    Don't Google anyone.

E859chr1

1          Next, be sure that I am informed of any person that

2     you recognize comes into the courtroom.  This is a public trial

3     so it could happen.  But it is important that you not hear from

4     them what may have happened in the court while the jury was not

5     present.  If you should see a friend, relative or acquaintance

6     come into the court please send a note to me through Ms. Miller

7     or Ms. Rivera at your first opportunity.

8          Next, you are not to allow anyone to speak to you

9     about this case.  If you are approached by anyone to speak

10    about it, politely tell them that the judge has directed you

11    not to do so.  If any person approaches you or seeks to contact

12    you about the case, you are required to report the incident

13    promptly to me and you can do that by telling Ms. Miller or

14    Ms. Rivera.

15         The lawyers, the parties, and the witnesses are not

16    supposed to talk to the jury outside of the courtroom.  Even to

17    offer a friendly greeting.  So if you happen to see any of them

18    outside the courtroom, they will and they should ignore you.

19    Please take no offense to this.  They will only be acting

20    properly by doing so.  Indeed, they will be following my

21    express directions to do so.  Experience has shown that even

22    innocent conversations with jurors can sometimes be

23    misinterpreted so courts have a hard-and-fast rule that the

24    lawyers and the parties cannot speak to jurors, period.

25         In addition, if anything should happen involving any

E859chr1

1    of you that is of -- if anything should happen involving any of

2    you that is of an unusual nature or which you think is

3    something the court should know, do not discuss it with any

4    other juror.  Simply give the clerk a note to that effect, to

5    the fact that you want to speak with me about it, and I can

6    then hear what it is you have to say.  Of course, I do not

7    expect that anything unusual will happen.

8            Finally let me say a few words about trial procedure.

9    The trial has five parts.

10           First, each side will have the opportunity to make

11   opening statements to you, and they will do that shortly.  As

12   I've told you already, these statements are not evidence.

13   Their purpose is to give you an idea in advance of the evidence

14   that the lawyers expect to hear -- expect you to hear from the

15   witnesses.  These statements allow the lawyers to give you a

16   preview of what this case is about but the only evidence comes

17   from the witnesses, exhibits, and stipulations.

18           The government has the burden of proof so it will go

19   first.  The defendants have no burden of proof and do not have

20   to do anything at this trial.  So the defendants do not have to

21   give an opening statement.  But if they choose to, the

22   defendants' lawyers will go next.

23           Second, after the opening statements you will hear the

24   testimony of the witnesses.  Now this will be the longest part

25   of the trial.  The government's witnesses go first.  Each

1    witness will first give direct testimony and then he or she may

2    be cross-examined by the other side.  Again, the defendants do

3    not have to question witnesses but may choose to do so.

4    Documents or physical objects or stipulations will be received

5    in evidence during this time as well.

6            Following the government's case, the defendants may,

7    but need not, present witnesses and other evidence.  If they do

8    call witnesses, those witnesses will be examined and

9    cross-examined just as the government's witnesses were.  If the

10   defendants choose to present evidence, it is possible that the

11   government would then present some rebuttal to that evidence.

12           Third, after all of the evidence has been received,

13   each side will have an opportunity to make closing arguments.

14   They will review the evidence and make arguments to you as to

15   what conclusions they think you should or should not draw from

16   the evidence.  These arguments also are not themselves evidence

17   but they may be helpful to you in summarizing the case before

18   your deliberations.

19           Fourth, after these arguments or summations, as they

20   are called, I will give you detailed instructions as to the law

21   that applies and controls in this case.  And you must follow

22   those instructions.  Those instructions to the jury are

23   sometimes referred to as the jury charge.

24           Fifth, and most importantly, after the jury charge,

25   you will go to the jury room to deliberate and discuss the

E859chr1

1    evidence in order to decide the facts and render a verdict.

2              Now, a few housekeeping matters before we begin.

3    Ms. Miller will show you to the jury room.  That's where you

4    will report in the morning.  She'll also give you her telephone

5    number where you can reach her if there is an emergency.

6    Please also give her your home, work, and cellphone numbers

7    just in case we have a last-minute schedule change or other

8    problem.

9              Our trial day will begin promptly at 9:30.  We'll have

10   a lunch break around 12:45 each day, give or take.  And we'll

11   have two fifteen-minute breaks, one midmorning an one

12   midafternoon.  We will end at 5:00 each day.  If you should

13   need a break before a scheduled break, just raise your hand and

14   we'll make every effort to accommodate you.

15             Be on time after the breaks and in the morning.  If

16   you're late you'll keep everyone else waiting.  I will make

17   sure my commitment to you is that the parties and my staff will

18   be here on time every morning and after every break.

19             If you wish, you may take notes and Ms. Miller will

20   provide you with pads and pens for that purpose but if you do

21   take notes you must leave them in the jury room when you go

22   home for the night.  And, remember, any notes you take are for

23   your own personal use to help you remember or focus on what's

24   going on.  But they're not to be relied on by anyone else.

25             It's also completely up to you whether you even want

E859chr1

1    to take any notes.  Some people find that it helps them

2    concentrate or remember.  Other people find it distracting.

3    It's your call entirely.  If you don't take any notes you

4    should rely on your independent recollection of the evidence.

5    When you deliberate, however, you should discuss what the

6    evidence was and not what one juror or another's notes do or do

7    not say.

8                    (Continued on next page)

E85nchr2

1          THE COURT:  Now what we will do now is we will take a

2     break.  Ms. Miller will take you into the jury room and

3     introduce you to it and take some information from you.  The

4     parties will prepare for their opening arguments.

5          So let's take a break and let's be back and make sure

6     that you are in the jury room no later than 25 minutes after

7     the hour.

8          (Jury not present)

9          THE COURT:  Let's talk about timing.  Everyone can be

10    seated.  We will be starting around 3:30.  I anticipate that we

11    will be able to get all the openings in.  I am not going to

12    require the government to put on any witness this afternoon,

13    since I don't think we will have any time.  We will have very

14    little time at the end.

15         MR. BAUER:  We do have one witness for whom it was a

16    specific hardship to come here today, Elena Gardner.  She is

17    going to be a very quick witness.

18         THE COURT:  If you have a witness you want to put on,

19    I'm happy to do that.

20         MR. BAUER:  We actually have four witnesses ready, but

21    Ms. Gardner is the most important because it will be difficult

22    for her to come tomorrow, so if there is any way we can call

23    her as the first witness.

24         THE COURT:  That will be fine.  Any idea who long the

25    openings will be, Mr. Bauer, Mr. Nawaday?

E85nchr2

1              MR. NAWADAY:  Your Honor, my opening will be about 12
2       minutes.
3              THE COURT:  12 minutes, OK.
4              Will there be three openings on this side?
5              MR. STRAZZA:  Yes.
6              THE COURT:  Who will been doing the openings.
7              MR. STRAZZA:  I will be opening on behalf of
8       Mr. Christian and my opening will be about 15 minutes.
9              THE COURT:  OK.
10             MR. GOLTZER:  I will be opening on behalf of
11      Mr. Whitaker.  It will be somewhat longer.
12             MR. BUCHWALD:  I will be opening on behalf of
13      Mr. Thomas.  Depending on what they cover, it won't be so long.
14      If they don't cover, it will be a little longer.
15             THE COURT:  I don't like to put limits on openings or
16      closings, but if you hear me banging my head against the
17      microphone, you have gone a little too long.  Very well.  25
18      after.
19             (Recess)
20             THE COURT:  Are the parties ready?
21             MR. NAWADAY:  Yes, your Honor.  Your Honor, I hope
22      it's OK.  I am going to use the small podium.
23             THE COURT:  That's fine.
24             MR. NAWADAY:  We are not allowed to move that.
25             THE COURT:  I don't chain lawyers to the podium, but

E85nchr2

1    don't stray too far and don't make any sudden moves towards the

2    jury.

3            MR. NAWADAY:  I will not.

4            THE COURT:  Or the judge, more importantly.

5            MR. DRATEL:  I have seen that.

6            (Jury present)

7            THE COURT:  Opening for the government will be

8    Mr. Nawaday.

9            MR. NAWADAY:  December 15, 2010, it is a little past

10   midnight at 54 Chambers Street, a small rooming house in

11   Newburgh, New York.

12           Suddenly several armed men rush into the first-floor

13   apartment wearing masks and armed with guns.  The robbers order

14   the people inside to get on the floor.  They point guns at

15   their faces, and they start shouting:  Give it up, give it up.

16   This is a robbery.

17           But things go wrong for the robbers.  One man fights

18   back.  He's able to wrestle a gun away from one of the robbers

19   and get that robber's ski mask off.

20           Another man jumps up and stabs another robber with a

21   knife, but then gets shot by a robber and crawls for cover.

22   Mayhem ensues.  The robbers try to rush out.

23           But when they get to the front door, they can't open

24   it.  Why not?  Someone is on the other side trying to hold the

25   door shut to trap the robbers while he calls 911.

1          That man is Jeffrey Henry.  Jeffrey Henry is holding

2     the door closed while at the same time calling 911.

3          So what did the robbers do?  They pull on the door

4     and, when they are able to get it partially open, they take

5     turns sticking their guns through the opening and open fire,

6     shooting at Jeffrey Henry.  Two of their shots hit Mr. Henry.

7     The robbers are able to force their way through the door.

8          Jeffrey Henry is terribly wounded.  He makes it about

9     two blocks before he collapses and later dies.  That is why we

10     are here today.  We are here today because those three men

11     robbed Jeffrey Henry of his life that night.

12          These two men, Glenn Thomas and Tyrell Whitaker, they

13     were shooters.  They were two of the robbers who were shooting

14     around that door at Mr. Henry.  And that man there, Raymond

15     Christian, he was a robber who planned the robbery.  He was the

16     robber who lost his gun and ski mask.

17          I am going to take a few minutes this afternoon to

18     explain the events that led to the robbery, and I am going to

19     explain how the government is going to prove its case.

20          You will learn that Raymond Christian was a drug

21     dealer and a leader of the gang.

22          You will learn that a couple weeks before the robbery

23     and murder of Jeffrey Henry, Raymond Christian wanted to find a

24     stash house to rob of money and crack cocaine.  The

25     neighborhood where his gang hung out was full of stash houses,

1  places where people could buy drugs, buy crack.  Christian knew

2  this because he was a drug dealer who sold crack.

3          Why did he want to find a stash house to rob?  Because

4  it would be an easy way and a quick way to get money and drugs

5  to sell.

6          So what was the plan?  Simple.  Find a stash house and

7  rob it.

8          You will learn that on the night of December 14

9  Christian and a member of his gang, a man named Anthony Baynes,

10  identified 54 Chambers Street as a stash house to rob.  54

11  Chambers Street was a known drug spot in Newburgh.

12          Jeffrey Henry and the other men who were at 54

13  chambers that night were drug dealers who sold crack and other

14  drugs out of that building.

15          So what did Christian and Baynes do?  They went to see

16  a man named James Williams, a high-ranking member of another

17  gang.  Why?  For help getting guns, and to recruit more

18  robbers.

19          You will learn that Baynes and Christian met with

20  Williams and he joined the plan.  He made phone calls and got

21  guns for the robbers.  He also got more robbers to help with

22  the robbery.

23          You will learn that more robbers came to Williams'

24  house that night.  Two of those additional robbers were those

25  two, Glenn Thomas and Tyrell Whitaker.

1           Once the crew was assembled, they made their way to 54

2    Chambers Street, which was only a few blocks away.  When they

3    got there, it was a little past midnight.  You heard earlier

4    what happened next.  Christian, Thomas and Whitaker went inside

5    the building with the other robbers.  They found men inside and

6    began robbing them, looking for drugs and money.  You will

7    learn that it was Christian who wrestled with the victim and

8    lost his gun and ski mask.

9           Anthony Baynes, he was the robber who got stabbed.  As

10   you heard earlier, you will learn that Whitaker and Thomas were

11   two of the robbers who were shooting around the door at

12   Mr. Henry.  For their conduct, the defendants are charged with

13   committing a variety of crimes, such as the armed robbery of 54

14   Chambers Street, the use of firearms during the robbery and the

15   murder of Jeffrey Henry.

16          So, how will the government prove its case to you?

17          First, you will hear from police officers, the

18   officers who found Mr. Henry's body and processed the evidence

19   at the crime scene.

20          You will also hear that Christian and Thomas and

21   Whitaker were drug dealers who carried guns.

22          You will also hear from police officers who recovered

23   guns and drugs from some of them before that night.

24          You will also hear the 911 call that Mr. Henry made

25   while he was trying to stop the robbers.  During that call, you

E85nchr2                        Opening - Mr. Nawaday

1    will hear gunshots, and you will hear Mr. Henry cry out in a

2    bone chilling scream.  At the end of the call, right after he

3    was shot and the robbers rushing out past him, you will hear a

4    robber whisper, Check his pockets, right before Mr. Henry's

5    phone goes dead.

6            You will also see photographs and see physical

7    evidence that was recovered, like spent shell casings, the

8    knife that the victim used to stab Anthony Baynes, and

9    Christian's ski mask that was left at the scene.

10           In this case you will also hear from two expert

11   witnesses.  You will hear from the medical examiner who

12   conducted the autopsy of Mr. Henry and concluded that he died

13   from two gunshot wounds.  You will hear from the DNA expert who

14   will tell you that a blood stain was found on the inside cheek

15   area of that ski mask recovered at the scene and that Raymond

16   Christian's DNA was on that blood stain.

17           You will also see video recordings of the robbers

18   heading towards Chambers Street before the robbery and then

19   running back after the robbery.

20           You will hear from victims of the robbery.  You will

21   hear from the crack dealer who fought back and was able to

22   wrestle Christian's gun away from him.  You will also hear from

23   the man who fought back and stabbed Anthony Baynes and then was

24   shot by another robber.

25           You will hear from other eyewitnesses, like the woman

E85nchr2                      Opening - Mr. Nawaday

1   who lived across the street.  She will describe seeing the

2   robbers rush into 54 Chambers Street and how she saw Jeffrey

3   Henry trying to hold the door closed as the robbers pushed and

4   pulled and shot through the opening of the door into Mr. Henry.

5   She will describe some of the smoke from the gun and the

6   gunshots that hit Mr. Henry.

7         Now, these witnesses won't be able to tell you who the

8   robbers were because the robbers were wearing masks, but you

9   will also hear from witnesses who can.  You will hear from

10  insiders of the robbery crew people who participated and helped

11  carry out the robberies and murder of Jeffrey Henry.  You will

12  hear from the robber who was stabbed, Anthony Baynes, the man

13  who was there with the defendants when the robbery was planned

14  and carried out.  Baynes will tell you in detail from his own

15  personal experience as a participant and eyewitness to this

16  crime everything he saw heard and did with those three men.

17        You will also hear from one of the men Williams call

18  to get guns for the robbery, a man named Jamar Mallory.

19  Mallory will tell you that Williams called him that night and

20  told him he was sending two guys and to give them guns.

21        Who were the two people who showed up?  Whitaker and

22  Thomas.  Mallory will also tell you that after the robbery

23  Whitaker and Thomas returned the guns to him and told him what

24  happened.

25        Now Baynes and Mallory are criminals just like the

E85nchr2                     Opening – Mr. Nawaday

1   defendants.

2          Baynes is a robber and a drug dealer.  You will hear

3   that at the robbery at 54 Chambers Street was not the only

4   robbery Baynes has been involved in.  He's going to tell you

5   about other robberies he's participated in.  He's also going to

6   tell you that when he was first questioned by detectives he

7   didn't tell the full story of what happened.  He made it sound

8   like he wasn't part of the robbery, and he tried to protect his

9   friends like Raymond Christian by not telling the police about

10  everyone's involvement.

11         As for Mallory, he is a robber and a drug dealer, too.

12  Both Baynes and Mallory will tell you about their crimes and

13  how each of them was arrested, prosecuted, and pled guilty.

14         You will also hear from witnesses who have committed

15  crimes before, but did not participate in this robbery and

16  shooting.

17         For example, you will hear from a marijuana dealer in

18  Newburgh, who will tell you that just minutes after the robbery

19  Tyrell Whitaker came to his house with bloody clothes, and he

20  gave Whitaker a garbage bag to put the bloody clothes in.

21         With all these witnesses you will learn that they all

22  entered into agreements with the government to provide

23  information and testimony in the hopes of getting less jail

24  time for themselves.

25         As with any witness, the issue is not whether you like

E85nchr2                          Opening - Mr. Nawaday

1    what you hear.  It's whether you believe it.  And the reality

2    is, and your common sense will tell you this, only other

3    criminals can tell you how a robbery murder like this one was

4    planned and carried out.

5           So I urge you to listen carefully when they testify.

6    Scrutinize what they tell you closely and consider whether what

7    each of them tells you is consistent with the other testimony

8    and evidence that you will hear in this case.

9           When you do that, you will find that it is consistent,

10   that what each witness tells you matches the others, and that

11   they are all corroborated by all the other evidence you will

12   see and hear, like the testimony you will hear from the law

13   enforcement witnesses, eyewitnesses and expert witnesses.

14          This is a serious case with serious charges.  Like all

15   criminal trials, it is an important trial for the government

16   and for the defendants.  So I am going to ask you to do three

17   things:

18          First, pay close attention to the evidence, listen

19   carefully to the witnesses;

20          Second, follow Judge Ramos' instructions on the law;

21   and,

22          Third, rely on your common sense and life experience,

23   your life experience you walked into this courtroom with this

24   morning.  Use your common sense to weigh the evidence and the

25   credibility of the witnesses.

1          If you do those three things, the government will get

2     a fair trial, and the defendants will get a fair trial.  And if

3     you do those three things, you will reach the only verdict

4     consistent with the evidence that the defendants are guilty.

5          THE COURT:  Thank you, Mr. Nawaday.

6          Did Mr. Christian wish to make an opening statement?

7          MR. STRAZZA:  Yes, your Honor.

8          THE COURT:  Mr. Strazza.

9          MR. STRAZZA:  Good afternoon, ladies and gentlemen.

10         JURORS:  Good afternoon.

11         MR. STRAZZA:  My name is Anthony Strazza.  Along with

12    my cocounsel David Greenfield, I represent Raymond Christian in

13    this matter.

14         Raymond Christian had absolutely nothing to do with

15    the robbery and the shooting that took place on December 15,

16    2010.  He wasn't there.  He didn't plan it.  He didn't agree

17    with anybody to do it.  He played no role in that incident

18    whatsoever.

19         Now, let's be clear about something.  You are going to

20    hear a lot about Mr. Christian throughout the course of this

21    trial.  I'll tell you right now, he is a no angel.

22         Like many of the witnesses you will hear during the

23    course of this trial that are going to sit in that chair,

24    Raymond grew up in the ghetto on the streets of Newburgh, New

25    York.

1          For those of you who are not familiar with the city of

2     Newburgh, New York, you are going to learn that the

3     neighborhood where Raymond and his family live is littered with

4     drugs, violence, weapons, and crime.

5          Yes, you are going to hear that Raymond Christian has

6     possessed guns in the past;

7          Yes, you are going to hear that Raymond Christian has

8     sold drugs in the past;

9          Yes, you are going to hear that Raymond Christian was

10    part of a group that was called Star Status on the street.

11         But none of that means that Raymond Christian is

12    guilty of the crimes that he is on trial for here today.  Just

13    because the government is going to show you that Raymond

14    Christian has committed crimes in the past, it doesn't mean

15    they are going to be able to prove to you that he committed

16    these crimes.

17         Throughout the course of this trial, you are going to

18    be presented with different types of evidence.  One of those

19    types is going to come in the form of testimony from the

20    witnesses that take the stand.

21         The second type will be presented to you in the form

22    of exhibits.  I like to refer to that as the tangible evidence,

23    evidence you can see, hear and touch.  It's going to be your

24    job to evaluate all of that evidence.  But when you do, please

25    keep in mind that evidence, a piece of evidence is not the same

E85nchr2                    Opening - Mr. Strazza

 1    thing as a fact.  Evidence is what gets presented to you.  A
 2    fact is something you, and only you, can determine based upon
 3    your evaluation of that evidence.
 4              With the tangible evidence, the physical items, the
 5    words, the sounds, the things depicted in those pieces of
 6    evidence are all pieces of evidence.  But what those words
 7    actually mean, what those sounds mean, what's actually depicted
 8    is for you to determine.
 9              So, for example, the government just told you that
10    they are going to present to you evidence of recordings that
11    show that my client Raymond Christian was present in the area
12    of 54 Chambers Street the night that this incident occurred.
13              I want you to take a close look at these recordings.
14    Look at the clarity of these recordings, and ask yourselves, is
15    there any way possible, based upon looking at these recordings,
16    that anybody could make any sort of identification just based
17    on looking at these recordings?
18              You are also going to hear about the 911 call that was
19    made from 54 Chambers Street during the robbery.  Listen
20    carefully to that recording.  Yes, you will be able to hear
21    gunshots; yes, you will be able to hear somebody screaming.
22              But the government also told you that you will be able
23    to hear people talking and that based upon that talking you
24    will be able to identify who those people are.
25              Hold them to that burden.  Listen to that recording

1    for yourself and see if that's even remotely possible.

2          The point is that just because a piece of evidence is

3    presented to you, it doesn't mean that that evidence proves the

4    existence of the fact that the government is trying to prove.

5          The same is true for the DNA evidence that you just

6    heard.  The government's going to present you with this DNA

7    evidence to try and prove that Raymond Christian was present

8    inside of the apartment at 54 Chambers Street the night of the

9    robbery.

10          Pay careful attention when you are hearing about this

11    evidence.  Listen carefully to who recovered this evidence,

12    where it was recovered, what exactly was recovered, when it was

13    recovered, how it was recovered.

14          Then listen carefully to what was done with this

15    evidence after it was recovered.  Who tested it?  What kind of

16    tests were done?  When was it tested?  Where was it tested?

17    How was it tested?

18          You are going to learn that the mere presence of this

19    DNA evidence on this mask cannot tell us anything about how the

20    DNA actually got on the mask.

21          More importantly, you are going to learn that the mere

22    presence of this DNA evidence on that mask cannot tell us

23    anything about how that mask got into 54 chambers street.

24          Again, ladies and gentlemen, just because a piece of

25    evidence is presented to you doesn't mean that that evidence

E85nchr2                          Opening - Mr. Strazza

1    proves the fact that the government is trying to prove.

2            Let's talk about some of the testimonial evidence that

3    you are going to hear throughout the course of this trial.  You

4    are going to hear from law enforcement witnesses.  You are

5    going to hear from actual people who were robbed at 54 Chambers

6    Street, you are going to hear from witnesses who were outside

7    of 54 Chambers Street when the robbery occurred, and some

8    people who were in the area shortly after the robbery occurred.

9            Finally, you are going to hear from some of the actual

10   participants in the robbery people who already pled guilty to

11   this crime.

12           I expect that throughout the course of this trial you

13   will hear from approximately 20 witnesses.  Out of these 20

14   witnesses, only one of them is going to sit in that chair and

15   tell you that he saw Raymond Christian at 54 Chambers Street.

16   That witness is Anthony Baynes.

17           It your job to listen to Mr. Baynes and determine

18   whether or not you believe what he's saying is truthful and

19   accurate.  As you already heard, Anthony Baynes does not have

20   such a good track record when it comes to being truthful and

21   accurate when recounting what took place on the night of

22   December 15, 2010.

23           You are going to learn that Anthony Baynes gave at

24   least six or seven different stories about what he says

25   happened.  You are going to learn that the only reason Raymond

1    Christian is sitting here today is because of these stories.

2              Anthony Baynes was a participant in the robbery.

3    Anthony Baynes was stabbed and injured as a result of his

4    participation.  As a result of being injured, Anthony Baynes

5    wound up in the hospital right next to some of the victims that

6    he just robbed.

7              When the police arrived at the hospital and questioned

8    Anthony Baynes, Anthony Baynes tried to come up with an

9    innocent explanation for why or for how he got hurt.

10             As the police continued to press and press Anthony

11   Baynes, Anthony Baynes started to change his story in an

12   attempt to provide an innocent explanation for himself by

13   giving the police information that he thought they had already

14   obtained.

15             During the third or fourth version of his story,

16   Anthony Baynes tried to come up with an innocent explanation

17   for being at 54 Chambers Street that night.  His explanation

18   was that he was with an individual by the name of Laquavious

19   Boykin, who you are going to learn is Raymond Christian's

20   little brother.  He told the police that he went to 54 Chambers

21   Street that night because he thought Raymond might be there,

22   and they wanted to see if Raymond was OK.

23             As the police continued to push, Anthony Baynes again

24   changed his story in an attempt to come up with an innocent

25   explanation for why he was now inside of 54 Chambers Street.

So this time he says he went there to check on Raymond, but when he got there, he was able to see inside of the apartment and he saw Raymond struggling with somebody.  So he went in the apartment to help Raymond, and that's when he got stabbed.

Ladies and gentlemen, you are going to learn about all of the different stories that Anthony Baynes gave when he testifies.  When you do, please listen carefully as he tries to weasel his way out of this crime by blaming other people for his actions.

In addition to his story changing numerous times, you are also going to learn that Anthony Baynes has entered into a contract with the Orange County district attorney's office.  He has promised to help the government prosecute this case in the hope of getting out of jail.

You are going to learn that Anthony Baynes was indicted for murder, but as a result of his cooperation agreement, he was allowed to plead guilty to a lesser included count of robbery in full satisfaction of all of the charges that he was indicted on.

I expect that the government will tell you that this cooperation agreement is motivation for Anthony Baynes to tell the truth throughout the course of this trial.  The evidence is going to show that Anthony Baynes is only motivated to help himself, just like his actions showed the night he changed his story over and over and over again.

1            Now, the government knows that the testimony of

2       cooperating witnesses is sometimes tough and that it's tough

3       for juries to deal with and that sometimes jurors have a hard

4       time with it.  So the way they handle this is they take that

5       evidence, that testimony from these cooperators, and they try

6       to use the tangible evidence that we spoke about earlier and

7       corroborate each other.

8            But, ladies and gentlemen, one piece of weak evidence

9       mixed with another piece of weak evidence that doesn't make

10      strong evidence.  If you pour ten weak cups of coffee into a

11      pot, you don't have one pot of strong coffee.  It's the quality

12      of the evidence that counts, not the quality -- excuse me, it's

13      the quality not the quantity.

14           I am going to sit down now, and I'm going to let my

15      colleagues talk about more about what we expect the evidence to

16      show throughout the course of this trial.  Before I do, I'm

17      only going to ask you to do one thing, be the fair and

18      impartial juror you would want sitting in your seat if you were

19      on trial accused of these serious crimes.

20           MR. STRAZZA:  Thank you.

21           THE COURT:  Thank you, Mr. Strazza.

22           Does Mr. Whitaker wish to make an opening statement?

23           MR. GOLTZER:  He does.

24           THE COURT:  Mr. Goltzer.

25           MR. GOLTZER:  Thank you.

E85nchr2                        Opening – Mr. Goltzer

1          May it please the Court, Mr. Whitaker, Ms. Stafford,

2     the gentlemen at the prosecution and defense table, the

3     prosecution team, to all of you who are interested in being

4     here and most of all to you, ladies and gentlemen of the jury,

5     good afternoon.

6          My name is George Goltzer.  Along with Ms. Ying

7     Stafford, we are going to be representing Tyrell Whitaker.

8     With Court's permission, I would ask Mr. Whitaker just for a

9     moment to stand up and face the jury.

10          Thank you, Tyrell, you may sit down.

11          Ladies and gentlemen of the jury, the reason you are

12     here today, as far as I am concerned and as far as Mr. Whitaker

13     is concerned, is that Mr. Whitaker stood before a judge and

14     said:  I plead not guilty.  I would like a trial by a jury.

15          On behalf of Mr. Whitaker and his defense team, we

16     would like to thank each and every one of you for taking time

17     out of your busy lives and being his jury.

18          As a defense lawyer, I am not obliged to say anything

19     or do anything.  I am not obliged to prove anything.  But

20     Ms. Stafford and I intend to take an active role on his part,

21     and we intend to demonstrate to you, to each and every one of

22     you, that the prosecution cannot and will not prove in this

23     courtroom beyond any reasonable doubt that Tyrell Whitaker is

24     guilty of the crimes with which he is charged.  Indeed, we will

25     show you that there is every reason to believe that he was not

present, didn't rob anybody, didn't have a gun, didn't shoot
anybody.  The evidence against Tyrell Whitaker I will show you
is seriously flawed.

          Before I do that and explain to you what I intend to
prove and what the evidence will show, let me tell you what
Mr. Whitaker is not charged with in this courtroom and let me
tell you what you will not see in this courtroom.

          Number one, I know the Court read you the charges.  He
did it rather eloquently, but it's difficult to comprehend and
absorb everything all at once.  We have been living with this
case for a long time, both sides of the aisle, but you are
hearing it for the first time.

          Mr. Whitaker is not charged in this courtroom with
being a member of a drug conspiracy.  You are not going to be
asked to decide whether he was or was not a member of a drug
conspiracy.  He is not charged in that count.

          Mr. Whitaker is not charged in this indictment with
the first charge, which is a robbery conspiracy or an agreement
to commit a robbery.  You will not be asked to decide whether
he conspired or agreed with other people to commit a robbery on
December 15, 2010.

          From where I stand, the question that I will ask you
to decide when the case is over, when the evidence has been
presented, is whether Mr. Whitaker has been proved beyond a
reasonable doubt to have actually taken part in the robbery on

1    December 15, 2010 and whether Mr. Whitaker took part in what is

2    essentially a terrible, terrible murder on December 15, 2010.

3          Let's go back to the evening of those horrible events

4    when Mr. Jeffrey Henry was shot, when there were robberies,

5    when there were stabbings, when there were injuries, when there

6    was, as the government put it, chaos or mayhem at 54 Chambers

7    Street in Newburgh, New York.

8          At about 27 minutes after midnight on December 15,

9    2010, calls went out to the Newburgh Police Department.  Shots

10   were fired.  The Newburgh Police Department responded as

11   quickly and as properly as they could.

12         They responded to a couple of locations.  They

13   responded to Chambers, they responded to the location where

14   Mr. Henry was supposed to be, and they responded to a hospital

15   in Newburgh, New York.

16         They found three people there.  They found Mr. Henry,

17   who couldn't talk to anybody, he was dying.  They found Baynes,

18   who was clearly bleeding from a stab wound and they found one

19   of the victims of the robbery.

20         Shortly after the police arrived, Baynes was

21   interviewed by a detective from the Newburgh Police Department

22   named Loscerbo.  It is a very important interview.  What he

23   told Loscerbo shortly after midnight, shortly after the robbery

24   and shooting occurred, was that he and a friend of his by the

25   name of Laquavious -- Laquavious.  I never get it right.

E85nchr2                     Opening – Mr. Goltzer

1    Laquavious -- Quay Quay was the nickname -- Boykin.  They were

2    with two other people named Bash and Baby E.  Bash and Baby E

3    were friends of theirs, and Bash and Baby E had guns.

4         Bash they told the police over a period of that day

5    had a silver gun that had a wheel on it, meaning a silver

6    revolver, and that it was Bash and the other fellow, Baby E,

7    who wanted to rob a drug spot at 54 Chambers Street.

8         Within an hour or two after the robbery, the attempted

9    robbery, unlike what the government will prove, we will prove

10   that he wasn't trying to protect his friend.  In fact, he had

11   already implicated two of his friends, Bash and Baby E.  What

12   he told Loscerbo was that he and Quay Quay wanted nothing to do

13   with the robbery that they were going to commit.

14        What he told the police was, We left.  We went

15   someplace else.  We went into a house.  After a while, we came

16   back outside because we were curious.  We wanted to see if Bash

17   and Baby E had committed the robbery.  This is what they were

18   talking to Detective Loscerbo about.  So we went back outside,

19   and there were shots.  They committed the robbery.  They

20   committed the crime.

21        That wasn't a very good story, and the police knew it

22   wasn't a very good story.  And by 9 o'clock in the morning,

23   after he had had a chance to sleep on it, Baynes realized it

24   wasn't a very good story, because Baynes knew that the police

25   were going to discover that he was inside, because the police

1    were already interviewing the man who stabbed him.

2              So he had to come up with a better story.  You are

3    going to hear that story, if not on direct examination on cross

4    examination by one of the defense lawyers.

5              The second story he told was as follows:  Quay Quay

6    and I were walking down the street minding our own business.

7    We saw a group of men.  They started shooting.  I got hurt.

8              The police didn't buy that story either, so he told

9    another story.  He said basically, and this is really

10   important, I didn't want to commit a robbery.  Quay Quay didn't

11   want to commit a robbery.  We were afraid that Raymond

12   Christian, Quay Quay's brother, was involved, and we wanted to

13   go make sure he was OK.  So that's why we went there, and

14   that's why I went in, to be my friend's brother's keeper.  He

15   told that story.

16             Then he told another story and another story, and you

17   are going to hear all the stories that this man told the day

18   after the robbery.

19             You are going to learn that the one thing he never

20   said on that day was that a Bow Wow, which is Whitaker's street

21   name or nickname, or Gucci, which is Thomas' nickname or street

22   name, while he was implicating two of his dear friends and the

23   brother of a dear friend in a crime that he was falsely trying

24   to avoid, he never told the police in all of those statements

25   that Tyrell Whitaker or Glenn Thomas were part of that crime.

1          That's how things stood for six months.  In April of

2    2011, he was indicted for murder in Orange County in the state

3    court.  This is Mr. Baynes.  Mr. Baynes stood before a judge,

4    pled not guilty, and as a 16-year-old defendant charged with

5    murder and robbery, he was facing the rest of his life in a

6    cage.

7          On May 11, 2011, for the first time, six months after

8    the crime, he decided to point the finger, and it's easy to

9    point a finger, he decided to point the finger at Tyrell

10   Whitaker and Glenn Thomas.

11         What he originally told the police was, in one of his

12   stories on that day, it was me, it was Laquavious, it was Bash,

13   it was Baby E.  I went in to take care of Christian, and there

14   were a group of other men there and I didn't recognize them.

15         Six months later, when he decided to snitch his way

16   out of a life sentence, he points the finger at Tyrell Whitaker

17   and he points the finger at Glenn Thomas in the same way that

18   he told about Mr. Christian, I needed a reason to go in there,

19   so I was worrying about Mr. Christian.

20         This fellow Baynes made a really sweetheart deal for

21   himself.  He was facing life in prison with a 15- to 25-year

22   mandatory minimum before he would be eligible for parole in New

23   York State on the life term, and he cut the following deal in

24   writing:  You cooperate with the Orange County district

25   attorney's office and you cooperate with these folks from the

1    Southern District of New York federal prosecutors and you won't

2    face a life term.  You will face a first degree robbery count.

3    All you have to do is cooperate and tell the truth.  And if you

4    don't do that, if you breach the agreement, you still won't

5    face murder charges.  We will recommend 17 years.  That is a

6    lot of time, but that's not life.

7           If you do cooperate properly, we, the Orange County

8    district attorney's office, will tell the judge what you did,

9    and you can get any legal sentence and any legal sentence in

10   that situation is as little as five years, which means that

11   after this trial he hopes to go home.  That's the deal he made.

12          On the day he pled guilty, the prosecutor actually

13   stood up in front of him in court and said, if you can do

14   better, we'll let you take the plea back and you can plead

15   guilty in the federal court.

16          That is their star witness.  That's the only witness

17   in the case who claims to have seen Tyrell Whitaker inside of

18   that location.  The government is going to try to put that

19   silver gun with the wheel in Tyrell Whitaker's hands.  They

20   claim that they have a witness by the name of Mallory who is

21   going to help them do it, who saw Whitaker take that gun, who

22   gave the gun back.  You heard him.

23          What we are going to show you is that Mr. Mallory was

24   another cooperator who entered into an agreement with the

25   government and became what is commonly known as a snitch or a

 1    rat, but I would like to say in more delicate terms a

 2    tattletale.

 3              Mr. Mallory told several stories about that gun.

 4    Mr. Mallory said to the government, I never saw that gun after

 5    the robbery.  And Mr. Mallory said I saw that gun in

 6    Mr. Whitaker's hands two days after the robbery.  Then

 7    Mr. Mallory said, wait a minute, I could be wrong.  Maybe it

 8    was two days before the robbery.

 9              Mr. Mallory has a lot of stories to tell.  And what

10    will prove that Mr. Mallory is not worthy of your belief is

11    Mr. Mallory's claim that he can identify voices on a 911 tape

12    as Mr. Thomas and Mr. Whitaker and he can identify people on a

13    videotape.

14              You are going to see the videotape of people going

15    back and forth on the streets of Newburgh on the evening of

16    December 15.  You jurors are going to see it.  You will hear

17    the 911 tape.

18              I promise you that you will find that you couldn't

19    identify your mother's voice on that tape, and you couldn't

20    identify her face on that videotape.  It is just not there.

21              That is the quality of the evidence that the

22    government is going to present to you, and that's how we are

23    going to expose it.

24              There is a man named McDermott who is going to testify

25    in this courtroom.  You have to understand that after Baynes,

E85nchr2                    Opening – Mr. Goltzer

1    who was a serial robber who himself admitted to committing

2    eight or nine or ten robberies over his lifetime with guns, who

3    was dealing drugs, who was generally a bad kid, after Baynes

4    pointed the finger at these people, the government scraped the

5    bottom of the barrel, and they came up with two witnesses,

6    Mallory and McDermott, who were essentially roommates.  One of

7    them had been in jail with Baynes and was talking about the

8    case.

9           They both coincidentally became informants, Mallory

10   and McDermott, in January of 2012.  McDermott had been arrested

11   for serious crimes and needed to snitch his way out.  He is

12   awaiting sentence as I speak on a first degree assault case in

13   the New York State courts, facing up to 25 years in prison.

14          He claims, falsely we will show you, that on the night

15   of the robbery, Whitaker walks in with blood all over his

16   clothing.

17          There's only one problem.  Even if you believe that

18   Whitaker was there according to Baynes' testimony, which he was

19   not, no testimony will put Whitaker or the guy they claim is

20   Whitaker in contact with anybody who's bleeding.  This fellow

21   McDermott is such a good witness with such a good memory that

22   on one occasion he said to the government at least a year and a

23   half after the crime, I can tell you that Tyrell Whitaker was

24   wearing a red and blue sweatshirt with a hood.  And the brand

25   name of the sweatshirt was Hollister.  That's how good he

E85nchr2                           Opening - Mr. Goltzer

1    claims his memory is.  It's remarkable.  On another occasion,

2    he said, no, the Hollister shirt was black.

3              There was no blood.  Tyrell Whitaker wasn't there.

4    Tyrell Whitaker didn't bring a gun to or from a place.  He's

5    not guilty, and that's what the evidence is showing to show.

6              There is a process that we are going to introduce you

7    to.  It is a process known as the proffer process.  It is a

8    process known as the cooperation agreement process.

9              You are going to learn how the government both in

10   state courts and in federal courts goes through the process of

11   interviewing these people and preparing them to testify for

12   hour after hour after hour.  You are not going to get a witness

13   who walks into court and says, They asked me to come in and

14   tell you what happened.  I am going to give you my spontaneous

15   version of events.  They are interviewed time and time and time

16   again.

17             That's when, after that process is over, they enter

18   into these so-called cooperation agreements.  These agreements

19   are written in a way that is most palatable to you.  You will

20   learn that what the government puts in these agreements is the

21   following, If you lie, if you violate this agreement, if you

22   don't tell the truth, if you commit another crime, we are going

23   to tear up your agreement.  You are going to get everything you

24   pled guilty to.

25             You, Mr. Mallory, pled guilty to crimes that carry

1    potential penalties of a mandatory minimum of 17 years in the

2    federal penitentiary and a possible maximum of life.  If you

3    don't tell the truth, we can prosecute you for all these

4    crimes.

5            But what they said to Mr. Baynes was, you already

6    heard it, you can do better if you want to go to federal court.

7    Well, Mr. Baynes doesn't want to go to federal court.

8    Mr. Baynes will never face, as these defendants face, life

9    sentences --

10           MR. BAUER:  Objection, your Honor.

11           THE COURT:  Ladies and gentlemen, as I instructed you

12   before, the subject of sentencing or punishment is not for the

13   jury.  It's for the judge.  Mr. Goltzer.

14           MR. GOLTZER:  I am not asking you to consider

15   sentences, ladies and gentlemen.  That's up to the judge.  What

16   I'm asking you to consider and what I am going to prove to you

17   is that these particular witnesses, particularly, Mr. Baynes is

18   not going to face a life sentence in a federal courtroom.

19   That's the deal he made even if he lies.

20           And Mr. Mallory breached his agreement and nobody tore

21   it up.  Mr. Mallory was out.  Mr. Mallory had promised that he

22   would behave himself and not use drugs anymore.  Mr. Mallory

23   used marijuana and ecstasy and failed drug tests and violated

24   that.

25           Mr. Mallory had promised the government that he would

1    tell them everything he ever did, and they confronted him with
2    robberies that he committed while he was cooperating for the
3    government.  And you will not hear the sound of paper being
4    torn in this courtroom by them tearing up his agreement.

5            By the time we are finished with this evidence and
6    with this trial, you will have many reasons to doubt whether
7    the government is has proved its case, and that's why you are
8    here.

9            You are not here to decide whether Mr. Whitaker was a
10   petty drug dealer in Newburgh.  By the way, they found about
11   6/1000ths of a gram of heroin on him at one time.  There was
12   testimony that he was out there pitching packages.  He is not
13   charged with that.

14           We can only appeal to your decency and your ability to
15   follow the instructions given by the Court, that you not say
16   I'm not going to like him because he was a member of the gang,
17   as everybody else in the room was, and that's why I am going to
18   convict him.  You have to believe beyond a reasonable doubt
19   that he committed the crimes he is charged with in the
20   indictment, and I am going to tell you at the end of this case
21   we will have demonstrated to you that it wasn't proven, he's
22   not guilty, and we will ask you to follow the law and follow
23   the oath that you took and find him on each and every one of
24   these very, very serious charges not guilty.

25           Thank you.

1          THE COURT:  Thank you, Mr. Goltzer.

2          MR. GOLTZER:  Thank you, Judge.

3          THE COURT:  Did Mr. Thomas wish to make an opening

4     statement?

5          Mr. Buchwald.

6          MR. BUCHWALD:  Good afternoon, ladies and gentlemen.

7     May it please the Court, my name is Don Buchwald.  Along with

8     my colleagues, Josha Dratel and Levi Downing, we represent

9     Mr. Glenn Thomas.

10         Mr. Thomas would you stand up, please.  That is

11    Mr. Thomas.

12         Our position in this trial is also very, very clear.

13    Mr. Thomas did not participate in any of the events of December

14    15, 2010.  He wasn't involved in a robbery at 54 Chambers

15    Street in Newburgh.  He wasn't involved in a robbery conspiracy

16    that lasted from 2008 to 2012.

17         As a matter of fact, he wasn't even in Newburgh for

18    three and a half of those four years.  He wasn't involved in a

19    drug conspiracy which they claim went from 2008 to 2012.  He

20    wasn't in Newburgh during three and a half of those years, and

21    during the period of time that he was there he was not involved

22    in robberies of drug dealers, he was not involved in sales of

23    drugs.  There may have been some marijuana smoking, involvement

24    with marijuana on his part, but not the sales, not drug

25    conspiracy.  That is our simple position, and that is one we

E85nchr2                    Opening – Mr. Goltzer

1   will prove over the next two to three weeks at this trial.

2          Ladies and gentlemen, as counsel for the codefendants

3   indicated, this trial is largely going to come down to the word

4   of Anthony Baynes.

5          You are not going to find with respect to Mr. Thomas

6   any forensic or physical evidence whatsoever that ties him in

7   either to the events of December 15, 2010 or to a robbery

8   conspiracy or a drug conspiracy.  You will find no

9   fingerprints, you will find no clothes left behind, you will

10  find no DNA.

11         There is a 911 call from Mr. Henry where you are going

12  to hear about a second and a half of a voice in the background.

13  That certainly is not Mr. Thomas' voice, but it will be

14  absolutely impossible, I suggest to you, to understand whose

15  voice it is with that length of time.

16         The government has access, we will show, to the most

17  sophisticated equipment in the world to try to make voice

18  identifications.  They didn't even attempt to do that because

19  they know that with a snippet that small you can't possibly

20  make a voice identification.  And anybody who comes in here and

21  says that was Mr. Thomas' voice or that was Mr. Whitaker's

22  voice you will know cannot possibly be telling the truth and

23  isn't telling the truth.

24         They have pole cameras in Newburgh.  There are cameras

25  on many of the street corners.  The night of December 15, 2010,

E85nchr2                      Opening – Mr. Goltzer

1   there were cameras set up at First Street about a block away

2   from 54 Chambers where the robbery and the shooting occurred.

3           There will be certain facts which I think we will be

4   able to agree on.  You are going to see seven people, seven

5   people heading a few minutes before the shooting, a few minutes

6   before the 911 call so you are able to know the time, heading

7   in the direction of 54 Chambers Street.  You are going to see a

8   few minutes later, around the time or shortly after the 911

9   call, you are going to see seven people in the opposite

10  direction.

11          You are going to see them all head on down First

12  Street, except one of them turns left on Lander Street.  Lander

13  Street is a block away, perpendicular to chambers in Newburgh.

14  You are going to hear, and we will show you during the course

15  of this trial, Mr. Thomas lives way up on Lander in the

16  opposite direction.  One would have turned right if one was

17  going to go to Mr. Thomas' home, but instead six people proceed

18  on First Street and one person turns left, so you are going to

19  have a number of seven.

20          And you are going to hear from the various witnesses,

21  depending on who you believe, and you remember you have

22  victims, you have some civilian witnesses outside or in the

23  neighborhood, and you have Mr. Baynes, who was there, and you

24  have to evaluate each of their testimony in a somewhat

25  different way.

E85nchr2                        Opening - Mr. Goltzer

1           You have heard from the judge witnesses like Baynes

2    and Mallory are folks, the government is presenting evidence

3    from people like this, but your oath as jurors requires that

4    you follow the law and that you give such evidence extra care

5    and scrutiny before you accept it.

6           So you are going to be evaluating the testimony of

7    these various people using various criteria, your own common

8    sense, but by and large you are going to be hearing from five

9    people, maybe four, maybe six, but five people it sounds like

10   go into that apartment at 54 chambers.  You are going to hear

11   the various stories that Mr. Baynes tells the authorities,

12   starting with -- what happened to the thing of water?

13           THE COURT:  Water?

14           MR. GOLTZER:  I thought it was mine.

15           MR. BUCHWALD:  I wish I could blame it on Mr. Baynes,

16   taking my water.

17           You are going to hear the various stories of

18   Mr. Baynes, when he is not protecting friends, but on that very

19   night as he's at the hospital where he's been stabbed and he's

20   making up story after story.

21           His first story is simply he and his friend Quay Quay

22   walking down the street late at night, and a group of black men

23   come in the other direction and suddenly somebody shoots him.

24           Of course, that doesn't work very well.  When he

25   thinks about it, he's going to realize he's got some problems,

E85nchr2                    Opening - Mr. Goltzer

1    like his blood in the apartment where he was stabbed.

2                And then he moves on to, no, it was me and Quay Quay

3    and Bash and Baby E.  We were all together and some people

4    discussed perhaps robbing a weed place on 54 Chambers, but we

5    told Bash and Baby E we didn't want to do that.  So later on we

6    went to look for them, and as we're walking on down a group of

7    black males passed us, and that's when I was stabbed, and we

8    started to run and we saw Bash and Baby E running and they had

9    guns.  That was story No. 2.

10               And then story No. 3 as the night progresses is, well,

11   actually we heard a larger group earlier in the night planning

12   on doing this robbery at 54 Chambers, so we went with them.  We

13   decided after we went back to our own home and we watched

14   Facebook and we played on the computer, gee, where is Quay

15   Quay's brother?  He might be involved in that.  Let's see if

16   they actually robbed some place, and so we went over in that

17   direction and then we heard a commotion and I got stabbed.

18               Then it changes again:  Yeah, we went over and I

19   actually looked inside, says Baynes, I could see inside, and we

20   saw Quay Quay's brother and he needed help so we raced inside

21   to try to help him, and that's when I got stabbed.

22               You are going to go through it, and what he has is

23   five people, five people involved and going on him.  When he

24   gets to his final story in the morning to Detective Cortez

25   after he has spoken to Loscerbo earlier in the day, he had

E85nchr2                    Opening - Mr. Goltzer

1  himself and Bash and Baby E and Quay Quay's brother and Quay

2  Quay.  He has five people involved.

3        And it stays that way, ladies and gentlemen.  It stays

4  that way until May of the following year.  In the interim you

5  are going to learn that Mr. Thomas was arrested for a gun

6  possession in February of 2011, a gun which has absolutely

7  nothing to do and no connection with this robbery.  It was an

8  inoperable gun, but it was loaded, and he was arrested for it

9  and that was publicized.

10        Baynes knew about it, and at that point in time,

11 Thomas became an easy patsy for Baynes to try to substitute

12 into the group.  Baynes has himself outside still in May of

13 2011, claiming that Bow Wow -- and then the next time he speaks

14 to the prosecutors claiming that Bow Wow and Mr. Thomas are in

15 the premises.  So you are going to see as he extricates himself

16 he starts to insert two new people into the crime.

17        You are going to know, ladies and gentlemen, that he

18 is lying, because all of the way through until this day he

19 maintains he wasn't armed, Quay Quay wasn't armed.  Initially

20 he's saying Bash and Baby E were armed, then he is saying Bash

21 and Baby E and Bow Wow were armed, then he is saying Bash and

22 Baby E and Bow Wow and Gucci were armed.

23        Until this day he claims he wasn't armed.  We are

24 going to present to you, if they don't, one of the victims of

25 that crime, one of the victims in the house, a fellow by the

1  name of Tarrence Smith.  He is one of the people who was in 54

2  Chambers.  Tarrence Smith will tell you that he saw a wrestling

3  match between one of the robbers and a fellow by the name of

4  Akinto who was also in the house, and he went over to help

5  Akinto, and Akinto wrestled the gun away from a guy, was able

6  to get control of the gun, and that he, Tarrence Smith, stabbed

7  that guy.

8          We know these things because we have the prior

9  statements of some two and a half weeks before this trial

10 started.  We were given the prior statements as the law

11 requires of people who have testified so that we have a chance

12 to see what they have said and to be able to prepare the

13 cross-examination.

14         That is what he said.  He said that he stabbed the man

15 whose gun was taken from Akinto.  You will hear, ladies and

16 gentlemen, notwithstanding Baynes' claim that he never had a

17 gun, that he was armed the whole time, that Baynes himself was

18 the person who had that gun.  You are going to hear that the

19 claims about the chrome gun and about a black gun which Baynes

20 and Mallory are putting in the hands of Whitaker and Thomas,

21 and they are claiming these are the guns, these are the

22 revolvers, these are the .38s that they allegedly shot Jeffrey

23 Henry with.

24         But we are going to present to you, ladies and

25 gentlemen, forensic evidence -- if they don't present it, we

E85nchr2                          Opening - Mr. Goltzer

1    are going to present it -- evidence concerning the shell

2    casings, evidence concerning the bullets that were found,

3    evidence concerning the bullets that were in Jeffrey Henry,

4    that were found during the autopsy, and Jeffrey Henry was

5    killed with two bullets from a nine millimeter gun.

6                (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E859chr5                    Opening – Mr. Buchwald

1           MR. BUCHWALD:  (Continuing).  Nine millimeter gun.

2           We ask you to remember that as you're hearing the

3    testimony from the various witnesses, particularly Baynes and

4    then Mallory when they're testifying because it helps put the

5    lie to their testimony.  It's not like TV where you

6    cross-examine somebody and they start to cry in the middle and

7    say "I did it."  I don't know if everybody is old enough to

8    remember Perry Mason.  Not one of you is old enough to remember

9    Perry Mason -- well maybe one.  That's the way it would happen

10   on Perry Mason.  That's not the way it happens in real life.

11   You show that they're lying about things of significance,

12   things which according to their plea agreements oh, if they

13   lie, the deal goes out.  But you'll know that they're lying

14   when you see the forensic evidence and when you see the autopsy

15   report.

16           Yes.  Jeffrey Henry was shot and killed with three

17   bullets that were found during the autopsy.  Three bullets --

18   two -- three bullets were found during the autopsy.

19           Two are nine millimeter bullets, the new shots from

20   that evening, from December 15 of 2012.  There's one other

21   bullet in his shoulder.  From events, and the medical office

22   will examiner will testify to this, from events nine years or

23   ten years or however long before.  And they know when it's a

24   new bullet or an old bullet because inside the body when a

25   bullet has come in there's, of course, a track that you see

E859chr5                          Opening - Mr. Buchwald

1    that the bullet took.  If the bullet stays in you for a long,

2    long period of time things heal around it and there is no

3    track.  And the medical examiner from Newburgh will testify

4    unequivocally that that third bullet that is in him is from

5    years and years ago.  What he is shot with, what he is killed

6    with, two nine millimeter bullets.

7           Ladies and gentlemen, we're going to show from the

8    forensic evidence that there are a total of eight shots fired

9    that evening.  They are all accounted for, including the shot

10   that hits Terrence Smith from one of the robbers, including the

11   shots that Akinto takes.  He's the robber who wrestles the gun

12   away from Baynes.  The shots that he takes because they find

13   the casings.  They find a total of six casings and eight

14   bullets.  And you're going to hear them, ladies and

15   gentlemen -- if they don't elicit it, we will.  If they don't

16   elicit it, we will.

17          You're going to hear testimony that these -- what you

18   have when an automatic weapon is fired, you have casings that

19   come out and bullets.  And there should be an equal number when

20   a revolver is fired, which would be a .38, there is no casing.

21   It stays in the weapon.  So you're going to find that there are

22   two .38 caliber shots that were fired for which no casings were

23   found.  But you're going to find a total of eight shots.

24          And you're going to see, ladies and gentlemen, their

25   theory that shots are fired out the door, two shots fired out

E859chr5                    Opening - Mr. Buchwald

1    the door that kill Henry that couldn't possibly have been done

2    the way they claim by .38s that are being held by Bow Wow and

3    Gucci.

4            Ladies and gentlemen, I'm going to ask you -- and I

5    know it's hard, these names are being thrown at you and the

6    stuff about the ballistics.  Probably doesn't make great

7    clarity right now until the actual testimony comes in.  But

8    it's important because you're going to be hearing Baynes'

9    testimony the next day or two or Monday or tomorrow or whenever

10   and you're not going to hear the testimony from Terrence Smith

11   until much later in the trial.  So it's important to know as

12   he's testifying, as Mallory is testifying that there is this

13   fellow, the victim who knows that the guy who's stabbed is the

14   guy whose gun was wrestled away and you will know that the guy

15   that is stabbed is Baynes.  He's the one in the hospital.  He's

16   the one whose blood is found at the scene and matched.

17           So these things are very, very important.  The

18   government controls the order of witnesses.  And that's why we

19   want to point out certain things that are going to happen later

20   in the trial as you evaluate the earlier testimony.

21           With respect to Mr. Mallory, he is someone who has

22   lied consistently, someone who, even after his agreement,

23   continued to commit crimes; someone who continued to commit

24   robberies while he was supposedly cooperating with the

25   authorities.  But ultimately it is Baynes' testimony and

E859chr5                    Opening - Mr. Buchwald

1    Baynes' testimony alone that the government hangs its hat on

2    when it suggests that Glenn Thomas was involved in these events

3    of December 15.

4           I'm going to ask you if you would, I'm going to

5    suggest one or two dates to keep in mind.  You have notepads

6    that you can use during the course of the trial to the extent

7    that you think useful.

8           January 2012.  It will be very, very important.  When

9    you hear from us again in summations, whether it's Mr. Dratel

10   or myself on behalf of Mr. Thomas, January 2012, to see what

11   events have occurred before that time and what events have

12   occurred after that time.  That's the time when the coincidence

13   of Mallory and McDermott both suddenly offering to make deals

14   to get out from under the horrendous crimes that they have

15   committed.

16          You're going to hear, ladies and gentlemen, about the

17   eight or nine or ten likely people -- except we know that there

18   are only seven who actually commit the offense -- who actually

19   are walking in that video, who actually are going down to the

20   area of 54 Chambers Street, five of whom go into that building,

21   including Mr. Mallory himself as one of those likely

22   participants.

23          You're going to hear about a fellow whose nickname and

24   street name is Snelly.  You're going to hear about a fellow

25   whose street name is L-1.  You're going to hear all of this

1    testimony about people who are involved, who it is claimed were

2    the shooters or participated in the robbery that evening.

3         And when all is said and done, ladies and gentlemen,

4    when all is said and done I suggest to you that you will return

5    the one verdict consistent with your oaths as jurors,

6    consistent with the presumption of innocence that Mr. Thomas is

7    entitled to, consistent with the requirement that you consider

8    testimony of people like Baynes and Mallory with extra caution

9    and care, consistent with the total absence of forensic or

10   physical evidence that corroborates what they say, and that is

11   a verdict of not guilty.

12        Thank you.

13        THE COURT:  Thank you, Mr. Buchwald.

14        Mr. Bauer, does the government have its first witness?

15        MR. BAUER:  Your Honor the government calls Elena

16   Gardner.

17        THE COURT:  Did you want to move the podium.

18        Is someone tasked with getting Ms. Gardner?

19        Ms. Gardner, step all the way up along the front of

20   the jury box and step into the witness stand and remain

21   standing.  Please watch any wires that may be on the floor.

22    ELENA MARIA GARDNER,

23       called as a witness by the Government,

24       having been duly sworn, testified as follows:

25        THE COURT:  Mr. Bauer.

E859chr5

1              MR. BAUER:  Thank you, your Honor.

2    DIRECT EXAMINATION

3    BY MR. BAUER:

4    Q.  Ms. Gardner, how old are you?

5    A.  43.

6    Q.  Where did you grow up?

7    A.  Newburgh.

8    Q.  Is that in Newburgh, New York?

9    A.  Yes.

10   Q.  How far did you go in school?

11   A.  Tenth grade.

12   Q.  Did you finish the tenth grade?

13   A.  No.

14   Q.  So did you finish the ninth grade?

15   A.  Yes.

16   Q.  Do you have any degrees?

17   A.  I have my GED.

18   Q.  And approximately when did you get your GED?

19   A.  2006.

20              MR. GOLTZER:  Forgive me.

21              THE COURT:  You can move the microphone closer to you.

22   Please speak directly into the microphone.

23              THE WITNESS:  2006.

24   Q.  Are you currently employed?

25   A.  No.

E859chr5                          Gardner - direct

1    Q.  When is the last time that you worked?

2    A.  2008.

3    Q.  And in 2008 what were you doing?

4    A.  I was a food packaging, shipping and receiving at a -- an

5    Indian restaurant.

6    Q.  How long did you work there for?

7    A.  Six months.

8    Q.  Why did you stop working there?

9    A.  Because in a blast chiller, in a freezer, working in a

10   freezer.  I was getting sick.

11   Q.  So since 2008 have you had any other income or any other

12   funds that you received?

13   A.  No.

14   Q.  Do you have any money that comes in every month?

15   A.  My son.  My son receives disability.  I receive social

16   services.

17   Q.  Ms. Gardener, have you been subpoenaed to testify here

18   today?

19   A.  Yes.

20   Q.  Do you want to be here?

21   A.  No.

22   Q.  Why not?

23         MR. GOLTZER:  Objection.

24         THE COURT:  Sustained.

25   Q.  Are you here because the subpoena is making you be here?

E859chr5                        Gardner - direct

 1   A.  Yes.

 2   Q.  In response to that subpoena did you tell the government

 3   that you would consider asserting your Fifth Amendment right

 4   not to incriminate yourself?

 5   A.  Yes.

 6   Q.  By "incriminate yourself," I mean to get yourself in

 7   trouble with your testimony here today?

 8   A.  Yes.

 9   Q.  Have you reviewed an order that was signed by the judge

10   relating to your testimony?

11   A.  Yes.

12   Q.  What do you understand that order to require of you?

13   A.  Speak the truth.  And immunity.

14   Q.  What protections does that order provide for you?

15   A.  That I won't be discriminated for whatever I say.

16   Q.  You won't be discriminated?

17   A.  From myself.

18   Q.  So earlier you used the term immunity.  What does that

19   mean?

20   A.  Oh, God.

21   Q.  Does immunity mean what we talked about just before, that

22   you wouldn't get in trouble for your testimony?

23   A.  Yes.

24   Q.  Do you know what protection the order gives you if you

25   testify falsely?

E859chr5                        Gardner - direct

1    A.   Yes.

2    Q.   What -- does the order protect you if you testify falsely?

3    A.   No.

4    Q.   Ms. Gardener have you ever used any drugs?

5    A.   Yes.

6    Q.   What drugs?

7    A.   Marijuana.

8    Q.   When did you start using marijuana?

9    A.   My late teens.

10   Q.   Have you stopped?

11   A.   No.

12   Q.   So in 2014 now you're still using marijuana?

13   A.   Yes.

14   Q.   How often?

15   A.   Everyday.

16   Q.   And how about back in 2010, how often were you using

17   marijuana?

18   A.   Everyday.

19   Q.   Have you ever sold drugs?

20   A.   Yes.

21   Q.   What drugs have you sold?

22   A.   Crack.

23   Q.   When did you first sell crack?

24   A.   In my late 20s.

25   Q.   When is the last time that you sold crack?

E859chr5                        Gardner - direct

1    A.   2009.

2    Q.   Why did you stop in 2009?

3    A.   I went to prison.

4    Q.   When you went to prison did you go to prison because you

5    were selling crack?

6    A.   Yes.

7    Q.   So you were arrested for selling crack?

8    A.   Yes.

9    Q.   Did you plead guilty to those charges?

10   A.   Yes.

11   Q.   Ms. Gardner, when is the last time that you were arrested?

12   A.   March 2014.

13   Q.   Where were you?

14   A.   In a car in the City of Newburgh.

15   Q.   Were you by yourself in that car?

16   A.   No.

17   Q.   Who were you with?

18   A.   Akinto Boone and Tamia Hayes.

19        THE COURT:  What were those names?

20        THE WITNESS:  Akinto Boone and Tamia Hayes.

21   Q.   Whose car was it?

22   A.   Akinto's mom.  It was a rental from North Carolina.

23   Q.   And did the police stop the car?

24   A.   Yes.

25   Q.   Did the police find anything in the car?

E859chr5                          Gardner - direct

1    A.  Yes.

2    Q.  What did they find?

3    A.  Crack in the back seat.

4    Q.  Whose crack was it?

5    A.  Akinto Boone's.

6    Q.  What happened to your arrest charges?

7    A.  It got dropped to no parking -- not stopping at a stop

8    sign.

9    Q.  So you weren't made to plead guilty to any crack-related

10   charges, correct?

11   A.  No.

12   Q.  Ms. Gardner, at this time I would like to draw your

13   attention to the events that took place on December 15, 2010.

14   Back then in 2010 where were you living?

15   A.  111 Johnston -- no 122 Johnston Street.

16   Q.  Is that in Newburgh?

17   A.  Yes.

18   Q.  Do you remember where you were just after midnight on that

19   day?

20   A.  I was in a car.

21   Q.  And were you in the car by yourself?

22   A.  No.

23   Q.  Who were you with?

24   A.  Larry Cheery.

25   Q.  Who is that?

1    A.  He's behind you.

2    Q.  He's here in the courtroom today.  What is your relation?

3    A.  He's a friend.  He was taking me -- I called him to come

4    pick me up to take me to the gas station.

5    Q.  For what purpose?

6    A.  Cigarettes.

7    Q.  And where did Larry pick you up?

8    A.  On Johnston, 122 Johnston.

9    Q.  Your house?

10   A.  Yes.

11   Q.  And where did you go?

12   A.  To on the -- we was going to Underrun.  We came down -- we

13   came down Farrington.  And we turned down Lander and I seen

14   somebody laying on the ground.

15   Q.  So I'm sorry -- so you turned onto Lander from Farrington?

16   A.  From Johnston.

17   Q.  Okay.  And you saw someone lying on the ground.  Were they

18   on the street or on the sidewalk?

19   A.  On the sidewalk.

20   Q.  And where on Lander Street?

21   A.  45A.

22   Q.  45A Lander Street?

23   A.  Yes.

24   Q.  Now when you saw this person lying on the ground what, if

25   anything, did you and Mr. Cherry do?

1    A.  We kept going at first and then we backed up.

2    Q.  Why is that?

3    A.  I don't know why.  I just told him to back up and I got out

4    the car, asked him if he been shot, if he needed help or

5    something and he said, yeah, call the ambulance.  So I called

6    the ambulance.

7    Q.  I'm sorry.  So you spoke to the person that was lying on

8    the ground?

9    A.  Yes.

10   Q.  And then based on that conversation you made a phonecall,

11   you said?

12   A.  Yes.

13   Q.  Who did you call?

14   A.  Called 911.

15           MR. BAUER:  Your Honor, may I approach?

16           THE COURT:  You may.

17   BY MR. BAUER:

18   Q.  Ms. Gardner, I'm showing you what's been marked as

19   Government Exhibit 282 for identification.  Can you take a look

20   at this and tell me if you recognize it?

21   A.  Yes, I do.

22   Q.  What do you recognize it to be?

23   A.  CD.

24   Q.  Did you --

25   A.  With my initials on it and the date.

E859chr5                              Gardner - direct

1    Q.  I'm sorry.  Continue.

2    A.  My initials and the date that I signed it.  And I signed it

3    once I heard it.

4    Q.  Do you know what's on the CD?

5    A.  Yes.

6    Q.  What is it that's on the CD?

7    A.  My actual 911 call.

8    Q.  And you said your initials are on here?

9    A.  Yes.

10   Q.  When did you initial it?

11   A.  Today.

12   Q.  Was that after listening to the call?

13   A.  Yes.

14           MR. BAUER:  Your Honor, the government offers Exhibit

15   282 into evidence.

16           MR. GOLTZER:  No objection.

17           THE COURT:  Government's 282 will be received.

18           (Government's Exhibit 282 received in evidence)

19           MR. BAUER:  Your Honor, may we have permission to

20   publish it, in this case play it for the jury?

21           THE COURT:  You may.

22           (Audio recording played)

23   BY MR. BAUER:

24   Q.  Ms. Gardner, did the police eventually show up at that

25   scene?

E859chr5                              Gardner - direct

1    A.  Yes.

2    Q.  I'm sorry.  Just to ask you about that recording.  Did you

3    recognize the voice on the recording?

4    A.  Yes.

5    Q.  Whose voice was it?

6    A.  Mine.

7    Q.  And when did you make that recording?

8    A.  (No response).

9    Q.  Or when did you make the phonecall that was recorded on

10   that CD?

11   A.  What do you mean when?  Like --

12   Q.  When did you make that call to 911?

13   A.  December 15.

14   Q.  Okay.  I'm sorry.  So the police eventually arrived?

15   A.  Yes.

16   Q.  What, if anything, did you see the police do when they got

17   there?

18   A.  They was talking to him and they zipped the coat down off

19   his face.

20   Q.  You saw them unzip his coat?

21   A.  Yeah, off of his face.

22   Q.  After they unzipped his coat, could you see who it was?

23   A.  Yes.

24   Q.  Did you recognize the person?

25   A.  Yes.

E859chr5                         Gardner - direct

1    Q.  Who was it?

2    A.  It was Joker.  Jeffrey Henry.

3    Q.  You said Jeffrey Henry, and then you said Joker?

4    A.  Yes.

5    Q.  Is that how you knew him?

6    A.  Joker, yes.

7    Q.  You knew him by the name Joker?

8    A.  Mm-hmm.

9    Q.  After they unzipped his jacket and you saw his face, what,

10   if anything, else did you do?

11   A.  I left and I went -- I went to his mother's house to tell

12   her.

13   Q.  And after you did that, after you went to his mother's

14   house did you go anywhere else?

15   A.  I went to the hospital.

16   Q.  What hospital is that?

17   A.  St. Luke's.

18   Q.  And who, if anybody, did you see there at the hospital?

19   A.  Besheltie.

20   Q.  Besheltie?

21   A.  Yes.

22   Q.  Who is Besheltie?

23   A.  Besheltie Smith.

24   Q.  And how do you know Besheltie Smith?

25   A.  Grew up -- like grew up together.

E859chr5                              Gardner - direct

1    Q.  Does Besheltie Smith have any children?

2    A.  Yes.

3    Q.  Do you know her children?

4    A.  I know her son.

5    Q.  What's her son's name?

6    A.  Quay Quay -- no, it's Little.

7    Q.  Is it Quay Quay or is it Little, just to be clear?

8    A.  Little.

9    Q.  Is Little his real name or his nickname?

10   A.  I don't know his real name.

11   Q.  So you know him by his nickname Little?

12   A.  Yes.

13   Q.  Did you see anybody else at the hospital besides Besheltie?

14   A.  I seen Mike Boone.  I seen Terrence in the wheelchair.  And

15   the other kid I don't really know.  I think his name is

16   Tyrrell.

17   Q.  Let me ask you about Terrence.  What, if anything, did you

18   notice about Terrence.  You said he was sitting in a

19   wheelchair, correct?

20   A.  Yes.

21   Q.  When else did you notice?

22   A.  His foot was bleeding.

23   Q.  Excuse me?

24   A.  His foot was bleeding.  His leg or his foot.

25          MR. BAUER:  Your Honor, may I approach?

E859chr5                          Gardner - direct

1           THE COURT:  You may.

2     BY MR. BAUER:

3     Q.  Ms. Gardner, I'm showing you what's has been marked as

4     Government Exhibit 221, 215 and 216.  These are photographs.

5     Could you take a look at these three tell me if you recognize

6     the individuals in these photos.

7     A.  (No response).

8     Q.  Starting first with Government Exhibit 215.  Do you

9     recognize that person?

10    A.  Yes.

11    Q.  Who is that?

12    A.  This is Terrence.

13    Q.  That's Terrence?

14    A.  Yes.

15    Q.  Do you know Terrence's last name?

16    A.  I think it's Stubs.  I'm not sure.

17    Q.  You're not sure?

18    A.  No.

19    Q.  Okay.

20          MR. BAUER:  Your Honor, the government offers

21    Government Exhibit 215 into evidence.

22          MR. BUCHWALD:  No objection.

23          THE COURT:  215 will be received.

24          (Government's Exhibit 215 received in evidence)

25          MR. BAUER:  May we publish it to the jury?

1          THE COURT:  Sure.

2          Is the jury able to see that on the screens?

3          So one of the screens is not working.  We'll take care

4     of that.

5          JUROR:  Now we can.

6          THE COURT:  You just have to kick it once or twice.

7     Okay.

8     BY MR. BAUER:

9     Q.  Ms. Gardner, now moving to Government Exhibit 216.  Do you

10    recognize that individual?

11    A.  Yes.

12    Q.  Who is that?

13    A.  This is Little.

14    Q.  Little.  Is that the person that you identified as

15    Besheltie's son?

16    A.  Yes.

17          MR. BAUER:  The government offers Government Exhibit

18    216 into evidence.

19          THE COURT:  Any objection.

20          216 will be received.

21          (Government's Exhibit 216 received in evidence)

22          MR. BAUER:  Permission to publish, your Honor?

23          THE COURT:  You may.

24    BY MR. BAUER:

25    Q.  Finally Government Exhibit 221.  Do you recognize that

E859chr5                          Gardner - direct

1   individual?

2   A.  Yes.

3   Q.  Who is that?

4   A.  This is Joker.

5   Q.  Joker.  The individual you referred to as Jeffrey Henry as

6   well?

7   A.  Yes.

8           MR. BAUER:  The government offers Government Exhibit

9   221 into evidence.

10          THE COURT:  Any objection?

11          221 will be received.

12          (Government's Exhibit 221 received in evidence)

13          MR. BAUER:  Can we publish it, your Honor?

14          THE COURT:  You may.

15          MR. BAUER:  Thank you.

16   BY MR. BAUER:

17   Q.  Just to be clear, Ms. Gardner, how do you know Joker?

18   A.  Grew up around.

19          THE COURT:  I'm sorry.  I didn't hear you.

20          THE WITNESS:  Grew up together.  Close friends.

21          MR. BAUER:  Your Honor, no further questions.

22          THE COURT:  Okay.  Any cross-examination?

23          MR. BUCHWALD:  Yes, your Honor.

24   CROSS-EXAMINATION

25   BY MR. BUCHWALD:

1    Q.  Good afternoon, Ms. Gardner.

2            Clear from the 911 call this was a very upsetting

3    experience; is that right?

4    A.  Yes.

5    Q.  Now, when you got to -- let me show you what has been

6    marked as -- premarked as Exhibit 3505-6 for identification and

7    ask you if you'd read that to yourself.

8            MR. BAUER:  Objection to form here.

9            THE COURT:  I'm sorry.

10           MR. BAUER:  Objection to form here.

11           THE COURT:  There has been no question.

12           MR. BUCHWALD:  I'm going to ask her if she's able to

13   identify it after she reads it to herself.

14           THE COURT:  Okay.

15   BY MR. BUCHWALD:

16   Q.  Does that refresh your recollection as to anyone else that

17   you saw at the hospital that evening when you went to the --

18   when you went to the hospital?

19   A.  No.

20   Q.  It doesn't?

21           Was there a point in time -- withdrawn.

22           Today is August 5.  Was there a point in time four

23   days ago on August 1 when you sent a text message to one of the

24   U.S. attorney's investigators?

25   A.  Yes.

1   Q.  Concerning who you had seen?

2   A.  Yes.

3   Q.  Right.  And in that text message did you say that you had

4   not seen somebody by the name of Quay Quay?

5   A.  Yes.

6   Q.  And why was it that you were sending a message saying you

7   hadn't seen Quay Quay?

8           Had somebody suggested to you that Quay Quay was

9   there?

10  A.  No.

11  Q.  Well how is it that you were sending a text message saying

12  you had not seen Quay Quay if nobody had asked you about it?

13  A.  Oh, I was asked who all did I see.  At the hospital.

14  Q.  All right.  But how did you know to send a text saying I

15  didn't see Quay Quay?

16  A.  I sent the text because my phone is broke.  That's why I

17  sent the text.

18  Q.  No.  I understand that.  But how did you know in the text

19  to say I didn't see Quay Quay if no one had suggested to you or

20  asked you about whether you had seen Quay Quay?

21  A.  I named who I seen at the hospital.  And then that's when I

22  texted them and told them it wasn't Quay Quay, it was Mike

23  Boone I seen.

24  Q.  I understand you sent a text saying it wasn't Quay Quay.

25  But that at least suggests that somebody asked you did you

E859chr5                           Gardner - cross

1    see --

2    A.   Asked me who all was at the hospital that night when I got

3    up here.

4    Q.   Say it again.

5    A.   I was asked who all was at the hospital when I got up here.

6    Q.   Who asked you that?

7    A.   A city detective asked me first.

8    Q.   Did somebody recently ask you that?

9    A.   No.

10   Q.   So when you sent this text and you said you didn't see

11   Quay Quay --

12   A.   What was the date from that?

13   Q.   This is --

14            MR. BUCHWALD:   If I may?

15            THE COURT:   Show her the document.   See if it

16   refreshes her recollection.

17   BY MR. BUCHWALD:

18   Q.   Four days ago when you sent -- did you send this text four

19   days ago.

20   A.   Yes, I did.

21   Q.   So that's the date.   And my question to you is had someone

22   suggested to you, asked you do you see Quay Quay?

23   A.   No.

24   Q.   So no one asked you that?

25   A.   No.

E859chr5                         Gardner - cross

```
1    Q.  You were just sending a text out of the blue saying I did

2    not see Quay Quay?

3    A.  This was when I had to meet the -- Mr. Patrol at the city

4    police station before they gave me the date to come here for

5    trial.

6    Q.  But this is just four days ago, right?

7    A.  Yes.

8    Q.  So four days ago did somebody suggest to you that you had

9    seen Quay Quay and you were saying no, I didn't?

10   A.  No.

11   Q.  So you were just out of the blue saying I did not see

12   Quay Quay?

13           MR. BAUER:  Objection, your Honor.  Asked and

14   answered, your Honor.

15           THE COURT:  Asked and answered.  Yes.  Sustained.

16   BY MR. BUCHWALD:

17   Q.  But you did see -- withdrawn.

18           You saw somebody by the name of Mike Boone?

19   A.  Yes.

20   Q.  Is Mike Boone related to Akinto Boone?

21   A.  Yes.

22   Q.  What is the relationship?

23   A.  His brother.

24   Q.  And did you see Mike Boone at the hospital?

25   A.  Yes.
```

E859chr5                          Gardner - cross

1   Q.  And did you see Akinto Boone at the hospital?

2   A.  No.

3   Q.  Do you know who Quay Quay is?

4   A.  Yes.

5   Q.  Who is Quay Quay?

6   A.  His mother name is Lonna.  I know his family very well.

7   Q.  Quay Quay, he lives in Newburgh?

8   A.  Yes.

9   Q.  And Quay Quay is the nickname?

10  A.  I guess so, yes.  I don't know his real name.

11  Q.  And could we have --

12          MR. BUCHWALD:  I'm going to play -- this is not in

13  evidence yet.  If I can have it marked as Defendant Thomas' Q

14  for Quay Quay -- Q for identification.

15          MR. BAUER:  Your Honor, objection.

16          THE COURT:  Let's see what the exhibit is.

17          MR. BUCHWALD:  I'm going to ask that it be played just

18  for you at this point because it's not in evidence yet, just to

19  see if you can identify it.  Is there a way so that it's only

20  on the witness's screen at this point?

21          THE COURT:  What is it that you're going to show her?

22  Is it a picture?

23          MR. BUCHWALD:  I want to show it to her and see if it

24  refreshes her recollection as to who she saw that night at the

25  hospital.

1              Are you watching that?

2              THE COURT:  Are you able to see something on the

3     screen in front of you, Ms. Gardner?

4              THE WITNESS:  No.

5              MR. BAUER:  Your Honor, objection.  Lack of

6     foundation.

7              MR. BUCHWALD:  Well I guess we need a button so she

8     can see it.

9              THE COURT:  Well, let's meet at sidebar.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              THE COURT:  Let me ask a question.  Did you expect her

3     to be done today?

4              MR. BAUER:  Yes.  We didn't expect any

5     cross-examination.

6              THE COURT:  Does she need to come back?  How much more

7     do you have?

8              MR. BUCHWALD:  I think also Mr. Greenfield --

9              MR. GREENFIELD:  I have cross also.

10             THE COURT:  She may need to come back.  And if she may

11    need to come back, I'd rather send the jury home now because --

12    then we can take care of these issues.

13             MR. BAUER:  How long do you have?

14             MR. BUCHWALD:  He has some time.

15             MR. BAUER:  She has young kids.  It's difficult for

16    childcare.

17             THE COURT:  If we can be done at 5:30, then I'll --

18             MR. BUCHWALD:  Can we be done by 5:30?

19             MR. GREENFIELD:  I can't say I would.

20             MR. BUCHWALD:  Can we go off the record for a second?

21             THE COURT:  Off the record.

22             (Discussion off the record)

23             THE COURT:  So what is the objection to what

24    Mr. Buchwald is doing?

25             MR. BAUER:  He hasn't established that she doesn't

1    remember.  He is asking questions about text messaging.

2              You were asking about a text message.  What had

3    happened.  She met with us, mentioned that Quay Quay was there.

4    And then later she was thinking about it, sent a text message

5    you know what, I thought about it some more, I don't think I

6    saw --

7              MR. GREENFIELD:  She went home and wracked her brain.

8              MR. BAUER:  I don't think you've laid the foundation.

9              MR. BUCHWALD:  I mean the ultimate point is we just

10   want to show Quay Quay is there.  I'm not out to --

11             MR. BAUER:  That Quay Quay was there.  We can

12   stipulate to it.  Perfect.  Let's save her a trip back.  Let's

13   stipulate.  Quay Quay was there.

14             MR. BUCHWALD:  He's going to have cross no matter what

15   so it's not going to save a trip back.

16             THE COURT:  Did she say anything about Mr. Christian?

17             MR. GREENFIELD:  No.  But there are certain things

18   about the investigation I want to elicit that she was involved

19   in.

20             THE COURT:  Beyond being a witness and being at the

21   hospital how was she involved in the investigation?

22             MR. GREENFIELD:  Statements that she made to the

23   police.

24             MR. BUCHWALD:  She also was interfacing with Akinto

25   Boone who was at the scene that night.  She was arrested with

1    him.  Did I hear that correctly on direct?

2              MR. BAUER:  A few months ago, yes.

3              THE COURT:  I'm going to send the jury home.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                (In open court)

2                THE COURT:  Ladies and gentlemen, I've already broken

3     one of my promises to you.  I told you that we'd be done by

4     5:00.  It was the hope that we would be able to finish with

5     this witness.  However, that's not going to happen.  So we're

6     going to excuse you for the evening.  We're going to ask that

7     you be back first thing tomorrow morning, no later than 9:25 in

8     the jury room.  I know that you may need to spend some

9     additional time in the back with Ms. Miller if you have some

10    questions.  This will not happen again.  We will work from 9:30

11    until 5:00.  Okay.  Until then, please do not discuss the case.

12    And that includes on social media.  Have a very pleasant

13    evening and we'll see you bright and early tomorrow morning no

14    later than 9:25 in the jury room.

15                Thank you.  All rise.

16                (Jury excused)

17                (Continued on next page)

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  Ms. Gardner, you may step down.  But you

3    will be required to come back tomorrow.

4              (Witness excused)

5              MR. BAUER:  Your Honor, while Ms. Gardner is here,

6    obviously when a witness is on cross-examination we don't speak

7    with them.  We do need to coordinate transportation for her.

8              THE COURT:  That conversation can take place.  Any

9    nonsubstantive conversation can take place concerning

10   logistics, the weather, the YES Network, etc.

11             MR. BAUER:  Thank you, your Honor.

12             THE COURT:  And I guess technologically will we be

13   able to do what Mr. Buchwald expected us to be able to do which

14   is to play that video or whatever it is on that monitor and not

15   for the jury?

16             MR. NAWADAY:  Yes, your Honor, we can do that.

17             THE COURT:  Okay.  Very well.  Is there anything else

18   that we need to do this evening that you need me for.

19             MR. BUCHWALD:  Tomorrow morning are we going to be

20   reconfigured?

21             This was mostly for jury selection.  So are we going

22   to be somewhat reconfigured tomorrow so that the teams are

23   actually together?

24             I think we can just do that on our own.

25             THE COURT:  If you want me to come down and move

1    tables, I'm happy to come down and move tables.

2            Very well.  Just make sure that that happens before

3    9:30.

4            (Adjourned to August 6, 2014 at 9:00 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

 ELENA MARIA GARDNER

Direct By Mr. Bauer  . . . . . . . . . . . .73

Cross By Mr. Buchwald  . . . . . . . . . . .87

                 GOVERNMENT EXHIBITS

Exhibit No.                              Received

 282  . . . . . . . . . . . . . . . . . . .81

 215  . . . . . . . . . . . . . . . . . . .85

 216  . . . . . . . . . . . . . . . . . . .86

 221  . . . . . . . . . . . . . . . . . . .87