E86nchr1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA
3              v.                        12 CR 626 (ER)
    RAYMOND CHRISTIAN a/k/a
4   "Reckless"
    GLENN THOMAS, a/k/a "Gucci"
5   TYRELL WHITAKER, a/k/a "Bow Wow"
               Defendants
6   ------------------------------x
                                        New York, N.Y.
7                                       August 6, 2014
                                        9:15 a.m.
8

9   Before:
                        HON. EDGARDO RAMOS
10                                      District Judge

11

                        APPEARANCES
12  PREET BHARARA
         United States Attorney for the
13       Southern District of New York
    ANDREW BAUER
14  KAN M. NAWADAY
         Assistant United States Attorney
15

    DAVID S. GREENFIELD
16       and
    ANTHONY STRAZZA
17       Attorneys for Defendant Christian

18  LAW OFFICES OF DON BUCHWALD
         Attorney for Defendant Thomas
19  DON D. BUCHWALD

20  KELLEY DRYE & WARREN LLP
         Attorney for Defendant Thomas
21  LEVI DOWNING

22  GEORGE ROBERT GOLTZER
         and
23  YING STAFFORD
         Attorneys for Defendant Whitaker
24  -- also present--
    S.A. Andrei Petrov - FBI

25

E86nchr1

1          (Trial resumed)

2          (In open court; jury not present)

3          THE COURT:  Already in the first two days we have had

4    situations where one of the defendants has asked to go to the

5    bathroom in the middle of while we were out here.  All of us

6    are going to be here and we will have a break midmorning, a

7    break midafternoon, and a break for lunch.  You should contain

8    yourselves until those breaks.  We will not be breaking for

9    bathroom breaks for the defendants whenever they choose.

10          MR. BAUER:  Your Honor, we have two small matters, if

11   you want to address them.

12          THE COURT:  Absolutely.  That is why we are here.

13          MR. BAUER:  OK.

14          The first relates to our witness order.  As you know,

15   Elena Gardner is still on the witness stand under

16   cross-examination.  We just spoke with her.  She is coming

17   today, but she is not here at 9:30 a.m.

18          What we would propose to do, if it is OK with the

19   Court and defense counsel, is proceed with Sergeant Carrion,

20   our next witness, and if she is still not here, then move to

21   Detective Frederick, at which point we hope she will be here so

22   we can finish her up before we move on to our next long

23   witness, Anthony Baynes.  But I guess we can revisit that at

24   this point.  But to move the trial forward, we would propose

25   that we start with Sergeant Carrion.

E86nchr1

<pre>
 1                THE COURT:  Absolutely.

 2                MR. GOLTZER:  No problem.

 3                THE COURT:  OK.

 4                MR. BAUER:  The other small matter, your Honor, has to

 5     do with Jason Henry, the son of the deceased Jeffrey Henry.

 6     The parties are still in conversation about one small

 7     evidentiary matter; that is, proving that the phone number that

 8     was used to make the phone call, that your Honor will hear

 9     soon, the one that we suggest was from Jeffrey Henry, to match

10     that phone number, our plan was for the defense to stipulate to

11     that.  If they choose not to, then we plan on calling a family

12     member to testify that that's the phone number that Jeffrey

13     Henry used.

14                The parties are still in conversation over that.  What

15     I am asking, your Honor, is for leave to allow Jason Henry to

16     watch the trial and stay here for all of the other witnesses in

17     light of the fact that he's only, A, a potential witness and,

18     B, he would only be testifying for the very limited purpose of

19     his father's cell phone number.

20                THE COURT:  OK.

21                MR. GOLTZER:  No objection.

22                MR. BUCHWALD:  No objection.

23                MR. GREENFIELD:  No objection.

24                THE COURT:  Very well.  Why can't that information

25     also be gathered or obtained from the phone company?
</pre>

E86nchr1

1          MR. BAUER:  Because the phone was not registered to

2     Jeffrey Henry.  It was registered to a different name.

3          MR. BUCHWALD:  What was the name IT was registered to?

4          MR. BAUER:  It was a variation of Jeffrey H., but it

5     was not Jeffrey Henry.  I don't remember.

6          MR. GOLTZER:  If you are done, I would like to place

7     something on the record?

8          MR. BAUER:  Sure.

9          MR. GOLTZER:  We have alerted the government, and we

10    are hoping we will be able to agree on it, to a jurisdictional

11    issue pertaining to Count Six.  We have gone through everything

12    again just to be careful.  We noticed that the attorney general

13    of the United States never certified Count Six, which is a

14    924(c) drug count as required under 5032 of 18 U.S. Code.  So

15    it is our view that the Court is without jurisdiction over

16    Count Six.  The certifications that were submitted pie the

17    government and the two charges in the information were the

18    substantive Hobbs Act robbery and the 924(j).  So obviously the

19    924(c) relating to the robbery is a lesser, so we are not going

20    to raise the jurisdiction as to that.  But as to the drug

21    count, that's important to us for obvious reasons.  We think

22    the Court is without jurisdiction.  If the government hasn't

23    checked it by the end of the day, we will submit a letter

24    tomorrow.

25          THE COURT:  OK.  I guess I'm curious as to why we are

E86nchr1

1    finding, or I am finding out about this now.

2           MR. GOLTZER:  We just alerted the government to it

3    yesterday.  We were hoping we could have consent.  I just

4    didn't want to take the Court by surprise tomorrow.

5           THE COURT:  All right.

6           MR. BAUER:  To your point, your Honor, we argued this

7    juvenile motion I think it's over a year ago now.  This is the

8    first --

9           MR. BUCHWALD:  I can't hear.  I'm sorry.

10          MR. BAUER:  We argued the juvenile motion over a year

11   ago.  We filed those papers well over a year ago.  So this is

12   the first that I am hearing of it, too.  I heard it from

13   Mr. Goltzer yesterday, if that was your question.  I neglected

14   to check the paperwork last night, so I told Mr. Goltzer I

15   would do it --

16          MR. GOLTZER:  I checked the date on the superseding

17   indictment, which was December of 2013, and I noticed

18   Mr. Whitaker didn't turn 21 until March of 2014.  So we went

19   back and double checked all the documents, which were sitting

20   there kind of quietly while we were pending appeal, and noticed

21   that there was one thing missing.  We discovered it and we're

22   raising it as soon as we know about it.  Jurisdiction, as I

23   understand it, is not waived.

24          MR. BAUER:  Your Honor, I would just ask that we be

25   given the opportunity to look into this.

E86nchr1

1          THE COURT:  OK.

2          MR. GOLTZER:  That's why I mentioned it to him

3     yesterday, Judge.

4          THE COURT:  Yes.  If the parties don't have anything

5     more, I did receive a letter from Ms. Stafford.  The government

6     does not appear to be cced.  I assume that they received it by

7     e-mail.

8          MR. NAWADAY:  Yes, we have.

9          THE COURT:  It concerns the limiting instruction

10     concerning Mr. Tyrell Whitaker.  Has the government had an

11     opportunity to review it, and do you have any objections to the

12     proposed instruction?

13          MR. NAWADAY:  We have had a brief opportunity to

14     review the instruction.  It is pretty short.  Our objection is

15     we just don't see what type of evidence we would be presenting

16     which would call for this limiting instruction.  So I would put

17     the question to the defense what type of evidence they are

18     talking about or testimony that would only be limited to

19     Mr. Christian and Mr. Thomas.

20          MS. STAFFORD:  Your Honor, Mr. Whitaker is not charged

21     in the narcotics conspiracy because of his juvenile status at

22     the time, so -- or the robbery conspiracy.  Not knowing all of

23     the government's evidence and exactly which would pertain to

24     Mr. Whitaker, I would imagine that there is going to be

25     instances like your Honor did bring up the other day where we

E86nchr1

1    do need a limiting instruction.

2              THE COURT:  Yes.  It may be that we just need to see

3    how the evidence comes in.

4              MR. NAWADAY:  That's fair, your Honor.

5              I just point out that even though Mr. Whitaker is not

6    charged with the robbery conspiracy, he is charged with the

7    robbery, and evidence relating to the existence of that

8    conspiracy, even though he's not charged with it, is of course

9    admissible to prove that he participated in the robbery.

10             THE COURT:  I understand.  But I think the jury at

11   some level needs to be instructed that they can't consider any

12   evidence concerning the actual conspiracy, but again we will

13   see how it comes out.

14             MR. NAWADAY:  Yes, your Honor.

15             MS. STAFFORD:  Your Honor, just to finish the point,

16   the defendants are entitled to each have their own jury trial,

17   so it is a common limiting instruction given at most

18   multiple-defendant trials.

19             THE COURT:  I think that the instruction that's

20   proposed is fairly noncontroversial.  I don't think the

21   government is saying otherwise.  It is just a matter much how

22   we parse the evidence as it comes in.

23             MR. BUCHWALD:  Your Honor, in the same respect in

24   light of that, the names will have to be changed if it is

25   offered against either of the other codefendants and not

E86nchr1

1   against Mr. Thomas, as might be the case with some of the

2   proposed 404(b) against Mr. Christian or any admissions made by

3   one of the other defendants.  So on that limiting instruction

4   we can just switch the names around.

5               THE COURT:  OK.

6               MR. BUCHWALD:  I suspect that Mr. Christian would want

7   the same thing.

8               THE COURT:  Certainly.  Let's see where we are with

9   respect to the jury.

10              So counsel is aware, Ms. Loftin again expressed to

11  Ms. Miller concern about her travel arrangements, and I assured

12  her that we would get her a MetroCard so that she can get to

13  and from the courthouse.  We are making efforts to do that.

14              She also mentioned, I think she just may be mistaken

15  in regard, again to Ms. Miller, that she believes or upon

16  observing Mr. Whitaker, she believes that she may know him from

17  the neighborhood.  She lives in the Bronx.  I assume that she

18  is mistaken, but what, if anything, did the parties wish or

19  think is appropriate to do in that regard?

20              MR. BUCHWALD:  Who is this?

21              THE COURT:  Juror No. 6.

22              MR. BUCHWALD:  Juror No. 6?

23              THE COURT:  I am sorry, Juror No. 5.  She is the young

24  lady with the 30-year-old.

25              MR. GOLTZER:  Mr. Whitaker has visited the Bronx, but

E86nchr1

1   he has not been there in a long time obviously and never lived

2   there.

3           THE COURT:  Again, I assume she's just mistaken.

4           MR. GOLTZER:  Can we get an instruction that she's

5   wrong.  We can get a photo array.

6           THE COURT:  Speaking of which, there are still three

7   exhibits at the witness stand.  Are you guys ready with the

8   technology?  I know Mr. Buchwald had some hiccups yesterday.

9           MR. BAUER:  The answer to your question is I think the

10  party are prepared to stipulate to the admissibility of the

11  video he was trying to show Ms. Gardner so that we can air it

12  to everybody at the same time.

13          THE COURT:  OK.  That's fine.

14          Folks, we are still missing three jurors as of two

15  minutes ago.  One of the jurors, Ms. Torres, is it?  Who is

16  Juror No. what?

17          MR. GOLTZER:  I think it's 4.

18          THE COURT:  Jennyvette Torres has advised Ms. Miller

19  that she has two appointments next week that she forgot about.

20  One Monday morning at 9, one Tuesday afternoon at 4:30.

21          Since we are still waiting, I propose that we bring

22  her out and question her about them and see whether we can't

23  take care of that.  I don't know what they're about, but I'm

24  obviously willing to put in a call to get them changed.  So

25  let's get Ms. Torres and we can talk to her over here at the

E86nchr1

1    sidebar.

2              (At sidebar)

3              (Juror present)

4              THE COURT:  Good morning.

5              JUROR:  Good morning.

6              THE COURT:  Ms. Torres?

7              JUROR:  Yes.

8              THE COURT:  I understand you may have some conflict

9    that you didn't tell us about?

10             JUROR:  I completely forgot until last night that I

11   looked at my calendar and I saw my two appointments that I

12   have, one on Monday for myself and on Tuesday for my children.

13             THE COURT:  What is the appointment?

14             JUROR:  My appointment for myself is recertification

15   for my SNAP that I receive.

16             THE COURT:  OK.

17             JUROR:  On Tuesday is my children have dental.  And my

18   Monday appointment is at 9 in the morning.

19             THE COURT:  Where is that?

20             JUROR:  In the Bronx.

21             THE COURT:  Who is that with?  What office do you go

22   to?  Do you have a counselor there?

23             JUROR:  No.  I have the --

24             THE COURT:  OK.

25             Have you gone through this process before?

E86nchr1

1          JUROR:  It is recertification.  I can't pass the 25th

2     of this month.  If I do, they will close my case.

3          THE COURT:  Have you been recertified before?  I am

4     just trying to understand how it works.

5          JUROR:  Yes.

6          THE COURT:  If you were to be there at 9 o'clock in

7     the morning, how long does that take?

8          JUROR:  The office opens at 8:30.  I am going to try

9     my best to be there by 8:30 because it's close to where I live.

10    It all depends on them, what time they start calling me.  I can

11    be done by 9:30 and try and head down here.  And I will arrive

12    about 10:15, 10:30 the latest.

13         THE COURT:  It all depends on them?

14         JUROR:  I could be there first thing in the morning.

15    It is just them.

16         THE COURT:  The other thing, it does have a number

17    that you can call.

18         JUROR:  Right.

19         THE COURT:  What I can do is I can have my chambers

20    call and see whether they can change this appointment.

21         JUROR:  OK.

22         THE COURT:  I can just order them to change the

23    appointment.  I have that kind of authority.

24         JUROR:  Lucky you.

25         THE COURT:  Maybe not.  We'll see.  We will take care

E86nchr1

1    of this.  I will make a copy of this and I will have my

2    chambers call.

3              JUROR:  No problem.  This is my children's

4    appointment.  That is also in the Bronx.

5              THE COURT:  Is this an appointment that you can

6    change?

7              JUROR:  The dentist I can reschedule, but it is for my

8    son's day care that he starts in September and my daughter's

9    school also in September.  I just don't know.

10             THE COURT:  We obviously want to keep you.  You saw

11   the lengthy process that we went through in other to pick this

12   jury.  We don't want to do anything to disrupt that.  Obviously

13   we want to get this thing done as soon as possible.  We will

14   call this number.  Why don't you see if you can --

15             JUROR:  Reschedule?

16             THE COURT:  Yes.  OK?

17             JUROR:  For when?

18             THE COURT:  If you can do it for the week of the 25th,

19   because we will be done by then.

20             JUROR:  No problem.

21             THE COURT:  Thank you so much.  We'll make a copy of

22   this and get it back to you.

23             JUROR:  OK.

24             MR. DRATEL:  Or Friday.

25             THE COURT:  Or on a Friday.  You can change it for

E86nchr1

1    Friday.

2            JUROR:  They don't have anything this Friday.  How

3    about next Friday?

4            THE COURT:  Yes.  Next Friday.

5            JUROR:  We are not coming in next Friday either?

6            THE COURT:  Unlikely.

7            JUROR:  OK.  Thank you.

8            (Juror not present)

9            THE COURT:  Do we have Ms. Gardner.

10           MR. NAWADAY:  I'm pretty sure we don't.  We do have

11   Sergeant Carrion.  We can have him on the stand, if you would

12   like.

13           THE COURT:  As soon as the jury is ready.

14           Do you have a witness, Mr. Bauer.

15           MR. BAUER:  Yes.

16           THE COURT:  Is she here?

17           MR. BAUER:  No.

18           THE COURT:  Do defense counsel object if I just point

19   out to the jury that the defendants have been reconfigured?

20           MR. BUCHWALD:  You will mention that to the jury?

21           THE COURT:  Yes.

22           MR. BUCHWALD:  That is fine.

23           THE COURT:  The jury is here and ready so we are going

24   to bring them out.

25           (Jury present)

E86nchr1

1          THE COURT:  Good morning, everyone.  Please be seated.

2     Ladies and gentlemen, thank you so much for being so prompt.  I

3     trust you had a pleasant evening.

4          A couple of things to point out to you, but, first of

5     all, purely for convenience of the attorneys, we have

6     reconfigured the tables at the defense side so Mr. Christian is

7     now seated in the white shirt closest to you, Mr. Whitaker is

8     in the corner, and Mr. Thomas is here on the far side.

9          Also, because of the convenience of the witnesses, we

10    are going to be taking the next witness out of turn.

11    Ms. Gardner, as you know, was on the stand.  We are going to

12    put her on the side for a moment and take another witness in

13    her stead.

14          So, Mr. Bauer or Mr. Nawaday.

15          MR. NAWADAY:  The government calls Richard Carrion.

16     RICHARD CARRION,

17        called as a witness by the Government,

18        having been duly sworn, testified as follows:

19          THE COURT:  Mr. Nawaday.

20    DIRECT EXAMINATION

21    BY MR. NAWADAY:

22    Q.  Where do you work?

23    A.  City of Newburgh Police Department.

24    Q.  About how long have you worked for the Newburgh Police

25    Department?

E86nchr1                          Carrion - direct

1    A.  I am in my 20th year.

2    Q.  What is your rank?

3    A.  I am a sergeant.

4    Q.  About how long have you been a sergeant?

5    A.  Since September of 2010.

6    Q.  What were you before that after you were at the police

7    department?

8    A.  A patrolman.

9    Q.  What did you do before you joined the Newburgh Police

10   Department?

11   A.  I was in the United States Marine Corps.

12   Q.  Are you assigned to a particular unit?

13   A.  Yes, sir, I am assigned to the patrol division.

14   Q.  Do you know what a watch commander is?

15   A.  Yes, sir.

16   Q.  What is a watch commander?

17   A.  It's the shift supervisor for the patrol division.

18   Q.  Have you ever been a watch commander?

19   A.  That is my current job.

20   Q.  What was your job back in December 2010?

21   A.  I was patrol watch commander.

22   Q.  How many officers are under your command typically during

23   your watch?

24   A.  Depending on the night of the week, anywhere from five to

25   nine.

1   Q.  Were you working as a watch commander on December 15, 2010.

2   A.  Yes, sir.

3   Q.  What shift were you working that day?

4   A.  The midnight until 8 o'clock in the morning.

5   Q.  Do you know what a radio call is?

6   A.  Yes, sir.

7   Q.  What is it?

8   A.  It's being advised by headquarters of a call for service.

9   Q.  Did there come a time during your tour on December 15,

10  2010, that a radio call came in?

11  A.  Yes, sir.

12  Q.  Around what time did that call come in?

13  A.  Approximately 12:30 in the morning.

14  Q.  What was that call?

15  A.  The call was for shots fired in the area of First Street

16  and Grand Street.

17  Q.  What did you do after you received that call?

18  A.  I grabbed my gear, left headquarters, and began responding

19  to that location.

20  Q.  Were you the only one who responded?

21  A.  No, sir, the entire shift is sent, any available unit to a

22  shots-fired call will respond.

23  Q.  Where did you go?

24  A.  I left headquarters and began traveling up Broadway towards

25  the area of First and Grand.

E86nchr1                    Carrion - direct

1   Q.  About how far from the Newburgh Police Department is First

2   and Grand Street?

3   A.  It's one block west and then one block north, very close to

4   the police station.

5   Q.  Did you ever get there?

6   A.  I didn't get to that intersection, no, sir.

7   Q.  Why not?

8   A.  Headquarters had advised again over the police radio that

9   they were taking more phone calls for a man done down in the

10  area of Lander Street and First Street.

11  Q.  What did you do when you got that call?

12  A.  I redirected myself to that location.

13  Q.  By the way, how were you traveling to that new location?

14  A.  I was in the watch commander's marked police vehicle.

15  Q.  Where did you go?

16  A.  I went to the intersection of First and Lander Streets.

17  Q.  What did you see when you got there?

18  A.  There was a man down on the ground.  It appeared that he

19  had been shot.

20  Q.  Please describe that man's appearance.

21  A.  He was a black male, fairly large in size.  He was laying

22  prone on the sidewalk.  There was blood on the ground around

23  him, there was blood coming from his upper torso, and he

24  appeared to be in pretty severe medical distress.

25  Q.  What did you do when you saw that?

1   A.   I made sure that EMS had been notified and was en route,

2   and I began securing the area around him to secure it as a

3   crime scene.

4   Q.   Was he moving?

5   A.   He was.

6   Q.   Did he say anything?

7   A.   He didn't say anything to me.

8   Q.   Did you wait for the EMTs to arrive?

9   A.   Yes, I did.

10  Q.   What did you do after they arrived?

11  A.   Once EMS had come and treated and taken him in the

12  ambulance, I assigned an officer to go to the hospital with

13  them.  I then had the officers that were with me, and we began

14  backtracking towards the area of First and Grand Street to make

15  sure that this was the only victim of this shots-fired call.

16  Q.   How did you get to First and Grand Street?

17  A.   We were on foot.  The blocks in Newburgh, they are not

18  normal New York City blocks.  They're fairly short.

19  Q.   Did you ever make it to First and Grand?

20  A.   No, sir, I didn't.

21  Q.   What happened?

22  A.   The intersection the street that's directly east from

23  Lander Street is Chambers Street, and when I got to the area of

24  Chambers and First, I looked southbound down the block and

25  noticed an individual who was on the sidewalk who was waving me

E86nchr1                         Carrion - direct

1    towards him.

2    Q.  Did you recognize that person?

3    A.  As I got closer, I did.  I recognized him as Marshall

4    Williams, just a guy that I know from the community.

5    Q.  Without telling me what was said did you have a

6    conversation with Marshall Williams?

7    A.  Yes, I did.

8    Q.  As a result of that conversation what did you do?

9    A.  I directed my investigation up towards the area of No. 54

10   Chambers Street.

11              MR. NAWADAY:  May I approach, your Honor?

12              THE COURT:  You may.

13   Q.  Sergeant I'm going to hand you what's been marked for

14   identification as Government Exhibits 250 and 251.  Please take

15   a look at those and tell me if you recognize them.

16   A.  They are both maps of the streets of the any of Newburgh.

17   Q.  Are those fair and accurate maps of some of the areas you

18   have just told us about?

19   A.  They are.

20              MR. NAWADAY:  The government offers Government

21   Exhibits 250 and 251.

22              MR. GREENFIELD:  No objection.

23              THE COURT:  250 and 251 will be received.

24              (Government's Exhibits 250 and 251 received in

25   evidence)

1          MR. NAWADAY:  May we publish 250 and 251 for the

2     jurors, your Honor.

3          THE COURT:  You may.

4          MR. NAWADAY:  Ms. McInerney, if you could put up

5     please, starting with 250.

6     Q.  Sergeant Carrion, what are we looking at here?

7     A.  It is Exhibit No. 250.

8     Q.  On Exhibit No. 250, this map, is the location of police

9     headquarters on this map?

10    A.  Yes, sir.

11    Q.  Please indicate where the police station is.

12    A.  Do I just point on it?

13    Q.  I don't know if this is a tech screen.

14         THE COURT:  No.  You have to indicate where by using

15    words.

16    A.  Colden Street is towards the right side of the map, two

17    streets up from the river.  Broadway is right in the center of

18    the map.  The big square that is at the bottom intersection of

19    Colden and Broadway is where police headquarters is.

20    Q.  Do you see First and Grand on this map?

21    A.  I do.

22    Q.  Please indicate where First and Grand is on Government

23    Exhibit 250?

24    A.  First and Grand Street is just two blocks east of the

25    little indicator that has the letter A in it.

E86nchr1                          Carrion - direct

1    Q.  Which way did you go first when you got the first radio

2    call to go to First and Grand?

3    A.  I pulled out of police headquarters and began going west up

4    Broadway, away from the river.  Grand Street would have been

5    the first street that I would have come to.

6    Q.  Do you see Lander Street?

7    A.  Yes, I do.

8    Q.  Where is that?

9    A.  Lander Street is the block directly west of the little bulb

10   with the letter A in it.

11   Q.  Where did you find the man you said the man that you said

12   had been injured on Lander Street?

13   A.  He was on the east side of Lander Street just south of

14   First Street, south being towards Broadway.

15   Q.  Looking at Government Exhibit 251, where was it again that

16   you first saw that man on Lander Street?

17   A.  If you have the intersection of First and Lander, if you go

18   down towards Broadway, he would be on the right side of that

19   page, just south of First Street.

20   Q.  I'm going to show you what's been marked for identification

21   as Government Exhibit 266.

22           Do you recognize it?

23   A.  Yes, I do.

24   Q.  What does it appear to be?

25   A.  It appears to be the intersection of Chambers and First

E86nchr1                          Carrion - direct

1   Street -- I'm sorry, Lander and First Street.

2   Q.  Is that a fair and accurate photograph of Lander and First

3   Street?

4   A.  It is.

5            MR. NAWADAY:  The government offers Government Exhibit

6   266.

7            MR. BUCHWALD:  Voir dire?

8            THE COURT:  Very well.

9   VOIR DIRE EXAMINATION

10  BY MR. BUCHWALD:

11  Q.  Sergeant Carrion?

12  A.  Yes, sir.

13  Q.  You will see in the middle of the photo there looks like a

14  pole.  Do you see that?

15  A.  Yes, sir, telephone pole.

16  Q.  Yes.  And there appear to be certain metallic items on the

17  pole.  Do you see that?

18  A.  Yes, sir.

19  Q.  And is one of those a camera?

20  A.  I am not aware of if they are cameras or not, sir.

21  Q.  Do you know, were there cameras in the area of Lander and

22  First Street on December 15 of 2010?

23           MR. NAWADAY:  Objection.

24           THE COURT:  Overruled.

25  A.  I am not familiar if there were cameras there or not.

E86nchr1                        Carrion - direct

1    Q.  So you don't know if there were or there weren't?

2    A.  There are cameras in that area.  I don't know what was

3    there at that time in December 2010.

4    Q.  Your experience in Newburgh, when there are cameras on a

5    pole, will they generally have cameras that can go in all four

6    directions so that you can see all of the directions as opposed

7    to just one direction?

8                THE COURT:  That objection is sustained.

9    Q.  You don't know what the metallic things are that are on

10   this pole?

11   A.  No, sir.

12               (Counsel conferred)

13               MR. NAWADAY:  The government offers Government Exhibit

14   266.

15               THE COURT:  Any objection?

16               MR. BUCHWALD:  Was the testimony that this is what it

17   looks like now, your Honor?

18               THE COURT:  I believe that was the testimony, correct.

19               MR. BUCHWALD:  What it looks like now.  OK, no

20   objection.

21               MR. NAWADAY:  The government offers Government Exhibit

22   266.

23               THE COURT:  266 is received.

24               (Government's Exhibit 266 received in evidence)

25               MR. NAWADAY:  Ms. McInerney, if you could please pull

E86nchr1                    Carrion - direct

1    up Government Exhibit 266.

2    Q.   Sergeant, do you see where the red car is on Government

3    Exhibit 266?

4    A.   Yes, sir.

5    Q.   What street is that?

6    A.   That's First Street.

7    Q.   Do you see where there is a fire hydrant, a yellow fire

8    hydrant in the lower left-hand corner?

9    A.   Yes, sir.

10   Q.   What street is that cross-street?

11   A.   That's Lander Street.

12   Q.   Are you familiar with First and Lander?

13   A.   Yes, sir.

14   Q.   Just describe that corner, what types of houses?

15   A.   There is a little bodega that is right on the corner that

16   you can almost see part of the roll-down gate to.  And the rest

17   of the block are usually three story row houses that are all

18   connected.  Most of them have a little bit of a backyard, but

19   not much front yard.  It comes out right on to the sidewalk.

20   Q.   Is First Street a one-way or two-way street?

21   A.   First Street is a one-way street coming towards us

22   eastbound.

23   Q.   You said there was a little bodega.  Where is that bodega?

24   A.   You can see it.  It's the southwest corner.  In the photo

25   you can see a little bit of the roll-down gate there.  That's

1    the front of the bodega.

2    Q.  Is it right where there is a yellow awning?

3    A.  A yellow what?

4    Q.  I'm sorry.  A red awning.

5    A.  Yes.

6    Q.  What street does that bodega face?

7    A.  It faces to Lander Street.

8    Q.  Sergeant Carrion, I'm going to show you what's been marked

9    for identification as Government Exhibit 276.

10           Please take a look at that and tell us if you

11   recognize it?

12   A.  I do.

13   Q.  What is it?

14   A.  It is a CD that has my initials and my sergeant's

15   designator written on it.  I marked it yesterday.

16   Q.  Have you viewed what is on Government Exhibit for

17   identification 276 before?

18   A.  There were three disks that I reviewed yesterday.  I am not

19   sure which one this is.

20   Q.  Have you reviewed that particular one that has your

21   initials?

22   A.  Yes, I have.  The ones that have my initials on them I did

23   review yesterday.

24   Q.  Did that particular disk have a panoramic photograph of

25   First and Lander Street?

1  A.  I am not sure which is actually on this disk.  One of the

2  disks that I reviewed yesterday, yes, did have a panoramic view

3  of First and Lander.

4  Q.  I am just going to do them all at the same time.  I'm going

5  to show you what are marked for identification Government

6  Exhibits 274 and 275 as well.

7          What do you recognize 274 and 275 to be?

8  A.  They are both also CDs that have my initials and my

9  sergeant's designator on them.

10 Q.  Did you review those before today?

11 A.  Yes, sir.

12 Q.  Government Exhibits marked for identification 274, 275 and

13 276, what did those disks have on them, if anything?

14 A.  They all had, two of them had panoramic views, one was of

15 the intersection of First and Lander.  The other was of the

16 intersection at First and Chambers, and the third had a view of

17 No. 54 Chambers Street.

18 Q.  Were those all fair and accurate panoramic pictures of

19 those locations?

20 A.  Yes, sir.

21 Q.  Are those pictures substantially similar to what those

22 areas looked like back in 2010?

23 A.  Yes, sir.

24          MR. NAWADAY:  The government offers government

25 Exhibits 274, 275 and 276.

E86nchr1                        Carrion - direct

1           THE COURT:  Any objection?

2           MR. GOLTZER:  No.

3           THE COURT:  274, 275 and 276 will be received.

4           (Government's Exhibits 274, 275 and 276 received in

5    evidence)

6           MR. NAWADAY:  Ms. McInerney, can you please pull up

7    Government Exhibit 276.

8    Q.  Now, Sergeant, what are we looking at here?

9    A.  Can we just scroll to the right so I can get a better view

10   of where we are.  This is the panoramic view of First and

11   Lander Street.  Right now, we are looking eastbound down First

12   Street.  To the right is southbound on Lander towards Broadway.

13   Q.  So if you look to the right side of this particular

14   viewpoint, there is a gray sedan.

15          Do you see that?

16   A.  I'm sorry.  There is a what?

17   Q.  A gray sedan.  Do you see that?

18   A.  Yes, sir.

19   Q.  What street is that sedan on?

20   A.  That's Lander Street.

21   Q.  Where did you find the man on the ground?

22   A.  Approximately in between the group of people and that gray

23   sedan on the sidewalk.

24   Q.  Indicating the area between the yellow fire hydrant and the

25   gray sedan on Lander Street?

1    A.  Yes, sir.  That's right.

2    Q.  Going back, you said after you had a conversation with

3    Marshall Williams you went towards 54 Chambers, is that right?

4    A.  Yes, sir.

5    Q.  What happened when you got there?

6    A.  I had walked eastbound on First Street, the direction that

7    the camera is facing in right now.  That next intersection is

8    Chambers Street.  As I turned the corner on Chambers Street,

9    looking southbound towards Broadway on that block is when I

10   observed Mr. Williams about midway down the block waving me

11   towards him.

12   Q.  After the conversation with Mr. Williams, where did you go?

13   A.  I went over towards 54 Chambers Street.

14   Q.  Please describe 54 Chambers Street.

15   A.  It's an apartment building that has two doors right in the

16   front.  There was blood evidence, blood on the ground, blood on

17   the door, outside of 54 Chambers Street.

18   Q.  What did you do when you saw that blood on the door?

19   A.  I called officers over.  I put one in the backyard.  I

20   wanted to do a protective sweep of the inside of the location

21   to see if there were any additional victims or possibly

22   suspects inside No. 54.

23   Q.  What did you do next?

24   A.  The door was locked.  We tried to raise someone inside the

25   apartment.  When it wasn't answered, we forced entry.  Myself

1    and the two officers cleared the apartment.  There was nobody

2    in there.  However, immediately upon entering the apartment, I

3    noticed shell casings on the floor.  There was blood on the

4    floor, blood on the walls.  I believed at that time that this

5    was a crime scene and possibly the incident location.

6    Q.  What did you do after you saw that there were shell casings

7    and blood on the walls inside 54 Chambers?

8    A.  I had myself and the officers exit the apartment.  I

9    secured it as a crime scene, posted one of those officers

10   there, and began making notifications to the investigators.

11   Q.  On what floor did you see those items?

12   A.  It was on the ground floor.

13   Q.  Do you remember how many rooms in that apartment?

14   A.  There was approximately five rooms, counting bathrooms and

15   kitchens, bedrooms, five or six rooms possibly.

16            MR. NAWADAY:  Ms. McInerney, if you can please put up

17   Government Exhibit 274, which is the panoramic view of the

18   corner of Chambers and First Street.

19            Ms. McInerney, you can stop right around here.

20   Q.  Sergeant, what are we looking at here?

21   A.  This is the intersection of First Street and Chambers

22   Street.  We are looking southbound on Chambers Street towards

23   Broadway, and the cross-street that is going left to right in

24   front of us is First Street.

25   Q.  Are you able to see 54 Chambers Street?

1   A.   Yes, sir.

2   Q.   Where is 54 Chambers Street?

3   A.   54 Chambers Street is to the left and it's where the

4   gentleman appears to be standing.  That's the right of the two

5   doors for No. 54 Chambers Street.

6   Q.   Is that near what appears to be a Jeep Cherokee?

7   A.   Yes, sir.

8   Q.   Can you see on Government Exhibit 275 in this viewpoint the

9   area where you first saw Marshall Williams?

10  A.   Yes, sir.

11  Q.   Where was that?

12  A.   It was on the right side of the street, approximately where

13  that first vehicle is parked, the white vehicle that's facing

14  us.

15          MR. BUCHWALD:  Excuse me, your Honor.  Is this the

16  right side as we look at it?

17          THE COURT:  I'm sorry.

18          THE WITNESS:  Yes.

19          THE COURT:  Mr. Nawaday, can you direct him.

20  Q.   Sergeant Carrion, please describe again where in this

21  viewpoint you first saw Marshall Williams.

22  A.   As we are looking at the picture, there are cars parked on

23  both sides of the road.  On the right-hand side, the side that

24  has the yellow fire hydrant the first vehicle on that side of

25  the road that's facing us is a white vehicle, it was in that

E86nchr1                          Carrion - direct

```
 1   area on the sidewalk.

 2   Q.  Indicating Chambers Street on the side with the yellow fire

 3   hydrant?

 4   A.  Yes, sir, the west side of the Chambers Street about mid

 5   block, between First Street and Broadway.

 6        MR. NAWADAY:  Ms. McInerney, if you can please pull up

 7   Government Exhibit 275.

 8   Q.  What are we looking at here?

 9   A.  We are looking at No. 54 Chambers Street.  It is the

10   building where the ladder, with the gentleman on the ladder and

11   the white door and the blue door to the left.

12   Q.  Do you remember which door you went through?

13   A.  I believe it was the right door, the white one.

14   Q.  I'm going to hand you what's been marked for identification

15   as government Exhibits 260, 261, 262, 263, 264, and 265-- I'm

16   sorry, 267.

17        THE COURT:  265 and 267 or 267 instead of 265?

18        MR. NAWADAY:  267 instead of 265.

19        THE COURT:  OK.

20   Q.  Please take a look at those and tell us if you recognize

21   them.

22   A.  I do.

23   Q.  What do you recognize those exhibits marked for

24   identification to be?

25   A.  Two of them are pictures of east and west on First Street.
```

1              That would be 264 and 267.  The other pictures are all

2      of Lander Street, in and around the area of First and Lander.

3      Q.  OK.  So starting with 260 to 263, what do those appear to

4      be?

5      A.  Pictures of Lander Street.

6              MR. NAWADAY:  Let me just make sure.

7      Q.  Let's start with 260.  You said Lander.  Is that Lander or

8      Chambers?

9      A.  I'm sorry.  Chambers Street.

10     Q.  OK.

11     A.  260 is Chambers Street.  My mistake.  They are all Chambers

12     Street, not Lander Street.

13     Q.  So 260 through 263, are those fair and accurate photographs

14     of the area of Chambers Street we have been talking about?

15     A.  Yes, sir.

16     Q.  Are those similar to the way Chambers Street looked back in

17     2010?

18     A.  Yes, sir.

19             MR. BAUER:  The government offers 260 through 263.

20             THE COURT:  Any objection?

21             MR. BUCHWALD:  Voir dire, your Honor.

22     VOIR DIRE EXAMINATION

23     BY MR. BUCHWALD:

24     Q.  Do you know when these photos were taken?

25     A.  No, sir.

1   Q.  You didn't take them?

2   A.  No, sir.

3   Q.  You don't know if they were taken in the last few days?

4   A.  No, sir.

5   Q.  Or the last few months as opposed to closer in time to

6   2010?

7   A.  No, sir.

8   Q.  You have no reason to believe that these were taken or do

9   you know that these were taken in or around December 2010?

10  A.  I don't know.

11  Q.  But they are fairly accurate as to what it looked like in

12  2010 as far as you recall?

13  A.  Yes.

14          MR. BUCHWALD:  No objection.

15          THE COURT:  260, 261, 262 and 263 will be received.

16          (Government's Exhibits 260, 261, 262 and 263 received

17  in evidence)

18          MR. NAWADAY:  Ms. McInerney if you can just scroll

19  through 260, 261, 262.

20  BY MR. NAWADAY:

21  Q.  Sergeant what are we looking at in 260, 261 and 262?

22  A.  260, 261, 262, No. 54 Chambers Street.

23  Q.  And 263, what are we looking at there?

24  A.  It appears to be the other side of the street.

25  Q.  Other side of the street from what?

1    A.   From No. 54.

2    Q.   What do Government Exhibits marked for identification 264

3    and 267 appear to be?

4    A.   They are pictures of First Street right at that same

5    intersection.

6    Q.   With Chambers Street?

7    A.   With Chambers Street.  It's an east-and-west view.

8    Q.   Are those fair and accurate photographs of the intersection

9    of First and Chambers Streets?

10   A.   They are.

11   Q.   Are they substantially similar to the way that intersection

12   looked in 2010?

13   A.   Yes, sir.

14          MR. NAWADAY:  The government offers 264 and 267.

15          THE COURT:  Any objection?

16          There being none, 264 and 267 will be received.

17          (Government's Exhibits 264 and 267 received in

18   evidence)

19   Q.   Starting with 264, Sergeant, what are we looking at here?

20   A.   We are looking westbound on First Street.  The next

21   intersection up that is in this picture is Lander Street.

22   Q.   When you say the next intersection, are you referring to

23   the intersection where there is a yellow fire hydrant?

24   A.   Yes, sir.

25   Q.   That's Lander Street?

E86nchr1                         Carrion - direct

1    A.  Yes.

2    Q.  What is the cross-street where you see on the left-hand

3    side what appears to be a GMC SUV?

4    A.  That's Chambers Street.  Chambers and First.

5            MR. NAWADAY:  Ms. McInerney, if you could please blow

6    up Government Exhibit 267.

7    Q.  What are we looking at there?

8    A.  We are looking eastbound on First Street from the

9    intersection of Chambers and First.

10   Q.  What is this cross-street?

11   A.  The next one up, or the one that the camera is on taking

12   the photo?

13   Q.  The one the camera is on.

14   A.  Chambers Street.

15   Q.  Sergeant, do you know what a pole camera is?

16           THE COURT:  I'm sorry.  I didn't hear that.

17   Q.  Do you know what a pole camera is?

18   A.  Yes, sir.

19   Q.  What is a pole camera?

20   A.  It is a camera that is mounted to either a telephone pole,

21   a light pole, utility pole that allows police to watch what is

22   going on on the street.

23   Q.  In December 2010 do you know if the Newburgh Police

24   Department, the City of Newburgh had pole cameras in operation?

25   A.  Yes, sir.

1      MR. NAWADAY:  No further questions, your Honor.

2      THE COURT:  Cross-examination?

3      MR. GREENFIELD:  Yes, your Honor.

4      THE COURT:  Mr. Greenfield.

5  CROSS EXAMINATION

6  BY MR. GREENFIELD:

7  Q.  Good morning, Sergeant Carrion?

8  A.  Good morning, sir.

9  Q.  If I might, I would like to start my examination with the

10  time you spent as watch commander on December 15, 2010.  I

11  believe you said that the first thing you did with respect to

12  the murder that occurred was that you received a call somewhere

13  around 12:30 that morning, is that right?

14  A.  That sounds about right, yes.

15  Q.  How many men or women were under your command that evening?

16  A.  I don't recall the exact number.  I'm going to put it at

17  five.  That's the standard number of personnel I would have on

18  that shift.

19  Q.  One of the first things that you did that evening after you

20  received the call, you had a conversation with someone named

21  Marshall Williams; is that right?

22  A.  It wasn't one of the first things.  As I got to the scene

23  and we began backtracking to try to make sure we had checked

24  the whole area, I did encounter Mr. Williams, yes, sir.

25  Q.  In point of time, when is it is that you first meet up with

E86nchr1                         Carrion - cross

1    this individual named Marshall Williams?

2    A.   Approximately 15 minutes into the call.

3    Q.   Now, your conversation with him was one of many things that

4    occurred that day, is that right --

5    A.   Yes, sir.

6    Q.   -- with respect to this incident?

7         Would it be fair to say that once you had some time at

8    the end of your tour you reduced the facts and circumstances of

9    that conversation to writing?

10   A.   Yes, sir.  I did a supplemental report to the incident.

11   Q.   What is a supplemental report?

12   A.   There is one officer that will be assigned the initial

13   report, and then any other officer who had any involvement or

14   had anything to document would do a supplemental report.  It is

15   just added to the original incident report.

16   Q.   You do that as quickly as you can at the end of your tour

17   so you don't forget what you saw or heard or did, is that

18   correct?

19   A.   As soon as is practical, yes, sir.

20   Q.   The reason behind that is you want to be accurate, correct?

21   A.   Yes, sir.

22   Q.   You want to have it memorialized so that a record is made

23   as to what occurred on your tour, correct?

24   A.   The incident report would just cover a specific call, not

25   the whole tour.

1   Q.  But the purpose of writing these reports is to be accurate

2   and to memorialize what occurred, correct?

3   A.  Yes, sir.

4   Q.  If somebody in the future wanted to refer to what happened,

5   they would be able to read your report and say, oh, this is

6   what Sergeant Carrion wrote within minutes or hours of his

7   interview of Marshall Williams, correct?

8   A.  Yes.

9   Q.  The same is true from your, what you said, supplemental

10  report, is that correct?

11  A.  Yes, sir.

12  Q.  Is there something known as a lead report also?

13  A.  I'm sorry?

14  Q.  A lead sheet or a lead report?

15  A.  Not that I am familiar with.

16          MR. GREENFIELD:  Judge, may I approach the witness?

17          THE COURT:  You may.

18  Q.  I show you what's been marked as 3518-1.

19          THE COURT:  3518-1?

20          MR. GREENFIELD:  Yes, Judge.

21          THE COURT:  OK.

22  Q.  Do you know what that is?

23  A.  It says right on it, City of Newburgh Police Department

24  Detective Division Investigation Lead Sheet.

25  Q.  What is a lead sheet?

1    A.  I have never been an investigator, sir, I have never had

2    occasion to view one of these before in my career.

3    Q.  19 years on the job, and you never saw one before?

4    A.  No, sir.  Canine, patrol, I have only been in uniform my

5    entire career.

6    Q.  Which leads to another question.  Who was the first

7    detective that night to respond to the scene?

8    A.  I don't recall which detective responded.  My notification

9    goes to the detective supervisor.  He calls in or notifies

10   whichever detective he has on call.

11   Q.  Do you recall any detectives being at the scene of 54

12   Chambers Street in the evening of December 15 or the early

13   morning hours, excuse me, of December 15, 2010?

14   A.  No, sir, I was not present to witness any detectives there.

15   Q.  If we can, when you got to the vicinity of 54 Chambers

16   Street, you ascertain that the door is locked, is that correct?

17   A.  Yes, sir.

18   Q.  Did you notice anything else about the door that stood out

19   to your eye that evening?

20   A.  Yes, sir.  There appeared to be blood in the area around

21   the door on the floor outside the door.

22   Q.  How about on the door?

23   A.  I remember seeing some on the door as well.

24   Q.  The door that you are describing, if we could put up a

25   picture of 54 Chambers Street -- I think it was 260 -- is the

E86nchr1                    Carrion - cross

1    white door, is that right?

2    A.  Yes, sir.

3    Q.  Is that the same door that you saw on the early morning

4    hours of December 15, 2010?

5    A.  I don't know if that's specifically the same physical door.

6    Q.  You can't -- you don't know?

7    A.  No, sir, I don't know.

8    Q.  When you realized the door was locked, you broke it down

9    basically, is that right?

10   A.  Yes, sir, I used the ram.

11   Q.  A ram?

12   A.  Yes, sir.  A ram, r-a-m, a metal object used for forcing

13   your way through a door.

14   Q.  You and one other or two others, three other police

15   officers went through the crime scene?

16   A.  Two other officers, yes.

17   Q.  Before you went through the crime scene, did you put any

18   protective clothing on your hands or feet to protect the

19   forensic integrity of that crime scene?

20   A.  No, sir.

21   Q.  Your first duty in your mind as watch commander was to

22   secure the premises and the safety of your men, yourself and

23   anybody who lived in that vicinity, correct?

24   A.  My first priority is always the safety of myself and my

25   men.  The purpose of entering that residence was to check for

E86nchr1                         Carrion - cross

1   any additional victims or possibly suspects that may be inside.

2   Q.  Rightfully.  But your job was not to gather forensic

3   evidence, your job is to secure the crime scene?

4   A.  Yes, sir.

5   Q.  That was for detectives and the forensic unit to figure out

6   later on?

7   A.  Yes.

8   Q.  Evidence preservation?

9   A.  Correct, sir.

10  Q.  You have never done that?

11  A.  No, sir.

12          MR. GREENFIELD:  Let's go to Exhibit 276, please.

13  Q.  As you sit on the stand now, do you have a recollection

14  back to December 15, 2010 or December 14, 2010, in that period

15  of time, do you have any recollection as to the placement of

16  different pole cams in the vicinity of the area we are looking

17  at on Exhibit 276?

18  A.  No, sir.

19  Q.  Were you aware at all back then as to the locations of pole

20  cams -- withdrawn.  Let me rephrase the question.

21          Were you made aware by the department, the police

22  department, as a watch commander that certain pole cam

23  locations had been set up in this vicinity?

24  A.  Yes, sir.

25  Q.  And was it written down in some formal or official document

E86nchr1                     Carrion - cross

1    as to where these pole cam locations were?

2    A.  I don't know.

3    Q.  Again, back to report writing, like the supplemental

4    report, do you know -- withdrawn.  Let me rephrase it again.

5    Do you know if the detective division of the police department

6    maintains a chronological order of reports that had been

7    created over the course of an investigation into an incident

8    like this?

9    A.  I don't know.

10   Q.  Does the patrol division maintain such a chronological

11   record of reports?

12   A.  The records division does.  If I needed to pull up or

13   review reports, I could go into the records management system

14   that we have in the police department.

15   Q.  The police department has what you call a records division

16   which has a compilation of any report written in the case by

17   any officer?

18   A.  I am not sure if the detective notes or part of the

19   investigation.  The original incident report and the

20   supplemental reports are available.

21   Q.  In the conversation that you had with Mr. Williams --

22   incidentally, you say you have known him previously.  Is that

23   on a personal basis or professional basis?

24   A.  Professional basis.

25   Q.  Meaning what?

1   A.   Meaning I know his family, he's had some, a couple of

2   brushes with the law.

3   Q.   Had you had any dealings with him professionally?

4   A.   Yes.

5   Q.   Under what circumstances?

6   A.   He was placed under arrest and I've dealt with him when I

7   had a short tour as a court officer.

8   Q.   What was that for?

9   A.   I don't recall.

10  Q.   You don't recall?

11  A.   No, sir.

12  Q.   Did he describe to you any of the facts and circumstances

13  of what he observed that evening in the vicinity of 54 Lander

14  Street?

15  A.   He did.

16  Q.   Did you reduce all of that to writing?

17  A.   The best I could.

18  Q.   Did you direct him to go to police headquarters and talk to

19  the detectives with regard to what he allegedly saw?

20  A.   Yes, sir.  I made him aware that the investigators were

21  going to want to speak to him.

22  Q.   Did you tell him the names of any particular investigators

23  that you wanted him to speak with?

24  A.   No, sir.

25  Q.   Did he immediately go to the headquarters as far as you

 1    know?

 2    A.   I don't believe he did.

 3    Q.   Did he say he didn't want to go right away?

 4    A.   I believe he asked if he could talk to the investigators in

 5    a more private setting instead of on the street.

 6    Q.   The more private setting would be right in police

 7    headquarters?

 8    A.   Yes, sir.

 9    Q.   Do you know if he had a prior relationship with members of

10    the Newburgh Police Department in a professional relationship?

11    A.   I have no personal knowledge of that.

12    Q.   Do you know if he worked for the police department as an

13    informant?

14    A.   No, sir, I don't know.

15              MR. GREENFIELD:  One second, Judge.

16              I believe I'm complete.

17    Q.   You mentioned a bodega on a corner.  Were you or did you

18    instruct the patrol officers under your command to conduct a

19    canvass of the vicinity of 54 Chambers Street?

20    A.   Yes, sir.

21    Q.   Would you explain to the jury what a canvass is?

22    A.   A canvass is checking in the area around an incident

23    location for physical evidence, witnesses that may have seen

24    it.

25    Q.   Do you recall as you sit on the stand now if that bodega

E86nchr1                    Carrion - cross

1   was open or closed that evening?

2   A.   I don't recall.

3            MR. GREENFIELD:  No further questions, Judge.

4            THE COURT:  Any further cross-examination?

5            MR. BUCHWALD:  Yes, your Honor.

6            THE COURT:  OK.

7            MS. STAFFORD:  Nothing for Mr. Whitaker.

8            THE COURT:  Very well.  Mr. Buchwald.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E869chr2                         Carrion - cross

1   CROSS-EXAMINATION

2   BY MR. BUCHWALD:

3   Q.  Officer Carrion, good morning.

4   A.  Good morning, sir.

5   Q.  Now, directing your attention back to the early morning

6   hours of December 15, 2010, the day of the events in question.

7   Were you the first police officer to arrive at the scene of the

8   place where Mr. Henry was found on the ground?

9   A.  No, sir.

10  Q.  When you arrived was there a woman still there -- do you

11  know who Elena Gardner is?

12  A.  I had heard the name, sir, yes.

13  Q.  Was she still there at the premises or had she left?

14  A.  She had left.

15  Q.  And do you remember the names of any of the police officers

16  that were there when you arrived?

17  A.  Yes, sir.

18  Q.  And who was there when you arrived?

19  A.  Officer Moore, Officer Lahar.

20  Q.  Was there an Officer Perez at all?

21  A.  Yes, sir.

22  Q.  Was he there?

23  A.  Yes, sir.

24  Q.  Officer Henderson, was he there?

25  A.  Yes, sir.

E869chr2                        Carrion - cross

1   Q.  Now, do you know -- the time when you arrived -- withdrawn.

2       I take it Mr. Henry at that point was still alive as

3   best you knew or best you understood but not responsive or do

4   you know one way or another?

5   A.  He was alive.  Yes, sir.

6   Q.  And the blood on the ground next to him that you saw, do

7   you know if that had been immediately visible to people when

8   they first arrived at the scene of Mr. Henry on the ground or

9   whether that blood became visible after the first policemen

10  arrived and moved some of his clothing?

11  A.  I don't know.

12  Q.  You don't know?

13  A.  No, sir.

14  Q.  There came a point in time when you saw Marshall Williams;

15  is that right?

16  A.  Yes, sir.

17  Q.  And that's when you had walked down and gotten as far as

18  the intersection of First and Chambers?

19  A.  Yes.

20  Q.  And when you got there you looked then to the right as you

21  reached the intersection?

22  A.  Yes, sir.  I even began walking down a little portion of

23  the block.

24  Q.  Was there anybody else on the block at that time?

25  A.  Not that I remember.

1   Q.  Or on First, as you had walked down First, toward Landers,

2   was anybody else on the block?

3   A.  Not that I remember.

4   Q.  It was late at night, right, or early morning hours,

5   correct?

6   A.  Yes, sir.

7   Q.  And the street itself at that point was quiet, correct?

8   A.  Fairly.

9   Q.  And there weren't -- people hadn't assembled outside,

10  correct?

11  A.  No, sir, they hadn't.

12  Q.  And you saw Marshall Williams and you recognized him from

13  that distance or not?  Because that photo that you showed, he

14  was down some considerable length on that one block?

15  A.  Yes, sir.  I didn't recognize him until I got close.

16  Q.  And he was waving over to you, correct?

17  A.  Yes, sir.

18  Q.  And waving pretty excitedly; is that right?

19  A.  He was motioning that he wanted to speak to me.

20  Q.  He had just -- he explained to you, observed a scene that

21  was unusual, correct?

22  A.  Yes, sir.

23  Q.  He was -- once he got to you he spoke pretty rapidly to

24  explain what he had seen and that you should go to that place,

25  correct?

E869chr2                              Carrion - cross

1    A.  Yes, sir.

2    Q.  He was explaining you should go to 54 Chambers, pointing,

3    correct?

4    A.  He didn't say it by number but he indicated by pointing

5    where I should go.

6    Q.  He was pretty excited?

7    A.  I don't recall him being excited.

8    Q.  He had just observed a very unusual, adrenaline-creating --

9    he just made an unusual, adrenaline-creating observation, as it

10   turned out, correct?

11   A.  Yes, sir.

12   Q.  And then he spoke to you and told you what he saw?

13   A.  That's correct.

14   Q.  Because that was part of the reason he was saying go to

15   that house, correct?

16   A.  Yes.

17   Q.  And what did he say?

18           MR. NAWADAY:  Objection.

19           THE COURT:  Sustained.

20           MR. BUCHWALD:  Excited utterance, your Honor.

21           THE COURT:  Overruled.

22   BY MR. BUCHWALD:

23   Q.  What did he say?

24   A.  That he had heard gunshots and when he looked up the street

25   he saw about four or five people running out of what turned out

E869chr2                         Carrion - cross

1   to be No. 54 Chambers Street run away.

2   Q.  In fact, he told you he saw four or five people, did he

3   not?

4   A.  Four or five, that sounds accurate, yes.

5   Q.  Four or five is what you wrote in your report, correct?

6   A.  Yes, sir.

7   Q.  Why did you say five or six now when you wrote in your

8   report four or five?

9   A.  I misspoke.

10  Q.  Now, the -- you had the police officers conduct a -- hand

11  this -- you had them conduct a canvass of the area.  (Pause)

12          Did Mr. Marshall Williams also describe the four or

13  five people or give some description of the four or five people

14  that he saw?

15  A.  Briefly.

16  Q.  And that brief description was what?

17  A.  That he wasn't able to see their face.  They had hoodies up

18  and they were running away.  He wasn't able to give much of a

19  physical description.

20  Q.  He said they had masks, did he not?

21  A.  Yes, sir.

22  Q.  Now, you had a canvass conducted of the area around where

23  Mr. Henry's -- Mr. Henry was found, correct?

24  A.  Yes, sir.

25  Q.  And a canvass conducted around the area of 54 Chambers,

E869chr2                      Carrion - cross

1    correct?

2    A.  Yes, sir.

3    Q.  And did you find any physical evidence or did any of the

4    officers under your command who were conducting the canvass

5    find physical evidence during those canvasses outside?  I'm not

6    talking about inside 54 Chambers, outside 54 Chambers?

7    A.  Other than the blood, I'm not aware of what was found.

8    Q.  Now, I believe you testified that when you observed the

9    door to 54 Chambers it was locked, correct?

10   A.  Yes.

11   Q.  And you didn't know who had locked it, right?

12   A.  That's correct.

13   Q.  You also observed, did you not, that there were no bullet

14   holes in the door; isn't that right?

15   A.  Yes, sir.

16   Q.  I'm correct?  There were no bullet holes in the door,

17   correct?

18   A.  Correct.

19   Q.  And even though you then knocked it down, the door itself

20   was preserved for evidentiary purposes by the crime scene unit

21   that arrived, correct?

22   A.  I'm not aware if it was preserved or not.

23   Q.  You never saw after that Exhibit -- Government Exhibit 40

24   for identification?

25   A.  No, sir.

1   Q.  But there were no bullets in the outside door, correct?

2   A.  That's correct.

3   Q.  You don't know if the -- well, the inside door was

4   preserved, was it not, by the crime scene unit?

5   A.  I have no knowledge of what crime scene preserved, sir.

6   Q.  When you went into the house you found that there was the

7   outside door and then after you went in a few steps there was

8   an inner door; is that right?

9   A.  That's correct.

10          MR. BUCHWALD:  May I have just a moment, your Honor?

11          (Pause)

12          I have no further questions, your Honor.  Thank you.

13          THE COURT:  Any redirect?

14          MR. NAWADAY:  Just briefly, your Honor.

15   REDIRECT EXAMINATION

16   BY MR. NAWADAY:

17   Q.  Sergeant Carrion, you remember there were some questions on

18   cross-examination about whether you put on any gloves or

19   anything before you first entered 54 Chambers Street.

20   A.  Yes, sir.

21   Q.  Did you personally recover or touch any of the evidence

22   inside?

23   A.  No, sir.

24   Q.  What was your purpose of securing 54 Chambers Street that

25   night?

E869chr2                          Carrion - redirect

1    A.   After ensuring that there were no people inside, preserving

2    it is for crime scene.  That's why it was secured.

3    Q.   What does that mean?

4    A.   That means we don't want to further contaminate any

5    physical evidence that may have been in there unnecessarily.

6    We had to enter to check to see if there were victims or

7    suspects.  Once we realized that there weren't, we backed out

8    of there, doing our very best not to contaminate any physical

9    evidence and secured it for crime scene and the investigators.

10   Q.   Did you pick up any shell casings?

11   A.   No, sir.

12   Q.   Did you pick up any other physical evidence while inside 54

13   Chambers?

14   A.   No, sir.

15            MR. NAWADAY:  No further questions.

16            MR. GREENFIELD:  None, Your Honor.

17            MR. BUCHWALD:  Briefly.

18   RECROSS EXAMINATION

19   BY MR. BUCHWALD:

20   Q.   Do you know how many police officers went into the

21   premises?  You did, correct?

22   A.   Correct, sir.

23   Q.   How many others with you?

24   A.   Two others.

25   Q.   And when you went in I take it your focus was in front of

E869chr2                    Carrion - recross

1    you to see, number one, if there were other people,

2    particularly other people who might be armed, correct?

3    A.  Yes, sir.  That's one of the concerns, absolutely.

4    Q.  And am I correct -- you're quite certain you didn't pick up

5    any bullets or shell casings that were on the ground or in the

6    wall or anything like that, right?

7    A.  Absolutely, sir.

8    Q.  Do you know if any were possibly accidentally moved because

9    as you -- I take it two or three of you -- how many of you

10   again were there that went in?

11   A.  Myself and two officers.

12   Q.  The three of you went in.  I assume your weapons were drawn

13   when you went in?

14   A.  Yes, sir.

15   Q.  And I assume you went in trying to look in all directions

16   as you went in among the three of you, correct?

17   A.  Yes, sir.

18   Q.  And do you know if any, on the way in or on the way out,

19   any of the casings, shell casings or anything were possibly

20   moved accidentally in one direction or another as you're going

21   in?

22   A.  I don't know.

23   Q.  You don't know.  But you're confident that you didn't pick

24   up any, take them out, anything like that, correct?

25   A.  Yes, sir.

E869chr2                        Carrion - recross

1          MR. BUCHWALD:  I have no further questions.

2          THE COURT:  Mr. Carrion, you may step down.

3          THE WITNESS:  Thank you, your Honor.

4          (Witness excused)

5          MR. BAUER:  Your Honor at this time the government

6    would like to read a stipulation, to offer a stipulation.

7          THE COURT:  Very well.

8          MR. BAUER:  It's marked for identification as

9    Government Exhibit 904.

10         Your Honor, there are going to be a number of

11   stipulations in this case.  What I would suggest that I read

12   the preamble to the stipulation now but for further

13   stipulations condense it because it just lists the names of the

14   attorneys involved.

15         THE COURT:  Certainly.

16         MR. BAUER:  It is hereby stipulated and agreed, by and

17   between the United States of America, by Preet Bharara, United

18   States Attorney for the Southern District of New York, Andrew

19   Bauer and Kan M. Nawaday, Assistant United States Attorneys, of

20   counsel, and:  A. Raymond Christian, the defendant, by and

21   through the consent of his attorneys, David Greenfield and

22   Anthony Strazza, Esquires; Tyrell Whitaker, the defendant, by

23   and through the consent of his attorneys, George Goltzer and

24   Ying Stafford, Esquires; and Glenn Thomas, the defendant, by

25   and through the consent of his attorneys, Don Buchwald and

E869chr2

Joshua Dratel, Esquires, that:

   1.  If called to testify a law enforcement agent of
the Newburgh City Police Department would testify that:

   A.  Government Exhibit 252 contains a true and
accurate video recording dated December 15, 2010, spanning from
at least approximately 12:00 a.m. to 12:30 a.m., from four
cameras situated atop a telephone pole located in the vicinity
of 56 Lander Street near the corner of Lander Street and First
Street, one block west of the Chambers Street in Newburgh,
New York.

   B.  On or about December 15, 2010 there were many
locations with active pole cameras functioning in the City of
Newburgh.

   It is further stipulated and agreed that there is no
chain of custody objection with respect to Government Exhibit
252.

   It's dated:  New York, New York.  August 4, 2014, and
signed by a representative of the government as well as for
each of the three defendants.

   The government would first offer Government Exhibit
252 into evidence at this time.

   THE COURT:  There being no objection, 252 will be
received.

   (Government's Exhibit 252 received in evidence)

   MR. BAUER:  The government will also move to admit

E869chr2

1    Government Exhibit 904 into evidence, the stipulation itself.

2              THE COURT:  The stipulation will also be received,

3    Government Exhibit 904.

4              (Government's Exhibit 904 received in evidence)

5              MR. BAUER:  Your Honor, at this time we would seek

6    your permission to publish snippets or small parts of the

7    footage that is on Government Exhibit 252.

8              THE COURT:  Very well.

9              MR. BAUER:  Your Honor, as I said, there are four

10   cameras; one titled west, one titled east, one titled corner;

11   and one titled first.  So we're going to play the relevant time

12   periods from each of the four.

13             So Ms. McInerney, if we can pull up the first camera

14   which is titled west, pull up the file begins at 12:10 a.m. and

15   scroll to the time starting at 17:27.

16             MR. BUCHWALD:  Will this correspond to 12:17:27.

17             MR. BAUER:  I'm sorry that's military time 17:27 and

18   that's the time that's on the camera.

19             Can you press play.

20             (Video played)

21             MR. BAUER:  Now, Ms. McInerney, can we pull up the

22   next -- from that same west camera.

23             MR. DRATEL:  Do these correspond to designated

24   subexhibits or they all part of 252?  Is it 252A, B?

25             MR. BAUER:  No.  This is all part of 252.

E869chr2

1          THE COURT:  Just so that I'm clear.  00:17:27.

2          That's 12:17 in the morning of December 15?

3          MR. BAUER:  Your Honor, because this is a stipulation

4   all I can say is that is the time that is -- that is on the

5   camera.  That is part of Government Exhibit 252.

6          THE COURT:  Okay.

7          MR. BAUER:  So Ms. McInerney on the second file from

8   the western-facing camera, if we can go to 25:03.

9          Thank you.  And then press play.

10         (Video played)

11         MR. BAUER:  Thank you, Ms. McInerney.

12         Now for those same time periods let's move to the

13  camera titled east; and if we can go to the file that begins at

14  12:10 a.m let's start at 17:27 again.

15         (Video played)

16         MR. BAUER:  Thank you, Ms. McInerney.

17         Could we now using that same east camera.  Go to the

18  next file that begins at 12:20 a.m.  Go to the 24:57 mark.

19         (Video played)

20         MR. BAUER:  Thank you, Ms. McInerney.

21         Now let's move on to the next camera that's titled

22  corner and let's start again with the file from that camera

23  that's 12:10 a.m.

24         MR. BUCHWALD:  Which camera is this called?

25         MR. BAUER:  Corner.  Can we go to the 17:40 mark.

E869chr2

1    Actually let's go to the 17:35 mark, please.

2              (Video played)

3              MR. BAUER:  Thank you, Ms. McInerney.

4              Now let's go to that same corner camera, the next file

5    that begins at 12:20 a.m.

6              If we can go to the 24:57 mark.

7              (Video played)

8              MR. BAUER:  Thank you, Ms. McInerney.

9              Then the final camera from Government Exhibit 252 is

10   the one titled First.  And then it's W2, 12:10 a.m. file.

11   Start it again at the 17:27 mark.

12             (Video played)

13             MR. BAUER:  Then let's do the very last one from that

14   same camera.  Good to the 12:20 a.m. file.  Then go to 25:03

15   mark, please.

16             (Video played)

17             MR. BAUER:  Thank you, Ms. McInerney.

18             Your Honor, that's it that we want to show from

19   Government Exhibit 252, at this time at least.

20             THE COURT:  Okay.

21             MR. BAUER:  So we propose to call our next witness.

22             THE COURT:  Well it's 5 minutes of 11.  So let's take

23   our morning break now.  Please be in the jury room no later

24   than 10 minutes after the hour.  We'll take 15 minutes.  We'll

25   begin promptly at 11:10.

E869chr2

1          Please do not discuss the case.

2          (Jury excused)

3          (In open court)

4          THE COURT:  Okay.  Fifteen minutes; ten after.

5          (Recess)

6     ELENA MARIA GARDNER, resumed

7          (Jury present)

8          THE COURT:  Ladies and gentlemen, we will now continue

9     with the cross-examination of Ms. Gardner.

10          Ms. Gardner, you are reminded that you are still under

11     oath.

12          THE WITNESS:  Yes.

13     CROSS-EXAMINATION

14     BY MR. BUCHWALD:

15     Q.  Good morning, Ms. Gardner.

16     A.  Good morning.

17     Q.  We left off yesterday I believe you said that you knew the

18     person whose nickname was Quay Quay, correct?

19     A.  Yes.

20     Q.  But you don't believe that you saw him at the hospital when

21     you went there; is that right?

22     A.  Yes.  That's right.

23          MR. BUCHWALD:  Your Honor, the defense and government

24     have stipulated that Defendants' Exhibit Q for identification

25     contains, among other things, hospital surveillance photos on

E869chr2                          Gardner - cross

1     video from the early morning hours of December 15, 2010.  And

2     we will offer those portions of Exhibit Q for identification

3     which are the hospital video.

4                THE COURT:  Okay.

5                MR. BUCHWALD:  What I'd like to do, Ms. Gardner, if

6     you would watch your screen.  We've set this up.

7                THE COURT:  So if I haven't done so already,

8     Defendants' Exhibit Q will be admitted.

9                MR. BUCHWALD:  Thank you very much, your Honor.

10               (Defendants' Exhibit Q received in evidence)

11    BY MR. BUCHWALD:

12    Q.  We're going to be playing a portion of the video.  I'm

13    going to ask you to look at it.  I'm going to ask you -- it's

14    very brief -- after you've seen it, if you recognize those

15    people.  It's different from the question of:  Did you see this

16    when you were there.

17    A.  Okay.

18    Q.  I'm just going to ask you if you recognize who those people

19    are.

20    A.  Okay.

21    Q.  All right?

22    A.  Yes.

23               MR. BUCHWALD:  If we would play that portion --

24    everybody's screen working?

25               (Video played)

E869chr2                         Gardner - cross

1             MR. BUCHWALD:  Stop that.  Could we back it up a
2    little bit?  Are we able to back it up just a bit?
3             Let's stop it there.
4    BY MR. BUCHWALD:
5    Q.  Are you able -- were you able to recognize either of those
6    people?
7    A.  No.
8    Q.  And am I correct you were not yet at the hospital as far as
9    you know when the person you knew as Little came to the
10   hospital, correct?
11   A.  No.
12   Q.  By the time you got to the hospital he was already there;
13   is that right?
14   A.  Yes.
15   Q.  Now we're going to show you another segment in just a
16   moment where I believe you're going to see a man or a male and
17   a female.  We're going to ask you if you can identify --
18             (Video played)
19             MR. BUCHWALD:  Stop it, please.
20             Are we able to go back one or two?
21             (Video played)
22             MR. BUCHWALD:  Stop it there.
23   BY MR. BUCHWALD:
24   Q.  Are you able to identify that man?
25   A.  No.

1  Q.  Can you see the face at all here?

2  A.  Not really.

3  Q.  But you believe you didn't see Quay Quay that night at all?

4  A.  No.

5  Q.  You didn't observe whether or not Quay Quay had blood on

6  his pants?

7  A.  No.  That was -- it was Mike.  That's why I texted the DA

8  and told him it wasn't Quay Quay I seen.  I apologized.  I told

9  him it was Mike Boone.

10  Q.  Why don't we keep going on this particular video.

11          (Video played)

12          MR. BUCHWALD:  Again, can we -- we'll go to the end

13  and then we'll play it again.

14  Q.  Do you recognize either the male or the female?

15  A.  No.

16  Q.  You did meet Besheltie Smith that night?

17  A.  Yes.

18  Q.  And that's Little's mother?

19  A.  Yes.

20  Q.  Whom you've known for some time, right?

21  A.  Yes.

22  Q.  And do you know if this is Besheltie Smith?

23  A.  No.

24  Q.  Have you ever been shown these videos before?

25  A.  No.

E869chr2                              Gardner - cross

1    Q.  Now, incidentally, do you remember when you were

2    interviewed that -- withdrawn.

3            Were you interviewed the morning or a few hours later,

4    more in the morning, about the incidents at the hospital by

5    Newburgh police officers?

6    A.  Yes.

7    Q.  And did you tell them that you saw a -- did you tell the

8    officers that you saw a dark-skinned kid at the hospital?

9    A.  The city cops?

10   Q.  Yes.

11   A.  Newburgh?

12   Q.  Yes.

13   A.  No.

14   Q.  Did you tell them you saw a dark-skinned little kid at the

15   hospital?

16   A.  No.  I don't remember -- I remember telling the DA that for

17   here.

18   Q.  And do you remember speaking with Besheltie Smith?

19   A.  At the hospital, yes.

20   Q.  And didn't you ask Besheltie Smith who was it that brought

21   Little to the hospital?

22   A.  No.  I asked her what happened.

23   Q.  And what did she say?

24           MR. BAUER:  Objection.

25           THE COURT:  Sustained.

1          MR. BUCHWALD:  Can we do the next video.

2   Q.  Again, if you'd look at this next portion of the video, I'm

3   going to ask you -- you testified about having seen Tarrence?

4   A.  Yes.

5   Q.  At the hospital.  And also having seen Akinto Boone's

6   brother?

7   A.  Yes.

8   Q.  What is his name?

9   A.  Mike.

10  Q.  Michael?

11  A.  Yeah.

12  Q.  And -- but not Akinto Boone; is that correct?

13  A.  That's correct.

14  Q.  So we're going to ask you to view this and then tell us if

15  there are any of these people who you can recognize and

16  identify.

17          (Video played)

18  Q.  Were you able from the video itself to recognize anybody?

19  A.  No.  I know it was Tarrance because he was in the

20  wheelchair.

21  Q.  Wheelchair.  But you can't even -- from the video you

22  couldn't even identify Tarrance; is that right?

23  A.  No.

24  Q.  I'm correct, right?

25  A.  Yes.

E869chr2                          Gardner - cross

1           MR. BUCHWALD:  If I might have just one moment, your

2    Honor.

3           (Pause)

4           MR. GREENFIELD:  Good morning.

5           THE WITNESS:  Good morning.

6           MR. BUCHWALD:  Mr. Greenfield, just give me a second,

7    please.

8           MR. GREENFIELD:  Certainly.

9           (Pause)

10          MR. BUCHWALD:  No further questions.

11          THE COURT:  Mr. Greenfield.

12          MR. GREENFIELD:  Thank you.

13   CROSS-EXAMINATION

14   BY MR. GREENFIELD:

15   Q.  You just saw a series of videotapes that took place at a

16   hospital on that evening?

17   A.  Yes.

18   Q.  It was a well lit hospital room, correct?

19   A.  Yes.

20   Q.  You knew who Michael -- you know who Michael Boone is,

21   correct?

22   A.  Yes.

23   Q.  You know who Tarrence Smith is, correct?

24   A.  Yes.

25   Q.  You know who Little's mom is, correct?

E869chr2                        Gardner - cross

1    A.  Yes.

2    Q.  Were you able, while you were looking at that screen, were

3    you able to identify them walking in that day?

4    A.  No.

5    Q.  You just couldn't; is that right?

6    A.  No.

7    Q.  Now, you saw what you thought was a person in distress on

8    the streets of Newburgh on December 15, 2010 and you reported

9    it to the police; am I right?

10   A.  Yes.

11   Q.  And after you reported it to the police you went to the

12   hospital as a good Samaritan to see what you could do; is that

13   correct?

14   A.  I went to his mom's first.  She never answered.  So I went

15   to the hospital to check on Joker.

16   Q.  I'm sorry.  Go ahead.

17   A.  I went back to the hospital to see how Joker was doing.

18   Q.  And then later that morning you went to police headquarters

19   and were questioned by a detective; is that right?

20   A.  They came and got me.

21   Q.  And who is it that came and got you?

22   A.  I don't remember at all.

23   Q.  Was it a detective or a uniformed officer?

24   A.  Detectives.

25   Q.  And if I say Detective Cortez does that refresh your

1    recollection?

2    A.  Not at all.

3    Q.  Now, when you got to police headquarters it was about eight

4    in the morning?

5    A.  I don't remember what time.  It was in the morning.  It was

6    early in the morning.  Before or after eight, I believe.

7    Q.  How long were you there at police headquarters?

8    A.  I don't -- maybe an hour, if that.  I'm not really sure.  I

9    don't remember.

10   Q.  And how long did the questioning take?

11   A.  It didn't -- I don't think it took long.

12   Q.  When did it start and when did it end?

13   A.  When I got there, they took me straight up, upstairs.

14   Q.  Yes.

15   A.  To the detective's office.

16   Q.  Okay.

17   A.  And started asking me questions right from there.  I just

18   don't remember the time.

19   Q.  Do you know if it was tape recorded, or do you know if it

20   was videotaped, or were they just taking notes?

21   A.  I don't even know.  I don't remember.

22   Q.  Well, I show you what's been marked as 3505-2.  You say you

23   thought you were there about eight o'clock in the morning; is

24   that right?

25   A.  I believe so, yeah.

E869chr2                        Gardner - cross

1    Q.  You believe you were there less than an hour?

2    A.  I think so.  I told you I didn't remember.

3    Q.  I'm going to show you the document and ask you, directing

4    your attention to the upper right-hand corner as you look at

5    it, to see if your recollection is refreshed as to what time

6    you got there.

7    A.  8:01 hours.

8    Q.  And if you turn it over is your recollection refreshed as

9    to when the statement was completed?

10   A.  8:46 a.m.

11   Q.  So your recollection is you were there about 45 minutes to

12   an hour; is that right?

13   A.  Yes, sir.

14   Q.  And then you left?

15   A.  Yes.

16   Q.  And after you left were you questioned by the police after

17   that -- were you questioned by the police any further during

18   the year 2011?

19   A.  No.

20   Q.  During the year 2012?

21   A.  No.

22   Q.  During the year 2013?

23   A.  No.

24   Q.  When is it for the first time that you were questioned

25   again about this case, approximately?

E869chr2                           Gardner - cross

1   A.  I'm not sure but I got subpoenaed for April 22.

2   Q.  You say you got -- who subpoenaed you?

3   A.  Detective.

4   Q.  And after you were subpoenaed what happened?

5   A.  I came here and it was postponed or something.

6   Q.  You did what?

7   A.  My son brought me here and it was postponed or canceled or

8   something.

9   Q.  When is it the next time that you met with anybody?

10  A.  Three, four weeks ago.

11          MR. GREENFIELD:  If I might have one second, judge?

12          THE COURT:  Certainly.

13          (Pause)

14  Q.  That questioning took place where?

15  A.  At first at my niece's apartment, 428 Liberty, and then at

16  the police station.

17  Q.  And were any detectives from the Newburgh police department

18  present?

19  A.  No.

20          MR. GREENFIELD:  I have no further questions.

21          THE COURT:  Any redirect?

22          MR. BAUER:  Briefly, your Honor.

23  REDIRECT EXAMINATION

24  BY MR. BAUER:

25  Q.  Ms. Gardner, you were shown a number of videos?

E869chr2                          Gardner - redirect

1    A.  Yes.

2    Q.  And asked if you could recognize individuals; is that

3    right?

4    A.  Yes.

5    Q.  Do you remember that?

6    A.  Yes.

7    Q.  And you were unable to do so; isn't that right?

8    A.  They are blurry.

9    Q.  It was too blurry, right?

10   A.  Yes.

11   Q.  Were you able to see yourself in that video?

12   A.  Not at all.

13   Q.  Do you think you would have been able to see yourself in

14   that video?

15   A.  I never stepped inside the hospital.

16   Q.  Okay.  But if you were in that video, do you think you

17   would have been able to see yourself?

18   A.  Probably not.  I wouldn't know it was me from my frame.

19            MR. STRAZZA:  Objection, your Honor, speculative.

20            THE COURT:  Sustained.

21            MR. BAUER:  No further questions.

22            THE COURT:  Very well.  Ms. Gardner, you may step

23   down.  You can go home.

24            (Witness excused)

25            MR. BAUER:  Your Honor the government calls its next

E869chr2                        Gardner - redirect

1    witness which is Peter Frederick.

2              THE COURT:  Mr. Frederick, please watch your step,

3    make sure you don't trip on any wires.  Step into the witness

4    box and remain standing.

5      PETER FREDERICK,

6          called as a witness by the Government,

7          having been duly sworn, testified as follows:

8              THE COURT:  Please have a seat, pull your seat

9    forward.  Please speak clearly and directly into the

10   microphone.

11   DIRECT EXAMINATION

12   BY MR. BAUER:

13   Q.  Good morning.  Where do you work?

14   A.  City of Newburgh police department, sir.

15   Q.  How long have you been with the City of Newburgh police

16   department?

17   A.  Transferred into the city August of 2002.

18   Q.  Where did you work before Newburgh PD?

19   A.  From 2000 to 2002 I was at the Village of Pottstown in

20   upstate New York.  And from '95 to '99, the City of Rocky

21   Mount.

22   Q.  City of Rocky Mountain?

23   A.  Mount.

24   Q.  What's your current rank with the Newburgh PD?

25   A.  Detective.

E869chr2                        Frederick - direct

1   Q.  When you first started with Newburgh PD were you assigned

2   to a particular unit?

3   A.  I was just a patrolman, sir.

4   Q.  Have you switched units during your time in the Newburgh

5   PD?

6   A.  Yes, sir.

7   Q.  When was that?

8   A.  January 2006.

9   Q.  And you switched from patrol to what?

10  A.  Detective, sir.

11  Q.  I'm sorry?

12  A.  Detective, sir.

13  Q.  And in what unit or division did you move to?

14  A.  The crime scene unit.

15  Q.  Is the crime scene unit also known as CSU?

16  A.  Yes, sir.

17  Q.  What are your duties and responsibilities as a detective in

18  CSU?

19  A.  Basically we process crime scenes which could be as minimal

20  as taking photos all the way up to photos, diagrams,

21  measurements, retrieving evidence, identifying evidence.  We

22  are also in charge of cataloging the evidence, storing the

23  evidence, and disposition of the evidence.

24  Q.  Are there particular types of crimes that you work on in

25  the CSU?

E869chr2                           Frederick - direct

1    A.  It's whatever we get assigned.  It could be as minimal as a

2    car -- a larceny from a car where a window is broken to a

3    homicide.

4    Q.  And how is it that CSU gets involved in those assignments?

5    A.  We're notified by a supervisor, whether it's a patrol

6    supervisor or detective supervisor, to respond to whatever they

7    assign us.

8    Q.  Detective Frederick, have you received any training as part

9    of your work in CSU?

10   A.  Yes, sir.

11   Q.  What type of training?

12   A.  I've been to several -- multiple trainings; a basic

13   evidence tech school, two-week school that was hosted by New

14   York State; there's an advanced crime scene school which is

15   also a two-week school that I've attended.  I've been to

16   several week-long schools over at the Henry Lee Institute in

17   Connecticut as well as a latent print examiner.

18   Q.  Have you been trained in the collection of biological

19   evidence?

20   A.  Yes.

21   Q.  When I say biological evidence what do you understand that

22   to mean?

23   A.  Biological evidence is any kind of either tissue or fluids

24   that are of a biological nature.

25   Q.  Does that include -- so fluid or liquid, does that include

1    blood?

2    A.   Blood, saliva, semen.

3    Q.   How many crime scenes have you responded to in your time in

4    CSU, approximately?

5    A.   Two thousand.

6    Q.   Did any of those crime scenes involve a shooting?

7    A.   Yes, sir.

8    Q.   Did any of those crime scenes involve a fatal shooting, a

9    homicide?

10   A.   Yes, sir.

11   Q.   Approximately how many of those types of crime scenes?

12   A.   I've done about 40 homicide scenes.  As far as how many

13   were shootings, 25, rough guesstimation.  But 40 -- right

14   around 40 homicides.

15   Q.   And when you responded to those crime scenes this is,

16   generally speaking, what types of evidence did you collect?

17   A.   Every scene being different, but for the most part you're

18   involved in shootings, you'll hopefully be able to identify and

19   ascertain and collect ballistic evidence, whether it be

20   projectiles and/or shell casings; as well as you'll find some

21   kind of biological evidence usually because once the human body

22   takes a projectile they usually bleed.  And then whatever else

23   we deem necessary at the scene.

24   Q.   Would you also take photographs at those crime scenes?

25   A.   Yes, sir.

E869chr2                          Frederick - direct

1    Q.  How many people are in the CSU unit in Newburgh PD?

2    A.  Two.

3    Q.  You and who else?

4    A.  Detective Kevin Burns.

5    Q.  How about back in December 2010, how many people in the CSU

6    unit?

7    A.  There were three at that point.

8    Q.  Was it you and Detective Burns?

9    A.  Myself, Detective Burns, and Sergeant Vancura.

10   Q.  And when you worked CSU did you work together or separately

11   from Detective Burns and Sergeant Vancura?

12   A.  The three of us shared an office.  And depending upon the

13   complexity of scenes, a lot of times you work by yourself, but

14   in the larger scenes you'll bring help.

15   Q.  Do you work a regular set of hours or a shift?

16   A.  Yes, sir.

17   Q.  What is that?

18   A.  8 to 4.  Monday through Friday.

19   Q.  That's 8 a.m. to 4 p.m.?

20   A.  Yes, sir.

21   Q.  What happens for crimes that occur after hours?

22   A.  Every other week Detective Burns and myself rotate what's

23   called an on-call.  So from 4 in the afternoon until 8 in the

24   morning whoever is the on-call detective is, if it's deemed

25   that one of us needs to come in for a particular crime scene,

E869chr2                         Frederick - direct

1    we get called from wherever we are to respond back to the

2    station and go to work.

3    Q.  Before I draw your attention to a particular date let me

4    ask you about evidence collection.  Once evidence is collected

5    at a particular crime scene, what happens to it?

6    A.  If we collect it, it's brought back to the station by

7    ourselves.  It's then cataloged, packaged, and stored for

8    distribution later.

9         If it's collected by another member of the agency,

10   they'll bring it back, they'll package it, they'll catalog it,

11   usually, and then it's put into an overnight holding area where

12   we'll then collect it and store it.

13   Q.  When you say store it, where do you store it?

14   A.  We have several evidence vaults.

15   Q.  I'm sorry?

16   A.  Several evidence vaults.

17   Q.  And the controller of the evidence vault, is that the CSU

18   unit?

19   A.  Yes, sir.

20   Q.  Now when we're talking about biological evidence, I wanted

21   to ask you, are you familiar with the term buccal swab?

22   A.  Yes, sir.

23   Q.  What is a buccal swab?

24   A.  A buccal swab is a controlled sample taken from a party

25   that is then submitted to be run against usually other

1   biological evidence that was recovered from the scene.

2   Q.  Where is it typically taken from?

3   A.  (No response).

4   Q.  From the person's body, I mean.

5   A.  It's basically -- it's a little tiny brush.  There's two of

6   them.  And you hand the brush to the party and they put it

7   inside their mouth and they scrape it against the inside of

8   their gum approximately 20 times.  And then it's placed in a

9   small box.  And you have them do it twice so you have two

10  different controls.  And they go into a bigger box.

11  Q.  Have you administered buccal swabs before?

12  A.  Yes.

13  Q.  And after you administer it, do you follow the same chain

14  of evidence storage that we talked about earlier?

15  A.  Yes, sir.

16  Q.  And what happens when somebody else from the Newburgh PD

17  obtains a buccal swab?

18  A.  It's either -- they either catalog it themselves and put it

19  into that overnight storage area that we then retrieve it from

20  or sometimes they'll just bring us the package already sealed

21  up and then we'll enter it for them.

22          THE COURT:  I'm sorry, Officer, can I ask you.  I hear

23  you say buccal swab.  Can you spell the word.

24          THE WITNESS:  B-U-C-C-A-L.

25          THE COURT:  B-U-C-C-A-L?

E869chr2                    Frederick - direct

1             THE WITNESS:  Yes.

2             THE COURT:  Thank you.

3             THE WITNESS:  It's also sometimes referred to as a

4    "buckle" swab.  The head of the state police Crime Lab says

5    either pronunciation is okay.

6             THE COURT:  Okay.

7             MR. BAUER:  Thank you.

8    BY MR. BAUER:

9    Q.  And are -- is biological evidence like a buccal swab or

10   blood that's been gathered, is that ever sent out for testing?

11   A.  Yes, sir.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.   Is that done automatically or upon request?

2    A.   Upon request.

3    Q.   I would like to now draw your attention to the early

4    morning hours of December 15, 2010, at a little after midnight.

5             Were you working your normal shift at that point?

6    A.   No, sir.

7    Q.   You worked earlier that day I guess, December 14, 2010?

8    A.   Yes, sir.

9    Q.   Was that your normal 8 to 4 shift?

10   A.   Yes, sir.

11   Q.   Who was on call that night, you or Detective Burns?

12   A.   I was.

13   Q.   Did you receive any calls?

14   A.   Yes, sir.

15   Q.   Approximately what time did you receive that call?

16   A.   12:30-ish, quarter to one I believe.

17   Q.   What did you do after you got that call?

18   A.   I was sleeping, so I got dressed, responded to the station,

19   gathered up my camera, vehicle, and then responded to Lander

20   Street.

21   Q.   So -- I was going to ask.  The call said to respond to

22   Lander Street?

23   A.   They told me to come in; they had had a fatal shooting.

24   Once I was at the station, I asked where I needed to go, and

25   they told me to go to Lander Street first.

E86nchr3                        Frederick - direct

```
 1    Q.  Do you remember where on Lander Street?

 2    A.  It was in a 40s I believe.

 3    Q.  That is fine.  So you ultimately went to Lander Street, is

 4    that correct?

 5    A.  Yes, sir.

 6    Q.  When you got there, what, if anything, did you see?

 7    A.  Officer William Lahar was at the scene.  He had a section

 8    of sidewalk he was securing, and on that sidewalk there was a

 9    decent amount of blood.

10    Q.  After you saw that -- you saw Officer Lahar and you saw the

11    blood, what, if anything, did you do?

12    A.  Took several photographs of it.  I did a swab from the

13    blood and secured that in my vehicle.

14    Q.  To be clear, did you see a victim, did you see the person

15    from whom the blood came from?

16    A.  No, sir.

17            MR. BAUER:  Your Honor, may I approach?

18            THE COURT:  You may.

19            MR. BAUER:  I am going to be approaching him a number

20    of times.  Would you mind if I dispense with the courtesy of

21    asking each time?

22            THE COURT:  Absolutely.

23            MR. BAUER:  Thank you, your Honor.

24    Q.  I am showing you what has been marked for identification as

25    Government Exhibits 91A through E.  Can you take a look at
```

1    those photographs and tell me if you recognize them.

2    A.  Yes, sir.

3    Q.  What are they?

4    A.  They are the photographs I took on Lander Street that

5    night, sir.

6    Q.  Who took them?

7    A.  I did.

8    Q.  Do they accurately reflect what Lander Street looked like

9    at that point?

10   A.  Yes, sir, with the addition of a flash.

11           MR. BAUER:  The government offers Government Exhibits

12   91A through E inclusive.

13           THE COURT:  Any objection?

14           MR. GOLTZER:  No objection.

15           MR. BUCHWALD:  No objection.

16           THE COURT:  91A through E will be received.

17           (Government's Exhibits 91A through 91E received in

18   evidence)

19           MR. BAUER:  With all the evidence we are going to show

20   Detective Frederick, is it OK if we go ahead and publish each

21   one after it's admitted?

22           THE COURT:  You may.

23           MR. BAUER:  Ms. McInerney, if you could pull up

24   Exhibit 91A.

25   Q.  Detective Frederick, can you explain to the jury what we

1    are looking at here.

2    A.   Basically I am standing in the middle of the street looking

3    at 45 Lander Street and just taking a photograph of the front

4    of the building along with the sidewalk.

5    Q.   OK.  Move on to B.  Again, what are we looking at here?

6    A.   This is a view of -- now I am standing on the sidewalk just

7    a view of the sidewalk with the bloodstains.

8    Q.   OK.  C.  Again?

9    A.   Once again, it's bloodstains on the sidewalk in front of 45

10   Lander Street.

11   Q.   Then we will do quickly D and then E.

12   A.   E is one of the bloodstains with -- it is basically a

13   ruler, we refer to it as a scale, to give somebody an idea of

14   how much volume you are talking about.

15   Q.   Just to be clear, who put the scale on the ground?

16   A.   I did.

17   Q.   How long were you at Lander Street for, Detective

18   Frederick, that night?

19   A.   20 minutes, 30 minutes.

20   Q.   After Lander Street, did you go anywhere else?

21   A.   Yes, sir.

22   Q.   Where did you go?

23   A.   Around the corner to 54 Chambers.

24   Q.   When you got to 54 Chambers, what, if anything, did you

25   see?

1   A.  There was crime scene tape blocking off the sidewalk area

2   and the building as well as two uniformed officers there.

3   Q.  Do you remember which officers?

4   A.  I do not.

5   Q.  Did you actually go inside 54 Chambers?

6   A.  I looked in through the door.  I didn't enter 54 Chambers

7   at that point.

8   Q.  Outside 54 Chambers did you see anything, anything out of

9   the ordinary?

10  A.  Yes, sir.

11  Q.  What did you see?

12  A.  There was a large knife on the sidewalk as well as a puddle

13  of blood.

14  Q.  Showing you what's been marked for identification as

15  Government Exhibits 92A through F, again can you take a look to

16  see if you recognize those photographs?

17  A.  Yes, sir.

18  Q.  What are they?

19  A.  They are the exterior of 54 Chambers Street as well as

20  photographs of the knife that was on the sidewalk as well as

21  the blood with and without scales.

22  Q.  Who took those photographs?

23  A.  I did, sir.

24          MR. BAUER:  The government offers Exhibits 92A through

25  F inclusive.

1              MR. GREENFIELD:  No objection.

2              THE COURT:  92A through F will be received.

3              (Government's Exhibits 92A through 92F received in

4     evidence)

5              MR. BAUER:  Ms. McInerney, can we pull up 92A.

6     Q.  Detective Frederick, each time we pull up the photo could

7     you dell us what we are looking at.

8     A.  I am standing in the roadway on Chambers Street and we are

9     looking at the front of the building.

10    Q.  92B.

11    A.  It is a closeup of the door of the door of the building

12    with the address above it.

13    Q.  92C.

14    A.  It's the bloodstain on the step.

15    Q.  92D.

16    A.  Knife on the sidewalk.

17    Q.  92E.

18    A.  Knife on the sidewalk with a placard.

19    Q.  And the placard says No. 1?

20    A.  Yes, sir.

21    Q.  Who put that placard there?

22    A.  I did, sir.

23    Q.  Why did you do that?

24    A.  As we start to identify evidence that we are going to later

25    collect, especially in a very complex scene like this, we will

1   placard the items.  So when we catalog them, the placard number

2   and the catalog number will correspond to each other.

3   Q.   And let's do 92F.

4   A.   Blood with a placard and the scale.

5   Q.   Can we go back to 92E.  Detective Frederick, I am showing

6   you what has been marked for identification as Government

7   Exhibit 1.  Can you take a look at this box and tell me if you

8   recognize it.

9             MR. BAUER:  I will just note for the record that we

10  asked Detective Frederick to bring a knife and gloves in order

11  to open some of the evidence we are about to see.

12            THE COURT:  Very well.

13  Q.   Do you recognize that?

14  A.   Yes, sir.

15  Q.   What is it?

16  A.   It is the box that item No. 1 was placed in by myself.

17  Q.   You placed it into the box?

18  A.   I did, sir.

19  Q.   Would you mind opening the box and taking a look at what's

20  inside.  Do you recognize the item inside?

21  A.   Yes, sir.

22  Q.   What is it?

23  A.   It's the knife from the sidewalk that I collected that

24  evening.

25            MR. BAUER:  Your Honor, the government offers Exhibit

1    1 into evidence.

2              THE COURT:  Any objection?

3              Seeing no objection, Government Exhibit 1 will be

4    received.

5              (Government's Exhibit 1 received in evidence)

6              MR. BAUER:  Your Honor, if we are publishing it, may I

7    walk it in front of the jury?

8              THE COURT:  You may.

9    Q.  Just to be clear, Government Exhibit 1, the knife is

10   attached to the box.  Did you do that as well?

11   A.  I did not.

12   Q.  No?  OK.

13             After 54 Chambers Street that night did you go

14   anywhere else?

15   A.  I responded to St. Luke's Hospital.

16   Q.  Where is that?

17   A.  70 Dubois Street in Newburgh.

18   Q.  When you got to the hospital, what, if anything, did you

19   do?

20   A.  Took to some photographs, spoke to the patrolmen that were

21   there, and they handed me clothing items.

22   Q.  They handed you what?

23   A.  Clothing items.

24   Q.  When you talked to the officers that were there, who

25   specifically did you talk to?

1  A.  Terrence Moore, Roman Scuadroni.

2  Q.  Did you see anybody else there at the hospital besides

3  Officers Moore and Scuadroni?

4  A.  The deceased.

5  Q.  When you say the deceased, who are you referring to?

6  A.  Mr. Henry.

7  Q.  When you saw him, was he alive or he was deceased?

8  A.  He was dead.

9  Q.  Where physically was Mr. Henry when you saw him?

10  A.  He was on a gurney in one of the bays.

11  Q.  What, if anything, did you notice about him?  I mean, you

12  said he was deceased.  Did you see blood?

13  A.  Yes, sir.

14  Q.  Did you see the wounds on his body?

15  A.  Yes.  He had a couple of gunshot wounds.

16  Q.  You said that you got some clothing items from officer --

17  is it officer or Detective Moore?

18  A.  Moore, sir?

19  Q.  Moore, yeah.

20  A.  When he worked with us, he was a patrolman.

21  Q.  What did you do with the evidence that you received from

22  Officer Moore?

23  A.  They were secured in my vehicle and then transported to the

24  station and secured in my office.

25  Q.  Did you document or catalog the items that you received?

E86nchr3                          Frederick - direct

1   A.  No, not right then.  It was done probably 12 or 14 hours

2   later.

3   Q.  Just to be clear, Officer Moore gave you clothing items

4   that belonged to who?

5   A.  He gave me clothing items that belonged to Mr. Henry.

6   Q.  OK.  And were these items removed from Mr. Henry at the

7   hospital as far as you know?

8   A.  I believe so.

9   Q.  OK.  I am going to show you -- we will start with

10  Government Exhibit 51.  I will do 51 and 52 at the same time

11  here.

12          I am going to ask you to open these brown paper bags,

13  but before I do, looking at Government Exhibit 51, just looking

14  on the outside of the bag, do you recognize the markings on the

15  outside?

16  A.  Yes, sir.

17  Q.  Then there is some handwriting there, correct?

18  A.  Yes, sir.

19  Q.  Whose handwriting is it?

20  A.  It's mine, sir.

21  Q.  I saw that you wrote up here the name Jeff Henry, J.H., is

22  that right?

23  A.  That part is not my handwriting.

24  Q.  OK.

25  A.  The initials with the number and the date is mine.

E86nchr3                        Frederick – direct

1   Q.  Could you open up Exhibit 51, please.

2            MR. GREENFIELD:  Can we see it before he opens it.

3            THE COURT:  You can see it after he opens it.  Do you

4   want to see it before he opens it?

5            MR. GREENFIELD:  Yes.

6            THE COURT:  OK.

7   Q.  Can you open up 51, please.

8   A.  Yes, sir.

9   Q.  Would you mind removing it and just taking a look at it.

10           What is it?

11  A.  A knit cap.

12           THE COURT:  I'm sorry, a what?

13           THE WITNESS:  A knit cap.

14           THE COURT:  Knit cap.

15  Q.  The government offers Exhibit 51 into evidence.

16           THE COURT:  Any objection?

17           MR. GREENFIELD:  No objection.

18           THE COURT:  51 will be received.

19           (Government's Exhibit 51 received in evidence)

20  Q.  For these items, I don't have gloves so would you just show

21  them to the jury.  Thank you.  Then the same thing for 52,

22  please.

23           What is Exhibit 52?

24  A.  It is a shirt.  A T-shirt.

25  Q.  What color is it?

E86nchr3                          Frederick - direct

1   A.  It was white at one point.

2   Q.  Now what is its condition?

3   A.  Soiled.

4   Q.  Soiled with blood?

5   A.  With blood.

6           MR. BAUER:  The government offers Exhibit 52.

7           MR. GREENFIELD:  No objection.

8           THE COURT:  52 will be received.

9           (Government's Exhibit 52 received in evidence)

10  Q.  Would you mind just showing it to the jury.  Thank you,

11  Detective Frederick.  I am going to show you for identification

12  but not ask you to open Government Exhibits 53 and 54.  Just

13  let me know if you recognize these items as items that you

14  collected that day from the hospital.

15  A.  Yes, sir.

16  Q.  OK.  Just let me ask you generally, did you collect a

17  number of items of clothes that were recovered from Jeffrey

18  Henry?

19  A.  Yes, sir.

20  Q.  Were multiple items of that clothing bloody and soiled, as

21  you've said?

22  A.  Yes, sir.

23  Q.  Rather than go through the process of opening each of those

24  item, the government would offer Exhibit 53 and 54 unopened.

25          MR. GREENFIELD:  No objection.

 1              MR. BUCHWALD:  What are the numbers?  I'm sorry.

 2              MR. BAUER:  53 and 54.

 3              THE COURT:  Those items will be received.

 4              (Government's Exhibits 53 and 54 received in evidence)

 5    Q.  I will take those back from you.  I'm going to show you

 6    Exhibit 55.  Do you recognize that rather large bag?

 7    A.  Yes, sir.

 8    Q.  What is it?

 9    A.  It is a winter coat.

10    Q.  Again, was this one of the items collected from Jeffrey

11    Henry?

12    A.  Yes, sir.

13    Q.  I am going to ask you to open that one, please.  Can you

14    describe what it is for the record.

15    A.  It is a large North Face maroon winter coat.

16              MR. BAUER:  The government offers Exhibit 55.

17              THE COURT:  Any objection?

18              MR. GOLTZER:  No.

19              THE COURT:  Government Exhibit 55 will be received.

20              (Government's Exhibit 55 received in evidence)

21    Q.  Detective Frederick, did you recover anything else -- I'm

22    sorry -- did you collect anything else that was recovered from

23    Jeffrey Henry besides clothing?

24    A.  Yes, sir.

25    Q.  I'm showing you what have been marked for identification as

E86nchr3                          Frederick - direct

1   Exhibits 56 and 57.  Let's first look at 56.  Do you recognize

2   that?

3   A.  Yes, sir.

4   Q.  What is it?

5   A.  It is his wallet.

6   Q.  Is there anything else in there besides the wallet?

7   A.  His driver's license.

8   Q.  Are there keys in there as well?

9   A.  Yes, sir.  And a condom.

10  Q.  I'm sorry?

11  A.  And a condom.

12          THE COURT:  And a what?

13          THE WITNESS:  Condom.

14          THE COURT:  Oh.

15  Q.  And you said it is his driver's license?

16  A.  Yes, sir.

17  Q.  Was this collected from Officer Moore as well at the

18  hospital?

19  A.  Yes, sir.

20          MR. GOLTZER:  I couldn't hear that.

21          MR. BAUER:  It was collected from Officer Moore at the

22  hospital.

23          MR. BUCHWALD:  Are we talking about 56?

24          MR. BAUER:  56.

25  Q.  The government offers Exhibit 56, the plastic bag that

194

E86nchr3                          Frederick - direct

1    contains the wallet, the driver's license, and the keys.

2              THE COURT:  Any objection?

3              56 will be received.

4              (Government's Exhibit 56 received in evidence)

5              MR. BAUER:  Your Honor, may I just publish that to the

6    jury.

7              THE COURT:  Certainly.

8    Q.  I have also placed before you, Detective Frederick,

9    Government Exhibit 57.  Do you recognize that item?

10   A.  Yes, sir.

11   Q.  What is it?

12   A.  The top part of the item is packaging materials, what we

13   originally packaged, the bottom part, which is two bags of

14   crack cocaine.

15   Q.  When you say crack cocaine, are you saying that it appears

16   to you based on your training and experience to be crack

17   cocaine?

18   A.  This is what crack cocaine looks like when it comes back

19   from the lab.  When we get it, it's in kind of a rock form.

20   But in my training and experience, when it comes back from the

21   lab, it's been pulverized and broken down.

22   Q.  Was this an item that was recovered from Jeffrey Henry as

23   well?

24   A.  Yes, sir.

25   Q.  Do you know where from where?

 1   A.   I believe it was in one of his pockets.  I don't remember

 2   which one.

 3           MR. BAUER:  The government offers Exhibit 57 into

 4   evidence.

 5           MR. GREENFIELD:  May I just see it?

 6           MR. BAUER:  Sure.

 7   Q.   Let me ask you one thing.  There's some papers attached,

 8   one of them headed Federal Bureau of Investigation.  Are these

 9   your papers?

10   A.   No.

11   Q.   Are you familiar with them at all?

12           MR. BAUER:  I think I'm going to remove them.  I am

13   going to offer 57 without the papers.

14           The government offers Government Exhibit 57.

15           MR. GOLTZER:  OK.

16           THE COURT:  Seeing no objection, Government's Exhibit

17   57 will be received.

18           MR. BAUER:  OK.

19           (Government's Exhibit 57 received in evidence)

20           MR. BAUER:  I am going to show the jury.

21           Your Honor, at this time, government would like to

22   read a stipulation.

23           THE COURT:  Very well.

24           MR. BAUER:  It is hereby stipulated and agreed by and

25   between the parties that:

1          1.  If called to testify, Kim E. Gray, a forensic

2     scientist with the New York State Police Department Mid Hudson

3     Regional Crime Laboratory in Newburgh, New York, would testify

4     that on or about September 5, 2013, she performed an

5     examination of Government Exhibit 57, which was recovered by

6     Newburgh police officers on or about December 15, 2010.  Based

7     on that examination, Ms. Gray would testify that Government

8     Exhibit 57 consisted of two plastic bags, each containing a

9     chunky off-white substance with an aggregate weight of

10    approximately 1.41 grams.  Ms. Gray would further testify that

11    the substance contained within the Government Exhibit 57 tested

12    positive for the presence of cocaine base also known as crack

13    cocaine.

14         2.  If called to testify, a law enforcement agent with

15    the Drug Enforcement Administration, DEA, would testify that:

16         Cocaine is not grown in the New York State and must be

17    imported from out of state.

18         B.  Crack cocaine is made from cocaine.

19         Dated August 4, 2014, New York, New York, signed by

20    the parties.

21         The government offers Government Exhibit 902, the

22    stipulation I just read, into evidence.

23         THE COURT:  902 will be received.

24         (Government's Exhibit 902 received in evidence)

25         MR. BAUER:  OK.

1    Q.  Moving on, Detective Frederick, at the hospital there at

2    St. Luke's, did you see any other victims that day?

3    A.  There were other victims there.  I didn't physically see

4    them.

5    Q.  Are you familiar with an individual named Anthony Baynes?

6    A.  Yes, sir.

7    Q.  Have you ever processed any evidence from him?

8    A.  Yes, sir.

9    Q.  On what date?

10   A.  On the 15th.

11   Q.  That's the same day we are talking about, December 15,

12   2010?

13   A.  Yes, sir.

14   Q.  To be clear, did you collect the evidence directly from

15   Mr. Baynes?

16   A.  No, sir.

17   Q.  Who did you collect it from?

18   A.  Roman Scuadroni handed me multiple bags containing

19   Mr. Baynes' clothing.

20   Q.  Do you know where Anthony Baynes was at the time that you

21   received the items from Scuadroni?

22   A.  He was in one of the bays at the hospital behind a curtain.

23   Q.  Just like the evidence, the items that were recovered from

24   Officer Moore, did you catalog these items that you got from

25   Scuadroni once you got back to the Newburgh headquarters?

1    A.  Yes.

2          MR. BAUER:  Can we have Government Exhibit 71.

3    Q.  I'm showing you what's been marked for identification as

4    Government Exhibit 71.  Take a look and tell me if you

5    recognize that.

6    A.  Yes, sir.

7    Q.  What is it?

8    A.  It is a black striped shirt that I obtained from officer

9    Scuadroni on the date which we are talking about.

10   Q.  The one that Scuadroni got from Baynes?

11   A.  Yes, sir.

12   Q.  There are a number of articles of clothing.  I'm not going

13   to make you open all of them.  Maybe we will open just this

14   one.  Can you open this one, please.

15         Showing the black sweatshirt let me just ask -- well,

16   I will just go ahead and offer it.

17         MR. BAUER:  The government will offer Exhibit 71 into

18   evidence.

19         THE COURT:  Any objection?

20         71 will be received.

21         (Government's Exhibit 71 received in evidence)

22   Q.  Before you put it away, I wanted to look at the front left

23   side.  Very lightly marked here is a little square with the No.

24   61A on it.  Do you see that?

25   A.  Yes, sir.

1   Q.  Who did that?

2   A.  I did, sir.

3   Q.  Can you just explain for the jury what you did and why you

4   did it.

5   A.  Yes, sir.  As we were processing all the evidence for this

6   case, we were trying to streamline what needed to be done for

7   the lab.  So we saw what appeared to be a biological substance

8   there.  I identified it, I swabbed it.  The swab was eventually

9   sent to the lab.

10  Q.  When you say a biological substance, what do you mean?

11  A.  Blood.

12  Q.  Can you open up the sweatshirt up again.  There appeared to

13  be perhaps another biological substance on the bottom left

14  there.  Can you take a look.  Is there blood there on that

15  sweatshirt?

16  A.  Yes, sir.

17  Q.  It is dried now.

18  A.  Yes.  But this area here.

19  Q.  OK.  Thank you.

20          Now I am just going to show you unopened Government

21  Exhibits 72, 73 and 74.  I am going to ask you if these are

22  additional items that were recovered from Baynes by Scuadroni

23  and given to you?

24  A.  Yes, sir.

25  Q.  Those are items that were recovered from Baynes by

E86nchr3                        Frederick - direct

1    Scuadroni and given to you?

2    A.  Yes, sir, they are.

3    Q.  Is it fair to say that those items include other items of

4    clothing?

5    A.  Yes.

6    Q.  Other items of clothing?

7    A.  Yes, sir.

8    Q.  Were at least some of those items of clothing also covered

9    in blood.

10   A.  Yes, sir.

11   Q.  I'm showing you what's been marked for identification as

12   Government Exhibit 76.  Do you recognize that item?

13   A.  Yes, sir.

14   Q.  What is it?

15   A.  It is a buccal box.  Basically the buccal swabs that I

16   described before, they come in this little kit.  Both the

17   little brushes are placed within small boxes then placed within

18   this kit which is then sealed.

19   Q.  The buccal swabs that are contained in there, who are they

20   taken from?

21   A.  Mr. Baynes.

22   Q.  To be clear, did you take the swab?

23   A.  I did not.

24   Q.  But did you receive the swabs into evidence?

25   A.  Yes, sir.

1    Q.  OK.  Who was it that took the swab?

2    A.  The detective at the time, Cortez.

3           MR. BAUER:  The government will offer Exhibit 76 into

4    evidence.

5           MR. GREENFIELD:  No objection.

6           THE COURT:  There being no objection, 76 will be

7    received.

8           (Government's Exhibit 76 received in evidence).

9    Q.  Are you familiar with an individual named Tarrence Smith?

10   A.  Not by face or person.

11   Q.  Did you collect evidence at St. Luke's Hospital that day

12   from any other victims?

13   A.  Yes.

14   Q.  Do you remember who?

15   A.  I believe Tarrence Smith.

16   Q.  When you said you weren't familiar, meaning you weren't

17   personally familiar with him?

18   A.  I don't know what he looks like.

19   Q.  The items from Mr. Smith, who did you collect those items

20   from?

21   A.  Terrence Moore had those as well.

22   Q.  Do you know where Tarrence Smith was at the time when --

23   A.  . he was in a different area of the hospital.

24   Q.  Did you follow the same protocols of processing the items

25   that Moore gave you that he had gotten from Tarrence Smith?

1    A.  Yes, sir.

2    Q.  I'm going to show you Exhibits 81 through 84, but only ask

3    you to open 81.

4            Is it fair to say that multiple items that you

5    received regarding Tarrence Smith were covered in blood?

6    A.  Yes, sir.

7    Q.  So if you could look at 81 through 84 and just tell me if

8    you recognize them.

9    A.  Yes, sir.

10   Q.  Are those all items that you received from Officer Moore,

11   who had recovered them from Tarrence Smith at St. Luke's

12   Hospital on December 15, 2010?

13   A.  Yes, sir.

14           MR. BAUER:  I will offer Exhibits 81 through 84 into

15   evidence.

16           MR. GREENFIELD:  No objection.

17           THE COURT:  81 through 84 will be received.

18           (Government's Exhibits 81 through 84 received in

19   evidence)

20           MR. BUCHWALD:  I'm sorry, your Honor, if I could.

21           Each of these came to you from patrolman Terrence

22   Moore.

23           THE WITNESS:  Yes, sir.

24           MR. BUCHWALD:  OK.

25   BY MR. BAUER:

E86nchr3                          Frederick - direct

1   Q.  Please just open 81 for us, please.  For 81, what are we

2   looking at here?

3   A.  A pair of jeans.

4   Q.  If I could draw your attention to the left front pocket.

5   Is there a hole there in that pocket?

6   A.  Yes, sir.  This area right here.

7   Q.  In the back has it been, to use your words, soiled at all?

8   A.  Yes, sir.

9   Q.  Is that by blood?

10  A.  Yes, sir.

11          MR. BAUER:  OK.  Thank you I think we're done with

12  clothes.

13          MR. BUCHWALD:  What exhibit number was that?  Exhibit

14  81?

15          MR. BAUER:  81, yes.

16  Q.  I want to move on now Detective Frederick to what you did,

17  if anything, after the hospital.  Where did you go?

18  A.  I went back to my office.

19  Q.  Then after you were at the office, did you go anywhere

20  else?

21  A.  We basically stayed at the office until the case detectives

22  upstairs were done with writing and having a search warrant

23  signed.

24  Q.  Having a search warrant signed?

25  A.  Yes, sir.

1    Q.  Did there come a point in time when the search warrant was

2    signed?

3    A.  Yes, sir.

4    Q.  You are saying a search warrant.  A search warrant for what

5    premises?

6    A.  54 Chambers.

7    Q.  After that search warrant was signed, did you go back to 54

8    Chambers?

9    A.  Yes, sir.

10   Q.  And what, if anything -- I'm sorry.  Approximately what

11   time did you go back?

12   A.  It was daylight, in the morning.  Off the top of my head I

13   don't recall.

14   Q.  Was it after the courts opened, for instance?

15   A.  Yes, sir.

16   Q.  Based on your experience, when does the court in Newburgh

17   open?

18   A.  It varies, but hopefully usually by 9.

19   Q.  What, if anything, did you do when you returned to 54

20   Chambers?

21   A.  Once we had the search warrant, we could then proceed to

22   process the scene at 54 Chambers.  So basically we suit up and

23   I start, I just take overall photographs of the entire

24   premises.  While doing that, I am kind of making mental notes

25   of things I see that we are going to then later identify as

1   pieces of evidence to be further photographed and eventually

2   collected.

3   Q.   Were you writing anything down while you were processing

4   the scene?

5   A.   Yes, sir.

6   Q.   What types of things were you doing when you were writing?

7   A.   Once everything is photographed and everything is

8   identified, then what we do is we do a quick sketch of the

9   scene, and within that sketch we will put the items that we are

10  seeing as well as doing measurements for those items.

11  Q.   I'm going to show you Government Exhibits 95A through O

12  that have been marked as such for identification.

13           Can you tell me if you recognize these documents,

14  these photographs.

15  A.   Yes, sir.

16  Q.   What are they?

17  A.   They are the photographs I took that morning of 54 Chambers

18  Street.

19  Q.   You said that you did a walk-through, and then you went

20  back to collect evidence.  Were these photographs taken during

21  the walk-through or during the evidence collection portion of

22  your processing of the scene?

23  A.   This is the overalls that I described earlier.  When we

24  first have the search warrant and you first go in, you start to

25  photograph everything as we're going through the residence.

1          MR. BAUER:  The government offers Exhibits 95A through

2     O into evidence.

3          MR. GREENFIELD:  No objection.

4          MR. BUCHWALD:  No objection.

5          THE COURT:  95A through O will be received.

6          MR. BAUER:  I'm sorry, inclusive.

7          (Government's Exhibits 95A through 95O received in

8     evidence)

9          MR. BAUER:  Ms. McInerney, can we start with 95A.  We

10    will go through each one briefly.

11    Q.  Again, Detective Frederick, if you can just explain what we

12    are looking at for each photo.

13    A.  I am standing in the street, and this is the front of the

14    residence; that is, if I am standing on the step that had the

15    blood on it, looking into the foyer area and through a

16    secondary door that goes into a hallway into the residence.

17    Q.  So to be clear, we are looking at 95B here.  You took this

18    photo right outside the front door?

19    A.  Yes, sir.

20    Q.  Looking into the residence of 54 Chambers?

21    A.  Yes, sir.

22    Q.  Can we go to 95C.

23    A.  This is standing in by the interior door but just without

24    entering that interior door and looking down the hallway.

25    Q.  Was there a small room or foyer that you are standing in?

1    A.  Yes, sir.

2    Q.  OK.

3    A.  This is behind the front door.  The main focus of this

4    photo is the blood on the wall.

5    Q.  OK.  95E.

6    A.  Just going down a little bit in that first, that hallway

7    that leads into the residence, once again just shooting

8    forward.

9    Q.  95F, is this just further walking into the residence?

10   A.  Yes, sir.

11   Q.  95G.

12            MR. BUCHWALD:  Sorry?

13            MR. BAUER:  That was 95F and we are we are on to 95G.

14   Q.  What are we looking at here, 95G?

15   A.  As you exit that hallway, it opens into a middle room, and

16   basically stepping into that middle room be and looking into

17   the kitchen, this is a photograph of that area.

18   Q.  Sorry, just going back for a second.  Looking at 95G, all

19   the way in the back there appears to be a door and an aqua or

20   turquoise-looking towel?

21   A.  Yes, sir.

22   Q.  What is that room there?

23   A.  The one with the tiles?

24   Q.  Yes, the tiles.

25   A.  The bathroom, sir.

1   Q.  The bathroom opens up right into the kitchen?

2   A.  Yes, sir.

3   Q.  Next one.  95H, please.  Is this just another photograph of

4   the kitchen?

5   A.  Yes, sir.

6   Q.  95I?

7   A.  This is the opposite wall from the last photo in the

8   kitchen.  The stove and sink are on the right-hand side if you

9   were facing it.  This is the on the left-hand side.

10  Q.  OK.  95J.

11  A.  This is a shot from looking into that bathroom over the top

12  of the microwave.

13  Q.  OK.  K.

14  A.  This is standing in the same position the previous photo

15  was taken, but turning 180 degrees, taking a photo back out

16  from the kitchen through the middle room looking back down that

17  hallway towards the door that leads to the foyer.

18  Q.  OK.  95L.

19  A.  This is what we labeled as the master bedroom that was off

20  the kitchen.

21  Q.  OK.  M.  Just another photo from that bedroom?

22  A.  Yes, sir.

23  Q.  OK.  N.

24  A.  The same bedroom.

25  Q.  OK.  Lastly, O.  Also from the bedroom?

1   A.  Yes, sir.

2   Q.  I'm showing you now what's been marked for identification

3   government Exhibits 44 and 44A.  Can you take a look at these

4   items and tell me if you recognize them.

5   A.  Yes, sir.

6   Q.  What are they?

7   A.  Government Exhibit 44 is the rough sketch that was done

8   that day at the scene as well as the measurements of all the

9   items that were seized.

10  Q.  You say the rough sketch.  Who did that sketch?

11  A.  I did, sir.

12  Q.  It's a sketch of what, just to be clear?

13  A.  54 Chambers Street.

14  Q.  You did it during the time that you were processing the

15  scene after the search warrant was obtained?

16  A.  Yes, sir.

17  Q.  All right.  The government offers Exhibit 44 into evidence.

18          THE COURT:  Any objection.

19          MR. GREENFIELD:  No objection.

20          THE COURT:  44 will be accepted.

21          (Government's Exhibit 44 received in evidence)

22  Q.  What is 44A?

23  A.  44A is just a cleaned-up version of this.  It's just a

24  cleaner and neater copy, if you will.

25  Q.  Who cleaned it up?

1   A.  I did.

2   Q.  Where did you clean it up?

3   A.  In my office.

4   Q.  After you left 54 Chambers?

5   A.  Yes.

6   Q.  The same day, December 15?

7   A.  No.  Probably a week later if that long.

8              MR. BUCHWALD:  A week?

9              MR. BAUER:  A week later, if not longer.

10             The government offers Exhibit 44A into evidence.

11             MR. BUCHWALD:  Sorry.  If not longer maybe eight days

12   or nine days or do you mean maybe months?

13             THE WITNESS:  It could have been.  This is

14   something --

15             MR. BUCHWALD:  How about years?

16             THE WITNESS:  Not years.

17             MR. BUCHWALD:  Months?  It could have been several

18   months?

19             THE WITNESS:  No longer than I would say a couple of

20   weeks.

21             MR. BAUER:  The government offers 44A.

22             THE COURT:  No objection?  44A will be received.

23             (Government's Exhibit 44A received in evidence)

24             MR. BAUER:  Let's focus on 44A.  If we can zoom in a

25   little bit, Ms. McInerney.

1   Q.  Detective Frederick, can you just explain your drawing I

2   guess starting from the front door, which I take it is on the

3   bottom.

4   A.  Yes, sir.

5   Q.  I guess, before you walk us through your drawing, let me

6   ask you.  There is a number of little circles with numbers

7   inside of them.  What are those?

8   A.  The numbers within the circles correspond to our item

9   numbers or piece of evidence that was seized.

10  Q.  I'm sorry, in case anyone didn't hear, correspond to the

11  evidence?

12  A.  The item numbers that -- the items that were seized.  At

13  the very bottom of the photograph you'll see a circle that has

14  the No. 1 on it.  That was the knife that was labeled with City

15  of Newburgh item No. 1.

16  Q.  These are numbers that you assigned to them?

17  A.  Yes, sir.

18  Q.  Again, could you just walk us through your diagram so the

19  jury can understand the layout of the house.

20  A.  Yes, sir.

21  Q.  For the record, the drawing has been rotated 90 degrees so

22  it fits our horizontal screens better.  Now the front door is

23  on the left.  Starting with the front door can you walk us

24  through.

25  A.  If you look on the bottom left corner of your screen.  Is

1    everybody's screen the same, sir?

2    Q.   Yes.

3    A.   That's the front door.  Do you see the angled section with

4    the swoop with the arrows, representing the doorway?  You walk

5    through that doorway, you enter the foyer, what we have labeled

6    as the foyer area.  You have a secondary door that leads to the

7    hallway.  If you go down that hallway, there was a larger room

8    off to the left.

9         Then it opened into a large middle room, a small

10   bedroom off of that middle room, and then, if you just go

11   straight through, it goes into a kitchen.  Off the kitchen is

12   what we labeled as the master bedroom and then a bathroom to

13   the far right of the drawing.

14   Q.   Just a couple of questions about this.

15        First, was this to scale?

16   A.   No.

17   Q.   Are you trained in I guess architectural drawing to make

18   things to scale?

19   A.   Not since high school.

20   Q.   On the top left, there is a room that has two circles in it

21   but nothing else.  Why is there nothing else in there?

22   A.   It was empty.

23   Q.   I just want to be clear that in the middle there is a big

24   open space with the No. 19 in it.  Is that the big open room

25   that you were referring to?

1    A.  Yes.  It's what we labeled as the middle room.

2    Q.  It flowed directly into the kitchen?

3    A.  Yes.

4    Q.  Which flowed directly into the bathroom?

5    A.  Yes, sir.

6    Q.  I am now going to show you what's been marked for

7    identification as Government Exhibits 94A through 94ZZ.

8         Do you recognize these items?

9    A.  They appear to be the photos I took at the scene while we

10   were processing and collecting evidence.

11   Q.  Who took these photographs?

12   A.  I did, sir.

13   Q.  When you were taking the photographs, were you with anybody

14   else?  Was anybody working with you?

15   A.  Yes, sir.

16   Q.  Who was that?

17   A.  Sergeant Bencuria (phonetic).

18   Q.  Bencuria?

19   A.  Yes.

20   Q.  You were cataloging evidence that you were seizing in those

21   photos, correct?

22   A.  Yes, sir.

23   Q.  And you were taking the photographs?

24   A.  Yes, sir.

25   Q.  So was somebody else cataloging, writing down the No. 3 is

1    this, No. 4 is that?

2    A.  I was pretty much doing both.

3          MR. BAUER:  The government offers Exhibits 94A through

4    ZZ inclusive.

5          THE COURT:  Any objection.

6          MR. GREENFIELD:  No.

7          THE COURT:  94A through 94ZZ will be received.

8          (Government's Exhibits 94A through 94ZZ received in

9    evidence)?

10         MR. BAUER:  Thank you, your Honor.  Let's pull up 94A.

11   Q.  What are we looking at here Detective Frederick?

12   A.  There is a placard, which is the yellow item with the No. 3

13   on it.  Next to that is a neoprene mask.  So the placard with

14   the 3 represents the mask, which became item No. 3 for the City

15   of Newburgh.

16   Q.  Where in the house?

17   A.  In the foyer, sir.

18   Q.  I am going to leave Government Exhibit 44A up here for your

19   reference as we go through these items of evidence.  I'm

20   showing you what has been marked for identification as

21   Government Exhibit 3.  Do you recognize that?

22   A.  Yes, sir.

23   Q.  What is it?

24   A.  It's the mask in the photo.

25   Q.  The government offers Government Exhibit 3 into evidence.

1          MR. GREENFIELD:  May I have a voir dire.

2          THE COURT:  OK.

3    VOIR DIRE EXAMINATION

4    BY MR. GREENFIELD:

5    Q.  Correct me if I'm wrong, Detective, but I assume that when

6    the mask was recovered in 54 Chambers Street it was placed in

7    this brown bag that is in the folder, is that right?

8    A.  That's correct, sir.

9    Q.  Where did you place the mask into the bag?  Right at 54

10   Chambers Street?

11   A.  Yes, sir.

12   Q.  This plastic container that it's now in, is that something

13   that is used by the Newburgh Police Department, or is this

14   another law enforcement agency's idea of evidence preservation?

15   A.  We use plastic bags, but we don't seal them that way.  That

16   is not our bag.

17   Q.  All these brown bags that you have identified, were they in

18   plastic bags also?

19   A.  No, sir.

20   Q.  The ones that you have identified on the witness stand?

21   A.  The paper bags?

22   Q.  Yes.

23   A.  Our paper bags.

24   Q.  I know they are your paper bags.  Did you seal your

25   evidence after you put it in the paper bag in a plastic bag?

1    A.  No, sir.

2    Q.  You don't use plastic bags in Newburgh?

3    A.  We don't use plastic bags for this type of evidence.

4    Q.  For this type of evidence?

5    A.  Yes, sir.

6    Q.  OK.  Correct.  Would it be fair for me to say that when you

7    placed it in the bag you sealed it and you dated it and you

8    signed it?

9    A.  Yes, sir.

10   Q.  Then you placed it into the property clerk's office?

11   A.  I am the property clerk.

12   Q.  You are the property clerk?

13   A.  We are a small agency.

14   Q.  You took it from the scene of the crime to the property

15   clerk's office and you put it into the chain of custody?

16   A.  Yes.

17   Q.  Correct?

18   A.  Correct.

19   Q.  Could you very briefly --

20           MR. GREENFIELD:  Judge, I'll save it for cross

21   examination?

22           THE COURT:  OK.

23           MR. GREENFIELD:  No objection.

24           THE COURT:  Is that 3?

25           MR. BAUER:  3, yes.

1             THE COURT:  Government's Exhibit 3 will be received.

2             (Government's Exhibit 3 received in evidence)

3             MR. BAUER:  May I show it to the jury, your Honor.

4             Can we move on to the next photograph, Ms. McInerney,

5    94B.

6    Q.  94B, is that just a closeup of the same mask?

7    A.  Yes, sir.

8    Q.  94C.  What are we looking at for 94C?

9    A.  That was the bloodstain that was on the foyer wall.  It was

10   kind of behind the front door.  The placard is wedged into the

11   plate for the window -- I'm sorry, the plate for the light

12   switch, so you can see that this is going to be item No. 4.

13   Q.  With this blood stain, what, if anything, did you do with

14   it, besides photograph it?

15   A.  It was swabbed.

16   Q.  Showing you what's been marked for identification as

17   Government Exhibit 4, will you look at it and tell me if you

18   recognize it.

19   A.  Yes, sir.

20   Q.  What is it?

21   A.  It is an envelope containing the swab box from the wall.

22   Q.  It is sealed there in the back.  Did you seal it?

23   A.  Yes, sir.

24   Q.  Is that your handwriting on the back there?

25   A.  Here and here, yes, sir.

1   Q.  Let me just ask you, there is a sticker on the front that

2   also contains the No. 4, the yellow -- I guess there are two

3   stickers.  The white and the yellow sticker both say No. 4.

4   Who prints up and produces though stickers?

5   A.  The white stickers are ours, produced at the City of

6   Newburgh.  The yellow stickers are produced by the New York

7   State crime lab.

8   Q.  Once you took this swab, what did you do with it?

9   A.  It was basically stored, then transported to the

10  department, sealed up, then cataloged and eventually taken to

11  the lab.

12          MR. BAUER:  The government offers Government Exhibit 4

13  into evidence.

14          MR. GREENFIELD:  No objection.

15          THE COURT:  Government's Exhibit 4 will be received.

16          (Government's Exhibit 4 received in evidence)

17  Q.  Let's move along to some more photographs.

18  A.  94D.

19  Q.  What are we looking at here?

20  A.  Inside the foyer there is some blood on the floor which is

21  represented by placard No. 5 and then underneath it looks like

22  the top of a grill, item No. 25, which is a sock.

23  Q.  I'm not going to show you all of the swabs that you did

24  there that day, but is it fair to say that you swabbed all of

25  the various blood samples that you found at 54 Chambers?

```
 1   A.   Yes, sir.  Everyone that's a placard with a number, the
 2   swab corresponds to that number.
 3   Q.   So for No. 5, you swabbed that as well?
 4   A.   Yes.
 5   Q.   Following the same procedure?
 6   A.   Yes, sir.
 7   Q.   Let's move on to 94E.  What is 94E?
 8   A.   It is a photograph of placard No. 6.
 9   Q.   OK.  What is next to that placard No. 6?  It's a little
10   hard to see.
11   A.   It is a piece of a projectile.
12   Q.   When you say projectile, what do you mean?
13   A.   A bullet.  In lay man's terms a projectile is a bullet.
14   Q.   I'm going to ask you about bullets in a moment.  But let's
15   keep going to the next photo, 94F.
16   A.   Next to the overturned grill, placard No. 7 represents a
17   shell casing.
18   Q.   When you say a shell casing, what do you mean?
19   A.   The shell casing is a piece of a cartridge.  A cartridge
20   basically is the bullet, the cylinder that holds the bullet,
21   the powder, and the primer is considered a cartridge.  Once the
22   cartridge is fired, the bullet leaves, the powder is turned
23   off, and you end up with just a shell casing left.
24   Q.   Let me ask you, do all guns and all bullets -- all bullets
25   that are put in guns have a shell casing?
```

1    A.   Yes.  Other than muzzle loaders.

2    Q.   I'm sorry?

3    A.   Other than muzzle loaders.

4    Q.   Do certain guns handle shell casings differently than other

5    guns?

6    A.   I'm sorry?

7    Q.   Do certain guns handle or expend shell casings differently

8    than other guns?

9    A.   Yes.

10   Q.   Can you explain for the jury, based on your training and

11   experience.

12   A.   Sure.  Semiautomatic weapons, which are a magazine fed

13   weapon, when the primer is struck and it sets the powder off

14   and it sends the bullet out of the barrel, the gases are used

15   to slide the slide back, which then the shell casing is ejected

16   from the weapon and then it chambers another weapon -- I'm

17   sorry, it chambers another cartridge.

18   Q.   What happens to the shell casing?

19   A.   It goes away.  It is ejected and falls someplace.

20   Q.   It is ejected out of the gun?

21   A.   Yes, sir.

22   Q.   That's for an automatic or a semiautomatic weapon?

23   A.   Yes, sir.

24   Q.   What about a revolver?  What happens to shell casings with

25   a revolver?

1   A.  In a revolver they stay contained within the cylinder and

2   they have to be manually ejected out.

3   Q.  So when somebody is shooting multiple shots using a

4   revolver, the shell casings will not be ejected to the floor,

5   is that what you are saying?

6   A.  That is correct.

7   Q.  When you said that for a revolver a shell casing would need

8   to be manually ejected, what do you mean by manually ejected?

9   A.  If it is a standard revolver, basically the cylinder is on

10  a -- the cylinder is swung into the frame, so it lines up with

11  the barrel.  It has to be swung out and then there is an

12  ejection rod that has to be manually pushed and it pushes all

13  the shell casings out of the cylinder.

14  Q.  I guess my question is when you say manually ejected, what

15  do you mean?

16  A.  You have to physically do it.  You have to physically swing

17  the cylinder out.  You have to push the ejection rod on top to

18  push the shell casings out.

19  Q.  About how long does that take typically?

20  A.  A couple of seconds.

21  Q.  Thank you.  Let's move on to 94G, please.  This is just a

22  closeup again of the shell casing at No. 7?

23  A.  Yes, sir.

24  Q.  94H.

25  A.  That is a sock on the floor with a placard No. 8.

1   Q.  OK.  94I.

2   A.  This is the door leading from the foyer into the hallway.

3   Q.  OK.  Just to be clear, this is not the front door, correct?

4   A.  No.

5   Q.  It's the door after you walk in those few number of steps?

6   A.  Yes, sir.

7   Q.  What, if anything, are we looking at at the door here?

8   A.  The door has multiple holes in it and the little --

9            MR. BUCHWALD:  What door are you talking about?

10           MR. BAUER:  The one, I just clarified with him, the

11  one we just clarified, the internal door.

12           MR. BUCHWALD:  The internal door?

13           MR. BAUER:  Yes.  Sorry.

14  A.  It's got multiple holes in it, and below those holes are

15  little sticky scales or rulers.

16  Q.  OK.  I think that we are going to return to the door in a

17  bit.  Let's skip ahead to 94K.

18           What are we looking at here?

19  A.  This is looking down the hallway from that foyer door

20  looking towards the middle room along the wall.

21  Q.  There are placards 12, 13 and 14?

22  A.  Yes, sir.

23  Q.  Let's go on to 94M.  I think we'll come back to those

24  numbers.  94M.

25  A.  Yes.

E86nchr3                         Frederick - direct

1    Q.   What are we looking at here?

2    A.   These placards are behind the foyer door in that hallway.

3    Q.   OK.  Let's zoom in on these placards.

4              94N.  No. 11, what is that?

5    A.   It is a shell casing.

6    Q.   Is it a shell casing or is it a projectile?

7    A.   No. 11?

8    Q.   Yes.

9    A.   On 94N was a shell casing.

10   Q.   OK.  94O.

11   A.   Placard No. 10 with a shell casing next to it.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  94P?

2  A.  It is placard No. 9.  And the blurry gray piece is a piece

3  of projectile.

4  Q.  I think 94Q might help the blurriness.  Move on to 94Q.

5  A.  Yes, sir.  That is that piece of projectile next to placard

6  No. 9 with the scale next to it.

7  Q.  Moving on to 94R.

8  A.  This is placard No. 12 representing the knife that's

9  underneath the radiator.

10  Q.  And 94S?

11  A.  (No response).

12  Q.  Is that just zooming in on the knife?

13  A.  Yes, sir.

14  Q.  I plan on showing you all the shell casings and projectiles

15  at the end.  I'll interrupt that to show you Government Exhibit

16  12.  Will you take a look at that and tell me if you recognize

17  that.

18  A.  Yes, sir.

19  Q.  What is it?

20  A.  It's the box that the knife that placard No. 12 is next to.

21  Q.  Can you open that you, please.

22          Is the knife inside?

23  A.  Yes, sir.

24          MR. BAUER:  The government offers Government Exhibit

25  12 into evidence.

E869CHR4                          Frederick - direct

1           THE COURT:  Any objection?

2           MR. GREENFIELD:  No objection.

3           THE COURT:  Government's 12 will be received.

4           (Government's Exhibit 12 received in evidence)

5           MR. BAUER:  May I just show it to the jury, your

6    Honor?

7           THE COURT:  You may.

8           MR. BAUER:  Judge, by the way, I think about 20, 30

9    minutes more with Detective Frederick.  I'm looking at the time

10   here.  I'm happy to keep going now.

11          THE COURT:  I don't know that the rest of us are.

12          MR. BAUER:  Exactly.

13          THE COURT:  Why don't we break now.  It's about ten

14   minutes of 1.  So we'll break for an hour and fifteen minutes.

15   Please be in the jury room no later than 5 minutes after 2 in

16   the afternoon.  Five after 2 so we can get started as quickly

17   as possible.

18          (Jury excused)

19          (Witness excused)

20          (Luncheon recess)

21

22

23

24

25

```
 1                        AFTERNOON SESSION

 2                           2:07 p.m.

 3            (Trial resumed)

 4            PETER FREDERICK, resumed

 5            THE COURT:  We're missing one juror still.  So as soon

 6     as that person is here.

 7            MR. BAUER:  Judge, a logistical question.  On the

 8     record is fine.

 9            Anthony Baynes is our next witness who is going to

10     testify.  We're going to put a bunch of faceplates in, start

11     building that blackboard with pictures on it.  Where should we

12     put that?  That's a relevant question both in terms of where we

13     should put it --

14            MR. BUCHWALD:  How high is your blackboard?  In the

15     last trial we put it in the second row as opposed to blocking

16     us or blocking --

17            MR. BAUER:  I don't want to block you.

18            MR. BUCHWALD:  Is it tall enough so it's above --

19            MR. BAUER:  We brought the smaller board.  I actually

20     don't think -- but we have an easel.

21            MR. BUCHWALD:  Otherwise, it's sort of blocking.

22            MR. BAUER:  What about right here?

23            MR. BUCHWALD:  The attorneys -- we have to be in the

24     first row to be able to hear the witness so we don't want it

25     right there because it will block us.
```

E869CHR4                        Frederick - direct

1                (Discussion off the record)

2                THE COURT:  Are we ready for the jury?

3                We're bringing out the jury.

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Ladies and gentlemen of the first row, I

3    believe that you now have a floor beneath you.

4          Everyone please be seated.

5          Mr. Bauer.

6          MR. BAUER:  Thank you, your Honor.

7    DIRECT EXAMINATION CONTINUED

8    BY MR. BAUER:

9    Q.  So before we broke for lunch, Detective Frederick, we were

10   going through photographs that you took at 54 Chambers.  I'd

11   like to pull up the next photograph, which is 94T.  Can you

12   tell the jury what we're looking at here?

13   A.  We're looking at placard No. 13 with a shell casing next to

14   it.

15   Q.  Let's move on to 94V.  What are we looking at here?

16   A.  Placard No. 14 with a shell casing next to it.

17   Q.  Can we do 94W?

18          This is a zoom-in on the shell casing?

19   A.  Yes, sir.

20   Q.  Okay.  Just so we can check back in on this.  Where in the

21   house did you recover this item No. 14?

22   A.  No. 14 was edge of the hallway by the opening to the middle

23   room.

24   Q.  Let's move on to 94X.  These are Nos. 15 and 16.  What are

25   we looking at here?

 1   A.  Two placards with bloodstains next to them.

 2   Q.  Let's move on to 94Y.

 3   A.  Two more placards with stains next to them in the small --

 4   the large room to the left of the hallway.

 5   Q.  Is that the room that you testified earlier was the empty

 6   room?

 7   A.  Yes, sir.

 8   Q.  Did you swab that blood from that room?

 9   A.  Yes, sir.

10   Q.  Just like all the other blood?  Okay.

11        94 -- let's move on to 94Z.  What's this?

12   A.  It's the grill that was at the end of the hallway with some

13   scales next to what appears to be a bullet hole through it.

14   Q.  Let's look at 94AA.  Is this one of those bullet holes in

15   the grill?

16   A.  Yes.  It's the closeup of the entrance wound or entrance

17   hole.

18   Q.  Okay.  And let's look at 94DD.

19   A.  Bullet hole in the wall.

20   Q.  94EE?  Is this another bullet hole in the wall?

21   A.  Yes, sir.

22   Q.  94FF, please.  What's that?

23   A.  Shell casing on the floor with placard 19 next to it.

24   Q.  Again the placard 19 corresponds to item No. 19 that you

25   inventoried?

1   A.  Yes, sir.

2   Q.  Let's move on to 94HH?

3   A.  It's placard No. 20 next to a bloodstain on the floor.

4   Q.  94II?

5   A.  It's placard No. 21 next to a projectile on the floor.

6   Q.  Again when you say projectile you mean?

7   A.  Bullet.

8   Q.  94JJ?

9   A.  Is a closeup of that projectile with a scale.

10  Q.  Let's move ahead to 94LL.  What are we looking at here?

11  A.  LL shows a section of the kitchen wall and a doorjamb

12  leading to the -- what we refer to as the master bedroom.

13  There is a projectile strike on the doorjamb.  And then on that

14  little section of wall where you see other scales kind of in

15  the center of the photograph is where the projectile hit

16  against that wall.

17  Q.  There's a door on the far right.  What door is that?

18  A.  It leads to the bathroom, sir.

19  Q.  94MM?

20  A.  It's a closeup of the secondary strike on the wall.

21  Q.  When you say "secondary strike," what do you mean?

22  A.  In the previous photograph you saw the strike against the

23  doorjamb.  And then there was in the middle of the photograph,

24  you saw the scales in the same shape.  It's a closeup of that

25  secondary strike.

1   Q.  Move on to 94PP.

2   A.  It's a placard No. 26 next to a piece of projectile

3   fragment.

4   Q.  And 94QQ?

5        MR. BUCHWALD:  I'm sorry.  I couldn't hear that

6   answer.

7        THE WITNESS:  It's placard No. 26 next to a piece of

8   projectile fragment.

9   Q.  94QQ?

10  A.  Is a closeup of that fragment with a scale.

11  Q.  94RR?

12  A.  Shows another strike on the wall.

13  Q.  And there's somebody here in 94RR holding up a scale.  Who

14  is that?

15  A.  Sergeant Vancura.

16  Q.  94SS, please.

17  A.  This is a closeup of that strike, and with the scale next

18  to it, it tells us how high off the floor it was.

19  Q.  94TT?  What's that?

20  A.  Once again it shows Sergeant Vancura holding a tape measure

21  next to the hole in one -- one of the holes in the wall.

22  Q.  94VV?  What's this?

23  A.  This was as we are now starting to take walls down looking

24  for projectiles that have entered them.  This is a section of

25  the wall.  The previous picture shows Sergeant Vancura with a

E869chr4                        Frederick - direct

1   tape measure.  This is part of that wall removed.

2   Q.  Again looking for the bullet?

3   A.  Yes, sir.

4   Q.  94WW?  Is this a closeup of the wall removed?

5   A.  Yes, sir.

6   Q.  And then 94XX?

7   A.  It shows the projectile, the little copper section, you see

8   it, center of the photograph.

9   Q.  And then 94ZZ?

10  A.  It's that projectile with a scale in my hand.

11  Q.  Now, I'm now going to show you a number of items that have

12  been marked for identification.  I'm going to just list them

13  now.  It's Government Exhibits 6, 7, 9, 10, 11, 13, 14, 19, 21,

14  26, 27, 28, and 29 -- I'm sorry.  And 30.

15          MR. BUCHWALD:  Can you run through that list one more

16  time.

17          MR. BAUER:  Sure.  It's Government Exhibits 6, 7, 9,

18  10, 11, 13, 14, 19, 21, 26, 27, 28, 29 and 30.

19  Q.  If you could look through each one and tell us if you

20  recognize -- first look through each one and tell us if you

21  recognize all of them.

22  A.  Yes, sir.

23  Q.  You do recognize them?

24  A.  Yes, sir.

25  Q.  Generally speaking, what are they?

E869chr4                         Frederick - direct

1    A.  The ballistic evidence recovered from 54 Chambers Street.

2    Q.  Is it the same ballistics evidence we've been looking at

3    other photographs for?

4    A.  Yes, sir.

5    Q.  Let's go through each one.  Government Exhibit 6, what is

6    that?

7    A.  It's projectile fragments.

8    Q.  And I believe you testified earlier they were found near

9    the foyer on the floor?

10   A.  Yes, sir.

11   Q.  Government Exhibit 7, what is that?

12   A.  Nine millimeter shell casing, sir.

13   Q.  We'll keep going and then we're going to return to the nine

14   millimeter part there.

15          Government Exhibit 9.

16   A.  More projectile fragments.

17   Q.  And Government Exhibit 9 as well as Government Exhibit 7 --

18   well, I'm sorry.  Government Exhibit 7, I didn't ask you, was

19   that also recovered on the foyer floor?  Is that what you said

20   earlier?

21   A.  Yes, sir.

22          MR. BUCHWALD:  I'm sorry.  Could we have that question

23   read back, question and answer.

24          (Record read)

25   Q.  Then Government Exhibit 9, where was that found?

E869chr4                    Frederick - direct

1   A.  Government Exhibit 9.  May I refer to the sketch?

2   Q.  Sure.

3   A.  Behind the door in the hallway.

4   Q.  And Government Exhibit 10, that was a shell casing that you

5   referred to earlier; is that right?

6   A.  Yes, sir.

7   Q.  Where was that recovered?

8   A.  Behind the doorway in the hallway as well.

9   Q.  Actually that would be helpful.  Can we pull up Exhibit 44A

10  again while Detective Frederick testifies.

11          What caliber is that shell casing?

12  A.  Nine millimeter.

13  Q.  Government Exhibit 11.  What's that?

14  A.  .380 caliber shell casing.

15  Q.  And where was that found?

16  A.  In the hallway behind the door.

17  Q.  Government Exhibit 12?  I'm sorry.  Sorry.  Twelve is the

18  knife that we already did.

19          Thirteen?

20  A.  .380 caliber shell casing.

21  Q.  Fourteen?

22  A.  Nine millimeter shell casing.

23  Q.  Government Exhibit 19?

24  A.  .380 caliber shell casing.

25  Q.  Government Exhibit 21.

1   A.  Lead projectile.

2   Q.  Government Exhibit 26.

3   A.  26 you said?

4   Q.  Yes.  Is it possible that you don't have it up there?

5   A.  I do not see 26, sir.

6   Q.  We'll look for it again.  Let's skip ahead to 27.

7   A.  It's a copper jagged projectile.

8   Q.  28.

9   A.  Lead projectile.

10  Q.  29?

11  A.  Piece of projectile fragment.

12  Q.  And then 30?

13  A.  Lead projectile.

14  Q.  And here is Government Exhibit 26.

15  A.  Piece of lead projectile.

16          MR. BAUER:  Your Honor, the government offers each of

17  the aforementioned exhibits.  I can list them again if you'd

18  like.

19          THE COURT:  No need.  Any objection?

20          There being no objection, Government Exhibits 6, 7, 9,

21  10, 11, 13, 14, 19, 21, 26, 27, 28, 29 and 30 will be received.

22          (Government's Exhibits 6, 7, 9, 10, 11, 13, 14, 19,

23  21, 26, 27, 28, 29 and 30 received in evidence)

24          MR. BAUER:  Your Honor, I would ask permission to

25  publish to the jury, to pass these around so the jury can look

E869chr4                         Frederick - direct

1    at them.

2                THE COURT:  Certainly.

3    Q.  Now as the jurors are looking at the exhibits, let me ask

4    you, Detective Frederick, for some of the shell casing --

5                MR. BUCHWALD:  Excuse me, your Honor.  We really

6    should not do both at once.  This is important testimony.

7    Maybe the jurors should look at it and then proceed with the

8    testimony or --

9                THE COURT:  Or we can take it back.  I'm not going to

10   spend 45 minutes while each of these exhibits goes around.

11               MR. BUCHWALD:  I'll represent there's going to be more

12   questioning.

13               THE COURT:  Okay.  Just take the exhibits back,

14   Mr. Bauer.

15               MR. BAUER:  Okay.

16               Maybe what I'll do, your Honor, is just show a couple

17   of them.  Is that okay?

18               THE COURT:  That's fine.  Just indicate for the record

19   which they are.

20               MR. BAUER:  Here is Government Exhibit 6, Government

21   Exhibit 30, Government Exhibit 28.  Here is Government Exhibit

22   13.

23               THE COURT:  I'm sorry.  Are they all either

24   projectiles or casings?

25               MR. BAUER:  Exactly.

1          THE COURT:  Why don't you have one of each and pass

2    that around and continue your questioning.  Two representative

3    samples.

4          MR. BAUER:  Good idea.  Government Exhibits 13 is a

5    shell casing and 30 and 21 are different types of projectiles.

6    So those three I'll pass around.

7          THE COURT:  You may continue your questioning.

8          MR. BAUER:  Thank you, your Honor.

9    BY MR. BAUER:

10   Q.  When you were discussing shell casing earlier, you denoted

11   that shell casings had different calibers on them, I believe.

12   You said some were 9 millimeter and some were .380; is that

13   correct?

14   A.  That's correct, sir.

15   Q.  Based on your training and experience can you explain what

16   you mean when you say 9 millimeter and when you say .380?

17   A.  Calibers are usually denoted by diameter, meaning the base

18   of the projectile is 9 millimeter.  And pending on where these

19   things are developed, they use different measurement systems; 9

20   millimeter, metric system; .380 is .380 was basically done at

21   standard, so it's not metric.  They're different.  But most

22   calibers are designated by diameter.

23   Q.  And have you ever heard the term .38 caliber class?

24   A.  Yes, sir.

25   Q.  What does that mean?

1    A.  .38 caliber class is denoted by the size of the

2    projectiles, the diameter on the bottom of the projectiles;

3    .38.  So there's several calibers that fall within .38 caliber

4    class.

5    Q.  What are those?

6    A.  .38.  380, and 9 millimeter, all fall within a .38 caliber

7    class.

8    Q.  Now, in terms of projectiles, is it possible to tell the

9    caliber of the projectile -- not the shell casing but the

10   projectile?

11   A.  For experts it is, yes.

12   Q.  Okay.  Can you, based on your recovery of the exhibits that

13   you found there, could you tell what the caliber was of the

14   various projectiles that you recovered?

15   A.  No, sir.

16   Q.  Now, I think earlier you testified that after you processed

17   the crime scene at 54 Chambers Street you returned back to

18   headquarters; is that right?

19   A.  That's correct, sir.

20   Q.  Showing you what's been marked for identification as

21   Government Exhibits 96A through D.  Will you take a look and

22   tell me if you recognize them.

23   A.  Yes, sir.

24   Q.  What are they?

25   A.  They are photographs that were taken at our office.

1   Q.   And they are photographs of what, generally speaking?

2   A.   Government Exhibit 96A and 96B are photographs of the

3   process of extracting a projectile from that foyer door, the

4   door that led from the foyer into the hallway.  We actually

5   took the entire door and brought it back to the station and we

6   could hear something in it so we cut a section of the door away

7   and we found another projectile.

8        People's No. 96C and D are Mr. Henry's wallet, and the

9   contents thereof.

10  Q.   Who took the photographs?

11  A.   I did.

12       MR. BAUER:  Government offers 96A through D.

13       THE COURT:  Any objection.

14       MR. GREENFIELD:  Just one question, judge.

15  VOIR DIRE EXAMINATION

16  BY MR. GREENFIELD:

17  Q.   When were these photographs taken?

18  A.   Later same day that the search warrant was done.

19  Q.   I'm sorry?

20  A.   Later the same day the search warrant was done, so late in

21  the afternoon on the 15th.

22       MR. GREENFIELD:  I have no objection.

23       THE COURT:  There being no objection, 96A through D

24  will be received.

25       (Government's Exhibits 96A through D received in

1    evidence)

2    DIRECT EXAMINATION CONTINUED

3    BY MR. BAUER:

4    Q.  Let's start with 96C first.  Can we show that.

5            What are we looking at here?

6    A.  It's Mr. Henry's wallet -- the ID is a little washed out by

7    the flash -- and the two bags of crack.

8    Q.  The backdrop there looks like something maroon.  Do you

9    recognize that?

10   A.  That was the big maroon winter coat.

11   Q.  And now let's go to 96A.  What's this?

12   A.  This is a section -- this is the door with the section of

13   it cut away.  Sergeant Vancura is holding that piece back so I

14   could photograph inside of it.  And if you look kind of towards

15   the bottom top of the cut you'll see something reflecting.

16   That's the projectile.

17   Q.  Can we look at 96B?  Is that a zoom-in of the projectile?

18   A.  Yes, sir.

19   Q.  I'm going to show you what's been marked as Government

20   Exhibit 41 for identification.  Do you recognize that?

21   A.  Yes, sir.

22   Q.  What is it?

23   A.  It's the cast lead projectile from the door.

24           MR. BAUER:  The government offers Exhibit 41 into

25   evidence.

1         THE COURT:  Any objection?

2         41 will be received.

3         (Government's Exhibit 41 received in evidence)

4    Q.  Detective Frederick, showing you what's been marked for

5    identification as Government Exhibit 40.  Do you recognize

6    this?

7    A.  Yes, sir.

8    Q.  What is it?

9    A.  It's the foyer door that led to the hallway from 54

10   Chambers.

11   Q.  And turn it around for you here.  There are these holes

12   here and a scale.  Do you see that?

13   A.  Yes, sir.

14   Q.  Who put the scale there?

15   A.  I did.

16   Q.  And when you found the door were the holes already there?

17   A.  Yes, sir.

18        MR. BUCHWALD:  I'm sorry.

19        MR. BAUER:  Are you going to come over?  I'll come to

20   you.

21        I'll ask Mr. Nawaday to hold the door for a moment.

22   Q.  This is marked as 40A.  Do you recognize this item?

23   A.  Yes, sir.

24   Q.  What is it?

25   A.  It's the piece of the door that we cut away so we were able

1    to retrieve the projectile from the door.

2    Q.   Again there's a number of holes and a scale there.  Did you

3    put the scale there?

4    A.   I put the scales there, yes, sir.

5    Q.   And then finally Government Exhibit 40B.  Do you recognize

6    this?

7    A.   Yes, sir.

8    Q.   What is it?

9    A.   It's another piece of door.

10          MR. BAUER:  The government offers Exhibits 40, 40A,

11   and 40B into evidence.

12          MR. BUCHWALD:  Voir dire.

13          THE COURT:  Okay.

14   VOIR DIRE EXAMINATION

15   BY MR. BUCHWALD:

16   Q.   This is the internal door, 40.  This is the internal door;

17   is that correct?  There was an external door, the outside door

18   that would go to the street, and then there was an internal

19   door; is that right?

20   A.   That is correct, sir.

21   Q.   And the external door, the knob was on the right and it

22   goes in, correct, from the photos?  And the same thing for the

23   internal door, the knob was on the right?  And it goes in?

24   They both went in the same direction, correct?

25   A.   That is correct, sir.

1              MR. BUCHWALD:  And now Mr. Nawaday would you be kind

2      enough to still hold --

3              MR. BAUER:  I'm still here.

4              MR. BUCHWALD:  What is this one?

5              MR. BAUER:  40A.

6      Q.  40A now is a section then of the internal door -- the side

7      of the internal door facing the street?

8      A.  Yes, sir.

9      Q.  And just roughly -- trying to figure out where this

10     would -- is this it -- roughly, could you hold that.

11             This is where it fits.  It's the upper half basically

12     except for one little chunk, correct?

13     A.  That is correct.

14     Q.  And the other piece of our jigsaw puzzle door here is the

15     part that goes -- better at jigsaw puzzles than I am -- is the

16     part that goes there with the ragged edge to the right; is that

17     correct?

18     A.  Yes, sir.

19     Q.  And, again, just so we have it correctly, this is the door

20     that you took back to your office or the headquarters and you

21     made photographs of?

22     A.  Correct.

23     Q.  And this is the door where you found certain bullets lodged

24     in the door?

25     A.  One projectile, yes, sir.

1   Q.   Sorry?

2   A.   One projectile, yes, sir.

3   Q.   One projectile.

4        And that projectile, was it associated with either the

5   opening in Exhibit 40B or with the opening in Exhibit 40A, do

6   you recall?

7   A.   It appears to be almost even with the cut line.  Between

8   the two.

9   Q.   At least that's where you took the photo?

10  A.   That's where the projectile ended up.  We could hear it.

11  It was loose at that point.

12  Q.   It was loose at that point.  So, as you sit here today you

13  don't know whether it's -- you don't know whether it's a

14  projectile that was associated with one hole, the other hole,

15  or from some place else?

16       MR. BAUER:  Judge, I'm going to object now.  This is

17  voir dire on the admissibility of this door.  This is not

18  cross-examination.

19       MR. BUCHWALD:  Just so the jurors can understand what

20  these pieces.

21       MR. BAUER:  He's taking my job away from me.

22       MR. BUCHWALD:  Trying to save time.

23       I have no more questions, in any event, and on the

24  voir dire I do not object.

25       THE COURT:  Okay.  Is it 40?

1            MR. BAUER:  40, 40A, and 40B.

2            THE COURT:  40, 40A, and 40B will be received.

3            (Government's Exhibits 40, 40A, and 40B received in

4     evidence)

5     DIRECT EXAMINATION CONTINUED

6     BY MR. BAUER:

7     Q.   And the one additional question I wanted to ask you,

8     Detective Frederick, is there are a number of bullet holes in

9     40 and 40A and 40B, correct?

10    A.   That is correct.

11    Q.   Do some of the bullet holes indicate that the bullets went

12    straight through the door?

13           MR. BUCHWALD:  I'm sorry.  I thought the witness

14    testified that there was one bullet hole on voir dire.

15           THE COURT:  Is there an objection?

16           MR. BUCHWALD:  Yes, assumes a fact not in evidence.  I

17    mean I see two holes but he testified about one -- one bullet.

18    I stand corrected.  He said one bullet.  I stand corrected.  Go

19    ahead.

20           MR. BAUER:  Judge, can we approach sidebar?

21           THE COURT:  Sure.  With or without the door?

22           (Continued on next page)

23

24

25

E869chr4                           Frederick - direct

1              (At the sidebar)

2              MR. BAUER:  Judge, the practice Mr. Buchwald, among

3     others, have been doing -- voir dire is on the limited issue of

4     the admissibility of evidence.  He's interrupting our direct

5     examination for -- these are all cross-examination questions.

6              THE COURT:  If the government had objected earlier I

7     would have sustained the objection.  Let's please try to limit

8     voir dire questions to their appropriate use.  Okay.  That goes

9     for Mr. Greenfield as well.

10             MR. BAUER:  While we're here Mr. Buchwald was at the

11    lectern for the last witness when he was playing the video, he

12    was speaking very loudly, loud enough for the jury to hear, and

13    he was saying show them the individual when Quay Quay is there,

14    show them the video with Tarrence.  Ms. Garner was not

15    identifying Quay Quay or Tarrence.  But the jury could hear

16    that that's what Mr. Buchwald thought it was.

17             THE COURT:  I don't assume that Mr. Buchwald was doing

18    that purposefully.  Let's me be aware that even though the

19    acoustics in this courtroom can sometimes be bad --

20             MR. BAUER:  I could hear him.

21             THE COURT:  I heard him giving some instructions.  I

22    couldn't hear what the substance of what those instructions

23    were but let's all be cognizant of that.

24             (Continued on next page)

25

1          (In open court)

2    BY MR. BAUER:

3    Q.  Detective Frederick, I'm going to move on from December 15,

4    2010 and I want to draw your attention to July 23, 2010.  Were

5    you working that day?

6    A.  I worked during the day.

7    Q.  Was that your normal shift?

8    A.  Yes, sir.

9    Q.  Which was what again?

10   A.  8 in the morning until 4 in the afternoon.

11   Q.  And after that shift ended did you get any calls?

12   A.  Yes, sir.

13   Q.  And approximately what time did you get that call?

14   A.  Top of my head, I don't recall.

15   Q.  Were you sleeping yet?

16   A.  I don't believe so.

17   Q.  And what did -- after you got that call did you report

18   anywhere?

19   A.  Yes.  I was told to report to the station and contact one

20   of the case detectives.

21   Q.  And then where did you go after that?

22   A.  We went to an address on William Street.

23   Q.  Why did you go there?

24   A.  Serve a search warrant.

25   Q.  Do you remember this building on William Street?  Do you

E869chr4                          Frederick - direct

1    remember its layout, whether it was multiple floors, a

2    single-floor residence?

3    A.  It had several floors.

4    Q.  And did you focus your search on a particular floor?

5    A.  It was one apartment.  Yes, sir.

6    Q.  I'm going to show you what have been marked for

7    identification as Government Exhibits 101A through R.  Do you

8    recognize those photographs?

9    A.  Yes, sir.

10   Q.  What are they?

11   A.  Photographs I took that evening of the apartment.

12   Q.  Of the apartment at William Street?

13   A.  Yes, sir.

14   Q.  You took them while you executed the search warrant; is

15   that correct?

16   A.  Yes, sir.

17           MR. BAUER:  The government offers exhibits 101A

18   through R inclusive.

19           THE COURT:  Any objection?

20           101A through R will be received.

21           MR. BUCHWALD:  Your Honor, I think this would be

22   subject to a limiting instruction.

23           MR. BAUER:  I don't agree.

24           THE COURT:  Do you want a sidebar, Mr. Buchwald?

25           MR. BUCHWALD:  Should we step up?

1          MR. BAUER:  Okay.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. BUCHWALD:  I think that this is 404(b) evidence

3   being offered against Mr. Greenfield.

4          MR. GREENFIELD:  I'm not a defendant.

5          MR. BUCHWALD:  His client.

6          MR. BAUER:  Your Honor, this is a search warrant that

7   was executed at James Williams, L-1's house.

8          MR. BUCHWALD:  This is L-1's house?

9          MR. BAUER:  And Jamar Mallory was there.  There's

10  actually going to be no proof that any of the defendants were

11  there this day.  This is all for background.  Crack was

12  recovered there.  And that's why we're offering it.

13         MR. GOLTZER:  Then it's all got to be admissible to

14  background because it seems to be irrelevant to Mr. Whitaker's

15  case.  He's not charged in conspiracy counts.

16         MR. BAUER:  I would suggest this is not the witness to

17  do that for.  He's not going to mention any of these

18  defendants' names.  He just executed a crime scene.  There will

19  be other witnesses who will have interacted with James

20  Williams, interacted with Jamar Mallory, then you can have your

21  limiting instruction.

22         THE COURT:  Accepted subject to connection.

23         MS. STAFFORD:  They're going to assume that it's

24  coming from the police officer what are they going to know it's

25  connected to.

E869chr4                      Frederick - direct

1          MR. BUCHWALD:  Why don't you have him identify it now.

2     There is no purpose in handing these things around now until

3     you somehow connect it.  He's going to identify it.

4          MR. BAUER:  This is not how -- the trial comes in in

5     pieces.  It doesn't always come in in sequence.  Because he's

6     on the witness stand now we're going to offer it now.  It will

7     become very clear when you cross-examine other --

8          MR. GOLTZER:  We'd just like a limiting instruction

9     that the testimony is not related to our client.

10         MR. BAUER:  That is totally inappropriate for --

11         THE COURT:  I'll accept it subject to connection.

12         (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

E869chr4                          Frederick - direct

1            (In open court)

2            THE COURT:  Government Exhibits 101A through 101R will

3    be accepted subject to connection.

4            (Government's Exhibits 101A through R received in

5    evidence)

6    Q.   Detective Frederick, when you executed this search warrant

7    were you by yourself or were there other officers present?

8    A.   There were other people present.

9    Q.   Do you recall who those officers were?

10   A.   Detective Goodman I know was there.  I believe she was the

11   applicant of the search warrant.  As far as the other people, I

12   don't recall.

13   Q.   And do you remember seeing anybody else besides Newburgh

14   police officers there that day?

15   A.   No, sir.

16   Q.   Let's walk through these photographs starting with 101A.

17   What are we looking at here?

18   A.   Just looking -- just an overview from the living room

19   looking into one of the side rooms.

20   Q.   And then 101B?

21   A.   Bed in the bedroom.

22   Q.   Let's skip ahead to 101D.

23   A.   Top of a like computer stand, computer desk.

24   Q.   Focusing on the left side of that computer stand, what's

25   depicted there?

1   A.  There's some drug paraphernalia, packaging materials.

2   Q.  101E?  What are we looking at here?

3   A.  It's the -- a radiator with some clothing on top of it,

4   just some bins that were in the residence.

5   Q.  Moving on to 101F?  What are we looking at here?

6   A.  Handgun that was found in that area.

7   Q.  Same radiator that we saw in the previous photograph?

8   A.  Yes, sir.

9   Q.  And then 101G?

10  A.  Gives a different angle of the same handgun.

11  Q.  I'm showing you what's been marked for identification as

12  Government Exhibits 102 and 103.  Will you take a look and tell

13  me if you recognize those items?

14  A.  Yes, sir.

15  Q.  Starting with 102, what is that?

16  A.  It's the handgun from the -- William Street.

17  Q.  And what's 103?

18  A.  103 were the rounds the handgun was loaded with.

19  Q.  And just to be clear were -- you said they were loaded.  So

20  the rounds didn't look like that when you found it on the

21  radiator?

22  A.  No.

23  Q.  Where were those rounds?

24  A.  These rounds were in the cylinder of the weapon.

25  Q.  Who took them out?

E869chr4                          Frederick - direct

1    A.  I did.

2    Q.  And you placed them in an evidence bag?

3    A.  Yes, sir.

4    Q.  And who placed the actual weapon in the box, Government

5    Exhibit 102?

6    A.  Who placed --

7    Q.  The gun in that white box?

8    A.  I did, sir.

9          MR. BAUER:  The government offers Exhibits 102 and

10   103.

11         MR. GOLTZER:  Same objection.

12         THE COURT:  101 and 103 will be.

13         MR. BAUER:  102.

14         THE WITNESS:  102 and 103 will be received.

15         (Government's Exhibits 102 and 103 received in

16   evidence)

17         THE COURT:  Subject to connection as well.

18   Q.  Moving on Government Exhibit 101H, the photograph.  Look at

19   that.

20   A.  Table that was in the apartment.

21   Q.  And focusing on the -- what's on the table, right there in

22   the middle?  There's a small green box.  Do you see that?

23   A.  The Newport cigarette box, sir?

24   Q.  Yes.

25   A.  Yes, sir.

E869chr4                          Frederick - direct

1   Q.  Behind it there's the yellow box.  What's that?

2   A.  Box of sandwich baggies.

3   Q.  Can you tell what is next to that Newport cigarette box?

4   A.  I'm sorry.  Did you ask what was next to it?

5   Q.  Yes.

6   A.  It's a plastic bag to the left of it.  There is a bowl with

7   rice in it to the right of it.

8   Q.  Showing you what's been marked for identification as

9   Government Exhibit 104.  Can you take a look and tell me if you

10  recognize that?

11  A.  Yes, sir.

12  Q.  What is it?

13  A.  It's the cigarette box that was on the table with the

14  contents that were in it.

15  Q.  And the contents, what are the contents?

16  A.  Crack cocaine.

17  Q.  Again, is it like you testified earlier?  It's what it

18  appears to you based on your training and experience to be

19  crack cocaine?

20  A.  Yes, sir.

21  Q.  Why is that?  What is it about it that makes you say it

22  looks like crack cocaine?

23  A.  I've been a cop for 18 years.  I have seen crack cocaine

24  tons of times.  I also know this was tested for cocaine solids

25  and tested positive for it.

1              MR. BAUER:  The government offers Government Exhibit

2     104 into evidence.

3              THE COURT:  Any objection?

4              MR. BUCHWALD:  Same.  Subject to connection.

5              THE COURT:  Very well.  It will be admitted subject to

6     connection.

7              (Government's Exhibit 104 received in evidence)

8     Q.  Just moving along to the rest of the photos briefly.  101I.

9     What's this a photo of?

10    A.  The cabinets above the sink in the apartment.

11    Q.  101K?

12    A.  The stove in the apartment.

13    Q.  Again there's more baggies there?

14    A.  Yes, sir.

15    Q.  101L?

16    A.  Some hand-rolled cigarettes on top of the microwave.

17    Q.  101M?

18    A.  Some debris next to the microwave.

19    Q.  101N?

20    A.  A spoon and a match on top of the stove.

21    Q.  101P?

22    A.  Digital scale, some baggies, a table.

23    Q.  101Q?

24    A.  More drug paraphernalia, baggies, a crack stem, phone on

25    top of looks like a table or a computer-type stand.

1    Q.  101R?  What's 101R?

2    A.  It's a job application.

3    Q.  Can you just read us the name and the address there.

4    A.  Williams, last name; first name, James; middle initial J;

5    20 William Street, Newburgh, New York.

6    Q.  Now going to show you what has been marked for

7    identification as Exhibits 105, 106, 107, 108, 109, and 110.

8    A.  Yes, sir.

9    Q.  Let's run through each one then.  Government Exhibit 105,

10   what is that?

11   A.  Digital scale that was taken from the apartment that day.

12   Q.  And Government Exhibit 106?

13   A.  It's crack stem which is a smoking device used to smoke

14   crack cocaine.

15   Q.  Is that known colloquially by anything else?

16   A.  Just normally a crack stem.  That's what we call them.

17   Q.  Government Exhibit 107 what's that?

18   A.  Razor blade.

19   Q.  Government Exhibit 108, what is that?

20   A.  Bunch of baggies.

21   Q.  The plastic baggies?

22   A.  Yes, sir.

23   Q.  Government Exhibit 109?

24   A.  (No response).

25   Q.  You can't tell?  109 and 110 together?

1    A.  There's a spoon and a plastic bag with looks like some

2    cocaine residue on it in this bag with both those stickers on

3    it.

4            MR. BAUER:  For the record we've marked, at least for

5    our exhibit list, 109 to be the spoon and 110 to be the bag.

6            The government offers Exhibits 105 through 110 into

7    evidence.

8            THE COURT:  Any objection?

9            Those exhibits 105 through 110 will be received

10   subject to connection.

11           (Government's Exhibits 105 through 110 received in

12   evidence)

13           MR. BAUER:  The government has no further questions

14   for Detective Frederick.

15           THE COURT:  Cross-examination.

16           MR. GOLTZER:  Thank you.

17   CROSS-EXAMINATION

18   BY MR. GOLTZER:

19   Q.  Detective Frederick, good afternoon?

20   A.  Good afternoon, sir.

21   Q.  My name is George Goltzer.  I represent Tyrell Whitaker.

22   Just a few questions I'd like to direct your way having to do

23   with the clothing that was recovered from the hospital that you

24   testified belonged to the victim, Mr. Henry, okay?

25   A.  Yes, sir.

E869chr4                          Frederick - cross

1    Q.  There are times when you go to a homicide scene that you

2    are able to take photographs of the victim right there at the

3    scene, right?

4    A.  That is correct.

5    Q.  And you've done that over the course of your long career?

6    A.  Yes, sir.

7    Q.  And one of the reasons you do that is you might be able to

8    recreate what happened and have a record of what happened

9    during the crime; is that correct?

10   A.  Yes, sir.

11   Q.  And that's not what was done in this case; is that right?

12   A.  That is correct.

13   Q.  Because when there's medical attention that can be given to

14   the victim in an effort to help him or her survive they're

15   immediately rushed to the hospital?

16   A.  Yes, sir.

17   Q.  And when you arrived at one -- at both crime scenes the

18   victim had already been taken away?

19   A.  That is correct.

20   Q.  And you had no personal knowledge of what that scene looked

21   like before the victim was taken from it?

22   A.  That is correct.

23   Q.  And you had no way of photographing or memorializing that

24   scene before the victim was taken from it?

25   A.  That is correct.

E869chr4                         Frederick - cross

1   Q.   Now, in fact, you talked about crime scenes, plural; is

2   that correct?

3   A.   Yes, sir.

4   Q.   One crime scene was at 54 Lander -- 54 Chambers?

5   A.   Yes, sir.

6   Q.   And the other was at 45 Lander?

7   A.   Correct.

8   Q.   There was some distance between the two; is that correct?

9   A.   Yes, sir.

10  Q.   Were any evidentiary items seized between the two scenes?

11  A.   None that were located, sir.

12  Q.   But there was a search done; is that correct?

13  A.   Yes, sir.

14  Q.   For example, you wanted to determine whether there was a

15  blood trail?

16  A.   Yes, sir.

17  Q.   Or anything that was dropped by either the victim or a

18  perpetrator to the crime?

19  A.   Yes, sir.

20  Q.   You're familiar with Locard's principle?

21  A.   Yes, sir.

22  Q.   And Locard's principle stands for the proposition that when

23  one goes into an area, there's an exchange between the area and

24  the person?

25  A.   That is correct.

E869chr4                          Frederick - cross

1    Q.  And that's, in fact, the entire theory behind what crime

2    scene units do, the theory that someone should or would leave

3    trace evidence?

4    A.  We hope so.

5    Q.  You hope so.  And the only problem is sometimes even if --

6    even if the principle is true or the hypothesis is true,

7    sometimes you just can't find it?

8    A.  That's true.

9    Q.  It's not for lack of trying?

10   A.  That's correct.

11   Q.  So you went through the area between 54 Chambers and 45

12   Lander in an effort to see if there were any biological fluids

13   that were left by anyone?

14   A.  Correct.

15   Q.  And you didn't find any?

16   A.  I did not.

17   Q.  And had you found them, you would have taken a swab?

18   A.  That is correct.

19   Q.  Do you recall -- and if you need anything to refresh your

20   recollection, I have no objection to your looking at it if the

21   court doesn't and the prosecution doesn't.

22          Do you recall what time you got to the hospital that

23   night?

24   A.  I would have to see my notes, something.

25   Q.  Was it closer to dawn or closer to midnight?  If you can

E869chr4                    Frederick - cross

1    remember?  The precise time isn't important.

2    A.  It would have been after I went to -- I went to Lander

3    Street.  Then I went to Chambers Street.  Took care of the

4    knife and the swabbing.  It was after that that I went to the

5    hospital.

6    Q.  Would it be fair to say it was a matter of hours?

7    A.  From when the initial incident took place?

8    Q.  Yes.

9    A.  Maybe two.  Maybe.

10   Q.  Could have been two?  Could have been three?

11   A.  I don't think so.  I don't think three.

12   Q.  So within a couple of hours after Mr. Henry was removed

13   from the scene at 45 Lander you were at the hospital?

14   A.  Yes, sir.

15   Q.  By that time he had been pronounced dead?

16   A.  Yes, sir.

17   Q.  And by that time his clothing had been removed by hospital

18   personnel apparently?

19   A.  Yes, sir.

20   Q.  And when you first recovered his clothing, where was it in

21   relation to him?  Was it next to him or in some other place?

22   A.  Mr. Henry was in the -- we call it a bay.

23   Q.  Lying on a table?

24   A.  On a table.  Officer Moore was outside of the curtain.

25   Q.  It was apparent -- you viewed Mr. Henry?

E869chr4                          Frederick - cross

1   A.  Yes, sir.

2   Q.  And it was apparent from your having viewed Mr. Henry that

3   he had received some medical treatment.

4   A.  Yes, sir.

5   Q.  There were tubes and the like; is that right?

6   A.  That is correct, sir.

7   Q.  There was a bandage on his arm?

8   A.  I don't recall that, but.

9   Q.  But obviously efforts had been made to save him?

10  A.  Of course.

11  Q.  Were his clothing on the same table or somewhere else?

12  A.  No.  They were bagged.

13  Q.  They were packed?

14  A.  They were bagged.

15  Q.  So would it be fair to say that all of the clothing was

16  bagged in one bag?

17  A.  No.  Separate.

18  Q.  Separate bags?

19  A.  The coat wasn't bagged because they didn't have a bag big

20  enough for it.

21  Q.  Now you mentioned -- let's talk about the coat.  The coat

22  is Government Exhibit 55 in evidence.  You held it up for the

23  jury.  I'm not going to ask you to do that again.

24          But that's the large maroon coat?

25  A.  Yes, sir.

E869chr4                        Frederick - cross

1  Q.  And you referred to a couple of bags of crack; is that

2  correct?

3  A.  Yes, sir.

4  Q.  And you referred to a wallet; is that correct?

5  A.  Yes, sir.

6  Q.  Is it a fact that the wallet was found within the coat?

7  A.  Yes, sir.

8  Q.  Was it also a fact that the two bags of crack were found

9  within the coat?

10  A.  Yes, sir.

11  Q.  Were they found in the same pocket or different pockets?

12  A.  I believe in the same pocket.

13  Q.  And you took a photograph of it?

14  A.  Yes, sir.

15  Q.  Was that 96A in evidence?  May we have 96A, if you please.

16          I'm sorry.  It would be C.  Is that it?

17  A.  Yes, sir.

18  Q.  And is that the pocket out of which those two items came?

19  A.  I don't recall.

20  Q.  Do you recall how many pockets the -- the coat had more

21  than one pocket?

22  A.  Oh, yes, sir.

23  Q.  You didn't take any blood swabs or biological fluid swabs

24  from the wallet?

25  A.  No, sir.

E869chr4                          Frederick - cross

1   Q.  You didn't take any biological fluid swabs from any of the

2   contents of the wallet?

3   A.  No, sir.

4   Q.  You didn't take any biological fluid swabs from either one

5   of the crack envelopes or white powder envelopes that were in

6   that pocket; is that correct?

7   A.  Correct.

8   Q.  And the reason you didn't take any biological swabs is you

9   didn't happen to see what appeared to be any biological fluids?

10  A.  That's correct.

11  Q.  And if you don't see it, you don't take it?

12  A.  Normally, yes.

13  Q.  Well was this done normally or abnormally?

14  A.  This was done normally.

15  Q.  Were you the person who found these items, the wallet and

16  the crack, inside the pocket?

17  A.  No.  I was standing -- I was working the office and my

18  partner was with me.

19  Q.  Who was that?

20  A.  Detective Burns.

21  Q.  Now did you see Detective Burns go through the pockets?

22  A.  Yes, sir.

23  Q.  Did he appear to have any difficulty finding the wallet in

24  the pocket?

25  A.  No, sir.

1    Q.  Did he appear to have any difficulty finding the crack in

2    the pocket?

3    A.  No, sir.

4    Q.  Did he have to look for any secret compartments or the

5    like?

6    A.  Did he have to or did he?

7    Q.  Did he?

8    A.  Not that I know of.

9    Q.  It was basically he looked at the coat he went into the

10   pockets and pulled these items out?

11   A.  That is correct.

12   Q.  Had you observed any indication that anybody else had gone

13   through the pockets before Burns?

14   A.  No.

15   Q.  Now with respect to the issue of blood.  You mentioned that

16   some clothing was covered with blood and you held up a shirt;

17   is that correct?

18   A.  That is correct.

19   Q.  That would appear to be the shirt that was closest to

20   Mr. Henry's body; is that right?  A T-shirt?

21   A.  A T-shirt, yes, sir.

22   Q.  There were other layers of clothing that you took?  For

23   example, you took a sweatshirt?

24   A.  Yes, sir.

25   Q.  What else did you take?

E869chr4                          Frederick – cross

1   A.   There was multiple layers of clothing, I believe there was

2   pants, underwear, socks, shoes.

3   Q.   With respect to the maroon coat, the outside of the maroon

4   coat didn't appear to be covered with blood?

5   A.   That is correct.

6   Q.   Did you see any blood on the outside of the coat, if you

7   recall?

8   A.   I do not recall seeing it.

9   Q.   Did you take any swabs from the outside of the coat?

10  A.   I did not.

11  Q.   If you had seen what appeared to be any biological fluids

12  whatsoever on the outside of the maroon coat would you have

13  taken a swab?

14  A.   Yes, sir.

15  Q.   Did you take swabs from any of the more interior clothing

16  of Mr. Henry?

17  A.   I did not.

18  Q.   Why not?

19  A.   With the coat covering the interior clothing as well as the

20  blood saturation from his wounds, there would have been no way

21  to separate if there was anything on there.

22              (Continued on next page)

23

24

25

1   Q.  So it wouldn't have been of any forensic use in your

2   opinion to take any swabs from Mr. Henry's clothing?

3   A.  Interior clothing, that's correct, sir.

4   Q.  You didn't find a large amount of blood at 45 Lander, you

5   found one stain?

6   A.  There was a fair amount of blood.  There was, I think, two

7   separate areas.

8   Q.  You took swabs from both?

9   A.  Yes.

10  Q.  You sent those along for analysis?

11  A.  I believe so.

12  Q.  And you took some blood from 54 Chambers?

13  A.  That's correct.

14  Q.  You also sent that along for analysis?

15  A.  Yes, sir.

16  Q.  Again, there was no blood between the two areas?

17  A.  I did not locate it.

18  Q.  So you had no reason to believe that Mr. Henry had been

19  bleeding out of his clothing between those two areas in the

20  absence of visible blood?

21  A.  That is correct.

22  Q.  You had no way of knowing when his clothing was taken off

23  or opened?

24  A.  That is correct.

25  Q.  You had no idea how it was that the hospital personnel had

1    treated his clothing?

2    A.  That is correct.

3    Q.  You had no idea whether there was cross-contamination from

4    one item of bloody clothing to another?

5    A.  Yes, I have no idea what they did.

6    Q.  Did you make any inquiry along those lines?

7    A.  I don't know who took his clothing.

8    Q.  You don't know whether they piled it up before they bagged

9    it?

10   A.  I don't know, sir.

11   Q.  You don't know whether they used it to wipe blood away from

12   the table while they were treating him?

13   A.  They're training is pretty stringent.  I'm pretty certain

14   they did not do that.

15   Q.  There are mistakes that are made in forensic laboratories,

16   too, right?

17   A.  That is correct.

18   Q.  By the way, when you took the photographs of Mr. Henry's

19   maroon jacket and the items that were found within it at the

20   precinct, what, if any, precautions did you take to avoid

21   contaminating those items or some other items at the precinct?

22   A.  As far as when we take things out to photograph them, the

23   other items are not in the vicinity.

24   Q.  Is anything done to clean off the table or desk?

25   A.  We use butcher paper, fresh butcher paper.

E86nchr5                          Frederick - cross

1    Q.  Butchered paper?

2    A.  Butcher paper.

3    Q.  Butchered paper?

4    A.  The big rolls of brown paper.  We take it out, lay the

5    items on it, do the photographs, put the item back in the bag,

6    the butcher paper is thrown away.

7             MR. GOLTZER:  Thank you very much.  I have no further

8    questions.

9             THE COURT:  Any other cross?

10            MR. BUCHWALD:  Your Honor.

11            THE COURT:  Mr. Buchwald.

12            MR. GOLTZER:  Can I ask one more question I don't mean

13   to be impertinent.

14   Q.  Is there still good hockey up in Potsdam?

15   A.  University of Clarkson, sir.  They are always ranked.

16   BY MR. BUCHWALD:

17   CROSS EXAMINATION

18   BY MR. BUCHWALD:

19   Q.  Good afternoon, Detective Frederick?

20   A.  Good afternoon, sir.

21   Q.  Now, I would like to focus right away on the ballistics and

22   the casings and bullets or projectiles that you found during

23   the course of your investigation on December 15, 2010.

24   A.  OK.

25   Q.  All right.  When you were going through, you were trying to

e86nchr5                    Frederick - cross

1   find every casing and every -- when I say projectile, that's

2   what most people think of as the bullet, correct?

3   A.  Correct.

4   Q.  So you were trying to find every actual bullet and every

5   casing that you could find on the premises or near the premises

6   or just outside, is that correct?

7   A.  That is correct, sir.

8   Q.  You were trying to document what it was that you found,

9   correct?

10  A.  Yes, sir.

11  Q.  Because you wanted to be able, among other things, to

12  determine how many shots were fired, correct?

13  A.  Correct, sir.

14  Q.  How many guns are used, correct?

15  A.  Correct.

16  Q.  Which shots hit anybody, correct?

17  A.  Yes, sir.

18  Q.  Because you try to tie it up with whatever is found with

19  any victim, is that correct?

20  A.  That is correct.

21  Q.  And you want to be able to document it carefully so that

22  when the experts examine the ballistics, the bullets, for

23  example, and the casings, everybody knows what it is that is

24  being examined and can report it accurately, correct?

25  A.  Yes, sir.

e86nchr5                                    Frederick - cross

1   Q.  So you prepare rather detailed reports or charts of what it
2   is that you found, correct?
3   A.  Yes, sir.
4   Q.  With respect to your findings concerning the ballistics,
5   how do you get that tested?
6   A.  It's sent to the New York State Police lab in Albany.
7   Q.  All right.  It's sent by the Newburgh police to the
8   laboratory in Albany, and then the laboratory in Albany
9   eventually tests things and sends back their expert report; is
10  that right?
11  A.  Yes, sir.
12  Q.  That was done in this case?  Part of your function was to
13  prepare things to get sent up to Albany, correct?
14  A.  That is correct.
15  Q.  And that when the report comes back, is there a particular
16  place that you put the report?  Do you put it in the case file?
17  What do you do?
18  A.  The report is delivered to the lead detective in charge.
19  Q.  In this case was that Detective Cortez?
20  A.  It might have been.  I am not sure, to be quite honest with
21  you.
22  Q.  You have seen reports like that, correct?
23  A.  Yes, sir.
24  Q.  Let me show you what we have premarked as Defendants'
25  Exhibits B-1 and B-2 for identification.

e86nchr5                        Frederick - cross

1          Are you able to identify B-1 and B-2 for

2    identification?  You have seen documents like this before,

3    correct?

4    A.  This one I am very familiar with.  This I am not.

5          THE COURT:  I'm sorry.  Could you indicate what

6    exhibit numbers they are.

7          THE WITNESS:  I'm sorry.  B-1 I'm very familiar with.

8    Item B-2 I am not.

9          THE COURT:  All right.

10   Q.  But these are the report and case notes, are they not, that

11   came back from Albany with respect to the ballistics that you

12   sent up?

13         MR. BAUER:  Objection.

14         THE COURT:  Overruled.

15   A.  It says "Case Notes" on the top, but I've never seen one of

16   these reports.

17   Q.  B-1 is the report with the conclusions, correct?

18   A.  Yes.

19   Q.  All right.  Again, without yet going into the specifics

20   with respect to B-2 -- let me ask you a preliminary question.

21   When you are preparing your submission to send to Albany, you

22   are sending up a list of items by item number of the various

23   bullets and casings that you had found, correct?

24   A.  Yes, sir.

25   Q.  Those bullets and casings item numbers correspond to the

e86nchr5                          Frederick - cross

1   item numbers that you were just talking about on the chart that

2   you made of the premises at 54 Chambers, correct?

3   A.   That is correct, sir.

4   Q.   The item numbers that you photographed that would say 1, 2,

5   3, 4, right, the ones of those that were bullets or casings,

6   those are the particular numbers that you send up to Albany to

7   be tested, correct?

8   A.   That is correct.

9   Q.   If you look through B-2, the item numbers that are

10  reflected on B-2 correspond to your item numbers, do they not,

11  that you put on the specific items of casings and projectiles

12  that you found?

13  A.   It appears that way, yes, sir.

14           MR. BUCHWALD:   We offer B-1 and B-2 for identification

15  into evidence, your Honor.

16           MR. BAUER:   Your Honor, voir dire?

17           THE COURT:   OK.

18  VOIR DIRE EXAMINATION

19  BY MR. BAUER:

20  Q.   Focusing on B-2, Detective Frederick, you said that you

21  have never seen this document before, B-2?  Have you ever seen

22  it in any other cases?

23  A.   No, sir.

24  Q.   So to be clear, you didn't draft this, right?

25  A.   No, sir.

e86nchr5                          Frederick - cross

1    Q.  B-1, did you draft this document?

2    A.  No, sir.

3    Q.  Do you know who did?

4    A.  Somebody from the state lab, sir.  It's usually -- it looks

5    like Dennis Lyons did.

6               MR. BUCHWALD:  I'm sorry.  I didn't hear that answer.

7               THE WITNESS:  Dennis Lyons.  Technical Sergeant Dennis

8    Lyons.

9    Q.  Is he what you consider to be a ballistics expert?

10   A.  No, sir.

11   Q.  Are you a ballistics expert?

12   A.  No.

13   Q.  To be clear, did you prepare this document --

14   A.  No, sir.

15   Q.  -- b-1?

16   A.  No, sir.

17               MR. BAUER:  Your Honor, the government objects to the

18   admissibility of B-1 or B-2 as hearsay.

19               THE COURT:  The objection is sustained.

20               MR. BUCHWALD:  Your Honor, if we can just refer to

21   803(8).  Specifically 803(8)(a)(iii) (B).

22               THE COURT:  Come to sidebar.

23          (Continued on next page)

24

25

 1

 2              (At sidebar)

 3              THE COURT:  OK.  So you are trying to get it in under

 4     803?

 5              MR. BUCHWALD:  (8)(a)(iii)

 6              MR. GOLTZER:  It is a factual finding by a government

 7     agent against the government in a criminal case, which is an

 8     exception to the rule.

 9              MR. BAUER:  Against the government.

10              MR. BUCHWALD:  Against the government, only admissible

11     against the government.

12              MR. GOLTZER:  You couldn't do it to us, but we can do

13     it to you.

14              THE COURT:  It reads as follows:  A record or

15     statement of a public office, if in a civil case, or against

16     the government in a criminal case, factual findings from a

17     legally authorized investigation.

18              MR. NAWADAY:  He can't authenticate it.  We're happy

19     to stipulate that it is an authentic document if we can have

20     time to look at it.

21              THE COURT:  The problem is arguably it is admissible

22     under this rule, but this gentleman doesn't know what those

23     documents are.

24              MR. GOLTZER:  I am not sure it matters.

25              THE COURT:  He hasn't seen them.

1           MR. GOLTZER:  I am not sure it matters because they

2      have asked him questions about ballistics.  I assume

3      Mr. Buchwald has the right to do the same.  Once the document

4      is in, Mr. Buchwald can ask him some questions about the

5      procedures followed.

6           THE COURT:  The problem is that Mr. Buchwald could

7      have drafted these documents.  They are not authenticated.

8           MR. GOLTZER:  They are willing to stipulate that it's

9      the document.

10          MR. NAWADAY:  If it is authentic, we may very well

11     stipulate.  This is a hearsay exception.  It is not an

12     authentication exception.  The document still has to be what it

13     purports to be.  This particular witness doesn't know what it

14     is.

15          MR. GOLTZER:  You gave it to us.

16          MR. NAWADAY:  I understand that.  It is not through

17     this witness that you should do it.  If we agree this is the

18     document, we'll stipulate.  If not, we have to call somebody.

19     That is what we are saying.

20          MR. GOLTZER:  I suppose the question to ask is whether

21     the government is willing to concede that this is a document

22     that is authentic because they gave it to us, and they got it

23     from New York State.

24          MR. BUCHWALD:  They gave it to us under Rule 16.

25          MR. DRATEL:  The bar for authentication under 901 is

1    very low, in particular if it's something that the government

2    has already produced to us.

3            MR. NAWADAY:  That is understood, your Honor.  It is

4    just, beyond that, this witness has no knowledge about this

5    document, so why is he testifying about it anyway?  This can

6    come in later, and I am sure you can use it during closing.  If

7    it's authenticated, then it is authentic.  But the examination

8    of this witness on a document he didn't draft is inappropriate.

9            MR. BUCHWALD:  We want to put it in.  And then, only

10   to the extent that he's saying something different -- I don't

11   expect that he will -- then we will read the relevant portion

12   of the document.  But I think it is just going to actually

13   speed things up immensely because he is going to be agreeing --

14           MR. NAWADAY:  That document says what it says.

15           MR. DRATEL:  He may not have knowledge of the drafting

16   of the document, but the substance of what is in the document

17   is just what he has testified to for two hours.  It is the same

18   stuff.

19           THE COURT:  Except that he is going to be questioned

20   concerning specific statements within the document.  Is there

21   going to be another witness that will be able to speak to these

22   documents?

23           MR. BAUER:  The government wasn't planning on calling

24   any.

25           MR. GOLTZER:  The government is not planning to call a

1    ballistics expert.  This is the guy they have put forth with

2    questions about the ballistics.  He is the one that should be

3    asked.  No one is going to be putting words in his mouth.

4            There is a factual finding by a government agency in

5    an investigation and Don is going to ask him, Mr. Buchwald is

6    going to ask him -- he will tell you what he's going to ask

7    him.  He can give you an offer of proof.

8            MR. BUCHWALD:  He knows Lyons.  He's had case after

9    case with Lyons.  Lyons is the guy he always sends the stuff

10   to, he always gives his reports to.  He says he's familiar with

11   1.

12           THE COURT:  This type of document.

13           MR. BUCHWALD:  He's I think he even has No. 1.  I

14   think he's gotten --

15           MR. BAUER:  Here's our position.  Mr. Buchwald can ask

16   nonexpert type ballistics questions of him.  He's already

17   testified based on his training and experience, but he should

18   not be able to ask him about this document.  The parties can

19   sort out the admissibility of this later to save a witness.

20   Once we authentic it, I think we are inclined to agree to put

21   in and then it will speak for itself and you can use it in your

22   argument.

23           THE COURT:  Can he be re-called?

24           MR. BAUER:  If necessary.

25           MR. BUCHWALD:  What is the only time delay now that

1   you are not willing to authenticate it now?

2           MR. BAUER:  We don't want you to be able to ask him

3   about this.

4           MR. BUCHWALD:  I can refresh his recollection with a

5   banana.

6           MR. BAUER:  OK.  Feel free to refresh his recollection

7   with this.  That is what you can do.

8           MR. GOLTZER:  There are two separate issues it seems

9   to me.  One is the admissibility of the document, the second is

10  what questions, if any, is Mr. Buchwald entitled to ask.  Why

11  don't we take it one step at a time.

12          MR. BUCHWALD:  It is clearly admissible.

13          MR. GOLTZER:  We will ask the judge to rule on hot

14  next issue once it is admitted.

15          MR. DRATEL:  Once it's admitted whether the question

16  is proper or not depends on the question, not on the document

17  once it's in.

18          MR. GOLTZER:  Right.

19          THE COURT:  What is the government's position on the

20  admissibility?

21          MR. BAUER:  Your Honor, it is only good faith here,

22  but we are likely to stipulate to it.

23          MR. GOLTZER:  Are you prepared to make a

24  representation?

25          MR. BUCHWALD:  I make the representation that we got

e86nchr5                         Frederick - cross

1    these documents from the government under Rule 16.

2              MR. NAWADAY:  Not this one.  This is hearsay.  Case

3    notes.  We are talking about this, right?  Which is marked as

4    B-1.  Is that correct, Mr. Buchwald?

5              THE COURT:  What is substantive difference between the

6    two?

7              MR. BUCHWALD:  B-2 is the basis for B-1, and B-2 is

8    simply he has testified that these numbers correspond exactly

9    to his item numbers.  He sent them up with these item numbers,

10   and so that is the backup for the conclusions that are in here.

11   We are not going to be able to ask him about the backup in the

12   specific things.  It's there, if he needs it.

13             MR. NAWADAY:  Your Honor, this appears to me, B-1

14   seems to be the lab report.

15             THE COURT:  Do you gentlemen know what these documents

16   are?

17             MR. NAWADAY:  Yes, your Honor, we do.  This is the

18   firearm ballistics report prepared by Mr. Lyons.  It appears to

19   be what it is.  It is what we provided.  These are the case

20   notes that Mr. Lyons prepared.  I don't know about the

21   admissibility of the case notes themselves that will underlie

22   the report.

23             THE COURT:  Typically the actual backup is not

24   admitted.

25             Do you need B-2?

e86nchr5                          Frederick - cross

1              MR. BUCHWALD:  Pardon me.

2              THE COURT:  Do you need B-2?

3              MR. BUCHWALD:  Why don't we take it that we will have

4     B-1 for now.  If it comes to pass that we need B-2 for this

5     questioning, I will raise it with you, and we will raise it.

6     Let's move on with B-1, which may be sufficient.

7              MR. BAUER:  It is still our position that you had you

8     shouldn't -- you can ask him questions, but once he says about

9     B-1, now that he has already said he didn't prepare it, then I

10    am not really sure of the propriety of any further questions

11    except you can show it to him to refresh his recollection but

12    not to ask him about the document itself.

13             MR. BUCHWALD:  It is in evidence.  Assuming your Honor

14    allows it in evidence, it is in evidence.  I don't have to ask

15    him a question.  I can read the relevant part and see if he has

16    a problem with it.

17             MR. BAUER:  That is fine with me.

18             THE COURT:  So B-1 will be received.

19             MR. BAUER:  Sure.

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Defendant's B-1 will be received.

3          (Defendant's Exhibit B-1 received in evidence)

4          MR. BUCHWALD:  Thank you very much, your Honor.

5    Q.  Do you recall from your own reports and records how many

6    casings, shell casings were found on the premises or near the

7    premises of 54 Chambers?

8    A.  Yes, sir.

9    Q.  How many?

10   A.  I believe it was three .380s and three nine-millimeters.

11   Q.  So a total of six, right?  Three .380s and three

12   nine-millimeters, is that right?

13   A.  That is correct, sir.

14   Q.  OK.  And just to tie that in to -- well, let me go through.

15   How many projectiles, bullets, were found on the premises or

16   near the premises of 54 Chambers Street?  If you recall or if

17   you need to look at your report or any of your notes?

18   A.  I believe it was four full projectiles.

19   Q.  I'm sorry?

20   A.  I believe it was four full projectiles.

21   Q.  Four full --

22   A.  Not counting the full fragment.

23   Q.  We will go through them one at a time and see if that is

24   going to be one to stick with or whether your recollection is

25   refreshed.  Incidentally, at some point did you do the adding

1   yourself?

2   A.  I'm sorry.

3   Q.  At some point did you add up the numbers and take some

4   notes to see how many were found all together?

5   A.  Just as we catalog them we know you know how many we have.

6   I mean, I just look at my full evidence report, I go through.

7   Q.  We will do that in just a moment.  In addition to the

8   bullets or projectiles that you found on the premises at 54

9   Chambers Street, there are also certain other bullets in the

10  investigation that were processed and sent to Albany, correct?

11  A.  That is correct.

12  Q.  Those included some bullets that were found in Mr. Henry

13  during the medical examination, during the autopsy, correct?

14  A.  That is correct.

15  Q.  Those were eventually processed in the same way, chain of

16  custody, taken care of and those were sent on to Albany,

17  correct?

18  A.  Yes, sir.

19  Q.  The reports concerning them came back in the same report,

20  B-1, correct?

21  A.  Yes, sir.

22  Q.  All right.  And incidentally, this fellow, Mr. Lyons, who

23  did the expert report, Dennis Lyons, he's somebody you are

24  familiar with, correct?

25  A.  Yes, sir.

e86nchr5                          Frederick - cross

1   Q.   He's somebody -- approximately how many reports from

2   Mr. Lyons have you seen during the course of your work in the

3   Newburgh Police Department?

4   A.   Two, three hundred.

5   Q.   He's somebody who I think you indicated that you consider

6   an expert, is that right?

7   A.   Yes, sir.

8   Q.   He was the expert for the New York State lab, correct?

9   A.   He was one of them, yes, sir.

10  Q.   Let me show you what has been marked as Government Exhibit

11  2324-23, and see if that refreshes your recollection as to the

12  total number of bullets or projectiles that you counted up in

13  connection with the investigation.

14  A.   Thank you.  This one, sir?

15  Q.   Yes.  Is the handwriting on that page, the page to your

16  right, is that your handwriting?

17  A.   Yes, sir.

18  Q.   Does that refresh your recollection?

19  A.   Yes, sir.

20  Q.   What does your refreshed recollection tell you about the

21  total number of projectiles?

22  A.   This says there's eight.

23  Q.   Yes.  But that includes the items from the autopsy,

24  correct?

25  A.   Yes, sir.

e86nchr5                          Frederick - cross

1   Q.  How many items were there from the autopsy?

2   A.  How many total items from taken from the autopsy?

3   Q.  Yes.

4   A.  Off the top of my head I don't know.

5   Q.  We are going to go through these individually, if we could,

6   and perhaps we can do it in a sort of a logical way.  You have

7   mentioned .380s?

8   A.  Yes, sir.

9   Q.  And you have mentioned nine-millimeters, correct?

10  A.  That is correct.

11  Q.  Am I correct those are both what you referred to before in

12  your direct testimony as semiautomatic weapons, that they would

13  leave shell casings, correct?

14  A.  Yes.

15  Q.  You're familiar with .38 revolvers, correct?

16  A.  Yes, sir.

17  Q.  .38 revolvers are the other kind of firearm that you

18  mentioned that do not leave shell casings, they don't eject the

19  shell casings, correct?

20  A.  They don't eject the shell casings automatically.  They

21  have to be manually ejected.

22  Q.  You have to manually remove the shell casing, correct?

23  A.  That's correct.

24  Q.  Right.  If you were firing a .38, you can fire it and fire

25  it and fire it again until it was empty without removing any of

e86nchr5                    Frederick - cross

1   the shell casings, correct?

2   A.  That's correct.

3   Q.  You don't have to in order to fire a second time remove the

4   shell casing number one?

5   A.  No, sir.

6   Q.  So let's go through now the number of .380 shell casings.

7        I think you mentioned that there were three of them

8   that you found on the premises, is that right?

9   A.  That is correct.

10  Q.  The .380 shell casings, am I correct that those were items

11  11, 13, and 19?

12  A.  Yes, sir.

13  Q.  What are you looking at in order to determine that?

14  A.  I just grabbed your item No. B-1.

15  Q.  This is Exhibit B-1.  And the 7, the 13 and the 19

16  correspond to the numbers that you put on those photographs

17  when you had the little placard, the yellow placards with the

18  numbers, those were the numbers, correct?

19  A.  That is correct, sir.

20  Q.  So 11 and 13 and 19 were the three .380 casings that you

21  found, correct?

22  A.  Yes, sir.

23  Q.  It was determined, was it not, by the expert, Mr. Lyons,

24  that the three .380 casings came from the same gun, isn't that

25  right?

1   A.  Yes, sir.

2           MR. BAUER:  Objection, your Honor.

3           THE COURT:  Overruled.

4   Q.  There were also, were there not, there were two .380

5   bullets that you found, isn't that right?

6   A.  According to the report, yes, sir.

7   Q.  What about your own reports?

8   A.  My report, I wouldn't be able to classify them.

9   Q.  But in sending up the projectiles to Albany, they were able

10  to classify it as .380s, as .380 bullets, is that right?

11          MR. BAUER:  Objection.

12          THE COURT:  Sustained.

13  Q.  The projectile numbers 30 and 28 were found by you, is that

14  right, you and your team that was there at 54 Chambers?

15  A.  Yes, sir.

16  Q.  Could you look through the rest of your own reports to see

17  if there were any other .380 projectiles that were found on the

18  premises?

19  A.  I wouldn't have any report that said .380 projectiles.

20  Even after the lab sends us a report I don't go in and change

21  what I have had.  They are just projectiles.

22  Q.  They are just projectiles.  But you know that they were No.

23  30 and No. 28 that were sent up to Albany, correct?

24  A.  Yes, sir.

25  Q.  And that 30 and 28 were determined to be .380 projectiles,

e86nchr5                        Frederick - cross

1   correct?

2   A.  Yes, sir.

3           MR. BAUER:  Objection, your Honor.  Objection.

4           THE COURT:  This exhibit is in evidence, correct,

5   Mr. Buchwald?

6           MR. BUCHWALD:  Yes, your Honor.

7           THE COURT:  If you want him to read what is in the

8   exhibit, you can ask him to read what is in the exhibit.  You

9   can't otherwise characterize it.

10           MR. BUCHWALD:  If I might read the relevant portion

11   then.  This is in evidence, the expert's report, Mr. Lyons in

12   Albany.

13           Reading from page 3, item F:  "Items 28 and 30,

14   deformed expended .380 auto caliber projectiles are consistent

15   with having been fired from the same weapon.  However, they

16   lack sufficient individual characteristics necessary for a

17   positive identification."

18   Q.  Correct?

19   A.  Yes, sir.  That's what it says.

20           MR. BAUER:  Judge, excuse me.  Mr. Buchwald omitted

21   the word "apparent" before the word ".380"  It says, "Deformed

22   expended apparent .380."

23           THE COURT:  He did.

24           MR. BUCHWALD:  "Deformed expended apparent .380" --

25   yes, your Honor -- ".380 auto caliber projectiles."

e86nchr5                          Frederick - cross

1    Q.  Correct?

2    A.  Yes, sir.

3    Q.  And the .380 casings, 11, 13, and 19, if you look at

4    paragraph B on the same page --

5    A.  Yes, sir.

6    Q.  -- were determined by Mr. Lyons to be items 11, 13 and 19,

7    this is item B, "Expended.380 auto caliber cartridge cases were

8    discharged in the same weapon."

9           Is that correct?

10   A.  Yes, sir.

11   Q.  Now, the .380 casings were found, were they not, item 11

12   was found on the hallway floor, is that correct?

13   A.  Yes, sir.

14   Q.  And item 13 was found on the hallway floor, is that

15   correct?

16   A.  Yes, sir.

17   Q.  And item 19 was found in the middle room floor, is that

18   correct?

19   A.  Yes, sir.

20   Q.  And you don't know exactly where they originally were

21   before you got there, correct?

22   A.  That is correct.

23   Q.  But this is where they were when you were taking the

24   photographs, correct?

25   A.  That's correct, sir.

e86nchr5                          Frederick - cross

1  Q.  And the .380 bullets, the two .380 bullets, No. 30 was

2  found in the south hall wall, correct?

3  A.  Yes, sir.

4  Q.  And No. 28 was found in the west foyer wall, is that

5  correct?

6  A.  Yes, sir.

7  Q.  All right.  Presumably, if they were in the wall, the

8  greatest likelihood is that that that's where they were when

9  the police first got there, correct?

10  A.  I think we can assume that, sir.

11  Q.  Right.  As something on the floor might possibly have

12  accidentally been moved when they were conducting the original

13  sweep, correct?

14  A.  That's correct.

15         THE COURT:  Mr. Buchwald, might this be a good time to

16  take a break?

17         MR. BUCHWALD:  Sure.

18         THE COURT:  Ladies and gentlemen, it's about ten

19  minutes of the hour.  We will take 15 minutes.  Please be in

20  the jury room no later than five minutes after the hour.  4:05.

21         Please do not discuss the case.

22         (Recess)

23         THE COURT:  Everyone please be seated.

24         Mr. Buchwald.

25         MR. BUCHWALD:  May I proceed?

1           Thank you, your Honor.

2    BY MR. BUCHWALD:

3    Q.   Detective Frederick, I want to direct your attention, if I

4    might now, to the nine-millimeter projectiles.  Am I correct

5    that you found one nine-millimeter projectile on the premises

6    and you got two more from the hospital?

7    A.   I believe one of the projectiles from the residence came

8    back from a nine-millimeter, and as far as you are referring to

9    what came from the autopsy, I didn't collect that.

10   Q.   Say that again?

11   A.   I didn't collect it.

12   Q.   Let's do them one at a time.  The one from the premises you

13   found, item No. 27 was a nine-millimeter caliber projectile

14   that you found, is that right?

15   A.   Yes, sir in the hall.

16   Q.   Am I correct that the bullets that were found in Mr. Henry

17   at the hospital were collected by your partner, Burns?

18   A.   That is correct, sir.

19   Q.   That's right.  Then they go through the process you

20   describe before, and they are sent unto Albany eventually and

21   the report comes back, is that right?

22   A.   That is correct, sir.

23   Q.   Those items numbers were item Nos. 72 and 74, is that

24   right?

25   A.   Yes, sir.

e86nchr5                          Frederick - cross

1   Q.  The report from the expert was that 72 and 74 were fired

2   from the same weapon, is that right?

3           MR. BAUER:  Objection, your Honor.  I would ask

4   Mr. Buchwald to read aloud rather than ask the witness

5   something for which he lacks personal knowledge.

6           THE COURT:  The objection is sustained.

7   Q.  If you look at item D on page 3 of the report, it reads as

8   follows, ladies and gentlemen, Mr. Lyons' report, "The items 72

9   and 74, expended nine-millimeter Luger caliber projectiles,

10  were fired from the same weapon."

11  Q.  Is that right?

12  A.  That's what it states, sir, yes, sir.

13          MR. BAUER:  Your Honor, again, words were omitted

14  there.  It's "consistent with having been fired from the same

15  weapon" is what the exhibit says.

16          MR. BUCHWALD:  No.  D.  At remarks, page 3, D.  "The

17  items 72 and 74 expended from nine-millimeter Luger caliber

18  project times were fired from the same weapon."

19          MR. BAUER:  OK.  I was looking at E.

20          MR. BUCHWALD:  You were looking at something else.

21          MR. BAUER:  E.

22  Q.  Item 27, right, which was the item you found, which was the

23  nine-millimeter that you found on the premises at 54 Chambers,

24  was a nine-millimeter, correct?

25  A.  That's what Mr. Lyons classified it as, yes.

1   Q.   Right.   With respect to the examination of item No. 27, the

2   projectile, that reads as follows, this is item E on page 3 of

3   Mr. Lyons' conclusions, "Item 27, expended nine-millimeter

4   Luger caliber projectile, is consistent with having been fired

5   from the same weapon as items 72 and 74, nine-millimeter Luger

6   caliber projectiles.   However, it lacks sufficient individual

7   characteristics necessary for a positive identification."

8            Did I read that right?

9   A.   Yes, sir.

10  Q.   So 72 and 74 are from the same gun, 27, consistent with

11  that, can't be positive, correct?

12  A.   Correct.

13  Q.   But the three casings, the three nine-millimeter casings

14  that you found, the three nine-millimeter casings were 7, 10

15  and 14, correct?

16  A.   Yes, sir.

17  Q.   Those are ones that you found all on the premises, correct?

18  A.   Yes, sir.

19  Q.   Those are ones that you sent up to Albany for analysis,

20  correct?

21  A.   Yes, sir.

22  Q.   Testing and analysis, and those are ones that Albany,

23  Mr. Lyons concluded 7, 10 and 14, the three casings, were

24  definitely fired from the same gun, is that right?

25  A.   It says discharged in the same weapon, yes, sir.

e86nchr5                         Frederick - cross

1    Q.  Then item A of the report, which reads on page 3, "The

2    items No. 7, No. 10 and No. 14 expended from nine-millimeter

3    Luger caliber cartridge cases were discharged in the same

4    weapon."  I'm reading that correctly, right?

5    A.  Yes, sir.

6    Q.  So Mr. Henry was killed with two nine-millimeter bullets?

7              MR. BAUER:  Objection, your Honor.

8              THE COURT:  Sustained.

9    Q.  The two bullets that Burns collected from the doctor at the

10   hospital, Dr. Ely, correct?

11             MR. BAUER:  Objection, your Honor.

12   Q.  Do you know who he collected it from?

13   A.  I don't, sir.  I wasn't there.

14   Q.  The two nine-millimeter bullets that Burns collected from

15   the hospital were sent up to Albany and determined to be

16   nine-millimeter bullets, correct?

17             MR. BAUER:  Objection.

18             THE COURT:  Sustained.

19   Q.  There was a third item, was there not, that was found at

20   the hospital by Burns, a third projectile?

21   A.  Quite possibly.  Like I said, I would have to refer to the

22   case.

23   Q.  Would you look at -- withdrawn.

24   A.  If you give me an item number, I can probably find it on

25   this report.

e86nchr5                        Frederick - cross

1   Q.   Who prepared this.  Let me show you 3524-26, which is a

2   116-page report.  If you would tell me who prepared this.

3   A.   This is a culmination of everything that was entered.  I

4   believe most of it was entered by myself; I believe some was

5   entered by Detective Burns.

6   Q.   That is a compilation of everything that is entered, and it

7   shows which items were sent to Albany for testing, correct?

8   A.   That's correct, sir.

9   Q.   It's made in the ordinary course by your department,

10  correct?

11  A.   That's correct, sir.

12  Q.   That is how you know, for example, that items 72 and 74 at

13  pages 49 and 51 of the report --

14  A.   Thank you.

15  Q.   -- were collected by Detective Burns from the hospital?

16  A.   Yes, sir.

17  Q.   That is how you know that it's the items from the hospital,

18  72 and 74, that were sent to Albany, that were determined in

19  Albany, that's how you know it's the same bullets that were

20  determined by the expert in Albany, Mr. Lyons, to be

21  nine-millimeter bullets, correct?

22          MR. BAUER:  Objection, your Honor.

23          THE COURT:  Sustained.

24  Q.   The 72 and the 74 here as you understand it are the same 72

25  and 74 referred to by Lyons because that's the purpose of

e86nchr5                          Frederick - cross

1   numbering them, isn't that right?

2   A.  Yes, sir.

3   Q.  With respect to item 73, does your report refresh your

4   recollection as to what that was and where it was found?

5   A.  It leads to the projectile that was removed from Mr. Henry

6   collected by Detective Burns.

7   Q.  Do you know from the investigation whether that third

8   projectile that was removed from Jeffrey Henry and that was

9   given to Burns was from an old wound or a new wound?  Do you

10  know?

11  A.  I do not.

12  Q.  You didn't hear at all, in the course of your investigation

13  you didn't learn anything?

14          MR. BAUER:  Objection.

15          MR. BUCHWALD:  I'm asking him if he says he doesn't

16  know at all.

17          MR. BAUER:  I believe was question was have you heard.

18  That's hearsay.

19          THE COURT:  The objection to that question is

20  sustained.

21  Q.  In your investigation did you determine what the source of

22  item 73 was?

23  A.  I believe Detective Burns said they believed it to be from

24  an old injury.

25          MR. BAUER:  Your Honor, objection.  Move to strike

1    that.

2              THE COURT:  Yes.  That will be stricken.

3    Q.  That will have to await the testimony of the medical

4    examiner?

5    A.  Yes, sir.

6    Q.  Or if the government should choose to call Detective Burns,

7    is that right?

8              THE COURT:  That objection is sustained as well.

9    Q.  Now, as far as you know, you are not aware of any other

10   nine-millimeter projectile or casings having been found either

11   on the premises or near the premises of 54 Chambers, is that

12   right?

13   A.  Related to this incident?

14   Q.  Correct.

15   A.  No, sir.

16   Q.  You have no information that would suggest that there were

17   more than three nine-millimeter shots fired, correct?

18   A.  That is correct.

19   Q.  The same with respect to the .380, where you had three

20   casings that were found and -- well, have we gone over the .380

21   bullets that were found on the premises?

22   A.  I don't believe so.  Not yet, sir.

23   Q.  If you would look at items 28 and 30.

24   A.  Yes, sir.

25   Q.  These are the ones that you've said you didn't know if they

1    were .380s?

2    A.  At the time I removed them, I did not.

3    Q.  Once you sent them up for testing and it came back, you

4    learned from the test that these were .380s fired from the same

5    weapon, correct?

6    A.  Yes, sir.

7    Q.  With respect to the three .380 casings and the two .380

8    bullets, were you ever able to find a third .380 bullet on the

9    premises or at the hospital?

10   A.  I do not believe so.

11   Q.  I think you testified, perhaps it was you, that there was

12   a -- you did testify there was a third victim over at the

13   hospital that you collected forensic evident from?

14   A.  There was a third victim at the hospital whose clothes were

15   seized by the police and I collected the clothes, right.

16   Q.  That person had been shot, is that right?

17   A.  To be quite honestest with you, sir, I don't know.

18   Q.  You actually don't know, or you don't have personal

19   knowledge?

20   A.  I don't have personal knowledge.

21   Q.  All right.  But you know, right?

22   A.  Yeah.  Through this being discussed.

23           MR. BAUER:  Objection, your Honor.

24           THE COURT:  Sustained.

25   Q.  Do you know if a bullet was ever removed from Tarrence

1    Smith?

2    A.  I do not believe so.  I don't ever remember seeing a

3    projectile come in with that name.

4    Q.  So there is still a bullet in Tarrence Smith as far as you

5    know?

6    A.  I don't --

7              MR. BAUER:  Objection.

8              THE COURT:  Sustained.

9    Q.  So the difference between finding three .380 casings and

10   two .380 bullets might be that there is a bullet in Tarrence

11   Smith, isn't that correct?

12             MR. BAUER:  Objection.

13             THE COURT:  Sustained.

14   Q.  So we have the three nine-millimeter bullets, one of which

15   is found on the premises and two of which Burns gets from the

16   hospital from the autopsy of Henry, correct?

17   A.  Yes, sir.

18   Q.  We have the three .380 bullets for which you found two .380

19   casings, all on the premises, correct?

20   A.  Three .380 casings, and I believe Lyons classified two of

21   the projectiles as .380.

22   Q.  And two projectiles, right?

23   A.  So three and two.

24   Q.  Three and two.  There's one bullet in Tarrence Smith, and

25   you don't know what it is?

1          MR. BAUER:  Objection, your Honor.

2          THE COURT:  Sustained.

3   Q.  There are two other bullets, item No. 21 and item No. 42,

4   which were found on the premises, is that correct?

5   A.  Yes, sir.

6   Q.  Item No. 21 and item No. 41 were determined by Mr. Lyons,

7   the expert in Albany, to be .38 caliber, is that correct?

8   A.  .38 caliber class, yes, sir.

9   Q.  They were determined to have been consistent with having

10  been fired from the same .38-caliber weapon, correct?

11  A.  The same .38-caliber-class weapon, yes, sir.

12  Q.  A nine-millimeter bullet cannot be fired from a .38

13  revolver, isn't that correct?

14          MR. BAUER:  Your Honor, this question being asked

15  based on his training and experience or as an expert?

16          THE COURT:  He's not been classified as an expert.

17  Q.  How long have you been a policeman?

18  A.  About 18 years.

19  Q.  Have you dealt a lot with .38s?

20  A.  Yes, I own quite a few of them.

21  Q.  Say again?

22  A.  I own quite a few of them.

23  Q.  You own two of them.  All right.  Have you fired any

24  nine-millimeter bullets from them?

25  A.  I never tried.

e86nchr5                     Frederick – cross

1   Q.  Isn't it a fact that you cannot fire a nine-millimeter from

2   a .38?

3   A.  I don't believe so.

4   Q.  You don't think you can, correct?

5   A.  I do not think you can.

6   Q.  As somebody who has been an owner of a .38 for how many

7   years?

8   A.  At least ten.

9   Q.  As somebody who's been a police officer for how many years?

10  A.  18.

11  Q.  You have also testified about some fragments, is that

12  right?

13  A.  Yes, sir, right.

14  Q.  Am I correct the fragments were really so small there was

15  no purpose in sending them up for laboratory analysis?

16  A.  That is correct.

17  Q.  You didn't send them up for laboratory analysis?

18  A.  That is correct.

19  Q.  Because they appeared to be small, I am not going to say

20  tiny, but they were really quite small fragments from what you

21  assume were the bullets that you found, correct?

22  A.  Yes, sir.

23          (Continued on next page)

24

25

E869chr6                      Frederick - cross

1    Q.  Now, you recall that when we were playing with the jigsaw

2    puzzle here, the internal door?

3    A.  Yes, sir.

4    Q.  Rather than picking it up again, having people abandon

5    their notes and pads, if I may -- I have my back now to the

6    jury.  And if I am now facing the front door, that white door

7    that you saw in the photos of 54 Chambers, right, the knob to

8    the outside door is on the right side, correct?

9    A.  If you're in the foyer facing --

10   Q.  No.  Outside.  I'm on the street facing the premises.

11   A.  Yes, sir.

12   Q.  The knob is on the right side.  And the way the door would

13   open is inside?  You don't -- not pulling it out but you turn

14   the knob and move to the inside, correct?

15   A.  Yes, sir.

16   Q.  And open that door and you walked in.  And for a couple of

17   steps you get to the internal door, correct?

18   A.  That is correct, sir.

19   Q.  And then, again, that door has a knob.  And that's this --

20   that's this door, Government Exhibit 40?

21   A.  Yes, sir.

22   Q.  And this Government Exhibit 40 also has the knob on the

23   right, correct?

24   A.  Yes, sir.

25   Q.  And you open it up, again, the same way you would go

1    internal?

2    A.  Yes, sir.

3    Q.  And the same direction, correct?

4    A.  Yes, sir.

5    Q.  Now Exhibit 44A.  This is the diagram.

6           MR. BUCHWALD:  Can we put 44A up on the screen for

7    everybody to see.  Are we able to -- is there a way to turn it

8    around or not?

9    BY MR. BUCHWALD:

10   Q.  Does everybody have 44A?  Is it in front of you, sir?

11   A.  Yes, sir.

12   Q.  Now, you were taking a photo which I think was 95B.

13          MR. BUCHWALD:  Are we able to put up 95B for a second?

14   Q.  You said that this was a photo from outside going in; is

15   that correct?

16   A.  That's correct.

17   Q.  When this photo was taken do you recall, are you standing

18   right in the middle of the entranceway to 54 Chambers or

19   slightly to the left, slightly to the right, do you know?

20          Do you know?  Do you remember?

21   A.  I would probably say I was to the left because there was

22   quite a bit of blood to the right on that step.

23   Q.  Yes, there is.  That's just the point.

24          Let me show you -- I'm going to mark as Defendant

25   Thomas' Exhibit P for identification.  Put a more formal

1    exhibit tag on it later, with the court's permission.

2              Now, have you been back there recently, at all, to the

3    premises?

4    A.  I don't recall.

5    Q.  Do you know if you ever went there again after December 15

6    or 16 of 2010?

7    A.  I don't recall.

8    Q.  Not for quite some time.

9              I realize that may be difficult to rely on your

10   recollection but if you have a recollection --

11   A.  I don't recall being back there since that day.

12   Q.  I'm talking about the actual premises and whether you can

13   actually, if that helps refresh your recollection, you can

14   actually, from some considerable distance in the back, if you

15   walk through door No. 1 and then you walk through door No. 2,

16   and you proceed to back here, can you, if the doors were open,

17   be able to see out the front door?  Do you recall?

18   A.  I don't, sir.  I'm sorry.

19   Q.  So, would you be in a position to know whether this

20   photograph in front of you, Defendants' Exhibit P for

21   identification, is a true and accurate representation of the

22   premises of 54 Chambers if one looks out toward the door,

23   toward the street from back --

24   A.  It looks like this picture was taken either where that

25   hallway enters into the middle room.  But from there, yes, sir.

E869chr6                        Frederick - cross

1    Q.  Say that again.

2    A.  It looks like this picture was taken from where that

3    hallway enters into the middle room.  So, from there, yes, sir.

4    Q.  And it does look fair and accurate?

5    A.  Yes, sir.

6              MR. BUCHWALD:  We offer P1 for identification.

7              THE COURT:  You offer P1?

8              MR. BUCHWALD:  We now offer it into evidence as

9    Exhibit P.

10             THE COURT:  It's P1 as -- P not P1, correct?

11             MR. BUCHWALD:  This is P.

12             THE COURT:  Okay.  P will be received.

13             (Defendant's Exhibit P received in evidence)

14             MR. BUCHWALD:  It's not in electronic form so I don't

15   think we can put it up.  Are we able to do it on the ELMO?

16             To save time.  This is in evidence.  We can all see

17   it.  Maybe hand it around and you can see it during

18   deliberations.  But if I can just display it

19   BY MR. BUCHWALD:

20   Q.  You don't know when this was taken precisely, correct?

21   A.  That's correct.

22   Q.  But am I correct that if the doors were open one from a

23   distance could fire out through the front door, correct?

24   A.  Based on that photograph, what I could see from that

25   photograph, I would say from inside that hallway, at the end of

E869chr6                         Frederick - cross

1    the hallway where that middle room is, possibly.  But any

2    farther back, I can't say that.

3    Q.  You just don't know?

4    A.  Yes, sir.

5    Q.  So you don't know -- in the course of your investigation

6    did you ascertain whether a gentleman by the name of Akinto

7    Brown was ever firing in that direction from the -- Akinto

8    Boone was ever firing in that direction toward the front from

9    the rear well beyond the internal door on the inside?

10   A.  I have no direct knowledge of that.

11   Q.  You don't have direct knowledge?  But it would have been

12   possible?

13   A.  Based on -- the statement I said before with where that

14   picture is taken, from the opening in that hallway in the

15   middle room forward, I think it's possible.  Any farther back

16   into the dwelling I can't say.

17   Q.  You just don't know.

18           MR. BUCHWALD:  If I might have just one moment?

19           (Pause)

20           I have nothing else, sir.

21           THE COURT:  Mr. Greenfield.

22           MR. GREENFIELD:  Yes, sir.

23   CROSS-EXAMINATION

24   BY MR. GREENFIELD:

25   Q.  Good afternoon, Detective Frederick.

1   A.  Good afternoon, sir.

2   Q.  Just very briefly.  So I at least for the education of the

3   jury -- edification of the jury.  Would you again explain how

4   you process the scene of a crime such as this.  And

5   specifically bagging evidence and what you do after you bag it

6   and how you bag it.

7        For example, you found a knife outside the entrance of

8   54 Chambers, correct?

9   A.  Correct.

10  Q.  Do you know as you sit on the stand now when you bagged it

11  and what you did with it when you had bagged it?

12  A.  It was bagged -- it was photographed, seized, bagged, at

13  the scene.  Then it was secured in my vehicle.  Went to the

14  hospital.  Gathered all the clothing.  Then we went back to the

15  station.  Everything was secured in the office.

16  Q.  So it was put into your office at 55 Broadway.  Is that the

17  headquarters address?

18  A.  Yes, sir.

19  Q.  What floor is the office on that you maintain?

20  A.  First floor.

21  Q.  Is that the property clerk's office also?

22  A.  All where crime scene/property it's all in one.

23  Q.  All in one.

24       And the overnight bins that you discussed earlier, are

25  they over in that same first floor office area?

1   A.  The overnight storage area is next to the dispatch area.

2   It's a locked room.  There's lockers.  And like a large postal

3   mail box with a lock on it that the guys submit evidence into.

4   Q.  So let me ask you this.  We've talked about chain of

5   custody.  There's a computerized system set up in Newburgh that

6   when a case is open any evidence that is gathered during the

7   course of your investigation is assigned a number

8   chronologically as its gathered and it's stored in this

9   computerized system?

10  A.  Yes, sir.  The numbers are just generated as they're

11  entered.  So as we assign things placard numbers we have to

12  make sure we enter them in that order.

13  Q.  I'm handing up to the witness 3524-26.

14  A.  Thank you, sir.

15  Q.  Detective Frederick, does that document fairly represent

16  the chain of custody in the case that's on trial now?

17  A.  Yes, sir.

18  Q.  And that's something that you created somewhere on about

19  December 15, 2010?

20  A.  The beginning of it, yes, sir.

21  Q.  And would it be fair to say that any item that was seized

22  by you, any item that was seized by Detective Burns.  What was

23  the third detective?  I didn't pick up his name?

24  A.  Sergeant Vancura.

25  Q.  And that sergeant -- I still didn't pick up the name.

1   A.   Vancura V-A-N-C-U-R-A.

2   Q.   One of the three of you would enter that into the chain of

3   custody, correct?

4   A.   Yes, sir.

5   Q.   And if another officer, say Detective Cortez finds a piece

6   of property that he deems might be important to the case, he

7   would put it into your office and ask you to add it to the

8   chain?

9   A.   Sometimes they do that.  They also can do it themselves.

10  Q.   Do they have access to your office?

11  A.   No, they don't but this computer program and the bar code

12  printers, there's two of them out for the patrol guys and the

13  detectives to enter evidence themselves.

14  Q.   Just, for example, again the knife is the first item that

15  went into the chain of custody here; is that not correct?

16  A.   That is correct, sir.

17  Q.   Would it be fair to say that that knife entered the chain

18  of custody early in the morning, one or two o'clock of

19  December 15?

20  A.   In the afternoon, sir.

21  Q.   What time was it entered into the chain?

22  A.   1730.

23  Q.   And what was the next item that was entered into the chain?

24          MR. BAUER:  Your Honor, objection.

25          THE COURT:  Overruled.

1             MR. BAUER:  Your Honor, may we have a sidebar briefly?

2             THE COURT:  Okay.

3             (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. BAUER:  Your Honor, I'm all for efficiency but as

3    I understand the practice of refreshing a witness's

4    recollection is show him a document and then take it away and

5    then ask him if it refreshes his recollection.  He's just

6    sitting here reading from the document, so.

7          MR. GREENFIELD:  Do you want me for offer it into

8    evidence?  I'll do that.

9          MR. BAUER:  Why don't you offer it at least as for

10   identification so -- and then just make it clear that he's

11   reading off of the document rather than independently.

12         MR. GREENFIELD:  I could ask him to refresh his

13   recollection each time.

14         THE COURT:  Just ask him.

15         MR. BAUER:  Get a global statement about how he's

16   refreshing his recollection by reading each entry because I

17   think you're going to work through this.

18         MR. GREENFIELD:  I'm really not going to work through

19   the whole list.  What I really want to do with him is bring out

20   how an item is entered into custody and if there are any

21   movements of the item out of custody to the laboratory, to the

22   court, whatever, an entry is made.  That's really where I'm

23   going.

24         MR. BAUER:  You're not going to do every item?

25         MR. GREENFIELD:  No.

E869chr6                        Frederick - cross

1          MR. BAUER:  To the extent that it's appropriate I'd

2     just like the assumption that he's reading the document.

3          THE COURT:  Just ask him the question.  Essentially

4     what you're asking him to do is read the document.

5          MR. GREENFIELD:  I didn't expect him to do that, but.

6          THE COURT:  He's got nothing else to do but read the

7     document that's in front of him.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2    BY MR. GREENFIELD:

3    Q.  Detective, let me just ask, putting that aside, without

4    referring to it, your recollection about the way the history or

5    the footprint or the fingerprint of a piece of property moves

6    through the property clerk's office.  In this instance you put

7    the knife into evidence somewhere on December 15, 2010,

8    correct?  When I say "evidence," in the chain of custody?

9    A.  It's entered into the computer at that time.  It dates --

10   basically you enter the date and the time and who collected it

11   and where it's collected from.  And then as you -- you manually

12   enter that.  Then as you actually are typing that into the

13   computer it gives it a date stamp.

14   Q.  I see.  Now, for instance, ten days after the item goes

15   into evidence, the officer who gave it to you or yourself wants

16   to bring it to court for a grand jury proceeding.  Is an entry

17   made in the chain of custody that it left the property clerk's

18   office and went to court or the grand jury?

19   A.  Yes, sir.

20   Q.  And when it comes back is an entry made saying the document

21   or the piece of evidence is put back into the property clerk's

22   office?

23   A.  Yes, sir.

24   Q.  And then after say another ten days it's sent up to Albany

25   for expert analysis.  Is an entry made in that system that

1    shows that the property left the office and traveled somewhere

2    or other up to Albany for examination?

3    A.  Yes, sir.

4    Q.  So that's true for any item that would be entered into the

5    property clerk's chain of custody?

6    A.  It is supposed to be that way, sir.  I can't say it's

7    happened every single solitary time.  It's just too many items

8    for me to say that.

9    Q.  There is a reason for the chain of custody, isn't there?

10   A.  Absolutely, sir.

11   Q.  And what is the reason, as you understand it?

12   A.  It's so it shows -- it's where it's been since the time it

13   gets seized until the time we end up here.

14   Q.  So, that it be clear to anybody looking at that piece of

15   evidence that it was tamper-free, correct?

16   A.  Correct.

17   Q.  That it wasn't -- that every time any movement was made

18   with that piece of property out of the property clerk's office,

19   or even within it, an entry was made in the system itself to

20   show what happened to that piece of property?

21   A.  Yes, sir.

22   Q.  And then the piece of property here, such as the items that

23   you opened up earlier in the brown bags, when are those brown

24   bags allowed to be opened?  Under what circumstances?

25   A.  Either by the people in the lab for lab analysis.

1    Q.  So let me stop you right there.  There came a time sometime

2    in December that a number of items left the property clerk's

3    office in Newburgh and traveled to Albany for expert analysis;

4    is that right?

5    A.  Yes, sir.

6    Q.  And an entry was made on a lot of these items that, a whole

7    series of pieces of evidence went to Albany in their brown

8    paper bags and the bags remained sealed, correct?

9    A.  Correct.

10   Q.  When they got to Albany, obviously to be examined, somebody

11   in Albany had to open those bags; is that right?

12   A.  That's correct.

13   Q.  They opened them and resealed them when they finished with

14   their examination?

15   A.  Yes, sir.

16   Q.  And they dated the time when the bag was opened?  And they

17   dated the bag on the time it was closed right on the bag; isn't

18   that right?

19   A.  I know they date and initial when it's sealed.  I wasn't

20   aware they did it when they opened it.

21   Q.  Is that what they call bagging, signing, and sealing?

22   A.  Yeah.

23   Q.  And also a seal can be broken in a court of law because,

24   obviously, evidence has to be shown to a court or a jury or

25   whatever.  So that's another time when it's appropriate to

1    break a seal; isn't that right?

2    A.  Yes, sir.

3    Q.  But the seal shouldn't be broken under any other

4    circumstances, should it be?

5    A.  There are times when we will have requests from district

6    attorney's offices to take photographs of clothing.  So we'll

7    have an official request where they'll have us unpackage

8    something, photograph it, and repackage it.

9    Q.  When you say an "official request," do you get an order

10   from a district attorney in Orange County to open up a bag and

11   take photographs without judicial approval?

12   A.  I -- yes.

13   Q.  Yes?

14   A.  Yes, sir.

15   Q.  Under what circumstances do you do that?

16   A.  Upon them asking.

17   Q.  Do you have any written order in this case that said to you

18   open up these bags and do certain things to the contents of

19   those bags?

20   A.  I don't --

21   Q.  Photograph it or whatever?

22   A.  I don't believe so.

23   Q.  You don't believe so?

24   A.  No, sir.

25   Q.  Now, with regard to your training, specifically with DNA,

E869chr6                          Frederick - cross

1   when is it that you received your first training with respect

2   to the collection of DNA?

3   A.  It would have been the basic two-week crime scene school.

4   Q.  When was that?

5   A.  2004 or '5.

6   Q.  Where did you take this course?

7   A.  I took it at the Dutchess County Sheriff's Department.

8   Q.  Dutchess County Sheriff's Department?

9   A.  Yes, sir.

10  Q.  Who were your lecturers with regard to DNA?

11  A.  I don't recall.

12  Q.  Other than DNA what other subjects were taught during this

13  two-week course in the Dutchess County Sheriff's Office?

14  A.  Yes, sir.

15  Q.  What other subjects were taught?

16  A.  Photographing, casting foot impressions or tire

17  impressions, dusting for prints, fuming for prints.

18  Q.  A number of different areas of crime scene investigation

19  were taught during the course of these two weeks?

20  A.  Two weeks, yes, sir.

21  Q.  And how many hours, as you sit on the stand now, do you

22  recall were devoted to DNA collection?

23  A.  In that one class?

24  Q.  In the class on DNA collection, yes.

25  A.  It was probably a half a day.

1    Q.   Half a day.  And that was what eleven, twelve years ago?

2    A.   Yeah.  Yes, sir.

3    Q.   Now, were you taught about what contamination of DNA is?

4    A.   Yes, sir.

5    Q.   And what were you taught back then?

6    A.   The basic is about cross-contaminating items.

7    Q.   What is cross-contamination?

8    A.   Basically you're going to take DNA evidence from one

9    section and bring it to another section, whether you're

10   touching it -- you're touching something, you're dropping

11   something, you're putting two things together.

12   Q.   So would it be fair to say just moving into December 15 at

13   this point, 2010, when you entered the crime scene and you put

14   on rubber gloves like you did in the courtroom today and I

15   assume you put on the rubber boots also or shoe cover?

16   A.   Full Tyvek, sir.

17   Q.   And you recovered a piece of property and you put it in the

18   bag as you've described?

19   A.   Yes, sir.

20   Q.   What did you do after that?  Say you picked up the knife,

21   put it into the bag.  What was the next thing you did after

22   that?

23   A.   You throw those gloves out and you get new gloves.

24   Q.   Every time you put a piece of property into a bag you

25   changed gloves; is that right?

E869chr6                          Frederick - cross

1   A.  Any kind of bloody items, any kind of potential DNA items

2   we do it -- like when we were doing shell casings and fragment

3   projectiles, we don't.

4   Q.  So that was contamination.  What about transference?

5   A.  It all kind of falls under the same topics.  Like I said

6   you don't bag things together.  You don't lay things on top of

7   each other.  You don't pick up this bloody shirt with this

8   glove and then grab another item with the same bloody glove.

9   Q.  Earlier today when you were opening the bags up and lifting

10  the property out and putting it back in, I don't recall now,

11  did you change gloves?

12  A.  I did not.

13  Q.  So that would be contaminating all of the evidence?

14  A.  If it was evidence that had not been processed yet, yes.

15  Q.  And that's the reason why you didn't change gloves here?

16  A.  Correct.

17  Q.  But that would be an example why you would change -- was a

18  video tape made of any of the evidence retrieval at 54

19  Chambers?

20  A.  No, sir.

21       MR. GREENFIELD:  Judge, would this be a fair time to

22  stop.

23       THE COURT:  It would be.  Ladies and gentlemen, it's

24  almost 5:00.  I took some time from you yesterday so this makes

25  us even.

E869chr6                    Frederick - cross

1              So we'll see you tomorrow morning bright and early.

2     Please be in the jury room no later than 9:25 in the morning so

3     we can get started on time.  Until then please do not discuss

4     the case including on social media.

5              Please have a pleasant evening.

6              (Jury excused)

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          (Witness excused)

3          THE COURT:  Did the government get back its exhibits?

4          MR. BAUER:  The ones that were passed around?

5          THE COURT:  Yes.

6          MR. BAUER:  Yes.

7          THE COURT:  There are a number of exhibits by the

8    witness.

9          MR. BAUER:  Just a brief thing about tomorrow.  I'm

10   not sure if you had an agenda but it appears that Detective

11   Frederick might take another 30 minutes to an hour.

12         MR. GREENFIELD:  Might be more than an hour but should

13   be in that area.

14         MR. BAUER:  Then our plan is to call Anthony Baynes.

15   The direct examination, Mr. Nawaday will be doing it, it's

16   probably in the three-hour range.  And then based on

17   representations from defense counsel, it appears that there

18   will be a significant amount of cross-examination.

19         With the Court's consent we were going to not arrange

20   for any other witnesses except for Detective Frederick and

21   Mr. Baynes to be here tomorrow.  I think the chances are

22   essentially nil that anybody else will reach the witness stand.

23         MR. GOLTZER:  Probably correct.  Can't guarantee it,

24   but it's probably correct.

25         THE COURT:  That's fine.

1              MR. BAUER:  Thank you, your Honor.

2              THE COURT:  Okay, folks.

3              (Adjourned to August 7, 2014 at 9:0 a.m.)

4                          INDEX OF EXAMINATION

5        Examination of:                          Page

6        RICHARD CARRION

7        Direct By Mr. Nawaday  . . . . . . . . . . . 114

8        Cross By Mr. Greenfield  . . . . . . . . . . 136

9        Cross By Mr. Buchwald  . . . . . . . . . . . 146

10       Redirect By Mr. Nawaday  . . . . . . . . . . 152

11       Recross By Mr. Buchwald  . . . . . . . . . . 153

12        ELENA MARIA GARDNER

13       Cross By Mr. Buchwald  . . . . . . . . . . . 160

14       Cross By Mr. Greenfield  . . . . . . . . . . 166

15       Redirect By Mr. Bauer  . . . . . . . . . . . 170

16        PETER FREDERICK

17       Direct By Mr. Bauer  . . . . . . . . . . . . 172

18       Cross By Mr. Goltzer . . . . . . . . . . . . 258

19       Cross By Mr. Buchwald  . . . . . . . . . . . 270

20       Cross By Mr. Greenfield  . . . . . . . . . . 307

21

22

23

24

25

324

```
 1                          GOVERNMENT EXHIBITS

 2     Exhibit No.                                        Received

 3     250 and 251  . . . . . . . . . . . . . . . 119

 4     266  . . . . . . . . . . . . . . . . . . . 123

 5     274, 275 and 276  . . . . . . . . . . . . . 127

 6     260, 261, 262 and 263  . . . . . . . . . . 133

 7     264 and 267  . . . . . . . . . . . . . . . 134

 8     252  . . . . . . . . . . . . . . . . . . . 156

 9     904  . . . . . . . . . . . . . . . . . . . 157

10     91A through 91E  . . . . . . . . . . . . . 182

11     92A through 92F  . . . . . . . . . . . . . 185

12     1  . . . . . . . . . . . . . . . . . . . . 187

13     51  . . . . . . . . . . . . . . . . . . . . 190

14     52  . . . . . . . . . . . . . . . . . . . . 191

15     53 and 54  . . . . . . . . . . . . . . . . 192

16     55  . . . . . . . . . . . . . . . . . . . . 192

17     56  . . . . . . . . . . . . . . . . . . . . 194

18     57  . . . . . . . . . . . . . . . . . . . . 195

19     902  . . . . . . . . . . . . . . . . . . . 196

20     71  . . . . . . . . . . . . . . . . . . . . 198

21     76  . . . . . . . . . . . . . . . . . . . . 201

22     81 through 84  . . . . . . . . . . . . . . 202

23     95A through 95O  . . . . . . . . . . . . . 206

24     44  . . . . . . . . . . . . . . . . . . . . 209

25     44A  . . . . . . . . . . . . . . . . . . . 210
```

1                    GOVERNMENT EXHIBITS CONTINUED

2    Exhibit No.                                        Received

3    94A through 94ZZ . . . . . . . . . . . . . . 214

4    3    . . . . . . . . . . . . . . . . . . . . 217

5    4    . . . . . . . . . . . . . . . . . . . . 218

6    12   . . . . . . . . . . . . . . . . . . . . 225

7    6, 7, 9, 10, 11, 13, 14, 19, 21, 26,  . . . . 235

8              27, 28, 29 and 30

9    96A through D  . . . . . . . . . . . . . . . 239

10   41   . . . . . . . . . . . . . . . . . . . . 241

11   40, 40A, and 40B . . . . . . . . . . . . . . 245

12   101A through R . . . . . . . . . . . . . . . 252

13   102 and 103  . . . . . . . . . . . . . . . . 254

14   104  . . . . . . . . . . . . . . . . . . . . 256

15   105 through 110  . . . . . . . . . . . . . . 258

16                       DEFENDANT EXHIBITS

17   Exhibit No.                                        Received

18   Q   . . . . . . . . . . . . . . . . . . . . . 161

19   B-1  . . . . . . . . . . . . . . . . . . . . 283

20   P   . . . . . . . . . . . . . . . . . . . . . 306

21

22

23

24

25