3879chr1                          Trial

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA
 3              v.                              12 CR 626 (ER)
     RAYMOND CHRISTIAN a/k/a
 4   "Reckless"
     GLENN THOMAS, a/k/a "Gucci"
 5   TYRELL WHITAKER, a/k/a "Bow Wow"
                    Defendants
 6   ------------------------------x
                                               New York, N.Y.
 7                                             August 7, 2014
                                               9:18 a.m.
 8

 9   Before:
                          HON. EDGARDO RAMOS
10                                             District Judge

11
                              APPEARANCES
12   PREET BHARARA
          United States Attorney for the
13        Southern District of New York
     ANDREW BAUER
14   KAN M. NAWADAY
          Assistant United States Attorney
15
     DAVID S. GREENFIELD
16        and
     ANTHONY STRAZZA
17        Attorneys for Defendant Christian

18   LAW OFFICES OF DON BUCHWALD
          Attorney for Defendant Thomas
19   DON D. BUCHWALD

20   KELLEY DRYE & WARREN LLP
          Attorney for Defendant Thomas
21   LEVI DOWNING

22   GEORGE ROBERT GOLTZER
          and
23   YING STAFFORD
          Attorneys for Defendant Whitaker
24   -- also present--
     S.A. Andrei Petron - FBI
25
```

1             (In open court)

2             (Trial resumed; jury not present)

3             MR. NAWADAY:  Good morning your Honor there is one

4    issue we wanted to raise.  It's with respect to defendant

5    Thomas' Exhibit B1 which was the ballistics report.

6             THE COURT:  Yes.

7             MR. NAWADAY:  We would like to move to redact the

8    notations on the report which say -- list of people's names and

9    that they're suspects.

10            Our understanding of the exception is that the

11   exception is allowed to put in the out-of-court statements,

12   personal observations of a person like Dennis Lyons, the

13   ballistics technician who prepared this report.  And we have no

14   quarrel with his remarks, his conclusions about the things he

15   personally observed, which appear to be the tests he conducted

16   on the ballistics.

17            But part of the report is basically listing who the

18   suspects are.  And that comes -- it has to come not from Dennis

19   Lyons that prepared the report's personal observations but

20   basically as a way to track the case as it goes through the New

21   York State Police laboratory.

22            I can hand up a copy of defendant Thomas' Exhibit B1

23   so your Honor can see what we're talking about.  We did raise

24   this with defense counsel last night.  I spoke briefly with

25   Mr. Buchwald this morning.  He objects to redacting those

1    portions.  I think it would be misleading to the jurors if they

2    saw these statements that, you know, Raymond Christian was a

3    suspect; that a man named Treyvon Hall was a suspect.

4    Mr. Lyons has no direct personal knowledge of that.  He has no

5    personal observations he recorded to put that there.

6          I don't think it's appropriate for that portion of

7    defendant Thomas' Exhibit B1 to be before the jury.  And I

8    don't believe that the report has been published to them at

9    this stage anyway.

10          THE COURT:  I also note that B1 does not include the

11   names Glenn Thomas and Tyrell Whitaker which may account for

12   the reduction to redact.

13          MR. BUCHWALD:  That's right.  It does not, as of

14   March 17.  And it's undisputed as of March 17 the following

15   year.  It's undisputed I believe from the evidence that they

16   weren't suspects.  They weren't named until May 13 is the first

17   time or May 20 is the first time that names are ever mentioned.

18   So it, obviously, is significant to us, your Honor.

19          Our first response is many of us regret not having

20   made a particular objection at a time when something was

21   offered.  But once it's in, it's in.  And I believe that they

22   waived an objection to the extent that this is a separate

23   hearsay objection as I understand.  The relevance of this, I

24   think is clear.  Your Honor has stated what it is.  Our

25   clients, the two clients were not suspects.

1          It will be absolutely clear, as soon as Mr. Baynes

2     testifies, that Baynes, Vassel, Cromardie, Laquavious Boykin,

3     Raymond Christian, Jamar Mallory, were all suspects because

4     they're all mentioned by Baynes at one time or another in one

5     of his various versions on December 15.  So that's going to be

6     clear that they were suspects.

7          Michael Moore -- Michael Monroe, as I understand,

8     lives upstairs at some point so -- and I don't think he was

9     present at the time of the robberies, or would have been

10    natural that he would be a suspect at the time.  And Treyvon

11    Hall is the one other person.

12         And certainly I'm not, and I don't know what the

13    position of the others are, I'm not going to be contending that

14    Treyvon Hall is -- I think we outlined in our opening the

15    number of people who are implicated in this by the various

16    witnesses who are going to testify.  Treyvon Hall wasn't in my

17    list.

18         I think it will be easy to disabuse the jury -- there

19    isn't going to be any kind of surprise here.  And we would have

20    had much more extensive cross-examination of Mr. Frederick.

21         THE COURT:  Why?  What does Mr. Frederick have to do

22    with who the government is to believe was a suspect in

23    March 17, 2011.

24         MR. BUCHWALD:  Mr. Frederick -- what this list is --

25    this is simply a returning of the list -- Newburgh sends a list

1     up to Albany of -- with the exhibits.  This is just -- it's

2     just repeating the subject line.  It's a repetition of the

3     subject line.

4              THE COURT:  I understand that.  I just don't

5     understand --

6              MR. BUCHWALD:  Albany sends it back to Newburgh.

7              THE COURT:  I just don't understand your comment that

8     this would have required much more extensive cross-examination

9     of Mr. Frederick when all he did was collect pieces of evidence

10    at a particular location.

11             MR. BUCHWALD:  He collected swabs from these people.

12             THE COURT:  Right.  But he doesn't know who was

13    involved.  He doesn't know the names of the individuals.  He

14    doesn't know who the suspects were.  There would have been

15    absolutely nothing to cross him on because he would have had no

16    knowledge regarding any of these names.

17             But that aside, let me ask Mr. Nawaday:  How is the

18    government prejudiced?  What's going to come out is that at

19    some point after March 17 several other individuals who are

20    identified as suspects -- so what, that, you know, three months

21    after the incident they had not yet been identified as such?

22             MR. NAWADAY:  Your Honor I think the point is that by

23    having this in an official document that appears official it's

24    misleading to the jury.  It will call -- it asks the jury and

25    invites the jury to speculate about other people who may have

1   been involved.

2           I don't doubt that -- I don't know that the defense

3   will say their defense is, yes, there were five people involved

4   or seven people involved but it wasn't my guy.  And then there

5   are these other names there that have not been mentioned.  And

6   it's in an official document that says they are a suspect.  So

7   it just, in our view, calls for jury confusion.

8           I don't think Mr. Buchwald has named any nonhearsay

9   exception that allows these particular statements on this

10  report to come in.  To the extent Mr. Buchwald is saying that

11  we've waived the objection, I don't think there's anything in

12  the rules that says that the judge, district judge can't make

13  an evidentiary ruling and amend his evidentiary ruling

14  afterwards.

15          Frankly, Mr. Buchwald showed us -- this is our

16  document, but Mr. Buchwald showed us this document basically

17  right before he was going to use it.  And it kind of -- it did

18  catch us off guard.  And frankly, I think we just ask your

19  Honor reconsider your ruling and amend the ruling to -- so that

20  this portion can be redacted to prevent any confusion before

21  the jury.

22          THE COURT:  I'm not going to amend the ruling.  But I

23  will grant the government's requests that these names be

24  redacted.  I do find -- I do believe that the inclusion here,

25  first of all, has nothing to do with the subject matter or the

3879chr1                     Trial

1    substance of what Mr. Lyons was required to do, the fact that

2    names were provided had nothing to do -- and I'm basing this

3    purely on logic and common sense -- that the fact that suspects

4    were named or not named did not affect or would not affect the

5    substance of the analysis that Mr. Lyons would have been

6    required to do.  There is a danger that the jury might become

7    confused and distracted by the fact that there is a list of

8    names, some of whom have not been charged or will not be

9    charged or who may not even be mentioned.

10           So the names of the suspects will be redacted.

11           MR. BUCHWALD:  Your Honor, might I ask -- we haven't

12   shown it to the jury yet -- your Honor reserve on that, on the

13   representation that we're not going to show it to the jury

14   because there may be other evidence that is developed.  And I

15   would ask for an opportunity to cross-examine Mr. Frederick a

16   bit longer after Mr. Greenfield is finished and others.

17           THE COURT:  Well let's --

18           MR. BUCHWALD:  It's not confusing.  And so rather than

19   redacting it now, our representation is it's not going to go --

20   we're not going to show it to the jury at this point and your

21   Honor can make a ruling later in the case if your Honor thinks

22   it will be confusing under the circumstances.

23           THE COURT:  I suppose there is no harm in reserving

24   decision but I cannot imagine any relevant cross-examination of

25   Mr. Frederick concerning these names.

1            MR. BUCHWALD:  Let me try.

2            THE COURT:  I'll reserve.  But I can't imagine a set

3    of circumstances pursuant to which that type of

4    cross-examination or cross-examination of Mr. Frederick

5    concerning these names, how they came to be in the report,

6    etc., would be relevant.

7            And in that case it's almost 9:30.  Are we ready to

8    bring the jury out in a couple of minutes otherwise or is there

9    anything else?

10            MR. NAWADAY:  Nothing else.  Should we have the

11    witness on the stand, your Honor.

12            THE COURT:  Sure.  Let's just get a status of where

13    the jury is.  See if they're all here.

14            Who is on the stand now, currently?

15            MR. GREENFIELD:  Frederick.

16            THE COURT:  He should start making his way into the

17    courtroom if he's not.

18      PETER FREDERICK, resumed

19            THE COURT:  Good morning, sir.

20            THE WITNESS:  Good morning.

21            THE COURT:  We're bringing the jury out.

22            (Continued on next page)

23

24

25

3879chr1                         Trial

```
 1              (Jury present)
 2              THE COURT:  Good morning, everyone.  Please be seated.
 3     It's always interesting to me to see at which point in a trial
 4     the jury figures out pretty much how to march in so that
 5     they're not stepping over each other to get to their chairs.
 6              Ladies and gentlemen, Mr. Frederick is still on the
 7     stand.
 8              Mr. Frederick, you are reminded that you are still
 9     under oath.
10              THE WITNESS:  Yes, sir.
11              THE COURT:  Mr. Greenfield.
12              MR. GREENFIELD:  Thank you, Judge.
13     CROSS-EXAMINATION CONTINUED
14     BY MR. GREENFIELD:
15     Q.  Good morning, Detective Frederick.
16     A.  Good morning, sir.
17     Q.  Yesterday I was asking you a series of questions about when
18     items were bagged at the scene of the crime.  Do you recall
19     that?
20     A.  Yes, sir.
21     Q.  And you -- I think it must have been my question being
22     unclear but I'd like to go back to that portion of my
23     examination and try to clarify something with you, okay?
24     A.  Yes, sir.
25     Q.  The first time you were at the scene is approximately
```

3879chr1                    Frederick - cross

1   1 a.m., 1:30, something like that?

2   A.   Yes, sir.

3   Q.   And you see the knife on the ground?

4   A.   Yes, sir.

5   Q.   Correct.   And you box it at that time?

6   A.   It was put in a paper bag, transported to the station and

7   it was then placed in the box.

8   Q.   But clearly it was bagged and now in a sealed environment

9   as of approximately 1:30 a.m. on the early morning hours of

10  December 15, correct?

11  A.   It was not sealed.   It was placed in a bag and transported

12  to the station.

13  Q.   And it was never sealed at the scene?

14  A.   No, sir.

15  Q.   It was sealed back at the headquarters office?

16  A.   Yes, sir.

17  Q.   Is that true for every piece of evidence that was gathered

18  at 54 Chambers Street?

19  A.   That's correct.

20  Q.   Nothing was sealed at 45 Chambers Street?

21  A.   Nothing was sealed on the scene, sir.

22  Q.   Where were all these bags stored?

23  A.   As we were collecting evidence we were lining them up in

24  the first room to the left, the empty room.

25  Q.   And you were just putting them in there as you completed

3879chr1                    Frederick - cross

1   the bagging process; is that what you're saying?

2   A.  Yes, sir.

3   Q.  Do you recall as you sit on the stand now what time it is

4   that you retrieved item No. 8?

5        Would you like to look at 3524-26 to refresh your

6   recollection?

7   A.  I would, sir.

8   Q.  Please do.

9   A.  Item No. 8, the white gloves, sir?

10  Q.  Yes.

11  A.  Are you asking what time it was sealed or what time it was

12  collected?

13  Q.  The time it was collected.

14  A.  Collection time is 14:37.

15  Q.  And as soon as you collect that, based on your testimony

16  yesterday, you now change your booties and your gloves and

17  everything else; is that correct?

18  A.  Gloves.

19  Q.  Just the gloves?  That's it?

20  A.  Yes.  We don't strip.

21  Q.  You carry these gloves in your pocket as go along?

22  A.  No.  We have a box in there with us.

23  Q.  And then when is it that the next item is seized?

24  A.  Item No. 9 would be projectile fragment.

25  Q.  Now were you seizing these items or collecting these items

1    as you went further and further and further into the apartment

2    or into -- yeah I guess it's an apartment -- in a numerical

3    order, item No. 1 being the knife that was seized; No. 2, blood

4    swab that was near the knife, so on and so forth.  So as you're

5    going further and further into the apartment you're collecting

6    the items as you go?  You weren't hopscotching back and forth,

7    were you?

8    A.  Without reviewing this entire document and looking at every

9    single time that's listed, I wouldn't be able to answer that.

10   Q.  But every time that you took an item from the scene, you

11   put it in a bag and then changed the gloves?

12   A.  Anytime it was something that could possibly have some kind

13   of DNA value, yes.  When we got to several shell casings, we

14   wouldn't change our glove every time we picked up a shell

15   casing.

16   Q.  Now were fingerprints retrieved from the scene of the

17   crime?

18   A.  I don't believe there were any lifts that came.

19   Q.  That was not my question, sir.

20          My question to you is were fingerprints retrieved from

21   the scene of the crime?

22   A.  No, sir.

23   Q.  Say that again.

24   A.  No, sir.

25   Q.  Did you, in item No. 35, would you look at No. 35?  What is

1    that?  If it refreshes your recollection --

2    A.  It's listed as several plates.

3    Q.  What's that?

4    A.  Several plates.

5    Q.  What does that mean?

6    A.  Several plates.  Like eating -- dishes.

7    Q.  Eating plates?

8    A.  Yes, sir.

9    Q.  And did you retrieve or take fingerprints off the plate?

10   A.  At headquarters, yes, sir.

11   Q.  So you took the plates to headquarters?  Is that it?

12   A.  Yes, sir.

13   Q.  How many plates did you take to headquarters or other items

14   to headquarters for the removal of latent fingerprints?

15   A.  There was multiple items.  I don't recall off the top of my

16   head.

17   Q.  That was item 33.  What about item 34?  Does -- reading the

18   document I have before you, does it refresh your recollection

19   as to the retrieval of latent prints?

20   A.  It's just listed as 13 items for fingerprint processing.

21   Q.  And that -- where were those 13 items?  Do you recall?

22   A.  In the residence, throughout the residence.

23   Q.  So you lifted fingerprints in that particular -- at that

24   particular time?

25   A.  No, sir.  These 13 items were taken back to headquarters

1    and in our processing area is where all the latent work was

2    done.

3    Q.  By looking at the report in front of you, could you

4    estimate how many latent prints or possible latent prints were

5    brought back to police headquarters for the lifting of those

6    prints?

7    A.  I'm sorry.  Could you rephrase that.

8    Q.  Start with item 33.  That deals with fingerprints, correct?

9    A.  Yes, sir.

10   Q.  How about item 34?

11   A.  Yes, sir.

12   Q.  35?

13   A.  Yes, sir.

14   Q.  36?

15   A.  Yes, sir.

16   Q.  Would it be fair to say that between those four items you

17   identified what could be 67 latent fingerprints; is that right?

18   A.  No, sir.

19   Q.  What does that mean?

20   A.  This is -- it says 21 items for fingerprint processing,

21   there were 21 items that were brought in and then they were

22   dusted for fingerprints.

23   Q.  Well what were the items?  Do you have a recollection?

24   A.  Off the top of my head, I do not.

25   Q.  Well did you write a report for that day?  At the end of

1   the day when the day was over, did you prepare a report to your

2   superior officers saying what you did that day and reduce it to

3   writing on that same day?

4   A.  No, sir.

5   Q.  Did you do it the next day?

6   A.  No, sir.

7   Q.  Did you do it any day prior to today?

8   A.  No, sir.

9   Q.  So you did not prepare any report whatsoever dealing with

10  what you did during the course of your examination at the scene

11  of the crime back on December 15, 2010?

12  A.  Correct.

13  Q.  Is it your practice not to write reports?

14  A.  This chain of custody --

15  Q.  Yes or no.

16  A.  This chain of custody is considered our report.

17  Q.  Say that again.

18  A.  This chain of custody is considered our report.

19  Q.  That is considered your report?

20  A.  Yes, sir.

21  Q.  So when you say 13 items, what is your recollection of what

22  the 13 items were?

23  A.  Anything that I felt that could have a possible fingerprint

24  on it.

25  Q.  Well, was it -- like the door handle right on the door that

341

1   we have here now, did you process fingerprints off that door

2   handle?

3   A.  No, sir.

4   Q.  Did you take the door handle with you to the laboratory to

5   see if you could lift prints?

6   A.  No, sir.

7   Q.  Now there were two doors that we're dealing with, right?

8   A.  Yes, sir.

9   Q.  The front door had two handles on it, agreed?

10  A.  Yes, sir.

11  Q.  And would you agree that if somebody is entering the

12  apartment they probably have to use that handle to get in?

13  A.  Usually, yes, sir.

14  Q.  And did you take it upon yourself to go ahead and figure

15  that maybe that handle could have some fingerprints on it?

16  A.  I didn't process it, sir.

17  Q.  You didn't process it?

18  A.  No, sir.

19  Q.  And none of the handles were processed?

20  A.  No, sir.

21  Q.  And you have no recollection as you sit on the stand what

22  any one of the 67 items was but for a piece of china?

23  A.  I know there was drinking containers, like beer bottles,

24  that sort of thing.

25  Q.  And were any of the fingerprints that you lifted at the

1   police station sent to Albany for analysis?

2   A.  No, sir.

3   Q.  Why is that?

4   A.  We take the latent fingerprints to Rockland County

5   Sheriff's Department and enter them in the SABIS there.

6   Q.  Enter them where?

7   A.  SABIS is the fingerprint searching, search engine.

8   Q.  Do they issue a report saying this fingerprint belongs to

9   so and so or this fingerprint belongs to so and so?

10  A.  They do not.

11  Q.  You just give it to them and they don't report to you what

12  the results are?

13  A.  No.  I enter them.  I entered fingerprints.

14  Q.  You enter the fingerprints?

15  A.  Yes, sir.

16  Q.  And what is your training in fingerprint analysis?

17  A.  I'm a level two latent fingerprint examiner.

18  Q.  That's a lifter?

19  A.  That's a lifter and a fingerprint examiner.

20  Q.  How many hours in course did you have in fingerprint

21  analysis?

22  A.  It's a week-long school.

23  Q.  And when was that?

24  A.  I believe early in 2010.

25  Q.  Now, 67 possible latent prints?

1    A.  Yes, sir.

2    Q.  We know Tarrence Smith lived in that apartment, right?

3    A.  Maybe, sir.

4    Q.  We know Tarrence Smith was in that apartment that night,

5    don't we?

6    A.  Yes, sir.

7    Q.  We know Tarrence Smith has a criminal record, don't we?

8    A.  Okay, sir.

9    Q.  Did we get any fingerprints back for Tarrence Smith?

10   A.  I don't recall.

11   Q.  You know Akinto Boone was in that apartment that day?

12   A.  That's what I've been told, yes, sir.

13   Q.  You know he has a -- there is a fingerprint history for

14   him.  Do you know that?

15   A.  He does have a criminal history, yes, sir.

16   Q.  Did his print come up anywhere in that apartment?

17   A.  I don't recall, sir.

18   Q.  Well, did you get -- you don't recall?

19   A.  I don't recall.

20   Q.  Well did you have -- so you did have some -- some positive

21   identifications possibly -- some positive prints; isn't that

22   right?

23   A.  Yes, sir.

24   Q.  Well, whose prints were they?

25   A.  I don't recall.

1   Q.  Did you put it down in writing and say:  These are the

2   prints we have?

3   A.  We -- once the hit comes up, we verify it through a

4   ten-print card and then it's a file that's created.

5   Q.  Where's the file?

6   A.  The file's back in my office.

7   Q.  Did you turn it over to the government?

8   A.  I don't -- I don't remember, sir.

9   Q.  Incidentally, what you're saying is that you're comparing

10  whatever lifts you have to known people within Orange County;

11  is that it?  Is that where you bring your latent fingerprint

12  list?

13  A.  The way the system works is you enter the latent.  You plot

14  the latent.  It gives you back possibles and you have to

15  manually look and make the comparison.

16          Once you find one that you are satisfied that it's the

17  print, then it provides a NYSID number for that print.

18          You go back to the station.  You run the NYSID number.

19  You find out who it is.  Then you request a certified ten-print

20  card.  And then you have to do it manually again to verify.

21  Q.  And you did have some hits?

22  A.  Yes, sir.

23  Q.  And as far as you know you never told any law enforcement

24  official, any assistant district attorney, your boss, a

25  detective what the results of those hits were?

1   A.  No.  Everybody was told.

2   Q.  Everybody was told?

3   A.  Yes.  My bosses knew.  The district attorneys knew.

4   Q.  You walked in and you told them face-to-face rather than

5   writing it down on a report?

6   A.  Yes, sir.

7   Q.  What if you tell it to your boss and the next day he dies

8   so nobody now knows what you told him?

9   A.  Like I said, there's a file that's made.

10  Q.  Where is the file?

11  A.  I explained before.  The file is at my office.

12  Q.  Now incidentally, as I understand it, you're comparing

13  latent prints against known people whose fingerprint is on file

14  within Orange County?

15  A.  New York State.

16  Q.  Full-state basis?

17  A.  Yes, sir.

18  Q.  Now you were talking yesterday about a buccal swab --

19  excuse me one second.

20          You were talking about the buccal swab.  It was

21  taken -- when was the buccal swab of my client taken?

22  A.  Without either referring to the item number here or seeing

23  the box, I don't know.

24  Q.  Seeing the box containing the buccal swab that my client

25  gave in 2010?

3879chr1                        Frederick - cross

1  A.  I'm sorry.  What was the question?

2  Q.  In preparation for trial, have you seen the buccal swab

3  that contained my client's swab that was given in 2010?

4  A.  I'm assuming so, yes.

5  Q.  Assuming so.  It should have been kept, right?

6  A.  Yeah.

7  Q.  Any reason -- withdrawn.

8          So you don't know the day it was taken as you sit on

9  the stand?

10  A.  No, sir.

11  Q.  Were you present when it was taken?

12  A.  I don't believe so.  And I don't know which defendant is

13  your client, sir.

14  Q.  Well, were you present -- prior to the murder in

15  December 15 of 2010, were you present for the swabbing of any

16  defendant in this case?  Any defendant in this case?

17  A.  I don't believe so.

18  Q.  You were given a swab with regard to Raymond Christian, is

19  that not correct, by a member of the -- by somebody?

20  A.  I believe so.

21  Q.  And do you know who that person is?

22  A.  I do not.

23  Q.  It was a member of the City of Newburgh police department?

24  A.  I would assume so but sometimes we get them from members of

25  the district attorney's office as well.

Q.  When you received this swab, do you have an idea about what

date it was?

A.  It would -- like I said, if I had an item number I could

look it up.  If it's involving this case.  If not, if we have

the box, I could look at the box.

Q.  Well, let's get -- assume -- just assume now, that a swab

was taken September of 2009, a buccal swab, voluntarily given

by the individual.

A.  Okay.

Q.  What should happen with that swab as far as the rules and

regulations of the Newburgh police department?

A.  It should be cataloged and entered into evidence.

Q.  And when you say entered as evidence, put into the chain of

custody that we were talking about?

A.  That is correct.

Q.  So, assume again.  If a swab is taken by Raymond Christian

on October 7, 2010 the appropriate and proper procedure would

be to place it into the chain of custody that has been

established in the property clerk's office of the City of

Newburgh police department?

A.  Yes, sir.

Q.  Can you think of any reason why it wouldn't be put in the

same day it was taken?

A.  For myself, speaking for myself?

Q.  Speaking for yourself, yes?

1    A.  Unless something major happened where we had to leave the

2    station in an emergency situation, as far as myself goes, no.

3    Q.  Now what -- assume again that a swab was taken October 7,

4    2010 and it's not put into the system, the chain of custody

5    system, and it's just left laying around somewhere, what

6    becomes of the integrity of that item?

7    A.  Somebody is going to have to do a lot of explaining.

8    Q.  A lot of explaining.

9    A.  I would say so.

10   Q.  And would it not be fair to say that that item is subject

11   to contamination?

12   A.  If the box is sealed --

13   Q.  Maybe not.  What if it's left in a hot environment locked

14   away somewhere, put in a drawer and not touched for

15   two-and-a-half months, would there be degradation?

16   A.  I -- from what I've been told, yes.  I'm not a scientist

17   but I would agree with that statement.

18   Q.  And it would be certainly subject to tampering by somebody

19   who has a motive to tamper with it?

20   A.  If somebody like that existed, yes.

21   Q.  But can you quickly check through 3524-26 and see if a

22   buccal swab taken on October 7, 2010 of Raymond Kristen is in

23   the -- if it refreshes your recollection whether or not a

24   buccal swab taken of Raymond Christian is in the chain of

25   custody.

1          MR. BAUER:  Your Honor, the government is willing to

2     stipulate that there is no record of this October 7 swab in

3     this document before Detective Frederick.

4          THE COURT:  Okay.

5          MR. GREENFIELD:  It's been agreed by the parties that

6     it's not in there.

7     BY MR. GREENFIELD:

8     Q.  So might it have been entered into the system under another

9     number?

10    A.  Yes, sir.

11    Q.  Have you been asked to check the system to see if it was

12    entered under another number?

13    A.  I don't remember.

14    Q.  Now incidentally, is your system, the fingerprint system,

15    is that hooked into the FBI's fingerprint system?

16    A.  The system in Rockland County, sir?  From my understanding

17    is the administrator of the SABIS unit at the end of the month

18    all the ULs, unidentified latents, are then entered into the

19    FBI system.

20          THE COURT:  I'm sorry.  You mentioned the name of this

21    system at Rockland County.  Could you spell it.

22          THE WITNESS:  It's S-A-B-I-S.

23          THE COURT:  S-A-B-I-S?

24          THE WITNESS:  Yes.

25          THE COURT:  Thank you.

3879chr1                          Frederick - cross

1    Q.  Do you remember how many fingerprint hits there were?

2    A.  I believe there was three.  And I think they all came back

3    to the same party.

4    Q.  Now, when is it that you received this swab, from whoever

5    it is that gave it to you?

6    A.  Without having chain of custody report or the box --

7    actually the chain of custody report would tell me.  Without

8    having the chain of custody report for that item, I have no

9    idea.

10   Q.  Well clearly -- withdrawn.

11            If it was in any chain of custody you would have had

12   to retrieve it yourself, wouldn't you, since you were the

13   custodian of the property?

14   A.  One of us would have.

15   Q.  So, am I correct in assuming if it was any case, chain of

16   custody, somebody would have told you go to case number 1234

17   and go get us a buccal swab that was put into the system back

18   on October 7, 2010?  Wouldn't that be a fair statement?

19   A.  Yes, sir.

20   Q.  Do you recall that happening?

21   A.  I do not.

22   Q.  So you're saying it didn't happen?

23   A.  I'm saying I don't remember.

24   Q.  So would it be fair to say from the date the swab was made

25   until you received it in the property clerk's office you have

1    no idea what was done with that swab, who dealt with it or who

2    in any way may have touched it?

3    A.   Correct.

4    Q.   Approximately what day after October 15 -- withdrawn.

5              What day after December 15, 2010 did you receive the

6    swab?

7    A.   I have no idea.

8    Q.   Well, we know that the murder took place on December 15.

9    We know, don't we, that any items that you seized during the

10   course of your crime scene functions and property clerk

11   functions, everything was sent to Albany on December 21, 2010;

12   am I right?

13   A.   Yes, sir.

14   Q.   So that's a six-day window we're looking at?

15   A.   Okay.

16   Q.   Do you remember when it is that you, looking at that

17   six-day window now, when it is that you received the buccal

18   swab of Raymond Christian?

19   A.   No, sir.

20   Q.   When you received it, after you received it, did you enter

21   it into your property clerk's chain of custody for the murder

22   of Mr. Henry?

23   A.   No, sir.  This is the same one we just said it's not in

24   here?

25   Q.   The one that's sitting in front of you, yes.

3879chr1                              Frederick - cross

1    A.   We just agreed that -- we all stipulated it's not in here.

2    Q.   So you didn't put it in?

3    A.   No.  Because it was taken for another case, it's got to go

4    under that case number.

5    Q.   Now, did you send it to Albany at a certain point?

6    A.   I believe so.

7    Q.   You have no recollection, again, if you personally did it?

8    A.   I don't.

9    Q.   Did there come a time on December or in December,

10   particularly December 21 of 2010, that a representative of the

11   New York State Police laboratory, a fell know named Irv Klein

12   came to pick up all the evidence to bring it up to the lab?

13   A.   No, sir.

14           Irv Klein?

15   Q.   Or Mr. Klein.

16   A.   Is it Investigator Klein?

17   Q.   Investigator Klein?

18   A.   I'm asking?  I don't -- sometimes -- sometimes

19   investigators from the state police will transport things to

20   Albany for us in major cases.  But depending on what paperwork

21   you have, I know if we submit DNA and ballistic evidence to the

22   lab at Stewart Airport they have people that transport every

23   Thursday from there to Albany.

24   Q.   Well, by referring to 3524-26 could you quickly look at

25   that and see if your recollection is refreshed as to who picked

1   up the property from your office and transported it to Albany.

2   A.   Investigator Klein, yes, sir, New York State Police.

3   Q.   And he took all the property from your office that you had

4   to send to Albany and he brought it up there?

5   A.   Yes, sir.

6   Q.   Correct?  And that occurred on December 21, 2010 sometime

7   in the morning hours?

8   A.   Yes, sir.

9   Q.   Now, with regard to the ski mask that you recovered at 54

10  Chambers Street -- may I have that, actually?

11          MR. GREENFIELD:  May I approach the witness, judge?

12          THE COURT:  You may.

13  Q.   Could you open this up, please.  And remove the mask and

14  the other contents.

15          MR. GREENFIELD:  Your Honor, may I stand near the

16  witness while we're discussing this?

17          THE COURT:  Sure.  Just keep your voice up.

18          MR. GREENFIELD:  I will.

19          May I see the bag first?

20          THE WITNESS:  The paper bag or plastic bag?

21          MR. GREENFIELD:  Yes.  The paper bag.

22          THE WITNESS:  There you go, sir.

23  BY MR. GREENFIELD:

24  Q.   Now, looking -- this is in evidence.  Looking at -- this

25  bag contains a written record of the chain of custody, correct?

1    A.  Yes.

2    Q.  This bag shows that on December 15, 2010 you placed it in a

3    bag at 14:38 hours?

4    A.  Yes, sir.

5    Q.  Can I have it back?

6    A.  Here you go.

7    Q.  And this bag shows that on December 15 you sealed it?

8    A.  Correct.

9    Q.  And this bag also shows that on December 21, 2010 RLK, most

10   probably RL, not knowing what that means, but K meaning Klein

11   picked it up from you and brought it to Albany?

12   A.  Quite possibly.

13   Q.  Well do you know anybody who handled that bag besides

14   yourself on December 21, 2010?

15   A.  No, sir.

16   Q.  Didn't you say before you gave it to Klein?

17   A.  I'm sorry.

18   Q.  Didn't you say before you gave it to Inspector Klein?

19   A.  Oh, yes, sir.  Sorry.  I misunderstood.

20   Q.  And there's a seal opened on the top of the bag.  Is that a

21   New York State Police seal?

22   A.  Yes, sir.

23   Q.  So when it got to the laboratory that's what that

24   indicates, correct?

25   A.  Yes, sir.

1    Q.  What date was it opened in the laboratory?

2    A.  Well, it's dated on 12-28.  So I don't know if that's the

3    open date or the reseal date.

4    Q.  But clearly the only date from the laboratory on that bag

5    is December 28, 2010?  Other than Klein taking it into

6    possession?

7    A.  Yes, sir.

8    Q.  Now, could you open the mask up.

9         Did you ever open that -- this envelope during the

10   time from December 15, 2010 to December 21, 2010 and remove

11   that mask and take swabs from that mask?

12   A.  I do not believe so.

13   Q.  You do not believe so or you didn't?

14   A.  I did not.

15   Q.  You did not?

16   A.  No.

17   Q.  Did you ever tell the grand jury that at some point after

18   December 15 and before December 21, 2010 you removed all the

19   items of clothing from the bags and you photographed them and

20   took blood stain swabs from them?

21   A.  If it's in the grand jury record, then yes.

22   Q.  Well would you like to read your grand jury testimony

23   for -- would you like to read your grand jury testimony and see

24   if it refreshes your recollection?

25   A.  Sure.

3879chr1                    Frederick - cross

1    Q.  I'm going to show you what's been marked as grand jury --

2    withdrawn -- as 3524-17.  And ask you to direct your attention

3    to page 28 through page 32.

4    A.  Okay.  Thank you.  (Pause)

5            Yes, sir.

6    Q.  Is your recollection refreshed now?

7    A.  Yes, it is.  Thank you.

8    Q.  What occurred?

9    A.  (No response).

10   Q.  What happened when you opened the bag?  Did you open the

11   bag containing the ski mask?

12   A.  I did not.

13   Q.  Who did, if anybody?

14   A.  The lab opened this bag.

15   Q.  The lab opened the bag?

16   A.  Yes, sir.

17   Q.  That would be on December 28.

18   A.  I'm not sure.  Like I said, I don't know if that's the

19   sealed date or an open date.

20   Q.  Let me ask you this:  Were any swabs sent with regard to

21   that mask from the Orange County property clerk's office to

22   Albany brought up there by Inspector Klein?

23   A.  No, sir.

24   Q.  Now, Inspector Klein indicates that he received five swabs

25   from that mask.  Would he be correct or incorrect?

3879chr1                        Frederick - cross

1   A.  Five swabs from this mask from my office?

2   Q.  Yes.

3   A.  Incorrect, sir.

4   Q.  Say that again.

5   A.  Incorrect, sir.  I didn't swab this mask.  I swabbed some

6   clothing but not this mask.

7   Q.  So the mask was not swabbed by you?

8   A.  No, sir.

9   Q.  Was it swabbed by anybody else?

10  A.  I'm assuming at the lab somebody did it.

11  Q.  You're assuming?

12  A.  Yes.  But I don't -- I can't say for certain.  I wasn't

13  there with them.

14  Q.  Are you familiar with the procedures at the lab and how

15  they work up there?

16  A.  I'm going to say no.

17  Q.  Would it be fair to say that they have a similar system in

18  the laboratory -- in the New York State Police lab to your

19  chain of custody -- to your chain of custody?

20  A.  It's the exact same system, sir.

21  Q.  It's the same system?

22  A.  That's why we bought it.

23  Q.  So, when whatever you gave to Inspector Klein gets up there

24  to the laboratory, it goes into the chain of custody, correct?

25  A.  Correct.

1   Q.  So, for instance, the ski mask went into the chain of

2   custody on whatever time, whatever moment Klein got to Albany

3   and gave it to the property clerk, correct?

4   A.  Yes, sir.

5   Q.  And if you didn't create swabs, no swab should have been

6   turned over to the property clerk in the New York State Police

7   lab because there were no swabs, correct?

8   A.  Correct.

9   Q.  Dealing with the ski mask?

10  A.  Correct.

11  Q.  And if there were, then we have a mystery, right?

12  A.  Yes, we do.

13  Q.  Now what formal education -- do you have any formal

14  education in the taking of swabs for DNA purposes -- for

15  laboratory DNA purposes?

16  A.  Just the crime scene schools I've been to.  That's it.

17  Just the crime scene schools I've been to, sir.

18  Q.  And approximately how many hours of classes did you take

19  involving DNA training for performance of laboratory-related

20  functions?

21  A.  As far as what the lab does, no training.

22          As far as the actual collection aspect of it, yes.

23  Q.  But you did do swabbing of some of the evidence in this

24  case, according to your testimony; isn't that correct?

25  A.  Yes, sir.

3879chr1                        Frederick - cross

1    Q.  You did open up bags of evidence in your offices and

2    swabbed some of those pieces of evidence for crime scene -- for

3    laboratory analysis purposes, correct?

4    A.  Correct.

5    Q.  What items are those?

6    A.  It was clothing items, sir.  I don't recall --

7    Q.  You don't recall that?

8    A.  I could refresh.  I believe --

9    Q.  Please refresh.

10   A.  They are listed in the grand jury testimony.

11   Q.  Refresh.

12   A.  They were our City of Newburgh items Nos. 60, 61, and I

13   believe it says 63, which are:  City of Newburgh item No. 60 is

14   a gray sweatshirt; City of Newburgh item No. 61 is a black

15   sweatshirt; and City of Newburgh item No. 63 are bluejeans.

16   Q.  Now, yesterday you said when you opened the bags that were

17   containing these clothing items we had determined to streamline

18   them.  You said "we."  Who are the we that made that

19   determination?

20   A.  It would have been -- that decision would have been made in

21   cooperation with the district attorney's office and my

22   superiors.

23   Q.  And the lead detective in the case?

24   A.  More than likely.

25   Q.  And the lead detective's name is?

1    A.  I believe it's Joe Cortez.  Yes, sir.  Joseph Cortez.

2    Q.  But as you sit on the stand today you have no recollection

3    of removing that mask and making swabs prior to it being turned

4    over to Investigator Klein, swabs from that mask?

5    A.  Correct.

6    Q.  Would you go through the process -- not go through the

7    process.  Explain the process of how you removed these items

8    that you did remove and tested or removed swabs from.

9    A.  Yes, sir.

10   Q.  Do you understand my question?

11   A.  I do.  I believe so.  I'll start and if I'm not answering

12   it properly I'm sure you'll let me know.

13        Basically what we'll do is we'll get a fresh piece of

14   butcher paper, like I explained yesterday, we put it on the

15   table.  The bag is opened.  The item is laid out onto the bag.

16   We will identify an area that would be a stain.  We will then

17   swab it, using two sterile -- basically really large Q-tips and

18   you will moisten it up with some sterile water by -- you drop

19   the water from above onto it.  You don't ever touch the Q-tips.

20   You deposit it from above.

21        Then you will, in a circular motion or a rolling

22   motion put the moistened Q-tips into the stain.  Most of the

23   time you'll see some kind of color transfer so you know you're

24   actually picking up some kind of -- biological evidence,

25   especially when you're dealing with blood, you'll get a reddish

1    or brownish coloring onto the Q-tips.

2            It's then placed into a little box, a little box which

3    contains -- we'll write date, time, person who is doing it, and

4    usually we'll put some type of item number on that box.  That

5    box is then placed into an envelope and sealed.

6            The stain on the shirt is then identified usually with

7    magic marker.  We'll go around it.  So if we have to go back

8    later on and say where we got it exactly from we can now say it

9    came from within this magic marker square or circle.

10           The swab is then eventually placed into evidence and

11   given a -- an item number.  Sometimes each swab box themselves

12   will get an item number.  Sometimes if we're taking multiple

13   swabs it will be item No. 37, twelve swabs.

14   Q.  If I could interrupt you now.

15   A.  Yes, sir.

16   Q.  Where was this performed?  Is there a room within police

17   headquarters that has a sterile laboratory environment?

18   A.  No, sir.

19   Q.  Is there a room within the police headquarters for the

20   taking of laboratory quality samples from items seized in

21   evidence -- seized during the course of investigation?

22   A.  You said laboratory quality?

23   Q.  Yes.

24   A.  We just work in our office.  It's not a sterile

25   environment.

1   Q.  When you say in your office, you mean your personal office

2   or in the property clerk's office in general?

3   A.  My personal -- it's all one and the same.

4   Q.  Well, you use your regular desk?

5   A.  No.  We have several work tables within the office.

6   Q.  Okay.  And you keep saying we, we, we.  Give me names.  Not

7   we-s but names.

8   A.  Yes, sir.  Sergeant Vancura, Detective Burns and myself all

9   at that time shared the same office area and that's where we

10  work from.

11  Q.  Repeat those names again?

12  A.  Detective Kevin Burns, Sergeant Peter Vancura V-A-N-C-U-R-A

13  all shared the same office, large office.  We all worked in it.

14  And it has the stations that we work -- not just our desk but

15  also tables we work from, we do work from.

16  Q.  That's your recollection as to where this procedure took

17  place that you've just described?

18  A.  Yes, sir.

19  Q.  How long did it take?

20  A.  Probably just several minutes for each piece of clothing.

21  Q.  Well did you gather any -- put it on the table, how did

22  that go?

23  A.  I'm sorry.  Did I gather?

24  Q.  Withdrawn.

25        What equipment did you use to make your cuttings?

1    A.  I didn't do any cuttings, sir.

2    Q.  Didn't do any cutting at all?

3    A.  No, sir.

4    Q.  So all you used was swabs?

5    A.  Correct.

6    Q.  And did you have them laid out in front of you?

7    A.  (No response).

8    Q.  How many swabs -- are they individual kits is what I'm

9    saying.

10   A.  Basically the Q-tips come in a big box.  They are

11   individually packaged, two Q-tips per package, I think they

12   come a hundred to a box.  The water is in a one-ounce squeeze

13   bottle.  And the cardboard boxes come I think 50 to a package.

14   Q.  I think you also -- withdrawn.

15           Did you photograph the items which you did these

16   swabbings on?

17   A.  Yes, sir.

18   Q.  As you sit on the stand now, do you recollect what day this

19   happened.

20   A.  Can I refresh?

21   Q.  Please.

22   A.  (No response).

23   Q.  What are you using to refresh your recollection?

24   A.  The chain of custody report, sir.

25           It looks like it's February 1, 2011 around 1500 hours.

3879chr1                    Frederick - cross

1    Q.  So this didn't occur prior -- withdrawn.  This occurred

2    after a good portion of the evidence went up to the lab on

3    December 21, 2010?

4    A.  Yes, sir.

5    Q.  So, again, putting aside this incident where apparently

6    something happened between December 21, 2010 and -- what was

7    that February date you just mentioned in 2011?

8    A.  February 1, yes, sir.

9    Q.  Go back to that period of time between December 15, 2010

10   and December 21, 2010, and I asked you the same question.  Did

11   you or anybody in your labor your office remove that ski mask

12   and take swabs off of that ski mask?

13            MR. BAUER:  Objection.  Asked and answered a number of

14   times, your Honor.

15            THE COURT:  Sustained.

16            MR. GREENFIELD:  Different point in time, judge.

17            THE COURT:  What's the point of time?

18            MR. GREENFIELD:  He's referring -- he says in the

19   grand jury to other items that occurred at a different point of

20   time.  That's why I was referring back to this last question.

21            THE COURT:  You can answer the question.

22            THE WITNESS:  No swabs were ever taken from this mask

23   by a member of my department.

24   Q.  By you?

25   A.  By me.

3879chr1                         Frederick - cross

1    Q.  By you?

2    A.  By me.

3    Q.  Now would you say the procedure you used for opening up the

4    bags and swabbing them for laboratory purposes was not the

5    usual procedure?

6    A.  We normally -- we normally don't do it.  We'll normally

7    send it to the lab to be done.  But sometimes -- not always --

8    sometimes we will be asked to do things like that.

9    Q.  The lab function to make the swabs and to make the

10   cuttings; isn't that correct?

11   A.  Yeah, one of the functions up there, yes, sir.

12   Q.  And in your career how many times have you broken the chain

13   of custody and opened a bag in the laboratory and taken

14   swabbings?

15   A.  A couple dozen.

16   Q.  A couple thousand?

17   A.  Dozen.

18   Q.  Dozen.  Now, clearly, if the bag should have been opened

19   during December 15 through December 21 an indication should

20   have been put on the bag that it had been opened, correct?

21   A.  Correct.

22   Q.  Just check one second, your Honor.

23            THE COURT:  Yes.

24            (Pause)

25            MR. GREENFIELD:  Nothing further, judge.

3879chr1                     Frederick - cross

1          THE COURT:  Mr. Goltzer, you weren't going to

2    cross-examination, correct?

3          MR. GOLTZER:  No, thank you, judge.

4          THE COURT:  Any redirect?

5          MR. BAUER:  Yes, your Honor.  Thank you.

6    REDIRECT EXAMINATION

7    BY MR. BAUER:

8    Q.  Mr. Greenfield was just asking you a number of questions

9    about your testimony before the grand jury.  Do you recall

10   those questions?

11   A.  Yes, sir.

12   Q.  And he showed you your grand jury testimony, correct?

13   A.  Correct.

14   Q.  That's 3524-17.  It's still before you.

15   A.  Yes, sir.

16   Q.  And he referred you to page 32 where you testified about

17   taking certain items of clothing out of the bags and swabbing

18   them, correct?

19   A.  Correct.

20   Q.  And he asked you a number of questions about swabbing --

21   swabbing those articles of clothing, right?

22   A.  Correct.

23   Q.  I think he even used the term breaking chain of custody.

24   Do you remember those questions?

25   A.  Yes, sir.

1    Q.  On page 32, I think you made it clear that the articles of

2    clothing that you testified about before the grand jury, that

3    you pulled out of the bags and swabbed, those were the articles

4    of clothing that you had gotten from the hospital, right?

5    A.  Yes, sir.

6    Q.  I'm going to ask you to refer to page 30, just two pages

7    before in your transcript.

8    A.  Yes, sir.

9    Q.  And now on page 30 does that refresh your recollection

10   about your -- about the testimony that you provided with regard

11   to the mask as well as a white glove?

12   A.  Yes, sir.

13   Q.  And before the grand jury what did you say about how you

14   handled the mask?

15   A.  It basically I describe wearing rubber gloves, placing it

16   in a bag, sealing the bag, and then having the bag sent to

17   Albany.

18   Q.  Specifically didn't you say that -- that you collected the

19   rubber gloves, you placed it into a paper bag, sealed it, and

20   then it is not opened until it's sent out?

21   A.  Yes.

22   Q.  So when Mr. Greenfield pointed you to the testimony about

23   you opening bags, it had nothing to do with the mask, correct?

24   A.  Correct.

25          MR. BUCHWALD:  Objection, your Honor.  I think the

3879chr1                    Frederick - redirect

1    reference was to page 28 to 32 when Mr. Greenfield asked the

2    questions.

3              THE COURT:  Overruled.

4    Q.  Again, sticking with the mask, Mr. Greenfield asked you a

5    number of questions about who swabbed the mask.  Do you recall

6    those questions?

7    A.  Yes, sir.

8    Q.  I think you answered a number of times that it was not you,

9    correct?

10   A.  Correct.

11   Q.  Do you know -- do you know if your office received the

12   swabs that were taken from that mask at any point?

13   A.  Yes, sir.

14   Q.  You do.  And would that information be in the chain of

15   custody report?

16   A.  It would, sir.

17   Q.  I'd like you to -- to refer you to 3524-26 that chain of

18   custody report and I can shortcut this by referring you to page

19   71.  Items 3(a) through 3(e).

20   A.  Yes, sir.

21   Q.  Is your recollection refreshed as to items 3(a) through

22   3(e)?

23   A.  Yes, sir.

24   Q.  What are items 3(a) through 3(e)?

25   A.  Swabs that were -- swabs that we got back from the lab that

3879chr1                          Frederick - redirect

1   are listed that they came from the mask.

2   Q.  And what date did your office receive those swabs?

3   A.  February 22.

4   Q.  February 22?

5   A.  Sorry.  March -- 3-22.

6   Q.  March 22 of what year?

7   A.  2011.

8   Q.  So the first time those swabs entered the Newburgh PD

9   according to your chain of custody report was March 22, 2011?

10  A.  Correct.

11  Q.  Mr. Greenfield was also asking you about a buccal swabs

12  from October 7, 2010 of Raymond Christian.  Do you remember

13  those questions?

14  A.  Yes, sir.

15  Q.  Did you work on that case -- a case involving an October 7,

16  2010 buccal swab of Raymond Christian?

17  A.  I don't remember to be quite honest with you.

18  Q.  Sitting here today do you remember anything about that

19  case?

20  A.  No, sir.

21  Q.  Do you know if it was incident to an arrest or some other

22  reason that the buccal swab was taken?

23  A.  I have no idea, sir.

24  Q.  You just don't know?

25  A.  At all.

3879chr1                    Frederick - redirect

1   Q.  Mr. Greenfield asked you a couple of questions about

2   fingerprint hits in this case.  Do you remember those

3   questions?

4   A.  Yes, sir.

5   Q.  He's asking you where was that file, the file that you

6   wrote down what the fingerprint hits were.  Do you remember

7   those questions?

8   A.  Yes, sir.

9   Q.  Now, during the course -- during the last three plus years

10  you've interacted with a number of lawyers and case agents who

11  are involved in this case, correct?

12  A.  Yes, sir.

13  Q.  Have you interacted with an ADA?

14  A.  Yes, sir.

15  Q.  Have you interacted with me and Mr. Nawaday?

16  A.  Yes, sir.

17  Q.  Have you interacted with FBI agents?

18  A.  Yes, sir.

19  Q.  Have you interacted with Newburgh PD detectives?

20  A.  Yes, sir.

21  Q.  During the course of the last three-and-a-half years have

22  one of them, even if you don't remember which one, asked you

23  for your file?

24  A.  No, sir.

25  Q.  Nobody has asked you for your file for the fingerprints?

371

3879chr1                    Frederick - redirect

1    A.   I don't know if anybody -- I just -- we never are brought

2    to talk to somebody about those.   I just --

3              MR. GREENFIELD:   Your Honor, may we have a sidebar?

4              THE WITNESS:   -- bring it.

5              THE COURT:   Okay.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              MR. GREENFIELD:  Judge we were going to go to trial,

3      it was April, I think it was, when I had told you in your other

4      courtroom that we didn't receive any reports with regard to

5      fingerprint analysis done by this witness.  That's the primary

6      reason we adjourned the trial from April until today, to this

7      date.  And it sounds like they're now going to come forward

8      with some reports that I have never received.

9              The only thing I received when we got to my question

10     back then about the fact that we didn't have any latent

11     fingerprint results was that they came back negative.  Or there

12     were no reports.  There is nothing with regard to the

13     fingerprints.  And that's what I was told.  A letter was

14     written in that regard I think by Mr. Nawaday.

15             MR. BAUER:  The point of this question is I don't want

16     it to be -- want to make it clear that we asked for the file

17     and that he provided information either via file or verbally.

18     So we weren't withholding information from defense or from the

19     jury.  So that's the whole reason I'm asking these questions.

20     I don't want the jury to be left with the impression that we've

21     been holding back information.

22             MR. GREENFIELD:  I don't want to be saying that in

23     front of a jury.

24             MR. BAUER:  It's not about the report.  It's about the

25     information.

1           THE COURT:  I'm trying to figure out what's happened

2    here.  Is there a report that was prepared by this witness?

3           MR. BAUER:  He has notes.

4           THE COURT:  So he has notes.

5           MR. BAUER:  He has notes in a file.

6           THE COURT:  And were they requested of him?

7           MR. BAUER:  They were.

8           THE COURT:  Did he turn them over?

9           MR. BAUER:  I believe he -- I believe he provided the

10   information orally which we then communicated to them.

11          THE COURT:  To them being who?  Being the defense

12   lawyers?

13          MR. BAUER:  Defense, yes.

14          THE COURT:  When did that happen?

15          MR. GREENFIELD:  I received nothing, judge, other than

16   one sentence in a -- basically there was no results.

17          MR. BAUER:  Right.

18          MR. GREENFIELD:  That doesn't sound like -- he said

19   there were results.

20          MR. BAUER:  Why don't I leave this line of questioning

21   for now and I'll just move on and we'll talk to --

22          THE COURT:  Are you intending to rely on any report or

23   any conclusions --

24          MR. BAUER:  No.

25          THE COURT:  -- conclusions that Mr. Frederick obtained

1   from the fingerprints?

2            MR. BAUER:  No.

3            THE COURT:  Okay.

4            MR. BAUER:  I'll move on.

5            MR. GREENFIELD:  We move to strike his testimony.

6            MR. GOLTZER:  The problem is that there's the

7   potential of the violation of the witness advocacy rule because

8   the government is now placing its own credibility before the

9   jury.  No one is contesting the government's good faith.  The

10  problem is this witness isn't keeping proper records.

11           MR. BAUER:  Do you want to strike the last couple

12  questions?

13           MR. GOLTZER:  I think that's the application, is to

14  strike the last questions and answers.

15           MR. BAUER:  That's fine.  Let's deal with this later.

16  That's fine.

17           THE COURT:  Okay.  How many questions was that?  The

18  last two?

19           MR. BAUER:  I think it was -- I think it was one

20  question, one long question and one follow-up.

21           MR. NAWADAY:  David, which question did you want

22  stricken?  It was just this last one?

23           MR. GREENFIELD:  Just having a conference with

24  cocounsel.

25           (Pause)

3879chr1                          Frederick – redirect

1              THE COURT:  The last two.

2              MR. GREENFIELD:  Just leave it as it.

3              THE COURT:  Okay.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  Mr. Bauer.

3    BY MR. BAUER:

4    Q.  I am going to move on, Detective Frederick.  Just a couple

5    of quick things.

6              Mr. Greenfield asked you about whether you swabbed

7    this door, this big door, Government Exhibit 40, for

8    fingerprints.  Do you remember that question?

9    A.  If I dusted it for fingerprints?

10   Q.  Yes.

11   A.  Yes.

12   Q.  I believe you had said that you did not?

13   A.  Correct.

14   Q.  Why is that?  Why wouldn't you dust something like a door

15   handle for fingerprints?

16   A.  We had multiple members of the agency go through that door,

17   go through the front door when they had to do a sweep of the

18   apartment originally.

19   Q.  So what does that mean for you in terms of fingerprint

20   collection?

21   A.  Basically it's been compromised already.

22   Q.  OK.  Yesterday Mr. Buchwald asked you questions,

23   hypothetical questions about whether somebody could shoot from

24   the inside of 54 Chambers through the front door if both the

25   interior door and the exterior door were open.  Do you remember

1   those questions?

2   A.  Yes, sir.

3   Q.  Then he asked you some follow-up questions about whether --

4   he asked you about the holes in this door, Government Exhibit

5   40, and then he asked you questions about the front door.  Do

6   you remember those questions?

7   A.  Yes, sir.

8            MR. BAUER:  Ms. McInerney if we could pull up

9   Government Exhibit 92B again.

10  Q.  I believe yesterday you testified this was a photograph

11  that you took in the early morning hours of December 15, 2010.

12           Do you remember that?

13  A.  Yes, sir.

14  Q.  What is it a picture of?

15  A.  The front door of 54 Chambers.

16  Q.  Are there any bullet holes through that front door?

17  A.  No, sir.

18  Q.  Mr. Buchwald yesterday asked you a number of questions

19  about the number of shell casings and the number of projectiles

20  that were collected at the crime scene.  Do you remember those

21  questions?

22  A.  Yes, sir.

23  Q.  Then he referred briefly to the fragments that you had

24  collected.  Do you remember those questions?

25  A.  Yes, sir.

E87nchr2                         Frederick - redirect

1    Q.  And in particular, you testified yesterday about fragments

2    Government Exhibits 6, 9, 26 and 29.  Do you remember looking

3    through those yesterday?

4    A.  Yes, sir.

5    Q.  Now, those fragments, do you know one way or the other

6    whether they were part of the projectiles that you collected?

7    A.  No, sir.

8    Q.  Meaning is it possible that those fragments came from

9    different bullets and not the same bullets that you collected?

10   A.  Anything is possible, sir, yes, sir.

11             MR. GOLTZER:  Object to the speculation.  Move to

12   strike.

13             THE COURT:  Sustained.

14   Q.  Do you know if those fragments definitively belonged to the

15   bullets that you collected?

16   A.  I do not.

17   Q.  Now, yesterday you testified about nine-millimeter guns and

18   .380s and your personal experience with those types of guns.

19             Do you remember those questions?

20   A.  Yes, sir.

21   Q.  In particular, you had said that, based on your experience

22   that you cannot fire a nine-millimeter bullet from a .38 gun,

23   or I believe that's what you had said.

24   A.  I believe I think I said I don't know if you can or not.

25   Q.  That's my question.

1   A.  OK.

2   Q.  Do you know one way or the other if you can fire a

3   nine-millimeter round from a .38-caliber weapon?

4   A.  I do now.  I tried to chamber a nine-millimeter in one of

5   my .38s last night, and it won't fit in the cylinder, because I

6   was curious about what the man said.

7   Q.  You did that last night?

8   A.  Yes, sir.

9   Q.  Do you know one way or the other if there are other ways

10  for a nine-millimeter bullets to fit in a .38 gun?

11  A.  I do not.

12  Q.  Do you know in particular if you were to shave down or

13  otherwise try to make the nine-millimeter fit into a .38

14  whether it would fit?

15          MR. BUCHWALD:  Objection as to speculation.

16          MR. BAUER:  I'm asking if he knows.

17          MR. BUCHWALD:  He says he didn't know.

18          THE COURT:  Overruled.

19  Q.  Do you know if it's possible to shave down a

20  nine-millimeter bullet to fit into a .38-caliber weapon?

21  A.  I do not know.

22  Q.  Finally, Detective Frederick, Mr. Greenfield kept asking

23  you a number of questions about things that you tested, did you

24  test this?  Did you test that?  Do you remember those

25  questions?

1   A.  Yes, sir.

2   Q.  Yesterday, you testified that the primary purpose of your

3   job when you go to a crime scene is to collect evidence,

4   correct?

5   A.  Yes, sir.

6   Q.  Do you test evidence?

7   A.  Not normally.

8   Q.  What is your normal job?

9   A.  Normal job is we document, collect, catalog, and either

10  store or send it somewhere.

11          MR. BAUER:  Judge, just one moment.

12  Q.  I'm sorry.  Just to be clear, collecting, does that include

13  a buccal swab?  Would you consider that a collection or a test?

14  A.  Collection.

15  Q.  What about the DNA swabs that you took from those

16  sweatshirts?

17  A.  Collection.

18          MR. BAUER:  No further questions, your Honor.

19          THE COURT:  Mr. Buchwald, any recross?

20          MR. GOLTZER:  I have no recross, your Honor.

21          MR. BUCHWALD:  I have no recross.

22          MR. GREENFIELD:  I have a few questions.  I can do it

23  from here, Judge.

24          THE COURT:  I can't hear you from there.

25          MR. GREENFIELD:  I can do it from here.

1          THE COURT:  As long as you speak into the microphone.

2     I can't hear you if you are not near a microphone.

3          MR. GREENFIELD:  I can go over to the lectern.

4     RECROSS EXAMINATION

5     BY MR. GREENFIELD:

6     Q.  Your job is evidence collection, correct?

7     A.  Yes, sir.

8     Q.  Your job is not preparing any evidence for examination in a

9     laboratory.  That's the laboratory's function, correct?

10    A.  Yes, sir.

11    Q.  You were asked to look at 3524-26.  I think you said on

12    page 71 it indicates that on March 22, 2011, you received some

13    swabs back from the laboratory indicating they were 3A through

14    3E, am I right?

15    A.  I'm just making sure I have all the numbers correct here.

16    Q.  Take your time.

17    A.  3A through 3E, yes.  Correct.

18    Q.  All right.  Would that be the first entry for 3A, 3B, 3C,

19    3D, and 3E in the chain of custody with regard to this case?

20    A.  Yes, sir.

21    Q.  If the New York State Police lab said that your office, the

22    property clerk's office sent them 3A, 3B, 3C, 3D and 3E on

23    December 21, 2010, you couldn't account for how that happened

24    because you have no entry with regard to those swabs prior to

25    March 22, 2011?

E87nchr2                        Frederick - recross

1   A.  Yes, sir.

2            MR. GREENFIELD:  No further questions.

3            THE COURT:  Anything further?

4            MR. BAUER:  No, your Honor.

5            THE COURT:  Mr. Frederick, you may step down.

6            THE WITNESS:  Thank you, your Honor.

7            THE COURT:  Ladies and gentlemen, it's a quarter to

8   11, so let's take our morning break now.  15 minutes, please.

9   Be in the jury room no later than 11 a.m.

10           (Jury not present)

11           THE COURT:  You may step down.

12           THE WITNESS:  Thank you, your Honor.

13           (Witness excused)

14           THE COURT:  It will be Mr. Baynes next?

15           MR. NAWADAY:  Yes, your Honor.

16           THE COURT:  Anything for me?

17           MR. GOLTZER:  11 o'clock?

18           THE COURT:  Sorry?

19           MR. GOLTZER:  11?

20           THE COURT:  11.

21           (Recess)

22

23

24

25

 1                (Jury present)

 2                THE COURT:  Everyone please be seated.  Will the

 3      government please call its next witness.

 4                MR. NAWADAY:  The government calls Anthony Baynes.

 5                THE COURT:  Mr. Baynes, please stand, face the clerk

 6      and raise your right hand.

 7        ANTHONY BAYNES,

 8            called as a witness by the Government,

 9            having been duly sworn, testified as follows:

10                THE COURT:  Mr. Baynes, please be seated.  Bring your

11      seat forward, and I want you to speak directly into the

12      microphone, and I want you to speak clearly and slowly, OK,

13      when you answer the questions.

14                THE WITNESS:  OK.

15                THE COURT:  You need to say the word yes in response

16      to the questions, OK?

17                THE WITNESS:  Yes.

18      DIRECT EXAMINATION

19      BY MR. NAWADAY:

20      Q.  Do you have any nicknames?

21      A.  Yes.

22      Q.  What are they?

23      A.  My last name, Baynes, and Little.

24                THE COURT:  I am sorry.  Could you bring the

25      microphone a little closer and speak directly into the

1    microphone.  Please repeat your answer.

2    A.  Baynes and Little.

3    Q.  How old are you?

4    A.  21.

5    Q.  Are you married?

6    A.  No.

7    Q.  Do you have children?

8    A.  No.

9    Q.  Have you committed any crimes in your life?

10   A.  Yes.

11   Q.  What kind of crimes?

12   A.  Robbery, holding guns, selling drugs, burglaries.

13   Q.  Have you ever committed any assaults?

14   A.  Yes.

15   Q.  Have you ever committed any robberies during which someone

16   was shot and killed?

17   A.  Yes.

18   Q.  Around when did that happen?

19   A.  December 15, 2010.

20   Q.  Where did that robbery and shooting happen?

21   A.  54 Chambers Street, Newburgh, New York.

22   Q.  What were you looking to rob?

23   A.  A drug dealer of weed and money.

24   Q.  Were you looking to rob drugs?

25   A.  Yes.

E87nchr2                    Baynes - direct

1   Q.  What kind of drugs?

2   A.  Any -- crack, weed, anything.

3        MR. GREENFIELD:  Your Honor, can you have the witness

4   speak up.

5        THE COURT:  Yes.  I'm sorry, Mr. Baynes.  I know it's

6   difficult.  Can you bring your face closer to the microphone.

7   Q.  Did you commit that robbery alone or with others?

8   A.  No, no.  With others, with others.

9   Q.  Who?

10  A.  Raymond, Gucci, Bow Wow, Quay Quay, Baby E, Bash.

11  Q.  You mentioned somebody named Raymond.  Did you know Raymond

12  by any other names?

13  A.  Reckless, Reckless.

14  Q.  You mentioned somebody named Gucci.  Did you know that

15  person by any other names?

16  A.  Glenn.

17  Q.  You mentioned somebody named Bow Wow?

18  A.  Tyrell.

19  Q.  You mentioned somebody named Bash.  Did you know that

20  person by another name?

21  A.  Rashawn.

22  Q.  You mentioned someone named Quay.  Quay did you know that

23  person by another name?

24  A.  Laquavious.

25  Q.  You mentioned somebody named Baby E.  Did you know that

E87nchr2                          Baynes - direct

 1   person by another name?

 2   A.  Eric.

 3   Q.  Looking around the courtroom do you recognize anyone with

 4   whom you committed that robbery on December 15, 2010?

 5   A.  Yes.

 6   Q.  Who do you recognize?

 7   A.  Reckless, Bow Wow, and Gucci.

 8   Q.  Starting with Reckless.  Please describe the person, what

 9   that person you knew as Reckless is wearing, an article of

10   clothing that they are wearing and where they are sitting or

11   standing, where they are.

12   A.  White shirt, blue and white tie, and to my right.

13   Q.  Where in the courtroom do you see this person?

14   A.  To my right.

15   Q.  Could you describe any other persons that this person is

16   sitting next to or around?

17   A.  Sitting like next to two lawyers, one with a blue tie, one

18   with a red tie in a suit.

19          MR. NAWADAY:  May the record reflect that the witness

20   has identified the defendant Raymond Christian.

21          THE COURT:  The record will so reflect.

22   Q.  You mentioned that you see Gucci in the courtroom.  Please

23   describe an article of clothing that that person is wearing and

24   where they are sitting or standing in the courtroom.

25   A.  Like a gray shirt, he got glasses, he's in between two

E87nchr2                         Baynes - direct

1    lawyers, one gray tie, one gray shirt -- I mean gray suit.

2            MR. NAWADAY:  May the record reflect that the witness

3    has identified Glenn Thomas.

4            THE COURT:  The record will so reflect.

5    Q.  Please describe an article of clothing that Bow Wow is

6    wearing and where Bow Wow is in the courtroom.

7    A.  He's next to two lawyers, white shirt, in between a female

8    and a man.

9            MR. NAWADAY:  May the record reflect that the witness

10   has identified Tyrell Whitaker.

11           THE COURT:  The record will so reflect.

12   Q.  Were any guns used during this robbery?

13   A.  Yes.

14   Q.  Where did some of the guns come from?

15   A.  Someone named L-1.

16           MR. GREENFIELD:  I can't hear the witness.

17   A.  L-1.

18   Q.  Mr. Baynes, please keep your voice up and speak directly

19   into the microphone.

20   A.  Yes.

21   Q.  Did you know L-1 by any other names?

22   A.  No.

23   Q.  Mr. Baynes, I'm going to hand you what's been marked for

24   identification as Government Exhibits 201, 202 and 203.  Please

25   take a look at those and tell me if you recognize them, and if

1   you do, please tell us what they are.

2   A.   Yes.   Pictures of people that I committed the crimes with.

3   Q.   What does Government Exhibit marked for identification 201

4   appear to be?

5   A.   Raymond, Reckless.

6   Q.   The person you identified as Reckless?

7   A.   Yes.

8   Q.   Do you know Raymond's last name?

9   A.   Christian.

10  Q.   And Government Exhibit 202, who does that depict?

11  A.   Gucci.

12  Q.   Does that appear to be a fair and accurate photograph of

13  Gucci?

14  A.   Yes.

15  Q.   Do you know Gucci's last name?

16  A.   No, I -- no.

17  Q.   Government Exhibit 203, what does that appear to be?

18  A.   Bow Wow.

19  Q.   Is that a fair and accurate photograph of Bow Wow?

20  A.   Yes.

21            MR. NAWADAY:  The government offers Government

22  Exhibits 201, 202 and 203.

23            THE COURT:  Any objection?

24            MR. BUCHWALD:  May I just see them.

25            No objection.

1          THE COURT:  201, 202 and 203 will be received.

2          (Government's Exhibits 201, 202 and 203 received in

3    evidence)

4    Q.  Mr. Baynes, I'm going to hand you what has been marked for

5    identification as Government Exhibit 201A, 201B, 202B, and

6    203B.

7          What is 201A and B?

8    A.  Raymond, Christian, and Reckless.

9    Q.  Are those --

10   A.  Names.

11   Q.  The names Raymond, Christian, and Reckless?

12   A.  Yes.

13   Q.  And 202B?

14   A.  Gucci.

15   Q.  The name Gucci?

16   A.  Yes.

17   Q.  And 203B?

18   A.  The name Bow Wow.

19          MR. NAWADAY:  The government offers Government

20   Exhibits 201A, 201B, 202B and 203B.

21          MR. GOLTZER:  No objection.

22          MR. GREENFIELD:  No objection.

23          MR. BUCHWALD:  These are as aide-mémoires?

24          THE COURT:  I'm sorry.

25          MR. BUCHWALD:  Are these simply as aids to the jury?

1    Otherwise they have no independent purpose.

2                THE COURT:  The objection is overruled.

3                The exhibits will be received.

4                (Government's Exhibits 201A, 201B, 202B and 203B

5    received in evidence)

6                MR. NAWADAY:  Your Honor, permission to put these

7    exhibits on the board and also to publish on the screens

8    Government Exhibits 201, 202 and 203.

9                THE COURT:  You may.

10   Q.  Mr. Baynes, I'm going to hand you what has been marked for

11   identification as Government Exhibits 205, 204, and 207.

12               Please look at these and tell me if you recognize

13   them.

14   A.  Yes.

15   Q.  What do they appear to be?

16   A.  The people I did this crime with.

17               MR. GOLTZER:  I'm sorry, Judge.  I just can't hear

18   anything.

19               THE COURT:  Can you repeat that Mr. Baynes.

20               THE WITNESS:  The people I did the crime with in this

21   case.

22               MR. GOLTZER:  Still can't hear it.

23               THE COURT:  People I did this crime with in this case.

24   Q.  Mr. Baynes, please keep your voice up.  And speak directly

25   into the microphone.

1              Government Exhibit 216, which is already in evidence.

2    Do you recognize that?

3    A.  Yes.

4    Q.  What is it?

5    A.  Me.  A picture of me.

6    Q.  Government Exhibits, I'm going to hand you for

7    identification 216A and 216B, are those name plates with your

8    name and your nickname?

9    A.  Yes.

10             MR. NAWADAY:  The government offers Government

11   Exhibits 216A and 216B.

12             MR. GOLTZER:  No objection.

13             THE COURT:  Those will be received.

14             (Government's Exhibits 216A and 216B received in

15   evidence)

16   Q.  Starting with what's been marked for identification as

17   Government Exhibit 204, do you see that in front of you,

18   Mr. Baynes?

19   A.  Yes.

20   Q.  What is that?

21   A.  A picture of L-1.

22   Q.  Did you know L-1 by any other names?

23   A.  No.

24   Q.  I'm going to hand you Government Exhibit marked for

25   identification Government Exhibit 204B.  Is this just a

E87nchr2                          Baynes - direct

1    nameplate that says L-1?

2    A.   Yes.

3    Q.   The government offers Government Exhibit 204 and 204B.

4            MR. GOLTZER:  No objection.

5            THE COURT:  204 and 204B will be received.

6            (Government's Exhibits 204 and 204B received in

7    evidence)

8    Q.   Moving on to what's been marked for identification as

9    Government Exhibit 205, do you recognize that?

10   A.   Yes.

11   Q.   What is it?

12   A.   A picture of Bash.

13   Q.   I am going to hand you Government Exhibit marked for

14   identification 205B.  Is that just a nameplate that has the

15   name Bash?

16   A.   Yes.

17           MR. NAWADAY:  The government offers Government

18   Exhibits 205 and 205B.

19           MR. GOLTZER:  No objection.

20           THE COURT:  205 and 205B will be received.

21           (Government's Exhibits 205 and 205B received in

22   evidence)

23   Q.   Government Exhibit marked for identification 207, do you

24   recognize that?

25   A.   Yes.

E87nchr2                        Baynes - direct

1   Q.   What is it?

2   A.   A picture of Quay Quay.

3   Q.   Do you know Quay Quay's full name?

4   A.   Laquavious Boykin.

5   Q.   I'm going to hand you what's been marked for identification

6   as Government Exhibits 207A and 207B.  Are these just

7   nameplates that say the names Quay Quay and Laquavious Boykin?

8   A.   Yes.

9            MR. NAWADAY:  The government offers Government

10  Exhibits 207, 207A and 207B.

11           MR. GOLTZER:  No objection.

12           THE COURT:  207, 207A and 207B will be received.

13           (Government's Exhibits 207, 207A and 207B received in

14  evidence)

15  Q.   And Government Exhibit 208 marked for identification, what

16  is that?

17  A.   A picture of Baby E.

18           THE COURT:  You said Baby E?

19           THE WITNESS:  Yes.

20           THE COURT:  Thank you.

21  Q.   I am going to show you Government Exhibit marked for

22  identification 208B.  Is that just a nameplate with the name

23  Baby E?

24  A.   Yes.

25           MR. NAWADAY:  The government offers Government

E87nchr2                         Baynes - direct

1    Exhibits 208 and 208B.

2              MR. GOLTZER:  No objection.

3              THE COURT:  208 and 208B will be received.

4              (Government's Exhibits 208 and 208B received in

5    evidence)

6    Q.  Generally, what was each person's role with the 54 Chambers

7    Street robbery?

8    A.  Reckless and L-1 was like the planners.  L-1 was also a

9    supplier.  And everybody else was the robbers.  And me and Quay

10   Quay was like robbers and lookouts.

11   Q.  You said L-1 was the supplier.  The supplier of what?

12   A.  The guns.

13   Q.  I want to turn to your background.  Are you a United States

14   citizen?

15   A.  Yes.

16   Q.  Where were you born?

17   A.  In Westchester.

18   Q.  Where did you grow up?

19   A.  Newburgh.

20   Q.  What area of Newburgh?

21   A.  On the south side, South Street, South Street.

22   Q.  How far did you get in school?

23   A.  To 11th grade.

24   Q.  Which school did you go to when you stopped going?

25   A.  NFA.

E87nchr2                          Baynes - direct

1    Q.   What is NFA?

2    A.   Newburgh Free Academy.

3    Q.   Did you go in the daytime or night?

4    A.   Nighttime.

5    Q.   Around when did you stop going in the day?

6    A.   Like two or three months before this case happened, this

7    started.

8    Q.   Around what months and year did you stop going to the day

9    program at NFA?

10   A.   Like October, around October 2010.

11   Q.   Why did you stop going to the day program?

12   A.   I got suspended.

13   Q.   For what?

14   A.   For a fight.

15   Q.   Who did you fight?

16   A.   Somebody named -- I forgot his name.

17   Q.   How old were you in October 2010?

18   A.   17.

19   Q.   Where do you currently live?

20   A.   MCC.

21   Q.   What is the MCC?

22   A.   Federal holding facility.

23   Q.   That is a federal jail?

24   A.   Yes.

25   Q.   How long have you been at the MCC?

E87nchr2                        Baynes - direct

1   A.   Two years, around two years.

2   Q.   Where were you before you were brought to the MCC?

3   A.   At Orange County facility.

4   Q.   At a state prison?

5   A.   Yes.

6   Q.   Did there come a time when you spoke with Newburgh

7   detectives about the robbery and shooting at 54 Chambers?

8   A.   Yes.

9   Q.   Around when was the first time you spoke with them?

10  A.   The night of December 15.

11  Q.   About how soon after the robbery and shooting was that?

12  A.   Right after.  It was like probably an hour.

13  Q.   Where were you when you spoke with them?

14  A.   The hospital in Newburgh.

15  Q.   Which hospital?

16  A.   St. Luke's.

17  Q.   In Newburgh?

18  A.   Yes.

19  Q.   What did you tell them?

20  A.   That I walked inside of the robbery and ended up being

21  robbed and stabbed, too.

22           MR. GOLTZER:  We didn't hear, Judge.

23  A.   I walked inside of a robbery and ended up being stabbed and

24  robbed, too.

25  Q.   Did you tell them that you participated in --

1             MR. BUCHWALD:  Objection.

2             THE COURT:  Sustained.

3             MR. NAWADAY:  May I approach, your Honor?

4             MR. GOLTZER:  May we have that read back -- I'm sorry,

5     it's very difficult -- the answer.

6             (Record read)

7             MR. NAWADAY:  May we approach, your Honor?

8             THE COURT:  Yes.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E87nchr2                        Baynes - direct

1           (At sidebar)

2           MR. NAWADAY:  I believe the objection is a hearsay

3      objection.

4           MR. BUCHWALD:  Leading.

5           MR. NAWADAY:  It is not being offered for the truth.

6      I asked him what did you tell them.

7           THE COURT:  Was that the objection.

8           MR. BUCHWALD:  The objection was leading.  My

9      objection was leading.

10          THE COURT:  OK.  As to leading, I am going to overrule

11     it.  This is obviously an important witness, but we are having

12     some difficulty with him.  To the extent we can get through

13     this material, I don't think that this particular question and

14     answer or this particular question is controversial.

15          MR. BUCHWALD:  We disagree, your Honor.

16          MR. GOLTZER:  It's critical.

17          MR. BUCHWALD:  It is critical.

18          THE COURT:  What he asked was what did you tell him.

19          MR. GOLTZER:  There are numerous statements that are

20     contradictory that come in over a number of hours of

21     questioning.  To the extent that he can or can't recall, the

22     jury should be able to evaluate his demeanor without the

23     prosecutor injecting himself into the process.

24          MR. BUCHWALD:  What did he tell him is fine.  That is

25     a nonleading question.  I think the last one that I objected to

1   was in very leading form.  What did he will tell them I have no

2   objection to.  That's fine.

3          MR. GOLTZER:  There is no hearsay objection.

4          THE COURT:  OK.

5          MR. NAWADAY:  I just want to make sure.  I thought my

6   last question was, Did you tell them about your involvement.

7          THE COURT:  Right.  That was the last question.

8          MR. NAWADAY:  I don't think that is a leading

9   question.  It's a yes or no.  Though it is a yes or no answer,

10  it's not leading because the answer isn't presented in the

11  question.

12         MR. BUCHWALD:  First you have to exhaust what he

13  remembers telling them before you can go into did you tell him

14  this did you tell him that.

15         MR. GOLTZER:  To the extent that you are suggesting

16  the subject matter before he can recount what happened, you are

17  suggesting an answer.

18         MR. BUCHWALD:  That is fair.  You have to ask him

19  first for a narrative.  Then, if there's something you believe

20  he left out, we can deal with it.

21         THE COURT:  OK.  See if you can't do that.

22         MR. GOLTZER:  Thank you.

23         (Continued on next page)

24

25

1

2              (In open court)

3    BY MR. NAWADAY:

4    Q.  I will rephrase the last question.  What do you mean by

5    that you told them you walked into a robbery?

6    A.  That I saw a robbery -- I went there to buy drugs, and I

7    saw a robbery happen.  And that's when I was trying to leave,

8    and they grabbed me.

9    Q.  Who grabbed you?

10   A.  The people that was robbing, the robbers.

11   Q.  What did you tell the Newburgh Police Department at that

12   point about what happened to you next?

13   A.  That I was stabbed, and after that I was stabbed and I got

14   out free and ran away.

15   Q.  Was that true?

16   A.  No.

17   Q.  That night did you tell the Newburgh Police Department

18   anything else about what happened?

19   A.  No.

20   Q.  About how long did you speak with the Newburgh Police

21   Department then?

22   A.  For hours.

23           MR. GREENFIELD:  May we have a time frame.

24   Q.  That night?

25   A.  For hours, hours and hours.

E87nchr2                    Baynes - direct

1   Q.  Was that the only thing you told them that night, what you

2   just said?

3   A.  That I can think of, that's it.

4   Q.  Did there come a time when you were charged with the

5   robbery that happened that night?

6   A.  Yes.

7   Q.  Around when was that?

8   A.  April 6, 2011.

9   Q.  Who prosecuted you for that robbery?

10  A.  The state.

11  Q.  Prior to that arrest and prosecution, had you ever been

12  arrested and convicted of anything?

13  A.  No.

14  Q.  What were you initially charged with by the state?

15  A.  Murder, robbery, burglary, and possession of a weapon,

16  assault.

17  Q.  Did there come a time when you pled guilty?

18  A.  Yes.

19  Q.  What did you plead guilty to?

20  A.  To a robbery.

21  Q.  Was that pursuant to a cooperation agreement?

22  A.  Yes.

23  Q.  With what agency?

24  A.  The state and federal, both.

25  Q.  In order to get that cooperation agreement, what did you

1    have to do?

2    A.  I had to tell them everything I did before, before and

3    after again about that crime, for that crime.

4    Q.  Did you only have to tell them about the robbery?

5    A.  No.  Everything.

6    Q.  What do you mean by everything?

7    A.  Stuff that happened before, years, years before.

8    Q.  Did you have to tell them about other crimes you have

9    committed?

10   A.  Yes.

11   Q.  Who were you telling these things to?

12   A.  The state.

13   Q.  Who was typically there when you met with the state?

14   A.  My lawyer, the DA, and a state, a state detective.

15   Q.  About how many meetings did you have with the state

16   prosecutors?

17   A.  I didn't understand.

18   Q.  About how many meetings?

19   A.  Probably around five.

20   Q.  Did you ultimately admit to your participation in the

21   robbery?

22   A.  Yes.

23   Q.  Did you describe the participation of others?

24   A.  Yes.

25   Q.  What is your understanding of your obligations under your

E87nchr2                           Baynes - direct

1     cooperation agreement?

2     A.  I tell the truth, don't lie, and get a recommendation.

3     Q.  Mr. Baynes, I'm going to hand you what's been marked for

4     identification as Government Exhibit 422.  I will ask you to

5     look at it and please tell us if you recognize it.

6     A.  Yes.

7     Q.  What does this appear to be?

8     A.  The agreement that I had to sign.

9     Q.  Turning to the last page of what's been marked for

10    identification as Government Exhibit 422.  Do you recognize any

11    signatures?

12    A.  Yes.

13    Q.  Whose signatures do you recognize?

14    A.  Mine and my lawyer.

15    Q.  The government offers Government Exhibit 422.

16             MR. GOLTZER:  No objection.

17             MR. BUCHWALD:  No objection.

18             THE COURT:  422 will be received.

19             (Government's Exhibit 422 received in evidence)

20    Q.  Is that your cooperation agreement, Government Exhibit 422?

21    A.  Yes.

22    Q.  What is your understanding of what you have to do under

23    your cooperation agreement?

24    A.  I have to tell everything that happened and testify on this

25    case.

E87nchr2                           Baynes - direct

1   Q.  Are you allowed to lie under your agreement?

2   A.  No.

3   Q.  Are you allowed to commit more crimes?

4   A.  No.

5   Q.  Do you have to tell the government about all the crimes you

6   committed and all the people you committed them with?

7   A.  Yes.

8   Q.  What is your understanding what the government has to do if

9   you do what you are supposed to do under your agreement?

10  A.  A lower sentence.

11  Q.  I think you mentioned a recommendation.

12  A.  Yes.

13  Q.  What is your understanding of what this recommendation is?

14  A.  That I get a letter to the judge for a lower sentencing.

15  Q.  And who sends that letter?

16  A.  The prosecutors.

17  Q.  And who gets that letter?

18  A.  The judge.

19  Q.  If the judge gets that letter, what can the judge do?  What

20  is your understanding?

21  A.  Sentence me to anything lower.

22  Q.  What is your understanding of, if the judge gets that

23  recommendation, the lowest sentence you could get?

24  A.  Time served.

25  Q.  If you get that recommendation, what's the highest sentence

405

1   you can get?

2   A.  17.

3   Q.  17 what?

4   A.  Years.

5   Q.  What sentence are you hoping to get?

6   A.  Time served.

7   Q.  If you don't get a recommendation letter, what is your

8   understanding of what sentence you could possibly get?

9   A.  17 years here on a possible federal indictment.

10          MR. GOLTZER:  Possible what?

11          THE WITNESS:  Federal indictment.

12  Q.  About how many people did you tell the government you

13  committed crimes with?

14  A.  Around 15.

15  Q.  Do you know what the government did with that information

16  you provided?

17  A.  No.

18  Q.  Were you ever a member of a gang?

19  A.  Yes.

20  Q.  Which gang?

21  A.  Star Status.

22  Q.  Did you tell the government about members of Star Status?

23  A.  Yes.

24  Q.  Under your agreement, did you have to testify against any

25  of them if called upon?

1    A.  Yes.

2    Q.  Did you consider any of the members of Star Status your

3    friends?

4    A.  Yes.

5    Q.  Would you have to testify against them under your

6    agreement?

7    A.  Yes.

8    Q.  Does your sentence depend on the outcome of this trial?

9    A.  No.

10   Q.  What is your understanding of what happens if you lie under

11   your agreement?

12   A.  I will have no agreement.

13   Q.  What is your understanding of what happens if you tell the

14   truth?

15   A.  Then I get the recommendation.

16   Q.  What sentence are you hoping to get?

17   A.  Time served.

18   Q.  Has anyone told you what sentence you will get?

19   A.  No.

20   Q.  Who decides your sentence?

21   A.  The judge.

22   Q.  In what court did you plead guilty?

23   A.  State.

24   Q.  Where did you go after you pleaded guilty in state court?

25   A.  To the fed, federal case.

1   Q.   Did there come a time when you had meetings with

2   representatives of the federal government?

3   A.   Yes.

4   Q.   Approximately how many meetings did you have?

5   A.   Around five to ten.

6   Q.   Who was typically present?

7   A.   The DA, sometimes my lawyer and an FBI agent.

8   Q.   What did you have to talk about during those meetings?

9   A.   This case and cases and crimes I committed before this

10   case.

11   Q.   What kinds of crimes did you talk about?

12   A.   Robberies, selling drugs of all sorts, and holding guns.

13   Q.   I want to talk about some of the crimes that you told the

14   government about.  Have you ever stolen any cars?

15   A.   Yes.

16   Q.   How many times have you done that?

17   A.   Twice.

18   Q.   And what did you do --

19            MR. BUCHWALD:  I was going to ask you to keep your

20   voice up, too.  I'm sorry.

21   Q.   What did you do with the cars you stole?

22   A.   Just rode around Newburgh in them.

23   Q.   Mr. Baynes, please keep your voice up.  Did you steal those

24   cars alone or with other people?

25   A.   With other people.

E87nchr2                         Baynes - direct

1   Q.  Who did you steal those cars with?

2   A.  Somebody named Geo, G., Snipes, that's it that I can think

3   of.

4   Q.  Did you steal anything out of the cars you stole?

5            MR. BUCHWALD:  Can we have that read back.  I'm sorry.

6   A.  Geo, G. and Snipes.

7            MR. BUCHWALD:  Three people?

8            THE WITNESS:  Yes.

9   Q.  Did you steal anything out of those cars?

10  A.  Yes.

11  Q.  What?

12  A.  Radio systems, money, iPods, anything that we could find.

13  Q.  Around what year did you steal those cars?

14  A.  '08, '09.

15  Q.  About how many robberies have you committed?

16  A.  Around five, six.

17  Q.  Who did you typically rob?

18  A.  Drug dealers.

19  Q.  Why did you target drug dealers?

20  A.  Because they had the most money on them.

21  Q.  Did you do those robberies alone or with others?

22  A.  With others.

23  Q.  Who did you commit those robberies with?

24  A.  Somebody -- Reckless, Quay Quay --

25           MR. BUCHWALD:  Your Honor, can we break them down.  We

E87nchr2                              Baynes - direct

1    have been talking about six all together.

2              THE COURT:  To the extent that you can, Mr. Nawaday.

3    Q.  Mr. Baynes, just generally, who did you commit the

4    robberies with?

5    A.  Reckless.

6              MR. BUCHWALD:  Again, objection, your Honor, because

7    the prosecutor is lumping together other robberies with a

8    robbery that --

9              THE COURT:  The objection will be overruled.

10   Q.  Who did you commit robberies with?

11   A.  Reckless, Quay Quay, Marcus.

12   Q.  Anyone else?

13   A.  Freaky.

14             MR. GOLTZER:  Freaky?

15             THE WITNESS:  Yes.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1    Q.   You mentioned robberies.  About how many robberies did you

2    do with Reckless?

3    A.   Around four.

4    Q.   How did you first meet Reckless?

5    A.   Through his little brother.

6    Q.   Who is his little brother?

7    A.   Quay Quay.

8    Q.   About how long have you known Reckless?

9    A.   Since '09 or '08.  Around '08.

10   Q.   Were you ever part of any gangs with Reckless?

11   A.   Yes.

12   Q.   What gang?

13   A.   Star Status.

14   Q.   Who else was in Star Status?

15   A.   Quay Quay, Marcus, James, Pooters, T'Andre.

16   Q.   Do you know someone named Quick?

17   A.   Quick, yes.

18   Q.   Was quick a member of Star Status?

19   A.   No.

20   Q.   You mentioned somebody named Freaky?

21   A.   Yes.

22   Q.   Who is Freaky?

23   A.   T'Andre's older brother.

24   Q.   Did you know Freaky by any other names?

25   A.   Tyrik.

E879chr3                              Baynes - direct.

1   Q.  Was Freaky a member of Star Status?

2   A.  Yes.

3   Q.  I'm going to hand you was been marked for identification as

4   Government Exhibit 209 and -- 209.

5          Do you recognize that?

6   A.  Yes.

7   Q.  Who is that?

8   A.  Freaky.

9          MR. NAWADAY:  Government offers Government Exhibit

10  209.

11         THE COURT:  Any objection?

12         MR. GOLTZER:  Just for the record we wish to preserve

13  all prior objections to the nature of the testimony in general

14  so we won't --

15         THE COURT:  Very well.

16         MR. GOLTZER:  We won't mention that we have an

17  objection to the upcoming exhibits.

18         THE COURT:  I'm sorry.

19         MR. GOLTZER:  We're not going to mention that we have

20  no objection to upcoming exhibits because we had prior

21  conversations about this type of testimony.

22         THE COURT:  Very well.

23  Q.  I'm going to hand you what's been marked for identification

24  Government Exhibit 211.  Do you recognize that?

25  A.  Yes.

E879chr3                          Baynes – direct.

1   Q.  What is it?

2   A.  A picture of Geo.

3           MR. NAWADAY:  Government offers Government Exhibit

4   211.

5           THE COURT:  I'm sorry?

6           THE WITNESS:  Geo.

7           THE COURT:  211 will be received.  Did I receive 209?

8   If I did not, I will.  209 is received.

9           (Government's Exhibits 209 and 211 received in

10  evidence)

11  Q.  Who is Geo?

12  A.  The person that I did burglaries and was riding in the cars

13  with, one of them.

14  Q.  Are you talking about the stolen cars?

15  A.  Yes.

16  Q.  Geo you're referring to?

17  A.  Yes.

18          THE COURT:  I'm sorry.  Mr. Baynes when you were

19  testifying earlier about stolen cars you said that you did that

20  with Geo, G, was that another person?

21          THE WITNESS:  Yes.

22          THE COURT:  And then there was a third person that you

23  said.

24          THE WITNESS:  Snipes.

25          THE COURT:  Thank you.

E879chr3                         Baynes - direct.

1   BY MR. NAWADAY:

2   Q.  I'm going to hand you what's been marked for identification

3   Government Exhibit 212.  Do you recognize that?

4   A.  Yes.

5   Q.  What is it?

6   A.  A picture of Quay.

7           MR. NAWADAY:  Government offers Government Exhibit

8   212.

9           THE COURT:  212 will be received.

10          (Government's Exhibit 212 received in evidence)

11  Q.  Around when were you in Star Status with Reckless?

12  A.  '09 to this case.

13  Q.  And around what year was Star Status formed?

14  A.  '09.

15  Q.  How was it formed?

16  A.  We was a part of a gang called Black Flag and Reckless went

17  to branch off to make his own.

18  Q.  Do you know what ranks are?

19  A.  Yes.

20  Q.  What are ranks?

21  A.  A level of position that people have.

22  Q.  Did you have any rank at Star Status?

23  A.  Yes.

24  Q.  What was your rank?

25  A.  I was second.

E879chr3                           Baynes - direct.

1   Q.  Did Reckless have any rank status?

2   A.  Yes.

3   Q.  What was that?

4   A.  He was first.

5   Q.  In 2009 2010 how often did you see Reckless?

6   A.  Almost everyday.

7   Q.  What did you typically do with him when you saw?

8   A.  I partied, drink, went to school together, everything.

9   Q.  What school was that?

10  A.  NFA.

11  Q.  I want to talk about some of the robberies you committed

12  with Reckless.  Did you ever rob someone outside of a party?

13  A.  Yes.

14  Q.  And around when did that happen?

15  A.  Around '010.

16  Q.  What happened?

17  A.  We was inside of the party, Reckless came to me and Freaky

18  and told us that there was somebody outside of the party that

19  wasn't from here, wasn't from Newburgh.  So he told us to come

20  with him.  And we came outside and once we got -- to him,

21  Reckless brought out two guns and we robbed -- me and Freaky

22  took his money and jewelry.

23  Q.  Jewelry?

24  A.  Yes.

25  Q.  And around where was this party?

E879chr3                          Baynes - direct.

1    A.  On South Miller Street.

2    Q.  What town?

3    A.  What time?

4    Q.  What town?

5    A.  Newburgh.

6    Q.  You said we were there.  Who was there?

7    A.  It was -- it was a party.  It was like most everybody that

8    was Star Status was -- a lot of people that was Skull Gang in

9    Southside.

10   Q.  What is Skull Gang?

11   A.  A gang of young guys.

12   Q.  Who did you do the robbery with?

13   A.  Freaky and Reckless.

14   Q.  What did you get out of the robbery?

15   A.  A couple of hundreds.

16   Q.  Was that the only robbery you did that night?

17   A.  No.

18   Q.  What other robbery did you do that night?

19   A.  After that we -- me and Reckless went across town to

20   Heights side and we walked up to random person and robbed him.

21   And Reckless pulled out a gun and the guy gave us all his

22   money.

23   Q.  Around where did that happen?

24   A.  Carson Street.  Inside Heights.  Newburgh.

25   Q.  What did you get out of that robbery?

E879chr3                              Baynes - direct.

1    A.   A couple hundreds.

2    Q.   Have you ever robbed anyone near City Terrace in Newburgh?

3    A.   Yes.

4    Q.   What happened with that robbery?

5    A.   One night I was walking towards Reckless' house.  It was

6    raining.  He -- he was outside by hisself.  I walked up to him

7    and asked him what he was doing.  He told me he was trying to

8    get a come up and he told me to stay with him.

9            So I stayed there with him and like 20 minutes later

10   somebody walked up and we robbed -- he pulled out a gun on him

11   and I took everything that he had.

12   Q.   You used the words "come up."  What's a come up?

13   A.   Quick way -- a robbery for a quick way to get money.

14   Q.   Do you know who that victim was?

15   A.   No.

16   Q.   Do you know if he was a drug dealer?

17   A.   No.

18   Q.   What were you hoping to get?

19   A.   Money.

20   Q.   Were you ever asked by Reckless or Freaky to go to a

21   robbery that you didn't go to?

22   A.   To what?

23   Q.   To go to a robbery that you ended up not going to?

24   A.   Yes.  Yes.

25   Q.   And what happened with that?

E879chr3                          Baynes - direct.

1    A.   Like the next day they -- Quay Quay was telling me that --

2    that they robbed people that was in the Heights and that that

3    once they -- it was seven of them or -- around seven of them

4    when they walked up to them and they robbed one of them and the

5    other person they tried to rob but he didn't want to give them

6    anything so Freaky shot him in the leg and they ran.  They was

7    in a shootout with somebody, Quiotis.  Named Quiotis.

8    Q.   Were you ever approached before that robbery happened to go

9    along?

10   A.   Yes.

11   Q.   And what happened when you were approached?

12            MR. BUCHWALD:  Could we have a timeframe?

13            THE COURT:  Yes, Mr. Nawaday.  Establish a timeframe.

14   BY MR. NAWADAY:

15   Q.   Around what year was?

16   A.   '010.  I don't know what month.

17   Q.   So what happened when you were first approached about this

18   robbery?

19   A.   I was with my Godbrother and we just came -- we just left.

20   So he didn't want to go back to the Heights.  So I told him

21   that I couldn't go.

22   Q.   You mentioned the Heights.  What are the Heights?

23   A.   Across town, the other side of town where all of us hang

24   out.

25   Q.   Please describe the other robberies that you've done

E879chr3                        Baynes - direct.

1    besides the ones you've just mentioned.

2    A.   That's a time me and Laquavious and Marcus we -- we robbed

3    a Spanish guy outside of the Heights.  We end up jumping him

4    and taking his money and his chain.

5    Q.   Around when was that?

6    A.   The beginning of '010 or the ending of '09.

7    Q.   Who were you with when you did that?

8    A.   Marcus and Quay Quay.

9          MR. BUCHWALD:  Could somebody repeat the last two

10   answers.  The testimony was '09 and '10.

11         THE WITNESS:  The beginning of '09 -- I mean ending of

12   '09 beginning of '010.

13         MR. NAWADAY:  Mr. Baynes, please keep your voice up.

14   Q.   Who was with you with that one?

15   A.   Marcus and Quay Quay.

16   Q.   The same Quay Quay?

17   A.   Yes.

18   Q.   You say you jumped somebody.  Please describe what you did.

19   A.   We walked up to him.  And we ended up hitting -- we punched

20   him.  We ended up jumping him.  He fell on the ground.  We took

21   all his money and his chain.

22   Q.   Please describe another robbery you've done.

23   A.   It was time I was walking home.  And I was with James,

24   somebody, a friend of him named HB.  And we was walking around.

25   And once we came to my house we just trying to get a come up

E879chr3                              Baynes - direct.

1   again and James saw somebody with a big chain on.  So he

2   snatched it off his neck and we all ran to the pawn shop.

3   Q.  Around when was that?

4   A.  '010.

5   Q.  Have you committed any burglaries?

6   A.  Yes.

7   Q.  About how many?

8   A.  Around two.

9   Q.  Please describe them.

10  A.  G, somebody named G.  He had a girl that lived inside of

11  the Kenny's Complex.  And she used to leave her door opened for

12  him to come every night.  So one time he told us that we was

13  going to all go inside and we waited real late.  So we all went

14  inside the house.  And started taking everything.  And

15  that's -- we took the car -- her mother's car keys and that's

16  when we ended up joy riding inside the car.

17  Q.  How did this burglary come about?

18  A.  It was just a normal day.  And I don't know.

19  Q.  Who were you with?

20  A.  Geo, G, and Snipes.

21  Q.  That's the same Geo?

22  A.  Yes.

23  Q.  Around when was this?

24  A.  Around '09.

25  Q.  What did you get out of the burglary?

E879chr3                          Baynes - direct.

1   A.   Laptops, iPods, phones, money, liquor, and then we took the

2   car.

3   Q.   What did you do with the car?

4   A.   We drove around and left it at a random spot.

5   Q.   Whose car was it?

6   A.   The girl mother's.

7   Q.   Who was that girl again?

8   A.   I don't know her name.

9   Q.   Have you ever participated in any assaults?

10  A.   Yes.

11  Q.   About how many?

12  A.   Around like 30.

13  Q.   Were weapons used in those assaults?

14  A.   No.  Some -- sometimes.

15  Q.   Say that again.

16  A.   Yes.  Sometimes.

17  Q.   What kind of weapons?

18  A.   Knives and sticks, you know.

19  Q.   And typically what led to those assaults that you

20  participated in?

21  A.   Just gang, gang stuff.

22  Q.   Do you know who Smoke is?

23  A.   Yes.

24  Q.   Who is that?

25  A.   Somebody from Newburgh that sells weed.

E879chr3                          Baynes - direct.

1    Q.  Did you ever participate in an assault on smoke's stack?

2    A.  Yes.

3    Q.  How did that come about?

4    A.  One day Reckless called me, Pooters, Quay Quay, and Dubose

5    to Lander Street and he point out his smoke stack and told us

6    to beat him up for it.

7    Q.  Please name the people you were with again.

8    A.  Pooters, Dubose, Quay Quay, and that's it.

9    Q.  Spell Pooters.

10   A.  P-O-O-T-E-R-S.

11   Q.  And spell Dubose.

12   A.  D-U-B-O-S-E.

13   Q.  Around when did that happen?

14   A.  Around wintertime in '010.

15   Q.  Do you know why Reckless wanted you to do that?

16   A.  He had a gun under Smoke's father's porch.  And when the

17   cops came, Smoke's father making a big scene.  So they got into

18   an argument.  And he was telling him to move his gun.  And

19   while the cops was there.  So once the cops left, Reckless

20   grabbed his gun and that's when he called us.

21   Q.  Who is us?

22   A.  Me, Pooters, Dubose, Quay Quay.

23   Q.  What did Reckless tell you?

24   A.  He just pointed and told us to get him.

25   Q.  What did you do?

E879chr3                          Baynes - direct.

1    A.  I had a stick in my hand.  I told everybody that I was

2    going to hit him and tell everybody just follow up.

3    Q.  What happened?

4    A.  I walked up to him.  I hit him.  And then that's when

5    Dubose, Pooters, and Quay Quay started fighting.

6    Q.  How did the fight end?

7    A.  Somebody was screaming our names so we ended up running

8    away.

9    Q.  Have you ever gotten into a fight when you tried to stab a

10   rival gang member?

11   A.  Yes.

12   Q.  Around when did that happen?

13   A.  '010.

14   Q.  What happened?

15   A.  I was hanging out in the Heights with somebody named Freddy

16   and I -- some people named -- I heard that it was Crip I didn't

17   get along with.  And they drove up to me and we was arguing.

18   And then one of them tried to pick up a garbage can.  And I

19   tried to stab them with the knife -- with a knife.  And it

20   broke.  And then after that they ended up jumping me after

21   that.

22   Q.  Who ended up jumping you?

23   A.  The Crip people, Crips.

24   Q.  You mentioned Crips.  What are Crips?

25   A.  A gang that beat -- that was beefing with Blood, Bloods.

E879chr3                          Baynes - direct.

1  Q.  Do you know why they jumped you?

2  A.  I didn't me -- I didn't get along with them.

3         MR. BUCHWALD:  I'm sorry.  Could we have that read

4  back.

5         (Record read)

6  Q.  What happened after they assaulted you?

7  A.  Reckless showed up with a bag and he had it -- he was

8  acting -- he did have a gun inside and he was saying that

9  whoever was Crip he will shoot them right now.

10 Q.  What happened after that?

11 A.  We ended up leaving and we went to my house and we stole a

12 gun from my mom's boyfriend.

13 Q.  Who is we?

14 A.  Me and Reckless.

15 Q.  What kind of gun was it?

16 A.  .380.

17 Q.  What happened next?

18 A.  After that we went looking for them.

19 Q.  Did you ever find them?

20 A.  We found one of them.  We ended up jumping him after that.

21 Q.  Where do you mean, jump?

22 A.  Both me, Reckless was fighting.

23 Q.  And what happened?

24 A.  After that we just -- we went away.

25 Q.  What happened with that .380?

E879chr3                          Baynes - direct.

1    A.  We kept it.  Reckless kept it mostly.

2    Q.  Did you ever get it back from Reckless?

3    A.  We shared it some -- but he had it most of the times but I

4    could have if I wanted.

5    Q.  I think you said you sold drugs before?

6    A.  Yes.

7    Q.  What drugs did you sell?

8    A.  Crack.

9    Q.  Where did you sell it?

10   A.  Dubois --

11            MR. BUCHWALD:  Timeframe.

12            MR. NAWADAY:  Your Honor, may we have a quick sidebar?

13            THE COURT:  Sure.

14            (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. NAWADAY:  Your Honor, I'd object to Mr. Buchwald

3     continuing to interrupt my examination asking for timeframe.  I

4     will get the timeframe when I think it's appropriate.  If the

5     timeframe is important to him he can ask on cross-examination.

6     But for him to suggest that I need to ask timeframe at the

7     beginning of every section of my questions is inappropriate.

8          MR. BUCHWALD:  Your Honor, my client is charged with a

9     four-year drug conspiracy, a four-year robbery conspiracy.  We

10    know there's only about a five-month period where he's not in

11    custody during that time.  So it's important to know are we

12    talking about something that involves that time period or

13    doesn't involve that time period.

14         THE COURT:  I suppose Mr. Nawaday is objecting to

15    the -- what I'm guessing is the assumption that he won't get to

16    timeframe and that you are disturbing the flow of the direct

17    examination.  It's difficult enough.  This witness is

18    completely tapping my powers of concentration because I'm

19    trying to listen so very carefully.  So I think that I would

20    also recommend, Mr. Buchwald, that we all assume that

21    eventually Mr. Nawaday will get to that information rather than

22    suggest to him when he should bring it out.

23         MR. BUCHWALD:  The problem is if he doesn't, am I

24    expected then to go through all of his direct because otherwise

25    I'll move to strike if we don't eventually get it because we've

E879chr3                              Baynes - direct.

1   been through a number of things where we didn't get it until I

2   asked.

3                THE COURT:  Then you have something to ask on

4   cross-examination.  I think, you know, the objection --

5   Mr. Nawaday's complaint is well placed.  So let him conduct the

6   examination.  Assume that he will get to a timeframe and if he

7   doesn't then you can ask in cross-examination.

8                (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E879chr3                          Baynes – direct.

1               (In open court)

2      BY MR. NAWADAY:

3      Q.   Where did you typically sell crack?

4      A.   Dubois Street.

5      Q.   And around when did you start selling crack?

6      A.   '010.  Around '010.

7      Q.   Where on Dubois Street?

8      A.   Dubois and Van Ness, around.

9      Q.   What was the second street?

10     A.   Van Ness.

11              MR. NAWADAY:  Ms. McInerney can you please pull up

12     what's already in evidence as Government Exhibit 250.

13     Q.   Do you recognize that?

14     A.   Yes.

15     Q.   This is a map of Newburgh.  Do you see the area where you

16     sold drugs in about 2010?

17     A.   Yes.

18     Q.   And where was Dubois and Van Ness?

19     A.   The same street as St. Luke's Hospital but closer to

20     Broadway.

21     Q.   I'd like to go back briefly to when you were jumped by the

22     Crips.

23     A.   Yes.

24     Q.   Do you know if the Bloods and Crips got along?

25     A.   They didn't.

E879chr3                        Baynes - direct.

1   Q.   Were you Blood?

2   A.   No.

3   Q.   Were you friendly with Bloods?

4   A.   Yes.

5   Q.   Did you only sell on Dubois?

6   A.   Yes.

7   Q.   Do you know what other areas in Newburgh where crack was

8   sold?

9   A.   Lutheran, Lander, William Street.

10  Q.   You said Lutheran.  Do you see Lutheran?

11  A.   Yes.

12  Q.   Where is Lutheran?

13  A.   No.  I don't see it.  It's not there.

14          MR. NAWADAY:  Maybe if we can put up Government

15  Exhibit 251.

16          Do you see Lutheran here?

17          THE WITNESS:  Yes.

18  Q.   Where is Lutheran?

19  A.   In between Carpenter and City Terrace.

20  Q.   You mentioned before a robbery that happened at City

21  Terrace?

22  A.   Yes.

23  Q.   What were you referring to?

24  A.   (No response).

25  Q.   City Terrace that's on the map?

E879chr3                              Baynes - direct.

1    A.  Yes.

2    Q.  For about how long did you sell crack?

3    A.  Like a month.  Not -- a couple of months out of the year.

4    Not long.

5    Q.  How often were you out on Dubois Street selling crack?

6    A.  Not often.  Just a week or so.

7    Q.  How much did you typically make in a week when you were

8    selling crack?

9    A.  Around 500, 450.

10   Q.  500, 450?

11   A.  Hundred -- dollars.

12   Q.  Could anyone sell on Dubois?

13   A.  Sometime -- not -- yeah, mostly yes.

14   Q.  How did it work when you sold crack on Dubois Street?

15   A.  You just sit there.  If crackheads walk by you or walk up

16   to you, if they walk by you just tell them that you got

17   something for them.  If they walk up to you then they're going

18   to tell you whatever they need.

19   Q.  Were you the only one selling on Dubois at that time?

20   A.  No.

21   Q.  Who else do you remember when you were out there was also

22   selling on Dubois Street?

23   A.  Bloods.  And Ashy Bandits.

24            THE COURT:  Ashy?

25            THE WITNESS:  Ashy Bandits.

E879chr3                          Baynes - direct.

1   Q.  Who were the Ashy Bandits?

2   A.  A gang in Newburgh.

3   Q.  Do you know any members of the Ashy Bandits at that time?

4   A.  Quay, Geo, Bow Wow, Spazo, Corey, T-Black, T-Rex.

5   Q.  When you were out on Dubois Street selling crack, did you

6   ever warn other crack dealers that the police were around or

7   anything like that?

8   A.  Yes.

9   Q.  Do you know what splits are?

10  A.  Yes.

11  Q.  What are splits?

12  A.  If a crackhead asks me for too much I will to somebody tell

13  them to split, for a split.  And they will give me the

14  remaining of what I need and I sell it and we just split the

15  profit.

16  Q.  Basically just splitting the sale?

17  A.  Yes.

18  Q.  Have you done that before?

19  A.  No.

20  Q.  Have you seen other people do it before?

21  A.  Yes.

22  Q.  What other people have you seen split?

23  A.  (No response).

24  Q.  On Dubois Street?

25  A.  I don't know.  Random people.

E879chr3                            Baynes - direct.

1          MR. GOLTZER:  Can we have that read back please.

2          THE WITNESS:  Random people.  Random people.  Random.

3  Random.

4  Q.  Do you know someone named J-Mark?

5  A.  Yes.

6  Q.  Who is that?

7  A.  A Blood.

8  Q.  In 2010 how often, if at all, did you ever see J-Mark?

9  A.  Every couple of weeks, once like a couple of weeks.

10  Q.  Where did you typically see him?

11  A.  On William Street, Lutheran Street.

12  Q.  Do you know if J-Mark was affiliated with any gangs?

13  A.  Blood.  He was Blood.

14  Q.  Do you know J-Mark by any other names?

15  A.  Yes.

16  Q.  Do you know someone by the name of Kev Gotti?

17  A.  Yes.

18  Q.  Who is that?

19  A.  A Blood too that would be on Lutheran and First Street.

20  Q.  Did you know Kev Gotti by any other names?

21  A.  No.

22  Q.  I'm going to show you what's been marked for identification

23  as Government Exhibits 206, 206C, and 220, and 220B.

24          Starting with 206 and 220.  Do you recognize those?

25  A.  Yes.

E879chr3                          Baynes - direct.

1    Q.  What are they?

2    A.  A picture of Kev Gotti and J-Mark.

3    Q.  And is 220B a nameplate that has the name J-Mark?

4    A.  Yes.

5    Q.  I'm going to hand you what's been marked for identification

6    as 206C.  Is this a nameplate with the name Kev Gotti?

7    A.  Yes.

8            MR. NAWADAY:  Government offers Government Exhibits

9    206 and 206C and 220 and 220B.

10           MR. GOLTZER:  No objection.

11           THE COURT:  206 and 206C and 220 and 220B will be

12   received.

13           (Government's Exhibits 206 and 206C and 220 and 220B

14   received in evidence)

15   Q.  Do you see on your screen, Mr. Baynes, Government Exhibit

16   206?

17   A.  Yes.

18   Q.  Who is that?

19   A.  That's Kev Gotti.

20           MR. NAWADAY:  And Ms. McInerney if we can please put

21   up Government Exhibit 220.

22   Q.  Who are we looking a lot here?

23   A.  J-Mark.

24   Q.  Back in 2010, 2009 and 2010 do you know how Reckless made

25   money?

E879chr3                              Baynes - direct.

1    A.  Robberies and selling drugs.

2    Q.  Do you know how he got money to buy the drugs he sold?

3    A.  No.  Mostly from robberies.

4    Q.  What drug, drugs did Reckless sell?

5    A.  Crack.

6    Q.  Do you know where Reckless sold drugs?

7    A.  Broadway, Dubois, and Lander.

8    Q.  What was the first?

9    A.  Broadway and Dubois.

10   Q.  And how do you know that?

11   A.  I saw him.

12   Q.  What did you see?

13   A.  I saw -- I saw him like call crackheads to him, bring them

14   to him.  Alleyways and stuff.

15   Q.  What did you see him do?

16   A.  He just go in the alleyway and he'll come back out putting

17   money in his pocket.

18   Q.  How did you know that the people he was meeting with when

19   you saw him were crack cocaine customers?

20   A.  Some of them I sold to.

21   Q.  Some of them you had sold to before?

22   A.  Yes.

23   Q.  About how often did you see Reckless on Dubois or Lander?

24   A.  Like a -- like a -- months, like months here.  And he would

25   sell for like a whole month and then a couple of months after

E879chr3                           Baynes - direct.

1    that he won't sell.  Then the next months he will.  So months.

2    Q.  When you saw Reckless on Dubois was he the only one selling

3    on Dubois around that time?

4    A.  No.

5    Q.  2009, 2010?

6    A.  No.

7    Q.  Had you seen anyone else sell on Dubois in 2009 and 2010

8    besides Reckless?

9    A.  Yes.

10   Q.  Did you know any of those people?

11   A.  Some of them.

12   Q.  Who are some of the people you knew?

13   A.  Bow Wow, L-1, and -- (pause) um.

14   Q.  You said you saw Bow Wow?

15   A.  Yes.

16   Q.  Where did you see Bow Wow doing?

17   A.  I seen him like sitting on a porch and somebody -- a

18   crackhead would come up and he'll point to the -- inside of a

19   hallway and like seconds later he will follow him, follow the

20   crackhead inside.

21   Q.  Do you know if Reckless ever sold crack to Freaky?

22   A.  Yes.

23   Q.  How do you know that?

24   A.  I saw him.

25   Q.  And around when did you see Reckless with Freaky?

E879chr3                          Baynes - direct.

1    A.  '010.

2    Q.  What did you see him actually doing?

3    A.  They just be on Lander selling just -- both of them would

4    be on Lander together and doing the same thing, like crackheads

5    would come.  They would both sell.

6    Q.  What were you typically doing when you were out there?

7    A.  Either just stopping by to see what's up or hanging out

8    there with them.

9    Q.  Do you know where Reckless stored his crack?

10   A.  No.  I saw him one time.  He had it inside of a cup but I

11   don't know if -- other times.  I don't know other times.

12   Q.  What did you see in his cup?

13   A.  He had a cup full of crack and he had it inside the rice.

14   He said it was to keep it fresh.

15   Q.  And describe how the crack is placed in this cup of rice.

16   A.  All in baggies inside.  They was just -- it was mixed up

17   all together.  And you can just see -- see some of them, top of

18   some of them, inside the cup.  It was a see-through cup.

19   Q.  About how big was that cup?

20   A.  Normal size.  Just like a -- a normal cup that you get from

21   like a Chinese spot that they give the soup in.

22   Q.  Can you describe how tall it was?

23   A.  Like around this tall.  And type, skinny like.

24   Q.  Can you do that again, Mr. Baynes.

25   A.  Just around this tall, like a skinny cup.  Not skinny but a

E879chr3                         Baynes - direct.

1   normal cup size.

2            MR. NAWADAY:  May the record reflect that the witness

3   is describing with his hands a height of about eight-inches.

4            MR. BUCHWALD:  Eight-inches.

5            THE COURT:  Very well.

6   Q.  You said you saw bags in the rice?

7   A.  Yes.

8   Q.  What were in the bags?

9   A.  Crack.

10  Q.  What does crack look like?

11  A.  It's hard.  Like a -- like a cream, off-white, yellow

12  color.

13  Q.  And what shape does it have?

14  A.  Circle.  Like a circle.  Some of them square.  Like -- like

15  a box.

16  Q.  About how many bags of crack did you see in that cup?

17  A.  Around like 15, 20.

18  Q.  And please describe the size of those bags.

19  A.  Some of them was dimes and some of them was 20s.

20  Q.  What do you mean dimes?

21  A.  Ten-dollar bags.

22  Q.  What do you mean 20s?

23  A.  20-dollar bags.

24  Q.  Around when was this that you saw this cup?

25  A.  Like winter of '010.

E879chr3                          Baynes - direct.

1    Q.  In 2009, 2010 how often did you see Bow Wow out on Dubois

2    Street?

3    A.  Like most -- when I walk past him when -- not -- not often

4    but some -- sometimes I see him when I walk past.

5    Q.  Going back to the Ashy Bandits.  Who are the Ashy Bandits

6    you knew?

7    A.  Bow Wow, Spazzula, T-Rex, Quay, Geo.

8    Q.  Do you know someone named Fuzzy?

9    A.  Yes.

10   Q.  Who is Fuzzy?

11   A.  He was an Ashy Bandit too.

12   Q.  Mr. Baynes, please speak clearly.

13   A.  Yes.

14   Q.  I'm going to show you what's been marked for identification

15   as Government Exhibit 218.  Please tell us if you recognize

16   that?

17   A.  Yes.

18   Q.  What is it?

19   A.  A picture of Fuzzy.

20   Q.  Of who?

21   A.  Fuzzy.

22   Q.  Did you know Fuzzy by any other names.

23   A.  No.

24            MR. NAWADAY:  The government offers Government Exhibit

25   218.

E879chr3                          Baynes - direct.

1     THE COURT:  No objection.  218 will be received.

2          (Government's Exhibit 218 received in evidence)

3   Q.  Do you if you know the Ashy Bandits were Blood?

4   A.  Now most of them had to turn Blood.

5   Q.  Do you know what flagging is or peacing someone is?

6   A.  Peacing somebody is like a handshake that Bloods do and

7   flagging is just having a red flag.

8   Q.  What do you mean having a red flag?

9   A.  Having a red flag in your right pocket.  It's just -- the

10  color and the flag that Bloods have.

11  Q.  Do you know what it means when somebody flags?

12  A.  No.  Most that they Blood.  That's what I --

13  Q.  Can you repeat that?

14  A.  That they're Blood.  I don't really know what.

15  Q.  Who of the people you've mentioned have you seen either

16  peace someone or flag?

17  A.  Bow Wow, Quay, Spazo.  That's it.

18  Q.  Have you ever seen Gucci peace someone, flag someone?

19  A.  No.

20  Q.  Have you ever seen Reckless peace someone or flag them?

21  A.  No.

22  Q.  Did Star Status get along with the Bloods?

23  A.  Yes.  Sometimes.

24  Q.  Have you ever carried a gun?

25  A.  Yes.

E879chr3                              Baynes - direct.

1   Q.  Around what years did you carry a gun?

2   A.  Around '010, '09.

3   Q.  What kind of gun did you carry?

4   A.  I carried .380, a .22, and a .45.

5   Q.  Going through each one, where did you get each of those

6   guns that you carried?

7   A.  The .380 I got from my mom's boyfriend.  The .22 Marcus,

8   somebody named Marcus had.  And the .45 Freaky and Reckless

9   had.

10  Q.  And on what occasions did you carry those guns?

11  A.  Just random occasions.  Just -- yeah, random.

12  Q.  What do you mean by random?

13  A.  I can be walking down the street and I just, if somebody

14  give it to me I carry it.

15  Q.  Have you ever seen Reckless with a gun?

16  A.  Yes.

17  Q.  On about how many occasions and during what years?

18  A.  Around like '10, '09 and '010.

19  Q.  About how often did you see Reckless with a gun in that

20  time period?

21  A.  Every -- every couple of days, weeks.  Every couple of

22  months.

23  Q.  Do you know if during 2009, 2010 what kinds of guns

24  Reckless had?

25  A.  A .22, a .380, and a .45.  That's it.

E879chr3                                Baynes - direct.

1   Q.  Have you ever seen Reckless carrying a gun while he was out

2   on Dubois Street?

3   A.  No.  But -- like I never seen it but I knew.  But I

4   never -- like he never pulled it out.

5   Q.  What do you mean he never --

6              MR. GOLTZER:  Objection.

7              THE COURT:  Overruled.  You can ask a follow-up

8   question.

9   Q.  What do you mean?

10  A.  You could see the bulge of the gun.  He -- you could just

11  see the bulge of it inside his pants or.

12  Q.  And when you saw that bulge, about how close were you

13  typically?

14  A.  I was right in front of him.

15  Q.  And how often did you see Reckless in 2009 and 2010?

16  A.  Everyday almost.

17  Q.  Do you know where he kept his guns?

18  A.  Mostly out of Freaky's house they kept all their guns

19  together at Freaky's house.

20  Q.  How do you know that?

21  A.  I saw them.  I saw them bring out all of them together.

22  Q.  Do you know if Reckless shared guns with anyone?

23  A.  Yes.

24  Q.  Who?

25  A.  Freaky.

E879chr3                              Baynes - direct.

1    Q.  Did Reckless ever talked about his guns that he shared with

2    Freaky?

3    A.  Yes.  Once they bring them out, yes.

4    Q.  What did he talk about?

5    A.  About how light -- like how light it is, what's easier to

6    get away with carrying.  And what's louder, like stuff, like

7    describing them.

8    Q.  And describe the guns you saw -- where was this that you

9    saw these guns, whose house?

10   A.  Freaky's.

11   Q.  Describe the guns you saw at Freaky's house?

12   A.  I saw all black, small, .380; a silver, long .22; and like

13   a big .45.

14              THE COURT:  Mr. Nawaday, it's 12:30.  Why don't we

15   break for lunch.  Ladies and gentlemen we'll break until, it's

16   12:30 now, until 1:45.  So please be sure to be in the jury

17   room no later than 1:45 so we can get started promptly.  Until

18   then, please do not discuss the case.

19              (Jury excused)

20              (Continued on next page)

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1              (In open court)

 2              THE COURT:  Mr. Baynes, you can step down.

 3              (Witness excused).

 4              THE COURT:  Everyone can be seated.

 5              We have another couple hours, Mr. Nawaday?

 6              MR. NAWADAY:  Yes, your Honor.

 7              THE COURT:  Okay.  Any issues to be brought up?  I see

 8    no hands.

 9              MR. BUCHWALD:  Say that again.

10              THE COURT:  Any issues?

11              MR. GOLTZER:  The only issue is --

12              MR. NAWADAY:  Your Honor, may I suggest, for before

13    the jurors come out, if we could have, if the defense is okay

14    with it, have Mr. Baynes sit there, adjust the microphone so

15    that it's in a good spot for him.  I think it's a little too

16    close and it's fuzzing out.

17              THE COURT:  The problem that we have with this witness

18    stand, unfortunately, is that there is a table -- and I sat

19    here yesterday -- and the table is very low so that there's

20    only so far that the chair can be brought forward.  And the

21    microphone obviously can be adjusted but the person would have

22    to lean well over.  Mr. Baynes is, from what I can tell, at

23    least six inches taller than I am, so it's more difficult for

24    him.  I tried experimenting yesterday with putting the

25    microphone up on the higher portion of the bench but it does
```

E879chr3                          Baynes – direct.

1    not allow –– it does not have enough flexibility to.

2              MR. BUCHWALD:  What about that hand mic that we were

3    using for the jurors?  It's impossible to hear him.

4              THE COURT:  We could try.  Does this work?  Does this

5    work?

6              MR. NAWADAY:  May I suggest using the Federal Code or

7    something to raise the microphone to adjust for his height.

8              THE COURT:  If I had a Federal Code we could use it.

9              Maybe this will work.  Maybe we'll go with this.  That

10   way he can adjust it more.

11             MR. GOLTZER:  Your Honor, this may be unnecessary

12   about much of the testimony is clearly that having to do with

13   gangs and the like, was the subject of motions in limine.

14   We're not objecting because it's our understanding of the rule

15   that those objections are preserved.

16             THE COURT:  Right.  Okay.

17             Anything further?

18             So we'll see you all at 1:45.

19             (Luncheon recess)

20

21

22

23

24

25

1                  A F T E R N O O N   S E S S I O N

2              (1:55 p.m.)

3              (Jury present)

4              THE COURT:  Everyone please be seated.

5              Mr. Nawaday.

6     BY MR. NAWADAY:

7     Q.  Before the break, you had mentioned someone named Smoke?

8     A.  Yes.

9     Q.  I am going to hand you what's been marked for

10    identification as Government Exhibit 219.  Tell me if you

11    recognize that.

12    A.  Yes.

13    Q.  What is it?

14    A.  A picture of Smoke's mom or aunt, one of them.

15    Q.  Do you know that person's name?

16    A.  Danielle.

17              MR. NAWADAY:  The government offers Government Exhibit

18    219.

19              THE COURT:  No objection, 219 will be received.

20              (Government's Exhibit 219 received in evidence)

21    Q.  Again, it is on the juror's screen.  Who are we looking at

22    here?

23    A.  Danielle, Smoke's mom.

24    Q.  Danielle?

25    A.  Huh?

E87nchr4                          Baynes - direct

1   Q.   Danielle?

2   A.   Yes.

3   Q.   Have you ever seen Reckless shoot?

4   A.   Yes.

5   Q.   Were you ever present at a party at Vail Gates or Vails

6   Gate when a shootout occurred?

7   A.   Yes.

8   Q.   Around when what is that?

9   A.   '010.

10  Q.   Do you know what season?

11  A.   No.  I think summer.

12  Q.   Did you say summer?

13  A.   I think the summer.

14  Q.   What happened?

15  A.   A fight broke out, and it was like Newburgh versus

16  out-of-town people.  We was fighting, and then somebody pulled

17  out a gun, named Big Mike, and Reck -- he started shooting and

18  then Reckless took the gun from him and started shooting at the

19  car.

20  Q.   Who was Big Mike?

21  A.   Somebody that was from the South Side.

22  Q.   What you do mean the South Side?

23  A.   A gang, South Side.

24  Q.   Who were you at the party with?

25  A.   South Side Star Status people.

1    Q.   Who were the particular people you were at the party with?

2    A.   Reckless Quay Quay, S-Dot.

3    Q.   Who is S-Dot?

4    A.   Somebody that's School gang.

5    Q.   What is School gang again?

6    A.   A gang.

7    Q.   What did you see Reckless do, if anything, when the fight

8    broke out?

9    A.   He took the gun from Big Mike and started shooting at the

10   car that the people got inside.

11   Q.   How close were you to Reckless when he started shooting?

12   A.   I was right there.

13   Q.   Who was the fight between?

14   A.   Newburgh versus out-of-town people.

15   Q.   Versus out-of-town people?

16   A.   Yes.

17   Q.   How did the fight end?

18   A.   The cops came and we all walked to the laundromat down the

19   street.

20   Q.   Who is "we all"?

21   A.   Everybody that was on the Newburgh, like, the Newburgh

22   side.

23   Q.   What did you do when you got to the laundromat?

24   A.   We called up the guys to come get us.

25   Q.   Where did you go?

1    A.  Back to the main part, the town -- I mean the city of

2    Newburgh.

3    Q.  Back to where?

4    A.  The City of Newburgh.

5    Q.  Where was this party?

6    A.  Vails Gate.

7    Q.  Vails Gate?

8    A.  Yes.

9    Q.  Were you ever present at any other shootouts at a party

10   with Reckless present?

11   A.  Yes.  One on Chambers Street.

12   Q.  Around when was that?

13   A.  '010, early '010.

14   Q.  What happened?

15   A.  A fight broke out, and after the fight Reckless was

16   shooting in the air.

17   Q.  By the way, going back to the Vails Gate party, about how

18   close were you to Reckless when he started shooting?

19   A.  I was right next to him.

20   Q.  Going back to this Chambers Street party, do you know how

21   the fight broke out?

22   A.  No.

23   Q.  How close were you when Reckless pulled out a gun and shot

24   in the air?

25   A.  Right next to him.

E87nchr4                          Baynes - direct

1   Q.  How did the fight end?

2   A.  It just stopped -- the fight stopped once Reckless was

3   shooting.

4   Q.  What happened?

5   A.  He was shooting after the fight.

6   Q.  What happened after Reckless started shooting again?

7   A.  We was walking away and cops came and we all ran.

8   Q.  Where did you go?

9   A.  I went down to a complex called the Varicks, the Varicks.

10  Q.  A complex called what?

11  A.  The Varicks.

12  Q.  Can spell that please?

13  A.  V-a-r-r-i-c-k.

14  Q.  How did you get there?

15  A.  I ran.

16  Q.  Were you with anyone?

17  A.  No.

18  Q.  Do you know where Reckless went?

19  A.  No.

20  Q.  Do you know what happened to Reckless?

21  A.  He got arrested.

22  Q.  How did you learn that?

23  A.  After somebody -- I found out once he came over to me and

24  he wrote me.

25  Q.  Who told you?

E87nchr4                         Baynes – direct

1    A.   Reckless.

2    Q.   What did he tell you happened?

3    A.   That he stopped to pick up somebody, Marcus, and that's the

4    reason why he got caught.

5    Q.   What did he tell you --

6              MR. GREENFIELD:  Objection, your Honor.

7              THE COURT:  Overruled.

8              MR. GREENFIELD:  Again, the acoustics here are awful.

9              THE COURT:  Is that the objection?

10             MR. GREENFIELD:  That is an observation.

11             THE COURT:  Actually, the problem now, Mr. Baynes, may

12   be that you're too close to the microphone so let's try to

13   experiment a little bit.  OK.

14             MR. GOLTZER:  Your Honor, we would request a limiting

15   instruction on this testimony.

16             THE COURT:  Sidebar.

17         (Continued on next page)

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MR. GOLTZER:  I respectfully suggest that the

3     testimony about Reckless getting into fights with folks that

4     have nothing do with us or nothing to do with the charged

5     crimes is at best for them 404(b) and shouldn't be admitted

6     against our clients for any purpose.

7          MR. NAWADAY:  Your Honor, I think so long as the

8     instruction makes clear that each defendant is charged in

9     separate counts, that some defendants aren't charged in

10    particular counts, and they have to consider each defendant

11    individually as to a charge, what the charges are.

12         MR. GOLTZER:  I have no problem with that.  I would

13    like the Court to instruct the jury that certain evidence in

14    the case comes in against one and not others, and this is one

15    of them.

16         MR. BUCHWALD:  I would say that 70 percent of the

17    testimony up to this point has been about Reckless' involvement

18    with guns or with fights or with assaults, none of which has

19    been related to robberies of drug dealers in which our clients

20    are alleged to be involved or to sales of drugs in which our

21    clients are alleged to have been involved.  All of this is

22    essentially 404(b) with respect to Reckless.  There should be

23    instruction that all of that testimony is simply against

24    Reckless and not against our clients, unless there is some

25    proffer tying it.

1          MR. GOLTZER:  I don't think you need to say

2   necessarily it is admissible against Reckless, but you need to

3   say it's not admissible against Thomas and Whitaker.

4          MR. NAWADAY:  First, I disagree that there is no

5   evidence or testimony about drug dealing with respect to your

6   clients.

7          MR. GOLTZER:  There was.

8          MR. NAWADAY:  There was.

9          MR. GOLTZER:  He said about 70 percent of it.

10          MR. BUCHWALD:  I said 70 percent, and none with

11   respect to my client.

12          MR. NAWADAY:  Pardon.

13          MR. BUCHWALD:  None with respect to my client, at

14   least that I have heard.  Maybe there was something I didn't

15   hear.

16          MR. NAWADAY:  You are correct about the drug dealing

17   with respect to that with your client.  Insofar as the limiting

18   instruction, I think the issue for us is that this evidence is,

19   one, is Giglio as to this witness; number two, the evidence of

20   this witness's relationship with Reckless is frankly background

21   of the criminal conduct charged, which is the robbery and

22   murder.  It shows their close relationship.

23          So we would object to any limiting instruction saying

24   you cannot consider these facts, that Reckless and Baynes had

25   committed to these crimes together against the other defendants

E87nchr4                          Baynes - direct

1    to the extent that then the jury will be left with a confusing

2    view that there is no that -- the criminal relationship --

3              MR. GOLTZER:  How about a limiting instruction to the

4    effect that it's only offered as background?

5              MR. NAWADAY:  That's fine.

6              MR. GOLTZER:  And not substantive evidence against

7    Mr. Whitaker or Mr. Thomas.

8              THE COURT:  That's what I would propose to do, that it

9    is being offered as background concerning how these individuals

10   know each other.

11             MR. NAWADAY:  That is perfect.

12             MR. GOLTZER:  But not Reckless, not Whitaker and

13   Thomas.  We are also raising a 403 objection because this is

14   unduly prejudicial, and to the extent it may be background, it

15   is substantially outweighed by the prejudice.  We are going to

16   raise that objection as well, of course.

17             THE COURT:  OK.

18             (Continued on next page)

19

20

21

22

23

24

25

1                (In open court)

2                THE COURT:  Ladies and gentlemen, you have heard

3    testimony in part this afternoon by Mr. Baynes, that he was

4    present at times where there were fights or shootings, that

5    Mr. Christian was involved in fights at parties, things of that

6    nature.  Obviously none of the defendants here are being

7    charged with having fights at parties or shooting at parties.

8    This information is being elicited by the government in part to

9    show the background of the relationship between Mr. Baynes and

10   Mr. Christian, so it should be considered by you in that

11   regard.  And this should not be considered against Mr. Thomas

12   or Mr. Whitaker.

13                Very well.

14                MR. GOLTZER:  Thank you, Judge.

15                THE COURT:  Mr. Nawaday.

16   Q.  Mr. Baynes, I think we were just talking about the party at

17   Chambers Street where you learned that it later that Reckless

18   got caught?

19   A.  Yes.

20   Q.  What did you learn from Reckless about what happened after

21   he left that party?

22   A.  That he got -- that he tried to help somebody and he went

23   to pick him back up, and that's when he ended up getting

24   caught.

25   Q.  Did he describe any details of how he got caught?

1   A.  He just said --

2             MR. GREENFIELD:  Objection, Judge.

3             THE COURT:  Overruled.

4   A.  He just said, when he first started running he threw the

5   gun in the air, somebody tripped and fell, and he stopped and

6   picked him up.  And after that he, like he tried to hide and

7   they saw him, where he went to.

8   Q.  Did he tell you what happened with the gun?

9   A.  That they got the gun, but a screw or something came out.

10  Q.  Can you say that again?

11  A.  That they found the gun, but like a screw or something came

12  out that made it not be able to work.

13  Q.  What came out about not being able to work?

14  A.  Like a spring or something.  I don't know.

15  Q.  Who is the they who found this gun?

16  A.  The cops.

17  Q.  Do you know who Little Homey is?

18  A.  Yes.

19  Q.  Who is he?

20  A.  A person that was a Mac Baller, a Blood, sir.

21  Q.  What is Mac Baller?

22  A.  A Bloods set.

23  Q.  What do you mean a Bloods set?

24  A.  A branch of Bloods, a branch of Bloods that is under

25  Bloods.

E87nchr4                         Baynes - direct

1    Q.  Do you know if Reckless was ever involved with the shooting

2    with Little Homey?

3    A.  Yes.

4    Q.  Around when was that?

5    A.  '010.

6    Q.  What do you know about that?

7    A.  I seen Reckless like a week later and he was at his

8    grandmother's house and he told me that he wanted that -- he

9    told me that he shot Little Homey, he said he shot him like

10   seven times, that he fell in the garbage can, that he was still

11   shooting at him and that he wanted me to get rid of a gun for

12   him.

13   Q.  Did you do that?

14   A.  No.

15   Q.  Back in 2009, 2010 do you know if Reckless was still in

16   school?

17   A.  Yes.

18   Q.  And what school?

19   A.  NFA.

20   Q.  Same school you were in?

21   A.  Yes.

22   Q.  During that time period did you communicate by Facebook?

23   A.  Yes.

24   Q.  Did he use his real name as a user name or a different

25   name?

E87nchr4                          Baynes - direct

1    A.   Different name.

2    Q.   What names has he used if you know?

3    A.   He used Flea, Flea -- no, Fly Guy, La Flare, Reckless.

4    Q.   Am I right that you said Fly Guy.

5    A.   Yes.

6    Q.   La Flare?

7    A.   Yes.

8    Q.   And Reckless?

9    A.   Yes.

10   Q.   Did you use your real name as a user name back then?

11   A.   No.

12   Q.   What names have you used?

13   A.   Biggah Flea Guy YGonna.

14   Q.   Did you say Biggah Flea Guy?

15   A.   Flea Guy YGonna.

16   Q.   Those are two separate names?

17   A.   Just the whole name, Biggah Flea Guy YGonna.

18   Q.   Biggah Flea Guy YGonna?

19   A.   Yes.

20          MR. NAWADAY:  Your Honor, at this time we would like

21   to read in a stipulation.

22          THE COURT:  Very well.

23          MR. NAWADAY:  This is marked for identification

24   Government Exhibit 905.

25          It is hereby stipulated and agreed by and between the

E87nchr4                        Baynes - direct

1    United States by Preet Bharara, United States Attorney for the

2    Southern District of New York.

3             THE COURT:  Slow down, sir.

4             MR. NAWADAY:  Andrew Bauer, Kan M. Nawaday, and

5    defense counsel and the parties, and the defendants that:

6             1.  Or about June 25, 2014, a New York State

7    trooper -- let me back up -- stipulated and agreed that, if

8    called to testify a law enforcement officer with the New York

9    State troopers, the Officer, would testify that:

10            1.  On or about June 24, 2014, the officer went to the

11   publicly available Facebook website page of the person with the

12   Facebook user name of La Flare, defined as the La Flare

13   Facebook page.  The officer then downloaded pages directly from

14   the La Flare Facebook page and pasted them into Microsoft

15   PowerPoint files.

16            2.  Government Exhibit 301 contains -- I believe it

17   should be 301A -- contains true and correct copies of excerpts

18   from the La Flare Facebook page as downloaded by the officer on

19   June 24, 2014.

20            This stipulation marked for identification as

21   Government Exhibit 905 is signed by the parties.

22            Your Honor, the government offers Government Exhibit

23   301A, and also there is a typographical error on government

24   Exhibit 905.  It should refer to Government Exhibit 301A, not

25   301.  I believe there is no objection to that.  The government

E87nchr4                         Baynes - direct

1    offers Government Exhibit 905 as well.

2              THE COURT:  Any objection?

3              There being no objection, Government Exhibits 301A and

4    905 will be received.

5              (Government's Exhibits 301A and 905 received in

6    evidence)

7    BY MR. NAWADAY:

8    Q.  I am going to hand you what is already in evidence as

9    Government Exhibit 301A.  Flipping through Government Exhibit

10   301A, are there any photographs you recognize?

11   A.  Yes.

12   Q.  Is there an individual depicted in those photographs?

13   A.  Yes.

14   Q.  Who is depicted in the photographs, the majority of the

15   photographs on Government Exhibit 301A?

16   A.  Reckless.

17   Q.  Does this appear to you to be pages from Reckless's

18   Facebook page from about 2010?

19   A.  Yes.

20   Q.  What was his user name at that point?

21   A.  La Flare.

22   Q.  La Flare?

23   A.  Yes.

24   Q.  I would like to walk through some of the postings on

25   Government Exhibit 301A.

1              Turn to the second page it should appear on your

2    screen.  Do you see the posting dated January 27, 2010 on page

3    2?

4    A.  Yes.

5    Q.  And what does it say there?

6    A.  "Star Status goons on deck."

7    Q.  What is the third word?

8    A.  Goons.

9    Q.  Have you ever heard Reckless use the term "goons"?

10   A.  Yes.

11   Q.  Have you ever used the term "goons"?

12   A.  Yes.

13   Q.  What is a goon?

14   A.  A person that's like, like that the person that put in

15   work, like that does shootings and sorts of stuff.

16   Q.  What do you mean by work?

17   A.  Crimes.

18   Q.  Have you ever heard the term "on deck"?

19   A.  Yes.

20   Q.  What does "on deck" mean?

21   A.  Like, here.  Like, right here.  Like, that I got him on

22   standby, like, right here, ready to go.

23   Q.  And in the posting dated January 31, 2010, do you see the

24   phrase --

25   A.  Yes.

1   Q.  -- "holla at me"?

2   A.  Yes.

3   Q.  Have you ever used that phrase?

4   A.  Yes.

5   Q.  Have you ever heard Reckless use that phrase?

6   A.  Yes.

7   Q.  What do you understand that phrase to mean?

8   A.  Get at me.  Like, what's up, like, talk to me.

9           MR. NAWADAY:  Ms. McInerney, if you can please turn to

10  page 3 of Government Exhibit 301A.  Do you see the last word on

11  page 3?

12  A.  Yes.

13  Q.  What does "HMU" stand for?

14  A.  Hit me up.

15  Q.  What do you understand that to mean?

16  A.  To write me, like, talk to me.

17          MR. NAWADAY:  Ms. McInerney, if we can please turn to

18  page 4 of Government Exhibit 301A.

19  Q.  Mr. Baynes, if you can read what that posting is.

20  A.  "Chyllen with my shun Baynes, hit me up."

21  Q.  Mr. Baynes, do you know if Reckless knew any other Baynes

22  besides you?

23  A.  No.

24  Q.  What does the word, if you know, "shun" mean?

25  A.  Like, son.  It's just son spelled differently.

1   Q.  Can you say that again and step back from the microphone.

2   A.  It's just son spelled differently.

3   Q.  The word son spelled differently?

4   A.  Yes.

5   Q.  Turning to page 6, the posting dated May 2, 2010 at the

6   bottom.  Can you read that?

7   A.  "Maxxing fuck with us Star Status niggas, we wavy."

8   Q.  What is maxing?

9   A.  Trouble, like.

10  Q.  What does it mean to be wavy?

11  A.  The talk of the town.  Like live.  Like, the talk.  Like,

12  we, like, we are just the livest people, the people that --

13  Q.  Are you saying loudest?

14  A.  Live, livest.

15  Q.  Livest?

16  A.  Yeah, like, I don't know how to explain it.  We the people

17  that everybody wants to be.

18  Q.  The people that everyone wants to be?

19  A.  Yeah.

20  Q.  Turning to page 9.  Do you know the posting at the bottom

21  of page 9 dated May 20, 1010?

22  A.  Yes.

23  Q.  Can you please read that?

24  A.  "Maxing in Lighthouse with brazy Baynes, hit me up."

25  Q.  Do you know what Lighthouse is?

1   A.  That was the night school that I was in.

2   Q.  The night school you were in?

3   A.  Yes.

4   Q.  What was the name of that night school?

5   A.  Light -- huh, the Lighthouse, the Lighthouse.

6   Q.  Who were you in that night school with?

7   A.  Reckless.

8   Q.  Do you know what the word "brazy" means?

9   A.  Crazy.

10  Q.  Do you know why it's spelled with a B and not a C?

11  A.  It is just something like Bloods do.  Bloods do that.

12  Q.  Do you know why they do that?

13  A.  They don't use Cs.

14  Q.  Why not?  If you know?

15  A.  Because it's for -- I mean, Cs is for Crips.

16  Q.  C is for what?

17  A.  Crips.

18  Q.  Mr. Baynes, maybe if you can just stand back a little bit.

19  Turn to page 10.  At the top there is a posting from La Flare

20  dated May 24, 2010.

21          Do you recognize that phrase, that posting?

22  A.  Yes.

23  Q.  What do you recognize it from?

24  A.  A song.

25  Q.  From what?

1    A.  A song.

2    Q.  What song?

3    A.  A Waka Flocka song "Love Dem Gun Sounds."

4    Q.  Who is Waka Flocka?

5    A.  A rapper.

6    Q.  Is this a lyric from a Waka Flocka song?

7    A.  Yes.

8    Q.  Is there anything different about the Waka Flocka song and

9    this posting?

10   A.  He puts "Star Status," and the guns are changed to .22 and

11   9.

12   Q.  So am I right that what's different is the word "Star

13   Status" is put into the lyric?

14   A.  Yes.

15   Q.  And what changes about the guns?

16   A.  The type of gun, to a .22 and to a 9.

17   Q.  Do you know if Reckless ever had a .22?

18   A.  Yes.

19   Q.  Do you know if he ever had it?

20   A.  Yes.

21   Q.  What is the actual lyric from that Waka Flocka song?

22   A.  "Ring alarm, them boys in town, like JOC, lay that pussy

23   nigga down, I don't talk, I don't laugh, I just frown, from the

24   eagle to the chopper, I love that gun sound."

25

1    Q.  From the eagle to the what?

2    A.  Chopper.

3    Q.  What is a chopper?

4    A.  An AK.

5    Q.  An AK-47?

6    A.  Yes.

7    Q.  So in the lyric, the lyric refers to a chopper?

8    A.  Yes.

9    Q.  Here it refers to a .22 and a 9?

10   A.  Yes.

11   Q.  What is an eagle?

12   A.  A desert eagle.  A gun, a desert eagle.

13   Q.  And that's in the lyric?

14   A.  Yes.

15   Q.  Turning to page 12, the June 5, 2010 posting at the bottom

16   of page 12.

17          Can you read that posting?

18   A.  "Yo why these heights niggas snitching Nygee and Day Day,

19   damn, I thought y'all was tough, LOL, but I might do this seven

20   years, something like out of 10 stacks ball -- actually 10

21   stacks bail, Free freaky and Ty Murda, Star Status all day."

22   Q.  Do you know a Freaky?

23   A.  Yes.

24   Q.  Who is freaky again?

25   A.  Tyrik, Ty Murda, Tyrik.

1   Q.  And it says here, Free Freaky.  Do you know if Freaky was

2   ever arrested?

3   A.  Yes.

4   Q.  Turning to page 14, the posting dated June 8, 2010.  Can

5   you read that?

6   A.  "Macking and all that.  Hit me up, Star Status, you

7   already, I get money and it don't cost a thing to get popped."

8   Q.  Do you know where that phrase is from?

9   A.  I don't, no.

10  Q.  Do you know what the word "popped" means?

11  A.  Shot.

12  Q.  Turning to page 15, the posting dated June 16, 2010.

13          Can you read that?

14  A.  "Macking, stacking this bread on my flea boy shit, hit me

15  up, Star Status."

16  Q.  Do you know what "bread" refers to?

17  A.  Money.

18  Q.  What does "stacking bread" mean?

19  A.  Saving -- like, saving, yeah.

20  Q.  Do you know who this is referring to as "flea boy"?

21  A.  Yes.  Reckless, like fly.

22  Q.  Can you say that again?

23  A.  I said, flea is like fly.  Like flea is like another word

24  for fly.

25  Q.  Flea is another word for fly?

1    A.   Yes.

2    Q.   Turning to page 18, the posting at the bottom dated July 7,

3    2010.

4            Can you read that, please.

5    A.   "Jewelry three below, niggas get Peter rolled, tunnel

6    vision on that money, I don't see ya ho, free my son, Ty

7    Murda."

8    Q.   Do you know what "Peter rolled" means?

9    A.   Body, killed.

10   Q.   Turn to page 19.  The first posting dated July 12, 2010,

11   can you read that?

12   A.   "Macking on Dubois getting money, holla at me 1.

13   Q.   Have you ever seen Reckless on Dubois Street?

14   A.   Yes.

15   Q.   Have you ever seen Reckless on Dubois Street dealing drugs?

16   A.   Yes.

17   Q.   Going back to the July 12, 2010 posting, "Macking on

18   Dubois," what does getting money mean?

19   A.   Getting money, like, trapping.  I mean, selling.

20   Q.   Selling what?

21   A.   Crack.

22   Q.   Turning to page 20, the posting dated July 25, 2010 at the

23   top.  Can you read that?

24   A.   "Last night was wavy, with AD Poppa, E Dubs, Baynes Dev

25   Rock, James Pooters and some Middletown chicks shaking my head,

1   bitches is nasty.  Hit me up, though."

2   Q.  It refers to Pooters.  Is that the same footers you

3   referred to before?

4   A.  Yes.

5   Q.  There is a reference to James.  You had mentioned a James

6   before, is that the same James or a different James?

7   A.  The same.

8   Q.  Page 23, the posting dated July 30, 2010.  Please read

9   that.

10  A.  "Macking with my left hand Baynes.  I got da gallon of

11  Henny and a half pound of kutch who trying to get wavy and

12  everything on me, LMAO.  Hit me up, though."

13  Q.  What does my left hand Baynes mean?

14  A.  It's like same as right hand, like right hand.

15  Q.  The same as the right hand?

16  A.  Yes.

17  Q.  What did he mean by that?

18  A.  Like a person that you do most stuff with, like your main

19  person.

20  Q.  Like right-hand man?

21  A.  Yes.

22  Q.  If you can turn to page 31.  It is an October 5, 2010

23  posting at the top.  Can you read that?

24  A.  "Fuck 2 to 6, I'm about to go to Court hit me up.  Where my

25  son Baynes at?"

1   Q.  Do you see there's postings below that?

2   A.  Yes.

3   Q.  Who are these postings from?

4   A.  Me, and Reckless.

5   Q.  Who are you?

6   A.  "Biggah Flea Guy YGonna."

7   Q.  What was this conversation about?

8   A.  Meeting up.

9   Q.  Where were you going to meet up?

10  A.  On William and Southwest.

11  Q.  Please turn to page 33.  It is a posting dated December 15,

12  2010.  Can you read that?

13  A.  "What the fuck niggas keep putting my name in shit, shaking

14  my head hate, Newburgh people.

15  Q.  What does putting somebody's name in shit mean?

16  A.  Putting, like, telling a story and then having that person

17  name inside of it, like, like, putting -- when you tell

18  somebody something and you tell it, you put that person's name

19  in it, like, saying it.

20  Q.  Did you ever use that phrase?

21  A.  Yes.

22  Q.  In the days after the 54 Chambers robbery were you using

23  Facebook?

24  A.  Yes.

25  Q.  Did you post anything similar about people putting your

1    name in shit?

2    A.   Yes.

3    Q.   When you did that what were you talking about?

4    A.   Everybody.

5    Q.   What was the thing that your name was being put into that

6    you were talking about?

7    A.   The murder that happened at 54 Chambers Street.

8    Q.   Why were you posting that people were putting your name

9    into that on Facebook?

10   A.   Because people was telling me a whole bunch of like random

11   stories saying that they thought, what they heard happened.

12   Q.   Why were you posting about the fact that people were

13   putting your name into it on Facebook?

14   A.   Just so that they can, like, think that nothing, everything

15   didn't have nothing to do with me, nothing that was involving

16   me.

17   Q.   What did you just say?

18   A.   So they wouldn't think that anything was involving me.

19   Q.   That you weren't involved in it?

20   A.   Yes.

21   Q.   But you were involved in it?

22   A.   Yes.

23   Q.   Turning to page 34, the posting dated April 6, 2011.  Can

24   you read that?

25   A.   "I had a dream I was rich, but I woke up with a couple of

E87nchr4                        Baynes - direct

1   stacks and a gun in my hand shaking my head."

2   Q.  What are stacks?

3   A.  Thousands.

4   Q.  Thousands of what?

5   A.  Of dollars.

6   Q.  Turning to page 35, it is a posting.  Can you read that.

7   A.  "Free my son Baynes.  He's a innocent man, word too."

8   Q.  When were you arrested?

9   A.  April 6.

10  Q.  What year?

11  A.  2011.

12  Q.  Turning to page 39, who is that in the photograph?  Do you

13  know?

14  A.  Reckless.

15  Q.  Page 42, who is that in the photograph?

16  A.  Reckless.

17  Q.  Page 43, who is that in the photograph?

18  A.  Reckless.

19  Q.  I want to turn to the robbery at 54 Chambers Street.  Why

20  were you going to rob that location?

21  A.  Why what?

22  Q.  Why were you going to rob 54 Chambers Street?

23  A.  For money and drugs.

24  Q.  What kind of drugs were you looking for?

25  A.  Weed, crack, coke, anything like that.

E87nchr4                        Baynes - direct

1   Q.   Was that the only location you had been looking at to rob?

2   A.   No.

3   Q.   What other locations did you look at?

4   A.   A spot on Lander, a spot on City Terrace, a spot on

5   Johnson, on South Miller -- I mean South Street.

6   Q.   You keep saying the word "a spot."  What do you mean by a

7   spot?

8   A.   A crack spot or a weed spot.

9   Q.   What is a crack spot?

10   A.   A place they sell crack at.

11   Q.   What is a weed spot?

12   A.   A place they sell weed at.

13   Q.   How soon before the robbery did you learn that the plan was

14   to rob a drug spot?

15   A.   Like that same day.

16   Q.   Did you have any conversations with Reckless before the day

17   of the robbery about robbing a drug spot?

18   A.   Yes.

19   Q.   About how soon before the day of the robbery did you have

20   those conversations?

21   A.   Like two weeks before.

22   Q.   What conversations did you have?

23   A.   Just walking past the spot, we're just, you know, a spot,

24   saying that that is a good spot, a lot of people go there and

25   stuff, and what makes the most money.

E87nchr4                          Baynes - direct

1   Q.  Mr. Baynes, please speak up and just answer that question

2   again.

3   A.  We was -- we, like, walked around and we would point out a

4   random spot, and we'd just say which one makes the most money

5   and had the most people coming.

6   Q.  Who came up with the idea to rob a drug spot?

7   A.  Reckless.

8   Q.  And why did you need money?

9   A.  To start selling our own drugs.

10  Q.  What do you mean by that?

11  A.  We was going to start selling on star -- I mean, on Dubois

12  Street and Lander Street, start selling.

13  Q.  What do you mean your own stuff?

14  A.  Our own supplies that we was -- instead of robbing and

15  stuff like that, we would have our own stuff.

16  Q.  Where were you getting the drugs to sell before?

17  A.  We robbed, like, other drug dealers.

18  Q.  What was the point of robbing a drug spot?

19  A.  To front, like, to have, so we would have more, more money

20  for drugs.

21              (Continued on next page)

22

23

24

25

473

1   Q.  Was there a particular place you wanted to sell after the

2   robbery?

3   A.  Dubois Street and Lander Street.

4   Q.  I think you said you were walking around pointing out

5   places.  Who were you walking around with?

6   A.  Days before the robbery just me and Reckless.  But the day

7   of the robbery, me, Reckless, and Lou.  Then me Reckless and

8   Quay were.

9   Q.  So let's talk about the day of the robbery.  Did you meet

10  Reckless that day?

11  A.  Yes.

12  Q.  When did you first meet him?

13  A.  Around like twelve, eleven.

14  Q.  In the afternoon or night?

15  A.  Afternoon.

16  Q.  And what did you do when you first met with Reckless that

17  day?

18  A.  We started walking around and he was just pointing out

19  spots and saying that which one was good to rob.

20  Q.  And at that point who were you walking with?

21  A.  Me, Reckless, and Lou.

22  Q.  Who is Lou?

23  A.  A friend I was with.

24  Q.  Was he a member of Star Status?

25  A.  No.

E879CHR5                          Baynes - direct

1    Q.  After you walked around with Reckless and Lou, what

2    happened?

3    A.  We end up dropping off Lou and going to pick up Quay Quay.

4    Q.  Where did you pick up Quay Quay?

5    A.  At Reckless's grandmother's house.

6    Q.  Where is Reckless's grandma's house?

7    A.  Broadway.

8    Q.  On Broadway?

9    A.  Yes.

10   Q.  What happened after you picked up Quay Quay?

11   A.  We went back to choosing which spot we was gonna rob.

12   Q.  And at that point what spots were in play?

13   A.  A spot on Lander Street and 54 Chambers.

14   Q.  What was discussed, if anything, about 54 Chambers and this

15   other spot on Landers Street?

16   A.  That they have the most people that come to them, the most

17   drugs and stuff.

18   Q.  What do you mean they have the most?

19   A.  Like more people come to them so they have more money, more

20   drugs, more -- everything.

21   Q.  Did there come a time when you went to Dubois Street?

22   A.  Yes.

23   Q.  Where on Dubois Street did you go?

24   A.  Around Dubois and Van Ness.

25   Q.  Dubois and Van Ness?

E879CHR5                         Baynes - direct

1    A.  Yes.

2    Q.  Who was there when you went to Dubois Street?

3    A.  L-1.

4    Q.  And where was L-1 when you saw him on Dubois Street?

5    A.  He was on the porch.

6    Q.  The porch of what?

7    A.  Of a house, apartment I would say.

8    Q.  What happened when you got there?

9    A.  Him and Reckless started talking and Reckless just end up

10   like filling him in on everything that we was planning on

11   doing.

12   Q.  What do you mean Reckless began filling L-1 in on what you

13   were planning on doing?

14   A.  He started telling him that we was gonna rob the place and

15   that asking him was he -- just telling him like everything we

16   was doing.

17            MR. NAWADAY:  Ms. McInerney if you can please pull up

18   Government Exhibit 204.

19   Q.  Who is this person?

20   A.  L-1.

21   Q.  Was that the person Reckless was talking to?

22   A.  Yes.

23   Q.  And what, if anything, did L-1 say when Reckless brought

24   this up?

25   A.  He was -- yeah, he was just saying he was with it.

1  Q.  What do you mean "with it"?

2  A.  That he was willing to do it with us, help us.

3  Q.  What happened after Reckless said that he was with it?

4  A.  He and L-1 end up calling somebody to bring him a gun.

5  Q.  And what -- did you hear L-1 have that conversation?

6  A.  Yes.  He told him to come through with the chain.

7  Q.  What is a chain?

8  A.  Another word for a gun.

9  Q.  And when you heard that from L-1 was he on the phone or was

10  he telling this to someone in person?

11  A.  He was on the phone.

12  Q.  What happened after L-1 called somebody to bring a chain?

13  A.  A lady showed up like five minutes later and L-1 pointed to

14  the house and he just said drop it in the mailbox.  So the lady

15  dropped the whole purse in the mailbox and left.

16  Q.  Do you know what was in the purse?

17  A.  I didn't see it but a gun.

18  Q.  Do you know if L-1 made any other calls while you were

19  there?

20  A.  Yes.

21  Q.  Who else did he call?

22  A.  He started calling people and telling them that he had

23  something for them and to come through.

24  Q.  After he made those calls did anyone else come to that

25  porch?

E879CHR5                          Baynes - direct

1    A.  Yes.  Somebody named Bash, Bow Wow, and Gucci.

2    Q.  You mentioned someone named Bash came?

3    A.  Yes.

4            MR. NAWADAY:  Ms. McInerney can you please put up

5    Government Exhibit 205.

6    Q.  Do you know who that is?

7    A.  Yes.  Bash.

8    Q.  So Bash came and who else came?

9    A.  Bow Wow and Gucci.

10   Q.  What happened when Bash, Bow Wow, and Gucci arrived?

11   A.  We all was about to go inside of the -- inside of the

12   hallway of one of the houses.  But me and Bash didn't get along

13   so he said that he didn't want me to come with him.  So me and

14   Quay Quay, we was -- we stayed on the porch while all of them

15   went inside.

16   Q.  Why did Bash and you not get along?

17   A.  We fought once before.

18   Q.  What was the fight about?

19   A.  I don't know.  He just -- we just fought.  I guess he

20   didn't like me for some reason.

21   Q.  Where did you stay after Bash, Gucci and Bow Wow went into

22   the hallway?

23   A.  On the porch.

24   Q.  Where was Reckless and L-1 at that point?

25   A.  In the hallway where everybody else was.

1   Q.  Did you hear any conversation inside?

2   A.  L-1 got off the phone and he was telling everybody that he

3   just sent somebody there, into 54 Chambers and that the person

4   said that was good, they just re'd up and that everything was

5   good for us.

6   Q.  What does it mean re-up?  Is that the word you used?

7   A.  Yes.  They just bought more supplies, more drugs.

8   Q.  Who bought more supplies?

9   A.  The people that was selling out of 54 Chambers.

10  Q.  And what was L-1 saying to everyone in that hallway?

11  A.  That whoever he just called was telling him that it was

12  good, good robbery for us.

13  Q.  Why was it a good robbery for you?

14  A.  Because they just -- the people that just re'd up and had a

15  lot of drugs in there.

16  Q.  Did you and Quay Quay stay on the porch?

17  A.  No.

18  Q.  Where did you go?

19  A.  We end up leaving to my house.

20  Q.  Did you say anything to Reckless before you left?

21  A.  Right before we left Reckless came out and he asked us

22  where we was going.  I told him that we was going back to my

23  house.

24  Q.  Where did you go?

25  A.  We went to my house.

1   Q.  Around what time of night was it when you left the porch?

2   A.  I don't know.  It was real late though.

3   Q.  What did you say?

4   A.  It was late.  I don't know what time.

5   Q.  Was the sun out?

6   A.  No.

7   Q.  What did you do when you got to your house?

8   A.  We stayed at my house for like an hour just on the computer

9   and playing games.

10  Q.  Did you stay there all night?

11  A.  No.

12  Q.  Please speak up, Mr. Baynes.

13        Where did you go?

14  A.  We ended up leaving going back to Dubois Street and we

15  didn't see nobody so we went to South Miller Street.

16  Q.  And what happened when you got to South Miller Street?

17  A.  We ended up seeing a crowd on the porch and we went up to

18  them, asked them did they see Reckless anywhere and they just

19  told us -- they told us that they just left and that we can

20  catch them.

21  Q.  What did you do?

22  A.  We ended up running to First Street.  They was in between

23  South Miller and Johnston on First Street.

24  Q.  Who is they?

25  A.  Reckless, Bash, Bow Wow, Gucci, and Baby E.

E879CHR5                      Baynes - direct

1    Q.  Who is Baby E?

2    A.  Baby E is Eric.  Somebody from the Heights.

3    Q.  Was he at L-1's house before?

4    A.  No.  Not while I was there.

5    Q.  How was each person dressed when you caught up to them?

6    A.  All black -- all black hoodies, black boots, and facemasks

7    and black flags across their face.

8    Q.  When you say black flag, do you mean like a bandanna?

9    A.  Yes.

10   Q.  Describe the masks.

11   A.  Some of them, like the full ski mask that go over their

12   head.  Some of them put like the half ski mask that only comes

13   to your nose and you got to strap it in the back.

14   Q.  Do you remember what Reckless's mask looked like?

15   A.  Half-mask, half-mask that you had to strap in the back.

16

17   Q.  What do you mean by half-mask?

18   A.  It only came up to your nose.  It didn't go all the way up.

19   Q.  It only came up to the nose?

20   A.  It only came up to your nose.

21   Q.  How were you dressed?

22   A.  Black hoodie, jeans, and boots too.

23   Q.  When you caught up with the rest of them did you see any

24   guns?

25   A.  Some of them.

E879CHR5                        Baynes - direct

1    Q.  Who do you remember seeing with a gun?

2    A.  I don't remember who had -- just some people had them.

3    Q.  So what happened after you caught up to them?

4    A.  Bow Wow end up telling me and Quay Quay to stay and stay

5    lookout for them.  And we ended up walking down the street.

6    Q.  What do you mean stay lookout for them?

7    A.  While they rob, me and him stay lookout for police.

8    Q.  You and who?

9    A.  Quay Quay.

10   Q.  Where did you go?

11   A.  We went down First Street to Chambers Street.

12   Q.  What happened when you got to Chambers Street?

13   A.  Once we got to 54 Chambers, there was three people outside

14   and we robbed them all.

15   Q.  How did you rob them?

16   A.  They pulled out their guns and then after that they didn't

17   have -- end up emptying their pockets giving us everything.

18   Q.  Who pulled out guns?

19   A.  Bow Wow, Bash, Reckless, Gucci and Baby E.

20   Q.  What were you doing at that point?

21   A.  I was in with -- I was there.

22   Q.  How close were you to them?

23   A.  Right in the circle with everybody.

24   Q.  Can you say that again and please say it more loudly and

25   clearly, Mr. Baynes.

1   A.   I was in the circle with everybody.

2              MR. GOLTZER:  I can't hear.  I'm sorry.

3              THE WITNESS:  I was in the circle with everybody.

4              MR. BUCHWALD:  Can we have that read back.

5              THE WITNESS:  I was inside -- I was in the crowd.

6   With everybody else in the crowd.

7   Q.   And exactly like that, Mr. Baynes, please speak clearly and

8   loudly.

9              What happened after the men outside were robbed?

10  A.   They pointed -- the people that was robbing ended up

11  pointing inside the house and the people that was being robbed

12  ended up walking inside the house.  And the robbers was

13  following.  Everybody besides me and Quay Quay.

14  Q.   So the people who were outside were brought into the house?

15  A.   Yes.

16  Q.   Who went into the house first?

17  A.   Two of the people that was getting robbed outside.

18  Q.   And who followed them in?

19  A.   Bow Wow, Reckless, Gucci, Baby E and -- and -- and Bash.

20  Q.   What did you and Quay Quay do?

21  A.   We stayed at the door.

22  Q.   What happened next?

23  A.   We ended up -- well we opened the door, peaked in and we

24  end up hearing the commotion.  So we went inside and we saw

25  Reckless wrestling with somebody, one of the people that was

E879CHR5                           Baynes - direct

1    being robbed with a gun in their hand.

2    Q.  What did you do when you saw that?

3    A.  We end up trying to pull them away from each other.  We end

4    up grabbing the guy that was being robbed trying to get him off

5    him.

6    Q.  Get him off of who?

7    A.  Reckless.

8    Q.  I want to backup.  Describe the inside of the apartment you

9    went into.

10   A.  Once you walked through the door it's like a hallway.  Then

11   once you get past the hallway it's, like a big living room.

12   Q.  When you first entered, where was everyone besides Reckless

13   and the man he was wrestling with?

14   A.  They was -- everybody else was still in the hallway.

15   Q.  Describe how you were trying to help Reckless?

16   A.  We was grabbing the man and pulling him.

17   Q.  Who were you grabbing?

18   A.  The guy that was being robbed.

19   Q.  And describe how you -- what you saw Reckless and that man

20   doing when you saw them wrestling together?

21   A.  They had a gun in the air like and they both was fighting

22   for the gun, both wrestling each other fighting for the gun.

23   Q.  About how tall are you?

24   A.  Six foot.

25   Q.  Is Reckless taller or shorter than you?

1    A.  Around the same height.

2    Q.  How close were you to Reckless and that man when you were

3    trying to help out?

4    A.  I was right there, on him.  I was on him, right next to

5    him.  Right grabbing him.

6    Q.  Grabbing who?

7    A.  The person that was being robbed.

8    Q.  What happened when you jumped in?

9    A.  Reckless let go of the gun.  He left.  He ran out the room.

10   Quay Quay ended up running out the room.  So I tried to hide.

11   And one of the people end up -- that was in another room end up

12   seeing me and he came and grabbed me.  He started stabbing me.

13   Q.  Who came and started stabbing you?

14   A.  One of the people that was being robbed that was inside of

15   another room.

16   Q.  Do you know where Reckless's gun was at that point?

17   A.  The guy took it from him, the --

18   Q.  Which guy?

19   A.  The one that he was wrestling with.

20   Q.  Do you know what happened, if anything, with Reckless's

21   mask?

22   A.  I don't know.  He didn't have it on though when I went back

23   inside the room.  But I don't know what happened to it.

24   Q.  At what point did he not have it?

25   A.  Once I ran back inside the hallway, he didn't have no mask

E879CHR5                           Baynes – direct

1   on at that time.  After all the wrestling with the gun.

2   Q.  Was this after you got stabbed?

3   A.  Yes.

4   Q.  What did you do after you were stabbed?

5   A.  I got off the -- I mean I broke free and I ran back into

6   the hallway where everybody else was at.

7   Q.  What did you see when you got back in the hallway?

8   A.  Once I ran past Baby E started shooting back inside of the

9   living room part of the house and Bow Wow and Bash was

10  kicking -- they was kicking at the door, trying to get it

11  opened.

12  Q.  Which door were Bow Wow and Bash kicking at?

13  A.  The door that you walk in from the outside.

14  Q.  The front door?

15  A.  Yes.

16  Q.  Which way was Baby E shooting?

17  A.  Inside the house, back inside the house.

18  Q.  Towards the people who -- that were being robbed?

19  A.  Yes.

20  Q.  What part of the house were you in at that point?

21  A.  In the hallway.

22  Q.  About how close to the front door were you?

23  A.  Right there.

24          Right there.  I can touch the door right there.

25  Q.  You were an arm's length?

1   A.  Yes.

2   Q.  And where were Bow Wow and Bash?

3   A.  They was in front of me kicking at the door.

4   Q.  Do you know why they were kicking at the door?

5   A.  Somebody was, on the outside, holding the door, blocking us

6   from getting out.

7   Q.  At that point where was Reckless, Quay Quay, and Gucci?

8   A.  They was right behind me.  They was behind me.

9   Q.  About how far away from you?

10  A.  We all was in touching distance.  We could all touch each

11  other.

12  Q.  Were you bumping up against each other?

13  A.  Yes.

14  Q.  Do you remember if at any point you were bumping up against

15  Bow Wow?

16  A.  No.  He was in front of me.

17  Q.  What happened after Bash and Bow Wow were trying to kick

18  the door?

19  A.  They realized they wasn't going to open it that way so

20  Gucci came and tried helping them and they was taking turns,

21  one of them will pull -- pull the door open.  The way that the

22  door opened, it opens towards the inside.  So one of them would

23  pull the door open while the other one would stick his hand out

24  and start shooting.

25  Q.  Who were the people who were doing that at that point?

 1   A.   It was Bow Wow, Bash, and Gucci.

 2   Q.   How were they shooting?

 3   A.   They were -- have to stick their hand out real quick and

 4   shoot.  And then hurry up and pull their hand back in before

 5   the door shut.

 6   Q.   And were they each doing this?

 7   A.   Yes.  They was rotating, like taking turns.

 8   Q.   Please demonstrate how they were shooting.

 9   A.   They would have to stick their hand out.  They would go to

10   the left of the door and they would stick the hand out and

11   start shooting quick and hurry up and pull their hand back in.

12   Q.   You're making a motion.  What were they shooting through?

13   A.   They were shoot like through the crack of the door.  Once

14   the door would crack and they just had to hurry up and put

15   their hand out.

16   Q.   So am I right when the door became partially opened --

17   A.   Yeah.

18   Q.   -- they would stick their hand through?

19   A.   Yes.

20   Q.   And then shoot?

21   A.   Yes.

22   Q.   Do you know if you were bleeding at any point during this?

23   A.   At that time I was bleeding but I thought somebody was

24   scared and they was peeing on me.

25   Q.   Why did you think someone was scared?

1    A.  Because somebody -- somebody was right behind me and they

2    was rubbing on the spot that I was bleeding at.

3    Q.  So at the time you thought someone was peeing on you?

4    A.  Yes.

5          MR. GOLTZER:  I'm sorry.  I couldn't hear you,

6    Mr. Nawaday.

7    Q.  So at the time you thought somebody was peeing on you.

8    A.  Yes.

9    Q.  About how many shots do you remember hearing being fired?

10   A.  A lot.  I don't remember.

11   Q.  What happened next?

12   A.  Somebody screamed and then the door was opened and we all

13   ran out -- out the front door.  I looked over and saw a man

14   shot and I just kept going.

15   Q.  You said somebody screamed.  Was it from inside or outside?

16   A.  It sounded like it was from the outside.

17   Q.  Where did you -- after you ran out of the 54 Chambers where

18   did you see this man?

19   A.  Right to the left of the -- right where you walk out, on

20   the left of the wall -- the wall outside of the front of the

21   house.

22   Q.  Describe what that man was doing at that point.

23   A.  He was just holding on to hisself leaning against the wall.

24   Q.  Do you remember who the first people out were?

25   A.  Whoever was shooting at that point was out first.  Because

1    the other two people that was pulling the door open they was

2    like stuck behind the door.  And after that it was me and

3    whoever was behind me.

4    Q.  So, how many people left before you did?

5    A.  One.

6    Q.  Who was that person?

7    A.  I don't remember.  I don't know.

8    Q.  And you said the other two people who were helping pull the

9    door were stuck behind the door.  What do you mean?

10   A.  Like the way that they was pulling the door open, the

11   door -- once they let go, like they was -- the door was

12   blocking them from running outside.  So they had to run around

13   it and wait for everybody else to run out.

14   Q.  So you were the second one to leave?

15   A.  Yes.

16   Q.  After you turned back and looked at the man who was

17   clutching himself, what did you do?

18   A.  I kept running up First Street.

19   Q.  Where did you go?

20   A.  I went to Johnston Street and turned down Johnston.

21   Q.  When you were running down First Street who was running

22   with you?

23   A.  I don't know who was running but it was like four people

24   that I could see.

25   Q.  Were they the people --

1    A.  Yes.  That I was robbing with.  They was all people I was

2    there -- I came there with.

3    Q.  They were people you went to 54 Chambers to rob 54 Chambers

4    with?

5    A.  Yes.

6    Q.  You were running with them down First Street?

7    A.  Yes.

8    Q.  What happened next?

9    A.  I turned down Johnston Street and once I turned down

10   Johnston Street Quay Quay said that I was shot because he saw

11   blood going down my legs -- I mean down my pants.  So he looked

12   at it and he then -- we end up going to his grandmother's

13   house.  His mom end up telling me that I need to go to the

14   hospital, that she was going to take us.  But I told her that I

15   could walk.  And me and Quay Quay walked to the hospital.

16   Q.  Where was Quay Quay's grandma's house?

17   A.  On Broadway.

18          On Broadway.

19   Q.  On Broadway?

20   A.  In between Johnston and South Miller.

21          MR. NAWADAY:  Your Honor, I don't know if this is a

22   good time for the afternoon break.

23          THE COURT:  Why don't we do that, ladies and

24   gentlemen.  It's ten minutes after the hour so please make sure

25   to be in that jury room no later than 25 after.

E879CHR5                        Baynes – direct

1              Until then don't discuss the case.  Twenty-five after

2      three.

3              (Jury excused)

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  (In open court)

2                  THE COURT:  Mr. Baynes, you may step down.

3                  (Witness excused)

4                  (Recess)

5                  THE COURT:  Are we ready?

6                  MR. NAWADAY:  Yes, your Honor.

7                  THE COURT:  We have everyone?

8             Mr. Baynes, I'm going to follow up on Mr. Nawaday's

9    instructions.  Please, please, try to keep your voice up so we

10   can all hear you.

11                 THE WITNESS:  Mm-hmm.

12                 THE COURT:  Not like that.

13                 (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2               THE COURT:  Everyone be seated.

3               Mr. Nawaday.

4               MR. NAWADAY:  Thank you, your Honor.

5      BY MR. NAWADAY:

6      Q.  I want to go back to who had guns.  Who were the people you

7      saw who had guns during the robbery?

8      A.  Reckless, Bash, Gucci, Bow Wow, and Baby E.

9      Q.  That's five?

10     A.  Yes.

11     Q.  Who did not have guns?

12     A.  Me and Quay Quay.

13     Q.  Now, when you were trying to help Reckless, how did you put

14     hands on the person Reckless was fighting with?

15     A.  Just grabbed him, like wrapped my hands around him.  I just

16     pulled him.

17     Q.  Did you try to jump on him at any point?

18     A.  No.

19     Q.  When you say hands on him, please demonstrate that.

20     A.  Like first I was grabbing at his shirt.  Then I was

21     grabbing at his arms trying to like pull his arms away from the

22     gun.  Like just grabbing him.

23     Q.  Were only your arms and hands touching him?

24     A.  No.  My whole body was.

25     Q.  Was it just one hand or one arm?

1    A.  Both arms, both hands, everything.

2    Q.  Of the robbers who was the last one out of that room?

3            MR. GOLTZER:  Objection.  Lack of foundation.

4    Personal knowledge.

5            THE COURT:  If you know.

6            THE WITNESS:  Of the living room?

7    Q.  Of the room where you were wrestling with that guy?

8    A.  Me.

9    Q.  Who?

10   A.  Me.

11   Q.  When you were by the front door and you all were trying to

12   get out, where did you hear gunshots coming from?

13   A.  From the door, inside the house, and from Baby E shooting.

14   Q.  You said inside the house.  Was someone inside the house

15   other than Baby E shooting?

16   A.  It sounded like somebody was shooting back at Baby E.

17   Q.  You said it sounded like someone was shooting back at

18   Baby E?

19   A.  Yes.

20   Q.  During that time were you only facing the front?

21   A.  Yes.

22   Q.  Did you turn around at any point?

23   A.  In the beginning.  But then after they started shooting I

24   was just watching the door.

25   Q.  So in the beginning you looked back?

E879CHR5                          Baynes – direct

1    A.  Yes.

2    Q.  I want to move back to after the robbery.  What happened

3    when you got to Quay Quay's grandmother's house?

4    A.  His mother saw my wound and she just told me I got to go to

5    the hospital and she said she would take me but I told her I

6    could walk.  So me and Quay Quay end up walking to the

7    hospital.

8    Q.  Was anyone else there at the house?

9    A.  Yes.  Reckless was there once we got there.

10   Q.  Did you have any conversation with Reckless at that point?

11   A.  Yeah.  He was just acting like he didn't know what was

12   going on.  He was looking at my wound.  And after that he just

13   left.

14   Q.  Did you go to the hospital?

15   A.  Yes.

16   Q.  How did you get there?

17   A.  I walked.

18   Q.  About how far from the hospital is from Quay Quay's

19   grandma's house?

20   A.  Right around the corner.

21        MR. NAWADAY:  Ms. McInerney, can you please put up

22   Government Exhibit 251.

23   Q.  Can you see the area where you saw L-1 that day?

24   A.  On Dubois and Van Ness right in between St. Luke's and

25   Broadway.

E879CHR5                          Baynes - direct

1   Q.  Where did you go after L-1's again?

2   A.  To my house.

3   Q.  Where is that?

4   A.  On Mill Street.  That's up Broadway.

5   Q.  Do you see it on this map?

6   A.  Yes.  It's across -- across town all the way up Ann Street

7   you can see Mill Street.

8   Q.  And when you left L-1's, how did you get to your house?

9   A.  I walked.

10  Q.  About how long a walk is that?

11  A.  About five minutes.

12  Q.  Do you see where 54 Chambers Street is?

13  A.  Yes.

14  Q.  Where is that?

15  A.  Down between First Street and Broadway, closer to First

16  Street.

17  Q.  About where that A is?

18  A.  Yes.

19  Q.  I want to show you what's already in evidence, certain

20  clips from Government Exhibit 252.

21        MR. NAWADAY:  Ms. McInerney can you play Government

22  Exhibit 252 and this is the First and Lander west view starting

23  at timestamp 00:17:20 just play it through 00:17:35.

24        (Video played)

25  Q.  Do you recognize this street?

1    A.  Yes.

2    Q.  What street is this?

3    A.  First Street.

4            MR. NAWADAY:  Pause it.

5    Q.  Do you recognize anyone in this frame?

6    A.  Yes.

7    Q.  Who do you recognize?

8    A.  Me, and Quay Quay.  I got the black hoodie on with the gray

9    underneath and behind the two people in the front.  And

10   Quay Quay is right beside me with the all-black hoodie on.

11   Q.  How are you able to recognize yourself?

12   A.  Because I remember what I was wearing.

13   Q.  You were there?

14   A.  Yes.

15   Q.  Where were you walking at this moment?

16   A.  Down First Street towards 54 Chambers.

17   Q.  Is this before the robbery?

18   A.  Yes.

19   Q.  Is this after you caught up with everyone else?

20   A.  Yes.

21   Q.  And who do you remember walking next to?

22   A.  Quay Quay.

23   Q.  Do you see Quay Quay in this frame?

24   A.  Yes.  He's right next to me.

25   Q.  I'm going to hand you what's been marked for identification

E879CHR5                              Baynes - direct

1    as Government Exhibit 252K.  Tell me if you recognize it.

2    A.  Yes.

3    Q.  Is that a still from the video we just saw?

4    A.  Yes.

5    Q.  At timestamp 00:17:35?

6    A.  Yes.

7              MR. NAWADAY:  Government offers Government Exhibit

8    252K.

9              MR. GOLTZER:  No objection.

10             THE COURT:  252K will be received.

11             (Government's Exhibit 252K received in evidence)

12   Q.  Do you remember who you were walking with towards 54

13   Chambers that night?

14   A.  Yes.

15   Q.  Who were the people?

16   A.  Reckless, me, Bash, Quay Quay, Gucci, and Bow Wow, and

17   Baby E.

18   Q.  Do you know who the people in front of you were at this

19   point?

20   A.  The person in the black was Reckless.

21   Q.  Do you know the person next to him?

22   A.  No.

23             MR. NAWADAY:  Ms. McInerney, if you can continue

24   playing and stop at timestamp 00:17:45.

25   Q.  Is there anyone in this frame that you can recognize?

1    A.   Bash.

2    Q.   Who is Bash?

3    A.   He got the white hoodie under his jacket in the street.

4    Q.   How are you able to recognize Bash?

5    A.   I remember him having the white hoodie on.

6    Q.   Do you remember anything else about what he was wearing

7    that night?

8    A.   Yeah.  He was all black but just the white hoodie under and

9    he had white gloves on.

10   Q.   He had white what?

11   A.   Gloves.

12   Q.   Gloves?

13   A.   Yes.

14   Q.   Can you tell who the other two people are in this frame at

15   00:17:45?

16   A.   No.  I don't remember.

17   Q.   I'm going to hand you what's been marked for identification

18   as Government Exhibit 252.

19            Is that a still of the video we just stopped at?

20   A.   Yes.

21            MR. NAWADAY:  The government offers Government Exhibit

22   252L.

23            THE COURT:  L?

24            MR. NAWADAY:  L.

25            THE COURT:  Any objection?

E879CHR5                              Baynes - direct

1           MR. GOLTZER:  No.

2           MR. BUCHWALD:  No.

3           THE COURT:  252L will be received.

4           (Government's Exhibit 252L received in evidence)

5           MR. NAWADAY:  Ms. McInerney can you please play the

6    east view of Government Exhibit 252 starting at timestamp

7    00:17:20 and stopping at 00:17:40.

8           (Video played)

9           MR. NAWADAY:  You can keep playing and stop at 17:42.

10   Q.  Do you recognize anyone here?

11   A.  Yes.  Me and Quay Quay.

12   Q.  Which person is you?

13   A.  I'm closer to the wall and.

14   Q.  And who is Quay Quay?

15   A.  The one closer to the stop sign.

16   Q.  Again, what street are we on?

17   A.  This is Lander and First Street.

18   Q.  Which street is First?

19   A.  The one with the stop sign on, going down.

20   Q.  And the cross street is Lander?

21   A.  Lander, yes.

22   Q.  Do you see there's an awning right there?

23   A.  A what?

24   Q.  Awning.

25   A.  An awning?

E879CHR5                      Baynes - direct

1   Q.  Do you know what's on the corner, if anything, of Lander

2   and First?

3   A.  A store.

4   Q.  What kind of store?

5   A.  A corner -- a corner, regular store.

6   Q.  A corner store?

7   A.  Yes.

8   Q.  And can you see that corner store in this frame?

9   A.  Yes.

10  Q.  Where?

11  A.  Right over my head.

12  Q.  To your right?

13  A.  Yes.

14  Q.  Before we stop this frame, there are two people that pass

15  by you?

16  A.  Yes.

17  Q.  I'm sorry.  Withdrawn.

18           Two people who were ahead of you?

19  A.  Yes.  Yes.

20  Q.  Do you know who they were?

21  A.  The first one was Reckless but I don't know -- I don't

22  remember the second one.

23  Q.  I'm going to hand you what's been marked for identification

24  as Government Exhibit 252M.

25           Is this a still have the video we just saw at

E879CHR5                          Baynes - direct

1    timestamp 00:17:42?

2    A.  Yes.

3              MR. NAWADAY:  Government offers Government Exhibit

4    252M.

5              THE COURT:  Any objection?

6              MR. GOLTZER:  No.

7              THE COURT:  252M will be received.

8              (Government's Exhibit 252M received in evidence)

9              MR. NAWADAY:  Ms. McInerney, can you please continue

10   playing this video and stop at that time timestamp 00:17:52.

11             (Video played)

12   Q.  Do you recognize anyone in the frame here?

13   A.  Bash.

14   Q.  Where is Bash?

15   A.  In the street with the white hoodie.

16   Q.  Again, which way is everyone walking?

17   A.  Towards Chambers Street.

18   Q.  I'm going to hand you what's been marked for identification

19   as Government Exhibit 252N.

20             Is this a photographic still of this video at

21   timestamp 00:17:50?

22   A.  Yes.

23             MR. NAWADAY:  Government offers Government Exhibit

24   252N.

25             MR. GOLTZER:  No objection.

1    THE COURT:  252N will be received.

2    (Government's Exhibit 252N received in evidence)

3    Q.  By the way, on this corner of Lander and First Street,

4    about how far away are you from Chambers Street?

5    A.  Like a block away, a block or two away.

6    MR. NAWADAY:  Ms. McInerney, can we put up what's

7    already in evidence as Government Exhibit 264?

8    Q.  Do you recognize this?

9    A.  Yes.

10   Q.  What intersection is this?

11   A.  This is First Street and Chambers.

12   Q.  Which street is Chambers?

13   A.  The one going across.

14   Q.  The one where the SUV is?

15   A.  Yes.

16   Q.  Which direction is Lander Street?

17   A.  Straight ahead at that corner -- at the next corner.

18   Q.  At the next corner?

19   A.  Yes.

20   Q.  Government Exhibit 261.

21   MR. NAWADAY:  Ms. McInerney, can you please put that

22   up.

23   Q.  Do you recognize this?

24   A.  Yes.

25   Q.  What are we looking at here?

E879CHR5                          Baynes - direct

1    A.  The house of 54 Chambers.

2    Q.  Which one is 54 Chambers?

3    A.  The door -- the white door -- the second apartment with the

4    white door.

5    Q.  The building with the white door?

6    A.  Yes.

7    Q.  I'm going to hand you what's been marked for identification

8    as Government Exhibit 259.

9              Do you recognize that?

10   A.  Yes.

11   Q.  What do you recognize it to be?

12   A.  The drawing of the inside of 54 Chambers.

13   Q.  Is that a diagram of the inside of 54 Chambers?

14   A.  Yes.

15   Q.  Has this diagram been marked up with handwriting?

16   A.  Yes.

17   Q.  Do you recognize any of the handwriting on it?

18   A.  Yes.

19   Q.  Whose handwriting do you recognize?

20   A.  Mine.

21   Q.  Whose?

22   A.  Mine.

23   Q.  Do you know if this is an exact diagram, shows the exact

24   size of each of the rooms?

25   A.  No.

1   Q.  But does it substantially depict where each of the rooms

2   were?

3   A.  Yes.

4   Q.  Did you -- are there any initials on this?

5   A.  Yes.

6   Q.  Whose initials do you recognize?

7   A.  Mine.

8           MR. NAWADAY:  Government offers Government Exhibit

9   259.

10          THE COURT:  Any objection?

11          MR. GOLTZER:  No.

12          MR. GREENFIELD:  None.

13          THE COURT:  259 will be received.  I'm sorry,

14  Mr. Greenfield?

15          MR. GREENFIELD:  No objection.

16          (Government's Exhibit 259 received in evidence)

17  Q.  Mr. Baynes, what are we looking at here?

18  A.  The inside of the house, a drawing of it.

19  Q.  Of 54 Chambers?

20  A.  Yes.

21  Q.  And you mentioned that there were initials you recognize?

22  A.  Yes.

23  Q.  Where are your initials?

24  A.  On -- at the bottom of the paper.

25  Q.  To the right and below the Government Exhibit label?

1    A.  Yes.

2    Q.  And there are names written out on Government Exhibit 259.

3    Whose handwriting is that?

4    A.  Mine.

5    Q.  And then there are these black circles?

6    A.  That's where everybody was standing.

7    Q.  And when did you mark this up?

8    A.  While I was in the -- what I was still in the state.

9    Q.  When you were in state custody?

10   A.  Yes.

11   Q.  And was a detective present when you filled this out?

12   A.  Yes.

13   Q.  There are two black circles with "victims" underneath?

14   A.  Yes.

15   Q.  Do you see that?

16   A.  Yes.

17   Q.  The notation victims.  What are those two black circles

18   supposed to represent?

19   A.  Those are the people that grabbed me.

20   Q.  Two of the people who were inside the house?

21   A.  Yes.

22   Q.  Now, there are two of them.  Are there particular ones that

23   are being depicted there?

24   A.  The one that was further to the left was the person that

25   stabbed me and the person that was further to the right is the

1    one that Reckless was wrestling with.

2    Q.  And you see there's an arrow coming out of a room to the

3    left --

4    A.  Yes.

5    Q.  -- of those dots for victims.  Do you see that?

6    A.  Yes.  On the paper, yes.

7         MR. NAWADAY:  Ms. McInerney if you could zoom out.

8    Thank you.

9    Q.  Do you see the -- an arrow coming out of the room to the

10   left of where the victims are?

11   A.  Yes.

12   Q.  What is that supposed to represent?

13   A.  That's where the guy who stabbed me.  That's what room he

14   came out of.

15   Q.  There's also going into the hallway, there's a dot and then

16   the name Baby E.  What is the dot supposed to represent?

17   A.  His location of where he was at, at the -- in the hallway.

18   Q.  And then there's a dot and the name Reckless again.  What

19   is that supposed to represent?

20   A.  Where he was at.

21   Q.  And am I right that each of the dots with the name next to

22   it is supposed to represent where each of those people were

23   standing?

24   A.  Yes.

25   Q.  And at what point in time were the people standing in these

1    positions at set forth in this diagram?

2    A.   Right when I came -- well I ran out of the living room.

3    Q.   What were Bash and Bow Wow doing at that point?

4    A.   Kicking at the door.

5              (Continued on next page)

1    Q.  What were Bash and Bow Wow doing at that point?

2    A.  Kicking at the door.

3    Q.  How close, again, was everyone at that time?

4    A.  Everybody was in an arm's distance.

5    Q.  Where was Gucci at that point?

6    A.  He was behind me.

7    Q.  Did there come a time when he went in front of you?

8    A.  Yes.

9    Q.  Around when did he do that?

10   A.  After, once they realized they couldn't kick the door open,

11   they started pulling at the door, and Gucci went to help them.

12   Q.  When Gucci went to help what did he do?

13   A.  He just went in front of all of those people and he started

14   helping grabbing at the door.

15   Q.  You said in front of you at that point?

16   A.  Yes.

17   Q.  What was he doing to help when he went in front of you?

18   A.  Grabbing and pulling the door open.

19   Q.  Was he doing anything else?

20   A.  He was rotating, so after -- once they started rotating, he

21   was shooting, everybody was just shooting at the door,

22   grabbing, but they kept on rotating.

23   Q.  Who is they again?

24   A.  Bow Wow, Bash, and Gucci.

25           MR. NAWADAY:  Ms. McInerney, can you please play

1    Government Exhibit 252, the video clip of First and Lander, the

2    east view, starting at time stamp 00:24:50 and then stopping at

3    00:25:05.

4                    (Video played)

5    Q.  Do you recognize anyone in this frame at this point?

6    A.  Yes.

7    Q.  Who?

8    A.  Me.

9    Q.  Where are you?

10   A.  Next to the stop sign.

11                  MR. NAWADAY:  Ms. McInerney, if you could back up and

12   stop at 00:25:04.

13                  (Video played)

14   Q.  Do you see yourself here?

15   A.  Yes.

16   Q.  Do you recognize anyone else in this frame?

17   A.  Yes.

18   Q.  Who?

19   A.  Bash.

20   Q.  Where is Bash?

21   A.  Over in the street with the white hoody on under the black

22   hoody.

23   Q.  I am showing to show you what's been marked for

24   identification as Government Exhibit 252O.  Is that a still of

25   this video at time stamp 00:25:04?

E87nchr6                        Baynes - direct

1   A.  Yes.

2               MR. NAWADAY:  The government offers Government Exhibit

3   252O?

4               MR. GOLTZER:  No objection.

5               THE COURT:  252O will be received.

6               (Government's Exhibit 252O received in evidence)

7   Q.  What street is this again?

8   A.  First Street.

9   Q.  In which direction is everyone running?

10  A.  Up First Street towards the Johnson, Dubois Street area,

11  so --

12  Q.  So away from Chambers?

13  A.  Yes.

14              MR. NAWADAY:  Ms. McInerney, can you please play now

15  Government Exhibit 252, the west view of First and Lander

16  starting at time stamp 00:25:00 and stopping at 00:25:06.

17  Q.  Do you recognize anyone in the frame at this point?

18  A.  Yes.

19  Q.  Who?

20  A.  Me and Bash.

21  Q.  Where are you?

22  A.  On the sidewalk.

23  Q.  So the male without the hoody up on the bottom left-hand

24  corner?

25  A.  Yes.

1   Q.  And where is Bash?

2   A.  The last one in the street with the white hoody under the

3   black, sort of.

4   Q.  I'm going to show you what's been marked for identification

5   as Government Exhibit 252P.  Is this a still from the video

6   that we just saw at 00:25:06?

7   A.  Yes.

8           MR. NAWADAY:  The government offers Government Exhibit

9   252P.

10          MR. GOLTZER:  No objection.

11          THE COURT:  252P will be received.

12          (Government's Exhibit 252P received in evidence)

13  Q.  During this video when people are running away, is this

14  before or after the robbery?

15  A.  After.

16  Q.  Who are you running with?

17  A.  Everybody that I came to rob, came there to rob people

18  with.

19  Q.  Throughout these video clips, you recognize yourself and

20  Bash.  The other people in the videos that you've seen, even

21  though you don't know who is who, again, who were you running

22  with?  Who were the people you went to the robbery with and ran

23  away from the robbery with?

24  A.  Bash, Reckless, Quay Quay, Gucci, Bow Wow and Baby E.

25  Q.  Do you know what kind of guns everyone had at the robbery?

1   A.   No.

2   Q.   Also, going back to, going to L-1's house.

3   A.   Right.

4   Q.   Why did you need help getting guns?

5   A.   We didn't have any at the time.

6   Q.   Do you know why you didn't have any at the time?

7   A.   No.

8   Q.   Do you know if Freaky was in jail at the time?

9   A.   Yes.

10  Q.   Why were you and Quay Quay just lookouts?

11  A.   Neither of us had a gun, and like we -- I didn't get along

12  with Bash, so he didn't want me to be part of the robbery, so I

13  was supposed to stay lookout.  Quay Quay was just doing,

14  helping me out.

15  Q.   What happened when you got to the hospital?

16  A.   After they took my clothes and everything, the cops came to

17  talk to me.

18  Q.   Did you tell them what really happened?

19  A.   No.

20  Q.   Why not?

21  A.   Because I didn't want to go to jail at the time.

22  Q.   Was that the only reason?

23  A.   And I was protecting myself and friends.

24  Q.   Since you have been in jail, have you received any letters

25  from Reckless?

E87nchr6                         Baynes - direct

1   A.  Yes.

2   Q.  I am going to show you what's been marked for

3   identification as Government Exhibit 311.  You can take it out

4   of the envelope sleeve.  Please take a look at that and tell me

5   if you recognize it.

6   A.  Yes.

7   Q.  What is it?

8   A.  A letter that was wrote to me from Reckless.

9   Q.  Where were you at the time you received this letter?

10  A.  In MCC.

11  Q.  At the federal jail?

12  A.  Yes.

13  Q.  How are you able to recognize it as a letter from Reckless?

14  A.  The name, the envelope, and the handwriting.

15  Q.  The handwriting?

16  A.  Yes.

17          MR. NAWADAY:  The government offers Government Exhibit

18  311.

19          THE COURT:  Any objection?

20          MR. GREENFIELD:  No objection.

21          MR. BUCHWALD:  A limiting instruction.

22          THE COURT:  311 will be received.

23          (Government's Exhibit 311 received in evidence)

24  Q.  Please turn to the last page of the letter.  Please read

25  the last two sentences.

1    A.  "Love is love, but loyalty is everything.  Loyalty over

2    all.  Prada."

3    Q.  Is Prada a name Reckless had used before?

4    A.  Yes.

5    Q.  What did you understand "loyalty is everything" to mean?

6    A.  To don't snitch.

7    Q.  To not what?

8    A.  Snitch.

9    Q.  I'm going to show you what has been marked for

10   identification as Government Exhibit 312.

11           Please take a look at that, and take it out of the

12   plastic envelope and tell us if you recognize it.

13   A.  Yes.

14   Q.  What is it?

15   A.  A letter from Reckless.

16   Q.  How are you able to recognize it?

17   A.  The handwriting and the name on the envelope.

18           MR. GOLTZER:  May we have a limiting instruction on

19   all of the letters.

20           THE COURT:  Well, how many more letters are there,

21   Mr. Nawaday?

22           MR. NAWADAY:  There's only one letter more.  Actually,

23   I am going to retrieve what's been marked for identification as

24   Government Exhibit 312.

25           THE COURT:  OK.

E87nchr6                          Baynes - direct

1   Q.  I will hand the witness instead Government Exhibit marked

2   for identification 313.  Please take that out of the envelope,

3   what is been marked for identification Government Exhibit 313.

4            Do you recognize that?

5   A.  Yes.

6   Q.  What do you recognize it to be?

7   A.  A letter sent from Reckless.

8   Q.  Where were you when you received that letter?

9   A.  MCC, federal holding center.

10           MR. NAWADAY:  The government offers Government Exhibit

11  313.

12           THE COURT:  Any objection?

13           MR. GREENFIELD:  No.

14           MR. BUCHWALD:  Your Honor, again, we ask that this not

15  be admitted against Mr. Thomas.

16           THE COURT:  OK.  Government's Exhibit 313 will be

17  received.

18           (Government's Exhibit 313 received in evidence)

19  Q.  Turning to the last page of 313, please read what it says

20  on the bottom.

21  A.  "Loyal to the bone."

22  Q.  What do you understand that to mean?

23  A.  That he's a loyal person, a loyal person.

24  Q.  Did you take that as an instruction to do anything or not

25  do anything?

 1  A.  Basically not snitch, too.

 2          THE COURT:  Ladies and gentlemen, you have heard

 3  testimony from Mr. Baynes' concerning various letters that he

 4  received from Mr. Christian while Mr. Baynes was incarcerated.

 5  You can only consider this testimony against Mr. Christian in

 6  deciding whether the government has proved him guilty.  You

 7  cannot consider these letters in any way as against Mr. Thomas

 8  or Mr. Whitaker.

 9          OK.  Very well.

10          MR. NAWADAY:  One moment, your Honor.

11          No further questions.

12          THE COURT:  Very well.

13          Cross-examination.

14          MR. GOLTZER:  Thank you.

15          THE COURT:  Mr. Goltzer.

16          MR. GOLTZER:  Your Honor, may I retrieve the exhibits?

17          THE COURT:  Certainly.

18  CROSS EXAMINATION

19  BY MR. GOLTZER:

20  Q.  Good afternoon, Mr. Baynes.

21  A.  Good afternoon.

22  Q.  We have never had a chance to speak to each other before,

23  have we?

24  A.  No.

25  Q.  My name is George Goltzer.  I'm a lawyer, and I'm going to

1    be asking you several questions for the rest of the day.  OK?

2    A.  Yes.

3    Q.  You were just shown a few parts of a videotape where you

4    identified yourself on the videotape?

5    A.  Yes.

6    Q.  You couldn't even see your own face, could you?

7    A.  No.

8    Q.  So, if you didn't know what kind of clothing you were

9    wearing, you couldn't have identified yourself on the

10   videotape, could you?  Just from looking at yourself you knew

11   what kind of clothes you wore?

12   A.  Yes.

13   Q.  You couldn't see your face?

14   A.  No.

15   Q.  You couldn't see Bash's face?

16   A.  No.

17   Q.  And you couldn't see Quay Quay's face?

18   A.  No.

19   Q.  So if you didn't remember what kind of clothing they were

20   wearing, it would be impossible to identify them on the

21   videotape even for you, is that correct?

22   A.  Right.

23   Q.  You couldn't have identified them unless you knew what kind

24   of clothes they had?

25   A.  Yes.

1    Q.  And you have known them for a long time, is that right?

2    A.  Yes.

3    Q.  You have been friends with Quay Quay for quite a while,

4    haven't you?

5    A.  Yes.

6    Q.  You have known Quay Quay for a number of years?

7    A.  Yes.

8    Q.  You and Quay Quay used to see each other just about every

9    day, is that correct?

10   A.  Yes.

11   Q.  And it was Quay Quay who took you to the hospital after you

12   got hurt inside of the apartment at 54 Chambers Street, isn't

13   that correct?

14   A.  Yes.

15   Q.  And it was Quay Quay's grandma's house that you ran to when

16   you were trying to get away, is that correct?

17   A.  Yes.

18   Q.  And the one person you didn't want to get into trouble was

19   Quay Quay, is that right?

20   A.  Yes.

21   Q.  Because of all the people involved with you over the years

22   can we say that Quay Quay was your best friend?

23   A.  Yes.

24   Q.  And you were Quay Quay's best friend?

25   A.  Yes.

1   Q.  You were not best friends with Bash, were you?

2   A.  No.

3   Q.  You were not best friends with Baby E, were you?

4   A.  No.

5   Q.  You weren't concerned about protecting Bash on the night of

6   the robbery, were you?

7   A.  No.

8   Q.  And you weren't concerned about protecting Baby E on the

9   night of the robbery, were you?

10  A.  No.

11  Q.  Now, in the beginning, when you got to the hospital, is it

12  fair to say that you knew you could get into trouble?

13  A.  Yes.

14  Q.  And you didn't want to get into trouble, did you?

15  A.  No.

16  Q.  When things went bad on the night that you went to the

17  hospital, you knew that Quay Quay could get into trouble,

18  right?

19  A.  Yes.

20  Q.  And you didn't want Quay Quay to get into trouble?

21  A.  No.

22  Q.  When you got to the hospital, you learned that there were

23  some other people there who were involved at 54 Chambers

24  Street, is that right?

25  A.  When I was at the hospital?

E87nchr6                    Baynes - cross

1    Q.   Yes.

2    A.   No.

3    Q.   Did the police tell you at the hospital there's somebody

4    here who died?

5    A.   No, not at first.

6    Q.   Afterwards?

7    A.   Not at first.

8    Q.   Not at first.  You got to the hospital shortly after

9    midnight, is that right?

10   A.   I don't know the time.

11   Q.   Whenever you got there, you had an injury?

12   A.   Yes.

13   Q.   What part of your body was hurt?

14   A.   My lower back.

15   Q.   Your lower back had suffered some stab wounds?

16   A.   Yes.

17   Q.   Did you know that you had not been shot?

18   A.   Not at that time.

19   Q.   So, as far as you were concerned right after you got to the

20   hospital, you had either been stabbed or been shot, you didn't

21   know which it was?

22   A.   Yes.

23   Q.   But you knew you had been hurt?

24   A.   Yes.

25   Q.   You knew you had been hurt during a robbery?

1   A.  Yes.

2   Q.  You knew you could get into trouble for it?

3   A.  Yes.

4   Q.  You knew that the injury could connect you to the location

5   where there was trouble?

6   A.  Yes.

7   Q.  And you wanted to lie your way out of it, didn't you?

8   A.  Yes.

9   Q.  And it was your idea -- by the way, you expected that you

10  would be spoken to by the police, right?

11  A.  Yes.

12  Q.  Because there were police at the hospital?

13  A.  Yes.

14  Q.  You didn't know whether there were any victims at the

15  hospital at that point, right?

16  A.  No.

17  Q.  You didn't know how many people got hurt?

18  A.  No.

19  Q.  You knew that one guy probably got shot because you saw him

20  standing next to a building, is that right?

21  A.  Yes.

22  Q.  And that was someone you learned was joker?

23  A.  Yes.

24  Q.  And you told the police a lot of lies, didn't you?

25  A.  Yes.

1    Q.  You told the police some things that were lies?

2    A.  Yes.

3    Q.  And you told the police some things that were true while

4    you were still at the hospital, is that correct?

5    A.  Yes.

6    Q.  So it's fair to say that what you did in an effort to keep

7    yourself from getting into trouble is you mixed lies with the

8    truth, is that correct?

9    A.  Yes.

10   Q.  And the lies that you told were in an effort to keep you

11   from getting arrested for serious crimes?

12   A.  Yes.

13   Q.  And the lies that you told were in an effort to keep Quay

14   Quay from getting arrested for serious crimes?

15   A.  Yes.

16   Q.  You don't remember the names of the detectives who

17   questioned you?

18   A.  No.

19   Q.  You don't remember the names of the police officers who

20   questioned you?

21   A.  No.

22   Q.  But would you agree that over the period of hours that you

23   were questioned you were questioned by a number of different

24   people?

25   A.  Yes.

1   Q.  Some of them were police officers, is that correct?

2   A.  Yes.

3   Q.  And some of them were detectives, is that correct?

4   A.  Yes.

5   Q.  And the way you can tell the difference between a police

6   officer and a detective is that one of them is wearing a

7   uniform and one of them is dressed in a suit or plain clothing,

8   is that correct?

9   A.  Yes.

10  Q.  The first guy who talked to you, was he a patrolman or a

11  detective, if you remember?

12  A.  A policeman, regular.

13  Q.  There was a detective who spoke to you not long after that

14  who was wearing plainclothes, right?

15  A.  Yes.

16  Q.  And that was probably around 1, 1:30 in the morning?

17  A.  I don't remember.

18  Q.  It was about an hour after you got there or less?

19  A.  Right.

20  Q.  Is that true?

21  A.  I don't remember the time.

22  Q.  You don't remember how long you were there before you were

23  spoken to by the police?

24  A.  No.

25  Q.  But you do remember that you spoke to a detective not too

1    long after you were there, when it was still dark out?

2    A.  Yeah, it was still dark.

3    Q.  Is that right?

4    A.  Actually I don't even know.  I was inside the building.

5    Q.  So you don't know if it was light or dark?

6    A.  Yeah.

7    Q.  Was it before or after you had finished your medical

8    treatment?

9    A.  That I talked to him?

10   Q.  Yeah, the first one.

11   A.  I don't think I went into medical -- they checked to see if

12   a bullet was in me, and then after that they stitched me up.

13   Q.  When you spoke to the first detective did you tell him that

14   you were walking down the street with Quay Quay, you saw a

15   group of strange men, and you got shot?

16   A.  I -- I told -- yeah, I told him.

17   Q.  You told him that, didn't you?

18   A.  I don't know exactly that, but I told him that I was

19   walking towards there and there was a robbery that was going

20   on.

21   Q.  Did you tell the first detective you got shot on the

22   street?

23   A.  I think.  I don't remember.

24   Q.  Do you remember?

25   A.  I just said I don't remember.

1    Q.  You don't remember?

2    A.  I said I think.  I don't remember.

3    Q.  Whatever you told the first detective was a lie?

4    A.  Yes.

5    Q.  It was an intentional lie by you to trick the police?

6    A.  Yes.

7    Q.  It was an intentional lie by you to avoid responsibility

8    for what you had done?

9    A.  Uh --

10   Q.  Do you understand the question?

11   A.  Yes.

12   Q.  Was it an intentional lie by you to avoid responsibility

13   for what you had done?

14   A.  Yes.

15   Q.  Because you knew when you were in the hospital that you

16   were guilty of taking part in a robbery?

17   A.  Yes.

18   Q.  And you knew how serious that was?

19   A.  Yes.

20   Q.  And you knew you could go to prison for it?

21   A.  Yes.

22   Q.  And you knew you were old enough to be treated as an adult

23   for it?

24   A.  Yes.

25   Q.  And you intentionally lied to the police?

1   A.  Yes.

2   Q.  Then they came back to you a little while later, right?

3   A.  Yes.

4   Q.  And said, Listen, in words or substance, we're getting a

5   different story from somebody else.  They told you that?

6   A.  Yes.

7   Q.  How many of them were there when they told you that?

8   A.  Two.

9   Q.  Detectives or plainclothes men?

10  A.  Detectives.

11  Q.  Did they sit you down at a table?

12  A.  No.

13  Q.  Where did this second interview take place?

14  A.  It was at the hospital room.

15  Q.  Where in the hospital?

16  A.  In my room that I was being treated in.

17  Q.  Was there a doctor there?

18  A.  No.

19  Q.  Was there a nurse there?

20  A.  No.

21  Q.  It was just you and two detectives in the middle of the

22  night?

23  A.  Yes.

24  Q.  Were you scared?

25  A.  Yes.

1   Q.  Did you think you were in trouble?

2   A.  Yes.

3   Q.  And you still told them some lies, didn't you?

4   A.  Yes.

5   Q.  But they told you they wanted the truth, didn't they?

6   A.  Yes.

7   Q.  And you didn't give it to them, did you?

8   A.  No.

9   Q.  You told them that you were with Quay Quay and Bash and

10  Baby E in Newburgh earlier that day, didn't you?

11  A.  No.

12  Q.  Didn't you tell them that you were with those three men --

13  or boys -- by the way, how old was Quay Quay at this time, back

14  in 2010?

15  A.  Like 15, 16.

16  Q.  Did you know how old Bash was?

17  A.  No.

18  Q.  Did you know how old Baby E was?

19  A.  No.

20  Q.  You told the police at that time that Baby E and Bash

21  wanted to rob a drug spot, didn't you?

22  A.  No, I don't remember saying that.  No.

23  Q.  You don't remember, or you say you didn't?

24  A.  I don't think I said that, no.

25  Q.  After you were arrested for murder in April of 2011, you

1    were appointed a lawyer by the Court?

2    A.  Yes.

3    Q.  That is because you couldn't afford to hire your own?

4    A.  Yes.

5    Q.  You went to court with that lawyer, right?

6    A.  Yes.

7    Q.  And you pled not guilty?

8    A.  Yes.

9    Q.  As was your right, yes?

10   A.  As what?

11   Q.  As was your right.  You said to the judge, I plead not

12   guilty?

13   A.  Yes.

14   Q.  And the judge told the prosecutor, You have to give this

15   man, Mr. Baynes, certain information, right?  They gave you

16   papers?

17   A.  Yes.

18   Q.  And you went over the papers with your lawyer?

19   A.  Actually, they didn't give me papers.  They brung me to

20   court to show me papers sometimes.

21   Q.  They brought you to court and showed you papers.  At some

22   point in August of 2011, they actually brought you to court

23   where there was something called a hearing, is that correct?

24   A.  I don't know if that's the date, but, yes.

25   Q.  That was hearing where different people testified when you

1   were there, is that right?

2   A.  Yes.

3   Q.  And the district attorney got to question those detectives

4   and police officers, is that correct?

5   A.  Yes.

6   Q.  And your lawyer got to question them, is that correct?

7   A.  Yes.

8   Q.  And you were there?

9   A.  Yes.

10  Q.  And you were able to hear everything?

11  A.  Yes.

12  Q.  And those detectives at that hearing or the police officers

13  at the hearing, the same way you did, swore to tell the truth

14  and nothing but the truth, so help them God?  Do you remember

15  that?  They took an oath?

16  A.  I don't remember.  I think.

17  Q.  I'm sorry?

18  A.  I don't remember.  I think.  I don't remember if they did.

19  Q.  Wasn't the subject matter of that hearing the statements

20  that the police said you made to them in the hospital?

21  A.  Yes.

22  Q.  It was, right?

23  A.  Yes.

24  Q.  And those police officers testified about the statements

25  they say you told them in the hospital, is that correct?

1    A.  Yes.

2    Q.  And was your lawyer given a copy of a transcript of that

3    particular hearing so you could read it?

4    A.  No.

5    Q.  You don't know?

6    A.  I don't think.

7    Q.  Do you remember receiving something known as a notice of

8    statements that repeated all the statements they said you made

9    to them in the hospital?

10   A.  No.

11   Q.  You never saw that?

12   A.  No.

13   Q.  When you were in the hospital with the police, you were

14   questioned for hours you said, is that correct?

15   A.  Yes.

16   Q.  How many different police questioned you over the period of

17   hours?

18   A.  The first man I remember, the policeman, then the two

19   detectives.  Then the next day it was like three of them that

20   came.

21   Q.  Let's go through it, and for the jury's benefit let's talk

22   about the timing between the questioning, OK.  Do you

23   understand what I want to do?

24   A.  Yes.

25   Q.  You got to the hospital?

1    A.  Yes.

2    Q.  And you went to the emergency room?

3    A.  Yes.

4    Q.  You didn't know if you had been shot or stabbed?

5    A.  Yes.

6    Q.  You knew you were in trouble?  Could be in trouble?

7    A.  Could be in trouble.

8    Q.  A patrolman came in and questioned you?

9    A.  Yes.

10   Q.  And then some time not too long after that two detectives

11   came in and questioned you?

12   A.  Yes.

13   Q.  And then you spent the night at the hospital?

14   A.  Yes.

15   Q.  And then sometime after it was light some number of

16   detectives came and questioned you again.

17   A.  Yes.

18   Q.  And the longest questioning took place after it was light?

19   A.  Not -- when the two detectives came.

20   Q.  I'm sorry?

21   A.  When the two detectives came.

22   Q.  Was that between like 9 o'clock in the morning and around

23   12 noon?

24   A.  It was at night when the two detectives came.

25   Q.  You were questioned the next day?

1   A.  Yes.

2   Q.  How many detectives questioned you the next day?

3   A.  It was around three.

4   Q.  Were you in the same room?

5   A.  No, they moved me.

6   Q.  Where did they move you to?

7   A.  Up the stairs.

8   Q.  Into an office?

9   A.  No.  To a room that had a window so I could see when it as

10  day and night.

11  Q.  Did you know what time it was?

12  A.  I know the sun was out when the three detectives came.

13  Q.  You didn't know what time it was?

14  A.  No.

15  Q.  Had you had much sleep that night?

16  A.  Yeah.  After they left, the first time --

17  Q.  Did those detectives tell you you were in trouble?

18  A.  They just told me they knew I was lying.

19  Q.  Those detectives told you that they knew that you were

20  lying.  Did they tell you why they knew you were lying?

21  A.  Yes.

22  Q.  What did they tell you?

23  A.  They told me that whoever stabbed me said he stabbed me

24  inside the building; and in the street that I said that I

25  walked down on, that they had cameras on that street, and they

1    knew I didn't walk down that street.

2    Q.  So they told you they had cameras?

3    A.  Yes.

4    Q.  That is not something you knew when you first began to lie

5    to them?

6    A.  No.

7    Q.  You weren't happy to hear that, were you?

8    A.  No.

9    Q.  And they told you that they had a witness?

10   A.  Yes.

11   Q.  And that the witness told them that you had been stabbed

12   inside, right?

13   A.  Yes.

14   Q.  The first story you told them was that you had been stabbed

15   outside, right?

16   A.  At the door.

17   Q.  That wasn't true?

18   A.  No.

19   Q.  Then you told them that Quay Quay and Bash wanted to rob a

20   spot, but that you and Quay Quay didn't want anything to do

21   with it, right?

22   A.  I don't remember saying that.

23   Q.  Didn't you tell the police that you were with Baby E and

24   Quay Quay and Bash, and Baby E and Bash wanted to rob a drug

25   spot, but you and Quay Quay didn't want to do it?

1   A.  I don't remember saying that --

2   Q.  I can't understand what you are saying?

3   A.  I don't remember saying that.  I don't think I said it.

4   Q.  You don't think you said that?

5   A.  I don't remember saying that.

6   Q.  Were those detectives taking notes while you were talking?

7   A.  One of them was.

8   Q.  And they took notes for hours, right?

9   A.  Yes.

10  Q.  And there were several pages of notes?

11  A.  I don't know.

12  Q.  Didn't your lawyer tell you what they told you -- I will

13  withdraw that.  Didn't you learn what they claimed you told

14  them?

15  A.  Yes, later.

16  Q.  Later?  Didn't you learn that you told the detectives early

17  in the morning of December 15 that Baby E and Bash wanted to

18  commit a robbery?

19  A.  No.

20  Q.  Did Baby E and Bash want to commit a robbery?

21  A.  I don't know.  I don't -- I didn't -- I wasn't with them at

22  that time you are saying.

23  Q.  Did you tell the police that you and Quay Quay didn't go

24  with Baby E and Bash to commit a robbery?

25  A.  I don't -- I never said -- I don't know anything they

E87nchr6                          Baynes - cross

1    was -- at that time I don't think I said that.

2    Q.  When you were in the hospital, before the sun came up, do

3    you remember telling the police the name Bash?

4    A.  Before the sun came up, no.

5    Q.  Do you remember before the sun came up telling them the

6    name Baby E?

7    A.  No.

8    Q.  After the sun came up, did you tell them the name Bash?

9    A.  Yes.

10   Q.  After the sun came up, did you tell them the name Baby E?

11   A.  Yes.

12   Q.  After the sun came up, you weren't trying to protect Bash,

13   were you?

14   A.  No.

15   Q.  After the sun came up, you weren't trying to protect Baby

16   E, were you?

17   A.  No.

18   Q.  You told the police that Baby E was part of a robbery,

19   didn't you?

20   A.  Yes.

21   Q.  You told the police that Bash was part of a robbery, didn't

22   you?

23   A.  Yes.

24   Q.  That's because the police told you that they wanted the

25   truth, isn't that right?

E87nchr6                          Baynes - cross

1    A.  Yes.

2    Q.  Was it true that Bash was part of a robbery?

3    A.  Yes.

4    Q.  Was it true that Baby E was part of a robbery?

5    A.  Yes.

6    Q.  You told the police that Baby E had a gun, didn't you?

7    A.  I don't remember.

8    Q.  Didn't you tell the police that Baby E and Bash had guns?

9    A.  I don't remember.

10   Q.  Didn't you tell the police that one of those two people had

11   a chrome or silver gun with a wheel?

12   A.  I remember saying that after that day, but I don't remember

13   if I said it that day or not.

14   Q.  Did you tell the police at any time before you were

15   arrested --

16   A.  No.

17   Q.  Can I finish the question.

18        Did you tell the police at any time before you were

19   arrested that either Bash or Baby E had a silver gun with a

20   wheel?

21   A.  I don't remember.  I don't think so.

22   Q.  Did Bash have a silver gun with a wheel?

23   A.  I think I saw Baby E with it, but --

24   Q.  Did Baby E have a silver gun with a wheel?

25   A.  That I -- I think I saw him with a silver gun with a wheel.

E87nchr6                        Baynes - cross

1    Q.  With a wheel?

2    A.  Yes.

3    Q.  You are no stranger to guns, are you?

4    A.  No.

5    Q.  You have carried guns for years?

6    A.  Yes.

7    Q.  You like to walk the street with guns?

8    A.  Yes.

9    Q.  You like to hold guns for other people?

10   A.  Not really, no.

11   Q.  You did hold guns for other people, and you're comfortable

12   with guns?

13   A.  I didn't just go around holding guns for other people.

14   Q.  You never did?

15   A.  No.

16   Q.  You never held a gun because anybody asked you to?

17   A.  If a person gave it to me, when I asked them to hold it,

18   but they never just gave me a gun and told me to hold a gun.

19   Q.  So there were times over the last few years before you were

20   in jail when you would ask people for guns?

21   A.  Yes.

22   Q.  And the reason you would ask people for guns is you wanted

23   to use the guns?

24   A.  No.  I just wanted to have it.

25   Q.  You just liked having a gun?

E87nchr6                          Baynes - cross

```
 1   A.  Yes.
 2   Q.  You feel comfortable in some way having a gun?
 3   A.  Yes.
 4   Q.  You feel safe in some way having a gun?
 5   A.  Yeah.
 6   Q.  You feel secure in some way having a gun?
 7   A.  Yes.
 8   Q.  That's the only reason that you would want to have a gun?
 9   A.  It's just like a bragging reason.
10   Q.  I'm sorry?
11   A.  A bragging reason.
12   Q.  I can't hear you.
13   A.  Like a flashy, bragging reason.
14   Q.  It's bragging to have a gun?
15   A.  At the time that's what I was thinking.
16   Q.  How old were you the first time you had a bragging gun?
17   A.  Like probably like 16.
18   Q.  16?
19   A.  Yes.
20   Q.  So that would be around 2009?
21   A.  Yes.
22   Q.  How many times do you think between 2009 and April of 2011
23   did you walk around the streets of Newburgh with bragging guns?
24   A.  Like probably like three times.
25   Q.  How many?
```

1    A.  Like three.

2    Q.  Three times?

3    A.  Yeah.  Around three or four.

4    Q.  Three or four times.  That's it?

5    A.  Yeah, that's it.

6    Q.  How many times did you use guns in robberies?

7    A.  When I rob people I never have a gun.  It was usually,

8    like, people I'm with that have it.

9         MR. GOLTZER:  Can we have that read back.

10   A.  When I rob people, I never have guns on me.  It's usually

11   the person I'm with.

12   Q.  So when you rob people, you don't have guns, is that right?

13   A.  Yes.

14   Q.  But when you brag, you do have guns?

15   A.  Right.

16   Q.  You know the difference between a semiautomatic and a

17   revolver?

18   A.  Yes.

19   Q.  A semiautomatic has a clip, is that right?

20   A.  Yes.

21   Q.  Is that right?

22   A.  Yes.

23   Q.  A clip is a metal device in which you put bullets stacked

24   one on top of the other?

25   A.  Yes.

1    Q.  And you put that into the semiautomatic, is that right?

2    A.  Yes.

3    Q.  And you can put one of those bullets up in what they call

4    the chamber, is that right?

5    A.  Yes.

6    Q.  And if you pull the trigger what happens?

7    A.  It shoots.

8    Q.  What does it shoot?

9    A.  Bullets.

10   Q.  And what happens to the clip when the first bullet goes out

11   of the gun?

12   A.  I don't know.

13   Q.  Doesn't another bullet go up?

14   A.  I guess, yes.

15   Q.  Have you ever fired a semiautomatic?

16   A.  No.

17   Q.  Have you ever fired a gun?

18   A.  No.

19   Q.  I'm sorry?

20   A.  No.

21   Q.  Yes or no?

22   A.  No.

23   Q.  A revolver has a wheel?

24   A.  Yes.

25   Q.  That's when you put the bullets in?

1   A.  Right.

2   Q.  Did you ever see cowboy movies?

3   A.  Yes.

4   Q.  That's like the gun in the cowboy movies, is that correct?

5   A.  Yes.

6   Q.  And you told the police that Baby E had the silver gun with

7   the wheel, right?

8   A.  Yes.

9   Q.  And you told the police that Bash had the other gun, the

10  semiautomatic, right?

11  A.  Yes.

12  Q.  Is that right?

13  A.  Yes.

14  Q.  Was that true?

15  A.  Yes.  I think --

16  Q.  When you told the police that Bash and Baby E had those

17  guns, you were telling the police the truth, right?

18  A.  That I remember, yes.

19  Q.  Because you were trying to get out of trouble by mixing

20  lies and truth?

21  A.  Yes.

22  Q.  One of the other lies you told the police is that you went

23  into the apartment after the man was shot and was lying on the

24  ground, right?

25  A.  I don't know.

E87nchr6                        Baynes - cross

1   Q.  Didn't you tell them that?

2   A.  I don't remember.

3   Q.  You don't remember?

4   A.  I don't think so.

5   Q.  On December 15, at St. Luke's Hospital, 70 Dubois Street,

6   Newburgh, New York, did you have a conversation with a police

7   officer by name of Terrence Moore --

8   A.  I don't know.

9   Q.  -- in which you said to him in words or substance, I was

10  walking down Lander Street toward Broadway with Laquavious

11  Boykin.  Did you tell him that?

12  A.  I don't remember.

13  Q.  Did you tell him you saw a group of black men running

14  toward you?

15  A.  Yes.

16  Q.  Was that true?

17  A.  No.

18  Q.  Did you tell him the next thing you knew that the unknown

19  black males were shooting at you?  Did you tell him that?

20  A.  Yes.

21  Q.  Was it true?

22  A.  No.

23  Q.  A lie?

24  A.  Yes.

25  Q.  And you got shot in the back.  You told them that?

1    A.  Yes.

2    Q.  Was that true?

3    A.  No.

4    Q.  And you told them you walked to the hospital.  Was that

5    true?

6    A.  Yes.

7    Q.  Did you have a conversation on December 15, 2010, at the

8    same hospital on the same evening with a detective named

9    Loscerbo, and did you tell him the following:

10           I'll take you through it one piece at a time.  All

11   right, Mr. Baynes?

12           Did you tell Detective Loscerbo Bash and Baby planned

13   on robbing the weed spot at 54 Chambers Street?

14   A.  It don't remember saying that.

15   Q.  Will you admit or deny making that statement to Loscerbo?

16   A.  I deny it.

17   Q.  You deny it?

18   A.  Yes.

19   Q.  Did you tell Loscerbo they planned the robbery on Dubois

20   Street at about 10 p.m.?

21   A.  I didn't know no times at that time, so, no.

22   Q.  Would you admit or deny making the state?

23   A.  Deny it.

24   Q.  You deny it?

25   A.  I don't remember saying it.

1   Q.   Did you tell him that Bash and Baby E had guns on them when

2   they were planning the robbery?

3   A.   I don't remember saying that either at that time.

4   Q.   I'm sorry?

5   A.   I don't remember saying that either.

6   Q.   Do you deny it or not remember it.

7   A.   I don't remember saying it.

8           MR. GOLTZER:   May I approach the witness?

9           THE COURT:   You may.

10          MR. GOLTZER:   Please take a look, Mr. Baynes, at the

11  document that I am placing in front of you.   Read it to

12  yourself --

13          MR. NAWADAY:   What exhibit number?

14          MR. GOLTZER:   I'm sorry.   3501-4, the second page.

15  Please take a look at that document.   Read it to yourself

16  silently, and when you have finished reading it, let me know.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1    Q.  Have you a chance to read the document?

2    A.  Yes.

3    Q.  Does that help you remember whether you told detective

4    Michael Loscerbo on December 15, 2010 at St. Luke's Hospital,

5    70 Dubois Street, Newburgh, New York, whether you told the

6    police that Bash and Baby had guns on them when they were

7    planning the robbery?

8    A.  No.

9    Q.  Doesn't help you remember at all?

10   A.  No.

11   Q.  Did you tell that detective in that same interview that

12   Bash and Baby E -- Bash and Baby told me and Laquavious to help

13   them rob the weed house but we went home and then went out

14   later to see if they got anything.

15   A.  No.

16   Q.  Never said it?

17   A.  Not that I remember, no.

18   Q.  Did you tell them that you saw a lot of people running,

19   Bash and Baby E were being chased by guys and that's when

20   somebody stabbed you?

21   A.  No.

22   Q.  You deny that?

23   A.  No.

24   Q.  You deny telling him that?

25   A.  Yes.

1  Q.  Did you tell the same detective in that same interview that

2  you heard shots?

3  A.  When I was talking to the police officer I did tell him I

4  heard shots.

5  Q.  Talking to who?

6  A.  A police officer.  I did tell him that I heard shots.

7  Q.  At some point the police told you that they knew you were

8  lying?

9  A.  Yes.

10  Q.  Did you tell the police that you had nothing to do with the

11  robbery?

12  A.  Yes.

13  Q.  Did you tell the police that Laquavious, Quay Quay, had

14  nothing to do with the robbery?

15  A.  Yes.

16  Q.  Did you tell the police that it was Bash and Baby E who did

17  the robbery?

18  A.  Yes.

19  Q.  Was that true?

20  A.  Yes.  But not all of it.  The end of it.

21  Q.  What?

22  A.  The part, Baby E and Bash had something to do with it.

23  Q.  Well, you told them that they were shooting their guns,

24  didn't you?

25  A.  (No response).

1   Q.  You told the police they fired their guns?

2   A.  I don't --

3   Q.  When you were in the hospital you told them that Baby E and

4   Bash fired guns, didn't you?

5   A.  Not that I remember.

6   Q.  Have you ever used drugs?

7   A.  Yes.

8   Q.  What sorts of drugs?

9   A.  Weed and E pills.

10  Q.  E pills is what, ecstasy?

11  A.  Yes.

12  Q.  How old were you when you started to smoke weed?

13  A.  Like 15.

14  Q.  And you haven't been smoking weed while you're in jail?

15  A.  No.

16  Q.  Right?

17  A.  No.

18  Q.  But you smoked weed on a regular basis from the age of 15

19  until you got arrested at the age of 17?

20  A.  Yes.

21  Q.  You were dealing weed?

22  A.  No.

23  Q.  What?

24  A.  No.

25  Q.  What were you dealing?

1    A.  Crack sometimes.

2    Q.  Did you like weed?

3    A.  Smoking it, yes.

4    Q.  You smoked it as much as you could get it?

5    A.  Yes.

6    Q.  You smoked it as much as you could?

7    A.  Yes.

8    Q.  If you could get it in the morning you'd smoke it in the

9    morning?

10   A.  Yes.

11   Q.  If you could get it all day long you'd smoke it all day

12   long?

13   A.  Yes.

14   Q.  You did that for a couple of years?

15   A.  Smoke -- yeah, smoked.

16   Q.  And what's the most you ever smoked in a day?

17   A.  Like I don't know, like around -- a quarter, I guess, I

18   don't know, a quarter of weed.

19   Q.  A?

20   A.  Quarter of weed.

21   Q.  A quarter?

22   A.  Yes.

23   Q.  Are you talking about a quarter ounce?

24   A.  Yes.

25   Q.  And how many times could you smoke a quarter of an ounce in

1    the same day?

2    A.   Once.

3    Q.   Do you know what a spliff is?

4    A.   No.

5    Q.   Did you ever here a Jamaican use the word spliff?

6    A.   No.

7    Q.   Did you ever see a big marijuana cigarette or cigar?

8    A.   Yes.

9    Q.   Did you ever do those?

10   A.   No.

11   Q.   How many joints could you smoke in a day?

12   A.   As many as I could.

13   Q.   I'm sorry?

14   A.   There is no limit.  Any.

15   Q.   Did you ever smoke five joints in a day?

16   A.   Yes.

17   Q.   Did you ever smoke ten joints in a day?

18   A.   Yes.

19   Q.   Did you ever smoke more than ten joints in a day?

20   A.   Yes.

21   Q.   What's the most joints you ever smoked in a day?

22   A.   I don't know.

23   Q.   How often would you smoke five joints in a day?

24   A.   Like that's a -- like around everyday.

25   Q.   How often -- you smoked at least five joints everyday?

E879chr7                        Baynes - cross

1    A.  Not at least.  Probably -- that's probably -- yeah, around,

2    yeah, yes, yes.

3    Q.  And were there days when you would smoke more than five

4    joints?

5    A.  Yes.

6    Q.  And E is ecstasy, right?

7    A.  Yes.

8    Q.  And how often did you use ecstasy?

9    A.  Only on weekends.

10   Q.  And did you find that smoking five or six or ten joints a

11   day had an effect on your ability to remember things?

12   A.  I guess.  I don't know really.

13   Q.  I can't understand you.  I'm very sorry.

14   A.  I never, like it's not a proven fact but I think -- I don't

15   know.

16           MR. GOLTZER:  May we have that read back.  Maybe it's

17   my hearing.  I just --

18   A.  It's not a proven fact but I -- it might.  I don't know.

19   Q.  Oh, you said it's not a proven fact.

20           Is that right?

21   A.  Yes.

22   Q.  While it's not a proven fact, would you agree that smoking

23   five or ten joints a day clouds your mind -- your mind?

24   A.  Clouds?

25   Q.  Does it make things seem a little hazy to you?

1    A.  No.

2    Q.  A little razy to you?

3    A.  No.

4    Q.  You think your mind is better with or without the five to

5    ten joints a day?

6    A.  I feel like it's the same, my mind.

7    Q.  It's the same?

8    A.  Yes.

9    Q.  So the police told you that you were lying because they

10   knew you were inside?

11   A.  Yes.

12   Q.  And when they told you that -- you remember that?

13   A.  Yes.

14   Q.  And you remember that happening at the hospital?

15   A.  Yes.

16   Q.  And these were detectives?

17   A.  Yes.

18   Q.  Who were taking notes?

19   A.  One of them was.

20   Q.  And they were telling you different things while they were

21   asking you questions; is that correct?

22   A.  Yes.

23   Q.  And among the things they told you was as follows; for

24   example, you're in deep trouble?

25   A.  I don't -- no, I don't --

1   Q.  They never told you that?

2   A.  No.

3   Q.  Did they ever tell you that you were a suspect in a crime?

4   A.  No.

5   Q.  Do you ever -- do you remember receiving what are known as

6   Miranda warnings?

7   A.  No.

8   Q.  Did you ever hear the term Miranda warnings?

9   A.  Miranda -- Miranda, not Miranda warning.

10  Q.  Did you ever hear the words Miranda warnings?

11  A.  Warnings?

12  Q.  Yes.

13  A.  Yes.

14  Q.  And at some point the detectives said to you:  Wait a

15  minute, we're going to read you your rights; is that correct?

16  A.  No.

17  Q.  They never read you your rights?

18  A.  No.

19  Q.  None of those detectives ever told you that you had a right

20  to remain silent?

21  A.  No.

22  Q.  None of those detectives ever told you you had a right to

23  an attorney?

24  A.  No.

25  Q.  None of those detectives ever told you that anything you

1    said could be used against you in a court of law?

2    A.  No.

3    Q.  And none of those detectives ever told you that if you

4    couldn't afford a lawyer they would get you one?

5    A.  No.

6    Q.  And none of those detectives ever told you that you could

7    stop the questioning at any time and consult with a lawyer if

8    you wanted to?

9    A.  No.

10   Q.  And none of those detectives ever asked you to sign

11   anything?

12   A.  Yeah, they asked me to sign papers.

13   Q.  What did they ask you to sign?

14   A.  Pictures of Reckless, Bash and Baby E.

15          MR. GOLTZER:  May I approach the witness?

16          THE COURT:  You may.

17   Q.  I'm handing you a document, Mr. Baynes.  I would ask you to

18   look at it.  And ask -- (pause)  I would ask you to take a look

19   at that, Mr. Baynes.

20          Do you recognize that?

21   A.  No.

22   Q.  Have you ever seen it before?

23   A.  No.

24   Q.  Do you recognize the signature on the bottom?

25   A.  Yes.

1    Q.  Whose signature is that?

2    A.  Mine.

3    Q.  You signed it?

4    A.  I don't know if I signed that but that's my signature.

5           MR. GOLTZER:  I'd offer it, Judge, as Whitaker's A in

6    evidence.

7           THE COURT:  Whitaker A in evidence?

8           MR. GOLTZER:  Yes.

9           THE COURT:  Any objection?  Is there a 3500 number

10   affiliated with it?

11          MR. GOLTZER:  It's 35 -- perhaps the government can

12   give it to you.  I don't have it handy, Judge.

13          It's the second page of 3501-2 and I'm offering it in

14   evidence.

15          MR. NAWADAY:  No objection.

16          THE COURT:  Whitaker A will be received.  Can we say

17   Defendant's A.  Defendant's A.

18          (Defendant's Exhibit A received in evidence)

19   BY MR. GOLTZER:

20   Q.  Mr. Whitaker, let me give you a copy -- Mr. Whitaker -- I

21   mean Mr. Baynes.  Let me give you a copy of that and let's read

22   together.  Okay.

23          At the bottom of the page do you see where it says the

24   word defendant?

25   A.  Yes.

 1   Q.  And your name is next to it printed, Anthony Baynes.

 2           Do you see that?

 3   A.  Yes.

 4   Q.  And it's your signature under it?

 5   A.  Yes.

 6   Q.  Signed by you; is that right?

 7   A.  That's my signature, yes.

 8   Q.  You put it there, didn't you?

 9   A.  No.  I don't remember putting it there, but.

10   Q.  I'm sorry?

11   A.  I don't remember putting it there but that's my signature,

12   yes.

13   Q.  You don't deny it's your signature?

14   A.  No.

15   Q.  And it looks like your real signature?

16   A.  Yes.

17   Q.  So it seems that you put it there?

18   A.  All right.

19   Q.  Can you agree with me that you put it there at some point?

20   A.  No.  I don't remember putting it there.

21   Q.  You think I wrote it?

22   A.  No.  But there's computers.

23   Q.  I'm sorry?

24   A.  We have computers now.

25   Q.  You think this is a computer signature?

1   A.  I could take my signature off of a paper and put it on

2   another one.

3   Q.  You think this is a forgery?

4   A.  I don't know.

5   Q.  Well let's see what it says.

6           It says Complaint No. and there's a complaint number

7   at the top next to it; is that correct?

8   A.  Yes.

9   Q.  And it says the word Miranda on top of it?

10  A.  Yes.

11  Q.  Did you think that was a woman's name?

12  A.  No.

13  Q.  What did you think it was?

14  A.  I didn't see this paper.  I don't know.

15  Q.  You never saw this paper before?

16  A.  No.

17  Q.  You never -- so you signed something you never saw before?

18  A.  I don't remember signing this.

19  Q.  And it says Miranda warning on this piece -- this document

20  Whitaker's A in evidence, right?

21  A.  It says Miranda, yes.  Yes.

22  Q.  And you see the number one?

23  A.  Yes.

24  Q.  "You have the right to remain silent and refuse to answer

25  questions.  Do you understand?"

1              Do you see that question?

2    A.  Yes.

3    Q.  Did you answer that question yes?

4    A.  No.  I never -- I never was read my Miranda rights.

5    Q.  And so the word yes appears next to it; that's something

6    that shouldn't be there?

7    A.  That's not my handwriting up there either.

8    Q.  The only handwriting on the form is your signature at the

9    bottom?

10   A.  Yes.

11   Q.  And No. 2.  Let's read it together.  "Anything you say may

12   be used against you in a court of law.  Do you understand?"

13              That's on the form?

14   A.  Yes.

15   Q.  The word yes is there?

16   A.  Yes.

17   Q.  Not in your handwriting?

18   A.  No.

19   Q.  And three, "You have the right to speak to an attorney and

20   have him present during any questioning.  Do you understand?"

21              That's on the form?

22   A.  Yes.

23   Q.  And the word yes is next to it?

24   A.  Yes.

25   Q.  That comes as a surprise to you?

E879chr7                       Baynes - cross

1   A.  Yes.

2   Q.  And No. 4, "If you cannot afford an attorney, one will be

3   provided to you without cost.  Do you understand?"

4           And it says yes.  You never heard that?

5   A.  No.

6   Q.  "Have these rights in mind, do you wish to talk to us?"

7           And the answer is yes.  That's No. 5.

8           You never said that?

9   A.  No.

10  Q.  So, it was witnessed, according to the document, the

11  Miranda was read to you by a Detective Joseph H. Cortez.  Do

12  you see that on the document?

13  A.  Yes.

14  Q.  Was it true that Detective Cortez read you your Miranda

15  warnings?

16  A.  No.

17  Q.  And it says witnessed by Detective J. Staton S-T-A-T-O-N

18  and it's signed by him apparently.

19          Do you see that?

20  A.  Yes.

21  Q.  And is that true?  Or is that false that he witnessed you

22  getting your Miranda warnings.

23  A.  False.

24  Q.  Never happened?

25  A.  Never happened.

1   Q.  But it did happen that those detectives questioned you?

2   A.  Yes.

3   Q.  Did they scare you?

4   A.  They made me change my statement a couple times.

5   Q.  They forced you?

6   A.  No.  They told me things that made me change it.

7   Q.  What did they tell you?

8   A.  To think about the camera and the person that stabbed me.

9   Q.  What did they tell you about the camera?

10  A.  That the side of the street, the side I was walking on has

11  a camera -- I mean they had a camera that showed -- that didn't

12  show me on that street.

13  Q.  What did they tell you about the person who stabbed you?

14  A.  That he said he stabbed me inside the house.

15  Q.  Did they scare you?

16  A.  I guess, yes.

17  Q.  Did they tell you how much time you could do?

18  A.  No.

19  Q.  Did they tell you you could do time?

20  A.  Yes.

21  Q.  Did they tell you you could do a lot of time?

22  A.  No.

23  Q.  Did you ask them how much time you could do?

24  A.  No.

25  Q.  They told you you had to give up the people who committed

E879chr7                          Baynes - cross

1    the robbery, right?

2    A.  Yes.

3    Q.  You gave up Baby E?

4    A.  Yes.

5    Q.  And you gave up Bash?

6    A.  Yes.

7    Q.  And that was in the hospital?

8    A.  Yes.

9    Q.  And in the hospital you never mentioned Bow Wow, right?

10   A.  Not that I remember.

11   Q.  And in the hospital you never mentioned Thomas, right?

12   A.  Not that I remember.

13   Q.  Now, once you found out that they had you inside, you

14   needed to give them a reason that you went inside that would

15   keep you from getting into trouble, right?

16   A.  (No response).

17   Q.  Is that right?

18   A.  Yes.

19   Q.  And it was then that you said to them:  I wanted to make

20   sure somebody was okay inside; that's why I went inside.

21   Right?

22   A.  No.  I said I went to buy weed and that's why I went

23   inside.

24   Q.  You told them you went to buy weed?

25   A.  Yes.

1   Q.  Did you tell them that you went inside to check on

2   Quay Quay's brother to see if he was okay?  Yes or no?

3   A.  After, yes.

4   Q.  What?

5   A.  After -- yes, after.

6   Q.  Because that's when they didn't believe you, they told you

7   they didn't believe you about the grass, right?

8   A.  About the --

9   Q.  About going to buy weed?

10  A.  Yes.

11  Q.  So what's happening is you're in the hospital.  Right?

12  A.  Yes.

13  Q.  And you know you're in trouble or could be in trouble,

14  right?

15  A.  Yes.

16  Q.  And you lie to the first cop you spoke to?

17  A.  Yes.

18  Q.  And they come back in and they tell you:  We want the truth

19  this time.

20          Right?

21  A.  Yes.

22  Q.  And you lie to them again?

23  A.  Yes.

24  Q.  And then they come back in again.  And they tell you:  We

25  got you inside.

1              Right?

2    A.   Yes.

3    Q.   And you still lie to them?

4    A.   Yes.

5    Q.   You told them I went in to buy weed and I got robbed and

6    stabbed?

7    A.   (No response).

8    Q.   Right?

9    A.   Yes.

10   Q.   You lied to them three times in a row over a period of

11   hours, right?

12   A.   Yes.  Yes.

13   Q.   You did.  And then -- right?

14   A.   That I lied to them?

15   Q.   Yes.  Repeatedly?

16   A.   Yes.

17   Q.   Are you a truthful person?

18   A.   Yes.

19   Q.   Would you lie in a courtroom to keep yourself out of

20   trouble?

21   A.   No.

22   Q.   On Monday we'll come back to the interviews in the hospital

23   but I want to ask you a few questions before 5:00 about the

24   deal that you made with the Orange County district attorney's

25   office.

1          You signed into an agreement with the Orange County

2     district attorney's office; is that right?

3     A.  Yes.

4     Q.  And that was on the day you pled guilty to the robbery that

5     you repeatedly told these police officers you had nothing to do

6     with, right?

7     A.  Yes.

8     Q.  And you wanted to make a deal, didn't you?

9     A.  Yes.

10    Q.  And you made a deal in August of 2011, right?  In August --

11    in October of 2011?

12    A.  I don't know the date.

13    Q.  You don't remember the date?

14    A.  No.

15    Q.  Do you remember if there was snow on the ground or the sun

16    was shining?

17    A.  No.

18    Q.  But you were a happy man the day you got that deal, weren't

19    you?

20    A.  No.

21    Q.  What?

22    A.  No.

23    Q.  After you finish testifying against the people in this

24    courtroom you want to go home?

25    A.  Yes.

1  Q.  And you're hoping that that judge in Orange County is going

2  to sentence you to time served?

3  A.  Yes.

4  Q.  Time served meaning as long as you've been in jail since

5  April of 2011, that's it, you're done, you go home?

6  A.  Yes.

7  Q.  You're expecting that, aren't you?

8  A.  Not expecting but hoping.

9  Q.  Hoping.  You think it's a realistic possibility?

10  A.  Kinda, yeah.

11  Q.  You do?

12  A.  Yes.

13  Q.  Anybody tell you there was a realistic possibility that you

14  would get time served?

15  A.  No.

16  Q.  What?

17  A.  No.

18  Q.  Nobody?

19  A.  No.

20  Q.  Where did you get the idea that it was a realistic

21  possibility?

22  A.  Just people -- other people.

23  Q.  What other people?

24  A.  It's just -- just the thought like.

25  Q.  Who told you you could get time served, policemen?

1    A.  No.

2    Q.  Detective?

3    A.  No.

4    Q.  FBI agent?

5    A.  No.

6    Q.  Who?

7    A.  No one -- other inmates.

8    Q.  Other inmates who knew what had happened to other

9    cooperators in other cases?

10   A.  Yes.

11   Q.  When you got indicted for murder in the second degree you

12   knew you were facing a life sentence, right?

13   A.  Possible life, yes.

14   Q.  With a mandatory minimum on that life sentence of between

15   15 and 25 years, correct?

16   A.  No.  I didn't know that.

17   Q.  Did you ask your lawyer what you were facing?

18   A.  Yes.  But he never told me that.

19   Q.  He refused to tell you what you were facing?

20   A.  No.  He just -- he was saying -- he was looking at --

21       MR. GREENFIELD:  Judge, can the witness keep his voice

22   up, please.

23       THE WITNESS:  He never said that.  He just never said

24   that.

25   Q.  Did you know that the penalty in New York State for a first

1    degree robbery is up to a maximum term of 25 years in the state

2    penitentiary?

3    A.  No.

4    Q.  Did you know that the maximum term for assault in the first

5    degree in New York state was 25 years in the state

6    penitentiary?

7    A.  No.

8    Q.  Did you know that acting in concert with others who had a

9    gun in New York state with the intent to use it unlawfully

10   carried a possible maximum penalty of fifteen years in a

11   penitentiary?

12   A.  No.

13   Q.  Weren't you told that by the judge on the day you pled

14   guilty that the maximum term of imprisonment was 25 years,

15   robbery in the first degree?

16   A.  (No response).

17   Q.  Didn't he tell you that?

18   A.  No.

19   Q.  Never happened?

20   A.  No.

21   Q.  By the way, this fellow Bow Wow, you -- when was the first

22   time you ever heard his name, his real name?

23   A.  What you mean, his real name?

24   Q.  What's his name?

25   A.  Tyrell.

1    Q.  Tyrell what?

2    A.  I don't know.

3    Q.  Well did anybody ever tell you his name was Whitaker?

4    A.  No.

5    Q.  When you pled guilty did you tell the judge I did something

6    with Tyrell Whitaker?

7    A.  Yes.

8    Q.  Well how did you know his name was Whitaker?

9    A.  Because the paper that I signed to.

10   Q.  Who told you his name was Whitaker?

11   A.  The paper I signed to.  It said everybody.

12   Q.  Who gave it to you?

13   A.  My lawyer.

14   Q.  So your lawyer told you that there was somebody named

15   Whitaker?

16   A.  My lawyer gave me a piece of paper that had Tyrell

17   Whitaker, in parentheses, Bow Wow on it.

18   Q.  Your lawyer gave that to you.

19          How many times have you interviewed by the Orange

20   County police department before you pled guilty?

21   A.  I don't know.  Like five times around.

22   Q.  How many detectives were there when you pled -- before you

23   pled guilty and were interviewed by them?

24   A.  One that I can think of.  One.

25   Q.  Cortez?

E879chr7                        Baynes - cross

1    A.   Yes.

2    Q.   That's the one you say never read you the Miranda rights?

3    A.   Yes.

4    Q.   That's the one you're saying lied when he put his name on

5    this form?

6    A.   Yes.

7              MR. GOLTZER:  Is this a good time to break, Judge?

8              THE COURT:  It is.

9              Ladies and gentlemen, that concludes this week.  We

10   don't sit tomorrow.  I know some of you have had questions.  We

11   will not be sitting next Friday either.  So we will see you

12   Monday morning.  I believe you were introduced to Ms. Rivera,

13   my courtroom deputy.  She will be with us on Monday.  So we

14   will see you bright and early Monday morning.  Please plan on

15   being in the jury room no later than 9:25 a.m. so we can get

16   started on time.  Until then have a very, very pleasant weekend

17   and please do not discuss the case, including on social media.

18             (Jury excused)

19             (Continued on next page)

20

21

22

23

24

25

 1          (In open court)

 2          THE COURT:  Okay, Mr. Baynes you can step down.

 3          (Witness excused)

 4          MR. GOLTZER:  May he be instructed not to discuss his

 5   testimony with the government over the weekend.

 6          THE COURT:  I'm sure the government will not be

 7   discussing.

 8          MR. NAWADAY:  Yes, your Honor.  I will put that on the

 9   record; that, of course, the government will not be contacting

10   the witness since he is on cross-examination over the weekend

11   and while he's on cross-examination.

12          THE COURT:  However I do not prohibit parties from

13   discussing logistical matters with their witnesses.

14          MR. GOLTZER:  I wasn't asking that, your Honor.

15          MR. NAWADAY:  Your Honor, one logistical matter.

16          THE COURT:  I'm sorry?

17          MR. NAWADAY:  One logistical matter.

18          THE COURT:  Certainly.

19          MR. NAWADAY:  There is one witness we need to get on,

20   because she has vacation plans, on Monday.  We'd like to be

21   safe.  It's the ME, the medical examiner, Dr. Susan Ely.  Not

22   knowing how long the cross-examination of Mr. Baynes will go,

23   we'd like to be safe and be able to call Dr. Ely out of order,

24   call her first thing in the morning so that she can get on and

25   off and then we can continue with Mr. Baynes.  Unless defense

1    counsel believe that the cross is going to go until 5 p.m. on

2    Monday.

3              THE COURT:  Is there an objection to taking Dr. Ely

4    out of order Monday morning?

5              MR. BUCHWALD:  Just a second.

6              (Pause)

7              MR. NAWADAY:  Monday afternoon is fine too, your

8    Honor.

9              MR. GOLTZER:  We would prefer that she be called in

10   the afternoon.

11             THE COURT:  Okay.  So first thing after lunch Monday

12   afternoon.

13             MR. NAWADAY:  That works.

14             THE COURT:  Gentlemen?  First thing after lunch Monday

15   afternoon?

16             MR. GOLTZER:  Sure.

17             THE COURT:  Very well.

18             Anything further?

19             MR. GOLTZER:  I have nothing.

20             MR. NAWADAY:  Not from the government.

21             MR. BAUER:  No, your Honor.

22             THE COURT:  Nothing more.

23             MR. BUCHWALD:  How long is her direct?  May we inquire

24   how long her direct is?

25             THE COURT:  Gentlemen, how long will the direct of

E879chr7                          Baynes - cross

1    Dr. Ely be?

2               MR. NAWADAY:  Direct of Dr. Ely will be I expect

3    between 45 minutes to an hour tops.

4               THE COURT:  Okay.  Very well.

5               Gentlemen if there are any issues that come up over

6    the course of the weekend do e-mail or fax it in to chambers.

7    And if there's nothing more, we will see you at 9:00 Monday

8    morning.

9               Apparently there is something more.  Mr. Buchwald?

10              MR. BUCHWALD:  Just off the record.

11              (Discussion off the record)

12              (Adjourned to August 11, 2014 at 9:00 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                      INDEX OF EXAMINATION

 2    Examination of:                           Page

 3     PETER FREDERICK

 4    Cross By Mr. Greenfield . . . . . . . . . . 334

 5    Redirect By Mr. Bauer  . . . . . . . . . . 366

 6    Recross By Mr. Greenfield  . . . . . . . . 381

 7     ANTHONY BAYNES

 8    Direct By Mr. Nawaday  . . . . . . . . . . .383.

 9    Cross By Mr. Goltzer . . . . . . . . . . . 517

10                      GOVERNMENT EXHIBITS

11    Exhibit No.                             Received

12     201, 202 and 203 . . . . . . . . . . . . 389

13     201A, 201B, 202B and 203B  . . . . . . . 390

14     216A and 216B  . . . . . . . . . . . . . 391

15     204 and 204B . . . . . . . . . . . . . . 392

16     205 and 205B . . . . . . . . . . . . . . 392

17     207, 207A and 207B . . . . . . . . . . . 393

18     208 and 208B . . . . . . . . . . . . . . 394

19     422  . . . . . . . . . . . . . . . . . . 403

20     209 and 211  . . . . . . . . . . . . . . 412

21     212  . . . . . . . . . . . . . . . . . . 413

22     206 and 206C and 220 and 220B  . . . . . 432

23     218  . . . . . . . . . . . . . . . . . . 438

24     219  . . . . . . . . . . . . . . . . . . 444

25     301A and 905 . . . . . . . . . . . . . . 458
</pre>

1   252K   . . . . . . . . . . . . . . . . . . 498

2   252L   . . . . . . . . . . . . . . . . . . 500

3   252M   . . . . . . . . . . . . . . . . . . 502

4   252N   . . . . . . . . . . . . . . . . . . 503

5   259   . . . . . . . . . . . . . . . . . . 505

6   252O   . . . . . . . . . . . . . . . . . . 511

7   252P   . . . . . . . . . . . . . . . . . . 512

8   311   . . . . . . . . . . . . . . . . . . 514

9   313   . . . . . . . . . . . . . . . . . . 516

10                        DEFENDANT EXHIBITS

11   Exhibit No.                              Received

12   A   . . . . . . . . . . . . . . . . . . 555

13

14

15

16

17

18

19

20

21

22

23

24

25