E8bnchr1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA
 3              v.                            12 CR 626 (ER)
     RAYMOND CHRISTIAN a/k/a
 4   "Reckless"
     GLENN THOMAS, a/k/a "Gucci"
 5   TYRELL WHITAKER, a/k/a "Bow Wow"
                  Defendants
 6   ------------------------------x
                                             New York, N.Y.
 7                                           August 11, 2014
                                             9:10 a.m.
 8

 9   Before:
                         HON. EDGARDO RAMOS
10                                           District Judge

11
                           APPEARANCES
12   PREET BHARARA
          United States Attorney for the
13        Southern District of New York
     ANDREW BAUER
14   KAN M. NAWADAY
          Assistant United States Attorney
15
     DAVID S. GREENFIELD
16        and
     ANTHONY STRAZZA
17        Attorneys for Defendant Christian

18   LAW OFFICES OF DON BUCHWALD
          Attorney for Defendant Thomas
19   DON D. BUCHWALD

20   KELLEY DRYE & WARREN LLP
          Attorney for Defendant Thomas
21   LEVI DOWNING

22   GEORGE ROBERT GOLTZER
          and
23   YING STAFFORD
          Attorneys for Defendant Whitaker
24   -- also present--
     S.A. Andrei Petrov - FBI
25
```

E8bnchr1

1           (Trial resumed)

2           (In open court; jury not present)

3           MR. BAUER:  Judge, I believe last week Mr. Goltzer put

4   on the record something that he discovered with regards to

5   Count Six of the indictment with regards to his client Tyrell

6   Whitaker.  That was that he was looking over the juvenile

7   paperwork that the government had filed back when we sought

8   authorization from the U.S. attorney and then moved before your

9   Honor to transfer Mr. Whitaker to adult status.  What

10  Mr. Goltzer had discovered is that the juvenile paperwork, the

11  juvenile complaint, the juvenile information only included

12  charges for the robbery and for the shooting, the cause of

13  death of Jeffrey Henry.  It did not include the substance of

14  Count Six, which is using a firearm during and in relation to

15  the narcotics conspiracy.

16          Mr. Goltzer is correct.  We've reviewed the paperwork.

17  It is, if not an oversight, it was at least obviously caused by

18  our office.  We are inclined to, due to Mr. Goltzer request,

19  move to dismiss that count for Mr. Whitaker.  Our concern --

20  not our concern, the thing that I wanted to bring before your

21  Honor before we did so was to bring you back to two Fridays ago

22  when the parties argued the various 404(b) motions.  At that

23  time defense counsel had made the argument or tried to preclude

24  evidence with regards to Mr. Whitaker's drug selling as well as

25  his membership in gangs.  At that time the government had made

E8bnchr1

1    a number of arguments as to why that evidence was relevant.

2         The first was that it went to the background of the

3    conspiracy and the background as to the relationship between

4    the defendants as well as their coconspirators.  We also argued

5    that it went to motive and other 404(b) type arguments in that

6    Whitaker was a drug seller he was part of the Bloods, and

7    therefore that was one of his motives in participating in the

8    robbery and eventual murder of Jeffrey Henry.  But one of the

9    other arguments we made is that he was charged with Count Six

10   and Count Six, the underlying object was the narcotics

11   conspiracy.

12        We still believe that that the first grounds, the

13   motive, those grounds for admissibility still are very much in

14   play.  I don't think Mr. Goltzer is prepared to renew those

15   objections at this time.  I don't think he's going to ask for

16   any additional rulings from your Honor, but I wanted to make

17   the record clear, that if we dismiss Count Six we still firmly

18   believe that all of that evidence, his drug selling and his

19   membership in gangs and the like, and that also includes a

20   robbery that he did with Kevin Burden, that all of that

21   evidence is still admissible under the alternate grounds of

22   admissibility.

23        THE COURT:  So how many counts would that leave

24   Mr. Whitaker in?  Just two counts?

25        MR. BAUER:  Three counts actually.  He's charged in

E8bnchr1

1     Count Two, which is the robbery, the substantive robbery, he's

2     charged in Count Four, which is the shooting that caused the

3     death of Jeffrey Henry.  And then Count Five is a mirror to

4     Count Four.  Count Four is brought under 18 U.S.C. 914(j).

5     Count Five is brought under 924(c), the discharge of the

6     firearm.  And also, if Mr. Whitaker or any defendant is

7     convicted of both at trial, then at sentencing our office only

8     proceeds on the 924(j), not the 924(c).

9                 MR. GOLTZER:  What Mr. Bauer says is correct, your

10    Honor.  What Mr. Bauer says is accurate.  I am assuming that

11    the Court's rulings would be the same, so I am not going to ask

12    that anything be reopened at this time.

13                As I mentioned to Mr. Bauer, the only issue that is

14    open has to do with the Mallory Burden tape based upon issues

15    that may have come up during the trial, and the Court has

16    already reserved on that.

17                THE COURT:  OK.

18                I recall that there's already been some testimony

19    about Mr. Whitaker's drug dealing, correct?

20                MR. BAUER:  Yes.

21                MR. GOLTZER:  Yes.

22                MR. BAUER:  Mr. Baynes on Thursday testified to it.

23                MR. GOLTZER:  Based on your Honor's prior rulings,

24    notwithstanding the coming motion to dismiss, I'm contented, as

25    I mentioned to the government, to rely on the record of the

E8bnchr1

1     motions in limine, and I won't be making a motion to strike.

2              THE COURT:  What needs to be done, therefore, by way

3     of dismissing Count Six against Mr. Whitaker.

4              MR. BAUER:  I can make that motion now, early, your

5     Honor, with the consent of the parties.  You can rule now or

6     take it under advisement.

7              THE COURT:  I'm ready.  If you want to move now, I'm

8     ready to grant the motion.

9              MR. BAUER:  Formally now the government, for all the

10    reasons that I stated earlier, moves to dismiss Count Six with

11    regards to Tyrell Whitaker.

12             THE COURT:  Very well.  That motion, that application

13    is granted.

14             MR. BAUER:  Thank you your Honor.

15             MR. GREENFIELD:  I have an application.

16             THE COURT:  Yes, sir.

17             MR. GREENFIELD:  Prior to the trial, the government

18    sought a stipulation from the defense -- can I stand over here,

19    Judge.

20             THE COURT:  You can.

21             MR. GREENFIELD:  Prior to trial, the government sought

22    a stipulation from me regarding the buccal swab that contained

23    my client's DNA taken by Detective Goodman on October 7, 2010,

24    the stipulation being that the swab was taken and turned over

25    to the property clerk's office and sent to Albany at a later

E8bnchr1

1    time.

2          I did not agree to that stipulation.  I said I don't

3    see a chain of custody.  Show me the chain of custody, and I

4    might stipulate to it.

5          All I was told after that was that Goodman would

6    testify and that Fredericks would testify, and they would make

7    the chain that way.

8          THE COURT:  OK.

9          MR. GREENFIELD:  I questioned and I received no

10   documentation backing up this chain.

11         Based on the fact that there was no documentation

12   regarding the chain as to the buccal swab, and based upon the

13   fact that we've gotten a plethora of chain of custody from just

14   about every witness in this case, formalized chain of custody

15   documents from the Newburgh police as well as the Albany lab, I

16   felt safe that there was no chain of custody, formal chain of

17   custody documentation, and that's how I proceeded with

18   Detective Fredericks when I cross examined him.

19         During the cross-examination, if you will recall, the

20   government stood up and asked me if I would stipulate with them

21   that in fact there was no chain of custody with regard to the

22   documentation of the buccal swab in the Henry chain of custody.

23   We stipulated to the fact that there was no documentation of

24   the buccal swab.  Over the weekend the government sent a formal

25   chain of custody for the buccal swab, which I had never seen

E8bnchr1

before.

Based upon my decision-making process to go into the Fredericks, to go after Fredericks with regard to the chain of custody, I think it put my defense in a great position of jeopardy.

I was blindsided, Judge.  If I had those documents prior to my cross-examination of Fredericks, I may not have questioned him whatsoever about chain of custody.

The government has an obligation under Rule 16 and even under 3500 to provide that type of stuff, not after I've cross-examined the witness, but before I cross-examined the witness.  If I didn't get the chain of custody, the burden is on them, the onus is on them, and they have to bear the problem.

I have a right under Rule 16 to expect that any documentation that would be material to my defense would have been turned over prior to the beginning of trial under Rule 16, and certainly under Rule 35 prior to the witness's testimony.

THE COURT:  I get all that, Mr. Greenfield.

What is your application?

MR. GREENFIELD:  First I move to dismiss the indictment.

THE COURT:  That application is denied.

MR. GREENFIELD:  Second, I would move for a mistrial.

THE COURT:  That application is denied.

E8bnchr1

1          MR. GREENFIELD:  Third, I would move to preclude the

2     testimony with regard to the DNA evidence with respect to my

3     client coming into evidence.

4          THE COURT:  All of the DNA evidence?

5          MR. GREENFIELD:  There's only one piece.

6          THE COURT:  OK.  So let's hear from the government.

7          MR. NAWADAY:  Your Honor, first, the reason that the

8     chain of custody with respect to the buccal swab was -- number

9     one, it is accurate that it wasn't originally part of the

10    Jeffrey Henry evidence because that buccal swab was taken, as

11    Mr. Greenfield has known for many, many months, from a

12    different case from an arrest in October 2010 of Raymond

13    Christian.  That's number one.

14         Number two, Mr. Greenfield has known how we were going

15    to prove the chain of custody for the buccal swab, that it was

16    going to be the detective who took the swab and that we want

17    have necessarily all the links in the chain.

18         We would also have someone from the laboratory testify

19    on the other end that they took that buccal swab from Raymond

20    Christian, that they received from the Newburgh police, and

21    they took that swab and they tested it.

22         So we don't need every link in the chain, and at the

23    end of the day it goes to the weight of the evidence if there

24    is a missing link in the chain.  So I actually don't think that

25    Mr. Greenfield has any grounds to ask for precluding our use of

583

E8bnchr1

1      this buccal swab.

2                As it goes to authenticity at the end of the day, and

3      I don't think we have to prove chain of custody through a

4      certain manner that Mr. Greenfield says we have do, like

5      through documentation, we do it through a live witness such a

6      person in the chain and someone else who had dealt with that

7      piece of evidence at the end of the chain.  It just goes to

8      authenticity at the event of the day.

9                THE COURT:  Why wasn't it turned over?

10               MR. BAUER:  Judge, since I was who had obtained a lot

11     of documents I figured I would speak.  We turned over many

12     documents from that October 7, 2010, arrest of Mr. Christian,

13     arrest reports, evidence reports demonstrating the evidence

14     that was collected, things of that nature.

15               Frankly, we didn't know that that document existed at

16     the time that we were collecting those documents.  Upon

17     Mr. Greenfield's cross-examination of Detective Fredericks, it

18     became clear that there was such a document, and it became

19     clear just how much hay Mr. Greenfield was going to make of

20     this chain-of-custody argument.

21               You can check my e-mail or text messages in that as

22     soon as we had the first break I said we need to find that

23     document and we have to by the next morning.

24               But to be totally frank, the reason why we didn't have

25     that document is because we didn't realize, I didn't realize

E8bnchr1

until Detective Fredericks testified that such a document was made for every single piece of evidence.

As Mr. Nawaday said, our focus has always been on that December 15 incident, and when we had 116-page chain of custody report for that document, for that incident in which Detective Fredericks reported to a crime scene and collected hundreds of pieces of evidence, I thought the situations were discrete. Obviously I was wrong. Detective Fredericks appears to have -- I'm sorry, the CSU creates that document for every piece of evidence that comes in.

As to Detective Fredericks's 3500, his name is on the report as somebody who accepted that buccal swab into evidence, but he wasn't going to testify to it because he didn't remember it. Because, as he testified, he takes in hundreds of pieces of evidence all the time. So it frankly didn't occur to us that he was going to have any relevant testimony on that buccal swab.

THE COURT: OK.

MR. GREENFIELD: Judge, my problem with that explanation, they asked me for a stipulation in the chain of custody. I said no because I don't see a chain of custody. Show me the chain of custody.

THE COURT: When did that conversation happen?

MR. GREENFIELD: Two, three weeks before trial.

THE COURT: OK.

E8bnchr1

1          MR. GREENFIELD:  It's plain and simple.  They should

2     have then right then and there called up Newburgh and said is

3     there a chain custody to this.  We have the chain of custody

4     for everything else in the case, where is the chain of custody

5     as to this?  And they would have gotten the same answer with

6     them as with all those e-mails flying around Thursday and

7     Friday.

8          The bottom line is, Judge, I would not have questioned

9     that witness, Fredericks about the topic that I questioned him

10    about if I knew there was a chain of custody.  And now it bites

11    me in the back.  I didn't need that cross if I knew this

12    existed.  We should not bear the burden, and I would ask that

13    that evidence be excluded.

14         MR. BAUER:  If Mr. Greenfield is looking to strike the

15    testimony of those few questions and his answers, that

16    Detective Fredericks did not know anything about the buccal

17    swab, we have no objection.

18         THE COURT:  I don't think he's asking for that.

19         MR. BAUER:  I know.

20         THE COURT:  I think he's asking for the entire DNA

21    evidence to be stricken.

22         MR. BAUER:  Right.  Judge, first of all, on the

23    stipulation point, the stipulation, the thrust of the

24    stipulation was we were trying to save the testimony of

25    Detective Goodman, who is now going to be testifying, who took

E8bnchr1

1    the buccal swab.  So the thrust of the stipulation was a

2    Newburgh Police Department officer took this swab and it went

3    up to the lab.  The thrust was not that we were representing in

4    the stipulation every link in the chain of the chain of

5    custody.

6              MR. GREENFIELD:  We discussed the chain.  We actually

7    discussed the chain among ourselves when we talked about that.

8    I said prove the chain and I'll give you the stipulation.

9              THE COURT:  I guess my concern is, I mean clearly the

10   government is correct that any particular gap in the chain of

11   custody doesn't go to admissibility.  It goes to weight.  The

12   concern that Mr. Greenfield has rightly highlighted, however,

13   is the strategic decision he made on, let's call it the

14   representation of the government that there would be no

15   documentary evidence establishing the chain and that the

16   government would attempt to establish the chain through

17   testimony.

18             I do recall Mr. Greenfield's cross-examination of

19   Officer Fredericks concerning the lack of a complete chain.  So

20   that is some matter of concern for the Court, that counsel,

21   based on the government's representations, undertook a

22   strategic decision which will apparently, if given the

23   opportunity, be rebutted by the government's recent production

24   of those documents.

25             As I sit here, I don't know what the right answer is.

E8bnchr1

1    I am not inclined to strike the DNA evidence, but perhaps there

2    is something short of that by way of precluding certain

3    arguments on the part of the government.  I don't know.  I will

4    have to think about that.

5            MR. GREENFIELD:  Judge, one more little item to add to

6    the mix as you are considering this.  I am not blaming the wait

7    on the government here.  They probably made phone calls to

8    Newburgh all along and asked for this or that.  What I am

9    pointing to is the fingerprints.  We were told there was no

10   fingerprint evidence of any consequence.  They took the

11   fingerprints and they got no results of any kind.  Fredericks

12   testified on the stand with regard to having three positive IDs

13   of fingerprints.  Again, we never got that.  We should have

14   gotten it.  I'm pointing to the fact that they play fast and

15   loose in Newburgh.

16           THE COURT:  The fact that they've got three positive

17   prints does not necessarily negate that they were of any

18   relevance.

19           What can the government say in that regard?  By the

20   way it's, almost 9:30, so I do want to bring the jury out if

21   they are here, but until they come out.

22           MR. BAUER:  Judge, just on the fingerprints, the

23   fingerprint hits I believe were all of persons who were not of

24   interest to the investigation.  So our representations are not

25   inconsistent with the facts from that report.  By the way, I do

E8bnchr1

1    want to go back to the DNA.  The representation that there was

2    no chain of custody report we had, our representation was that

3    we were going to prove the first and the last pieces of the

4    chain and not the middle.  So it still can be problematic in

5    that we didn't have the document, but our representation wasn't

6    that there was no report, that there was no other chain.  It

7    was simply we didn't know of it and we were going to offer the

8    two ends of it.

9              THE COURT:  We're waiting on one more juror.  What

10   does the government propose to do by way of the chain?

11             MR. BAUER:  That is the thing about Mr. Greenfield's

12   argument here today, nothing.  The answer is nothing.  Our

13   strategy remains entirely the same.  I frankly don't see any

14   prejudice Mr. Greenfield experienced based on the later

15   disclosure of this document.

16             MR. GREENFIELD:  We certainly can't put the milk in

17   the bottle that I expended on my cross-examination.

18             THE COURT:  I suppose if the documents themselves are

19   not evidence, then your arguments remain the same.  I guess

20   what you are arguing about is you weren't given the documents

21   establishing the steps from collection through analysis.

22             MR. GREENFIELD:  What I was given was the same

23   document in the Henry Murray case.

24             THE COURT:  I understand that.

25             MR. GREENFIELD:  I expect if there was something in

E8bnchr1

1    the buccal case, I would have gotten it.  They are one number

2    apart 266, 267 I believe.

3            THE COURT:  OK.

4            MR. GREENFIELD:  Why would I get it in one case and

5    not the other.  I think I have every right to believe that if

6    it was out there they would have given it to me, just like they

7    did he in Henry.  And then when I said show me the chain, they

8    told me two witnesses would testify.  That is not good enough.

9            THE COURT:  Apparently that's all that is going to

10   happen.  Two witnesses are going to testify and I think you

11   will still have your argument.

12           MR. GREENFIELD:  I don't know, Judge.  If I see that

13   chain in writing, that is an argument I might not pursue or an

14   area of cross-examination I probably would not, most assuredly

15   would not have pursued if I saw what purports to be a chain of

16   custody to this evidence.

17           If it was turned over on October 7, it's sent to

18   Albany December 21, then I abandon that line.  I don't do it

19   with Fredericks, I do it another way.  I don't cross-examine

20   him to the extent that I did on the subject.

21           MR. BAUER:  Judge, as I said, our strategy with a

22   number of the witnesses remains exactly the same.  I will also

23   underscore the point that Mr. Greenfield did know that that

24   buccal swab was sent to the lab along with the ski mask.  So he

25   didn't have the report, but he knows it went up there.  This is

590

E8bnchr1

1    not a shocking development here, that at the time that the ski

2    mask was sent up on December 21 that the buccal swab was sent

3    the same day because those were the two items that were

4    compared.  So the shock and surprise that Mr. Greenfield has is

5    a little surprising for us as well.

6              MR. GREENFIELD:  Of course, I know they went up there

7    on December 21.  My question is and was during the

8    cross-examination where was it from October 7 to December 21,

9    not when it got to the laboratory.  I want to know how many

10   hands touched it, under what circumstances, and who had it and

11   who touched it and where it went.  That's what my

12   cross-examination was, not that it got to Albany.  I want to

13   know how it got to Albany, in what condition, and how many

14   people touched it before it got there.

15             THE COURT:  OK.

16             Let's see where the jury is.

17             MR. GREENFIELD:  Do we have a minute, Judge?

18             THE COURT:  We'll see where the jury is, if the jury

19   is ready?  No.

20             MR. GREENFIELD:  Can we do the tag team with my

21   partner?

22             THE COURT:  Sure.  I take it, Mr. Goltzer, you are

23   still on with -- actually we need the witness.

24             MR. GOLTZER:  May I set up?

25             THE COURT:  Yes, please.

E8bnchr1

 1            MR. GOLTZER:  Yes, I'm still on cross, Judge.

 2            THE COURT:  You can hold Mr. Baynes.

 3            MR. GREENFIELD:  Still one?

 4            THE COURT:  Still one.

 5            MR. GOLTZER:  Judge, there is going to be an

 6    application without objection from the government to take

 7    judicial notice of a little piece of a transcript of an Orange

 8    County plea hearing, your Honor.

 9            THE COURT:  An Orange County?

10            MR. GOLTZER:  Plea hearing.

11            THE COURT:  Hold off, because we don't have a full

12    jury yet.

13            I'll let you know.

14            (Pause)

15            THE COURT:  The jury is here.  Can you get Mr. Baynes.

16     ANTHONY BAYNES, resumed.

17            THE COURT:  Mr. Baynes, I am going ask you to please

18    keep your voice up, OK?

19            THE WITNESS:  All right.

20            MR. GOLTZER:  Can you ask Mr. Baynes to say something

21    so we can test the sound system to see if he's in the right

22    position.

23            THE WITNESS:  Good morning.

24            MR. GOLTZER:  If you brought that a drop closer, you

25    probably won't have to bend over as far.

E8bnchr1

1              THE COURT:  Except that it's too close.

2              MR. GOLTZER:  Thursday was impossible.

3              THE COURT:  Yes, it was very difficult.

4         (Continued on next page)

1          (Jury present)

2          THE COURT:  Good morning, all.

3          Please be seated.  We will now continue with the

4     cross-examination of Mr. Baynes by Mr. Goltzer.

5          Mr. Baynes, you are reminded that you are still under

6     oath, OK?

7          THE WITNESS:  Yes.

8          THE COURT:  Louder.

9          THE WITNESS:  Yes.  Good morning.

10    CROSS EXAMINATION

11    BY MR. GOLTZER:

12    Q.  Good morning, Mr. Baynes?

13    A.  Good morning.

14    Q.  Mr. Baynes, you do not have a written agreement with the

15    federal government, do you?

16    A.  No.

17    Q.  The only plea agreement that you entered into was with the

18    state authorities?

19    A.  Yes.

20    Q.  And that was the district attorney's office for Orange

21    County?

22    A.  Yes.

23    Q.  And Newburgh is part of Orange County?

24    A.  Yes.

25    Q.  Is it true that you were provided with an opportunity to

e8bnchr1                        Baynes - cross

1    make a choice where you wanted to plead guilty?

2    A.  Yes.

3    Q.  And is it true that you still have that choice?

4    A.  Yes.

5    Q.  In fact, you were told by a prosecutor named -- Hoberman

6    was it?  Do you remember the name of the prosecutor?

7    A.  No.

8    Q.  Do you remember meeting with a prosecutor by the name of

9    Haberman several times?

10   A.  I don't remember his name.

11   Q.  But you do remember meeting with a prosecutor?

12   A.  Yes.

13   Q.  And that was the same prosecutor who was present when you

14   pled guilty?

15   A.  Yes.

16   Q.  And at the time you pled guilty, you were told on the

17   record that if you could do better than the deal you made with

18   Newburgh, you could plead guilty in the federal court and they

19   would let you take your plea back like it never happened, isn't

20   that true?

21   A.  I don't remember.  I don't think that's what happened.

22   Q.  Do you deny that happened?

23   A.  No.  But I don't think it happened.

24   Q.  Your Honor, without objection from the government and

25   pursuant to Rule 201, I would ask the Court to take judicial

e8bnchr1                    Baynes - cross

1   notice of pages 3, line 21, through page 4, line 2, of the

2   October 21, 2011 plea hearing.  And I would request that that

3   be admitted or deemed admitted and I could publish it to the

4   jury?

5           THE COURT:  Any objection?

6           MR. NAWADAY:  No objection.

7           THE COURT:  Very well, you can publish it to the jury.

8   That will be admitted.

9           MR. GOLTZER:  It's 3501-11 for the convenience of the

10  government.  Thank you, Judge.

11  Q.  I am going to read to a few lines from that proceeding that

12  are now in evidence.  OK, Mr. Baynes?

13  A.  OK.

14  Q.  Beginning at page 3, line 21, by Mr. Haberman, I'm quoting:

15   "There is one other matter.  In case Mr. Baynes chooses

16  voluntarily to be prosecuted by the United States Attorney for

17  the same crimes, we would permit him after a plea to withdraw

18  his plea here and allow him to be sentenced federally if he

19  thought he could do better by that route rather than this."

20           Did you hear me read that?

21  A.  Yes.

22  Q.  Do you now remember that that's what happened?

23  A.  No, I don't.

24  Q.  Do you agree that if you and your lawyer decide you could

25  plead guilty with these folks and take the plea back with those

1   folks?

2   A.  It's possible.

3   Q.  Is it true or not?

4   A.  I don't -- I don't remember.  I didn't never hear that,

5   but --

6   Q.  Do you have memory problems?

7   A.  No.  But I never -- nobody never told me that.

8   Q.  I beg your pardon?

9   A.  Nobody never told me that.

10  Q.  Do you remember being in a courtroom when that was said on

11  the record out loud by Mr. Haberman?

12  A.  No.

13  Q.  You have no memory of that whatsoever?

14  A.  No.

15  Q.  Do you dispute that that happened?

16  A.  No.

17  Q.  But you haven't entered into an agreement with the

18  prosecutors from the federal court?

19  A.  No.

20  Q.  And according to the deal you have -- well, let me start

21  this way.  You testified on Thursday that you committed how

22  many robberies?

23  A.  Around 10.

24  Q.  Huh?

25  A.  Around 10.

1    Q.  Around 10?  Didn't you say six?

2    A.  I said around.  I never said a number.

3    Q.  You said around six?

4    A.  Around, yeah.

5    Q.  Was it six or ten, Mr. Baynes?

6    A.  It's around that number.

7    Q.  Around how many?

8    A.  Around six.  In between six and ten.

9    Q.  In between six and ten?

10   A.  Yes.

11   Q.  Could it have been more than ten?

12   A.  No, it's around, like around six, it's not more than ten.

13   Q.  Do you actually have a recollection of how many robberies

14   you have committed in your life or not?

15   A.  No.

16   Q.  You do not?

17   A.  Not all of them.

18   Q.  You don't remember all of the robberies you've committed?

19   A.  I would have to sit and think about all of them, but it's

20   not that many.

21   Q.  You have been interviewed by the government, between the

22   state government and the federal government, you have been

23   interviewed how many times, if you remember?

24   A.  Around like 25, 30.

25   Q.  You sat through 25 or 30 interviews with agents and

e8bnchr1                    Baynes - cross

1   prosecutors?

2   A.  Yes.

3   Q.  And each of those interviews involved some number of hours?

4   A.  Yes.

5   Q.  And some of them were an hour?

6   A.  I don't know.  I guess, yes.

7   Q.  You're guessing?

8   A.  I don't know specifically how long they was.

9   Q.  Could some of them have been half a day?

10  A.  They were only for hours.  Hours.

11  Q.  I beg your pardon?

12  A.  Hours, hours.

13  Q.  How many hours?

14  A.  I don't know.  They was hours, though.

15  Q.  Did you ever spend three or four hours with prosecutors and

16  agents?

17  A.  Could have, yes.

18  Q.  Do you remember?

19  A.  No, I wasn't looking at the time before I went or after I

20  left.

21  Q.  Did you spend a hundred hours preparing for your testimony

22  in this courtroom?

23  A.  I -- no.  No.

24  Q.  I beg your pardon?

25  A.  No.

1  Q.  Can you estimate for this jury, without guessing, but an

2  estimate, how many hours you spent preparing for your testimony

3  before this jury?

4  A.  I don't -- no.

5  Q.  Did you have occasion to answer the questions that you were

6  asked on Thursday by the prosecutor in the office?

7  A.  Yes.

8  Q.  How many times were you asked those questions?

9  A.  Probably once or twice.

10 Q.  How many times did you answer those questions?

11 A.  Once or twice.

12 Q.  So before you came to court before this jury you were told

13 the specific questions that you were going to be asked by the

14 prosecutor?

15 A.  Yes.

16 Q.  And you told them the answers that you were going to give

17 them?

18 A.  Yes.

19 Q.  And can you tell the jury in any way how often it was that

20 you prepared for that?  Of the 25 or 30 times, how many of

21 those meetings happened before you went through your direct

22 testimony with the prosecutors?

23 A.  Like four.

24 Q.  How many?

25 A.  Like four, like four.

e8bnchr1                          Baynes - cross

1    Q.  All right.

2    A.  Like, yeah, like around four.

3    Q.  Around four?

4    A.  Four.

5    Q.  How many times did you meet with the Orange County

6    prosecutor?

7    A.  I don't know.

8    Q.  How many times did you meet with the federal prosecutors?

9    A.  Like probably -- I don't know.  It's around -- they like

10   split up, like half and half.

11   Q.  Half and half?

12   A.  Yes.

13   Q.  Was it always the same prosecutors for the state?

14   A.  Yes.

15   Q.  Was it always the same prosecutors for the federal

16   government, or did they change?

17   A.  They changed.

18   Q.  Do you remember the names of the any of the prosecutors?

19   A.  No.  I just know it was a female.

20   Q.  What was the name of the prosecutor in the state case?

21   A.  I don't remember.

22   Q.  Did you just hear me say the name Haberman?

23   A.  Yes.

24   Q.  Did you hear me read what Mr. Haberman said in the

25   courtroom?

e8bnchr1                        Baynes - cross

1    A.  Yes.

2    Q.  Were you unable to remember the name Haberman from the time

3    I read it about ten minutes ago until now?

4    A.  No.

5    Q.  You didn't remember the name, did you?

6    A.  Yeah, I remember the name, but you said two names at first.

7    I didn't --

8    Q.  Did you ever have a fight with Bow Wow?

9    A.  No.

10   Q.  When you were being interviewed by Mr. Haberman on May 13,

11   2011 in Orange County, did you ever tell him that you had

12   previously, or before, you had had a fight with Bow Wow?

13   A.  No.

14   Q.  You deny that?

15   A.  Yes.

16   Q.  The fight you had was with Bash?

17   A.  Yes.

18   Q.  Now you are not sure how many robberies you've committed?

19   A.  A rounded number, though.  Around -- I know a rounded

20   number.

21   Q.  How many robberies have you committed in your life with

22   Quay Quay?

23   A.  One, one or two.

24   Q.  Just one or two?

25   A.  Yes.

e8bnchr1                        Baynes - cross

1   Q.  Could it have been more?

2   A.  No.

3   Q.  You were part of a group that committed a number of

4   robberies or muggings of people for change and money in

5   Newburgh, weren't you?

6   A.  No.

7   Q.  Wasn't Quay Quay part of that group?

8   A.  Yes.

9   Q.  Quay Quay was part of a group that you committed robberies

10  with in Newburgh when you were 16 and 17 years old, right?

11  A.  Yes.

12  Q.  Do you recall committing approximately ten chain snatch

13  robberies?

14  A.  No.

15  Q.  Did you tell the federal authorities, namely, an attorney,

16  a U.S. attorney by the name of Rebecca Mermelstein on May 7,

17  2012, during a proffer session that you recalled committing

18  approximately ten chain-snatch robberies in the past -- forgive

19  me -- I'll try and say it three times fast.  Ten chain-snatch

20  robberies?

21  A.  No.

22  Q.  You deny saying that?

23  A.  Yes.

24  Q.  When you were interviewed, do you remember a female U.S.

25  attorney by the name of Mermelstein?

1    A.  Yes.

2    Q.  Was there an agent in the room at the same time?

3    A.  Yes.

4    Q.  What was his name or her name?

5    A.  I don't remember.

6    Q.  Do you see that agent in court?

7    A.  No.  It was --

8    Q.  What was the name of your lawyer who was present at that

9    interview?

10   A.  A. J..

11   Q.  What?

12   A.  A.J.

13   Q.  I couldn't understand that?

14   A.  A.J.  A.J.

15   Q.  The name of your lawyer was?

16   A.  At that time it was a lawyer A.J.

17   Q.  A.J.?

18   A.  Yes, the same state lawyer.

19   Q.  You ever hear the name Paul Rinaldo?

20   A.  Yes.

21   Q.  Who is Paul Rinaldo?

22   A.  My lawyer now.

23   Q.  Your federal lawyer?

24   A.  Yes.

25   Q.  Was he at that meeting?

e8bnchr1                         Baynes - cross

1   A.  Not at those -- no, he didn't come until later.

2   Q.  He wasn't there on May 7, 2012?

3   A.  I don't know that date, but he was -- at first my state

4   lawyer was at the meetings.

5   Q.  When you were 16 years of age, were you part of a group

6   that robbed a chain necklace from randomly selected victims?

7   A.  That's not -- we did that, but that is not what we -- yeah,

8   I guess you could say yes.

9   Q.  You guess?

10  A.  Yes.

11  Q.  Don't you know?

12  A.  No, I know.  I say yes, yes.

13  Q.  The answer is yes, isn't it?

14  A.  Yes.

15  Q.  And the others who committed the robberies with you were

16  Laquavious Boykin, also known as Quay Quay, is that right?

17  A.  Yes.

18  Q.  James?

19  A.  Yes.

20  Q.  And Darryl Roberts?

21  A.  I don't know who that is.

22  Q.  Was there a robbery that occurred at Fullerton and

23  Broadway?

24  A.  Not that I remember.

25  Q.  Did you tell Rebecca Mermelstein on May 7, 2012 that there

e8bnchr1                          Baynes - cross

1    was a robbery at Fullerton and Broadway?

2    A.  Not that I remember.

3    Q.  Did you tell hear that James snatched the chain?

4    A.  Yes.  That is by my house.

5    Q.  Did you tell her that you received $300 from a pawn shop?

6    A.  Yes, around my house that was.  That was by my house.

7    Q.  Do you remember that robbery now?

8    A.  It was by my house.  It wasn't by Fullerton and Broadway.

9    Q.  Did you tell her it was at Fullerton?

10   A.  No.

11   Q.  But you remember a robbery near your house where those

12   things happened?

13   A.  Yes.

14   Q.  Could have been confused about the location of the robbery?

15   A.  No.

16   Q.  In the spring of 2010, while you were walking down Mill

17   Street in Newburgh, were you there when James snatched the

18   chain from your neighbor?

19   A.  Yes.

20   Q.  Did you know your neighbor?

21   A.  No, not really, no.

22   Q.  Did you know it was your neighbor?

23   A.  Yeah, I seen him before, but I don't know him.

24   Q.  And he had seen you before?

25   A.  Yes.

e8bnchr1                    Baynes - cross

1    Q.  Did you tell Mr. James, That's my neighbor, leave him

2    alone?

3    A.  No, he was running.

4    Q.  Did you tell Mr. James, Don't rob him, he can identify me?

5    A.  He took it, but I told him -- it happened too quick.  He

6    took it and ran.

7    Q.  Did you split the proceeds with him?

8    A.  Yes.

9    Q.  Because you were part of the group?

10   A.  Not -- it was because we was close.  It was just because we

11   was close.

12   Q.  You were close to James?

13   A.  It had nothing to do with the group.

14   Q.  You were close to James?

15   A.  Yes.

16   Q.  You were close to Quay Quay?

17   A.  Yes.

18   Q.  And you were present during that robbery?

19   A.  Yes.

20   Q.  But you had nothing to do with it?

21   A.  No.

22   Q.  But you took the money anyway?

23   A.  Yes.

24   Q.  While you were at a party in Vails Gate, New York, there

25   was a fight and a chain fell off of somebody, is that right?

1  A.  Yes.

2  Q.  And Houston Brown and you decided to steal it?

3  A.  Yes.

4  Q.  And you did, didn't you?

5  A.  Yes.

6  Q.  Were you involved in a robbery during the summer of 2010 on

7  Carson Street in Newburgh?

8  A.  I don't know if that's the date, but I was involved in a

9  robbery on Carson Street, yes.

10  Q.  You were?

11  A.  Yes.

12  Q.  That was with Quay Quay?  Did you tell Mermelstein that it

13  was Quay Quay and James?  Yes or no, if you remember?

14  A.  No.

15  Q.  You didn't tell her that?

16  A.  No.

17  Q.  Did it involve a big chain?

18  A.  No.

19  Q.  Did you tell her it involved a big chain?

20  A.  No.

21  Q.  Did you tell her that the victim chased James?

22  A.  No.

23  Q.  Did the victim chase James?

24  A.  No.

25  Q.  Did Edwin Cortez punch the victim?

1    A.  No.

2    Q.  Did you tell her that Edwin Cortez punched the victim?

3    A.  No.

4    Q.  Now, the chain robberies that you were involved in usually

5    involved Mexican victims, is that correct?

6    A.  Not really.  It was just, the Spanish -- the Spanish -- my

7    next door neighbor was the only Spanish person.

8    Q.  Didn't you tell Mermelstein when notes were being taken

9    that your chain robberies usually involved Mexicans?

10   A.  I don't know what you are saying.  I said the robberies

11   usually involved Mexicans, not chain.  That was the only chain

12   that we took from a Spanish person.

13   Q.  Is it accurate to say that you usually targeted Mexicans?

14   A.  For chains, no.

15   Q.  For anything?

16   A.  Yes.

17   Q.  Why?

18   A.  I don't know.

19   Q.  Why did you pick on Mexicans?

20   A.  I don't know.

21   Q.  Can you think of any reason why you decided to pick on

22   Mexicans?

23   A.  I didn't -- I don't -- I didn't -- I don't know.

24   Q.  Do you like Mexicans or not like Mexicans?

25   A.  Yes.  I'm not racist or -- yes, I like Mexicans, but --

e8bnchr1                          Baynes - cross

1    Q.  But you rob Mexicans?

2    A.  What?

3    Q.  You rob Mexicans?

4    A.  No, I was only --

5    Q.  Why did you pick Mexicans to rob as opposed to some other

6    group?

7    A.  We robbed a lot of people.  We robbed drug dealers, black

8    drug dealers, anybody.

9    Q.  Who did you rob?  You robbed drug dealers?

10   A.  Yes.

11   Q.  You robbed black people?

12   A.  Yes.

13   Q.  You robbed white people?

14   A.  No.

15   Q.  Do you like white people enough that you don't rob them?

16           MR. NAWADAY:  Objection.

17           THE COURT:  Sustained.

18   Q.  You robbed Latino people?

19   A.  Yes.

20   Q.  But why did you tell Mermelstein that you picked on Mexican

21   people?

22   A.  I said we robbed Mexican people.  We robbed Mexicans, we

23   robbed black people.

24   Q.  Did you rob the Mexicans because what you you thought they

25   were illegal and wouldn't go to the police?

1    A.  No.

2    Q.  Did you rob Mexicans because they were smaller than you?

3    A.  No.

4    Q.  Why did you rob Mexicans?  Why did you pick them out?

5    A.  Just did.

6    Q.  You can't think of a reason?

7    A.  It was just -- they're deal -- like the street I lived on,

8    there was a lot of them.

9    Q.  What?

10   A.  The street that I lived on, where I lived, around, there

11   was a lot of them.

12   Q.  Was --

13   A.  A lot of Spanish people.

14   Q.  Strange people?

15   A.  Spanish, Spanish.

16   Q.  So you committed robberies on the street where you lived?

17   A.  Not on my, but around my street.

18   Q.  You just said that the people --

19   A.  I said around where I live there's a lot of Spanish people.

20   Q.  You stole cell phones, too, didn't you?

21   A.  Not like -- I picked up cell phones.

22   Q.  You used to go to basketball games when guys were playing

23   ball in the neighborhood, right?

24   A.  Yes.

25   Q.  And the guys who were playing basketball didn't want to

e8bnchr1                    Baynes - cross

1  break their cell phones, so they would put them down on the

2  side of the court?

3  A.  Yes.

4  Q.  And you would sneak over there and steal the phones --

5  A.  No.

6  Q.  -- and sell them for $60?

7  A.  No.

8  Q.  How did you steal the cell phones?

9  A.  The time everybody left the court and there was a cell

10  phone there, I just took it.

11  Q.  You would sell them for $60 apiece, wouldn't you?

12  A.  For random prices.

13  Q.  I'm sorry?

14  A.  For random prices.

15  Q.  I can't hear you.

16  A.  Random prices.

17  Q.  Did you tell Mermelstein at the same proffer session on May

18  7, 2012, that you sold them for $60 a piece to corner stores in

19  Newburgh and that the store was on Broadway and Dubois.  Did

20  you tell her that?

21  A.  I told her that we sold cell phones, but it was all random,

22  like random prices.

23  Q.  You didn't tell her $60?

24  A.  No.

25  Q.  You didn't tell her where the store was?

1  A.  That phone there I probably got for $60, but --

2  Q.  You told weed sometimes, didn't you?

3  A.  Not really.  I tried to sell weed, but I smoked it.  I

4  never sold weed.

5  Q.  Did you get your supply of weed from Lander street on one

6  occasion?

7  A.  I don't remember.

8  Q.  Did you tell Mermelstein at the same proffer, on May 7,

9  2012, that you got weed from someone known as C?

10  A.  Yes.

11  Q.  So you had a supplier for weed?

12  A.  No, he was just a random person, like a random person I

13  would go to.

14  Q.  You would buy an eighth of an ounce for 40 or 50 dollars?

15  A.  Yes.

16  Q.  And you would sell dime bags?

17  A.  I tried -- I never -- I never really sold, but I tried to.

18  Q.  But you smoked it?

19  A.  Yes.

20  Q.  Did smoking in any way affect the way you saw things,

21  perceived things?

22  A.  No.

23  Q.  So the fact that you smoked five or ten or more joints a

24  day didn't affect your mind in any way?

25  A.  No.

e8bnchr1                          Baynes - cross

1    Q.  Do you know what a blunt is?

2    A.  Yes.

3    Q.  What is a blunt?

4    A.  A rolled-up weed.

5    Q.  It is not a joint?

6    A.  No.

7    Q.  It's bigger?

8    A.  Yes.

9    Q.  You do blunts?

10   A.  Yes.

11   Q.  How many blunts in a day?

12   A.  I don't know.  Around 5.

13   Q.  A blunt is about the size of a cigar?

14   A.  Yes, but not as fat.

15   Q.  What?

16   A.  Not as fat as a cigar.

17   Q.  It's as fat as a cigar?

18   A.  Not as fat.

19   Q.  So it's like a small cigar?

20   A.  Yes.

21   Q.  You committed some burglaries, didn't you?

22   A.  Yes.

23   Q.  You say you committed two burglaries?

24   A.  I said around two.

25   Q.  Two.  Could it have been more?

e8bnchr1                          Baynes - cross

1    A.  Two or three, not a lot.

2    Q.  Do you remember whether it's two or whether it's three?

3    A.  I remember, I remember three.  I remember three.

4    Q.  You just said that's not a lot?

5    A.  It depends on who's looking at it.

6    Q.  One burglary is a lot for the victim, isn't it?

7    A.  Yes.

8    Q.  One of the burglaries involved the mother of a girl that

9    somebody knew?

10   A.  Yes.

11   Q.  Do you remember the girl's name?

12   A.  No.

13   Q.  Who knew her?

14   A.  G.

15   Q.  Who?

16   A.  Somebody named G.

17   Q.  Jay?

18   A.  G.

19   Q.  G?

20   A.  Yes.

21   Q.  Do you know if G was dating her?

22   A.  Yes.

23   Q.  Was it G's girlfriend?

24   A.  Yes.

25   Q.  And G was somebody who knew this mother?

e8bnchr1                          Baynes - cross

1    A.  I don't know.  I guess.

2    Q.  And G decided that you guys were going to go into that

3    house?

4    A.  Yes.

5    Q.  G's girlfriend's mother's house?

6    A.  Yes.

7    Q.  Did you say to G, it is your girlfriend's mother.  Why do

8    you want to do that?

9    A.  No.

10   Q.  Did you say to G, let's pick somebody else?

11   A.  No.

12   Q.  Why not?

13   A.  No reason.

14   Q.  Did you think it was wrong to rip off his girlfriend's

15   mother?

16   A.  Yes.

17   Q.  What?

18   A.  Yes.

19   Q.  Did you care?

20   A.  No.

21   Q.  Did you think it was wrong to rob chains off of people's

22   necks?

23   A.  Yes.

24   Q.  Did you care?

25   A.  No, not at the time.

e8bnchr1                          Baynes - cross

1   Q.   You were able to make four or five hundred dollars a week

2   selling drugs, right?

3   A.   Not every week.  Yes, I guess, yes.

4   Q.   Did you ever have a legitimate job?

5   A.   A summer job.

6   Q.   What job did you have?

7   A.   A summer job at a summer camp.

8   Q.   What did you do?

9   A.   Watched kids.

10  Q.   Did you ever look for work?

11  A.   After that job?

12  Q.   In the winter.

13  A.   No.

14  Q.   After you got thrown out of school, did you ever look for a

15  job?

16  A.   No.

17  Q.   Are you physically healthy?

18  A.   Yes.

19  Q.   Are you able to do physical labor?

20  A.   Yes.

21  Q.   Are you able to do honest work?

22  A.   Yes.

23  Q.   Did you ever do honest work other than working at a camp?

24  A.   No.

25  Q.   Why not?

1   A.  I was young, I just --

2   Q.  You were young?

3   A.  Yes.

4   Q.  When you were young you stole things that didn't belong to

5   you?

6   A.  Yes.

7   Q.  You knew that people had worked to buy those things?

8   A.  Yes.

9   Q.  The girl's mother, what did you steal?  A laptop?

10  A.  Yes.

11  Q.  Did it occur to you that maybe her personal information was

12  on that laptop and she needed it?

13  A.  Yes.

14  Q.  Didn't stop you, though?

15  A.  No.

16  Q.  You sold the laptop?

17  A.  Yes.

18  Q.  What else did you steal?

19  A.  Out of the house?

20  Q.  What?

21  A.  Out of the house?

22  Q.  Yes.

23  A.  Cell phones, iPods, her car.

24  Q.  Her car?

25  A.  Yes.

1    Q.   You joy rided the car?

2    A.   Yes.

3    Q.   And this was somebody that G knew?

4    A.   Yes.

5    Q.   And somebody that was related to somebody that he liked?

6    A.   Yes.  It was his girl's house, too.

7    Q.   It was his girl's house, too?

8    A.   Yes.

9    Q.   Did you see anything wrong with that?

10   A.   Yes.

11   Q.   Did you feel bad about it?

12   A.   No, not at the time.

13   Q.   You felt bad about it at the time?

14   A.   I said, no, not at the time.

15   Q.   Then you committed a burglary at the Mullins apartments,

16   right?

17   A.   Yes.

18   Q.   You stole an Xbox?  Laptop?

19   A.   Yes.

20   Q.   You used to ride around in people's cars that didn't belong

21   to you?

22   A.   Yes.

23   Q.   Didn't care if they had to be at work the next morning?

24   You would leave the car somewhere off where nobody could find

25   it?

e8bnchr1                    Baynes - cross

1   A.  Yes.

2   Q.  You were involved in 30 assaults?

3   A.  Around 30.

4   Q.  Around 30.  Could it have been more than 30?

5   A.  Yes.

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E8b9chr2                         Baynes - cross

1    Q.  Used weapons?

2    A.  No.  No.

3    Q.  No?

4    A.  Sticks.

5    Q.  What kind of sticks?

6    A.  Like a random stick I pick up.

7    Q.  How tall are you?

8    A.  Around five-eleven.

9    Q.  How much do you weigh?

10   A.  220.

11   Q.  How much did you weigh back in 2010?

12   A.  Same.

13   Q.  220?

14   A.  Yes.

15   Q.  You can hurt somebody, hitting them with a stick?

16   A.  Yes.

17   Q.  Did you ever hurt anybody?

18   A.  Yes.

19   Q.  What?

20   A.  Yes.

21   Q.  How many people have you hurt?

22   A.  (No response).

23   Q.  Do you know?

24   A.  No.

25   Q.  Do you care?

E8b9chr2                        Baynes - cross

1    A.  At the time I didn't.

2    Q.  Didn't care who you hurt?  Didn't care who you hurt?

3    A.  At the time I didn't.

4    Q.  Do you care now?

5    A.  Yes.

6    Q.  You've changed?

7    A.  Yes, I guess, yes.

8    Q.  You're a better person?

9    A.  Yeah.

10   Q.  What?

11   A.  Yes.  Yes.

12   Q.  Have you ever helped James Cooper deal crack?

13   A.  Who?

14   Q.  James Cooper?

15   A.  No.

16   Q.  Do you know the name James Cooper?

17   A.  Yes.

18   Q.  Who is James Cooper?

19   A.  My mom old boyfriend.

20   Q.  Did you deal crack with James Cooper?

21   A.  No.

22   Q.  Did you help him deal crack?

23   A.  No.

24   Q.  Did you tell Rebecca Mermelstein on May 7, 2012 that you

25   helped James Cooper deal crack approximately five times?

1   A.  No.

2   Q.  Did customers call you in an effort to get ahold of this

3   fellow, James Cooper?

4   A.  Yes, sometimes.

5   Q.  Were you in a car with James Cooper when Cooper delivered

6   crack?

7   A.  Yes.

8   Q.  Why?

9   A.  Just with him.

10  Q.  You needed some place to be?

11  A.  No.  I could have been anywhere I just was hanging with

12  him.

13  Q.  You just decided to be with somebody who was dealing crack?

14  A.  He wasn't going out to deal crack.  He was handing it to

15  somebody.

16  Q.  So he was handing it to somebody that would sell for him?

17  A.  No.

18  Q.  You told Mermelstein that you helped him deal crack, didn't

19  you?

20  A.  No.

21  Q.  You deny saying it?

22  A.  Yes.

23  Q.  You deny doing it?

24  A.  I never -- I -- if somebody called me I told them to call

25  his number and I get him -- or I be with him sometimes while he

E8b9chr2                        Baynes - cross

1    was but I never helped him or anything.

2    Q.  We just went through a number of crimes that you committed;

3    is that correct?

4    A.  Yes.

5    Q.  We went through a couple of burglaries?

6    A.  Yes.

7    Q.  By the way, the third burglary, what was in that about?

8    A.  (No response).

9    Q.  If you remember?

10   A.  What do you mean, what was it about?

11   Q.  You said you committed three burglaries.

12   A.  Yes.

13   Q.  I went through two of them with you.

14   A.  The third one.

15   Q.  I went through the one with G's girlfriend, right?

16   A.  Yes.

17   Q.  And I went through the one where you took the Xbox?

18   A.  In the Mullins, yes.

19   Q.  What was the third burglary you did, if you remember?

20   A.  It was in the Kenneys too.

21   Q.  What?

22   A.  In the Kenneys.

23   Q.  When?

24   A.  I don't know when.

25   Q.  Can you remember the year?

1    A.  '09.

2    Q.  Are you sure?

3    A.  No.

4    Q.  Could have been a different year?

5    A.  Could have been '09 or '010.

6    Q.  Can you remember the month?

7    A.  No.

8    Q.  Can you remember the time of day?

9    A.  Night.

10   Q.  Because you only do burglaries at night, right?

11   A.  Yes.

12   Q.  When people are sleeping in their houses?

13   A.  Yes.

14   Q.  What would you do if somebody woke up?

15   A.  Hide.

16   Q.  What?

17   A.  Hide.

18          Nobody ever woke up.

19   Q.  Did you ever think you'd have to hurt somebody in their

20   house?

21   A.  No.

22   Q.  Somebody who committed more than 30 assaults, you would

23   have hurt somebody if they woke up, wouldn't you?

24   A.  Just run away.  Just run out.

25   Q.  Would you hurt somebody to keep from going to jail?

E8b9chr2                         Baynes - cross

1    A.  No.

2    Q.  Would you lie to keep from going to jail?

3    A.  No.

4    Q.  Would you lie to get property in 2009?

5    A.  Lie to get property?

6    Q.  Yeah.  Would you trick somebody, tell them -- make a

7    promise to them that you wouldn't keep?

8    A.  I don't know.

9    Q.  Did you ever sell bad crack?

10   A.  Yes.

11   Q.  How many times did you sell bad crack?

12   A.  A few.

13   Q.  What's a few?

14   A.  Around five times.

15   Q.  Around five times.

16           Aren't you just making up a number?

17   A.  Yeah.  Around.

18   Q.  You just made up a number five, right?

19   A.  Yes.  Around though.  It's around that amount of times.

20   Q.  The question is --

21   A.  I made up a number around the times sold crack.

22   Q.  You just made up a number in response to my question,

23   correct?

24   A.  Yes.

25   Q.  Do you understand that you're in a federal courtroom?

1    A.   Yes.

2    Q.   Do you understand that you've taken an oath to tell the

3    truth?

4    A.   Yes.

5    Q.   Do you understand that when I ask you a question you have

6    to give me an honest answer?

7    A.   Yes.

8    Q.   Do you understand that this jury has to rely on your

9    testimony in a murder case?

10   A.   Yes.

11   Q.   And you're making up answers?

12   A.   I didn't -- I said around the time -- around --

13   Q.   Did you just tell this jury you made up an answer?

14   A.   I said I made around the time -- around the numbers of --

15   that I committed.

16   Q.   Did you just agree with me that you made up an answer five?

17   A.   I said I made up an answer around the numbers of times I

18   sold crack.

19   Q.   You've been asked questions about the number of robberies

20   you committed?

21   A.   Yes.

22   Q.   On Thursday you said it was around six?

23   A.   Yes.

24   Q.   Today you said it was around six to ten?

25   A.   Yes.

E8b9chr2                        Baynes - cross

1   Q.  Then you said it was around ten?

2   A.  No.  I said it was around six to ten.

3   Q.  Did you make up those answers too?

4   A.  It's around the number.

5   Q.  Did you make up those answers also?

6   A.  I don't know the exact number.  I'm telling --

7   Q.  Wouldn't the honest answer be:  I don't know how many

8   robberies I committed?

9   A.  Yes.

10  Q.  Wouldn't the honest answer be:  I don't know how many times

11  I sold drugs?

12  A.  Yes.

13  Q.  Wouldn't the honest answer be; I don't know how many houses

14  I burglarized?

15  A.  Yes.

16  Q.  The government didn't tell you to make up answers?

17  A.  No.

18  Q.  The government told you you had to tell the truth?

19  A.  Yes.

20  Q.  And can we agree that making up answers isn't the truth?

21  A.  I'm not making up answers.  I'm saying around so you'll

22  know around the number.

23  Q.  Do you think they're going to tear up your agreement after

24  you finish testifying today?

25  A.  I don't know.

1   Q.  Do you still think you're going to get time served after

2   testifying today?

3   A.  I don't know.

4   Q.  You're still hoping to get time served after testifying

5   today.

6   A.  Yeah.

7   Q.  With respect to any of the robberies that you committed in

8   Orange County, have you ever been asked to plead guilty to one

9   of them, the chain snatches?

10  A.  No -- yeah.  Yes.

11  Q.  You haven't pled guilty to one chain snatch robbery?

12  A.  Yes, I have.

13  Q.  What chain snatch robbery did you plead guilty to?

14  A.  Right -- during this case -- it was a petty -- it dropped

15  to a petty larceny.

16  Q.  That wasn't a chain snatch.  Somebody died in the robbery

17  you committed?

18  A.  No.  I'm talking before I pled guilty to this.

19  Q.  Yes.  As a matter of fact in this case, in Orange County,

20  you never pled guilty to killing Mr. Henry, did you?

21  A.  No.

22  Q.  You never pled guilty to robbing Mr. Henry, did you?

23  A.  I did.

24  Q.  You never pled guilty to it?

25  A.  I pled guilty to robbery.

1    Q.  You pled guilty to robbing somebody else and taking

2    something from him, didn't you?

3    A.  I just pled guilty to robbery.

4    Q.  To robbing somebody else and injuring somebody else.

5         You never pled to the Henry murder, did you?

6    A.  I -- I just pled guilty to robbery.  I don't -- not to a

7    specific person.

8    Q.  Under the terms of your plea agreement with Orange County

9    even if you breach the agreement they will never prosecute you

10   for the murder, will they?

11   A.  No.

12   Q.  They will recommend 17 years even if you lie through your

13   teeth in this courtroom, won't they?

14   A.  (No response).

15   Q.  That's the promise they made to you, isn't it?

16   A.  Yes.

17   Q.  You won't even face the maximum penalty of 25 years if you

18   lie through your teeth to this jury, will you?

19   A.  No.

20   Q.  And you've not been asked to plead guilty in a federal

21   courtroom to any of the crimes that those three men are charged

22   with, have you?

23   A.  No.

24   Q.  And you never will be, will you?

25   A.  I don't know.

E8b9chr2                         Baynes - cross

1    Q.   I just asked you about a bunch of chain snatches.  Do you

2    remember that?

3    A.   Yes.

4    Q.   Have you been asked to plead guilty to one chain snatch?

5    A.   (No response).

6    Q.   Of the ones other than December 15, have you pled guilty to

7    one chain snatch?

8    A.   One, yes.

9    Q.   That's the one in this case?

10   A.   No.

11   Q.   When did you plead guilty?

12   A.   I pled guilty to -- a petty larceny case like -- like a

13   week or two before I pled guilty to this case.

14   Q.   Petty larceny is a misdemeanor?

15   A.   But it was a chain snatching too.

16   Q.   A misdemeanor, right?

17   A.   Yes.

18   Q.   You've committed maybe ten or more chain snatches.  Did you

19   plead guilty to those ten robberies?

20   A.   No.

21   Q.   You know that a robbery is stealing property with the use

22   of force, right?

23   A.   I don't know.

24   Q.   You don't know what a robbery is?

25   A.   Yeah.  I know what a robbery is.  I didn't know that it

1    was --

2    Q.  How many robberies did you commit that you haven't pled

3    guilty to?

4    A.  Um around --

5    Q.  According to your plea agreement which is in evidence --

6              MR. GOLTZER:  May I publish it to the jury, Judge,

7    parts of it?

8              THE COURT:  Any objection?  Is it in evidence?

9              MR. NAWADAY:  It is in evidence.

10             THE COURT:  Yes.  You may publish it.

11             MR. GOLTZER:  Thank you so much.

12             I withdraw that.  Forgive me.  I'm not going to do

13   that.  Mr. Greenfield will cover that.

14   BY MR. GOLTZER:

15   Q.  The burglaries, did you ever plead guilty to a burglary?

16   A.  No.

17   Q.  Thirty assaults.  Were you ever asked to plead guilty to

18   any of the assaults you committed?

19   A.  No.

20   Q.  Do you remember who you assaulted?

21   A.  Some of them, yes.

22   Q.  There are some you don't remember?

23   A.  Yes.

24   Q.  There are some you couldn't even describe?

25   A.  Yes.

1   Q.  Do you remember testifying here on Thursday to

2   conversations that you had in the hospital with the police?

3   A.  Yes.

4   Q.  By the way, you remember I asked you about being present at

5   a hearing in Newburgh when the subject of your -- of the

6   hearing was the statements you made to the police at the

7   hospital?

8   A.  Yes.

9   Q.  And were you there?

10  A.  Yes.

11  Q.  Not with Mr. Rinaldo, with a different lawyer?

12  A.  Yes.

13  Q.  And you told us you heard what everybody said?

14  A.  Yes.

15  Q.  Did you hear a detective testify by the name of Cortez?

16  A.  A detective did testify, yeah.

17  Q.  He did?

18  A.  Yes.

19  Q.  Now, you know that you took an oath to tell the truth here?

20  A.  Yes.

21  Q.  Right?

22  A.  Yes.

23  Q.  And you know that if you lie about something important it

24  can be a crime?

25  A.  Yes.

E8b9chr2                          Baynes - cross

1   Q.  And you know that whoever testifies has to take the same

2   oath, right?

3   A.  Yes.

4   Q.  So that when different police officers testified at your

5   hearing they put their hands on a Bible, right?

6   A.  I don't know.

7   Q.  Well they raised their hand?

8   A.  Yes.

9   Q.  They swore to tell the truth?

10  A.  Yes.

11  Q.  The whole truth, right?

12  A.  Yes.

13  Q.  And nothing but the truth, right?

14  A.  Yes.

15  Q.  Did you hear Detective Cortez say -- I'm not offering it

16  for the truth -- did you hear Detective Cortez say that he gave

17  you Miranda warnings?

18  A.  No.

19  Q.  You deny that?

20  A.  (No response).

21  Q.  That he said it at a hearing?

22  A.  Yes.  He did say that.  He did say that.

23  Q.  In fact, you were there and he said that he asked you if

24  you understood each of the rights, correct?

25  A.  No.  He didn't.

E8b9chr2                         Baynes - cross

1   Q.  He didn't testify to that?

2   A.  Yeah, yeah, he -- yes, he testified to that.

3   Q.  What did he testify to?

4   A.  He said that -- he said that he read me my rights.

5   Q.  Now you told us -- and he asked you if you understood,

6   right?  He asked you if you understood?  That's what he

7   testified to?

8   A.  Yes.

9   Q.  And he said you said yes?

10  A.  Yes.

11  Q.  To each of those questions?

12  A.  Yes.

13  Q.  And he testified under oath that you signed that paper?

14  A.  Yes.

15  Q.  And Thursday you told us that never happened?

16  A.  I never signed the paper.  Yes.

17  Q.  Are you saying to this jury that Detective Cortez committed

18  the felony of perjury by lying under oath about you?

19  A.  Yes.

20  Q.  You also testified on Thursday, did you not, that you were

21  questioned by the police in the hospital for hours and hours,

22  right?

23  A.  Yes.

24  Q.  And the prosecutor asked you what you remembered.  And all

25  you could remember was that you said you went in to buy weed

E8b9chr2                          Baynes - cross

1    you got robbed and stabbed; is that right?

2    A.  Yes.

3    Q.  Now, it's been three days since you gave that testimony.

4    Can you remember anything else that you told the police during

5    all of those hours of questioning while they were taking notes?

6    A.  Yes.

7    Q.  What else do you remember?

8    A.  Seeing what gun Baby E and Bash had.  Changing up my story

9    once they said that they had cameras of me walking down -- I

10   mean me -- of the street that I said I was walking down.  And

11   changing up my story after that that the person that they said

12   stabbed me was inside the house.

13   Q.  Did you tell them -- now, the questions I'm about to ask

14   you involve all the time you were in the hospital being

15   questioned by police, okay?

16   A.  Yes.

17   Q.  I'm not asking you to separate night, day, but all the

18   hours, all right?

19   A.  Yes.

20   Q.  Did you, Laquavious, Raymond, Baby, and Bash and a bunch of

21   unknown people walk past 54 Chambers Street to Dubois Street?

22   A.  No.

23   Q.  Did you on December 15, 2010 at St. Luke's Hospital tell

24   that to the police?

25   A.  I don't remember.

E8b9chr2                    Baynes - cross

1  Q.  Will you admit it or deny it?

2  A.  I don't remember saying that.

3  Q.  Did you say that every one went to an unknown house on

4  Dubois Street?

5  A.  No.

6  Q.  Did you say that you and Laquavious stayed outside on the

7  porch and could overhear them saying that they wanted to rob a

8  weed spot?  Did you say that?

9  A.  Yes.  Yes.

10  Q.  Did you get tired of waiting so you and Laquavious went to

11  your house at 75 Mill Street and stayed there for about an

12  hour?

13  A.  Yes.

14  Q.  Did you tell them you went to look for Raymond because

15  Laquavious thought his brother would be involved?

16  A.  Yes.

17  Q.  You went to the weed spot and everybody started running?

18  A.  Yes.

19  Q.  Did you lie to the police when you told them that the man

20  was shot before you went inside?

21  A.  Yeah -- I -- if I did tell them, yes.

22  Q.  You lied to them about that?

23  A.  Yes.

24  Q.  You didn't want to put yourself inside the property while

25  the man was shot?

1   A.  Yes.

2   Q.  Did you lie to them when you told them you were a lookout?

3   A.  No.

4   Q.  What?

5   A.  No.

6   Q.  Did you lie to them when you said Laquavious was a lookout?

7   A.  No.

8   Q.  Four different times they told you you were lying and you

9   had to start the story over again, right?

10  A.  Yes.  I guess.  More than -- I don't -- around four.

11  Q.  Four different times.  And every time you changed your

12  story you said now I'm telling you the truth?

13  A.  Yes.

14  Q.  But you lied?

15  A.  Yes.

16  Q.  But the first time you ever told anybody from the Orange

17  County district attorney's office that Bow Wow was involved in

18  a robbery with you was in May of 2011, six months after you

19  committed the crime, right?

20  A.  Um --

21  Q.  You never talked about Bow Wow in the hospital, did you?

22  A.  No.  I don't think so.  I don't think so.

23  Q.  Not until six months later, right?

24  A.  I don't remember when.

25  Q.  You don't remember when?

E8b9chr2                         Baynes - cross

1    A.  Yes.

2    Q.  But not in the hospital?  You talked about Baby E?

3    A.  Yes.

4    Q.  You talked about Bash?

5    A.  Yes.

6    Q.  You talked about other people, right?

7    A.  Yes.

8    Q.  But not Bow Wow?

9    A.  I don't remember.

10   Q.  While you were in the hospital you accused Baby E of

11   committing a crime?

12   A.  Yes.

13   Q.  You accused Bash of committing a crime?

14   A.  Yes.

15   Q.  Didn't accuse Bow Wow of committing a crime, did you?

16   A.  No.

17   Q.  Not in the hospital?

18   A.  No.  I don't --

19   Q.  You accused Bash of having a gun?

20   A.  Yes.

21   Q.  You accused Bash of planning a robbery?

22   A.  I don't --

23   Q.  Do you remember?

24   A.  No.  Not saying how -- I don't remember saying that at that

25   time.

E8b9chr2                    Baynes - cross

1    Q.  You didn't accuse Bow Wow of planning a robbery while you

2    were being questioned for hours and hours in the hospital, did

3    you?

4    A.  No.

5    Q.  You didn't accuse Bow Wow of taking part in a robbery while

6    you were being questioned for hours and hours in a hospital,

7    did you?

8    A.  No.

9         MR. GOLTZER:  Nothing further.  Thank you.

10        THE COURT:  Thank you, Mr. Goltzer.

11        Mr. Greenfield.

12   CROSS-EXAMINATION

13   BY MR. GREENFIELD:

14   Q.  Just a little bit ago you were talking about using a stick

15   and beating people on the street.  Do you recall that?

16   A.  Yes.

17   Q.  Can you keep your voice up.

18   A.  Yes.

19   Q.  Keep your voice up.

20   A.  Yes.  Yes.

21   Q.  When you had this incident with the person on the street,

22   what was it all about?

23   A.  Reckless had a gun under the porch.  The person told him to

24   move it when the cops came so he called us and told us the

25   whole story and he told us to get him.  And that's when we --

1   Q.  Were you speaking in the same tone of voice then as you are

2   now when you had this confrontation with the guy?

3   A.  I didn't -- I wasn't there when they was arguing with each

4   other.

5   Q.  You just showed up late and you just started swinging?

6   A.  I showed up, point him out, and then, yes, that's when we

7   in a fight.

8   Q.  Keep your voice up.

9   A.  Yes.  Yes.  Yes.

10  Q.  You're not keeping your voice up.

11          Is there a problem with keeping your voice up?

12  A.  No.

13  Q.  Please keep your voice up.

14          When is it for the last time that you hit somebody

15  with a stick?

16  A.  What was -- what's the question?

17  Q.  When is it for the last time that you hit somebody with a

18  big stick?

19  A.  When is it the last time I hit somebody with a stick?

20  Q.  When did you swing a stick at somebody or a bat?  When is

21  the last time you did that?

22  A.  That day.

23  Q.  Approximately what date or month or year did that happen?

24  A.  The day that fight that happened on Lander Street.

25  Q.  Sorry?

E8B9CHR2                          Baynes - cross

1    A.  The day of that fight when Reckless called us to --

2    Q.  What year?

3    A.  '010.

4    Q.  When is the last time you carried a gun?

5    A.  '010.

6    Q.  Are you a changed person today?

7    A.  I am.

8    Q.  Would you carry a gun today?

9    A.  No.

10   Q.  Would you hit somebody with a stick today?

11   A.  No.

12   Q.  Since the last time you carried a gun, the last time you

13   used a stick against somebody where have you been living?

14   A.  I was outside until '011 of April.

15   Q.  So is it fair to say that you haven't used a gun or a stick

16   on anybody since 2011, in April, is because you've been under

17   arrest?

18   A.  No.  Ever since '010 before this crime happened.

19   Q.  When did you go to the Orange County jail?

20   A.  April 011.  April 6, 2011.

21   Q.  April 2011?

22   A.  Yes.

23   Q.  And when you were in the Orange County jail, were you in

24   contact with people via telephone?

25   A.  Yes.

1   Q.  Friends of yours?

2   A.  Yeah.  Yes.

3   Q.  Sorry?

4   A.  Yes.  Yes.

5   Q.  Do you know what a third-body telephone call is in jail?

6   A.  Yes.

7   Q.  What is a third-body telephone call?

8   A.  When you call somebody to call somebody in a three-way.

9   Q.  And if you want to talk to somebody but you're not allowed

10  to speak to him you can call a friend who can call that person;

11  is that right?

12  A.  Yes.

13  Q.  Have you ever spoken -- after April 11, 2011 I should say

14  did you ever speak to Quay Quay on the telephone?

15  A.  No.

16  Q.  Did you ever speak to somebody called Freaky?

17  A.  On the telephone?

18  Q.  Yeah?

19  A.  No.  He was arrested then.

20  Q.  He was in jail then?

21  A.  Yes.

22  Q.  Orange County jail?

23  A.  Yes.

24  Q.  You and he were talking to each other in the Orange County

25  jail?

E8B9CHR2                         Baynes - cross

1    A.  Yes.

2    Q.  On a daily basis?

3    A.  Mostly, yes.

4    Q.  Do you know somebody named McDermott?

5    A.  No.

6    Q.  Do you know somebody named Mallory?

7    A.  No.

8    Q.  You never met anybody named McDermott or Mallory?

9    A.  I probably met them but I don't know them by last names.

10   Q.  Do you know J-Mark?

11   A.  J-Mark, yes.

12   Q.  Who is that?

13   A.  A Blood guy from Newburgh.

14   Q.  Do you know somebody named Stacks?

15   A.  Yes.  I know a few -- a couple of Stacks.

16   Q.  What's that?

17   A.  I know a few people named Stacks.

18   Q.  Well did you ever speak to Stacks on the telephone?

19   A.  No.

20   Q.  That could visit you in jail?

21   A.  No.

22   Q.  Anybody named Stacks in jail with you while you were there

23   in Orange County jail?

24   A.  Yes.

25   Q.  And do you know a person named Louis?

Baynes – cross

1    A.  Yes.

2    Q.  Who is Louis?

3    A.  A friend of mine's.

4    Q.  A friend or a relative?

5    A.  He is my Godbrother -- yeah, my Godbrother.

6    Q.  He's your what?

7    A.  Godbrother.

8    Q.  Did he ever come visit you in jail?

9    A.  No.

10   Q.  Did he speak to you on the telephone?

11   A.  No.

12   Q.  Do you know where he is now?

13   A.  No.

14   Q.  Do you know where he was when you were arrested?

15   A.  No.

16   Q.  So since you were arrested have you had any contact at all

17   with Louis?

18   A.  No.

19   Q.  Do you know if he still lives in Newburgh?

20   A.  No.

21   Q.  How far from your house did he live?

22   A.  I don't know.

23   Q.  He was a good friend of yours, wasn't he?

24   A.  I guess, yes.

25   Q.  Don't guess.  I want you to answer me.  Was he a good

E8B9CHR2                         Baynes - cross

1   friend of yours, yes or no?

2   A.  Yes.

3   Q.  Everyday friend?

4   A.  Not -- no.

5   Q.  You're at his house he was in your house; isn't that right?

6   A.  Yes.  Sometimes.

7   Q.  And the same is true for Quay Quay?

8   A.  Yes.

9   Q.  You were arrested April 2011 and your lawyer you say his

10  name was AJ?

11  A.  Yes.

12  Q.  Did AJ tell you at the time of your arrest that the police

13  were saying you made statements to them?  Did he tell you that?

14  A.  Yes.

15          MR. NAWADAY:  Objection.

16          THE COURT:  Overruled.

17          THE WITNESS:  Yes.

18  Q.  And did he tell you that they were reduced to writing by

19  these police officers and he read them to you; isn't that

20  right?

21  A.  Yes.  Yes.

22          Yes.

23  Q.  And did you tell him that's not true, I didn't make those

24  statements?

25  A.  No.

1   Q.  What did you tell him?

2   A.  Nothing.  I just went along with it -- with him.

3   Q.  Did you tell them that your rights were violated and you

4   want to contest the voluntariness of those statements?

5   A.  He --

6                MR. NAWADAY:  Objection.

7                THE COURT:  Overruled.

8                THE WITNESS:  (No response).

9   Q.  I didn't hear your answer.

10  A.  He -- he said that we will bring up everything in trial.

11  Q.  Did you have some early communication with your lawyer

12  about cooperating with the district attorney's office?

13  A.  Did I what?

14  Q.  Did you talk to your lawyer in April or May of 2011 about

15  cooperating with the assistant district attorney and the

16  district attorney of Orange County?

17  A.  No.

18  Q.  Isn't it a fact that on May 13, 2011; May 20, 2011;

19  June 20, 2011 you sat down in a room with an assistant district

20  attorney and discussed the case of the murder of John --

21  Mr. Henry?

22          Isn't that right?

23  A.  I don't know the dates but yes.

24  Q.  Well forget the dates.  You were arrested April 2011,

25  right?

1   A.  Yes.

2   Q.  Within a month or so you're sitting down with an assistant

3   district attorney in an office; isn't that right?

4   A.  Yes.

5   Q.  Had you ever sat in an office with an assistant district

6   attorney face-to-face and have conversations with him?

7   A.  Yes.

8   Q.  You had?  Before that time?

9   A.  No.

10  Q.  This is an important time for you, right?  You want to sell

11  yourself to this district attorney; am I right?

12  A.  Um not real -- no.

13  Q.  Sorry?

14  A.  What do you mean by sell myself?

15  Q.  I don't understand what you're saying.

16  A.  I don't understand what you mean by sell myself to.

17  Q.  Well you're being charged with a murder?

18  A.  Yes.

19  Q.  In April?

20  A.  Yes.

21  Q.  You're telling the district attorney through your lawyer,

22  "I can help you," right?

23  A.  No.

24  Q.  Why did you go in the room to sit down with the DA?

25  A.  He just told me that they wanted to meet and show him

E8B9CHR2                         Baynes - cross

1   every -- all the evidence they had against me.

2   Q.  Didn't you sit down in that room with the DA for the

3   purpose of possibly cooperating with the DA?

4   A.  At that first -- at first it was just to see what evidence.

5   He said to see what evidence they had against me.

6   Q.  And they were asking you a lot of questions in that first

7   meeting?

8   A.  Yes.

9   Q.  It wasn't about are you a Yankee or are you a Met fan, was

10  it?

11  A.  No.

12  Q.  It wasn't about what your favorite rap artist is, was it?

13  A.  No.

14  Q.  Well what was the subject matter?

15  A.  The murder.

16  Q.  What?

17  A.  The murder case.

18  Q.  And you were in the room to talk about the murder to try to

19  get yourself off of that murder; isn't that right?

20  A.  (No response).

21  Q.  Yes or no?

22  A.  Yes.

23  Q.  And you had a product to sell and the product was your

24  story, yes or no?

25  A.  Yes.

1   Q.  Going back to the statements that you made.  On the night

2   of your -- the night you were stabbed.  You were in a hospital,

3   right?

4   A.  Yes.

5   Q.  And the detective walks in?

6   A.  Yes.

7   Q.  In a suit -- maybe not a suit, maybe just a zip up jacket

8   because it was cold out that night; am I right?

9   A.  Yes.

10  Q.  Isn't it a fact that you told the detective named Michael

11  Loscerbo -- withdrawn.

12          During the interview you had with that detective did

13  you or did you not tell them Bash and Baby planned on robbing

14  the weed spot at 54 Chambers Street?

15  A.  I don't remember saying that.

16  Q.  You deny saying that?

17  A.  I don't remember saying that at that time, no.

18  Q.  What's that?

19  A.  At that time I don't remember saying that.

20          MR. GREENFIELD:  I'm sorry, Judge.

21          THE WITNESS:  At the time I don't remember saying

22  that.

23  Q.  At the time.  I'm asking you -- so you're -- well, would

24  you --

25  A.  I said that but not at that time.

1   Q.  What's that?

2   A.  I said it but not -- I don't remember saying it at that

3   time.

4   Q.  You did say it?

5   A.  Yes.

6   Q.  Did you also tell that detective that the four of you,

7   Quay Quay, yourself, Bash, and Baby E planned the robbery on

8   Dubois Street about 10 p.m. that night?

9   A.  No.

10  Q.  You didn't tell that to the detective?

11  A.  No.

12  Q.  You're denying making that statement?

13  A.  Yes.

14  Q.  Did you or did you not tell the detective that you had guns

15  or Baby, Bash -- Baby E and Bash had guns on them when they

16  were planning the robbery?  Did you tell that to the detective?

17  A.  I don't remember.

18  Q.  You're saying you didn't say it, or you don't know, or you

19  deny it?

20  A.  I don't know.

21  Q.  Did you not tell the detective, Bash and Baby E told you

22  and Laquavious to help them rob the weed house?

23  A.  Um --

24  Q.  You didn't say that?

25  A.  No.

E8B9CHR2                          Baynes - cross

1    Q.  And did you tell them that both you or him -- that both you

2    and Laquavious went home and then went back on the street to

3    see if they got anything.

4               Did you say that?

5    A.  No.

6    Q.  You deny saying that also?

7    A.  Yes.

8    Q.  And during this interview did you tell the detective that

9    you saw a lot of people running at you -- you saw Baby E and

10   Bash were being chased and that's when you were shot.

11              Did you tell that to the detective?

12   A.  No.

13   Q.  I'm sorry.  I didn't hear what you said.

14   A.  Not really like that, no.

15   Q.  Well what did you say?

16   A.  That we came there looking for Quay Quay brother and then

17   after that they all was running out and one of them grabbed me

18   and stabbed me, the robbers grabbed me and stabbed me.

19   Q.  Are you taking any medications at the MCC?

20   A.  No.

21   Q.  None at all?

22   A.  No.

23   Q.  When and where was it when you first met Quay Quay?

24   A.  From my little brother I met him.  They went to school

25   together.

E8B9CHR2                          Baynes – cross

1   Q.  When did that -- when did you first meet Quay Quay?

2   A.  In my life?  That day?

3   Q.  Say that again.

4   A.  In my life or in that day?

5   Q.  In your life -- what year did you first meet Quay Quay?

6   A.  I don't remember.  I just remember him and my little

7   brother they was going to school together.

8   Q.  Your little brother and Quay Quay were going to school

9   together?

10  A.  Yeah.  And I met him during.

11  Q.  And you started hanging out with Quay Quay?

12  A.  Yes.

13  Q.  Well, the crime occurs in December of -- on December 15,

14  2010.  How many years before is it that you meet Quay Quay?  Is

15  it four or five?

16  A.  Yeah.  Like around four.

17  Q.  About four years?

18  A.  Yes.

19  Q.  And you knew Quay Quay fairly well for four years?

20  A.  Yes.

21  Q.  He was in your house, you were in his house?

22  A.  Yes.

23  Q.  On a daily basis?

24  A.  Yes.

25  Q.  How far away do you live from Quay Quay?

E8B9CHR2                        Baynes - cross

1   A.  Across the town from you him.

2   Q.  Across town?

3   A.  Yes.

4   Q.  How far away is Quay Quay's grandmother's house from where

5   you live?

6   A.  Across town too.

7   Q.  And how about -- how far away is Quay Quay's mother's house

8   from where you live?

9   A.  Across town.

10  Q.  How long does it take if you're walking to go from

11  Quay Quay's house, his grandma's house, to your house?

12  A.  Around -- around like five minutes.  Five to ten minutes.

13  Q.  Now Newburgh is a small town?

14  A.  Yes.

15  Q.  When did you and Quay Quay start committing crimes?

16  A.  I don't know.

17  Q.  Do you have any clue at all?

18  A.  No.  We -- we used to fight when we was younger, like fight

19  people when we was younger.

20  Q.  Well, again, we're in 2010 and a murder takes place, right?

21  A.  Yes.

22  Q.  What is the first crime that you and Quay Quay commit?

23  A.  Assault.  Fighting people.

24  Q.  What's that?

25  A.  Assault.  Fighting people.

654

1   Q.  Where were you fighting people?

2   A.  All over.

3   Q.  How many fights did you have with people?

4   A.  (No response).

5   Q.  Along with Quay Quay.  Give me an estimate.

6   A.  Like five, around.  Five to ten.

7   Q.  When you say fighting?

8   A.  Yes.

9   Q.  Using sticks?  Is that what you mean?

10  A.  No.  Just at one time we used the stick -- I used a stick.

11  Q.  What else would you use?  Knife?

12  A.  No.

13  Q.  You always carried a knife, didn't you?

14  A.  Yes.

15  Q.  From how old on were you carrying a knife?

16  A.  From how old?  I was --

17  Q.  How old were you when you first started carrying a knife?

18  A.  Around 16.

19  Q.  What's that?

20  A.  16.  Like 16, 17.

21  Q.  So that would be 2010 you started carrying a knife?

22  A.  2010, 2009.

23  Q.  Besides assaults, what other crimes did you commit with

24  Quay Quay?

25  A.  Robberies.

1   Q.  How many robberies with Quay Quay?

2   A.  One.  One or two.

3   Q.  One or two?

4   A.  Two.  I can think of.

5   Q.  Now, Louis, how well -- you've known him all your life

6   basically; isn't that right?

7   A.  Yes.

8   Q.  And was he as tight with you as Quay Quay?

9   A.  Not as tight but somewhere around.

10  Q.  The three of you were good friends; isn't that right?

11  A.  Yes.

12  Q.  You hung out together?

13  A.  Yes.

14  Q.  You committed crimes together?

15  A.  (No response).

16  Q.  Yes or no?

17  A.  No.  I never committed crimes with Louis.

18  Q.  You never committed a crime with Louis?

19  A.  No.

20  Q.  You named somebody named G before; is that right?

21  A.  Yes.

22  Q.  Who is G?

23  A.  Another brother.

24  Q.  Where does he live?

25  A.  In the Mullins -- well he lived in Mullins.

E8B9CHR2                          Baynes - cross

1   Q.  Close to you?

2   A.  Yes.

3   Q.  Not close to Quay Quay?

4   A.  No.

5   Q.  G is one of your boys?

6   A.  Yes.

7   Q.  And who is George.  I think you said Geo.  I'm sorry.  Geo.

8   Who is he?

9   A.  Another friend.

10  Q.  Another friend?

11  A.  Yes.

12  Q.  Where does he live?

13  A.  Across town.

14  Q.  Across town.  Closer to you or closer to Quay Quay?

15  A.  Quay Quay.

16  Q.  Closer to your age?

17  A.  Yes.

18  Q.  Did you go to school with him?

19  A.  No.

20  Q.  Did you commit crimes with him?

21  A.  Yes.

22  Q.  What crimes did you commit with him?

23  A.  Burglary.

24  Q.  How about a guy named Snipes?  Who is that?

25  A.  Somebody that lived in Mullins.  He lived in the Mullins.

1    Q.  Near you?

2    A.  Yes.

3    Q.  Close friend of yours also?

4    A.  Yes.

5    Q.  Commit crimes with him?

6    A.  Yes.

7    Q.  Do you know where Snipes is today?

8    A.  No.

9    Q.  Geo?

10   A.  Yes.

11   Q.  Where is he?

12   A.  He's in a federal pen.

13   Q.  What about G?

14   A.  He is home somewhere.

15           MR. BUCHWALD:  Get that read back, please.

16           THE WITNESS:  I don't know where G is at.

17   Q.  Now does your relative and/or friend who's never committed

18   a crime with you, does he have a nickname?

19   A.  Lou, Gangsta Lou.

20   Q.  What is that?

21   A.  Lou, Gangsta Lou.

22   Q.  Gangsta Lou?

23   A.  Yeah.

24   Q.  But he doesn't commit crimes with you?

25   A.  We just happen to never commit a crime together.

E8B9CHR2                          Baynes - cross

1   Q.  Now you said you sold crack on occasion.  When did you

2   start selling this crack?

3   A.  Like 16, 17.

4           Around 16, 17.

5   Q.  At the age of 16 or 17?

6   A.  Yes.

7   Q.  Who was your supplier?

8   A.  Just random drug dealer.  Just go to.

9   Q.  You have a member of your family who is a drug dealer?

10  A.  No.

11  Q.  Does anybody in your family, your close family sell drugs?

12  A.  No.

13  Q.  No?

14  A.  Yeah.  No.

15  Q.  What does your mother do for a living?

16  A.  She works but.

17  Q.  What's that?

18  A.  She works.  She just came home.

19  Q.  Came home from where?

20  A.  From being arrested.

21  Q.  For doing what?

22  A.  Violating -- a violation of parole.

23  Q.  What was the violation -- what led to the violation of

24  parole?

25  A.  A fight I think.  I don't --

E8B9CHR2                        Baynes - cross

1   Q.  Is your mother a crack dealer?

2   A.  No.

3   Q.  Never sold crack?

4   A.  I don't know.  I don't think so.

5   Q.  As far as you know?  Is that what you said?

6   A.  Yeah, as far as I know.

7   Q.  And did you say you stole a gun from her boyfriend?

8   A.  Yes.

9   Q.  What did he do for a living?

10  A.  He sold drugs.

11  Q.  He sold drugs?

12  A.  Yes.

13  Q.  And he lived in your apartment with your mother?

14  A.  Yes.

15  Q.  And he lived there in 2009 and '10?

16  A.  Yes.

17  Q.  How far back did he live there?

18  A.  Just 2009 and '10 they lived together.

19  Q.  Was he your supplier?

20  A.  No.

21  Q.  Now on direct examination you talked about different people

22  selling drugs in Newburgh.  Do you remember that?

23  A.  Yes.

24  Q.  And you said all you had to do basically is show up on

25  Dubois or Broadway and you can set up shop; am I right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   A.  Yes.

2   Q.  Did you need approval from any gang?

3   A.  No.  No.

4   Q.  Isn't it a fact that back in 2009, 2010, 2011 even up until

5   today that the Bloods control the drug trade in Newburgh?

6   A.  I don't know.

7   Q.  Would your mama's boyfriend a Blood?

8   A.  No.

9   Q.  What was he?

10  A.  Nothing.

11  Q.  You don't know if he's in a gang?

12  A.  He wasn't.

13  Q.  You told us -- you said that Raymond had a clear plastic

14  cup and he sold crack out of that cup?

15  A.  No.  He held his crack inside a cup.

16  Q.  And there was rice in the cup?

17  A.  Yes.

18  Q.  And where would he get this rice, do you know?

19  A.  It was uncooked rice.

20          Uncooked rice.

21  Q.  Where would he get it, do you know?

22  A.  No.

23  Q.  And he would put crack in this cup and cover it with rice?

24  A.  Yeah.  It would be a mixture.

25  Q.  Was he standing on the street with this?

1    A.  No.

2    Q.  Where was he --

3    A.  He kept it in his dresser.

4    Q.  Where was it kept?

5    A.  In his dresser.

6    Q.  Where?

7    A.  In his dresser.

8    Q.  In his dresser?

9    A.  Yes.

10   Q.  He was selling out of his house?

11   A.  He kept it there so the crack would stay fresh in the rice

12   overnight and stuff, like when he wasn't selling.

13   Q.  So what you're saying is this clear plastic container of

14   rice that he kept his crack in never made it to the street?  Is

15   that what you're saying?

16   A.  I don't think so -- I don't know.

17   Q.  He kept it in a dresser in his home?

18   A.  Yes.

19   Q.  And he put it -- well what if you're selling it on the

20   street, that's where you say he was selling?

21   A.  Yes.

22   Q.  If you bought crack from him there might be a couple

23   kernels of rice in every package, right?

24   A.  No.

25   Q.  But what you're not saying is he didn't carry this clear

E8B9CHR2                          Baynes - cross

1   plastic container onto the street and sell out of that

2   container on the street; is that right?

3   A.  Yes.

4   Q.  What are the 1090 Grimey Boys.  What is that?  Does that

5   mean anything to you?

6   A.  That was something we was going to call ourselves.

7   Q.  What's that?

8   A.  It was a gang we were going to call ourselves.

9   Q.  Who were members of this gang?

10  A.  We didn't start it.

11  Q.  What's that?

12  A.  We didn't start it.

13  Q.  Did you ever tell anybody that you did start it?

14  A.  That I did start it?

15  Q.  Yes.

16  A.  No.

17  Q.  Did you ever tell prosecutors when you were being debriefed

18  that the 1090 Grimey Boys was a gang that you and others

19  belonged to?

20  A.  No.  I said -- I told them that that's what we was going to

21  turn ourselves to.

22  Q.  So as you sit on the stand now, so it's clear, did you ever

23  tell a prosecutor during the course of your, quote unquote,

24  cooperation with them that Star Status was abandoned and the

25  1090 Grimey Boys came into existence?

E8B9CHR2                          Baynes - cross

1    A.  I said that --

2    Q.  Yes or no?

3    A.  No.

4            MR. GREENFIELD:  One second, Judge.

5            (Pause)

6            THE COURT:  Actually it's quarter after so why don't

7    we take our morning break.

8            Ladies and gentlemen, please be in the jury room no

9    later than 11:30 so we can get started on time.

10           (Jury excused)

11           THE COURT:  Mr. Baynes, you may step down.

12           (Witness excused)

13           (Recess)

14           THE COURT:  Can we bring in Mr. Baynes.

15           Let's get the jury.

16           (Jury present)

17           THE COURT:  Mr. Greenfield.

18           MR. GREENFIELD:  Yes, Judge.

19   BY MR. GREENFIELD:

20   Q.  You testified last week, you testified that on I think

21   three or four occasions you and Raymond and others were

22   involved in burglaries.  Do you recall that?

23   A.  Burglaries?

24   Q.  Robberies.  Excuse me.

25   A.  Yes.

E8B9CHR2                          Baynes - cross

1    Q.  And you were sure you were there because he was right next

2    to you when these things happened?

3    A.  Yes.

4    Q.  You also said that on a couple of occasions you saw him in

5    possession of guns.  Do you remember saying that?

6    A.  Yes.

7    Q.  And one time you said that you were at a party I think it

8    was when Raymond started firing the weapon?

9    A.  Yes.

10   Q.  And you were right next to him when this happened?

11   A.  Yes.

12   Q.  And this is in the early part of 2010?

13   A.  (No response)

14   Q.  Do you recall saying that?

15   A.  Yes.

16   Q.  You were standing right next to him.  You were shooting

17   into the air.

18           Is that the way it was happening?

19   A.  Yes.

20   Q.  How many shots did he fire into the air?

21   A.  I don't remember.

22   Q.  Well was it one or several or the whole -- did he unload

23   the chamber?

24   A.  Like two or three.

25   Q.  Two or three.  No doubt about it?

1   A.  No.  I really don't remember.  I don't remember.

2   Q.  You were standing right next to him, correct?

3   A.  Yeah but I just -- years.

4   Q.  He takes a gun and starts firing it, correct?

5   A.  Yes.

6   Q.  Your ear is right next to him, correct?

7   A.  Yes.

8   Q.  How many did you hear?

9   A.  I don't --

10  Q.  Tell me.

11  A.  I don't remember.

12  Q.  Two, three, one, six?  Give me a number.

13  A.  It was like two -- two shots.

14  Q.  Two shots.  What kind of gun was it?

15  A.  I don't remember that either.

16  Q.  Was it a two-shot Derringer?

17  A.  I don't know.

18  Q.  But he was arrested right within a few minutes of that

19  happening; isn't that right?

20  A.  I don't know.  Somebody called me and told me that he was

21  arrested.

22  Q.  Somebody told you he was arrested?

23  A.  Yes.

24         MR. GREENFIELD:  With the Court's approval I would ask

25  that the witness be allowed to step down.  I want to show him a

1    diagram and ask him to make certain notations thereon.

2                THE COURT:  Has the government seen the diagram?

3                MR. NAWADAY:  No, we haven't.

4                THE COURT:  No objection?

5                MR. NAWADAY:  No objection.

6                THE COURT:  Okay.

7                MR. GREENFIELD:  Be deemed marked at this time as

8    Defendants' Exhibit A I'll mark it when I'm complete.

9                THE COURT:  Defendants' A?

10               MR. BUCHWALD:  I think there is an A already.

11               MR. GREENFIELD:  Defendant Christian's A.  Okay.

12               THE COURT:  Mr. Baynes, you can step down.  Please

13   both of you since you won't be near a microphone keep your

14   voices up.

15   Q.  Now I'm going to ask you to look at this diagram and ask

16   you if it looks familiar to you.

17   A.  Yes.

18   Q.  And have you seen this diagram or something just like it

19   previously?

20   A.  Yes.

21   Q.  Now I want you to look at the diagram and choosing

22   whichever color you wish take one of these markers and put an X

23   on the spot where you say you were when you were stabbed.

24   A.  (Witness complies)

25   Q.  And this area up here, pointing to the top of Defendant

1    Christian A, is the entranceway; is this not right?

2    A.  No.  This is.

3    Q.  Is that the entranceway here?

4    A.  Yes.

5    Q.  So you have him approximately how many feet into the

6    apartment?

7              MR. NAWADAY:  Objection.

8              Your Honor, can we have brief voir dire because I

9    don't think this is in evidence yet.

10             THE COURT:  Defendant's A.  Okay.

11             MR. NAWADAY:  It's only been offered.

12   VOIR DIRE EXAMINATION

13   BY MR. NAWADAY:

14   Q.  Mr. Baynes, do you recognize this?

15   A.  Yeah.  Looks like the inside of the apartment.

16   Q.  It's a diagram.  Have you seen it before?

17   A.  Yes.

18   Q.  Do you know if it's to scale, meaning everything is exact?

19   A.  No.

20   Q.  And is it a fair and accurate diagram other than it's not

21   to scale of what you remember the different rooms looking like?

22   A.  Kind of besides this --

23             MR. GREENFIELD:  Keep your voice up.

24             THE COURT:  Mr. Baynes, I can't hear you at all.

25             THE WITNESS:  Yes.  Besides this part right here.

E8B9CHR2                          Baynes - cross

1   Q.  Where is the front entrance?

2   A.  Down here.

3   Q.  Is that about accurate?

4   A.  Yes.

5   Q.  By the way, did you draw this?

6   A.  No.

7            MR. NAWADAY:  Nothing further.

8            THE COURT:  Mr. Greenfield.

9            MR. GREENFIELD:  I offer it into evidence as Defendant

10   Christian A.

11            MR. NAWADAY:  No objection.

12            THE COURT:  Okay.

13            (Defendant's Exhibit Christian A received in evidence)

14   CROSS-EXAMINATION CONTINUED

15   BY MR. GREENFIELD:

16   Q.  Could you estimate how many feet it is from the entranceway

17   to where you marked your X, the green X?

18   A.  I don't -- I don't know.

19   Q.  You have no idea based on your recollection of what the

20   apartment looked like as to how deep into the apartment you

21   got?

22   A.  (No response).

23   Q.  You do not?

24   A.  It was -- this -- yes.  It was --

25   Q.  Speak up.

E8B9CHR2                         Baynes - cross

1    A.  I don't really know.  It was just --

2    Q.  Face the jury so that they can hear you.

3    A.  This all was -- it was quick.  I don't know.  It wasn't

4    that far though inside the house.

5    Q.  Well this is more than halfway or just about halfway into

6    the apartment; isn't that right?

7    A.  Yeah, around.

8    Q.  Speak up.

9    A.  Yes.  Yes.

10   Q.  And from the entrance to the second door there was

11   approximately how many feet?

12   A.  See I don't remember it being like a second door.

13             MR. GREENFIELD:  Well, one second, Judge.

14             (Pause)

15             THE COURT:  Any day, gentlemen.

16             MR. GREENFIELD:  The picture that's in evidence, we'd

17   like to show it to the witness.  We're trying to locate it.  I

18   have a copy.

19   Q.  I show you what's been marked as Defendants' Exhibit P

20   that's --

21             THE COURT:  Defendant Christian B?

22             MR. GREENFIELD:  No.

23             MR. BUCHWALD:  Thomas P.

24             MR. GREENFIELD:  Defendant Thomas P like in Paul.

25             THE COURT:  So this is in evidence?

1          MR. GREENFIELD:  It's in evidence.

2          THE COURT:  Okay.

3   Q.  I show you this photograph.  Does that look familiar to

4   you?

5   A.  Yes.

6   Q.  What's that?  You need to speak up.

7   A.  Yes.  Yes.  Yes.

8   Q.  Think you're on the street and then talking to your

9   friends, okay.

10          You've seen this previously?

11  A.  Yeah, yes.

12  Q.  And is this the interior of the apartment of 54 Chambers

13  Street looking out onto the street?

14  A.  Yes.

15  Q.  And would it be fair to say that from the outside door

16  until this portion of the wall is met it takes about --

17  withdrawn.

18          From this part of the apartment out to the door can

19  you estimate how many feet that is?

20  A.  A few feet.  It was small.  Small.

21  Q.  Well how many feet would you estimate that to be?

22  A.  I don't know.

23  Q.  Speak up.

24  A.  I don't know.  Some feet.

25  Q.  Ten feet?

1    A.  Yes.

2    Q.  Approximately?

3    A.  Yes.

4    Q.  Could be eight?  Could be a little more?  Could be a little

5    less?

6    A.  Yes.

7              MR. GREENFIELD:  Take your seat again please and we'll

8    come back to this diagram.

9    Q.  Last week you were talking about the incident that happened

10   on December 15, 2010.  And at some point in that recitation you

11   said that after a phonecall was made by a man, a lady came up

12   with a bag.

13             Do you remember that?

14   A.  Yes.

15   Q.  And approximately what time of the day or night was it when

16   this lady came forward with the bag?

17   A.  I don't remember.

18   Q.  What's that?

19   A.  I don't know the time.  It was nighttime.

20   Q.  It was nighttime?

21   A.  Yes.

22   Q.  Now do you own a cellphone, by the way -- did you own a

23   cellphone on December 15, 2010?

24   A.  Yes.

25   Q.  And did your friend Quay Quay own one?

E8B9CHR2                          Baynes - cross

1   A.  I think, yes.

2   Q.  Do you recall ever having a conversation with your best

3   friend basically, Quay Quay, on a cellphone?

4   A.  Yes.  But it was times we didn't have a cellphone.

5   Q.  And how about your relative friend and also -- I guess your

6   relative friend Louis.  Did he have a cellphone?

7   A.  Yes.

8   Q.  And how about G?  Did he have a cellphone?

9   A.  Yes.

10  Q.  And Geo?  Did he have a cellphone?

11  A.  I don't know.

12  Q.  And Snipes?  Did he have a cellphone?

13  A.  I don't know.

14  Q.  Now, there came a time in May about a month, six weeks

15  after you were first arrested when your lawyer and you went to

16  a meeting in the prosecutor's office.

17          Do you remember that?

18  A.  Yes.

19  Q.  It would be fair to say that you went into the prosecutor's

20  office for the sole purpose of trying to help yourself get out

21  of predicament you were in?

22  A.  Yes.

23  Q.  And you wanted to be there and tell them what happened on

24  the night of December 15, 2010 and hope that they would believe

25  your story?  Is that right?

E8B9CHR2                         Baynes - cross

1    A.  No.  That time was just going for evidence.

2    Q.  What's that?

3    A.  At that time we was going to look at all the evidence they

4    had on us.

5    Q.  Do you recall sitting down with the prosecution in May

6    of -- May 13, 2011 and telling them what you wanted them to

7    believe as to what happened on December 15, 2010?

8    A.  Yes.

9    Q.  You did?  You told them a story, right?

10   A.  Yes.

11   Q.  And you hoped and you really wanted them to believe you,

12   right?

13   A.  Yes.

14   Q.  Because you thought that if you were able to convince them

15   of this story, that maybe you could avoid a murder charge,

16   right?

17   A.  Yes.

18   Q.  And that was on top, right here, in the front of your

19   brain, you wanted to avoid the murder charge; isn't that right?

20   A.  Yes.

21   Q.  Now, did you tell -- withdrawn.

22        The first thing you told the district attorney on that

23   day was that you left your house with Louis; isn't that right?

24   A.  Yes.

25   Q.  Louis was Gangsta Lou, right?

E8B9CHR2                          Baynes - cross

1   A.  Yes.

2   Q.  And what time of the day is it that you leave your house?

3   A.  Around twelve, eleven in the morning.  Daytime.

4   Q.  Did you tell the district attorney that you and Gangsta Lou

5   and my client, Raymond, were walking around checking out drug

6   spots?

7   A.  No.  We was walking around.  Then Raymond just start

8   putting --

9   Q.  Is your answer no, you didn't tell them that?

10  A.  Yes.  Yes.

11  Q.  Isn't it a fact specifically that you told him on the first

12  time you met the district attorney that it was you, Lou, and

13  Raymond were walking around checking spots?

14  A.  Yes.

15  Q.  Yes.  So when you just said no you were wrong?

16  A.  When I said no what?  To what?

17  Q.  Did you tell the prosecutor that same day that Gangsta Lou

18  left and Quay Quay took his spot?

19  A.  Yes.

20              (Continued on next page)

21

22

23

24

25

E8bnchr3                        Baynes - cross

1   Q.  Did you tell the district attorney that three of you were

2   walking around and planning to rob drug spots?

3   A.  Yes.

4   Q.  Did you then tell the district attorney that you and Lou on

5   your own walked around from anywhere from 30 minutes to an

6   hour, checking spots?

7   A.  No.

8   Q.  Did you tell him that you and Lou were walking around by

9   yourselves in that area?

10  A.  No.

11  Q.  Specifically did you tell the district attorney on May 13,

12  2011, that you and Louis walked around for about 30 minutes to

13  an hour, and then Louis left and got Quay Quay and you spent a

14  few hours checking.  Did you make that statement?

15  A.  No, not like that.

16  Q.  If somebody who was present at that meeting says you said

17  that, would they be wrong?

18  A.  Yes.

19  Q.  Because you say you never said it?

20  A.  I said -- not like that I didn't say it -- just me and Lou

21  was walking around.

22  Q.  You and Lou were walking around?

23  A.  No, it wasn't just me and Lou walking around.

24  Q.  Well, why was Lou with you that day?

25  A.  He spent night at my house the day before.

1    Q.  Why was he with you that day walking around when other

2    people were walking around with him supposedly checking drug

3    spots?

4    A.  He was already with me.

5    Q.  What is that?

6    A.  He was already with me at first.

7    Q.  Correct me if I'm wrong, you said earlier that Gangsta Lou

8    Lou never committed a crime with you?

9    A.  I didn't say he never committed a crime.  He never

10   committed one with me.

11   Q.  That is what I am saying.

12   A.  Right.

13   Q.  You testified earlier that Gangsta Lou and yourself in your

14   entire relationship never committed a crime, correct?

15   A.  Yes.

16   Q.  And here on December 15, 2010, the day that you are walking

17   around checking drug spots out, Gangsta Lou is walking around

18   with you?

19   A.  But it was really just me and Reckless together.  He was

20   just there.

21   Q.  He was just there?

22   A.  Yes.

23   Q.  How far away from Chambers Street, 54 Chambers Street, does

24   Gangsta Lou live?

25   A.  I don't know.

1   Q.  How far away do you live?

2   A.  A good maybe like ten minutes away, ten, fifteen minutes

3   away.

4   Q.  Did you invite him along for the walk?

5   A.  At that time I didn't know what we was doing that day.

6   Q.  You had no idea what was going to happen that day when you

7   woke up and walked with Lou to the vicinity of 54 Chambers

8   Street?  Is that what you are testifying to in this courtroom?

9   A.  Yes.

10  Q.  You had no prior knowledge of it?

11  A.  We didn't plan it days before.  It just happened.

12  Q.  Were you on prior days walking around checking out drug

13  spots with Quay Quay?

14  A.  No.  With Reckless.

15  Q.  What is that?

16  A.  Not with Quay Quay.

17  Q.  With Lou?

18  A.  No.

19  Q.  Who then?

20  A.  Reckless.

21  Q.  Who is that?

22  A.  Reckless, Raymond.

23  Q.  When did those walk-arounds take place?

24  A.  When?

25  Q.  When.

1    A.  Just in all random times.

2    Q.  Incidentally, what was the weather like that day?

3    A.  I don't know.  It was sold, but the sun was out.

4    Q.  What was that?

5    A.  It was cold, but the sun was out.

6    Q.  Very cold?

7    A.  Yes.

8    Q.  While this walking around is taking place, how long does it

9    take?  How many hours are used up?

10   A.  Everything happened, all of that, because we was walking

11   around the 24th -- I mean, the 14th of December.

12   Q.  What?

13   A.  Everything that happened before the murder was the 14th of

14   December, it took the whole day.  Everything was the whole day.

15   The next day --

16   Q.  I'm sorry?

17   A.  Late at night, the next day.

18   Q.  When you were walking around on the 14th --

19   A.  Yes.

20   Q.  What time do you start checking spots?

21   A.  Around like 2, I don't know.  Because I have to -- we met

22   up with Reckless.

23   Q.  You said there came a time where you met up with a guy

24   whose name you didn't know, and that fellow made a phone call

25   on a cell phone and at that point a lady came with a bag?  Do

E8bnchr3                              Baynes - cross

1    you remember that?

2    A.   Yes.

3    Q.   And this is at nighttime now?  It's dark out?

4    A.   Yes.

5    Q.   What street did this occur on?

6    A.   Dubois.

7    Q.   Dubois Street?

8    A.   Yes.

9    Q.   What happened after that lady came with the bag?  What was

10   the next thing that occurred?

11   A.   He pointed on the mailbox, and she dropped the bag in the

12   mailbox.

13   Q.   Put it in the mailbox?

14   A.   Yes.

15   Q.   You mean somebody's -- not the box where you would drop

16   mail?  You are not saying that, are you?

17   A.   The mailbox on a person's house.

18   Q.   A person's home?

19   A.   Yes.

20   Q.   Do you know the address or the street where this happened?

21   A.   Dubois.

22   Q.   Could you point the apartment out or the building out?

23   A.   Not the exact building, but around the building.

24   Q.   Then you say after she left what happened?

25   A.   After that, he started calling more people.  He started

1   calling more people.

2   Q.  That other person called more people?

3   A.  Yes.

4   Q.  And again on a cell phone?

5   A.  Yes.

6   Q.  And what happened after he called more people on the cell

7   phone?

8   A.  Some people started showing up, coming.

9   Q.  A number of people showed up?

10  A.  Yeah, like two or three.

11  Q.  Was your cell phone ever seized by the police?

12  A.  No.

13  Q.  It wasn't?

14  A.  No.

15  Q.  Did you have one that day?

16  A.  Not on me.

17  Q.  Was your account ever seized via subpoena or search warrant

18  by law enforcement?

19  A.  No, not that I know of.

20  Q.  I think you said something about a meeting in a building

21  and you were on a porch, do you remember that?

22  A.  Yes.

23  Q.  Tell me what that is all about.

24  A.  They went inside, and Bash didn't want me going with them,

25  so me and Quay Quay stayed outside while they was inside

1    talking.

2    Q.  Now you are on a porch on -- is it Dubois Street?

3    A.  Yes.

4    Q.  You were outside?

5    A.  Yes.

6    Q.  How long are you outside while the people are inside that

7    building on Dubois Street?

8    A.  Like 15, 20 minutes.

9    Q.  It was cold out, you are saying?

10   A.  Yes.

11   Q.  I assume the people closed the door?

12   A.  Yes.

13   Q.  You were standing where on the porch in relation to the

14   door?

15   A.  Right next to it.

16   Q.  And you could hear through this closed door?

17   A.  Yes, some, a little bit.

18   Q.  Were you wearing a hat that day?

19   A.  No.

20   Q.  What if I tell you when you were brought to the hospital

21   part of your clothing was a hat?

22   A.  A hat?

23   Q.  Yes.

24   A.  I don't --

25   Q.  You are not sure?

1   A.  I don't think I had a hat on.

2   Q.  Well, this conversation is taking place behind the closed

3   door, and you are outside on the street with Quay Quay, on the

4   porch with Quay Quay, am I right?

5   A.  Yes.

6   Q.  Again, you are able to overhear this conversation while you

7   are on the porch?

8   A.  Bits and pieces, yes.

9   Q.  Where do you go from there?  What do you do at that time?

10  A.  We left, went to a chicken spot, and then we went to my

11  house.

12  Q.  Then what do you do after you go to a chicken spot and go

13  to your house?

14  A.  We come out -- we stay at my house for a little bit, and

15  then we come back out.

16  Q.  So you are on the street now after being in your house for

17  a little bit.  Then what happens?

18  A.  We go looking for everybody.

19  Q.  Where did you go looking?

20  A.  First at Dubois, but nobody was there.

21  Q.  Why did you go there?

22  A.  Because that's where we left them at.

23  Q.  What is that?

24  A.  That's where we left them at.

25  Q.  By the way, how far is it from the house on Dubois to your

1   house where you went to that night?

2   A.  Like five or ten minutes.  It was close.

3   Q.  And then you come back and you go on the street looking for

4   everybody?

5   A.  Yes.

6   Q.  Last week you told this jury that when you came upon these

7   people, you and Quay Quay saw three people being robbed on the

8   street, and that they were forced into 54 Chambers Street?

9           Do you remember testifying to that?

10  A.  Not fully -- I said we went down with them and then the

11  robbery happened.

12  Q.  Did you say that you saw three people being forced into the

13  building and that they were robbed?

14  A.  Yes.

15  Q.  On the street?  They were robbed on the street?

16  A.  They was right outside the house on the sidewalk.

17  Q.  What is that?

18  A.  On the sidewalk outside the house.

19  Q.  On the sidewalk outside the house three men were robbed at

20  gunpoint?

21  A.  Yes.

22  Q.  And that those three men who were robbed at gunpoint were

23  then forced into the house by these other people on the street

24  who had guns?

25  A.  Not really forced.  They just told them to go inside and

1    all of them besides one of them went.

2    Q.  You were standing across the street when you made this

3    observation of the three people being robbed, correct?

4    A.  No, I was there in the crowd.

5    Q.  You were right there?

6    A.  Yes.

7    Q.  Seeing them being robbed?

8    A.  Yes.

9    Q.  When you went to the DA's office in May of 2011, did you

10   tell the DA that you saw a man pulling on the door and --

11   pulling on the door?

12   A.  From the outside?

13   Q.  From the outside.

14   A.  I said I -- I don't think that day.  I said the night of

15   the murder.

16   Q.  When you first got there, did you tell the DA that, I saw a

17   man pulling on the door?

18   A.  Yes.

19   Q.  Was that true?

20   A.  No.

21   Q.  Why did you tell that to the DA?

22   A.  To still make it seem I wasn't involved.

23   Q.  So what you wanted to do by telling that lie about seeing

24   the man pulling on the door was to remove yourself from the

25   murder itself, is that right?

1    A.  Yes.

2    Q.  Put yourself in a position where you can say, I was outside

3    on the street, I saw this man pulling on the door, and I was

4    still on the street when shots were fired from inside, hitting

5    the man who screamed, is that right?

6    A.  Yes.

7    Q.  That is what you told the DA, right?

8    A.  Yes.

9    Q.  You lied to the DA?

10   A.  Yes.

11   Q.  The purpose of your lie was to show to him that you were

12   not involved in the murder, you are on the street, you had

13   nothing to do with the murder, somebody from inside that

14   apartment shot that man, correct?

15   A.  Yes.

16   Q.  You knowingly lied about that to try to help yourself?

17   A.  Yes.

18   Q.  Am I right?

19   A.  Yes.

20   Q.  You told them the man screamed after he was shot?

21   A.  Yes.

22   Q.  That is true, the man screamed, didn't he?

23   A.  Yeah.  I heard screaming, yes.

24   Q.  But you were inside the apartment when that happened,

25   weren't you?

1   A.   Yes.

2   Q.   You were deep inside that apartment, weren't you?

3   A.   I was at the door.

4   Q.   You were at the door when the man was shot?

5   A.   Yes.

6   Q.   Right at the door?

7   A.   I was --

8   Q.   Please come down again and --

9           MR. NAWADAY:  Objection.  Can he let the witness

10  finish the answer.

11          THE COURT:  Did he answer the question?

12          MR. NAWADAY:  I thought the witness had started to

13  answer and he cut him off.  Your Honor, can we have the witness

14  step down.

15          THE COURT:  Mr. Baynes, you may step down.

16  Q.   Mr. Baynes, you prefer the green pen still?  Please put an

17  X with a 1 next to it, X-1 where you were standing in the

18  apartment when the man was shot.

19          You can take your seat.

20          Going back to the story you told the district attorney

21  back in May of 2011, did you say that at the moment the man was

22  shot and you were still across the street or still not inside

23  the apartment, five people ran out of the apartment, is that

24  right?

25  A.   Yes.

E8bnchr3                        Baynes - cross

1   Q.  You told them that?

2   A.  Yes.

3   Q.  Another lie, isn't that right?

4   A.  Yes.

5   Q.  The purpose of that lie was to show that one of those five

6   people who were in the apartment pulled the trigger, isn't that

7   right?

8   A.  Yes.

9   Q.  That you couldn't have pulled the trigger because you were

10  still outside, correct?

11  A.  Yes.

12  Q.  But we now know that you lied through your teeth, am I

13  right?

14  A.  Yes.

15  Q.  You lied through your teeth to help to save your buddy,

16  correct?

17  A.  Yes.

18  Q.  You also said that the five people who ran out all were

19  wearing masks, is that right?

20  A.  No.  Some of them was wearing masks.

21  Q.  Some of them, that is your recollection now.  I'm asking

22  you back then.  Did you tell the district attorney in May of

23  2011 all five people had masks on?

24  A.  Yes.

25  Q.  Again, was that a lie or was that telling the truth?

1     A.   A lie.

2     Q.   When this man is shot and you hear him screaming, is it

3     fair to say you and Quay Quay started walking toward the

4     apartment?

5     A.   No.

6     Q.   No, but that is what you told the DA back in May of 2011,

7     isn't it?

8     A.   I said we seen him, and we started to run away, and that's

9     when everybody came and grabbed us, or grabbed me.

10    Q.   Did you tell the DA in May, particularly May 13, 2011 that

11    you and Quay Quay were across the street, the man got shot, and

12    you started walking toward the apartment?

13    A.   I don't remember saying that.

14    Q.   You don't remember?

15    A.   No.

16    Q.   Now, you say that you ultimately enter the apartment,

17    correct?

18    A.   Yeah.

19    Q.   Where in the apartment is it that you say you first see

20    Raymond wrestling with somebody?

21    A.   In like the living room part.

22            MR. GREENFIELD:  With the Court's approval, could the

23    witness come down and mark X-2 at the spot where the witness

24    says he first saw my client.

25            THE COURT:  You may step down, Mr. Baynes.

1    Q.  I should have kept you down here.  Sorry.

2          I am going to ask you one further question.  When you

3    are stabbed, were you standing where you put the X mark now?

4    A.  Yes.

5    Q.  Isn't it a fact that you told the district attorney on May

6    13, 2011, that when were you stabbed you were within five or

7    ten feet of the entrance to the building, to the apartment?

8    A.  Yes.

9    Q.  You did say that, correct?

10   A.  Yes.

11   Q.  So would you come down here now and put an X-2 as to where

12   you -- withdrawn.  Let's stay at that.

13         Did there come a time when somebody told you that you

14   couldn't have been standing by the door and that you were

15   standing somewhere else?

16   A.  Yes.

17   Q.  Who was that person?

18   A.  The detective.

19   Q.  Who is that?

20   A.  The detective.

21   Q.  Say that loudly.

22   A.  The detective.

23   Q.  The detective told you what?

24   A.  That I couldn't be standing by the door.

25   Q.  You couldn't have been there.  The detective, was he there

E8bnchr3                    Baynes - cross

1   when this happened?

2   A.  No.

3   Q.  You were there when this happened, correct?

4   A.  Yes.

5   Q.  You said you were standing right next to the X-1 mark,

6   right?

7   A.  Yes.

8   Q.  Are you sure the detective wasn't there that night?

9   A.  Positive.

10  Q.  Positive.

11  A.  Yes.

12  Q.  But the detective said, Anthony, you're wrong, you couldn't

13  have been standing there, you had to be all the way over here

14  inside the apartment, something like that?

15  A.  Yes.

16  Q.  And that's Detective Cortez?

17  A.  I don't know the --

18  Q.  Which detective told you, the detective who was at the

19  first meeting?

20  A.  I don't -- yeah, it was the same lawyer -- I mean the same

21  detective at all of them.

22  Q.  Where did you go after this whole occurrence happened

23  inside the apartment?

24  A.  To Quay Quay's grandmother's house.

25  Q.  How far is that from the area where this happened?

1   A.  Like around the corner, like five minutes.

2   Q.  When you got to Quay Quay's grandmother's apartment -- who

3   is also Raymond's grandmother, right?

4   A.  Yes.

5   Q.  Raymond was in the apartment?

6   A.  Yes.

7   Q.  When you first spoke to the DA on May 13, 2011, the

8   detective was there, the DA was there, you were there, and your

9   lawyer was there, am I right?

10  A.  Yes.

11  Q.  You made no mention to the district attorney of the fact

12  that you were stabbed in the interior rooms of the apartment?

13  A.  I don't know.  I don't think so.

14  Q.  What's that?

15  A.  I don't know.  I don't think so.

16  Q.  You don't think so.

17          Well, you told them it happened here at the door,

18  didn't you?

19  A.  It was a point in time, yeah, I did tell them that.

20  Q.  The first time you spoke to law enforcement in an effort to

21  cooperate with them, you said you were stabbed within five or

22  ten feet of the entrance to the apartment?

23  A.  Yes.

24  Q.  No doubt about that, right?  The masks you said everybody

25  was wearing when they went in, you described them as half

E8bnchr3                          Baynes - cross

1    masks, do you recall?

2    A.  Yes.

3    Q.  And I think you said up to the nose, is that right?

4    A.  No, it covered the nose, too.

5    Q.  It covers the nose, just over the nose?

6    A.  Yes.

7    Q.  And everybody had the same type mask on?

8    A.  Some of them had a full mask, some of them had black flags.

9    Q.  When for the first time do you say they had masks?  When

10   did you tell that to anybody?

11   A.  I told that when I first talked to them so they would think

12   that I couldn't point out anybody.

13   Q.  You said Raymond was wearing a half mask, didn't you?

14   A.  Yes.

15   Q.  And a half mask covers the nose and down around the back of

16   the head and the chin and the lips, correct?

17   A.  Yes.  It covers the bottom half of your face.

18   Q.  It doesn't cover the top of your head, does it?

19   A.  No.

20   Q.  It doesn't cover the eyes, does it?

21   A.  No.

22   Q.  Were you ever shown a mask in this case?

23   A.  What?

24   Q.  Were you ever shown a mask in this case?

25   A.  No.

E8bnchr3                    Baynes - cross

1   Q.  No one from the government or the detectives or the DA's

2   office ever showed you a mask and asked you if you could

3   identify it?

4   A.  No.

5   Q.  Now, with respect to the occurrence on December 14, 2010,

6   going into December 15, 2010, right around the midnight hour,

7   one thing you're sure of, you didn't have a gun?

8   A.  Yes.

9   Q.  You didn't have a mask?

10  A.  Yes.

11  Q.  Quay Quay didn't have a gun?

12  A.  Yes.

13  Q.  Quay Quay didn't have a mask?

14  A.  Yes.

15  Q.  Was Louis there or not that night?

16  A.  Wasn't.

17  Q.  What's that?

18  A.  He wasn't there.

19  Q.  Incidentally, with the masks, when is it that you first saw

20  people wearing masks?

21  A.  Once I caught up to them on First Street.

22  Q.  How far from the incident?

23  A.  Right down the street.

24  Q.  That's when the masks started going on?  Is that what you

25  are saying?

1    A.  Yes.

2    Q.  How long have you been in the MCC now?

3    A.  Around two years.

4    Q.  You have heard stories in the MCC about people who are

5    cooperating with the government, have you not?

6    A.  Yes.

7    Q.  It's common knowledge in the MCC that the government writes

8    letters for people who cooperate in their investigations,

9    correct?

10   A.  Yes.

11   Q.  You have seen guys in there or heard stories of people in

12   there who have faced a whole lot more time than you are facing

13   on a 17-year plea, am I right?

14   A.  Yes.

15   Q.  People facing life sentences, life plus 30, life plus 50,

16   right?  You have heard of those?

17   A.  Yes.

18   Q.  You have been on the floor with people like that, haven't

19   you?

20   A.  Yes.

21   Q.  When it is time to get sentenced, most people know they are

22   not getting that life sentence, they are not going to get the

23   number that they've pled to, but they are going to get a break

24   in their sentencing based on the cooperation?

25            MR. NAWADAY:  Objection.

1                THE COURT:  Overruled.

2    A.  I guess.  I don't --

3    Q.  You know so, isn't that right?  Has anybody who you know

4    has been cooperating in the two years you have been here, did

5    you ever hear of somebody getting the number they pled to?

6    A.  No.

7    Q.  Have you heard of anybody getting anywhere near the number

8    they pled to?

9    A.  No.

10   Q.  That gives you hope that you are going to get time served?

11   A.  Yes.

12   Q.  You have heard a lot of people have gotten time served in

13   the MCC for the crimes that they pled guilty to, even though

14   they faced horrendously high numbers?

15   A.  Yes.

16   Q.  In fact, people on your floor, I'm sure, were looking at

17   say a 40-year plea sentence and they went down to get sentenced

18   and never came back?  Am I right?

19   A.  Yes.

20   Q.  And the reason they didn't come back is they didn't escape

21   from custody, did they?

22   A.  No.

23   Q.  They got time served?

24   A.  Yes.

25   Q.  A lot of guys got time served?  That's why you think you

E8bnchr3                          Baynes - cross

1     can get time served?

2     A.  Yes.

3     Q.  But you wouldn't lie to get time served, would you?

4     A.  No.

5              MR. GREENFIELD:  Nothing further.

6              THE COURT:  Any further cross-examination?

7              Mr. Buchwald, will you be cross-examining?

8              MR. BUCHWALD:  Can I just see the exhibit so I can see

9     where the second mark is.

10    CROSS EXAMINATION

11    BY MR. BUCHWALD:

12    Q.  Good afternoon, Mr. Baynes.

13    A.  Good afternoon.

14    Q.  You and I have never spoken, have we?

15    A.  No.

16    Q.  You mentioned during the course of your testimony somebody

17    by the name of Baby E.

18             MR. BUCHWALD:  Can we have Government Exhibit 208.

19    Q.  Let me show you Government Exhibit 208.  Is that Baby E?

20    A.  Yes.

21    Q.  I think you also knew him as Eric?

22    A.  Yes.

23    Q.  And as of December 2010, how long had you known him?

24    A.  A couple of years.

25    Q.  He lived in the Heights, is that right?

E8bnchr3                        Baynes - cross

1  A.  I don't know for -- he hangs out in Heights.  I don't know

2  where he lives.

3  Q.  I'm sorry.  Could you speak up.

4  A.  He hangs out in the Heights.  I don't know where he lives.

5  Q.  Well, did you ever tell the prosecutors that he lived in

6  the Heights?

7  A.  No.

8  Q.  But he hung out in the Heights?  That's where you're

9  familiar with seeing him?

10  A.  Yes.

11  Q.  You lived on what street?  Mill Street?

12  A.  Yes.

13  Q.  Could we have Government Exhibit 251 on the screen.  This

14  is the map.  Is Mill Street depicted on the map in front of

15  you?

16  A.  Yes.

17  Q.  Could you tell us, as you look at the map where is Mill

18  Street, to help the ladies and gentlemen of the jury, on the

19  left side or the right side?

20  A.  The bottom left corner.

21  Q.  Do you see the Heights?

22  A.  Yes -- well, yes.

23  Q.  Could you tell us, generally where is the Heights.

24  A.  It is not really on here, but it's like William Street, the

25  whole other side of Broadway.

1   Q.  Is it on the lower right side?

2   A.  It's more like in the middle bottom.

3   Q.  Let me show you 251 in evidence, 250 in evidence and see if

4   you're better able to see the Heights.

5   A.  Yes.  About the middle.

6   Q.  Let me show you what we've previously marked as Defendant

7   Thomas Exhibit H for identification and ask you if that appears

8   to be an accurate street map of what you know as the Heights in

9   Newburgh.

10  A.  Yes.

11          MR. BUCHWALD:  We offer H for identification into

12  evidence, your Honor.

13          MR. NAWADAY:  No objection.

14          THE COURT:  Defendant Thomas H will be received.

15          (Defendants' Exhibit Thomas H received in evidence)

16  Q.  Am I correct, if we can keep up Exhibit 250, on Exhibit

17  250, do you see at the bottom center where it says Carson

18  Avenue?

19  A.  Yes.

20  Q.  Carson Avenue is really right in the middle of the Heights,

21  is that correct?

22  A.  Yes.

23          MR. BUCHWALD:  If I may display this to the jury, your

24  Honor.

25  Q.  The part from Carson Avenue south, going down, is called

1    the Center or Inner Heights, is that right?

2    A.  I don't know.

3    Q.  Is there a part of the Heights called the Upper Heights,

4    the part that goes from Carson to Benkard?

5    A.  I don't know.  I just know the Heights.

6    Q.  But this is the entirety of the Heights as you understand

7    it, in Newburgh, is that correct?

8    A.  Yes.

9    Q.  Now, there came a point in time in preparation for the

10   trial when you were asked by the federal prosecutors about a

11   month and a half ago to tell them how you came to first meet

12   Gucci, isn't that correct?

13   A.  Yes.

14   Q.  When did you first meet Gucci?

15   A.  In the Heights.  It was like being in the Heights.

16   Q.  Please keep your voice up.

17   A.  In the Heights.  In the Heights, sir.

18   Q.  When did you first meet him?  Not where, when?

19   A.  I couple of years before this case.

20   Q.  All right.

21   A.  Like a year.

22   Q.  A couple of years before.  This case is December 15, 2010.

23   Is that what you are referring to when you say this case?

24   A.  Yes.

25   Q.  Incidentally you were born in January of 1993, correct?

1    A.   April 1993.

2    Q.   April of 1993.  So you were just a few months short of 18

3    years old on December 15, of 2010, correct?

4    A.   Yes.

5    Q.   When you say a few years before this event that you are

6    talking about, 2009, 2008, when was it that you first met?

7    A.   Yeah, like around 2009 or '8.

8    Q.   Where did you meet Gucci?

9    A.   In the Heights.

10   Q.   How often did you see him in the Heights?

11   A.   Like every once in a while I seen him like.  He would be in

12   the Heights a lot, all the time.

13   Q.   Please keep your voice up.

14   A.   He would always be in the Heights.  When I'm in the Heights

15   I see him sometimes.

16   Q.   All right.  Well you say all the time, how frequently did

17   you see Gucci in the Heights?  Was it once a week?  Once a

18   month?  A couple of times a week?  How frequently would you see

19   him in the Heights?

20   A.   Like once a week.  I don't usually go to the Heights that

21   much.

22   Q.   So you would see him once a week, and was that how often

23   in -- I'm going to ask you first how often in 2008 you saw him

24   and then how often in 2009 you saw him.  So in 2008, how often

25   did you see Gucci in the Heights?

1   A.  I don't remember that.  Like, I just seen him around

2   sometimes.

3   Q.  Do you remember telling the prosecutors that you socialized

4   with him on and off?

5   A.  No, we was in the same crowd.  Like, he knew people I knew.

6   Q.  Say again?

7   A.  We was in -- like, he knew people that I know.

8   Q.  He knew people that you knew, and so you would be together?

9   A.  Not necessarily talking with each other, just in the same

10  crowd, just talking.

11  Q.  All right.  But you told the prosecutors that you and he

12  socialized on and off, is that right?

13  A.  Not -- just like, What's up?  Not really talking.  We never

14  really talked.

15  Q.  On July 2 of this year, just a month or so before our trial

16  began, did you tell the prosecutors that you and Gucci

17  socialized on and off?

18  A.  No.  Just hi's and byes.  Not talking.  Just hi's and byes

19  not really talking.

20  Q.  All right.  You believed, did you not, that Gucci was

21  several years older than you, is that right?

22  A.  Yes.

23  Q.  How much older than you did you believe Gucci was?

24  A.  Like six or five years.

25  Q.  Six or five years older than you?

1   A.  Yes.

2   Q.  That's what you told the prosecutors, correct?

3   A.  Yes.

4   Q.  That's what you have always believed, since you met him in

5   2008, is that right?

6   A.  Yes.

7   Q.  And incidentally, in 2009, how often did you see Gucci?

8   A.  The same, just on and off.

9   Q.  Always in the Heights?

10  A.  Yes.

11  Q.  Is there someplace that you would refer to as the South

12  Side?

13  A.  Yes, like the other side of town.

14  Q.  All right.  Did you ever see him on the South Side?

15  A.  No.

16  Q.  Did you tell the prosecutors that you believed Gucci was

17  from the South Side?

18  A.  No.

19  Q.  Do you deny telling prosecutors that Gucci was from the

20  South Side?  Withdrawn.

21       Now, you told the prosecutors you believed Gucci's

22  first name was Glenn, is that right?

23  A.  Yes.

24  Q.  And you told them that you believed his first name was

25  Glenn because that name Glenn had been mentioned to you in 2008

E8bnchr3                          Baynes – cross

1   or 2009?

2   A.  Like around '010.

3   Q.  In 2010.  How long before the events of December 15, 2010,

4   the day of the robbery and the shooting, was the name Glenn

5   mentioned to you?

6   A.  It was after when I was talking to somebody about it.

7   Q.  When you were talking to somebody?

8   A.  Yeah.

9   Q.  And the somebody that you were talking to was who?

10  A.  A cousin of mine.

11  Q.  A cousin of yours?

12  A.  Yes.

13  Q.  The cousin of yours who you were speaking to had a name?

14  A.  Yes.

15  Q.  And that cousin's name was?

16  A.  Sadea.

17  Q.  Sadea?

18  A.  Sadea.

19  Q.  Sadea?

20  A.  Sadea, Sadea, Sadea.

21  Q.  Sadea?

22  A.  Yes.

23  Q.  Male or female?

24  A.  Male -- I mean female, female.

25  Q.  Female.  You recall the questions that you were asked by

E8bnchr3                         Baynes - cross

1   Mr. Goltzer, the first defense attorney, last Thursday I guess,

2   about the various stories you told in the hospital to the

3   police.

4            Do you remember that?

5   A.  Yes.

6   Q.  In the stories to the police you mentioned various names.

7   You mentioned Bash and Baby E, correct?

8   A.  Yes.

9   Q.  And you mentioned Raymond, correct?

10  A.  Yes.

11  Q.  And you mentioned J-Mark, did you not?

12  A.  No.

13  Q.  Well, isn't it a fact that when you spoke to the police

14  from the hospital that you did in fact mention J-Mark?

15  A.  No.

16  Q.  When you say J-Mark, do you know who I'm referring to?

17  A.  Yes.

18  Q.  I'm referring to the fellow who is in Exhibit 220.  Can we

19  put that up, please.  That is J-Mark.

20  A.  Yes.

21  Q.  Do you deny mentioning J-Mark to the police in the

22  hospital?

23  A.  Yes.

24  Q.  Do you recall the telling the police in the hospital --

25  3501-2, page 6 -- the person you had described as a heavyset

 1  guy called J-Mark?

 2  A.  No, I never said that.  I never knew J-Mark ever had a part

 3  in this.

 4  Q.  Say again?

 5  A.  I never even knew J-Mark had a part in this.  I never said

 6  J-Mark, ever.

 7  Q.  But you certainly didn't mention it in your direct

 8  testimony here, did you?

 9  A.  I never knew J-Mark.  I knew him, but I didn't know he ever

10  was in this case.

11  Q.  Well, didn't you tell the police in the hospital that while

12  you were on the porch at Dubois that the heavyset guy called

13  J-Mark?

14  A.  No.

15  Q.  Didn't you tell the police in the hospital that the

16  heavyset guy told Baby E and Bash that he was calling J-Mark?

17  A.  No.

18  Q.  And that this was one of the things you overheard while you

19  were on the porch?

20  A.  No.

21  Q.  Isn't that one of the things that you told Detective

22  Cortez?

23  A.  No.

24  Q.  Do you remember when you were arrested in April of 2011

25  that the prosecutors when you were first brought to court had

E8bnchr3                           Baynes - cross

1   to relay a certain notice of the statements that you had made

2   earlier to the police?

3           Do you remember that?

4   A.  No.

5   Q.  Right?  They provided a notice in court, notice to

6   defendant of claimed statements that the defendant had made to

7   the police.  You recall that, right?  Their claims?

8   A.  No.

9   Q.  You don't remember?  You don't remember the Judge and

10  everybody being told in court in front of you when you were

11  arrested that one of the statements that it was claimed that

12  you made was that you had told the police that the heavyset guy

13  told Baby E and Bash that he was calling J-Mark?

14  A.  No.

15  Q.  But, in any event, you deny now as you sit here that you

16  mentioned J-Mark at all during the hospital interviews of you,

17  is that correct?

18  A.  Yes.

19  Q.  Now, you remember testifying about a fight that you had

20  with Bash?

21  A.  Yes.

22  Q.  When was the fight that you had with Bash?

23  A.  We had two.  It was in the wintertime of '010.

24  Q.  In the wintertime of 2010?

25  A.  Yes.

E8bnchr3                          Baynes - cross

1   Q.  When you say the wintertime of 2010, just to clarify that,

2   December 15 of 2010 when the events involving the robbery and

3   the shooting at 54 Chambers Street, do you consider that the

4   wintertime of 2010, or are you talking about a year earlier,

5   January, February of 2010?

6   A.  It was fall, fall, winter.  It was around this -- it was

7   before December, like November, September, around there.

8   Q.  You are talking then about late 2010?

9   A.  Yes.

10  Q.  Not 2009?

11  A.  No.

12  Q.  Not early 2009?

13  A.  No.

14  Q.  So, when you say wintertime of 2010, what you are talking

15  about is that period of time right around the time of the

16  robbery and the shooting at 54 Chambers?

17  A.  Yes.

18  Q.  And what was the reason for the fight with Bash?

19  A.  I don't know.  He just didn't like me for some reason.

20  Q.  He just?

21  A.  Didn't like me for some reason.

22  Q.  He just didn't like you for some reason.  All right.

23          Do you recall having been interviewed about the fight

24  with Bash?

25  A.  No -- yes.

1   Q.  Do you remember who interviewed you?

2   A.  I don't remember.

3   Q.  Do you recall telling law enforcement authorities that the

4   reason for fighting Bash had something to do with J-Mark?

5         Do you recall that now?

6   A.  Yes.

7   Q.  Yes?

8   A.  Yes.

9   Q.  Right.  It had something to do with J-Mark, correct?

10  A.  Yes.

11  Q.  What did it have to do with J-Mark?

12  A.  J-Mark asked me who I was.  After I told him that, then

13  that's when me and Bash fought.  But J-Mark started, like, he

14  was pointing out who I was.

15  Q.  J-Mark was pointing out --

16  A.  Who I was.

17  Q.  Who you should fight?

18  A.  No I guess they was supposed to fight me before, and Bash

19  didn't know who I was.  Once J-Mark saw me, he pointed out who

20  I was, that I was the person, and that's when Bash punched me

21  and we started fighting.

22  Q.  Did you have the conversation with J-Mark the same day that

23  you had the fight with Bash?

24  A.  It was right there.  He asked -- it happened two seconds

25  apart.

1    Q.  But on direct examination you said you didn't remember the
2    reason that you had the fight with Bash, correct?
3    A.  I said I didn't have no reason to fight him.  I said I
4    guess he didn't like me.  I don't know what was the reason.
5              THE COURT:  Mr. Buchwald, would this be a good time to
6    break?
7              MR. BUCHWALD:  If we could have three more minutes
8    just to finish this area.
9              THE COURT:  Sure.
10             MR. BUCHWALD:  OK.
11   Q.  So, in connection with the fight with Bash, you didn't
12   mention J-Mark in your direct testimony, correct?
13   A.  No.
14   Q.  You also spoke to J-Mark after the events of December 15,
15   2010, did you not?
16   A.  Yes.
17   Q.  You spoke to him about a Joker robbery homicide, did you
18   not?
19   A.  No, no.  He just said that --
20   Q.  I'm asking you, did you speak to him about the Joker
21   robbery homicide?
22   A.  Yes.  A little bit, but --
23   Q.  How many times did you speak to J-Mark about the Joker
24   robbery homicide after the events of December 15, 2010?
25   A.  That one time.  It wasn't really about the homicide.  It

1    was just, he said that the cops kicked in his door looking for

2    guns for that case.

3    Q.  Well, he told you, did he not, that L-1 had something to do

4    with that homicide, didn't he?

5    A.  No.

6              MR. NAWADAY:  Objection.

7              THE COURT:  Sustained.

8    Q.  Shortly after the homicide, you left town, did you not?

9    A.  Yes.

10   Q.  You went down south someplace?

11   A.  Yes.

12   Q.  How long did you stay?

13   A.  Like two weeks.  Two or three weeks.

14   Q.  Incidentally, when did you get out of the hospital?

15   A.  Like two days, three days after.

16   Q.  Then you went down south and then you came back?

17   A.  Yes.

18   Q.  When was the conversation that you had with J-Mark?

19   A.  That was after I got arrested.

20   Q.  Say again?

21   A.  After I got arrested.

22   Q.  After you got arrested, you had the conversation with

23   J-Mark?

24   A.  Yes.

25   Q.  That was once you were in jail?

1    A.  Yes.

2    Q.  Was he in jail with you?

3    A.  Yes.  But for a different --

4    Q.  Say again?

5    A.  He was in jail for something different.

6    Q.  That is Orange County jail?

7    A.  Yes.

8    Q.  How often did you speak to J-Mark about -- well, how often

9    did you speak to him while you and he were in Orange County

10   jail?

11   A.  I didn't really -- we went to court together.  That was the

12   only time we spoke together, that one time.

13   Q.  Now, isn't it a fact that J-Mark told you that Big L had

14   something to do with the homicide?

15   A.  No.

16   Q.  You deny having told the prosecutors on March 1, 2012, the

17   federal prosecutors, that J-Mark told you that Big L had

18   something to do with the homicide?

19   A.  Yes.

20   Q.  Who is Big L?

21   A.  I don't know.

22   Q.  You don't know him?

23   A.  I don't know.

24   Q.  The heavyset guy, who is the heavyset?

25   A.  L-1.  That's who I was thinking Big L was, but I don't know

E8bnchr3                          Baynes - cross

1   for a fact.

2   Q.  You deny having told the prosecutors that either L-1 or Big

3   L had something to do with the Joker homicide?

4   A.  I didn't never know L-1's name.  Once I saw the picture of

5   him, that's when I said, yeah, that's him.

6   Q.  You deny having told the prosecutors that J-Mark,

7   Government Exhibit 220, told you that Big L had something to do

8   with the homicide?

9   A.  Yes.

10          MR. BUCHWALD:  This would be a good place to break.

11          THE COURT:  OK.  Ladies and gentlemen, it's now 10

12   minutes of 1.  So please make sure to be in the jury room no

13   later than 5 minutes after 2.

14          Please, if you are going to leave the building, do

15   allow for the possibility that when you come back there may be

16   a line at the security door.  So do allow for that.  We'll see

17   you in the jury room 5 minutes after 2.

18          Until then, do not discuss the case.

19          (Jury not present)

20          THE COURT:  Mr. Baynes, you may step down.  I do have

21   a 12:30 that is now about 20 minutes late.  I will be ready as

22   soon as we can clear out.

23          (Witness not present)

24          MR. BAUER:  Judge, sorry.

25          THE COURT:  Sure.

1           MR. BAUER:  Very briefly, with regards to witnesses, a

2     reminder that after lunch we are going interrupt Mr. Baynes'

3     cross for Dr. Ely.

4           THE COURT:  OK.

5           MR. BAUER:  We anticipate that will be, with all in,

6     about an hour.

7           THE COURT:  OK.

8           MR. BAUER:  So then we can resume Mr. Baynes.

9           Just talking to defense counsel, I think Mr. Baynes

10    will likely be done today, and we have one witness, one

11    Newburgh PD officer, Kevin Lahar.  I think that we'll get to

12    him as well.  My question is, if it's 4:45 or so and we're done

13    with PO Lahar, we could have another cooperating witness here

14    to begin if you would like, although we have people with

15    vacation plans who need to testify tomorrow.  So it's our

16    preference with apologies to the Court, that if we end

17    somewhere between 4:30 and 5 o'clock that we adjourn for the

18    day rather than put on -- it would be Jamar Mallory.  We would

19    put him on for just a very brief introductory testimony and

20    then interrupt it with at least two witnesses tomorrow.

21          THE COURT:  OK.  Let's see where we are.

22          MR. BAUER:  I just need to tell the marshals whether

23    to have him here or not, which we can do obviously.

24          THE COURT:  Why don't you have him here.

25          MR. BUCHWALD:  What was the answer.

E8bnchr3                       Baynes - cross

1            THE COURT:  Yes, have him here.

2            MR. BUCHWALD:  We have one concern; namely, we

3    understand Thursday people were leaving, whatever, maybe it was

4    at the MCC, that the three defendants were all put in the same

5    elevator with a witness who is to testify later on.  I think

6    it's Mr. Evans.  So we ask that everybody try to avoid this as

7    best as possible.  We may be increasing it if we have both

8    Baynes and Mallory.

9            THE COURT:  I'm sorry.  What is your concern?  That

10   the cooperators not be put in the with the defendants or that

11   the --

12           MR. BUCHWALD:  They were all in the same elevator the

13   other day.  I think that was at the MCC as I understand it.  I

14   just mention it to alert the marshals to the sensitivity of it,

15   but it may be a reason to not actually have Mallory up here

16   today for the ten minutes.

17           THE COURT:  I don't discern anything in what you said

18   that requires my involvement.

19           MR. BAUER:  Thank you, your Honor.

20           THE COURT:  But do have Mr. Mallory this afternoon.  I

21   can't imagine why Dr. Ely would be on the stand for more than

22   an hour or even an hour.

23           MR. BAUER:  Agreed.

24           THE COURT:  OK.

25           (Luncheon recess)

715

E8B9CHR4

1                          AFTERNOON SESSION

2                              2:06 p.m.

3           (Trial resumed; jury not present)

4           THE COURT:  Do we have Dr. Ely.

5           MR. BAUER:  She's ready to go.  Would you like to have

6    her come to the stand?

7           THE COURT:  It would be nice to hear a witness for a

8    change.

9           MR. NAWADAY:  I don't know what you're talking about.

10          THE COURT:  Okay.  We're bringing out the jury.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E8B9CHR4

1          (Jury present)

2          THE COURT:  Everyone please be seated.

3          Ladies and gentlemen, we are going to continue with

4     the cross-examination of Mr. Baynes in just a little bit.  The

5     parties have agreed to take this one witness out of turn.

6     Mr. Nawaday, do you want to call your next witness.

7          MR. NAWADAY:  The government calls Susan Ely.

8          THE COURT:  Please speak directly into the microphone

9     and please begin by stating your full name and spelling your

10    first and last name for the record.

11         THE WITNESS:  Dr. Susan S-U-S-A-N; last name Ely

12    E-L-Y.

13     SUSAN ELY,

14        called as a witness by the Government,

15        having duly been sworn, testified as follows:

16    DIRECT EXAMINATION

17    BY MR. NAWADAY:

18    Q.  Are you currently employed?

19    A.  Yes, I am.

20    Q.  Where do you work?

21    A.  I work full time at the Office of Chief Medical Examiner

22    for the City of New York.

23    Q.  What's your title?

24    A.  I am deputy chief medical examiner for the Bronx County.

25    Q.  What are your duties and responsibilities as a deputy chief

1  for the Bronx County ME's Office?

2  A.  I'm in charge of overseeing the running of that office in

3  terms of overseeing the professional staff and all of the other

4  departments as well as doing medical/legal death investigation

5  on certain cases of my own.

6  Q.  What does the ME's office do generally?

7  A.  The ME's office is a city agency in charge of investigating

8  certain kinds of deaths that have occurred in the city and all

9  boroughs.  Those kinds of deaths include deaths due to

10  intoxications or poisonings; any kind of sudden unexplained or

11  unexpected death; any violent death, including deaths related

12  to criminal deaths, meaning homicides or suicides; accidents,

13  including both violent accidents like motor vehicle accidents,

14  as well as chemical accidents like intoxications from

15  recreational drug use or abuse; any kind of death that's

16  related to a therapeutic or diagnostic procedure that takes

17  place in a hospital or a clinic; any kind of unexplained

18  childhood death; and deaths that occur under unusual

19  circumstances or have public health importance.

20  Q.  Is the ME's office part of any law enforcement agency?

21  A.  No.

22  Q.  Please describe your educational background.

23  A.  I received my bachelor's of science degree at the

24  University of Maryland.  And that was followed by receiving a

25  medical degree in master's of public health and tropical

1    medicine at Tulane University.  Followed by residency training

2    and internship training after medical school here in New York;

3    including one year in pediatrics and child psychiatry, one year

4    internal medicine, and four years in the study of pathology,

5    both clinical and surgical pathology, and finally one year in

6    specialty training within pathology in the area that I now

7    practice which is forensic medicine or forensic pathology.

8    Q.   What is pathology?

9    A.   Pathology is the study of, in very general terms, is the

10   study of disease and injury in people.  Pathologists are

11   medical doctors who in a hospital or a clinic setting diagnose

12   things like cancer by looking at tissue under the microscope,

13   or any other kind of disease, whether it's inflammation or

14   infection or something else unusual.  They also diagnose things

15   like diabetes, or anemias, urinary tract infections, all those

16   kinds of things in the laboratory setting.

17          A forensic pathologist goes on to further training to

18   investigate certain kinds of deaths and injuries that occur

19   under the specific circumstances that I've just described.  We

20   also look at injuries that occur in the living and try to

21   understand the patterns of those injuries in order to answer

22   questions about them.

23   Q.   And forensic pathology?

24   A.   The forensic pathology is just what I've described in terms

25   of investigating and interpreting disease and injury,

1  particularly in the setting of certain kinds of deaths that

2  fall under our jurisdiction.

3  Q.   Are you licensed to practice medicine in any states?

4  A.   Yes.

5  Q.   Which ones?

6  A.   In New York State.

7  Q.   Are you board certified?

8  A.   Yes.

9  Q.   What does that mean?

10 A.   Board certification for a physician means that that doctor

11 has taken either written and/or an oral exam after undergoing

12 training in that specific field.  For instance, if you've

13 trained in cardiology after training in internal medicine, you

14 would be eligible to take an examination in that field; and if

15 you pass it -- the examination is given by other leaders in

16 that field.  And if you pass it, you are deemed board

17 certified, which is not a requirement to practice.  It just

18 gives an added level of expertise recognized by the people in

19 your field.

20 Q.   Have you performed any autopsies before?

21 A.   Yes.

22 Q.   And what is the purpose of an autopsy?

23 A.   Well, first of all, an autopsy is a medical physical

24 examination of a person after they've passed away.  It first

25 includes doing an external examination of an individual, taking

E8B9CHR4                         Ely - direct

1    a look at any general characteristics of that person, hair

2    color, hair length, the presence or absence of tattoos or

3    scars, height, weight, etc.  Also during that external part of

4    examination any evidence of disease or injury is made note of.

5         After that and after X-rays that are sometimes taken

6    and photographs, incisions are made on the scalp, on the chest

7    and on the abdomen in order to look at the internal organs and

8    tissues for any evidence of disease or injury.

9         These autopsies are performed typically as part of an

10   investigation into the kinds of deaths that I have previously

11   described so that a cause and manner of death can be

12   determined.

13   Q.  Approximately how many autopsies have you conducted in your

14   career?

15   A.  Over 2700.

16   Q.  Have you testified in the past as an expert in forensic

17   pathology?

18   A.  Yes.

19   Q.  And about how many times have you done that?

20   A.  110 to 115 times.

21   Q.  Have you been qualified as an expert in forensic pathology

22   in both state and federal court?

23   A.  Yes.

24        MR. NAWADAY:  Government offers Dr. Ely as an expert

25   witness in forensic pathology.

1              THE COURT:  Any objection?

2              MR. BUCHWALD:  No objection.

3              THE COURT:  Very well.  Her testimony will be received

4      as an expert in forensic pathology.

5      BY MR. NAWADAY:

6      Q.  Dr. Ely, besides your work at the New York City ME's office

7      do you also from time to time conduct autopsies for other

8      municipalities?

9      A.  I did in the past.

10     Q.  And about how often did that occur?

11     A.  Sometimes it was as frequently as once a month or twice a

12     month.

13     Q.  And why does it typically occur that a particular

14     municipality calls upon an ME from a different office?

15     A.  It might just have a need in terms of staffing for more

16     medical examiners at any given time.

17     Q.  What municipalities have you conducted autopsies for?

18     A.  Besides New York City?

19     Q.  Yes.

20     A.  Orange County, New York.

21     Q.  And when you testify with regard to an autopsy, you've

22     conducted for another municipality, are you typically

23     compensated?

24     A.  Yes.

25     Q.  And are you being paid by the government for your time

E8B9CHR4                        Ely - direct

1   today and for the time you spent in preparing for your

2   testimony?

3   A.   Yes.

4   Q.   How much are you being paid?

5   A.   $2,500 a day.

6   Q.   Going back to autopsies in general terms, and I think

7   you've probably already answered this, but can you detail the

8   steps you take generally in conducting an autopsy?

9   A.   Yes.  The external examination portion of the autopsy is

10  sometimes preceded -- and in the case of Mr. Henry -- is

11  preceded by both X-rays of the body and photographs.

12  Photographs are often taken in an ongoing fashion throughout

13  the examination.

14          First, the external examination is conducted and any

15  evidence of therapeutic intervention, any physical

16  characteristics of that person and any injuries are noted.

17  Q.   And then after the external examination, what happens next?

18  A.   And then the internal examination portion of the autopsy is

19  conducted and that's where the incisions are made on the scalp

20  and on the chest and on the abdomen so that the internal organs

21  and tissues can be examined for any abnormalities, any

22  injuries, any notable findings and so that a cause of death can

23  be determined.

24  Q.   Is an autopsy report prepared typically?

25  A.   Yes.

E8B9CHR4                          Ely - direct

1   Q.  I'm going to show you what's been marked for identification

2   as Government Exhibit 440 and 440A.  Please take a look at

3   those and tell me if you recognize them.

4   A.  Yes, I do.

5   Q.  What do you recognize Government Exhibit marked for

6   identification 440 to be?

7   A.  440 is a copy of the autopsy report for Jeffrey Henry

8   conducted in Orange County on December 15, 2010.

9   Q.  There's a signature at the end.  The last page.  Do you

10  recognize it?

11  A.  Yes.

12  Q.  Whose signature is that?

13  A.  That's my signature.

14  Q.  Did you prepare this report, Government Exhibit 440 marked

15  for identification?

16  A.  Yes.

17  Q.  And then Government Exhibit 440A.  Do you recognize that?

18  A.  Yes, I do.

19  Q.  What do you recognize that to be?

20  A.  This is page two of the autopsy notes also associated with

21  Mr. Henry's autopsy which was case 0C10-606.  This is the

22  diagram portion of the autopsy notes and it shows the front and

23  back, two dimensional general drawing of the human body with my

24  handwriting or notes on it.

25  Q.  Is this a diagram you prepared?

1    A.  Yes.

2    Q.  And were these documents prepared at or near the time when

3    the autopsy was performed?

4    A.  Yes.

5    Q.  Made in the -- kept in the regular course of the medical

6    examiner's office?

7    A.  Yes.

8          MR. NAWADAY:  Government offers Government Exhibit 440

9    and 440A.

10          THE COURT:  Any objection?

11          MR. GOLTZER:  No objection.

12          THE COURT:  There being no objection, Government

13    Exhibits 440 and 440A will be received.

14          (Government's Exhibits 440 and 440A received in

15    evidence)

16          MR. NAWADAY:  Ms. McInerney, can you please put up

17    Government Exhibit 440.

18    BY MR. NAWADAY:

19    Q.  Dr. Ely, I think you should be able to see it in front of

20    you on the screen.

21          Is this the autopsy report you prepared?

22    A.  Yes, it is.

23    Q.  I'd like to go to the second page just starting with the

24    section labeled external examination.  Please tell the jury

25    generally what the external examination of Jeffrey Henry's body

1    showed.

2    A.   The external examination for Mr. Henry showed a

3    five-foot-ten-inch black man with -- who weighed 312 pounds.

4    His appearance was consistent with the given age of 35 years.

5           He had evidence of having undergone some attempts at

6    resuscitation.   In other words, he had intravenous catheters

7    and other kinds of catheters and tubes in his body that were

8    put there when there was an attempt to revive him in the

9    emergency department of St. Luke's Hospital.

10          He also had bags on his hands.   Fastened at the

11   wrists.   These were placed there by law enforcement personnel

12   prior to his arrival in my examination.

13   Q.   You said he had -- his hands were bagged.   Do you know why

14   his hands were bagged?

15   A.   It's not uncommon for somebody who has been shot and where

16   there's an investigation by the police to cover the hands with

17   bags in an attempt to preserve any trace evidence that may or

18   may not be on the hands.

19   Q.   Now, what time did you first begin conducting the autopsy

20   of Mr. Henry?

21   A.   It was 2 p.m. on December 15, 2010.

22   Q.   Do you know around what time Mr. Henry was pronounced dead?

23   A.   He was pronounced dead, I believe it was -- it was 2:25 in

24   the morning on the same day, I believe.

25   Q.   There's a section marked clothing.

1   A.  Yes.

2   Q.  Did you examine any clothing?

3   A.  I did.

4   Q.  And what did your examination of the clothing show you, if

5   anything?

6   A.  The clothing that I examined was not on his body when he

7   was received to the Orange County morgue.  It actually was

8   received with him and consisted of one long-sleeved white

9   thermal shirt, one white tank top, and one white T-shirt as

10  well as a pair of boxer shorts.

11       All of the shirts that were received and that I

12  examined had defects on them that were consistent with the

13  gunshot wound injury that he sustained to his body.

14  Q.  And based on your examination of Mr. Henry, how many

15  gunshot wounds did you identify?

16  A.  He had two gunshot wounds of his torso and one of his right

17  upper arm.  However, the one he sustained to his right upper

18  arm entered the outside of the right upper arm and exited the

19  inside of the right upper arm before reentering the torso.  So

20  even though there was a gunshot wound that went in and out of

21  his right upper arm, it was -- it occurred together with the

22  same gun shot wound injury and the same bullet that continued

23  on into his torso.  So the total of the injuries consisted of a

24  total of two gunshot wounds or two firings of a gun.  But there

25  were -- it was a defect in the right upper arm and two defects

E8B9CHR4                        Ely - direct

1    in the torso.

2    Q.   What did you do with the clothing after you examined it?

3    A.   It was submitted to a Newburgh police department detective

4    who was present.

5    Q.   In this report did you refer to the gunshot wounds in any

6    particular manner?

7    A.   I did.

8    Q.   And how did you refer to them?

9    A.   I labeled the gunshot wounds as A, B, and C arbitrarily.

10   It doesn't indicate the sequence in which they were sustained.

11   But just to distinguish one from the next, they were labeled A

12   through C.

13   Q.   And were these bullets that you recovered?

14   A.   Yes.  And one that I didn't mention was an old -- a bullet

15   that was recovered from his body from an old gunshot wound that

16   was not sustained at the same time as the injuries I had just

17   mentioned.

18   Q.   And what -- how did you refer to that bullet as?

19   A.   That was labeled as C.

20   Q.   Turning to page 3 of your report.

21        There's a section labeled A.  Is that bullet A?

22   A.   That's correct.

23   Q.   Please describe the gunshot wound or wounds associated with

24   bullet A?

25   A.   So bullet or gunshot wound A consisted of a penetrating

1  gunshot wound of the left side of Mr. Henry's torso.

2              When I say it's a "penetrating gunshot wound" that

3  means the bullet entered his body but did not exit the body.

4              It entered the body on the lower part of the left

5  chest, not far from the bottom of the rib cage.

6              After entering that area of his body, it traveled in a

7  steeply downward trajectory and went through the abdominal

8  cavity and blood vessels and tissues of the pelvis before

9  becoming lodged in the upper part of the left side or the lower

10 part of the left buttock.

11             So the direction this bullet traveled was from front

12 to back, slightly from left to right, and steeply downwards.

13 Q.  When you say "steeply downwards," can you demonstrate what

14 you mean by that?

15 A.  Well, whenever a gunshot entrance wound is identified, its

16 location from the body from the top of the head and from the

17 midline in inches is measured.

18             When the bullet exits the body it creates an exit

19 wound.  And that wound is also measured from the top of the

20 head and from the midline of the body to give its relative

21 position to where it came in.

22             When a bullet lodges in the body and does not exit,

23 the same measurement is taken of where that bullet came to rest

24 from the top of the head and from the midline.

25             In the case of this gunshot wound A, the bullet

1   entered his body and traveled a little less than 15 inches down

2   in his body; so more than a foot it traveled in length through

3   his torso and into his left buttock and thigh area.

4           So when I say steeply downward, it didn't travel

5   downward just a couple of inches, it traveled downward almost

6   15 inches.

7   Q.  Where did the -- that bullet end up?

8   A.  That bullet ended up in the back top part of the left -- of

9   the tissues of the left thigh and kind of the area of the lower

10  left buttock.

11          MR. BUCHWALD:  I'm sorry.  Could you just have the

12  last answer.

13          THE WITNESS:  It lodged in the upper portion of the

14  back of the left thigh near the thigh -- near the lower left

15  buttock.

16  BY MR. NAWADAY:

17  Q.  And in the report, in the first paragraph on page three the

18  last sentence says "there's neither fouling or stippling"?

19  A.  Yes.

20  Q.  What does that mean?

21  A.  The comment that there's neither fouling or stippling is

22  referring to whether I saw any evidence of gun powder residue

23  on the body.  That's a general statement that's always made,

24  the presence or absence of stippling, when a gunshot wound has

25  been sustained.  And what it means is when a gun is fired what

E8B9CHR4                         Ely - direct

1    leaves the muzzle of the gun first is the bullet and what

2    propels that bullet down the barrel is the combustion of gun

3    powder, so fire and gas.  And that pushes the bullet down the

4    barrel so that what comes behind the bullet as it leaves the

5    muzzle of the gun is burned gun powder, which is basically just

6    soot or smoke, which means that gun powder has now burned.

7           But what may also follow that is unburned flakes of

8    gun powder.  And when those unburned powder flakes leave the

9    gun, they're very lightweight, they are tiny, so they can only

10   travel a short distance.  The typical, the average distance

11   that those flakes can travel if they follow a bullet out of the

12   muzzle of a gun is anywhere from -- I should say is up to

13   30 inches.  So beyond 30 inches, they're not going to have the

14   capacity to reach the body and create any injury or residue

15   around the gunshot wound.

16          The soot or the burned gun powder residue is called

17   fouling and that's even lighter weight than the actual flakes

18   that might leave the gun.  And so soot or burned gun powder can

19   only travel to a maximum on average of six inches from the

20   muzzle of the gun after it's fired.

21          So when the comment "no fouling or stippling is seen"

22   it means that there is no soot or powder seen around the

23   entrance wound and there are no tiny injuries or scrapes caused

24   by the flakes that are seen around the injury.

25          However, I will say that even though it says that no

E8B9CHR4                         Ely - direct

1   fouling or stippling is seen, when an individual is wearing

2   clothing at the time that they're shot, the absence of fouling

3   or stippling can't really be interpreted because the clothes

4   are covering the skin around the wound.  So if there was going

5   to be any residue there, it would be found on the clothing.

6   And the absence on the skin doesn't have as much significance

7   or really interpretability.

8   Q.  Looking at Government Exhibit 440A.

9        MR. NAWADAY:  Ms. McInerney, if you can put that up.

10  Q.  Whose handwriting is this?

11  A.  This is mine.

12  Q.  And you see there are the letters A and B circled on this

13  diagram?

14  A.  Yes.

15  Q.  What do the As and the Bs refer to?

16  A.  The As and Bs refer to the labeling of the gunshot wounds

17  that I described in my report.

18  Q.  And on this diagram is there anywhere on the diagram where

19  the entrance wound for gunshot A is set forth?

20  A.  Yes.

21  Q.  Where is that?

22  A.  That is on the left side of the body as shown in the

23  forward-facing diagram, below and towards the midline from the

24  left nipple.

25       MR. NAWADAY:  Zoom in.

1   Q.  Is it where it's highlighted?

2   A.  Yes.

3   Q.  And then which way -- so that's the entrance wound; am I

4   right?

5   A.  That's right.

6   Q.  Which way did that bullet travel through the body?

7   A.  So it traveled from front to back.  It traveled slightly

8   left towards the right and downwards as I mentioned before,

9   steeply downwards.

10  Q.  Is it set forth on this diagram where the bullet was found?

11  A.  Yes.

12  Q.  Where is that?

13  A.  It's shown by an X and a label A to the left of and below

14  the general area of the groin.

15  Q.  What effect, if any, did the bullet have by passing through

16  the body in such a manner?

17  A.  It went through tissues and blood vessels and it caused

18  internal bleeding.

19  Q.  Did you find this bullet?

20  A.  Yes.

21  Q.  What did you do with it when you found it?

22  A.  I retrieved it from the body.  I etched the letter A on the

23  base of the bullet.  And I submitted it to the detective who

24  was present from the Newburgh police department.

25  Q.  Are you able to tell what caliber bullet it is?

E8B9CHR4                        Ely - direct

1   A.  Not specific caliber.

2   Q.  I want to move on to gunshot wound B.  Turning back to

3   Government Exhibit 440.

4            Do you see the section B on page 3?

5   A.  Yes.

6   Q.  Please describe your observations and conclusions with

7   respect to gunshot wound B.

8   A.  So gunshot wound B consisted of a wound where the bullet

9   went through the right upper arm and then reentered the torso

10  before it came to rest in the left pelvis.  So even though the

11  arm and the torso were both injured, the combination of those

12  two injuries constituted one firing of a gun.

13           The bullet first entered the outside of the right

14  upper arm.  It went through the tissues and muscles of the

15  upper arm, the right upper arm without going through the bone

16  of the upper arm.  And then exited from the inside portion of

17  the upper arm not far from the biceps region.

18           It then reentered the right side of the chest, torso,

19  and went through the lower part of the right chest cavity, the

20  diaphragm, the liver and gallbladder, the bowel, the intestines

21  in multiple locations, and then the pelvis before coming to

22  rest next to the pelvic bone on the left side.  So it crossed

23  over from the right side of his body to the left side of his

24  body and went downward before coming to rest.

25  Q.  Do you see in the first paragraph under section B?

1   A.  Yes.

2   Q.  Were there any typographical errors in that?

3   A.  Oh, yes.  So in the last sentence of that first paragraph

4   under B it says that the exit wound from the arm is from the

5   medial "left upper arm" is a typographical error.  It should

6   say right upper arm.

7   Q.  So the bullet went through the right upper arm first?

8   A.  Yes.  It never went through the left arm.

9   Q.  Also the next paragraph begins, "The bullet then apparently

10  reenters the lateral right thorax."

11          What's the lateral right thorax?

12  A.  Lateral right thorax refers to the side of the right chest

13  wall, thorax meaning chest.

14  Q.  Did you find this bullet?

15  A.  Yes.

16  Q.  Where did that bullet end up?

17  A.  That bullet became lodged in -- just on the inside aspect

18  of the left pelvic bone.  It also went from right to left --

19  I'm sorry.  It went from right to left.  It also went

20  downwards.  But it wasn't discernable whether it went front to

21  back or back to front.  It pretty much just went straight

22  across the body from right to left.

23          MR. NAWADAY:  Ms. McInerney can you please put up

24  Government Exhibit 440A.

25  Q.  Dr. Ely, can you show us where the entrance wounds relating

E8B9CHR4                          Ely - direct

1   to gunshot wound B are set forth?

2   A.   Yes.  There's a small circle which represents the gunshot

3   entrance wound on the outside aspect of the right arm in the

4   diagram.  And it's labeled as B.  Yes.

5   Q.   Is it that small circle right there on the front-facing

6   right side of the right arm?

7   A.   Yes.  That's the first entrance wound.

8            And then the second hole that you highlighted that has

9   B written to the left of it or on the left side of his body is

10  the reentrance wound into the right thorax.

11  Q.   And then where did the bullet travel after reentering in

12  the right thorax?

13  A.   So it crossed the body directly across from right to left,

14  and it went downwards and became lodged in the left pelvis

15  where the X and a B is noted.

16  Q.   Did that bullet go through any internal organs?

17  A.   Yes, it did.

18  Q.   Which ones?

19  A.   It traveled through the lower part of the right -- well

20  through the chest wall, the rib cage, and then the lower part

21  of the right chest cavity.  It went through the right

22  diaphragm, the liver, the gallbladder, the intestines in

23  multiple locations, and blood vessels and tissues of the

24  pelvis.

25  Q.   And what effect, if any, did the bullet have by passing

1   through the body in that manner?

2   A.  It caused internal bleeding as well.

3        The internal bleeding in the abdominal cavity was

4   about a half a liter, 500 milliliters.  There's about five to

5   six liters of blood in anybody's body normally.  So there's

6   about a half a liter of internal bleeding in the abdominal

7   cavity, which was contributed to by both gunshot wound A and

8   gunshot wound B.  And there was also a half a liter of internal

9   bleeding in the space around the right lung, which was

10  contributed to only by gunshot wound B, the one I just

11  described.

12  Q.  What did you do with this bullet after you found it?

13  A.  This bullet I also removed from the body, I etched with the

14  letter B on the base, and submitted to the same detective who

15  was present from Newburgh police department.

16  Q.  You said there was an old bullet you found from an old

17  injury as well?

18  A.  Yes.

19  Q.  And do you see on this diagram where that old bullet was

20  found?

21  A.  Yes.

22  Q.  Where is that?

23  A.  It is -- there's an X marking -- an X marking on the -- in

24  the right -- I'm sorry.  In the left shoulder region.

25  Q.  How could you tell that it was from an old injury?

1    A.  Well there are several things.  First of all, this bullet

2    was found because Mr. Henry was X-rayed prior to autopsy.  So a

3    bullet was seen easily on X-ray.

4         But from the outside of the body there was no

5    indication that there was a fresh defect in the skin,

6    indicating that this was a new gunshot wound.  There was a scar

7    on the left shoulder which would potentially be consistent with

8    an old gunshot entrance wound.  But there was no new injury.

9         There was also healing.  Healing within the -- around

10   the bullet, which was lodged and stuck within the top of or the

11   head of the long bone in the upper arm called the humerus.

12   There was no bleeding.  There was no bullet path.  There was

13   only healing and scarring, indicating that this was an old

14   gunshot wound injury and had not been sustained at the same

15   time that these other wounds had been sustained.

16   Q.  Did you remove that bullet as well?

17   A.  Yes.

18   Q.  And what did you do with that bullet?

19   A.  That was also submitted to the detective present.

20   Q.  Was toxicology testing done in this case?

21   A.  Yes.

22   Q.  And what is toxicology testing?

23   A.  Toxicology testing is testing of blood and fluids and any

24   other tissues in the body for prescription drugs, drugs of

25   abuse, or alcohol.

1   Q.  What did the toxicology testing in Mr. Henry's case show,

2   if anything?

3   A.  It showed chemicals found in marijuana as well as

4   phencyclidine which is known as PCP.

5        I'm sorry.  He also had alcohol in his system.

6   Q.  Are you able to draw any conclusions about the immediate

7   impact on Mr. Henry, if any, right after he was shot?

8   A.  The immediate impact would be that he would immediately

9   start to bleed internally and somewhat externally as a result

10  of these wounds.

11       When a gunshot wound injury causes immediate

12  incapacitation or death, meaning that the person is unable

13  to -- when they become flaccid and fall in their tracks and are

14  unable to have any voluntary movements or purposeful movements,

15  that's called a gunshot wound that has immediate stopping power

16  or incapacitation.  An example of that kind of gunshot wound

17  would be a bullet that travels through the brain, the vital

18  parts of the brain, or through the upper part of the spinal

19  cord, rendering that person unable to move and sometimes causes

20  them to die immediately or very shortly after the wound is

21  sustained.

22       In this case, that kind of wound was not sustained.

23  The kind of impact that these wounds would cause, in

24  combination -- at least the two to the torso -- would be

25  internal bleeding which takes on the order of minutes to

E8B9CHR4                        Ely - direct

1   accumulate as opposed to seconds.  Can't take longer than

2   minutes.

3   Q.  Based on your expert opinion would Mr. Henry be able to be

4   mobile after these two gunshot wounds?

5   A.  He could.

6   Q.  And for about how long?

7   A.  I would say minutes or less.

8   Q.  I'm going to show you what's been marked just for

9   identification as Government Exhibits 63, 64, and 65.

10          Do you recognize those?

11  A.  Yes.

12  Q.  Did you review -- look at those before testifying today?

13  A.  Yes.

14  Q.  And what do they appear to be?

15  A.  These appear to be bullets consistent with the ones that I

16  removed from Mr. Henry's body in that they have a copper

17  coating on the outside of the bullet.  It's called a copper

18  jacket.  They're not deformed.  And they have etchings on the

19  bottom of A and B.

20          There's also a bullet that's still encased somewhat in

21  bone.  That was the -- that is the bullet removed from the --

22  the old bullet removed from his left shoulder.

23          MR. NAWADAY:  Government offers Government Exhibits

24  63, 64, and 65.

25          MR. BUCHWALD:  No objection.

1              THE COURT:  63, 64, and 65 will be received.

2              (Government's Exhibits 63, 64, and 65 received in

3     evidence)

4     BY MR. NAWADAY:

5     Q.  Dr. Ely, based on your -- the autopsy you conducted of

6     Mr. Henry, have you reached a conclusion regarding the cause of

7     his death?

8     A.  Yes.

9     Q.  What is it?

10    A.  Gunshot wounds of torso and upper extremity with

11    perforations of chest wall, liver, bowel, and blood vessels.

12    Q.  In your opinion did bullet C have anything to do with the

13    cause of death?

14    A.  No.

15    Q.  So it was bullet A and bullet B?

16    A.  That's correct.

17    Q.  Did you reach any conclusion regarding the manner of death?

18    A.  Homicide.

19              MR. NAWADAY:  No further questions.

20              THE COURT:  Thank you.

21              Any cross-examination?

22              MR. BUCHWALD:  Thank you.

23    CROSS-EXAMINATION

24    BY MR. BUCHWALD:

25    Q.  Good afternoon, Dr. Ely.

1   A.  Good afternoon.

2   Q.  Let me just go through your report again.  This is Exhibit

3   440.  Do you have that in front of you?

4   A.  I do.

5   Q.  If we can put it up on the screen again.

6           Direct your attention to the first page under external

7   examination.  So I guess the next page.

8           Am I correct that Mr. Henry was a large man?  You

9   measured him at five-ten, 312 pounds; is that correct?

10  A.  Yes.

11  Q.  You took or there were certain photographs taken of the

12  body; is that correct, in connection with the autopsy?

13  A.  Yes.

14  Q.  You checked his extremities to see if there were any track

15  marks, drug track marks; is that right?

16  A.  Yes.

17  Q.  And did not find any discernable track marks.  Am I

18  correct?

19  A.  Yes.

20  Q.  And then I think you indicated that you also checked his --

21  the clothing.

22          I assume the clothing had all been removed by the time

23  the autopsy was performed; is that right?

24  A.  That's correct.

25  Q.  I take it the policemen or the hospital had custody of it

1   at that point?

2   A.   At the time of the autopsy, it was with him, brought by the

3   police.

4   Q.   Brought by the police.

5         And so you were able to check to see if the holes in

6   the shirt and the other clothes matched the wounds that you

7   found on his body?

8   A.   Yes.

9   Q.   And am I correct -- withdrawn.

10        Did you perform tests on the clothes?

11  A.   No.

12  Q.   That's not something you do, correct?

13  A.   No.

14  Q.   To determine if there is soot or any kind of foreign object

15  on the clothes; is that right?

16  A.   That's correct.  I don't perform those tests.

17  Q.   You don't perform them.

18        But if there was no -- withdrawn.

19        You indicated that with respect to each of the wounds

20  you found neither fouling nor stippling; is that right?

21  A.   That's right.

22  Q.   And am I correct putting aside the question of the clothes,

23  if there had been direct wounds to the body the absence of

24  fouling or stippling would have suggested, would it not, that

25  the weapon that was used to shoot Mr. Henry was at least

1   30 inches away from his body?

2   A.  Yes.  If his skin was exposed and not covered by anything,

3   including clothing, at the time of the firing of the gun, the

4   absence of soot around the wound and the absence of injuries

5   caused by powder flakes would indicate that in all likelihood.

6   Q.  And as you sit here you do not know whether there was soot

7   or anything on the clothing?

8   A.  I don't.

9   Q.  And you do not know if the clothing was tested for soot or

10  anything like that?

11  A.  I don't.

12  Q.  The clothing -- was that bagged in some way?

13  A.  It was, yes, and submitted to the police department.

14  Q.  And if the clothing were in evidence here and had been

15  bagged properly it could still to this day be tested, couldn't

16  it?

17  A.  I presume so.

18  Q.  Now, exhibits -- can I have 63, 64, and 65?

19          MR. BUCHWALD:  May I approach, your Honor?

20          THE COURT:  You may.

21  Q.  Am I correct that Exhibits 64 and 65 correspond, if you can

22  tell, to the bullets that killed Mr. Jeffrey?

23  A.  Yes.

24  Q.  And are you able to tell -- yes.  Okay.

25          Can you see that these bullets correspond to item Nos.

E8B9CHR4                          Ely - cross

1    72 and 74 from the Newburgh police inventory of evidence in the

2    case?

3    A.  Yes.

4    Q.  And am I correct that you examined those bullets and

5    included your visual impressions of those bullets in your

6    report?

7    A.  Yes.

8    Q.  And am I correct with respect to bullet A you determined

9    that the bullet is nondeformed and copper-jacketed?

10   A.  Yes.

11   Q.  And with respect to bullet B you determined that that

12   bullet was nondeformed and copper-jacketed?

13   A.  Yes.

14   Q.  You didn't find anything unusual about the bullets?

15   A.  Can you define what you mean by "unusual?"

16   Q.  Deformed.

17   A.  They were nondeformed.

18   Q.  Now, I believe you testified, and wrote in your report at

19   the bottom of that same page that we're on, where it says

20   injuries, external and internal, if we can go down to that

21   bottom paragraph.

22        You wrote, "The wounds are lettered arbitrarily; no

23   sequence is implied."

24        Correct?

25   A.  Correct.

1   Q.  "There is also an old bullet found and embedded in the left

2   humeral head with no discernable acute wound track," correct?

3   A.  Correct.

4   Q.  And that was bullet No. 63, correct?

5   A.  Yes.

6   Q.  That's the Exhibit No. 63.  And Exhibit No. 63 indicates on

7   it that it corresponds to item No. 73 in the Newburgh police

8   department list of exhibits that they seized; is that right?

9   A.  Partially covered by adhesive but it looks like a 73 to me.

10  Q.  And I'm correct that among the ways that you know it's an

11  old wound and not a new wound is that there is no internal

12  tracking of injury around the bullet itself?  Everything has

13  healed?

14  A.  Yes.  It's all scarred and there is no blood and also there

15  is no gunshot entrance wound and the bullet itself has

16  oxidized.  It looks older.

17  Q.  So while the wounds are "labeled arbitrarily, no sequence

18  is employed," have you no doubt that bullet C which corresponds

19  to Exhibit 63 entered him long before the other two bullets?

20  A.  That's right.

21  Q.  But with respect to A and B, what you're saying is you

22  don't know which one entered first?

23  A.  Yes.  I do not.

24  Q.  And the fact that you called one A doesn't -- one of them A

25  and one of them B doesn't mean that you think A entered first.

1    You just don't know which one entered first?

2    A.  Yes.  It could have.  But I don't know.

3    Q.  An injury of this type, it would be highly unusual to be

4    able to figure out which one entered first?

5    A.  In this specific scenario, yes.

6    Q.  Now, I just -- visually sometimes it's easier with a body

7    than with a schematic.  So if you could see me.  All right.

8           Am I correct that there are -- do you know the results

9    of the ballistics report and that the two bullets were

10   determined to have been fired from the same gun?

11   A.  I don't.

12              MR. NAWADAY:  Objection.

13              THE WITNESS:  I'm sorry.

14   BY MR. BUCHWALD:

15   Q.  Am I correct that one of the bullets, I think you call it

16   B, right, enters the right arm, comes out of the right arm,

17   enters the chest on the side, travels through the body and ends

18   up inside, in the upper -- I guess upper thigh area or would it

19   be the --

20   A.  No.  That would be -- you're describing the location of

21   bullet A.  Bullet A is the one that lodges in the back of the

22   thigh and buttock.

23   Q.  So that was bullet A.

24   A.  Bullet B which is the one you've just described the path of

25   in the arm and the right torso lodges in the left pelvic area.

E8B9CHR4                          Ely - cross

1    Q.  So let me do that again.  Okay.  The one that goes through

2    the right arm, comes out the right arm, comes into the chest on

3    the side, and ends up inside about where my hand is, just below

4    the belt level on the left side; is that correct?

5    A.  Roughly.

6    Q.  The other bullet -- you're going to remind me if it's B or

7    A -- enters here, approximately and goes roughly, you say,

8    steeply down?

9    A.  Yes.

10   Q.  Moving to the right slightly, and ending up in the body, in

11   the thigh, upper thigh area?

12   A.  In the back, yes.

13   Q.  In the back.

14         So it travels then from left, slightly right, and

15   steeply down?

16   A.  And front to back.

17   Q.  From front to back?

18   A.  Yes.

19   Q.  Whereas the first one is not level but gently down from

20   right to left -- I say, first of all, the other one goes from

21   right to left gently down?

22   A.  I wouldn't use the word "gently."  Actually, the downward

23   trajectory of the one that comes in the right chest which is B

24   also goes fairly significantly down.  It's not as steep as A

25   but they are both pretty steep in the body.

E8B9CHR4                        Ely - cross

1           MR. BUCHWALD:  If I could have just one moment, your

2     Honor.

3           (Pause)

4     Q.  And both bullets so far as you can tell moved in a

5     generally straight direction as opposed to ricocheting off of

6     bone?

7     A.  That's correct.

8     Q.  And the determination that the two bullets were

9     9-millimeter bullets was not made by you?

10          MR. NAWADAY:  Objection.

11          THE COURT:  Yes.  Assumes facts not in evidence.

12          MR. BUCHWALD:  I believe it is in evidence, your

13    Honor, from the ballistics, from the report that's in evidence.

14    BY MR. BUCHWALD:

15    Q.  You didn't make a determination as to the caliber of the

16    bullets?

17          THE WITNESS:  I can answer?

18          THE COURT:  You can answer that.

19          THE WITNESS:  I did not.

20    Q.  You just made an observation that they were nondeformed?

21    A.  And copper-jacketed, yes.

22          MR. BUCHWALD:  If I might have just one moment again,

23    your Honor.

24          THE COURT:  Sure.

25          (Pause)

1            MR. GOLTZER:  Very briefly.

2            MR. BUCHWALD:  If I could have just one moment.

3            (Pause)

4            THE COURT:  Are you done, Mr. Buchwald?

5            MR. BUCHWALD:  I am, your Honor.  Thank you.

6            THE COURT:  Okay.  Mr. Goltzer.

7            MR. GOLTZER:  Thank you.

8    CROSS-EXAMINATION

9    BY MR. GOLTZER:

10   Q.  Good afternoon, Doctor?

11   A.  Good afternoon.

12   Q.  I just have a couple of questions for you.

13            Would it be fair to say that the cause of death was

14   really internal bleeding?

15   A.  That's the mechanism of death.  The cause of death is

16   gunshot wound.

17   Q.  Of course.  But the gunshot wounds in combination caused

18   internal bleeding?

19   A.  The results of the gunshot wounds were internal bleeding

20   and that's what led -- primarily what led to his death.

21   Q.  But it wasn't a brain wound or a heart wound.  That would

22   have been instantaneous death.  It would have been something he

23   could have walked around for a couple of minutes?

24   A.  He could have had some purposeful activity.

25   Q.  One of the things you do not do as a medical examiner is

E8B9CHR4                           Ely - cross

1    try to reconstruct exactly how something happened; is that

2    correct?

3    A.   I'm actually asked questions with regard to body positions,

4    given hypotheticals, not uncommonly.  From the autopsy, that's

5    not typically determined.

6    Q.   From the autopsy you cannot determine that?

7    A.   From the autopsy alone.

8    Q.   And these things happen in three dimensions; is that

9    correct?

10   A.   Well, again, particularly if you're involving two people,

11   then there's more than one variable, than just -- I can tell

12   you what the direction is in the body, but relative to other

13   things.

14   Q.   Whether it was somebody who was short or tall that fired

15   the weapon, you can't determine that kind of thing?

16   A.   I can't determine the height.

17   Q.   Or the weight or anything like that?

18   A.   From a gunshot wound, for the shooter?  No.

19   Q.   And basically when you say there is no fouling or

20   stippling, the distance cannot be determined beyond -- it's at

21   least 30 inches, but it could be up to the effective range of

22   weapon?

23   A.   I'm sorry.  Could you --

24   Q.   When there is no evidence of fouling or stippling soot, if

25   you will, it's got to be at least 30 inches away but it can be

E8B9CHR4                          Ely - cross

1  as far away as the effective range of the weapon?

2  A.  Well, what -- I'm not really sure if I understand the

3  question.

4        But beyond 30 inches on average for most handguns --

5  Q.  But how far beyond 30 inches there is no way to know?

6  A.  Oh, in other words, once it's beyond 30 inches it's called

7  a distant gunshot wound and, you know, four feet can look the

8  same in terms of the injury on the body as, you know, farther

9  than that.

10 Q.  So as far as -- the weapon can be as far away as the weapon

11 is capable of firing.  You just don't know?

12 A.  For a distant gunshot wound.

13 Q.  And this appeared to be a distant?

14 A.  No.  I have no opinion about range because he was wearing

15 clothing.  I can't interpret the wound's range.

16 Q.  And because you couldn't test the clothing you have no

17 way --

18 A.  It's not that I couldn't test it.  I'm in charge of looking

19 at the body.  So the wounds themselves, given the fact that he

20 was wearing clothing, are not interpretable in terms of range

21 in and of themselves.

22 Q.  So with respect to the distance of the wound, you have no

23 opinion?

24 A.  I don't have an opinion based on the autopsy findings.

25        MR. GOLTZER:  Thank you, Doctor.

1          THE COURT:  Any further cross-examination?

2          MR. STRAZZA:  We have no questions.

3          THE COURT:  Any further redirect?

4          MR. NAWADAY:  No, your Honor.

5          THE COURT:  Dr. Ely, you may step down.

6          (Witness excused)

7          THE COURT:  May we get Mr. Baynes.

8      ANTHONY BAYNES, resumed

9   CROSS-EXAMINATION

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Mr. Baynes, you are again reminded that

2     you are still under oath.  Please do keep your voice up when

3     you respond to the questions.

4          Mr. Buchwald.

5          MR. BUCHWALD:  Thank you, your Honor.

6     BY MR. BUCHWALD:

7     Q.  Good afternoon, Mr. Baynes.

8     A.  Good afternoon.

9     Q.  Mr. Baynes, you referred in your testimony to some guy by

10    the name or nickname of Smoke who sold weed.  Do you recall

11    that?

12    A.  Yes.

13    Q.  I think you testified that you and some other people, Quay

14    Quay and Pooters and Dubose, assaulted Smoke at some point.

15         Do you remember that testimony from last Thursday?

16    A.  Yes.

17    Q.  My question to you is, when did that assault take place as

18    best as you recall?

19    A.  I just remember '010.  It was in 2010.

20    Q.  Do you recall, sir, I think you testified that you were

21    suspended from school about three months before, you think you

22    said three months before the December 15, 2010 robbery and

23    shooting.  Do you recall that testimony?

24    A.  Yes.

25    Q.  So were you suspended for that entire school year from the

E8bnchr5                              Baynes - cross

1    school?

2    A.  No, I did like a month or two.

3    Q.  Did this assault on Smoke occur before you were suspended

4    or after you were suspended?

5    A.  I don't remember.

6    Q.  You just don't remember at all?

7    A.  No.

8    Q.  Did it occur in toward the latter part of 2010, around the

9    time of the shooting of Joker or in the early part of 2010?

10   A.  The ending part.

11   Q.  Say again?

12   A.  The ending part, around the shooting.

13   Q.  Around the time of the sheeting.  How soon before or after

14   the shooting?

15   A.  It was before the shooting, but I don't know how --

16   Q.  Just before like days?  Weeks?  Months?

17   A.  Probably like months.

18   Q.  So it happened after you were suspended from school?

19   A.  I don't know.

20   Q.  You don't know?

21   A.  No.

22   Q.  You referred to a fight with the Crips where you also tried

23   to stab somebody with a knife.  Do you recall that testimony?

24   A.  Yes.

25   Q.  Did that occur before or after the assault on Smoke?

E8bnchr5                        Baynes - cross

1  A.  I think before.  It was --

2  Q.  Was it before or after you were suspended from school?

3  A.  Before.

4  Q.  Was it in 2010 or 2009?

5  A.  2010.

6  Q.  2010.  Thank you.  Let me show you Exhibit 219 in evidence.

7        Who is that, if you know?

8  A.  Danielle.  Somebody by the name of Danielle.

9  Q.  Sir, you have to keep your voice up?

10  A.  Somebody by the name of Danielle.

11  Q.  Was that Smoke's mother?

12  A.  Or aunt.  One of them.  Mother or aunt.

13  Q.  Do you know?  Was it Smoke's mother or his aunt?

14  A.  I don't know.  It was two sisters.  One of them was his

15  mom, one his aunt.

16  Q.  Now if we can show you what's previously been marked as

17  Defendant Thomas Exhibit S for identification.

18        MR. BUCHWALD:  May I approach, your Honor?

19        THE COURT:  You may.

20  Q.  Which is a photograph, is that right?

21  A.  Yes.

22  Q.  Do you recognize that person?

23  A.  Kind of, yes, but I don't know who he is.

24  Q.  Say again?

25  A.  I seen him before, but I don't know who he is.

E8bnchr5                        Baynes - cross

1   Q.  You have seen him before?

2   A.  Yes.

3   Q.  Did he have a nickname?

4   A.  He looks like a somebody named Stacks, but I don't know if

5   that's him.

6   Q.  Is this the Stacks you were referring to before?

7   A.  Before that was -- that I was arrested with?  That I was in

8   the county with?

9   Q.  During the questioning before about a Stacks.

10  A.  Yes.  That was --

11  Q.  This is the Stacks?

12  A.  Yes.

13  Q.  Yes?

14  A.  I told them I knew a couple of Stacks, a couple of people

15  named Stacks.

16          MR. BUCHWALD:  We offer Exhibit S for identification

17  into evidence.

18          MR. NAWADAY:  Your Honor, I don't think there is a

19  foundation that he recognized who was in that photograph.

20          THE COURT:  Well, Mr. Baynes, you said that you know a

21  couple of people named Stacks.  Was this would be of the people

22  that you were referring to?

23          THE WITNESS:  Yes.

24          THE COURT:  You knew him as Stacks?

25          THE WITNESS:  Yes.

1              THE COURT:  The objection is overruled.

2              (Defendant's Exhibit Thomas S received in evidence)

3    Q.  Where did you know this Stacks from?

4    A.  School.

5    Q.  Other than from school is that the only thing you knew

6    about this Stacks?

7    A.  He was in the county with me, too.

8    Q.  He was?

9    A.  In the county jail with me, too.

10   Q.  Orange County jail?

11   A.  Yes.

12   Q.  Was he in Orange County jail when you got there?

13   A.  Yes.

14   Q.  Do you know how long he had been in Orange County jail when

15   you got there?

16   A.  No.

17   Q.  Was there a fellow by the name of Ramone who was in Orange

18   County jail when you got there?

19   A.  I don't remember.  I don't remember.

20             MR. BUCHWALD:  Are we able at this point because it is

21   not in evidence to just so the witness Government Exhibit 217

22   for identification.

23   Q.  Is there a photograph on your screen?

24   A.  Yes.

25   Q.  Do you recognize that individual?

E8bnchr5                          Baynes - cross

1   A.  Yes.

2   Q.  Is that an individual who you knew as Ramone?

3   A.  Yes.

4   Q.  Did you have his last name?  Ramone, did you ever hear the

5   name McDermott?

6   A.  No.

7   Q.  Was there any other name you associated with Ramone?

8   A.  I didn't know him like that.  I just knew people he knew.

9   Q.  Well, you knew the name Ramone?

10  A.  Yes, from somebody he knew.

11  Q.  I'm sorry.  You have to speak up.

12  A.  I knew it from one of the people that he got arrested with,

13  his codefendant.

14  Q.  You knew it from when he got arrested?

15  A.  Yes.

16  Q.  And he was in jail when you got to the Orange County jail,

17  is that right?

18  A.  Yes.

19  Q.  You got to the Orange County jail on April 6 or April 7 of

20  2011, correct?

21  A.  Yes.

22  Q.  This fellow was in the jail already, correct?

23  A.  I think, yes.

24  Q.  You knew him before out on the street a little bit,

25  correct?

E8bnchr5                         Baynes - cross

1   A.  Not really.  I seen him before, but I didn't know him.

2   Q.  You had seen him before.  What had you seen him doing?

3   A.  Nothing, just walking by and stuff.

4   Q.  So you had seen him on the street, and you knew him from

5   the jail, is that right?

6   A.  I guess, yes.

7           MR. BUCHWALD:  We offer -- I will keep the government

8   exhibit number if they don't mind -- Government Exhibit 217 for

9   identification into evidence.

10          MR. NAWADAY:  No objection.

11          THE COURT:  217 will be received.

12          (Government's Exhibit 217 received in evidence)

13          MR. BUCHWALD:  If we can just show that now to

14  everyone.

15  Q.  When was the last time you saw Ramone?

16  A.  Back in the county, when I was in the county still.

17  Q.  You were in the county jail from April of 2011 until

18  approximately May of 2012?

19  A.  I think April, but --

20  Q.  For a year or somewhat over a year, is that correct?

21  A.  Yes.

22  Q.  He was in that jail that whole time, correct?

23  A.  I think, yes.

24  Q.  While you were there, correct?

25  A.  Yes.

1    Q.  All right.  You and he would chat at times, correct?

2    A.  No.

3    Q.  You never talked to him?

4    A.  No.

5              MR. GREENFIELD:  Could I hear that again, Judge?

6              THE WITNESS:  No, no, I never talked to him.

7    Q.  In fact, you recall there came a point in time when you

8    spoke to the district attorney's office, Assistant District

9    Attorney Haberman up in Orange County with your attorney.  Do

10   you remember that?

11   A.  Yes.

12   Q.  That was, I think, May 13 and May 20 and June 20 of 2011 or

13   thereabouts, is that right?

14   A.  Yes.

15   Q.  Am I correct, after having those conversations with ADA

16   Haberman, isn't it a fact that you spoke to Ramone, the Ramone

17   in Exhibit 217, and told him the names of various people who

18   you claimed had been involved in the Joker homicide who were in

19   Orange County jail?

20   A.  He was in a PC.  We didn't never -- he was in the PC.  We

21   was never had contact with each other.

22   Q.  Do you deny having told Ramone, the Ramone in Government

23   Exhibit 217 --

24   A.  Yes.

25   Q.  The names of people who you claimed were at Orange County

1   jail and were involved in the Joker homicide?

2   A.  Yes.

3   Q.  You deny that?

4   A.  Yes.

5   Q.  Do you deny telling Ramone that you were the only person

6   charged in the homicide, even though there were others there in

7   the jail who you claimed were involved with you?

8   A.  Yes.

9   Q.  You deny that?

10  A.  Yes.

11  Q.  You deny that?

12  A.  Yes, yes.

13  Q.  When you say PC, what does PC mean?

14  A.  Protective custody.

15  Q.  It is your testimony that he was in PC and that you never

16  spoke to him?

17  A.  Yes.

18  Q.  But you would see him now and then?  Is that how you knew

19  he was in jail?

20  A.  I was with his codefendant that told me about him.

21  Q.  So you didn't actually see him, you just heard about him

22  from his codefendant?

23  A.  No, when I first came to the jail, I was unclassed -- once

24  you are unclassed, you are in the PC.  I was there with him

25  when I first came, I saw him, and when I left there, that's

1   when his codefendant told me.

2   Q.  Who was his codefendant?

3   A.  Dequan.

4   Q.  Dequan?

5   A.  Yes.

6   Q.  The codefendant told you he was in PC?

7   A.  Yes.

8   Q.  Do you know if he went into PC after January of 2012?

9   A.  He was there when I got there in 2011.

10          MR. BUCHWALD:  If once again we might put on the

11  screen just for Mr. Baynes at this time what's previously been

12  marked as Government Exhibit 210 for identification.

13  Q.  Do you see that, Mr. Baynes?

14  A.  Yes.

15  Q.  Do you know that person?

16  A.  No.

17  Q.  Do you know a person whose nickname is Snelly?

18  A.  Yes, I heard of him.

19  Q.  Do you know a person whose real name is Alton Junior?

20  A.  No.

21  Q.  But you know the name Snelly?

22  A.  Yes, I heard it.

23  Q.  Is this a photograph of Snelly?

24  A.  I don't know what Snelly looks like.

25  Q.  You don't know what Snelly looks like?  You just heard the

 1  name?

 2  A.  Yes.

 3  Q.  You have heard the name because prosecutors have asked you

 4  about Snelly?

 5  A.  No, I was arrested with his cousin.

 6  Q.  You were arrested with Snelly's cousin?

 7  A.  Yes.

 8  Q.  When you say you were arrested with Snelly's cousin, you

 9  mean on April 7?

10  A.  No.  I was in a federal MCC or in a house with one of his

11  cousins.

12  Q.  So, you weren't arrested with him, you happened to be in

13  jail with him?

14  A.  Yeah, yeah, yes.

15  Q.  You mean after you were transferred to the MCC -- and the

16  MCC being the jail in Manhattan, correct?

17  A.  Yes.

18  Q.  The federal jail in Manhattan, correct?

19  A.  Yes.

20  Q.  After you were transferred to the federal jail in

21  Manhattan, the MCC, you were in touch with at the MCC somebody

22  who you understood to be the cousin of Snelly?

23  A.  Yes.

24  Q.  You recognized Snelly from that, or do you recognize --

25  A.  No.

E8bnchr5                              Baynes – cross

1    Q.  You don't recognize the picture?

2    A.  No.

3    Q.  But the name you recall?

4    A.  Yes.

5    Q.  Do you know the name of the cousin?

6    A.  Rashan.  Rashan Melvin I think.

7    Q.  Rashan?

8    A.  Melvin.

9    Q.  Melvin?

10   A.  Yes.

11   Q.  Rashan Melvin.  Now, you also testified about certain, I

12   guess they were robberies or burglaries involving three people

13   by the names of Geo, G, and Snipes.  Do you remember that?

14   A.  Yes.

15   Q.  Showing you Government 211, do you recognize that

16   photograph?

17   A.  Yes.

18   Q.  Is that Geo?

19   A.  Yes.

20   Q.  Let me show you what has previously been marked for

21   identification as defendant Thomas Exhibit J for

22   identification.

23        Are you able to identify that individual?

24   A.  No.

25   Q.  Do you know that individual?

1    A.  Not from the picture.

2    Q.  Can you tell us what G looks like?

3    A.  Skinny, young, brown skin.

4    Q.  Sorry, what's the last thing?

5    A.  Brown skin.

6    Q.  Brown skin.  Let me show you Government Exhibit 218 in

7    evidence.  Can you identify this person?

8    A.  Fuzzy.

9    Q.  Fuzzy?

10   A.  Yes.

11   Q.  This is the person you know as Fuzzy?

12   A.  Yes.

13   Q.  Do you know him by any other name?

14   A.  No.

15   Q.  Let me show you Exhibit 220.  Government Exhibit 220 in

16   evidence.  Do you know that person?

17   A.  J-Mark.

18   Q.  I think you testified that you knew J-Mark by other names,

19   is that right?

20   A.  No.

21   Q.  Do you remember testifying on direct examination in

22   response to Mr. Nawaday that you did know him by other names?

23   A.  No.

24   Q.  If you testified to that effect, it was a mistake?

25   A.  Yes.  I don't know him by nothing but --

E8bnchr5                          Baynes - cross

1    Q.  The only name you know J-Mark by is J-Mark?

2    A.  Yes.

3    Q.  Am I correct, sir, that J-Mark and Bash, you saw them

4    selling drugs together?

5    A.  Yes.

6    Q.  How often would you see J mark and Bash sell drugs

7    together?

8    A.  I seen them twice.  Twice.

9    Q.  Twice?

10   A.  Yes.

11   Q.  When was that?

12   A.  '010.

13   Q.  In 2010 after you were suspended from school or before?

14   A.  Probably around the same time.

15   Q.  Around the same time?

16   A.  Yes.

17   Q.  After or before the assault on Smoke?

18   A.  Probably -- after.

19   Q.  It was after the assault on Smoke.  Were the two times

20   close in time to one another, or were they far apart?  Were

21   they separated?

22   A.  They was close.  This is all in around the same time.

23   Everything was --

24   Q.  Within a couple of days?

25   A.  A couple of weeks about.

1  Q.  A couple of weeks?

2  A.  Yes.

3  Q.  You have testified about a meeting that you observed and

4  listened in on on December 15, 2010 on Dubois.  Do you recall

5  that?

6  A.  December 14.  The 14th.

7  Q.  December 14.  I believe you testified, sir, that after

8  Louis left you, and you were joined by Quay Quay, that there

9  came a point in time after you had gone to various weed spots

10  where you went to Dubois with Quay Quay and Raymond.  Do you

11  recall that?

12  A.  Yes.

13  Q.  You testified as well about overhearing the conversation

14  that went on inside, is that right?

15  A.  Yes.

16  Q.  This was from the porch while you were there with Quay

17  Quay?

18  A.  Yes.

19  Q.  I believe you testified that there came a point when other

20  people showed up, is that right?

21  A.  Yes.

22  Q.  Everyone then who was inside while you were listening from

23  the outside had a gun, is that right?

24  A.  At that time, no.

25  Q.  Do you remember telling the prosecutors who interviewed you

E8bnchr5                          Baynes - cross

1    that everyone had a gun?

2    A.  At that time?

3    Q.  Yes.

4    A.  No.

5    Q.  Do you remember telling the prosecutors that before you

6    went for the walk where you had looked at the weed spots that

7    you weren't aware of anybody with a gun; that afterwards, at

8    Dubois, everybody did have a gun except you and Quay Quay you

9    claimed?

10   A.  No.

11   Q.  There came a point in time you said when a group of

12   individuals arrived at Dubois, correct?

13   A.  Yes.

14   Q.  And did they come together?

15   A.  Two of them did.

16   Q.  Who came?

17   A.  Bow Wow, Bash, and Gucci.

18   Q.  All right.  And did Baby E come?

19   A.  Not at that time, no.

20   Q.  When did he come?

21   A.  After I left.

22   Q.  After you left?

23   A.  Yes.

24   Q.  Do you remember at any point telling the prosecutors that

25   Baby E came to the meeting at Dubois?

1   A.  No.

2   Q.  How soon after you and Quay Quay and Raymond went to Dubois

3   did you see these other individuals?

4   A.  Probably like an hour later.

5   Q.  How long?

6   A.  Like an hour later.

7   Q.  An hour?

8   A.  Yeah.  Like 30 minutes to an hour later.

9   Q.  30 minutes to an hour?

10   A.  Yes.

11   Q.  After these other individuals arrived I think you testified

12   about a phone call that you overheard to a woman?

13   A.  That was before.

14   Q.  That's before these other individuals arrived, is that

15   correct?

16   A.  Yes.  That's when she brung the pocketbook with the gun in

17   it.

18   Q.  That's before the individuals arrived?

19   A.  Yes.

20   Q.  Do you recall anything about a skinny tall Jamaican?

21   A.  Yes.

22   Q.  What do you recall about a skinny tall Jamaican?

23   A.  That he was the guy that went to the house and that he was

24   the person that was inside the house while L-1 -- L-1 sent him

25   to the house to see what was going on inside the house.

E8bnchr5                        Baynes - cross

1   Q.  Was there a particular reason why you left the information

2   about the skinny tall Jamaican out on direct examination?

3   A.  No.  I said -- I just didn't describe him.  I talked about

4   him, though, that L-1 called and he was saying that he was

5   getting ready.  I just didn't describe him.

6   Q.  This individual came to the house, is that correct?

7   A.  Yes.  He was there and then he left.  He wasn't there that

8   long.

9   Q.  He came to the house, correct?

10  A.  Yes.

11  Q.  Did he come to the house after these other individuals had

12  arrived?

13  A.  No, before.

14  Q.  Did he come to the house after the woman had come?

15  A.  No -- yes, he came after the woman came.

16  Q.  He came after the woman?

17  A.  Yes.

18  Q.  And then he left?

19  A.  Yes.  He wasn't there that long.

20          THE COURT:  Mr. Buchwald, let's take the afternoon

21  break.  Ladies and gentlemen, 15 minutes.  Please be in the

22  jury room no later than 4 o'clock.  Until then don't discuss

23  the case.

24          (Continued on next page)

25

E8bnchr5                        Baynes - cross

```
 1              (Jury not present)

 2              THE COURT:  OK.  You may step down.

 3              (Witness not present)

 4              (Recess)

 5              THE COURT:  How much more, Mr. Buchwald?

 6              MR. BUCHWALD:  It appears I will go for the rest of

 7     the day.

 8              THE COURT:  I'm sorry.

 9              MR. BUCHWALD:  I fear that I am going to go the rest

10     of the day with him.

11              THE COURT:  You fear?

12              MR. GOLTZER:  I give up.  I surrender.

13              MR. BAUER:  Judge, Mr. Mallory is here.  Looking at

14     the pace, I think we will send him back.  I have another

15     witness before him, too.

16              THE COURT:  OK.

17              (Witness resumed)

18           (Continued on next page)

19

20

21

22

23

24

25
```

 1          (Jury present)

 2          THE COURT:  Please be seated.

 3   Q.  After the group of people arrived at Dubois, how much

 4   longer were you out on the porch with Quay Quay listening to

 5   what was being said inside?

 6   A.  About 20 more minutes.

 7   Q.  So from the point that you claim that Bash, Bow Wow, and

 8   Gucci arrived you were out on the porch with Quay Quay for

 9   about 20 minutes?

10   A.  Yes.

11   Q.  And listening in the whole time, correct?

12   A.  Yes.

13   Q.  At that point you and Quay Quay left, is that right?

14   A.  Yes.

15   Q.  Where did you go?

16   A.  To my house.

17   Q.  I'm sorry?

18   A.  My house.

19   Q.  Before you went to your house, where did you go?

20   A.  To the chicken spot.

21   Q.  So you went to a chicken spot.  And you mentioned the

22   chicken spot.  That came out during the cross-examination by

23   Mr. Greenfield, right?

24   A.  Yes.

25   Q.  But you hadn't mentioned that in your direct examination?

E8bnchr5                        Baynes - cross

1    A.   No.

2    Q.   Because it wasn't important?

3    A.   I just skipped over it.

4    Q.   You just forgot?

5    A.   Yes.

6    Q.   You forgot?

7    A.   Yes, yes.

8    Q.   So you went to Crown Fried, is that what it was called?

9    A.   Yes.

10   Q.   How long did it take to go from the porch to Dubois to

11   Crown Fried?

12   A.   It right across the street from it, right there.  Like --

13   Q.   When you say right across the street, it's just a couple of

14   blocks?

15   A.   Once you get to Broadway and Dubois, it's right across the

16   street.

17   Q.   Once you get to what and Dubois?

18   A.   Broadway and Dubois.

19   Q.   Is that the corner or one block up on the corner?

20   A.   That's the corner.

21   Q.   And then you go into Crown Fried?

22   A.   Yes.

23   Q.   And the purpose of that was?

24   A.   To warm up.

25   Q.   To warm up.  And you told the prosecutors about having gone

E8bnchr5                          Baynes - cross

1    there to warm up?

2    A.  Yes.

3    Q.  And you did warm up there, is that correct?

4    A.  Yes.

5    Q.  And you were there about 15 minutes?

6    A.  Yeah, around.

7    Q.  Well, could it have been a little longer than that?

8    A.  Probably less, I don't --

9    Q.  Ten?

10   A.  Yes, around ten minutes.

11   Q.  So you and Quay Quay warm up at Crown Fried, is that right?

12   A.  Yes.

13   Q.  And then where did you go?

14   A.  To my house.

15   Q.  And where is your house?

16   A.  Mill Street.

17   Q.  And so you walked back from Crown Fried past Dubois?

18   A.  No, up the street.

19   Q.  How do you get to your house on Mill Street?

20   A.  You go up the street and then down -- it's the corner of

21   Mill and Dubois -- I mean, Mill and Broadway, you just go up

22   the street until you get to Mill Street.

23   Q.  About how many blocks?

24   A.  It's one, one block.

25   Q.  So it just takes you a couple of minutes?

1    A.  Yes.

2    Q.  Five?

3    A.  Yes.

4    Q.  Then you go into your house, and it's you and Quay Quay?

5    A.  Yes.

6    Q.  And any of your family home?

7    A.  My mom.

8    Q.  You Quay Quay and your mother?

9    A.  Yes.

10   Q.  And you played with your computer, is that right?

11   A.  Yes.

12   Q.  You went on to Facebook, is that right?

13   A.  Yes.

14   Q.  You played games?

15   A.  Yes.

16   Q.  Correct?

17   A.  Yes.

18   Q.  And I think your testimony was that you were there for

19   about an hour, is that right?

20   A.  Yes.

21   Q.  And then you started to walk -- where did you go from

22   there?

23   A.  Back to Dubois Street.

24   Q.  It's at that time that you say you met up with Baby E?

25   A.  No.  We met up with all of them at First Street, on First

E8bnchr5                        Baynes - cross

1     Street.

2     Q.  How long did it take to meet up with everybody?

3     A.  From leaving my house about like ten minutes, fifteen.

4     Q.  Ten or fifteen?

5     A.  Ten to fifteen minutes.

6     Q.  Ten to fifteen minutes before you met him, and here when

7     say everybody, Baby E was there?

8     A.  Yes.

9     Q.  Do you recall telling prosecutors, the assistant district

10    attorney on May 13, 2011 that Baby E was at Dubois?

11    A.  No.

12    Q.  Do you deny telling the assistant district attorney on May

13    13 of 2011 that Baby E was at Dubois?

14    A.  I don't deny it.  I don't remember saying that.

15    Q.  You don't remember saying it?

16    A.  No.

17    Q.  But you might have said it?

18    A.  I could have.  At that time I was still lying.

19    Q.  At that time?

20    A.  I was still lying.

21    Q.  What was the purpose of the lie that Baby E was at Dubois?

22    A.  It was just putting everybody besides -- I don't know.  I

23    don't even know if I said that.

24    Q.  You don't know?

25    A.  I even know if I said that.  I don't know.

E8bnchr5                          Baynes - cross

1    Q.  Do you remember telling the prosecutors, Assistant District

2    Attorney Haberman in the presence of your attorney and

3    Detective Cortez that at Dubois everybody had a gun?

4    A.  No.

5    Q.  Let me just ask you a little bit about Facebook.  You were

6    a Facebook friend of a number of people, correct?

7    A.  Yes.

8    Q.  Would you explain to the ladies and gentlemen of the jury,

9    those who might not be on Facebook, what a friend is on

10   Facebook?

11   A.  A person you can socialize with on it?  A person you can

12   socialize with.

13   Q.  You have to speak up.  I'm sorry, Mr. Baynes.  It's very

14   hard to hear you.

15   A.  A person that you can socialize with that requests you.

16   Q.  There are certain friends that you are able, when you write

17   a message on Facebook, it will go out to a certain category of

18   friends, is that right?

19   A.  I don't know.

20   Q.  You got messages or you read postings from friends on

21   Facebook, did you not?

22   A.  Yes.

23   Q.  Did you ever send postings to people on Facebook?

24   A.  Yes.

25   Q.  One of your Facebook friends was Raymond, was he not?

1    A.   Yes.

2    Q.   There were certain postings, were there not, concerning

3    Gucci, isn't that correct?

4    A.   I don't know.

5    Q.   Let me ask you about the term and the word Gucci.

6             Can you explain to the ladies and gentlemen of the

7    jury how many meanings Gucci has?

8    A.   Gucci can be Gucci I'm good, like as being OK, I'm good.

9    Q.   As being?  I'm sorry?

10   A.   OK.  Like, if you're Gucci you, that means you're good,

11   like you're OK.

12   Q.   Can I ask you to stop for a second.  Mr. Reporter would you

13   read that back, the answer if that's all right, your Honor.

14             THE COURT:  Sure.

15             (Record read)

16   Q.   So if something is Gucci, one of the names, that is that

17   something is good, it's a happiness, good, cheerful, correct?

18   A.   Yes.

19   Q.   Can Gucci mean anything else?

20   A.   The brand.

21   Q.   The brand, like clothes or apparel, is that right?

22   A.   Yes.

23   Q.   Can Gucci mean anything else?

24   A.   Not that I know of.

25   Q.   Did you ever hear of Gucci Mane?

1    A.  Yes.  Oh yeah, a rapper, too.

2    Q.  He is a rapper?

3    A.  Yes.

4    Q.  And then there is Gucci?

5    A.  Yes.

6    Q.  The person you have identified?

7    A.  Yes.

8    Q.  Do you know any other Guccis?

9    A.  No.

10   Q.  Let me show you, if I might, an exhibit in evidence with

11   certain Facebook postings.  Can somebody give me the number.

12   301A.  If we could move to page 50.

13              MR. GREENFIELD:  Judge, may we have a sidebar?

14              THE COURT:  Sure.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1

2            (At sidebar)

3            MR. GREENFIELD:  You should have told me you would

4   make some observations about my client during your

5   cross-examination.  What is this all about?  Where are we

6   going?

7            MR. BUCHWALD:  I am going to eliminate certain Gucci

8   references.

9            MR. GREENFIELD:  You mean like free Gucci, giving away

10  clothing?

11           MR. NAWADAY:  Your Honor, we would stipulate that the

12  Gucci references in that exhibit are not to Mr. Buchwald's

13  client.

14           THE COURT:  OK.  Does that satisfy you?

15           MR. BUCHWALD:  No.

16           THE COURT:  Why don't you show me what you have and

17  what it is that you want to do with it.

18           MR. BUCHWALD:  We are going to show Gucci and True E.

19  That is a reference to the clothes.

20           THE COURT:  Do you know who this is?

21           MR. GREENFIELD:  That's my client.

22           THE COURT:  OK.

23           MR. BUCHWALD:  It is in evidence already.

24           MR. GREENFIELD:  Yes, but I don't need you to

25  highlight it.

1              THE COURT:  We can go through this fairly quickly.

2     You are not going to take the government's stipulation?

3              MR. BUCHWALD:  No.

4              MR. GREENFIELD:  I could object, but there is no

5     objection now.

6              THE COURT:  OK.

7              MR. BAUER:  Are you going to do this with all the

8     references to Gucci?

9              MR. BUCHWALD:  Yes.

10             MR. BAUER:  This page is Gucci on page.

11             MR. BUCHWALD:  There is, Free my shun Gucci.

12             THE COURT:  This refers to the defendant?

13             MR. BAUER:  He was arrested the day before.  This

14    Gucci was arrested February 28.  So I mean, unless there is

15    something we don't know, it would be our strong inference that

16    he is talking about his shun, which is a son, Gucci, who just

17    got arrested the day before.

18             THE COURT:  What does this mean.  Macking?

19             MR. BAUER:  Macking, as Mr. Baynes said on direct,

20    macking is kind of like chilling, like hanging out.

21             MR. GREENFIELD:  Holla could be give me a call, almost

22    hollering, be in touch.

23             MR. BAUER:  Holla is just a declaration.

24             THE COURT:  SMH.  What do you intend to do?

25             MR. BUCHWALD:  We will be putting this in, asking him

E8bnchr5                            Baynes - cross

 1    if he saw it.

 2              THE COURT:  OK.  This is all in evidence?

 3              MR. BAUER:  Yes.

 4              MR. BUCHWALD:  This one was not in evidence yet.

 5              THE COURT:  They are all in evidence.  It came in as a

 6    package.

 7              MR. BUCHWALD:  This one was excluded from their

 8    package.

 9              THE COURT:  Was it?

10              MR. BUCHWALD:  Because they have agreed that if there

11    were any additional ones that I wanted to put --

12              MR. BAUER:  We have to look at the exhibit because we

13    have different memories of what it is in.  As I told you, my

14    theory on this is still sound.  We have a different memory as

15    to whether we took it out or not.

16              THE COURT:  Mr. Greenfield, do you have an objection

17    to Mr. Buchwald using what is in evidence to eliminate --

18              MR. GREENFIELD:  What is it that you say this says?

19    What is your argument going to be about this?

20              MR. BUCHWALD:  Our argument is going to be that he

21    knows that Gucci was arrested.

22              MR. GREENFIELD:  Right.

23              MR. BUCHWALD:  He knows that Gucci and your client

24    know each other.  Have they made up the story about your

25    client?  It's very easy now to insert Gucci for the first time,

1   who he's never inserted before, into his narrative that he

2   feeds the district attorney's office three months later for the

3   first time.

4              MR. GREENFIELD:  This is being sent by my client or

5   your client.?

6              MR. BUCHWALD:  This is being sent by your client.

7              MR. GREENFIELD:  How does my client's feeding the

8   name -- I would object to it.

9              MR. BAUER:  As Mr. Nawaday is reminding me it's not

10  clear Mr. Baynes is going to say this is the same Gucci.

11             MR. BUCHWALD:  Mr. Baynes is going to say, according

12  to the 3500, that is the rapper.

13             MR. BAUER:  Right.  It is our theory that this was

14  Gucci given the timing and the fact -- remember, this is

15  reckless, not Baynes, posting.  So really Baynes doesn't know

16  one way or the other.

17             THE COURT:  The first question should be, Did you see

18  this, right?  And maybe he did, maybe he didn't.  I don't know.

19             MR. BUCHWALD:  Maybe he did, maybe he didn't.  But

20  he's already testified to being a Facebook friend of Raymond's.

21  When you go on to Facebook you see the postings of your

22  friends.  That is what Facebook is.  So he can deny it if he

23  wants, but --

24             THE COURT:  OK.  The objection is overruled.

25             (Continued on next page)

1              (In open court)

2              MR. BUCHWALD:  May we proceed, your Honor?

3              THE COURT:  You may.

4    BY MR. BUCHWALD:

5    Q.  Showing you page 50 in evidence, so if we could put it on

6    everybody's screen.  Just so that I'm clear, when you are a

7    friend of someone on Facebook, if that friend puts up a posting

8    on their wall, then the people who are that person's friends

9    see the posting if they look, correct?

10   A.  Yes, yes.

11   Q.  So my question to you is, first, do you remember one way or

12   another if you saw this posting?

13   A.  No, I don't.

14   Q.  You don't remember?

15   A.  I was arrested at this time.

16   Q.  You were in?

17   A.  Jail at this time.

18   Q.  You were in jail at this time.  Sir, do you know if Gucci

19   and True E is referring to the belt that Reckless is wearing, a

20   Gucci belt?

21   A.  Yes.

22   Q.  The inverted Gs on the belt, correct?

23   A.  Yes.

24   Q.  I want to show you page 5.  This is March 30, 2010.  You

25   weren't in jail then, correct?

E8bnchr5                              Baynes – cross

1   A.  Yes.

2   Q.  I'm correct, right?

3   A.  Yes.

4   Q.  This is a reference to Gucci Mane, my shun, is that

5   correct?

6   A.  Yes.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E8B9CHR6                        Baynes - cross

1    Q.  And what is this Gucci a reference to?

2    A.  The rapper.

3    Q.  The rapper Gucci Mane?

4    A.  Yes.

5    Q.  Gucci Mane had been arrested for something, correct?

6    A.  Yes.

7    Q.  And there's a reference there to Waka Flocka; is that

8    right?

9    A.  Yes.

10   Q.  Waka Flocka is also a rapper; is that correct?

11   A.  Yes.

12   Q.  Have you ever heard of 50 Cent?

13   A.  Yes.

14   Q.  Is 50 Cent a rapper?

15   A.  Yes.

16   Q.  Now let me show you what's been marked as Exhibit F1 for

17   identification.  Do you know if you -- withdrawn.

18        It's a Facebook posting, correct?

19   A.  Yes.

20   Q.  And do you recall if you saw that Facebook posting?

21   A.  No.

22   Q.  You don't know?

23   A.  No.

24   Q.  You may have.  You may not have?

25   A.  May have -- yeah.  Yeah, I may have.  May not have.

1    Q.  You may have?

2    A.  Yes.

3    Q.  Because you were not in jail yet on that day, correct?

4    A.  No.

5    Q.  That's a Facebook posting of March 1 of 2010?

6    A.  Yes -- no.  2011.

7    Q.  March 1 of -- excuse me.  March 1 of 2011, correct?

8    A.  Yes.

9           MR. BUCHWALD:  We offer F1 for identification in

10   evidence.

11          MR. GREENFIELD:  May we see it?

12          THE COURT:  Yes, you may.

13          MR. GREENFIELD:  No objection.

14          MR. NAWADAY:  No objection.

15          THE COURT:  There being no objection, Defendant Thomas

16   F1 is it?

17          MR. BUCHWALD:  Yes, your Honor.

18          THE COURT:  Will be received.

19          (Defendant's Exhibit Thomas F1 received in evidence)

20          MR. BUCHWALD:  May I publish it, your Honor?

21          THE COURT:  You may.

22   Q.  You testified that you may have seen this; is that right?

23   A.  Yes.

24   Q.  And what is this?

25   A.  Facebook posting saying "free Gucci."

E8B9CHR6                        Baynes - cross

1    Q.  And what did it mean?

2    A.  Free Gucci.

3    Q.  And what did you understand it to mean?

4    A.  It could have been the rapper or it could have been this,

5    of Gucci here.  I don't know.

6    Q.  And, indeed -- and you understood it when you saw it?

7    A.  Just now?  I don't remember seeing it before but just now.

8    Q.  You don't remember seeing it before.

9    A.  No.

10   Q.  You saw it in the United States Attorney's Office, didn't

11   you?  Didn't they show it to you?

12   A.  No.

13   Q.  Didn't they show it to you just -- (Pause) couple days ago?

14   Didn't you tell the United States Attorney that you believed

15   this is a reference to the rapper?

16   A.  No.

17   Q.  You deny having told the U.S. Attorney that you believed it

18   was a reference to the rapper?

19   A.  I don't -- I probably did but I didn't know the dates of

20   it.  I thought it had something to do with the first posting.

21   Q.  The fact of the matter is you read it and you believed it

22   to be, when you saw it, in March of 2011 a reference to Gucci

23   the person; isn't that correct?

24            THE COURT:  Gucci which person?

25            MR. BUCHWALD:  Gucci who he's identified in this

1  courtroom as part of the robbery homicide.

2              THE WITNESS:  Yes.

3  Q.  And isn't it a fact, sir, that prior to this, prior to the

4  time that you saw that posting on March 1 of 2011 that you had

5  never, to any policemen, assistant district attorney, or United

6  States Attorney, ever said or suggested that Gucci was involved

7  in any way, shape, or form in the Joker robbery homicide; isn't

8  that a fact?

9  A.  Yes -- I never seen this --

10  Q.  And isn't it a fact, sir, when you arrived at Orange County

11  jail on April 7 of 2011 one of the people that was in the jail

12  that you saw was Gucci; isn't that correct?

13  A.  I seen him once later.

14  Q.  You saw him in the jail; is that right?

15  A.  Yes.

16  Q.  And then for the first time sometime in May of 2011 you

17  claimed that Gucci was somehow involved in the robbery and the

18  homicide -- the Joker homicide; isn't that correct?

19  A.  Yes.

20  Q.  Because you thought that that was a lie that you might be

21  able to sell to the prosecutors; isn't that so?

22  A.  No.

23  Q.  Well, let's go back to the different statements that you

24  made to police and assistant district attorneys and federal

25  prosecutors at different times.  And I'm not going to repeat

1   all of those questions and answers that you gave to Mr. Goltzer

2   last Thursday and today.

3           It's fair, is it not, to say that in all of the

4   statements that you gave to the police at the hospital, the

5   many, many different versions that you gave to the police at

6   the hospital when you were mentioning Bash and Baby E, you

7   never mentioned Gucci; isn't that correct?

8   A.  No.

9   Q.  I'm not correct or I am correct?

10  A.  Yeah, you are correct.  You are correct.

11  Q.  I'm correct.

12          And you've testified you knew Gucci already; isn't

13  that right?

14  A.  Yes.

15  Q.  And then you got arrested in April of 2011; is that

16  correct?

17  A.  Yes.

18  Q.  And when you got arrested you saw Gucci was in jail,

19  correct?

20  A.  Yeah months later.

21          Months later, yeah.

22  Q.  Well Gucci was in jail when you arrived there; isn't that

23  true?

24  A.  I didn't know.

25  Q.  And you were shown or told about the statements and the

1    physical evidence that the prosecutors said they had that

2    showed that you were involved in the Joker robbery and

3    homicide, correct?

4    A.  Some of them.

5    Q.  The day you were arrested they announced in open court that

6    they had found blood samples, correct?

7    A.  Yes.

8    Q.  They announced in open court about all of the contradictory

9    statements that you had made, correct?

10   A.  Yes.

11   Q.  And you spoke to your lawyer, correct?

12   A.  Yes.

13   Q.  AJ?

14   A.  Yes.

15   Q.  Mr. Albert Iuele?

16   A.  Yes.

17   Q.  And you and he went in to see the various pieces of

18   evidence that they had against you, correct?

19   A.  Yes.

20   Q.  And so you decided at that time to speak to the prosecutors

21   and see if you could persuade them that you were not involved,

22   correct?

23   A.  Yes.

24   Q.  And so you spoke on May 13 of 2011, correct?

25   A.  Yes.

1   Q.  You spoke to assistant district attorney Haberman who had

2   been the assistant district attorney in court when you were

3   arrested on April 7?

4   A.  Six.

5   Q.  Isn't that right?

6   A.  April 6, yes.

7   Q.  April 6.

8          And you told him, did you not, that you hadn't been

9   telling the truth up until then but now you were going to tell

10  the truth?

11  A.  (No response).

12  Q.  Correct?

13  A.  I didn't say that --

14  Q.  In substance, correct?

15  A.  Um --

16  Q.  You admitted that you had -- well what had you done back in

17  the hospital, you weaved together some true facts and some

18  false facts in order to tell an overall lie, correct?

19  A.  Yes.

20  Q.  But now things were going to be different.  You and your

21  lawyer were in there to tell the assistant district attorney in

22  Orange County what the true facts were, correct?

23  A.  Yes.

24  Q.  And so you told the assistant district attorney on

25  May 13 -- in fact, when you went in on that first occasion to

E8B9CHR6                        Baynes - cross

1    speak to Assistant District Attorney Haberman with your lawyer,

2    Detective Cortez was there, correct?

3    A.  Yes.

4    Q.  And on this occasion you told him that there were people

5    that you had met that you've seen at Dubois; isn't that right?

6    A.  Yes.

7    Q.  But you didn't tell him that Gucci was one of them, did

8    you?

9    A.  No.

10   Q.  You didn't mention Gucci's name at all on May 13, did you?

11   A.  I don't think so, no.

12   Q.  You told him that at Dubois among the people there was

13   Baby E; isn't that correct?

14   A.  Yes.

15   Q.  And you told him that the people at Dubois all had guns;

16   isn't that correct?

17   A.  I don't remember saying that.

18   Q.  I'm sorry.

19   A.  I don't remember saying that.

20   Q.  Let me show you what's been marked for identification as

21   3501-6.

22            MR. BUCHWALD:  May I approach, your Honor?

23   Q.  See if that refreshes your recollection, directing your

24   attention to the bottom third.

25            Tell me when you're finished reading, please.

1            (Pause)

2            Does that refresh your recollection, sir?

3   A.  I still don't --

4   Q.  I'm sorry?

5   A.  I still don't think I said that.

6   Q.  You still don't recall having said that.

7            Do you deny having said that?

8   A.  Yes.

9   Q.  Does it refresh your recollection that you told them that

10  Baby E was at Dubois?

11  A.  No.  I never said -- I don't remember --

12  Q.  Do you remember telling them that Baby E was at Dubois?

13  A.  No.

14  Q.  You don't remember that now either?

15  A.  I -- yes.  Yes.  I said that, yes.

16  Q.  You did say that?

17  A.  Yes.  At that time, yes.

18  Q.  But you don't remember telling the prosecutors at that time

19  that they all had guns?

20  A.  No.

21  Q.  And no mention whatsoever of Gucci that day at that meeting

22  with the assistant district attorney; isn't that true?

23  A.  Yes.  I don't think so.

24  Q.  But you didn't mention it?  Correct?

25  A.  Correct.

1    Q.  Now, at that meeting with the assistant district attorney

2    after you told him that now you're going to tell the truth you

3    described the shooting of Joker; isn't that right?

4    A.  Yes.

5    Q.  And you told him and you were standing at the corner of

6    Lander and First and you saw Joker -- a person who turned out

7    to be Joker cross the street, pulling on the door, correct?

8    A.  Yes.

9    Q.  You said you could see him from behind, correct?

10   A.  Yes.

11   Q.  From the corner, correct?

12   A.  Yes.

13   Q.  Where you and Quay Quay were, correct?

14   A.  Yes.

15   Q.  And you saw shots fired out the door?

16   A.  Yes.

17   Q.  And you said -- you told them that the shooter had a

18   half-mask on, correct?

19   A.  I don't remember saying that.

20   Q.  You told them that you thought the shooter was Bash,

21   correct?

22   A.  I said I thought it was Bash or Bow Wow.

23   Q.  Did you tell them that you thought it was Bash?

24   A.  Yes, sir.  Or Bow Wow.  Yes.

25   Q.  Right.  You didn't say you thought it was Bash or Bow Wow.

1    You said you thought it was Bash.

2              Isn't that right?

3    A.  No.  I said both.  One or the other.

4    Q.  That whole story was a lie, was it not?

5    A.  Most of it.

6    Q.  Most of it?

7    A.  Yes.

8    Q.  Even though you gave all of those details about standing at

9    the corner at First and Lander and about seeing somebody

10   pulling on the door, that was a lie, correct?

11   A.  Yes.

12   Q.  Now, were you trying to protect Gucci by not telling them

13   about Gucci?

14   A.  I was trying to tell as least as possible.

15   Q.  Say that again.

16   A.  The least amount of information as possible.

17   Q.  Now, a week later you came back to the district attorney's

18   office with your attorney again, correct?

19   A.  Yeah.  Yes.

20   Q.  Well let me stick with the first story on May 13.  On

21   May 13, that first time you were back with ADA Haberman and

22   Detective Cortez and your attorney you told them that at the

23   end after the -- you heard the shooting, after you saw Joker

24   pulling on the door outside and the shooting occurred, that

25   everybody who had planned the robbery, who you had seen at

1  Dubois, came running out and that they ran past you; is that

2  correct?

3  A.  Yes.

4  Q.  And you told them, did you not, that you observed more than

5  five people?

6  A.  I don't remember.

7  Q.  Do you deny having told ADA Haberman and Detective Cortez

8  that you saw more than five people?

9  A.  No.

10  Q.  And that those more than five people included some older

11  guys who ran past you.

12          Do you remember telling them that?

13  A.  No.

14  Q.  Do you deny having told ADA Haberman and Detective Cortez

15  that the folks who ran out included some older guys who ran

16  past you?

17  A.  Yes.

18  Q.  You deny that?

19  A.  Yes.

20          Yes.  Yes.

21  Q.  And that's when you told them as well, did you not, that

22  when -- withdrawn.

23          So you go back on May 20, a week later, to the

24  district attorney's office and they're asking you questions,

25  correct?

E8B9CHR6                         Baynes - cross

1    A.  Yes.

2    Q.  And, again, it's ADA Haberman and now there's another

3    assistant district attorney with him and your attorney and

4    Detective Cortez, correct?

5    A.  Yes.

6    Q.  And you're claiming again that when you got to the vicinity

7    of 54 Chambers Street everybody was already in the building;

8    isn't that right?

9    A.  I think, yes.  I don't really remember all the stories I

10   said.

11   Q.  I'm sorry.  I couldn't hear you.

12   A.  I don't really remember all the stories I said there.

13   Q.  You don't remember all the stories you told?

14   A.  No.

15   Q.  You just remember telling lies, a lot of lies, correct?

16   A.  Yes.  At that time, yes.

17   Q.  Trying to weave some truth with the lies in order to fool

18   people, correct?

19   A.  Yes.

20   Q.  In order -- look them in the eye and do your best to fool

21   them, correct?

22   A.  Yes.

23   Q.  And you told them about seeing a wrestling match going on

24   inside; is that correct?

25   A.  Yes.

E8B9CHR6                    Baynes - cross

1   Q.  And that you started wrestling with the guy -- the guy who

2   ended up with the gun, correct?

3   A.  That I started wrestling with him?

4   Q.  You started -- you joined the wrestling match.

5   A.  Yes.

6   Q.  And it's at that time that you got, you said, poked,

7   correct?

8   A.  After.

9   Q.  You told them that it was at that point that you got poked?

10  A.  I told them after, after the fight.

11  Q.  And that you were -- everybody left and you were the last

12  one out, correct?

13  A.  Outside of that room?  Yes.

14  Q.  And at that point Detective Cortez or the assistant

15  district attorneys said wait a minute, wait a minute, you told

16  us last week that you were at the corner and you saw all this

17  stuff.  Are you saying you were in the apartment, in the

18  building before everybody went out?

19  A.  No.

20  Q.  Isn't that the way it happened?  Isn't that what happened?

21  Didn't the ADA say:  What is this line of BS you were feeding

22  us?

23  A.  Yes.

24  Q.  Yes.  Correct?

25  A.  Yes.

1    Q.  Correct?

2    A.  Yes.  Yes.  Yes.

3    Q.  So this is the first time then that you told them that you

4    were in the house already when the person who turned out to be

5    Joker was shot; isn't that correct?

6    A.  Yes.

7    Q.  And at this time you told them that there were three

8    shooters, correct?

9    A.  I don't remember.

10   Q.  Isn't it a fact that you told them that there were three

11   shooters and you didn't mention Gucci at all?

12   A.  I don't remember.

13   Q.  Isn't it a fact that you told them two people were shooting

14   outside through the door or around the door and that one person

15   was shooting inside in the other direction; isn't that right?

16   A.  I said there was three people that was rotating through the

17   door.

18   Q.  Isn't it a fact that on May 20 of 2011 you told them in

19   this story that Bash and Bow Wow were shooting outside and

20   Baby E was shooting inside?

21   A.  Yes.

22   Q.  Didn't mention Gucci as shooting at all; isn't that

23   correct?

24   A.  I said he was helping too.

25   Q.  On May 20 you didn't mention Gucci as shooting at all;

1   isn't that correct?

2   A.   I remember saying he was helping; not that he was shooting,

3   that he was helping with the door.

4   Q.   Isn't it a fact that on May 20 you didn't mention Gucci as

5   helping with the door or shooting; isn't that correct?

6   A.   No.

7   Q.   Do you deny it?

8   A.   Do I deny --

9   Q.   That you make no mention of Gucci as shooting or helping

10  with the door?

11  A.   No, I don't deny it.

12  Q.   Do you deny having told prosecutors that you believed that

13  Bash was the one who shot Joker?

14  A.   I said Bash or Bow Wow.

15  Q.   Now, that May 20 meeting when you returned to the district

16  attorney's office you told them about another person who was

17  there, not shooting, not helping with the door, but someone who

18  you told them name was G.  Do you remember that?

19  A.   No.

20  Q.   Do you remember telling them there was a black male, dark,

21  skinny teenager, 18 or 19, from up at the Heights with Baby E

22  with the name G.

23       Do you remember telling them that?

24  A.   No.

25  Q.   Do you deny that you told them that?

1   A.  Yes.  I don't remember saying that.

2   Q.  You deny it or you're not sure?

3   A.  I'm not sure.  I don't remember saying it.

4        I'm not sure.  I don't remember saying it.

5   Q.  You don't remember saying it.  You might have said it?  You

6   might not have?

7   A.  Right.

8   Q.  And do you remember if Detective Haberman or anybody else

9   said is G Gucci?  Do you remember that?

10  A.  No.  When I said Gucci I said his whole name, Gucci, not G.

11  Q.  Do you remember describing this person as skinny teenager,

12  18 or 19, up at the Heights, with Baby E?

13  A.  No.

14  Q.  But you knew Gucci, you believed, was five or six years

15  older than you; isn't that right?

16  A.  Yes.

17  Q.  And you were just short of your 18th birthday when that

18  homicide occurred; isn't that right?

19  A.  Yes.

20  Q.  You knew he wasn't 18 or 19, correct?

21  A.  No.  I didn't know -- I don't know his age.

22  Q.  You believed he wasn't 18 or 19, correct?

23  A.  Yes.

24        THE COURT:  Mr. Buchwald, it's 5:00 so we're going to

25  end for the day.  Ladies and gentlemen, we will see you bright

1    and early tomorrow morning.  Please try to be in the jury room

2    no later than 9:25 so we can get started on time.  Until then,

3    have a wonderful evening.  Please do not discuss the case

4    including on social media.

5              (Jury excused)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Mr. Baynes, you may step down.

3          (Witness excused)

4          THE COURT:  Are there going to be other cooperators

5    called in this case?

6          MR. BAUER:  Four more.

7          THE COURT:  Will they be as long?

8          MR. BAUER:  Definitely not on direct examination, your

9    Honor.

10          THE COURT:  Is there an end in sight to Mr. Baynes?

11          MR. GOLTZER:  One would hope.

12          THE COURT:  Because I am starting to hear a lot of

13    questions again, so.

14          MR. BUCHWALD:  I will try to streamline it, your

15    Honor.

16          THE COURT:  Anything further?

17          MR. GREENFIELD:  Order of witnesses.

18          THE COURT:  Could we have tomorrow's order of

19    witnesses.

20          MR. BAUER:  We told defense counsel a number of times

21    I'm happy to tell you, your Honor.

22          MR. GREENFIELD:  I think it might be an issue with

23    regard to there is no ruling yet on the chain of custody.

24          THE COURT:  Okay.

25          MR. GREENFIELD:  They're intending to call the DNA

1   expert tomorrow.  I have cross that I have prepared which deals

2   not with what looks like his testimony is going to be with

3   regard to chain of custody and I think it would be quite unfair

4   to have that witness testify until both Goodman and Frederick

5   testify as to chain of custody of the buccal swab and I'm not

6   going to have an opportunity to prepare that cross until the

7   day -- I've done the cross.  At this point I don't know if it's

8   appropriate on the change of circumstances.

9              THE COURT:  What will the order be?

10             MR. BAUER:  Judge the order for tomorrow was -- is

11  going to be -- we're going to finish up Mr. Baynes.  Then

12  Detective Goodman who took the buccal swab from Mr. Christian

13  on October 7, 2010.  And then the DNA expert.  Mind you that

14  order, including saving the DNA expert until now, was at

15  Mr. Greenfield's request.  He's speaking of these change of

16  circumstances but the reason why it is this way, and we've

17  pushed in particular the DNA expert as far as tomorrow, because

18  he has vacation plans after that.

19             THE COURT:  Okay.

20             MR. GOLTZER:  Then Mallory.

21             MR. BAUER:  Then Officer William Lahar and then Jamar

22  Mallory.

23             MR. GREENFIELD:  Judge, I would ask the Court to

24  preclude the testimony with regard to the DNA.  But if the

25  court is inclined to allow it in, then I would ask the Court to

1    ask the witness to hold off or the prosecution -- adjust my

2    cross to change in the circumstances.

3              THE COURT:  I don't understand.  As I understand,

4    there are no changed circumstances other than the government

5    actually has the chain of custody.  They do not intend to

6    introduce it, correct?

7              MR. BAUER:  That's correct.

8              THE COURT:  Their plan is the same as it was when you

9    opened.  I really don't see a basis for, first of all,

10   precluding the testimony.  And I don't see a basis for

11   otherwise punishing the government in any way for this late

12   disclosure.  Apparently you did know the contours of this other

13   case.  You knew that there was this other case.  You knew that

14   the buccal swab was taken in connection with that other case.

15   The government's plan as I understand it and their order will

16   be the same as they've indicated to you.  So I don't see how

17   you will be prejudiced going forward.  Okay.

18             Anything further?

19             MR. BAUER:  Not from the government, your Honor.

20             THE COURT:  Very well.  So we'll see you folks

21   tomorrow morning.  Try to be here by 9 or be here by 9.

22             (Adjourned to August 12, 2014 at 9:00 a.m.)

23

24

25

```
1                        INDEX OF EXAMINATION

2     Examination of:                              Page

3     ANTHONY BAYNES

4     Cross By Mr. Goltzer . . . . . . . . . . . . 593

5     Cross By Mr. Greenfield . . . . . . . . . . 639

6     Cross By Mr. Buchwald . . . . . . . . . . . 696

7      SUSAN ELY

8     Direct By Mr. Nawaday . . . . . . . . . . . 716

9     Cross By Mr. Buchwald . . . . . . . . . . . 740

10    Cross By Mr. Goltzer . . . . . . . . . . . . 749

11     ANTHONY BAYNES

12    Cross By Mr. Buchwald . . . . . . . . . . . 752

13                       GOVERNMENT EXHIBITS

14    Exhibit No.                              Received

15     440 and 440A . . . . . . . . . . . . . . . 724

16     63, 64, and 65 . . . . . . . . . . . . . . 740

17     217 . . . . . . . . . . . . . . . . . . . 759

18                        DEFENDANT EXHIBITS

19    Exhibit No.                              Received

20     Christian A  . . . . . . . . . . . . . . . 668

21     Thomas H   . . . . . . . . . . . . . . . . 698

22     Thomas S   . . . . . . . . . . . . . . . . 757

23     Thomas F1  . . . . . . . . . . . . . . . . 787

24

25
```