E8c9chr1                    Trial

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     UNITED STATES OF AMERICA
3              v.                        12 CR 626 (ER)
     RAYMOND CHRISTIAN a/k/a
4    "Reckless"
     GLENN THOMAS, a/k/a "Gucci"
5    TYRELL WHITAKER, a/k/a "Bow Wow"
                Defendants
6    ------------------------------x
                                        New York, N.Y.
7                                       August 12, 2014
                                        9:05 a.m.
8

9    Before:
                        HON. EDGARDO RAMOS
10                                      District Judge

11
                             APPEARANCES
12   PREET BHARARA
          United States Attorney for the
13        Southern District of New York
     ANDREW BAUER
14   KAN M. NAWADAY
          Assistant United States Attorney
15
     DAVID S. GREENFIELD
16        and
     ANTHONY STRAZZA
17        Attorneys for Defendant Christian

18   LAW OFFICES OF DON BUCHWALD
          Attorney for Defendant Thomas
19   DON D. BUCHWALD

20   KELLEY DRYE & WARREN LLP
          Attorney for Defendant Thomas
21   LEVI DOWNING

22   GEORGE ROBERT GOLTZER
          and
23   YING STAFFORD
          Attorneys for Defendant Whitaker
24   -- also present--
     S.A. Andrei Petron - FBI
25
```

1              (In open court)

2              (Trial resumed; jury not present)

3              THE COURT:  Good morning, gentlemen.

4              MR. GOLTZER:  If it's convenient, Judge, we have an

5     issue to take up.

6              THE COURT:  Anything folks?

7              MR. GOLTZER:  We could take up an issue, yes.

8              THE COURT:  I'm sorry?

9              MR. GOLTZER:  Do you have an issue?  Because I have an

10    issue.

11             MR. BAUER:  Yours.

12             MR. GOLTZER:  Okay.

13             Good morning, Judge.

14             THE COURT:  Good morning, Mr. Goltzer.

15             MR. GOLTZER:  Your Honor had reserved on the issue of

16    the Mallory/Burden tape and there is some new information that

17    has come to our attention both from the record and from the

18    government which might militate against finding corroborating

19    circumstantial guarantees of trustworthiness.

20             On the issue of Pop, who purportedly told somebody on

21    the tape that Mr. Whitaker was covered with blood, in addition

22    to the prior hearsay-within-hearsay argument and the fact that

23    it's not a declaration against penal interests at all, we now

24    have a record where the government's theory is absolutely

25    contradicted by the evidence in the case.  We know from the

1    medical examiner that Mr. Henry bled out internally.  We know

2    from the crime scene people that there was no blood trail

3    between the two locations.  We know from the crime scene people

4    that there was no visible blood on the outside of Mr. Henry's

5    parka.  We know, and the only reasonable inference that one can

6    draw, is that, contrary to the government's theory about

7    Mr. Whitaker having gone through somebody's pockets or somebody

8    having stated that on the tape, that when the police went

9    through the pockets of the parka they found drugs and a wallet

10   which would have hardly been missed if somebody indeed had gone

11   through there.

12        All of the information that's in the record now

13   contradicts the notion that Mr. Whitaker somehow had blood on

14   him from contact with Mr. Henry.

15        I asked Mr. Baynes if he had come into contact with

16   Mr. Whitaker, because Mr. Baynes was bleeding.  And Mr. Baynes

17   said he was not.  So, that portion of the tape, at the least of

18   it, is now contradicted by the record.  The government's theory

19   has contradicted it.

20        THE COURT:  So you're crediting Mr. Baynes in that

21   regard?

22        MR. GOLTZER:  I'm not crediting Mr. Baynes in any

23   regard.  But the court has the right to make a finding based on

24   the state of the record.  The state of the record is such that

25   there are no corroborating circumstances that Mr. Whitaker came

1   into contact with blood, even if he was at the scene, which we

2   contest.

3          So that's my position.

4          THE COURT:  Okay.

5          MR. GOLTZER:  With respect to the other part of the

6   tape which has to do with guns supposedly being turned over to

7   Mr. Whitaker and Mr. Thomas on the date of the homicide.  There

8   is something in the tape, which I'm sure the court recalls,

9   about a gun being brought back and not working; a gun being

10  brought back from a robbery that, according to Mr. Burden,

11  never happened.

12         We have been provided with new discovery over the last

13  few days of an interview with Mr. Mallory himself which

14  occurred at the end of July of this very year, right before the

15  trial began.  I think it was on July 29.

16         Mr. Mallory no longer knows whether that particular

17  incident occurred two days after the crime or two days before

18  the crime.  If it occurred two days before the crime, which

19  makes a whole lot more sense, based upon the record in the

20  case, it would have involved an incident that had nothing to do

21  with the crimes with which Mr. Whitaker is charged and would

22  have had nothing to do with the homicide with which Mr. Thomas

23  is charged, although Mr. Thomas is charged in another gun

24  count.

25         In terms of corroborating circumstantial guarantees of

1    trustworthiness, the fact that Mr. Mallory can no longer

2    definitively corroborate what the government's theory is about

3    the tape and that he himself has doubts about whether it

4    happened on that day would militate against its introduction.

5              THE COURT:  Okay.

6              MR. BAUER:  Your Honor.

7              MR. GOLTZER:  Of course I renew each and every

8    argument I made previously.  I'm not asking the court to rule

9    now.

10             I wanted to place on the record the information.

11             THE COURT:  Very well.  Thank you, Mr. Goltzer.

12             MR. BAUER:  Your Honor, I'll just respond briefly

13   because I think Mr. Mallory will speak for himself as to the

14   corroborating circumstances.

15             As to Mr. Goltzer's first point about the blood.  I

16   did say before you two Fridays ago that one of the theories

17   might have been that Mr. Whitaker came in contact with

18   Mr. Henry when he was grabbing his phone and maybe looking

19   through his pockets.  But honestly we're not sure how he got

20   the blood on him.

21             And I agree with Mr. Goltzer.  It appears as though it

22   wouldn't have come from Jeffrey Henry.  We think it came from

23   Anthony Baynes.  Anthony Baynes was stabbed in the back.  He

24   was bleeding excessively enough to smear that whole wall.  He

25   thought he was bleeding so much, that somebody peed on him, if

1    you remember that was his testimony.  And everybody was in this

2    cramped space where everyone was rubbing up against each other.

3    Whether he knew he was rubbing up against Mr. Whitaker or

4    not -- everything was happening so fast.  We don't need to

5    expect that from Mr. Baynes.  We can have the jury and your

6    Honor in this case draw the inference.

7           More importantly this is now -- we have evidence of

8    them in very close proximity with Mr. Baynes bleeding

9    excessively.  We also have the tape.  But then we also have

10   Ramone McDermott who is going to testify that Mr. Whitaker came

11   into the house covered in blood.

12          So the corroborating circumstances are still there on

13   that point.  Nothing has really changed at all except for --

14   except for the point that it doesn't look like it was Jeffrey

15   Henry's blood because he wasn't bleeding outside of his parka.

16          With regards to the second point.  I think Mr. Mallory

17   is going to very credibly testify that he seen Mr. Whitaker

18   with this chrome gun on two occasions, one was a couple days

19   before the murder -- three occasions, excuse me.  One was a

20   couple days before the murder, the day of the murder when he

21   was given the gun, and a couple days later.  And what he's

22   going to say as to -- and based on return the gun to Kev Gotti

23   on two occasions:  Two days before the murder and approximately

24   two days after.  And he'll say:  I don't remember which one --

25   which one it was.  But on one of those two occasions he came

1    back and said this gun doesn't work.  And that's when Kev Gotti

2    said if it doesn't work, point it at my hand and shoot.  He

3    didn't do that.  And Kev Gotti loaded it and pointed it out the

4    window and shot.

5         To be clear, Mr. Mallory has been somewhat unsure

6    about -- of which one of those incidents it was.  Perhaps my

7    notes were a little clearer on this July 30 date.  But he's

8    actually always been consistent on that point, which one it

9    was.

10        And let's not lose the forest from the trees here.

11   Kev Gotti tells the same story here.  So Mr. Mallory, whether

12   it's two days before or two days after, it's still credibly

13   corroborated by a witness who has every reason to be

14   trustworthy and that's Kevin Burden.

15        MR. GOLTZER:  There is nothing in the 3500 material to

16   indicate that version of events.  To the contrary.  The 3500

17   material reflects in the last entry that he's not sure whether

18   it was before or after.  And if this man is going to get up

19   there and testify that it happened on two or three occasions,

20   he's hardly credible.  He's tailoring his testimony, as he's

21   done before.  It's a matter of foundation.  Not a matter of

22   weight.  You can't find circumstantial guarantees of

23   trustworthiness when this man changes his testimony like other

24   people change their shirt.

25        THE COURT:  You say it's in the last entry of the 3500

1    material?  Is that the Mallory 3500 material?

2              MR. GOLTZER:  Yes, your Honor.

3              I'm not sure that they gave you a copy of it, Judge.

4    Did you give the court a copy -- it came to us unnumbered

5    during the trial.

6              THE COURT:  I'm getting updates on a daily basis, I

7    think, as witnesses are called.

8              MR. GOLTZER:  The last three or four pages at the very

9    end.  Not sure whether it was two days before or two days

10   after.  Now we have yet another version.  That's hardly the

11   kind of corroboration.

12             As far as this fellow McDermott testifying, McDermott

13   can testify from today until tomorrow.  The question is whether

14   we have to suffer the double hearsay from a guy named Pop who

15   is not going to testify on this record.

16             By the way, how it is -- I mean I can understand the

17   government contending that when Burden says I gave somebody a

18   gun to commit a robbery, that might be, arguably, a declaration

19   against penal interest.  But the rest of it?  The fact that Pop

20   said something doesn't incriminate Burden at all.

21             MR. BAUER:  Judge, we've already had this argument.

22   I'm not sure we need to do in full again unless your Honor

23   wants.  But on the double hearsay argument, just to be clear

24   when Pop talks to -- there are two levels of hearsay here.  The

25   second level is the 804(b)(3) theory.  And that's the theory of

1    Burden statements to Mallory and why they're admissible against

2    penal interests and trustworthiness and all of that.

3            The first part, from Pop to Burden.  The theory of

4    admissibility there is an 801(d)(2)(E) theory; that is, a

5    coconspirator's statement.  Pop and Gotti, Kev Gotti were

6    selling weed together out of that house and they shared guns in

7    that house and they were in business together.  And the fact

8    that somebody comes to their house with bloody clothes,

9    somebody who by the way also from time to time as you heard --

10   I'm sorry as you will hear from Mr. Mallory would do some sales

11   for them because he hung out there so much.  That first leg of

12   the hearsay is an 801(d)(2)(E) admissibility theory.

13           MR. GOLTZER:  There is no allegation Mr. Whitaker was

14   a member of that conspiracy.  That conspiracy is not charged.

15   There are multiple conspiracies in this case, must be ten or

16   twelve conspiracies in this case.  It's hearsay within hearsay.

17   And it's not a declaration against penal interests.

18           MR. BAUER:  That's correct.  It's not a declaration

19   against penal interests.

20           MR. GOLTZER:  So if the government concedes it's not a

21   declaration against penal interests, it ought not come in

22   because under Rule 403, even if it were arguably a

23   coconspirator's statement -- and there's been no evidence that

24   Mr. Whitaker was a member of a conspiracy with Pop or

25   Mr. Burden at this point -- the probative value is

1   substantially outweighed by the prejudice.  It's just really

2   prejudicial in the context of this case.

3        THE COURT:  So what is the conspiracy pursuant to

4   which Pop and Burden's conversation would be admissible?

5        MR. BAUER:  260 First Street was one of the most well

6   known weed spots in Newburgh.  They sold marijuana out of there

7   24/7.  Kevin Burden lived in that house as did Pop -- Pop was

8   more of an active seller there but Burden sold weed out of the

9   house as well.  What they also used the house for is, you're

10  going to hear ample testimony from numerous witnesses -- just

11  let me finish.

12        MR. GOLTZER:  I am.

13        MR. BAUER:  That you're going to hear from multiple

14  witnesses, including Mr. Mallory, that Mr. Whitaker would use

15  that house to bag up his crack.  He would also use -- he would

16  also, because he was there so often, would make some sales on

17  behalf of Pop and Kevin Burden.

18        THE COURT:  So Whitaker arguably is in a conspiracy

19  with Pop and Burden.  Is that conspiracy charged in this

20  indictment?

21        MR. BAUER:  No.  But I'm not sure that it needs to be

22  charged, your Honor.

23        THE COURT:  Okay.

24        MR. GOLTZER:  Not only that but the statement doesn't

25  further any argument of conspiracy.  It's mere narrative, if

1     it's anything.  It doesn't further any conspiracy.  It's a

2     statement that takes place 18 months after, according to the

3     government, Mr. Whitaker is gone.  One wonders -- if they're

4     talking about Pop's statement, it doesn't further any

5     conspiracy.  It doesn't further Pop's arguable marijuana

6     conspiracy.  The fact that they let Whitaker do some

7     independent stuff there is totally irrelevant to this case.

8     The testimony in the case is that Mr. Whitaker dealt with

9     somebody else.

10           So when all is said and done that particular piece

11    should not come in.  And I think we're absolutely correct on

12    that.

13           If it's not a declaration against penal interests,

14    then its value -- probative value for a statement in

15    furtherance of the conspiracy is minimal and the prejudice is

16    substantial and outweighs it terribly.

17           THE COURT:  Let me get back to the first point, the

18    blood.  I don't mean to step on the government's case or on

19    anyone's defense but do we know how many purported victims

20    there were at 54 --

21           MR. BAUER:  I'm sorry.  How many?

22           THE COURT:  Purported victims.

23           MR. BAUER:  How many people who were actually

24    struck -- who were bleeding?

25           THE COURT:  Bleeding or in the apartment at the time

1    that the robbery took place.

2              MR. BAUER:  There were over five people in the

3    apartment at the time.

4              THE COURT:  Okay.

5              MR. BAUER:  Two of which sustained injuries, as far as

6    we know, both of who will be testifying, Tarrence Smith and

7    Akinto Boone, neither of whom -- there won't be evidence that

8    Tyrell Whitaker came in contact with any of the victims who

9    were inside.  So in terms of the potential that it was their

10   blood, I don't think there will be any evidence to that.

11             THE COURT:  Okay.

12             MR. BAUER:  It feels as though we're rearguing most of

13   what we've already argued and --

14             THE COURT:  We're getting some additional color now.

15             MR. BAUER:  We do have some additional, but

16   Mr. Goltzer characterized your holding as you had reserved.  I

17   recall your holding that it was admissible but that we would

18   check in again right before I played the tape.  And so I would

19   plan -- I would propose that we do the same thing.  I have a

20   big note in my Q and A right before we get to the tape to ask

21   for a sidebar, and I think that's the best way to proceed.  And

22   you'll hear Mr. Mallory testify to a number of things that I've

23   represented he's going to say, you'll hear it from him, and

24   then we can go from there.

25             MR. GOLTZER:  If that's going to happen, I'd like to

1    have a hearing on it where I have an opportunity to

2    cross-examine Mr. Mallory outside the presence of the jury so

3    the court can make a more intelligent finding, not that the

4    Court's finding is not intelligent.

5            THE COURT:  What is the government's theory as to

6    whether or not this conversation, going back to the

7    conversation between Pop and Burden, in what way that was in

8    furtherance of the conspiracy.

9            MR. BAUER:  Judge I'll cite you to Maldonado-Rivera,

10   Second Circuit case from 1990, 922 F.2d 934; as well as United

11   States v. Paone P-A-O-N-E, 782 F.2d 386.  That second case and

12   I quote, says "A further requirement of 801(d)(2)(E) is

13   satisfied when a coconspirator is appraised of the product of

14   the conspiracy or when the statements are designed to induce

15   his assistance.

16           United States V. Burden, it's a different case, "A

17   statement that identifies the role of one coconspirator to

18   another is in furtherance of the conspiracy."

19           And Maldonado-Rivera again stands for the more general

20   concept that when coconspirators are updating each other on

21   what is happening during the conspiracy then it is in

22   furtherance of said conspiracy.

23           THE COURT:  Okay.

24           MR. GOLTZER:  I, of course, dispute that black letter

25   law applying to these particular facts.  Because it has nothing

E8c9chr1                    Trial

 1    to do -- Pop is not a member of any conspiracy to rob or

 2    accomplice to a robbery.  Pop is engaging in gossip or mere

 3    narrative about an incident that occurred that has nothing to

 4    do with his sale of drugs at all.

 5          THE COURT:  Okay.

 6          MR. GOLTZER:  Doesn't further the object of his

 7    conspiratorial agreement with Burden which is to deal marijuana

 8    on a regular basis.  It's gossip.

 9          MR. BAUER:  Here is my last quote from

10    Maldonado-Rivera, Judge.

11          "That statements in furtherance include statements

12    that provide reassurance or seek to induce a coconspirator's

13    assistance, or serve to foster trust and cohesiveness, or

14    inform each other as to the progress or status of the

15    conspiracy."

16          MR. GOLTZER:  That hardly applies here, Judge.

17          THE COURT:  Well I mean.

18          MR. GOLTZER:  It's just a stretch.

19          THE COURT:  I'm familiar with that line of authority.

20    It can be read very expansively to essentially cover any

21    conversation amongst coconspirators.

22          MR. GOLTZER:  If that were the case, then 403 would

23    have no application.

24          THE COURT:  No.  If that were the case then 403 would

25    be the only backstop on that type of conversation.

1          MR. GOLTZER:  I think the government reads it far too

2     broadly.

3          THE COURT:  We'll see what Mr. Mallory has to say at

4     the appropriate time.  And I trust that the government will

5     appraise all of the parties prior to -- obviously will have to,

6     prior to playing the tape.  So we'll hear what he has to say.

7     It's 9:30.  Can we go see her the jury is and bring them in.

8              Is Mr. Baynes here?

9          MR. BAUER:  Just one point on that Mallory/Burden tape

10    so while we're waiting for one second.  In your Exhibit 291T

11    there are six excerpts.  We are only planning on playing the

12    first five and admitting to the jury the exhibit for their

13    assistance -- I'm sorry for their aid, the first five excerpts.

14    We've taken out the sixth.  And so Ms. McInerney has created a

15    new 291T that only uses the first five excerpts, not the sixth.

16         THE COURT:  Okay.

17         And Mr. Buchwald I would ask you to be ready.

18         MR. BUCHWALD:  Yes.  I will be all of three minutes.

19         THE COURT:  Wonderful.

20         MR. BUCHWALD:  All the jurors are here?

21         THE COURT:  All the jurors are not yet here but we're

22    going to check again in 30 seconds.

23      ANTHONY BAYNES, resumed

24         THE COURT:  The jury is here so everyone get

25    yourselves situated.

 1              (Jury present)

 2              THE COURT:  Good morning, everyone.  Please be seated.

 3              Ladies and gentlemen, we will now resume with the

 4    cross-examination of Mr. Baynes.

 5              Mr. Baynes, you're reminded that you are still under

 6    oath and you're reminded once again to please keep your voice

 7    up, okay?

 8              THE WITNESS:  All right.

 9    CROSS-EXAMINATION

10    BY MR. BUCHWALD:

11    Q.  Good morning, Mr. Baynes.

12    A.  Good morning.

13    Q.  Let me ask you to focus again on 54 Chambers Street.  Prior

14    to December 15 of 2010 had you ever been inside of that

15    building?

16    A.  No.

17    Q.  And after December 15, 2010 were you ever in that building?

18    A.  No.

19    Q.  And prior to the time that you entered it, that you've

20    testified about here, on that day, had you been in the

21    building?

22    A.  No.

23    Q.  So, your testimony is -- concerns the one and only time you

24    were ever in that building; is that correct?

25    A.  Yes.

E8c9chr1                         Baynes - cross

1   Q.  Now, Mr. Baynes, do you recall your testimony yesterday

2   about various times in 2008 when you saw Gucci?  Do you

3   remember that testimony?

4   A.  Yes.

5   Q.  And do you remember that testimony about all those times in

6   2009 when you saw Gucci?  Do you recall that testimony?

7   A.  Yes.

8   Q.  And you claim to have seen him in the Heights.  Do you

9   remember that?

10  A.  Yes.

11  Q.  And you claim to have seen him sometimes weekly,

12  sometimes -- do you recall that testimony?

13  A.  Yes.

14  Q.  And the fact of the matter is that you made that testimony

15  up completely, isn't it?

16  A.  No.

17  Q.  The fact of the matter is that you lied to this jury about

18  seeing Gucci in 2008, 2009; isn't that true?

19  A.  No.  No, I didn't.

20  Q.  The fact of the matter is, is it not, that Gucci was not

21  even in Newburgh during 2008, 2009?  Isn't that so?

22  A.  I don't know.  I seen him -- I met him --

23  Q.  Let me ask you this.

24          Is it not a fact that from March 16 of 2008 through

25  September 14 of 2010, except for three days in March of 2010,

E8c9chr1                          Baynes - cross

1    Gucci was in jail upstate?

2    A.  He could have been but that leaves more months of 2008 that

3    we seen each other.  I met him 2008, 2009.

4    Q.  It leaves no months in 2009, does it?

5    A.  No.  But I met him 2008, 2009.  That's what I said.  I seen

6    him days.

7    Q.  Sir, can you account for having told this jury that you saw

8    him throughout 2008 and 2009 when the facts of the matter are

9    that from March of 2008 through September of 2010 he was in

10   jail?

11   A.  Yes.  I --

12              MR. BUCHWALD:  I have nothing further, your Honor.

13              THE COURT:  Mr. Nawaday, any redirect?

14              MR. NAWADAY:  Yes, your Honor.

15   REDIRECT EXAMINATION

16   BY MR. NAWADAY:

17   Q.  Mr. Baynes, you were asked some questions on

18   cross-examination from some of the defense attorneys about what

19   happened on L-1's porch.  Do you remember those questions?

20   A.  Yes.

21   Q.  And why did you leave the porch initially?

22   A.  Because it was too cold.

23   Q.  And do you know where -- who were the people you left at

24   L-1's house that time?

25   A.  Reckless, Bash, Gucci, Bow Wow, and L-1.

E8c9chr1                         Baynes - redirect

1   Q.  Do you know where, if anywhere, any of those people went

2   after L-1's house?

3               MR. GOLTZER:  Objection.  Personal knowledge.

4               THE WITNESS:  No.

5               THE COURT:  Overruled.

6               THE WITNESS:  No.

7   Q.  Do you know whether they might have gone somewhere else

8   to --

9               MR. GOLTZER:  Objection.  Speculation.

10              THE COURT:  That's sustained.

11  Q.  You were asked about whether you had any --

12              MR. GOLTZER:  I can't hear you.

13              MR. BUCHWALD:  Could you keep your voice up.

14              MR. GOLTZER:  Could you use the microphone.

15  Q.  You were asked whether you had any lawful employment in the

16  past, right?

17  A.  Yes.

18  Q.  Do you remember those questions?

19  A.  Yes.

20  Q.  You said you worked at a summer camp?

21  A.  Yes.

22  Q.  Do you know how Reckless made money when you knew him on

23  the street?

24              MR. GOLTZER:  Objection.

25              THE WITNESS:  Um.

1           MR. GOLTZER:  Objection.

2           THE COURT:  Overruled.

3           MR. GREENFIELD:  I didn't ask any questions along

4     those lines.

5           MR. BUCHWALD:  Nobody asked that.  The opposite.

6     Objection.

7           THE COURT:  Overruled.

8     Q.  Do you know whether Reckless had any lawful employment

9     while you knew him out on the streets?

10    A.  No.

11    Q.  Do you know if Bow Wow had any lawful employment when you

12    knew him on the streets?

13    A.  No.

14          MR. GOLTZER:  Same objection.

15          THE COURT:  Overruled.

16    Q.  Do you know if Gucci had any lawful employment while you

17    knew him out on the streets?

18    A.  No.

19          MR. BUCHWALD:  Same objection.

20          THE COURT:  Overruled.

21    Q.  Do you remember questions from one of the defense attorneys

22    about how you made up a number about how many robberies you had

23    done.  Do you remember those questions?

24    A.  Yes.

25    Q.  Were you making up a number or were you estimating?

1    A.   Estimating.

2    Q.   And were those numbers you provided based on facts, things

3    you actually did?

4              MR. GOLTZER:  Objection, leading.

5              THE COURT:  Sustained as to leading.

6    Q.   What were those numbers based on?

7    A.   To give people like an estimate of how many I did around.

8    Q.   And how many robberies had you done when someone was shot

9    and killed?

10   A.   One.

11   Q.   And which one was that?

12   A.   The 54 Chambers.

13   Q.   And who did you do that with?

14   A.   Bash, Reckless, Quay Quay, Bow Wow, Gucci, and Baby E.

15   Q.   And is that an estimate of the number of robberies you've

16   done where someone was shot and killed?

17   A.   No.  That's an exact.

18   Q.   By the way, where is Baby E?  Do you remember those

19   questions about Baby E?

20   A.   Yes.

21   Q.   Do you know where he is?

22   A.   He died.

23   Q.   There are a lot of questions about statements you gave to

24   detectives in the hospital the night of the murder.  Do you

25   remember those questions?

E8c9chr1                          Baynes - redirect

1   A.  Yes.

2   Q.  And you lied to the detectives that night, right?

3   A.  Yes.

4   Q.  You didn't tell them the truth?

5   A.  No.

6   Q.  And the detectives interviewed you over the course of many

7   hours?

8   A.  Yes.

9   Q.  Why were you in the hospital?

10  A.  Because I was stabbed.

11  Q.  Did you get stitches that night?

12  A.  Yes.

13  Q.  Were you on any pain medications?

14  A.  I don't think -- I don't know.

15  Q.  Do you remember everything that was talked about with those

16  detectives?

17  A.  Not everything, no.

18  Q.  And you said you signed some papers; is that right?

19  A.  Yes.

20  Q.  Do you remember everything you signed?

21  A.  Not everything, no.

22  Q.  Were you ever placed under arrest during that night?

23  A.  No.

24  Q.  Do you remember every lie you told them?

25  A.  No.

1  Q.  Do you recall while your state case was pending your lawyer

2  moving to suppress some of the statements you made to the

3  police?

4  A.  Yes.

5  Q.  And do you remember that the basis was that you had been

6  advised of the Miranda warnings but that you made your

7  statements involuntary?  Do you remember that?

8  A.  Yes that -- yes.  Yes.

9  Q.  Did you say yes or you don't know?

10 A.  No.  Yes.

11         MR. BUCHWALD:  He said yes.

12 Q.  So, what is your testimony about whether you got Mirandised

13 or not that night?

14 A.  I told them that I didn't remember that and my lawyer told

15 me that he had to wait until trial to bring it up.

16 Q.  That you didn't remember giving a Miranda waiver?

17 A.  Yes.

18         MR. BUCHWALD:  I'm sorry.  Could you -- we have that

19 answer read back.

20         (Record read)

21         MR. BUCHWALD:  I guess it's the question and answer

22 just before that, your Honor, read.

23         (Record read)

24 Q.  So what is your testimony about whether you got Mirandised

25 or not that night?

1    A.  That I didn't.

2    Q.  Is it that you didn't or you don't remember?

3              MR. GOLTZER:  Objection.

4              THE WITNESS:  I don't remember.

5              MR. GOLTZER:  Move to strike the leading question and

6    answer.

7              THE COURT:  That objection will be sustained.  The

8    answer and the question will be stricken.

9    Q.  Do you remember there were a series of questions on

10   cross-examination when you were asked whether you remember

11   saying certain things to detectives or the ADA.  Do you

12   remember those questions?

13   A.  Yes.

14   Q.  And after some of those questions you were asked -- when

15   you said that you didn't remember saying certain things you

16   were asked do you admit or deny that.  Do you remember those?

17   A.  Yes.

18   Q.  And sometimes you said you denied.  What do you mean by

19   that?  What do you mean by that?  Do you mean you denied

20   talking to --

21             MR. GOLTZER:  Objection.

22             THE COURT:  Let him finish the question.

23   Q.  What do you mean by you denied?  Did you mean denied

24   talking to him or denied just remember saying those things?

25             MR. GOLTZER:  Objection.

1           THE COURT:  Sustained.

2    Q.  What did you mean by "deny"?

3    A.  I met that I didn't -- I didn't remember saying that.  I

4    denied remembering it.

5    Q.  When you spoke to detectives that first night in the

6    hospital did you have a cooperation agreement?

7    A.  No.

8    Q.  And when you spoke to the DA the first times did you have a

9    cooperation agreement?

10   A.  No.

11   Q.  And what was your understanding once you decided you wanted

12   to cooperate what you had to do to get a cooperation agreement?

13   A.  I had to tell everything I did in the past and on each case

14   the truth about it.

15   Q.  And when you told the government about your other robberies

16   and those 30 assaults, had you ever been charged for those --

17   at that time had you ever been charged for those assaults and

18   robberies?

19   A.  No.

20   Q.  Do you know if you're under investigation for those crimes

21   when you brought them to the attention of the authorities?

22   A.  No.

23           MR. BUCHWALD:  Objection.  Speculation.

24           THE COURT:  Overruled.

25           THE WITNESS:  No.

E8c9chr1                           Baynes - redirect

1   Q.  By the way, when you started speaking with the government

2   and telling them about these other crimes, was there any

3   guarantee that you would get a cooperation agreement?

4   A.  No.

5   Q.  And you hope to get time served, right?

6   A.  Yes.

7   Q.  And who decides your sentence?

8   A.  The judge.

9   Q.  And have you been sentenced yet?

10  A.  No.

11  Q.  Do you remember that defense counsel asked you about what

12  you had pled to in the state?

13  A.  Yes.

14  Q.  That you pled to the 54 Chambers robbery?

15  A.  Yes.

16  Q.  But you didn't plead to the murder, right?

17  A.  No.

18  Q.  Did -- at your plea did the state judge know that the

19  robbery you pled to involved the shooting and murder of Jeffrey

20  Henry?

21          MR. GOLTZER:  Objection.  Form.

22          THE COURT:  Sustained.

23  Q.  What's your understanding whether the judge who sentences

24  you will know the facts of the robbery you pleaded guilty to?

25          MR. GOLTZER:  Objection.  Speculation.

1              THE COURT:  Overruled.

2              THE WITNESS:  He knows about the whole case.

3   Everything.

4   Q.  About all the facts of the robbery?

5   A.  Yes.

6   Q.  Do you remember that defense counsel asked you questions

7   about your cooperation agreement?

8   A.  Yes.

9   Q.  As part of your agreement do you have to tell the

10  government about all the people you committed crimes with?

11  A.  Yes.

12  Q.  And some of those people were friends, right?

13  A.  Yes.

14  Q.  Was Quay Quay a friend?

15  A.  Yes.

16  Q.  Was Quay Quay involved in this 54 Chambers robbery?

17  A.  Yes.

18  Q.  And who else do you consider friends?

19  A.  (No response).

20  Q.  Who was involved in the robbery?

21  A.  Reckless, and most of them just people I talked to.

22  Q.  And about how many people have you told the government

23  about who you committed crimes with?

24  A.  About fifteen to twenty.

25  Q.  And if asked to testify against those people, would you

1    have to?

2    A.   Yes.

3    Q.   Are you allowed to lie under your cooperation agreement?

4    A.   No.

5    Q.   As far as you understand what happens if you lie and the

6    defendants are found guilty?  Do you get that recommendation

7    letter?

8    A.   No.

9    Q.   What happens if you tell the truth and the defendants are

10   found not guilty?  Do you get your letter?

11   A.   Yes.

12   Q.   As far as you understand, will the outcome of this case

13   have any effect on your sentence?

14   A.   No.

15   Q.   Some of the defense counsel used the phrase that you sold a

16   story to prosecutors.  Do you remember those questions?

17   A.   Yes.

18   Q.   Is there any doubt in your mind that you were there at 54

19   Chambers with Reckless, Gucci, Bow Wow, Bash, and Baby E to

20   commit a robbery, and Quay Quay?

21   A.   No, no doubt.

22   Q.   Any doubt there was seven of you there?

23   A.   No.

24   Q.   Any doubt that Reckless lost his mask and lost his gun?

25   A.   No.

1    Q.  Any doubt that Gucci and Bow Wow were helping at the door

2    and shooting around the door?

3    A.  No.

4    Q.  Any doubt that you heard a scream of a man on the other

5    side of the door?

6    A.  No.

7              MR. BUCHWALD:  Your Honor objection to this line.

8    It's just a repeat of his direct examination.

9              THE COURT:  Overruled.

10             MR. NAWADAY:  No further questions, your Honor.

11             THE COURT:  Very well.

12             Mr. Goltzer.

13             MR. GOLTZER:  Thank you, sir.

14   RECROSS EXAMINATION

15   BY MR. GOLTZER:

16   Q.  Is there any doubt in your mind that Detective Cortez lied

17   when he said he gave you Miranda warnings?

18   A.  Yes, there's doubt.  Yes.

19   Q.  Today you have a doubt about it?

20   A.  About -- giving.  I always had a doubt about it.

21   Q.  You just said you got no Miranda warnings, right?

22   A.  Yes.

23   Q.  You said Detective Cortez lied about it, right?

24   A.  (No response).

25   Q.  Yesterday?

1   A.  Yes.

2   Q.  You're changing your testimony about it today?

3   A.  No.

4   Q.  Do you have any doubt in your mind that he lied or didn't

5   he lie?

6   A.  I said that I didn't -- I said that I didn't -- I don't

7   think I was Mirandised.

8   Q.  Are you sure that Detective Cortez lied?

9          MR. NAWADAY:  Objection.  Asked and answered.

10          THE COURT:  Overruled.

11          THE WITNESS:  He gave me a whole bunch of papers to

12   sign.  He never read me them, but he could have had me sign

13   them without knowing what I was signing.

14   Q.  Are you sure that he never read you your Miranda warnings?

15   A.  Yes.

16   Q.  Are you as sure about that as you are about the rest of

17   your testimony in this case?

18   A.  Yes.

19   Q.  You indicated in response to a question on redirection that

20   your statements were involuntary.  Do you remember saying that?

21   A.  Yes.

22   Q.  What does that mean?

23   A.  Nobody couldn't come see me.  They wouldn't let nobody in.

24   They wouldn't let me do anything.  I couldn't leave.  Nothing.

25   Q.  Does that mean you were forced to lie?

E8c9chr1                         Baynes - recross

1  A.  No.  I was giving them a story so I could leave and

2  people --

3  Q.  So you lied because you wanted to leave?

4  A.  And to stay out of trouble.

5  Q.  Is that right?

6  A.  Yes.

7  Q.  Did the police force you to lie?

8  A.  No.

9  Q.  Whose idea was it to lie?

10  A.  Mine.

11  Q.  Whose idea was it to lie on the evening of December 15,

12  early morning of December 15, yours or Cortez?

13  A.  Mine.

14  Q.  Who made up the lies, you or Cortez?

15  A.  Me.

16  Q.  Who was trying to fool the police, you or Cortez?

17  A.  Me.

18  Q.  On the morning for three hours from 9 o'clock to noon when

19  you lied for hours and hours, did anybody force you to lie?

20  A.  No.

21  Q.  Whose idea was it to lie?

22  A.  Mine.

23  Q.  How many lies did you make up?

24  A.  I don't know.

25  Q.  You can't blame Cortez for that, can you?

1            MR. BAUER:  Objection.

2            THE COURT:  Overruled.

3            THE WITNESS:  I wasn't blaming him.

4    Q.  It wasn't involuntary, was it?

5    A.  No.

6    Q.  You lied because you wanted to lie?

7    A.  Yes.

8    Q.  You volunteered the lies?

9    A.  No.

10   Q.  Do you know what voluntary means?

11   A.  That means you offer, like.  I never went to him.  He came

12   to me.

13   Q.  Did you offer the lies to them of your own free will?

14   A.  No.  They --

15   Q.  They forced you to lie?

16   A.  I told lies after they told me I couldn't leave.  I had to

17   stay there.  And they wouldn't let nobody else see.  I didn't

18   volunteer nothing.

19   Q.  When you went to the district attorney's office in Orange

20   County and spoke to Haberman in May of 2011 nobody forced you

21   to go there, did they?

22   A.  No.

23   Q.  Nothing you said to them was involuntary, was it?

24   A.  No.

25   Q.  And you told one of the lawyers yesterday that most of what

1    you said during that meeting was a lie, right?

2    A.   Yes.

3    Q.   Those lies weren't involuntary, were they?

4    A.   No.

5    Q.   You were trying to sell a story, weren't you?

6    A.   Yes.

7    Q.   And you were lying to do it?

8    A.   Yes.

9    Q.   And that was before you had a cooperation agreement?

10   A.   Yes.

11   Q.   And before you had the cooperation agreement you changed

12   your story from Bash and Baby E to Bow Wow and Thomas, right?

13   A.   I didn't change it.  I told them most --

14   Q.   You added them to it, right?

15   A.   Yes.

16   Q.   And when you got a cooperation agreement, the judge in

17   Orange County told you at the time you pled guilty you can't

18   change your testimony?  Didn't he tell you that?

19   A.   He -- no.

20   Q.   He said you made a promise, you had to keep it?  Right?

21   A.   He told me to tell the truth.  That's it.

22   Q.   He told you you had to keep a promise, didn't he?

23   A.   No.  He said -- he just told me I had to tell the truth.  I

24   don't, then this happens.

25   Q.   You didn't get the cooperation agreement until after you

1    changed your story, did you?

2    A.  No.

3    Q.  And now you know you have to stick with your story, don't

4    you?

5    A.  I know -- I changed up stuff once I figured certain stuff

6    was wrong, it was written wrong, that doesn't matter; it's just

7    the truth, whatever is the truth.

8    Q.  What happens to you if you change your story?

9    A.  It's the truth.  Whatever the truth is.

10   Q.  Is there a difference -- do you speak differently when you

11   lie or tell the truth or do you speak the same?

12   A.  I don't know.

13   Q.  You don't know?  When you speak lies do you try to come

14   across as being honest?

15   A.  I don't know.

16   Q.  When you lie, do you tell people:  By the way don't believe

17   what I'm telling you, I'm a liar?

18   A.  No.

19   Q.  When you lied to the police were you trying to get them to

20   believe you were telling the truth?

21   A.  Yes.

22   Q.  When you lied to Haberman in May of 2011 were you trying to

23   get Haberman to believe you were telling the truth?

24   A.  Yes.

25   Q.  When you went to these prosecutors' offices did you want

E8c9chr1                     Baynes - recross

1    them to believe you were telling the truth?

2    A.   When -- once I was telling the truth, yes.

3    Q.   And when you speak to this jury you want them to believe

4    you're telling the truth?

5    A.   Since I'm telling the -- yes.

6    Q.   And they're supposed to rely on your word for that?

7    A.   Yes.

8    Q.   Thank you.

9             MR. GREENFIELD:  Very briefly.

10   RECROSS EXAMINATION

11   BY MR. GREENFIELD:

12   Q.   A few moments ago Mr. Nawaday asked you some questions

13   about the porch that you were on on Dubois Street.  Do you

14   remember those questions?

15   A.   Yes.

16   Q.   Is that the abandoned house that you were talking about

17   yesterday?

18   A.   I don't know if it's abandoned or not.

19   Q.   Did you ever refer to it as anything other than an

20   abandoned house before the questions about -- you heard from

21   Mr. Nawaday this morning?

22   A.   I never said it was abandoned.

23   Q.   You never said that?

24   A.   No.

25            MR. GREENFIELD:  No further questions.

1          MR. BUCHWALD:  No questions.

2          THE COURT:  Okay.  Nothing.

3          Mr. Baynes, you may step down.

4          (Witness excused)

5          MR. BAUER:  Your Honor, a couple of housekeeping items

6     before we call our next witness.

7          The first has to do with the faceplates that are on

8     the board here.  I think with defense counsel's consent we had

9     agreed to wait until Mr. Baynes' testimony was complete.

10          The government is going to now move into evidence the

11     full name, the government names of the witnesses on the board

12     for whom they're not there already.

13          THE COURT:  Is this on consent?

14          MR. BAUER:  I believe -- when we talked about it a

15     couple days ago it was on consent.

16          MR. GOLTZER:  It is.

17          THE COURT:  Very well.

18          MR. BAUER:  Just for the record the government is now

19     moving to admit Government Exhibit 204A, which is the name

20     James Williams; 205A which is the name Rashawn -- I'm sorry.

21     James Williams is L-1.

22          Rashawn Vassell is Bash.

23          We're moving now 206A, Kevin Burden, who is Kev Gotti.

24          208A, which is Eric Cromartie, Baby E.

25          220A.  That's Jamar Mallory, J-Mark.

E8c9chr1                    Baynes - recross

1          And 221A.  That's Jeffrey Henry, the victim.

2          In addition, it's the two defendants' names, Glenn

3    Thomas 202A, that's Gucci.  And 203A, Tyrell Whitaker, that's

4    Bow Wow.

5          THE COURT:  Okay.  There being no objection, 203A,

6    202A, 204A, 205A, 206A, 208A, 220A, and 221A will be received.

7          (Government's Exhibits 203A, 202A, 204A, 205A, 206A,

8    208A, 220A, and 221A received in evidence)

9          MR. BAUER:  Thank you, your Honor.  And at this time

10   the government would like to read a stipulation.

11         THE COURT:  Very well.

12         MR. BAUER:  First has been marked for identification

13   as Government Exhibit 901.

14         It's hereby stipulated and agreed, by and between the

15   United States of America, by Preet Bharara, United States

16   Attorney for the Southern District of New York, Andrew Bauer

17   and Kan M. Nawaday, Assistant United States Attorneys, of

18   counsel, and Raymond Christian, the defendant, by and through

19   the consent of his attorneys David Greenfield and Anthony

20   Strazza, Esquires, that if called to testify a court custodian

21   from Orange County Court would testify that pursuant to their

22   review of plea transcripts and certificates of conviction

23   maintained by the Orange County clerk's office -- I'm sorry --

24   the county court clerk's office that stemming from his arrest

25   on or about October 7, 2010 Raymond Christian pled guilty on or

1    about April 21, 2011 in Orange County court of criminal

2    possession of a weapon in the second degree, a loaded firearm,

3    in violation of New York Penal Law Section 265.03(3).

4            The parties further agree that this stipulation may be

5    received in evidence as a government exhibit at trial.

6            It was signed and dated August 1, 2014.

7            New York, New York.  Signed by the government as well

8    as Mr. Christian's attorney.

9            THE COURT:  Very well.  Exhibit 901 will be received.

10           (Government's Exhibit 901 received in evidence)

11           MR. BUCHWALD:  Limiting instruction.

12           THE COURT:  With respect to the stipulation that's

13   just been read you've heard testimony by way of stipulation

14   that Mr. Christian pleaded guilty to a gun charge in Orange

15   County.  You can only consider this testimony against

16   Mr. Christian in deciding whether or not the government has

17   proven its case against him.  And you cannot consider it in any

18   way against either Mr. Thomas or Mr. Whitaker.

19           MR. BAUER:  And then one more stipulation, your Honor.

20           It's Government Exhibit 906.  It is hereby stipulated

21   and agreed, by and between the United States of America, by

22   Preet Bharara, the United States Attorney for the Southern

23   District of New York, Andrew Bauer and Kan M. Nawaday,

24   Assistant United States Attorneys, of counsel, and Tyrell

25   Whitaker, the defendant, by and through the consent of his

1    attorneys, George Goltzer and Ying Stafford, Esquires, that:

2                    If called to testify David L. Wurtz, a forensic

3    scientist with the New York State Police Department Mid-Hudson

4    Regional Crime Laboratory in Newburgh, New York would testify

5    that on or about July 31, 2014 he performed an examination of

6    Government Exhibit 151 which was recovered by Newburgh police

7    department officers on or about August 12, 2010.  Based on that

8    examination Mr. Wurtz would testify that Government Exhibit 151

9    consisted of one plastic bag with six glassine envelopes

10   inside, each containing a powdery substance.  Mr. Wurtz would

11   further testify that he examined only one of those six glassine

12   envelopes which weighed approximately .055 grams and that the

13   substance contained within that glassine envelope from

14   Government Exhibit 151 tested positive for the presence of

15   heroin.

16                   Second.  If called to testify, a law enforcement agent

17   with the Drug Enforcement Administration, DEA, would testify

18   that heroin is not grown in New York state and must be imported

19   from out of state.

20                   Signed and dated:  August 4, 2014.

21                   New York, New York.  Signed by the government and

22   Mr. Whitaker's attorneys.

23                   At this time the government would move to admit

24   Government Exhibit 906 into evidence.

25                   MR. GOLTZER:  No objection.

E8c9chr1                    Baynes - recross

1              THE COURT:  And 906 will be received.

2              (Government's Exhibit 906 received in evidence)

3              MR. BUCHWALD:  Limiting instruction.

4              THE COURT:  And with respect to this stipulation as

5    well you've heard testimony by way of stipulation that certain

6    forensic examinations were done in connection with heroin that

7    presumably was taken from Mr. Whitaker.  You can only consider

8    this testimony against Mr. Whitaker and in deciding whether or

9    not the government has proven its case against him and you may

10   not consider it in any way against either Mr. Christian or

11   Mr. Thomas.

12             MR. BAUER:  Judge, at this time can we ask for a very

13   brief sidebar.

14             THE COURT:  Certainly.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. BAUER:  Judge we are -- our plan was to call a

3    number of law enforcement witnesses this morning.  Most

4    importantly was Roberta Goodman who we had represented to you,

5    and most importantly to Mr. Greenfield and Mr. Strazza that

6    Ms. Goodman -- sorry, Sergeant Goodman would testify before the

7    DNA expert.  She got a late start to the morning.  She is on

8    her way but she is probably one to two hours away.  We then

9    tried to --

10          THE COURT:  Late start meaning she just left?

11          MR. BAUER:  Yes.

12          MR. GOLTZER:  She needs her sleep.

13          MR. BAUER:  So then we audibled and tried to get the

14    other police officers here just to have them ready.  None of

15    them are here yet.  I don't have an explanation.

16          Who we do have ready to go, a Jamar Mallory, who is

17    sitting in the back right now.  What I would propose we do is

18    have Mr. Mallory, for at least through the break and if not all

19    the way through lunch and then -- this keeps happening in this

20    case -- and then interrupt him with Goodman and then the DNA

21    expert.  The most important consideration for us in terms of

22    scheduling is the DNA expert.  We need him to testify today

23    because of his personal obligations.

24          MR. GREENFIELD:  I have a long cross of that man.

25    What are you saying, I've got to finish by five o'clock because

1    he's got a vacation?  I don't think that makes a difference to

2    me.  I really don't.  My client is looking at life in jail.  I

3    could care less about your witness's vacation.

4              THE COURT:  You know when --

5              MR. BAUER:  He's here right now.  We can put him on

6    the stand right now.

7              MR. GREENFIELD:  Just we have to establish we had that

8    chain of custody issue now breaking it again.

9              MR. BAUER:  Judge we can put Mallory on for an hour

10   and as soon as we get a thumbs-up that she's here we can

11   interrupt Mallory and put her on right way.  She's going to be

12   a very quick witness.  And then spend as much time as

13   Mr. Greenfield field wants with the DNA expert.  But I don't

14   want to waste the time now.  I'm sure you don't either.

15             THE COURT:  Absolutely.

16             MR. GOLTZER:  If Mallory takes the stand I would hope

17   that you would just do non-consequential background and Giglio

18   and we don't have to have the jury hear damaging testimony and

19   then wait for some cross-examination for a day or two.

20             Certainly you have an hour's worth of background.

21             THE COURT:  Do you have an hour's worth of Giglio?

22             MR. BAUER:  We've got a lot of Giglio.

23             MR. GOLTZER:  That's why I said it, Judge.

24             MR. BAUER:  Here is what I was going to do -- what I

25   was going to do is just do a very preliminary:  How do you know

1   him -- how do you know these three defendants; have you seen

2   them commit some crimes.  Very top level.  And then go into the

3   Giglio.  And then an hour later return to the meat behind how

4   he's seen them commit crimes.  So I'm going to do that.  That

5   whole thing will take five minutes tops.  And then we'll do 55

6   minutes of Giglio.

7           MR. GOLTZER:  I defer to Mr. Greenfield.  Do you have

8   a position, David?  You've got the main problem today.

9           MR. GREENFIELD:  I don't know that I'm going to be

10  able to finish my cross on your DNA expert.  So I don't want

11  him on the stand until I've got a full day to do it.

12          MR. NAWADAY:  I don't know if I'm interrupting at the

13  wrong moment but I can confirm for Mr. Greenfield that if

14  necessary Mr. Myers can stay overnight again.  They'll pay for

15  another hotel for him.  And he will still be available tomorrow

16  if you have not completed your cross-examination.

17          MR. GREENFIELD:  Let's just do Mallory today then.

18          THE COURT:  Not going to step on the government's

19  choice.

20          MR. GREENFIELD:  The idea of splitting witnesses;

21  direct here, direct there, not completing cross.  A main

22  witness should be right through without interruption.

23          MR. BAUER:  What I propose, Judge --

24          MR. GREENFIELD:  Finish Mallory.

25          MR. BAUER:  He's going to take quite some time too.

E8c9chr1                         Baynes – recross

1            What I propose is that let's –– let me do Mallory

2    through the break.  Let me reconnect because we're on –– we're

3    sitting here now.  I haven't had a chance to really know where

4    all the witnesses are.  It will be fairly uncontroversial

5    except for kind of a top level of what he knows about the

6    witnesses and then we'll check in then.  Okay.

7            MR. GREENFIELD:  Okay.  That's fair enough.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (In open court)

 2              THE COURT:  Mr. Bauer.

 3              MR. BAUER:  Your Honor, the government calls Jamar

 4      Mallory.

 5              THE COURT:  Mr. Mallory please step into the witness

 6      stand and remained standing and face the clerk.

 7              Mr. Mallory, please be seated and please pull your

 8      chair up.  You're going to be speaking directly into the

 9      microphone.  I want you to speak slowly and clearly and I want

10      you to begin by stating your full name and spell your last name

11      for the record.

12        JAMAR MALLORY,

13           called as a witness by the Government,

14           having been duly sworn, testified as follows:

15              THE COURT:  Mr. Mallory, did you need your glasses?  I

16      saw you had some difficulty with your glasses.

17              Do you want to take a moment to pull them together.

18              MR. BAUER:  Your Honor, may I?

19              THE COURT:  You may.

20      DIRECT EXAMINATION

21      BY MR. BAUER:

22      Q.  Good morning, Mr. Mallory.

23      A.  Good morning.

24      Q.  How old are you?

25      A.  Twenty-seven.

1           THE COURT:  Mr. Mallory, I want you to keep your voice

2   up and speak directly into the microphone, okay.

3   Q.  Pull the microphone a little closer to you.

4           You said you're 27?

5   A.  Yes, sir.

6   Q.  When did you turn 27?

7   A.  November 30.

8   Q.  How far -- to what grade did you go in school?

9   A.  The last grade I completed was tenth, so tenth.

10  Q.  Where did you attend the tenth grade?

11  A.  Newburgh Free Academy in Newburgh.

12  Q.  And where did you grow up?

13  A.  Newburgh.  The Heights area.  And Renwick.

14  Q.  You said Renwick?

15  A.  Renwick.  Yes, sir.

16  Q.  Did you have any nicknames in Newburgh, Mr. Mallory?

17  A.  Just J-Mark.

18  Q.  J-Mark?

19  A.  Yes, sir.

20  Q.  Have you ever held any legitimate jobs in your life?

21  A.  Yes, sir.

22  Q.  What kinds of jobs have you had?

23  A.  Warehouse jobs, temp agency jobs, babysitting jobs.

24  Q.  What was your most recent job that you had?

25  A.  I forget the name of it but it was like a week or

E8c9chr1                        Mallory - direct

1    two-week -- it was a little bit before I turned myself in to --

2    September 2012.  It was working for cleaning and folding

3    hospital towels and blankets and stuff.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  Were you a member of any gangs in Newburgh, Mr. Mallory?

2  A.  Yes, sir.

3  Q.  What gang was that?

4  A.  Bloods.

5  Q.  So you said you turned yourself in in September of 2012.

6  Is that what you said?

7  A.  Yes, sir.

8  Q.  I want to draw your attention to a little earlier, to

9  January 24, 2012.  What, if anything, happened to you that day?

10  A.  I was arrested.

11  Q.  What were you arrested for?

12  A.  For drugs or holding drug paraphernalia or something.

13  Q.  Who were you arrested by?

14  A.  Newburgh Police Department.

15  Q.  Where were you?

16  A.  In Newburgh on West Parmenter Street.

17  Q.  After you were arrested were you incarcerated?

18  A.  Yes, sir.

19  Q.  For how long?

20  A.  About 24 hours.

21  Q.  What, if anything, did you do the following day after you,

22  around the time that you got out of jail?

23  A.  I started to cooperate.

24  Q.  When you say started to cooperate, what do you mean?

25  A.  I helped the Newburgh Police Department.

1    Q.  Since that arrest, have you pled guilty to committing any

2    federal crimes?

3    A.  Yes, sir.

4    Q.  What crimes have you pled guilty to committing?

5    A.  Robbery, conspiracy to robbery, providing guns for robbery,

6    selling drugs, conspiracy to drugs, and brandishing a firearm.

7    Q.  Why did you plead guilty to those crimes?

8    A.  Because I was guilty of them.

9    Q.  When you pled guilty, did you do so pursuant to a

10   cooperation agreement with the government?

11   A.  Yes, sir.

12   Q.  What are some of the things that that agreement requires

13   you to do?

14   A.  Stay out of trouble, testify, and don't lie.  Tell the

15   truth.

16   Q.  You said earlier that you turned yourself in, in September

17   of 2012.  Have you been in jail ever since?

18   A.  Yes, sir.

19   Q.  Mr. Mallory, looking around the courtroom today, do you

20   recognize anyone from Newburgh?

21   A.  Yes, sir.

22   Q.  Let me ask you, before I ask you who, do you need those

23   glasses to see them?  Because, if not, you can take them off.

24   A.  Just to see them.  I will take them off after.  I can't see

25   good without them.

1          MR. GREENFIELD:  I didn't hear the answer.

2          THE COURT:  What was the last part of that answer?

3          THE WITNESS:  I can't see that good without them.

4    Q.  So you need them to see that distance?  Is that what you

5    are saying?

6    A.  Just that distance.  It's to see the faces of the people.

7    Q.  Do you see one person or more than one person from Newburgh

8    here?

9    A.  I see three people.

10   Q.  So let's do one at a time.  Can you point to one of the

11   people who you know and describe an article of clothing that

12   they're wearing.

13   A.  Yes.  I see him right there.  His name is Reckless.  He got

14   a white shirt on, button shirt on, collar shirt.

15          MR. BAUER:  Your Honor, can we let the record reflect

16   that Mr. Mallory has identified the defendant Raymond

17   Christian.

18          THE COURT:  The record will so reflect.

19   Q.  Who else do you see here from Newburgh?

20   A.  I see Bow Wow right there.  He got I think like a light

21   green button-up shirt on.

22   Q.  Let the record reflect that Mr. Mallory has identified the

23   defendant Tyrell Whitaker.

24          THE COURT:  The record will so reflect.

25   Q.  And the third person that you know from Newburgh?

1   A.  Gucci.  He got a brown button shirt.

2          MR. BAUER:  Your Honor, if the record can reflect that

3   Mr. Mallory has identified Glen Thomas the defendant.

4          THE COURT:  The record will so reflect.

5   Q.  Let me ask you about each of them briefly, Mr. Mallory, and

6   then we will turn to them later.  Asking you first about the

7   individual you identified as Reckless, did you know him by any

8   other names other than Reckless?

9   A.  Prada.

10  Q.  Prada?

11  A.  Yes.  That's it.

12  Q.  Was he affiliated with any gangs in Newburgh?

13  A.  Yes.

14  Q.  What gang was that?

15  A.  Star Status.

16  Q.  How do you know Reckless?

17  A.  Because he was staying with my wife cousin.  Freaky and I

18  used to sell drugs around the area where he used to hang out

19  at.

20  Q.  Your wife's cousin is named Freaky?

21  A.  Yes, sir.

22  Q.  Mr. Mallory, have you ever seen Reckless commit any crimes?

23  A.  Yes, sir.

24  Q.  What kind of crimes have you seen Reckless commit?

25  A.  Sell drugs and carry a gun.

E8cnchr2                          Mallory - direct

1   Q.  When you say sell drugs, what kind of drugs?

2   A.  Crack.

3   Q.  Let's turn to the individual you identified as Bow Wow.

4   How do you know him?

5   A.  I know Bow Wow because he used to hang out with a close

6   friend of mines, Kevin, Kev Gotti, and I used to sell drugs

7   around the area where he used to hang out at also.

8   Q.  Was Bow Wow affiliated with any gangs in Newburgh?

9   A.  Yes.

10  Q.  What gang or gangs is that?

11  A.  Ashy Bandits and Bloods.

12  Q.  You said Ashy Bandits and --

13  A.  Bloods.

14  Q.  Have you ever seen Bow Wow commit any crimes?

15  A.  Yes, sir.

16  Q.  What types of crimes have you seen him do?

17  A.  I have seen him carry a gun, and I've seen him sell drugs.

18  Q.  What kind of drugs did you see him sell?

19  A.  Heroin and crack.

20  Q.  Then, finally, the individual you identified as Gucci, how

21  do you know him?

22  A.  I grew up with him, and I knew him for a long time, I grew

23  up with him.

24  Q.  So you have known him since you were a kid?

25  A.  Yes, sir.

1    Q.  Was Gucci affiliated with any gang or gangs in Newburgh?

2    A.  Yes, sir.

3    Q.  What gang or gangs was he affiliated with?

4    A.  Crips and Bloods.

5    Q.  Was he affiliated with the Crips and the Bloods at the same

6    time?

7    A.  No, sir, he was a Crip at one time and he was a Blood at

8    another time.

9    Q.  Have you ever seen Gucci commit any crimes?

10   A.  Yes, sir.

11   Q.  What kind of crimes have you seen him do?

12   A.  I seen him carry a gun and sell drugs and rob people.

13   Q.  You said carry guns.  You have seen him sell drugs and rob

14   people?

15   A.  Yes, sir.

16   Q.  What drugs have you seen him sell?

17   A.  Marijuana and crack.

18   Q.  Have you seen him rob people?

19   A.  Yes, he robbed me before.

20   Q.  So, Mr. Mallory, you have said that you have seen each of

21   them with guns, is that right?

22   A.  Yes, sir.

23   Q.  Did you ever give any of them guns?

24   A.  Yes, sir.

25   Q.  Were you ever present when another person gave them guns?

E8cnchr2                          Mallory - direct

1   A.  Yes, sir.

2   Q.  Which one of the defendants did you give guns or were you

3   present for when another person gave them guns?

4   A.  Bow Wow and Gucci.

5   Q.  For what purpose did you give those guns?

6   A.  To commit a robbery, commit a crime.

7   Q.  Approximately when did that happen that you gave guns to

8   Bow Wow and Gucci to commit a robbery?

9   A.  Late 2000s, like 2010.

10  Q.  Did you talk to them about what they did with the guns?

11  A.  After.  I talked to one of them after.

12  Q.  Who did you talk to?

13  A.  Gucci.

14  Q.  Did you hear Bow Wow talk about what had happened with the

15  guns.

16          MR. GOLTZER:  Objection.  Leading.

17          THE COURT:  Overruled.

18  A.  Repeat that question one more time.

19  Q.  Did you hear Bow Wow talking to anyone about what happened

20  with the guns?

21  A.  Yes, sir.

22  Q.  How about -- I'm sorry.  So in a sentence or two, what did

23  Gucci say about what they did with those guns?

24  A.  Gucci told me that a robbery took place with those guns and

25  they got shot.  They shot the guns off at the robbery.

E8cnchr2                          Mallory – direct

1              MR. GOLTZER:  Your Honor, I respectfully object.  May

2     we have a sidebar.

3              THE COURT:  Sure.

4           (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MR. GOLTZER:  With all due respect to my adversary, I

3     thought this was going to be a fairly inconsequential direct to

4     tread water until the other witnesses came.  Now we are right

5     into admissions that I won't be able to address for a long

6     period of time because we are breaking up the case.  I object

7     to it.  That wasn't what I expected from the prosecutor's

8     representations.

9          MR. BAUER:  I thought I was pretty clear.  I said it

10    was going to be do about five minutes or less --

11         MR. GOLTZER:  You said you were going to be at a very

12    superficial legal.  This is hardly superficial.

13         MR. DRATEL:  One of the other problems, your Honor, I

14    might ordinarily object to sort of these omnibus introductions

15    of generalized statements and get time frame and specifics all

16    of that, which I don't want to do because then it's going to

17    put us in the position that Mr. Goltzer is concerned with.  I

18    think if we can move on --

19         MR. GOLTZER:  We ought to get to the Giglio.  I didn't

20    object when he said we were dealing some drugs because that's

21    really inconsequential.  But confessing to a murder seems to be

22    a little more consequential.

23         THE COURT:  OK.  Can you move forward, Mr. Bauer?

24         My understanding of what you had indicated was that

25    you would go over very briefly, five or so minutes, about how

1    Mr. Mallory knew them and how he had observed them committing

2    crimes and then you would go into Giglio.

3            MR. BAUER:  I'm sorry if that wasn't clear.  I really

4    have like two questions left on this.  That's fine.

5            MR. GOLTZER:  The next question I don't want you to

6    ask.

7            MR. BUCHWALD:  We would ask that the last question and

8    answer be struck, so it comes in just once in the proper

9    sequence as opposed to coming in now and then being repeated a

10   second time later.

11           THE COURT:  There is no such thing as a proper

12   sequence.  So that application would be denied.  But do move

13   on.

14           MR. BAUER:  If it's OK, may I say Mr. Mallory I'll

15   come back to this later, and then I will move on.

16           THE COURT:  That's fine.

17           (Continued on next page)

18

19

20

21

22

23

24

25

1              (In open court)

2    Q.  Mr. Mallory, I am going to return to talking about the

3    defendants and things they have told you in a bit.  Before we

4    do that, I want to talk a little bit more about you.

5              Mr. Mallory, have you ever used drugs?

6    A.  Yes.  Sir.

7    Q.  What types of drugs?

8    A.  I used marijuana, I used PCP, angel dust, cocaine, and I

9    tried ecstasy.

10   Q.  Let's talk about the marijuana first.  Around when did you

11   start?

12   A.  Early 2000s, around early 2000s.

13   Q.  At that time, when you started using, were you doing it

14   every day?

15   A.  No.

16   Q.  Did there come a point in time in your life when you

17   started using marijuana on a more frequent basis?

18   A.  Yes, sir.

19   Q.  Around when?  How old were you?

20   A.  Around 15.

21   Q.  Around 15?

22   A.  Yes, sir.

23   Q.  Up until the point that you were in jail, did you use it

24   more consistently then?

25   A.  Yes, sir.

E8cnchr2                          Mallory - direct

```
 1   Q.  By more consistently, is that on a daily basis or something
 2   else?
 3   A.  Probably like every couple of days I was smoking.
 4   Q.  I believe you mentioned PCP.  When you say PCP, what do you
 5   mean?
 6   A.  Angel dust.
 7   Q.  Around when did you start using PCP?
 8   A.  Mid 2000s.
 9   Q.  And back then, when you started using, how often were you
10   doing that?
11   A.  Every couple of days, like every couple of days.
12   Q.  Did there come a point in time when you increased how much
13   you were using angel dust?
14   A.  Yes, sir.
15   Q.  Around when?  What time in your life was around that?
16   A.  Late 2000s, around the time that my daughter came.
17         MR. GREENFIELD:  I'm sorry, your Honor.  I couldn't
18   hear.
19   Q.  You said around the time that you had a kid?
20   A.  Yes, sir.
21   Q.  You also mentioned that you used cocaine?
22   A.  Yes, sir.
23   Q.  Around what time did you start using cocaine?
24   A.  Late 2000s also.
25   Q.  Around that same time?
```

E8cnchr2                          Mallory - direct

1   A.  Yes, sir.

2   Q.  How often did you use cocaine?

3   A.  Every like once or twice a week.

4   Q.  You mentioned ecstasy as well?

5   A.  Yes, sir.

6   Q.  When did you first try ecstasy?

7   A.  Early 2000s.

8   Q.  How many times have you taken ecstasy?

9   A.  Only twice.

10  Q.  Mr. Mallory, are you still using those drugs now?

11  A.  No, sir.

12  Q.  When did you stop using them?

13  A.  September 2012.

14  Q.  That's when you said earlier you turned yourself in?

15  A.  Yes, sir.

16  Q.  Mr. Mallory, have you ever sold drugs?

17  A.  Yes, sir.

18  Q.  Where?  In what city or cities have you sold drugs?

19  A.  Newburgh, New York.

20  Q.  Which drugs did you sell in Newburgh?

21  A.  Crack, cocaine, heroin, OxyContin, ecstasy, angel dust,

22  marijuana.

23  Q.  Out of all those drugs, was there one drug that you sold

24  more often than the others?

25  A.  Yes, sir.

E8cnchr2                                Mallory - direct

1    Q.   What was that?

2    A.   Crack cocaine.

3    Q.   Did you sell all those drugs at the same time, or were

4    there any of periods of your life that you sold them?

5    A.   There was different periods of my life.

6    Q.   What was the first drug that you ever sold?

7    A.   Marijuana.

8    Q.   When was that?  How old were you or what year?

9    A.   This is early 2000s.

10   Q.   How did you get the marijuana that you sold that first

11   time?

12   A.   My cousin stoled it from his mother's boyfriend.

13   Q.   And how much money did you sell?

14   A.   About 10, 10 nickel bags of it.

15   Q.   When did you first start selling crack?

16   A.   Early 2000s, also.

17   Q.   But after when you did that first marijuana sale?

18   A.   Yes, sir.

19   Q.   When you were selling crack that first time, was it by

20   yourself or with other people?

21   A.   It was with another person.  It wasn't by myself.

22   Q.   Who was it with?

23   A.   A friend of mines, a close friend of mines.

24   Q.   What's that friend's name?

25   A.   Gank, Gabriel, Gabriel Alfred.

E8cnchr2                        Mallory - direct

1   Q.  His nickname was Gank?

2   A.  Gank, yes, sir.

3   Q.  Where did you sell that crack?

4   A.  Newburgh, New York.

5   Q.  Do you remember where in Newburgh?

6   A.  On Broadway.

7   Q.  How did you get the crack that you sold that first time?

8   A.  He stoled it from his older brother.

9   Q.  Do you remember how much he stole?

10  A.  About 20 $10 bags of it.

11  Q.  Did you sell it all?

12  A.  No.

13  Q.  Between you and Gank, did you sell it all?

14  A.  Yes, sir.

15  Q.  Did you only sell part of it, then?

16  A.  I sold part of it.  I sold about ten of them.

17  Q.  Did there come a point in time when you started selling

18  crack more consistently?

19  A.  Yes, sir.

20  Q.  When was that?

21  A.  Mid 2000s.

22  Q.  Why did you start selling more frequently?

23  A.  Because I had a kid and I needed money, and that was my

24  only source of income I had at the time.

25  Q.  Would you sell crack every day?

E8cnchr2                        Mallory - direct

1    A.   Yes, sir.

2    Q.   And between the mid 2000s and your arrest in January 2012,

3    did you sell crack consecutively, straight without any

4    interruptions?

5    A.   No.

6    Q.   How often then during that time period were you selling

7    crack?

8    A.   When I wasn't working, I would sell crack, or when I wasn't

9    working I would sell drugs.

10   Q.   When you say working, you mean working one of those

11   legitimate jobs you talked about earlier?

12   A.   Legitimate jobs, yes, sir.  Yes, sir.

13            MR. BAUER:  Ms. McInerney if you can pull up

14   Government Exhibit 250, which is already in evidence.

15            Thanks.

16   Q.   Mr. Mallory, do you see on the screen there, it is

17   Government Exhibit 250.  Don't worry about the map right now.

18   Just hold on to your glasses.  We can talk through this.

19   A.   All right.

20   Q.   Generally speaking, where in Newburgh did you sell crack?

21   A.   On Broadway, Broadway and Dubois Street, Broadway and City

22   Terrace, Broadway and Lutheran, William and Ann Street, William

23   and Benkard, Lutheran and Van Ness Street, City Terrace and Van

24   Ness Street.

25   Q.   Is that an exhaustive list or just some of the streets that

1    you sold crack?

2    A.  That's the exhaustive list.  That's it.

3    Q.  OK.  When you listed those streets of where you sold, does

4    that mean that you would stand on the street and people would

5    come up and buy from you?

6    A.  Yes, sir.

7    Q.  Did you sell crack anywhere else besides on the actual

8    street?

9    A.  Yes, sir.

10   Q.  Where was that?

11   A.  In customers' houses or a friend of mines house, one.  Of

12   the customers lived on City Terrace and Broadway.  One of them

13   lived on -- a friend of mine's whose house I sold drugs at

14   lived on William and Ann Street, the corner.

15   Q.  You say a friend of yours.  A friend of a friend of yours,

16   the one on William and Ann?

17   A.  My friend's kid's mother lived on William and Ann.

18   Q.  What friend are you referring to?

19   A.  L-1, James Williams.  The lady, the female whose house we

20   was selling drugs at, her name was Geneva.

21   Q.  Geneva?

22   A.  Yes, sir.

23   Q.  You sold out of that house as well?

24   A.  Yes, sir.

25   Q.  I think you mentioned another house which was a crack

E8cnchr2                          Mallory - direct

1    customer -- I'm sorry -- a drug customer's house?

2    A.  Yes, sir.

3    Q.  What was the name of that customer?

4    A.  Her name was Sissy.

5    Q.  Did you transact with customers in any other ways besides

6    just meeting up with them on the street or in the house?

7    A.  Could you repeat that.

8    Q.  How did you get in contact with your customers?

9    A.  They'll call me and I meet them.  They'll call me and I

10   meet them somewhere, in the hallway or in the alleyway or

11   somewhere or in the customer's house or I will be outside and

12   they just walk up to me and buy it off of me.

13   Q.  I am going to come back to your sale of crack in a moment.

14   Let's talk about the other drugs that you sold.  You mentioned

15   that you sold heroin, right?

16   A.  Yes, sir.

17   Q.  When did that start?

18   A.  Mid 2000s -- no, around late 2000s.  Excuse me.  Late

19   2000s.

20   Q.  And where in Newburgh did you sell heroin?

21   A.  I sold heroin on City Terrace and William Street.

22   Q.  Did you sell heroin out of the customer Sissy's house?

23   A.  Yes, sir.

24   Q.  Did you sell heroin out of L-1's child's mother's house,

25   Geneva?

1    A.  Yes, sir.

2    Q.  Why did you start selling heroin?

3    A.  Because at that time the people I was hanging out with were

4    selling it.  It was a drug that was easy for me to sell and was

5    selling.

6    Q.  How long did you sell heroin for?

7    A.  For about a year, no longer than a year.

8    Q.  How often during that time, during that year did you sell

9    heroin?

10   A.  On and off, probably, like -- on and off.

11   Q.  Were you selling crack at the time as well.

12   A.  Yes.

13   Q.  Where did you get the heroin from?

14   A.  I bought the heroin off of a friend, Michael Knight.

15   Q.  Anyone else besides Michael Knight?

16   A.  A guy name Dust.

17   Q.  A guy named Dust?

18   A.  Yes, sir.

19   Q.  How much did you buy each time that you bought heroin?

20   A.  A couple of bundles.

21   Q.  What's a bundle?

22   A.  A bundle is ten packages, ten bags packaged in white paper,

23   like wax paper.

24   Q.  So a bundle is ten of those small bags?

25   A.  Yes, sir.

1   Q.  Would you sell heroin by the bundle or would you sell it by

2   the small bag?

3   A.  Both.

4   Q.  Both.  How much would you buy a bundle for?

5   A.  About no more than $60 -- like $40 to $60.

6   Q.  If were you to sell a bundle, not the little bags but a

7   bundle, how much would you sell it for?

8   A.  $100.

9   Q.  If you were to sell one of those little bags, how much

10  would you sell it for?

11  A.  $10.

12  Q.  How much heroin were you selling back during that year, say

13  each day?

14  A.  No more than about a bundle, two bundles.  No more than two

15  bundles.

16  Q.  Was there a time where you were selling more than that?

17  A.  Yes, sir.

18  Q.  So on a good day during that year, how much would you sell?

19  A.  Probably like three to four bundles.

20  Q.  OK.  Do you know how much a bundle weighs in grams?

21  A.  About .3 of a gram.

22  Q.  So, asked another way, do you know how many bundles is in a

23  gram?

24  A.  How many bundles are in a gram?  About two and a half

25  bundles are in a gram.

1    Q.   When you were selling heroin, did you sell it by yourself

2    or with other people?

3    A.   Other people.

4    Q.   Who were some of those people?

5    A.   L-1, Burger.

6    Q.   Somebody named Burger?

7    A.   Yes, sir.

8    Q.   And were there others, too?

9    A.   Hustle.  That's it that I can remember.

10   Q.   OK.  Let's talk about your cocaine, your sales of cocaine.

11        When approximately did you sell cocaine?

12   A.   Mid 2000s.

13   Q.   Where did you sell cocaine?

14   A.   William Street, Newburgh.

15   Q.   How did it come to be that you started selling cocaine?

16   A.   Because my friends who I was hanging out with at that time

17   were selling it, and it was a drug that was easy for me to

18   sell.

19   Q.   Who were some of those friends?

20   A.   D Money, Pyro -- those are the two I can remember right

21   now.

22   Q.   Where did you get the cocaine that you sold?

23   A.   I got the cocaine from City -- from City --

24   Q.   When you say the city, what do you mean?

25   A.   No, City.  It's a person actually --

1   Q.  Oh.

2   A.  -- named City.  A couple of other people.  I can't remember

3   their names, though.

4   Q.  How much cocaine were you selling?

5   A.  About an eight ball a day.

6   Q.  An eight --

7   A.  Excuse me.  An eight ball is about like three grams every

8   couple of days.

9   Q.  I'm sorry.  You said you were selling an eight ball,

10  correct?

11  A.  Yes, sir.

12  Q.  I think were you explaining what an eight ball is.  Can you

13  say that again?

14  A.  An eight ball is an eighth of an ounce, three and a half

15  grams.

16  Q.  You sold an eighth ball how often?

17  A.  About every two days I would sell it actually.  Every two

18  days I would sell an eight ball.

19  Q.  Just to be clear, when you say an eight ball, is that how

20  you buy it, you buy it as an eight ball?

21  A.  Yes, sir.

22  Q.  Would you resell it as an eight ball, or would you break it

23  down into smaller bags?

24  A.  Break it down into smaller bags.

25  Q.  Let me ask you about marijuana.  You said that you sold

E8cnchr2                          Mallory - direct

1   marijuana as well, correct?

2   A.  Yes, sir.

3   Q.  Was that more than just that first time that you sold

4   marijuana?  Did you sell it on other occasions, too?

5   A.  Yes, sir.

6   Q.  How did you get the marijuana that you sold?

7   A.  Customers with different drugs that I was selling, like

8   those times I was selling crack, they would be customers that

9   had paid me in marijuana so I could make the transaction with

10  them for the marijuana instead of the money, just selling it

11  for the marijuana.

12          THE COURT:  I'm sorry, Mr. Mallory.  Could you keep

13  your voice up, please.

14  Q.  So you were saying that customers for other drugs, like

15  crack customers would pay you in marijuana rather than dollars?

16  A.  Yes, sir.

17  Q.  How often did that happen?

18  A.  Every couple of months.  Not often, every couple of months.

19  Q.  Did those things happen every couple of months between when

20  you first started selling and when you were arrested in 2012?

21  A.  Yes, sir.

22  Q.  You also mentioned that you sold angel dust.  How many

23  times did you sell angel dust?

24  A.  Probably once.  Once or twice.

25  Q.  Mr. Mallory, it's important to keep your voice up, but also

1     just take like a couple of inches away from the microphone.

2     All right.  You sold angel dust once?

3     A.  Yes, sir.

4     Q.  How did you get that angel dust?

5     A.  Somebody owed me some money and they paid me in angel dust.

6     Q.  When was that approximately?

7     A.  Late 2000s.

8     Q.  You also mentioned that you sold -- let me ask you this, I

9     think you said this, that you sold oxy?

10    A.  Yes, sir.

11    Q.  How many times have you sold oxy?

12    A.  Only one time.

13    Q.  How did you get that oxy?

14    A.  From a crack customer who wanted to trade it for crack.

15    Q.  Mr. Mallory, let's now talk about guns.  Have you ever

16    owned a gun?

17    A.  Yes, sir.

18    Q.  How many guns have you owned?

19    A.  One.

20    Q.  Where did you get that gun?

21    A.  I bought it off a friend of mines.

22    Q.  Which friend did you buy it from?

23    A.  Burger.

24    Q.  Do you know approximately when that was?

25    A.  It was mid 2000s.  It was around the time when I had my

1    daughter.

2    Q.   Just to be clear, because you're using the birth of your

3    child a couple of times to mark points in time, how many kids

4    do you have?

5    A.   I have three.

6    Q.   Three.  So I think you mentioned earlier that you started

7    selling crack after the birth of one of your children, right?

8    A.   Yes, sir.

9    Q.   I'm sorry.  You started selling crack more frequently after

10   the birth of one of your children?

11   A.   Yes, sir.

12   Q.   Then you bought this gun from Burger after the birth of a

13   child, right?

14   A.   Yes, sir.

15   Q.   Or around the time of a birth of a child?

16   A.   Yes, sir.

17   Q.   Was that the same child or a different child?

18   A.   Different child.

19   Q.   Different?

20   A.   Yes, sir.

21   Q.   Have you ever held guns owned by other people?

22   A.   Yes, sir.

23   Q.   Why would you hold those guns?

24   A.   For protection.  And to either bring it to them or -- for

25   protection or to bring it to them.

1    Q.  When you say protection, what do you mean by that?

2    A.  What do you mean by protection?

3    Q.  What did you need protection from?

4    A.  From people that rob people or people that want to hurt

5    people.

6    Q.  Why did you think that you needed protection from

7    robberies?

8    A.  Because I was selling drugs, and I was also doing things to

9    people.

10   Q.  With regards to the selling drugs, why did you think that

11   the fact that you were selling drugs meant that you needed to

12   be protected from robberies?

13   A.  Because there were people that stuck people up for money.

14   Q.  You said you held guns for other people, correct?

15   A.  Yes, sir.

16   Q.  Who were those people who you held guns for?

17   A.  L-1, Snelly, and Kev Gotti.  That's it.

18   Q.  Are you familiar with somebody named Guns?

19   A.  And Guns also, yeah.

20   Q.  OK.  To be clear, the person's name is Guns that I'm asking

21   about?

22   A.  Guns, yes.

23   Q.  Have you held guns for Guns?

24   A.  Yes, sir.

25   Q.  Have you ever shot a gun before?

1   A.  Yes, sir.

2   Q.  Approximately how many times have you shot guns before?

3   A.  Probably around seven or eight times.

4   Q.  Were any of those shootings done at or in the direction of

5   other people?

6   A.  Yes, sir.

7   Q.  Approximately how many of those?

8   A.  Three.

9   Q.  Let's talk about each of those.  Are you familiar with

10   somebody named Quiotis?

11   A.  Yes, sir.

12   Q.  Have you ever shot at Quiotis?

13   A.  Yes, sir.

14   Q.  Approximately when was that?

15   A.  Mid 2000s.

16   Q.  Can you explain for the jury why you shot at him, what the

17   circumstances were of that incident?

18   A.  We were drinking and an argument happened over somebody,

19   and it led to me shooting by him.

20   Q.  You said it ended up with you shooting what?

21   A.  Shooting by him, like, trying to scare him.

22   Q.  Shooting by him?

23   A.  Yes, sir.

24   Q.  You were shooting at him, right, or in his direction?

25   A.  His direction, yeah.

E8cnchr2                          Mallory - direct

1   Q.  You did it to try to scare him you said?

2   A.  Yes, sir.

3   Q.  What was the argument over?

4   A.  Over a girl, somebody.

5   Q.  Who is Quiotis?

6   A.  Quiotis is a friend of mines that grew up in the area where

7   I grew up, was a friend of mine that grew up in the area where

8   I grew up.  He is a Crip.

9   Q.  He is a member of the Crips?

10  A.  Yes, sir.

11          MR. GOLTZER:  It is difficult to understand.

12          THE COURT:  What you need to do is put the microphone

13  a little bit away from you, but keep your voice up So we can

14  all hear you.  All these people in this large room have to be

15  able to hear you.

16          MR. GOLTZER:  Thank you, your Honor.

17          THE COURT:  Go ahead.

18  Q.  So that was one of your shootings, right?

19  A.  Yes, sir.

20  Q.  Can you tell us about the next shooting that you did.

21  A.  Kev Gotti.  I shot him in his foot.

22  Q.  So you shot Kev Gotti, and it actually hit him in the foot?

23  A.  Yes, sir.

24  Q.  When was that?

25  A.  Late 2000s.

1  Q.  Is this the same Kev Gotti who you testified earlier was

2  your friend?

3  A.  Yes, sir.

4  Q.  Can you explain for the jury what happened during that

5  incident?

6  A.  There was a something had happened with these guys that,

7  that I was friends with, and they wanted to go do something to

8  another guy, and we got into an argument and they wanted to

9  shoot Gotti.  So instead of them shooting him, I shot him in

10  his foot, because they were going to try to really harm him,

11  like shoot him in his face or something.  So I took the gun and

12  I shot him in his foot.  Me and Gotti we talked about that.  Me

13  and Gotti we talked about it, and that's what happened after.

14  Q.  Whatever you're doing right now is the right way to talk by

15  the way, that distance?

16  A.  All right.

17  Q.  Let's break that down a little bit.  You said that

18  something happened where they wanted to do something?

19  A.  Yes, sir.

20  Q.  Can you be more specific?  What happened?

21  A.  There was there was a guy named Chief, Chaz, he had an

22  incident with a friend of L-1's, and L-1 and four other people

23  came to my house, and it was me and Kev Gotti there, and they

24  wanted me and Kev Gotti to come around the corner with them to

25  do something to the guy Chaz, beat him up or whatever, fight

884

1  him, and me and Kev Gotti didn't want to go.  So they got into

2  an argument with Gotti and --

3  Q.  Who is that?  Who got into a fight with Gotti?

4  A.  It was L-1, Guns, Hood, and Buck.  I don't know Buck's

5  name.  I don't know Hood's name.

6  Q.  OK.  So those guys, including L-1, were fighting with Kev

7  Gotti, and then what happened that --

8  A.  Kev Gotti left, and he called my phone and I put him on the

9  phone with L-1, and they got into an argument.  And shortly

10  after that Kev Gotti came up there and Kev Gotti left back out,

11  and then L-1 was getting a gun and he was saying he need to

12  come back in, he was going shoot him in his face.  I told him

13  being that he was with me, I would shoot him, and I shot him.

14  Q.  So you shot him.  You told L-1 that you would shoot him so

15  L-1 didn't have to shoot him?

16  A.  Yes, sir.

17  Q.  I'm sorry.  Just to be clear, one more time, why did you do

18  that?

19  A.  I didn't want them -- I didn't want no one to shoot him in

20  his face.  I didn't want Gotti -- I didn't want them to kill

21  Gotti, so I shot him in his foot to make it seem like I was

22  helping him, I was helping L-1, but I really wasn't helping

23  L-1, I was helping Gotti.

24  Q.  By shooting him in his foot?

25  A.  By shooting him in his foot.

1   Q.  You said you talked to Gotti about this after the shooting?

2   A.  I talked to him while he was in the hospital.  I talked to

3   him when he got out of the hospital, yes, sir.  I talked to him

4   about the shooting.

5   Q.  Did your friendship continue after this incident?

6   A.  Yes, sir.

7   Q.  OK.  That's your second shooting.  You said that you had

8   three shootings.  Can you tell us about the third one.

9   A.  Something had happened -- me and my friend Burger, we was

10  walking somewhere, and some guy started shooting at us.  I got

11  grazed on my back and Burger got shot in his head, like grazed

12  in his head.

13  Q.  Let me just stop you.  You were walking somewhere.  Where

14  were you?

15  A.  I was in Newburgh leaving out of my house, walking down

16  First Street, heading towards the liquor store.

17  Q.  When you say you were grazed in the back, do you mean

18  grazed by a bullet?

19  A.  Yes, sir.

20  Q.  And Burger was grazed in the head by a bullet?

21  A.  Yes, sir.

22  Q.  Did you know who shot you at the time?

23  A.  No, sir.  I had an idea, but I didn't know exactly who was

24  the person that shot me.

25  Q.  What was your idea?

E8cnchr2                         Mallory - direct

1   A.   It was a couple of Spanish guys that hang out around the

2   corner from where I sell drugs.

3   Q.   You say Spanish guys.  Were they members of any gang?

4   A.   The Latin kings, yes, sir, they were.

5   Q.   So you were grazed by a bullet that you believe was from

6   the Latin Kings.  What happened that lead you to a shooting?

7   A.   I seen them driving past like a couple of days after and I

8   shot at their car.

9   Q.   Did you hit anybody?

10  A.   No, I didn't hit anybody.

11  Q.   Did you hit the car?

12  A.   No, I didn't hit the car.

13  Q.   Besides for protection and besides for these three

14  shootings, have you used guns for any other reason in your

15  pass?

16  A.   Yes, sir.

17  Q.   For what reason?

18  A.   To rob people.

19  Q.   Approximately how many robberies have you done?

20  A.   About six or seven.

21  Q.   Just to be clear, when you say a robbery, what do you mean?

22  A.   Stealing, taking from somebody, with either a gun or

23  without the gun, basically taking from somebody.

24  Q.   So some of those robberies included a gun?

25  A.   Yes, sir.

E8cnchr2                         Mallory - direct

1    Q.  And did some of the robberies not include a gun?

2    A.  Yes, sir.

3    Q.  Did you do them by yourself or with other people?

4    A.  Both.

5    Q.  Let's talk about some of these robberies.  Are you familiar

6    with somebody named White Chocolate?

7    A.  Yes, sir.

8    Q.  Did you ever rob White Chocolate?

9    A.  Yes, sir.

10   Q.  When was that approximately?

11   A.  Mid 2000s.

12   Q.  Was that with a gun or without?

13   A.  It was with a gun.

14   Q.  Was it the gun that you had bought from Burger or a

15   different gun?

16   A.  It was a gun I bought from Burger.

17   Q.  What kind of gun was that, by the way?

18   A.  A .25 caliber.

19   Q.  I'm sorry?

20   A.  A .25 caliber, a .25.

21   Q.  When you robbed white chocolate, what did you do?

22   A.  I pulled the gun out and I took his drugs and his money.

23   Q.  What did you get?

24   A.  I got crack and money, about a hundred dollars.

25   Q.  Why did you rob White Chocolate?

1    A.  Because he was telling people that the drugs I was selling

2    were no good.

3         MR. GOLTZER:  I'm sorry.  I can't understand.

4    A.  He was telling people that the drugs I was selling were no

5    good, and that -- basically telling customers that I was doing

6    business with that they shouldn't do business with me.

7    Q.  So that's why you robbed him?

8    A.  Yes, sir.

9    Q.  After the robbery, what did you do with the money that you

10   had taken from White Chocolate?

11   A.  I gave it back to him.  I gave him some of it back.

12   Q.  Back to White Chocolate?

13   A.  Yes, sir.

14   Q.  Why did you do that?

15   A.  Because I didn't need the money, and it wasn't really for

16   the money.  It was just to get him from not being up there in

17   that territory, just to let him know that he didn't belong up

18   there.

19   Q.  By the way, what territory was that?

20   A.  City Terrace.  This happened on City Terrace.

21   Q.  Are you familiar with somebody named Murder?

22   A.  Yes, sir.

23   Q.  Have you ever robbed someone named Murder?

24   A.  Yes.

25   Q.  When was that, around?

1    A.  Late 2000s.

2    Q.  Why did you rob Murder?

3    A.  Because something of mines came up missing, and I was told

4    that he had it.  Some drugs of mines came up missing, and I was

5    told that he had it.  I robbed him.

6    Q.  Just to be clear, what kind of drugs came up missing?

7    A.  Weed.

8    Q.  Weed?

9    A.  Yeah.

10   Q.  Was it --

11   A.  Weed and crack.

12   Q.  I'm sorry.  Was it both weed and crack or just weed?

13   A.  Both.

14   Q.  Did you use a gun when you robbed Murder?

15   A.  Yes, sir.

16   Q.  You said for White Chocolate you pulled the gun out.  How

17   about for Murder?  Did you pull the gun out?

18   A.  I didn't pull the gun out with Murder.  I just like -- I

19   didn't pull the gun out on Murder.  I put my shirt up to show

20   him that I had it, and then I took the stuff that he had.

21   Q.  What did you get?

22   A.  A cell phone, drugs, and money.

23   Q.  Are you familiar with an individual named Ill Will?

24   A.  Yes, sir.

25   Q.  Did you ever rob someone named Ill Will?

1    A.  Yes, sir.

2    Q.  I'm sorry.  The robberies of White Chocolate and Murder,

3    were those by yourself or with other people?

4    A.  Those were by myself.

5    Q.  How about the robbery of Ill Will?  Was that by yourself or

6    with other people?

7    A.  It was with another person.

8    Q.  Who?

9    A.  Kev Gotti.

10   Q.  The same Kev Gotti we have been talking about?

11   A.  Yes, sir.

12   Q.  Approximately when did you rob Ill Will?

13   A.  Late 2000s.

14   Q.  Did either you or Kev Gotti have a gun?

15   A.  No.

16   Q.  Why did you rob Ill Will?

17   A.  Him and Kev got into a fight, and as they were fighting, I

18   went in his pockets and I took some money from him.

19   Q.  What did you do with the money that you got?

20   A.  Gave it to Kev, split it with Kev Gotti.

21   Q.  Are you familiar with somebody named O'Neill?

22   A.  Yes, sir.

23   Q.  Who is O'Neill?

24   A.  He is a person that sells drugs in Newburgh.

25   Q.  Have you ever robbed O'Neill?

1    A.  Yes, sir.

2    Q.  Was that by yourself on with other people?

3    A.  With other people.

4    Q.  Who were the other people who were involved in the robbery?

5    A.  Quick, Pierez and Snelly.

6    Q.  So someone named Quick, someone named Snelly, and someone

7    named Pierez?

8    A.  Yes, sir.

9    Q.  Did all of you rob O'Neill?

10   A.  No.  Me and Pierez did.  Me and Pierez did.

11   Q.  So while you and Pierez were robbing O'Neill, what were

12   Quick and Snelly doing?

13   A.  They were inside the car waiting for us around the corner.

14   Q.  OK.  Did you or Pierez have guns?

15   A.  Yes, sir.

16   Q.  Both of you or just one of you?

17   A.  Just one gun.

18   Q.  Who had the gun?

19   A.  Pierez had the gun.

20   Q.  Do you know what gun?

21   A.  It was a .22, I believe, or a .25, one or the other.

22   Q.  Do you know where he got the gun from?

23   A.  Yes, sir.

24           MR. GREENFIELD:  We are just not hearing anything over

25   here.

1          THE COURT:  Mr. Mallory, you are going to have to keep

2     your voice up, OK.

3     Q.  What happened during the robbery when you and Pierez robbed

4     O'Neill?

5     A.  Pierez pulled the gun out and I took his money and I took

6     his weed.

7     Q.  Just to be clear, when you say weed, what are you referring

8     to?

9     A.  Packets, nickel bags.

10    Q.  Of what drug?

11    A.  Marijuana.

12    Q.  When did this robbery take place?

13    A.  Late 2000s.

14    Q.  Late 2000s?

15    A.  Yes, sir.  2012, actually.

16    Q.  Was that before or after that arrest in January 2012 when

17    you began cooperating with the government?

18    A.  There was after.

19    Q.  After you began cooperating?

20    A.  Yes, sir.

21    Q.  That gun that O'Neill used, did you see that gun again?

22    A.  Yes, sir.

23    Q.  Where had you seen that gun again?

24    A.  Quick, Quick.  I bought it off of Quick.

25    Q.  You bought it off of Quick?

1    A.  Yes, sir.

2    Q.  Again, that was before or after you started cooperating

3    with the government?

4    A.  This is when I was cooperating with the government.

5    Q.  What do you mean by that?

6    A.  I bought the gun for the government with the government's

7    money.

8    Q.  So you bought the gun at the government's direction?

9    A.  Yes, sir.

10   Q.  From Quick?

11   A.  Yes, sir.

12   Q.  Mr. Mallory, are you familiar with somebody named Scrappy?

13   A.  Yes, sir.

14   Q.  Did you ever rob Scrappy?

15   A.  Yes, sir.

16   Q.  Who is Scrappy?  What did he do for a living?

17   A.  He sold drugs.

18   Q.  Who did you do that robbery with?

19   A.  Quick.

20   Q.  When was it approximately?

21   A.  Late 2000s.

22   Q.  Before or after you started cooperating?

23   A.  This is before I started cooperating.

24              THE COURT:  Louder please.

25              THE WITNESS:  This was before I started cooperating.

1  Q.  Was a gun used?

2  A.  Yes, sir.

3  Q.  Who had the gun?

4  A.  Quick.

5  Q.  You have to say it louder, OK.

6         What happened during that robbery?

7  A.  We was walking down the street and Quick told him to empty

8  out his pockets and I went in his pockets and I took his money

9  and he ran off, he ran.

10  Q.  You mentioned one robbery of O'Neill that you did after you

11  were cooperating with the government?

12  A.  Yes, sir.

13  Q.  Did you do any other robberies after you began cooperating

14  with the government?

15  A.  Yes, sir.

16  Q.  How many others?

17  A.  Two.

18  Q.  Was it two robberies or two people that you robbed?

19  A.  It was two people that I robbed.

20  Q.  Who did you do that with?

21  A.  Geo.

22  Q.  Geo.  Anybody else?

23  A.  Snelly.

24  Q.  Geo and Snelly.

25         Do you know the names of the people who you robbed?

1   A.  No, sir.

2   Q.  Was a gun used?

3   A.  Yes, sir.

4   Q.  The people you robbed, were they drug dealers?

5   A.  Yes, sir.

6   Q.  What drugs did they sell?

7   A.  Marijuana.

8   Q.  Who had guns?

9   A.  Both of us did.

10  Q.  You said both of us.  You and who?

11  A.  Me and geo.

12  Q.  Where was Snelly during the robbery?  Speak up.

13  A.  Snelly was inside of the car, a little bit up the street

14  from us.

15  Q.  What happened during the robbery?

16  A.  Geo pulled the gun out.  As he had the gun out, I had

17  walked up to the other person and I took -- as he had the gun

18  out, I walked up to the other person and I took his phone and I

19  took some money and some marijuana from him.

20          MR. BAUER:  Your Honor, this is a pretty good time for

21  me.  I'm happy to keep going.

22          THE COURT:  No.  Let's take a break now.  It is 5

23  after 11, so please be back 20 after 11 in the jury room.  OK.

24  Please don't be late.

25          (Continued on next page)

E8cnchr2                    Mallory - direct

1

2          (Jury not present)

3          THE COURT:  Mr. Mallory, you may step down.

4          MR. NAWADAY:  Your Honor, I don't know if this will

5     help matters, but I noticed that the defense table does not

6     have a speaker, so perhaps we could move a speaker over there

7     so that they it might be easier for them to hear.

8          THE COURT:  That may be, but your witnesses are

9     killing us, killing us.  I can't hear a word they are saying.

10    I'm sitting right here.  I don't know whether one can be made

11    available.  I don't know that it's going to do a whole lot of

12    good.

13         MR. GOLTZER:  If the jury can't hear the direct, we

14    can live with them.

15         MR. BAUER:  Judge, I can assure you that we didn't

16    have the luxury of talking with Mr. Baynes, but we did tell

17    Mr. Mallory all about the room and how he had to speak up.  We

18    had told him multiple times in our last session.

19         THE COURT:  A direction to speak up I would not

20    disallow during examination.

21         I don't want to keep telling him with every answer,

22    louder, louder, but if I have to, that's what I am going to

23    need to do.

24         Where are we with respect to witnesses?

25         MR. BAUER:  Can we have a few minutes now to figure

1    that out, and then we'll report back.

2              THE COURT:  OK.  Sure.

3              MR. BAUER:  OK.

4              (Recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Trial resumed; jury not present)

2          THE COURT:  Any update, Mr. Bauer?

3          MR. BAUER:  Yes.  Detective Goodman is about fifteen

4   minutes out, here's the plan I was talking over with most of

5   defense counsel is that we take Jamar Mallory through lunch.  I

6   think that there's almost an hour left, probably about an hour

7   left of stuff where he's not really getting into the murder

8   and, in fact, if there's still -- if that's not -- if time --

9   if there's still more time left I can skip the murder, then go

10  to some of the -- like the drug selling, I guess.

11         The order was going to be all of this intro stuff,

12  murder, and then drug selling.  I can flip it around if there's

13  still more time.  But, anyway, take him through lunch.  Then

14  Detective Goodman, put her on the witness stand right after

15  lunch.

16         Then our preference is so long as I stay away from the

17  murder with Mallory it seems it's okay with defense counsel

18  that we then go to DNA Expert Myers for the, what sounds like

19  he may take up the rest of the day based on Mr. Greenfield's

20  cross-examination.

21         MR. GREENFIELD:  While other counsel might not have a

22  problem, I really don't want two main witnesses' direct started

23  without cross being completed on one of them.  I just don't see

24  any need to put the DNA expert on today.

25         MR. BAUER:  I'm sorry.  I'm suggesting that -- that

1    it's not piecemeal.  We would do Myers in totality and then

2    return to Mallory.

3              THE COURT:  That was my understanding.

4              We're good.

5              MR. DRATEL:  Your Honor, the other thing was rather

6    than get too deep into Mallory, if there's an issue, we just

7    break a little early for lunch.  Because that's -- you'll

8    understand.

9              THE COURT:  Okay.

10             So let's bring out the jury.  Actually let's get

11   Mr. Mallory back.

12             Mr. Mallory, you have to keep your voice up.  If I

13   have to yell at you after every answer to repeat it, I'm going

14   to do that.  Okay.  So please try to keep your voice up.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

```
1              (Jury present)

2              THE COURT:  Everyone be seated.

3              MR. BAUER:  Your Honor, may I proceed?

4              THE COURT:  You may.

5              MR. BAUER:  Or continue I guess.

6  BY MR. BAUER:

7  Q.  Mr. Mallory you testified earlier that you pled guilty on

8  this case to a cooperation agreement; is that right?

9  A.  Yes, sir.

10 Q.  And after that arrest in January 2012 you said you started

11 working with law enforcement, right?

12 A.  Yes, sir.

13 Q.  Did you also --

14             MR. GREENFIELD:  Your Honor I'd ask the court to

15 admonish the witness to keep his voice up.

16             THE COURT:  Yes.

17             Go ahead.

18 BY MR. BAUER:

19 Q.  Did there come a point in time when you started meeting

20 with prosecutors?

21 A.  Yes, sir.

22 Q.  And why did you meet with prosecutors?

23 A.  To talk about the things that were going on, the help I was

24 giving to the law enforcement.

25             THE COURT:  Louder, please.  Help you were giving to
```

1   who?

2           THE WITNESS:  To the law enforcements.

3   Q.  You said you talked about things going on.  Were those

4   things being done by you?

5   A.  Repeat that one more time.

6   Q.  You said that you talked to prosecutors about things being

7   done.  Let me ask did that include talking about things that

8   other people were doing?

9   A.  Yes, sir.

10  Q.  Did it talk -- did it include talking about things that

11  other people had done in the past?

12  A.  Yes, sir.

13  Q.  Did it include talking about things you had done in the

14  past?

15  A.  Yes, sir.

16  Q.  Who was present at those meetings?

17  A.  My lawyer -- my lawyer, the prosecutor, a Newburgh police

18  department, and a FBI agent.

19  Q.  Besides providing information to the government, did you do

20  anything else as part of your cooperation?

21  A.  Repeat that one more time.

22  Q.  Besides sitting in rooms with lawyers and agents talking

23  about information, did you do anything else as part of your

24  cooperation with law enforcement?

25  A.  Yes, sir.  I checked in everyday with the law enforcements

1    and -- that's it.

2    Q.  You testified earlier that you bought a gun from someone

3    named Quick; is that right?

4    A.  Yes, sir.

5    Q.  And was that part of your cooperation with law enforcement?

6    A.  Yes, sir.

7    Q.  Did you do anything else on the street at the direction of

8    law enforcement?

9    A.  Yes, sir.

10   Q.  Like what?

11   A.  Wore wires and um -- wore wires.

12   Q.  When you say wore a wire, what do you mean?

13   A.  Like audio and -- audio and the video.  Wire thing.

14   Q.  And was the wire -- what was the purpose of the wire?  Were

15   you recording conversations?

16   A.  Recording conversations, yes, sir.

17   Q.  You said that you stayed in contact with law enforcement

18   while you were out on the street?

19   A.  Yes, sir.

20   Q.  How often did you stay in touch with them?

21   A.  Everyday.

22   Q.  Did you do that in person or via phone?

23   A.  Both.

24   Q.  How often would you meet with them in person?

25   A.  Probably once -- one to two times a week.

E8C9CHR3                          Mallory - direct

1        MR. GREENFIELD:  I can't hear him, Judge.

2        THE WITNESS:  One time or two times a week.

3   Q.  Where would those meetings take place?

4   A.  At their office or in the cars.

5   Q.  In the cars?  Is that in Newburgh?

6   A.  Yes, sir.  In Newburgh.

7   Q.  Did you have one or two main points of contact with law

8   enforcement, people who you were checking in with?

9   A.  Repeat that one more time.

10  Q.  Was there one or more than one person who you were checking

11  in with on a daily basis?

12  A.  Yes, sir.  There were two.

13  Q.  Who were they?

14  A.  Steve Bunt and Jim I forget his last name.

15  Q.  What agency was Steve Bunt with?

16  A.  Steve Bunt was with Newburgh police department and Jim was

17  with the FBI.

18  Q.  How many times did you wear a wire?

19  A.  About fifteen times.

20  Q.  Were you getting paid to help the government when you were

21  on the street?

22  A.  No, sir.

23  Q.  So why were you cooperating?

24  A.  To -- repeat that one more time.

25  Q.  If you weren't getting paid, why were you helping?

E8C9CHR3                         Mallory - direct

```
 1   A.  Because I was in trouble.

 2   Q.  Based on your arrest?

 3   A.  Based on my arrest.

 4   Q.  Were you ever paid anything by the government?

 5   A.  No, sir.

 6   Q.  Did you ever get anything of value besides that cooperation

 7   agreement from the government?

 8   A.  Lunch probably once or twice.  That's it.

 9   Q.  Lunch you said?

10   A.  Yes, sir.

11   Q.  When you were checking in with the government would you

12   tell them about what you were doing on the street?

13   A.  As far as the trouble I got into?

14   Q.  Would you talk to them about the things you were doing

15   throughout the day?

16   A.  Yes, sir.

17   Q.  You mentioned earlier that your cooperation agreement

18   required you to tell the government everything you did; is that

19   right?

20   A.  Yes, sir.

21   Q.  Now, when you were checking in with those officers on a

22   daily basis did you tell them everything you were doing?

23   A.  No, sir.

24   Q.  What types of things were you not telling them about?

25   A.  About trouble I was doing, about getting into myself.
```

1    Q.   What kind of trouble?

2    A.   Robberies and stuff.

3    Q.   You testified earlier about two robberies you did while you

4    were cooperating.  Are those the robberies you're speaking

5    about?

6    A.   Yes, sir.

7    Q.   Did you do anything else besides those robberies?

8    A.   Yes, sir.  There was a burglary too that I didn't do but we

9    was gonna do but we stopped.

10   Q.   How about using drugs?  Were you using drugs at that time

11   too?

12   A.   Yes, sir.

13   Q.   What about selling drugs?

14   A.   No, sir.

15   Q.   Why didn't you tell law enforcement about the robberies,

16   the burglary, and the using of drugs?

17   A.   I told them about the using of drugs but the robberies I

18   didn't tell them about because I didn't want to -- the

19   robberies I didn't tell them about because I was -- I didn't --

20   I didn't want to get -- I didn't want to mess up my agreement

21   that I had going on -- not agreement, the plea agreement.

22   Q.   So you said that you committed these other crimes while you

23   were cooperating, right?

24   A.   Yes, sir.

25   Q.   Had you actually signed the cooperation agreement yet at

1    that point?

2    A.  No, sir.

3    Q.  Did you ultimately tell the government about those

4    robberies that you committed while on the street?

5    A.  Yes, sir.

6    Q.  You mentioned earlier a number of the crimes that you pled

7    guilty to.  Do you remember saying those?

8    A.  Yes, sir.

9    Q.  I believe you said that you pled guilty to -- because you

10   were guilty of those crimes, right?

11   A.  Yes, sir.

12   Q.  Have you been sentenced on those charges yet?

13   A.  No, sir.

14   Q.  At the time that you pleaded guilty what was your

15   understanding as to the maximum statutory sentence you could

16   receive?

17   A.  Life, sir.

18   Q.  Do the crimes that you pled guilty to carry any mandatory

19   minimum sentences?

20   A.  Yes, sir.

21   Q.  What's your mandatory minimum sentence?

22   A.  Seventeen years, sir.

23        MR. BAUER:  Your Honor, may I approach?

24        THE COURT:  You may.

25   Q.  Mr. Mallory, I'm showing you what's been marked for

1    identification as Government Exhibit 421.  Can you take a look

2    at this document and tell me if you recognize it.

3    A.  Yes, sir.

4    Q.  What is it?

5    A.  It's the plea agreement that I signed.

6    Q.  The cooperation agreement we've been referring to?

7    A.  Yes, sir.

8    Q.  Referring you to the last page.  Do you see a number of

9    signatures there?

10   A.  Yes, sir.

11   Q.  Do you see your signature there?

12   A.  Yes, sir.

13        MR. BAUER:  The government offers Exhibit 421 into

14   evidence.

15        MR. DRATEL:  No objection.

16        THE COURT:  No objection.  421 will be received.

17        (Government's Exhibit 421 received in evidence)

18   Q.  Mr. Mallory, what's your understanding of what your

19   obligations are under this agreement?

20   A.  Stay out of trouble, testify if needed -- stay out of

21   trouble, testify, and tell the truth.

22   Q.  What's your understanding of what the government would do

23   under that agreement if you live up to your obligations?

24   A.  Write a 5K1 letter.

25   Q.  Who does that letter go to?

1    A.  To the judge.

2    Q.  Which judge?

3    A.  The one that sentences me, my sentencing judge.

4    Q.  To be clear, you mentioned that you committed crimes while

5    cooperating with the government.  Do you remember saying that?

6    A.  Yes, sir.

7    Q.  And that you ultimately told the government about those

8    robberies, right?

9    A.  Yes, sir.

10   Q.  Did you tell the government about those robberies right

11   away?

12   A.  No, sir.

13   Q.  Did you wait until after your cooperation agreement was

14   signed?

15   A.  Yes, sir.

16   Q.  So would you say that you lied to the government?

17   A.  Yes, sir.

18   Q.  Put another way:  Did you withhold information from the

19   government?

20   A.  Yes, sir.

21   Q.  So you violated the terms of your agreement, correct?

22   A.  Yes, sir.

23   Q.  What's your understanding of what the government can do if

24   you violate that agreement?

25   A.  Rip the cooperation agreement up and not do the 5K1 letter.

1   Q.   What would that mean for your sentence?

2   A.   That I could get up to life and no less than 17 years.

3   Q.   Has your agreement been ripped up by the government yet?

4   A.   No.

5   Q.   Has the government made any representation to you as to

6   whether they've decided one way or the other if they'll rip up

7   your agreement?

8           MR. GOLTZER:   Objection.   Witness advocacy rule.

9           THE COURT:   Sustained.

10  Q.   Do you know if your agreement is going to be ripped up?

11  A.   No, I don't know.

12  Q.   So sitting here today have you been guaranteed as to

13  whether you'll get that 5K letter?

14  A.   No, sir.

15  Q.   Just getting to that letter.   What is your -- what's your

16  understanding of what that letter allows your sentencing judge

17  to do?

18  A.   Go under the mandatory minimum.

19  Q.   And if you receive that 5K letter, do you know what goes

20  into that letter?

21  A.   The cooperation that I did -- the cooperation that I did

22  and the all the -- the bad stuff I did also.

23  Q.   So the good stuff and the bad stuff?

24  A.   Yes, sir.

25  Q.   How about those robberies that you told the government

E8C9CHR3                        Mallory - direct

1    about after you had already signed the agreement, will that

2    information be in your 5K letter?

3    A.  Yes, sir.

4    Q.  Did the government make any promises to you about what

5    sentence you would receive?

6    A.  No, sir.

7    Q.  Did anyone make any promises to you?

8    A.  No, sir.

9    Q.  As far as you understand will the government recommend to

10   the judge a specific sentence for you?

11   A.  No, sir.

12   Q.  Let me ask you:  If you lie here on the witness stand today

13   do you know what happens to your cooperation agreement?

14   A.  It gets ripped up.

15              MR. DRATEL:  Objection.

16              THE COURT:  Overruled.

17   Q.  It gets ripped up?

18   A.  Yes, sir.

19   Q.  Could anything else happen to you?

20   A.  I get charged with perjury.

21   Q.  Mr. Mallory, I want to return back now to your crack

22   selling.  You listed a number of streets that you sold crack

23   out of at Newburgh.  Do you remember that?

24   A.  Yes, sir.

25   Q.  When you were out there, approximately how many other

E8C9CHR3                          Mallory - direct

1    people would be out there on the block selling crack at any

2    given time?

3    A.  Three, four.  Up to nine or ten people sometimes.

4    Q.  Was there a more active corner or block that you referenced

5    earlier?

6    A.  Yes, sir.

7    Q.  What were some of those more active blocks?

8    A.  City Terrace and Broadway, um, City Terrace and Van Ness.

9    Q.  And on those corners --

10          MR. BAUER:  Actually, Ms. McInerney, just while he's

11   talking if we could have Government Exhibit 250 up again.

12   Q.  On those corners approximately how many people were out

13   there selling crack at the same time?

14   A.  Up to ten people.

15   Q.  Were those ten people, including yourself, working together

16   as part of a team?

17   A.  No, sir.

18   Q.  Were they working together in any way?

19   A.  Yes, sir.

20   Q.  Are you familiar with the term split?

21   A.  Repeat that again.

22   Q.  Are you familiar with the term a split?

23   A.  Split, yes, sir.

24   Q.  Can you explain for the jury what a split is?

25   A.  A split would be when, like if a customer comes for like a

1   hundred dollars, let's say I only have $40 worth of drugs.

2   I'll get the other 60 from whoever is outside with me.  And the

3   60 will balance -- the 60 and the 40 will equal up to a hundred

4   dollars so that will be considered a split.

5   Q.  And in that example, the hundred-dollar sale, how much

6   money would you pocket?

7   A.  It depends on how much drugs I had to put into the sale.

8   Q.  In your example you said you had $40 worth of crack.  How

9   much money would you keep?

10  A.  Oh, $40.

11  Q.  And then you'd get crack from another person for the $60

12  worth?

13  A.  Yes, sir.

14  Q.  How much would they keep?

15  A.  They'll keep 60.

16  Q.  Why did you do splits, you and other people do splits?

17  A.  To either help the other person if they needed the money or

18  to help yourself in case you didn't have the drug, the amount

19  of drug that they wanted.

20  Q.  When you say "help yourself," why would you not just give

21  the customer $40 and say go find someone else?

22  A.  I don't know.  Because you don't -- to keep the customer

23  coming to you, you want to always make sure that you could

24  cover the order.

25  Q.  You said you also would do it to help another person out.

1   What do you mean by that?

2   A.  If a person needs money to do something at that moment and

3   they don't have any money, you help them out like that.

4   Q.  Would people work together out on these streets in any

5   other way to share crack sales?

6   A.  Yes, sir.

7   Q.  What types of ways?

8   A.  For example, I will be inside of my house for the day or

9   the night and somebody will call my phone and I'll direct them

10  to somebody that's on the corner that's outside.

11          THE COURT:  Louder, Mr. Mallory, please.

12          THE WITNESS:  Somebody will call my phone and I'll

13  direct them to somebody that's outside or vice versa, they will

14  be inside and they'll direct them to me.

15  Q.  So you would direct customers to each other?  Is that what

16  you're saying?

17  A.  Yes, sir.

18  Q.  How about going to a supplier?  You would go to buy your

19  crack from somebody else, right?

20  A.  Yes, sir.

21  Q.  Would you ever work with other people when you'd go to

22  suppliers?

23  A.  What -- like work, what does that mean?

24  Q.  That's a fair point.  What I mean is would you ever share

25  either money or crack when you'd go to a supplier?

1    A.  Yes, sir.

2    Q.  How so?  What do you mean?

3    A.  Somebody want drugs and they say somebody want drugs and

4    they can't get in contact with the people that they usually

5    get -- they can't get in contact with the people that they

6    usually deal with, I'll take their money and go get it when

7    I'll go get mines, or they'll do the same for me, or I'll call

8    somebody and they'll tell me what they want and give me their

9    money and I'll go get the drugs for them.

10   Q.  Would you ever go with another person to a supplier and

11   both get crack at the same time?

12   A.  Yes.

13   Q.  When you do that, would you ever combine your money so

14   that -- so that it would be one sale from the supplier rather

15   than two?

16   A.  Yes, sir.

17   Q.  Why would you do that?

18   A.  Sometimes we'll get deals like if um a certain amount costs

19   a certain amount of money, buying two orders of it, it will

20   cost probably more.  So if you buy it together you get it like

21   for a little bit cheaper and you just divide it yourself.

22   Q.  Now let me ask you:  After you'd buy crack from a supplier,

23   what would you do with it?

24   A.  Break it up.  Bag it up.

25   Q.  I'm sorry?  You said break it up and then something else.

1    What did you say after that?

2    A.  Package it.

3    Q.  Can you explain for the jury what you mean by break it up

4    or package it?

5    A.  Breaking it up means breaking the piece up to pieces

6    that -- would be like breaking -- break it up to pieces to the

7    amount that you sell.  So if you sell 20s, you break it up to

8    all 20s and bag it up as 20s, $20.

9    Q.  Let me take a step back.  When you would buy crack from a

10   supplier, how much would you on average buy?

11   A.  Three grams up to -- it depends where I'm at and -- it

12   depends the time of the year, where I'm at, what block I'm on.

13   Q.  What's the most -- I'm sorry.  What's the most you've ever

14   bought from a crack supplier?

15   A.  Probably like two ounces, a little bit more than two

16   ounces.

17   Q.  Two ounces.  Do you have any idea how many grams that is?

18   A.  About like 56 to 60 grams.

19   Q.  You said on average it's closer to three grams?

20   A.  No.  No.  That's the most I ever bought.

21   Q.  Right.  But on average, not at the most, but on average it

22   would be closer to three grams?

23   A.  Yes, sir.

24   Q.  What would it look like when you would buy crack from a

25   supplier?  How would it being packaged?  What would it look

E8C9CHR3                          Mallory - direct

1   like?  Explain for the jury.

2   A.  It would be packaged in a clear sandwich bag but as -- it

3   could be one solid rock or it will be pieces of rock.  But it

4   will weigh out to whatever I buy.

5   Q.  Okay.  And then you would take that sandwich bag full of

6   crack and you'd then, you said, to use your words, break it up

7   or package it?

8   A.  Yes, sir.

9   Q.  And then what size packages would you package it into?

10  A.  What does -- could you explain that, what size packages?

11  Q.  So you'd have this big package of crack you bought from the

12  supplier.  Can you explain to the jury what size packages you

13  would then break it up into to sell to your customers?

14  A.  To dimes, and twenties, and hundreds.

15  Q.  When you say dimes, what are you referring to?

16  A.  To rock -- pieces of crack that are sold for $10.

17  Q.  And when you say twenties?

18  A.  Those are pieces of crack that are sold for $20.

19  Q.  And fifties and a hundreds, those are $50 and $100?

20  A.  Yes, sir.

21  Q.  And what would you package it into?

22  A.  Sandwich bags, the corner of sandwich bags.

23  Q.  Can you explain what you mean by that?

24  A.  Like Ziploc bags, like clear sandwich backs.  Like bags

25  that you put like sandwiches in.  You just use the corners of

E8C9CHR3                              Mallory - direct

1   it.  Tie it up in knots.

2   Q.  Would you use the whole bag or did you cut off only the

3   corner part?

4   A.  Only the corner parts.

5   Q.  About how much crack went into a dime?  Do you know how

6   much it weighed?

7   A.  .1.

8   Q.  .1?

9   A.  Of a gram.

10  Q.  Of a gram.

11           Did you weigh each piece before you put it in the

12  corner of the Ziploc bag?

13  A.  No.  No, sir.

14  Q.  How did you know?

15  A.  Just by looking at it.

16  Q.  So getting back to my questions of how, if anything, people

17  worked together.  Did you ever work together by bagging up or

18  packaging your crack?

19  A.  Yes, sir.

20  Q.  How did you do that?

21  A.  We'll go to a place -- we'll go to a place together and bag

22  up together.  Like he'll be -- like I'm with somebody else.

23  They will be sitting on another couch with their plate and I'll

24  be on another couch with my plate and bagging it up.  Breaking

25  it up and bagging it up.

E8C9CHR3                          Mallory - direct

1  Q.  So the equipment you need to bag it up, you mentioned a

2  plate, correct?

3  A.  Yes, sir.

4  Q.  And you said that you didn't need a scale, right?

5  A.  No, sir.

6  Q.  Did you need baggies?

7  A.  Yes, sir.

8  Q.  Would you share baggies with the person you were bagging up

9  with?

10  A.  Yes, sir.

11  Q.  Anything else you would share?

12  A.  If the cops are riding up the street or something, somebody

13  will make a noise or give a signal to let whoever is out there

14  know that the cops are coming or they're close by or something.

15  Q.  So, you're saying that somebody would warn the other people

16  who were selling that the cops were coming through?

17  A.  Yes, sir.

18  Q.  Did you ever do that?

19  A.  Yes, sir.

20  Q.  What noise or indication did you use to let people know?

21  A.  I just tell them "one time."

22  Q.  "One time"?

23  A.  I say "one time."

24  Q.  And what did that mean?

25  A.  That mean cops.

1    Q.  You've got to speak up.

2    A.  That means police.

3    Q.  Again in terms of how people worked together when they are

4    out on the street, let me ask you:  Did you ever carry a gun

5    while you were selling drugs?

6    A.  Yes, sir.

7    Q.  And did you ever -- did you always have a gun on you or did

8    you put it somewhere else?

9    A.  It would be outside somewhere else.

10   Q.  Like where, for example?

11   A.  Underneath a garbage can, in a mailbox, or in the alleyway

12   somewhere, in garbage, something.

13   Q.  And would that be -- would that gun just be used by you or

14   would other people know where it was?

15   A.  Other people would know where it's at.

16   Q.  And what was the reason for that?

17   A.  Protection.

18   Q.  What do you mean?

19   A.  From people who rob people and just protection.

20   Q.  You said earlier that you carried a gun to protect yourself

21   from being robbed because you were selling drugs?

22   A.  Yes, sir.

23   Q.  Is that what you mean here now again?

24   A.  Yes, sir.

25   Q.  How many hours a day would you say you generally spend

1  standing on the streets in Newburgh?

2  A.  Eight to twelve.

3  Q.  And I meant standing on the streets selling crack.  Still

4  eight to twelve?

5  A.  Eight to twelve, yes, sir.

6  Q.  Were there particular hours that you used -- that they used

7  to sell?

8  A.  No, sir.

9  Q.  Was there ever a shift that you preferred over other

10 shifts?

11 A.  Yes, sir.

12 Q.  What shift was that?

13 A.  Daytime.

14 Q.  Daytime.  So from approximately when to when?

15 A.  From like 6 in the morning, 5 in the morning to like,

16 probably like 4 in the afternoon, 5 in the afternoon.

17 Q.  And then after you called it a day on the streets did you

18 stop selling completely?

19 A.  No, sir.

20 Q.  How else -- how then did you sell when you're not on the

21 street?

22 A.  People will call my phone and I'll meet them or they will

23 come meet me.

24 Q.  The other people who were out on the street with you, did

25 they work different hours than you?

1    A.  Not really.  No.

2    Q.  So you guys were all working similar hours?

3    A.  Yes, sir.

4    Q.  Were there different days of the month or times of the

5    month in which you worked harder than other days?

6    A.  Yes, sir.

7    Q.  What days were those?

8    A.  The early days of the month from like the first of the

9    month to the ninth of the month.

10   Q.  Why was that?

11   A.  Because a lot of the customers that I sold drugs to got

12   checks from the government.

13   Q.  And they got them when?  As far as you knew?

14   A.  The beginning of each month.

15   Q.  Mr. Mallory, how much crack were you selling per day or per

16   week?

17   A.  Probably like ten grams every couple days, like an ounce a

18   week.

19   Q.  Would you say you were selling the same, more, or less than

20   the other guys who were out there?

21             MR. GREENFIELD:  Objection.

22             THE COURT:  Overruled.

23             THE WITNESS:  Some same.  Some less.

24   Q.  Some the same?  Some less?

25   A.  Yes, sir.

1   Q.  So there were some people who were selling more?

2   A.  Yes, sir.

3   Q.  And, I'm sorry, earlier you said that you sold about an

4   ounce a week?

5   A.  Yes, sir.

6   Q.  How much is an ounce again?

7   A.  28 grams.

8   Q.  Let me focus you specifically on 2010.  Where were you

9   selling at that point?

10  A.  2010 I was on William and Ann Street in Newburgh.

11          THE COURT:  Where?

12          THE WITNESS:  William and Ann Street in Newburgh.

13  Q.  Were you selling that same ounce per week or something

14  different?

15  A.  Something different.

16  Q.  How much were you selling back then in 2010?

17  A.  Probably about an eight ball -- an eight ball a day.

18  Q.  An eight ball a day?

19  A.  Yes, sir.  Or every two days.  An eight ball every two

20  days.

21  Q.  An eight ball you said earlier was 3.5 grams?

22  A.  Yes, sir.

23  Q.  So just to be clear when you said 28 grams or an ounce a

24  week, that was at a different time in 2010?

25  A.  Yes, sir.

1    Q.  When approximately was that?

2    A.  Probably later in the year.

3    Q.  I'm sorry?

4    A.  Later in that year.

5    Q.  Okay.  And in 2010 when you were selling an eight ball

6    every couple of days were you also selling heroin at that

7    point?

8    A.  Yes, sir.

9    Q.  Do you know how crack cocaine is made?

10   A.  Yes, sir.

11   Q.  Have you ever made crack?

12   A.  Yes.

13   Q.  How do you do it?

14   A.  With hot water -- with boiling water, cocaine, and baking

15   soda.

16   Q.  Where do you put all those ingredients?

17   A.  You put the hot water in the pot, in the jar.  You put the

18   cocaine, and you put the baking soda in, more water in it --

19   more water inside of the jar.

20   Q.  And what's the purpose as far as you know of the baking

21   soda?

22   A.  I don't know the purpose of the baking soda.

23   Q.  When you were on the street where did you keep your crack?

24   A.  Um either stashed or on my body parts -- or on my body.

25   Q.  When you say a stash, what do you mean?

E8C9CHR3                      Mallory - direct

1    A.  For example, in the chip bag across the street from

2    wherever I'm standing at, in a mailbox, in the hallway.

3    Q.  When you say in a chip bag, where would that chip bag be?

4    A.  By a garbage can by where there's some other chip bags

5    there.

6    Q.  And you said that you -- so you'd store your crack either

7    in a stash like a chip bag or on your person?

8    A.  Yes, sir.

9    Q.  Where on your person would you store the crack?

10   A.  In my butt area, my -- like my butt area.

11   Q.  Your butt, your rear end?

12   A.  Yes, sir.

13   Q.  Did you ever store it anywhere else besides in your rear

14   end area?

15   A.  Sometimes in my pocket but that would just be for short

16   moments.

17   Q.  Did you ever store crack in your mouth?

18   A.  Yes, sir.  I had crack in my mouth before.

19   Q.  Was it already packaged in little sandwich bags?

20   A.  Yes, sir.

21   Q.  Now why did you store your crack either in a stash or in

22   your butt or in your mouth?  Why did you do that?

23   A.  So I don't get caught with it.

24   Q.  Did you ever get approached by the police when you had

25   crack in your mouth?

1    A.   Yes, sir.

2    Q.   What did you do with the crack?

3    A.   I would swallow it.

4    Q.   How many pieces of crack did you swallow?

5    A.   Probably like 18.

6    Q.   How many times did you do that?

7    A.   Probably once or twice.

8    Q.   Did you get caught by the police?

9    A.   No.

10   Q.   So after the police left what did you do with that -- what

11   did you do?

12   A.   Throw it up.

13   Q.   Make yourself throw up?

14   A.   Yes, sir.

15   Q.   And then what did you do with the crack that you threw up?

16   A.   Rinse it and probably change the bags up and sell it.

17   Q.   Can you explain for the jury briefly how a crack

18   transaction works -- worked for you on the street, how you met

19   with a customer, how you served them, etc.?

20   A.   Somebody will call my phone and they'll either text me and

21   tell me how much in codes.  And I'll have it put together so

22   when they come I get in the car with them or I bring them in

23   the hallway and I will give them the drugs or if I'm outside

24   standing out there I'll um -- they'll come up to me and they'll

25   tell me what they want, I'll go get it for them, and I come

1    back, give it to them, and take the money.

2    Q.  Where would you ordinarily give it to them on the street,

3    right on the street or would you walk anywhere?

4    A.  In the alleyway or in the hallway or inside of a car.

5    Q.  Mr. Mallory, were you ever arrested for selling or

6    possessing crack?

7    A.  Yes, sir.

8    Q.  How many times?

9    A.  Once -- twice.  Twice.

10   Q.  Was one of those times your arrest that you already talked

11   about in January of 2012?

12   A.  Yes, sir.

13   Q.  What was the other time?

14   A.  When I was about 14 or 15 I had sold drugs to an undercover

15   cop.

16   Q.  Did you go to court for that case?

17   A.  Yes, sir.

18   Q.  What happened to those charges?

19   A.  I got -- I did juvenile time for it.

20   Q.  Did you plead guilty?

21   A.  Yes, sir.

22   Q.  And you had juvenile time.  Does that mean you served time

23   in a juvenile detention center?

24   A.  Yes, sir.

25   Q.  You said that you sold crack and heroin with L-1, correct?

1   A.  Yes, sir.

2   Q.  Did you ever get arrested at L-1's residence?

3   A.  Yes, sir.

4   Q.  Where was that?

5   A.  On William Street.

6   Q.  Do you know if the police recovered crack?

7   A.  Yes, sir.

8   Q.  Whose crack was it?

9   A.  Mines and his.

10  Q.  Where was it hidden?

11  A.  The drugs I had were hidden in the mailbox.

12  Q.  Was there other crack that was recovered as well?

13  A.  Yes, sir.

14  Q.  We're was that crack hidden?

15  A.  In the hallway by the step area.

16  Q.  Was it out in plain sight or was it hidden in something?

17  A.  Honestly I don't know where it was at because he put it in

18  there when I was outside.  I just know that they found more

19  drugs in the hallway where he was at.

20  Q.  Did you plead guilty to these charges?

21  A.  No, sir.

22  Q.  Do you know why not?

23  A.  No.

24  Q.  Mr. Mallory, you testified earlier that you were a member

25  of the Bloods; is that right?

1   A.  Yes, sir.

2   Q.  When was it that you joined the Bloods?

3   A.  Early 2010 or -- late 2009, early 2010.

4   Q.  Are you still a member of the Bloods now?

5   A.  No, sir.

6   Q.  Sorry.  Just going back to that arrest at L-1's residence.

7   You said the crack was yours and someone else's.  Who else did

8   the crack belong to?

9   A.  L-1.

10  Q.  Okay.  So you're no longer a member of the Bloods, correct?

11  A.  No, sir.

12  Q.  How long were you a member of the Bloods, approximately?

13  A.  Almost a year.

14          MR. GREENFIELD:  I'm sorry.  I couldn't hear.

15          THE WITNESS:  Almost a year.  About eight months, nine

16  months, almost a year.

17  Q.  Why did you stop being a member of the Bloods?

18  A.  Not getting along with the people -- not getting along with

19  the other Blood members and drugs I was doing.

20  Q.  So you said you weren't getting along with members of the

21  Bloods; is that right?

22  A.  Yes, sir.

23  Q.  And then you said it's because of the drugs you were doing?

24  A.  Yes, sir.

25  Q.  What did you mean by that?

E8C9CHR3                         Mallory - direct

1   A.  I was smoking PCP and using cocaine while I was -- while I

2   was being -- when I was Blood.

3   Q.  Was the reason that you were selling drugs or, sorry, using

4   drugs and then stopped becoming a Blood, was that by your

5   choice or by their choice?

6   A.  By my choice.

7   Q.  How did you join the Bloods?

8   A.  Through -- through a family member's boyfriend.

9   Q.  A family member's boyfriend?

10  A.  Yes, sir.

11  Q.  Which family member is this?

12  A.  My cousin.

13  Q.  And it was your cousin's boyfriend?

14  A.  Yes, sir.

15  Q.  What was his name?

16  A.  Water.

17  Q.  Water?

18  A.  Yes, sir.

19  Q.  Now where did your cousin and Water live?

20  A.  In New Jersey.

21  Q.  Where in New Jersey?

22  A.  East Orange, New Jersey.

23  Q.  Did you meet Water in Newburgh or in East Orange?

24  A.  I met him in Newburgh -- I mean in New Jersey.

25  Q.  In East Orange?

E8C9CHR3                          Mallory - direct

1   A.  Yes, sir.

2   Q.  Was Water a member of the Bloods?

3   A.  Yes, sir.

4   Q.  Did Water have a particular rank or status within the

5   Bloods?

6   A.  Yes, sir.

7   Q.  What was that?

8   A.  I believe he was a high.

9   Q.  A high?

10  A.  Yes, sir.

11  Q.  Is that the name of a rank?

12  A.  Yes, sir.

13  Q.  And did Water help you become a member of the Bloods?

14  A.  Yes, sir.

15  Q.  How did that work?  Explain for the jury.

16  A.  Being that I was family, being that he had a son by my

17  cousin and he knew the things that I did like as far as the

18  drug activity I took in and how I um -- the things, the

19  criminal activity I was into, he basically, when he had to ask

20  somebody was -- when he had to get the approval for me to be

21  Blood it basically was easy -- it was easy.  I didn't have to

22  do anything.  I had to go -- I didn't have to go through any

23  initiation or anything being that he knew my background and all

24  that.

25  Q.  So what actually did you do or what did he do for you to

E8C9CHR3                          Mallory - direct

1    make you a member of the Bloods?

2    A.   Giving me a little bit of paperwork -- giving me a little

3    bit of paperwork and um -- that's it.

4    Q.   You said paperwork.  What are you referring to?

5    A.   Blood oaths.  Blood history.

6    Q.   So Blood oaths and Blood history?  Is that what you said?

7    A.   Yes, sir.

8    Q.   Did you have to recite an oath to become a member of the

9    Bloods?

10   A.   Yes, sir.

11   Q.   Now you said that you didn't have to do any initiation.

12   Are you familiar with how people are normally joined into the

13   Bloods?

14   A.   Yes, sir.

15   Q.   What type of initiation do they have to do?

16   A.   Fighting or shooting -- fighting or some form of violence.

17   Q.   Fighting or some form of violence?  I think you said

18   shooting also?

19   A.   Yes, sir.

20   Q.   But you didn't need to do that?

21   A.   No, sir.

22   Q.   So as a member -- I'm sorry.  So you joined the East

23   Orange, New Jersey Bloods, right?

24   A.   Yes, sir.

25   Q.   Were you also a Blood in Newburgh?

1    A.   Yes, sir.

2    Q.   How did that work?  You joined the Bloods in New Jersey but

3    could come to Newburgh and be a Blood?

4    A.   Because I lived in Newburgh.  When I used to go to

5    Jersey -- I was only in Jersey for like weeks or whatever.  So

6    I got a lot of my stuff there.  And being that I knew people

7    that were Blood in Newburgh, I just had to introduce them -- I

8    had to introduce myself to them as Blood.  And that's how I

9    was -- brought Blood in New Jersey and able to still be Blood

10   in Newburgh.

11   Q.   Okay.

12   A.   Because I knew a lot of them.

13   Q.   As a member of the Bloods in Newburgh what types of things

14   did you do?

15   A.   Sold drugs.  Carried guns.  That's it.

16   Q.   You said that Water had given you some paperwork in

17   New Jersey, correct?

18   A.   Yes, sir.

19   Q.   Did anybody give you any paperwork in Newburgh?

20   A.   Yes, sir.

21   Q.   Who gave you paperwork in Newburgh?

22   A.   L-1 did.  Kev Gotti did.

23   Q.   What type of paperwork did L-1 and Kev Gotti give?

24   A.   More history and more oaths.

25   Q.   Did the Bloods in Newburgh wear any particular articles of

1    clothing?

2    A.  Some of them wore red.  Some of them wore green.

3    Q.  Red or what did you say?

4    A.  Some of them wore red.  Some of them wore green.

5    Q.  Green?

6    A.  Yes, sir.

7    Q.  Were there any articles of clothing that members of the

8    Bloods avoided wearing?

9    A.  Too much red.

10   Q.  Too much red?

11   A.  Not a lot of red, yeah.

12   Q.  Were there any colors that members of the Bloods would not

13   wear?

14   A.  No, sir.

15   Q.  The Bloods existed in Newburgh as well as in East Orange,

16   according to your testimony, right?

17   A.  Yes, sir.

18   Q.  How did -- how are the different members of the Bloods

19   divided?

20          MR. DRATEL:  Objection, your Honor, to the terms of

21   the generality of the question.

22          THE COURT:  Why don't you rephrase, Mr. Bauer.

23   Q.  Were the Bloods in Newburgh organized in any way?

24   A.  Yes, sir.

25   Q.  How were they organized?

1    A.  In different sets.

2    Q.  Sets?

3    A.  Yes, sir.

4    Q.  What were some of the sets of the Bloods in Newburgh?

5    A.  9 Trey.

6    Q.  9 Trey?

7    A.  Gangsters.

8            G-Shine.

9    Q.  G-Shine.

10   A.  Sex Money Murder.

11   Q.  Sex Money Murder?

12   A.  5-9 Brim.

13   Q.  5-9 Brim?

14   A.  Mac Baller.

15   Q.  Mac Baller.

16           Were you in a particular set?

17   A.  Yes, sir.

18   Q.  Which set were you in?

19   A.  GKB.  Gangster Killer Blood.

20   Q.  GKB stands for Gangster Killer Blood?

21   A.  Yes, sir.

22   Q.  That was your set?

23   A.  Yes, sir.

24   Q.  Was that related to G-Shine at all?

25   A.  Yes, sir.

1   Q.   How so?

2   A.   That is considered G-Shine.

3   Q.   That's the same set?  That's two different names?

4   A.   Two different names but it's the same set.

5   Q.   You mentioned earlier that Water was the high in

6   New Jersey, right?

7   A.   Yes, sir.

8   Q.   Did the -- and that that was a rank within the Bloods,

9   right?

10  A.   Yes, sir.

11  Q.   Did the GKB or G-Shine set in Newburgh have a similar set

12  of ranks?

13  A.   Yes, sir.

14  Q.   Can you walk through for the jury what the different

15  statuses or ranks are?

16        MR. GOLTZER:  May the record note our continuing

17  objection, Judge.

18        THE COURT:  Very well.

19        THE WITNESS:  The difference of rank would be

20  considered like GF, high, low, 5, 4, 3, 2, 1.  The highest

21  would be GF.  The lowest would be 1.

22  Q.   Does GF stand for anything?

23  A.   Yes.

24  Q.   What does it stand for?

25  A.   I'm not sure.  I think Godfather.  I'm not sure.

1   Q.  You think Godfather?

2   A.  Yes, sir.

3            MR. DRATEL:  Objection.

4            THE COURT:  But you're not sure?

5   Q.  But you're not sure?

6   A.  I'm not sure.

7   Q.  And so next under GF would be what?

8   A.  High.

9   Q.  And then after that?

10  A.  Low.

11  Q.  And then after that?

12  A.  Five.

13  Q.  Does 5 also go by anything else?

14  A.  No.

15  Q.  And then under 5 is 4, 3, 2, 1?

16  A.  Yes, sir.

17  Q.  Now, in the GKB set in Newburgh, who was the highest

18  ranking member of the Bloods back in around 2010?

19  A.  L-1.

20  Q.  L-1.  What was his rank?

21  A.  L-1 was the high.

22  Q.  Was the high?

23  A.  Yes, sir.

24  Q.  Who was the high before L-1?

25  A.  In Newburgh?

1   Q.  Yes.  For GKB.

2   A.  I don't know.

3   Q.  Okay.  You mentioned that Kev Gotti was a Blood.  He gave

4   you some paperwork, you said?

5   A.  Yes, sir.

6   Q.  Did he have a rank or status?

7   A.  Yes, sir.

8   Q.  Do you know what his status was?

9   A.  Three or 4.  One or the other.

10  Q.  Three or 4?

11  A.  Yes, sir.

12  Q.  You're not sure which one?

13  A.  No.

14  Q.  But he had status?

15  A.  Yes, sir.

16  Q.  Can you name some of the other people in Newburgh who had

17  status in the Newburgh GKB set in or around 2010?

18  A.  Freaky.

19  Q.  Freaky?

20  A.  Yeah.  Waldo.

21          THE COURT:  Sorry.  What was that that name you just

22  said?

23          THE WITNESS:  Waldo.

24          Kev Gotti, L-1, that's all that I can remember.

25  Q.  Did the Bloods in Newburgh and the GKB set have meetings?

1   A.  Yes, sir.

2   Q.  Where were they held?

3   A.  What year?

4   Q.  In around 2010.

5          MR. GREENFIELD:  Can you ask him if he was a Blood

6   then.

7          THE WITNESS:  Yes, sir.  I was a Blood then.

8   Q.  Yes, you were a Blood?

9   A.  Yeah, I was a Blood then.

10  Q.  Where were the meetings?

11  A.  On First Street and some other places.  When I came around

12  they were usually on First Street.

13  Q.  You've I think you said when you came around they were

14  usually on First Street?

15  A.  Yes, sir.

16  Q.  Do you know where on First Street?

17  A.  260 First Street.

18  Q.  Who lived at 260 First Street?

19  A.  My girlfriend lived there and, um, it was a weed spot on

20  260 First Street.

21  Q.  So the meetings were held at that weed spot on 260 First

22  Street?

23  A.  Yeah.  Both of them.  It was upstairs and downstairs.  But

24  when they were upstairs that wasn't my girlfriend at the time.

25  But they were held upstairs and they was held downstairs.

E8C9CHR3                          Mallory - direct

1   Q.  Okay.  I'll return to 260 First Street in a moment.

2           Are you familiar with a gang called -- I'm sorry.

3   Star Status I think you said earlier that Reckless was member

4   of Star Status; is that correct?

5   A.  Yes, sir.

6   Q.  Do you know if Reckless -- I'm sorry.  Do you know if Star

7   Status exists beyond Newburgh?

8   A.  No.

9   Q.  As far as you know, what?

10  A.  It's only in Newburgh.

11  Q.  You've got to speak up.

12          Only in Newburgh?

13  A.  Yes, sir.

14  Q.  Who are members of Star Status?

15  A.  That I knew back then?

16  Q.  Yes.  Exactly.  Back in 2010.

17  A.  Reckless, Baynes, Marcus.  I don't really know a lot of

18  them.

19  Q.  Marcus you said?

20  A.  Yeah.

21  Q.  Are you familiar with somebody named Peachy?

22          MR. GREENFIELD:  Objection.

23          THE COURT:  Overruled.

24  Q.  If you know somebody named Peachy?

25  A.  Yes, sir.

1  Q.  Was he a member of any gangs in Newburgh?

2  A.  I believe he's Star Status.  I'm not sure.

3  Q.  Were you --

4          MR. DRATEL:  Move to strike.  Not sure.

5          THE COURT:  Overruled.

6  Q.  To be clear, were you a member of Star Status?

7  A.  No.

8  Q.  Are you familiar with a gang known as the Ashy Bandits?

9  A.  Yes, sir.

10  Q.  Is that a gang that exists in Newburgh?

11  A.  Yes, sir.

12  Q.  Do you know if it exists outside of Newburgh?

13  A.  No, sir.

14  Q.  Who are some of the members of Ashy Bandits?

15  A.  Um, Quick, Geo.

16  Q.  Quick, Geo?

17  A.  Kev Gotti.  Bow Wow, um -- that's the only people I can

18  think of right now.

19  Q.  What was the relationship between Star Status and the

20  Bloods back in 2010?

21  A.  Nothing.

22  Q.  Were they friendly, unfriendly, or something else?

23          MR. GOLTZER:  Objection, your Honor.  It's repetitive.

24  There was a prior answer.  He said nothing.

25          THE COURT:  Overruled.

1           THE WITNESS:  I don't remember them having any

2    relationship.

3    Q.  You don't remember?

4    A.  No, sir.

5    Q.  Do you remember if there was any -- any problems between

6    Star Status and the Bloods?

7    A.  (Pause)  What do you consider problems?

8    Q.  Have you ever heard the term beef?

9    A.  With the whole gang?

10   Q.  Were the gangs fighting, Bloods and Star Status?

11   A.  No, sir.

12   Q.  How about Bloods and Ashy Bandits?

13   A.  No, sir.

14   Q.  Did members of the Bloods ever have guns?

15   A.  Yes, sir.

16           MR. DRATEL:  Objection, your Honor.

17           THE COURT:  Sustained as to the form.

18           MR. DRATEL:  Objection, your Honor.

19   Q.  Back in 2010 did you ever see members of the Bloods with

20   guns?

21   A.  Yes, sir.

22           MR. DRATEL:  Objection.

23           THE COURT:  Overruled.

24   Q.  Was that around the time that you also possessed guns?

25   A.  Yes, sir.

E8C9CHR3                          Mallory - direct

1    Q.  Did you ever share your guns with other members of the

2    Bloods?

3    A.  I shared guns with other Blood members but I only had one

4    gun.  I didn't have a lot of guns.

5    Q.  Did you ever see other members of the Bloods sharing guns

6    with other members?

7    A.  Yes, sir.

8    Q.  Do you know why they were sharing guns?

9    A.  For protection and for -- to commit crimes.

10   Q.  What types of crimes did they need the guns for?

11   A.  For robberies and that's it.

12            MR. GOLTZER:  May we have a sidebar, Judge?

13            THE COURT:  Yes.

14            (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1           (At the sidebar)

2           MR. GOLTZER:  We had previously objected to gang

3   testimony and of course the court ruled so we hadn't been

4   objecting for a while but we seem to go far beyond the offer of

5   proof that was made by the government during the argument on

6   the motions in limine.  He's turning it into an enterprise case

7   with vague allegations about gang members doing this, doing

8   that, having nothing to do with our clients.  They're not

9   charged with being members of an enterprise.  The conspiracies

10  alleged in the indictment do not encompass the gangs as

11  integral parts.  He's repeated testimony that different members

12  at the defense tables are members of different gangs.  The

13  witness testified with respect to one of the questions that

14  there was no relationship, there was nothing between them.  So

15  most of this testimony should be stricken, most respectfully,

16  as being irrelevant and immaterial and unduly prejudicial under

17  Rule 403.

18          THE COURT:  The answer that he gave that there was

19  nothing in response to the question, what was the relationship,

20  I understood that to be an ambiguous answer, which is why I

21  overruled the objection to the follow-up question because

22  "nothing" could have meant that there was no problem between

23  them; "nothing" could have meant that there was no relationship

24  whatsoever.  So that was why that objection was overruled.

25          But did you want to speak to the balance of the

 1    objection?

 2             MR. GOLTZER:  I also wanted to add that it's really a

 3    great deal of propensity evidence.  He's trying to show the

 4    character and nature of the organizations in a vague and

 5    general way that shows a general propensity of guilt by

 6    association and membership to commit certain kinds of crimes

 7    and that's wholly improper.

 8             MR. BAUER:  Judge, as we have said in the argument,

 9    this evidence is important background as to the specific

10    allegations for each of the defendants.  The fact that these

11    individuals were members of these gangs, Bloods and Star

12    Status, is an inextricable part of the robbery as to how it was

13    organized, how it was planned, who participated, what the

14    motivation was for it.

15             Similarly, all of the other evidence about these

16    individuals doing other robberies or selling drugs is all

17    relevant to the participation in the Bloods.  So this was just

18    relevant background so the jury can understand, when we're

19    talking about the Bloods, and how the Bloods are relevant to

20    Newburgh, what we're talking about.

21             THE COURT:  One of the problems that I see is that you

22    ask him, for example, did you ever see Bloods with guns or did

23    you ever see Bloods share guns.  It's very a open-ended

24    question.  Could you then ask the follow-up questions what

25    Bloods and, you know, when, where, give some indication as to

1    the context of that.

2            MR. BAUER:  I'm happy to do that.  I was going to

3    steer away from that because I didn't wan to name defendants as

4    part of our agreement of how this would proceed.  What I

5    propose if I can say -- I won't list their clients.  I'll say

6    did L-1 -- have you ever seen L-1 with guns?  Did you ever see

7    him share guns?  Did you ever see Kev Gotti do it?  But I won't

8    mention the clients.

9            MR. GOLTZER:  He's turning it into a Blood trial.

10   It's -- for example Reckless wasn't a Blood.  My client was an

11   Ashy Bandit.  Kevin Gotti --

12           MR. BAUER:  And Blood.

13           MR. GOLTZER:  According to this guy.

14           But it's not central to the allegations in the case.

15   We're being overwhelmed with gang evidence that we have no way

16   of rebutting because it's vague, it's general, it's --

17           MR. DRATEL:  Shouldn't have to rebut it.  It's not the

18   conspiracy.

19           MR. GOLTZER:  It's not the conspiracy charged.  I'm

20   not even charged in a conspiracy.  But those defendants who

21   are, are not charged in a conspiracy, being members of the

22   Bloods.  Being a member of a Blood is not a crime.

23           THE COURT:  It's also Giglio as to this witness.

24           MR. GOLTZER:  But his Giglio doesn't mean it's our --

25   it's just guilt by association.

1          MR. DRATEL:  Frankly with Star Status for us, because

2     we're not affiliated with that, or Ashy Bandits, because Thomas

3     is not affiliated with that either, it's neither necessary or

4     sufficient with respect to the case.  So it really floats out

5     there as something that we don't have the burden of proving or

6     disproving -- not that we could because, as Mr. Goltzer said,

7     it's impossible to take on the entirety of the whole Blood

8     organization, so why should we have to?  So it creates a burden

9     on us that's insurmountable.

10         MR. GOLTZER:  We're talking about ranks.  We're

11    talking about sets.  We're talking about five or six sets that

12    nobody ever heard of.  We're talking about New Jersey.  We

13    might as well be in Cleveland by the time we break.

14         THE COURT:  Again --

15         MR. GOLTZER:  It should be limited to some extent.

16         THE COURT:  I don't know that any of that testimony is

17    necessarily prejudicial as to the defendants.  It's just this

18    gentleman was a member of a gang and he's describing how the

19    gang was.

20         MR. GOLTZER:  Most respectfully, Judge, I get the

21    impression from listening to the testimony that anybody who is

22    within striking distance of being a member of the Bloods is

23    committed to following orders, committing crimes, selling

24    drugs, holding guns, sharing guns, committing robberies, and

25    shooting people.  That's what the jury is getting out of this.

1          MR. BAUER:  Judge, just as a reminder, the fact that

2     they are Bloods is how they know each other.  The testimony --

3     the evidence is going to come out that L-1 -- already has

4     that -- that L-1 brought Gucci in as a Blood.  And the same

5     relationship was there for Kev Gotti and Bow Wow.  So, I'm not

6     sure how you can separate it.

7          Let me just finish.  You keep cutting me off.

8          THE COURT:  He hasn't said a word.  He makes a move

9     and you object.

10         MR. GOLTZER:  I was about to cut him off.

11         MR. BAUER:  What I was going to suggest is that we

12    would not object to an instruction along the lines of that

13    being a member of the Bloods alone is not a crime.  And it's

14    being offered to demonstrate the -- how the defendants knew

15    each other and to put in context some of the other crimes that

16    they're charged with.  It seems like a reasonable solution.

17         MR. GOLTZER:  It's like -- you know what, it's like,

18    it's like saying that I was a member of the Bonanno crime

19    family and I committed an extortion with Mr. Bauer who was also

20    a member of the Bonanno crime family.  And then we bring in all

21    the murders that the Bonanno crime family ever committed or all

22    the prostitution or the drug dealing and how they took an oath

23    follow the code and leave their families and burn things in

24    their hand to become a member.  That's what's going on here.

25         MR. BAUER:  To be clear I didn't ask about --

1          MR. GOLTZER:  And the instruction -- I'm cutting you

2    off again.

3          The instruction that's suggested by the government

4    doesn't begin to cure the prejudice here.  I mean the -- it's

5    true.  I mean you might tell the jury that being a member of

6    the Bloods isn't a crime; and it's not to imply that if one

7    person commits a crime, another person commits a crime; that

8    not all members of the Bloods commit crime.  What are you going

9    to do?  Give a whole defense argument to an enterprise

10   corruption case?  It's bizarre.

11         THE COURT:  I'm happy to give an instruction if the

12   defendants want an instruction.

13         How much more do you have along these lines?

14         MR. BAUER:  Very little.  I was just going to ask

15   about -- I was in the middle of the guns.  And I was going to

16   ask if members of the Bloods committed robberies together.

17   Again, it's relevant to the testimony.  I was not going to go

18   into any of the other crimes.  I was focusing on the crimes

19   that are relevant to this case.

20         MR. GOLTZER:  Creates the impression that being a

21   member of the Bloods makes you guilty by association of the

22   crime of robbery and it's unfair, Judge.

23         Mr. Buchwald would like to cutoff Mr. Bauer.

24         MR. BUCHWALD:  Just for the record, your Honor,

25   defendant Thomas moves for a mistrial on the grounds of the

1    overwhelming prejudice of the testimony that's been elicited

2    that has nothing to do with charged conspiracies.  It's totally

3    confusing the jury by bringing in multiple, multiple, multiple

4    conspiracies.  I don't think there's going to be any way for

5    them -- just as there is no way for us -- to figure out what

6    conspiracy is actually charged here that our clients are

7    theoretically part of when it comes to the drug conspiracy or

8    the robbery conspiracy.  We understand the -- December 15.  But

9    what kinds of conspiracies are we talking?  There's absolutely

10   no way for this jury to be able to distinguish between these

11   things.  Given the prejudice of all of this testimony, we move

12   for a mistrial.

13            MR. STRAZZA:  Just for the record, on behalf of

14   defendant Christian, we join in the application.

15            The same prejudice that goes along with the gang

16   testimony regarding the Bloods.  It's clear that Raymond

17   Christian is not a Blood, never was a Blood, and we feel that

18   we can't overcome the prejudice here.

19            THE COURT:  The application for a mistrial will be

20   denied.  I don't believe that the defendants have been

21   prejudiced by the eliciting of the testimony about the

22   organizational structure of the Bloods that Mr. Bauer has gone

23   through with Mr. Mallory.  There has been prior testimony that

24   these various defendants were members of various gangs.  This

25   is simply giving some background as to how these gangs are

1    structured and how they operate.  And I don't believe that, as

2    I've mentioned, that they've been prejudiced at all by this

3    testimony.

4             There's been the representation by the government that

5    they will be moving on from this topic.  If the defendants wish

6    to propose an instruction, I'm happy to give one, along the

7    lines that membership in a gang is not obviously anything

8    that's charged in this case, and I think that the jury will be

9    able, if properly instructed, to focus on the conspiracies that

10   have been charged in this case and the crimes that have been

11   charged in this case.

12            MR. GOLTZER:  I would also request an instruction

13   under those circumstances that the fact that there's been

14   testimony that members of gangs in general commit crimes

15   doesn't mean that particular members -- that all members commit

16   crimes or that these defendants committed the crime.

17            THE COURT:  I'm happy to give an instruction along the

18   lines that you propose.

19            MR. BUCHWALD:  Can we be told now, the government

20   having declined to do it before the trial and not been ordered

21   to do it, have a list -- what is the conspiracy that Mr. Thomas

22   is charged with?  Who are the coconspirators in the drug --

23   four-year drug conspiracy that he is charged with?  And who are

24   the coconspirators in the four-year robbery conspiracy that he

25   is charged with?

E8C9CHR3                        Mallory - direct

1            MR. BAUER:  Are you looking at me.

2            There's been ample disclosures in the form of 3500

3    otherwise with that information.  I don't think we need to

4    provide that.

5            THE COURT:  Okay.  Continue.

6            MR. GOLTZER:  Are you going to give that instruction

7    now?

8            THE COURT:  Do you want to propose some language or do

9    you want me to give something now?

10            MR. GOLTZER:  I trust you to give it now.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E8cnchr4                          Mallory - direct

1                    (In open court)

2                    THE COURT:  Ladies and gentlemen, thank you for your

3       patience.  Obviously there are some very important legal issues

4       that the parties and I have to work through.

5                    What I wanted to tell you now, however, is that you

6       have heard testimony from Mr. Mallory concerning the structure

7       of the Bloods gang, in particular some membership, how they

8       operate when they meet, where they meet, things along those

9       lines.

10                   You will recall during my brief introduction about the

11      allegations in the case and the parties' opening arguments that

12      there is no allegation here that any gang was involved, that

13      there's no crime that is being charged that is specifically

14      related to any gang.  So this is just being provided to you by

15      way of background to the crimes that are actually alleged in

16      the indictment and how these various individuals know each

17      other.

18                   You should also understand that just because certain

19      members of certain gangs commit crimes does not mean that other

20      members of the gangs necessarily either commit those crimes or

21      are required to commit those crimes.

22                   With that, Mr. Bauer.

23      BY MR. BAUER:

24      Q.  Mr. Mallory, at this time I want to show you some

25      photographs, most of which are already in evidence.

 1              MR. BAUER:  Ms. McInerney, if we could pull up

 2   photograph 201.

 3   Q.  Is that up on your screen?

 4   A.  Yeah.  Yes, sir.

 5   Q.  Who is that a photograph of?

 6   A.  Reckless.

 7              MR. BAUER:  Can we pull up 202.

 8   Q.  Who is that a photograph of?

 9   A.  Gucci.

10   Q.  Photograph 203.  Who is that a photograph of?

11   A.  Bow Wow.

12              MR. BAUER:  Let's do photograph 204.

13   Q.  Who is that?

14   A.  L-1.

15   Q.  Do you know his real name?

16   A.  James Williams.

17   Q.  Is this the L-1 you were talking about earlier who I

18   believe was the high for the Bloods?

19   A.  Yes, sir.

20   Q.  I was asking you before about members of the Bloods who had

21   guns.  Have you ever seen L-1 with guns?

22   A.  Yes, sir.

23   Q.  Have you ever seen L-1 share guns?

24   A.  Yes, sir.

25   Q.  Have you seen him share guns with other members of the

E8cnchr4                              Mallory - direct

 1   Bloods?

 2   A.  Yes, sir.

 3   Q.  Did L-1 sell drugs?

 4   A.  Yes, sir.

 5   Q.  You testified earlier that you sold with him at times,

 6   correct?

 7   A.  Yes, sir.

 8   Q.  What drugs did L-1 sell?

 9   A.  Heroin, crack, and that's it that I remember.

10            MR. BAUER:  Can we pull up 205.

11   Q.  Do you know who that is?

12   A.  Bash.

13   Q.  Was Bash a member of any gangs?

14   A.  Yes, sir.

15   Q.  What gang was he a member of?

16   A.  Bloods.

17   Q.  Have you ever seen Bash with a gun?

18   A.  Yes, sir.

19   Q.  Have you ever seen Bash with drugs?

20   A.  Yes, sir.

21   Q.  Have you ever seen him sell drugs?

22   A.  Yes, sir.

23   Q.  What drug did you see him sell?

24   A.  Crack and marijuana.

25   Q.  You said you saw Bash with a gun.  Do you know if Bash has

1    ever done any robberies?

2    A.  Besides the one in 2010?

3    Q.  Other than any robberies in 2010, do you know if Bash did

4    any robberies?

5    A.  I don't remember.

6    Q.  In particular, do you know if Bash ever did any robberies

7    that were arranged by L-1?

8             MR. GOLTZER:  Objection to leading.

9             THE COURT:  Overruled.

10   A.  No, sir.

11   Q.  Are you familiar with an individual named Mo Nice?

12   A.  Mo Nice, yes, sir.

13   Q.  Who is Mo Nice?

14   A.  Mo Nice is a drug dealer that used to sell drugs on West

15   Parmenter that testified on the murder that L-1 beat in the

16   state.

17   Q.  So Mo Nice is a drug dealer from Newburgh?

18   A.  Yes, sir.

19   Q.  What drugs did he sell?

20   A.  He sold crack and heroin.

21   Q.  You said he testified at a trial?

22   A.  Yes, sir.

23   Q.  Do you know that firsthand?  Did you see him testify?

24   A.  L-1 showed me like papers --

25             MR. GOLTZER:  Objection.

1    A.  Yes, I seen that.

2              THE COURT:  I'm sorry?

3              THE WITNESS:  L-1 showed me papers and it had his name

4    on it, Mo Nice.

5              MR. BAUER:  Judge, I'm happy to move from this.  I was

6    trying to clear up an ambiguous statement, but I'm happy to

7    move on.

8              THE COURT:  OK.

9    Q.  Do you know if Mo Nice has ever been robbed?

10   A.  Yes, sir.

11   Q.  Do you know who robbed him?

12   A.  Mo Nice got robbed a couple of times, a lot of times.

13   Q.  Do you know who robbed him any of those times?

14   A.  I don't remember.

15   Q.  Just one more question.  Were you ever present when Mo Nice

16   was robbed?

17   A.  No, sir.

18             MR. BAUER:  Ms. McInerney can we pull up 206.

19   Q.  Who is that?

20   A.  Kev Gotti.

21   Q.  You mentioned that Kev Gotti is a member of the Bloods,

22   too, correct?

23   A.  Yes, sir.

24   Q.  Have you ever seen Kev Gotti with guns?

25   A.  Yes, sir.

1    Q.  Have you ever seen Kev Gotti with drugs?

2    A.  Yes, sir.

3    Q.  Have you ever seen him sell drugs?

4    A.  Yes, sir.

5    Q.  What drugs have you seen him sell?

6    A.  Crack, marijuana, and heroin, heroin also.

7    Q.  And heroin also?

8    A.  Yes, sir.

9            MR. BAUER:  Let's move on to 207.

10   Q.  Do you know who that is?

11   A.  Let me see.

12   Q.  You are shaking your head.  Is that no?

13   A.  Yes, I -- yes, I know who that is.

14   Q.  Who is it?

15   A.  Quay Quay I think his name is.  Quay Quay.

16   Q.  You think his name is Quay Quay?  Do you know if he is a

17   member of any gangs?

18   A.  Star Status.

19   Q.  Star Status?

20   A.  Yes, sir.

21   Q.  Have you ever seen Quay Quay with any guns?

22   A.  Yes, sir.

23   Q.  You've seen Quay Quay with guns?

24   A.  Yes, sir.

25   Q.  Where have you seen Quay Quay with a gun?

1   A.   The day that I bought the gun off of Quick he was trying to

2   sell me a .22.

3   Q.   The day you bought the gun off of Quick, that's the gun you

4   bought at the direction of law enforcement?

5   A.   Yes, sir, and in that recording you can hear somebody

6   trying to sell a .22 to me.  That's him.

7   Q.   You say that recording.  Was your purchase of the gun from

8   Quick recorded?

9   A.   Yes, sir.

10  Q.   Is that the recording your speaking of?

11  A.   Yes, sir.

12  Q.   During that recording, you can hear what?

13  A.   He was trying -- he had a .22 that he was trying to sell

14  me.

15          THE COURT:  I'm sorry.  Can you repeat that.

16          THE WITNESS:  He wasn't trying to sell me the gun.  He

17  had a .22 because I told Quick that I needed a gun to do

18  something.  Quick said that he didn't have a gun at that time

19  on him, so Quay Quay said that he had a .22, and I told him

20  that I would give him money to hold it.  He said, yeah first

21  and then he changed his mind.

22  Q.   Have you ever seen Quay Quay with a gun on any other

23  occasions?

24  A.   No.

25  Q.   Have you ever seen Quay Quay with drugs?

1    A.  No.

2              MR. BAUER:  Can we move on to 208, Ms. McInerney.

3    Q.  Who is that?

4    A.  That's Baby E right there.

5    Q.  Was Baby E a member of any gangs?

6    A.  Yes.

7    Q.  What gang?

8    A.  He was a blood.

9    Q.  Did Baby E have you ever seen Baby E with drugs?

10   A.  Yes.

11   Q.  Have you ever seen him sell drugs?

12   A.  Yes.

13   Q.  What drugs have you seen him sell?

14   A.  Crack.

15   Q.  Have you ever seen Baby E with a gun?

16   A.  Yes, sir.

17   Q.  How many times have you seen Baby E with a gun?

18   A.  Once.

19   Q.  When approximately was that?

20   A.  I think it was late 2010.

21   Q.  Let me ask you, let me circle back I was asking you about

22   Bash you told us that he sold drugs.  Approximately when did

23   you see him sell drugs?

24   A.  I seen Bash sell drugs in 2010 also.

25   Q.  Let's move on to 209.  Actually, your Honor, I apologize.

1    I don't know if 209 is in evidence.  Can we take it down.

2    Thanks.

3           I'm going to show you what's been marked for

4    identification as Government Exhibit 209.  Can you take a look

5    at this photo and tell me if you recognize this person?

6    A.  Yes, sir.

7    Q.  Who is it?

8    A.  This is freaky.

9    Q.  Do you know freaky's real name?

10   A.  Tyrik Legette, Legette.

11   Q.  Legette or Legette?

12   A.  Yes, sir.

13          MR. BAUER:  The government offers Exhibit 209.

14          MR. GREENFIELD:  No objection.

15          THE COURT:  Any objection?

16          No objection, 209 will be received.

17          (Government's Exhibit 209 received in evidence)

18          MR. BAUER:  May we publish it to the jury, your Honor.

19          THE COURT:  You may.

20   Q.  You mentioned earlier that a Freaky had status in the

21   Bloods, is this the same Freaky?

22   A.  Yes, sir.

23   Q.  Have you ever seen Freaky with a gun?

24   A.  Yes, sir.

25   Q.  Approximately when?

1   A.  2009, late 2009.

2   Q.  Have you ever seen him sell drugs?

3   A.  Yes, sir.

4   Q.  What kind of drugs?

5   A.  Crack.

6   Q.  When was that?

7   A.  2009.

8   Q.  I think 210 may not be in evidence either.

9           Let me show you what's been marked for identification

10  as Government Exhibit 210.  Do you recognize this individual?

11  A.  Let me see.  Yes, sir.

12  Q.  Who is it?

13  A.  Snelly.

14  Q.  Is do you know Snelly's real name?

15  A.  Alton Junior.

16          MR. BAUER:  The government offers Exhibit 210 into

17  evidence.

18          THE COURT:  Any objection?  210 will be received.

19          (Government's Exhibit 210 received in evidence)

20          MR. BAUER:  May we publish it, your Honor.

21          THE COURT:  You may.

22  Q.  Was Snelly a member of any gangs, Mr. Mallory?

23  A.  Yes, sir.

24  Q.  What gang?

25  A.  Bloods.

1    Q.  Did you ever see Snelly with guns?

2    A.  Yes, sir.

3    Q.  You testified earlier that there was a Snelly who was part

4    of some of the robberies you have committed, is this the same

5    Snelly?

6    A.  Yes, sir.

7    Q.  Have you ever seen Snelly sell drugs?

8    A.  Yes, sir.

9    Q.  What drugs?

10   A.  Crack.

11   Q.  Approximately when?

12   A.  Heroin and marijuana --

13   Q.  Sorry.  I cut you off.  Crack, heroin, and marijuana?

14   A.  Yes, sir?

15   Q.  Approximately when did you see that?

16   A.  2012.

17            MR. BAUER:  Can we go to 211, please.

18            Do you recognize this individual?

19   A.  That's Geo.

20   Q.  That's Geo?

21   A.  Yes, sir.

22   Q.  Is Geo a member of any gangs?

23   A.  Ashy Bandits.

24   Q.  Ashy Bandits?

25   A.  Yes, sir.

1    Q.  Have you ever seen Geo with a gun?

2    A.  Yes, sir.

3    Q.  Have you ever seen him sell drugs?

4    A.  Yes, sir.

5    Q.  When was that?

6    A.  2012 also.

7            MR. BAUER:  All right.  Can we go to 212.

8            Who is this?

9    A.  Quick.

10   Q.  Is this the same Quick who you referred to earlier that who

11   you bought a gun from?

12   A.  Yes, sir.

13   Q.  Besides a gun have you ever seen him sell drugs?

14   A.  Yes, sir.

15   Q.  What drugs?

16   A.  Crack.

17   Q.  When was that?

18   A.  2012 also.

19   Q.  Was he a member of any gangs?

20   A.  Ashy Bandits.

21           MR. BAUER:  Can we go to 216, please.

22   Q.  Do you know who this is?

23   A.  Yes, sir.

24   Q.  Who is it?

25   A.  Baynes.

1   Q.  Was Baynes a member of any gangs?

2   A.  Yes, sir.

3   Q.  What gang?

4   A.  Star Status.

5   Q.  Have you ever seen Baynes with guns?

6   A.  No.

7   Q.  Have you ever seen Baynes sell drugs?

8   A.  No.

9          MR. BAUER:  Can we do 218, please.

10  Q.  Do you know who this is?

11  A.  Fuzzy.

12  Q.  Do you know his real name?

13  A.  David Evans.

14  Q.  Was he a member of any gangs?

15  A.  I'm not sure.

16  Q.  Have you ever seen him sell drugs?

17  A.  No.

18  Q.  Have you ever seen him with guns?

19  A.  No.

20         MR. BAUER:  Just a couple more here.  Could you go to

21  219.

22  Q.  Do you know who this is?

23  A.  I get her name mixed up.  I know who she is, though.  I

24  know who that is.

25  Q.  Where have you seen her before?

E8cnchr4                         Mallory - direct

1    A.  I seen her in the car with a couple friends of mines back

2    in like 2007.  It's been a long time since I've seen her.

3    Q.  Was it in Newburgh or somewhere else?

4    A.  Newburgh.

5    Q.  Have you ever seen her with drugs?

6    A.  No.

7    Q.  Have you ever seen her with guns?

8    A.  No.

9    Q.  Do you know if she was affiliated with any gangs?

10   A.  Bloods.

11   Q.  Can you pull up 220.

12           Who is that?

13   A.  That's me.

14           MR. BAUER:  And the last one is 221.

15           Do you know who that is?

16   A.  Yes, sir.

17   Q.  What's his name?

18   A.  Joker.

19   Q.  Do you know his real name?

20   A.  Jeffrey Henry.

21   Q.  Do you know if he was affiliated with any gangs?

22   A.  No.

23   Q.  Did you ever see him sell drugs?

24   A.  Yes.

25   Q.  What drugs have you seen him sell?

1    A.  Crack.

2    Q.  Approximately when did you see that?

3    A.  2001 or 2000.  Early 2000s.

4    Q.  Early 2000s?

5    A.  Yes, sir.

6    Q.  Do you know if he did anything else for money besides sell

7    drugs?

8    A.  No.  I don't know.

9    Q.  Do you know if he had any legitimate jobs?

10   A.  No, I don't know.

11        MR. BAUER:  Judge, this is a good time for me to

12   break.

13        THE COURT:  Very well.  Ladies and gentlemen, it's

14   almost a quarter of the hour.  So we are going to break until 2

15   o'clock.  Please be sure to be in the jury room no later than 2

16   o'clock or so.  And, please, if you are going to leave the

17   building, do allow for the possibility that there may be a line

18   at the security desk.  Until then, please do not discuss the

19   case.

20        (Continued on next page)

21

22

23

24

25

E8cnchr4                          Mallory – direct

 1              (Jury not present)

 2              THE COURT:  OK.  You may step down, Mr. Mallory.

 3              (Witness not present)

 4              THE COURT:  So what is the plan for this afternoon?

 5              MR. BAUER:  The plan is Detective Goodman, who should

 6    be a quick witness and then Dan Myers, DNA expert.

 7              THE COURT:  He will be available tomorrow morning if

 8    needed?

 9              MR. BAUER:  If necessary he will be here tomorrow

10    morning.

11              THE COURT:  Very well.  Anything more before lunch?

12              (Luncheon recess)

13

14

15

16

17

18

19

20

21

22

23

24

25

 1

 2                  A F T E R N O O N   S E S S I O N

 3                          (2:00 p.m.)

 4          THE COURT:  Is the government ready with its next

 5  witness?

 6          MR. NAWADAY:  Yes.

 7          MR. BAUER:  Should we bring her in now, your Honor?

 8          THE COURT:  Sure.  All of the defense lawyers are

 9  here?

10          MR. GOLTZER:  Yes.

11          THE COURT:  And the defendants are here.

12          Let's get the jury.

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (Jury present)

 2              THE COURT:  Ladies and gentlemen, as has happened a

 3    couple of times already, for the convenience of the witnesses

 4    and the parties, we are taking a witness out of turn.  So we

 5    will continue later with the testimony of Mr. Mallory.

 6              Mr. Nawaday?

 7              MR. NAWADAY:  The government calls Roberta Goodman.

 8    ROBERTA GOODMAN,

 9        called as a witness by the Government,

10        having been duly sworn, testified as follows:

11              THE COURT:  I want you to speak directly into the

12    microphone slowly and clearly.  And I want you to begin by

13    stating and spelling your full name for the record.

14              THE WITNESS:  Roberta Goodman, R-o-b-e-r-t-a

15    G-o-o-d-m-a-n.

16              THE COURT:  Thank you.  Mr. Nawaday.

17    DIRECT EXAMINATION

18    BY MR. NAWADAY:

19    Q.  Where do you work?

20    A.  The City of Newburgh Police Department.

21    Q.  About how long have you worked for the Newburgh Police

22    Department?

23    A.  I am in my 19th year.

24    Q.  What is your current title there?

25    A.  Sergeant.

E8cnchr4                          Goodman - direct

1    Q.  About how long have you been a sergeant?

2    A.  Approximately three years.

3    Q.  In 2010, what was your rank?

4    A.  Detective.

5    Q.  What types of cases did you investigate as a detective?

6    A.  Major crimes.

7    Q.  Were you working on October 7, 2010?

8    A.  I was.

9    Q.  Did there come a time that day that you interviewed Raymond

10   Christian?

11   A.  Yes.

12   Q.  How did that come about?

13   A.  The patrol individuals had brought up an individual they

14   had in custody for weapons possession.  They asked me if I

15   would interview him for their case.

16   Q.  Before that day, had you met Raymond Christian before?

17   A.  I've known of him, yes.

18   Q.  How did you know of him?

19   A.  Just working in Newburgh throughout my career.

20   Q.  Where did that interview on October 7, 2010, take place?

21   A.  Police headquarters, detective division.

22   Q.  Did Mr. Christian agree to speak with you?

23   A.  He did.

24   Q.  Did you read him his Miranda rights before you spoke with

25   him?

1   A.  Yes, sir.

2   Q.  Did he waive them?

3   A.  He did.

4   Q.  Just generally, what did Mr. Christian tell you that day?

5   A.  He stated that he was in possession of a weapon.  It was

6   loaded.  He carried it for protection.  When I asked him where

7   he got it, he stated that he bought it, and then stated that he

8   stole it, which is the same thing in Newburgh.

9            THE COURT:  Is that what he said?

10           THE WITNESS:  Yes, sir.

11  Q.  Was his statement to you reduced to writing?

12  A.  Yes, sir.

13  Q.  And how did that happen?

14  A.  It's a typewritten statement.  I would type the questions,

15  read them to him.  He would answer the questions, and I typed

16  his answers.

17  Q.  I'm going to show you what's been marked for identification

18  as Government Exhibit 136.  Ma'am, please take a look at this

19  and tell me if you recognize it.

20  A.  I do.

21  Q.  What do you recognize it to be?

22  A.  A copy of the Miranda and a copy of the typewritten

23  statement I obtained from Raymond Christian.

24  Q.  On the first page, you said that is a copy of the Miranda

25  waiver?

1   A.  Yes, sir.

2   Q.  Are there signatures on that page?

3   A.  There is.

4   Q.  Whose signatures do you recognize?

5   A.  Raymond Christian's.

6   Q.  Anyone else's signature?

7   A.  Myself.

8   Q.  And on pages 2 and 3 of Government Exhibit 136 marked for

9   identification, is that the statement you typed up?

10  A.  It is.

11  Q.  Is it signed?

12  A.  It is.

13  Q.  By whom?

14  A.  Raymond Christian and myself.

15          MR. NAWADAY:  The government offers Government Exhibit

16  136.

17          MR. GREENFIELD:  No objection based on prior rulings.

18          THE COURT:  136 will be received.

19          (Government's Exhibit 136 received in evidence)

20          MR. BAUER:  Ms. McInerney, if we could please put up

21  the first page of 136.

22  Q.  Sergeant Goodman, what are we looking at here?

23  A.  A copy of the typewritten Miranda warnings I read to

24  Mr. Christian.

25  Q.  Do you see there are initials RC.  Whose initials are

1   those?

2   A.  Raymond Christian's.

3   Q.  Who wrote those initials on this paper, on the copy?

4   A.  He did, sir.

5   Q.  Who signed at the bottom?

6   A.  He did, sir.

7   Q.  There is a signature towards the top.  Whose signature is

8   that?

9   A.  My signature.

10  Q.  Turning to the next page, are we looking at the statement

11  you typed out?

12  A.  The first page, yes, sir.

13  Q.  You see the letters RC again.  Who wrote those?

14  A.  Raymond Christian.

15  Q.  Turning to the last page, do you see signatures on the

16  bottom?

17  A.  I do.

18  Q.  Whose signatures are those?

19  A.  Raymond Christian's and myself.

20  Q.  What's the date and time set forth on the last page?

21  A.  10/07/10, 2308 hours.

22  Q.  Do you know what a buccal swab is?

23  A.  I do.

24  Q.  What is it?

25  A.  It is a collection of specimen taken from an individual to

1   ascertain DNA.

2   Q.  Have you conducted buccal swabs of people before?

3   A.  Yes.

4   Q.  About how many times have you done that in your career?

5   A.  At least a hundred.

6   Q.  Please walk through how a buccal swab is taken from an

7   individual?

8   A.  It is a kit that our agency uses.  What is inside the kit

9   is two large, they appear to be, look like Q-Tips.  There's two

10  of them in the box.  You ask the individual to swab each side

11  of their cheek for approximately 15 seconds.  Once that's done,

12  the individual is asked to place it inside a tiny, long narrow

13  box.  That box is placed into the bigger box, which I fill out

14  and I seal in front of them.

15  Q.  What happens after you seal that bigger box?

16  A.  It's placed in our 24-hour evidence room.

17  Q.  What typically happens after it's placed into the evidence

18  room?

19  A.  The evidence detectives assigned to that room collect it

20  normally in the mornings.  They submit what needs to be

21  submitted to Albany and sort through the other stuff.

22  Q.  After you interviewed Mr. Christian on October 7, 2010, did

23  you take a buccal swab from him?

24  A.  I did.

25  Q.  Again, walk through the steps of how you took that buccal

E8cnchr4                          Goodman - direct

1    swab?

2    A.  I took each -- we will call it a Q-Tip, a large Q-Tip,

3    asked him to swab the inside of his check for about 15 seconds.

4    He did so.  After he was done, he would place the one inside

5    the narrow box.  I would hand him the other what appears to be

6    a large Q-Tip, ask him to swab the other side of his cheek.

7    About 15 seconds after that, he again placed it in the narrow

8    box.  I took both boxes from him, placed them inside the bigger

9    container, filled out the box, and sealed it in front of him.

10   Q.  Did he do that voluntarily?

11   A.  He did.

12   Q.  What did you do after you sealed the box?

13   A.  I took it down and placed it in our 24-hour evidence

14   storage facility.

15   Q.  Why did you place it in that facility?

16   A.  Because it's secure.

17   Q.  Were there evidence technicians on staff at the time?

18   A.  Not that I know of.

19   Q.  And is it typical practice when it is after hours and

20   evidence is collected to put it in the evidence locker?

21   A.  Yes, sir.

22   Q.  I'm going to show you what's been marked for identification

23   as Government Exhibit 135.

24            I will ask you if you recognize it.

25   A.  I do.

```
 1    Q.  What do you recognize it to be?

 2    A.  The box that I filled out and sealed containing the buccal

 3    swabs belonging to Raymond Christian.

 4    Q.  Are there any initials on that box?

 5    A.  There are.

 6    Q.  Any initials you recognize?

 7    A.  Yes.

 8    Q.  Whose?

 9    A.  My initials.

10    Q.  And where did you put those initials?

11    A.  I initialed where I sealed the tape on to the box.  That

12    way if anyone opened this box they could tell because my

13    signature or my initials would be broken.

14    Q.  Which seal did you put on that box?

15    A.  The orange seal.

16    Q.  There is another seal labeled NYSP on that box.  Is that

17    right?

18    A.  Yes, sir.

19    Q.  Do you know who put that on there?

20    A.  The New York State Police.

21    Q.  That was on there when you sent it into the evidence

22    locker?

23    A.  No, sir.

24    Q.  And is there a "Date Collected" field on there?

25    A.  Yes.
```

E8cnchr4                          Goodman - direct

1    Q.  Is it filled out?

2    A.  No.

3    Q.  What date was this collected?

4    A.  October 7, 2010.

5    Q.  After you placed that in the evidence locker, when's the

6    next time you saw that box?

7    A.  Approximately two hours ago, when you showed it to me.

8    Q.  In between October 7, 2010 and approximately a couple of

9    hours ago have you seen that box?

10   A.  I have not.

11   Q.  Do you know when, if at all, that box was sent to the New

12   York State Police lab?

13   A.  I do not.

14          MR. NAWADAY:  The government offers Government Exhibit

15   135.

16          MR. GREENFIELD:  May I see it.

17          MR. DRATEL:  Your Honor, either now or at the

18   conclusion of the subject of this testimony a limiting

19   instruction as to the testimony and as to the exhibits?

20          THE COURT:  Certainly.

21          MR. DRATEL:  OK.

22          THE COURT:  There being no objection, 135 will be

23   received.

24          (Government's Exhibit 135 received in evidence)

25   Q.  Sergeant Goodman, I would like to go back to what is

1    already in evidence as Government Exhibit 136, the statement.

2             MR. NAWADAY:  Ms. McInerney, if you can go to the

3    first page of the statement and then zero in on the portion

4    that begins, ""Question:  Raymond what kind of handgun did you

5    have on you?"

6    Q.  Do you see that, Sergeant?

7    A.  I do.

8    Q.  Do you see the question:  "Raymond, how many bullets did it

9    have in it?"

10            What was the response?

11   A.  I am a little confused.  Do you want me to read off this or

12   that?  Does it matter?

13   Q.  Either one.

14   A.  OK.

15   Q.  The screen is just an electronic version of what you are

16   looking at.

17   A.  OK.  He stated, his answer was:  "One in the head seven in

18   the clip."

19   Q.  Do you have an understanding of what that means?

20   A.  Yes.

21   Q.  What does that mean?

22   A.  It means one in the chamber, seven in the clip.

23            MR. NAWADAY:  Also, Ms. McInerney, if you can turn to

24   the last page of Government Exhibit 136.

25   Q.  Sergeant, if you can just read the response to your

1   question, "Raymond what did you do with the gun when the cops

2   were chasing you?"

3          What was the response?

4   A.   His answer was, "I threw it by the garage in the alleyway

5   on Dubois Street."

6   Q.   And where is Dubois Street located?

7   A.   The northeast section of the city.

8   Q.   Of Newburgh?

9   A.   Yes, sir.

10         MR. NAWADAY:  No further questions.

11         THE COURT:  Before we get to cross-examination, ladies

12  and gentlemen, you have heard testimony from Sergeant Goodman

13  concerning a gun that was or an arrest that was made of

14  Mr. Christian concerning a gun and a buccal swab that was taken

15  of him at that time.

16         You may only consider this testimony against

17  Mr. Christian in deciding whether the government has proved its

18  case.  You may not consider this testimony in any way against

19  either Mr. Thomas or Mr. Whitaker.

20         Mr. Greenfield.

21         MR. GREENFIELD:  Thank you, Judge.

22  CROSS EXAMINATION

23  BY MR. GREENFIELD:

24  Q.   Good afternoon, Sergeant Goodman?

25  A.   Good afternoon.

1   Q.  During your career at the Newburgh Police Department, did

2   you spend any time at all in narcotics law enforcement?

3   A.  Can you be more specific?

4   Q.  Yes.  Did you spend any of your career as a detective in

5   narcotics law enforcement?

6   A.  Negative.

7   Q.  Negative?

8   A.  I'm sorry.  No, sir.

9   Q.  You were assigned back in December of 2010 to the major

10  case squad?

11  A.  Yes, sir.

12  Q.  But you say on October 7, 2010, you and my client,

13  Mr. Christian, were together in headquarters, and he made a

14  statement to you and he voluntarily gave you a swab of DNA?

15  A.  Yes, sir.

16  Q.  Now, explain, if you can, what you meant by putting it in a

17  sealed locker after you had this box sealed away?

18  A.  There is a 24-hour holding room that we place our evidence

19  in if our detectives aren't present.

20          It is a room that has a combination lock.  You have to

21  open that lock in order to enter the room.  It's a small like,

22  like four by six.

23  Q.  OK.

24  A.  Inside that room are numerous lockers which have locks, key

25  locks on them.  The box was placed inside one of those lockers

E8cnchr4                         Goodman - cross

1   and the lock was locked, and I left the room, closing the door.

2   Q.  So when you put it in that box that night around midnight

3   or so of the 7th, whatever time it was, would it be fair to say

4   that you never saw that box again until you got to Court today?

5   A.  Correct.

6   Q.  That box was or that swab was created for a particular

7   purpose, is that not right?

8   A.  Yes, sir.

9   Q.  Was it created for the purpose of not sending it to Albany

10  and putting it in the Albany database?

11  A.  No, sir.

12  Q.  What was the purpose that swab was created for?

13  A.  To attempt to retrieve DNA off Mr. Christian.

14  Q.  The Newburgh Police Department is not trained for DNA

15  testing, is it?

16  A.  I'm sorry?

17  Q.  The Newburgh Police Department is not trained to do DNA

18  testing?

19  A.  The testing of the DNA obtained?

20  Q.  The testing of any either known sample or item in question

21  to see if there is any DNA?

22  A.  We're trained on how to obtain a swab from an individual.

23  Q.  You mean at a crime scene?

24  A.  Yes, sir.

25  Q.  Something of that sort?

1    A.  I'm sorry.

2    Q.  Gathering possible DNA evidence from a crime scene?

3    A.  Correct.

4    Q.  But it was your understanding and your belief that once

5    this box went into the evidence room it would be sent posthaste

6    up to Albany and it would go into the system up there, the DNA

7    database?

8    A.  Posthaste?

9    Q.  As soon as possible.

10   A.  No, sir.

11   Q.  Was it created to lay around in the property clerk's

12   office?

13   A.  Of course not, sir.

14            (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

E8C9CHR5                          Goodman - cross

1    Q.  It was supposed to be sent by the property clerk's office

2    to Albany as quickly as possible or as soon as possible?

3    A.  I don't know how their time schedules are, sir.  I obtained

4    it hoping to get DNA for a nonspecific reason.

5    Q.  Now about -- on August 5 of this year you received a

6    phonecall from Mr. Nawaday, Mr. Bauer about what happened with

7    this particular DNA swab; isn't that right?

8    A.  With regards to what happened to it?

9    Q.  Yeah, after you took it.

10   A.  I received a phonecall explaining that I would be needed to

11   testify in regards to that.

12   Q.  And did you or did you not have a conversation with these

13   two gentlemen about what happened the day you took the swab?

14   A.  Yes.  I explained to them what I do with it once the swab

15   is taken.

16   Q.  Did you explain to them what you did with it once this swab

17   was taken?

18   A.  Yes, sir.

19   Q.  And what did you tell them?

20   A.  That I placed it in the 24-hour evidence room, secured it,

21   and that was it.

22   Q.  Did you tell them that once it was taken in the morning you

23   turned it over to Fredericks and Burns to send it up to Albany?

24   A.  I did not.

25   Q.  And if they say you did say it, would they be wrong?

1    A.  (No response).

2    Q.  I'm talking about two assistant United States attorneys

3    now.

4    A.  I understand.

5    Q.  Did you or did you not tell them in words or substance the

6    materials were sent in the morning to Albany by Fredericks and

7    Burns for testing?

8    A.  I don't believe I did, no, sir.

9    Q.  You don't believe you did?

10   A.  No, sir.

11   Q.  Am I wrong?  Did you not say that?

12   A.  I don't believe I did, sir.  I don't recall that.  Not in

13   those words.

14   Q.  Now you were working on December 15 of 2010; is that not

15   right, Sergeant Goodman?

16   A.  I'm not sure, sir, if I was working that date.

17   Q.  Were you part of the investigative team that was

18   investigating the murder of Joker?

19   A.  Minimally, yes.

20   Q.  The day of the murder didn't you conduct interviews or the

21   morning of the murder didn't you conduct interviews with

22   individuals on the streets of Newburgh?

23            MR. NAWADAY:  Objection.  Outside the scope of direct.

24            THE COURT:  Overruled.

25   Q.  Yes or no?

E8C9CHR5                        Goodman - cross

1   A.  I would have to first make sure that I was working that day

2   in order to answer your question, sir.

3   Q.  What is a lead sheet?

4   A.  A lead sheet is a detective form that we used in the agency

5   which specifies each detective's assignments, their conclusion

6   of that assignment, the date, the time, the location.

7   Q.  Is there a master file kept of all lead sheets that are

8   created during the course of an investigation?

9   A.  Depending on the lead detective, yes.

10  Q.  And who would the lead detective, if you know, be in the

11  case of the Joker murder?

12  A.  I do not know, sir.

13  Q.  You have no recollection?

14  A.  I don't recall.

15  Q.  You don't recall.

16           I show you what's been previously marked as 3525-16

17  and as I approach I'll ask you to look at this and see if it

18  refreshes your recollection as to whether or not you were part

19  of the investigative team.

20  A.  Yes, sir.

21  Q.  It refreshes your recollection?

22  A.  Yes, sir.

23  Q.  And, indeed, did you conduct -- may I have it back,

24  please -- did you conduct an interview of an individual on the

25  streets of Newburgh within hours of the murder of Joker?

E8C9CHR5                          Goodman - cross

1    A.  I could have, sir.

2    Q.  Say that again.

3    A.  I could have, yes, sir.

4    Q.  Isn't it a fact that earlier -- withdrawn.

5           Isn't it a fact that on the day after the murder of

6    Joker that you conducted an interview of an individual named

7    Bernard Brown?

8    A.  I don't know, sir.

9    Q.  If I show you 3525-15, would you please read it to see if

10   it refreshes your recollection.

11   A.  Yes, sir.

12          (Pause)

13   A.  Okay, sir.

14   Q.  Does it refresh your recollection?

15   A.  Yes, sir.

16   Q.  Do you remember that interview as you sit on the stand now?

17   A.  No, sir.

18   Q.  Does it indicate -- is your recollection refreshed by

19   reading that document as to who the lead detective was that

20   day?

21   A.  No, sir.

22   Q.  Approximately what time is it that you conduct an interview

23   of Mr. Brown?

24   A.  It doesn't appear to have a time on it, sir.

25   Q.  Would it be fair to say that during the course of that

E8C9CHR5                        Goodman - cross

1   interview you garnered some information about the number of

2   people who may or may not have been involved in the murder of

3   Joker?

4   A.  Sir, I stated I don't recall that interview.

5   Q.  Now why do you create reports?  Do you have a reason why

6   you create a report like this lead sheet?

7   A.  Yes, sir.

8   Q.  What is the purpose for it?

9   A.  To gather and obtain information in regards to whatever

10  crime you're investigating.

11  Q.  And like four years later if you're asked questions about

12  it you use it to refresh your recollection, correct?

13  A.  Hopefully, yes.

14  Q.  This document didn't refresh your recollection?

15  A.  I believe that document to be true and factual, but no,

16  sir.

17  Q.  So my question is do you believe that the document I just

18  showed you is true and accurate?

19  A.  Yes, sir.

20          MR. GREENFIELD:  I'd offer it as a past recollection

21  recording.

22          MR. NAWADAY:  Your Honor, it's -- there's double --

23  there's hearsay involved in here so we object.

24          THE COURT:  Objection is sustained.

25  Q.  Would it be fair to say that after this interview you

1    believed four people were involved in the murder of Joker?

2              MR. NAWADAY:  Objection.

3              MR. GREENFIELD:  Not for the truth of it, Judge.  Just

4    for the fact it was said to her.

5              THE COURT:  The question was her belief?

6              MR. GREENFIELD:  May we have a sidebar, Judge?

7              THE COURT:  Sure.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. GREENFIELD:  I believe my question was after this

3     interview did you have reason to believe that the -- there were

4     four people involved in the murder of Joker.

5          MR. NAWADAY:  On relevance why is her belief based on

6     a hearsay statement relevant?  It's hearsay.  You are offering

7     it for the truth.  If you want -- if you would like --

8     Mr. Greenfield would like that testimony in, he should subpoena

9     this witness and have him come testify.

10          MR. GREENFIELD:  Excuse me.

11          MR. NAWADAY:  You should not be asking somebody who

12     interviewed somebody who saw something for that testimony.

13     That's rank hearsay.

14          MR. GREENFIELD:  I'm not asking for the truth of it,

15     Judge.  I'm just asking if she had a belief that that's who

16     they were looking.  She took that information and gave it to

17     other members of the police department.

18          MR. GOLTZER:  As the course of investigation.

19          MR. GREENFIELD:  As part of investigation, obviously.

20          MR. NAWADAY:  What does the belief of someone who

21     wasn't there have any relevance to what happened there and what

22     people saw there?

23          THE COURT:  The objection is sustained.

24          (Continued on next page)

25

E8C9CHR5                          Goodman - cross

1           (In open court)

2    Q.  So as you sit on the stand now, you have no specific

3    recollection of what you did on December 15, 2010 with respect

4    to the Joker homicide investigation?

5    A.  Sir, I had very minimum involvement with that investigation

6    so I cannot state exactly what I did or conducted with regards

7    to that homicide.

8    Q.  Well we know you had a -- you did conduct an interview.

9    You just don't have a recollection of what happened at that

10   interview; isn't that right?

11   A.  I can't answer that yes or no, sir.

12   Q.  Well did you create a report about the interview?

13   A.  If I conducted an interview I would have created a report,

14   yes.

15   Q.  And when I showed you 3525-15 is that a copy of the report

16   that you created?

17   A.  I do not know that I created that, sir.

18   Q.  Did you -- do you know an investigator named H-I-K-A-D-E?

19   A.  Senior Investigator Hikade, yes, sir.

20   Q.  Was he a partner of yours?

21   A.  State police.  He worked with me, yes.

22   Q.  Was he working with you in December of 2010.

23   A.  If his name is on there, I assume he was, yes.

24   Q.  And do you recall whether or not you interviewed a person

25   named Bernard Brown?

1           MR. NAWADAY:  Objection.  Asked and answered.

2           MR. GREENFIELD:  I'm trying to refresh her

3    recollection as best I can.

4           THE COURT:  You can answer the question.

5           THE WITNESS:  I do not recall, sir.

6    Q.  Do you -- did you ever interview a person by the name of

7    Akinto Boone?

8    A.  In regards to what, sir?

9    Q.  This investigation, ma'am.

10   A.  I know I've interviewed him.  I'm not sure if it's this

11   investigation.

12   Q.  I show you the following document, 3525-19, and ask you if

13   this document refreshes your recollection as to whether or not

14   you ever interviewed Akinto Boone?

15   A.  Yes, sir.

16   Q.  It does refresh your recollection?

17   A.  This -- I remember typing this letter, yes.

18   Q.  And you wrote a letter on behalf of Akinto Boone sometime

19   in early 2011; isn't that right?

20   A.  Correct.

21   Q.  Was it a job referral letter?

22   A.  A job referral?  No, sir.

23   Q.  Who was it to?

24   A.  His parole officer.

25   Q.  And in that letter did you tell the parole officer that

 1  Akinto Boone was helpful in what regard?

 2  A.  Can I take a moment and read it?

 3  Q.  Please do.

 4          (Pause)

 5  A.  Okay, sir.  Can you repeat the question.

 6  Q.  Did you write the parole officer to inform them that Akinto

 7  Boone had been helpful in regard to an investigation you were

 8  conducting?

 9  A.  That he was cooperative, yes.

10  Q.  And as to what investigation was that?

11  A.  The Jeffrey Henry.

12  Q.  The Joker murder?

13  A.  Yes, sir.

14  Q.  So you were involved in the -- as you sit on the stand do

15  you recall now being involved in the investigation?

16  A.  Minimally, sir, yes.

17          MR. GREENFIELD:  I don't have any further questions of

18  this witness, Judge.

19          THE COURT:  Okay.  Any redirect?

20          MR. NAWADAY:  Brief redirect, your Honor.

21  REDIRECT EXAMINATION

22  BY MR. NAWADAY:

23  Q.  You were asked about a conversation you had with

24  prosecutors scheduling your testimony today.  Do you remember

25  that conversation?

E8C9CHR5                          Goodman - redirect

 1   A.  Yes.

 2   Q.  And do you remember during that conversation whether when

 3   saying something to the effect that typically what happens, if

 4   evidence is put into the overnight locker that typically the

 5   next morning the evidence detectives send it to -- for testing?

 6   A.  Typically, yes.

 7   Q.  And in this case do you know exactly what happened?

 8   A.  I do not, sir.

 9            THE COURT:  Anything further?

10            MR. NAWADAY:  No, your Honor.

11   RECROSS EXAMINATION

12   BY MR. GREENFIELD:

13   Q.  Good police work would have been to send it to Albany the

14   next morning, correct?

15   A.  In a perfect world, yes, sir.

16   Q.  And that's what you assumed happened; isn't that correct?

17   A.  No, sir.

18   Q.  Well, isn't it a fact that you told these two gentlemen

19   that it did happen?

20   A.  I said typically it would happen.  I do not know their

21   schedule.

22   Q.  You told the government typically?

23   A.  I believe I did, sir, yes.

24   Q.  Now you recall the conversation?

25   A.  Parts of it, yes, sir.

1          MR. GREENFIELD:  No further questions.

2          THE COURT:  If there's nothing further.

3          MR. NAWADAY:  Nothing from the government.

4          THE COURT:  You can step down.

5          THE WITNESS:  Thank you.

6          THE COURT:  Thank you.

7          (Witness excused)

8          MR. NAWADAY:  Call the next witness, your Honor?

9          THE COURT:  Please.

10          MR. NAWADAY:  Government calls Daniel Myers.

11          THE COURT:  This witness also will be taken out of

12     order.

13          Sir, please step into the witness box and remain

14     standing.

15          Please face the court clerk.

16          Sir, please be seated.  Pull your seat forward.  I

17     want you to speak directly into the microphone, clearly.  And

18     please begin by stating your full name and spelling your first

19     and your last name for the record.

20     DANIEL MYERS,

21          called as a witness by the Government,

22          having been duly sworn, testified as follows:

23          THE COURT:  Mr. Nawaday.

24          (Continued on next page)

25

E8C9CHR5                          Goodman - recross

1   DIRECT EXAMINATION

2   BY MR. NAWADAY:

3   Q.  Where do you work?

4   A.  I work in the state Crime Lab in Albany.

5   Q.  And about how long have you worked there?

6   A.  Fourteen years.

7   Q.  Is that a state agency?

8   A.  Yes.  It's the division of state police.

9   Q.  What's your current title there?

10  A.  I'm a forensic scientist.

11  Q.  Mr. Myers keep your voice up.  Thank you.

12  A.  Sorry.

13  Q.  About how long have you been a forensic scientist at the

14  state police lab?

15  A.  Since 2002.

16  Q.  And about how long have you been a forensic scientist

17  there?

18  A.  Twelve years.

19  Q.  What are your duties and responsibilities in that position?

20  A.  The identification, preservation, collection of biological

21  material, DNA analysis.

22          MR. GREENFIELD:  Can't hear him.

23          THE COURT:  I'm sorry.  Could you just please keep

24  your voice up.

25          THE WITNESS:  I'm sorry.

E8C9CHR5                          Myers - direct

1           The identification, preservation, collection of

2    biological evidence, DNA testing, hair evaluation, kinship

3    testing.

4    Q.  What does the lab do generally?

5    A.  We test evidence that is submitted by agencies from around

6    the state, basically make comparisons and provide that service

7    and testimony when necessary.

8    Q.  Does the lab analyze evidence submitted for DNA analysis?

9    A.  Yes, we do.

10   Q.  And what department of the lab are you in?

11   A.  Biological sciences.

12   Q.  Please -- I think you said you do DNA analysis as part of

13   your job?

14   A.  Yes.

15   Q.  Please tell the jurors about your education in the DNA

16   testing field.

17   A.  I have a Bachelor of Science in biochemistry from SUNY

18   Binghamton.  I have course work in molecular biology from SUNY

19   Albany.  Course work in statistics from Hudson Valley Community

20   College.  Six months on-the-job training with the state police

21   as a laboratory technician.  Six months on-the-job training as

22   a serologist with the state police.  And eight months DNA

23   training from the state police.

24   Q.  Do you undergo any ongoing education in connection with DNA

25   testing?

1   A.  Every year we have to have eight hours of continuing

2   education.  Usually it's in training by vendors, other state

3   agencies, sometimes people from other labs across the country

4   will come.  And also symposiums.

5   Q.  Again for about how long have you been conducting DNA

6   testing at the lab yourself?

7   A.  About twelve years.

8   Q.  And how long has the lab performed DNA analysis?

9   A.  Since about '94, '95.

10  Q.  Is the lab accredited to conduct DNA testing?

11  A.  Yes.  We are accredited by the American Society Crime Lab

12  Directors Laboratory Accreditation Board.  And ISO, the

13  International Standards Organization.

14  Q.  And what does it mean to be accredited?

15  A.  Auditors will come from around the country and other labs

16  when we have an external audit.  They will review our

17  procedures, interview staff, review our case work to make sure

18  that the quality is the best that it can be.

19  Q.  About how often is the lab accredited?

20  A.  We are accredited every five years.  There's an interim

21  audit every two-and-a-half years.  For ASCLD and ISO.  And we

22  do have internal audits constantly.  We have QA audits.  And

23  internal ASCLD audits all the time.

24  Q.  Are there external audits performed as well as?

25  A.  Yes.  Those are the ones that have to be every other year

1   and then the ones for re-accreditation every five years.

2   Q.  Is the lab in good standing?

3   A.  Yes, we are.

4   Q.  In addition to the audits of the lab do you personally

5   undergo any evaluations?

6   A.  Every six months we -- each analyst has an evaluation.

7   Q.  Are you in good standing?

8   A.  Yes, I am.

9   Q.  What systems, if any, are in place to maintain the

10  integrity of the DNA testing process at the lab?

11  A.  We have a quality management quality -- a quality

12  management manual and a quality assurance group.  And they

13  review our procedures constantly.  They makeup reagents and

14  test them to make sure that everything that we are doing is up

15  to the standards.

16  Q.  You mentioned the word reagency.  What do you mean?

17  A.  What was that again?

18  Q.  I thought you mentioned the word reagent?

19  A.  Reagents, yes.

20          The quality -- the quality management team, the

21  quality assurance team, they'll make up the reagents that we

22  use in our testing to make sure that they're the best quality

23  they can be.

24  Q.  What are reagents?

25  A.  Just the chemicals we use in testing.

1    Q.  Are there any controls for maintaining a clean work area?

2    A.  Yes.  Before every examination the areas have to be cleaned

3    with bleach and ethanol to make sure that any surfaces that

4    might be contaminated are cleaned.

5    Q.  Are there any controls about certifying the instruments you

6    use?

7    A.  The instruments have to be tested and recertified any time

8    they're moved and any time that the thresholds are

9    recalculated.  If they're shut down for any reason, before they

10   actually get used again, they have to be tested using an NIST

11   standard -- that's the National Institute of Science and

12   Technology -- or an NIST traceable standard.  And we have to

13   get the correct profile with that standard before that

14   instrument can actually be online.

15   Q.  And are there any controls to track evidence that goes

16   through the lab?

17   A.  With each case there's an amplification control that we

18   have to get the correct profile on and with every case there is

19   controls such as reagent blanks to check all of the reagents to

20   make sure that they're clean also.

21   Q.  Are reports created after evidence is tested and analyzed?

22   A.  Yes.

23   Q.  And do you prepare reports for DNA tests you conduct?

24   A.  Yes.

25   Q.  Are those reports reviewed?

1   A.  Yes, they are.  There's a tech review by another analyst.

2   Then there's a supervisory review.  And then an admin review

3   before the report is released.

4   Q.  Do you review the work of others?

5   A.  Yes, I do.

6   Q.  When you prepare a DNA report do you review all the work

7   and data that underlies the report?

8   A.  Yes.

9   Q.  I want to talk a little bit about your experience at the

10  lab and about what the lab does in more detail.

11          Approximately how many DNA cases does the lab handle

12  per year?

13  A.  Over a thousand, sometimes two or three.

14  Q.  Have you personally performed DNA testing during your

15  career?

16  A.  Yes.

17  Q.  And about how many items of evidence have you tested in

18  your career as the lab?

19  A.  Thousands of items, over hundreds of cases.

20  Q.  What ties of items have you tested for DNA?

21  A.  Anything that a submitting agency wants to send to the lab.

22  A lot of times we will get swabs, furniture, clothing.  We even

23  get vehicles.

24  Q.  Are you familiar with the processes by which the lab

25  conducts its DNA testing?

E8C9CHR5                          Myers - direct

1    A.  Yes, I am.

2    Q.  What are the different steps generally in the process of

3    DNA testing at the lab?

4    A.  The first step in most cases is to conduct serology.

5    That's just the identification of body fluids.  In most cases

6    it's easiest to do that first as a screening test.

7              MR. GREENFIELD:  Can I interrupt.  Is this witness

8    being offered as an expert at this point?

9              MR. NAWADAY:  Your Honor, the government can offer at

10   this juncture or does offer Mr. Myers as an expert in the field

11   of forensic DNA analysis.

12             MR. GREENFIELD:  I'd like to voir dire.

13             THE COURT:  Okay.

14   VOIR DIRE EXAMINATION

15   BY MR. GREENFIELD:

16   Q.  Sir, you've been a forensic scientist for the New York

17   State Police labs the last twelve years, correct?

18   A.  Yes.

19   Q.  And are those -- is the title forensic scientist given

20   rankings or gradings?

21   A.  Yes.  We are given rankings from one through four.

22   Q.  And how long have you been a first grade forensic

23   scientist?

24   A.  I'm a third grade.

25   Q.  You're a third grade?

E8C9CHR5                          Myers - direct

1    A.  Three.  Yes.

2    Q.  And your education is what?

3    A.  I have a Bachelor of Science in biochemistry from SUNY

4    Binghamton.

5    Q.  And when did you start your education?

6    A.  1995.

7    Q.  Were you a full-time student?

8    A.  Yes, I was.

9    Q.  And did you graduate in 1999?

10   A.  I graduated in 2000.

11   Q.  And your major was in what?

12   A.  Biochemistry.

13   Q.  And do you have any advanced degrees in science,

14   mathematics, or statistics?

15   A.  No, I don't.

16   Q.  Have you taken any college-level courses since you

17   graduated in 2000?

18   A.  Yes, I have.

19   Q.  For mathematics or in any of the sciences?

20   A.  Yes.  I have taken course work in molecular biology and

21   statistics.

22   Q.  Where did you take that course?

23   A.  Statistics from Hudson Valley Community College in

24   Schenectady.

25   Q.  So you were in a two-year college and you took a course in

1   what?  What was that?

2   A.  Statistics.

3   Q.  Now you're aware that many in your field of forensic

4   science have advanced degrees or doctorates; is that not right?

5   A.  Some do, yes.

6   Q.  Did you or are you pursuing any degree above -- any degree

7   above your bachelor's degree at this point?

8   A.  Not right now, no.

9   Q.  Well had you at any time started to pursue a degree once

10  you graduated from SUNY?

11  A.  No, I didn't.

12  Q.  So from 2000 to 2014 once you got your bachelor's your

13  formal education concluded?

14  A.  Yes.

15  Q.  Now, DNA testing is a very complicated procedure, is it

16  not?

17  A.  Yes, it is.

18  Q.  It involves many different disciplines of science, math,

19  and other areas?

20  A.  Yes, it does.

21  Q.  Could you very briefly state what those disciplines are?

22  A.  Well like I said the first step is serology.  We want to

23  identify the bodily fluids.

24  Q.  Please speak up.

25  A.  We want to identify body fluids as a screening process.

E8C9CHR5                        Myers - direct

1   Q.  My question is what advance -- what sciences are involved

2   in DNA testing?

3   A.  Biology, biochemistry, mathematics, chemistry, statistics.

4   Q.  How about distribution of genetic markers?

5   A.  Distribution of genetic markers.  What you're referring to

6   is population genetics.  And I did take a course in population

7   genetics in SUNY Albany.  It's also a required course for any

8   DNA analyst by the standards to take genetics biochemistry,

9   statistics, and courses such as that.

10  Q.  Have you ever studied -- what particular courses have

11  studied in genetic population?

12  A.  Just genetics under my degree.

13  Q.  Under what?

14  A.  In my degree at Binghamton I took genetics.

15  Q.  And the only -- the only course you've taken in the

16  probabilities and/or statistics was that course in the two-year

17  college?

18  A.  I took an analytical chemistry class in -- at SUNY

19  Binghamton where I actually learned more statistics than I did

20  at Hudson Valley Community College.  It was very

21  statistics-heavy course.

22  Q.  Are there any major universities near Albany?

23  A.  Albany University is right next door.

24  Q.  There are others too, aren't there?

25  A.  St. Rose is there.  Union is there.  Russell Sage is there.

E8C9CHR5                    Myers - direct

1    Q.  Since being hired by the lab in 2002 -- two; is that right?

2    A.  2000.

3    Q.  2000.  Since being hired by the lab in 2000, have you taken

4    one university-level course in any of the disciplines of

5    genetic and DNA testing?

6    A.  Yes.  I took a course in molecular biology and I took a

7    course in statistics.

8    Q.  And that was one course.  What school?

9    A.  University of Albany.

10   Q.  That's the only advanced course you've taken in 14 years?

11   A.  Yes.

12   Q.  Do you have an advanced degree in statistics?

13   A.  No, I don't.

14   Q.  Now your training in statistics came particularly based on

15   your job in the laboratory; is that not right?

16   A.  No.  I had one course at Hudson Valley Community College.

17   Q.  The Hudson Valley Community College course?

18   A.  Right.  And I've had several courses in kinship analysis,

19   which is very statistically-based.  And several symposiums

20   given by George Carmody.

21   Q.  Now your job is to work with the police of the State of New

22   York; is that right?

23   A.  Yes, it is.

24   Q.  You're employed by the state, state police, correct?

25   A.  Employed by the State of New York.

E8C9CHR5                           Myers - direct

1         Employed by the State of New York.

2    Q.  State of New York.  But you work for the New York state

3    police department?

4    A.  I work in their division, yes.

5    Q.  You work as a laboratory forensic scientist?

6    A.  Yes.

7    Q.  Third grade?

8    A.  Yes.

9    Q.  Right?

10         For the last 14 years you've worked for the police?

11   A.  Yes.

12   Q.  So you're a technician and/or an analyst; isn't that right?

13   A.  I was a laboratory technician for my first two years of

14   employment and then I was promoted to forensic scientist.

15   Q.  Forensic scientist?

16   A.  Yes.

17   Q.  And you did some training in the first two years as a lab

18   technician; isn't that right?

19   A.  Yes, I did.

20         MR. NAWADAY:  Objection to -- I think Mr. -- all these

21   questions have been asked and answered.  At this juncture the

22   government would renew its application to offer Mr. Myers as an

23   expert.

24         THE COURT:  Do you have more, Mr. Greenfield?

25         MR. GREENFIELD:  Yes.  Not that much more.

1    THE COURT:  Go ahead.

2  BY MR. GREENFIELD:

3  Q.  How many hours, weeks, months, were you trained how to

4  create a swab for DNA analysis?

5  A.  That would have been during my serology training.  And it

6  would have been six months.

7  Q.  Six-month course?

8  A.  Yes.

9  Q.  Everyday?

10  A.  Yes.

11  Q.  Arduous training?

12  A.  Yes.

13  Q.  What is the procedure -- withdrawn.  I'll save that.  I'll

14  save that, Judge.

15    As a general proposition would it be a fair statement

16  that as a forensic scientist for the State of New York police

17  department your major responsibility is to assist law

18  enforcement agencies throughout the state?

19  A.  I wouldn't call it that.  It's just, like I said, the

20  identification, preservation and collection of biological

21  evidence, DNA testing, and testimony when necessary.

22  Q.  Now, do you belong to any affiliations or do you have any

23  affiliations with any scientific organizations in the field of

24  forensic science?

25  A.  No.

E8C9CHR5                        Myers - direct

1   Q.  You don't list yourself as a member of the American Academy

2   of Forensic Sciences; is that correct?

3   A.  No, I'm not.

4   Q.  Do you know what the American Academy of Forensic Sciences

5   is?

6   A.  Yes, I do.

7   Q.  What is it?

8   A.  It's an organization that puts forth symposiums and has a

9   publication, the American Association of Forensic Sciences,

10  every six months, I think.  And we receive that publication at

11  the lab.  But becoming a member isn't necessary for doing the

12  work.

13  Q.  You don't list yourself as a member -- or being a member of

14  any regional affiliated -- affiliation.  Let me restate that.

15          You don't list yourself as being a member of any

16  regional affiliate it of the American Academy of Forensic

17  Sciences; is that right?

18  A.  No, I'm not.  I was a member of the NEAFS.  That's the

19  Northeastern Academy of Forensic Sciences.  But I didn't really

20  see any use in keeping my membership because I could read all

21  the publications and I could go to the symposiums without being

22  a member.

23  Q.  Are you certified by any independent organization dealing

24  with forensic science, DNA analyzing, like the AFS -- like the

25  AAFS?

E8C9CHR5                        Myers - direct

 1   A.  I don't believe the AFS certifies anybody.  But no, I

 2   don't --

 3   Q.  So you're not certified by any independent organization?

 4   A.  No.

 5   Q.  You're an employee of the State of New York and that's it

 6   as far as how you have your job?

 7   A.  Yes.

 8   Q.  You don't take any tests through any certified independent

 9   testing organization?

10   A.  We have proficiency tests that are given by CTS.  I believe

11   it's certified -- I can't remember CTS.  It's a testing agency.

12   They submit proficiency tests to us that we have to take every

13   six months.  And I have to pass or else I will not be online.

14   Q.  Have you ever been published in the 14 years since you've

15   been employed by the New York state lab?

16   A.  No, I haven't.

17   Q.  Have you ever submitted any publications or any articles

18   for publication in the 14 years you've worked for the lab?

19   A.  No, I haven't.

20   Q.  Now have you ever hear of an organization known as SWGDAM?

21   A.  SWGDAM?

22   Q.  Yes.

23   A.  Yes.

24   Q.  What is that?

25   A.  It's the scientific working group on DNA analysis.

E8C9CHR5                          Myers - direct

1    Q.  That's a group, is it not, comprised of some of the leading

2    forensic scientists in the United States?

3    A.  Yes, it is.

4    Q.  It's the gold standard for testing for creating standards

5    for DNA testing?

6    A.  They set forth recommendations for labs to follow.  And we

7    have a member actually of SWGDAM in the lab.  He's our

8    technical leader.  And he goes to the meetings.  And he

9    represents us there.  And he will bring back information and

10   help guide us to follow these guidelines that they put forth.

11   Q.  There's an organization that was created by the FBI and it

12   invited any number of people to create this think tank called

13   SWGDAM, correct?

14   A.  Yes.

15   Q.  Are you a member?

16   A.  A member?  I don't think they have membership.  They have

17   the board of individuals that most of the labs around the

18   country will send one person.

19   Q.  Do you read their publications?

20   A.  I haven't in a while.  The last one I read was their

21   publication on mixture analysis.  Maybe the last one that they

22   put out.

23   Q.  What?  I'm sorry.

24   A.  On mixture analysis.

25   Q.  When was that?

1    A.  May have been '08 or '09.

2    Q.  You haven't referred to anything that the gold standard for

3    DNA testing has published since then?

4    A.  They haven't put out one on analysis since then.

5              MR. GREENFIELD:  May I have a second, Judge?

6              (Pause)

7    Q.  Are you aware that effective September 1, 2011 the FBI

8    directors database -- database and quality assurance standards

9    for DNA testing was issued by SWGDAM?

10   A.  When was that?

11   Q.  9-01, 2011.

12   A.  2011.

13             I'm not aware of it.  I may just not be remembering.

14   Q.  I'm sorry.

15   A.  I may not just be remembering.

16             What you referred to is QAS, the quality assurance

17   standards.  Those are the standards that are set forth as part

18   of the audit documents.  The auditors that come in and check

19   our lab use those documents to evaluate us.

20   Q.  Would it be fair to say the last article you remember

21   reading that they published was 2008 or 2009?

22   A.  Yes.

23   Q.  Did you ever read the FBI Quality Assurance Audit for DNA

24   Databasing Laboratories?

25   A.  I read an older version of that, yes.

E8C9CHR5                    Myers - direct

1   Q.  This was published on -- in September of 2011, on the same

2   date as the prior one I just mentioned.

3             Did you read that?

4   A.  No.

5   Q.  Did you read the FBI Directors Forensic Quality Assurance

6   Standards for DNA Testing Laboratories?

7   A.  What year was that?

8   Q.  Same date?

9   A.  No.

10  Q.  Have you read Forensic Quality Assurance Standards Audit

11  for Forensic DNA Testing Laboratories?

12  A.  No.

13  Q.  Published the same date?

14  A.  No, I haven't.

15            MR. GREENFIELD:  I have no objection to him being

16  offered as an expert, Judge.

17            THE COURT:  Okay.  In that event, the testimony will

18  be received as expert testimony in the field of forensic DNA

19  analysis.

20            Mr. Nawaday.

21  DIRECT EXAMINATION CONTINUED

22  BY MR. NAWADAY:

23  Q.  Mr. Myers, by the way, Mr. Greenfield asked you about some

24  quality assurance documents.  Do you remember those questions?

25  A.  Yes.

E8C9CHR5                          Myers - direct

1    Q.  Do you know what he's referring to?

2    A.  He's referring to the quality assurance standards that are

3    set forth by the FBI to audit our be laboratory, the QAS

4    document.  They've been around for a long time and they update

5    them from time to time, change the standards a little bit here

6    and there.

7    Q.  And in your work for the past twelve years as a forensic

8    scientist at the New York State Police lab, do you have to

9    follow the quality assurance dictates of every audit?

10   A.  Yes, we do.

11   Q.  By the way, have you testified before in matters involving

12   DNA?

13   A.  Yes, I have.

14   Q.  Approximately how many times?

15   A.  About 30.

16   Q.  Ever in court?

17   A.  Yes.

18   Q.  And have you ever been designated as an expert in court?

19   A.  Yes.

20   Q.  And about how many times?

21   A.  A little less than half of that, about ten.

22   Q.  And have you ever testified on behalf of the defense?

23   A.  Yes, I have.

24   Q.  As an expert?

25   A.  Yes.

E8C9CHR5                          Myers - direct

1   Q.  I want to go back to the different processes generally and

2   steps in DNA testing.  What are the different steps in DNA

3   testing?

4   A.  Well as I said before the first step is usually screening,

5   identifying bodily fluids.  Sometimes there's a submission

6   where they don't want to know, submitting agency doesn't want

7   to know if it's bodily fluids.  They want to know if somebody

8   was touching this item or if there happens to be bodily fluid

9   we don't test for there.  In those cases, they'll go straight

10  the DNA.  So the first step is usually serology screening.

11          The second step is starting the DNA testing, is called

12  extraction.  What that is is we'll take a clipping or a cutting

13  of some of the biological material, place it in a tube with

14  some chemicals.  The chemicals will open up the cells, release

15  the DNA, and purify it.  That's the extraction procedure.

16          The next step is quantitation.  We need to know how

17  much is there for the next step, for the third step which is

18  amplification.

19          What that is is making millions of copies of the DNA

20  so that we can visualize it on a genetic instrument.  And the

21  data that comes off the genetic instrument is what we analyze

22  and compare.

23  Q.  During your career you took those processes before?

24  A.  Yes, I have.

25  Q.  Now, you mentioned serology.  What is serology?

1    A.  It's just the testing of bodily fluids.  Identification of

2    bodily fluids.

3    Q.  What is DNA?

4    A.  DNA is deoxyribonucleic acid.  It's the genetic material

5    that's in everybody that makes us who we are.

6    Q.  What are some of the sources of DNA on the human body?

7    A.  Anything in the body contains DNA with the exception of red

8    blood cells.

9    Q.  What is a DNA profile?

10   A.  DNA profile can be from any different form of testing.  In

11   our testing we did STR testing.  It's just a list of the

12   genetic markers that we look at.

13   Q.  And what does it look like?  How is it represented?

14   A.  An STR testing we represent in a table basically showing

15   the locations.  If you look at each location, sometimes they're

16   referred to as genes.  A gene is anything that has some sort of

17   characteristic.  So everybody has a gene for blue eyes.  And

18   then inside that table are the alleles.  If we go back to the

19   eye example, everybody has a gene for eye color.  Only some

20   people will have an allele for blue eyes.

21   Q.  So let me backup.  What are -- you mentioned the word

22   location.  What's a location?

23   A.  Location.  We refer to it as locus for short.  These are

24   just the areas on the DNA that we look at.

25   Q.  Did you mention the word allele?

E8C9CHR5                          Myers - direct

1  A.  Yes.  Allele is any different form of a gene.  With STRs

2  it's just a repetitive number.  So if you look at a profile, an

3  STR profile and think of it like a book, you go to the first

4  page in the book and you count up how many times you see a

5  four-letter word like bike.  And you'll see in the tables later

6  a 15, 16.  Well, each one of those numbers is a number of

7  repeats in a sequence.  And there will be at most two of them

8  at any given location.

9  Q.  What types of materials does the lab receive for testing?

10  A.  Excuse me.  I'm sorry.  I didn't hear you.

11  Q.  What types of materials does the lab receive for testing?

12  A.  We receive a lot of things.  We receive a lot of clothing.

13  We receive a lot of swabs.

14  Q.  What are swabs?

15  A.  We use swabs just to transfer biological material from one

16  surface to another.  So if, say, a vehicle comes in and there's

17  blood inside the vehicle, just to make things simple we'll take

18  a swab of something that's been identified as biological

19  material just to preserve it.

20  Q.  What is done with the swab after you swab, say, that part

21  of the car?

22  A.  The swab will be submitted for DNA testing.

23          (Continued on next page)

24

25

Q.   What do you do if you receive a piece of clothing that has
not been swabbed?

A.   Well, there's one of two things that we can do with it once
we have identified biological material.  We can either swab it
in an area that we want to test, or we can take a cutting from
it.

Q.   What are you hoping to pick up when you swab something?

A.   Just biological material, if there is any blood on it,
seminal fluid, if someone has been touching it, skin cells.

Q.   What chain of custody protocols are in place at the lab, if
any?

A.   The chain of custody is tracked from the moment an item
comes into the lab starting with the evidence receiving
section.  It is tracked in a laboratory management information
system.  Every person that obtains that item or has it in their
custody, it must be documented in this system and kept and
chain-of-custody reports.

Q.   Do you know what a lab case number is?

A.   A lab case number is just a unique identifier of
submissions or cases that occur.

Q.   Is the lab case number used to track items of evidence
submitted for a particular case?

A.   Yes, every item is going to have a case number associated
with it, be submitted under any -- it depends on the year, it
depends on the number that comes in, but then items associated

1   with that case will have that case number with it.

2   Q.  Am I right that a DNA profile is made of alleles,

3   particular alleles at particular locations?

4   A.  Yes.

5   Q.  How are the locations identified?

6   A.  The locations are identified with code letters and numbers,

7   depending on when they were developed or who developed them.

8   Q.  How are the alleles identified?

9   A.  Just like I said, by a number of repeats.

10  Q.  For a profile, how many locations do you look at?

11  A.  We look at 15 in addition to amelogenin, which is a sex

12  marker.

13  Q.  You mentioned that genetic instrument.  What is that?

14  A.  It is a genetic analyzer.  Amplified product is placed on

15  it and run through capillary electrophoresis to identify

16  alleles.

17  Q.  Is that the machine that is used to identify the alleles?

18  A.  Yes.

19  Q.  Did there come a time where you reviewed and analyzed

20  evidence submitted under the case numbers 10HL-6266 and

21  10HL-6267?

22  A.  Yes.

23  Q.  What type of evidence was submitted under those case

24  numbers?

25  A.  There were several items.  There were quite a number of

1    swabs, there were a couple of knives, there was a glove, there

2    was some clothing, some buccal swabs.

3    Q.  You mentioned buccal swab.  What is a buccal swab?

4    A.  A buccal swab, it usually comes in a kit we call a buccal

5    swab collection kit.  It would just be a box, and inside that

6    box there would be two swabs.

7    Q.  What is typically done with -- where does a buccal swab

8    come from?

9    A.  It's used to collect cheek cells from the inside of

10   someone's mouth.

11   Q.  What is done with buccal swabs when they come to the lab?

12   A.  The same extraction quantitation, amplification, and run on

13   the genetic instrument procedure.

14   Q.  To create a profile?

15   A.  To create a profile, yes.

16   Q.  What is the purpose of creating a profile from a buccal

17   swab of a known source?

18   A.  A buccal swab is what we have referred to as a control.

19   When we have an evidence profile, an evidence profile is

20   largely useless unless we have something to compare it to.

21   Q.  Did you receive any buccal swabs from individuals in this

22   case?

23   A.  Yes, I did.

24   Q.  Whose buccal swabs did you receive?

25   A.  I received a buccal swab from Raymond Christian, one from

E8cnchr6                         Myers - direct

1   Anthony Baynes, and another from Jeffrey Henry, along with

2   several others.

3   Q.  I am going to show you what's already in evidence as

4   Government Exhibit 135.

5           Do you recognize that?

6   A.  Yes, I do.

7   Q.  Are there initials on that, on Government Exhibit 135 that

8   you recognize?

9   A.  Yes, my initials are on the seal.

10  Q.  Which seal?

11  A.  My seal with the lab tape.

12  Q.  Which seal is that?  How can you tell the seal that you

13  used?

14  A.  Well, it's the top seal.  There's three seals on it.

15  There's one on an orange piece of paper and then there is

16  initials across the orange tape and then there's my seal with

17  the lab tape.

18  Q.  Does the lab tape say NYSP on it?

19  A.  Yes, it does.

20  Q.  What do you recognize Government Exhibit 135 to be?

21  A.  It is a buccal swab collection kit from Raymond Christian.

22  Q.  Around when did you first see that box?

23  A.  When I took it out of evidence.

24  Q.  When was that?

25  A.  I believe it was 12/21/10.

1    Q.  December 21, 2010?

2    A.  Yes.

3    Q.  Was that box sealed when you first saw it?

4    A.  Yes, it was.

5    Q.  What did you do with that box?

6    A.  I brought it back to the biological science section.

7    Q.  By the way, what number was that swab submitted under?

8    A.  10HL-6267.

9    Q.  What did you do with the box after you took it to your --

10   well, where did you take it?

11   A.  I took it back to the biological science section, and from

12   the day I took it until the day I opened it, it was stored in

13   our vault in the biological science section.

14   Q.  When did you actually unseal that box?

15   A.  On the 30th of December.

16   Q.  The 30th of December what year?

17   A.  2010.

18   Q.  What did you find inside?

19   A.  There's two boxes inside, each containing a buccal swab.

20   Q.  What did you do, if anything, with those buccal swabs?

21   A.  One of them I did not even open.  The other I took a small

22   cutting and sent it through the DNA procedure.

23   Q.  What do you mean by cutting?

24   A.  Just a clipping, take a clean razor blade, cut a little

25   piece off and put it into a tube.

1    Q.  Do you know if a DNA profile was created from that swab?

2    A.  Yes.

3    Q.  I am showing to show you what's been marked for

4    identification as Government Exhibit 402.  Do you recognize

5    that?

6    A.  Yes, I do.

7    Q.  What is it?

8    A.  This is part of a table I created in my report.  It has

9    Raymond Christian's DNA profile on it.

10   Q.  The profile created from Government Exhibit 135, the swab?

11   A.  Yes.

12           MR. NAWADAY:  The government offers Government Exhibit

13   402.

14           MR. GREENFIELD:  No objection.

15           THE COURT:  402 will be received.

16           (Government's Exhibit 402 received in evidence)

17   Q.  Mr. Myers, you should see Government Exhibit 402 on the

18   screen there.  I would like you to walk the jurors through what

19   we're looking at here.

20           Do you see the first column, it says "locus"?

21   A.  Yes.

22   Q.  What are the numbers in the first column?

23   A.  Those are just the designations of the locations of the DNA

24   that we look at.

25   Q.  What are locations again?

1   A.  They are akin to a gene, or if you want to, if you want to

2   make an analogy, I look to compare STR testing to a book,

3   consider it a page in a book.

4   Q.  In the second column?

5   A.  In the second column is the profile.  If you go down the

6   profile at any given location or page in the book at most we

7   only see two numbers.  We get half of our DNA from our mother

8   and half of our DNA from our father.  At the first location,

9   D8S1179, we see two numbers.  We see 15,16.  What that is, is

10  we have gone on to that page and that location and counted up

11  the number of times we have seen a specific sequence in the

12  DNA.  Think of it like a word I am looking for, say the word

13  "bike," how many times do I see it on page D8S1179.  On the

14  first page I count up that word 15 times.  On the next page I

15  see 16 times.

16        And if we go down the rest of the profile, we can do

17  something similar.  At other locations, say at TPOX, we see

18  just one number.  There is an 8 there.  What that means is

19  Raymond Christian received an 8 at that location from his

20  mother and an 8 also from his father, which is why there's only

21  one.

22        If we go up two places in the table, D19S433, we see

23  14.2 and 15.2.  What that means is it is a partial repeat.  At

24  the first page, at D19S433, I have counted up the word bike 14

25  times, but then there's only two letters of the next one, so

E8cnchr6                          Myers - direct

1    it's 14.2.

2    Q.  Are the numbers in that second column the alleles?

3    A.  Yes, each one of these is an allele.

4    Q.  What do you do with a profile from a known source, like

5    what's set forth on Government Exhibit 402, when you compare it

6    to a DNA profile found on a piece of evidence?

7    A.  We do a pretty much a pairwise comparison.  With simple

8    single-source profiles it's very easy.  I would just take

9    another table and compare each of those alleles and check to

10   see if they all match up.  If they all match up, we call it a

11   match.  If they don't, it's a no-match.

12   Q.  Did you also receive a buccal swab from Anthony Baynes?

13   A.  Yes, I did.

14   Q.  And what, if anything, did you do with that swab?

15   A.  The same procedure that I sent the swab from Raymond

16   Christian through.

17   Q.  Were you able to create a single-source profile from the

18   Baynes buccal swab?

19   A.  Yes.

20   Q.  I'm going to show you what's been marked for identification

21   as Government Exhibit 404.

22          Please take a look at that and tell me if you

23   recognize it.

24   A.  Yes.  This is a portion of the table I created for one of

25   my reports.  It contains a profile from Anthony Baynes.

E8cnchr6                    Myers - direct

1          MR. NAWADAY:  The government offers Government Exhibit

2     404.

3          MR. GREENFIELD:  No objection.

4          THE COURT:  404 will be received.

5          (Government's Exhibit 404 received in evidence)

6          MR. NAWADAY:  Ms. McInerney, if we can please put up

7     Government Exhibit 404.

8     Q.  Are we looking at here a single-source profile obtained

9     from the Anthony Baynes buccal swab?

10    A.  Yes.

11    Q.  I think you mentioned that as part of the evidence in this

12    case you received different types of evidence, is that right?

13    A.  Yes.

14    Q.  Did you receive any swabs that were labeled swabs of blood

15    from a foyer wall?

16    A.  Yes.

17    Q.  I'm going to show you what's been marked for identification

18    as Government Exhibit 4.  See if you recognize it.

19    A.  Yes, I do.

20    Q.  What do you recognize it to be?

21    A.  These are two swabs from the foyer wall.

22    Q.  Are there initials on there?

23    A.  Yes, sir.  My initials are on it.

24         MR. NAWADAY:  The government offers Government Exhibit

25    4.

1       THE COURT:  Did you say 4?

2       MR. NAWADAY:  4.  Actually it's already in evidence,

3  your Honor.

4       THE COURT:  OK.

5       MR. GREENFIELD:  I still don't have an objection.

6  Q.  What did you do, if anything, with those swabs when you

7  first received them?

8  A.  The first thing I did was a presumptive test or a serology

9  test for blood.

10  Q.  Was that presumptively positive for blood?

11  A.  Yes, it was.

12  Q.  Then what did you do?

13  A.  Then I took a small portion of the swabs and cut them,

14  placed them in a tube, and sent them through the DNA procedure.

15  Q.  Were you able to create a DNA profile from the those swabs?

16  A.  Yes.

17  Q.  What kind of profile were you able to obtain?

18  A.  I believe this one was a single-source profile.

19  Q.  What is a single-source profile?

20  A.  It's just like the control we see there, where we see no

21  more than one allele at any given location.

22  Q.  Did you compare the DNA profile from the swabs from the

23  blood on the foyer wall to any other controls that were

24  submitted in this case?

25  A.  Yes, I compared them to all of the controls.

E8cnchr6                         Myers - direct

1    Q.  Did it match anybody?

2    A.  Yes, it matched the profile from Anthony Baynes.

3    Q.  I think you mentioned that there was a knife submitted.

4    A.  Yes.

5    Q.  I'm going to show you what's already in evidence as

6    Government Exhibit 12.

7            Take a look at it.  Do you recognize it?

8    A.  Yes, I do.

9    Q.  What do you recognize it to be?

10   A.  It's item No. 12, a knife that I swabbed.

11   Q.  When you first saw that box, was it sealed or unsealed?

12   A.  It was sealed.

13   Q.  Where were you when you first saw that box?

14   A.  The evidence window.

15   Q.  At the New York State Police lab?

16   A.  Yes.

17   Q.  What did you do with that knife, if anything?

18   A.  Well, I brought it back to the section and I swabbed the

19   knife and checked those swabs for blood also and then sent the

20   swabs through the DNA procedure also.

21   Q.  I'm going to show you what's been marked for identification

22   as Government Exhibits 12A and 12B.

23           Please take a look at those and tell me if you

24   recognize them.

25   A.  These are the swabs I took from that knife.

E8cnchr6                        Myers - direct

1   Q.  From Government Exhibit 12?

2   A.  Yes.

3   Q.  How are you able to recognize them?

4   A.  They have the case number, the item number, and my initials

5   on them.

6   Q.  12A, from what area of the knife is 12A?

7   A.  12A is from the handle of this knife.

8   Q.  From what area of the knife is 12B?

9   A.  From the blade.

10  Q.  What did you do with those swabs, Government Exhibits 12A

11  and 12B?

12  A.  Tested them presumptively for blood add then sent them on

13  for DNA testing.

14          MR. NAWADAY:  The government offers government

15  Exhibits 12A and 12B.

16          MR. GREENFIELD:  No objection.

17          THE COURT:  12A and 12B will be received.

18          (Government's Exhibits 12A and 12B received in

19  evidence)

20  Q.  Did either of Government Exhibits 12A or 12B test

21  presumptively positive for blood?

22  A.  Yes, they did.

23  Q.  Did you create a profile of the DNA on the blade?

24  A.  Yes, I did.

25  Q.  What did conclude from that DNA profile?

1    A.  The profile on the blade of the knife was a mixture

2    profile, and there is what we call a major contributor.

3    Basically, when there's more than one person contributing to a

4    profile, sometimes there is enough of a difference that we can

5    treat that major contributor as a single source.

6    Q.  I think you explained this, but just to be clear, what does

7    a mixture profile mean?

8    A.  A mixture profile means there's more than one person.  So

9    in those tables that we were looking at before, we only see two

10   alleles at any given location.  When we have more than two, we

11   have three or four, that means we have at least two donors.  If

12   we have five or six, that means we have at least three donors,

13   and so on.

14   Q.  You mentioned the words major contributor.  What does that

15   mean?

16   A.  What that means is one person is standing out in there.  I

17   can conclusively say that these alleles belong to one person

18   and then go down the profile and take that portion of the

19   profile out as in essence a single donor.

20   Q.  Were you able to determine who the major contributor was?

21   A.  Yes, on this one, the major contributor was consistent with

22   Anthony Baynes.

23            THE COURT:  I'm sorry, who?

24            THE WITNESS:  The major contributor on this one was

25   consistent with Anthony Baynes.

1      THE COURT:  Mr. Nawaday, might this be a good time for

2  the afternoon break?

3      MR. NAWADAY:  Yes, your Honor.

4      THE COURT:  Let's do that, ladies and gentlemen.  15

5  minutes, so 3:45.

6      (Jury not present)

7      THE COURT:  15 minutes.

8      (Recess)

9      THE COURT:  We are going to get the jury.

10      MR. BAUER:  Judge, before the jury.

11      THE COURT:  OK.  Do we need the court reporter?

12      MR. BAUER:  No.

13      (Discussion at sidebar off the record)

14      (Jury present)

15      THE COURT:  Ladies and gentlemen, I have to apologize.

16  An issue has arisen that is going to require the attention of

17  the Court and the parties.  Rather than have you folks sit

18  around while we do that, we are going to break early today.  So

19  we will break now.  You seem all broken up about it, I know.

20      We will break now, and we will see you again tomorrow

21  morning no later than 9:25 in the jury room.

22      Thank you so very much.  Please do not discuss the

23  case.

24      (Jury not present)

25      THE COURT:  OK.  Unless there is anything else.

E8cnchr6                        Myers - direct

1           MR. NAWADAY:  Not from the government.

2           MR. BAUER:  On the record may I say one thing.  I

3   wanted to thank the Court and defense counsel for their

4   flexibility with regards to our witnesses.  It obviously didn't

5   work perfectly today, but I appreciate everybody's flexibility.

6           THE COURT:  You're welcome.

7           MR. GOLTZER:  We appreciate the government's remarks,

8   and I'm looking forward to cutting him off again tomorrow.

9           THE COURT:  I wouldn't expect anything less.

10          (Adjourned to Wednesday, August 13, 2014 at 9:00 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2     Examination of:                              Page

 3      ANTHONY BAYNES

 4     Cross By Mr. Buchwald . . . . . . . . . . . 823

 5     Redirect By Mr. Nawaday . . . . . . . . . . 825

 6     Recross By Mr. Goltzer . . . . . . . . . . . 836

 7     Recross By Mr. Greenfield . . . . . . . . . 842

 8      JAMAR MALLORY

 9     Direct By Mr. Bauer  . . . . . . . . . . . . 852

10     ROBERTA GOODMAN

11     Direct By Mr. Nawaday . . . . . . . . . . . 969

12     Cross By Mr. Greenfield . . . . . . . . . . 979

13     Redirect By Mr. Nawaday . . . . . . . . . . 992

14     Recross By Mr. Greenfield . . . . . . . . . 993

15      DANIEL MYERS

16     Direct By Mr. Nawaday . . . . . . . . . . . 995

17                       GOVERNMENT EXHIBITS

18     Exhibit No.                              Received

19      203A, 202A, 204A, 205A, 206A, 208A, . . . . . 844

20            220A, and 221A

21      901  . . . . . . . . . . . . . . . . . . . 845

22      906  . . . . . . . . . . . . . . . . . . . 847

23      421  . . . . . . . . . . . . . . . . . . . 907

24      209  . . . . . . . . . . . . . . . . . . . 960

25      210  . . . . . . . . . . . . . . . . . . . 961
```

136    . . . . . . . . . . . . . . . . . . 972

135    . . . . . . . . . . . . . . . . . . 977

402    . . . . . . . . . . . . . . . . . .1022

404    . . . . . . . . . . . . . . . . . .1025

12A and 12B   . . . . . . . . . . . . . . .1028