E8dchr1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA
 3             v.                              12 CR 626 (ER)
     RAYMOND CHRISTIAN a/k/a
 4   "Reckless"
     GLENN THOMAS, a/k/a "Gucci"
 5   TYRELL WHITAKER, a/k/a "Bow Wow"
                  Defendants
 6   ------------------------------x
                                              New York, N.Y.
 7                                            August 13, 2014
                                              9:00 a.m.
 8

 9   Before:
                         HON. EDGARDO RAMOS
10                                            District Judge

11
                            APPEARANCES
12   PREET BHARARA
          United States Attorney for the
13        Southern District of New York
     ANDREW BAUER
14   KAN M. NAWADAY
          Assistant United States Attorney
15
     DAVID S. GREENFIELD
16        and
     ANTHONY STRAZZA
17        Attorneys for Defendant Christian

18   LAW OFFICES OF DON BUCHWALD
          Attorney for Defendant Thomas
19   DON D. BUCHWALD

20   KELLEY DRYE & WARREN LLP
          Attorney for Defendant Thomas
21   LEVI DOWNING

22   GEORGE ROBERT GOLTZER
          and
23   YING STAFFORD
          Attorneys for Defendant Whitaker
24   -- also present--
     S.A. Andrei Petrov - FBI
25
```

E8dchr1

1           (Trial resumed)

2           (In open court; jury not present)

3           THE COURT:  Anything for me, folks?

4           MR. BAUER:  Not from the government, your Honor.

5           MR. GOLTZER:  No.

6           THE COURT:  Is Mr. Myers here and ready to go?

7           MR. NAWADAY:  He is, your Honor.  He's right outside.

8    I can have him come in if you want.

9           THE COURT:  No.

10          MR. NAWADAY:  Your Honor, one witness order matter.

11   We have spoken with the defense about this.  After we finish

12   with Mr. Myers, and after his cross-examination, he's done, our

13   intention is to call Officer Kevin Lahar, of the Newburgh

14   Police Department, and get him done before going back to the

15   examination of Mr. Mallory.

16          THE COURT:  Lahar?

17          MR. NAWADAY:  Yes, your Honor.

18          THE COURT:  By the way, are brothers?

19          MR. BAUER:  They are, your Honor.  There's Kevin

20   Lahar, William Lahar, both of whom will be testifying, there's

21   a Chris Lahar who is also a member of the Newburgh Police

22   Department.

23          THE COURT:  How long will Mr. Lahar be?

24          MR. NAWADAY:  His direct will be approximately 30

25   minutes.

E8dchr1

| | |
|---|---|
| 1 | THE COURT:  So we may not get to Mr. Mallory. |
| 2 | MR. BAUER:  I think we will, your Honor, depending on |

how long Mr. Greenfield's cross-examination of Mr. Myers is.  I

expect to have another 20 minutes with Mr. Myers on direct.

THE COURT:  OK.

MR. GOLTZER:  We will certainly get to Mallory today.

THE COURT:  OK.  I hope to have a draft of the jury

charge to the parties by tomorrow.  I hope to have a copy of

the draft jury charge to the parties by the end of the day

tomorrow.

I don't know whether the defendants will be submitting

anything in addition, but I hope to have the conference early

in the week next week.  OK?  At the end of the day.

MR. GOLTZER:  If we have anything it will be very

brief, depending on the evidence.

THE COURT:  OK.  So it will be 5 o'clock on Monday or

5 o'clock on Tuesday, depending on where we are in the

testimony.

MR. BAUER:  Judge, would you like the government to

put together a proposed verdict sheet?

THE COURT:  Yes.  And the defendants if they want to

propose, absolutely.

MR. BUCHWALD:  Do you have a present estimate of when

they think they will be finished.  I have a member of the

police department under subpoena.  We are looking for guidance.

E8dchr1

1              What is your guestimate as to --

2              MR. BAUER:  It depends more on defense counsel than

3    us.  We were going through it in our heads yesterday.  We are

4    actually considering eliminating a couple of witnesses so we

5    can move this forward.  Our hope is that maybe we can rest by

6    the end of the day Tuesday if that's realistic.  I am not sure.

7              MR. BUCHWALD:  We are just trying to get guidance.

8    It's the Newburgh Police Department we are trying to give the

9    guidance to.  It looks fairly safe to say they wouldn't be here

10   before Tuesday.  Does that seem safe?

11             MR. BAUER:  I think it does.  Right.

12             MR. GOLTZER:  I don't think that is a--

13             MR. BUCHWALD:  We will discuss with the prosecutors

14   stipulations that might make their testimony irrelevant having

15   to do with the prior inconsistent statements.  Hopefully we

16   will work that out with the prosecutors.

17             THE COURT:  The defendants are intending to put on

18   some sort of defense case?

19             MR. GREENFIELD:  Yes, Judge.

20             MR. BUCHWALD:  Yes.

21             THE COURT:  OK.

22             MR. BAUER:  Judge, on that score, perhaps if you are

23   thinking what I'm thinking, which is we have some jurors who

24   had vacation plans that following week, it would probably make

25   sense for us to consider asking or telling the jury that we

E8dchr1

1     expect them to sit the following Friday.

2              THE COURT:  Yes.

3              MR. BAUER:  Just so we keep that as a possibility, if

4     necessary.

5              THE COURT:  If they were deliberating, we would bring

6     them in on Friday anyway.

7              MR. BAUER:  Right.

8              THE COURT:  They will be sitting one way or another

9     next Friday.

10             MR. BAUER:  Judge, should we get Mr. Myers up on the

11    stand?

12             THE COURT:  We're still waiting for one juror.  As

13    soon as we have that juror.  If he wants to come into the

14    courtroom, that's fine.

15             We are still having an issue with one juror

16    apparently, some potential problem with a subway line, but it

17    is unclear.

18             MR. BUCHWALD:  Your Honor, during Mr. Mallory's

19    testimony yesterday, a nonresponsive answer that he gave to the

20    government included the fact that an individual by the name of

21    Mo Nice had testified at a state court trial where L-1 beat a

22    murder rap.

23             THE COURT:  Yes.

24             MR. BUCHWALD:  We would move to strike that portion of

25    the answer as unresponsive and irrelevant -- I don't think the

E8dchr1

1    government intended to elicit it -- and prejudicial.  The

2    notion that somebody else here was charge with another murder

3    and was acquitted for it.  Their acquitting the leader of this

4    group it seems to me is irrelevant and shouldn't be there.  I

5    have spoken to all counsel, and I think we all agree that it

6    would be appropriately stricken.

7            MR. BAUER:  Mr. Buchwald is correct.  It came out

8    without our knowledge that that was about to come out.  So the

9    government has no objection to be precise it is on page 955 of

10   the transcript.  It starts around line 11:  "Are you familiar

11   with an individual named Mo Nice?"

12           THE COURT:  Yes.

13           MR. BAUER:  Then it bleeds on to 956 where I had said,

14   "I'm happy to move on from this."

15           THE COURT:  Yes.

16           MR. BAUER:  So I would propose that we strike from

17   line 13 on 955 and through line 8 of 956.

18           THE COURT:  Is there any objection?

19           MR. BUCHWALD:  Just give me a moment, your Honor.

20           Where do you want to start, Mr. Bauer?  I'm sorry.

21           MR. BAUER:  Line 13 where I asked, who is Mo Nice, all

22   the way through to the colloquy between me and the Court on

23   line 8 of 956.

24           THE COURT:  So line 13 on 955 to --

25           MR. BUCHWALD:  May we just have a moment, your Honor?

E8dchr1

1    I'm sorry.

2              THE COURT:  Sure.

3              MR. BAUER:  Mr. Buchwald is proposing something that

4    probably makes even more sense, which is to start on line 14,

5    his answer begins, "Mo Nice is a drug dealer."

6              THE COURT:  Yes.

7              MR. BAUER:  We would strike after the word "drug

8    dealer" on line 14 all the way through line 8 on 956.

9              THE COURT:  So the stricken portion would begin on

10   line 14 with the words "that used to sell drugs"?

11             MR. BAUER:  Exactly.

12             THE COURT:  And the stricken portion will continue to

13   page 956, line 8, and the testimony would begin at line 9 of

14   page 956, right?

15             MR. BAUER:  Yes, your Honor.

16             THE COURT:  OK.

17             MR. BUCHWALD:  Thank you.

18             THE COURT:  I take it neither defense counsel other

19   than Mr. Greenfield intends to cross-examine Mr. Myers?

20             MR. GOLTZER:  Correct.

21             MR. DRATEL:  Correct, your Honor.  Also, I would

22   request a limiting instruction at some point during his

23   testimony.  After his direct is fine.

24             THE COURT:  OK.  Remind me.

25             MR. DRATEL:  Yes.

E8dchr1

1           THE COURT:  The jury is here.  Do you want to get

2    Mr. Myers.

3           I will do a softball admonition to continue to try to

4    be here on time.

5      DANIEL MYERS, resumed.

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E8dchr1

1           (Jury present)

2           THE COURT:  Ladies and gentlemen, before we begin, as

3    I hope you have been able to discern, even from your vantage

4    point, the Court and the parties have been doing everything we

5    can to make sure that we present these witnesses and present

6    the testimony as efficiently as possible.

7           I am trying my very best not to disrupt your lives any

8    more than absolutely necessary.  However, as I mentioned at the

9    beginning, nothing can happen unless all of us are here.  So I

10   am going to ask you again to please, please make sure that you

11   are here on time.  Make sure that you are here on time in the

12   mornings and after the breaks so that we can get you to your

13   lives just as soon as we possibly can.

14          OK.  And with that, we will continue with the

15   testimony of Mr. Myers.

16          Mr. Nawaday.

17   DIRECT EXAMINATION

18   BY MR. NAWADAY:

19   Q.  Mr. Myers, I think we ended yesterday talking about the

20   swabs you took of Government Exhibit 12 of that knife.  Do you

21   remember those questions?

22   A.  Yes.

23   Q.  Which one of the swabs, the profiles from which swab

24   matched Anthony Baynes?

25   A.  Of the two swabs, 12A was the handle, and it was a mixture

E8dchr1                         Myers - direct

1   of three people, and 12B was of the blade it was consistent

2   with a mixture of three people with a major contributor being

3   consistent with Anthony Baynes.

4   Q.  So it was the blade?

5   A.  Yes.

6   Q.  Was the material you swabbed off the blade presumptively

7   positive for blood?

8   A.  Yes, it was.

9   Q.  Did you test a ski mask?

10  A.  Yes, I did.

11  Q.  I am going to show you what's already in evidence as

12  Government Exhibit 3.  Please take a look and that and tell me

13  if you recognize it.

14  A.  This is a ski mask I looked at.

15  Q.  When you first saw that ski mask, what was it in, if

16  anything?

17  A.  A brown paper bag.

18  Q.  Is it the brown paper bag that's in Government Exhibit 3?

19  A.  Yes.

20  Q.  Was it sealed or unsealed?

21  A.  It was sealed.

22  Q.  When did you first see that bag containing the ski mask?

23  A.  On the 21st of December, 2010.

24  Q.  What did you do when you first saw that bag containing the

25  ski mask?

E8dchr1                         Myers - direct

1   A.   From the 21st to I think the 28th it was our -- I stored it

2   in the biological science vault.  On the 28th I took it out for

3   examination, cut into the bag and then swabbed the mask in

4   various places.

5   Q.   When you say cut into the bag, what do you mean?

6   A.   Just take a razor blade, cut it open, break the seal to get

7   the evidence out.

8   Q.   Where did you do that?

9   A.   In the biological science section.

10  Q.   By the way, when you did that, when you examined the ski

11  mask, was it before or after you examined the Christian buccal

12  swab?

13  A.   Two days before.

14  Q.   Sir, had you ever unsealed the Christian buccal swab at

15  that point?

16  A.   No.

17  Q.   Had you ever handled the Christian buccal swabs at all at

18  this point?

19  A.   Not outside of the box.

20  Q.   After you took the mask out of that brown paper bag, what

21  did you do?

22  A.   I swabbed the mask in various places and then tested the

23  swabs using the presumptive test for blood, and then I cut

24  those swabs for DNA.

25  Q.   What areas of the mask did you swab?

E8dchr1                          Myers - direct

1    A.   The way the mask appears, there is a crease in it when you

2    look, at it I decided that the crease was probably the outside

3    of the mask.  So I took four swabs from the outside and one

4    swab from the inside.

5    Q.   I'm going to show you what is marked for identification as

6    Government Exhibit 409.

7         THE COURT:  Mr. Myers, when you say the outside, is

8    that the part that would be facing on the outside, not against

9    the face?

10        THE WITNESS:  Yes.  That's the way I would wear it.

11        THE COURT:  OK.

12   Q.   Looking at what's been marked for identification as

13   Government Exhibit 409, do you recognize that?

14   A.   These are two pages of my notes, diagrams that I drew of

15   the mask and where I took the swab from.

16        MR. BAUER:  The government offers Government Exhibit

17   409.

18        MR. GREENFIELD:  No objection.

19        THE COURT:  409 will be received.

20        (Government's Exhibit 409 received in evidence)

21        MR. NAWADAY:  Ms. McInerney, can you please put up

22   Government Exhibit 409, starting with the first page.

23   Q.   Mr. Myers, what are we looking at here?

24   A.   This is page 8 of my notes, what I would presume to be the

25   outside and front of the mask.  This is just a sketch.  And

1   then there's four circles and then three subitem numbers in

2   places where I swabbed the mask.

3   Q.  How many areas did you swab on the exterior of the ski

4   mask?

5   A.  Four.

6   Q.  How did you label those swabs?

7   A.  With the subitems 3A, 3B, 3D and 3C.

8   Q.  I'm going to show you what's been marked for identification

9   as Government Exhibits 3A, 3B, 3C and 3D.

10          MR. GREENFIELD:  May I see them.

11  Q.  Looking at what's been marked for identification as

12  Government Exhibits 3A, 3A, 3C and 3D, do you recognize those?

13  A.  These are the swabs that I took from the mask.

14  Q.  From which side of the mask?

15  A.  The front.

16  Q.  So the exterior?

17  A.  Yes.

18          MR. NAWADAY:  The government offers Government

19  Exhibits 3A, 3B, 3C and 3D.

20          MR. GREENFIELD:  No objection.

21          THE COURT:  3A, B, C, and D will be received.

22          (Government's Exhibits 3A, 3B, 3C and 3D received in

23  evidence)

24  Q.  Any of the areas set forth that you swabbed using swabs 3A

25  through 3D, did any of those areas test presumptively positive

E8dchr1                          Myers - direct

1    for blood?

2    A.   They all did, yes.

3    Q.   What did you do with 3A through D after you had taken the

4    swabs of those areas?

5    A.   I cut the swabs and sent the cuttings through the DNA

6    procedure.

7              THE COURT:  I'm sorry.  Can you repeat that.

8              THE WITNESS:  I cut the swabs and I sent them through

9    the DNA procedure.

10   Q.   Turning to the second page of Government Exhibit 409, what

11   are we looking at here?

12   A.   This is the other side of the mask.

13   Q.   The interior?

14   A.   Yes.

15   Q.   So is this the side that touches the face?

16   A.   Yes.

17   Q.   How many swabs of the interior did you take?

18   A.   Just one.

19   Q.   You labeled it swab 3E?

20   A.   Yes.

21   Q.   I'm going to show you what's been marked for identification

22   as Government Exhibit 3E.  Take a look at that and tell us if

23   you recognize it.

24   A.   Yes.  This is the swab I took from the mask.

25   Q.   From the interior of the mask?

E8dchr1                          Myers - direct

1    A.  Yes.

2    Q.  That you labeled government 3E?

3    A.  Yes.

4            MR. NAWADAY:  The government offers Government Exhibit

5    3E.

6            MR. GREENFIELD:  No objection.

7            THE COURT:  3E will be received.

8            (Government's Exhibit 3E received in evidence)

9    Q.  What, if anything, did you do with the swab after you

10   swabbed the interior area of the ski mask?

11   A.  I tested this with the presumptive testing range and it

12   tested positive for blood.  Then I took a cutting from the swab

13   and sent it through the DNA procedure also.

14   Q.  Were you able to create profiles from the swabs 3A through

15   3E?

16   A.  Yes.

17   Q.  I'm going to show you what's been marked for identification

18   as Government Exhibit 401.  Please tell us if you recognize it.

19   A.  This is a portion of the chart that I created for one of my

20   reports.

21   Q.  What does that chart set forth?

22   A.  It has the DNA profiles from these items.

23   Q.  From the swabs 3A through 3E?

24   A.  Yes.

25           MR. NAWADAY:  So the government offers Government

E8dchr1                          Myers - direct

1    Exhibit 401.

2                MR. GREENFIELD:  May I see it.  No objection.

3                THE COURT:  401 will be received.

4                (Government's Exhibit 401 received in evidence)

5                MR. NAWADAY:  Ms. McInerney, can you please put up

6    Government Exhibit 401.

7    Q.  Mr. Myers, again, what are we looking at here?

8    A.  This is a portion of the charts from one of my reports

9    containing the DNA profiles that I obtained from 3A through 3E.

10   Q.  Please remind the jurors, what does column 1 set forth?

11   A.  Column 1 is the location that we are looking at on the DNA,

12   there's 15 of them, plus amelogenin, the sex marker.

13   Q.  Amelogenin -- I can't pronounce that.  Can you say how to

14   pronounce the last term in that column.

15   A.  Amelogenin.

16   Q.  What does that set forth in that row?

17   A.  It just says if there is a male or a female present.  If it

18   is an X and no Y, it's female.  If there's a Y, there is a male

19   contributing.

20   Q.  The numbers in each of the rows, what are those again?

21   A.  Those are the alleles.

22   Q.  The second column, item 3A, is that the profile for swab

23   3A?

24   A.  Yes, it is.

25   Q.  Where was that swab taken from?

1    A.   The right cheek of the ski mask.

2    Q.   The interior or exterior?

3    A.   The outside.

4    Q.   What, if anything, were you able to determine from your

5    analysis of the DNA from swab 3A?

6    A.   This is a mixture profile.  As I said before, we expect

7    only two alleles at any location for an individual.  When we

8    see that there's more than two alleles, we know there's more

9    than one donor.

10        So if you look at the first, the first box there,

11   there are seven alleles, so there's at least three contributors

12   here.  Also, there is a quantitative component to the data.

13   When one person is standing out, we can call a major

14   contributor.  And here, in the first column, we see that I have

15   bolded several alleles throughout the profile that I can call

16   as a single one of the contributors to this mixture profile.

17   That major contributor is consistent with Anthony Baynes.

18   Q.   So just to go over that, how many contributors did you

19   determine contributed to the DNA on swab 3A.

20   A.   There's at least three.

21   Q.   Were you able to determine a major contributor?

22   A.   Yes, I was.

23   Q.   And who did you determine was a major contributor?

24   A.   The major contributor was consistent with Anthony Baynes.

25   Q.   The alleles that are bolded, why are they bolded?

E8dchr1                          Myers - direct

1    A.  They are bolded because when we look at the data, the

2    electropherograms, those alleles stand out as a major

3    contributor from all the rest of the alleles.

4    Q.  Moving on to item, the next column, item 3B, is that the

5    profile you created relating to swab 3B?

6    A.  Yes.  This is a profile that I obtained from swab 3B, taken

7    from the chin of the outside of the ski mask.

8    Q.  What, if anything, were you able to determine from your

9    analysis of the profile from that swab?

10   A.  This is a mixture also of three people.  But in this

11   instance, the data wasn't standing out enough to call a major

12   contributor.  But it was consistent with what we would expect

13   to see if Anthony Baynes was mixed with two other individuals.

14   Q.  Moving on to the columns three and four, relating to swabs

15   3C and 3D, what were your conclusions, if any, from the

16   profiles from those swabs?

17   A.  If you look down these columns, I have designated certain

18   locations with a pound sign.  What that means is I didn't get

19   any data at those locations.  This is a partial profile.  And,

20   in fact, it's so partial that we don't bother making any kind

21   of comparison to it.  We call it insufficient.

22   Q.  So there was insufficient DNA from those areas to draw any

23   conclusions?

24   A.  That's correct.

25   Q.  Now, the last column, that relates to swab 3E.  Is that

1    right?

2    A.   Yes.

3    Q.   Where was this swab taken from?

4    A.   This swab was from the inside facial area.

5    Q.   And did that swab test presumptively positive for blood?

6    A.   Yes, it did.

7    Q.   And what were your conclusions, if any, from the DNA

8    profile you obtained from swab 3B?

9    A.   This is also a mixture of three individuals.  As we can see

10   from the first row, we have five alleles there.  So there's at

11   least three individuals, and there is a major contributor that

12   I did find, and that major contributor is consistent with

13   Raymond Christian.

14   Q.   Again, what does it mean when you determine someone's a

15   major contributor?

16   A.   It means the alleles are standing out enough that I can say

17   these alleles go together.  These came from one person.

18   Q.   Is there a statistical way that you describe your

19   conclusion?

20   A.   Yes.  Whenever we say that there is a match or there is a

21   consistent major contributor, we do calculate a rarity

22   statistic.  It's called a conditional match probability.

23   Q.   What was the statistical conclusion you reached with

24   respect to determining that Raymond Christian was a major

25   contributor to the swab 3E?

1   A.   The probability of selecting an unrelated individual

2   matching the manger contributor to this mixture.

3            THE COURT:   Could you slow down and keep your voice

4   up.

5            THE WITNESS:   OK.

6   A.   The probability of selecting an unrelated individual

7   matching the major contributor to this mixture is less than 1

8   in 300 billion.

9   Q.   One in 300 what?

10   A.   Billion.

11   Q.   Is there a way to describe what you just said visually?

12   A.   Basically, if you take 300 billion ping pong balls, throw

13   them into a pool and shake them up at random, you want to pick

14   a certain color or a certain profile out of that pool, shake it

15   up, close your eyes, pick one out, it is a very unlikely chance

16   that you are going to actually select that ping pong ball.

17   It's just a rarity statistic.   How rare is the event, how rare

18   it would be coincidentally.

19   Q.   That Raymond Christian's profile would be on that mask?

20   A.   That it would match.

21   Q.   Do you know when the Raymond Christian buccal swab was

22   collected?

23   A.   I know it was collected prior to any of the evidence in

24   this case.

25   Q.   Do you know what degradation is?

E8dchr1                          Myers - direct

1    A.  Degradation is when, what we refer to as degradation is

2    when the biological material is subject to the environment, to

3    bacteria, to heat, to water, washing it away.  Typically things

4    when they are degraded what you will see is what we saw in that

5    table where I put the pound sign.  We start losing data.

6    Q.  Assuming that the Christian buccal swabs were collected

7    about three months before you did your analysis and they were

8    in a sealed box, could that lead to any degradation?

9    A.  I guess it could, but I wouldn't expect it to.  We have

10   buccal swabs all the time that are collected years ago.  As

11   long as they're kept dry and cold, there isn't a problem.

12   Q.  In analyzing the buccal swabs of Raymond Christian in this

13   case, did you notice any degradation?

14   A.  No.

15   Q.  How do you know that there was no degradation?

16   A.  I obtained the full single source profile from it.

17   Q.  Would degradation ever result in a different person's

18   profile?

19   A.  No.

20              MR. NAWADAY:  No further questions.

21              THE COURT:  Cross-examination?

22              MR. GREENFIELD:  Yes, please.

23              MR. DRATEL:  Your Honor?

24              THE COURT:  Yes, sir.

25              MR. DRATEL:  The instruction.

E8dchr1                         Myers – direct

1          MR. NAWADAY:  Your Honor may we have a quick sidebar

2     before this.

3          THE COURT:  OK.

4          (Continued on next page)

E8dchr1                          Myers - direct

1                    (At sidebar)

2                    MR. BAUER:  Judge, our concern with the limiting

3        instruction that you have been agreeing to give for defense

4        counsel generally is that it's been overexpansive.

5        Particularly what we mean is, in this case, for instance, let's

6        talk about the Raymond Christian mask, there is direct evidence

7        of Raymond Christian's participation in the robbery, but it

8        could also be used to corroborate the credibility of our

9        witnesses.

10                   So the instruction you have been given has been along

11       the lines it cannot be used to consider the charges against any

12       of the other defendant in any way.  But if Anthony Baynes is

13       saying that Raymond Christian and Glenn Thomas and Tyrell

14       Whitaker were there, I think that the limiting instruction that

15       you have been giving has been, like I said, overinclusive.

16                   THE COURT:  OK.

17                   MR. DRATEL:  I think it would be grounds for a

18       severance to argue -- *Figueroa* is the case I am thinking of,

19       Second Circuit case -- by essentially corroborating the

20       evidence against one defendant to use against another defendant

21       independently I think would not be appropriate in the context

22       of specific evidence against one defendant.

23                   MR. BAUER:  I mean, a jury as a fact-finder can

24       consider any of the evidence that is presented.

25                   THE COURT:  Not unless I tell them that they can only

E8dchr1                          Myers - direct

1      consider it for a limited purpose.

2             MR. BAUER:  I am saying in terms of judging a

3      witness's credibility.

4             THE COURT:  Oh, sure.

5             MR. BAUER:  That was my amendment.  I am concerned

6      that the instruction you have been giving might discourage them

7      from doing that very practically.

8             THE COURT:  I don't know that that happens.  Not that

9      it is not a legitimate concern, but I don't know that it is a

10     concern ultimately that will bear out.  More to the point, the

11     instruction that was proposed by Ms. Stafford, I addressed that

12     proposed instruction with the parties at the very outset of the

13     trial.  There was no objection to it.  It's been the

14     instruction that I have been giving consistently.  I think the

15     jury will know what to make of it, and I think that the

16     government will have plenty of other information to provide by

17     way of arguments to the jury concerning corroboration of the

18     evidence, so I'm going to continue to give the instruction.

19            (Continued on next page)

20

21

22

23

24

25

E8dchr1                          Myers - direct

1            (In open court)

2            THE COURT:  Ladies and gentlemen, you have been

3    hearing testimony from Mr. Myers concerning certain tests that

4    he conducted and that those tests resulted in some positive

5    identifications of one particular defendant, Mr. Christian.  My

6    instruction to you in this regard is that you can only consider

7    this testimony against Mr. Christian in deciding whether or not

8    the government has proven its case against him, and you cannot

9    consider this evidence in any way against either Messrs.

10   Whitaker or Thomas.

11           Very well.  Mr. Greenfield.

12           MR. GREENFIELD:  Thank you, Judge.

13   CROSS EXAMINATION

14   BY MR. GREENFIELD:

15   Q.  Good morning, sir.

16   A.  Good morning.

17   Q.  Would you agree that the laboratory procedures that are

18   used for handling evidence in DNA cases is extremely important?

19   A.  Yes, it is.

20   Q.  Is it fair to say that at the time cuttings or made and

21   swabbings are made that every precaution is taken to insure the

22   integrity of the swab that is being made?

23   A.  Yes, it does.

24   Q.  You follow very detailed procedures in the laboratory for

25   making these swabs, correct?

E8dchr1                         Myers - cross

1    A.   Yes.

2    Q.   Could you explain to the jury what those procedures are?

3    A.   Just for making the swabs?

4    Q.   Just for making the swabs.

5    A.   Well, as an example, with the mask, you would open it up

6    and look at it, identify what we believe are stains.  We would

7    take -- it is a cotton-tipped swab, like a Q-Tip, soak it would

8    water, swab the area to transfer biological material off of

9    whatever we are swabbing to the swab, place it in a swab dryer,

10   dry it, and then move on with what ever other testing we're

11   going to do.

12   Q.   Now, it wouldn't be done at a desk in the laboratory.

13   Would it be done in a sterile environment?

14   A.   At a bench in the lab, at my bench.

15   Q.   A laboratory bench?

16   A.   Yes.

17   Q.   Are you wearing any particular items of clothing that you

18   wouldn't normally wear?

19   A.   Yes.  Face mask, hairnet, lab coat.

20   Q.   Would you think that laying a slab of butcher paper down on

21   a desk in a property clerk's office is the appropriate

22   procedure for making swabs?

23   A.   For making them?

24   Q.   Say again?

25   A.   Just for making them, for taking swabs?

E8dchr1                              Myers - cross

1   Q.   Yes.

2   A.   I don't see how it would hurt, as long as the area was

3   bleached beforehand.  That is what I would do.

4   Q.   What if I tell you the area wasn't bleached beforehand?

5   Would that change your opinion?

6   A.   It depends on how the swabs are taken.  If the swabs are

7   laid down on the bench, I --

8   Q.   You said you have six months training in making those

9   swabs, correct?

10  A.   Yes.

11  Q.   How many swabs did you make in training before you were

12  allowed to make one that would be used during the course of an

13  actual case?

14  A.   I don't remember.  We had to make or take a lot of

15  different samples and then actually conduct mock casework

16  before they would let us come online.  And then our first six

17  or twelve cases were actually reviewed a second time before

18  they would be released.

19  Q.   Have you ever used a butcher paper theory of making swabs?

20  A.   Theory?

21  Q.   Yes.

22  A.   We place butcher paper down on the desk.

23  Q.   Yes.

24  A.   Every time.

25  Q.   And do you bleach the area around the bench?

E8dchr1                       Myers - cross

1    A.  Yes, we do.

2    Q.  Do you also use ultraviolet lights to make sure things are

3    appropriately sterile?

4    A.  We use ultraviolet light in the hoods, but not on the

5    benches.

6    Q.  Are you aware that the property clerk in this case has 15

7    or 20 times decided to make swabs in his property clerk's

8    office and sent it to the DNA offices upstate in Albany?

9    A.  I am not aware of their procedure there.

10   Q.  You change gloves every time you pick up another piece of

11   prospective evidence?

12   A.  Change gloves constantly.

13   Q.  Constantly?

14   A.  Constantly.

15   Q.  You wear a mask?

16   A.  Yes.

17   Q.  And a hairnet, all for what purpose?

18   A.  To keep myself from contaminating the area and the

19   evidence, and to keep the evidence -- it's a biological hazard,

20   we are working with blood, seminal fluids, spinal fluid -- to

21   keep it off of me.

22   Q.  Correct me if I'm wrong, Mr. Myers, you want to create a

23   sample that is as pure as it could be for examination purposes?

24   A.  I don't want to create it pure.  I want to take what's

25   there and look at what's there.  I don't want to, you know,

E8dchr1                        Myers - cross

1   make it pure.  I want to look at what's there and see what it

2   is.

3   Q.  You want the swab to be an exact replica of what you took

4   it from?

5   A.  Yes.

6   Q.  Even in circumstances as secure, as sterile as a lab, there

7   have been contamination instances in the lab itself, haven't

8   there?

9   A.  In the past, yes.

10  Q.  Would it be fair to say that until all the evidence was

11  transported from Newburgh, New York, up to Albany New York, you

12  cannot vouch for how the evidence that came from Newburgh was

13  kept and how securely it was kept?

14  A.  I can't, no.

15  Q.  Say again?

16  A.  I can't, no.

17  Q.  The results that you are coming up with at the lab are only

18  as good, are they not, as the procedures that got that evidence

19  to your lab?

20  A.  I wouldn't know.  I mean, I only know how good our

21  procedures are.

22  Q.  If an item had been altered in some way, when you make your

23  determination, whatever that determination is, you are not

24  going to know that it was altered, are you?

25  A.  No.

E8dchr1                        Myers - cross

1    Q.  So it would be altered item in, altered item out, or,

2    speaking like we would on the streets, garbage in, garbage out,

3    correct?

4    A.  If it was, I suppose.

5    Q.  Do you have the mask up there?

6    A.  Yes.

7    Q.  Would you take it out of the envelope, please.

8    A.  Do you have a pair of gloves?

9    Q.  I don't have rubber gloves.  I don't use them.

10            THE COURT:  Do you need him to take the mask out of

11   the bag for some reason, Mr. Greenfield?

12            MR. GREENFIELD:  Yes, I would like him to.

13            THE COURT:  He's not going to be able to without some

14   sort of gloves or some sort of protection.

15            MR. BAUER:  We don't have any.

16            MR. GREENFIELD:  You don't have it?

17   Q.  If I took my tie off, could you take it out with my tie and

18   pick it up?

19   A.  Sure.

20            MR. GREENFIELD:  I will take my tie off.

21            MR. NAWADAY:  Can we suggest a paper towel.

22            THE COURT:  We are going to have to mark that tie,

23   Mr. Greenfield.

24            MR. GREENFIELD:  I have taken it off already.

25            THE COURT:  It is mine now.

E8dchr1                        Myers - cross

1    Q.  Please take it out.  Not the tie.  I mean the mask.

2            THE COURT:  I'm sorry.  You want him to use your tie

3    to take out the mask?

4            MR. GREENFIELD:  Yes.

5            THE WITNESS:  I thought he wanted me to use the tie

6    to -- I don't know what.

7            THE COURT:  Yes.  Your tie is not a pair of gloves

8    that would protect his hands, so, no.

9            THE WITNESS:  I'm sorry.  I wasn't understanding.

10           THE COURT:  Neither was I.

11   Q.  How about a tissue or a napkin?  Would you use that?

12           THE COURT:  Mr. Greenfield, unless you provide him

13   with a pair of gloves, he's not taking that mask out of that

14   bag.

15   Q.  Your Honor, can we have time to go get a pair of gloves?

16           THE COURT:  Why don't you move on to some other area

17   and have one --

18           MR. GREENFIELD:  All right.

19           THE COURT:  -- of the many people at this table go get

20   a pair of gloves.

21           MR. GREENFIELD:  Can I proceed without my tie, Judge?

22           THE COURT:  You may proceed without your tie, yes.

23   Q.  Mr. Myers, did you take a photograph of that mask?

24   A.  No, I didn't.

25   Q.  Is there a reason why you specifically didn't take a

1  photograph?

2  A.  No.  On many occasions, sometimes if there's something

3  specific, a pattern of staining or a specific cutting that

4  somebody requests, and we really feel that we want this

5  documented with a photograph, we will take photographs, but the

6  documentation necessary for where I took the swabs from and

7  kind of what the mask looks like, a drawing is fine.

8  Q.  Would it be fair for me to state that your involvement in

9  this case, you are involved in this case because of your

10 relationship with the New York State Police lab and local law

11 enforcement?

12 A.  With the lab?

13 Q.  The lab.

14 A.  Yes.

15 Q.  But working for the lab, you perform functions related to

16 local law enforcement cases?

17 A.  Yes.

18 Q.  Do you know what the phrase blind testing means?

19 A.  Are you referring to blind proficiency testing?  That's a

20 test that's set up?  That's not a real case?

21 Q.  No.

22 A.  To test and analyze --

23 Q.  I'm referring to sending all the items up to Albany, not

24 telling you who the suspects are, and asking you to find

25 whether A, B, or C are the people you're looking for?

E8dchr1                          Myers - cross

1    A.   No.   There's always a control involved.   We sometimes will

2    get evidence in where they don't know anything about who may

3    have been involved and we'll develop profiles from that.

4    Q.   I'm sorry.   In this case, weren't you provided with the

5    names of quote-unquote the suspects on the December 21?

6    A.   Yes.

7    Q.   You were provided with the name of Raymond Christian as a

8    suspect on December 21.

9    A.   Yes.

10   Q.   As well as seven or eight other people?

11   A.   Yes.

12   Q.   What I mean by blind testing is, would it be a fairer

13   method to do, just calling it -- let's use the number eight,

14   suspect one, suspect two, suspect three, suspect four, all the

15   way through to eight rather than putting names to it, wouldn't

16   that be a fairer way to test it?

17   A.   The names don't matter.   The DNA profile is what matters.

18   Q.   Did you have a conversation or did you learn on December

19   21, 2010, that Raymond Christian was a suspect?

20   A.   Yes.

21   Q.   You learned that before you conducted one single test or

22   looked at one single item?

23   A.   Yes.

24   Q.   Before we get into the particulars of the examination, can

25   you talk a bit about the DNA testing process and the

1   sensitivity of the process in the interpretation process?

2   A.   Sensitivity, what you're referring to is how sensitive the

3   instruments are and how low level we can go before we pick up

4   data that we can look at.  If you look at those tables that I

5   created --

6   Q.   Yes.

7   A.   -- in some of them you will see the pound signs.  In those

8   instances the instruments weren't sensitive enough to pick up

9   the data that was there because it what either degraded or

10  there was so little material on those two swabs that it

11  wouldn't pick it up.  With the other one, where there was a

12  major contributor, there was enough material that sensitivity

13  doesn't become an issue.  The instrument was able to pick up

14  the DNA.

15  Q.   What is a nanogram?

16  A.   A what?

17  Q.   A nanogram.

18  A.   An anagram?

19  Q.   An N.  Nanogram?

20  A.   Nanogram.  It is a very small amount.  It's thousands or

21  hundreds of thousands less than a gram.

22  Q.   DNA testing sometimes goes down to into the nanogram area,

23  doesn't it?

24  A.   Yes, actually it does.  When we do the amplification we

25  want about one nanogram of DNA.

E8dchr1                         Myers - cross

1   Q.  And a nanogram could break down into billions of smaller

2   pieces, isn't that correct?

3   A.  Yes.

4   Q.  By holding this pen up, would that be a fair example of the

5   size of a nanogram this pen I should say?

6   A.  The pen?

7   Q.  Yes.

8   A.  If that were a nanogram, a gram would probably be this

9   room.

10  Q.  That's right.

11  A.  Yeah.

12  Q.  Is there enough in one billionth of a nanogram to create a

13  DNA profile?

14  A.  One billionth?

15  Q.  Yes.

16  A.  I wouldn't know.  Sometimes we will take a quant. value

17  that shows us less than a nanogram, and we'll still get a

18  profile from it.  And sometimes we'll get a quant. value much

19  greater than that and not get a profile.

20  Q.  Is a nanogram something you can see with your naked eye?

21  A.  No.

22  Q.  Much, much smaller than that.  Could it be seen through a

23  microscope?

24  A.  I don't know.

25  Q.  What is a mixture.  What does a mixture mean?

1    A.  Mixture.  What you're referring to is a mixture profile.

2    It means more than one donor.  It could be mixtures of three,

3    four, five individuals.

4    Q.  What is the PCR process?

5    A.  Process is polymerase chain reaction.  That's what I

6    referred to as amplification.  Basically, we take a certain

7    amount of DNA and we add the necessary components that a cell

8    would actually use to replicate DNA, nucleotides, telomerase,

9    basically a reaction mix.  Put it in a tube and send it through

10   cycles.  We use 28 cycles.  It goes through cycles of

11   denaturing, opening the DNA, and then annealing the primers,

12   the targets that we want to see, those 15 locations on the left

13   side of the table.

14   Q.  Right.

15   A.  Sets down.  And then at another temperature elongation

16   adding nucleotides to amplify the section that we want to look

17   at.

18   Q.  What instrument is used to create this?

19   A.  A thermocycler.

20   Q.  Is an electropherogram also used?

21   A.  The electropherogram is the actual picture of the data.  So

22   when we are doing PCR, it's basically a metal block --

23   Q.  Right.

24   A.  -- that we've taken the tubes, with the extract in it, and

25   the components for doing an amplification, on that metal block,

E8dchr1                          Myers - cross

1    runs through its cycles.  It takes about three hours.  Then

2    that actual amplified product is taken and put on a genetic

3    analyzer.  The electropherogram is what the genetic analyzer

4    puts out.  That's the DNA profile that we analyze.

5    Q.  Would it be fair to say that the PCR process is not one

6    that is known to be perfect?

7    A.  Nothing is perfect.  But at 28 cycles, 28 to 30 cycles it's

8    optimized.

9    Q.  What is a five-second injection process?

10   A.  The five-second injection refers to the genetic analyzer.

11   So, in capillary electrophoresis we use a very small capillary.

12   That sample from the amplified tube goes on the instrument.

13   Q.  What is a ten-second process.

14   A.  I have to finish the five-second first.

15   Q.  I'm sorry.

16   A.  So, the capillary, when it takes the sample out and runs it

17   through the genetic instrument, the five-second injection is

18   how long the capillary is down in the sample taking up DNA.

19   And a ten-second injection is the same thing, just twice as

20   long.

21   Q.  What is the ten-second process?

22   A.  It's the same thing, just five seconds longer.

23   Q.  Did you have to employ that here with respect to the item

24   you took, item 3E?

25   A.  I would have to see my electropherograms.  I don't

1    remember.

2    Q.   Do you know what exhibit number that would be.

3              MR. GREENFIELD:  Was it all in one book?

4              May I approach the witness, Judge.

5              THE COURT:  You may.

6    Q.   I have given you 3521 in toto.

7              Could you find those charts, please.

8              Have you found it?

9    A.   Yes.

10   Q.   That would be page 20 of 31?

11   A.   102.  Page 20 of 31, I don't know what you are referring

12   to.

13   Q.   The bottom right-hand corner.  Is that the run on 3E?

14   A.   I have 3E in two runs.  I did a second run.

15   Q.   The first lower right-hand corner.

16   A.   You will have to show me what you are looking at.  I

17   don't -- OK.  This is the electropherogram.

18   Q.   I thought I had asked that.  I'm sorry.

19   A.   Yes.  This is my electropherogram.  This is page 122 of the

20   notes in my January 21 report.

21             THE COURT:  I'm sorry.

22             Can someone just for the record what document are we

23   looking at.

24             MR. GREENFIELD:  We are looking at portions of the

25   electropherogram charts that relate to item 3E, and those

E8dchr1                          Myers - cross

1    charts were created during the January 21 report.

2               THE COURT:  I am just looking for a 3500 number and

3    page number.

4               MR. GREENFIELD:  It's page 122 in of -- I don't have

5    the 3500 number in front of me.

6               MR. STRAZZA:  3522-7.

7               THE COURT:  3522 what?

8               MR. STRAZZA:  7.

9    Q.  Do you have it in front of you now?

10   A.  Yes, I do.

11   Q.  Would it be fair to state that in fact the PCR process is

12   better at amplifying some locations on the DNA strand than

13   others?

14   A.  In some instances, yes.  The larger locations, when you

15   have something that may be degraded, you will see it dropping

16   off at the larger locations.  And if you look at the minor

17   contributor or contributors in this instance at the larger

18   locations, you won't see the minors at all.  You will just see

19   that major contributor.

20   Q.  When you say drop off -- is that what you said?  Drop out?

21   A.  Dropping out, yes.

22   Q.  That is a phenomenon that is recognized within the area of

23   DNA analysis?

24   A.  Yes.

25   Q.  Would it be fair to say that when you are talking about

E8dchr1                          Myers - cross

1   drop out, you are talking about allelic dropouts?

2   A.   Yes.

3   Q.   Would you explain the theory of allelic dropout to the

4   jury.

5   A.   The same thing as I said before, when you get so little

6   data, random things happen within the baseline where some data

7   may drop out and some may come in randomly.  In this instance

8   specifically at the larger locations we are seeing the minor

9   contributors drop away or drop out because they are not

10   contributing enough material to the amplification.  Sometimes

11   we refer to it as preferential amplification, where if there's

12   more of one donor than another, they will take up the resources

13   faster so that the other donor won't appear.

14            (Continued on next page)

1   Q.  Putting it in lay terms, would it be fair to say that the

2   process you're discussing really -- you're able to gather more

3   information on short locations, some locations than you can at

4   others?

5   A.  Sometimes, yes.

6   Q.  And would it be fair to state that on the graph that we're

7   talking about here, the information moves from left to right?

8   A.  Yes.

9   Q.  And there are shorter locations and there are longer

10  locations, are there not?

11  A.  Yes.

12  Q.  And when you're looking for DNA profiles, when we're

13  talking about the shorter locations, we mean the process that

14  does not copy as much information?

15  A.  Right.

16  Q.  And when you were shown that little chart yesterday -- I

17  think again today by Mr. Nawaday -- about the different locus

18  or loci -- which is what the plural of locus?

19  A.  Loci.

20  Q.  Loci, excuse me.  And there are fifteen of those locations?

21  A.  Yes.

22  Q.  Some are short information; some are long information?

23  A.  Yes.

24  Q.  Now, I'm going to show you something on your screen, on the

25  ELMO, I'm going to ask you to address this.

E8d9chr2                          Myers - cross

1          MR. GREENFIELD:  Looking for the ELMO.

2          THE COURT:  You're looking for an ELMO?

3          MR. GREENFIELD:  We found it.

4          THE COURT:  Where are you going to project that on to?

5          MR. GOLTZER:  Can he proceed without a shirt?

6          MR. GREENFIELD:  No way, Judge.

7          MR. STRAZZA:  Projects on the screen.

8          MR. GREENFIELD:  I'd offer -- do we have any objection

9    to this?

10         I'm offering page 2031 and 2065, both exhibits within

11   the document that Mr. Myers has reviewed.

12         These are off 3522-7, Judge pages from within, the --

13         THE COURT:  If you're going to admit them into

14   evidence you've got to give them an exhibit number.  Do you

15   have an exhibit number to give them?

16         MR. GREENFIELD:  Exhibit No. C.  Defendant Christian

17   C.

18         THE COURT:  Defendant Christian C.  Are we sure that

19   there's not already in evidence a Defendant Christian C?

20         MR. GREENFIELD:  No.  A is all we have in.

21         THE COURT:  Defendant Christian C.

22         Any objection?

23         MR. NAWADAY:  No, your Honor.

24         THE COURT:  Defendant Christian C will be received.

25         (Defendant Christian Exhibit C received in evidence)

1    BY MR. GREENFIELD:

2    Q.  If you'd look at the chart, look at the first run on the

3    chart on the screen.  Do you see it?

4    A.  Yes.  Can I see the bottom, the page the number.

5    Q.  You mean the handwritten number?

6    A.  Yes.

7    Q.  It is 55.

8    A.  Thank you.  Yes.

9    Q.  Now, was that a run -- does that page represent a run that

10   you ran during the testing procedures of item No. 3E?

11   A.  Yes.

12   Q.  Would it be fair to state that the left side of that run

13   contains most of the information that you gathered during the

14   course of that run?

15   A.  It contains some of it, yes.  But as you can see I crossed

16   it out and said refer to run 2 on the page.

17         What that is, is I felt, through doing a ten-second

18   injection, if I resubmitted it to the instruments, the

19   instrument room that I might be able to get more information

20   from it.  So in the end this is, is just a partial or a portion

21   of the information that I used.

22   Q.  Now would it be fair to say though that most of the

23   information on any of the runs you used for 3E are on the

24   left-hand side of the page, the beginning of the run -- or the

25   left-hand side of the chart?

E8d9chr2                    Myers - cross

1   A.   Not this one.   It would be the other -- the other one that

2   you had, 122.

3              MR. GREENFIELD:   Put up 122.

4              And offer it as Defendant Christian Exhibit D.

5              THE COURT:   Any objection?

6              MR. NAWADAY:   No objection.

7              THE COURT:   Defendant Christian D will be received.

8              (Defendant Christian Exhibit D received in evidence)

9   Q.   Would it be fair to say that the shorter locations have

10  more information than the longer locations?

11  A.   The shorter -- now do you mean the information to the left

12  or do you mean the information that's down lower?

13  Q.   The information that you used to create your profile or the

14  mixture.

15  A.   This is the mixture profile.   I just transcribed the

16  alleles.   You can see, look at the first location D3S1358; 15,

17  16, 17.

18  Q.   Well as an expert in the field of DNA analysis, where would

19  the shorter location be on a graph?

20  A.   The smaller locations are to the left.

21  Q.   The beginning?

22  A.   Yes.

23  Q.   Now you were talking on direct examination about

24  degradation of possible samples or evidence for DNA analysis.

25  Would it be fair to say that what degradation really means is

E8d9chr2                          Myers - cross

1   that, if lay people are talking, that the biological matter had

2   broken down?

3   A.  Sure.

4   Q.  We talked about the dropout phenomenon?

5   A.  Yes.

6   Q.  What does that mean, in lay terms?

7   A.  Information lost.

8   Q.  Information lost?

9   A.  Yes.

10  Q.  And that information is lost going left to right on the

11  chart, isn't it?

12  A.  For the most part more is lost to the left.

13          For the most part more is lost to the left.

14  Q.  To the left?

15  A.  Yes.

16  Q.  At the beginning of the process?

17  A.  I'm sorry.  To the right.

18  Q.  Well it's important now.  We've got to know our right from

19  our left here.

20          Different chart.  Let me show you the chart again.

21  A.  Put it up there.

22  Q.  I'm going to show you what's in evidence as D.

23  A.  So, a perfect example is in the second lane where you see

24  starts with D19S433.

25  Q.  Yes.

A.   There's five allele calls there.  We have the major

contributor standing out as 14.2, 15.2.  That's one donor.  And

then we have two other donors that are comprised of an 11, 13,

and 14.  I don't know who is who.

          As we go right, those smaller donors, we start losing

them.  You can see it.  VWA there's only 17.  By looking at

that -- the person that donated 14.2 and the 15.2 also donated

the 17.  That's what I mean by major contributor.

          And as you go further right we've lost the information

in regard to the -- the two minor contributors there.  That's

the perfect example of degradation there.

          If you look at TPOX, you can actually see a little

peek below threshold that didn't get caught because it's

dropping out.

Q.   Would it be fair to say when you're looking at this chart

from 3E the fact is that a mixture of DNA appears on the left

side of the chart?

A.   Yes.

Q.   But not as clear on the right side of the chart?

A.   It's not clear on the right side of the chart that it is a

mixture but I know the profile as a whole is a mixture based on

everything else.

Q.   This can be explained by the limitations of the PCR process

itself; that the right side is less clear than the left side?

Correct?

E8d9chr2                    Myers - cross

1  A.  In regard to the minor contributors, yes.

2  Q.  Because of degradation, correct?

3  A.  Of those contributors, yes.

4  Q.  Because of dropout, correct?

5  A.  Yes.

6  Q.  Now no question when you're looking at the chart in front

7  of you or the chart previously that it is a mixture of DNA that

8  we're looking at?

9  A.  Yes.

10 Q.  And we could clearly state after looking at that chart when

11 looking at it you can also tell that someone who came in

12 contact with it might not be fully expressed at every location

13 on the chart?

14 A.  Correct.

15 Q.  Now, if you put those gloves on in front of you.

16          Open it up fully.  And does that go above the nose, by

17 looking at it?

18 A.  Excuse me?

19 Q.  Could you look at the front of the mask and tell if it goes

20 above the nose?

21 A.  Above the nose?  Yes.

22 Q.  Above the eyes?

23 A.  Yes.

24 Q.  Right up to the hairline on the forehead, correct?

25 A.  Yes.

E8d9chr2                         Myers - cross

1  Q.  Now lay the mask down on the outside, looking at the

2  outside of the mask.  You say you saw four bloodstains on the

3  outside of that mask?

4  A.  I saw what appeared to be staining.  I didn't know whether

5  or not it was blood until I tested.

6  Q.  So, then you turned it over and you thought there were --

7  you saw another blood stain inside?

8  A.  No, I didn't.  I didn't, on the inside, the point of the

9  test was to try and find out who may have been wearing the

10  mask.  I wasn't making any assumptions about whether there was

11  blood or not on the inside of the mask.  But I did test the

12  swab anyway because it had a reddish appearance after I took

13  it.

14  Q.  It had?

15  A.  A reddish appearance after I took it.

16  Q.  And you did call it a blood stain in your report, didn't

17  you?

18  A.  Yes.  Presumptive positive.

19  Q.  And what portion of the mask, the inside of the mask had

20  that blood stain come from?

21  A.  I can look at my diagram.

22  Q.  Please do.

23  A.  So pretty much the facial area, around the top of the eyes

24  and down like this.

25  Q.  How many swabs did you take of the interior of the mask?

E8d9chr2                        Myers - cross

1    A.   Just one.

2    Q.   Where on the mask did you take that swab?

3    A.   Like -- just like this.

4    Q.   Above the forehead?

5    A.   Above the eyes down and around the mouth.

6    Q.   Did you indicate on your little diagram where you took the

7    swabbing from?

8    A.   Yes.

9    Q.   May I see that, please.

10        MR. NAWADAY:  Your Honor can the record reflect that

11   is already in evidence as Government Exhibit 409.

12        THE COURT:  Okay.

13   Q.   So as you sit on the stand now, looking at the second page

14   of 409, your recollection is that above the eyebrows you took a

15   swabbing and you came up with DNA that you say belongs to

16   Raymond Christian?

17   A.   The major contributor is consistent with Raymond Christian.

18   Saying that it belongs to him is a source-attribution

19   statement, and we don't give those.

20   Q.   You can't say it belongs to him?

21   A.   No.

22   Q.   Did you see this stain with your naked eyes before you took

23   the swabbing.

24   A.   No.

25   Q.   There was no staining whatsoever on the interior of the

E8d9chr2                        Myers - cross

1    mask?

2    A.   Not that I noticed.  If I had I would have tried to avoid

3    it in the swabbing because, again, I have blood staining on the

4    outside of the mask and I'm trying to find out on the inside

5    who may have possibly been wearing it.

6    Q.   And is that the only location you tested?  This one

7    location was tested on the interior of the mask?

8    A.   Yes.

9    Q.   Do you have any scientific reason for not making other

10   testings on the interior of the mask?

11   A.   I just looked at it.  There's nothing scientific about

12   where I would think that contact would be with the skin.

13   Q.   Did you make -- so you chose not to make any further tests

14   for possible serological substances on the interior of the

15   mask?

16   A.   No.

17   Q.   Do you know what a control is when it comes to testing?

18   A.   A control?

19   Q.   Yes?

20   A.   Like the buccal swabs are a control.

21   Q.   Correct.

22   A.   Yes.

23   Q.   Did you do any testing for other locations for control

24   purposes?

25   A.   No.

E8d9chr2                              Myers - cross

1    Q.  You chose not to?

2    A.  We don't.  It's not in the protocol to.

3    Q.  I think your testimony was, and correct me if I'm wrong,

4    you found a mixture of DNA of at least three people?

5    A.  Yes.

6    Q.  And that doesn't say it could have been more?  That doesn't

7    say it could not have been more, correct?

8    A.  Right.

9    Q.  It could have been four people, five people, or any number

10   above three?

11   A.  Sure.

12   Q.  I'm not saying ten thousand.  A number of people could have

13   worn it?

14   A.  Sure.

15   Q.  Would it be fair to say, again, that dropout was occurring

16   when you did your electropherogram testing on 3E?

17   A.  Yes.

18   Q.  If you go the longer stations or location, excuse me, the

19   peaks got smaller and smaller?

20   A.  Of the minor contributors, yes.

21   Q.  Could you quantify how much DNA you recovered from the

22   interior of the mask?

23   A.  Sure, if I can look at the quant paperwork in this binder I

24   can tell you how much we measured.

25           Yes.

E8d9chr2                          Myers - cross

1   Q.  You've got the report in front of you?

2   A.  .0942 nanograms per microliter.

3   Q.  Would it be fair to say that that's about the same amount

4   of DNA that you could collect from a fingerprint?

5   A.  I don't know.

6   Q.  You don't know?

7   A.  I don't know how much --

8   Q.  Is that a large amount of DNA or is it a small amount of

9   DNA?

10  A.  It's a small amount.

11  Q.  Incidentally, if you were to open a door like the door in

12  this courtroom or the door against the wall there, touch the

13  handle of that door, DNA could be recovered from that, can't

14  it?

15  A.  It could.

16  Q.  Minor amount of DNA, anybody touching that door handle,

17  could have been gathered by a collector of DNA at the crime

18  scene?

19  A.  Sure.

20  Q.  Same is true for a gun that somebody might possess?  DNA

21  would appear on that gun?

22  A.  We wouldn't know if it appeared unless we took the swab and

23  tested it.  Sometimes it's there and sometimes it isn't.

24          With touch DNA it's, you know, sometimes we'll get a

25  good profile and sometimes we'll get a mixture of ten people.

E8d9chr2                        Myers - cross

1   A lot of the times with touch it's really difficult.  Most of

2   the times we don't get anything out of touch.

3   Q.  It was worth the try, though, right, to try to get it?

4   A.  Yeah.

5          THE COURT:  Could you just describe for me, I'm

6   sorry -- I'm sorry, Mr. Greenfield.

7          Could you just describe what touch DNA is?

8          THE WITNESS:  It's just a term we use to mean somebody

9   was handling something.  I pick up my water bottle here and I

10  handle it on the outside, it's not as good a source to say if I

11  open it up and take a drink.  So around the lip is a better

12  source of DNA than touch.

13         Depends largely on how much somebody sweats or how

14  much they handle something.  The more something is handled, the

15  more likely it is that we will get a profile from it.

16         THE COURT:  So would the DNA come from secretions from

17  the skin itself?

18         THE WITNESS:  Skin cells and possibly sweat that has

19  come off.

20         THE COURT:  Thank you.

21  BY MR. GREENFIELD:

22  Q.  You also created a report for January 31, did you not?

23  A.  Yes.

24  Q.  And you compared the results of the known samples to

25  certain specific items of DNA that you had in question?

E8d9chr2                        Myers - cross

1    A.  Yes.

2    Q.  Why did you choose those specific items like 3A and 3B

3    rather than other items to compare the known samples to?

4    A.  3A and 3B?  Because in those instances, and on January 21,

5    I think I may have defined them as John Does.  I'll have to

6    look at it and make sure.  But I may not have known at that

7    point.

8    Q.  Please do.  Look at your January 31 report.  Tell me why

9    you chose to compare the buccal swab samples that you got to 3A

10   and 3B and then 4A and then 12A and not to other items.

11   A.  So for certain items such as 4A and B you mentioned.

12   Q.  Yes.

13   A.  That was in a next report.  4A --

14   Q.  It was --

15   A.  It wasn't because I didn't -- I chose not to compare it --

16   or I chose to compare that in the next report instead of the

17   other items is because I didn't have any controls at that point

18   that I could say were consistent with the major contributor to

19   these items.

20           So in the end there's still a comparison that still

21   can be made with some items and with other items there isn't a

22   comparison that can be made because, for instance, say 3E was

23   consistent with Raymond Christian, there is no point going on

24   unless somebody else has the same profile as Raymond Christian.

25   Q.  On March 4 you created a third report; isn't that right?

1    A.  Yes.

2    Q.  And whose blood did you test against the items in evidence?

3    A.  In the March 4 report I had one control and it was from a

4    Laquavious Boykin.

5    Q.  Laquavious Boykin?

6    A.  Yes.

7    Q.  And did you compare Laquavious Boykin's blood sample to 3E?

8    A.  No.

9    Q.  Were you asked by the district attorney's office or the

10   police department to compare Laquavious Boykin's DNA to 3E?

11   A.  No, I wasn't.

12   Q.  Did they previously -- did they have you compare it to what

13   they wanted or did you make the determinations as to what to

14   compare it to?

15   A.  Well, it would be --

16   Q.  Answer my question.

17   A.  It's part of the process where when we have profiles where

18   we haven't made an association that we can still compare.  We

19   will then compare further controls to those.

20          So in 3E we already made an association between

21   Raymond Christian's DNA and the major contributor to this mask.

22          As far as the other contributors are concerned, there

23   is no reason to compare because I can't make a determination.

24   They are too low level.  And they are too closely mixed.

25   Whereas, one person is standing out, the major contributor, I

E8d9chr2                         Myers - cross

1   can compare.  And there is no reason to compare the major

2   contributor of this mask to Laquavious Boykin because

3   Laquavious Boykin has a different profile than that major

4   contributor.

5   Q.  Do you know that Laquavious Boykin is half-brother to

6   Raymond Christian?

7   A.  No, I don't.

8   Q.  You didn't know that at the time you made your decisions

9   what to test it against?

10  A.  It wouldn't matter.

11  Q.  The district attorney's office never told you that

12  Laquavious Boykin was a half-brother to Raymond Christian?

13  A.  No.

14  Q.  As we've discussed earlier in this session there are

15  certain locations on the locus standard -- I'll call it the

16  standard, maybe it's the wrong phrase -- certain locations that

17  you test that are shorter than other ones, correct?

18  A.  Yes.

19  Q.  Those would be D8, D21, D3, TH01, D19, VWA, and D5,

20  correct?

21  A.  The smaller ones being D8, D3, 01, VWA, D19, D5, yeah.

22          THE COURT:  Mr. Greenfield would this be a good time

23  for the morning break?

24          MR. GREENFIELD:  Yes.

25          THE COURT:  Let's do that, ladies and gentlemen.

E8d9chr2                        Myers - cross

1    11:30.   Please be in the jury room no later than 11:30.

2              (Jury excused)

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E8d9chr2                          Myers – cross

1              (In open court)

2              THE COURT:  Mr. Myers, you may step down.

3              Just briefly for the record I want to note that we

4    have a distinguished delegation here from the United Arab

5    Emirates.  So, welcome to all of you.

6              And for the parties, 11:30, unless there's anything

7    for the court to deal with now.

8              MR. BAUER:  Nothing from the government, your Honor.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E8d9chr2                         Myers - cross

1            (Jury present)

2            THE COURT:  Mr. Greenfield.

3            MR. GREENFIELD:  Yes, your Honor.

4   Q.  Mr. Myers, I'm going to show you a chart which is an

5   extraction from the Laquavious Boykin's report you prepared for

6   March 4, 2011.  On the chart -- ask you if you can identify

7   what this is.

8            It's Defendant's F, Anthony?

9            MR. STRAZZA:  Yes.

10           MR. GREENFIELD:  F for identification at this time.

11           MR. STRAZZA:  May I, your Honor?

12           THE COURT:  You may.

13           THE WITNESS:  What was the date on the report,

14  March 4?

15           MR. GREENFIELD:  March 4 report.

16           THE WITNESS:  Okay.

17           MR. GREENFIELD:  Show it to the government.  Does the

18  government have any objection?

19           MR. NAWADAY:  No objection.

20           THE COURT:  That will be received.  Defendant

21  Christian F in evidence.

22           (Defendant Christian Exhibit F received in evidence)

23  Q.  Would you state, Mr. Myers, that Defendant Christian F in

24  evidence is a fair and accurate chart showing the results of

25  your report from March 4, 2011?

E8d9chr2                         Myers - cross

1   A.  Yes.

2   Q.  As we discussed before, there are some locations on the --

3   that chart that are shorter than other locations?

4   A.  Yes.

5   Q.  And you identified them before, I believe, as D8, D21, D3,

6   TH01, D19, VWA, and D5?

7   A.  Yes.

8   Q.  The remainder are the longer of the locations?

9   A.  Yes.

10  Q.  Would it be fair to say at these shorter locations you see

11  more of a mixture than you do at the longer locations?

12  A.  On 3E.  On item 3E.  Not the control.

13  Q.  Have you ever compared this item, this chart, or the --

14  withdrawn.  Have you ever compared the Laquavious Boykin

15  results to 3E?

16  A.  No.

17  Q.  Were you ever requested to compare it to 3E?

18  A.  I don't believe so.

19          MR. GREENFIELD:  Your Honor, we're going to now put up

20  Defendant's E in evidence which is an extract of the Government

21  Exhibit 401.

22          THE COURT:  This item is in evidence?

23          MR. GREENFIELD:  This item E is an extract of a

24  portion of 401.

25          THE COURT:  Very well.

E8d9chr2                         Myers - cross

1          MR. STRAZZA:  Your Honor, may I have permission to

2    stand up here to assist Mr. Greenfield?

3          THE COURT:  Certainly.

4          MR. GREENFIELD:  Mr. Myers would you step down,

5    please, with the Court's approval?

6          THE COURT:  You may step down.

7          Please try to keep your voice up from where you're

8    standing.

9    Q.  Mr. Myers, again, when we look at the shorter locations and

10   compare them to Laquavious Boykin's profile you see something

11   remarkable, don't we?

12   A.  I don't know what you're referring to.

13   Q.  At each of the locations Laquavious Boykin on that chart

14   Mr. Boykin cannot be excluded as having contributed to the DNA

15   mixture at the shorter locations?

16   A.  Well, first comparing in this manner just this chart,

17   unless they're single-source samples, is kind of inappropriate

18   because you're missing -- you need to be able to --

19          THE COURT:  Mr. Myers, I'm sorry.  I can't hear you.

20          THE WITNESS:  You need to be able to look at peak

21   heights or the quantitative aspects of those profiles to be

22   able to make the statement such as "not excluded."

23          Now if I was to take these profiles like this in these

24   two charts, I would compare this profile with just the major

25   contributor.  And this is not the donor that's the major

E8d9chr2                         Myers - cross

1   contributor here.  Because the major contributor is what's

2   standing out.  That is, in essence, the single source part of

3   that:  15, 16, 30, 31, 8, 12, 9, 11, 15, 17, those you can

4   compare here and say this person is not that major contributor.

5           As far as the minor contributors here, there's not

6   enough information to say, even if I had someone who was a 12,

7   13, a 29 and maybe was included, 8, 12, 9, 11, and 16, there's

8   still not enough information to say that someone who would have

9   that profile is not excluded or is included in this profile.

10          That's what I mean about the peak heights and the

11  quantitative aspect to this.

12          As far as any of those minor contributors are

13  concerned, you really can't make a comparison with them.

14  There's not enough information there to go on.

15  Q.  That's due to dropout; is that not right?

16  A.  Because it's low levels --

17  Q.  Is the answer that's due to dropout; is that not right?

18  A.  Only at certain locations.  The first location --

19  Q.  Let's go to location D8.  What is the primary buccal swab

20  for Laquavious Boykin?

21  A.  He's a 15 at D8.

22  Q.  What about on the -- can you mark that with a red or choose

23  whichever one you'd like to mark.

24  A.  15?

25  Q.  15.  Circle it.

1    And on the item 3E, is there a 15?

2  A.  There is a 15.

3  Q.  Please circle that.

4    How about on 21?

5  A.  Laquavious Boykin was a 29, 31.

6  Q.  What about on the mask?

7  A.  There is a 29, a 30, and a 31.

8  Q.  Would you circle them.

9  A.  All three of them?  The 29 and the 31?

10 Q.  29 only.

11    MR. BUCHWALD:  31.

12    MR. STRAZZA:  And the 31.

13    MR. GREENFIELD:  Yes.

14 Q.  Do the same on the Boykin chart.

15    Now, D7 and CS, those are longer strings of

16 information, correct?

17 A.  Yes.

18 Q.  And there might be dropout on those longer strings,

19 correct?

20 A.  There might be, yes.

21 Q.  You don't know?

22 A.  Right.

23 Q.  Because that's what dropout means?

24 A.  Yes.

25 Q.  Lost forever?

E8d9chr2                          Myers - cross

1    A.   It means lost.  Information lost.

2    Q.   Now go to D3.  Compare it to the mask.

3    A.   There is a 16 and a 17 that are both in Laquavious Boykin

4    and the mask.

5    Q.   Would you circle those, please.

6            So far where the circles appear, those are all short

7    information strings; if I'm using the right phrase, strings?

8    A.   Smaller locations.

9    Q.   Smaller locations?

10   A.   Sure.

11   Q.   Less dropout, if no dropout at all?  Correct?

12   A.   Less dropout.

13           I mean it's a low level profile.  I can't even say for

14   sure that it is three donors.  There could be four.  There

15   could be five.  Just missed it.

16   Q.   And TH01.  Again, shorter string?

17   A.   Yes.

18   Q.   And what is the number there?

19   A.   6, 9 for Laquavious Boykin.  And 6, 8, 9 on 3E.

20   Q.   Would you circle the ones that are consistent with each

21   other.

22           And then the next is -- well before you get to D19 are

23   there any consistencies between the items on both -- withdrawn.

24           When it comes to D13, D16, D2, do you see any notable

25   comparisons?

E8d9chr2                    Myers - cross

1   A.  There is a 10 and a 12 on D16.  And there's a 22 at D2.

2   Q.  And those are longer string locations?

3   A.  Yes.

4   Q.  Just staying with the shorter string location, which is the

5   locations that contain the most information, correct?

6   A.  The shorter locations contain the best information.

7   Q.  The best information?

8   A.  The most reliable information in this profile.

9   Q.  Certainly.  That's all we're talking about.

10          So D19.  Any consistencies?

11  A.  There's 13, in D19 for Laquavious Boykin.  And there's a 13

12  on 3E.

13  Q.  Would you circle the numbers that are consistent with each

14  other on each chart.

15          Go to VWA which is the next short information string?

16  A.  They are both 17.

17  Q.  Would you circle them.

18          And the same for D5.

19          So would it be fair to say of the 17 -- 15, excuse me

20  loci?

21  A.  Loci.

22  Q.  Of the 15 loci, the shorter information strings contain the

23  best evidence, correct?

24  A.  They contain the more reliable portions of this profile.

25  Q.  And in those there are consistencies every time with the

1    mask and Laquavious Boykin?

2    A.  They are the same alleles, but they're not consistencies.

3    There's a second aspect that we're forgetting, the

4    electropherogram.

5            These are low levels:  12, 13, 14.  This 15 is high

6    level.  Laquavious Boykin does have a 15.  This 15 goes with

7    that 16.  So reliably, what's reliable here in the first one,

8    is that there's somebody who is a 15, 16.  If there is a 15

9    there, and it's a 15 like this, it's low level.  There's not a

10   significant contribution of a homozygote at 16 there.

11           You go to the next one.  This 29, it's low level.

12   Even though it's called -- there's a quantitative aspect to it,

13   that contributor, even though it's a smaller location, he might

14   be dropping out.  He could be a 28, 29.  So saying that these

15   are consistencies really can't do it.

16           In addition to that, we've only marked seven of them.

17   The resulting power of 6, 7 loci isn't that good.

18           So in the end if I only had a partial profile that was

19   low level in seven locations, I would call the profile either

20   insufficient or inconclusive.

21   Q.  You couldn't exclude it, could you?

22   A.  I couldn't say "exclude it" but I couldn't say they're not

23   excluded, which would mean --

24   Q.  You could not exclude Laquavious Boykin?

25   A.  Not something I would say.

1    Q.  Now, the circumstances of the crime itself could change

2    your opinion; isn't that right?

3    A.  No.

4    Q.  If I tell you Laquavious Boykin was standing about a foot

5    away from where the mask was found would that change your

6    opinion?

7    A.  No.  My opinion is based solely on the data and the

8    comparison that I make.

9    Q.  If I tell you that Anthony Baynes was present in that

10   apartment and said to Raymond Christian was wearing a

11   half-mask, would that change your opinion?

12   A.  No.

13   Q.  If I tell you that -- well, withdrawn.  You say the mask

14   that you tested on the interior had a stain above the -- on the

15   forehead?

16   A.  On the interior?

17   Q.  Yes.

18   A.  I don't remember saying that there was stain.  I may have

19   written that in my notes.  I don't recall.

20   Q.  Did you testify to the jury a little bit ago when you were

21   looking at the mask that the interior sample came from above

22   the eyes?

23   A.  It came from around.  I swabbed from around the eyes all

24   the way down to the chin.

25   Q.  So it was a big circular swab?

1    A.  The whole area.  All inside of it.

2    Q.  You swabbed the whole interior of the mask?

3    A.  Just this area.

4    Q.  Except what?

5    A.  Just around the eyes, down around the mouth.

6    Q.  Would it be fair to say scientifically speaking Laquavious

7    Boykin cannot be excluded from being in the mixture of DNA

8    based on these seven locations?

9               MR. NAWADAY:  Objection.  Asked and answered.

10              THE COURT:  Sustained.

11   Q.  Would it be fair to say that having someone match at seven

12   locations is a pretty significant event?

13   A.  (No response).

14   Q.  Yes or no?

15   A.  It is a significant event.  But with a mixture profile, we

16   don't use the term "match."  Match means exactly the same.  So

17   for me to say "match" I would be seeing a fifteen-locus profile

18   that said exactly this.

19   Q.  Isn't it fair to say statistically that a seven-location

20   match is in the probability of one to many millions?

21   A.  I would have to do the calculation to find out.

22   Q.  What are PopStats?

23   A.  PopStats is a computer program that we use to calculate the

24   statistics.

25   Q.  And that's something that your lab relies on?

1   A.  Yes, it is.

2   Q.  And would it be fair to say that a PopStat was not done in

3   this case with regard to Laquavious Boykin and the stain on the

4   mask?

5   A.  The statistic that's appropriate for the stain on the mask

6   is to the main contributor, because the major contributor is

7   the reliable portion of this data.  Everything else there isn't

8   reliable.  The minor contributors are low level.  There's

9   multiple minor contributors.  It's not really anything that we

10  can even make an interpretation of.

11          That's really what we're talking about.  Can we make

12  an interpretation here in regard to someone who has this

13  profile?  No.  We can't.  There's no reason to even bother with

14  the statistics until we can say this person is included as a

15  possible contributor here.  And, at best, anybody with this

16  profile, or even the minor contributor that is here, is

17  inconclusive.

18  Q.  You couldn't rule him out?  You could not rule him out?

19  A.  I could not say that --

20          MR. NAWADAY:  Objection.  Asked and answered.

21          THE COURT:  Sustained.

22          MR. GREENFIELD:  I don't think I asked that question,

23  Judge.  I don't believe I asked the question could Laquavious

24  Boykin be ruled out.

25          MR. NAWADAY:  It's the same.

1                  THE COURT:  He can answer.

2                  You can answer, Mr. Myers.

3                  THE WITNESS:  No.  Anybody that wouldn't be the main

4       contributor here is inconclusive.  Saying -- ruling somebody

5       out or saying "not excluded" is an inclusionary statement.

6       It's the same thing as saying they're included.  It's the same

7       thing as saying consistent with.  And that's not true.

8                  Anybody here that isn't a major contributor is

9       inconclusive.  Not ruled out.  Not included.  Not excluded.

10      None of that.  It's inconclusive in regard to anything but the

11      major contributor.

12      Q.  That's what your finding is, it's a major contributor, and

13      not as to who actually might have worn the mask that day?

14      A.  That's right.

15      Q.  Did you also know that multiple people have worn that mask

16      in the past?

17      A.  I know that there's at least three people that have had

18      contact with the mask at some point.

19      Q.  And on the high end could you determine how many people

20      could have worn that mask?

21      A.  The most I could say is three.  Could be more.

22      Q.  Now, the fact that you say there was DNA on the mask, can

23      you say when it got on that -- you can please go back to your

24      witness stand.  Thank you.

25                 Can you say when the DNA that you extracted for 3E got

1    on the mask?

2    A.  No, I can't.

3    Q.  You can't say that to any degree of scientific certainty?

4    A.  No.

5    Q.  Can you say it to any degree of scientific certainty the

6    order that any of the at least three people put their DNA on

7    that mask?

8    A.  No.

9    Q.  You can't say when that DNA got on the mask to any degree

10   of scientific certainty?

11   A.  No.

12   Q.  There is no timestamp in DNA, is there?  It's just that DNA

13   was present?

14   A.  That's correct.

15   Q.  How long can DNA stay on an item like a mask?

16   A.  Well it really depends on storage, you know, what kind of

17   conditions it's under.  DNA has been found in thousand-year-old

18   mummies.  They've produced full profiles from them.  Other

19   times we can have something, if it's been exposed to heat and

20   water and enclosed, then we're far less likely to get a profile

21   out of it.

22   Q.  You certainly, as a scientist, can't say how DNA got on the

23   mask?

24   A.  No.

25   Q.  It could have been worn, correct?

1    A.   That's correct.

2    Q.   It could have been touched innocently?

3    A.   Correct.

4    Q.   And incidentally on the mask you -- would it be fair to say

5    you did a full circle around the side of the mask?  With the

6    swab?

7    A.   Not the whole mask just around the facial area where it

8    would have contacted just the front of the face.

9    Q.   The chin, the forehead, back down the chin?  Is that what

10   you're saying?

11   A.   Yes.

12   Q.   Do you know what part of the mask you picked up the DNA?

13   A.   The reason I swabbed it was because it seems obvious to me

14   if you were wearing it that's what would be touching your face.

15   Q.   Well, you could have come from the top part, correct?

16   A.   Sure.

17   Q.   You can't extract -- you can't say to any degree of

18   scientific certainty that that DNA came from the top portion of

19   the mask?

20   A.   No.

21   Q.   Now you could have -- I think -- my last question was it

22   could have come from direct contact from an individual or some

23   secondary form of contact?

24   A.   Sure.

25   Q.   Now, I've got my hands on the podium right now.  And I

E8d9chr2                         Myers - cross

1    assume that would leave DNA, by my hands being here?

2    A.  It could.

3    Q.  And when I leave here, the prosecutor gets up and he puts

4    his hands on this podium, the chance that my DNA transfers to

5    his hands?

6    A.  It could.

7    Q.  And he goes up to his office and opens the door, sits down,

8    gets on the telephone and he checks his e-mails or voice mail,

9    I should say, the phone, the desk, could have my transferred

10   DNA in the United States Attorney's Office?  Could happen,

11   right?

12   A.  It's possible.

13   Q.  And then some theft occurs up in that office and they want

14   to know who stole it?  What if my DNA shows up there?  Am I a

15   suspect now?

16   A.  I wouldn't expect something like that to happen just

17   because --

18   Q.  You wouldn't expect it to happen?

19   A.  It's his phone.  He's touching it everyday.  He has more

20   exposure to it.  You just touched the podium.  You're going to

21   transfer not very much.

22   Q.  Is it scientifically excludable that my DNA won't show up

23   in that office?

24   A.  I don't know.  I'd have to see the profiles.

25   Q.  Now you tested how many items during the course of your

E8d9chr2                          Myers - cross

1    testing in the laboratory with respect to the January 21

2    report?

3    A.  Just the 21st report?

4            Let me check.

5    Q.  Please.

6    A.  56 items.

7    Q.  56 items that you checked, blood on the wall, blood on the

8    floor, knives, ballistics items, totaling to 56.  Did you come

9    up with any other indicia that it might have been DNA from

10   Raymond Christian?

11   A.  No.

12            MR. GREENFIELD:  No further questions.

13            THE COURT:  Any redirect?

14            MR. NAWADAY:  Is there anymore cross from the defense?

15            MR. GOLTZER:  No.

16            THE COURT:  No.

17            Any redirect?

18            MR. NAWADAY:  Yes, your Honor.

19   REDIRECT EXAMINATION

20   BY MR. NAWADAY:

21   Q.  Mr. Myers you were asked to make a bunch of circles on

22   these two defense exhibits; is that right?

23   A.  Yes.

24   Q.  And would it be fair to say that circling only 7 loci on

25   here could be misleading?

E8d9chr2                          Myers - redirect

1    A.  Not misleading.  The minor contributors are pretty much

2    unreliable for making any kind of comparison.  It's the major

3    contributor that is of the good quality data.

4                    (Continued on next page)

E8dnchr3                    Myers - redirect

1    Q.  Let me ask you this.  I think you said this on cross when

2    asked about certain of these numbers.  Is Laquavious Boykin a

3    major contributor?

4    A.  No.

5    Q.  Who is the major contributor?

6    A.  The major contributor is consistent with Raymond Christian.

7    Q.  So even though these allele numbers seem to match, in your

8    opinion, it is Raymond Christian who is the main contributor,

9    right?

10   A.  We are not giving source attribution statements.  We are

11   saying it is consistent with him.  So pulling out the major

12   contributor at those locations is consistent with Raymond

13   Christian.

14   Q.  By the way, the fact that Laquavious Boykin has some allele

15   numbers similar to Raymond Christian's allele numbers, is that

16   consistent with someone being a half brother, as far as you

17   know?

18   A.  We might see some consistencies between them.  It is a

19   completely different question.  I have been asked in the past

20   in making identifications of unknown remains and been handed,

21   well, this person is a half brother, can you identify the

22   remains?  It is a different type of comparison.  I was not

23   asked to do that here.  But the whole point is that the major

24   contributor is not Laquavious Boykin.  So we have the control

25   to make that comparison.  So the whole argument, of, well, this

1    profile really isn't me, it's my brother or half brother, the

2    answer to the question is get the control, and we make the

3    direct comparison and say it's not.

4    Q.  All of this circling, can you reach any conclusions other

5    than Laquavious Boykin is not the major contributor about the

6    swabbee and Laquavious Boykin?

7    A.  Right.

8    Q.  Can you make any conclusions other than that?

9    A.  No.

10   Q.  You were asked about allele dropoff on cross-examination.

11   Do you remember those questions?

12   A.  Sure.

13   Q.  Whose DNA from swab 3E dropped off?

14   A.  The minor contributor's.

15   Q.  Did the major contributor on swab 3E drop off?

16   A.  No.

17   Q.  Why do minor contributors drop off typically?

18   A.  It's low level.  There's not a lot of information there.

19   Like I said before, things happen, like preferential

20   amplification.  The major contributor is taking up the

21   resources.  There is more of that person in the mixture, and

22   the minor contributors get outcompeted, so that at some of the

23   larger locations you don't see the information in regard to

24   them.

25   Q.  Am I right that a minor contributor more typically has less

 1   contact and more limited contact with the mask?

 2   A.  I wouldn't say that.  There is just less material or maybe

 3   it is maybe the minor contributors are degraded.  I wouldn't be

 4   able to tell you the minor contributor actually had less

 5   contact.

 6   Q.  Does a person having the last contact with an item affect

 7   how much of their DNA may be left on a particular item?

 8   A.  I don't know.  I think what would have more of an effect is

 9   how much was there.  If I was bleeding on the desk here,

10   there's more of me here than everybody that's been up here

11   touching the desk obviously, because it's covered in blood.  It

12   really has more to do with how much of it is there and what

13   kind of conditions it's been stored under.

14   Q.  You were also asked questions about the integrity of taking

15   of swabs.  Do you remember those questions?

16   A.  Yes.

17   Q.  Who swabbed the mask?

18   A.  I did.

19   Q.  Where did you do that?

20   A.  On the inside around the facial area and then on the

21   outside right cheek, left cheek, chin, and I think nose.

22   Q.  Where were you when you did that?

23   A.  In the biological science section in the lab.

24   Q.  When did you swab the mask?

25   A.  December 28, 2010.

E8dnchr3                     Myers - redirect

1   Q.  Assuming that there was a two-week gap between when you

2   unsealed the bag where the ski mask was and swabbed it, would

3   you expect any degradation?

4   A.  From when it was collected?

5   Q.  Yes.

6   A.  Maybe.  I don't know how it was stored beforehand.  If it

7   was stored in this plastic wet, I would expect to see

8   degradation.  I wouldn't expect to see as good a major

9   contributor on that if it's just been allowed to sit in there

10  and rot.  Obviously the storage was OK, because I did get a

11  major contributor.

12  Q.  So in your opinion the storage, there was not much

13  degradation because you were able to develop a profile, right?

14  A.  In regard to the major contributor, yes.

15  Q.  You were asked about PCR testing.

16  A.  Yes.

17  Q.  Was there anything unusual about the testing of the swabs

18  from this mask in your opinion?

19  A.  No.

20  Q.  Mr. Myers, I know you said that circling, none of these

21  things, none of these alleles on these defense exhibits you can

22  reach any conclusions.

23  A.  Right.

24  Q.  But why don't you come down here, if I could ask with the

25  Court's permission for you to do so, and circle all the

E8dnchr3                          Myers - redirect

 1    differences in the allele numbers.

 2             We will use a green pen.

 3             You can go back to the witness stand.  You were also

 4    asked questions about statistics and pop stats.  Do you

 5    remember those questions?

 6    A.  Yes, I do.

 7    Q.  In statistical terms, what was your conclusion about who

 8    the major contributor was for the swab 3E.

 9    A.  The only statistic that can be calculated on this profile

10    is the conditional match probability to the major contributor.

11    That statistic is the probability of selecting an unrelated

12    individual matching the major contributor is less than one in

13    300 billion.

14             MR. NAWADAY:  No further questions.

15             THE COURT:  Mr. Greenfield.

16             MR. GREENFIELD:  Yes, your Honor.

17    RECROSS EXAMINATION

18    BY MR. GREENFIELD:

19    Q.  Assuming that Raymond Christian wore 3, the mask in

20    evidence a number of times in the past.

21    A.  OK.

22    Q.  And that Laquavious Boykin took it and wore it one night,

23    the night of the murder, would Laquavious Boykin still be a

24    minor contributor to the mask?

25    A.  He could be.

1             MR. GREENFIELD:  No further questions.

2             MR. NAWADAY:  No further questions, your Honor.

3             THE COURT:  Mr. Myers, you may step down.

4             (Witness excused)

5             THE COURT:  Will the government please call its next

6    witness.

7             MR. BAUER:  The government calls Kevin Lahar.

8     KEVIN LAHAR,

9        called as a witness by the Government,

10       having been duly sworn, testified as follows:

11            THE COURT:  Please be seated.  Pull your chair up.  I

12   want you to speak directly into the microphone in front of you

13   there.  You can adjust it.

14            I want you to begin by please stating your full name

15   and spelling your first and last name for the record.

16            THE WITNESS:  Officer Kevin Lahar, L-a-h-a-r.

17            THE COURT:  Thank you.

18            Mr. Bauer.

19            MR. BAUER:  Thank you, your Honor.

20   DIRECT EXAMINATION

21   BY MR. BAUER:

22   Q.  What do you do for a living?

23   A.  I am a police officer employed by the City of Newburgh

24   Police Department.

25   Q.  What is your rank with the City of Newburgh Police

E8dnchr3                         K. Lahar - direct

1   Department?

2   A.  I am a police officer in the canine unit assigned to the

3   patrol division.

4   Q.  How long have you been with the Newburgh police?

5   A.  11 years.

6   Q.  During those 11 years -- you said you are assigned to the

7   patrol division now?

8   A.  Yes, I am.

9   Q.  During the 11 years have you been in any other units or

10  divisions at the Newburgh police?

11  A.  I served in the anticrime unit, which was a plainclothes

12  unit, for approximately one year, and I have been a member of

13  the canine unit for the last eight years.

14  Q.  Briefly, what is the canine unit?

15  A.  We have police dogs as partners.

16  Q.  So now you are in the patrol division with the canine unit?

17  A.  Yes.

18  Q.  What are your duties and responsibilities in that

19  assignment?

20  A.  I have a canine partner with me when I work.  I work

21  midnight to 8 a.m., and I am on the patrol division, answer

22  calls for service, and enforce any of the local ordinance or

23  state laws.

24  Q.  When you say that you respond or address calls for service,

25  what do you mean by that?

E8dnchr3                          K. Lahar - direct

1    A.  Any calls that come in for service whether they are animal

2    complaints up to shots fired or robberies in progress.

3    Q.  As part of your patrol, are you assigned to a particular

4    part of the city?

5    A.  I am usually assigned to B zone, which is the northeast

6    corner of the city of Newburgh.

7    Q.  That's B zone, as in boy?

8    A.  B as in boy, yes.

9    Q.  Officer Lahar, are you familiar with a street in Newburgh

10   known as Chambers Street?

11   A.  Yes, I am.

12   Q.  What zone or area of the city is Chambers Street in?

13   A.  It's in B zone it runs northbound from Broadway to Gidney

14   Avenue.

15   Q.  Have you been to Chambers Street before?

16   A.  Yes, I have.

17   Q.  Have you been to the streets surrounding Chambers Street?

18   A.  Yes.

19   Q.  Approximately how often do you visit this area that, we

20   will call it zone B of the city?

21   A.  I drive up and down the streets in zone B pretty much my

22   entire tour.

23   Q.  So would you say every day?

24   A.  At least five days a week.

25   Q.  Five days a week that you work?

E8dnchr3                         K. Lahar - direct

1    A.   Yes.

2    Q.   And in each tour multiple times each day?

3    A.   Yes.

4    Q.   When you went to Chambers Street and the surrounding

5    streets in the northeast part of the city, what types of things

6    would you see?

7    A.   That particular area in the city of Newburgh is a

8    high-crime area.  It includes open-air drug dealing,

9    significant amount of violence, to include shootings, robberies

10   and assaults.

11   Q.   When you say open-air drug dealing, what do you mean?

12   A.   Individual drug dealers that will loiter on the corners and

13   deal drugs either to vehicles or persons that walk up to

14   purchase them.

15   Q.   During your time during these 11 years, have you witnessed

16   this open-air drug dealing?

17   A.   Hundreds of times.

18   Q.   During all of your years in the Newburgh PD, have you

19   participated in any arrests in this area of the city?

20   A.   Yes.

21   Q.   Approximately how many?

22   A.   I've made or assisted in more than a thousand arrests in my

23   career.

24   Q.   For what types of crimes?

25   A.   Anywhere from petit larceny or an open-container crime up

E8dnchr3                         K. Lahar - direct

1   to assaults, gun possession, drug possession crimes.

2   Q.  Approximately how many of those arrests, maybe you can

3   answer in percentages, involved drugs?

4   A.  At least 30 percent.

5   Q.  That's an estimate, right?

6   A.  Yes.

7   Q.  Approximately how many involved weapons?

8   A.  Approximately ten to fifteen percent.

9   Q.  Officer Lahar, are you familiar with an individual named

10  Raymond Christian?

11  A.  Yes, I am.

12  Q.  Have you ever participated in the arrest of Raymond

13  Christian?

14  A.  Yes, I have.

15  Q.  I want to draw your attention to February 7, 2010.  At

16  approximately 12:43 a.m., were you working that night?

17  A.  Yes, I was.

18  Q.  Were you on patrol at the time?

19  A.  Yes, I was in uniform in a marked police vehicle.

20  Q.  That was your normal shift you said earlier, midnight to 8

21  a.m.?

22  A.  Yes, sir.

23  Q.  Were you working by yourself or with other people?

24  A.  I was by myself in my police vehicle.

25  Q.  Did you arrest anyone that night?

E8dnchr3                          K. Lahar - direct

1    A.  Yes, I assisted in the arrest of Raymond Christian.

2    Q.  What, if anything, happened that led to that arrest?

3    A.  I received radio communication from our dispatch center,

4    specifically, Sergeant Swenson and Officer Joe Rose -- he

5    changed his name to Joe Burns -- about an armed individual in

6    the area of South Street and Chambers Street.

7    Q.  As part of that information, did you hear a description of

8    a potential suspect?

9            MR. GREENFIELD:  Objection.

10           THE COURT:  Overruled.

11   A.  Yes.  The description was a black male wearing a red type

12   vest.

13   Q.  I'm sorry.  What area was this call directing you to?

14   A.  South Street and Chambers Street.

15   Q.  Did you, in fact, respond there?

16   A.  Yes, I did.

17   Q.  Now let me ask you, before February 7, 2010, were you

18   familiar with Raymond Christian?

19   A.  No, I was not.

20   Q.  You never met or interacted with him before?

21   A.  Not that I recall.

22   Q.  So what happened when you got to Chambers and South Street?

23   A.  I observed an individual matching that description.  He was

24   a black male wearing a red, zipped-up, hooded sweatshirt.

25   Q.  What did you do after you saw him?

E8dnchr3                          K. Lahar - direct

1    A.  I exited my police vehicle.  I said, Police, let me see

2    your hands.  And that particular individual responded by

3    running southbound on Chambers Street.

4    Q.  Did you follow after him?

5    A.  Briefly.

6    Q.  Now let me ask you, when you arrived at Chambers and South

7    and when you approached the individual, did any other officers

8    arrive on the scene?

9    A.  Officer William Lahar.

10   Q.  So the jury keeps this straight during your testimony and

11   potentially others, are you related to William Lahar?

12   A.  He is my older brother.

13   Q.  So you chased after the individual?

14   A.  Briefly, yes.

15   Q.  What, if anything, happened while you were chasing after

16   him?

17   A.  As he crossed South Street running southbound on Chambers

18   Street, he removed an object from the left pocket of his

19   zipped-up hooded sweatshirt and tossed it high into the air.

20   Q.  Did you see him toss it?

21   A.  I did.

22   Q.  At that time, when you saw him toss it, could you tell what

23   kind of object it was?

24   A.  No, I could not.

25   Q.  Did you see where the object landed?

E8dnchr3                         K. Lahar - direct

1    A.   I did.

2    Q.   What, if anything, did you do after you saw him throw this

3    object?

4    A.   I looked at the object when it hit the ground.  I

5    identified it as being a handgun, and I advised the other

6    officers that he had just discarded a handgun.  And I remained

7    there with the handgun while they pursued after him.

8    Q.   Why did you do that?  Why did you stay with the handgun?

9    A.   So that it didn't get picked up by anybody else that was in

10   the area.

11   Q.   Was that individual eventually arrested?

12   A.   Yes, he was.

13   Q.   Could you see him when he was arrested?

14   A.   Yes, I did.

15   Q.   Where was it that he was arrested?

16   A.   In the area of 159 Chambers Street.

17   Q.   Who arrested him?

18   A.   Officer William Lahar and Officer Gonzalez.

19   Q.   We keep referring to him as the individual.  Who was that

20   individual who threw the gun and was arrested by William Lahar

21   and Gonzalez?

22   A.   Raymond Christian.

23            MR. BAUER:  Your Honor, may I approach?

24            THE COURT:  You may.

25   Q.   Officer Lahar, I'm showing you what's been marked for

E8dnchr3                           K. Lahar - direct

1    identification as Government Exhibits 121 and 122.  Can you

2    look at these items and tell me if you recognize them.

3    A.  Yes, I do.

4    Q.  What do you recognize them to be?

5    A.  This is the small handgun that I observed Raymond Christian

6    throw high into the air and hit the ground and the ammunition

7    that was recovered with that weapon.

8    Q.  To be clear, Government Exhibit 121 is the handgun?

9    A.  Yes.

10   Q.  And 122 is the ammunition?

11   A.  Yes.

12   Q.  When you saw the gun on the ground, was the ammunition in

13   that condition, in a bag separate from the gun?

14   A.  No, it was loaded within the gun.

15   Q.  At the time of the arrest, who took possession of that gun?

16   A.  Officer Gonzalez.

17   Q.  And that includes the ammunition?

18   A.  Yes.

19   Q.  At the time or following the arrest, did you write an

20   arrest report?

21   A.  I don't recall.

22   Q.  Did you write a report at all of the incident regarding

23   Raymond Christian?

24   A.  Yes, I did.

25   Q.  On that report did you make a reference to this gun?

E8dnchr3                      K. Lahar - direct

1  A.  I did.

2  Q.  Did that include the serial number of the gun?

3  A.  Yes.

4  Q.  Prior to your testimony today, have you had an opportunity

5  to look at this, the gun, 121?

6  A.  Yes, I have.

7  Q.  And have you compared the serial numbers?

8  A.  They match.

9          MR. BAUER:  The government offers Government Exhibits

10  121 and 122.

11          MR. STRAZZA:  May I just see them, please.

12          MR. BAUER:  Sure.

13          MR. STRAZZA:  No objection.

14          THE COURT:  121 and 122 will be received.

15          (Government's Exhibits 121 and 122 received in

16  evidence)

17          MR. BAUER:  Your Honor, may I show them to the jury?

18          THE COURT:  You may.

19          MR. GOLTZER:  May I have the appropriate instruction

20  if it's convenient.

21          THE COURT:  Certainly, ladies and gentlemen, this gun

22  is being offered in connection with testimony concerning

23  Mr. Christian, and you can consider this only against

24  Mr. Christian in deciding whether the government has proved its

25  case against him.  You cannot consider it in any way against

1   either Messrs. Whitaker or Thomas.

2   Q.  Officer Lahar, are you familiar with an individual named

3   James Williams?

4   A.  I am.

5   Q.  Do you know if he goes by any other names other than James

6   Williams?

7   A.  He goes by the street name or nickname of L-1.

8   Q.  Back in 2010, do you know where he lived?

9   A.  20 William street.

10  Q.  How do you know that?

11  A.  I responded there to assist our anticrime unit with the

12  execution of a search warrant.

13  Q.  Were you the only officer who executed that search warrant?

14  A.  No, I was not.

15  Q.  To be clear, were you the main officer assigned to that

16  search?

17  A.  No, I was not.

18  Q.  But what did you do as part of executing the search

19  warrant?

20  A.  I assisted in searching the apartment.

21  Q.  Did you do anything with that case after the execution of

22  the search warrant?

23  A.  Not that I recall.

24  Q.  While you were at that apartment at 20 William Street, do

25  you recall what, if anything, was recovered from the apartment?

1    A.  Some crack cocaine and a firearm.

2    Q.  Do you remember what kind of firearm?

3    A.  I do not.

4    Q.  To be clear, was James Williams present there?

5    A.  Yes, he was.

6    Q.  Did you see him?

7    A.  Yes, I did.

8    Q.  Moving on, are you familiar with an individual named Tyrell

9    Whitaker?

10   A.  Yes, I am.

11   Q.  Have you participated in an arrest of Mr. Whitaker?

12   A.  Yes, I did.

13   Q.  I want to draw your attention to August 12, 2010, at

14   approximately 6:05 p.m.  Were you working that night?

15   A.  Yes, I was.

16   Q.  That was not your normal midnight to 8 a.m. shift, was it?

17   A.  No, it was not.

18   Q.  What shift were you working?

19   A.  It was an afternoon shift with a special detail.

20   Q.  What does that mean, special detail?

21   A.  At times the police department will put out special details

22   targeting specific things.

23   Q.  You said earlier that for the incident involving Raymond

24   Christian you were in a marked vehicle.  On this day, on August

25   12, 2010, were you in a marked vehicle?

E8dnchr3                          K. Lahar - direct

1   A.  No, this vehicle was unmarked.

2   Q.  Were you working by yourself or with other people?

3   A.  I was with other people.

4   Q.  Do you recall who you were with?

5   A.  Detective Tom Nafi, Detective Kevin Burns, and officer

6   Roman Scuadroni.

7   Q.  Did you all arrest anybody that night?

8   A.  Yes, we arrested Tyrell Whitaker at 17 Lutheran Street.

9   Q.  Can you explain for the jury the circumstances of that

10  arrest.

11  A.  We were traveling in that area.  We observed Mr. Whitaker

12  in front of 17 Lutheran Street, and he appeared to be placing

13  marijuana in a brown, blunt-type wrapper.

14  Q.  Were you able to see that from the car?

15  A.  Yes, we were.

16  Q.  What did you do after you observed that?

17  A.  We exited our vehicle to interview Mr. Whitaker.

18  Q.  Did you approach Mr. Whitaker?

19  A.  We did.

20  Q.  What, if anything, did he do when you approached?

21  A.  He fled inside of 17 Lutheran Street to the second floor

22  and into a bedroom.

23  Q.  Did you chase him into 17 Lutheran?

24  A.  Yes.

25  Q.  Was it just you, or did all the officers chase?

E8dnchr3                         K. Lahar - direct

1    A.  All of the officers chased.

2    Q.  Did you eventually catch up with him?

3    A.  Yes.

4    Q.  Was it in that second floor bedroom that you just

5    mentioned?

6    A.  Yes, it was.

7    Q.  What did you do once you caught up with him?

8    A.  He was placed in handcuffs.

9    Q.  Pursuant to that arrest, did you recover anything from the

10   person of Mr. Whitaker?

11   A.  Yes.  He was found to have a small clear plastic baggy of

12   what appeared to be marijuana in his hand along with a brown

13   marijuana, blunt-type wrapper.  He was also found to have in

14   his left pants pocket a bag of Goya brown rice, and inside of

15   that rice we recovered six glassine envelopes consistent with

16   how heroin is packaged.  And within those glassine envelopes

17   was what appeared to be heroin.

18            MR. BAUER:  Your Honor, may I approach again?

19            THE COURT:  You may.

20   Q.  Officer Lahar, I'm showing you what's been marked for

21   identification as government Exhibits 151 and 152.  Can you

22   look at these items and tell me if you recognize them.

23   A.  Yes, I do.

24   Q.  Taking them one at a time, government Exhibit 151, what is

25   that?

E8dnchr3                         K. Lahar - direct

1    A.  151 contains the brown Goya rice, the Goya rice bag and the

2    heroin that was recovered within that bag.

3    Q.  The heroin, is that packaged in any smaller packaging?

4    A.  Yes.  There's six glassine envelopes.

5    Q.  When you say glassine envelopes, to any of the jurors who

6    don't know what that means, what are you referring to?

7    A.  The individual decks of heroin are packaged in small

8    glassine envelopes.

9    Q.  Those decks of heroin, Government Exhibit 151, are they

10   separated from the rice?

11   A.  Yes, they are.

12   Q.  When you recovered the heroin and the rice, were they

13   separated or were they together?

14   A.  They were together.  The glassine envelopes were within the

15   bag of rice.

16   Q.  Government Exhibit 152, what's that?

17   A.  Exhibit 152 contains the bag of marijuana and the brown,

18   blunt-type wrapper that was recovered from Mr. Whitaker's

19   hands.

20   Q.  Officer Lahar, after this arrest did you write a report

21   with regards to the circumstances of the arrest?

22   A.  Yes, I did.

23   Q.  Was that report assigned a number by the Newburgh Police

24   Department?

25   A.  Yes, it was.

E8dnchr3                          K. Lahar - direct

1    Q.  Had you compared that number to the number on that

2    packaging?

3    A.  Yes, I have.

4    Q.  Based on that review, what have you concluded?

5    A.  They were matched, and this is the evidence belonging to

6    that case.

7           MR. BAUER:  The government offers Government Exhibit

8    151 and 152 into evidence.

9           MR. BUCHWALD:  Can I have the limiting instruction.

10          MS. STAFFORD:  Based on a prior judgment, your Honor,

11   there's no objection.

12          THE COURT:  Very well.  151 and 152 will be received.

13          (Government's Exhibits 151 and 152 received in

14   evidence)

15          THE COURT:  Ladies and gentlemen, this evidence is

16   being received solely with respect to Mr. Tyrell Whitaker and

17   you can only consider it in your determination as to whether or

18   not the government has proved its case against him.  It may not

19   be considered against Mr. Christian and Mr. Thomas.

20          MR. BAUER:  Your Honor, may I show it to the jury?

21          THE COURT:  You may.

22   Q.  Officer Lahar, just a couple of questions about this rice.

23          You testified earlier that you've participated in

24   thousands of arrests, and 30 percent of those arrests involved

25   drugs, correct?

E8dnchr3                          K. Lahar - direct

1    A.   That is correct.

2    Q.   Have you ever arrested anybody with heroin in the past?

3    A.   Yes, I have.

4    Q.   Any of those arrests in the past, did they include seizure

5    of rice like this brown Goya rice?

6    A.   No, that was the first one.

7    Q.   The people who you had arrested before with heroin, how

8    many decks of heroin did you typically seize?

9    A.   The individual users typically had no more than one or two

10   decks of heroin in their possession.

11   Q.   Were those the people who you had arrested with heroin

12   before, individual users?

13   A.   Yes, and several drug dealers.

14   Q.   And several drug dealers?

15   A.   Yes.

16   Q.   And the drug dealers who had heroin, when you seized it,

17   did you --

18            MR. GOLTZER:  Objection.  403.

19            THE COURT:  Yes.  Sustained.

20   Q.   Officer Lahar, are you familiar with an individual named

21   Glenn Thomas?

22   A.   Yes, I am.

23   Q.   Have you participated in an arrest of Mr. Thomas?

24   A.   Yes, I have.

25   Q.   I want to draw your attention to February 28, 2011,

E8dnchr3                          K. Lahar - direct

1    approximately 6 p.m.  Were you working that evening?

2    A.  Yes, I was.

3    Q.  What shift were you working?

4    A.  I was working a 4 to 12 shift on a special detail targeting

5    arrest warrants.

6    Q.  When you say targeting arrest warrants on a special detail,

7    what do you mean?

8    A.  This particular detail was put out there to serve and

9    arrest anybody that had outstanding warrants.

10   Q.  Were you working by yourself that night?

11   A.  No, I was not.

12   Q.  Who else were you working with?

13   A.  Detective Mike Loscerbo and Officer William Lahar.

14   Q.  Were you on foot or in a car?

15   A.  We were in an unmarked police vehicle.

16   Q.  Did you arrest anyone that day?

17   A.  Yes, I did.

18   Q.  Who did you arrest?

19   A.  I assisted in the arrest of Glenn Thomas.

20   Q.  Where did that arrest take place?

21   A.  In the area of 220 Broadway.

22   Q.  And 220 Broadway, what intersection is that near?

23   A.  Broadway and Lutheran Street.

24   Q.  Why specifically did you respond to that area of Broadway

25   and Lutheran?

E8dnchr3                         K. Lahar - direct

1    A.  The patrol division was investigating an armed robbery.

2             MR. DRATEL:  Objection to eliciting hearsay, your

3    Honor.

4             THE COURT:  Overruled.

5    A.  The patrol division was investigating an armed robbery that

6    occurred in that area 30 minutes prior.

7    Q.  As part of that call or information that was transmitted to

8    you, what was the description of the suspects provided?

9    A.  Yes.

10   Q.  When you were there at Broadway and Lutheran, did you see

11   anybody?

12   A.  Yes, we observed three individuals that matched the

13   previous description.

14   Q.  What did you do when you saw those individuals?

15   A.  We exited our police vehicle and interviewed them.

16   Q.  Who were those individuals?

17   A.  Glenn Thomas, Jamar Mallory, Kevin Burden.

18   Q.  Just to be clear, I will fast forward to a question, was it

19   ever concluded that Glenn Thomas, Kevin Burden, or Jamar

20   Mallory were involved in that robbery that the original call

21   came in from?

22   A.  Not to my knowledge.

23   Q.  Getting back to that day, had you seen Glenn Thomas, Kevin

24   Burden and Jamar Mallory before?

25   A.  I was familiar with Jamar Mallory and Kevin Burden.

E8dnchr3                          K. Lahar - direct

 1   Q.  Not Glenn Thomas?

 2   A.  No.

 3   Q.  So what happened when you got out of the car to talk to

 4   these three individuals?

 5   A.  Detective Loscerbo approached Glenn Thomas.  I heard him

 6   interviewing him and I observed him patting him down.  I

 7   approached and interviewed Jamar Mallory and was patting Jamar

 8   Mallory down.

 9   Q.  While you were patting down Jamar Mallory, were you able to

10   see what Loscerbo was doing?

11   A.  Yes, I was.

12   Q.  What, if anything, happened between Loscerbo and

13   Mr. Thomas?

14   A.  I observed Mr. Glenn Thomas turn towards Detective Loscerbo

15   and try to flee across Broadway.  I then observed officer

16   William Lahar grab out to a piece of Mr. Glenn Thomas' clothing

17   and spin him around, at which time Detective Loscerbo reengaged

18   him into a parked vehicle and was advising us that Mr. Thomas

19   was in possession of a gun.

20   Q.  When you say he reengaged him into a vehicle, does that

21   mean he tackled or somehow forced him into that vehicle?

22   A.  He physically reconnected with Mr. Thomas.

23   Q.  You said that Loscerbo told you that Glenn Thomas was in

24   possession of a gun.  How did he do that?

25   A.  He was advising us that he had a gun.

E8dnchr3                          K. Lahar - direct

1    Q.   So what happened after that?

2    A.   I left Mr. Mallory and I went and tackled Mr. Thomas to the

3    sidewalk in front of 220 Broadway.

4    Q.   Then what happened?

5    A.   A small revolver was recovered from the groin area of

6    Mr. Glenn Thomas.

7    Q.   Do you remember who it was, which officers actually

8    recovered it from him?

9    A.   Officer William Lahar and Officer Kievsky.

10   Q.   Kievsky was not in the car with you originally, right?

11   A.   No, he was not.  He responded as a backup unit once the

12   struggle and fight with Mr. Thomas ensued.

13   Q.   Did you see them recover the gun?

14   A.   I did.

15   Q.   Was anything else recovered that day from either Thomas,

16   Mallory, or burden?

17   A.   Yes.

18   Q.   What else was recovered?

19   A.   A .22-caliber magazine was recovered from Jamar Mallory.

20   Q.   Who was the one who recovered it?

21   A.   I did.

22   Q.   Was Mallory arrested?

23   A.   No, he was not.

24   Q.   Was Kevin Burden arrested?

25   A.   No, he was not.

1      MR. BAUER:  Your Honor, may I approach one last time?

2      THE COURT:  You may.

3  Q.  Showing you what's been marked for identification as

4  Government Exhibits 141 and 142, will you take a look at these

5  two items and tell me if you recognize them.

6  A.  I do.

7  Q.  Starting with 141, what is that?

8  A.  141 is the revolver, handgun, firearm that was recovered

9  from Glenn Thomas' groin area.

10  Q.  In preparation for testimony today, have you been able to

11  review reports with regards to that incident and arrest?

12  A.  Yes, I have.

13  Q.  Were you able to compare the serial numbers?

14  A.  Yes.

15  Q.  And is that the same gun?

16  A.  The same exact gun.

17  Q.  And how about Government Exhibit 142?

18  A.  That is the ammunition that was recovered loaded within

19  that firearm.

20  Q.  It was loaded within the firearm?

21  A.  Yes, it was.

22  Q.  So it's separated out now.  It's different than how you saw

23  it originally?

24  A.  Yes.

25      MR. BAUER:  The government offers Exhibits 141 and 142

E8dnchr3                         K. Lahar - direct

1    into evidence.

2            THE COURT:  Any objection?

3            MR. GOLTZER:  No objection other than previously

4    stated.

5            THE COURT:  141 and 142 will be received.

6            (Government's Exhibits 141 and 142 received in

7    evidence)

8            THE COURT:  In accordance my previous instructions,

9    ladies and gentlemen, this evidence is being admitted solely

10   with respect to Mr. Thomas and you may not consider it with

11   respect to Mr. Christian or Mr. Whitaker.

12           MR. BAUER:  Judge, may I show them to the jury?

13           THE COURT:  You may.

14           MR. BAUER:  Judge, I have no further questions.

15           THE COURT:  Why don't we do this before

16   cross-examination.  Let's take our lunch break.  So it's about

17   a quarter of 1.  Please be sure to be in the jury room no later

18   than 2 o'clock so we can get started.  Please do account for

19   the lines at the security desk.

20           Until then, do not discuss the case.

21        (Continued on next page)

22

23

24

25

E8dnchr3                          K. Lahar – direct

1                   (Jury not present)

2                   THE COURT:  Sir, you may step down.

3                   (Witness not present)

4                   THE COURT:  Anything for me?

5                   MR. BAUER:  No, Judge.

6                   (Luncheon recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E8D9CHR4

<pre>
 1                          AFTERNOON SESSION

 2                              2:00 p.m.

 3          (Trial resumed; jury not present)

 4          MR. BAUER:  Judge, can we get Officer Lahar.

 5          THE COURT:  We're still missing one juror but you can

 6   have him come up.

 7          KEVIN LAHAR, resumed.

 8          THE COURT:  Will it be Mr. Strazza cross-examining?

 9          MR. STRAZZA:  Yes, your Honor.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

E8D9CHR4

1              (Jury present)

2              THE COURT:  Everyone please be seated.

3              Mr. Strazza.

4              MR. STRAZZA:  Thank you.

5    CROSS-EXAMINATION

6    BY MR. STRAZZA:

7    Q.  Good afternoon, Officer Lahar.

8    A.  Good afternoon, sir.

9    Q.  You've been a police officer in the City of Newburgh for

10   eleven years; is that correct?

11   A.  That is correct.

12   Q.  And throughout the course of your tenure on the Newburgh

13   police department you've worked in the anticrime unit, right?

14   A.  Yes, I have.

15   Q.  And the anticrime unit is commonly referred to as proactive

16   policing, right?

17   A.  Yes, sir.

18   Q.  And that's when the police officers in that unit are out on

19   the street looking to prevent crimes from taking place, right?

20   A.  Prevent and enforce quality-of-life type crimes.

21   Q.  And you're out there on the streets in high crime areas,

22   correct.

23   A.  Yes.

24   Q.  And you're looking for, among other things, guns?

25   A.  Yes.

1   Q.   Drugs?

2   A.   Yes.

3   Q.   Drug dealing activity, right?  I think you referred to it

4   as open-air drug dealing activity?

5   A.   Yes.

6   Q.   And one of the ways you try and prevent these things from

7   happening is by conducting surveillance, correct?

8   A.   At times we do conduct surveillance.

9   Q.   And there are different types of surveillance, right?

10  A.   Yes.

11  Q.   You have video surveillance, correct?

12  A.   We do have video surveillance.

13  Q.   And audio surveillance, right?

14  A.   Correct.

15  Q.   And have you participated in these type of activities

16  yourself throughout your tenure on the Newburgh police

17  department?

18  A.   Nothing with audio surveillance.

19  Q.   How about video surveillance?

20  A.   Yes, I have.

21  Q.   Have you also taken pictures?

22  A.   No, I have not.

23  Q.   And one of the ways that the police department tries to

24  combat activities such as drug dealing is by the use of

25  informants, correct?

E8D9CHR4                          K. Lahar - cross

1    A.  The police department does use informants.

2    Q.  And specifically with respect to narcotics-related

3    activity, right?

4    A.  They use various informants for various different --

5    Q.  Is narcotics activity one of those various things?

6    A.  Yes, it is.

7    Q.  And you're familiar with a buy-and-bust operation, right?

8    A.  I'm familiar with the terminology.

9    Q.  And what does that mean to you?

10   A.  They typically send in an undercover police officer to

11   purchase narcotic from a suspected drug dealer.  And if the

12   undercover police officer does, in fact, purchase narcotics

13   from a drug dealer, there are takedown teams that move in and

14   effect the arrest immediately.

15   Q.  And there are various members of the police department that

16   participate in these activities, correct?

17   A.  Yes.

18   Q.  Each of them having a different role in that kind of

19   operation, correct?

20   A.  Yes.

21   Q.  And so there would, for example, be the undercover who

22   actually makes the purchase, correct?

23   A.  Correct.

24   Q.  And then there will be other members who are responsible

25   for doing surveillance?

1            MR. BAUER:  Objection, your Honor, relevancy of this

2       line of questioning.

3            THE COURT:  I'll allow it.

4            THE WITNESS:  Can you repeat the question.

5  Q.  There will be other members responsible for conducting

6  surveillance of that specific purchase?

7  A.  Yes.

8  Q.  There will be sometimes a ghost out on the street with the

9  undercover?

10  A.  I don't know the terminology used but there are vehicles

11  out there that are watching the undercover police officer move

12  in and out of their target location.

13  Q.  And you mentioned earlier that you were assigned to Zone B;

14  is that correct?

15  A.  The majority of my time as a police officer, yes.

16  Q.  And can you tell me again what Zone B consists of?

17  A.  The northeast corner of the City of Newburgh which is north

18  of Broadway and east of 9W or Robinson Avenue.

19  Q.  So approximately how many blocks would make up Zone B?

20  A.  I wouldn't have an idea.

21  Q.  Are you familiar with Dubois Street?

22  A.  Yes, I am.

23  Q.  Am I saying that right?

24  A.  Yes, you are.

25  Q.  And is that in your zone?

E8D9CHR4                          K. Lahar - cross

1    A.  Yes, it is.

2    Q.  And you would agree with me that Dubois Street is a high

3    crime area, correct?

4    A.  Yes, it is.

5    Q.  It would certainly be one of the areas that anticrime

6    targets when enforcing the laws, right?

7    A.  Yes.

8    Q.  Now, prior to October 7 of 2010 you weren't familiar with

9    Raymond Christian, right?

10   A.  I don't recall.

11   Q.  You don't recall Raymond Christian or you don't recall

12   whether or not you were familiar with him?

13   A.  Whether or not I was familiar with him before that date.

14   Q.  Didn't you tell the prosecutor during your direct

15   examination that you were not familiar with Raymond Christian?

16   A.  I don't recall the specific date.  The first time I

17   encountered Raymond Christian was the incident at South and

18   Chambers Street in which he discarded that Derringer firearm.

19   Q.  You know what, I'm using the wrong date and I apologize to

20   everyone.  The date that I was referring to was -- that I meant

21   to refer to was February 7, 2010.  My apologies.

22        So let me backup.  Prior to February 7, 2010 you were

23   not familiar with Raymond Christian, right?

24   A.  Not that I recall.

25   Q.  And you had never personally observed him with a firearm

E8D9CHR4                          K. Lahar - cross

1    while conducting your duties prior to that date, correct?

2    A.  Not that I recall.

3    Q.  And you had never observed him in engaging in any

4    narcotics-related activity prior to that date, right?

5    A.  Not that I recall.

6    Q.  Based upon your experience as a police officer you're

7    familiar with different types of firearms, correct?

8    A.  Yes.

9    Q.  You know the difference, for example, between a

10   semiautomatic firearm and a revolver, right?

11   A.  Yes, I do.

12   Q.  And you know that there are different types of calibers of

13   firearms, correct?

14   A.  Yes.

15   Q.  And the type of caliber corresponds with the diameter of

16   the ammunition, right?

17   A.  I don't know the science behind it but different firearms

18   have different caliber.

19   Q.  On February 7, 2010 you testified that you recovered a .22

20   caliber firearm; is that right?

21   A.  That is correct.

22   Q.  And that's a -- you would consider that to be a small

23   firearm, right?

24   A.  Small caliber.

25   Q.  Okay.  The firearm that you specifically recovered, was

E8D9CHR4                         K. Lahar - cross

1   that a big firearm?

2   A.  No, it was not.

3   Q.  It was small, right?

4   A.  Yes, it was.

5   Q.  And, in fact, that was a Derringer style firearm, correct?

6   A.  Yes, it was.

7   Q.  More specifically a Davis Industries Model DM-22, right?

8   A.  Yes.

9   Q.  And that's a two-shot firearm, right?

10  A.  It is a two-shot firearm.

11  Q.  What does that mean?  Tell the jury what that means.

12  A.  The firearm is capable of firing one shot after the other

13  or both shots simultaneously.

14  Q.  But it only -- that specific firearm only holds two rounds

15  of ammunition, correct?

16  A.  Yes.

17  Q.  And when you recovered that firearm it was loaded with two

18  rounds of ammunition, correct?

19  A.  Yes, it was.

20  Q.  And, in fact, the firearm that you recovered that day

21  turned out to be inoperable; isn't that right?

22  A.  That is correct.

23  Q.  Meaning it was not capable of being fired, correct?

24  A.  After it hit the ground, correct.

25  Q.  Well, you say "after it hit the ground."  Do you know

E8D9CHR4                       K. Lahar - cross

1   whether or not that firearm was capable of being fired before

2   it hit the ground?

3   A.  No, I do not.

4   Q.  So you just added that part in, "after it hit the ground,"

5   right?

6   A.  Well with the level that the firearm was thrown into the

7   air and the impact it had on the ground.

8   Q.  Please continue.  You just assumed?

9   A.  I'm sorry?

10  Q.  You just assumed that that's the reason it was inoperable?

11  A.  That could be a reason as to why it was inoperable.

12  Q.  But you don't know that?

13  A.  No.  I do not know that.

14          MR. STRAZZA:  I have no further questions.

15          THE COURT:  Any further cross-examination?

16          Ms. Stafford.

17  CROSS-EXAMINATION

18  BY MS. STAFFORD:

19  Q.  Good afternoon, Mr. Lahar.

20  A.  Good afternoon, ma'am.

21  Q.  I represent Tyrell Whitaker.

22          Now you were just talking about the anticrime unit and

23  you described that as a proactive unit?

24  A.  Yes.

25  Q.  And you usually traveled in an unmarked police car?

1    A.   Yes.

2    Q.   With at least three other officers; is that true?

3    A.   The majority of the time, yes.

4    Q.   And you also had K9 with you as well?

5    A.   At times we did have my K9 partner with us.

6    Q.   And you also described special duty.  Can you tell me what

7    special duty -- there's any difference between that and the

8    anticrime unit?

9    A.   I believe I testified to a special detail.

10   Q.   Special detail.  I'm sorry.

11   A.   Sometimes special details are put together either by the

12   chief of police or supervisors within the department targeting

13   something specific.

14   Q.   And is that in any way similar to the anticrime unit?

15   A.   No.  It's separate.

16   Q.   Now, the anticrime unit is known on the streets as the

17   jump-out boys; is that right?

18   A.   That is correct.

19   Q.   And it's considered -- it's called the jump-out boys

20   because you literally jump out of the vehicle and chase the

21   suspect, right?

22   A.   If the circumstances warrant that, yes.

23   Q.   So I'd like to talk to you about the night that you spotted

24   Mr. Whitaker at 17 Lutheran Street.  Do you remember that?

25   A.   I do.

E8D9CHR4                          K. Lahar - cross

1   Q.  Again you were in an unmarked police car?

2   A.  Unmarked police car.  I was in uniform.

3   Q.  You were in uniform and you were with three other officers;

4   isn't that true?

5   A.  Two detectives and one other police officer.

6   Q.  And you saw Mr. Whitaker?

7   A.  I did.

8   Q.  And you jumped out of the vehicle?

9   A.  Yes.

10  Q.  And you pursued Mr. Whitaker?

11  A.  I did.

12  Q.  And you pursued him to the second floor of the building; is

13  that correct?

14  A.  That is correct.

15  Q.  And at any time did you not -- were you not able to see

16  Mr. Whitaker?

17  A.  Yes.  There was a brief moment in time that he entered the

18  bedroom.

19  Q.  There was a brief moment in time that he entered the

20  bedroom.

21          And you eventually found him in the bedroom?

22  A.  Yes.

23  Q.  And when you found Mr. Whitaker it's your testimony that he

24  had in his hand a blunt?

25  A.  It was a blunt-type wrapper.

E8D9CHR4                       K. Lahar - cross

1    Q.  And you also testified that in his front pocket that there

2    was a bag of rice?

3    A.  Yes.

4    Q.  Now, you didn't -- did you happen to search the area to

5    make sure that the area was secure?

6    A.  I don't understand your question.

7    Q.  As soon as you apprehended Mr. Whitaker, did you also

8    search the area of the apartment, the bedroom?

9    A.  Not that I recall.

10   Q.  You did not.  Okay.

11           So, in the time that Mr. Whitaker was now within your

12   eyesight and in the bedroom, you would not be able to know

13   whether Mr. Whitaker had actually thrown those items or tossed

14   those items as he was running away from you?

15   A.  Which items are you speaking of?

16   Q.  The blunt and the glassine envelope.

17   A.  Well if they were on his person, he didn't toss them.

18   Q.  So you're saying knowing, Mr. Whitaker knowing that you

19   were pursuing him and eventually finding himself hidden in the

20   apartment, kept those items on him?

21   A.  Yes, he did.

22   Q.  You did not find them anywhere else in the apartment?

23   A.  None whatsoever.

24   Q.  You found them in his hand and in his front pocket?

25           MR. BAUER:  Objection, your Honor.  Asked and

E8D9CHR4                          K. Lahar - cross

1    answered.

2              THE COURT:  Overruled.

3              THE WITNESS:  The bag of what appeared to be marijuana

4    and the blunt type wrapper was still in his hands, yes.

5    Q.  Still in his hands.  Okay.

6              After this one arrest of Mr. Whitaker, did you ever

7    have an occasion to arrest him again?

8    A.  Not that I recall.

9    Q.  And did you ever know Mr. Whitaker prior to this arrest?

10   A.  Not that I recall.

11             MS. STAFFORD:  Thank you.  No further questions.

12             THE COURT:  Mr. Dratel.

13             MR. DRATEL:  Thank you, your Honor.

14   CROSS-EXAMINATION

15   BY MR. DRATEL:

16   Q.  Good afternoon, Officer -- is it Lahar?

17   A.  Yes, sir.  Good afternoon.

18   Q.  I want to talk about the February 28, 2011 arrest of Glenn

19   Thomas that you participated in?

20   A.  Yes, sir.

21   Q.  And the description that was received, that you responded

22   to was really for six black men wearing dark clothing, right,

23   essentially?

24   A.  Yes.  In their late teens; early 20s, sir.

25   Q.  And you responded to 220 Broadway?

E8D9CHR4                          K. Lahar

1   A.  Yes.  We were in that area.

2   Q.  And you saw Mr. Thomas and two other men, right?

3   A.  Yes.

4   Q.  One was Jamar Mallory, the other Kevin Burden?

5   A.  Yes.

6   Q.  And you don't know whether they were together before you

7   got there, right?

8   A.  They appeared to be conversing amongst themselves prior to

9   us exiting our vehicle and approaching them.

10  Q.  But I'm saying before you got there you don't know whether

11  they were together or not?

12  A.  I don't know if I understand your question.

13  Q.  Before you arrived on the scene and saw them you don't know

14  whether they were together or not, or whether they were

15  together just prior to you getting there?

16  A.  No.  They were together when I saw them.

17  Q.  And with respect to Mr. Mallory you described that you

18  seized from him a .22 caliber magazine, correct?

19  A.  Yes, sir.

20  Q.  And magazine, you don't mean a printed item?  You mean

21  something that you would put into a semiautomatic weapon that

22  has ammunition in it for purposes of loading a semiautomatic

23  weapon, correct?

24  A.  That is correct.

25  Q.  That would be probably a .22 handgun with that magazine?

E8D9CHR4                         K. Lahar

1    A.  Yes.

2    Q.  And you also saw Mr. Mallory throw something away before

3    you apprehended him, correct?

4    A.  Yes.

5    Q.  And you thought at the time that it might be a gun, a

6    weapon?

7    A.  I did think that.

8    Q.  But you couldn't find anything?  You looked, but you

9    couldn't find it, right?

10   A.  Yes.

11   Q.  And you were working for the warrant squad at the time?

12   A.  Yes.  It was a special warrant detail.

13   Q.  And, in fact, there was -- you also knew that Mr. Mallory

14   was wanted in another robbery at that time, correct?

15   A.  Not that I recall.

16   Q.  Now with respect to the weapon that was seized from

17   Mr. Thomas, the handgun?

18   A.  Yes, sir.

19   Q.  Ultimately that weapon was found to be inoperable, right?

20   A.  That I'm not aware of.

21   Q.  I'm going to show you what are marked as Thomas I1 and

22   Thomas I2.  Just ask you to look at them.

23       MR. DRATEL:  Your Honor, I think the government is

24   willing to stipulate to the admissibility of these documents

25   under 803.8 so I would move I1 and I2 into evidence.

E8D9CHR4                           K. Lahar

1           THE COURT:  There being no objection, Defendant Thomas

2     I1 and I2 are received.

3               (Defendant Thomas Exhibits I1 and I2 received in

4     evidence)

5     Q.  And they are lab reports from New York State Police that

6     the weapon was inoperable, correct?

7     A.  Yes, it is.

8     Q.  You're also aware that Mr. Thomas -- the case was

9     ultimately dismissed in Orange County against Mr. Thomas,

10    right?

11    A.  Honestly don't know what the disposition of the case was.

12    Q.  But you do know that he was ultimately charged with that

13    same weapon in federal court, correct?

14    A.  Yes.

15    Q.  And he pleaded guilty to that charge, correct?

16    A.  I'm not aware of what the disposition was.

17    Q.  Now, you also during your testimony on direct talked about

18    a search of 20 William Street, correct?

19    A.  Yes, sir.

20    Q.  And you were brought in to help execute a search warrant,

21    right?

22    A.  Yes.

23    Q.  And Jamar Mallory was arrested at that location, correct,

24    that day?

25    A.  Yes, he was.

E8D9CHR4                        K. Lahar

1    Q.  That's July 23, 2010?

2    A.  I am not exactly sure of the date.

3            MR. DRATEL:  May I approach, your Honor?

4            THE COURT:  You may.

5    Q.  I'm going to show you what's marked as 3531-11 for

6    identification and just ask you, Officer Lahar, just to read

7    the -- just to read the first paragraph to yourself.  Then when

8    you're done let me know.

9            (Pause).

10           Does that refresh your recollection as to the date?

11   A.  Yes, it does.

12   Q.  July 23, 2010.

13           And Mr. Mallory was arrested -- he was wanted on a

14   menacing charge?

15   A.  That is correct.

16   Q.  And also it was thought that he was operating -- he was

17   selling drugs out of an apartment on 20 William Street?

18   A.  There was information to that extent.

19   Q.  And that apartment was the one that you searched, correct?

20   A.  Yes.

21   Q.  And a .357 revolver was recovered there, right?

22   A.  That is correct.

23   Q.  And about 19 grams of crack was recovered as well?

24   A.  Yes.

25   Q.  And crack -- and also a digital scale?

E8D9CHR4                         K. Lahar

1    A.   That I'm not aware of.

2    Q.   Let me give you 3511 again, just some additional pages of

3    that.  And ask you to look at the last paragraph.

4              (Pause)

5              I'm sorry.  I gave you the wrong page.  I'm sorry.

6    This is page one and this is page two.  This is the part if you

7    could -- let's just keep these together.  Thanks.

8              (Pause)

9              Just if that refreshes your recollection that a

10   digital scale was found in the apartment as well?

11   A.   Yes.

12   Q.   And other paraphernalia indicating that it was a place of

13   production and packaging of crack?

14   A.   Yes.

15             MR. DRATEL:  I have nothing further, your Honor.

16   Thank you.

17             Thank you, Officer.

18             THE COURT:  Any redirect?

19   REDIRECT EXAMINATION

20   BY MR. BAUER:

21   Q.   Very brief questions.  Both regards to this last incident

22   involving the apartment of James Williams.  You testified that

23   Jamar Mallory was arrested that day.

24   A.   Yes.

25   Q.   Was James Williams arrested that day as well?

E8D9CHR4                          K. Lahar - redirect

1    A.  Yes, he was.

2    Q.  Second, you said the address was 20 William Street; is that

3    right?

4    A.  Yes.

5    Q.  What's the -- is that near Ann Street?

6    A.  Yes.

7    Q.  Near the corner of William and Ann?

8    A.  Yes.

9              MR. BAUER:  No further questions.

10             THE COURT:  Anything further?

11             Officer, you may step down.

12             THE WITNESS:  Thank you, your Honor.

13             (Witness excused)

14             MR. BAUER:  Judge at this time the government would

15   request that we continue our examination of Jamar Mallory.

16             THE COURT:  Very well.

17      JAMAR MALLORY, resumed

18             THE COURT:  Good afternoon, Mr. Mallory.  Please bring

19   your chair forward -- you may be seated.  And you are reminded:

20   One, that you are still under oath; and two, that you should

21   keep your voice up so that we can all hear you.  Okay?

22             MR. BAUER:  Your Honor, may I proceed?

23             THE COURT:  You may.

24             (Continued on next page)

25

1    DIRECT EXAMINATION

2    BY MR. BAUER:

3    Q.  Good afternoon, Mr. Mallory.

4    A.  Good afternoon.

5    Q.  I want to start today's questioning by talking about the

6    three individuals who you identified in the courtroom

7    yesterday.  Do you remember doing that?

8    A.  Yes, sir.

9    Q.  I want to first talk about the man you know as Gucci.  Do

10   you know why he's called Gucci?

11   A.  No, sir.

12   Q.  Is he a member of any gangs that we've discussed?

13   A.  Yes, sir.

14   Q.  What gangs?

15   A.  Crips and Blood.

16   Q.  In December of 2010 what gang was he a part of?

17   A.  Blood.

18   Q.  Before that he was a member of the Crips?  Is that what you

19   said yesterday?

20   A.  Yes, sir.

21   Q.  How did it come to be that he became a member of the

22   Bloods?

23              MR. DRATEL:  Objection, your Honor.

24              THE COURT:  Overruled.

25              THE WITNESS:  Being friends with somebody that's Blood

1    that was high rank.

2    Q.  And who was that?

3           MR. DRATEL:  Personal knowledge.  Objection.

4           THE COURT:  Overruled.

5    Q.  Who was that who he knew?

6    A.  L-1, James Williams.

7    Q.  You say because he was friends with L-1 he became a Blood.

8    What do you mean?

9    A.  That L-1 basically gave him the okay to become Blood being

10   that they were friends.

11   Q.  And do you have any personal knowledge of whether he

12   underwent any initiation or anything like that to become a

13   member of the Bloods?

14   A.  Yes.

15   Q.  Did he?

16   A.  Yes.

17   Q.  Like what?

18   A.  He was sent to go do things to like Crip members that he

19   used to hang with.

20   Q.  Who sent him to do that?

21   A.  L-1.

22   Q.  How do you know that?

23   A.  Because I was told that.

24   Q.  Told that by --

25          MR. DRATEL:  Objection.

1           THE WITNESS:  By L-1.

2           MR. DRATEL:  Objection, your Honor.

3           THE COURT:  Sustained.

4           MR. DRATEL:  Move to strike.

5           THE COURT:  Stricken.

6           MR. BAUER:  Your Honor under 801(d)(2)(E) I would

7    argue that that's admissible.

8           THE COURT:  Continue, Mr. Bauer.

9    Q.  Did Gucci ever talk to you about things he did as part of

10   his initiation with the Bloods?

11   A.  Yes.

12   Q.  What did Gucci tell you about what he did under -- as far

13   as his initiation in the Bloods?

14   A.  He told me that he went to the Heights part of Newburgh --

15           MR. BAUER:  You've got to speak up.

16           THE WITNESS:  He told me that he went to the Heights

17   part of Newburgh and smacked somebody with a gun named D Blood.

18   Q.  Did he say why he did that or who sent him there?

19   A.  Yes.

20   Q.  Are you sure?

21   A.  L-1 told me actually.

22   Q.  So you can't say what L-1 said here.  You've got to say

23   only what Gucci said?

24   A.  Gucci didn't tell me that, no.

25   Q.  Okay.  When did you first meet Gucci?

E8D9CHR4                        Mallory - direct

1    A.  When I was younger, when I was like --

2              MR. BUCHWALD:  Can't hear, your Honor.

3              THE WITNESS:  Around ten or nine years old.  Young.

4    Q.  When you were ten or nine years old?

5    A.  Yeah.

6    Q.  How would you characterize or describe your relationship

7    with him?

8    A.  We know each other.  We knew each other for a long time.

9    I'm more friends with his brother.  I know his mother.  And I

10   also have a daughter by his sister, so.

11   Q.  Would you say that you were friends?

12   A.  At certain times of our lives, yes.

13   Q.  How about in December of 2010, were you friends?

14   A.  Yes.

15   Q.  Have you ever seen Gucci with drugs?

16   A.  Yes.

17   Q.  What types of drugs have you seen him with?

18   A.  I seen him with marijuana and I seen him with crack.

19   Q.  Let's talk about the crack.  Approximately how many times

20   have you seen him with crack?

21   A.  About five times, six times.

22   Q.  Five or six times?

23   A.  Yes, sir.

24   Q.  Do you know where he got the crack from?

25   A.  Yes, sir.

E8D9CHR4                          Mallory - direct

1    Q.  Where did he get the crack from?

2    A.  I gave it to him.

3    Q.  You gave him crack?

4    A.  Yes, sir.

5    Q.  All of those five or six times or only some of them?

6    A.  Some of them.

7    Q.  Why did you give him the crack?

8    A.  Like for a favor, to like -- sometimes he'll ask me to

9    borrow money.  And I won't have the money and I give it to

10   him -- I give him crack so he could sell it to have money.

11   Q.  So you'd give him crack instead of money so he'd have that?

12   A.  Yes, sir.

13   Q.  Approximately when was this?

14   A.  (No response).

15   Q.  What year or years?

16   A.  Late 2000s.

17   Q.  Was it around 2010?

18   A.  Yes, sir.  I gave --

19           MR. DRATEL:  Objection, your Honor, leading.

20           THE WITNESS:  -- 2010.

21   Q.  How much crack did you give him when you gave it to him?

22   A.  Not a lot, like around 20s.

23   Q.  20s?

24   A.  Yes, sir.

25   Q.  About how many 20s would you give him?

E8D9CHR4                          Mallory - direct

1    A.  No more than two.

2    Q.  No more than two.  So based on your testimony yesterday,

3    that's about $40 worth of crack?

4    A.  Yes, sir.

5    Q.  Did Gucci tell you what he was going to do with the crack?

6    A.  Yes.

7    Q.  What did he say?

8    A.  Sell it.

9    Q.  Did you ever see him sell it?

10   A.  Yes, sir.

11   Q.  What did you see him do?

12   A.  Give it to a customer and get their money.

13   Q.  Where?  Where did that happen?

14   A.  On Lutheran once.  On William Street once.

15   Q.  And when approximately was that?

16   A.  Early 2000s.

17   Q.  Early 2000s?

18   A.  Yes, sir.

19   Q.  You testified earlier that you saw him in possession of

20   crack in late 2000s?

21   A.  No, no, no.  I got it mixed up just now.  Late 2000 I

22   didn't mean to say.  Early 2000.

23            THE COURT:  Keep your voice up please.

24   Q.  Was it around the same time that you saw him with the

25   crack?

E8D9CHR4                          Mallory - direct

1    A.  Yes, sir.

2              MR. DRATEL:  Objection.  Leading.

3              THE COURT:  The objection is overruled.

4    Q.  Did you see who he sold the crack to?

5    A.  Yes, sir.

6    Q.  Did you recognize the person or people who he sold the

7    crack to?

8    A.  No, sir.

9    Q.  Had you ever seen them before?

10   A.  Yes, sir.

11   Q.  Had you ever sold crack to them?

12   A.  Yes, sir.

13   Q.  At the time that Gucci sold crack on William or Lutheran,

14   were you selling crack at the same time?

15   A.  Yes, sir.

16   Q.  Did you ever talk to Gucci -- I'm sorry.  Let me rephrase.

17             Were you ever with Gucci when a customer approached

18   the both of you?

19   A.  Yes, sir.

20   Q.  What, if anything, did Gucci say when that happened?

21   A.  It depends if -- nothing, really.  Like it depends like if

22   he had drugs he will ask him if he can serve them; or if he

23   didn't have drugs he wouldn't say anything.

24   Q.  So on the times that he had the drugs would he ask if he

25   could serve them?

E8D9CHR4                          Mallory - direct

1   A.  Yes, sir.

2   Q.  And what would you do?

3   A.  Tell them yeah most of the time.

4   Q.  Were those customers who you had served before or not?

5   A.  Customers that I served before.

6   Q.  Why did you let him do that?

7   A.  To do him a favor so he could have money.

8   Q.  Did Gucci ever talk to you about selling crack?

9   A.  Not really, no.

10  Q.  Besides the times where you gave it to him or you saw him

11  sell it, were there other times that you saw Gucci with crack

12  in his possession?

13  A.  Yes.

14  Q.  Where was that?

15  A.  This is like --

16  Q.  Speak up.

17  A.  Like mid 2000s like other people will give it to him --

18  yeah, he'll get it from other people.

19  Q.  You saw him with crack in the mid 2000s?

20  A.  Yes, sir.

21  Q.  And you said other people gave it to him?

22  A.  Yes, sir.

23  Q.  Did you see them give it to him?

24  A.  No, sir.

25  Q.  So how do you know other people gave it to him?

E8D9CHR4                    Mallory - direct

1   A.  Because he had it.  I know he didn't drugs.  He didn't like

2   to sell crack.  Crack wasn't his drug to sell.  He'll just sell

3   it to have money.

4   Q.  So he preferred to not sell crack?

5   A.  Yes, sir.

6   Q.  But he did it anyway?

7   A.  For fast money.  He wouldn't invest his money --

8            THE COURT:  Mr. Mallory, please keep your voice up.

9            THE WITNESS:  For fast money.  He wouldn't invest his

10  money into it though.

11  Q.  You also said that he sold marijuana; is that right?

12  A.  Yes, sir.

13  Q.  Where did he sell marijuana?

14  A.  In the Heights part of Newburgh.

15  Q.  In the Heights?

16  A.  Yes, sir.

17  Q.  I think you testified yesterday that includes Renwick; is

18  that right?

19  A.  Yes, sir.

20  Q.  Approximately when did he sell marijuana?

21  A.  Early 2000s, mid 2000s.

22  Q.  How many times have you seen him sell marijuana?

23  A.  Four to five times.

24  Q.  So besides selling crack and selling marijuana, did Gucci

25  do anything else to earn money?

E8D9CHR4                           Mallory - direct

1    A.  What do you mean?

2    Q.  Were there other -- well let me ask you this.  Did you ever

3    know Gucci to have a legitimate job?

4    A.  No, sir.

5    Q.  So besides selling crack or selling marijuana for fast

6    money, as you've said, did Gucci ever do anything else to earn

7    money?

8    A.  Yes, sir.

9    Q.  What did he do?

10   A.  Rob people.

11   Q.  How do you know that?

12   A.  He robbed me once.

13           Twice actually.

14   Q.  When was that?

15   A.  The first time he robbed me was in mid 2000s.

16   Q.  Where did that take place?

17   A.  On the -- in Newburgh on the corner of Ann Street and Clark

18   Street.

19           THE COURT:  Ann and what?

20           THE WITNESS:  Clark Street.

21   Q.  Was anyone else there besides Gucci?

22   A.  Yes, sir.

23   Q.  Who was that?

24   A.  Otter.  I believe his name was Otter.

25   Q.  At that point was Gucci part of a gang?

E8D9CHR4                      Mallory - direct

1  A.  Yes, sir.

2  Q.  Was it Crips or Bloods?

3  A.  Crips.

4  Q.  What happened during the robbery?

5  A.  They both pulled guns out and they took my sneakers and

6  they took some money from me.

7  Q.  Now at that point were you working at a legitimate job or

8  were you selling drugs?

9  A.  I was working at the time actually.

10  Q.  Where were you working?

11  A.  At FedEx.

12  Q.  Do you know if he robbed other people besides you?

13          MR. DRATEL:  Objection, your Honor.

14          THE COURT:  Overruled.

15          MR. DRATEL:  Foundation.

16          THE WITNESS:  At that time?

17  Q.  No.  Actually more around 2010.  Do you know if he robbed

18  anybody else?

19  A.  Only Joker at that spot.  That's the only one I know of.

20  Q.  Let me ask you this.  Do you know if he robbed other drug

21  dealers?

22          MR. DRATEL:  Objection, your Honor.  Asked and

23  answered.  Leading.

24          THE COURT:  Overruled.

25          MR. BAUER:  I can ask it a different way, your Honor?

E8D9CHR4                          Mallory - direct

1           THE COURT:  Sure.

2   Q.  Did Gucci ever talk to you about robbing other people?

3   A.  I don't remember.

4   Q.  Did Gucci ever sell drugs to you?

5   A.  Yes.  Yes, sir.

6   Q.  How many times did Gucci sell drugs to you?

7   A.  Probably twice.

8   Q.  When did that happen?

9   A.  (No response).

10  Q.  Approximately?

11  A.  Mid 2000s.

12  Q.  What gang was he a part of, if any, at that point?

13  A.  Crips.

14  Q.  Crips?  How much did he sell you?

15  A.  I don't remember.

16  Q.  Did he tell you how he got the drugs that he sold to you?

17  A.  I don't remember.

18  Q.  Have you ever been to a dice game?

19  A.  Yes, sir.

20  Q.  Have you ever been to a dice game on the streets of

21  Newburgh?

22  A.  Yes, sir.

23  Q.  Have you ever seen L-1 or Gucci at a dice game?

24  A.  Yeah.  I seen L-1 at dice games before.

25  Q.  You've seen L-1 at a dice games?

E8D9CHR4                          Mallory - direct

1   A.  Yes, sir.

2   Q.  Do you remember any specific dice games that he was at?

3   A.  Yes, sir.

4   Q.  Where was that dice game you're thinking of?

5   A.  In front of the house where we used to sell drugs at on

6   William Street.

7   Q.  On William?

8   A.  Yes, sir.

9   Q.  Did you ever see L-1 at a dice game on Carson Avenue?

10  A.  Yes, sir.

11  Q.  Tell me what, if anything, you remember that happened at

12  that dice game.

13  A.  I don't remember nothing.

14  Q.  Was Gucci at that game as well?

15  A.  I don't remember.

16  Q.  Besides the robbery you discussed earlier in which he

17  robbed you with a gun --

18  A.  Yes, sir.

19  Q.  And besides the time you gave him the gun for the, what you

20  called the Joker situation --

21  A.  Yes, sir.

22  Q.  -- have you ever seen Gucci with a gun on any other

23  occasions?

24  A.  Yes, sir.

25  Q.  When is that?

E8D9CHR4                        Mallory - direct

1   A.  When he got caught with the little revolver he had.  And he

2   had another gun that didn't even shoot.  It was like a -- like

3   some old gun, like an antique gun, looking gun.

4   Q.  So you've seen him with a -- what you said an old antique

5   gun?

6   A.  Yes, sir.

7   Q.  When you say antique, like how old?

8   A.  Could have been from like the early 1900s.  It was like a

9   late -- or late 1800s.  It was a real old gun.

10  Q.  Where did you see him with that gun?

11  A.  I seen him on First Street with it.

12  Q.  You said you also saw him with another gun that he was

13  caught with?  Is that what you said?

14  A.  Yeah.  I seen him with a little revolver.  I seen him with

15  three actually.  I seen him with the little revolver that he

16  got caught with.  I seen him with like a big revolver, looking

17  like a .357 or something.  And then I seen him with the antique

18  gun.

19  Q.  So let me -- so we asked you about the antique gun.  The

20  .357 that you saw, that's the big gun you're talking about?

21  A.  Yes, sir.

22  Q.  Where did you see him with that gun?

23  A.  I saw him on First Street with it.

24  Q.  When was that approximately?

25  A.  Late 2000s.

E8D9CHR4                        Mallory - direct

1   Q.  Do you know if Gucci has ever served time in jail?

2   A.  Yes, sir.

3   Q.  Do you know if you saw him with the gun before or after he

4   came home from that time?

5   A.  It was after.

6   Q.  And you said there was a little gun that he was caught

7   with.  When you say he was caught with, what do you mean?

8   A.  The police -- he got caught by the police with the gun.

9   Q.  How many times had you seen him with that gun?

10  A.  Twice.

11  Q.  When he had that gun on him did you talk to him about what

12  he intended to do with that gun?

13  A.  Yeah.

14  Q.  What did he say?

15  A.  Looking for a stickup, looking for jux.

16  Q.  Looking for a stickup or what?

17  A.  Looking for a stickup.

18  Q.  What's a stickup?

19  A.  Like a robbery.

20  Q.  Did he say anything else or ask you any questions?

21  A.  No.

22  Q.  Do you know how often Gucci brought guns out on the street?

23  A.  I don't understand that question.

24  Q.  You said you seen him with guns.  And actually let's

25  talk -- you said you saw him with guns on First Street.  Was

E8D9CHR4                           Mallory - direct

1   that on the street on First Street or in the house?

2   A.  Inside the house on First Street.

3   Q.  Did you ever see him with guns on the street?

4   A.  How would I see him with guns like put like --

5   Q.  What do you mean by that?

6   A.  Him like pulling the gun out on the street?

7   Q.  Yeah.

8   A.  No.  I've never seen him do that before.

9   Q.  You responded like that was a silly request.  Why is that?

10  A.  Because people usually don't pull their guns out on the

11  street to show people.

12  Q.  So is there a way for you to know if somebody has got a gun

13  on the street?

14  A.  Most of the times you won't know if a person got a gun on

15  the street.

16  Q.  Did any of the times that you gave him crack, did he have a

17  gun on him at this time?

18  A.  I don't remember.

19  Q.  When you gave him crack where were you?

20  A.  On Lutheran.

21  Q.  On Lutheran or in a house on Lutheran?

22  A.  On Lutheran, outside.  On First Street.

23  Q.  First Street.  Again, is that in the house?

24  A.  That's inside.  Inside the house.

25  Q.  How about those times, when you gave him crack inside, did

E8D9CHR4                        Mallory - direct

1   he have a gun on him?

2   A.  On First Street, yes.

3   Q.  He did?

4   A.  Yes.

5   Q.  So when you handed him the crack, he had a gun on him?

6   A.  Yes, sir.

7   Q.  Okay.  Now just getting back to the time that Gucci was

8   caught with that gun and arrested.  How do you know about that

9   incident?

10  A.  Because I was with him.

11  Q.  Where was it?

12  A.  Where was it that it happened at, or the gun that he had?

13  Q.  Where was it that you were with him when he got arrested?

14  A.  In Newburgh.  On Broadway and Lutheran.

15  Q.  Had you seen Gucci earlier that day before he got arrested?

16  A.  Yes, sir.

17  Q.  Where did you see him?

18  A.  I saw him on Lutheran up the street from -- like Lutheran

19  and Van Ness Street.

20  Q.  When you saw him there earlier that day, did he have

21  anything with him?

22  A.  Yes, sir.

23  Q.  What did he have?

24  A.  He had a gun with him.

25  Q.  And what did he do with the gun?

E8D9CHR4                         Mallory - direct

1   A.  He put it up.

2   Q.  What does that mean, put a gun up?

3   A.  Mean he stashed it because he had to go to a drug program.

4          MR. DRATEL:  Your Honor, I didn't hear.

5   Q.  You said he stashed it because he had to go to a drug

6   program?

7   A.  Correct, sir.

8   Q.  Did you see where he stashed it?

9   A.  Yes, sir.

10  Q.  Where was that?

11  A.  By like a car, by like a tire or something.

12         THE COURT:  I'm sorry, by what?

13         THE WITNESS:  By a car.

14  Q.  Was that the same gun he eventually got caught with?

15  A.  Yes, sir.

16  Q.  So there came a time when he came back and got it?

17  A.  Yes, sir.

18  Q.  And then was that before or after the drug program?

19  A.  This was after the drug program when he came and got it

20  when he got caught with it.

21  Q.  So after he came back and got the gun where were you?

22  A.  I was on the corner.  I just got out of the restaurant

23  eating.

24         I was on the corner.  I was right there on the corner

25  right in front of the store.

E8D9CHR4                          Mallory - direct

1    Q.  Mr. Mallory why don't you try to yell a little bit.  I feel

2    like I'm trying to be loud.  Why don't you try to do the same

3    so we don't have to keep asking you to speak up, all right.

4              So you were coming out of a restaurant then what

5    happened?

6    A.  I was talking to two of my friends and Gucci was out there

7    too.  We was talking.  We were talking.  And as we were talking

8    the detective DTs drove down, was driving down the street.  So

9    Gucci went inside the store and my friends and I kept talking.

10   And they got out their cars.  And when they got out their cars

11   they started asking me and my friends our names.  And then

12   Gucci came outside the store.  They told him to come here and

13   that's when he got found with the gun.

14   Q.  You said you were with two other friends.  Who were the

15   other friends?

16   A.  Double R and Kev Gotti.

17   Q.  Double R and Kev Gotti?

18   A.  Yes, sir.

19   Q.  So you were there when Gucci -- when the cops found the gun

20   on Gucci?

21   A.  Yes, sir.

22   Q.  Did the cops find anything else on any of you during that

23   arrest?

24   A.  Yes, sir.

25   Q.  Did they find anything on you?

E8D9CHR4                          Mallory - direct

1    A.  Yes, sir.

2    Q.  What did they find?

3    A.  An empty magazine to a gun.

4    Q.  Why did you have that?

5    A.  I was holding it for somebody to bring it to them.

6    Q.  Who were you holding it for?

7    A.  My friend Yeah Yo.

8    Q.  Now before the police found that empty magazine on you did

9    you do anything?

10   A.  Yes, sir.

11   Q.  What did you do?

12   A.  Threw an orange juice bottle or a water bottle.  But not

13   towards them.  I threw it like in the air.

14   Q.  So it was a water bottle or an orange juice bottle, you

15   said?

16   A.  It was a beverage bottle.  I don't remember if it was

17   orange juice or water.

18   Q.  Mr. Mallory, I want to move on to talk about who you

19   identified as Bow Wow.  When did you meet Bow Wow?

20   A.  You said when?

21   Q.  When did you meet him?

22   A.  (No response).

23   Q.  Approximately?

24   A.  2010, late 2000s.

25   Q.  You said earlier that you saw him sell drugs, correct?

1   A.  Yes, sir.

2   Q.  Did you ever sell him drugs?

3   A.  Yes, sir.

4   Q.  Where was that that you sold him drugs?

5   A.  On William Street at –– on William and Ann Streets out of a

6   house.

7   Q.  Was that the house that you were selling with L-1?

8   A.  Yes, sir.

9   Q.  What drugs did you sell him?

10  A.  Heroin and crack.

11  Q.  Approximately how many times?

12  A.  Five to seven times.

13  Q.  Let me ask you.  When I ask you for numbers approximately

14  how many times, is that an exact number or is that an estimate?

15  A.  Estimate.

16  Q.  And does that go for the other numbers that I've asked you

17  for during your testimony?

18  A.  Yes, sir.

19  Q.  How much would you sell Bow Wow when he came to William

20  Street to buy drugs from you?

21  A.   It was always different times.  Like he'll buy like for

22  customers and go serve them.  So if he come and buy –– if he

23  comes to buy heroin, he'll buy like probably a bundle or a half

24  a bundle –– like five bags or something.  They always different

25  amounts.

1    Q.  What was the most of either heroin or crack that you sold

2    him?

3    A.  Probably a bundle of heroin and probably three grams of

4    crack.

5              MR. GOLTZER:  How many grams?

6              THE WITNESS:  Three.

7              MR. GOLTZER:  Thank you.

8    Q.  Would he always pay you for the drugs?

9    A.  No.

10   Q.  So you'd give him the drugs?

11   A.  Yes, sir.

12   Q.  Sorry.

13   A.  He'll pay me but a lot of times -- a couple of times when

14   he came by to get it, he'll get the drugs and go serve the

15   customer and then come back and pay me the money.  So yeah he

16   always paid me for the -- he always paid me.  Besides probably

17   like once or twice.

18   Q.  So he always paid you except for once or twice, you said?

19   A.  Yes, sir.

20   Q.  Have you ever seen him sell drugs?

21   A.  Yes, sir.

22   Q.  Where?  Where did you see him sell drugs?

23   A.  On Lutheran in Newburgh.

24   Q.  Anywhere else besides Lutheran?

25   A.  And Dubois Street.

1   Q.  When you saw him selling drugs was he doing that by himself

2   or with other people?

3   A.  What's considered by himself?

4   Q.  Were other people around him while he was selling drugs?

5   A.  Yes, sir.

6           MR. GOLTZER:  Objection, repetitive.

7           THE COURT:  Overruled.

8           MR. GOLTZER:  Leading.

9           THE COURT:  Overruled.

10          THE WITNESS:  Yes.  There were other people around

11  yes, sir.

12  Q.  Who were the people who were around while he was selling

13  drugs?

14  A.  People that hang out on that corner or other Ashy Bandits

15  that he hang out with.

16  Q.  So with Ashy Bandits or people hang out on the corner.  Can

17  you remember specifically some of the people who were there?

18  A.  Quick.

19          MR. GOLTZER:  Couldn't hear.  Sorry, sir.

20  Q.  Quick?

21  A.  Yes, sir.  Geo.

22          Those are the only people I can remember right now.

23  Q.  I think you testified yesterday that Quick sold drugs too,

24  correct?

25  A.  Yes, sir.

E8D9CHR4                        Mallory - direct

1   Q.  And Geo sold drugs?

2   A.  Yes, sir.

3   Q.  In the same area?

4   A.  Yes, sir.

5   Q.  Was he ever out there selling drugs while Reckless was out

6   there?

7   A.  I don't remember.

8   Q.  When he was out there selling on either Lutheran or Dubois,

9   were you out there selling as well?

10  A.  Yes, sir.

11  Q.  Did you ever do a split as you testified earlier or

12  yesterday about splits?  Did you ever do a split with Bow Wow?

13  A.  Only when he'll come and buy drugs or either go serving one

14  of his customers.  That's the only form of split I did with

15  him.

16  Q.  Did you ever see Bow Wow with Gotti?

17  A.  Yes, sir.

18  Q.  How would you characterize their relationship, Gotti and

19  Bow Wow?

20  A.  Like they were very close.  Gotti used to tell me that he

21  loved him like a brother.

22          MR. GOLTZER:  Objection.  Move to strike.

23          THE COURT:  Overruled.

24  Q.  Now you've testified that -- yesterday that Bow Wow is a

25  member of the Bloods, correct?

E8D9CHR4                          Mallory – direct

1   A.  Yes, sir.

2   Q.  And Gotti was a member of the Bloods?

3   A.  Yes, sir.

4   Q.  I think you said Gotti had status?

5   A.  Yes, sir.

6   Q.  Was there any relationship between Gotti and Bow Wow with

7   regards to the Bloods?

8   A.  Yes, sir.

9   Q.  What was that?

10          MR. GOLTZER:  Objection.  Foundation.

11          THE WITNESS:  Gotti --

12          MR. BAUER:  You've got to wait for the judge.

13          THE COURT:  Overruled.

14  Q.  Now you can answer.

15  A.  Gotti brought Bow Wow home.  I don't know how to explain

16  that.  Gotti -- Bow Wow was Blood underneath Gotti.

17  Q.  Underneath Gotti?

18  A.  Yes, sir.

19  Q.  So what does -- well yesterday you testified that you were

20  brought home under Water from East Orange, New Jersey, right?

21  A.  Correct.

22  Q.  Is that the same type of thing between Bow Wow and Gotti?

23  A.  Similar, yes.

24  Q.  Similar.

25          Did you ever see Gotti and Bow Wow sell drugs

E8D9CHR4                          Mallory - direct

1   together?

2   A.  Yes, sir.

3   Q.  Where was that?

4   A.  260 First Street.

5   Q.  What drug did you see them sell together?

6   A.  Marijuana.

7   Q.  And was that at the weed spot that you talked about

8   yesterday?

9   A.  Yes, sir.

10  Q.  In that weed spot did you ever see Bow Wow with crack?

11  A.  Yes, sir.

12  Q.  What was he doing with the crack?

13  A.  Looking at it or putting something together for a customer

14  of his.

15  Q.  Putting something together for a customer.

16          What do you mean by that?

17          MR. GOLTZER:  Objection.  Self-explanatory and

18  repetitive.

19          THE COURT:  Overruled.

20          THE WITNESS:  That means like you'll have crack and

21  you'll take a piece off and put it in the bag -- put it in the

22  bag and have it with -- waiting for a customer, like that.

23  Q.  Did you ever see him serve customers at 260 First Street --

24  crack customers at 260 First Street?

25  A.  No.

E8D9CHR4                        Mallory - direct

1    Q.  How about outside 260 First Street?

2    A.  No.

3    Q.  Did you see him answer phonecalls from customers at 260

4    First Street?

5    A.  Yes.

6    Q.  Putting aside what we keep calling the Joker incident, have

7    you ever seen Bow Wow with a gun?

8    A.  Yes.

9    Q.  Actually, you know what, I'll return to that.

10        Let me ask you this.  Putting aside the, again, the

11   Joker incident, do you know if Bow Wow has ever committed any

12   robberies?

13   A.  Yes.

14   Q.  How many robberies do you know that Bow Wow has committed?

15   A.  Only one.

16   Q.  Where did that robbery take place?

17   A.  In the hallway at 260 First Street.

18   Q.  And again is that -- is that the same weed spot we've been

19   talking about?

20   A.  Yes, sir.

21   Q.  Approximately when did that take place?

22   A.  Late 2000s.

23   Q.  Late 2000s?

24   A.  Yes, sir.

25   Q.  Did he do that robbery by himself or with other people?

1    A.  Other people.

2    Q.  And who was that?

3    A.  Kev Gotti.

4    Q.  How do you know about this robbery?

5    A.  Because I was there.

6    Q.  Can you tell the jury what happened?

7    A.  Somebody came over with E pills and him and Gotti went out

8    there and they beat the -- Gotti beat him up and they got the E

9    pills from him.  And they came back inside the apartment and us

10   three split the E pills.

11   Q.  So you said -- you said that somebody with E pills came to

12   the -- I guess the hallway of 260 First Street.  Is that what

13   you had said?

14   A.  Yes, sir.

15   Q.  Do you know how they or why they came to 260 First Street?

16   A.  To make an E pills transaction.  To sell the E pills.

17   Q.  Do you know why -- did they show up randomly?

18   A.  No.

19   Q.  Why did they come?

20   A.  Gotti called them and he came over with the E pills.

21   Q.  And then once he came over, what happened?

22   A.  They basically got the E pills from him.  They like started

23   wrestling -- they started wrestling for the E pills -- they

24   started wrestling and a tussle happened.  And they got the E

25   pills from him.

1   Q.  Were guns used?

2   A.  No, sir.

3   Q.  So you said after that robbery you split the E pills?

4   A.  Yes, sir.

5   Q.  Did you just get them or did you have to buy them from

6   them?

7   A.  No.  I got them for free.

8   Q.  How many did you get?

9   A.  Probably like no more than 40.

10  Q.  And how many were there in total that were stolen from the

11  victim?

12  A.  A little more than a hundred.  I don't know exactly how

13  many but I know it was a little bit more than a hundred.

14  Q.  Where were you in the house at the time that they got the

15  pills from the E pill victim?

16  A.  I was in the living room downstairs in the weed spot.

17  Q.  Let's move on to Reckless.  When did you first meet

18  Reckless?

19  A.  Late 2000s.

20  Q.  Who introduced you to Reckless?

21  A.  Nobody really introduced me to him.  I just knew him from

22  hanging out with my daughter's mother's cousin and I always

23  knew of him.

24  Q.  You always knew of him?

25  A.  Yeah.

1  Q.  Well the first time that you had a real conversation with

2  him, do you remember that time?

3  A.  Yeah.  I think it was on Dubois Street.

4  Q.  And what was that conversation or that meeting about?

5  A.  I was trying to find some drugs actually.  And I asked him

6  if he knew where I could get some at.  And he told me that he

7  was going to get some hisself.  So I walked with him.

8  Q.  When you say drugs what kind of drugs?

9  A.  Crack.

10 Q.  What time of day was it?

11 A.  It was early in the morning, like around 5 in the morning.

12 Q.  And where did you go with Reckless?

13 A.  To South Miller Street in Newburgh.

14 Q.  South Miller?

15 A.  Yes, sir.

16 Q.  To go see who or what?

17 A.  To go see Wil, a guy named Wil.

18 Q.  A guy named Wil?

19 A.  Yes, sir.

20 Q.  And when you went to Wil, what did you do?

21 A.  Got the crack, bought the crack.

22 Q.  Did you buy the money directly from Wil?

23 A.  Yes, sir.

24 Q.  Whose connection was Wil?  Was it yours or Reckless's?

25 A.  I knew Wil but it was Reckless's.  I wasn't dealing with

1    him until that day.

2    Q.  How much crack did you get?

3    A.  I believe like seven grams.

4    Q.  And did Reckless buy crack for himself?

5    A.  Yes, sir.

6    Q.  How much did he get?

7    A.  I don't know.

8    Q.  I'm sorry?

9    A.  I don't remember.

10   Q.  Was it more or less than you or the same?

11   A.  Probably the same.

12   Q.  And did you both go into the house to see Wil or was it --

13   or did only one of you go in?

14   A.  He came outside.

15   Q.  And did both of you transact with Wil or did one of you

16   transact with Wil for the both of you?

17   A.  Both of us.

18   Q.  Have you ever seen Reckless sell crack?

19   A.  Yes.

20   Q.  When?

21   A.  Late 2000s.

22   Q.  Where?

23   A.  City Terrace, and on Lutheran.

24   Q.  How about on Dubois Street?  Did you ever see him sell on

25   Dubois?

E8D9CHR4                          Mallory - direct

1    A.  Yes, sir.

2    Q.  And when you say you saw him selling on Dubois or City

3    Terrace or Lutheran, what did you see him doing?

4    A.  Go hand-to-hand with the customer.  Give the customer drugs

5    and take their money.

6    Q.  And what were you doing at that time on City Terrace or

7    Lutheran or Dubois?

8    A.  Selling drugs too.

9    Q.  Was anyone else out there besides the two of you?

10   A.  Yes, sir.

11   Q.  Who else?

12   A.  I don't remember the people.

13   Q.  Well did Reckless sell crack by himself or with other

14   people?

15   A.  By hisself.

16   Q.  I think I asked you yesterday about someone named Freaky.

17   Do you remember Freaky?

18   A.  Yes, sir.

19   Q.  I think you said Freaky sells crack?

20   A.  Yes, sir.

21   Q.  Have you ever seen Freaky and Reckless sell crack together?

22   A.  No.

23   Q.  Have you ever seen Reckless with a gun?

24   A.  Yes.

25   Q.  I'm sorry.  Before I move on to the guns.  Approximately

1   how many times have you seen Reckless sell crack?

2   A.  (No response).

3   Q.  If you can count.

4   A.  About four times.

5   Q.  So, I'm sorry.  I asked have you ever seen Reckless with a

6   gun?

7   A.  Yes.

8   Q.  How many times?

9   A.  Twice.

10  Q.  What would you see him doing with the gun when you saw him

11  with it?

12          MR. GREENFIELD:  Objection, your Honor.  Can we find

13  out when?

14          MR. BAUER:  That will be one of my questions, yes.

15          THE WITNESS:  I seen -- answer?

16          MR. BAUER:  Yes.

17          THE COURT:  You can answer.

18          THE WITNESS:  I seen him with it, like carrying it, he

19  showed me it was like -- like a .380 gun.  And I seen him shoot

20  in the air one time on South Miller, in front of Freaky's house

21  at a party or something.

22  Q.  All right.  You said you seen him taking it out, right?

23  You said that?

24  A.  Yes, sir.

25  Q.  You seen it on him?

E8D9CHR4                          Mallory - direct

1    A.  Yes, sir.

2    Q.  And you seen him pull it out and you saw him shoot it in

3    the air once?

4    A.  Yes, sir.

5    Q.  And I think you said, it was a .380?

6    A.  Yes, sir.

7    Q.  Have you seen him with any other guns besides the .380?

8    A.  No, sir.

9    Q.  Approximately when was this that you -- that you saw him

10   with the .380?

11   A.  Early 2010, late 2000s.

12   Q.  Did Reckless ever give guns to or share guns with other

13   people?

14   A.  I don't know.

15   Q.  You said you saw him shoot a gun before in the air?

16   A.  Yes, sir.

17   Q.  Did you say it was on South Miller?

18   A.  Yes, sir.

19   Q.  What did you see him do?

20   A.  Just shoot in the air.

21   Q.  You've got to speak up.  You saw him shoot in the air?

22   A.  Point the gun in the air and shoot it in the air.

23   Q.  What was going on at the time?

24   A.  It was like a party going on with like young teenagers.

25   Q.  It was A party going on with young teenagers?

E8D9CHR4                    Mallory – direct

1    A.  Like mid age teenagers; like 18, 19.

2    Q.  Was that near anybody's house?

3    A.  Across the street from Freaky's house.

4    Q.  Across the street from Freaky's outset.

5            Did you see what Reckless did after he shot?

6    A.  Yes, sir.

7    Q.  What did he do?

8    A.  Run in Freaky's house.

9            THE COURT:  Sidebar.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. GOLTZER:  I noticed that Juror No. 5 had been

3     dozing for a few minutes and I thought that we might just let

4     the court know so we could take a break if it's appropriate.

5          MR. NAWADAY:  We should do a break or a stretch break.

6          MR. DRATEL:  I think juror No. 10 is out.

7          THE COURT:  So we'll take a ten minute break and maybe

8     a ten minute break later.

9          MR. GOLTZER:  Because they're tired.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E8D9CHR4                        Mallory - direct

1              (In open court)

2              THE COURT:  Okay, folks, what we're going to do is

3     we're going to take a ten minute break now so we can all

4     stretch and then we'll take a ten minute break later in the

5     afternoon.  So just ten minutes.  Do not discuss the case.

6              Five after.

7              (Jury excused)

8              THE COURT:  Okay, Mr. Mallory you can step down.

9              (Recess)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

e8ndchr5                        Mallory - direct

1           (Jury present)

2                MR. BAUER:  Your Honor, may I continue?

3                THE COURT:  You may.

4      BY MR. BAUER:

5      Q.  We were talking about Reckless, Mr. Mallory.

6           Do you remember those questions that I was just asking

7      you?

8      A.  Yes, sir.

9      Q.  You said you saw him shoot a gun in the air at a party

10     across from Freaky's on South Miller, right?

11     A.  Yes, sir.

12     Q.  What, if anything, did you see him do after he did that

13     shooting?

14     A.  Run inside Freaky's house.

15     Q.  Do you know where in Freaky's house he went?

16     A.  No.

17     Q.  Were you inside Freaky's house at the time?

18     A.  Yes.

19     Q.  Did you see reckless inside the building?

20     A.  Yes.

21     Q.  Had you heard those gunshots?

22           The ones where he shot in the air?

23     A.  Yes, sir.

24     Q.  Did you see them as well?

25     A.  Yes, sir.

1   Q.  Did you ever talk to Reckless about any other shootings he

2   had done?

3   A.  Yes, sir.

4   Q.  What did Reckless tell you about any other shootings he had

5   done?

6   A.  I asked him about something.

7   Q.  What did you ask him?

8   A.  About what happened with him and somebody that I heard that

9   he shot.

10  Q.  Who is that person?

11  A.  Little Homey.

12  Q.  So you asked him what happened with Little Homey?

13  A.  Yes.

14  Q.  And what did he say?

15  A.  He didn't say anything.

16  Q.  I'm sorry?

17  A.  He didn't say anything.

18  Q.  Did he tell you if he shot Little Homey?

19  A.  No.

20  Q.  So it was just a question you had asked him?

21  A.  Yes.

22  Q.  You testified yesterday that his nickname is Reckless.  I

23  can't remember if you said if you knew any other names that he

24  goes by.

25          Do you know any?

1  A.  Prada.

2  Q.  Prada?

3  A.  Yeah.

4  Q.  Do you know what that is a reference to?

5  A.  No.

6  Q.  How would you say Reckless dressed when he was out on the

7  street?

8  A.  He dressed nice.

9  Q.  What do you mean nice?

10  A.  He would wear nice clothes and stuff.

11  Q.  When you say nice, what do you mean?  Either specific

12  brands or monetary value?  What do you mine by nice?

13  A.  Like expensive clothes, expensive sneakers and shoes and

14  stuff.

15  Q.  Besides the crack selling that you have talked about

16  earlier, do you know if Reckless ever held any legitimate jobs?

17  A.  No, I don't know.

18  Q.  Do you know if he had any other source of income to pay for

19  those clothes?

20  A.  No.

21  Q.  I just want to ask you a quick question about the person

22  you identified as Baynes yesterday.

23      I think you said Baynes was a member of Star Status,

24  correct?

25  A.  Yes, sir.

e8ndchr5                          Mallory - direct

1   Q.  Have you ever seen him with other members of Star Status?

2   A.  Baynes?

3   Q.  Baynes, yeah.

4   A.  No.

5   Q.  You said earlier that Reckless is a member of Star Status,

6   correct?

7   A.  Yes, sir.

8   Q.  Have you ever seen Baynes and Reckless together?

9   A.  No.  No.

10  Q.  Never?

11  A.  I don't -- no.

12  Q.  Let me just ask you quickly about L-1.

13          Approximately how old is L-1?

14  A.  Around 30.

15  Q.  You testified yesterday about his drug selling, right?

16  A.  Yes, sir.

17  Q.  And you sold with him on William and Ann, is that right?

18  A.  Yes, sir.

19  Q.  Do you know other houses that L-1 lived at?

20  A.  Yes, sir.

21  Q.  Where is that?

22  A.  I know like three that he stayed at actually.

23  Q.  Which ones?

24          MR. BAUER:  He knows three of them.

25  Q.  Which ones?

e8ndchr5                          Mallory - direct

1   A.   One on Washington Street, by Johnson.

2   Q.   Speak up.  Washington near Johnson?

3   A.   Johnson.  One Ann Street by Johnson, one on Chambers by

4   First.

5   Q.   Did L-1 ever live or spend time on Dubois Street?

6   A.   Yes.

7            MR. BAUER:  Your Honor, may I approach?

8            THE COURT:  You may.

9   Q.   Showing you what's been marked for identification as

10  Government Exhibit 270, can you take a look at this photograph.

11           Do you recognize the house that is in this photograph?

12  A.   Yes.

13  Q.   What is it?

14  A.   It is on Dubois Street.

15  Q.   It is a house on Dubois Street?

16  A.   Yes, sir.

17  Q.   Have you ever seen anybody either in the house or outside

18  that house?

19  A.   Can I look at it one more time?

20  Q.   Sure.

21  A.   I am not sure if that's 38 Dubois Street or not, but it

22  looks familiar.  I know that's on Dubois Street, though.

23  Q.   And 38 Dubois, you are saying it could be 38 Dubois?

24  A.   Yes, sir.

25  Q.   Why 38 Dubois?  Why are you thinking of that?

e8ndchr5                     Mallory - direct

1   A.  Because of the house that's next door to it, that peaches

2   brick colored house right there.

3   Q.  The one with the peach colored brick, is that next to 38

4   Dubois?  Is that why you're thinking of 38 Dubois?  I'm just --

5   A.  Yes, sir.

6   Q.  My question to you is, have you ever hung out outside 38

7   Dubois?

8   A.  Me?

9   Q.  Yes.

10  A.  Yes, sir.

11  Q.  Did it look something like this?

12  A.  I don't remember.  It's been years since I've seen it.

13  That's why I'm not sure.

14  Q.  When you hung out at 38 Dubois, when did you -- or who were

15  you with?

16  A.  By myself.

17  Q.  Did you ever see L-1 out there?

18  A.  Yes, sir.

19  Q.  Mr. Mallory, I would like to focus your attention on

20  December 14, 2010.

21          Do you recall what you were doing that day?

22  A.  Yes, sir.

23  Q.  Where were you?

24  A.  260 First Street.

25  Q.  What were you doing there at 260 First Street?

1   A.   What time of the day?

2   Q.   Afternoon and evening?

3   A.   Evening time I was in there drinking and smoking with my

4   friend Kev Gotti.

5   Q.   Just to refresh the jury's recollection, 260 First Street,

6   did you live there?

7   A.   Yes, sir.

8   Q.   How about Kev Gotti?

9   A.   Yes, sir.

10  Q.   He lived there as well.

11       Who else lived there besides you and Kev Gotti?

12  A.   On the second floor, my girlfriend lived there and her son

13  lived there.  On the first floor, which is the weed spot, Gotti

14  stayed there, and three Jamaican guys stayed there that sold

15  marijuana out the house.

16  Q.   They sold marijuana?

17  A.   Yes, sir.

18       MR. BAUER:  Your Honor, may I approach?

19       THE COURT:  You may.

20  Q.   Showing you what has been marked for identification as

21  Government Exhibits 268 and 269.

22       Will you look at these photographs and tell me if you

23  recognize what's depicted there?

24  A.   This is 260 First Street right here.

25  Q.   That's Government Exhibit 268 you are looking at?

e8ndchr5                         Mallory - direct

1    A.  Yes, sir.

2    Q.  OK.  And 269?

3    A.  This is the corner of First and Carpenter.

4    Q.  Looking at 260 First Street as well?

5    A.  Yes, sir.

6    Q.  That's Government Exhibit 269?

7    A.  It's two --

8    Q.  Right.  Does the house at 260 First Street look the same or

9    similar to what it looked like back in December 2010?

10   A.  What do you mean?  Like the windows and everything, too?

11   Q.  Are there any differences between what it looked like then

12   versus what it looks like in this photograph?

13   A.  Yes.

14   Q.  What are the differences?

15   A.  The windows are boarded up.

16   Q.  Is it boarded up in the photographs?

17   A.  Yes, sir.

18   Q.  They were not boarded up back in December 2010?

19   A.  No.  I forget the name of these -- the bannister is broken

20   right here, too.

21   Q.  And the bannister was not broken back in December 2010?

22   A.  No.

23   Q.  There's some graffiti on the wall.  Was the graffiti there

24   back in December of 2010?

25   A.  No.

e8ndchr5                          Mallory - direct

```
 1   Q.  So, apart from those differences, does it look
 2   substantially like what it looked like back in December of
 3   2010?
 4   A.  Yes, sir.
 5   Q.  The government offers Government Exhibits 268 and 269 into
 6   evidence.
 7            MR. GOLTZER:  No objection.
 8            MR. BUCHWALD:  No objection.
 9            THE COURT:  268 and 269 will be received.
10            (Government's Exhibits 268 and 269 received in
11   evidence)
12            MR. BAUER:  Can we show the jury, your Honor?
13            THE COURT:  You may.
14            MR. BAUER:  Pull up 268, please.
15   Q.  Mr. Mallory, you are saying that you lived on the second
16   floor, is that right?
17   A.  Yes, sir.
18   Q.  You said the weed spot is operated out of the first floor?
19   A.  Yes, sir.
20   Q.  Is that the main doorway from which you enter through the
21   steps?
22   A.  Yes, sir.
23   Q.  You said that Gotti and some Jamaicans lived in the house,
24   correct?
25   A.  Yes, sir.
```

1   Q.  Where did they live in the house?

2   A.  Meaning where did they sleep at?

3   Q.  Yeah.  Where did they sleep?

4   A.  On the basement level floor.

5   Q.  What happened on the first floor?

6   A.  He sold marijuana out the front door.

7   Q.  Can you explain to the jury how that worked, how marijuana

8   was sold out of the first floor?

9   A.  People, customers for marijuana would come to that door,

10  and they would knock on the door and the doorknob part won't be

11  there.  It would just be a hole there, and they would put the

12  money in there and the people that sell the marijuana, they'll

13  take the money and they will put the amount of marijuana that

14  they paid for through that hole in the door.

15  Q.  How often would customers be coming to the house looking

16  for marijuana?

17  A.  Like every five minutes, every ten minutes.  It depends on

18  the time of the day.

19  Q.  Back on December 14, 2010, you said you were there in the

20  evening smoking and drinking with Gotti, right?

21  A.  Yes, sir.

22  Q.  Were any of the Jamaicans there that day?

23  A.  Yes, sir.

24  Q.  Which ones or one?

25  A.  Poppy was there.

1204

1          MR. BAUER:  Your Honor, may I approach?

2          THE COURT:  You may.

3          MR. BAUER:  Showing you what has been marked for

4    identification as Government Exhibits 213 and 217, will you

5    look at these photographs.

6          Do you recognize the people in those photographs?

7    A.  Yes, sir.

8    Q.  Let's start first with 213.  Who is depicted in 213?

9    A.  This is Poppy.

10   Q.  The individual, that Jamaican individual who sold marijuana

11   out of 260 First Street?

12   A.  Yes, sir.

13   Q.  Do you know his real name?

14   A.  No, sir.

15   Q.  The government offers Government Exhibit 213.

16         MR. BUCHWALD:  No objection.

17         THE COURT:  No objection.

18         213 will be received.

19         (Government's Exhibit 213 received in evidence)

20   Q.  Looking at Government Exhibit 217, do you recognize that

21   individual?

22   A.  Yes, sir.

23   Q.  Who is it?

24   A.  Ramone.

25   Q.  Who is Ramone?

e8ndchr5                         Mallory - direct

1   A.  Ramone is another Jamaican guy that stays on 260 First

2   Street that sold marijuana.

3   Q.  To be clear, was he there on December 14, 2010?

4   A.  I don't remember.  I don't think so.

5           MR. BAUER:  OK.  The government offers Government

6   Exhibit 217.

7           THE COURT:  Any objection?

8           MR. GOLTZER:  No.

9           MR. BUCHWALD:  No objection.

10          THE COURT:  217 will be received.

11          MR. BAUER:  May we publish that, your Honor?

12          THE COURT:  You may.

13          MR. BUCHWALD:  217 was in already.

14          MR. BAUER:  Oh, sorry.

15  BY MR. BAUER:

16  Q.  So back on December 14, 2010, besides Gotti -- I'm sorry.

17  You said there were a number of Jamaicans.  Was there anybody

18  else besides Pop or Poppy who was there at the house on

19  December 14, 2010?

20  A.  Yes, sir.

21  Q.  Who was that?

22  A.  T.

23  Q.  T?

24  A.  Yes, sir.

25  Q.  Do you know T's real name?

1    A.  No, sir.

2    Q.  Do you know Ramone's real name?

3    A.  Ramone McDermott.

4    Q.  OK.  So on December 14, besides Gotti and Poppy and T, did

5    you talk to anyone else that day or that evening?

6    A.  Yes, sir.

7    Q.  Who did you talk to?

8    A.  Later on that evening, when we was downstairs, I got a

9    phone call from L-1.

10   Q.  OK.  You are going to have to speak up here.

11           When he called you on that phone, did he -- what phone

12   did you have?

13   A.  I had his son's mother's Verizon phone, Verizon flip phone,

14   black Verizon flip phone.

15   Q.  The black Verizon flip phone that belonged to his son's

16   mother?

17   A.  Yes, sir.

18   Q.  What was her name?

19   A.  Geneva.

20   Q.  Did she also work with him?

21   A.  Yes, sir.

22   Q.  In particular, you testified that L-1 sold drugs, correct?

23   A.  Yes, sir.

24   Q.  And that L-1 also carried guns?

25   A.  Yes, sir.

e8ndchr5                         Mallory - direct

Q.   Did Geneva work with him with regards to the drugs and the guns?

A.   Yes, sir.

Q.   Why did you have her phone?

A.   Because for them to keep in contact with me, whether L-1 needed his gun or if they needed me for like to make a drug sale or something or they wanted to buy drugs or something, to keep in contact with me basically.

Q.   You said if L-1 needed a gun?

A.   Yes, sir.

Q.   Did you have one of his guns at the time?

A.   Yes, sir.

Q.   Do you remember specifically what time he called you?

A.   No.  It was evening time, late evening.

Q.   When L-1 called you on the phone, what did he say in sum and substance?

A.   He said he about to send these young boys over to get the chains.

Q.   Send his young boys over to get the chains?  Is that what you said?

A.   Yes, sir.

Q.   Do you know what he met when he said the word chains?

A.   Yes, sir.

Q.   Had you heard L-1 use that term before?

A.   Yes, sir.

e8ndchr5                          Mallory - direct

1   Q.   Had you used that term before?

2   A.   Yes, sir.

3   Q.   What did you think he was referring to when he said chains?

4   A.   A gun.

5   Q.   When L-1 had used the term chains in the past, what did he

6   use it to refer to?

7   A.   Either necklace or a gun.

8   Q.   OK.   Necklace, jewelry, chain?

9   A.   Yeah.

10  Q.   Is that what you mean when you said chain?  You mean like

11  jewelry chain?

12  A.   Yes, sir.

13  Q.   Or it also means what?

14  A.   A gun.

15  Q.   When he said chains, was it chain singular or chains

16  plural?

17  A.   Chains plural.

18  Q.   Do you know how many guns he was referring to?

19  A.   Two.

20  Q.   What types of guns?

21  A.   His gun and a gun that belonged to somebody else.

22  Q.   Who did the other one belong to?

23  A.   Kev Gotti.

24  Q.   Let's talk about his gun first.

25       Do you know what kind of gun that was?

e8ndchr5                          Mallory - direct

1   A.   I'm not sure of the caliber, but I know it was a, like,

2   chrome, silver revolver gun.

3   Q.   Is that Gotti's gun or is that L-1's gun?

4   A.   That's Gotti's gun.

5   Q.   Gotti's gun was a silver revolver?

6   A.   Yes, sir.

7   Q.   How about L-1's gun?

8   A.   L-1 is a black .38.

9   Q.   Black .38, was that a revolver or something else?

10  A.   It's a revolver.

11  Q.   When you say a revolver, what do you mean?

12  A.   A gun that doesn't take a magazine.  It takes the -- it has

13  a barrel, a spinning barrel.

14  Q.   At the time that L-1 called you for the chains, did you

15  know where those guns were stored?

16  A.   Yes, sir.

17  Q.   Let's talk about his black .38 revolver first.  Where was

18  that stored at the time?

19  A.   I had it stored upstairs in the garbage outside my door.

20  Q.   When you say upstairs is that on the second floor of 260

21  First Street?

22  A.   Yes, sir.

23  Q.   When you say in the garbage, what do you mean?

24  A.   Like a pile of garbage that hasn't been brought outside to

25  the garbage can.

e8ndchr5                          Mallory - direct

1   Q.  It was hidden within that garbage?

2   A.  Like pizza boxes and, like, stuff like that.

3   Q.  You said that gun belonged to L-1?

4   A.  Yes, sir.

5   Q.  Before December 14, 2010, had you seen that gun before?

6   A.  Yes, sir.

7   Q.  How many times approximately?

8   A.  About five times.

9   Q.  Before that day, had you seen other people with that gun?

10  A.  Yes, sir.

11  Q.  Who had you seen with it?

12  A.  I seen Geneva with it.  I seen his brother with it.

13  Q.  You say his brother?

14  A.  L-1's brother Supreme with it.

15  Q.  L-1's brother named Supreme?

16  A.  Yes, sir, I seen a girl named Christy with it.

17  Q.  A girl named Christy?

18  A.  Christy, yeah.

19  Q.  Who is Christy?

20  A.  It's a girl that he used to sell heroin to that used to

21  drive him around Newburgh.

22  Q.  Where had you seen Christy with it?

23  A.  260 First Street.

24  Q.  Why did she have the gun with her?

25  A.  She was bringing it to L-1.

e8ndchr5                              Mallory - direct

1  Q.  And L-1 was at 260 First at the time?

2  A.  No.

3  Q.  So Christy had it in 260 First Street?

4  A.  Yes, sir.

5  Q.  Was she picking it up from you?

6  A.  Yes, sir.

7  Q.  And she was going to bring it to L-1?

8  A.  Yes, sir.

9  Q.  Have you ever held that gun before December 14?

10 A.  Yes, sir.

11 Q.  What were you doing with it?

12 A.  Either bringing it to him or moving it around from area to

13 area.

14 Q.  How did that gun find its way to 260 First Street on that

15 day, December 14, 2010?  Do you remember?

16 A.  Yes, sir.  It was there before that day.  It was there

17 like, probably like days before L-1 brought it there, and I was

18 keeping it there.  Me and Kev Gotti was keeping it there

19 actually.

20 Q.  I'm sorry?

21 A.  I said me and Kev Gotti was keeping it there.

22 Q.  Were you there when L-1 brought it?

23 A.  Yes, sir.

24 Q.  And what did you guys do it when he brought it?

25 A.  Brought it downstairs to the first-level apartment.

e8ndchr5                          Mallory - direct

1   Q.  On the first floor?

2   A.  Yes, sir.

3   Q.  Then at some point you moved it up to the second floor?

4   A.  Yes, sir.

5   Q.  Just to be clear, who was the one who brought it upstairs

6   to the second floor?

7   A.  I brought it upstairs to the second floor.

8   Q.  Did L-1 explain why he wanted his gun kept at 260 First

9   Street?

10  A.  Repeat that again.

11  Q.  As far as you know, why did L-1 want his gun at 260 First

12  Street?

13  A.  Oh, for protection.

14  Q.  What do you mean?

15  A.  He sold drugs like right around the corner there.  He hung

16  out not too far from there, so he always used to like to keep a

17  gun by where he was at for his protection.

18  Q.  Let's talk about the other gun, the silver gun.

19          You said it was a revolver as well?

20  A.  Yes, sir.

21  Q.  It belonged to Gotti?

22  A.  Yes, sir.

23  Q.  How did that gun find its way to 260 First Street that day?

24  A.  When I got --

25          MR. GOLTZER:  Objection, foundation.

e8ndchr5                          Mallory - direct

1          THE COURT:  Overruled.

2   A.  When I got that call from L-1, I told Gotti.  Gotti called

3   his son's mother's little brother, and he brought it around the

4   corner from her house.

5   Q.  So he called his child's mother's brother?

6   A.  Yes, sir.

7   Q.  And that man, the brother, brought the gun over to the

8   house?

9   A.  Yes, sir.

10  Q.  When he brought it over to the house, what, if anything,

11  was it in?

12  A.  It was wrapped up in like a T-shirt, like tied up in a

13  T-shirt.

14  Q.  You said you got the call from L-1, and then you told Gotti

15  about the call?  What did you tell him in sum and substance?

16  A.  I told him that somebody -- I told him that a couple of

17  people about to come over and get the guns.

18  Q.  Did Gotti have a gun at the time?  I mean, did Gotti have a

19  phone at the time?

20  A.  No.

21  Q.  You said that you had Geneva's phone?

22  A.  Yes, sir.

23  Q.  Had you borrowed Geneva's phone in the past?

24  A.  Yes, sir.

25  Q.  How many of Geneva's phones had you borrowed in the past?

e8ndchr5                        Mallory - direct

1   A.  Two.  She had two phones.

2   Q.  And you borrowed both of them at one time or another?

3   A.  Yes, sir.

4   Q.  You talked about this one was a flip phone, correct?

5   A.  Yes, sir.

6   Q.  It was able to receive voice calls?

7   A.  Yes, sir.

8   Q.  Can you also text message on it?

9   A.  Yes, sir.

10  Q.  How about the other phone, the other phone you borrowed

11  from Geneva?

12  A.  On the other phone, I couldn't like dial out.  I couldn't

13  make phone calls or receive phone calls.  I could only send

14  text messages, receive and send text messages.

15  Q.  Getting back to Gotti's gun, how long did Gotti have the

16  gun for?

17  A.  Not long.  About a week or two, a week.

18  Q.  Had you seen him with that gun in any other occasion?

19  A.  Yes, sir.

20  Q.  How many times?

21  A.  Probably twice.

22  Q.  Twice?

23  A.  Twice.

24  Q.  Had you seen anybody else with that gun?

25  A.  Yes, sir.

e8ndchr5                          Mallory - direct

```
 1   Q.  Who?

 2   A.  Bow Wow.

 3   Q.  Anybody else besides Bow Wow?

 4   A.  Shablackie.

 5   Q.  Somebody named Shablackie?

 6   A.  Yes, sir.

 7   Q.  Who is Shablackie?

 8   A.  He is somebody that's and Ashy Bandit that is from

 9   Newburgh.

10   Q.  An Ashy Bandit from Newburgh?

11   A.  Yes, sir, yeah.

12   Q.  As far as Bow Wow, when did you see Bow Wow with that gun

13   before December 14?

14   A.  Gotti gave it to him and Gotti was waiting for him to bring

15   it back.  I was there when he brought the gun back.

16   Q.  You were there when he brought it back?

17   A.  Yes, sir.

18   Q.  What specifically did you see Gotti and Bow Wow do?

19   A.  I seen Bow Wow take the gun out and give it to Gotti, and

20   they was talking about something.

21   Q.  They were, excuse me?

22   A.  They were talking about something.

23   Q.  Do you know what they were talking about?

24   A.  I'm not sure.

25   Q.  Had you ever seen L-1 with that gun?
```

e8ndchr5                          Mallory - direct

1    A.  No.

2    Q.  Did L-1 know that Gotti had that gun?

3    A.  Yes.

4    Q.  How do you know that L-1 knew that Gotti had that gun?

5    A.  Because I was with L-1 and Gotti one time and Gotti had

6    that gun.  He was showing it to us when he first got it.

7    Q.  Did Gotti say why he had that gun?

8    A.  Yes, sir.

9    Q.  What did he say?

10   A.  That he was having problems with some Jamaicans and that he

11   didn't feel safe at 260 -- at that weed spot without his gun or

12   close to a gun.

13   Q.  You said that the gun was at his child's mother's house.

14          Had you ever sign the gone at 260 First Street?

15   A.  Yes, sir.

16   Q.  Where did he store it when it was there?

17   A.  In the kitchen in the cabinet or downstairs in the closet.

18   Q.  All right.  Getting back to L-1 and his phone call, you

19   said that he was sending young boys over, is that right?

20   A.  Yes, sir.

21   Q.  At the time that he made that phone call, did you know who

22   specifically he was referring to?

23   A.  No.

24   Q.  Had he ever sent anyone to pick up guns at your house

25   before?

1   A.  Yes.

2   Q.  Who had he sent?

3   A.  Geneva and Christy.

4   Q.  Geneva and Christy?

5   A.  Yes, sir.

6   Q.  Had he ever sent hit young boys over to the house to pick

7   up guns before?

8   A.  I don't remember.

9   Q.  Now, after you got the call from L-1 and you told Gotti

10  about it, what else, if anything, did you do?

11  A.  I went upstairs to go get the other gun.

12  Q.  The other gun, that's the black revolver that was stored

13  upstairs?

14  A.  Yes, sir.

15  Q.  After you got that gun, what did you do?

16  A.  Continued drinking.

17  Q.  On the second floor or on the first floor?

18  A.  The first floor.

19  Q.  Was the gun loaded at that time?

20  A.  I didn't check.

21  Q.  In the past when you had held the gun, was it loaded?

22  A.  Yes, sir.

23  Q.  At some point after L-1's call, did anyone come over to

24  pick up the guns?

25  A.  Yes, sir.

1    Q.  How long after L-1's call did somebody or did people come

2    over?

3    A.  No longer than a half an hour.

4    Q.  Who was it who came over to pick up the guns?

5         MR. GOLTZER:  Objection to the form of the question.

6    A.  Bow Wow --

7         MR. GOLTZER:  It assumes facts not in evidence, as far

8    as what they came for or didn't come for.

9         THE COURT:  Overruled.

10   Q.  You can answer.  Who came over to pick up those guns,

11   Mr. Mallory?

12   A.  Bow Wow and Gucci.

13   Q.  At that time, did you know Bow Wow and Gucci?

14   A.  Yes, sir.

15   Q.  Had you interacted with them before?

16   A.  Yes, sir.

17   Q.  You just said Bow Wow had come over with that gun just a

18   couple of or sometime in that week before?

19   A.  Yes, sir.

20   Q.  Did they come inside the house?

21   A.  Yes, sir.

22   Q.  Did they walk up those front steps to the first floor?

23   A.  Yes, sir.

24   Q.  After they entered, what happened?

25   A.  I gave the gun to Gucci and Bow Wow -- I mean, Reck --

1    Gotti gave the gun to Bow Wow.

2    Q.  So you gave a gun to Gucci and Gotti gave a gun to Bow Wow?

3    A.  Yes, sir.

4    Q.  Well, let's just take a step back.

5            When they walked in the house, was there any

6    conversation among the four of you, you, Gotti, Bow Wow and

7    Gucci, about the guns?

8    A.  Yes, sir.

9    Q.  What was that conversation in sum and substance?

10   A.  Gotti was telling me that -- I asked Gucci what gun he

11   wanted.  Gucci said it didn't matter.  Gotti said that nobody

12   is going to get his gun unless they his drop, so I gave Gucci

13   the black gun, Gotti gave Bow Wow the silver gun.

14   Q.  You said Gotti said that he was only going to give his gun

15   to his drop?  Is that the word you used?

16   A.  Yes, sir.

17   Q.  What does that mean?  What is a drop?

18   A.  That means that somebody that's a Blood that's underneath

19   you.

20   Q.  That is he underneath him?

21   A.  Not underneath him, littler than him.  Like, a person

22   that -- I can't explain it.  Under -- -- the person that

23   brought, the person that he brought Blood, he turned Blood.

24   Q.  The person that he brought Blood?  Is that what you are

25   defining as a drop.

1220

1   A.  Brought blood, yeah.

2   Q.  And you testified earlier that Gotti had brought Bow Wow as

3   a Blood, is that right?

4   A.  Yes, sir.

5   Q.  So when he said nobody but my drop is going get my gun,

6   what did you take that to mean?

7   A.  That Gucci wasn't getting his gun.

8   Q.  Is that why you gave -- you gave Gucci the gun you had?

9   A.  Yes, sir.

10   Q.  Where were you in the house when you give Gucci the gun?

11   A.  By the door.

12   Q.  So on the first floor?

13   A.  Yes, sir.

14   Q.  After you gave Gucci that gun, what, if anything, happened?

15   A.  They went downstairs.

16   Q.  Who's they?

17   A.  Gotti, Bow Wow and Gucci.

18   Q.  That's downstairs to the basement level?

19   A.  Yes, sir.

20   Q.  That's where you had said earlier, that's where Gotti and

21   the Jamaicans had slept?

22   A.  Yes, sir.

23   Q.  I'm sorry.  When you gave Gucci the gun, just to be clear,

24   this is the black revolver?

25   A.  Yes, sir.

e8ndchr5                           Mallory - direct

1   Q.   What did he do with it?

2   A.   Put it on -- put it away on himself.

3   Q.   On himself, OK.

4          So the three of them went downstairs.  Did you go

5   downstairs?

6   A.   No, sir.

7   Q.   How long were they downstairs for approximately?

8   A.   Minutes.

9   Q.   Minutes?

10  A.   Yes, sir.

11  Q.   Did they eventually come back up to the first floor?

12  A.   Yes, sir.

13  Q.   What, if anything, did you observe when they came up?

14  A.   Them tucking the guns away.

15  Q.   I'm sorry?

16  A.   Them talking the guns away, Bow Wow and Gucci.

17  Q.   When you say tucking their guns away, what do you mean?

18  A.   Concealing them, putting it on their waistbands.

19  Q.   Putting on their waistband?

20  A.   Yeah.

21  Q.   Did you actually see the guns on their waistbands?

22  A.   Yes, sir.

23  Q.   Did you see Gucci with the black revolver on his waistband?

24  A.   Yes, sir.

25  Q.   Did you see Bow Wow with the silver revolver on his

1    waistband?

2    A.   Yes.

3    Q.   After you saw them adjusting the guns on their waistbands,

     what happened?

4    

5    A.   They left.

6    Q.   They left?

7    A.   Yes, sir.

8    Q.   Did either Bow Wow or Gucci say why they needed the guns?

9    A.   I don't remember.

10   Q.   Did L-1 say when he called why they needed the guns?

11   A.   I don't remember.

12   Q.   What did you think as to why they needed the guns?

13          MR. GOLTZER:  Objection.

14          THE COURT:  Sustained.

15   Q.   Did you have any idea?

16          MR. GOLTZER:  Objection.

17   A.   Yes, sir.

18          THE COURT:  Sustained.

19   Q.   Did you have any knowledge --

20          MR. GOLTZER:  Objection.  Leading.

21          THE COURT:  Overruled.

22   Q.   Did you have any knowledge as to why they wanted the guns?

23   A.   No, sir.

24   Q.   Back on December 14, did you and Gotti talk about why they

25   needed the guns?

e8ndchr5                          Mallory - direct

1           MR. GOLTZER:  Objection.  Repetitive.

2           THE COURT:  Overruled.

3   Q.  I asked you about Gucci and L-1.  Now I'm asking you about

4   Gotti.  Did you and Gotti talk about why Bow Wow and Gucci and

5   L-1 needed the guns?

6   A.  He just thought they was --

7           MR. DRATEL:  Objection, your Honor.  Speculation.

8           MR. BAUER:  You have to let him answer.

9           THE COURT:  Sustained.

10           MR. BAUER:  He has to answer the question.

11           MR. GOLTZER:  No, he doesn't.  Most respectfully the

12   objection has been sustained.

13           THE COURT:  The objection is sustained.

14           MR. BAUER:  Can I have a readback of the question,

15   please.

16           MR. GOLTZER:  Object that.

17           THE COURT:  It was a yes-or-no question and he started

18   to enter into a narrative.  The objection is sustained.

19           MR. BAUER:  I just want know where I need to pick back

20   up.

21           THE COURT:  OK.  You can read the question back,

22   Mr. Mauro.

23           (Record read)

24   BY MR. BAUER:

25   Q.  That was a yes-or-no question.  So, yes or no, did you and

e8ndchr5                          Mallory – direct

1    Gotti talk about, talk about why they all needed the guns?

2    A.  Yes.

3    Q.  What did you say?

4           MR. GOLTZER:  Objection.

5           THE COURT:  Sustained.

6           MR. GOLTZER:  It calls for hearsay.

7    A.  That they was on --

8           THE COURT:  Sustained.

9           MR. BAUER:  I'm asking what Mr. Mallory said.  The

10   objection is sustained?

11          THE COURT:  Yes.

12          MR. BAUER:  May I have a brief sidebar, your Honor?

13          THE COURT:  Sure.

14        (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

 1

 2              (At sidebar)

 3              MR. BAUER:  I am just not clear why I can't ask this

 4      question.

 5              THE COURT:  He said he had no knowledge about why they

 6      needed the guns.  So anything that he has to say would be pure

 7      speculation based on his testimony.

 8              He was asked whether he had knowledge and he said no,

 9      correct.

10              MS. STAFFORD:  Yes.

11              MR. GOLTZER:  Then he was about to bring out what

12      Gotti thought, and that is totally irrelevant, immaterial, and

13      improper hearsay and the like.  So to the extent that he's

14      asking a question to bring that out, there's no reason to do it

15      that's not prejudicial to the defense.

16              MR. BAUER:  Two things.

17              First of all, these are coconspirators talking, so it

18      is a hearsay exception.  Whether it's for the truth or not,

19      it's a hearsay exception.

20              Number two, I am fine with passing this so long as you

21      don't come here in the sidebar in five minutes and say that his

22      statements aren't trustworthy.  Because this is the very

23      subject of what he and Burden talk about.

24              MR. GOLTZER:  I am not bargaining with you.  They are

25      totally untrustworthy.  You have already demonstrated that to

1    the Court, and we hope he will reconsider his ruling.

2              MR. BAUER:  OK.  I will address you then.

3              MR. GOLTZER:  And I won't cut you off.

4              MR. BAUER:  First of all, I think it is a hearsay

5    exception.  I think it's still permissible.  Second of all --

6              THE COURT:  Just because there is a hearsay exception

7    doesn't mean that something is relevant.  The testimony that

8    you were about to elicit based on his prior testimony was pure

9    speculation.  Whether he is talking to a coconspirator or to

10   anyone else, the fact that he is wondering why they need those

11   guns is improper.

12             MR. BAUER:  All right.  My objection is noted, but on

13   a second point, as to the trustworthiness of his testimony here

14   today with regard to the admissibility of the video, in the

15   video, they have this conversation.  In the video they talk

16   about how they thought it was for a robbery.  The fact that I

17   can't go any further on this, I just don't want to undermine my

18   later argument about the trustworthiness of the video.

19             THE COURT:  Again, my recollection means nothing in

20   this regard, but my recollection of what the transcript says is

21   that there did not appear to be any speculation as to why they

22   needed the guns.  And this testimony has come out I think

23   slightly different from what I expected in any event as to what

24   he would say.

25             MR. BAUER:  Which part?

1          THE COURT:  That he had no knowledge about what they

2     needed the guns for.

3          MR. GOLTZER:  That is a separate issue, but it might

4     militate against letting that in.

5          Perhaps we will get a chance to address it at the

6     break.

7          THE COURT:  It hasn't been an hour yet.

8          MR. BAUER:  OK.  I will address the second point I

9     guess when we come back here.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2   Q.   Mr. Mallory, when Bow Wow came over to the house that day,

3   December 14, what was he wearing?

4   A.   He had a red and black Champion hoody.

5   Q.   A red and black champion hoody.  How about Gucci?  What was

6   he wearing?

7   A.   Gucci had --

8   Q.   I'm sorry?

9   A.   Gucci had a black leather jacket on with a gray scarf.

10  Q.   Had you seen Bow Wow in that sweatshirt before?

11  A.   Yes, sir.

12  Q.   How seen Gucci in that outfit, the jacket and the scarf

13  before?

14  A.   Yes, sir.

15  Q.   Mr. Mallory, did you see Bow Wow or Gucci for the rest of

16  that day, December 14, 2010?

17  A.   No, sir.

18  Q.   What did you do after they left the house?

19  A.   I went upstairs and went to sleep.

20  Q.   Where were you during the early morning hours just after it

21  turned midnight on December 15, 2010?

22  A.   Asleep.

23  Q.   How about later that day, December 15, 2010, did you see

24  Bow Wow and Gucci again?

25  A.   No.

1   Q.  I will ask you one at a time.  Did you see Gucci that day,

2   December 15, 2010?

3   A.  Yes, sir.

4   Q.  Where was it that you saw him?

5   A.  Upstairs, 260 First Street, in my apartment.

6   Q.  At your apartment?

7   A.  Yes, sir.

8   Q.  Approximately what time of day?

9   A.  It was after midnight.

10  Q.  After midnight?

11  A.  Before 6, between those, between --

12  Q.  I'm sorry?

13  A.  It was after midnight.

14  Q.  After midnight.  Just to be technical about it, after

15  midnight, which turned into December 16, 2010?

16  A.  Yes, sir.

17  Q.  And when he came to your house, what, if anything, did he

18  say?

19  A.  Did I hear about what happened the day before.

20  Q.  Well, when he came there, did he bring anything with him?

21  A.  Yes, sir.

22  Q.  What did he bring with him?

23  A.  Beer.

24  Q.  Did he bring anything else besides beer?

25  A.  A gun.

1   Q.  A gun?

2   A.  Yes, sir.

3   Q.  Which gun?

4   A.  The gun that I gave to him.

5   Q.  The same gun you had given to him?  You have to speak up.

6   A.  Yes, sir, the same gun that I gave to him.

7   Q.  Did he say anything about that gun?

8   A.  I don't understand.

9   Q.  Did he say what he was looking to do with that gun?

10  A.  Yes, sir.

11  Q.  What was he looking to do with it?

12  A.  He was looking for L-1.

13  Q.  Why was that?

14  A.  To give it back to him.

15  Q.  To give the gun back to him?

16  A.  Yes, sir.

17  Q.  Did he try to give the gun back to you?

18  A.  Yes, sir.

19  Q.  Did you take it?

20  A.  No, sir.

21  Q.  So you said he asked you if you had heard what happened, is

22  that right?

23  A.  Yes, sir.

24  Q.  While you were talking, what, if anything, was he doing

25  with the gun?

e8ndchr5                         Mallory - direct

1    A.  Playing with the revolver part, like spinning it.

2    Q.  He was spinning it?

3    A.  Yes, sir.

4    Q.  Could you tell if there were bullets in there?

5    A.  It was empty, sir.

6    Q.  It was empty?

7    A.  Yes.

8    Q.  So when he asked you if you had heard what happened, what

9    did you say?

10   A.  I said yeah.

11   Q.  Then did Gucci explain what happened?

12   A.  Yes.

13   Q.  What did Gucci tell you about what happened?

14   A.  Somebody that they robbed, that they robbed a spot on

15   Chambers Street and shots was fired.

16   Q.  He told you that --

17   A.  A shooting.

18   Q.  Sorry?

19   A.  That there was shooting down there.

20   Q.  So he told you that they robbed a spot on Chambers Street

21   and shots were fired?

22   A.  Yes, sir.

23   Q.  Did he say who "they" were?

24   A.  I don't remember.

25   Q.  Let me ask you this.  When he said "they," did that include

e8ndchr5                          Mallory – direct

1    him?

2    A.  Yes, sir.

3    Q.  Did he list other people who he was with?

4           MR. GOLTZER:  Objection.  Repetitive.

5           THE COURT:  Overruled.

6           MR. GOLTZER:  Asked and answered.

7           THE COURT:  Overruled.

8    Q.  Did he list who else he was with?

9    A.  Yes.

10   Q.  Who did he say?

11          MR. GOLTZER:  Objection.  Hearsay.

12          THE COURT:  Overruled.

13   A.  Bow Wow, Baby E, Baynes -- Bow Wow, Baby E, Baines,

14   Reckless, Bash and Bow Wow.

15   Q.  I think you said Bow Wow twice.  I think you named Gucci

16   and five other people?

17   A.  Gucci, Reckless, Bow Wow, Bash, Baby E, Baynes.

18   Q.  A total of six people?

19   A.  Yes, sir.

20   Q.  He said they robbed a spot on Chambers.  Did he say where

21   on Chambers?

22   A.  No, sir.

23   Q.  When he said a spot, did he say what kind of spot?

24   A.  Yes, sir.

25   Q.  What kind of spot?

e8ndchr5                              Mallory - direct

1    A.   Somewhere that they sold drugs at.

2    Q.   Did he say if he had a gun with him?

3    A.   Yes, sir.

4    Q.   What did he say?

5    A.   They went down there and they pulled the guns out and they

6    got into a fight and shots was fired.

7    Q.   Who did he say had guns?

8              MR. GOLTZER:   Objection.

9    A.   Everybody that was there.

10             THE COURT:   The objection is overruled.

11   Q.   Who did he say had guns?

12   A.   Everyone that was there.

13   Q.   He said everyone had guns?

14   A.   That he went with.

15   Q.   And he said that a fight broke out?

16   A.   Yes, sir.

17   Q.   Did he say how or why the fight broke out?

18   A.   Yes, sir.

19   Q.   What did he say?

20   A.   That they didn't respect them, that they didn't respect the

21   handle, meaning like they didn't believe that they would use

22   the guns basically.

23   Q.   And when he said they didn't respect, who was he referring

24   to?

25   A.   The people, the guys that they were robbing.

1   Q.  Did he say if those people, the victims of this robbery had

2   guns?

3   A.  I don't remember.

4   Q.  Did he say if they had, if they ever had a gun at any point

5   during the robbery?

6   A.  Somebody lost their gun down there.

7   Q.  He said that somebody lost their gun?

8   A.  Yes, sir.

9   Q.  Did he say who lost their gun?

10  A.  No.

11  Q.  Did he say there were shots fired?

12  A.  Yes, sir.

13  Q.  Did he say if anybody got shot?

14  A.  Did Gucci say that?

15  Q.  Did Gucci say if anyone got shot?

16  A.  Yes, sir.

17  Q.  He said someone, he said people got shot?

18  A.  Yes.

19  Q.  Who did he say got shot?

20  A.  He said Joker got shot.

21  Q.  Did he say anything else about the shooting of Joker?

22  A.  That he died, I heard that he died.

23  Q.  Did he say where Joker was when he was shot?

24  A.  Behind the door or something.

25  Q.  Did he say if anybody else was injured?

e8ndchr5                          Mallory – direct

1   A.  No.

2   Q.  To be clear, I'm not asking necessarily about gunshots.

3   Was anybody injured at all during the --

4   A.  Baynes either got stabbed or shot.  I'm not sure which one.

5   Q.  Did Gucci say whether they got anything in the robbery?

6   A.  No, he never told me that.

7   Q.  Did he say what they did once the robbery ended, once they

8   got out?

9   A.  They ran.

10  Q.  Where did they run?

11  A.  They ran up a block.  He went separate from them.  He went

12  home.  He lived up the street.

13  Q.  Up the street.  Up what street?

14  A.  Lander Street.

15  Q.  Did Gucci mention that Joker shooting on any other

16  occasions after that?

17  A.  Yes, sir.

18  Q.  How so?

19  A.  Like basically saying that he like, like, like, saying that

20  his gun busts.  You know, he didn't say that -- he didn't talk

21  about that when he talked about that.  He was always talking

22  about how he shoot this gun, but he wasn't saying that, he

23  didn't talk about the Joker, like --

24          MR. DRATEL:  Your Honor, I can't hear.

25          THE COURT:  I'm sorry.  Could you repeat that,

e8ndchr5                          Mallory - direct

1  Mr. Mallory.

2  A.  Could you repeat the question one more time, please.

3  Q.  The question was, how did he talk about the Joker shooting

4  after that night?

5  A.  Basically he just said that, he just used to say that he

6  shoots his gun.

7  Q.  He shoots his gun?

8  A.  Yeah.

9  Q.  I believe you said earlier he used the term my gun bust?

10  A.  Yes, sir.

11  Q.  What does that mean?

12  A.  It means he shoots his gun, and he's quick to shoot his

13  gun.

14  Q.  How did you take that when he would say things like my gun

15  bust?

16  A.  I didn't like it.

17  Q.  Why not?

18  A.  Because the situation that I was put in.

19  Q.  What do you mean?  What situation?

20  A.  Joker was friends with my Uncle Flip.  So when I hear him

21  talk about stuff like that, it kind of bothered me, because,

22  for one, I didn't know nothing about that somebody was going to

23  die when I gave him that gun.  And, two, I didn't really know a

24  lot about what they was going to do.  So when I heard, when I

25  used to hear him talk like that, it kind of offended me because

e8ndchr5                          Mallory - direct

1   I knew I was in the situation because I was getting questioned

2   about it.

3   Q.  And were you questioned?

4   A.  Yes, sir.

5   Q.  Questioned by the police I mean?

6   A.  Yes, sir.

7   Q.  When you were questioned by the police, did you tell them

8   the truth?

9   A.  No, sir.

10  Q.  Did you tell them that you had given the guns to Bow Wow

11  and Gucci?

12  A.  No, sir.

13  Q.  How many times were you questioned?

14  A.  About four to five times.

15  Q.  Did you ever tell Gucci that you had been questioned?

16  A.  Yes, sir.

17  Q.  Did you ever tell Gucci that Joker was friends with your

18  uncle I believe?

19  A.  I don't remember.

20  Q.  What happened during the conversation where you told him

21  that you had been questioned?

22  A.  He didn't really say too much.  I know that he told some

23  people that he hung with around that I was going to end up

24  telling if anybody got caught, if I ever caught for it.

25  Q.  That if you ever got caught you would be telling?

1    A.  Yes, sir.

2    Q.  Did you ever fight with Gucci?

3    A.  We argued --

4    Q.  What was the argument over?

5    A.  -- it never led to us fighting.

6            I forget.

7    Q.  Was it related to this, the Joker incident?

8    A.  We had an incident over that?

9    Q.  Yes.

10   A.  Yes.

11   Q.  You just said before that you didn't know that someone was

12   going to get killed when you gave the guns, is that right?

13   A.  Yes, sir.

14   Q.  I think you said that you didn't know much in terms of what

15   they were going to do with the guns, right?

16   A.  Yes, sir.

17   Q.  Did you know anything about what they were going to do with

18   the guns?

19   A.  No, sir.

20   Q.  I am going to move on to Bow Wow.

21           Did you ever see Bow Wow after that night that you

22   gave him the guns?

23   A.  Yes, sir.

24   Q.  Where?

25   A.  260 First Street.

1    Q.  How long after that night?

2    A.  Probably a day or two.

3    Q.  And who was there when he came there?

4    A.  Me, Kev Gotti, and I think Shablackie was there.

5    Q.  And Shablackie?

6    A.  Yes, sir.

7    Q.  When he came, did he have anything with him?

8    A.  Yes, sir.

9    Q.  What did he have with him?

10   A.  He had his gun.

11   Q.  You say the gun.  What gun are you referring to?

12   A.  He had that silver gun.

13   Q.  The gun that Gotti gave him?

14   A.  Yes, sir.

15   Q.  And what, if anything, did he say about that gun?

16   A.  He was complaining to Gotti, telling him that it didn't

17   shoot, that the pin was broken or something, it didn't shoot.

18   Q.  You have to speak up.

19   A.  He was telling Gotti that the gun didn't shoot.

20   Q.  Let me stop you here for a second.

21       You said that you had seen him one other time with

22   that gun, right?

23   A.  Yes, sir.

24   Q.  That was sometime in the week before you gave him the gun?

25   A.  Yes, sir.

e8ndchr5                        Mallory - direct

1   Q.  On that occasion, it was at 260 First Street as well,

2   correct?

3   A.  Yes, sir.

4   Q.  On that occasion, what was he doing with the gun?

5   A.  He was giving the gun back to Gotti.

6   Q.  To Gotti?

7   A.  Yes, sir.

8   Q.  What, if anything, did he say to Gotti then?

9   A.  As a matter of fact, he was complaining that the gun didn't

10  work then, saying that the gun didn't shoot, and Gotti told him

11  to put the gun into his hands and shoot it out the window.

12  Q.  He was complaining about the gun not working that time as

13  well?

14  A.  Yes, sir.

15  Q.  Did he complain both times?

16  A.  No, just that one time right there.

17  Q.  Was the incident, as far as you remember, before you gave

18  him the guns or after the guns as far as you can remember?

19  A.  Before, before.

20  Q.  Are you sure or are you guessing?

21          MR. GOLTZER:  Objection, your Honor.

22          THE COURT:  Overruled.

23          MR. GOLTZER:  He's leading the witness, suggesting an

24  answer.

25          THE COURT:  Overruled.

1   A.  It was before.

2   Q.  OK.  So he brought the gun back on two different occasions?

3   A.  Yes, sir.

4   Q.  So let me ask you about that first time then.  What did

5   he -- he came back with the gun and said what?

6           MR. GOLTZER:  Objection.  Repetitive.  It's the third

7   time, sir.

8           THE COURT:  Overruled.

9   Q.  You can answer.

10  A.  Him and Gotti was talking about something and I heard Gotti

11  saying, My gun shoot, my gun shoot.  If it don't shoot, put it

12  in your hand and shoot it out the window.

13  Q.  That's what Gotti was saying to Bow Wow?

14  A.  Yes.

15  Q.  After Bow Wow said it wasn't working?

16  A.  Yes, sir.

17  Q.  Did Bow Wow put the gun into Gotti's hand?

18  A.  No, Gotti was telling him to put the gun into his own

19  hand --

20  Q.  Into his own hand.

21  A.  -- and shoot it out the window.

22  Q.  Did he do that?

23  A.  No, sir.

24  Q.  What did Gotti do after that?

25  A.  He put bullets in the gun and shot it out the window like

1   two times.

2   Q.  Did the gun work?

3   A.  Yes, sir.

4   Q.  You said he put bullets in the gun.  Did the gun have

5   bullets in it before he put the bullets in?

6   A.  No.

7   Q.  So it was empty?

8   A.  Yes, sir.

9   Q.  How many times did he shoot out the window?

10  A.  He shot it twice.

11  Q.  So you said a couple of days after the murder he came back

12  with the gun as well?

13  A.  Yes, sir.

14  Q.  Was that the time with Shablackie, or was the previous time

15  with Shablackie?

16  A.  The previous time was with Shablackie.

17  Q.  So when he came a couple of days after the murder, who was

18  he with when he came?

19  A.  He was by himself.

20  Q.  What did he do with the gun that time?

21  A.  He gave it to Gotti.

22  Q.  Did he say anything about the gun at that time?

23  A.  No, not that I heard.  No.

24  Q.  Did you see Bow Wow after that?

25  A.  I didn't see him, no.

1  Q.  Do you know where he was?

2  A.  I was told by a friend of his that he went down south --

3          MR. GOLTZER:  Objection to what he told.

4  Q.  You can't testify to what you were told about that.  Do you

5  know?

6  A.  Yes.

7  Q.  Where he was?

8  A.  Down south in North Carolina.

9  Q.  I'm sorry?

10  A.  Down south in North Carolina.

11          MR. GOLTZER:  Objection.  Move to strike.  Lack of

12  knowledge.

13          THE COURT:  Sustained.

14  Q.  The question was do you know --

15          MR. GOLTZER:  Move to strike.

16  A.  Yes, sir, I know.  I know when I gave the FBI people his

17  phone number to get in contact with him down in North Carolina.

18          MR. GOLTZER:  I couldn't hear.  I'm sorry.

19  Q.  You said when you gave the FBI his phone number?

20  A.  Yes, sir.

21  Q.  That phone number, what was the area code of that phone

22  number?

23  A.  I don't remember the number.

24  Q.  You don't remember it?

25  A.  No.

e8ndchr5                          Mallory - direct

1    Q.  Was it a New York phone number?

2    A.  No, it was a North Carolina phone number.

3    Q.  It was a North Carolina phone number?

4    A.  Yes, sir.

5             MR. GOLTZER:  May we have a time.

6    Q.  What year was it when you gave the FBI his phone number?

7    A.  2012 when I was working with the FBI.

8    Q.  Moving on to Reckless, did you see Reckless at all after

9    the Joker murder?

10   A.  Yes, sir.

11   Q.  Where did you see him next after December 15 or December

12   14, 2010?

13   A.  In the hallway of the apartment that I lived in.

14   Q.  260 First Street?

15   A.  Yes, sir.

16   Q.  Who was he talking to?

17   A.  To Kev Gotti.

18   Q.  And when was this with regards to the murder?

19   A.  This was either a day or two after.

20   Q.  It was a day or two after the murder?

21   A.  Yes, sir.

22   Q.  Did you hear what he was saying?

23   A.  He was coming from school and he got approached by the

24   detectives and they questioned him about the robbery or

25   whatever.

e8ndchr5                     Mallory - direct

1   Q.  What else, if anything, did he say?

2   A.  He just was, like, that he told them it there was a chance

3   that somebody could die down there.

4           THE COURT:  I'm sorry.  You need to repeat that.

5           I can't hear you.

6   A.  He told the people before they went down there was a chance

7   somebody could get shot, somebody could die down there.

8   Q.  He told the people before they went down there that

9   somebody could die?

10  A.  Yes, sir.

11  Q.  Was he one of the people that went down there?

12  A.  Yes, sir.

13  Q.  Did he say who else was involved?

14  A.  I just remember him talking about Baynes.  That's it.

15  Q.  What did he say about Baynes?

16  A.  Something about that he got arrested or -- something that

17  he got arrested, that he got arrested.

18  Q.  That Baynes got arrested.

19          Did Reckless say what happened during the robbery?

20  A.  I don't remember.

21  Q.  Let me ask you about L-1.

22          Did you ever talk to L-1 about the Joker murder?

23  A.  Yes, sir.

24  Q.  What, if anything, did you -- I'm sorry, when was that

25  conversation?

e8ndchr5                    Mallory - direct

1   A.  This was not too long after it happened.

2   Q.  What, if anything, did you talk about with L-1?

3   A.  I told him that I got questioned.

4   Q.  What -- I'm sorry.  Go ahead.

5   A.  I told him that I got questioned.  That's it.

6   Q.  What did he say, if anything?

7   A.  He was like that they bugged out, that they wowed out for

8   doing that, and he didn't send them down there to shoot nobody,

9   he just told them to go down there and rob them.

10          THE COURT:  I'm sorry, Mr. Mallory.  I can't hear what

11  you are saying.

12          THE WITNESS:  He said he didn't send them to go down

13  there and shoot anybody and that he wowed out for it.  And he

14  that he just, he said that he didn't send anybody down there to

15  get shot, to shoot anybody, and he just sent them down there to

16  rob.

17  Q.  They wowed out, they bugged out?  What does that mean?

18  A.  That they wowed out, that they made a reckless move.

19  Q.  Made a reckless move.  To be clear, you are not talking

20  about Reckless?  You are staying the word reckless?

21  A.  Yes, sir.

22          MR. BAUER:  Sidebar, your Honor, please.

23          THE COURT:  OK.

24      (Continued on next page)

25

1          (At sidebar)

2          MR. BAUER:  Judge, this is the point in time where I

3     said that we would check in about the Burden/Mallory video.

4          THE COURT:  OK.

5          MR. BAUER:  I think that everything -- I'll say

6     nothing that Mallory said was inconsistent with what was said

7     in the video, save one point, and that is the point that we

8     have talked about before your ruling and that is who gave the

9     guns, was it Mallory, was it Burden.  In fact, in the

10    transcript it's clear Mallory said that I don't remember who

11    gave the guns.  But, short of that, I think he has testified

12    very consistently with what is going to go on with the video in

13    terms of the hallmark of --

14         MR. GOLTZER:  That is absolutely false.  I am not

15    accusing you of being a liar.

16         MR. BAUER:  I am literally not done with my sentence.

17         MR. GOLTZER:  I'm sorry.  I did cut you off.

18         I apologize.

19         MR. BAUER:  You did.

20         I don't think the circumstances have changed.  In

21    fact, if anything, I think it is more clear that what Kevin

22    Burden, that is the focus here, what Kevin Burden said here was

23    trustworthy.

24         MR. GOLTZER:  Judge, it is absolutely the opposite.

25    Kevin Burden is talking about an incident where Bow Wow comes

1    back and says the gun didn't work.

2              What Burden says on the tape is Bow Wow came back from

3    a robbery that never happened, the gun didn't work.  He shot

4    the gun out the window.  What this witness has just testified

5    to under oath very clearly is that that happened two days

6    before the crime with which my client is charged, Mr. Whitaker

7    is charged.

8              Burden doesn't say anything about him coming back

9    twice.  Burden says they all came in a cab, this guy Mallory

10   says, let me refresh your recollection, it was Bow Wow on part

11   No. 1.  In No. 3, which is what they want to put in, they are

12   both talking about the time that the gun didn't work and he

13   shot it out the window, and he told him to put it to his head.

14             That's what Burden is referring to.  He's not

15   referring to the alleged second time.  I mentioned earlier that

16   in the 3500, the last piece of 3500 material for Mr. Burden --

17   not for Mr. Burden, for Mr. Mallory -- Mallory said the

18   incident happened either before or after.

19             The prosecutor brought out that it happened before.

20   So we are talking about an incident both people agree happened,

21   that this witness has sworn under oath happened two days before

22   the robbery, two days before my client got the gun.  So I don't

23   see how that is an admission against penal interest with

24   respect to this particular robbery and this particular charge.

25             MR. BAUER:  I am going to cut off a little bit here.

1   First of all, clearly it's against penal interest.  It is the

2   same gun.  Second of all, if you look at excerpt 4, Mr. Goltzer

3   is referring to changed circumstances.  It's actually exactly

4   what Mr. Mallory just said.  Kevin Burden says --

5            THE COURT:  What page?

6            MR. BAUER:  Right here.

7            "That was like a couple of days before this shit

8   happened, and I let them hold it for jux.  They came back empty

9   handed.  They said the gun ain't working.  So I said shoot that

10  shit out the window" --

11           MR. GOLTZER:  You're right.

12           MR. BAUER:  It is actually even more consistent.

13           MR. GOLTZER:  But it doesn't relate to this crime.

14  What you have represented all along was that it related to this

15  crime, that it happened afterwards.

16           That's what we had in the 3500 material.  Now we know

17  with the testimony from this witness that they are not talking

18  about the night of the crime.  Whether it's true or not I'm not

19  conceding, but they are talking about something that happened

20  two days before.  The evidence in this case is that and the

21  robbery, and what he pled to is giving them the guns for this

22  robbery, and that incident has nothing to do with this robbery.

23  That incident that has to do with the robbery that never

24  happened.  The guns weren't used in a robbery.  He says it.  It

25  is a robbery that never happened.  How does that come in as a

 1    declaration against penal interest?  I gave a man a gun.

 2              There is no evidence in the case that he knew there

 3    was a robbery that was going to happen before he gave him the

 4    gun.  What you have is a statement after the fact, I got a gun

 5    back, that never happened.  He said it didn't work, I shot it

 6    out the window.  Truth aside, it doesn't relate to this charge.

 7              Now that the second gun count is -- you know, you got

 8    in the fact that he possessed it allegedly, but to put this

 9    tape in to try to prove that he had the gun on this date as a

10    declaration against penal interest, it is not corroborated.  It

11    is quite contradicted now that we know it was two days before.

12              MR. BAUER:  Mr. Goltzer is wrong for two reasons.

13              For one, it is against penal interest.  Kevin Burns

14    has never been charged with a conspiracy to commit a robbery in

15    December 2010.  For this other robbery.  That is against penal

16    interest, pure and simple.

17              Number two, of course --

18              MR. GOLTZER:  You missed my point.

19              MR. BAUER:  Well --

20              THE COURT:  Go ahead.

21              MR. BAUER:  Of course it's relevant, just like a lot

22    of the other things we have been talking about in this case.

23    It is relevant to the background.

24              As Mr. Mallory testified, the reason why he gave

25    Tyrell Whitaker the gun is because he's his drop, because he

1    trusted him.  That goes right to that.  He's trying to parse

2    this out, your Honor, but this all part of the background.  You

3    have already ruled on this and nothing has changed.  We can

4    have this until we are blue in the face.  It is reargument.

5              MR. GOLTZER:  It is reargument, and you have to parse

6    it out.  The reargument is based on changed circumstances.

7    When we started with your offer of proof, your offer of proof

8    was that this was after the robbery, that this was the gun that

9    was used in the robbery, he brought it back, and that this

10   corroborated the fact that he gave him the gun for the December

11   '10 robbery --

12             MR. BAUER:  December 15.

13             MR. GOLTZER:  If we accept the record, that this is

14   not the case, this relates to something that happened two days

15   before.

16             This isn't what Burden pled to.  This doesn't

17   corroborate that he gave him the guns on that day.  It is

18   absolutely inconsistent with what your witness said before and

19   what you proffered before.  And I read to you what -- you said

20   in your own brief that he changed his testimony.

21             THE COURT:  Can I ask the parties a question?

22             MR. BAUER:  Sure.

23             THE COURT:  Let me ask the government.

24             Are there excerpts as to which, this issue aside, I

25   ruled that we can put to the jury, send to the jury this

e8ndchr5                      Mallory - direct

1    afternoon?  For example, I don't think there is any question

2    that 5 would come in, nor do I think there is any question that

3    1 would come in -- I'm sorry.  Not 1.  2.

4              MR. GOLTZER:  Which one is that?  I don't have it in

5    front of me, Judge.

6              THE COURT:  1 is the bloody clothes.

7              I am trying to figure out, we have 25 minutes.  Can we

8    set up the video, show them those excerpts that I am going to

9    rule are coming in, and then discuss the more controversial

10   ones after we are done for the day?

11             MR. BAUER:  I am sure we can do it, your Honor.  I

12   don't think it's necessary.  I think you have already ruled.  I

13   don't think anything has changed.

14             THE COURT:  Actually I do have some questions about

15   excerpt 1.

16             Can we do excerpts 2, 3 and 5.

17             MR. BAUER:  Sure.

18             Frankly, it may take past 5 o'clock to do all of them

19   anyway.  Why don't we do 2, 3 and 5.

20             MR. GOLTZER:  We have our record.  You ruled.

21             THE COURT:  Yes.

22             MR. GOLTZER:  On those you are sticking your ruling?

23             THE COURT:  Yes.

24             MR. GOLTZER:  On the other two you are going to get

25   some more argument?

1    THE COURT:  Yes.

2    MR. BAUER:  We have copies of 219T.  Those are all the

3    excerpts.  It's going to take a second to take out.  It's

4    stapled as one big packet.

5    MR. BUCHWALD:  What have we ended up with?

6    MR. BAUER:  2, 3 and 5.

7    (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1

 2              (In open court)

 3              THE COURT:  Ladies and gentlemen, we are going to

 4    continue on until 5 o'clock.

 5              MR. BAUER:  May I proceed, your Honor?

 6              THE COURT:  Yes.

 7    BY MR. BAUER:

 8    Q.  I asked you about conversations you had with a number of

 9    people after the Joker murder.

10              How about Gotti?  Did you ever talk to Gotti after the

11    Joker murder?

12    A.  Yes, sir.

13    Q.  As part of your testimony yesterday, you said that one of

14    the things you did as part of your cooperation was wear a wire

15    to record statements made by certain people, is that right?

16    A.  Yes, sir.

17    Q.  Did you ever record any conversations you had with Gotti?

18    A.  Yes, sir.

19    Q.  When was that?

20    A.  2012.

21    Q.  Where were you at the time when you recorded that

22    conversation?

23    A.  In the hotel.

24    Q.  Hotel where?

25    A.  In Newburgh.

e8ndchr5                     Mallory - direct

1   Q.  What were you doing in that hotel room?

2   A.  Repeat that one more time, please.

3   Q.  I'm sorry?

4   A.  Can you repeat that one more time.

5   Q.  Why were you in the hotel room?

6   A.  To talk to Gotti about the murder.

7   Q.  Were you wearing a wire on your body at the time?

8   A.  No, it wasn't on my body that time.  It was inside of a

9   clock.

10  Q.  Inside of a clock that was in the hotel room?

11  A.  Yes, sir.

12  Q.  How long were you in that hotel room for?

13  A.  About an hour and a half, two hours.

14  Q.  Was your entire conversation recorded?

15  A.  Yes, sir.

16          MR. BAUER:  Your Honor, may I approach?

17          THE COURT:  You may.

18  Q.  Mr. Mallory I'm showing you what's been marked for

19  identification as Government Exhibit 291.  Do you recognize

20  291?

21  A.  Yes, sir.

22  Q.  What is it?

23  A.  It is a DVD with my named marked on it.

24  Q.  Do you know what is on that DVD?

25  A.  Yes, sir, the recording of me and Kev Gotti.

1   Q.  Prior to your testimony today, have you viewed the contents

2   of that recording?

3   A.  Yes, sir.

4   Q.  You reviewed it with the government in preparation for your

5   testimony?

6   A.  Yes, sir.

7   Q.  Did you initial it after you saw what was on there?

8   A.  Yes, sir.

9   Q.  The government offers Government Exhibit 291 into evidence.

10          THE COURT:  Subject to previous objections, it will be

11  received.

12          (Government's Exhibit 291 received in evidence)

13  Q.  I show you what has been marked for identification as

14  Government Exhibit 291T.  Will you take a look at that.  I

15  think it's about a 12-page document.  Would you look at each

16  page briefly.

17          Do you recognize it?

18  A.  Yes, sir.

19  Q.  What is it?

20  A.  It's transcripts of the DVD.

21  Q.  Is the a transcript of the entire conversation, or is it

22  just excerpts?

23  A.  It is not the entire conversation.

24  Q.  Just excerpts?

25  A.  Yes, sir.

1    Q.  Have you seen this transcript before?

2    A.  Yes, sir.

3    Q.  Did you participate in its creation?

4    A.  Yes, sir.

5    Q.  Did you listen to the -- and watch the video and note what

6    was being said?

7    A.  Yes, sir.

8    Q.  And if there were any corrections to be made, did you make

9    them?

10   A.  Yes, sir.

11              MR. BAUER:  The government offers Government Exhibit

12   291T as an aid to the jury.

13              THE COURT:  291T will be received.

14              (Government's Exhibit 291T received in evidence)

15              MR. BAUER:  At this time the government would like to

16   play what has been marked as excerpt No. 3.  We're doing some

17   work here on copies for the jury.

18              Ms. McInerney, could you pull up excerpt 3.

19              Judge, do I have permission to hand out just excerpt 3

20   from 291T to the jury?

21              THE COURT:  Yes, you may.

22              MR. BAUER:  What I propose to do is play the video

23   while the jurors have the transcript in front of them and then

24   I'll ask Mr. Mallory some follow-up questions about that

25   excerpt.

E8d9chr6                          Mallory - direct

1            THE COURT:  Very well.  Will the jurors please just

2       let me know when everyone has a copy.

3            Does anyone not have a copy?  We have two people

4       without copies.  Or three.

5            MR. BAUER:  Just I'll note --

6            MR. BUCHWALD:  Can we have another sidebar.  Sorry.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. BUCHWALD:  Preserving all of our objections to all

3    of this as previously stated on the record.  If we're going to

4    have three and four in, then under the doctrine of completeness

5    they should hear excerpt one first because excerpt one this is

6    where Mallory is first spoonfeeding to Burden who was there.

7    This is Mallory starting.  "You remember, you remember who was

8    there.  Think about was it -- it was Bow Wow -- I'm gonna

9    refresh your memory -- it was Bow Wow."

10         MR. BAUER:  They're reading excerpt three right now.

11   Do you want to pull it away from them?

12         (In open court)

13         THE COURT:  Ladies and gentlemen, can I ask you not to

14   read what's just been given to you.

15         (At sidebar)

16         MR. BAUER:  Preserving whatever you're trying to do.

17         MR. BUCHWALD:  Thank you.  I appreciate it.

18         THE COURT:  I understand your argument, so.

19         MR. BAUER:  Sure.  We'll do one right now.

20         MR. GOLTZER:  We have a problem with each other then,

21   Mr. Buchwald and I, because there's a reference to Bow Wow and

22   I'm not aware that that's been ruled admissible yet in terms of

23   refreshing his memory because we're still up in the air as to

24   whether any part of the tape comes in.

25         Perhaps the way to do it might be not to play the tape

1    but to use the transcript as -- you know, preliminarily by

2    redacting Bow Wow's name out of it and if it comes in tomorrow

3    they can play the tape, if that works for Mr. Buchwald and the

4    Court.

5            THE COURT:  Except I don't know that we have the

6    ability.

7            MR. BAUER:  To do that in the next fifteen minutes.

8            MR. GOLTZER:  I'm not suggesting you change the tape.

9    I'm suggesting you not play the tape -- stipulate temporarily

10   the transcript come in as a substitute for the tape.

11           MR. BAUER:  It's impossible to do that right now.

12           I'd love to play excerpt one in order too.  That was

13   always the plan.

14           But, Mr. Buchwald, you can always note that excerpt

15   one happened before excerpt three.  So that your temporal

16   concern about spoonfeeding can be addressed pretty easily by

17   the fact whenever excerpt one or whatever portion of excerpt

18   one comes in.

19           MR. GOLTZER:  That seems to accommodate both of us.

20   Obviously if I get a redaction they'll do that and then they'll

21   accommodate you.

22           MR. BUCHWALD:  As a practical matter --

23           MR. GOLTZER:  It's not going to change anything.

24           THE COURT:  I think that you will be able to address

25   your concerns before the jury at the appropriate time.  So,

E8d9chr6                          Mallory – direct

1    let's do that.

 1              (In open court)

 2              MR. BAUER:  Judge, is the jury now allowed to look at

 3     excerpt three?

 4              THE COURT:  Tell us what we're about to do.

 5              MR. BAUER:  What I propose to do is to play excerpt

 6     three, which begins at the timestamp of 15:30.  And while it's

 7     being played if the jury could read along with excerpt three.

 8     And then I could ask Mr. Mallory some follow-up questions.

 9              MR. BUCHWALD:  I'm sorry.  Reading along?  Or should

10     they be watching the video so they can be seeing the reactions.

11              THE COURT:  Ladies and gentlemen, you can do whichever

12     you wish.  You have the transcript.  You can watch the video

13     and try to listen.  If you wish, you can read along as you

14     watch the video.  But I will leave it up to you and to what

15     makes you most comfortable about this tape.  Okay.

16              MR. BAUER:  Thank you, your Honor.

17     BY MR. BAUER:

18     Q.  Mr. Mallory can you see the video on your screen in front

19     of you?

20     A.  Yes, sir.

21     Q.  And there's a person with his back mostly turned to us in a

22     sleeveless shirt.  Who is that?

23     A.  That is me.  That's me.

24     Q.  And then there's another person with a -- looks like a

25     backwards hat on a little further from the camera angle.  Who

1   is that?

2   A.   That's Kev Gotti.

3           MR. BUCHWALD:  Have we established the date.

4           MR. BAUER:  I'm not sure Mr. Mallory knows the date.

5   I'm happy to stipulate to it.

6           The government would offer, with defense counsel's

7   consent, that this recording took place on July 9, 2012.

8           So, Ms. McInerney, if you could press play.

9           (Audio/videotape played).

10  Q.   Mr. Mallory, let's go back to the first page on excerpt 3.

11  Do you have that in front of you?

12  A.   Yeah.

13  Q.   I'm going to ask you questions about some of the things

14  that you and Mr. Burden said, okay?

15  A.   All right.

16  Q.   And if -- if I'm going to ask you about something that you

17  said, then I'm going to ask you what you meant by it, okay?

18  A.   All right.

19  Q.   And if it's something that Gotti said, I'm going to ask you

20  if you had ever heard him use that term before, okay?

21  A.   All right.

22  Q.   I'm going to ask you if you had ever used that term before,

23  okay?

24          And then I'm going to ask you what you understood that

25  to mean.  Okay?

E8d9chr6                          Mallory - direct

1   A.  All right.

2   Q.  So let me first focus you on your -- the third line where

3   you said, "Gucci was bragging about that shit."

4           Do you see that?

5   A.  Yes, sir.

6   Q.  What did you mean about that?

7   A.  Talking about it; like basically bragging me; like he was

8   talking about it; like glorifying, trying to make hisself look

9   bigger.

10  Q.  You've got to speak up.  Okay.

11          Now, when Gotti responds -- and Gotti's words are

12  denoted by the letter B, correct, over in the left column?

13  A.  Yes.

14  Q.  And your words are denoted by the CW?

15  A.  Yes.

16  Q.  When he says, "runover and got sour."

17          Have you ever heard those terms before?

18  A.  Yeah.  Yes.

19  Q.  What did you understand those to mean?

20  A.  "Runover and got sour" mean like when things didn't go

21  according to plan.

22  Q.  Then he says "Because he knew Gucci can't hold water."

23          "Can't hold water," have you ever heard that term

24  before?

25  A.  Yes, sir.

1    Q.  Have you ever heard Gotti use that term before?

2    A.  Yes, sir.

3    Q.  What does that mean?

4    A.  It could mean two things.

5            THE COURT:  You need to speak into the microphone.

6            THE WITNESS:  It could mean two things.  One way, how

7    he used it in this one, means that he gonna be bragging and

8    telling people, not like directly but just like bragging about

9    it so other people can know what's going on.  The second way is

10   like tell law enforcements what's going on, "hold water."

11   Q.  "Can't hold water," meaning to not keep it in, to talk

12   about it?

13   A.  Yes, sir.

14   Q.  And then when Gotti says, "You want to be Blood, let's go

15   do some other shit."

16            What does that mean?

17   A.  It means that -- he means that L-1 was like:  Somebody want

18   to be Blood, go do some other shit.  That means like do

19   something, like crazy.  Like do something that's not regular.

20   Like do something crazy.  Do something that you usually

21   wouldn't do.

22   Q.  And L-1.  You think he's referring to L-1 when you say,

23   "You want to be Blood, let's go do some other shit"?

24   A.  Yes.  That's what we was talking about.

25   Q.  And then later when he says, "He's a manipulative,

E8d9chr6                        Mallory - direct

1    manipulative person."

2              Who is he referring to there?

3    A.  He's talking about L-1.

4    Q.  Let's go to the second page.

5              When you said in your, I guess the third line down,

6    "L-1 knocked that shit up.  L-1 called and the niggas came

7    through.  When we was down at the weed spot."

8              What are you referring to?

9    A.  Supposed to say lined.

10   Q.  I'm sorry?

11   A.  It's not to supposed to say "knocked."  It's supposed to

12   say, "L-1 lined that shit up."

13   Q.  Lined?

14   A.  "Lined" meaning that he set it up.

15   Q.  You don't think it was "knocked."  You think it was

16   "lined"?

17   A.  Yes, sir.

18   Q.  So you think there was a mistake here?

19   A.  Yes, sir.

20   Q.  291T, excerpt 3, second page, fourth line down?

21   A.  Yes, sir.

22   Q.  Okay.  So what did that mean to you?

23   A.  Lined -- line something up means that he set it up.

24   Q.  And set it up.  You said here, "that shit up."  What are

25   you referring to, "that shit"?

1   A.  Robbery.

2   Q.  Robbery of who or where?

3   A.  That happened on Chambers Street.

4   Q.  And "L-1 called and they came through."

5           What are you referring to?

6   A.  He called and the people came.  They came.  To where I was

7   at.

8   Q.  And "the people came through," who are the people?

9   A.  Bow Wow and Gucci.

10  Q.  And then the next line, Gotti says "Yeah, I remember

11  exactly."

12          Do you know what he's referring to when he says he

13  remembers exactly.  What does he remember?

14          MR. DRATEL:  Objection, your Honor.

15          THE COURT:  Overruled.

16          THE WITNESS:  What does Gotti mean when he said -- he

17  remembered the whole incident that happened.

18  Q.  So, now, the next time that Gotti speaks, he says, "Bow Wow

19  smart bro, whatever happened, he disengaged from everybody."

20          What did you take that to mean?

21          MR. GOLTZER:  Objection.  Self-explanatory.

22          THE WITNESS:  It means --

23          THE COURT:  The objection is overruled.

24          MR. BAUER:  Now you can speak.

25          THE WITNESS:  It means that he got away from

E8d9chr6                          Mallory - direct

1    everybody.  He got like -- he stopped hanging out with people

2    and got away from everybody.

3    Q.  Okay.  Let's move on to the top of page three.

4              Do you see that third line, "We was sitting down.  It

5    was me, you, and SpongeBob"?

6    A.  Yes, sir.

7    Q.  Who is SpongeBob?

8    A.  SpongeBob is Poppy.

9    Q.  Same person, Poppy and SpongeBob?

10   A.  Yes, sir.

11   Q.  Why did you call him SpongeBob?

12   A.  Because of how his front teeth look.

13   Q.  You've got to speak into the microphone.

14             Because of how his front teeth look?

15   A.  Yes, sir.

16   Q.  So his front teeth look like SpongeBob's front teeth?  Is

17   that what you mean?

18   A.  Yes, sir.

19   Q.  Let's go down to where Gotti says, "Gucci came."

20             Do you see that part?

21   A.  Yes, sir.

22   Q.  Gucci came -- basically "Gucci came to see who was up there

23   and L came right behind him."

24             And I guess right before that you had said, "Gucci

25   came through here the next day."

E8d9chr6                    Mallory - direct

1          So, what is Gotti talking about when he says, "Gucci

2     came through?"

3     A.  He came to 260 First Street.

4     Q.  When?

5     A.  The next day.

6     Q.  The next day?

7     A.  Yes.

8     Q.  And then you said, "Yeah they was on point.  We wasn't on

9     point."

10         What does "on point" mean?

11    A.  Aware of what's going on.

12    Q.  So when you said they were on point and you weren't, what

13    do you mean?

14    A.  Talking about L-1 and Gucci, they knew what was going on

15    and I didn't know what was going on.

16    Q.  L-1 and Gucci?

17    A.  Yes, sir.

18    Q.  What about Bow Wow?  Was Bow Wow on point?

19             MR. GOLTZER:  Objection.

20             THE WITNESS:  We wasn't talking about Bow Wow right

21    here though.

22    Q.  You weren't talking about Bow Wow at that point?

23    A.  No.

24             MR. BAUER:  Judge, it's 5:00.  So we've gotten through

25    one of the excerpts.

1      THE COURT:  Yes.  Let's stop now, ladies and

2  gentlemen.  We'll reconvene again tomorrow morning bright and

3  early.  Please be in the jury room no later than 9:25 so that

4  we can get started on time.  In the meantime you should leave

5  the transcripts on your chairs.  Don't take the transcripts

6  back with you.

7      We'll see you tomorrow morning.  Have a pleasant

8  evening.  Please do not discuss the case, including on social

9  media.

10      (Jury excused)

11      (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (In open court)

2    THE COURT:  Mr. Mallory you can step down.

3    (Witness excused)

4    THE COURT:  Folks can be seated.

5    So I have a question concerning excerpt one.  And the

6    double hearsay portion I guess at page two concerning the

7    statement that the Jamaican person said to Burden concerning

8    Bow Wow that he was looking for Burden and that he was all

9    bloody.

10    Now, as I understand the government's theory -- and I

11    accept that it would be admissible under 804.3, the statement

12    generally, but the government says that this hearsay within the

13    hearsay is admissible under 801(d)(2) because it was made

14    during and in furtherance of a conspiracy.

15    What is the conspiracy?  Who are the members?  And in

16    what way is this statement in furtherance of that conspiracy?

17    MR. BAUER:  The conspiracy at 260 First Street to sell

18    marijuana included Kev Gotti, SpongeBob also known as Poppy, T,

19    Ramone, there's an individual who ran the whole place his name

20    was Pavlo.  And then Mallory, Bow Wow, people who did sales for

21    them.  They would be in that conspiracy.

22    THE COURT:  So Kev Gotti, Mr. Burden, was a member of

23    that conspiracy?

24    MR. BAUER:  Yes.

25    THE COURT:  And the Jamaican guy was a part of that

1    conspiracy?

2              MR. BAUER:  Correct.

3              THE COURT:  And Mr. Whitaker was a member of that

4    conspiracy?

5              MR. BAUER:  Yes.

6              THE COURT:  Okay.  And what evidence is there in the

7    record that Mr. Whitaker was a member of that conspiracy?

8              MR. BAUER:  I believe that Mr. Mallory had said that

9    he had seen Mr. Whitaker, first of all, bag up his crack at 260

10   First Street but also make marijuana sales there.

11             THE COURT:  I believe, and the parties will correct

12   me, that he saw Mr. Whitaker receive phonecalls from customers.

13             MR. BAUER:  That was for crack.

14             THE COURT:  At the location.

15             MR. BAUER:  Correct.  So he had crack with him.  He

16   was getting ready.  I think that is what he had said and I

17   asked for clarification.  Mr. Goltzer objected.  Then he went

18   ahead and said that he was packaging it for sale and then he

19   got phone numbers.  That was in reference to the crack.

20             THE COURT:  And so the conspiracy at 260 First

21   involving Mr. Whitaker and the Jamaican individual, was that a

22   marijuana conspiracy or a crack conspiracy, or both, or does it

23   matter?

24             MR. BAUER:  I would argue it was both.  It was mainly

25   a marijuana conspiracy because that spot in Newburgh was known

1  as a place to go to get marijuana.  But it was also a safe

2  haven for people like Mr. Whitaker and Mr. Mallory and

3  Mr. Burden to bring their crack and to package it.  I don't

4  think they sold out of there.  But you don't need to sell crack

5  out of a house like 260 First Street in order for it to be part

6  of the conspiracy.  What they did there was they packaged their

7  crack and stored their crack there.  So I would say it was

8  primarily marijuana but there was also crack as part of that

9  conspiracy.

10           THE COURT:  Okay.

11           MR. BAUER:  Judge, along these lines to the extent --

12  we renew our argument that it's admissible as an 801(d)(2)(E)

13  statement.  But to the extent that your Honor finds otherwise

14  we did spend last night thinking of a way to redact this

15  excerpt.  So I renew our argument but I also, to the extent

16  that you disagree, I would ask that you -- that rather than

17  discard the entire excerpt, just redact what we're calling

18  double hearsay.

19           THE COURT:  I don't want to step on your negotiations.

20           Mr. Goltzer, have you spoken with the government about

21  a way to redact this statement that would satisfy at least some

22  of your concerns?

23           MR. GOLTZER:  Well I believe, without waiving any

24  arguments, obviously, what we're focusing on now is the bloody

25  clothing statement.

1           THE COURT:  Right.

2           MR. GOLTZER:  It's easy enough to take that out.  If

3     you let in the first page of -- assuming your Honor is

4     considering ruling for the government on the other part of the

5     excerpt.

6           THE COURT:  Yes.

7           MR. GOLTZER:  I'm not expecting that, but assuming

8     that happens.

9           You take out page two, beginning with Burden's

10    statement, "Know what I'm saying?"  Which is basically in the

11    middle of the page.

12          MR. BAUER:  Judge, I was -- let's be clear that I

13    still think it's -- it should come in under my previous

14    arguments.  But if we were to redact this, I would like to

15    start in the middle of that section where it starts "Next day I

16    wake up" because the fact is "In the nighttime we shut it down

17    wild early," I think that's important because it's consistent

18    with Mallory's testimony.

19          So I would suggest that if we have to redact, we start

20    it with "next day" and go all the way through to the end of

21    burden's next entry.  It ends, "He said, he said like he wanted

22    to --" redact that out and go back to -- then begin again with

23    Mallory saying that they brought the hammers back.

24          MR. GOLTZER:  Any reference to Bow Wow for the

25    remainder of that page and the bloody clothing could be

1   redacted.  And what the government suggests, "The niggas

2   brought the hammers back?"  Forgive my French.  I hate that

3   word.

4           THE COURT:  I'm sorry.  You're talking about two

5   different portions, correct?

6           MR. GOLTZER:  No, no.  We're on the same page.

7           THE COURT:  So you're in agreement?

8           MR. GOLTZER:  I think so.

9           THE COURT:  About what should be redacted?

10          MR. BAUER:  Are you okay?

11          MR. GOLTZER:  Say it again, if you would.

12          MR. BAUER:  I want to start -- let's be clear.  I

13  don't want to redact at all.

14          If we redact I want to start at "next day" and I want

15  to go through "like he wanted to."  So the next thing would

16  pick up with the N word, brought the hammers back.

17          THE COURT:  Okay.  So you're in agreement?

18          MR. GOLTZER:  Yes.

19          MR. DRATEL:  Talking about taking out from "next day"

20  the next entry, which is CW, next B, and then starting again

21  CW.  So it's really starting with the second one from the

22  bottom again.

23          MR. BAUER:  Yes.  CW.

24          MR. DRATEL:  That's right.

25          THE COURT:  So do that.  Because I will direct you to

1    redact it because I am very concerned.

2            MR. GOLTZER:  Are you ruling that out then, Judge?

3            THE COURT:  Yes.  That the 801(d)(2)(E) does not say

4    that portion of the statement.

5            So let's go to excerpt four.

6            Mr. Bauer, tell me again what the sequence of this is.

7    And also tell me whether, in your mind, the government's

8    arguments prior to trial have now changed necessarily because

9    of the testimony that's come out.

10           MR. BAUER:  Happy to do all that, your Honor.  What do

11   you mean by the sequence?  Sequence of our arguments?

12           THE COURT:  The sequence of what happened with respect

13   to the gun being obtained from Mr. Burden, and the testing that

14   was done, etc., whether that was before or after or what have

15   you, so that I'm clear.

16           MR. BAUER:  So you are focusing on the third page of

17   excerpt four then?

18           THE COURT:  Yes.

19           MR. BAUER:  Just to be clear.  I think everything up

20   until excerpt four, the third page in excerpt four is

21   consistent with what Mr. Mallory had said.

22           Mr. Mallory, in his 3500, and I think will potentially

23   come out in cross-examination was not clear on when that

24   incident happened in terms of the incident where Bow Wow comes

25   back with the gun, says it doesn't work, and Gotti says put the

1    gun to your hand and then he does and then he shoots it out the

2    window.  And I think Mr. Goltzer was right at the sidebar that

3    at some point I had suggested, I think it was based on

4    something that Mr. Mallory had said, that it was likely that a

5    couple days after the murder.

6            Now, to that end, your Honor, so the fact -- the fact

7    that Mr. Mallory now under oath, which is the first time he's

8    testifying under oath, was saying anything under oath, says

9    that it happened two days before.  I'll remind you that that is

10   what is being said here.  So he's just bolstered the

11   trustworthiness of it.

12           Nevertheless, I think the focus on the two days before

13   or two days after is putting the -- or not seeing the forest

14   from the trees.  It's a pretty descriptive and unique incident

15   he's talking about.  He testified very clearly about an

16   incident where Bow Wow comes, says the gun doesn't work, Gotti

17   says put the gun to your hand, he doesn't do it, and then he

18   shoots it out the window.  That's very descriptive.  He's

19   remembering it in a very trustworthy manner.  The one question

20   mark here is was it a couple days before or a couple days after

21   an incident three-and-a-half years ago.  He has all of the

22   facts.  And the one thing that he's -- that he and, therefore

23   I, have flip-flopped on a little bit was it the time before or

24   the time after.  This is just a few days in between in which

25   Bow Wow came with the gun, both times.  The heart of the story

E8d9chr6                         Mallory - direct

1    is there.  It's there almost exactly.

2            THE COURT:  So, the gun, assuming that -- so the

3    testimony that we heard today from Mr. Mallory was that that

4    incident took place a couple days before the December 15

5    robbery, correct?

6            MR. BAUER:  Correct.

7            THE COURT:  So a couple days before Mr. Whitaker went

8    to that location to get that particular gun, to use it in a

9    robbery, came back the next day, said the gun didn't work.  So

10   presumably he left the gun at that location at that time?

11           MR. BAUER:  Yes.

12           THE COURT:  And then came back two days later at the

13   direction of L-1 to get it for the December 14 robbery?

14           MR. BAUER:  Correct.  And then came back two days

15   later to return it.

16           THE COURT:  Okay.

17           MR. BAUER:  So he had the gun three times in those

18   four days.

19           THE COURT:  And your reading of the transcript is that

20   its consistent -- the transcript is consistent with

21   Mr. Mallory's testimony?

22           MR. BAUER:  Yes.

23           THE COURT:  Okay.

24           Mr. Goltzer.

25           MR. GOLTZER:  There's a problem because doesn't Burden

E8d9chr6                    Mallory - direct

 1     say somewhere, "I never saw the chrome again"?  He says it

 2     right on the tape, "I never saw the chrome again."

 3            What Mallory has done, and he's pretty good at it, is

 4     he's changed his testimony several times, because the

 5     government's changed its arguments several times based on

 6     Mallory's change of testimony.  When Mallory -- let's talk

 7     about the sequence of events with the gun that we know from

 8     Mallory's testimony.

 9            Number one, you've got the gun a couple days before.

10     Nothing in the record about what he was going to do with it.

11            THE COURT:  I'm sorry.  Can you speak into the

12     microphone, Mr. Goltzer.

13            MR. GOLTZER:  There's nothing in the record about what

14     Whitaker was going to do with the gun.  We know from Burden

15     that Whitaker came back a couple days before with a gun, a

16     chrome gun, a gun that in early statements was put in someone

17     else's hands at the robbery.  But that's a different issue.

18            According to Burden there was a robbery that never

19     happened, a jux J-U-X that never happened.  Whitaker complained

20     that the gun didn't work.  And he was then told either to put

21     it to his head.  And it was shot out the window.  Totally

22     separate incident.  The government needs to concede that it's

23     unrelated to this particular robbery.

24            According to the witness today, I'm now sure, under

25     oath, it happened two days before.  In the 3500 material, I

1   think originally he had it happening after.  Then he wasn't

2   sure.  Now we know from the sworn testimony it happened two

3   days before.

4          Excerpt one.  Very interesting.  The witness goes to

5   Burden and says let me refresh your recollection.  His

6   recollection -- he's told by Burden.  Burden tells Mallory:

7   Surprise, surprise.  No.  No.  No.  I gave you the .38.  I mean

8   we still haven't accounted for that, if it comes in.

9          When Burden pleads, he specifically pleads to

10  providing a weapon; two weapons -- one weapon for the

11  December 15 robbery.  There's nothing in his plea about the

12  prior incident, at all.

13         It seems to me that it is not a declaration against

14  interest pertaining to the December 15 robbery that Whitaker

15  brought the gun back in a robbery that never happened on

16  December 13.  There's testimony in the case about it.  Sobeit.

17  But to the extent that we're going to hear from Burden, they're

18  trying to corroborate their witness, but it's not Burden's

19  declaration against penal interest that he gave the gun to

20  somebody that wasn't used in a robbery.  He's admitted the

21  possession of the gun.  That might be a declaration against his

22  penal interest.  He's admitted that he had a gun.  Fine.  But

23  as to the fact that he gave it to somebody and it wasn't used

24  is not a declaration against his penal interest for the crime

25  to which he pled.

1          MR. BAUER:  Judge, I think that might be the first

2     disconnect here.  A statement against penal interest does not

3     have to be regarding the crime that he pled to.  So I think

4     that is one of many reasons why Mr. Goltzer's argument is

5     failing here.  It's -- it was a statement against a penal

6     interest of a charge that could be brought against him for

7     conspiracy to commit robbery on December 13, 2010.

8          MR. GOLTZER:  He just cut me off, which I accept.

9          We go back to the case, I think it's the Wilkerson

10    case, where the Supreme Court addresses the question of whether

11    you can allow in inculpatory portions without corroborating

12    circumstances.  There's also the question of 403 and

13    materiality, Judge.

14          This is really a separate question.  You have to go

15    back to the requirements for the foundation of the 804(b)(3).

16    It doesn't matter who he gave the gun to.  What matters is that

17    he had a gun or gave the gun to somebody.  Implicating Whitaker

18    in a nonexistent robbery -- it doesn't implicate Whitaker in a

19    conspiracy.  Because there's nothing to indicate that Burden

20    agreed to commit that robbery.  Or that he knew beforehand that

21    Whitaker wanted the gun for a robbery.  That's not in here.

22    All that's in here is I had a gun and Whitaker gave it back to

23    me and didn't commit a robbery because he said that the gun

24    didn't work.

25          I don't see how that comes in as a declaration against

 1  penal interest where Whitaker's possession of the gun is

 2  corroborated.

 3          THE COURT:  I'm sorry.  I don't know that I agree with

 4  the last part that you said because -- I think I'm reading

 5  excerpt four on page three -- Burden speaking:  Yeah, that was

 6  a couple of days before this happened.

 7          MR. GOLTZER:  Right.

 8          THE COURT:  I let them hold it for a robbery -- I'm

 9  translating now -- I let them hold it for a robbery and they

10  came back empty-handed.  Now the fact that they came back

11  empty-handed does not negate the existence of a conspiracy.

12          MR. GOLTZER:  Okay.  That's true.  But still the

13  fact -- his declaration against penal interest is, "I let them

14  hold it for a robbery."  As to who it is, after it's being

15  suggested to him by Mallory at the beginning of the tape, is

16  not a reliable statement.

17          This conversation takes place 18 months after the

18  fact.  There is no longer a conspiracy in place.  The object

19  has been frustrated in terms of the December 15 robbery.  Any

20  conspiracy that arguably took place between Whitaker and Burden

21  is over.  The government is not going to argue against that.

22          THE COURT:  Okay.  Those arguments I understand and

23  those arguments I --

24          MR. GOLTZER:  They want to use an unavailable

25  witness -- forgive me, Judge, if I may?

1       THE COURT:  Sure.

2       (Pause)

3       MR. GOLTZER:  Under Williamson, when all is said and

4   done, only those parts that are truly self-inculpatory fall

5   within the exception.  And that's what Wilkerson says.  And

6   it's part of the foundation.  They say it.  We mix truth with

7   falsehood, just as this witness admitted before to having done,

8   Judge.  This is a very important issue for Mr. Whitaker.

9       You know -- and I went through it before.  I think

10  it's worth saying again.  I argued to you earlier that the

11  witness was impeachable.  They've got a witness all over the

12  place.  They've changed their arguments.  They've changed their

13  briefs.  He's changed his testimony the way Mr. Greenfield

14  changed his tie today.  It's an important issue.  He's going to

15  be denied a fair trial.  The kid's on trial for his life.  It's

16  an informant case.  And they're trying to bolster disreputable

17  informants who are impeachable with an unreliable statement

18  that is suggested to a man who is being plied with liquor, and

19  who is a dope-smoker, and everybody knows he's an addict.  He's

20  being plied with liquor and his recollection is being

21  refreshed.  And the two of them are sitting there explaining to

22  the world how they didn't know anything about what happened.  I

23  mean it really shouldn't come in at this trial, Judge.

24      THE COURT:  I understand all of those arguments,

25  Mr. Goltzer.  But I'm going to stick with the original pretrial

 1   ruling.  I do think that the elements of 804.3 are met in this

 2   case and in particular with respect to the statement for the

 3   reasons previously stated and stated by the government.  So

 4   that objection to excerpt four and in particular that portion

 5   of excerpt four is overruled and I'll allow the government to

 6   play it.

 7           MR. GOLTZER:  The gun's in.  The blood's out.

 8           THE COURT:  Yes.

 9           Anything further?

10           MR. BUCHWALD:  Can I just understand it.  What portion

11   of this now is in?

12           MR. GOLTZER:  You're getting what you want.  You're

13   getting the part you want on the first page.

14           MR. BAUER:  I'll be very specific.

15           MR. BUCHWALD:  Part two in?  Part two is out, right?

16           MR. BAUER:  Like an Abbott and Costello routine over

17   here.

18           As I understand it, one is in with the redactions we

19   discussed; two is in; three we've already done; four is in;

20   five is in.

21           Is that right?

22           THE COURT:  Correct.

23           MR. BAUER:  We've played three.  I plan tomorrow --

24   all I have left is the video and I'll be done -- is excerpt

25   one, which will be redacted.  I'll go in order:  One, two,

1    four, five.  Then you guys can have at him.

2              THE COURT:  Who after Mr. Mallory?

3              MR. BAUER:  We will have Officer William Lahar and

4    Joseph Palermo here.  Let's hope that we actually get to them.

5    And then we will have David Evans available if by some miracle

6    things speed up here.

7              MR. GOLTZER:  Will the court inquire of the government

8    whether they are going to be eliciting testimony from

9    Mr. Mallory about purported voice identifications or

10   identifications from the still -- from the pole cameras?

11             MR. BAUER:  At this time and what I've told defense

12   counsel for the last couple of days is that we have elected to

13   not show Mr. Mallory, the pole camera, or play the 911 call.

14             MR. GOLTZER:  Okay.

15             MR. BAUER:  Mr. Whitaker approves.

16             THE COURT:  If there's nothing else.  We'll see you

17   tomorrow.  Have a good night everyone.  Please do not discuss

18   the case.

19             (Adjourned to August 14, 2014 at 9:00 a.m.)

20

21

22

23

24

25

1                           INDEX OF EXAMINATION

2     Examination of:                              Page

3      DANIEL MYERS

4     Direct By Mr. Nawaday . . . . . . . . . . .1042

5     Cross By Mr. Greenfield . . . . . . . . . .1058

6     Redirect By Mr. Nawaday . . . . . . . . . .1107

7     Recross By Mr. Greenfield . . . . . . . . .1113

8     KEVIN LAHAR

9     Direct By Mr. Bauer . . . . . . . . . . . .1114

10    Cross By Mr. Strazza . . . . . . . . . . . .1139

11    Cross By Ms. Stafford . . . . . . . . . . .1146

12    Cross By Mr. Dratel . . . . . . . . . . . .1150

13    Redirect By Mr. Bauer . . . . . . . . . . .1155

14     JAMAR MALLORY

15    Direct By Mr. Bauer . . . . . . . . . . . .1157

16                          GOVERNMENT EXHIBITS

17    Exhibit No.                                Received

18     409   . . . . . . . . . . . . . . . . . . .1045

19     3A, 3B, 3C and 3D   . . . . . . . . . . . .1046

20     3E   . . . . . . . . . . . . . . . . . . . .1048

21     401   . . . . . . . . . . . . . . . . . . .1049

22     121 and 122   . . . . . . . . . . . . . . .1123

23     151 and 152   . . . . . . . . . . . . . . .1129

24     141 and 142   . . . . . . . . . . . . . . .1136

25     268 and 269   . . . . . . . . . . . . . . .1202

```
 1   213    . . . . . . . . . . . . . . . . . .1204

 2   291    . . . . . . . . . . . . . . . . . .1256

 3   291T   . . . . . . . . . . . . . . . . .1257
```

 4                    DEFENDANT EXHIBITS

 5   Exhibit No.                              Received

```
 6   C   . . . . . . . . . . . . . . . . . . .1075

 7   D   . . . . . . . . . . . . . . . . . . .1077

 8   F   . . . . . . . . . . . . . . . . . . .1092

 9   I1 and I2   . . . . . . . . . . . . . . .1153
```

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25