E8e9chr1                    Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     UNITED STATES OF AMERICA
3               v.                              12 CR 626 (ER)
     RAYMOND CHRISTIAN a/k/a
4    "Reckless"
     GLENN THOMAS, a/k/a "Gucci"
5    TYRELL WHITAKER, a/k/a "Bow Wow"
                  Defendants
6    ------------------------------x
                                           New York, N.Y.
7                                          August 14, 2014
                                           9:25 a.m.

8

9    Before:
                           HON. EDGARDO RAMOS
10                                         District Judge

11

                              APPEARANCES
12   PREET BHARARA
          United States Attorney for the
13        Southern District of New York
     ANDREW BAUER
14   KAN M. NAWADAY
          Assistant United States Attorney
15
     DAVID S. GREENFIELD
16        and
     ANTHONY STRAZZA
17        Attorneys for Defendant Christian

18   LAW OFFICES OF DON BUCHWALD
          Attorney for Defendant Thomas
19   DON D. BUCHWALD

20   KELLEY DRYE & WARREN LLP
          Attorney for Defendant Thomas
21   LEVI DOWNING

22   GEORGE ROBERT GOLTZER
          and
23   YING STAFFORD
          Attorneys for Defendant Whitaker
24   -- also present--
     S.A. Andrei Petron - FBI

25

E8e9chr1                     Trial

1              (In open court)

2              (Trial resumed; jury not present)

3              THE COURT:  Good morning all.

4              Is everyone ready to go?

5              MR. BAUER:  We are.

6              THE COURT:  Is Mr. Mallory here?

7              THE MARSHAL:  He's here.

8              THE COURT:  Go ahead and bring him out.

9       JAMAR MALLORY, resumed.

10             THE COURT:  Good morning, Mr. Mallory.

11             THE WITNESS:  Good morning.

12             MR. BAUER:  Judge, briefly on the record.  I think I'm

13      not sure if I just messed something up or not.  We have a full

14      set of the excerpts, excerpts one through five, with the video,

15      with the redactions that we discussed yesterday.  I thought I

16      was being helpful by picking up what was left on the chair of

17      the jurors.  It was excerpt three only.  And I planned on

18      asking your permission to hand out the full set of excerpt

19      three.  We noticed on one of them there's some handwritten

20      notes of the jurors that I picked up.  I didn't read what the

21      notes were but I just noted there were actual notes.

22             THE COURT:  I believe I saw several of them writing

23      notes.

24             MR. BAUER:  Right.  They're in a pile.

25             THE COURT:  Were they collected in some sort of order

E8e9chr1                         Trial

1    or not?

2              MR. BAUER:  I can try to recreate that, yes.

3              THE COURT:  Why don't you give them to Ms. Miller so

4    we can see whether more than one had notes.

5              MR. BAUER:  I'm sorry, your Honor.  I was just trying

6    to be helpful.

7              THE COURT:  We have reviewed.  All but four of the

8    transcripts have notes.  However, upon reflection and I'm happy

9    to hear the views of the parties, as I understand it the

10   transcripts are in evidence.

11             MR. BUCHWALD:  I think they were an aid.

12             THE COURT:  So they're just in evidence as an aid.  So

13   they would not be taking those into the jury room with them in

14   any event.

15             MR. BAUER:  Not in the ordinary course.

16             THE COURT:  So strictly speaking, even if they had

17   notes, they would not be entitled to them.  So my suggestion is

18   that we simply tell them that they were gathered.  They will be

19   given a full set.  And that although they may take notes on the

20   actual transcripts during the course of the trial they will not

21   have those notes during their deliberations.

22             MR. BAUER:  Right.  Perhaps suggest to them that if

23   they do want notes for their deliberations they should take

24   them elsewhere, not on the transcripts.

25             MR. GOLTZER:  I suppose they already know that but I

1     mean I have no objection to it except doing three things at

2     once.  They've got notes, the transcripts, the videos.  It's

3     awkward.

4             THE COURT:  Again, we don't need to give them pens or

5     notebooks.  So this is just for their convenience if they

6     choose to take notes.  So I think we'll do it that way.  We'll

7     let them know that they will be given a complete set and I

8     would advise them that they should be aware that they will not

9     have those notes with them.  If they choose to take notes on

10    the transcripts themselves they won't have those with them

11    during their deliberations.

12            MR. BUCHWALD:  Did you give us a redacted set?

13            MR. BAUER:  We did.

14            Should Ms. Miller rather than me pass out the --

15            THE COURT:  It doesn't matter.  You can publish them.

16            So any objection as to that approach?  I see none.

17            MR. BUCHWALD:  Do you have anymore of these?  You've

18    given us one each and there are two attorneys on each team.

19            MR. BAUER:  It's the same exact one, but with one

20    redaction.

21            MR. DRATEL:  Do you guys share one too?

22            THE COURT:  The jury is here.  We're going to bring

23    them out.

24            (Continued on next page)

25

E8e9chr1                          Trial

1              (Jury present)

2              THE COURT:  Good morning, everyone.  Please be seated.

3          Ladies and gentlemen, you may have noticed that the

4     transcripts that you left on your chairs last night are no

5     longer there.  Those were collected.  You'll be given some

6     additional copies this morning.

7          However I wanted to point out to you they were

8     collected and we noticed that certain of you, many of you wrote

9     notes on your transcripts.  Those notes were not read and they

10    will be shredded by the court.

11         I wanted to point out to you that those transcripts

12    were admitted solely as an aid to the jury; in other words,

13    they are not evidence.  And you will not have them with you

14    when you deliberate.  So to the extent that you wish to take --

15    you believe you wish to take notes concerning those

16    conversations you may want to put them in your notebooks rather

17    than on the transcripts.  Okay.

18         Very well.  We will now continue with the direct

19    examination of Mr. Mallory.

20         Mr. Mallory you are reminded that you are still under

21    oath.

22         Mr. Bauer.

23         MR. BAUER:  Thank you, your Honor.

24         (Continued on next page)

25

E8e9chr1                         Trial

1    DIRECT EXAMINATION CONTINUED

2    BY MR. BAUER:

3    Q.  Mr. Mallory, I was asking you yesterday at the end of the

4    day about the video in which you helped law enforcement record

5    the conversation between you and Mr. Burden on July 9, 2012.

6          Do you remember those questions?

7    A.  Yes, sir.

8    Q.  And we went through one of the excerpts at the end of the

9    day yesterday, right?

10   A.  Yes, sir.

11   Q.  Before we return to the other excerpts, I'd like to just

12   ask you a couple of questions.

13         In the video you can see that there are cups and

14   bottles.  What were you drinking, you and Mr. Burden, during

15   the video?

16   A.  Liquor.

17   Q.  Liquor?

18   A.  Yes, sir.

19   Q.  And in parts of the video are you smoking as well?

20   A.  Yes, sir.

21   Q.  What are you smoking?

22   A.  Black & Mild.  Tobacco.

23   Q.  Black & Mild, you said?

24   A.  It's tobacco.  Like a cigar.

25   Q.  It's a new day, Mr. Mallory.  So, I'll remind you, you

 1    gotta speak up, okay.

 2              You said Black & Mild?

 3    A.  Yes, sir.

 4    Q.  And that's a kind of tobacco?

 5    A.  Yes, sir.

 6    Q.  You said yesterday that the conversation or the meeting in

 7    the hotel lasted approximately, give or take, about an

 8    hour-and-a-half; is that right?

 9    A.  Yes, sir.

10    Q.  And the excerpt that we looked at, excerpt three, as we

11    noted started at the timestamp on the exhibit 291 at 15:30.

12              Do you know approximately how many minutes into your

13    meeting that part of the recording was?

14    A.  I could look at -- I would look real fast to see what it

15    says?

16    Q.  Sure.

17              (Pause)

18              MR. BAUER:  Your Honor may I approach?

19              THE COURT:  You may.

20              THE WITNESS:  Probably like ten minutes, around ten

21    minutes.

22    Q.  The timestamp 15:30 is it fair to say that it started --

23    that took place about 15 minutes and 30 seconds into your

24    meeting?

25    A.  Yes, sir.

E8e9chr1                          Mallory - direct

1   Q.  And at that point how many drinks had you and Mr. Burden

2   had?

3   A.  One.  No more than two.

4   Q.  Did you feel drunk at that point?

5   A.  No.

6   Q.  Was Mr. Burden acting in a way that you thought he was

7   drunk?

8   A.  No.

9           MR. DRATEL:  Objection.

10          THE COURT:  Overruled.

11          THE WITNESS:  No.

12  Q.  Do you know if Mr. Burden had been drinking at all prior to

13  meeting up with you?

14  A.  No, he wasn't.

15          MR. BUCHWALD:  Objection.  Foundation.

16          THE COURT:  Sustained.

17          MR. BUCHWALD:  Move to strike.

18          THE COURT:  Stricken.

19  Q.  Did you talk to Gotti, Kev Gotti about what he was doing

20  before he met up with you that day?

21  A.  Yes, sir.

22  Q.  What did he tell you he was doing?

23  A.  He was shopping with his girlfriend.

24  Q.  Did he mention if he was drinking at all during that

25  shopping?

1    MR. DRATEL:  Objection, hearsay.

2    THE COURT:  Overruled.

3  Q.  Did he mention if he was drinking at all?

4  A.  No.

5    MR. BAUER:  Judge, it appears we're having previous

6  technical difficulty but perhaps I can hand out the revised

7  291T for the jury's aid.

8    THE COURT:  Very well.

9    MR. BAUER:  Thank you.

10  Q.  So what I'd like to do Mr. Mallory I want to direct your

11  attention to excerpt one, which is on Government Exhibit 291T,

12  and I'd like to do what we did yesterday which is we'll play

13  the video and then we'll circle back to the transcript to ask

14  you to clarify a few things.

15    MR. BAUER:  So Ms. McInerney if you could start the

16  recording at timestamp 8:15.

17    (Audiovisual recording played)

18    MR. BAUER:  Stop here and move forward.

19    Can we stop here, Ms. McInerney.

20  BY MR. BAUER:

21  Q.  So Mr. Mallory, directing your attention to the first page

22  of excerpt one on 291T.  At the beginning you said "Remember

23  when, remember that jux with the Joker."

24    What's a jux?

25  A.  A jux.

E8e9chr1                        Mallory - direct

1   Q.  At the bottom of your first entry there?

2   A.  A jux is like a robbery.

3   Q.  And then it was Gotti who says Bash was there; is that

4   right?

5   A.  Yes, sir.

6   Q.  And then you name a number of people, right?

7   A.  Yes, sir.

8   Q.  It was you that named Bow Wow, Gucci, Reckless, Baby E?

9   That was you who named them, right?

10  A.  Yes, sir.

11  Q.  And you said Besheltie's son and Gotti said Baynes?

12  A.  Yes, sir.

13  Q.  But then he said "yeah," right?  In the next line he said

14  "yeah"?

15  A.  Repeat that again.

16  Q.  After you said Baynes, Baby E and Gucci.  The next line he

17  says "yeah," right?

18  A.  Yes, sir.

19  Q.  He says, "They all came in a cab and some shit."

20          Do you see that?

21  A.  Yes, sir.

22  Q.  So he's saying that they came in a cab, right?

23  A.  Yes, sir.

24  Q.  Who is "they" in there?

25          MR. GOLTZER:  Objection.

E8e9chr1                        Mallory - direct

1              THE COURT:  Overruled.

2    Q.  As far as you knew, who was "they"?

3              MR. DRATEL:  Objection.

4              THE COURT:  Overruled.

5              THE WITNESS:  Bow Wow and Gucci.

6    Q.  Then he says "yeah" like ten times, right?

7    A.  Yeah -- yes.

8    Q.  Then at the bottom of the page you said -- you referred to

9    the chrome .38.  Do you see that, the way bottom on the first

10   page?

11   A.  Yes, sir.

12   Q.  And then on the top of the second page he says "the chrome

13   .38"?

14   A.  Yes, sir.

15   Q.  The "chrome .38" what is that in reference to?

16   A.  The silver gun that he had, that he got -- that he got from

17   his son's mother brother.

18   Q.  Is that the one you testified yesterday that he gave to Bow

19   Wow?

20   A.  Yes, sir.

21             MR. BUCHWALD:  Objection, your Honor, to summarizing

22   the testimony.

23             THE COURT:  Why don't you rephrase, Mr. Bauer.

24   Q.  You testified yesterday that Gotti gave a silver revolver

25   to Bow Wow, correct?

E8e9chr1                        Mallory – direct

1    A.  Yes, sir.

2    Q.  Is that this chrome .38 or something different?

3    A.  Same gun as the chrome .38, yes, sir.

4    Q.  So when you said chrome, then he said chrome, was that

5    another word for silver?

6    A.  Yes, sir.

7    Q.  And then you said they came and snatched up the joints?

8    A.  Yes, sir.

9    Q.  The word "joints," what did that mean?

10   A.  Means guns.

11   Q.  You testified yesterday that L-1 had called and used a

12   different word for a gun, right?

13   A.  Yes, sir.

14        MR. BUCHWALD:  Objection, your Honor.  The prosecutor

15   is testifying.

16        THE COURT:  Sustained.

17   Q.  Joints is another word for gun?

18   A.  Yes, sir.

19   Q.  And I believe you testified yesterday when I asked you what

20   "on point" meant, but I'll ask you again.  What does "on point"

21   mean?

22   A.  Aware of what's going on.

23   Q.  And then Kev Gotti says yeah they, "ain't even put me up on

24   nothing."

25        What is -- have you ever heard him use that term "put

E8e9chr1                          Mallory - direct

1    me up on nothing" before?

2    A.  Yes, sir.

3    Q.  Have you ever used that term?

4    A.  Yes, sir.

5    Q.  What does that mean didn't even put me up on nothing?

6    A.  Tell him what's going on.

7    Q.  At the end -- at the end of the second page, on the third

8    page you said "they brought the hammers back."  What does

9    "hammers" mean?

10   A.  Means guns.

11   Q.  That's another word for gun?

12   A.  Yes, sir.

13   Q.  And then you said "what they do with the tre 8."  When you

14   said "tre 8" what did you mean by that?

15   A.  .38.

16   Q.  .38 -- the gun?

17   A.  Yes, sir.

18   Q.  And then Gotti says that he never saw that gun again?

19   A.  Yes, sir.

20   Q.  And then Meezy ended up with it?

21   A.  Yes, sir.

22   Q.  Who is Meezy?

23   A.  A friend of Kev Gotti's.

24   Q.  When he says he never got the gun again, did you know what

25   he meant by that?

1           MR. GOLTZER:  Objection.  It's "I never seen that gun

2    again."

3    Q.  I'm sorry.  When he said he never seen that gun again, did

4    you know what that was in reference to?

5    A.  It means that it wasn't brought back to him, like he hasn't

6    seen it since he gave it away or something.

7           MR. BUCHWALD:  Your Honor, could we have that read

8    back.  I couldn't hear.

9           (Record read)

10          MR. BUCHWALD:  Thank you, Judge.

11   Q.  I'd like to move on to excerpt two.

12          MR. BAUER:  So Ms. McInerney if you could press play

13   at the 12:01 time mark.

14          And Mr. Mallory, and ladies and gentlemen of the jury,

15   if you can read along on excerpt two.

16          (Audiovisual recording played)

17          MR. BAUER:  Stop it here.

18   BY MR. BAUER:

19   Q.  Mr. Mallory, at the bottom of Gotti's first long set of

20   statements he starts I guess four lines up, "So there's not one

21   or two people that could make me say oh them niggas is foul."

22          Do you see that?

23   A.  Yes, sir.

24   Q.  And then he says -- so basically like saying, "Since these

25   niggas foul fuck the whole movement."

E8e9chr1                        Mallory - direct

1           Do you see that?

2    A.  Yes, sir.

3    Q.  Do you know what he's referencing here?

4    A.  Talking about Bloods.

5    Q.  Talking about Bloods?

6    A.  Yes, sir.

7    Q.  When he says that somebody's foul, what does he mean?

8    A.  That they're no good.

9    Q.  In this excerpt two is he making reference to a particular

10   person.

11          (Pause)

12   A.  Repeat that question again.

13   Q.  In excerpt two either in the first part or the second part

14   when he's talking about -- is he talking about anybody in

15   particular?

16   A.  L-1.

17   Q.  So on the bottom where he says, "he's the main reason why

18   this shit, he single-handedly fucked up homies from Newburgh,

19   New York," that's a reference to L-1?

20   A.  Yes, sir.

21   Q.  When it says "he's the main reason why this shit."

22          Do you know what he's referring to, "why this shit"?

23   A.  Talking about how -- he's talking about how Bloods are --

24   the things that the Bloods were doing at the time.  How they

25   were moving at the time.

E8e9chr1                    Mallory - direct

1    Q.  The things they were doing and how they were moving?

2    A.  Yes, sir.

3    Q.  So then later he says, "single-handedly, because he had

4    that good ass gift of gab."

5           What did he mean by that?

6    A.  That he talks good.  Like he could convince somebody to do

7    something.

8    Q.  And then he says he got -- "he got a lot of people to

9    believe him and fall victim for his bullshit."

10          What did he mean by that?

11   A.  Meaning people -- meaning he got a lot of good people like,

12   people that are listening, people that will be loyal to him to

13   make mistakes because they believe what he said.

14          MR. BAUER:  I want to jump ahead now to excerpt five,

15   Ms. McInerney.

16   Q.  It's the last page, Mr. Mallory.

17          MR. BAUER:  Ms. McInerney, if we could start the video

18   at the 35:47 mark.

19          (Audiovisual recording played)

20   BY MR. BAUER:

21   Q.  So, Mr. Mallory, Gotti said he's "beefing with the

22   Jamaicans."

23          What's "beefing" mean?

24   A.  Meaning he was having issues with them.

25   Q.  I'm sorry.  That he has what?

1   A.   Having issues with them.

2   Q.   Issues.  What does that mean, to have issues with someone?

3   A.   Fighting with them.

4   Q.   And with the Jamaicans.  Did you know who or what group he

5   was referring to when he says "beefing with the Jamaicans"?

6   A.   No.

7   Q.   Had he mentioned this to you before?

8   A.   Yes, sir.

9   Q.   He mentioned that he was "beefing with the Jamaicans"?

10  A.   Yes.

11  Q.   Then he says he had "the guns with me at all times"?

12  A.   Yes.

13  Q.   When he says, "I keep two in the book bag and two in my

14  waist," what did he mean?

15  A.   He's just talking about guns.

16  Q.   So what did that mean then?

17  A.   That he had two guns -- he had two guns on his waist and

18  two in his book bag, it says.

19          MR. BAUER:  Ms. McInerney, if we can go back to

20  excerpt 4.  Which begins at timestamp 20:50.

21          (Audiovisual recording played)

22  Q.   Let's turn back a couple pages to the beginning of excerpt

23  four, Mr. Mallory.

24          Starts with Kev Gotti talking, right?

25  A.   Yes, sir.

1    Q.  He says "Next thing you know you go downstairs on the porch
2    and come back like come here."
3            Do you see that?
4    A.  Yes, sir.
5    Q.  And you -- sorry.  "You like, son, you still got that scat,
6    right?"
7    A.  Yes, sir.
8    Q.  Do you know what he's referencing here?
9    A.  Yes, sir.
10   Q.  What?
11   A.  Scat means gun.
12   Q.  Scat is another word for gun?
13   A.  Yeah.
14   Q.  And how about when you went downstairs and then came back
15   and asked him that question.  Do you know what he's making
16   reference to?
17   A.  I'm confused.  You can tell me that one more time.  Ask me
18   that one more time.
19   Q.  Here Gotti says that you go downstairs, on the porch.  And
20   then you came back and said "come here" and asked him about the
21   scat, right?
22   A.  Right.
23   Q.  Do you know what he's referencing to what happened when you
24   went on the porch and came back?
25   A.  I got a phonecall.

E8e9chr1                          Mallory - direct

1    Q.   From who?

2    A.   From L-1.

3              THE COURT:   Keep your voice up please.

4    Q.   Is that the phonecall you testified about yesterday?

5    A.   Yes, sir.

6    Q.   What did L-1 say in that phonecall?

7    A.   That he was sending somebody over to get the guns.

8    Q.   Did he say "somebody" or did he say something else?

9    A.   He said he was sending the young boys over to get the guns,

10   to get the chains.

11   Q.   So then he says, "yeah, that's my scat," right?  And then

12   he says and "you was like, aw right.  Listen homies got some

13   shit to do later on, so you ain't gon need to have it later

14   on."

15             Do you see that?

16   A.   Yes, sir.

17   Q.   So when he says that, he said, "Listen, homies got some

18   shit to do later on," do you know what he's referencing?

19   A.   Yes, sir.

20   Q.   What's he referencing?

21   A.   To the young boys that's coming over and that they got

22   something to do that need -- that they gonna need the guns for.

23   Q.   Something to do that needs guns you said?

24   A.   Yes, sir.

25   Q.   Then he said, "I ain't got it right now anyway; it's at my

E8e9chr1                          Mallory - direct

1   baby mother's house."

2   A.  Yes, sir.

3   Q.  Whose baby mother's house?

4   A.  Gotti's, Kev Gotti's.

5   Q.  And then you say, "I didn't even know," right?

6   A.  Yes, sir.

7   Q.  And then you said, "I just got a call."

8   A.  Yes, sir.

9   Q.  Is that the L-1 call or a different call?

10  A.  That's the L-1 call.

11  Q.  And then Gotti said, "No, you just said to have the scats

12  ready because we was gonna get a come up just by letting niggas

13  hold the scat."

14          Do you see that?

15  A.  Yes, sir.

16  Q.  So you said to have the scats ready.  What does that mean?

17  A.  Mean have the guns ready.

18  Q.  Okay.  Then Gotti says that you said "because we gonna get

19  a come up just by letting them hold the scat."

20          What's a "come up"?

21  A.  Means a come up -- a come up could mean anything.  It could

22  mean something out of something or --

23          THE COURT:  I'm sorry.  I can't hear you.

24          THE WITNESS:  A come up means like something.

25  Q.  Means what?

E8e9chr1                    Mallory - direct

1    A.  Something.

2    Q.  Means something?

3    A.  Yeah.

4    Q.  What something?

5    A.  Like you say "I'm gonna get a come up," that means I'm

6    gonna get something out of something like out of it.

7    Q.  You're going to get something out of it?

8    A.  Yes, sir.

9    Q.  You said "something out of it."  What do you mean?  You've

10   got to try to explain that a little better, Mr. Mallory.

11   A.  Um a percentage, a percentage.

12   Q.  A percentage?

13   A.  A percent -- yeah.

14   Q.  A percentage of it?

15   A.  Yes, sir.

16   Q.  What is "it"?

17   A.  (No response).

18   Q.  It's not what you said.  I'm asking for your -- you're

19   following up on what you said.  You're going to get a

20   percentage of it or something from it.  What's "it"?

21   A.  It could mean anything.  It could mean if I sell this paper

22   right here for ten dollars, you get a come up out of it, that

23   means like you got something out of the sale I made or

24   something, like I gave you a dollar or two dollars or

25   something.

E8e9chr1                        Mallory - direct

1    Q.   Okay.  So then Gotti says, "Bro, I just got this scat.  I

2    don't like doing that."

3              Do you see that?

4    A.   Yes, sir.

5    Q.   How long had he had that scat for?

6    A.   Not long.  Probably a week before that happened.

7    Q.   And then he says that you said, "Come on it's the homies,

8    fuck with me; they got a movement to move."

9              When you -- do you remember saying that to him?

10   A.   No.  I don't remember saying that to him.

11   Q.   Have you used that term "fuck with me"?

12   A.   Yes, sir.

13   Q.   What does that mean, "fuck with me"?

14   A.   Do something.  "Fuck with me," it mean like um -- I can't

15   explain that.  "Fuck with me" means like do something with me.

16   Q.   To do something?

17   A.   Do something.

18   Q.   Have you ever used that term "they got a movement to move"?

19   A.   No.

20   Q.   No?

21             And then he says, "Know what I'm saying.  They got a

22   jux, some real nice jux."

23             Earlier I think you said jux is a robbery?

24   A.   Yes, sir.

25   Q.   Do you remember telling Gotti that they had a jux, a nice

E8e9chr1                          Mallory - direct

```
1   jux lined up?

2   A.  No, sir.

3   Q.  So going down to the bottom the last part of what Gotti

4   says, he says, "We got the black joint.  I has this chrome

5   joint."

6           Do you know what he's referencing when he says we have

7   the black joint?

8   A.  Yes, sir.  Me and him.

9   Q.  Go on?

10  A.  Yes, sir.  It means me and him had the black gun.

11  Q.  The black gun?

12  A.  Yes, sir.

13  Q.  Where did you get the black gun from?  Whose gun was it?

14  A.  It was L-1's gun.

15  Q.  It says, "I has this chrome joint."  What's he referencing

16  there?

17  A.  That he had the chrome gun.

18  Q.  The chrome gun?

19  A.  Yes, sir.

20  Q.  So then at the very end of the first page they come later

21  on and they start hunting down for the scats.

22          Do you see that?

23  A.  Repeat that one more time.

24  Q.  I'm just asking if you see where he says "They come later

25  on and they start hunting people down for the scats."
```

E8e9chr1                          Mallory - direct

1   A.  Yes, sir.  I see that.

2   Q.  He says that's when he called his baby's mom?

3   A.  Yes, sir.

4   Q.  And what does it say he told his baby's mom?

5   A.  Repeat that question one more time.

6   Q.  What did Gotti say that he told his baby's mom?

7   A.  "Tell your little brother to bring that around the corner."

8   Q.  When he said "that" what was he referring to?

9   A.  Talking about the gun.

10  Q.  Then he says the next entry here, "the little brother came

11  and it was in a plastic bag with a shirt wrapped around it."

12          Do you see that?

13  A.  Yes, sir.

14  Q.  He says, "Remember it was in a plastic bag."  What's he

15  referring to?

16  A.  Talking about the gun.

17  Q.  Which gun, again?

18  A.  The chrome one.

19  Q.  And now he says I gave it to you to give to them.  And you

20  said, "I don't remember."

21          Do you see that?

22  A.  Yes, sir.

23  Q.  He says, "I gave the scat to you."  And then -- and then he

24  says again, "You gave the scat to Bow Wow."

25          Do you see that?

E8e9chr1                          Mallory – direct

1    A.  Yes, sir.

2    Q.  Who did you give a gun to?

3    A.  I gave a gun to Gucci.

4    Q.  Did you give the gun to Bow Wow?

5    A.  No.

6    Q.  So sitting here today as far as you remember who gave the

7    gun to Bow Wow?

8    A.  Gotti gave the gun to Bow Wow.

9    Q.  So then he says -- I'm sorry.

10           So then later on he says, "I seen them going upstairs

11   and I came in right behind them."  When he says "going

12   upstairs" do you know what he's referencing?

13   A.  Yes, sir.

14   Q.  What's he referencing?

15   A.  I believe the ground level, the -- like the steps that come

16   from the ground to the doors.

17   Q.  To the door to the first level?

18   A.  Yes, sir.

19   Q.  And then he said, "who gone hold my scat."  Do you see

20   that?

21   A.  Yes, sir.

22   Q.  Who did he say that to?

23   A.  He said that to me.

24   Q.  To you?

25   A.  Yes, sir.

E8e9chr1                      Mallory - direct

1  Q.  And then -- and then he said that you said, "Oh Gucci or

2  somebody was gonna."

3          And then he said, "Hell no.  If ain't my drop then I

4  don't -- then I'm not giving them my scat out there."

5          Do you see that?

6  A.  Yes, sir.

7  Q.  So he says if "it ain't my drop."  Was a drop?

8  A.  It means a person that you turned Blood.

9  Q.  I think I asked you that question yesterday.  I think you

10 explained that to us.  I'm sorry.

11          So he says he's only giving us his scat to a drop.

12 And then he says that's when "Bow Wow was like all right I'll

13 take your scat."

14 A.  Yes, sir.

15 Q.  So when he says that Bow Wow said that, what is he

16 referencing?

17 A.  To the chrome gun.

18 Q.  Let's turn to the third page.

19          Do you see where Gotti says we ain't -- right at the

20 top -- "that we didn't know nothing, we ain't had no

21 knowledge."

22          Do you see that?

23 A.  Yes, sir.

24 Q.  And then later he says, "we didn't even know how much

25 niggas was rolling."

1                 Do you see that?

2    A.   It says going.  Yes, I see it though.

3    Q.   You said going and then he says rolling?

4    A.   Oh, yeah, yeah.  I see it at the top of it.  Yeah, I see

5    it.

6    Q.   What did he mean, how much they was rolling?

7    A.   Meaning how many people were going.

8    Q.   So he's saying he didn't know how many people?

9    A.   Yes, sir.

10   Q.   What did he say that all he knew?

11   A.   "All I know is Bow Wow and Gucci."

12   Q.   So then he says that he's uneasy, right?

13   A.   Yes, sir.

14   Q.   He says, I'm already beefing with niggas."  Do you know

15   what that's a reference to?

16   A.   To the Jamaicans.  He was having problems with the

17   Jamaicans at the time.

18   Q.   Okay.  Then he says, "And this shit don't hardly work.  I

19   was trying to get people to fix my pin."

20                 Do you see that?

21   A.   Yes, sir.

22   Q.   When he's saying that the shit don't work, what shit is he

23   talking about?

24   A.   Talking about the chrome gun.

25   Q.   And then you said, "You shot it out the window," right?

E8e9chr1                        Mallory - direct

1    A.  Yes, sir.

2    Q.  And then he said, "that was like a couple of days before

3    this shit happened," right?

4    A.  Yes, sir.

5    Q.  "And I let these niggas hold it for a jux and they came

6    back empty-handed."

7            Do you see that?

8    A.  Yes, sir.

9    Q.  When he said that they came back empty-handed, who is he

10   referring to, do you know?

11   A.  It was Bow Wow and somebody else I think Shablackie or

12   somebody.

13   Q.  Bow Wow and you think Shablackie?

14   A.  Yes, sir.  And it was somebody else.  I don't remember who

15   was the other person.

16   Q.  You said that they, Bow Wow and Shablackie, they didn't jux

17   they didn't rob because they thought the gun wasn't working,

18   right?

19           MR. BUCHWALD:  Objection, your Honor.  He's inserted

20   Bow Wow and Shablackie.  It's Baynes.

21           THE COURT:  Just read from the transcript, Mr. Bauer.

22   Q.  When he says "they" in the next sentence "they ain't jux"

23   who is "they"?

24   A.  They would -- it was Bow Wow and somebody else.  I don't

25   remember who the other person was.  I can't think of it.

E8e9chr1                         Mallory - direct

1   Q.  Okay.  So he said "shoot that shit out the window.  My shit

2   work."

3            Do you see that?

4   A.  Yes, sir.

5   Q.  Do you remember that?

6   A.  Yes, sir.

7   Q.  What happened during that?

8   A.  Gotti took the gun, put a bullet -- put like two bullets in

9   it and he shot it out the window two times.

10  Q.  Okay.  Before that, when they said the gun didn't work,

11  what did he say to them?

12  A.  He told Bow Wow to put the gun to his hand and shoot it out

13  the window.

14  Q.  When you said put the gun to his hand?

15  A.  Yeah, and shoot it out the window, if it doesn't work.

16  Q.  Okay.  Then finally at the bottom you and he are both

17  saying that "they put us in a situation."  Do you see that?

18  A.  Yes, sir.

19  Q.  What's the situation that you're referring to?

20  A.  The situation we in now.

21  Q.  Which is what?

22  A.  Having -- being part of this robbery whatever.

23  Q.  What robbery are you referring to?

24  A.  The one that they did with Joker.

25            MR. BAUER:  Judge, may I have one moment.

E8e9chr1                          Mallory - direct

1              THE COURT:  Yes.

2              (Pause)

3              MR. BAUER:  Your Honor, no further questions for

4     Mr. Mallory.

5              THE COURT:  Very well.  Cross.

6              MR. DRATEL:  May we have a sidebar.

7              THE COURT:  Certainly.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E8e9chr1                    Mallory - direct

1              (At the sidebar)

2              MR. DRATEL:  There are a number of issues that are --

3    constitute Brady material that we have not received that are

4    evidently from the 3500.  I didn't know they were going to get

5    into it on direct, but they did not.  So, obviously, just

6    because it's not written down, just because it's not 3500,

7    doesn't mean it's not exculpatory and qualifies as Brady and a

8    subset of that being Giglio.

9              The first is we have nothing on his January 2012

10   arrest that he says precipitated his cooperation.  We have no

11   paperwork on that whatsoever.

12             We have nothing on the revocation of his bail in

13   September of 2012 where he says he went to jail.  We have a

14   pretrial services report that he tested positive.  But we do

15   not have any other paperwork on that.

16             Third is we do not have anything on these undisclosed

17   robberies including when he was confronted specifically and

18   what the nature of -- about the robberies themselves in the

19   sense that these two undisclosed robberies before he signed his

20   cooperation agreement that he did not disclose until

21   afterwards.  There's a notation that he was confronted about

22   them but it doesn't say when.  It doesn't say any detail about

23   the robberies.

24             THE COURT:  Confronted by who.

25             MR. DRATEL:  Prosecutors.

1         THE COURT:  Okay.

2         MR. DRATEL:  This is the first -- the trial is the

3    first that we have heard that he shot Burden.  In his 3500

4    material he has Williams shooting Burden.  So I would like to

5    know when he first disclosed that he shot Burden in the leg,

6    what he discussed the other day.

7         I'd like to ask the question whether the Newburgh

8    police department has any informant file on Mr. Mallory because

9    the lack of the paperwork on the arrest is confusing, if not

10   suspicious.

11        And the last thing is -- and I know that these

12   prosecutors were not present for Mr. Mallory's plea but it

13   appears from the transcript that he deliberately -- that

14   Mallory was deliberately not allocuted on the issue of drug use

15   at the plea and I'll say this because, first of all, it's not

16   there.  There is no competency allocution at all, which to me

17   is unusual.

18        THE COURT:  I didn't conduct that.

19        MR. DRATEL:  No.  I know it was Magistrate Judge

20   Smith.  It was Magistrate Judge Smith.  There is no competency

21   allocution whatever.

22        But towards the very end of the proceeding Magistrate

23   Judge Smith says -- now I know you're going to test positive

24   today but stay away from drugs from here on out.

25        So clearly it was raised with her that there was going

1    to be an issue and I think it was avoided to keep it off the

2    record and I would like to know what happened with that.

3              THE COURT:  Before I ask the prosecutors to respond I

4    will make the observation, Mr. Dratel, these are important

5    issues.  This is an important case.  But that's why -- issues

6    like this are why I have the lawyers here at 9:00 so that we

7    don't have the jury in the box waiting while we have this

8    discussion.  All of these issues, it seems to me, could have

9    been brought up at 9:00.

10             Mr. Bauer made the representation at the end of the

11   day yesterday that he would only be going through the excerpts

12   with Mr. Mallory and then ending his direct examination.  So

13   all of this could have been brought up either yesterday

14   afternoon or this morning at 9:00.

15             In any event, Mr. Bauer.

16             MR. BAUER:  Just on that score I'm really surprised to

17   be hearing about this all now because we've had a pretty

18   cooperative working relationship with defense counsel.  And

19   they've made a number of questions and said where's this and

20   where's that.  And we made every effort to get it; sometimes on

21   our own prerogative sometimes based on their requests.

22   Obviously, this goes without saying that none of this -- to the

23   extent there is documents missing -- none of it is deceitful.

24   In fact, we produced a tremendous amount of 3500 for

25   Mr. Mallory.  I'm trying to remember some of the things that

1    Mr. Dratel said.

2              The plea transcript is the only one that we were able

3    to get.  I wasn't there, nor was Mr. Nawaday, as Mr. Dratel

4    said.  I think it was Glen McGorty who was there, who is now in

5    private practice.  I can talk to him, I guess.

6              THE COURT:  Is there any other transcript?

7              MR. BAUER:  I guess there might have been other

8    transcripts of other proceedings that he was at but not on the

9    day of his plea.  That's the only one we got back.

10             What are the other issues?

11             THE COURT:  The January arrest that led to his

12   cooperation.

13             MR. BAUER:  I believe that we did turn over 302s.  I'd

14   have to look.  To the extent something is not in there, it's

15   been disclosed in a variety of ways, if not in this paperwork

16   that he's saying.  I don't remember what's in there.

17             THE COURT:  Well, this is what I suggest.  I mean

18   there is no lack of 3500 material, I believe, that the parties

19   have received concerning Mr. Mallory.  Why don't you provide a

20   list of what it is that you think that has been held back or

21   the things that you haven't received to the prosecutors and

22   let's get started the cross-examination.

23             MR. BAUER:  Judge, two things.

24             Number one, I'll also note for the record that we

25   turned over early disclosure of this 3500.  So they've had this

1   for an extra long time to raise these concerns.

2              Second of all, I think the one thing that Mr. Dratel

3   can use during his cross right now, the one that I think is

4   going to be useful is when was he confronted about these

5   robberies and he testified it was after his cooperation, before

6   his -- it was after his plea, I'm sorry, but before he went

7   in -- no, he didn't say that.  Frankly, it was after that.  It

8   was -- it was a couple -- off the top of my head, it was a

9   couple of months after he already went in.  I'm representing

10  that to you now.  It was in a proffer that I was present.  He

11  was already in.  He had already signed his cooperation

12  agreement.  We confronted him on it.

13             MR. DRATEL:  Was he confronted because other people

14  had told you about him?

15             MR. BAUER:  We neither confirm nor deny that.  We

16  obtained other information about those records.

17             MR. DRATEL:  You should know that because it's not

18  like he came in and he said have you committed any other

19  robberies and he said, oh, yeah, I forgot about these.  It's

20  because they put these other people in jail and then they

21  ratted on him and then he comes back to it.

22             MR. BAUER:  Cross him on it.  I'm giving you the

23  information.

24             MR. DRATEL:  If he lies will we get a stipulation that

25  he's not telling the truth.

E8e9chr1                    Mallory - direct

1              MR. BAUER:  Sure.  If he says something -- something,

2    what he's saying that's inconsistent with something else.

3              Is there anything else that I can represent to you now

4    that will facilitate your cross?

5              MR. DRATEL:  When did he say he shot Burden?

6              MR. BAUER:  I'm pretty confident it's somewhere in the

7    notes, and I think you missed it.  I think he did say at some

8    point it was L-1.  And then it's months and months that he has

9    said that same story about how he shot him in the foot to save

10   him from being shot in the face.

11             MR. DRATEL:  I don't think it's in the 3500 but maybe

12   he said it.  All right.

13             MR. BAUER:  It's been for months.  But to the extent

14   you're going to cross him, you can cross first he said L-1.

15             THE COURT:  So get whatever information you think you

16   haven't received and let's get started on cross.

17             (Continued on next page)

18

19

20

21

22

23

24

25

1        (In open court)

2    CROSS EXAMINATION

3    BY MR. DRATEL:

4        MR. DRATEL:  Your Honor, may I proceed?

5        THE COURT:  You may.

6        MR. DRATEL:  Thank you, your Honor.

7    Q.  Good morning, Mr. Mallory.

8    A.  Good morning.

9    Q.  Now, the tape that we just saw that you made in July of

10   2012 was made about six, seven months after you began

11   cooperating, correct?

12   A.  Yes, sir.

13   Q.  The purpose was for you to engage Mr. Burden in a

14   conversation about things that would incriminate Mr. Burden,

15   correct?

16   A.  No.

17   Q.  You weren't trying to get Mr. Burden to talk about the

18   night of December 14, 2010?

19   A.  Yes, sir.

20   Q.  And you were instructed to do so by the police, correct?

21   A.  Yes, sir.

22   Q.  It was important for you not to be discovered as someone

23   who was cooperating with the government at that point, right?

24   A.  Yes, sir.

25   Q.  So it was important for you to have that conversation over

1   an hour and a half with Mr. Burden and not have him know that

2   you were in fact taping the conversation and trying to get him

3   to have a conversation with you about those events, right?

4   A.   Yes, sir.

5   Q.   Have you ever taken any acting training?

6   A.   No.

7   Q.   Ever had any training as an undercover operative?

8   A.   No.

9   Q.   We are talking about, Mr. Burden, when I say Mr. Burden,

10   it's Kev Gotti, right?

11   A.   Yes.

12   Q.   I may refer to him as Mr. Burden or Kev Gotti, but you know

13   who I mean, right?

14   A.   Yes.

15   Q.   So you were very close to Mr. Burden, right?

16   A.   We were friends, yes.

17   Q.   You were friends you lived in the same house, right?

18   A.   No.

19   Q.   You didn't live at 260 First Street?

20   A.   I lived at 260 First Street, but it was two different

21   apartments.

22   Q.   In the same house.  That was my question.

23   A.   No.

24   Q.   He didn't live in 260 First Street?

25   A.   Yes.

E8enchr2                          Mallory - cross

1    Q.  And you did as well?

2    A.  Yes.

3    Q.  That's the same house, right, it's the same building?

4    A.  It's the same building, yes.

5    Q.  It is not an apartment building, right, it is a house?  It

6    is a multi-family dwelling?

7    A.  It is an apartment, yeah.  Yeah.

8    Q.  We saw a photo of it yesterday.  That is an apartment

9    building to you?

10   A.  It is a building with apartments in it.

11   Q.  But you lived in the same building, correct?

12   A.  Yes, sir.

13   Q.  And you've known him for years, correct?

14   A.  Yes, sir.

15   Q.  And you hang out with him a lot, correct?

16   A.  Yes, sir.

17   Q.  And you smoke and you drink with him, correct?

18   A.  Yes, sir.

19   Q.  And you were able to deceive him for that entire hour and a

20   half sitting right across the table from each other, right?

21   A.  What does "deceiving" mean.

22   Q.  Deceive?

23   A.  Yes.

24   Q.  To not be truthful with him about your purpose.  You told

25   him we are taping this?  By the way, there is a camera in the

E8enchr2                          Mallory - cross

1   clock, so everything you say is going to go to the government?

2        You said that to him?

3   A.  No, I didn't say that.

4   Q.  Of course not, right?  You deceived him.  Do you understand

5   what I mean?

6   A.  I understand.

7   Q.  You have a GED, right?

8   A.  Not yet, no.  I'm working on it.

9   Q.  You didn't tell the government you had a GED from Orange

10  County Community College?

11  A.  Yes, I told them that.

12  Q.  OK.  So that was a lie?

13  A.  I didn't complete it.

14  Q.  That was a lie?

15  A.  Yeah, it was a lie.

16  Q.  Among many lies that you have told, right?

17  A.  No.

18  Q.  You haven't told many lies.  OK.  We'll get into that.

19       Now, you also taped a bunch of other people you said,

20  right, 15 times you were wired, right?

21  A.  Yes.

22  Q.  And some of them were for long periods of time, more than

23  an hour, hour and a half, right, two hours, right --

24  A.  Yes.

25  Q.  -- some of those sessions, and no one was on to the fact

E8enchr2                          Mallory - cross

1    that you were taping them for purposes of helping the

2    government, right?

3    A.   No.

4    Q.   These were all friends of yours, right?

5    A.   No.

6    Q.   Snelly?

7    A.   Snelly was a friend of mines, yes.

8    Q.   Quick?

9    A.   Yes.

10   Q.   Geo?

11   A.   Yes.

12   Q.   You committed crimes with these people, right?

13   A.   Yes.

14   Q.   And you were able to deceive them for a long periods of

15   time in a single session, right?

16   A.   Yes.

17   Q.   And they spent a lot more time with you than this jury has,

18   right?

19   A.   Yes.

20   Q.   And you were able to lie to them consistently, so that they

21   didn't know your true purpose in speaking to them, right?

22   A.   No.

23   Q.   You told them the truth?

24   A.   They never asked me if I was doing it.

25   Q.   They never asked you.  You think that's OK.  You think it

E8enchr2                          Mallory - cross

1   is OK to tape your friends, you think that that's not lying to

2   them?

3   A.  If they had asked me --

4   Q.  If they had asked you, you would have told them, yeah, I'm

5   taping this for the government?  You would have told them?

6   A.  No, I wouldn't have told them.

7   Q.  Of course not.

8          You stayed in character the entire time, that whole 90

9   minutes with Mr. Burden, and all of your other sessions with

10  all of your other friends you stayed in character.  You never

11  let on for a second, right, that you were working for the

12  government and you were taping those conversations --

13  A.  No.

14  Q.  -- for a second.  That's because you had a purpose, right?

15  A.  Yes.

16  Q.  Which was to help yourself get out of your trouble, right?

17  A.  What do you mean by that?

18  Q.  I mean to get your deal, right?

19  A.  Yes.

20  Q.  You said during the course of your cooperation you met with

21  agents once or twice a week, you were in contact with them all

22  the time, texting, phone calls, everything, right?

23  A.  Yes, sir.

24  Q.  You were able to do that, hanging out with all these

25  people, committing crimes with them, without being detected,

1   right, by them?

2   A.  Yes.

3   Q.  No one knew.  I want to go back to your conversation with

4   Mr. Burden again for a bit.  Mr. Bauer asked you this morning

5   about the alcohol, right?

6   A.  Yes, sir.

7   Q.  Now, you gave him some alcohol to get him in the mood,

8   right?

9   A.  If you look at that, he drunk, but not to get him in the

10  mood.  He didn't even drink a lot.  He drunk like probably half

11  a cup.  He wasn't drinking.

12  Q.  The jury can see how deep you are into that bottle by the

13  time those excerpts -- the bottle is visible.

14          MR. BAUER:  Objection, your Honor.

15          THE COURT:  Overruled.

16  Q.  But you had to manipulate him, right?

17  A.  No.

18  Q.  Well, let's just look at on the transcripts.  Look at

19  excerpt 1.  All right.  Page 1, you're CW, right?

20  A.  Yes, sir.

21  Q.  By the way, that stands for confidential witness, right?

22  A.  Yes, sir.

23  Q.  So, let's look at the second entry for you.  There's one

24  entry for you, one entry for B, which is Burden, right, and

25  then there's you again?

1      So you say, Like, think about, you remember, you

2      remember who was there.  Think about it.  It was Bow Wow.  I'm

3      going to refresh your memory.  It was Bow Wow, Gucci, Reckless,

4      Besheltie's son.

5      Besheltie's son is Baynes, right?  Anthony Baynes,

6      correct?

7      A.  Yes.

8      Q.  And then you go on, he says, Uh-huh, Baynes.

9      And you go, Baynes, Baby E and Gucci.  So you said

10     Gucci twice there, right?

11     A.  Yes.

12     Q.  So we'll never know, will we, that if you hadn't fed those

13     names to Mr. Burden whether on his own he would have agreed

14     with you whether he would have had those names, whether he

15     would have put those people in there, right?

16     A.  Repeat that again.

17     Q.  If you hadn't said it first, and if you had given him a

18     chance to say who was there that night before you fed him all

19     those names, we'll never know whether he independently would

20     have named those people, right?

21     A.  He would have known.

22     Q.  We wouldn't know, would we, the jury won't know because you

23     fed him those names first, right?

24     A.  If you would have asked him, yeah, he would have knew.

25          MR. BAUER:  Objection, your Honor.

1           THE COURT:  The objection is overruled.

2    Q.  We don't know, and the jury will never know because you fed

3    him those names first, right, after feeding him some drinks,

4    correct?

5    A.  I never did that.  That's not correct.

6           MR. GOLTZER:  I couldn't hear the answer, Judge.

7           THE COURT:  Mr. Court Reporter.

8           (Record read)

9    Q.  But you did feed him the information, right?  There's no

10   point before in this, in your conversation with Mr. Burden

11   where he gets an opportunity to say who he thought was there,

12   right?

13   A.  I believe in the transcript that says that, who he thought

14   was there or he remembers was there.

15   Q.  That he said first who was there?  That you didn't say it

16   first?

17   A.  Yeah, I said it first.

18   Q.  That's in the transcript?

19   A.  I said it first.  I reminded him, but he knew after I said

20   it.

21   Q.  No.  But you are the one, you never gave him a chance,

22   right, to say who was there; you told him who was there?

23   A.  I didn't tell him.  I reminded him.

24   Q.  You reminded him?

25   A.  He knew.

E8enchr2                           Mallory - cross

1   Q.  OK.  By the way, you also mentioned Baby E, right?

2   A.  Yes.

3   Q.  That's Eric Cromartie.  Did you know his real name?

4   A.  No, I just knew Eric.

5   Q.  Baby E and you on direct -- withdrawn.  But Baby E is dead,

6   you know that, right?

7   A.  Yes, sir.

8   Q.  He died of a brain tumor, correct?

9   A.  I don't know the cause of his death.  I know that he died.

10  Q.  I'm sorry?

11  A.  I don't know the cause of his death, but I know he passed

12  away.

13  Q.  From natural causes, right?

14  A.  I don't know the cause of his death, but I know that he

15  passed away.

16  Q.  By the way, this is 20 months after the event itself,

17  correct?

18          THE COURT:  What is?

19          MR. DRATEL:  I'm sorry.  Thank you, your Honor.

20  Q.  The July 2012 conversation that you have with Mr. Burden is

21  20 months after Jeffrey Henry, Joker, was killed?

22  A.  Around 20 months, yeah.

23  Q.  You tape down these people, including Snelly, Geo, and

24  Quick, right, in the spring of 2012, even before Mr. Burden,

25  right?

1    A.  Yes, sir.

2    Q.  All this time, as you told us on direct, you were

3    committing robberies with them, right?

4    A.  Yes.

5    Q.  During that period?

6    A.  Yes, sir.

7    Q.  And somehow you thought that you would be able to get them

8    in trouble with these tapes and commit crimes with them and no

9    one would find out, right?

10   A.  No.

11   Q.  You thought they were going to tell, you thought you could

12   tape them, that they would get arrested, and that you would be

13   OK for the crimes that you committed with them that you never

14   told the government about while you were cooperating?

15   A.  Repeat that again?

16   Q.  Sure.

17          You're cooperating, correct, the first half of 2012

18   you're cooperating, right?

19   A.  Yes.

20   Q.  You are also committing crimes with Snelly, Geo, and Quick,

21   correct?

22   A.  Yes, sir.

23   Q.  At the same time, in March of 2012, you record Snelly,

24   right?

25   A.  Yes, sir.

E8enchr2                    Mallory - cross

1    Q.  In April of 2012, you record Geo, correct?

2    A.  Yes, sir.

3    Q.  And in April of 2012 you record Quick, correct?

4    A.  Yes, sir.

5    Q.  You know the purpose of those recordings is to get them

6    arrested essentially, right?

7    A.  Yes, sir.

8    Q.  So you thought that you would be able to commit crimes with

9    them at the same time that you are taping them and that you

10   weren't going to get any -- there were going to be no

11   consequences for you, right?  That is what you thought?

12   A.  No, I didn't think that.

13   Q.  You didn't think.  You just didn't think at all because

14   after they got in trouble, they told the government about your

15   robberies, right?

16   A.  No.  I told the government about my robberies.

17   Q.  But they confronted you first, right?  You didn't say, oh,

18   by the way, I forgot these robberies.  They said hey after you

19   signed your plea agreement after you pled guilty, after you are

20   already back in jail, the government came to you and said,

21   Mr. Mallory, we know about two robberies and a planned burglary

22   that you committed while you were cooperating, while you were

23   out, that you never told us, right?

24   A.  No.

25   Q.  You volunteered the information?  That's what you're

1  claiming?

2  A.  I told them about the robberies, right.

3  Q.  I'm asking you whether you volunteered it or they said to

4  you first, we know about these robberies?

5  A.  No, they said that to me.

6  Q.  They said they knew about it, right?

7  A.  Yes.

8  Q.  They knew about it because the other people had told them

9  about it who you had gotten in trouble, right?

10  A.  I don't know who told them.  I know that they knew about

11  it.

12  Q.  They didn't tell you, We have the information, because we

13  know exactly what happened?

14  A.  I don't remember that.

15  Q.  You don't remember that.  All right.

16          By the way, with respect to all those tapes that you

17  did, again, you never had any formal training on how to do

18  that, right, they just put you in those rooms and you went at

19  it, right?

20  A.  No.  They showed me to you to like, not that they told me

21  like little stuff not to do with it.

22  Q.  I'm sorry.  I couldn't hear.

23  A.  They told me like little stuff not to do with the recorder.

24  Q.  They told you stuff not to do with what?

25  A.  With the recorder that I had, with the little recorder that

E8enchr2                    Mallory - cross

1  I had.

2  Q.  On your body?

3  A.  Yeah.

4  Q.  But they didn't tell you how to act, they didn't give you

5  instruction, you didn't take a course on how to do all this,

6  right?

7  A.  No.

8  Q.  You are a natural, right?

9  A.  No.

10  Q.  You talked a little bit about your drug use, right, on

11  direct.

12          By the way, you understood from the process, from

13  talking to the government, from talking to your lawyer, that it

14  was in your best interest to disclose to the government when

15  you cooperated everything you had done, right?

16  A.  Yes.

17  Q.  Because that way you could get coverage for it, right?

18  A.  Yes.

19  Q.  You know what I mean by coverage?  Coverage means that they

20  wouldn't charge you for it after you made this agreement that

21  everything you disclosed you would have a clean slate

22  thereafter, right?

23  A.  Clean what?

24  Q.  A clean slate?

25  A.  What does that mean?

E8enchr2                         Mallory - cross

1    Q.  That means that you wouldn't have to worry that something

2    you did in the past was going to come back and be charged

3    against you because you hadn't disclosed it, right?

4    A.  Yes.

5    Q.  So it's to your advantage, it is in your best interest to

6    tell them everything, right?

7    A.  Yes.

8    Q.  And not to hold back?

9    A.  Yes.

10   Q.  So you met with the government in July 30, 2012, right?

11   A.  Yes.

12   Q.  That was not the first time obviously, right?  You had had

13   sessions with them before, starting in January?

14   A.  Yes.

15   Q.  And they discussed your drug use with you, right, at that

16   session?

17   A.  I believe it was when I went to court.  I am not sure if it

18   what July 30 or not.

19   Q.  I'm sorry?

20   A.  It was the day that I went to court.  I am not sure if it

21   was July 30.

22   Q.  Didn't you also have a meeting separately with the

23   government where they wanted to know what kind of drugs you had

24   done in your life, right?

25   A.  I don't remember that.

E8enchr2                    Mallory - cross

1    Q.  You don't remember it.  OK.  Fair enough.

2            You don't remember because it is a while ago, right?

3            Right?

4    A.  I don't remember that.

5    Q.  It was two years ago.  It's more than two years ago now,

6    right?

7    A.  It was two years ago, about two years ago, correct.

8    Q.  OK.  So you met with the government July 30, 2012.  You

9    don't remember -- I am going to show you what's marked --

10           MR. DRATEL:  If I may approach, your Honor?

11           THE COURT:  You may.

12           MR. DRATEL:  Thank you, your Honor.

13   Q.  -- 3502-31 and ask to you look at this document.  Then I'm

14   going direct you to this page and to that item there.

15           Look at that.  First, does that refresh your

16   recollection that you met with the government July 30, 2012 for

17   a proffer session?  Does that refresh your recollection?

18           Does that refresh your recollection that you met with

19   them on July 30, 2012, Mr. Mallory?

20   A.  I'm reading it.  Yeah.  I remember that.

21   Q.  OK.  Look at the second-to-last page, please, of that

22   document.  Withdrawn.  Before you do that, didn't you tell the

23   government during that interview when they asked you about drug

24   use, that you said that you had smoked marijuana -- weed I

25   think was the term used there -- occasionally, a couple of

1   times?  Right?

2   A.  Yes.

3   Q.  That was a lie, right?

4   A.  No, that wasn't a lie.

5   Q.  Did you tell us just the other day that you smoked it

6   regularly, on a nearly daily basis, if not a daily basis, until

7   you went to jail in 2012?

8   A.  That wasn't from --

9   Q.  This is July 2012, right?  By the way, you tested positive

10  two weeks later, right?

11  A.  Yes, sir.

12  Q.  And then you tested positive ten days after that, right?

13  A.  Yes, sir.

14  Q.  Occasionally, a couple of times.  That was your answer

15  there, right?  Even though you knew it was in your best

16  interest to tell the truth and disclose everything, right?

17  A.  I told them I smoked.  I told them the truth.  I told them

18  that I smoked, and I told them that my urine was dirty.

19  Q.  Did you tell them that you smoked occasionally a couple of

20  times?  Yes or no?

21  A.  A couple times a week, yeah, I told them that.

22  Q.  A couple of times or a couple of times a week?

23  A.  A couple of times, a couple times a week.  I forget what I

24  told them.

25  Q.  Look that the document again.  I am going to ask you, did

E8enchr2                    Mallory - cross

1    you tell them a couple of times a week or a couple of times,

2    that second-to-last page?

3              MR. BAUER:  Judge, is Mr. Dratel asking Mr. Mallory to

4    refresh his recollection or read directly from it.

5              MR. DRATEL:  I'm not asking him to read from it.  I'm

6    just asking him to refresh his recollection, your Honor.

7              Thank you.

8    A.  In here it says a couple of times, but it doesn't say a

9    couple of times when.  I know I smoked a couple times a week.

10   Q.  OK.  Now, PCP, right, angel dust, you did that, too, right?

11   A.  Yes, sir.

12   Q.  You told us on direct that you did it, and then for a while

13   you did it more after your child was born, right?

14   A.  Yes, sir.

15   Q.  In fact, you went to rehab once, didn't you, when you were

16   16 or 17 years old?

17             Mr. Mallory, please don't read the document, please

18   answer my questions.

19   A.  Repeat that question again.

20   Q.  Yes.  Please pay attention.

21             When you were 16 or 17 years old, you went to rehab,

22   right, for PCP?

23   A.  No, it was for marijuana.

24   Q.  Marijuana.

25   A.  But --

1    Q.  You went to rehab for marijuana at the age of 16, 17?

2    A.  Yes, sir.

3    Q.  It didn't take obviously.

4    A.  Repeat that again?

5    Q.  It didn't seem to work, correct, the rehab?

6    A.  It worked.  I just relapsed later on.

7    Q.  For a ten-year period.

8            PCP, you said you have done a lot, correct?  You

9    testified every couple of days and that it increased.  Didn't

10   you testify to that just the other day?

11   A.  Yes.

12   Q.  What do you like about PCP that you do it so much?

13   A.  What?

14   Q.  How does it make you feel?  What do you like about it that

15   you do it so much?

16   A.  I don't remember what I liked about it.

17   Q.  You don't remember.  Did it burn your brain out that much

18   that you can't remember why you did something every day?

19   A.  No.

20   Q.  So what was it that you liked about it?

21           MR. BAUER:  Asked and answered, your Honor.

22           THE COURT:  Overruled.

23           You can answer that, Mr. Mallory, if you can.

24   A.  I don't know, the high.

25   Q.  The high?  How did it make you feel?  What did a high do

E8enchr2                          Mallory – cross

1    for you?

2    A.  It made me high.

3    Q.  What do you mean by high?  There are different kinds of

4    highs.  What kind of high was it?

5    A.  I don't know.  I can't explain it.  It just made me high.

6    Q.  Now, when you committed your robberies, were you doing PCP?

7    A.  Yes.

8    Q.  When you were at your proffer sessions, were you doing PCP?

9    Were you on PCP for some of those times?

10   A.  Never.

11   Q.  Never.  How about your plea?  How about when you pled

12   guilty?

13   A.  No.

14   Q.  You tested positive for PCP that day, right?

15   A.  Yes.

16   Q.  And then ten days later you tested positive again for PCP,

17   right?

18   A.  Because it stays in your system.  You don't have to smoke

19   that day for it to be in your system.

20   Q.  You know?  You are a scientist?  You know that?

21   A.  No, I learned that as a teenager in drug programs.

22   Q.  Oh.  But, wait, you tested positive for PCP at your plea,

23   correct?

24   A.  I don't --

25   Q.  Withdrawn.  After you pled guilty you were out, right, you

E8enchr2                          Mallory - cross

1    weren't in jail at the time, correct?

2    A.  Yes.

3    Q.  You walked into the court and you walked out of the court

4    the day you pleaded guilty to all these crimes, right?

5    A.  Yes.

6    Q.  And the government didn't oppose granting you bail, right?

7    A.  Yes.

8    Q.  And you had to put up no money, all you had to do was sign

9    your name and you were out the door, right?

10   A.  Yes.

11   Q.  You went down to the probation department, and they took a

12   urine sample, right?

13   A.  Yes.

14   Q.  You tested positive for marijuana and PCP, right?

15   A.  Yes.

16   Q.  You had alerted the government at that point that you were

17   going to test positive, right?

18   A.  Repeat that again, sir.

19   Q.  You had told the government in advance of your plea

20   proceeding, the day you pleaded guilty you told the government

21   in advance that you were going to test positive for drugs,

22   right?

23   A.  Yes.

24   Q.  In fact, the judge knew about it as well, right?

25   A.  Yes.

E8enchr2                          Mallory - cross

1   Q.  In fact, the judge, not Judge Ramos, but the judge who you

2   pleaded guilty before, said to you, I know you are going to

3   test positive today, but you better not get near drugs after

4   today, right?

5   A.  Yes.

6   Q.  That was August 14, 2012, right?

7   A.  Yes.

8   Q.  And you tested positive that day for marijuana and PCP,

9   right?

10  A.  Yes.

11  Q.  And they let you stay out, right, because you disclosed it?

12  A.  Yes.

13  Q.  You took another urine test the 24th of August, 10 days

14  later, right?

15  A.  Yes.

16  Q.  And you tested positive again, right?

17  A.  Yes.

18  Q.  For PCP, for marijuana, right?

19  A.  Yes.

20  Q.  And for cocaine this time, too, right?

21  A.  Yes.

22  Q.  So, right after the judge tells you stay away from drugs

23  from now on, you not only test positive again for marijuana,

24  PCP, but now you have added cocaine to your regimen, right?

25  A.  Yes.

E8enchr2                         Mallory - cross

1   Q.  This was all drugs that you had done in between the 14th

2   and the 24th, right?

3   A.  Yes.

4   Q.  So you claimed you turned yourself in.  That's what you

5   said at the beginning of your testimony, right?

6   A.  Yes, sir.

7   Q.  But you didn't turn yourself in.  You violated the terms of

8   your bail, right?

9   A.  Yes.

10  Q.  By testing positive.  You were going in.  You didn't

11  volunteer.

12  A.  I got a call like two days before I had to go in, and they

13  told me to meet them somewhere and I turned myself in.

14  Q.  By turned yourself in you mean you didn't make them come

15  find you, but you were going in they put you in, right?

16  A.  Yes.

17  Q.  Because you violated the terms of your bail and the terms

18  of your cooperation agreement, right?

19  A.  My what?

20  Q.  You violated the terms of your cooperation agreement by

21  using drugs, right?

22  A.  Yes.

23  Q.  Now, you talked about the Bloods.  I just want to talk

24  about -- at some point in your testimony you said something

25  about things that you were doing and why you were no longer a

E8enchr2                     Mallory - cross

1   Blood.  Did your drug use have something to do with the Bloods

2   not wanting to have to do with you?  Were you too drugged out

3   on PCP for them to deal with you?

4   A.  No.

5   Q.  By the way, you weren't charged with any additional crimes

6   as a result of testing positive, right?  You weren't charged

7   with violating bail, right?  You got a pass on that, right?

8   A.  What?

9   Q.  You have never been charged with violating the terms of

10  your bail, correct?  You've never been charged with a crime for

11  violating the terms of your bail by doing drugs, right?

12  A.  No.

13  Q.  OK.  So you got a pass on that.  You know what I mean what

14  I mean by pass, right?

15  A.  I know what a pass is, yeah.

16  Q.  You got a pass on that, right?

17  A.  No.

18  Q.  You are going to get charged with that?  No, you are not

19  going to get charged with that, are you?

20  A.  I don't know what's going happen when I get sentenced.

21  Q.  It's been how long?  Two years now.  Do you think you are

22  going to get charged with it?

23  A.  Yeah.

24  Q.  OK.  You also weren't charged with any additional crimes

25  about drug possession, right?

E8enchr2                         Mallory - cross

1    A.  No.

2    Q.  In fact, you tested positive --

3             MR. BAUER:  Your Honor, objection.  It's the same

4    question.  Asked and answered.

5             THE COURT:  Overruled.

6    Q.  I mean they are separate.  One is violating bail and the

7    other is the actual use of the drugs, having drugs.  You

8    weren't charged with that either?

9    A.  I violated the bail for using drugs.

10   Q.  Right.

11   A.  But during --

12   Q.  The using of the drugs, the fact that you possessed drugs

13   was a crime in itself, right, the possession of drugs?  And you

14   weren't charged with that crime either.  After you signed your

15   cooperation agreement and pleaded guilty to all the other

16   offenses, you have not been charged with the additional crimes

17   that you committed since August 14, 2012, right?

18   A.  Not yet.

19   Q.  You mentioned that you did cocaine in your direct

20   examination, right?  One to two times a week, right?

21   A.  Yes.

22   Q.  You never told the government that beforehand, though, did

23   you?

24   A.  I wasn't using it at the beginning.

25   Q.  I'm sorry.  Before you met with the government on July 30,

1   2012, you hadn't used cocaine?

2   A.  I did it before, but I wasn't using it that time.

3   Q.  But they asked you about your historical drug use, your

4   history of drug use.  You went back to when were you 16 and 17.

5   You told them about rehab for marijuana, but you didn't tell

6   them about the cocaine use, correct?

7   A.  No.

8   Q.  Even though you knew it was in your best interest to tell

9   the truth?

10  A.  I forgot about it.  I only did it like one time.

11  Q.  I'm asking you a different question than whether you forgot

12  about it.  I'm asking you whether you understood it was in your

13  best interest to disclose everything, including your history of

14  drug use, that it was in your best interest to tell the truth

15  about that, but you didn't, right?

16  A.  No.

17  Q.  You never told them you did ecstasy either, right?  Even

18  though you only did that one or two times, you never told them

19  that?

20  A.  I don't remember.  I believe I did tell them about the

21  ecstasy.

22  Q.  You were born November 30, 1986, right?  So that makes you

23  about 27 and a half, a little bit more, right?

24  A.  Yes.

25  Q.  And you have been committing crimes since were you an early

1    teenager, right?

2    A.  Yes.

3    Q.  Stealing things, boosting stuff from stores, and then drug

4    dealing, right?

5    A.  Yes.

6    Q.  Fake IDs, things like that you have worked with, too,

7    right?

8    A.  I don't remember having no fake ID.  I never said I had a

9    fake ID.

10   Q.  Joy riding in stolen cars, the whole range of things,

11   right?

12   A.  I joy rided in stolen the cars --

13          THE COURT:  I'm sorry.  I can't hear you.

14          THE WITNESS:  I joy rided before and I have been in a

15   stolen car before, yeah.

16   Q.  Now, you testified on direct that as part of your crack

17   dealing and your other drug dealing that you would use a phone,

18   correct?  People would call you on the phone to set up meetings

19   so that you could exchange drugs for money, right?

20   A.  Yes.

21   Q.  Initially, you told the government, though, that you didn't

22   use the phone for your drug deals, right?

23   A.  No.  I don't remember saying that.

24   Q.  I'm sorry.  You don't remember saying that?

25   A.  No.

E8enchr2                    Mallory - cross

1   Q.  You met with the government, this is at the very beginning,

2   January 27, 2012, right?  If you are not sure of the day, I can

3   provide you documents to refresh your recollection.

4   A.  Yeah, I'm not sure of the date.

5             THE COURT:  I'm sorry?

6             THE WITNESS:  I'm not sure of the date.

7   Q.  OK.  Well, I ask you if this refreshes your recollection.

8   I am looking at 3502-5.

9             I just ask you if that refreshes your recollection

10  that you met with the government --

11  A.  I can't see it.  I have to see it closely.

12  Q.  That's fine.  Go ahead.

13            Does that refresh your recollection that you met with

14  them at that time, maybe it is the 25th of January, because if

15  you look at the date at the bottom that's probably the date of

16  the interview -- never mind.

17            Does that refresh your recollection about a meeting

18  with the government in late January of 2012?

19  A.  Yeah.

20  Q.  Look at page 2, at the end of the first paragraph.  Don't

21  read it out loud, but I want to know if it refreshes your

22  recollection as to whether or not you told the government that

23  you would not do telephone sales, only driveups and walkups?

24  A.  It says that, but I don't remember telling them that.

25  Q.  OK.  You don't remember it.

E8enchr2                         Mallory - cross

1    A.  Isn't it true that you didn't want to tell them that you

2    did phone calls because you didn't want them looking at your

3    phone, right?

4    A.  It's not true.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  Now, just so we're clear, crack cocaine -- please don't

2    read the document, Mr. Mallory.  Please listen to my questions

3    and pay attention.

4              MR. BAUER:  Maybe Mr. Dratel should retrieve it from

5    the witness after his recollection is refreshed.

6              THE COURT:  Just put the document away, Mr. Mallory,

7    when you're done refreshing your recollection.

8    Q.  There's a difference between crack cocaine and powder

9    cocaine, correct?

10   A.  Yes, sir.

11   Q.  And you sold both, correct?

12   A.  Yes, sir.

13   Q.  Now the eight balls you were talking about on your direct

14   is powder cocaine, right?

15   A.  I talked about crack and powder.  You got to let me know

16   when.

17   Q.  The eight balls are powder cocaine, correct?

18   A.  I sold eight balls of crack cocaine as well.

19   Q.  As well.  But you sold eight balls of powder cocaine,

20   correct?  As well?

21   A.  (No response).

22   Q.  You sold an eight ball per day during the week, more on the

23   weekends, right?

24   A.  Yes.

25   Q.  I'm sorry.  There was noise in the back.  Is that a yes?

E8e9chr3                                Mallory - cross

1    A.  Of what, cocaine?

2    Q.  Yes.

3    A.  Yes, sir.

4    Q.  You sold Oxycontin as well, right?

5    A.  Yes, sir.

6    Q.  Now, heroin.  You sold heroin?  Right?

7    A.  Yes, sir.

8    Q.  Now, you initially told the government -- withdrawn.

9            In that July -- withdrawn.

10           Did you not initially tell the government -- let me

11   start again.  Apologize.

12           You testified the other day that you sold heroin for

13   about a year, correct?

14   A.  Yes.

15   Q.  Didn't you initially tell the government that you only sold

16   it once and that it didn't move quickly enough for you, that it

17   took too long to sell it so that you only did it once?

18   A.  I don't remember that.

19   Q.  Show you what's marked as 3502-20 and ask you if it

20   refreshes your recollection.

21           If I can find the page for you.

22           Just first going to ask you a question that you met

23   with the government in March of 2012, correct?  Approximately,

24   right.

25   A.  I believe so, yeah.

E8e9chr3                    Mallory - cross

```
1   Q.  Look at the document.  See if it refreshes your
2   recollection, please.
3   A.  It says March here.
4   Q.  But I'm saying do you recall meeting -- does that refresh
5   your recollection that you met with the government at a proffer
6   session in March of 2012?
7   A.  Not really.
8   Q.  Now you said you didn't remember telling the government
9   that you only sold heroin once and it moved too slow.  Please
10  look at page 3 of that document and I'll come up there and
11  point out the paragraph I'd like you to read to yourself,
12  please.
13          Don't read it out loud.
14          Are you on page three?
15          Read that paragraph to yourself.
16          (Pause)
17  Q.  Let me know when you're finished.
18          Does that refresh your recollection that you told the
19  government that you sold heroin on one occasion.  That was in
20  2005 or 2006, that you had purchased a bundle and it sold --
21  and sold it after a week but the heroin moved slowly so you did
22  not pursue more heroin sales.
23          Does that refresh your recollection that that's what
24  you told the government initially back in March of 2012?
25  A.  I don't remember telling them.
```

1    Q.  You don't remember telling them that?

2             THE COURT:  Mr. Dratel.

3             MR. DRATEL:  It's a good time.

4             THE COURT:  Let's break now for the morning break.

5    Please be in the jury room no later than 11:30, ladies and

6    gentlemen, and until then please do not discuss the case.

7             (Jury excused)

8             THE COURT:  Mr. Mallory, you may step down.

9             (Witness excused)

10            THE COURT:  Anything from the parties?

11            (Recess)

12            (Jury present)

13            THE COURT:  Mr. Dratel.

14            MR. DRATEL:  Thank you, your Honor.

15   BY MR. DRATEL:

16   Q.  Mr. Mallory when we broke we were talking about your

17   heroin-selling days, right?

18   A.  Yes.

19   Q.  Do you remember?

20            And you didn't recall having told the government that

21   you only sold it once back in March of 2012.

22            Now in preparation for trial you've been interviewed

23   again by the government.  You've been prepared for the case,

24   right?

25   A.  Yes, sir.

E8e9chr3                          Mallory - cross

1   Q.  And, in fact, all told going back to the beginning of your

2   cooperation you've met with government, either agents or

3   prosecutors or both, at least fifteen times, would you say,

4   right?

5   A.  Yes.

6   Q.  And just a few days before we started the trial you met

7   with the government, right?

8   A.  Yes.

9   Q.  July 30?  Does that sound about right?

10  A.  I don't remember the date, but it was late July.

11  Q.  I'm sorry July 30 -- withdrawn.

12          July 30, 2012.  The same one we talked about before.

13          Didn't you tell the government then -- this is only a

14  few months after you told them -- withdrawn.

15          You told them at that point that you had sold heroin

16  for four or five months in 2009?  Didn't you tell them that?

17  A.  I don't remember.

18  Q.  Let me show you what's marked as 3502-31.  Just ask if it

19  refreshes your recollection that in July of 2012, July 30 to be

20  precise, that you told the government -- just look at that

21  section there, that you told the government more than just the

22  highlighted portion -- that whole section that you told the

23  government that you sold heroin for only four or five months

24  during 2009.

25  A.  It says that here, yeah.

1   Q.  Didn't you tell the government that, that you only sold it

2   for four or five months during that period?

3   A.  I don't remember telling them that.  I know I told them --

4   Q.  You don't remember.

5           By the way, just, again, you knew during all of these

6   sessions that it was in your best interests to tell the truth,

7   to disclose fully, right?

8   A.  Yes, sir.

9   Q.  And, again, just the other day -- now it's a year that you

10  sold heroin, right?  As much as three or four bundles a day?

11  A.  Repeat that again.

12  Q.  That you sold heroin for at least a year you testified on

13  your direct exam, correct?

14          MR. BAUER:  Your Honor, objection.  Misstatement of

15  the record.

16          THE COURT:  Overruled.

17          THE WITNESS:  Estimate.  I know it wasn't over a year

18  I was selling it for.

19  Q.  Page 873 of the transcript.

20          Did you not were you not asked these questions and

21  given these answers.

22  "Q.  How long did you sell heroin for?

23  "A.  For about a year.  No longer than a year."

24          Right.  So you said a year two days ago, correct?  Is

25  that too difficult for you to remember?

1   A.  No longer than a year.  That's all I remember.  No longer

2   than a year.  I wasn't selling heroin over a year.  It was all

3   an estimate.  I don't remember exactly how long but I know it

4   wasn't over a year.

5            THE COURT:  Mr. Mallory, please keep your voice up.

6   Q.  Now, you testified on direct that a lot of your drug

7   dealing was because your friends were doing it?

8   A.  No.

9   Q.  Because people you were hanging out with were doing it?

10  Didn't you say that on direct?  More than once?

11  A.  I said that the areas where I was selling drugs at, that

12  particular drug I was selling at the time --

13  Q.  No.  You didn't say that the reason you started selling

14  some of these drugs was because the people you were hanging out

15  with were selling drugs?

16  A.  They were selling drugs but that was the drug they were

17  selling, whatever drug I was selling with them, so it was easy

18  for me to sell it.  That's what I said.

19  Q.  Do you know the term rationalizations.  Do you know what

20  that means?

21  A.  No.

22  Q.  Now you also said you sold drugs because you needed money

23  because you were having a child, right?

24  A.  Yes, sir.

25  Q.  Wasn't it also because you needed it to buy PCP?

E8e9chr3                          Mallory - cross

1    A.  No, sir.

2    Q.  You didn't need money for that?

3    A.  I needed money for it, yes, sir.

4    Q.  And to buy a gun?  You needed money for that too, right?

5    A.  Yeah, I needed money to buy a gun.

6    Q.  Now, you testified about crack sales in Newburgh, right?

7    A.  Yes.

8    Q.  You just talked a little bit about it just a minute ago.

9            And in a particular place where let's say crack or

10   anything else, marijuana, anything was sold, there were a lot

11   of different people selling it at the same time, right?

12   A.  Yes, sir.

13   Q.  In a very close area to each other, right?

14   A.  Yes, sir.

15   Q.  And these were separate people selling, right?

16   A.  Yes, sir.

17   Q.  You didn't have a partner who was selling down the block?

18   You were selling here and somebody down the block was selling

19   for themselves, right?

20   A.  Yes, sir.

21   Q.  And you talked about splits and things.  But that wasn't a

22   formal arrangement that you had with people, right?  That

23   happened as it happened?

24   A.  Form of arrangement?  What does that mean?

25   Q.  Formal arrangement means you didn't have an agreement with

E8e9chr3                          Mallory - cross

```
1   someone that said either in writing or an understanding that
2   every time you needed something done that you were going to be
3   able to get their cooperation, right?
4   A.  No.
5   Q.  As it happened on the street, who was there, that's who you
6   went to, right?
7   A.  Yes, sir.
8   Q.  You didn't share your profits with anyone, right?
9   A.  No.
10  Q.  Now, I want to talk about your February 28, the time that
11  you were stopped by the police.  You were caught with an
12  unloaded magazine, the ammo clip, right?  Do you know what I'm
13  talking about?
14  A.  I remember that day, sir.
15  Q.  And as you testified you and Mr. Thomas were not together
16  that day.  You happened to be together in that spot at that
17  time, right?
18  A.  We were together that day earlier, before he went to the
19  program.  He left, came back.  We were together.
20  Q.  But you weren't hanging out all day together?  You just
21  happened to see him during the day?
22  A.  Yes.
23  Q.  And Mr. Thomas had asked to borrow money from you that day,
24  right?
25  A.  I don't remember.
```

E8e9chr3                        Mallory - cross

1    Q.  I'm going to show you 3502-64.

2              As we said, right after the break we were talking

3    about you met with the government several times in preparation

4    for trial, right?

5    A.  Yes.

6    Q.  One time was mid July, July 16, 2014?  Sound about right?

7    A.  I remember in the summertime.  I don't remember dates.

8    Q.  Let me just show you what's marked as 3502-64 and ask you

9    to look at page one for a second and ask you if that refreshes

10   your recollection that you met with the government July 16 of

11   this year.  That's less than a month ago.

12             (Pause)

13   Q.  Does it?

14   A.  It says July 16 there.

15   Q.  You met with them in preparation for trial several times,

16   right?

17   A.  Yes, sir.

18   Q.  Ask you to look at this part here.  I'm going to put

19   brackets around it.  You had said earlier you didn't remember

20   whether you had told the government that Mr. Thomas had asked

21   you -- by Thomas, Mr. Thomas, we all know who we're talking

22   about, right, that's the same as Gucci, right?

23             Mr. Mallory, I'm sorry.  I apologize.  Because that

24   time I interrupted you reading.

25             Mr. Thomas is Gucci, right?  Same person?

1   A.  Yeah.

2   Q.  You had said you did not recall whether you told the

3   government that he was trying to borrow money from you?

4           And if you look at that document, does that refresh

5   your recollection that on July 16, 2014, less than a month ago,

6   you told the government that the day that Mr. Thomas was

7   arrested, that day when you were caught with the unloaded

8   magazine at the same time, same place, that you had said that

9   Mr. Thomas had been asking to borrow money from you.

10  A.  Repeat that.

11  Q.  Do you remember telling the government that, that he was --

12  that that day he had been asking to borrow money from you?

13  A.  No.  I don't remember telling the government that.

14  Q.  I'm sorry?

15  A.  I don't remember that.

16  Q.  You don't remember.  Okay.

17          You can put that down now, please.

18          Mr. Thomas was arrested when he came out of a store,

19  right?

20  A.  Yes.

21  Q.  Correct?

22  A.  Yes.

23  Q.  Right?

24  A.  Yes.

25  Q.  And you weren't with him in the store?  You were in a

E8e9chr3                    Mallory - cross

1   restaurant separately, correct?

2   A.  Repeat that one more time.

3   Q.  You were not in the store with Mr. Thomas.  You were

4   separately in a restaurant and came out of a restaurant, right?

5   A.  When he got caught with the gun, it was outside the store.

6   Q.  But you were outside -- you had just come out of a

7   restaurant?

8   A.  Probably like 20 minutes before he even came there, I came

9   out of the restaurant, yes.

10  Q.  Now, you say you were holding the magazine, the ammo clip

11  for someone else, right?

12  A.  Right.

13  Q.  And you say you threw a beverage bottle?

14  A.  Yes, sir.

15  Q.  So you threw the beverage bottle away and you held onto the

16  unloaded ammo clip?  That's what you're testifying, right?

17  A.  Yes, sir.

18  Q.  Because you were afraid of being caught with a bottle of

19  water rather than an unloaded ammo clip?  That's what you're

20  testifying to?

21  A.  That's not true.

22  Q.  Well, you decided to throw something away.  You decided to

23  throw away the water bottle instead of the thing that had to do

24  with guns?  That's what you're testifying?

25  A.  What?

E8e9chr3                           Mallory - cross

1    Q.  You're testifying that you threw away -- withdrawn.  Do you

2    think you could get arrested -- withdrawn.

3              Could you get in trouble for having a bottle of water

4    on you if you were caught by the police?

5    A.  No.

6    Q.  Could you get in trouble if you were caught with a magazine

7    for a .22 caliber handgun on you when you were caught by the

8    police?

9    A.  Yeah.

10   Q.  But you threw away the bottle of water, kept the .22?

11   Right?  That's what you're testifying?  You kept the magazine

12   and you threw the bottle of water away?  That's what you

13   testified to, right?  That's your story?

14   A.  I threw the water bottle and I had the clip in my pocket.

15   Yes.  That's correct.

16   Q.  Isn't it a fact that you had a gun that you threw away?

17   A.  No.

18   Q.  We'll never know, right?  Because they never found it?

19   A.  I never had a gun.

20   Q.  You never had a gun, you mean -- at that point?  You've had

21   guns, many guns in your life, right?

22   A.  I never had a gun when I got caught with that magazine.

23   Q.  I couldn't hear you.

24   A.  I never had a gun when I got caught with that magazine.  I

25   only had an empty magazine.

1   Q.  When you got caught with it.  That's correct.

2           Now the robbery itself -- withdrawn.

3           You knew that something had happened there at that

4   location before the police came, right?

5   A.  I don't know what you're talking about.  What are you

6   talking about?

7   Q.  The police came because they got a call for a robbery at

8   that location, right?

9   A.  What location are you talking about?  What are you talking

10  about?

11  Q.  Where you came out of the restaurant.

12  A.  Yeah.

13  Q.  Right?

14  A.  Yeah.

15  Q.  You know what I'm talking about, right?

16  A.  Now I understand.

17  Q.  You know exactly what I'm talking about.  You've been

18  prepared for this for months by the government, right?

19          You know exactly what I'm talking about, correct?

20  A.  Are you talking about when Gucci --

21  Q.  Yeah, the day that Mr. Thomas was arrested with the gun and

22  that you had the .22 clip with you.  You know exactly what I'm

23  talking about?

24  A.  Yeah.  I remember that, yeah.

25  Q.  Yeah.  So, the police responded to a robbery call, right?

1    A.  Yes.

2    Q.  But you knew what happened actually there, right?

3    A.  Yes.

4    Q.  Mr. Thomas had nothing to do with it, correct?

5    A.  Yep.  He didn't.

6    Q.  And you didn't have nothing to do with it?

7    A.  Yes.

8    Q.  It had to do with a prostitute and crack and a dispute,

9    right?

10   A.  Yes, sir.

11   Q.  Now you talked about your robberies, right?

12   A.  Yes.

13   Q.  Now, the summer of 2005.  You robbed a crack dealer named

14   Murder, right?

15   A.  Yes, sir.

16   Q.  And with a .25 caliber handgun, right?

17   A.  I don't remember what kind of gun it was.

18   Q.  But it was a gun, right?

19   A.  Yes, sir.

20   Q.  And you had a round in the chamber?  Right?

21   A.  I don't remember.  I don't think so.

22   Q.  Let's look at 3502-14, see if that refreshes your

23   recollection.

24        Now, again, you met with the government a fair amount

25   in the beginning of 2012, right after you started cooperating,

1    right?

2    A.  Yes, sir.

3    Q.  Ask you if this refreshes your recollection that in one of

4    those early sessions back in February of 2012, whether you told

5    the government that you robbed Murder with a .25 caliber

6    handgun without a clip although one round was in the chamber.

7           I'd like you to read that to yourself, tell me whether

8    that refreshes your recollection.

9           (Pause)

10   Q.  Right?  Do you remember now telling the government that?

11   A.  Yes, sir.

12   Q.  And you robbed him because he was making money selling

13   crack, right?

14   A.  No.

15   Q.  Isn't that what you told the government that day?

16          Why don't you continue reading that paragraph.

17          (Pause)

18          Because Murder was making good money selling crack,

19   right.

20          (Pause)

21   A.  I don't remember saying "making good money" but I remember

22   robbing him.

23   Q.  But he was a crack dealer and you got crack off him, right?

24   A.  I got crack from him, yes.

25   Q.  And then another robbery was there someone named White

E8e9chr3                           Mallory - cross

1    Chocolate, right?

2    A.  Yes, sir.

3    Q.  Another crack dealer?

4    A.  Yes, sir.

5    Q.  Used a gun again, right?

6    A.  Yes, sir.

7    Q.  Different gun?

8    A.  No.  It was the same gun.

9    Q.  Why don't you look -- look at the same document.  I'll

10   point it out to you.

11            Withdrawn.

12            Didn't you tell the government that it was a different

13   .25 caliber handgun?

14   A.  I don't remember telling them that.

15   Q.  You don't remember.  Read the document and see if it

16   refreshes your recollection.

17            THE COURT:  Do you want to direct him, Mr. Dratel?

18            MR. DRATEL:  Yes, I do.  Thank you.

19            Mr. Mallory let me show you where.  If you look at the

20   next page -- I will show you exactly where.  That sentence.

21   Starting there.

22            (Pause)

23   Q.  Does that refresh your recollection that you told the

24   government that it was a different .25 caliber gun?

25   A.  I don't know if I'm reading the right thing because right

1    here it doesn't say what you said.

2              MR. DRATEL:  I'll find it for you.

3              I'll highlight it for you.  Read those two highlighted

4    portions to yourself.

5    Q.  Ask you if it refreshes your recollection that you told the

6    government that it was a different .25 caliber weapon.

7    A.  I don't remember this.

8    Q.  And you sold that gun to your cousin, right?

9    A.  Yes, sir.  I sold the .25 to my cousin.

10   Q.  Third robbery you talked about was with Mr. Burden, right,

11   Kev Gotti, right?

12   A.  Yes, sir.

13   Q.  And you robbed someone who he had been fighting with?

14   A.  Yes, sir.

15   Q.  Explain how that happened, that they're fighting and you're

16   going through the guy's pockets at the same time.  Can you

17   explain that to us?

18   A.  Just what you said is what happened.

19   Q.  So are they on the ground, standing up?

20   A.  Standing up.

21   Q.  So you're actually going through the guy's pockets while

22   he's fighting with Kev Gotti?

23   A.  I went in his pocket.  Not through his pockets.  I went

24   through one pocket.  Jacket.

25   Q.  You know the term round the pocket, right?

E8e9chr3                          Mallory - cross

1    A.  What?

2    Q.  You know the term round the pockets or run the pockets?  Do

3    you know that term?

4    A.  No.

5    Q.  You didn't use that yourself in the conversation with

6    Mr. Burden, have your pockets run?

7    A.  Oh, run?  Run the pockets?

8    Q.  Yeah.

9    A.  Yes.  I know what that means.

10   Q.  What does that mean?

11   A.  That means going in somebody's pockets.

12   Q.  And taking their money?

13   A.  And taking, yeah, whatever's in their pockets.

14   Q.  Whatever's in there.

15            Now, you talked about another robbery of Ill Will,

16   right?

17   A.  Yes, sir.

18   Q.  Was he also someone in the drug business?

19   A.  No, he was a smoker.

20   Q.  So he was just a customer?

21   A.  Customer that sold drugs, yeah.

22   Q.  Customer that sold drugs?

23   A.  Yeah.

24   Q.  What drug?

25   A.  Crack.

E8e9chr3                          Mallory - cross

1   Q.  And then you had another robbery of someone named Art with

2   Mr. Burden.  I don't know if you talk about this one on

3   direct --

4   A.  Yes.

5   Q.  -- but, right?

6           And you had him in a headlock while Mr. Burden ran his

7   pockets, right?

8   A.  Yes.

9   Q.  And you got money and some marijuana from him, right?

10  A.  I don't remember what was tooken.

11  Q.  And you also robbed someone named Carlos.  You took money

12  from his wallet?

13  A.  Yes, sir.

14  Q.  I don't think you discussed that one on direct either.

15          And then you told us on direct about robbing someone

16  named Scrappy, right?

17  A.  Yes, sir.

18  Q.  Again with a gun, with Quick, right?

19  A.  Yes, sir.

20  Q.  And then you talked about two robberies that you committed

21  while you were cooperating, right?

22  A.  Yes, sir.

23  Q.  The first half of 2012, right?

24  A.  Yes, sir.

25  Q.  Both of those with guns, right?

1   A.  (No response).

2   Q.  O'Neil and the one that you did with Snelly and Geo, right?

3   A.  Yes, sir.

4   Q.  Now you committed these robberies -- withdrawn.

5          At the time that you committed these robberies you

6   told us on direct that you were in constant contact with the

7   government, right?

8   A.  Yes, sir.

9   Q.  You were meeting with the agents a couple of times a week,

10  right?

11  A.  Yes, sir.

12  Q.  You were texting or on the phone with them on a daily

13  basis?

14  A.  Yes, sir.

15  Q.  And how did you keep it all from the government, all

16  this -- withdrawn.

17         I just want to ask you about the burglary.  Tell us

18  about the planned burglary.

19  A.  Say -- somebody -- I forget about it.  We --

20  Q.  Try to remember.

21  A.  Me and a friend of mines, he was having his girlfriend

22  boyfriend, whatever, at that -- his girlfriend -- his

23  ex-boyfriend -- his ex-girlfriend boyfriend was selling weed or

24  something and he wanted me to go in his house with him to go

25  find it.  So we started to do it and then we stopped.  We went

E8e9chr3                         Mallory - cross

1   through the front door like the hallway door then we stopped.

2   Q.   When did you do it?  What time of day was it?

3   A.   It was evening.  It was in the evening.

4   Q.   Were people in the house?

5   A.   We never made it inside the house.

6   Q.   I'm sorry?

7   A.   We never went inside the house.  We never made --

8   Q.   Do you know whether people were inside the house?

9   A.   Yeah.

10  Q.   Why didn't you go in?

11  A.   He turned around.  We turned around.

12  Q.   Why?

13  A.   I don't remember.

14  Q.   Did you have a gun with you?

15  A.   No.

16  Q.   Now, so all this time when you're -- and you're also doing

17  drugs during this period, right?

18  A.   On and off, yes.

19  Q.   PCP, marijuana, cocaine?

20  A.   Cocaine was later.

21  Q.   PCP and marijuana?

22  A.   Yes, sir.

23  Q.   So, how did you conceal all of this from the agents who

24  you're meeting with everyday, you're talking on the phone with

25  them, you're texting them, you're meeting, you're taping all

E8e9chr3                        Mallory - cross

1    these people.  Fifteen times you're wearing a wire during this.

2    And you're with the government on a constant basis almost.  How

3    are you concealing these crimes from them?

4    A.  I didn't tell -- the robberies?

5    Q.  Yeah?

6    A.  It was three.  It wasn't all those other robberies with

7    Murder.

8    Q.  The drug use.  How did you conceal it all from the

9    government?

10   A.  By not doing it.

11   Q.  I'm sorry?

12   A.  When I didn't deal with them, that's when I used it

13   sometime.

14   Q.  I couldn't understand?

15           MR. GOLTZER:  I can't hear you.

16           THE WITNESS:  I didn't -- it ain't like I used to

17   smoke and talk to them or meet up with them.  It will be days

18   that I won't talk to them and I won't have to meet up with them

19   that I do drugs.

20   Q.  But you said you talked to them on a daily basis?

21   A.  Yeah.  I talked to them everyday.  But the days that I

22   smoked that I didn't have to meet up with them.  I didn't text

23   them:  I'm checking in, I'm smoking a blunt right now.  Just

24   texting them, I'm checking in.

25   Q.  But what I'm saying, the robberies?

E8e9chr3                          Mallory - cross

1  A.  The three robberies that I did, yeah, I didn't tell them.

2  I just didn't tell them.

3  Q.  You knew it was in your best interests not to commit

4  anymore crimes, right?

5  A.  Yes, sir.

6  Q.  You knew it was in your best interests not to be doing

7  drugs, right?

8  A.  Yes, sir.

9  Q.  Around you knew it was in your best interests not to

10  conceal all of that from the government, right?

11  A.  Yes, sir.

12  Q.  Now you weren't getting drug tested during that period,

13  were you?

14  A.  No.

15  Q.  Now you talked about your shootings that you were involved

16  in, in which you shot a weapon at people.

17  A.  Yes, sir.

18  Q.  I want to talk about the one where you said the Latin Kings

19  drove by and you had an idea that it was them, right?

20  A.  Yes, sir.

21  Q.  So that was enough for you to shoot at them and try to kill

22  them, right?  That you had an idea that it was them?  That was

23  all the proof you needed?

24  A.  What?  Repeat that again.

25  Q.  You had an idea of who it was who had shot at you, right?

E8e9chr3                        Mallory - cross

1    A.  Yes.

2    Q.  You weren't sure?  Right?  You weren't sure?  You testified

3    you had an idea.  You testified two days ago.  Do I need to get

4    the transcript?

5    A.  Get the transcript.

6    Q.  You want me to get the transcript.  Fine.  We'll get the

7    transcript.  Page 885, line 22.

8    "Q.  Do you know who shot you at the time?

9    "A.  No, sir.  I had an idea but I didn't know exactly who was

10   the person that shot me."

11          Do you remember that?

12   A.  Yeah, I remember that.

13   Q.  You were here, right?

14   A.  What.

15   Q.  You were here for that?  Mentally?  Physically?  Were you

16   here for that?

17   A.  Yes.

18   Q.  So you had an idea who it was and that was enough for you

19   to try to kill that person because you had an idea?

20   A.  I didn't tell to kill them.  I shot by them.  I didn't

21   shoot at the car.  I didn't hit the car.  I shot to scare them.

22   They drove off.

23   Q.  You're that good a shot?  That you know where it's going

24   when you shoot in a direction, right?  Yes?

25   A.  Yes.

1  Q.  Okay.  Speaking of being a good shot, let's talk about when

2  you shot Mr. Burden, Kev Gotti.  All right.  You talked about

3  shooting him in the leg basically for his own good is basically

4  what you testified, right?

5  A.  Yes.

6  Q.  Now, when you first told that -- when you first talked

7  about that shooting to the government in January of 2012, right

8  at the very beginning of your cooperation, right?  You said it

9  was L-1 that shot him, right?

10 A.  Yes.

11 Q.  And you had a lot of detail, right?  You told the

12 government all about the beef that started the whole thing,

13 right?

14 A.  Yes.

15 Q.  But then you told the government that you were in the

16 living room with a three-year-old child when the shooting

17 occurred, right?

18 A.  Yes.

19 Q.  That's what you told the government?

20 A.  Yes.

21 Q.  And that you did not see a gun but you heard two shots,

22 right?

23 A.  Yes.

24 Q.  And that you later observed that the wall and the cabinet

25 at the residence had fifteen to twenty holes in them, right?

E8e9chr3                          Mallory - cross

1   A.  Yes.

2   Q.  But you said it was L-1 who shot him, right?

3   A.  Yes.

4   Q.  Complete lie, right?

5   A.  That shooting --

6   Q.  Complete one hundred percent lie, right?

7   A.  No.

8   Q.  You -- L-1 shot him?

9   A.  L-1 didn't shoot him, no.

10  Q.  You shot him, right?

11  A.  Yes.

12  Q.  Now you knew when you did that, you knew it was in your

13  best interests to tell them the truth, right?

14  A.  Yes.

15  Q.  So your guy -- now you said you did it because you didn't

16  want them to shoot him in the face so you shot him in the leg,

17  right?

18  A.  Yes.

19  Q.  And you were confident that you're a good enough shot that

20  you weren't going to hit anything major, you weren't going to

21  cause him any really serious damage, right?

22  A.  I wasn't thinking.

23  Q.  You weren't thinking.

24          You're a guy who can do what it takes, right?  You

25  shot your friend, right?

E8e9chr3                        Mallory - cross

1   A.  Yes.

2   Q.  You can do whatever's necessary, right?

3   A.  What does that mean?

4   Q.  That means that when your friend is standing in front of

5   you, you shoot him in the leg.  You do what's necessary, right?

6   A.  I shot my friend in the leg.  I don't know about this doing

7   what's necessary thing.  I know I shot my friend in the leg.

8   That's it.

9   Q.  And after this happened you somehow convinced him to still

10  be friends with you?

11  A.  No.

12  Q.  Right?

13  A.  No.

14  Q.  Oh, he wasn't friends with you after that?

15  A.  We were friends after that.

16  Q.  Of course, he was.

17          And you convinced him that it was for his own good

18  that you did it?

19  A.  No, I didn't convince him.

20  Q.  You talked about it afterwards?  Didn't you testify about

21  that?

22  A.  Yep, I talked to him after that, yes.

23  Q.  And he remained your friend, right?

24  A.  Yes.

25  Q.  Because of what you told him:  Not because he wanted to be

1    your friend again, right?  It's because what you told him?

2    A.  Because what he knew and what I told him.

3    Q.  Because what you told him.

4              That you saved him by shooting him in the leg?

5              MR. BAUER:  Your Honor, again misstatement of the

6    record.  I believe Mr. Mallory said he shot him in the foot.

7              THE COURT:  The jury will recall what the testimony

8    was.  The objection is overruled.

9    Q.  You've had a career not only of drug selling really from

10   2004 until the time that you were arrested, right in 2012,

11   right?

12   A.  Repeat that again.

13   Q.  You had a career as a drug dealer from 2004 to 2012?

14   A.  On and off, yes.

15   Q.  And you sold about a half dozen different drugs, right?

16   A.  Yes, sir.

17   Q.  And during that period you also committed I think we

18   counted seven robberies, right?

19   A.  Yes, sir.

20   Q.  Most of those robberies were of drug dealers, right?

21   A.  Yes, sir.

22   Q.  Most of those robberies were of crack dealers, right?

23   A.  Yes, sir.

24   Q.  And most of those robberies, particularly the one of the

25   dealers, were armed robberies, right?

E8e9chr3                         Mallory - cross

1   A.  Yes, sir.

2   Q.  So is it fair to say that you have a history of armed

3   robberies of drug dealers?

4              MR. GREENFIELD:  Didn't hear that answer.

5              MR. DRATEL:  I don't think he answered.

6              THE COURT:  He has not answered.

7              THE WITNESS:  Yes.

8   Q.  Thank you.  Now after Jeffrey Henry, Joker, was killed you

9   were visited by the police within a week, correct?

10  A.  Yes, sir.

11  Q.  And you adamantly denied any involvement in it, right?

12  A.  Yes, sir.

13  Q.  You said you were at home with your girlfriend, she went

14  out to get food, you were home watching cartoons, right?

15  A.  I never said I was home watching cartoons or any of that.

16  I said I was downstairs drinking and then I went upstairs and I

17  went to sleep.  That's it.

18             THE COURT:  Keep your voice up, Mr. Mallory.

19  Q.  Could you please answer.  I didn't hear the answer because

20  the court said you have to keep your voice up.

21             THE COURT:  Could you repeat the question for him.

22             MR. DRATEL:  I'm sorry.

23  BY MR. DRATEL:

24  Q.  That you told -- and this was just by Newburgh police,

25  right?  Correct?

E8e9chr3                          Mallory - cross

1    A.  Yeah.

2    Q.  You were interviewed by Newburgh police not the FBI at that

3    point, right?

4    A.  Yes.

5    Q.  And you told the Newburgh police that you went to your

6    girlfriend's house, right?  That night?

7    A.  Yeah.

8    Q.  And that was Deshawn Burden?

9    A.  Yes, sir.

10   Q.  Cousin of Kevin Burden?

11   A.  Yes, sir.

12   Q.  That you stayed the night there, right?

13   A.  Yes, sir.

14   Q.  And that you -- you said that you were probably watching

15   cartoons, right?  That you had soul food for dinner at First

16   and Carpenter, that you had sent your girlfriend out for

17   dinner?  That's what you told the police, right?

18   A.  I don't remember what I told them but I remember what

19   happened.  I remember what I was doing.

20   Q.  Well, let me show you what's marked as 3502-2.  And ask you

21   if you'd look at this section right here.  And if that

22   refreshes your recollection that you told the Newburgh police

23   on the 21st of December, 2010 that you were probably watching

24   cartoons, that Ms. Burden went to get food at a soul food

25   restaurant at First and Carpenter.

E8e9chr3                           Mallory - cross

1              (Pause)

2              Does that refresh your recollection?

3    A.  Yeah somewhat, yeah.

4    Q.  So you told them that, right?

5    A.  I didn't tell them that.

6    Q.  I'm sorry?

7    A.  I didn't tell them -- I remember what I said but I didn't

8    tell them this.

9    Q.  I didn't understand that answer.

10   A.  I remember what I said.

11   Q.  Yes.

12   A.  But I wasn't watching cartoons -- I remember her -- I

13   remember her going out to get food while we was downstairs

14   drinking.

15             THE COURT:  I'm sorry, Mr. Mallory.  The question is

16   do you remember what you told the police.

17             THE WITNESS:  Oh, the police.

18             No.

19   Q.  You don't remember what you told the police?

20   A.  It wasn't that.

21   Q.  What did you tell the police?

22   A.  I told them I was downstairs drinking, smoking, and that

23   after I got done drinking and smoking I went upstairs and I

24   went to sleep.

25   Q.  And what were you drinking and smoking?

1    A.  Smoking marijuana, and Black & Mild.

2            I was smoking marijuana.  And I was smoking Black &

3    Mild.  And I was drinking liquor.

4    Q.  How long?

5    A.  I don't remember how long.  It was for an hour or hours.

6    Q.  You got there at three o'clock.  Did you start right away?

7    A.  No.

8    Q.  When did you start?

9    A.  I don't remember.

10   Q.  Who were you drinking and smoking with?

11   A.  Me and Kev Gotti.

12   Q.  Was it hours?

13   A.  It could have been.  I don't remember.

14   Q.  That was a typical hanging out between the two of you,

15   right?

16   A.  Yes, sir.

17   Q.  Now, you let the Newburgh police look at your telephone,

18   correct, that day?

19   A.  I don't remember.

20   Q.  Look at that document again, 3502-2.  Look at the

21   typewritten document.  Okay.

22           Do you recall allowing Detective Cortez to review

23   recent calls and contacts on your phone?  Can you look at the

24   typewritten document.

25           MR. DRATEL:  Maybe I should direct him.

1                    Read that sentence to yourself, please.

2                    (Pause)

3    Q.  Mr. Mallory it's one sentence.  Does that refresh your

4    recollection that you allowed Detective Cortez to look at your

5    cellphone to see recent calls?

6    A.  I don't remember that.

7    Q.  You don't remember.

8                    The fact is you had a phone, right?

9    A.  I had a phone, correct.

10   Q.  What?

11   A.  Yes, I had a phone.

12   Q.  Didn't you tell them also when they asked you about two

13   calls that had been made that were on the phone that they were

14   interested in, you told them that you were probably asleep at

15   the time and that your girlfriend and her sister used the phone

16   and that they probably made those calls?

17   A.  I don't remember that neither.

18   Q.  You don't remember that.

19                   Now, about 14, 15 months later you start cooperating,

20   right?  End of January 2012, right?  14 months later?

21   A.  Yes, sir.

22   Q.  And in that first interview -- withdrawn.

23                   You testified on direct that it was sometime in the

24   evening when you received a phonecall from L-1, right?

25   A.  Yes, sir.

E8e9chr3                    Mallory - cross

1   Q.  And, in fact, it was about ten to eleven at night, right?

2   A.  I don't remember the time.

3   Q.  Didn't you tell the government at that first meeting that

4   you were cooperating that it was about ten to eleven at night?

5   A.  Yes.

6   Q.  You also told the government that you didn't have a phone,

7   right, that first time?

8   A.  Yes.

9   Q.  That was a lie?

10  A.  (No response).

11  Q.  Right?  You had a phone?

12  A.  I didn't own a phone myself.  I had a phone.  But it wasn't

13  my phone.

14  Q.  You just said in response to my question, literally five

15  minutes ago maybe, that you had a phone?

16  A.  Yes.

17  Q.  And now you're saying you didn't have a phone?

18  A.  That belonged to me.  I didn't have -- I had a phone at

19  that time but I didn't have a phone that belonged to me.  I was

20  borrowing somebody's phone.

21  Q.  But you had a phone?

22  A.  Yeah, I had a phone.

23  Q.  And in that first meeting there was nothing about you

24  handing a gun to anyone, right?

25  A.  Me handing a gun to who?  Could you repeat that one more

E8e9chr3                              Mallory - cross

1   time, please.

2   Q.  There's nothing about you handing a gun to anyone in that

3   first meeting, right?  You said Kevin Gotti gave the gun?  You

4   weren't there when that actually happened?

5   A.  Yes, sir.  I said that.

6   Q.  Right?

7   A.  Yes, sir.

8   Q.  In fact, you said you never saw guns that night.  You said

9   you saw Mr. Thomas with something -- adjusting his shirt but no

10  gun?  Right?

11  A.  I don't remember saying that.

12  Q.  Show you what's been marked 3502-4 and ask you whether in

13  your first proffer session, January 24, 2012 what you said to

14  the government was that you saw Gucci adjusting something in

15  his right side waistband, pulling his shirt down to cover a

16  gun.  Mallory did not clearly see this gun at this time.

17  A.  Yeah.  I said that.  I remember.

18  Q.  You said that, right?

19      You also said -- by the way there was nothing in that

20  session about Mr. Thomas coming back the next day with beers

21  and discussing things with you, right?  You didn't mention

22  that, right?  Fifteen months after the event?  Right?

23      There's nothing in there about it -- you didn't

24  mention that, right?

25  A.  I don't know if I mentioned that.

1      MR. GOLTZER:  I can't hear anything he's saying.

2      THE WITNESS:  That happened, no.

3  Q.  What?  I'm asking you whether you mentioned it that night.

4  I mean during the interview.  Would you like to look at the

5  interview.

6      Look at the interview.  Go through it.  Tell me if you

7  talk about him coming back to you with beers the next night?

8      THE WITNESS:  What part of this am I reading?  The

9  whole thing?

10     MR. DRATEL:  The whole thing.  I want to know if it's

11  anywhere in there, if you told them that.

12     (Pause)

13     MR. DRATEL:  We'll have a stip, your Honor, that it's

14  not in this report.

15     THE COURT:  Very well.

16     MR. DRATEL:  Thank you, Mr. Mallory.

17     Thank you.

18  Q.  Now, during this first interview you said that at some

19  point after Mr. Henry was killed that Mr. Thomas bragged about

20  it saying "my gun bust," right, in quotes?  You quoted

21  Mr. Thomas saying that, right?

22  A.  Yes.

23  Q.  In fact, you told us two days ago he never said that,

24  right?

25  A.  He said that my gun bust.  Yes, he did say that.

1    Q.  You didn't say two days ago that he didn't say that, that

2    he didn't use those words?

3    A.  That's what he said.  Yeah, if he said it in different

4    words I don't remember.  I don't remember --

5            MR. GOLTZER:  We can't hear a word the man says.  I'm

6    so sorry.

7            THE COURT:  Do you want to keep your voice up and

8    answer that question again, Mr. Mallory.

9            THE WITNESS:  What's the question again?

10           MR. GOLTZER:  Could we have it read back if possible

11   by the stenographer.

12           (Record read)

13           MR. GOLTZER:  Thank you.

14           MR. DRATEL:  Just in case it was confusing it wasn't

15   two days ago.  It was yesterday.  Sorry.  Yesterday.  Page

16   1235.

17   "Q.  Did Gucci mention that Joker shooting on any other

18   occasions after that?

19   "A.  Yes, sir.

20   "Q.  How so?

21   "A.  Like basically saying that he like, like, saying that his

22   gun busts.  You know, he didn't say that.  He didn't talk about

23   that when he talked about that."

24           So yesterday you said he didn't use those words.

25   Today you say he did.  Right?

E8e9chr3                    Mallory - cross

1   A.  He said his gun bust.  That's what I -- that's what he

2   said.

3   Q.  So even though yesterday you said he didn't use those

4   terms, now you're saying he did?

5   A.  Yeah.

6   Q.  Now you had several other sessions with the government in

7   2012, correct?  Before your guilty plea?  Right?

8   A.  Yes.

9   Q.  And in none of those sessions did you say that you had

10  actually handed one of the weapons to someone, right?

11  A.  Yes, I did tell them.

12  Q.  You told them before your guilty?

13  A.  Oh, no, not before the guilty plea.

14  Q.  No.  Not before your guilty plea.

15          And you met with them a good half dozen times, right,

16  before your guilty plea?

17  A.  Yes.

18  Q.  To talk about the events that happened that night.  And

19  every time you said it was Mr. Burden, Kev Gotti who handed

20  over the weapons, right?

21  A.  Yes.

22  Q.  That was not true, correct?  That was not true, correct?

23  A.  Gotti handed one gun over --

24  Q.  No, it was not true that he handed both weapons, correct?

25  A.  Yes.

E8e9chr3                        Mallory - cross

1   Q.  And you knew it was in your best interests when you told

2   that lie that you should be telling the truth, right?

3   A.  Yeah.

4   Q.  And, in fact, you never mentioned in all the time before

5   you signed your cooperation agreement, before you pleaded

6   guilty, you never mentioned anything about this late night

7   visit you claim from Mr. Thomas where you brought beers to

8   discuss the event, right?

9   A.  He brought beers.

10  Q.  I'm sorry?

11  A.  He brought beers.  And I did --

12          THE COURT:  I'm sorry.  Keep your voice up,

13  Mr. Mallory.  I can't hear you.

14          THE WITNESS:  He brought beers.  I didn't buy beers.

15  He came over.

16  Q.  That's not the question.  The question is you never told

17  the government that, that was never part of your story until

18  after your cooperation agreement was signed, right?

19  A.  A lot of that stuff I didn't remember.

20  Q.  So you remember it five years after the event, not a

21  year-and-a-half after the event?

22  A.  That's -- yeah.

23  Q.  Because you weren't interviewed by the government between

24  your guilty plea and March of this year, correct?

25  A.  What.  Repeat that again.

1    Q.  Sure.  From the time you pleaded guilty until March of this

2    year you were not prepared by the government?  You were not

3    interviewed about this case in preparation for the case?

4    A.  I don't understand it.

5    Q.  There was a long period of time after you pleaded guilty

6    and went to jail where the government and you were not

7    preparing for this case they weren't talking to you?  They

8    weren't bringing you in and having these sessions, right?

9    A.  Right.

10   Q.  But then in preparation for trial you started to have them

11   again, correct?

12   A.  Yes.

13   Q.  And that's when you came up with the fact that, say you

14   handed one of the weapons and that Mr. Thomas came to you late

15   at night, right?

16   A.  (No response).

17   Q.  Right?

18   A.  Yes.

19   Q.  That's when all this started?  And that one gun was Kevin

20   Gotti's.  Not both guns belonging to L-1.  Right?  The original

21   story was that they both longed the L-1, right?

22   A.  Yes, sir.

23   Q.  And that you had seen them in a closet, right?

24   A.  (No response).

25   Q.  That Gotti had showed you one time a little bit before the

1   event, before the night that Mr. Henry was killed?  They showed

2   them to you in a closet?  That's how you knew they were there?

3   A.  Yes.

4   Q.  But that wasn't true, right?  Because later on you're

5   claiming that you knew all along they were there?  That you

6   were there when L-1 brought them over, you said?

7   A.  L-1 brought one gun.

8   Q.  But you said both at one point, right?

9   A.  I don't remember if I said both.

10  Q.  Also there was a point at which you claimed that you didn't

11  even get a call from L-1, it was a text, right?

12  A.  Yes, sir.

13  Q.  But it was a call now you're saying?

14  A.  Yes, sir.

15  Q.  You've gone back and forth?

16  A.  Yeah I was confused because I used to borrow two phones.

17  Q.  And all these additions to your story came after you were

18  confronted by the government about your robberies, after your

19  cooperation agreement -- after you began cooperating which they

20  learned about -- after you signed your agreement when you

21  thought your cooperation agreement was in jeopardy, right?

22  A.  Repeat that again.

23  Q.  Sure.  All of these additions that we're talking about,

24  about who gave guns to whom, about Mr. Thomas coming to see you

25  with beers the next night, whether there was a text or whether

E8e9chr3                        Mallory - cross

1    it was a call, all of these changes, all of these additions

2    occur after you signed your cooperation agreement and after the

3    government learns about the two robberies that you didn't

4    disclose, right?

5    A.  Yes.

6    Q.  Now, back in 2012 when you're cooperating in the beginning

7    you talked about how you knew Mr. Thomas, right?

8    A.  Yes.

9    Q.  And you talked about that you knew his brother Jermaine,

10   right?

11   A.  Yes.

12   Q.  And that you had actually spent the night at Mr. Thomas'

13   house on occasion, right?

14   A.  Yes.

15   Q.  You never mentioned your relationship with Mr. Thomas'

16   sister Cayla, did you?

17   A.  When?

18   Q.  Back then.  Back in February of 2012.  You didn't mention

19   it until very recently, right, almost like two weeks ago maybe

20   was when you brought it up?

21   A.  I don't remember.  I don't remember when I mentioned it.

22   Q.  Okay.  Look at 3502-10.  February 2012.  Do you remember

23   having a meeting with the government sometime in that -- right

24   at the beginning of your cooperation.

25            Read the highlighted portion to yourself, please.

1       (Pause)

2  Q.  While you were being asked about Mr. Thomas, does that

3  refresh your recollection that you told them about Jermaine

4  Moody, his brother; that you spent the night at the residence

5  occasionally.  But there is nothing in there about your

6  relationship with his sister, correct?

7  A.  Yes.

8  Q.  And, in fact, February 2012 is what within a month of her

9  having your child, right?

10 A.  Yes.

11 Q.  But that was a detail you overlooked at the time, right?

12 A.  A detail.  Could you -- I don't understand that question.

13 Q.  Nevermind.

14      Now, you were also on the street during this whole

15 period of 2012, right?

16 A.  Yes, sir.

17 Q.  Between the time you cooperated and the time that you went

18 to jail in September for violating bail conditions, you were on

19 the street talking to all the people out on the street, right?

20 A.  Yes.

21 Q.  It's Snelly, Quick, Burden, others?  Right?

22 A.  Yes.

23 Q.  One of the persons you spoke to -- actually Snelly, I'm

24 sorry.  Snelly told you that he had given someone one of the

25 guns for the murder, correct?

1    A.  Yes.

2    Q.  And you told the police that, right?

3    A.  Yes.

4    Q.  And, in fact, you told the police that you were reminded of

5    it a few nights before when you had talked to Snelly, right?

6    A.  Yes.

7    Q.  So you're picking up pieces of information and putting them

8    in your story, right?

9    A.  No.

10   Q.  Now, you also told the police back in March of 2012 before

11   your cooperation agreement was in jeopardy, that you never saw

12   those guns again after that night?  Right?

13   A.  Yes.

14   Q.  And then it's not until May of this year that you claim

15   that you saw the guns again, that Mr. Thomas brought one back

16   the next night, right?

17   A.  Yes.

18   Q.  And even as late as July 30, 2012 -- withdrawn.

19          You claim that Mr. Thomas came to you to get rid of

20   the gun, right?

21   A.  Yes, sir.

22   Q.  And he was trying to get ahold of L-1, you claim, right?

23   A.  I wasn't.  He was.

24   Q.  That's what I'm saying.  He was trying to get ahold of L-1?

25   A.  I didn't know where he was at, no.

E8e9chr3                        Mallory - cross

1  Q.  Now, the first time that you talk about Mr. Burden having

2  one of the weapons and you handing one of the weapons is this

3  year, right?

4  A.  Yes.

5  Q.  And it's also after your conversation with Mr. Burden on

6  tape, right, well after, right?

7  A.  Yes.

8  Q.  And Mr. Burden on the tape says no, you did it, right?  You

9  handed the weapon?

10  A.  Yes.

11  Q.  So that's why you told the government, right?  Because you

12  knew you couldn't live with what's on that tape with your

13  story?

14  A.  That's not true.  No.

15  Q.  Didn't the government confront you with what's on the tape?

16  A.  They showed me what was on the tape, yes.

17  Q.  Yeah.  And they said how do you reconcile this?

18  A.  Forgot.  After watching it --

19  Q.  Even know you knew it was in your best interests to tell

20  the truth the whole time, right?

21  A.  Yep.  And I told the truth.

22  Q.  Because you could loose your agreement any time you lie?

23          MR. BAUER:  Your Honor, can Mr. Dratel let him answer.

24          THE COURT:  Yes.  Mr. Dratel, let him finish.

25          THE WITNESS:  I told them the truth.  I seen it.  I

1    remembered.  And I told them the truth.  That's what happened.

2    Q.  And you didn't say you weren't sure what happened back in

3    2012, right?  You were sure.  You said what happened, right?

4    A.  Yes.

5    Q.  And -- but somehow forgot your own participation?  That's

6    the part you forgot?  Not Mr. Gotti's.  Your own.  Right?

7    A.  Yes.

8    Q.  The thing that you did.  Convenient.  Yes?

9    A.  Repeat that again.

10   Q.  Convenient.  That you forgot?

11   A.  What does that mean?

12   Q.  It means that it's good that you forgot for yourself, that

13   you forgot the part that could get you in more trouble, right?

14   A.  No.

15   Q.  Because you knew it was in your best interests to tell

16   everything and tell the truth all the time, right?

17   A.  Repeat that again.

18   Q.  Withdrawn.

19        Now you also told the government only a few weeks ago

20   before this trial that it was a text from L-1, right?

21   A.  (No response).

22   Q.  July 21, 2014 you told the government it was a text?

23   A.  Yes.

24   Q.  And you told the government that you had got the gun from

25   under a stroller outside the apartment?

E8e9chr3                        Mallory - cross

1    A.  It wasn't under the stroller.  In the garbage by a

2    stroller, a garbage stroller that was on its way to the

3    garbage.

4    Q.  That's the first time that all this stuff comes up, right?

5    A.  Yes.

6    Q.  Do you know someone named Quahiri Red Cross?

7    A.  Yes, sir.

8    Q.  And he's a drug dealer in Newburgh or has been?

9    A.  Yes.

10   Q.  And he went to jail for shooting Mr. Henry, right?

11   A.  Yes, sir.

12   Q.  And he got out of jail very shortly before Mr. Henry was

13   killed, right?

14   A.  Yes, sir.

15   Q.  Did you ever buy from him?

16   A.  Buy what?

17   Q.  Any drug?

18   A.  Yes.

19   Q.  What drugs did you buy from him?

20   A.  When I was 13 -- when I was like 14, 15, I brought crack

21   from him.

22   Q.  For your own use?

23   A.  No.

24   Q.  So you were selling crack then?

25   A.  Repeat that again.

E8e9chr3                      Mallory - cross

1   Q.  So you were selling crack back then?

2   A.  Yes, sir.

3   Q.  Did you tell the government that, that you were selling

4   crack that early?

5   A.  Yes, sir.

6   Q.  Did you tell them the first time you sold anything was weed

7   when your friend stole it?

8   A.  Yes, sir.

9   Q.  When was that?  How old were you when that happened?

10  A.  Estimate like probably 13, 14.

11  Q.  Wasn't that first thing you said with drug dealing was that

12  marijuana that your stole -- that your friend stole from his

13  mother's boyfriend?  Wasn't that the beginning that you said,

14  right?

15  A.  My cousin stole, yeah, that's correct.

16  Q.  But you were selling crack at the same time?

17  A.  Shortly after that, like way shortly after that.

18  Q.  Did you tell the government the first time you sold crack

19  was when it was stolen, when you stole it from someone?

20  A.  Yes, sir.

21  Q.  That was when you were 13?

22  A.  It's all estimates.  It was before I was fifteen.  It was

23  like 14, 15.

24  Q.  Which is it?

25  A.  It's an estimate.  It's either when I was 14 or 15.  I

E8e9chr3                         Mallory - cross

1    don't remember my age.

2    Q.  Now, you talked about all the people on the street that you

3    spoke to while you were cooperating.  Even after you were in

4    jail you've actually spoken to people involved in this case,

5    right?

6    A.  No.

7    Q.  You spoke to Mr. McDermott, Ramone McDermott, at the GEO

8    Facility.

9            Different from Geo the person.  GEO.  You know what

10   I'm talking about, right?

11   A.  Yes, sir.

12   Q.  You spoke to him, right?

13   A.  I talked to him but it wasn't nothing about --

14   Q.  You spoke to him, right?

15   A.  Yes, sir.

16   Q.  That was the question.

17   A.  Yes, sir.

18   Q.  There is no recording of that conversation, right?

19   A.  No.

20   Q.  So we won't be able to verify what the subject matter was,

21   will we?

22   A.  No.  There is no recording.

23   Q.  Now, the other day on your direct you said you cooperated

24   to help law enforcement.  In fact, you did it to avoid life

25   imprisonment, right?

1    A.  Yes, sir.

2    Q.  And you're hoping to avoid anymore imprisonment than when

3    you get sentenced, right?

4    A.  No, sir.

5    Q.  You have a shot at time served, right?

6    A.  No, sir.

7    Q.  You don't?  The judge can't sentence you to time served?

8    A.  He can but.

9    Q.  He can, right?  He can.  And that's what you would like,

10   right?

11   A.  (No response).

12   Q.  Or do you want to do extra time in jail?

13   A.  If I have to do extra time in jail --

14   Q.  No.  Do you want to do extra time in jail?

15   A.  No.

16              THE COURT:  Mr. Dratel.

17              MR. DRATEL:  This is good, your Honor.

18              THE COURT:  Why don't we break, ladies and gentlemen.

19   We're going to have a luncheon recess now.  Please be in the

20   jury room no later than 1:55 so we can get started promptly at

21   2:00.  Please do not discuss the case.

22              (Jury excused)

23              THE COURT:  Mr. Mallory, you may step down.

24              (Witness excused)

25              Folks, I have another criminal matter right now so you

E8e9chr3                    Mallory - cross

1    may want to fold up some of your notebooks.

2              (Luncheon recess)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       AFTERNOON SESSION

2                         2:00 p.m.

3           THE COURT:  We're ready, the jury is here, we have

4    Mr. Mallory.

5           JAMAR MALLORY, resumed.

6           (Jury present)

7           THE COURT:  Mr. Dratel.

8           MR. DRATEL:  Thank you, your Honor.

9    CROSS-EXAMINATION CONTINUED

10   BY MR. DRATEL:

11   Q.   Good afternoon, Mr. Mallory.

12   A.   Good afternoon.

13   Q.   Take you back to a couple of your proffers for just a

14   minute which in one the FBI went through your phone contacts

15   with you, correct?

16   A.   Yes.

17   Q.   And you have someone named G, just the letter G in there.

18   You told them that was G More, right?

19   A.   I don't remember.

20   Q.   Was there a G More who sold heroin?

21   A.   G More --

22   Q.   You don't remember.  Okay.  Let me show you what's marked

23   as 3502-12.  Ask you if that refreshes your recollection that

24   when discussing your -- the contents of your phone contacts

25   with the FBI you said that G was G More who was someone who was

E8e9chr3                        Mallory - cross

1    a heroin dealer, correct?

2    A.  It's not G.  It's --

3    Q.  Sorry?

4    A.  It's G-MO not G More.  G-MO.  M-O.  Not M-O-R-E.

5    Q.  M-O-R-E?

6    A.  G-MO.

7    Q.  Oh, G-MO?

8    A.  Yes.  Not More.

9    Q.  I see.  Just G-MO.  But that's obviously not Mr. Thomas,

10   right?

11              Mr. Mallory?

12   A.  Repeat that again.

13   Q.  That's not Mr. Thomas, is it?

14   A.  No.

15   Q.  And when we talked before about that you had been reminded

16   by Snelly that Stacks -- rather that Snelly had -- that Snelly

17   had provided a gun to someone named Stacks for the homicide,

18   right?

19   A.  Yes.

20   Q.  And you were reminded of that by talking to Snelly about

21   the events, right?

22   A.  Yes.

23   Q.  And that Stacks was involved -- Stacks is a person, Alton,

24   Junior, right?

25   A.  Say that one more time.  I didn't understand it.

E8e9chr3                        Mallory - cross

1   Q.  I'm sorry.

2   A.  Could you repeat that.  I didn't understand what you said.

3   Q.  Stacks is Alton Junior.

4          MR. BUCHWALD:  Stella.

5   Q.  Stella is Alton Junior.  Stacks is --

6          MR. BUCHWALD:  Robert Bolton.

7   Q.  Robert Bolton, right?

8   A.  I don't know Stacks' name.

9   Q.  But he's the person who Snelly -- who Snelly told you or

10  reminded you that he had been provided a weapon for the

11  homicide?

12         MR. BAUER:  Objection.  Hearsay.

13         MR. DRATEL:  804.5, your Honor.

14         THE COURT:  Overruled.

15  Q.  And so that he was -- that Stacks was the person who Snelly

16  provided the weapon to for the Joker homicide, right?

17  A.  I heard that.

18  Q.  Right.  But you told the government right that you had been

19  reminded of that?

20  A.  Yeah, yeah, yes, sir.

21  Q.  So when did you first know that, that you had to be

22  reminded of that?

23  A.  I probably got the words mixed up or something because I

24  didn't -- I wasn't sure that Stacks was at that homicide.

25  Q.  So you were getting bits and pieces of information from

E8e9chr3                          Mallory - cross

1    varying sources?

2    A.  Yes, sir.

3    Q.  All of this is in between the time of the event and the

4    time you began cooperating.  You were on the street getting

5    information about it, right?  People were talking about it,

6    right?

7    A.  Could you repeat that one more time.  I didn't understand

8    what you was saying.

9    Q.  Sure.

10        Withdrawn.  During the time that you were cooperating

11   you were also collecting information about the events, right?

12   A.  Yes.

13   Q.  To help the government?

14   A.  Yes, sir.

15   Q.  And before you were cooperating there was also just general

16   talk on the street about what was going on too, right?

17   A.  Yes, sir.

18   Q.  I want to take you back to where we were right before lunch

19   with respect to your cooperation agreement.  Now, without a 5K

20   letter from the government -- you know what I mean by a 5K

21   letter, right?

22   A.  Yes, sir.

23   Q.  That's a letter where the government writes a letter to the

24   judge telling the judge who sentences you all the things that

25   you've done as far as your cooperation is concerned so that you

1    can get credit for it and get a lower sentence than you would

2    otherwise get, right?

3    A.  Yes, sir.

4    Q.  And, in fact, you're facing a mandatory minimum sentence

5    and without the government making a motion the judge can't even

6    go below that mandatory minimum, right?

7    A.  Yes.

8    Q.  And with the motion from the government and the 5K letter,

9    the judge can go all the way down to time served, right?

10   A.  Yes.

11   Q.  And so without the letter you get 17 years minimum, right?

12   A.  Yes.

13   Q.  And you're also facing a life -- it's not just a minimum

14   sentence but without an agreement you could be facing -- you're

15   facing a life sentence potentially?

16   A.  Yes.

17   Q.  Now, the conditions of your cooperation agreement, as you

18   testified yesterday, stay out of trouble, testify, don't lie,

19   tell the truth, right?

20   A.  Yes.

21   Q.  Well, certainly didn't stay out of trouble, right?

22   A.  Repeat that again.

23   Q.  You didn't stay out of trouble?  You committed robberies

24   while you were cooperating, right?

25   A.  Yes.

E8e9chr3                    Mallory - cross

1   Q.  And you didn't tell the government about it?

2   A.  I did tell the government about it.

3   Q.  Later when you were confronted with it after you signed the

4   agreement, correct?

5   A.  Yes.

6   Q.  And that was a violation of your agreement not to tell them

7   beforehand, right?

8   A.  Yes.

9   Q.  It was a violation of the agreement to commit the robberies

10  in the first place -- I'm sorry.  It was a violation of your

11  cooperation to commit the robberies in the first place, right?

12  A.  Yes.

13  Q.  It was a violation of your cooperation to use drugs, right?

14  A.  Yes.

15  Q.  And you used drugs even after you signed the agreement,

16  when you tested positive after -- and you went to jail, right?

17  A.  Yes.

18  Q.  You still have your agreement though, right?

19  A.  What.  Could you repeat that?

20  Q.  You still have your agreement?  The government hasn't

21  ripped it up, right?

22  A.  (No response).

23  Q.  You've violated two of the things that you had to do, which

24  was stay out of trouble and tell the truth.  You've violated

25  both.  You still have the agreement, right?  It is still

1   intact, correct?

2   A.  I don't -- I don't know if I have it.  I don't know if --

3   Q.  You have an agreement today -- you're testifying pursuant

4   to that agreement, right?

5   A.  Yes.

6   Q.  You failed to disclose the full extent of what you did on

7   the street as a whole, right?

8   A.  I don't understand that question.  Could you repeat it.

9   Q.  The full extent of your criminal past.  You never told them

10  about selling PCP before the cooperation agreement.  You never

11  told them about selling ecstasy -- I'm sorry -- about doing

12  ecstasy, right, before the agreement?

13  A.  That's not true.  I told them before.

14  Q.  But you committed more crimes?

15          MR. BAUER:  Your Honor, objection.  Asked and answered

16  a number of times.

17          THE COURT:  Sustained.

18  Q.  You also told very different stories about your role in the

19  actual event, right?

20  A.  Yes, sir.

21  Q.  Still have your agreement, right?  You're still testifying

22  pursuant -- in other words, the agreement still exists?  It

23  hasn't been ripped up, has it?

24  A.  I'm telling the truth.

25  Q.  No.  I'm asking you:  Has the agreement been ripped up?

E8e9chr3                    Mallory - cross

1   A.  Not yet, no.

2   Q.  You don't expect the agreement to be ripped up, do you?

3   That's why you're testifying today?

4   A.  There's a chance it might be.

5   Q.  There's a chance but it hasn't been.  You've done all of

6   these things in violation of the agreement and it hasn't been

7   ripped up yet, has it?  Right?

8   A.  I don't know.

9   Q.  You don't know whether it's been ripped up or not?

10  A.  No.

11  Q.  You don't know?  You were asked on direct that you don't --

12  whether the agreement is going to be ripped up, and you said

13  you don't know.  You don't know if it exists now?  Do you want

14  to see it?  Could we see the exhibit, the original?

15          MR. BAUER:  Are you talking to me?

16  Q.  You were shown this two days ago.  Government Exhibit 421.

17  You were shown this.  You verified your signature.  You're

18  saying you don't know whether the agreement has been ripped up

19  or not?

20  A.  It wasn't.  It's not.

21  Q.  Right.  It's not ripped up.  It's still there.

22          You robbed people, right?

23  A.  Yes.

24  Q.  And you still have your agreement, right?

25  A.  Yeah.  You just said that.  Yeah.

1    THE COURT:  I'm sorry?

2    THE WITNESS:  Yes.

3    Q.  Magistrate judge warned you to stay away from drugs and

4    within ten days you tested positive for three different drugs

5    and you still have your agreement, right?

6    MR. BAUER:  Objection.  Asked and answered.

7    THE COURT:  This is a different question.

8    Q.  And you still have your agreement, right?

9    A.  Yes.

10   Q.  And it's been two years almost since the government learned

11   all about this, right?  You tested positive in September of

12   2012.  You were confronted by the government in November of

13   2012 about these robberies, right?  And you still have your

14   agreement today?  Right?

15   A.  Yes.

16   Q.  Now, with respect to that -- you did that -- one of the

17   robberies that you didn't tell about until after your

18   cooperation agreement was signed was the one with Quick, right?

19   A.  Repeat that again.

20   Q.  Withdrawn.

21   You robbed somebody with Quick, right?

22   A.  Yes.

23   Q.  And that robbery was after you began cooperating.  One of

24   the two that you didn't disclose, right?

25   A.  Yes.

E8e9chr3                         Mallory - cross

1    Q.  So, you kept your agreement, right?  Despite that?

2    A.  Yes.

3    Q.  But you managed also to tape Quick, right?  You taped

4    Quick, right?

5    A.  I took Quick.  Doesn't make sense.  What are you talking

6    about?

7    Q.  You had a conversation with Quick that was taped by the

8    government, right?

9    A.  Yes.

10   Q.  He gets arrested, right?

11   A.  Yes.

12   Q.  On the basis of that, you keep your cooperation agreement,

13   he gets prosecuted, you keep your deal, and you get credit for

14   getting him arrested, don't you?

15   A.  If I get the 5K1 letter.  I don't know.

16   Q.  Yes.  You'll get credit for having him arrested, a guy you

17   committed a crime with while you were cooperating?

18   A.  It depends if I get credit, if I get that 5K1 letter.  But

19   it also in that letter will have the bad stuff that I did like

20   the robbery that you're talking about.  So it won't just be

21   good stuff.  It will be bad stuff also.

22   Q.  I didn't even hear your answer.  You're going to have to

23   repeat it, if you want.

24          MR. BAUER:  Can we have it read back, please.

25          THE COURT:  Yes, please.

1      (Record read)

2  Q.  Yeah, but it will be the bad stuff alone without the 5K,

3  right; and a 17-year mandatory minimum and a potential life

4  sentence, right?

5  A.  Yes, sir.

6  Q.  So that agreement is your ticket to a lower sentence,

7  right, than you would otherwise get, right?

8  A.  Repeat that question again.

9  Q.  The agreement and the 5K letter are your ticket to a much

10 lower sentence than you would otherwise get?

11 A.  They go under the guidelines and mandatory minimums.

12 That's all I know.  I don't know how much.

13 Q.  You could get as low as time served.  Do we have to keep

14 going through this?

15 A.  You going through it.

16 Q.  Yeah.  You could get as low as time served, right?

17 A.  Yes.

18 Q.  You're not going to say sentence me to the mandatory

19 minimum, that's fine with me, right?  You're not going to

20 volunteer for more jail, are you, when you get sentenced?

21 A.  No.

22 Q.  Now, with respect to Mr. Thomas -- withdrawn.

23      With respect to Mr. Burden, Kev Gotti, right?

24 A.  What.

25 Q.  With respect -- I asking you about Mr. Burden now, Kev

1   Gotti?

2   A.  All right.  Yeah.

3   Q.  He was a good friend of yours?

4   A.  Yeah, we were friends, yeah.

5   Q.  You hung out a lot together?

6   A.  Yeah.

7   Q.  Fellow Blood while you were Blood, right?

8   A.  Yes.

9   Q.  You taped him -- you did that whole tape that we saw plus

10  the other 85 minutes of it that we didn't see, right, for the

11  government?  Right?  Not telling him?

12  A.  What.  Repeat that again.

13  Q.  Sure.  The tape that was played earlier between you and

14  Mr. Burden, you did that for the government to tape Mr. Burden

15  without telling him, right?

16  A.  Yes.

17  Q.  You also shot him in the foot, right?

18  A.  Yes.

19  Q.  And you like him, right?

20  A.  What.  Repeat that.

21  Q.  And you like Mr. Burden?

22  A.  I don't understand that question.

23  Q.  He's a friend of yours?  You like him?

24  A.  He's a friend of mine, yes.  He's a friend of mine.

25  Q.  He's a friend of yours but you don't like him?

1   A.  I don't know what "like" mean.  What you talking about

2   like?

3   Q.  You have good feelings about him as opposed to bad feelings

4   about him?

5   A.  You could say that, yes.

6   Q.  But you don't like Mr. Thomas, right?

7   A.  I do like Mr. Thomas.

8   Q.  You like Mr. Thomas.  This is somebody you say robbed you

9   twice?

10  A.  He robbed me but --

11  Q.  Ran your pockets twice?

12          MR. BAUER:  Can we let --

13          THE COURT:  You've got to let him finish.

14          THE WITNESS:  He ran my pockets at gunpoint once.  The

15  second time he robbed me and snatched a necklace from me and

16  ran away.

17  Q.  He robbed you twice.  And he didn't like the fact that you

18  had a relationship with his sister, right?

19  A.  He never told me.  I don't know.  I don't know that.

20  Q.  You had a fistfight over it, didn't you?

21  A.  Over that chain we fought.

22  Q.  You had a fistfight about his sister too, didn't you?

23  A.  No.

24  Q.  You don't know?

25  A.  I said no.

E8e9chr3                    Mallory - cross

1   Q.  Now, you talked about Mr. Thomas -- by the way, he was a

2   Crip, right, and you were a Blood?

3   A.  At the time when he was Crip I wasn't Blood.

4   Q.  But Crips and Bloods are really opposite, right?  They

5   don't get along?

6   A.  That's not true.  Not where I'm from.  They do get along.

7   Q.  But you don't even know that he was a Blood, right?

8   A.  Yeah.  I do know he was a Blood.

9   Q.  Well didn't you tell the government "if he was a Blood"?

10  A.  What.  I don't understand that question.

11  Q.  I will help make it understandable.

12          Show you what we're going to have marked as Thomas --

13  is there a P yet?

14          There is a P we'll do Thomas M.

15          So I show you what's been marked as Thomas M.  Ask you

16  if you recognize that.

17  A.  (No response)

18  Q.  Do you see who that is?  Do you see what it is?

19  A.  Yeah.

20  Q.  And it's a photo of Mr. Thomas, right?

21  A.  Yes.

22  Q.  And your handwriting on it?

23  A.  (No response).

24  Q.  Your initials, a date, correct?

25  A.  Yes.

1    Q.  You wrote on it.  You wrote -- why don't you read what you
2    wrote next to Mr. Thomas.
3                By the way, this is for the FBI January 25, 2012.  I
4    beg your pardon.
5                I move it in evidence, your Honor.
6                MR. BAUER:  No objection.
7                THE COURT:  Defendant Thomas M for Mary will be
8    received.
9                (Defendant's Exhibit Thomas M received in evidence)
10   Q.  Read what you wrote about Mr. Thomas January 25, 2012 when
11   interviewed by the FBI and shown his photo.
12   A.  "If he's Blood he can be under L-1."
13   Q.  "If he's Blood," right?  Right?
14   A.  That's what I just read to you, yeah.
15   Q.  Not he's Blood, "if."
16                That's in your handwriting, right?
17   A.  Yes.
18   Q.  So first time he robbed you, he took sneakers and money,
19   you said, right?
20   A.  Yes.
21   Q.  The second time he took a necklace?
22   A.  Yes.
23   Q.  You're someone who remembers that kind of stuff, right?
24   A.  I don't understand that question.
25   Q.  You remember about having your pockets run.  That's

E8e9chr3                         Mallory - cross

1  something that's meaningful to you?

2  A.  Pockets -- I got in my pockets.

3          He pulled a gun out on me.  And I gave him what was in

4  my pockets.  He didn't go in my pockets.

5  Q.  Having your pockets run is something that's meaningful to

6  you?  You don't like that?  That stays with you, right?

7  A.  Yes, sir.

8  Q.  In fact, you talked about it with Mr. Burden on that tape,

9  right?

10  A.  No.

11  Q.  Never -- okay.  Can we play what we're marking as -- well

12  it's part of Government 291.  But it's not one of the excerpts

13  that the government has played.  So I don't know how we want to

14  submark it.

15          MR. GOLTZER:  May we see the exhibit?

16          MR. BAUER:  Has the court ruled on its admissibility?

17          THE COURT:  I don't know what Mr. Dratel is talking

18  about.

19          MR. DRATEL:  If we can have a sidebar I'll be happy

20  to.

21          THE COURT:  Okay.

22          MR. DRATEL:  If we can, your Honor.

23          (Continued on next page)

24

25

1          (At the sidebar)

2          MR. DRATEL:  Your Honor, it's a portion.  I will show

3    it.  It's a portion where he talks about that he's not

4    muscled -- put the beginning in for context.  It's a paragraph

5    here.  But it's really "used to get my pockets ran.  I couldn't

6    fight."  Why he became a Blood.  And it just goes on for the

7    next -- it's really about his bias against Mr. Thomas and this

8    is an important thing to him.  This is what he talks about.

9          THE COURT:  Is he talking about Thomas in this?

10         MR. DRATEL:  No.  Just about having his pockets run.

11   It's two minutes, two-and-a-half minutes.

12         THE COURT:  It's simply about him complaining or

13   commenting on how his -- he used to get robbed.

14         MR. DRATEL:  He just said he didn't talk about it at

15   all with Burden.  He just denied that he talked about it.  So I

16   think it impeachment, number one.

17         Number two, it's also about his bias because this is

18   something that stays with him.  And this is part of his

19   resentment against Mr. Thomas.

20         MR. BAUER:  I don't think your question -- the

21   questions were clear to Mr. Mallory that we were -- that the

22   question was generally about getting beaten up and generally

23   about fighting and that sort of thing.  So I don't think he --

24   this is proper impeachment based on the questions already

25   asked.

E8e9chr3                    Mallory - cross

1          But I will say since we're here that if he does lay

2     that foundation there is no statements by Burden here so

3     there's just prior statements by Mallory.  But I would object

4     to any transcript coming in because he hasn't reviewed this

5     transcript.

6          MR. DRATEL:  We're not --

7          MR. BAUER:  You're just going to play it?

8          THE COURT:  Will they be able to understand?  Will the

9     jury be able to understand what's being said?

10          MR. DOWNING:  He acts it out also.  He demonstrates

11     physically.

12          MR. BAUER:  I think the question should be more

13     clearly generally when we're talking -- not Gucci just

14     generally do you remember talking about fights generally.

15          MR. DRATEL:  I think it's admissible even if he says

16     he remembers, simply because it also goes to the bias which is

17     a very expansive admissibility standard.

18          I'll lay the foundation.  See what you hear.

19          (Continued on next page)

20

21

22

23

24

25

1          (In open court)

2    Q.   So during your conversation with Mr. Burden that was taped,

3    apart of which we saw yesterday and this morning, did you also

4    discuss your feelings about having your pockets run generally?

5    A.   I don't remember if I did or not.

6          MR. DRATEL:   Your Honor we'd like to play a section

7    that we'll call 291-GT -- we'll call it 291G.

8          THE COURT:   291G as in Gary?

9          MR. DRATEL:   Yes, your Honor.

10          THE COURT:   Any objection?

11          MR. BAUER:   It's part of 291.  I don't think it needs

12    to be marked as anything.

13          THE COURT:   But it's not in evidence.

14          MR. BAUER:   All of 291 is in evidence right now so

15    he's just playing another excerpt.

16          THE COURT:   Okay.

17          MR. DRATEL:   Just for purposes of identifying it.  But

18    I don't have a problem with it being part of 291.

19          (Audio visual recording played)

20    Q.   So, you said there, "I got a lot of anger in me because

21    people running my pocket and shit," right?

22    A.   Yes, sir.

23    Q.   You're angry at Mr. Thomas, right?

24    A.   I was not talking about Gucci when I was --

25    Q.   He ran your pockets twice?

1    A.  I said --

2    Q.  Once at gunpoint?

3    A.  I said the names, as I was talking to Gotti.  I never said

4    nothing about Gucci when I was talking to him there.

5    Q.  But he ran your pockets twice, right?

6    A.  No.  He never ran my pockets twice.

7    Q.  That wasn't acting, right?

8    A.  What?

9    Q.  That part wasn't acting?

10   A.  Listen, I'm telling the truth right now.

11   Q.  That was real?

12   A.  I told him the names in that recording.  You just heard it.

13   I never said nothing about Gucci.  Gucci never ran my pockets

14   twice.  He pulled a gun out on me and I gave him what I had in

15   my pocket one time.  The second time he snatched a chain from

16   me.  That's all that ever happened between him and me.

17   Q.  That wasn't acting on there, right?

18   A.  No.

19   Q.  The only acting you did on there with Burden, that part was

20   real?  Right?

21   A.  (No response)

22           (Pause)

23   Q.  Right?

24   A.  Right what?

25   Q.  That that part was real?

E8e9chr3                        Mallory - cross

1  A.  The whole thing was real.  There was no acting on it.

2  Q.  No acting on the whole thing?

3  A.  No.

4  Q.  Now, once you started to cooperate, it was in your best

5  interests not to do drugs, right?

6  A.  Yes.

7  Q.  It was in your best interests not to commit more crimes,

8  right?

9  A.  Yes.

10  Q.  It was in your best interests to tell the truth about

11  everything, right?

12  A.  Yes.

13  Q.  But you repeatedly don't do what's in your best interests,

14  right?

15  A.  I don't understand what you're saying.

16  Q.  You don't know how, do you?

17  A.  I don't know how to do what?

18  Q.  What's in your best interests?

19  A.  I do so know how to do what's in my best interests.

20          MR. DRATEL:  Nothing further, your Honor.

21          THE COURT:  Mr. Strazza.

22          MR. STRAZZA:  Yes.

23          May I inquire?

24          THE COURT:  You may.

25          (Continued on next page)

E8e9chr3                    Mallory - cross

1    CROSS-EXAMINATION

2    BY MR. STRAZZA:

3    Q.  Mr. Mallory, do you know this individual seated to my left

     over here?

4

5    A.  Yes, sir.

6    Q.  Who is that?

7    A.  I can't see that good.  Can you point who you're talking

8    about that's right next to you.

9    Q.  This gentleman seated in this chair right here?

10   A.  Yes, sir.

11   Q.  Who is that?

12   A.  AUSA.

13   Q.  Do you know his last name?  Is that AUSA Bauer?

14   A.  Bauer, yes, sir.

15   Q.  And are you sure?  Can you see him from where you're

16   sitting?

17   A.  Yes, sir.

18   Q.  Because I noticed that you don't have your glasses on

19   today.  Can you see without your glasses?

20   A.  Yeah, I can see without my glasses.

21   Q.  So why were you wearing your glasses when you first came

22   out the very first time?

23   A.  Because I had a feeling I was going to have to read stuff.

24   Q.  You need your glasses to read stuff?

25   A.  Yes, sir.

E8e9chr3                        Mallory - cross

1    Q.  Have you been reading documents over the last couple of

2    days without those glasses?

3    A.  Documents?

4    Q.  Yes.

5    A.  Yes.

6    Q.  And were you able to read those documents without your

7    glasses?

8    A.  Yes.

9    Q.  So you really don't need those glasses?

10   A.  I need them, yeah, I need them.

11   Q.  What do you need them for?

12   A.  To see.

13   Q.  To see what?

14   A.  Stuff that I read, whatever.  Just to see.

15   Q.  Are you nearsighted or farsighted?

16   A.  I don't know the difference between those two.

17   Q.  Do you need the glasses to see things that are close up or

18   to see things that are far away?

19   A.  Both.

20   Q.  So without those glasses you can't really see that well

21   right now?  Is that what you're saying?

22   A.  I could see but certain things are blurry to me.

23   Q.  When did you start wearing glasses?

24   A.  When did I start?

25   Q.  Yes.

E8e9chr3                        Mallory - cross

```
 1   A.  When I was about 13, 12.

 2   Q.  Do you think using PCP has affected your vision?

 3   A.  No.

 4   Q.  Has it affected your memory?

 5   A.  I don't know.

 6   Q.  PCP makes you hallucinate, right?

 7   A.  Yes, sir.

 8   Q.  Makes you see things that aren't there, right?

 9   A.  I was told that but I never hallucinated or seen anything.

10         THE COURT:  I'm sorry.  I can't hear you.

11         THE WITNESS:  I was told that but I never hallucinated

12   and seen anything before.

13   Q.  Does it make you remember things that didn't happen?

14   A.  No.

15   Q.  You started using PCP I believe you testified on direct

16   examination around the birth of your daughter; is that correct?

17   A.  Yes, sir.

18   Q.  Which -- and then you also testified that you owned a gun

19   around the birth of your daughter.  Do you remember saying

20   that?

21   A.  Yes, sir.

22   Q.  Is that the same daughter or different daughters?

23   A.  Different daughters.

24   Q.  How many kids do you have?

25   A.  Three.
```

E8e9chr3                          Mallory - cross

1    Q.  How old are they?

2    A.  Ten, seven, seven and I got a two-year -- I got four

3    actually.  I got a two-year old too that's two.

4    Q.  You've got four kids?

5    A.  Yes, sir.

6    Q.  Do you know when they were all born?

7    A.  Yes, sir.

8    Q.  Do you know their birthdays?

9    A.  Yes, sir.

10   Q.  What month and year were they born?

11   A.  My ten-year-old, February 2004.  One of my seven-year-olds,

12   February 2007.  Another one of them -- another -- my other

13   seven-year-old, October 2007.  And my youngest one in

14   January 2013 or 12 -- 13.

15   Q.  Are you sure about all that?

16   A.  Twelve.  Twelve.  I get the year mixed up.

17   Q.  Are you sure?

18   A.  Yeah.

19   Q.  Now, you used to be a Blood, right?

20   A.  Yes.

21   Q.  You were brought home or brought into the Bloods gang by an

22   individual named Water, right?

23   A.  Yes.

24   Q.  And Water was your cousin's child's father, right?

25   A.  Yes.

E8e9chr3                     Mallory - cross

1   Q.  And this happened in New Jersey, right?

2   A.  Yes.

3   Q.  And at the time when this happened you were only in

4   New Jersey for a couple of weeks, right?

5   A.  At that moment, yeah.  Yes.

6   Q.  You grew up in Newburgh, right?

7   A.  Yes.

8   Q.  You spent most of your life in Newburgh?

9   A.  Yes.

10  Q.  You were still living in Newburgh at the time, right?

11  A.  Yes.

12  Q.  But you -- before that you never tried to become a Blood in

13  Newburgh, did you?

14  A.  No.

15  Q.  So, you decide to become a Blood in New Jersey even though

16  you still live and hang out in Newburgh, right?

17  A.  Yes.

18  Q.  And you testified that you didn't have to go through the

19  initiation process by doing this in New Jersey, right?

20  A.  No.

21  Q.  You didn't have to fight anybody?

22  A.  No.

23  Q.  You didn't have to commit any violent acts?

24  A.  No.

25  Q.  You didn't have to risk getting hurt?

1    A.  No.

2    Q.  And you didn't have to risk getting arrested, right?

3    A.  No.

4    Q.  So by doing it this way, this was kind of like a shortcut

5    to getting into the Bloods, right?

6    A.  Not really.

7    Q.  Well it was an easy way to do it, right?

8    A.  No.

9    Q.  It wasn't easier?

10   A.  It would have been the same if I was in Newburgh.

11   Q.  You don't have to go through an initiation process in

12   Newburgh?

13   A.  I wouldn't of.

14   Q.  You're special?

15   A.  No.  It's just that I'm friends, I'm close friends with a

16   lot of people that was in Newburgh that was high-ranked Bloods

17   so all I would have to do was just talk to them.

18   Q.  But you never -- you never did that, right?

19   A.  No.

20   Q.  Isn't it true you were looking for an easy way out?

21   A.  I don't understand that question, sir.

22   Q.  I'll move on.

23       You were arrested in January -- on January 24, 2012.

24   Right?

25   A.  Yes.

1  Q.  And you were taken down to the precinct when you were

2  arrested, right?

3  A.  Yes, sir.

4  Q.  And you testified that you were held in custody for

5  approximately 24 hours, right?

6  A.  Yes, sir.

7  Q.  You were charged with criminal possession of a controlled

8  substance, right?

9  A.  Yes, sir.

10 Q.  You were given a date to -- you were given a court date to

11 come back in approximately two weeks, right?

12 A.  Yeah around that time.

13 Q.  During those two weeks you met with the police four times,

14 right?

15 A.  I don't remember the amount of times but I met with the

16 police though.

17 Q.  More than once?

18 A.  I believe so.

19 Q.  In fact, more than twice, right?

20 A.  I'm not sure.  I know -- I'm not sure how many times it

21 was.  But I remember meeting with the police.

22 Q.  You met with them a couple days in a row, right?

23 A.  I believe so, yes.

24 Q.  And your case was ultimately dismissed, wasn't it?

25 A.  Yes.

1    Q.  You didn't receive any kind of punishment, did you?

2    A.  I had R and R.  I had to stay out of trouble for like a

3    certain amount of time.  Five months or four months.  I forget

4    whatever it was.

5           I was released on R and R.

6           MR. GREENFIELD:  Could you have it read back please.

7           (Record read)

8    Q.  My question was you didn't receive any type of punishment,

9    did you?

10   A.  No.

11   Q.  And you didn't -- that case didn't result in any kind of

12   criminal record for you, did it?

13   A.  No.  But when I got caught with that paraphernalia it

14   wasn't nothing in the bag.  Like it was pretty much nothing in

15   the bag.  It weighed out to nothing.

16   Q.  We're going to talk about that in one second.

17          My question was you didn't get a criminal record as a

18   result of this, did you?

19   A.  I don't understand that.

20   Q.  Did you get a criminal conviction as a result of that

21   arrest?

22   A.  No.

23   Q.  You found a way out by speaking to the police, right?

24   A.  No.  I got released on R and R.  I had to stay out of

25   trouble for a certain amount of time.  If it was --

1    Q.  Let's talk about what led up to this arrest on January 24,

2    2012.  Earlier that day you had asked somebody for money,

3    right?

4    A.  I don't remember.  I don't even know what you're talking

5    about.

6    Q.  Okay.  You got arrested because you had a bag in your

7    pocket that contained residue of a controlled substance,

8    correct?

9    A.  Yes, sir.

10   Q.  And they searched your pocket that day because they were

11   looking for a gun, right?

12   A.  Yes.

13   Q.  And you had that baggie in your pocket that day because

14   somebody gave you a piece of crack when you asked them if you

15   could borrow money, right?

16   A.  I don't remember that.  I really don't remember that.

17   Q.  Well, when you got caught with that baggie the crack was no

18   longer in the bag, right?

19   A.  No.

20   Q.  You had taken it out and sold it, right?

21   A.  Yes.

22   Q.  And so all that was left was a little residue, right?

23   A.  Yes.

24   Q.  And this wasn't the first time you've been arrested, was

25   it?

E8e9chr3                         Mallory - cross

1    A.   No.

2    Q.   You knew you weren't going to go to jail for a baggie with

3    residue in it, right?

4    A.   Yes.

5    Q.   You knew this case wasn't going anywhere, right?

6    A.   Yes.

7    Q.   But you still decided to meet with the police all those

8    times?

9    A.   Yes.

10   Q.   You still decided to cooperate and volunteer all that

11   information even though you knew you weren't going to get in

12   trouble?

13   A.   Yes.

14   Q.   Was this the first time you began speaking with the

15   Newburgh police?

16   A.   Yes.

17   Q.   You never cooperated with the Newburgh police before this?

18   A.   No.

19   Q.   You just grew a conscience that day?

20          What happened?  What made you decide to cooperate that

21   day?

22   A.   Because I kept getting questioned for that robbery that

23   happened with -- that I kept getting questioned for a robbery

24   and they kept telling me -- they kept questioning me for it.

25   And I got tired of it.  I got tired of it.

E8e9chr3                        Mallory - cross

1    Q.  And when they were questioning you, they were telling you

2    that they knew certain information already, right?

3    A.  I don't remember that.

4    Q.  They were telling you they knew who was involved in that,

5    weren't they?

6    A.  I don't remember.

7    Q.  They were giving you names of people they say they knew

8    were involved in that, right?

9    A.  No.  I don't remember that.

10   Q.  You knew what information they were looking for when you

11   decided to cooperate with them, didn't you?

12   A.  Repeat that again.  I don't understand that question.

13   Q.  You knew what information they were looking for when you

14   decided to cooperate with them, didn't you?

15   A.  Yeah.

16   Q.  They told you what they were looking for, right?

17   A.  No.

18   Q.  Are you familiar with 20 William Street in Newburgh, right?

19   A.  Yes.

20   Q.  You sold drugs out of that location?

21   A.  Yes.

22   Q.  You packaged drugs in that location?

23   A.  Yes.

24   Q.  You stored drugs at that location?

25   A.  Yes.

E8e9chr3                         Mallory - cross

1   Q.  You had guns at that location?

2   A.  No.

3   Q.  You never held any guns at that location?

4   A.  No.

5   Q.  On July 23, 2010 that location was raided by the police,

6   right?

7   A.  No.

8   Q.  It was not?

9   A.  It was not raided.

10  Q.  On July 23, 2010 the police searched that location,

11  correct?

12  A.  Yes.

13  Q.  And you were there when the police first arrived, right?

14  A.  Yes.

15  Q.  You were arrested, right?

16  A.  Yes.

17  Q.  The police found, among other things, drugs?

18  A.  Yes.

19  Q.  Paraphernalia?

20  A.  I don't know.

21  Q.  A scale?

22  A.  I don't know.

23  Q.  They found a gun too, right?

24  A.  Yes.  I heard about that, yes.

25  Q.  And you were arrested with other people, right?

E8e9chr3                          Mallory - cross

1    A.   Yes.

2    Q.   You were arrested with Eric Gordon?

3    A.   Yes.

4    Q.   You were arrested with James Williams?

5    A.   Yes.

6    Q.   Did you make any statements to the police that day when you

7    were arrested?

8    A.   I don't remember.  I don't think I did.  No.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  Did you offer to help the police that day when you were

2    arrested?

3    A.  No.

4    Q.  I didn't hear you.

5    A.  No.

6    Q.  Did you try and cooperate with the police that day when you

7    were arrested?

8    A.  No.

9    Q.  Did the police ask you about the robbery that took place

10   when you were arrested?

11   A.  What robbery?

12   Q.  The robbery at 54 Chambers Street?

13   A.  No.

14   Q.  You never received any punishment as a result of that

15   arrest, did you?

16   A.  No.

17   Q.  You never received a criminal record as a result of that

18   arrest, did you?

19   A.  Criminal record, what does that mean?

20   Q.  A criminal conviction?

21   A.  No.

22   Q.  You really don't know what a criminal record is?

23   A.  I am not sure, sir, so I'm asking you the questions.

24   Q.  I am asking you.  You don't know what a criminal record is?

25   A.  I have an idea.  Now I know, I'm sure what it is now.

1   Q.  Are you familiar with 260 First Street in Newburgh?

2   A.  Yes, sir.

3   Q.  You sold drugs out of that location, too, right?

4   A.  Yes, sir.

5   Q.  You packaged drugs in that location?

6   A.  No, sir.

7   Q.  You stored drugs at that location?

8   A.  No, sir.

9   Q.  You had guns at that location?

10  A.  Yes, sir.

11  Q.  On July 15, 2011, the police searched that location as

12  well, didn't they?

13  A.  Yes, sir.

14  Q.  Again, you were there when the police arrived, right?

15  A.  Yes.

16  Q.  You were arrested?

17  A.  Yes, sir.

18  Q.  The police found, among other things, drugs that day,

19  right?

20  A.  Yes, sir.

21  Q.  They also found fake drugs that day, right?

22  A.  Yes, sir.

23  Q.  Fake crack, right?

24  A.  Yes, sir.

25  Q.  You sold fake crack sometimes, right?

E8enchr4                         Mallory - cross

1   A.  No, sir.

2   Q.  You never did that?

3   A.  No, sir.

4          THE COURT:  I'm sorry.

5          What is fake crack, Mr. Mallory?

6          THE WITNESS:  Fake crack is crack that is not, I mean,

7   stuff that looks like crack.

8          THE COURT:  But it doesn't --

9          THE WITNESS:  It could be soap, it could be anything

10  that's white that looks like crack that somebody would sell,

11  imitating it.

12  Q.  You sell it to people who are looking for crack, and it's

13  not really crack, right?

14  A.  Yeah, that's what it is, yeah.

15  Q.  You were arrested with three other people that day,

16  correct?

17  A.  Yes, sir.

18  Q.  Did you ever talk to the police that day?

19  A.  No, sir.

20  Q.  Did you ever offer to help the police that day?

21  A.  No, sir.

22  Q.  Did you try to cooperate that day?

23  A.  No, sir.

24  Q.  You never received any kind of punishment as a result of

25  that arrest either, did you?

E8enchr4                    Mallory - cross

1   A.  I didn't have anything, nothing was mines, so the person

2   who it belonged to took the rap for it.  So --

3   Q.  My question is you never received any punishment as a

4   result of that arrest, did you?

5   A.  No.

6   Q.  You didn't receive a criminal record as a result of that

7   arrest, did you?

8   A.  No.

9   Q.  You said someone else took the blame for you?

10  A.  No.

11  Q.  Someone else owned up to the drugs that were recovered at

12  that location that day?

13  A.  Yes, sir.

14  Q.  That was another easy way out for you, right?

15  A.  No, sir.

16  Q.  You have had some legitimate jobs in the past, isn't that

17  right?

18  A.  Yes, sir.

19  Q.  You worked for FedEx?

20  A.  Yes, sir.

21  Q.  You worked warehouse jobs?

22  A.  Yes, sir.

23  Q.  Other temporary jobs?

24  A.  Yes, sir.

25  Q.  Babysitting jobs?

E8enchr4                    Mallory - cross

1   A.  Yes, sir.

2   Q.  You folded hospital towels and blankets, isn't that right?

3   A.  As a job, yes, sir.

4   Q.  But this work was always on and off, right?

5   A.  Yes, sir.

6   Q.  In the meantime, when you weren't working the legitimate

7   jobs, you were selling drugs to make your money, right?

8   A.  Yes, sir.

9   Q.  Over the past decade you spent more time selling drugs than

10  you have working legitimate jobs, isn't that right?

11  A.  No, sir.

12  Q.  You've spent more time working legitimate jobs than you

13  have selling drugs over the past ten years, is that your

14  testimony?

15  A.  I don't know how -- I haven't been thinking about it.  I'm

16  not sure how long I did.  I'm not sure of the compilation.

17  Q.  Isn't it true that you could make more money selling drugs

18  than you could working at those legitimate jobs?

19  A.  What do you mean by that question?

20  Q.  Isn't it true that you could earn more money by selling

21  drugs than you could earn by working at those other jobs we

22  just spoke about, isn't that true?

23  A.  I don't know.  I don't understand that.  Like if you get --

24  make a -- you could make nothing at that, and you work and make

25  whatever you make an hour, a day, so that could be true, that

E8enchr4                        Mallory - cross

1    could be false.

2    Q.  What's the most amount of money you were ever paid per hour

3    at those legitimate jobs that I just mentioned?

4    A.  About $11.

5    Q.  $11 an hour?

6    A.  Yes, sir.

7    Q.  What's the most amount of hours you've ever worked in a

8    week at those legitimate jobs?  Let's say a day.  Excuse me.

9    How many hours a day did you work?

10   A.  Eight.

11   Q.  So that would be $88 a day, right?

12   A.  Yes, sir.

13   Q.  Isn't it true that you could make more money selling crack?

14   You could make more than $88 a day selling crack?

15   A.  Yes, sir.

16   Q.  It was probably easier to sell crack than to do what you

17   had to do at those other places, right?

18   A.  I guess so.  I don't know.

19   Q.  You get to make your own hours when you're selling crack,

20   right?

21   A.  No.

22   Q.  You don't get to make your own hours?

23   A.  No.

24   Q.  You have a boss?

25   A.  No, there's no boss, no.

1   Q.  You decide when you go to work when you're selling drugs,

2   right?

3   A.  Yes.

4   Q.  Mr. Mallory, is there a reason why you don't want to answer

5   my questions honestly?

6   A.  I am answering your questions honestly.  It is just the

7   questions that you are asking me, like, could I make more money

8   a day selling drugs than working, I answered it correctly.

9   Some days you could sell drugs and don't make no money.  When

10  you are working you make money per day, per hour.  How is that

11  lying?

12  Q.  Selling drugs was another easy way out for you, wasn't it?

13  A.  No.

14  Q.  By the way, when you were selling drugs, who were your main

15  drug suppliers?

16  A.  It depends what drug I was selling.

17  Q.  Let's go through all of them.

18          You sold crack, right?

19  A.  Yes, sir.

20  Q.  Who were your main crack suppliers, let's say, I think you

21  described it as the late 2000s.

22  A.  Late 2000s, Diz.

23  Q.  I didn't hear you?

24  A.  Diz.

25  Q.  Diz?

E8enchr4                         Mallory - cross

1    A.  Yeah.

2    Q.  Anybody else?

3    A.  Only him that I can remember right now.

4    Q.  How about powdered cocaine?

5    A.  Row.

6    Q.  Row?  How about heroin?

7    A.  Michael Knight.

8    Q.  How about marijuana?

9    A.  I never had a supplier for marijuana.  It never, never was

10   really my drug to sell.  I always got it from my customers --

11   Q.  And robbing people, right?

12   A.  I robbed somebody, yes.

13   Q.  Who is Lango?

14   A.  Lango is somebody that I grew up with.

15   Q.  Is he one of your suppliers?

16   A.  I bought crack off him before.

17   Q.  A lot?

18   A.  What is to say to a lot?

19   Q.  Excuse me?

20   A.  What is to say to a lot?

21   Q.  When you were selling crack, did you go to him to get your

22   crack to break down and sell to other people?

23   A.  I did that once or twice with him.

24   Q.  Who is Quahiri?

25   A.  Quahiri is somebody that I knew when I was younger that I

E8enchr4                    Mallory - cross

1   used to buy crack off of.

2   Q.  He is one of your crack suppliers also?

3   A.  He was when I was younger, in the early 2000s.

4   Q.  You started providing information to members of the FBI

5   when you got arrested that day, on January 24, 2012, right?

6   A.  Yes.

7   Q.  You met with the FBI eight times in the first two months

8   since you started providing that information, right?

9   A.  I'm not sure.  I know I met with them a couple of times.

10  Q.  A couple of times or a lot of times?

11  A.  What do you consider a lot?  It was more than two or three

12  times I met with them.  I don't know how many times it was.

13  Q.  When you met with them over the course of those first two

14  months, you didn't have a lawyer present with you, right?

15  A.  No.

16  Q.  And lawyers from the government weren't present at those

17  meetings, right?

18  A.  No.

19  Q.  It was just you and the members of law enforcement sitting

20  there, with you providing them information about what you knew

21  was going on in the street at that time, right?

22  A.  Yes.

23  Q.  You weren't speaking to them pursuant to a proffer

24  agreement, right?

25  A.  Repeat that again.  I don't understand that question.

E8enchr4                    Mallory - cross

1    Q.  You weren't speaking to them at that time, when I say at

2    that time meaning within the first two months after you were

3    arrested on January 24, 2012, pursuant to any kind of

4    agreements, right?

5    A.  No.

6    Q.  You were just giving them information trying to get out

7    from under your case, right?

8    A.  I don't understand that question either.

9    Q.  Why were you speaking to the FBI at that time?

10   A.  To help them with that robbery that I knew about.

11   Q.  To help get out from under the robbery, right?

12   A.  I didn't say that.  To help them with the robbery that I

13   knew about.

14   Q.  You weren't looking for anything in return for yourself?

15        You just wanted to help the police?

16   A.  No.

17   Q.  You wanted something, right?

18   A.  Yeah.

19   Q.  Yes or no?

20   A.  Yeah.

21   Q.  You had no idea you were going to wind up in the

22   predicament you're in right now during those first two months,

23   did you?

24   A.  Yes, I did.

25   Q.  You did?  You knew that you were going to have to plead

1    guilty to everything you were telling them about?  You knew

2    that when you first started talking to them those first two

3    months?

4    A.  No, but I knew I was going to get arrested for providing

5    the gun for that robbery.  That's what led me to cooperate.

6    Q.  You were just waiting for it to happen?

7    A.  I was doing what I could do, yeah.

8    Q.  Isn't it true that you thought you were going to be able to

9    walk away from this by just giving them some information and

10   they were going to let you know go, like they had done in the

11   past?

12   A.  No.

13   Q.  You weren't hoping to avoid being arrested?

14   A.  Was I hoping?

15   Q.  Yes.

16   A.  To avoid being arrested?

17   Q.  Yes.

18   A.  Yeah.

19   Q.  During those first couple of months, you tried to minimize

20   your role in that robbery, right?

21   A.  No.

22   Q.  You didn't?  You told them everything you did?

23   A.  I forgot a lot of it.  Most of it I forgot.

24          THE COURT:  I can't hear a word of this.

25          Speak up, Mr. Mallory.

1      THE WITNESS:  Can you repeat that question again.

2   Q.  You told them everything you did right away, during those

3   first two months that you started cooperating?

4   A.  No.

5   Q.  You tried to minimize your role, right?

6   A.  No.

7   Q.  You didn't tell them that you provided anybody with guns,

8   did you?

9   A.  No.

10  Q.  In fact, you referred to it as simply delivering a message

11  from L-1, didn't you?

12  A.  Yes.

13  Q.  You didn't tell the whole story about everything right

14  away, did you?

15  A.  The whole story about -- could you repeat that question.  I

16  don't understand.

17  Q.  What part of that question didn't you understand?

18      THE COURT:  Why don't you --

19      THE WITNESS:  Repeat it and I'll tell you.

20  Q.  You didn't tell the whole story about the robbery/Joker

21  homicide when you first started talking to the FBI, did you?

22  A.  No.

23  Q.  You didn't tell the whole truth, did you?

24  A.  I told them what I remember.

25  Q.  You told them everything you remembered?

E8enchr4                          Mallory - cross

1    A.   Yeah.

2    Q.   But your memory got better as time went on, didn't it?

3    A.   Yes, sir.

4    Q.   And that's because they were telling you what they knew

5    about the incident, right?

6    A.   No, that's not true.

7    Q.   They were refreshing your memory, weren't they?

8    A.   No.

9    Q.   You just one day woke up and started remembering things?

10   A.   No.

11   Q.   So your memory got better because they kept talking to you

12   about the incident, isn't that right?

13   A.   No.

14   Q.   Your memory got better because you were using drugs?

15   A.   No.

16   Q.   Your memory got better because you were robbing people?

17   A.   No.

18   Q.   Isn't it a fact your memory got better because you knew you

19   needed some help, isn't that right?

20   A.   No.

21   Q.   At some point after you started talking with the FBI, you

22   knew you were going to get arrested, right?

23   A.   Yes, sir.

24   Q.   And you knew that this was a federal investigation, right?

25   A.   At first I didn't.

E8enchr4                        Mallory - cross

1    Q.  Well, are you saying that when you were talking to the FBI

2    you didn't know that it was a federal investigation?

3    A.  That's when I knew, yeah, I knew then.

4    Q.  And the first time you spoke with the FBI was the very

5    first day, on January 24, 2012, wasn't it?

6    A.  Yes.

7    Q.  So that's when you knew?

8    A.  Yes.

9    Q.  So when you realized that you were going to get arrested

10   and it was going to be a federal investigation, you knew you

11   were looking at a lot of time, right?

12   A.  I didn't know how long I was looking at, but I knew I was

13   looking at some time.

14   Q.  You knew you weren't going to get R&R'd, right?

15   A.  Yeah.

16   Q.  Actually, you almost did, it was pretty close to that,

17   right?

18   A.  No.

19   Q.  No.  You didn't get released with a signature when you got

20   arrested in this case?

21   A.  Yeah.

22   Q.  Pretty close to ROR, right?

23   A.  No.

24   Q.  Your memory started getting better as time went on

25   throughout your cooperation with this investigation, right?

E8enchr4                          Mallory - cross

1    A.  Yes.

2    Q.  At some point you were assigned a lawyer to represent you,

3    right?

4    A.  Yes, sir.

5    Q.  At some point the meetings that you were attending with the

6    members of the FBI, during those meetings lawyers from the

7    government started showing up, right?

8    A.  What's lawyers from the government?  There was only one

9    lawyer.  That's my lawyer.

10   Q.  OK.  You said you know Mr. Bauer, right?

11   A.  Yes, sir.

12   Q.  Is he a lawyer?

13   A.  He is an AUSA.

14   Q.  OK.  I will ask the question differently.

15          At some point throughout the course of those meetings,

16   AUSAs started showing up, right?

17   A.  Yes, sir.

18   Q.  Now, instead of you just giving information you were

19   sitting down and meeting with them pursuant to a proffer

20   agreement, right?

21   A.  What is a proffer agreement?

22   Q.  Well, you had to sign an agreement before you started

23   talking with the AUSAs, right?

24   A.  I believe so, yes.

25   Q.  Do you remember whether or not you had to sign a proffer

E8enchr4                    Mallory - cross

1   agreement before you spoke with the prosecutors?

2   A.  I believe I did, but I get a lot of papers mixed up, like,

3   that I sign.

4           MR. STRAZZA:  Permission to approach?

5           THE COURT:  You may.

6           MR. STRAZZA:  May the record reflect that I'm handing

7   the witness what has previously been marked as 3502-21.

8           THE COURT:  OK.

9   A.  Yeah, I remember this.

10  Q.  That is an example of an agreement that you had to sign

11  when you started speaking with the AUSAs, right?

12  A.  Yes.

13  Q.  Pursuant to that agreement, you now knew that the

14  government couldn't use what you say against you on a direct

15  case in a subsequent prosecution against you, right?

16  A.  I don't understand what you just said.

17  Q.  Did your lawyer explain to you what that agreement meant?

18  A.  Yes, sir.

19  Q.  He explained to you that you could now tell the government

20  about crimes you've committed and they couldn't use those to

21  prosecute you, right?

22  A.  What does that mean, they couldn't use it to prosecute me?

23  Q.  You knew that now you could tell them everything, the whole

24  truth, the whole story, right?

25  A.  Right.

E8enchr4                          Mallory - cross

1    Q.   And you now knew that you were going to be arrested, right?

2    A.   Yeah.

3    Q.   And I'm sure you were told that it's very, very important

4    that you tell them the truth and the whole truth, right?

5    A.   Yes, sir.

6    Q.   And that proffer session took place on March, the first one

7    took place in March of 2012, right?

8    A.   I don't remember the date.

9    Q.   Did you say yes?

10   A.   I don't remember the date.

11   Q.   Was it a couple of months after you started talking to the

12   FBI?

13   A.   Yes, sir.

14   Q.   During that first meeting, you didn't tell the whole truth,

15   did you?

16   A.   Yeah, I told them the whole truth.

17   Q.   You told the whole truth?

18   A.   I told them the truth, yes.

19   Q.   When you told them that after December 14, 2010 you never

20   saw those guns again, were you telling them the truth?

21   A.   After when?

22   Q.   After December 14, 2010, you never saw those guns again

23   that you had in 260 first street, you were telling them the

24   truth, right?

25   A.   I probably got mixed up.  But I know I seen the guns after

E8enchr4                        Mallory - cross

1   that, I seen the black .38, I seen the guns after that.  I

2   probably got the dates mixed up.

3   Q.  Just like you got the dates mixed up about other things

4   that you testified to, right?

5   A.  Like what?

6   Q.  Well, you testified that you received a telephone call from

7   L-1 on December 14, 2010, right?

8   A.  Yes, sir.

9   Q.  But then during subsequent proffer agreements you said that

10  it was a text, right?

11  A.  Yes, sir.

12  Q.  And then you changed it back to a telephone call, right?

13  A.  Yes, sir.

14  Q.  An example of you getting mixed up, right?

15  A.  That's not with dates, though, that's with telephones.  You

16  said with dates.

17  Q.  Oh.  How about when you told the government that you only

18  sold heroin one time.  You got mixed up, right?

19  A.  I don't remember telling them I sold heroin one time.

20  Q.  Who is Geneva Hearing?

21  A.  That's James Williams' son's mother.  That's L-1's son's

22  mother, baby's mother rather.

23  Q.  Was she ever your girlfriend?

24  A.  No.

25  Q.  Did you ever have any kind of romantic relationship with

1   her?

2   A.   What do you mean?

3   Q.   Did you ever fool around with her?

4   A.   Yes.

5   Q.   Who's Snelly?

6   A.   Snelly is Alton Junior.

7   Q.   Was he involved in this robbery at 54 Chambers Street?

8   A.   No.

9   Q.   He had no involvement whatsoever?

10  A.   He told me that he gave Stacks a gun, and I heard that

11  Stacks was there, but Stacks wasn't there, but he did give --

12  he gave Stacks a gun that Stacks got caught with.  But he

13  didn't have it --

14  Q.   Let's back up.  You heard he gave Stacks a gun to use in

15  that robbery, right?

16  A.   Yes, sir.

17  Q.   You weren't at 54 Chambers Street that night, right?

18  A.   No, sir.

19  Q.   So you don't know whether or not Stacks was there, right?

20  A.   No.

21  Q.   Who's Gangster Lou?

22  A.   I know two gangster Lous.  I know an older one and I know a

23  younger one.

24  Q.   How old is the older one?

25  A.   In his 40s probably.

E8enchr4                     Mallory - cross

1   Q.  How old is the younger one?

2   A.  In his early 20s.

3   Q.  OK.  So let's talk about the younger one.  What does the

4   younger Gangster Lou look like?

5   A.  I can't describe him.  He's lighter than me, he's shorter

6   than me, he's like, he be slim.

7   Q.  So he's slimmer than you, lighter than you, and shorter

8   than you?

9   A.  Probably around the same height as me.

10  Q.  The same height as you?  On direct examination you told us

11  that you are here to tell the truth during this trial, right?

12  A.  Yes, sir.

13  Q.  That is because you don't want that cooperation agreement

14  to get ripped up, right?

15  A.  Yes, sir.

16  Q.  Another reason you want to tell the truth is because you

17  know, regardless of what happens with the cooperation

18  agreement, you could be charged with perjury if you lied,

19  right?

20  A.  Yes, sir.

21  Q.  You don't want that to happen, right?

22  A.  No, sir.

23  Q.  Do you know an individual by the name of Maino?

24  A.  Yes, sir.

25  Q.  Maino is a drug dealer on Dubois Street, right?

E8enchr4                    Mallory - cross

1    A.  Yes, sir.

2    Q.  And isn't it true in the summer of 2012 you tried to rob

3    Maino?

4    A.  No, sir.

5    Q.  You were wearing all white that day, right?

6    A.  I don't remember what I was wearing, but I know I never

7    tried to rob Maino before.

8    Q.  You shot him, right?

9    A.  No, sir.

10   Q.  You didn't shoot him in the neck?

11   A.  No, sir.

12   Q.  Did you have any altercations with Maino while you were

13   cooperating with the government in 2012?

14   A.  No, sir.

15   Q.  You have been in jail since September of 2012, right?

16   A.  Yes, sir.

17   Q.  You don't like being in jail, do you?

18   A.  No, sir.

19   Q.  It sounds silly, but some people actually do OK in jail,

20   right?

21   A.  Yeah.  Yes, sir.

22   Q.  You are not one of those people, though, right?

23   A.  What does that mean by doing OK?

24   Q.  You have had a hard time since you have been locked up,

25   right?

1    A.   What's considered a hard time?

2    Q.   Have you been threatened since you have been in jail?

3    A.   Yes, sir.

4    Q.   Have you written letters to people trying to get you out of

5    jail?

6    A.   Get me out of jail like meaning what?

7    Q.   Have you written letters to people asking for help to get

8    you out of this situation?

9    A.   No, sir.  What do you mean out of this situation, like in

10   the jail where I was at receiving threats out of that jail

11   moved to a different jail --

12   Q.   Sure.

13   A.   -- or home?

14        I did that, yes, sir.

15   Q.   That's having a hard time, right?

16   A.   Yes, sir.

17   Q.   You want to get out of jail as fast as possible, right?

18   A.   I want to get out of jail not as fast as possible.

19   Whenever I get out of jail I get out of jail.  I want to get

20   out of jail.

21   Q.   You don't care when you get out?

22   A.   Yeah, I care when I get out.

23   Q.   You want to get out as fast as possible, right?

24   A.   Yes.

25   Q.   You are looking for time served, right?

E8enchr4                        Mallory - cross

1   A.  No.

2   Q.  You don't want time served?

3   A.  Yeah, I want time served, yes.

4   Q.  So you are looking for time served, right?

5   A.  I'm looking for the --

6   Q.  Let me ask you this:  If you had the opportunity to get out

7   of jail today, this very day, you would do whatever it took,

8   right?

9   A.  No, sir.

10  Q.  You wouldn't?

11  A.  No, sir.

12  Q.  If I told you that all you had to do was tell a lie and you

13  wouldn't get in trouble for it and you could get out of jail

14  today, would you do it?

15          MR. BAUER:  Objection, your Honor.

16          THE COURT:  Sustained.

17  Q.  In order to get the 5K1 letter that we have all been

18  talking about, you have to provide substantial assistance to

19  the government, isn't that right?

20  A.  Yes, sir.

21  Q.  That means you have to help them, right?

22  A.  Yes, sir.

23  Q.  What do you think the government needs help with?

24  A.  The crime.

25  Q.  Excuse me?

E8enchr4                         Mallory - cross

1    A.  Crimes.

2    Q.  What specifically about the crimes?  The government needs

3    help with this trial, right?

4    A.  Yes, sir.

5    Q.  And if you don't have any information to provide, you can't

6    help, right?

7    A.  Yes, sir.

8    Q.  I didn't hear you.

9    A.  Yes.

10   Q.  If you didn't have any information to provide in 2012

11   during all of these meetings, you wouldn't be able to get a

12   cooperation agreement, would you?

13   A.  No.

14   Q.  If your memory didn't get better over the course of that

15   time, you wouldn't have gotten a cooperation agreement, would

16   you?

17   A.  No.

18   Q.  After you signed up with the cooperation agreement in this

19   case, you messed up, right?

20   A.  Yes, sir.

21   Q.  When you messed up, you ended up in jail, right?

22   A.  Yes, sir.

23   Q.  When you ended up in jail, you became desperate to fix

24   everything that you messed up, right?

25   A.  No, sir.

E8enchr4                          Mallory – cross

1    Q.  You didn't write letters saying you really needed the

2    government's help?

3    A.  Yes, sir.

4    Q.  You didn't write letters saying you are willing to do

5    whatever it takes?

6    A.  I don't remember that.

7    Q.  You didn't write letters saying you would have no problem

8    coming into court and testifying against anybody they needed

9    you to?

10   A.  I don't remember that neither, sir.

11   Q.  You were trying hard to find an easier way out of this,

12   weren't you?

13   A.  No, sir.

14   Q.  Do you consider yourself to be an honest man?

15   A.  Yes, sir.

16   Q.  Really?

17   A.  Yes, sir.

18   Q.  You spent the majority of the last ten years being

19   dishonest?

20   A.  No, sir.

21   Q.  Is robbing people dishonest?

22   A.  Yes, sir.

23   Q.  Is wearing a wire against your friends and setting them up

24   dishonest?

25   A.  Dishonest to what?

E8enchr4                          Mallory - cross

1    Q.  I'll move on.  Is lying to the police dishonest?

2    A.  Yes.

3    Q.  Is lying to the FBI dishonest?

4    A.  Yes.

5    Q.  Is lying to the AUSA's dishonest?

6    A.  Yes.

7    Q.  How did you feel when you were setting up your friend Gotti

8    in that hotel room that we just saw?  How did you feel during

9    that?

10   A.  I hated it.

11   Q.  You hated it?

12   A.  Yes.

13   Q.  It bothered you a lot?

14   A.  Yes.

15   Q.  But you still did it, right?

16   A.  Yes.

17   Q.  Because you had to do whatever it took for yourself, right?

18   A.  I don't understand that.  What do you mean?

19   Q.  Even though you hated it, you still did it because you had

20   to do what you had to do, right?

21   A.  No.

22   Q.  Was there a different reason that you did it then?

23   A.  Yes.

24   Q.  Are you telling this jury you didn't set Gotti up that

25   night to help yourself, is that what you are saying?

E8enchr4                          Mallory - cross

1    A.   I didn't set him up.  Just talked to him about the robbery,

2    had him talk -- we talked about what we both knew and what we

3    both remembered.  I didn't set him up.

4    Q.   Well, you had to refresh his recollection first, right?

5    Yes or no?

6    A.   No.

7    Q.   You had to feed him some booze first, right?

8    A.   No.

9    Q.   Mr. Mallory, you weren't setting up your friends to make

10   the world a better place, were you?

11   A.   I don't understand that question.

12   Q.   You weren't trying to clean up Newburgh, were you?

13   A.   No.

14   Q.   You were just looking for a come-up, weren't you?

15   A.   No.

16            MR. STRAZZA:  I have no further questions.

17            THE COURT:  Ladies and gentlemen, let's take the

18   afternoon break.  It's 25 after, so please be in the jury room

19   no later than 40 minutes after the hour, 3:40.  Please do not

20   discuss the case.

21            (Jury not present)

22            (Continued on next page)

23

24

25

1          THE COURT:  Mr. Mallory, you may step down.

2          I don't know who is going to be cross-examining on

3    behalf of Mr. Whitaker.  But I assume that all of the sort of

4    garden-variety cross has been gone over.

5          MR. GOLTZER:  I am not going to repeat it.

6          THE COURT:  Thanks.

7          (Recess)

8          MR. BAUER:  Your Honor, we have had three officers

9    outside ready to go for a couple of days now.  To the extent

10   that Mr. Mallory is completed with even a little bit of time to

11   spare, we would love to put some of these officers on, even if

12   that means we bleed over 5 o'clock.  I know that is against

13   what you said to the jury, but if they are looking at the

14   calendar like we are looking at the calendar, hoping to get it

15   this done by the end of next week they may be willing to stay.

16   I just raise that to you as a possibility.  The officers are

17   willing to come back on Monday, but they are quick witnesses,

18   and it would probably help to move things along.

19         THE COURT:  They are quick from your perspective.

20         MR. BAUER:  That is a really good point, but I think

21   from the defense perspective, too.

22         THE COURT:  Let's see where we are.  Let's try to move

23   forward.  Let's get the jury.

24         (Continued on next page)

25

1              (Jury present)

2              THE COURT:  Everyone please be seated.

3              Cross-examination, Mr. Goltzer.

4              MR. GOLTZER:  Thank you, Judge.

5    CROSS EXAMINATION

6    BY MR. GOLTZER:

7    Q.  Mr. Mallory, good afternoon.

8    A.  Good afternoon.

9    Q.  My name is George Goltzer.  I have not met you before, have

10   I?

11   A.  I don't believe so.

12   Q.  Can you keep your voice up.

13   A.  Yes.

14   Q.  Thank you.  Have you ever accused someone of a serious

15   crime that he didn't commit?

16   A.  No.

17   Q.  Are you sure?

18   A.  Yes.

19   Q.  Is that because accusing someone of a serious crime that he

20   didn't commit would be a bad thing to do?

21   A.  It would be a bad thing.  Also a lie.

22   Q.  It would be a lie?

23   A.  Yes, sir.

24   Q.  Would it be evil?

25   A.  Yes, sir.

E8enchr4                         Mallory - cross

1    Q.   Would it be vicious?

2    A.   Yes, sir.

3    Q.   Would it be cruel?

4    A.   Yes, sir.

5    Q.   It wouldn't be something that you would want somebody to do

6    to you, right?

7    A.   Yes, sir.

8    Q.   What do you think you did when you said that it was L-1 who

9    shot Kevin when it was you who shot Kevin?

10   A.   I lied.

11   Q.   Weren't you accusing a man of a crime that he didn't

12   commit?

13   A.   Yes, sir.

14   Q.   So what you did to L-1 during that interview was done by

15   you knowing that it was evil?  You knew it was evil when you

16   did it?

17   A.   Yes, sir.

18   Q.   You knew it was vicious when you did it?

19   A.   Yes.

20   Q.   You knew it was wrong when you did it?

21   A.   Yes.

22   Q.   But you have changed?

23   A.   Yes.

24   Q.   Now you are a decent person?

25   A.   Yes, sir.

E8enchr4                        Mallory - cross

1    Q.  When did you change?  Can we pick a time that you changed

2    from being doing evil things to being an honest, decent person?

3    A.  I changed when I started telling the truth to the people --

4    Q.  When you stopped lying?

5    A.  When I stopped lying, yes.

6    Q.  You became a decent person when the truth was going to set

7    you free, as you hoped, right?

8    A.  I don't understand that.

9    Q.  You hoped the truth, as you want this jury to believe it,

10   will set you free and get you time served?

11   A.  I hope the truth will help me.

12   Q.  Would you be willing to make an identification of a person

13   in a serious criminal case when you knew it wasn't true?

14   A.  Repeat that again.  I don't understand it.

15   Q.  Would you be willing to identify someone as having

16   committed a serious crime when you knew it wasn't true?

17   A.  I don't understand that question.

18   Q.  You have been asked to look at photographs in this case, is

19   that correct?

20   A.  Yes, sir.

21   Q.  Some of the photographs you have been asked to look at are

22   on this particular board, is that right?

23   A.  I can't see the faces on it.  It's blurred.

24   Q.  Let's take a look at Bash, Baby E, and Quay Quay.

25          MR. GOLTZER:  May I approach the witness?

E8enchr4                         Mallory - cross

1           THE COURT:  You may.

2    Q.  I'm going to hand you three photographs.

3           Take a look at those.  You know those folks, is that

4    right?

5    A.  Yeah, I know who they are.

6    Q.  You were asked while you were in the United States

7    Attorney's Office to look at a book with pictures in it, is

8    that right?

9    A.  Yes, sir.

10   Q.  When you looked at the book, nobody rushed you, right?

11   A.  No.

12   Q.  They gave you enough time to look at the pictures, right?

13   A.  Yes.

14   Q.  If you recognized somebody, you would select the photograph

15   and tell them who it was, is that correct?

16   A.  Yes.

17   Q.  When you looked at the book, you recognized Bash, is that

18   right?

19   A.  Yes.

20   Q.  You recognized Baby E?

21   A.  Yes.

22   Q.  You recognized Bow Wow?

23   A.  Yes.

24   Q.  Whose picture is on the board, right?

25   A.  I can't see the board, but I --

E8enchr4                        Mallory – cross

1   Q.  But you recognized a lot of people in the book?

2   A.  Yes.

3   Q.  There were some people that you didn't recognize, is that

4   true?

5   A.  Yes.

6   Q.  And you were able to look –- I mean, if you saw me

7   tomorrow, you could recognize me, right?

8   A.  I believe so, yes.

9   Q.  And that's because you are getting a good look at my face

10   now, right?

11   A.  Yes.

12   Q.  You see the color of my hair, yes?

13   A.  Yes.

14   Q.  You see the shape of my chin, or chins, depending upon how

15   I do that, right?

16   A.  Yes.

17   Q.  You can tell whether I have a beard or not, right?

18   A.  Yes.

19   Q.  The shape of my nose, the color of my eyes, right?

20   A.  Yes.

21   Q.  Everybody has individual characteristics that set them

22   apart from somebody else, right?

23   A.  Yes.

24   Q.  You can tell whether I am a white man or a black man,

25   right?

E8enchr4                          Mallory - cross

1    A.  Yes.

2    Q.  Although you probably couldn't tell if my grandfather was

3    from South America as opposed to Europe, that you couldn't tell

4    just by looking at me?

5    A.  No.

6    Q.  So you agree that everybody is different and there are

7    subtle differences between people, is that correct?

8    A.  Yes.

9    Q.  So you are aware of that and you know that making accurate

10   identifications can sometimes be difficult, right?

11   A.  Yes.

12   Q.  There were pole cameras in this case, as you know.  Is that

13   correct?

14   A.  Repeat that again.

15   Q.  There were pole cameras in the case that took pictures of

16   people on the streets of Newburgh, right?

17   A.  Yes.

18   Q.  Toward the end of July of this year, you were shown the

19   pole cameras, is that right?

20   A.  Yes, sir.

21   Q.  Did you notice on any of the pictures you looked at that it

22   was dark?

23   A.  Yes.

24   Q.  Did you notice on the pictures that you looked at that you

25   couldn't see any faces clearly?

E8enchr4                        Mallory - cross

1   A.  Yes.

2   Q.  Did you notice on the pictures that you looked at that many

3   people were covered up with hoods?

4   A.  Yes.

5   Q.  Did you notice on the pictures that it was hard to tell how

6   tall people were?

7   A.  Yes.

8   Q.  Did you notice who the pictures that you couldn't see hair?

9   A.  Repeat that again.

10  Q.  Did you notice on those pictures that you couldn't see

11  hair?

12  A.  I don't remember.

13  Q.  Did you notice on those -- well, those pictures were so bad

14  in quality that you wouldn't have been able to recognize your

15  own face, would you?

16  A.  I don't remember.

17          MR. GOLTZER:  May we have Government's Exhibit 252.  I

18  can put it on here.

19          (Counsel conferred)

20  Q.  Let's take a look at 252K in evidence.

21          Do you see that?

22  A.  Yes.

23  Q.  Are you able to see any of the distinct features on

24  anybody's face in that particular photograph?

25  A.  No.

E8enchr4                        Mallory - cross

1    Q.  And you couldn't really see the distinct facial features in

2    any of the photographs you looked at, right?

3    A.  No.

4    Q.  And I right?

5    A.  What's a distinct facial feature, like cheekbones?

6    Q.  Like my nose, my eyes, my chin or chins, whatever, you

7    couldn't make it out?

8    A.  No.

9    Q.  And you weren't there, according to you, when these things

10   happened on these pole camera photographs, right?

11   A.  Yeah.

12   Q.  You weren't there?

13   A.  I wasn't there.

14   Q.  Yet, as you sat in their office, you pointed at one of

15   these low-quality photographs and said, That's Bow Wow, didn't

16   you?

17   A.  It was a video.  It was a video.

18   Q.  And you pointed to Bow Wow.  You said, That's Bow Wow?

19   A.  I said it looked like Bow Wow.

20   Q.  I'm sorry?

21   A.  I said it looked like Bow Wow, moved like Bow Wow.  I can't

22   say that was Bow Wow for sure.

23   Q.  Didn't you write down on a piece of paper Bow Wow 25:05,

24   the time?

25   A.  Yes, sir, I remember writing that.

E8enchr4                    Mallory - cross

1   Q.  Now you're saying it didn't happen?

2   A.  I'm saying I wasn't sure it was him.  It looked like him.

3   He had some similar features of him.

4   Q.  But you didn't tell them you weren't sure?

5   A.  I don't remember if I did.

6   Q.  You don't remember?  You don't remember what happened two

7   weeks ago during an identification procedure in their office?

8   A.  I never said I didn't remember that.

9   Q.  There are some things that people are not expected to

10  remember, isn't that right?

11  A.  Yes.

12  Q.  I mean, if I asked you, for example, how many times you

13  sold crack in 2007, you couldn't remember?

14  A.  No.

15  Q.  But if I asked you whether you gave somebody a gun on the

16  night of the murder, you should remember that, shouldn't you?

17  A.  We was drinking, we was smoking.  I don't remember.

18  Q.  I can't understand a word you are saying.  If you could

19  put --

20          MR. BUCHWALD:  Your Honor, can we have that read back?

21          MR. GOLTZER:  Can we have that read back.

22          THE COURT:  Mr. Court Reporter, please.

23          (Record read)

24  A.  You cut me off before I could finish talking.  Before I

25  just said I can't remember you all cut me off.

1          MR. GOLTZER:  Can we have that read back, too.

2          (Record read)

3  Q.  My apologies.  Why don't you say whatever you would like to

4  ask about that last question when I cut you off.

5          MR. GOLTZER:  May we have it read back?

6          THE COURT:  Yes, please.

7          MR. GOLTZER:  It's the one before he said I was

8  drinking.

9          (Record read)

10 Q.  Do you understand that question?

11 A.  Yes.

12 Q.  Do you understand the difference between things that are

13 important and things that are not important?

14 A.  Yes, sir.

15 Q.  Do you understand the difference between things that matter

16 and things that don't matter?

17 A.  Yes, sir.

18 Q.  And one of the things that would matter is whether you gave

19 a gun to somebody on the night of a murder, right?

20 A.  No.

21 Q.  What?

22 A.  I don't understand that question.  I mean --

23 Q.  What don't you understand about it?

24 A.  Repeat it.

25 Q.  Hmm?

1   A.  Could you repeat it?  I don't understand it.

2   Q.  Isn't whether you gave somebody a gun on the night of the

3   murder something that matters as opposed to something that

4   doesn't matter?

5   A.  At the time I didn't know what was going on with the gun.

6   I didn't know that they was taking the gun to go shoot somebody

7   or to go rob or to go kill somebody.  So I just got a phone

8   call, they came, I gave it to them.  At first I didn't remember

9   it because we was drinking, we was smoking at the time.  When I

10  got time to think about it, that's what I remembered, and I

11  told the truth about what happened.

12  Q.  When you falsely claimed that L-1 shot Kev Gotti, was that

13  something you forgot also?

14  A.  No.

15  Q.  Because you had been drinking?

16  A.  No.

17  Q.  Was that something that mattered or something that didn't

18  matter?

19  A.  Something that mattered.

20  Q.  Something you lied about?

21  A.  You asked me was it something that mattered or didn't

22  matter.  Now you are saying something I lied about.  I don't

23  understand what you are saying.

24  Q.  You don't know the difference between lying and not lying?

25  A.  You said matter and don't matter.  What does that got to do

E8enchr4                         Mallory - cross

1    with nothing.  That's what is confusing me.  I don't

2    understand.

3            THE COURT:  Please keep your voice up, Mr. Mallory.

4    Q.  The drinking that you did on December 14 lasted for hours,

5    is that right?

6    A.  I'm not sure how long did it last for.

7    Q.  You and Kev Gotti used to drink a lot?

8    A.  What's considered a lot.

9    Q.  Hmm?

10   A.  What's considered a lot.

11   Q.  I can't hear you.

12   A.  What is considered a lot?

13   Q.  Well, did you drink every day?

14   A.  No.

15   Q.  How often did you drink with Mr. Gotti, Kevin Gotti?

16   A.  I can't count.  I don't remember.  It was a couple --

17   sometimes two times a week.

18   Q.  And would you drink a bottle?

19   A.  I don't understand that.

20   Q.  You just told this jury that it was the drinking and the

21   smoking that caused you not to remember that you gave somebody

22   a gun.  Wasn't that your testimony just now?

23   A.  Yes, sir.

24   Q.  Is there anything about that testimony you would like to

25   change?

E8enchr4                        Mallory - cross

1    A.  No, sir.

2    Q.  So your drinking that day and your smoking that day clouded

3    your memory, is that right?

4    A.  Yes, sir.

5    Q.  It made it hard for you to remember accurately, is that

6    right?

7    A.  No, sir.

8    Q.  When you told the police that you had nothing to do with

9    giving anybody a gun, that it was Gotti who gave people both

10   guns, were you trying to tell the truth?

11   A.  Yes.

12   Q.  Did you believe you were telling the truth?

13   A.  I wasn't sure.

14   Q.  Did you tell them, I'm not sure I'm telling the truth?

15   A.  No.

16   Q.  You told them this is what happened, yes?

17   A.  Repeat that again.  I don't understand what you said.

18   Q.  Do you understand the difference between being sure and

19   being unsure?

20   A.  Yes, sir.

21   Q.  When you told them that you didn't give somebody a gun,

22   were you sure or unsure?

23   A.  Unsure.

24   Q.  When you told them you had never seen the guns again after

25   the 14th of December, 2010, were you sure or not sure?

E8enchr4                         Mallory - cross

1    A.  One gun I was sure, the other gun not sure.

2    Q.  You became sure as time passed?

3    A.  No.

4    Q.  Were you drinking less?

5    A.  What?  Tell me that again.

6    Q.  Were you drinking less as time passed?

7    A.  I wasn't drinking at all since time passed.

8    Q.  When did you stop drinking?

9    A.  When I became incarcerated.

10   Q.  When did you become incarcerated?

11   A.  September 2012.

12   Q.  Before September 2012, you were drinking on a regular

13   basis?

14   A.  What's considered regular?

15   Q.  Is this 20 questions that you ask me, or do you answer my

16   questions?

17   A.  If I don't understand, I have to ask you a question.  I am

18   not going to answer a question that I don't understand.

19          THE COURT:  Mr. Mallory, if you don't understand a

20   question, simply say you don't understand the question.  OK?

21          THE WITNESS:  All right.

22   Q.  Were you a regular drinker?  Yes or no?

23   A.  No.

24   Q.  Were you a regular pot smoker?  Yes or no?

25   A.  Could you -- I don't understand the question.

E8enchr4                      Mallory - cross

1    Q.  Were you a regular user of PCP?  Yes or no?

2    A.  What's considered regular.  I don't understand what's

3    regular.  Every day?  Every other day?  Every week?  What's

4    considered regular?

5    Q.  Have you ever heard the word regular?

6    A.  Yeah.

7    Q.  Do you speak English?

8    A.  I'm speaking to you now, yeah.

9    Q.  Do you have any idea what the word regular means?

10   A.  I do, but I don't understand how you are using it.  Like

11   regular --

12   Q.  What do you mean by regular?

13   A.  Regular could be every day.  Regular could be every other

14   day.  Regular could be every three days.  I don't know what

15   regular means.  That's what I'm asking you.

16   Q.  Whether you were a regular user or not and whether you know

17   what the word regular means to me or not, is it fair to say

18   that on December 14, the use of substances that affected your

19   mind affected your ability to accurately remember what

20   happened?  Yes or no?

21   A.  Yes.

22   Q.  Now, when you started to cooperate with the FBI, did you

23   tell them, I was so smashed and I was so stoned that I can't

24   tell you what really happened because it's hard for me to

25   remember?

1            Did you tell them that?

2   A.  No.

3   Q.  Why not?

4   A.  I don't know.  I just didn't tell them that.

5   Q.  Do you think it would have helped you to tell them that?

6   A.  Yeah.

7   Q.  Then why didn't you tell them?

8   A.  I just told you I don't remember why I didn't tell them.

9   Q.  The fact of the matter is that in January of 2012 you were

10  arrested on a Mickey Mouse state case for small amount of

11  drugs, right?

12  A.  I don't know what Mickey Mouse state case is.  I don't have

13  no idea what you are talking about.

14  Q.  I don't want to use the bad words.  It was a small case

15  that wasn't going to put you in prison?

16  A.  Yes.

17  Q.  It was you being a good citizen that caused you to subject

18  yourself to a potential life term in the penitentiary; is that

19  what it was?

20  A.  No.

21  Q.  You wanted to keep from being charged with a federal

22  murder, right?

23  A.  Yes.

24  Q.  Because you were told by federal agents that they had you

25  pretty good, right?

E8enchr4                     Mallory - cross

1    A.  No.

2    Q.  Did they tell you we don't have you?

3    A.  They didn't tell me that.

4    Q.  But you knew they had you?

5    A.  I knew they knew what I knew.

6    Q.  They knew as far as you were concerned that they had enough

7    to arrest you?

8    A.  No.

9    Q.  What did you know they had?

10   A.  The phone call that I got from L-1.  They told me the phone

11   call.  That's when I told them the truth about everything that

12   I knew.

13   Q.  So they told you that they had evidence of a phone call

14   from L-1 to you?

15   A.  Yes, sir.

16   Q.  They told you that you were involved in setting up the

17   murder?

18   A.  No, they didn't tell me that.

19   Q.  They told you that you could be complicit as an aider and

20   abettor to a murder?

21   A.  I don't understand what that means.

22   Q.  Did they tell you that you could be in up to your neck?

23   A.  I don't understand what you are talking about.

24   Q.  Did they tell you that you could be in it up to your neck?

25   A.  What does up to my neck mean?  I don't understand.

E8enchr4                    Mallory - cross

1   Q.  Did they tell you that you could be held legally

2   responsible for the murder?

3   A.  No.

4   Q.  Did they tell you you could be legally responsible for the

5   robbery?

6   A.  Yes.

7   Q.  Did they tell you that there was somebody who died during

8   the robbery?

9   A.  Yes.

10  Q.  Did they tell you that that was the same as being liable

11  for the murder?

12  A.  I don't remember.

13  Q.  Felony murder?

14  A.  I don't remember if they told me that.

15  Q.  Is that something that matters or doesn't matter, whether

16  you could be held liable for a murder?

17  A.  Yeah, it matters, yeah.

18  Q.  Why don't you remember that then?

19  A.  I can't tell you something I don't remember.  I would be

20  lying to you.  I'm telling you the truth.  I don't remember if

21  they told me that or not.

22  Q.  Did they tell you that a federal murder carried a potential

23  possibility of a death sentence?

24  A.  They didn't tell me that.

25  Q.  Life sentence?

E8enchr4                          Mallory - cross

1   A.   They didn't talk about any sentencing when I -- when I

2   decided to talk to them about cooperating.

3   Q.   Then what sentence were you afraid of?

4   A.   I wasn't afraid of nothing.  I just was tired of getting

5   questioned about something that I knew about and lying to them.

6   Q.   When you began to cooperate, you did it because you didn't

7   want to be charged with a federal murder?

8   A.   Because I had nothing -- I felt like I had nothing to do

9   with it.  I didn't set it up.  I didn't -- I felt like I didn't

10  know nothing -- I didn't have anything do with it.  So, yeah, I

11  told them that.  I told them what I knew.

12  Q.   You told them at first back in December 21, 2010, that you

13  had nothing do with it, right?

14  A.   December 21, I don't remember that date.

15  Q.   When they spoke to you about a week or two after the murder

16  and you lied to them --

17  A.   Yes.

18  Q.   -- you told them I don't have anything to do with it,

19  right?

20  A.   Yes.

21  Q.   Did you believe you had nothing do with it at that time?

22  A.   Yes.

23  Q.   Two weeks after the crime, had you forgotten already that

24  you gave somebody a gun?

25  A.   No, I knew.

E8enchr4                        Mallory - cross

1   Q.  By the way, you indicated on your examinations by several

2   lawyers over the course of today -- I won't keep you much

3   longer because it's getting late -- you indicated that you

4   taped 15 people, is that correct?

5   A.  Around that number, yes.  Not 15 people, I wore it 15

6   times.  Not 15 people.

7   Q.  How many people did you wire up on?

8   A.  Under five, around five people.

9   Q.  One of the people you never wired up on was Tyrell

10  Whitaker, right?

11  A.  Who?

12  Q.  Do you know who I am talking about when I mention Tyrell

13  Whitaker?

14  A.  No.

15  Q.  How about Bow Wow?

16  A.  Yes.

17  Q.  You never wired up on him?

18  A.  No.

19  Q.  Who asked you to get his phone number in 2012?

20  A.  They were looking for him the FBI, the agents that I was

21  working with.

22  Q.  In 2012?

23  A.  The FBI agents that I was working with were looking for

24  him.  So I was recording Geo for a murder, and Geo said in the

25  recording that he was talking to Bow Wow a day or two before

E8enchr4                         Mallory - cross

1  that.

2  Q.  You got Bow Wow's phone number in North Carolina?

3  A.  Yes.

4  Q.  And you asked Geo because Geo and Bow Wow were close

5  friends?

6  A.  Yes.

7  Q.  In fact, there was a time, because Bow Wow's mom was in

8  North Carolina, that Bow Wow lived with Geo's mom, isn't that

9  right?

10  A.  I don't know nothing about that.  I have no idea about

11  that.

12  Q.  You were asked to find out where Bow Wow was and what he

13  was doing?

14  A.  No, I wasn't.

15  Q.  You were asked to find out his phone number?

16  A.  No.  They said that they was looking for him.

17  Q.  So you decided to find out where he was and how to reach

18  him?

19  A.  No, it was a coincidence.  Somebody brought up it up in the

20  middle of us doing something, and --

21  Q.  They told you that Bow Wow was in North Carolina working

22  for the post office, didn't they?

23          MR. BAUER:  Objection, your Honor.

24          THE COURT:  Overruled.

25          MR. BAUER:  It is hearsay, your Honor.

1   A.  Nobody told me that.

2   Q.  I beg your pardon?

3   A.  I don't remember being told that he was working at a post

4   office.

5   Q.  But you got them Bow Wow's phone number?

6   A.  That's right.  That's correct.  Yes, sir.

7   Q.  Did you say to the agents, now that we have his phone

8   number, let me call him?

9   A.  I never said that.

10  Q.  Did they say to you, now that we have Bow Wow's phone

11  number, let's give him a phone call?

12  A.  They never said that to me.

13  Q.  You knew Bow Wow?

14  A.  Yeah, I knew him.

15  Q.  Bow Wow was somebody that you did favors for?

16  A.  No.

17  Q.  Well, didn't you give Bow Wow a front on his drugs?

18  A.  That's not no favor.

19  Q.  It's not a favor?  You weren't being nice to him?

20  A.  No.

21  Q.  Was Bow Wow somebody that you were friendly with?

22  A.  Yes.

23  Q.  Was Bow Wow somebody that you could talk to?

24  A.  If I wanted to, yes.

25  Q.  Was Bow Wow somebody who would talk to you?

E8enchr4                         Mallory - cross

1   A.  If he wanted to, yes.

2   Q.  You were able to get a lot of people to talk to you, right?

3   A.  I don't understand that question.

4   Q.  You were out on the street gathering information for the

5   FBI and the Newburgh police for months?

6   A.  Correct.

7   Q.  And nobody knew it except you?

8   A.  Yes.

9   Q.  You were good at it?

10  A.  I don't know if I was good at it.  I know I did it.

11  Q.  When you gave the FBI information, they thanked you for it?

12  A.  I don't remember being thanked for it.

13  Q.  Did the FBI give you information?

14  A.  No.

15  Q.  Did the Newburgh police give you information?

16  A.  No.

17  Q.  Well, they told you they were looking for Bow Wow?

18  A.  Yeah.

19  Q.  Did they tell you that Baynes had talked about Bow Wow

20  months earlier?

21  A.  No.

22  Q.  You knew Baynes?

23  A.  Yes.

24  Q.  You knew people who knew Baynes?

25  A.  I knew Baynes' mother.  That's how I knew Baynes.  I didn't

E8enchr4                        Mallory - cross

1    know too much about things.

2    Q.  You said yesterday that Baynes was somebody you had never

3    seen sell drugs ever, right?

4    A.  Yes, sir.

5    Q.  You never saw Baynes commit a crime?

6    A.  No, sir.

7    Q.  Are you trying to protect Baynes?

8    A.  No, sir.

9    Q.  Did you ever see Baynes on the streets?

10   A.  I seen Baynes on the streets once or twice.

11   Q.  Just once or twice?

12   A.  Yes, sir.

13   Q.  Is that something that matters or something that didn't

14   matter?

15   A.  It doesn't matter to me.

16   Q.  So why do you remember that you only saw Baynes twice in

17   your 27 years on this earth?

18   A.  Because that's Besheltie's son.  Every time I seen him,

19   always looked at him as Besheltie's son because I was friends

20   with Besheltie.

21   Q.  As you sit here day, you can swear to this jury without a

22   doubt in your mind you saw Baynes twice in the street, no more?

23   Twice?  Is that right?

24   A.  I don't know how much time.  I know it wasn't a lot of

25   times.  It was a couple of times.

1491

E8enchr4                    Mallory - cross

1   Q.  If you don't know how many times, why did you say twice to

2   this jury?

3   A.  It is an estimate.  A couple of times.  It wasn't a lot of

4   times.

5   Q.  You said twice.  You didn't say it was an estimate.  Was it

6   an estimate or was it twice?

7   A.  It was twice, around two times.  I don't know how many

8   times.  It was a lot of times.

9   Q.  Is the truth that you don't know?

10  A.  I'm not lying right now.  Yeah, it's the truth.

11  Q.  What?

12  A.  What I'm telling you right now is the truth.  I'm not

13  lying.

14  Q.  What's the truth?  It was twice, almost twice, or I don't

15  know?

16  A.  I don't know how many times I seen him, but it wasn't a lot

17  of times.  It could have been two times.

18  Q.  In how many years was it two times?

19  A.  I don't know.  I don't remember.

20  Q.  How many times did you see Bow Wow in two years?

21  A.  I don't know.

22  Q.  You did tell the police that you had never seen the guns

23  after the 14th of December, right?

24  A.  I seen one gun, the black .38, after that, the 14th of

25  December.

E8enchr4                          Mallory - cross

1    Q.   I asked you what you told the police earlier.  You told

2    the --

3    A.   I didn't --

4    Q.   You told the police, and you have testified to it already,

5    that you told them you had never seen the guns again after the

6    night of the robbery.  Yes or no?

7    A.   No.

8    Q.   You didn't say that in response to a question by a lawyer

9    today?

10   A.   I must have got mixed up.  I know I seen one of them after

11   that, like the day after that I seen them.

12   Q.   You responded to a lawyer-

13   A.   I seen --

14   Q.   Did you tell a lawyer today, I told the agents I never saw

15   the guns again?

16   A.   You are asking me two things.  You are saying did I tell

17   them.  Now you are saying did I say --

18   Q.   Do you remember what you said today, this morning?

19   A.   Yes.

20   Q.   Did you tell a lawyer this morning, yes, I told the police

21   that I never saw the guns again afterwards?

22   A.   I don't remember.

23   Q.   I don't remember what happened today?

24   A.   Yeah, I remember what happened today.  But I don't

25   remember --

E8enchr4                        Mallory - cross

1    Q.  Did you tell them today that you --

2    A.  You cut me off.

3    Q.  -- you remember telling the police that in January of 2012,

4    and in March of 2012?

5    A.  In January or March?  Which one are you talking about.

6    Q.  3502-20.  During all of the times that you were

7    interviewed, Mr. Mallory, there was more than one person in the

8    room, is that right?

9    A.  Yes, sir.

10   Q.  There would be at least one assistant United States

11   Attorney, yes?

12   A.  I am saying yes to what.  What are you saying.  I don't

13   understand what you are saying, what you're asking me.

14   Q.  There was a woman United States Attorney that used to

15   interview you?

16   A.  I remember that.

17   Q.  You remember that?

18   A.  Yes, sir.

19   Q.  And her name was Rebecca Mermelstein, OK?

20           Do you remember that?

21   A.  Yes, I remember that, yes, sir.

22   Q.  Do you remember that whenever Ms. Mermelstein would

23   interview you, there would be at least one FBI agent in the

24   room?

25   A.  Yes, sir.

E8enchr4                         Mallory - cross

1   Q.  Sometimes your lawyer would be there, sometimes he wouldn't

2   be there?

3   A.  Yes, sir.

4   Q.  And whenever you were interviewed they would take notes as

5   you spoke, right?

6   A.  Yes, sir.

7   Q.  There were times in later interviews when they would look

8   at the notes and say, but you told us this last time, is it

9   different?  They would go through that process with you, is

10  that correct?

11  A.  Yes, sir.

12  Q.  You are aware that those notes have to be turned over to

13  the defense lawyers in this case, aren't you?

14  A.  Yes, sir.

15  Q.  You went over those questions and answers with them many,

16  many times, yes?

17  A.  Yes, sir.

18  Q.  If I give you a date, and I assume the government won't

19  contest it, will you accept the date that I give you as the

20  date of an interview?

21  A.  If it's true, yes.

22  Q.  Do you think I'm going lie about a date of an interview?

23  A.  I don't know what you'll do.

24  Q.  I might lie, right?

25  A.  I don't know what you will do.  I can just tell you if it's

1    correct or not.

2    Q.  You don't think I would be as truthful as you in this

3    courtroom?

4    A.  I don't know.  I could just tell you the truth if you show

5    me something, if I wrote it.  Or if I don't, I could answer it.

6    I'm not going to put it past anybody.

7    Q.  On March 14, 2012, in an interview with the office of the

8    United States Attorney for the Southern District of New York,

9    in the presence of Rebecca Mermelstein, your lawyer, Mike

10   Keesey, did you state that you had not seen the guns picked up

11   by Gucci and Bow Wow the night of the Joker murder since that

12   night?

13   A.  Yes.

14   Q.  Were you trying to tell the truth, or were you trying to

15   lie?

16   A.  I was trying to tell the truth.

17   Q.  You had no reason to protect Bow Wow?

18   A.  No.

19   Q.  You had no reason to protect Gucci?

20   A.  No.

21   Q.  So if you told them in March of 2014 when you were trying

22   to tell the truth that you had never seen the guns again,

23   wasn't that the truth?  You had never seen the guns again?

24   A.  No.

25   Q.  When you said that, did you know you were lying?

E8enchr4                    Mallory - cross

1   A.  I don't remember.

2   Q.  You don't remember whether you knew you were lying?

3   A.  Ask me the question one more time.  I don't understand the

4   question.

5   Q.  You don't remember whether you knew you were lying when you

6   said that?

7   A.  Said what?

8   Q.  That you had never seen the guns again?

9   A.  I was telling the truth.  I thought I was telling the

10  truth.

11  Q.  So you never did see the guns again?

12  A.  I did see the guns again.

13  Q.  Which is the lie, that you did see it or that you didn't

14  see it?

15  A.  The lie?  There was no lie.  The truth --

16  Q.  They're both true?

17  A.  The truth is I seen the gun like the day after, like the

18  following morning.

19  Q.  Why didn't you call Bow Wow on the phone and ask him about

20  it so you had a tape recording of it?

21  A.  I got his number -- I don't know.  Bow Wow didn't talk a

22  lot to me about it.

23  Q.  Didn't even try to talk to him about it?

24  A.  No.

25  Q.  You were able to talk to Geo about a murder, right?

E8enchr4                       Mallory - cross

1   A.  Yes.

2   Q.  As you just indicated?

3   A.  Yes.

4   Q.  Couldn't you have talked to Bow Wow about a gun?

5   A.  I don't know.

6   Q.  Couldn't you have talked to Bow Wow about a murder?

7   A.  I don't know.

8   Q.  Couldn't you have said to Bow Wow, The police are looking

9   for you, what do you want me to tell them?

10  A.  I don't know.

11  Q.  Couldn't you have said to Bow Wow, Remember that night when

12  I gave you the gun?  What do you want me to tell them?

13  A.  You see the difference, my relationship with Geo and my

14  relationship with Bow Wow were different I could talk.  I was

15  able to talk to Geo, but Bow Wow, my relationship with him

16  wasn't like that.  So if I could have asked him that question,

17  he probably would have hung up on me or something.

18  Q.  It was worth trying, wasn't it, if you know?

19  A.  If I know what?

20  Q.  Whether it was worth trying.

21  A.  Yes, it would have been worth trying.

22  Q.  Now, you heard a tape recording that was played by the

23  government, and you explained to the jury about it, is that

24  right?  Today and yesterday, different parts of a tape that you

25  made with Burden, Kev Gotti?

E8enchr4                    Mallory - cross

1   A.  Yes, sir.

2   Q.  You have been asked several questions about that particular

3   tape by these particular lawyers, is that right?

4   A.  Yes, sir.

5        MR. GOLTZER:  May I just have a moment, Judge.

6        THE COURT:  Yes.

7        (Pause).

8        MR. GOLTZER:  I apologize, Judge.  I got a little

9   confused.

10  Q.  When you wired up with Mr. Burden, you started by telling

11  him names, is that correct?

12  A.  Yes.

13  Q.  You have indicated that as a result of drinking and smoking

14  you sometimes have trouble remembering things, is that right?

15  A.  Sometimes, yes.

16  Q.  You've known Burden for a long time?

17  A.  What's considered a long time?

18  Q.  He wasn't strange to you, was he?  You lived in the same

19  house with him, building?

20  A.  Yes.

21  Q.  For how long did you live in the same building?

22  A.  About like a year.

23  Q.  Over the course of a year, twice a week, maybe a hundred

24  times you and he would drink together and smoke together?

25  A.  We drunk and we smoked together.  I don't know how many

E8enchr4                        Mallory - cross

1  times.

2  Q.  He got drunk, didn't he?

3  A.  When?

4  Q.  Ever.

5  A.  When?

6  Q.  Ever.  He used to get drunk?

7  A.  Yeah.

8  Q.  He liked to drink?

9  A.  Who?

10  Q.  Who do you think I am talking about?

11  A.  I don't know who you are talking about.  You talking about

12  Gotti?

13  Q.  I'm talking about Gotti.

14  A.  I don't know if he liked to drink.  I know that he drunk.

15  I don't know if he --

16  Q.  Did you ever offer him a drink that he turned down?

17  A.  Yes.

18  Q.  Did he ever refuse to drink with you?

19  A.  Yes sometimes he didn't want to drink.

20  Q.  Did he ever tell you he didn't like liquor?

21  A.  Certain liquors, yeah.

22  Q.  What did you and he drink together?

23  A.  Liquor.

24  Q.  I'm sorry?

25  A.  Liquor.

1   Q.  What kind?

2   A.  Hennessy.

3   Q.  Hennessy?

4   A.  Cognac, liquor.

5   Q.  Cognac, while you smoked grass?

6   A.  I don't smoke grass.  I wouldn't smoke grass.  You are

7   talking about marijuana?

8   Q.  I guess my generation is showing.  I'm talking about weed.

9   Weed?

10  A.  Yes, sir.

11  Q.  Smoke, ganja, good s-h-i-t, whatever you want to call it.

12          MR. GOLTZER:  May I approach the witness, your Honor.

13          THE COURT:  You may.

14  Q.  I'm going to hand you what's been marked as Whitaker's B

15  for identification.

16          Do you recognize that?

17  A.  Yes, sir.

18  Q.  What is it?

19  A.  It's a picture of the camera -- it's a picture of the

20  camera that they -- it's a picture from the camera that is on

21  that block.

22  Q.  It's picture from the camera that's on the video?

23  A.  Yes, sir.

24  Q.  From the night of the murder?

25  A.  Yes, sir.

E8enchr4                          Mallory – cross

1    Q.  And is your handwriting on it?

2    A.  Yes, sir.

3                 MR. GOLTZER:  I offer it.

4                 THE COURT:  Any objection?

5                 MR. BAUER:  No objection, your Honor.

6                 THE COURT:  Defendant Whitaker B will be received.

7                 (Defendant's Exhibit Whitaker B received in evidence)

8                 MR. GOLTZER:  May I publish, Judge?

9                 THE COURT:  You may.

10                (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E8e9chr5                          Mallory - cross

1    Q.  Can everybody see that now?

2           The word Bow Wow, was that written by you?

3    A.  Yes, sir.

4    Q.  And the date on there is 1/27/12?

5    A.  Yes, sir.

6    Q.  Now there's a person, it says Bow Wow, and then there's a

7    line; is that correct?

8    A.  Yes, sir.

9    Q.  And the line goes to somebody who's standing there on the

10   street; is that right?

11   A.  Yes, sir.

12   Q.  And that's the person you weren't sure but looked like Bow

13   Wow?

14   A.  Yes, sir.

15   Q.  But you weren't making an identification of Bow Wow?

16   A.  No, sir.

17   Q.  You weren't telling them that that was definitely Bow Wow?

18   A.  No, sir.

19   Q.  What did you think you were doing when you wrote the word

20   "Bow Wow" on there?

21   A.  Showing them somebody that looked like him, not looked like

22   him, but moved like him and had the same hoodie looking --

23   Q.  Can you see the face on that picture?

24   A.  No.  You don't see no face on this picture.

25   Q.  Couldn't see any face on the video either, could you?

1   A.  No.

2   Q.  Couldn't see those features we talked about?

3   A.  No.

4   Q.  You weren't there that night?

5   A.  No.

6   Q.  There was some testimony about a chrome gun.  Do you

7   remember that?

8   A.  Yes, sir.

9   Q.  Chrome gun or silver gun, right?

10  A.  Yes, sir.

11  Q.  But the chrome gun or the silver gun is the same gun?

12  A.  Yes, sir.

13  Q.  And it's a revolver not a semiautomatic?

14  A.  Yes, sir.

15  Q.  It has what looks like a wheel?

16  A.  Yes, sir.

17  Q.  You told your buddy Gotti on the tape that he gave the gun

18  to Bow Wow, right?

19  A.  Yes.

20  Q.  You were surprised to hear from him that he gave it to you,

21  weren't you?

22  A.  No.

23  Q.  What?

24  A.  Yeah, I was surprised, yeah.

25  Q.  You were surprised by that, weren't you?

E8e9chr5                          Mallory - cross

1    A.  (No response)

2    Q.  What?

3    A.  No.  I wasn't surprised, no.

4    Q.  You just said you were.  Were you or weren't you surprised

5    by that?

6    A.  No.

7    Q.  Were you happy to hear it?

8    A.  No, I wasn't happy to hear it.

9    Q.  What?

10   A.  No.

11   Q.  Why weren't you happy to hear from Mr. Kev Gotti Burden

12   that on the night of the murder he gave you the gun?

13   A.  You talking about a murder.  Why would I be happy to hear

14   about him saying he gave me a gun.

15   Q.  Well your memory was fuzzy from drinking and smoking,

16   wasn't it?

17   A.  A little bit, yeah -- what, that day?  No.

18   Q.  On the night of December 14.  Your memory was fuzzy, wasn't

19   it?

20   A.  Yes.

21   Q.  Has it occurred to you that he did give you the gun?

22   A.  No.

23   Q.  Has it occurred to you that his memory is better than yours

24   on that question of who gave who which gun?

25   A.  No.

E8e9chr5                          Mallory - cross

1    Q.  Is it possible that it was you who ended up with that

2    silver gun on the night of the murder and not him?

3    A.  No.

4    Q.  No.  Now you remember that?

5    A.  I know I didn't do that.

6    Q.  And that was a gun you never saw again, right?

7    A.  Yes.

8    Q.  Now you just told the jury that you saw that gun two days

9    later?

10   A.  No I didn't see that gun two days later.  It was the black

11   .38.

12   Q.  What?

13   A.  That wasn't that gun.

14   Q.  It was the black gun?

15   A.  Yes.

16   Q.  So Bow Wow never brought the gun back?

17   A.  I don't know if he did or not.

18   Q.  You do understand the seriousness of this case?

19   A.  Yes.

20   Q.  You do understand that you've been on the witness stand for

21   hours?

22   A.  Yes.

23   Q.  You do understand that you're under oath?

24   A.  Yes.

25   Q.  You do understand what's at stake for that young man?

E8e9chr5                    Mallory - cross

1    A.  Yes.

2    Q.  You understand that he's not asking for a cooperation

3    agreement like you?

4              MR. BAUER:  Objection, your Honor.

5              THE COURT:  Overruled.

6              THE WITNESS:  Yes.

7    Q.  That he's putting his faith in a jury, not the government?

8    A.  Yes.

9    Q.  And you keep changing your story?

10   A.  No.

11   Q.  You don't change your story?

12   A.  I changed my story but I'm telling you the truth now.

13   Q.  That you never saw the gun again?

14   A.  I don't -- I don't remember if I did or not.

15   Q.  Did you tell this jury within the last day, day-and-a-half

16   that Bow Wow was wearing a red and black Champion hoodie?

17   A.  Yes.

18   Q.  On an earlier occasion during one of the proffer sessions

19   didn't you tell the government that he was dressed all in

20   black?

21   A.  I don't remember.

22   Q.  Do you deny saying that?

23   A.  I don't deny anything.  I just don't remember saying that.

24        I know he had a Champion hoodie.  It had a red C on

25   it.

1    　　　THE COURT:  Please keep your voice up, sir.

2    　　　MR. GOLTZER:  3502-7, second page.

3    Q.  On January 7, 2012 did you tell an Assistant United States

4    Attorney that Bow Wow was wearing a black Champion jacket or

5    hoodie?

6    A.  Yes.

7    Q.  Was he wearing a black Champion jacket or hoodie or a

8    red-and-black Champion jacket or hoodie?

9    A.  It was all black with a red C, a big red C.  So it's a

10   black hoodie but it has red in it too.

11   Q.  He was not wearing a blue and red Hollister hoodie?

12   A.  No.

13   Q.  You talked about a robbery of some ecstasy; is that right?

14   A.  Yes, sir.

15   Q.  And that was a robbery that you say Bow Wow was involved in

16   in front of 260 First Street; is that correct?

17   A.  It was inside of the hallway.  It wasn't outside.  It was

18   in the hallway.  The hallway area.

19   Q.  That was a robbery, according to you, where somebody made a

20   phonecall to have someone come down and sell them about a

21   hundred ecstasy pills; is that right?

22   A.  Yes, sir.

23   Q.  And you knew that was about to happen?

24   A.  Yes, sir.

25   Q.  Did you say to Kev Gotti:  Wait a minute.  You don't rip

1    somebody off where you live because they could come back here

2    and burn the place down?

3    A.  No, I didn't say that to him.

4    Q.  Did it occur to you that committing a robbery where you

5    live wasn't a good idea because it could invite revenge?  Did

6    that occur to you?

7    A.  Yes.

8    Q.  Did it occur to you that it was a bad idea because your

9    girlfriend on the second floor could get shot in Newburgh if

10   somebody came back after they were ripped off?

11   A.  No.  I didn't think of that.

12   Q.  You thought about you though?  You didn't want to get hurt?

13   Did you?

14   A.  Nobody will want to get hurt.  No, I didn't want to get

15   hurt.

16   Q.  Yeah, you didn't want to get burned out, right?

17          You did not say to them take it outside, did you?

18   A.  It wasn't in my house.  It was in the hallway.  In the

19   hallway.  The hallway of the weed spot.  Nobody know I lived on

20   the second floor or any of that.  So I didn't really pay that

21   much attention.

22   Q.  And you got 40 pills out of that, right?

23   A.  Yes.

24   Q.  Now you said that the guy had a little over a hundred

25   pills; is that correct?

1   A.  He could have, yes.

2   Q.  Now Kev Gotti was somebody who, according to you, in the

3   Bloods had status; isn't that right?

4   A.  For Newburgh, right.

5   Q.  And that's a higher rank?  Status means he's higher up,

6   right?

7   A.  For Newburgh, yeah.

8   Q.  And a guy who has status when he commits a robbery with

9   somebody like you who isn't even in the Bloods anymore, he gets

10  more of the take than you do, right?

11  A.  Not all the time, no.

12  Q.  But it's about 60/40?

13  A.  So what?

14  Q.  That doesn't leave anything for Bow Wow, does it?

15  A.  I don't know what Bow Wow got out of it.

16  Q.  He got nothing because it was your robbery?  Wasn't it?

17  A.  No.

18  Q.  Because you wouldn't accuse somebody of a crime that he

19  didn't commit, would you?

20  A.  No.

21  Q.  You got 40 pills out of a hundred for doing nothing?

22  A.  Yes.  Plus Gotti owed me some money.

23  Q.  You just made that one up, didn't you?

24  A.  No.  I didn't make that up.

25  Q.  This business about shooting the gun out the window, do you

E8e9chr5                        Mallory - cross

1    remember that?

2    A.  Yes, sir.

3    Q.  That didn't happen according to you on the night of the

4    robbery, did it?

5    A.  No, sir.

6    Q.  That had nothing to do with the robbery, did it?

7    A.  I don't know, sir.

8    Q.  Well didn't that have to do with a robbery, according to

9    you, that never happened?

10   A.  I don't understand that question.  Could you ask me it over

11   differently.

12   Q.  Did he tell him to put the gun to his hand or to his head?

13   A.  To his hand.

14   Q.  Hand?

15   A.  Yes, sir.

16   Q.  Did you ever tell the government he told him to put it to

17   his head?

18   A.  No.

19   Q.  You deny it?

20   A.  I deny it.

21   Q.  Do you have any shame?

22   A.  What?

23   Q.  Do you have any shame?

24   A.  What kind of question is that?  I don't understand it.

25   Q.  What don't you understand about the question?  Do you know

E8e9chr5                         Mallory - cross

1    what shame is?

2    A.   I know what shame is.

3    Q.   Do you have any?

4    A.   Yes.

5    Q.   What are you ashamed of?

6    A.   Do I have to answer this?

7    Q.   Yeah.

8    A.   Shame of being locked up.  Shame of not finishing high

9    school.  I'm ashamed of a lot things.

10   Q.   What are you ashamed of other than being locked up and not

11   finishing high school?

12   A.   Putting my -- just that, and not being able to be there for

13   certain people.

14   Q.   I couldn't hear you.

15   A.   I'm ashamed for a couple things.

16   Q.   What are the couple of things you're ashamed of?

17   A.   I just told you two just now.  That's two.  That's a

18   couple.

19   Q.   I can't hear.

20   A.   I just told you two just now.  That's a couple right there.

21   Q.   Anything else?

22   A.   Not that I can think of.

23   Q.   You're not ashamed of turning on your friends?

24           MR. BAUER:  Objection, your Honor.

25           THE COURT:  Overruled.

E8e9chr5                          Mallory - cross

1          THE WITNESS:  I don't look on it as turning on them.

2   Q.  You're not ashamed of all the robberies you committed?

3   A.  Yes.

4   Q.  You're not ashamed of using drugs?

5   A.  Yes.

6   Q.  You were about to have the blessing of a daughter.  Do you

7   remember that?

8   A.  Yes.

9   Q.  And at that time you started to use more PCP?

10  A.  Yes.

11  Q.  How was that going to make you a better father?

12          MR. BAUER:  Objection.

13          THE COURT:  Sustained.

14          THE WITNESS:  Honestly, it's not.

15          THE COURT:  You don't have to answer.

16  Q.  Have you ever helped anybody other than yourself in your 27

17  years?

18  A.  Yes, sir.

19  Q.  Did you ever think of anybody other than yourself in your

20  27 years?

21  A.  Yes, sir.

22  Q.  Do you care about anybody but yourself?

23  A.  Yes, sir.

24  Q.  You're still an honest man?

25  A.  Yes, sir.

E8e9chr5                          Mallory - cross

1    Q.  You're still a decent man?

2    A.  Yes, sir.

3    Q.  You're a good citizen now?

4    A.  Yes, sir.

5           MR. GOLTZER:  Thank you.

6           THE COURT:  Redirect.

7    REDIRECT EXAMINATION

8    BY MR. BAUER:

9    Q.  I'm going to try to be brief with you, Mr. Mallory, for

10   everybody's sake.

11          Mr. Mallory, defense counsel, various lawyers showed

12   you a bunch of documents in an attempt to refresh your

13   recollection.  Do you remember that?

14   A.  Yes, sir.

15   Q.  Some of them were handwritten.  Others were typed.  Do you

16   remember that?

17   A.  Yes, sir.

18   Q.  I've been making a list here, 3502-7, 3502-6, 3502-20,

19   3502-12, 3502-10, 3502-4, 3502-2.  The list goes on.  Do you

20   remember all those documents?

21   A.  Yes, sir.

22   Q.  Did you write those handwritten notes on those documents?

23   A.  I have to look at them.

24          MR. BAUER:  May I, your Honor?

25          THE COURT:  Yes.

 1    Q.  With the exception of the ones where you had already

 2    pointed out your handwriting, is there -- have you made any of

 3    the notes there?

 4    A.  No.  I didn't write any of this.

 5    Q.  How about the things that are typed?  Did you type those

 6    documents?

 7    A.  I don't see nothing that's typed.  No.  I didn't type that.

 8    Q.  Before today have you even ever seen these documents?

 9    A.  (No response).

10    Q.  The notes and the typewritten reports is what I mean.

11    A.  No.

12    Q.  Were you ever asked to review them for accuracy?

13    A.  No, sir.

14    Q.  Do you remember when Mr. Dratel showed you a picture of

15    Gucci that you were shown back in January 2012?

16    A.  Yes, sir.

17    Q.  Do you remember you noticed your handwriting under it?

18    A.  Yes, sir.

19    Q.  And what you had written about Gucci?

20    A.  Yes, sir.

21    Q.  Do you remember seeing pictures of Reckless during that

22    same time?

23    A.  Yes, sir.

24    Q.  Do you remember seeing a picture of Bow Wow?

25    A.  Yes, sir.

E8e9chr5                    Mallory - redirect

1    Q.  Do you remember what you wrote under their names?

2    A.  Not offhand.  I don't remember.

3    Q.  I'm going to show you part of what's been marked of 3502-5.

4    Take a look at these two photographs and tell me if that

5    refreshes your recollection as to what you wrote under the

6    picture of Reckless.

7    A.  Yes, sir.  I wrote that.

8    Q.  What did you write under Reckless?

9              MR. STRAZZA:  Objection your Honor.

10             MR. GREENFIELD:  Improper redirect.

11             THE COURT:  Overruled.

12             THE WITNESS:  I just wrote his name and if I knew

13   if -- the gang I knew he was affiliated with.

14   Q.  Putting the document down now.  What did you write under

15   there?

16   A.  (No response).

17   Q.  What did you write on Reckless's?

18   A.  I wrote his name and the gang I knew that he was affiliated

19   with.  And I wrote my initials.

20   Q.  What gang did you write on the piece of paper?

21   A.  Star Status.

22   Q.  How about Bow Wow?  What did you write on Bow Wow?  You can

23   look at the photo.

24   A.  I just wrote his name and date and my initials and the gang

25   that I know him from being affiliated with.

E8e9chr5                        Mallory - redirect

1   Q.  What specifically did you write for Bow Wow?

2   A.  Blood under Gotti.  And Bow Wow.  And the date.  And my

3   initials.

4           MR. GOLTZER:  I couldn't hear you.

5           THE WITNESS:  Bow Wow, the date, my initials, and

6   Blood under Gotti.

7   Q.  You said Blood under Gotti, right?

8   A.  Yes, sir.

9   Q.  Mr. Mallory, defense counsel asked you a number of

10  questions about when you told the government about some of the

11  crimes that you've committed.  Do you remember all of those

12  questions?

13  A.  Yes.

14  Q.  There were a lot of them.  About when you told the

15  government about the crimes?

16  A.  I remember them asking me questions, yes.

17  Q.  And in particular they focused on the crimes that you

18  committed after you started cooperating in January 2012.  Do

19  you remember those questions?

20  A.  Yes, sir.

21  Q.  About the drug use, right?

22  A.  Yes, sir.

23  Q.  About the burglary?

24  A.  Yes, sir.

25  Q.  And about the two robberies?

E8e9chr5                     Mallory - redirect

1   A.  Yes, sir.

2   Q.  I want to be very clear.  When you committed that burglary,

3   the attempted burglary, had you signed your cooperation

4   agreement yet?

5   A.  No, sir.

6   Q.  And how about the robberies?  When you committed those two

7   robberies, had you signed your cooperation agreement yet?

8   A.  No, sir.

9   Q.  So were those violations of an agreement that didn't exist?

10  A.  I don't understand that, sir.

11  Q.  Cooperation agreement didn't exist at the time, did it?

12  A.  No, sir.

13  Q.  Now for the drug use.  You testified that you tested

14  positive for drug use at the time of your plea, right?

15  A.  Yes, sir.

16  Q.  And that obviously means that you used drugs before the

17  plea?

18  A.  Yes, sir.

19  Q.  Meaning before you signed your cooperation agreement?

20  A.  Yes, sir.

21  Q.  Now you tested positive -- I'm sorry.  So that use of the

22  drugs again was before you had a cooperation agreement, right?

23  A.  Yes, sir.

24  Q.  And then you testified that you tested positive after you

25  entered into the cooperation agreement, right?

E8e9chr5                          Mallory - redirect

1   A.  Yes, sir.

2   Q.  What happened to you after you tested positive at that

3   time?

4   A.  I had -- I violated the bail and I got arrested.

5   Q.  You got arrested and where did you go after that?

6   A.  To Valhalla.

7   Q.  Valhalla.  Is that a jail?

8   A.  Yes, sir.

9   Q.  Have you been at a jail since then?

10  A.  No, sir.  I've been locked up ever since.

11  Q.  You were asked questions about threats that you've received

12  in jail, right?

13  A.  Yes.

14  Q.  Do you remember those questions?

15  A.  Yes, sir.

16  Q.  Now, so you've received threats based on your cooperation,

17  correct?

18  A.  Yes, sir.

19  Q.  Have your family members received threats?

20  A.  Yes, sir.

21  Q.  Who has threatened your family members?

22          MR. DRATEL:  Objection.

23          MR. GOLTZER:  Objection.

24          MR. STRAZZA:  Objection.

25          MR. GREENFIELD:  Objection.

1            MR. BUCHWALD:  Objection.

2            MS. STAFFORD:  Objection.

3            MR. DRATEL:  Can we have a sidebar.

4            THE COURT:  Sure.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (At the sidebar)

2            MR. DRATEL:  Just like an offer of proof as to what he

3    intends to elicit because I didn't go there.  And I'm going to

4    have to ask for a mistrial if it comes in.  It's beyond 403 for

5    threats to come in even -- I don't think they have anything to

6    do with my client specifically but it's just going to be game

7    over at that point as far as I'm concerned.

8            MR. GOLTZER:  Same thing for us.

9            MR. BUCHWALD:  Can we is have an offer as to who he

10   claims.  That's none of our clients.

11           MR. BAUER:  Well, that's not true.  I believe if he

12   remembers correctly, he's had a little trouble remembering,

13   that it was Raymond Christian's family who threatened his

14   family.  And I believe the door has been opened.  They asked

15   about threats.

16           MR. DRATEL:  I mean I understand that there was cross

17   on it, but we're in a joint trial here.  And I just think that

18   it's so toxic that -- I didn't go there.  I didn't go there for

19   a reason.  And I mean I just can't be in a position where my

20   client gets tarred by that in a way that's devastating.

21           MR. BUCHWALD:  If I can for the record, just the

22   enormous reaction by this jury as we started this at sidebar,

23   tremendous reaction by this jury which I observed after we were

24   forced to object to this and all came to the sidebar.  I can't

25   think of anything more prejudicial than what just happened.

1             MR. GOLTZER:  They have no basis to allege that our

2    client or any of these three defendants engaged in threatening

3    behavior.  There are letters in the record where he complains

4    about having been threatened.  But they don't relate to our

5    clients.  They relate to other people.

6             MR. STRAZZA:  And I was talking about the specific

7    letters that --

8             MR. BAUER:  I'm talking about questions that he did.

9             MR. STRAZZA:  My questions were with respect to

10   specific letters.  And he actually clarified what I was talking

11   about, about him having problems with people in the jail, where

12   he wrote to his lawyer about it.  That's where my questions all

13   came from, that letter.

14            MR. BAUER:  In that letter he mentions threats to him

15   and to his family.

16            THE COURT:  I understand that.  I saw that letter.

17            However, unless you have any information that these

18   specific defendants directed any threats be made, I think this

19   is unduly prejudicial and I would ask that you stay away from

20   it.

21            MR. BAUER:  I know that his family did.  I don't have

22   any direct information that Christian directed his family.

23            THE COURT:  I think you shouldn't go there.

24            MR. GOLTZER:  Would you instruct the jury to ignore

25   the question.

E8e9chr5                    Mallory - redirect

1          THE COURT:  I'll just direct that the question be

2     stricken and you should move on.

3          MR. BUCHWALD:  Respectfully, I don't believe that just

4     striking the question is going to do it considering the

5     reaction that I saw in that jury, unless the jury is

6     specifically instructed that the government has no information

7     that any defendant here has threatened his family or this

8     witness because otherwise they're left with the impression that

9     this was going to be elicited and that somehow we've kept it

10    out through some technical objection.

11         MR. BAUER:  I mean it's been pretty clear that since

12    he's been cooperating these three defendants have been in jail.

13    If you'd like to remind the jury that these three defendants

14    have been in jail and not in the same jail as him, that's fine.

15    But anything further than that would insinuate the opposite.

16         MR. GOLTZER:  It's only fair to say that the

17    government has not contended in this trial that any of these

18    three defendants threatened anybody.

19         MR. STRAZZA:  I don't like any reference to the jail.

20    That's not what I'm asking for.

21         MR. GOLTZER:  And the fact that they're in separate

22    jails doesn't mean they can't make a phonecall.

23         THE COURT:  I don't know that the jury would know that

24    but that's certainly correct as a matter of fact.

25         MR. BAUER:  So then I would oppose any further

1   clarification other than what you had already indicated you

2   were going to do, Judge.

3           THE COURT:  I think that if it is true as a matter of

4   fact that -- well I know that it's true as a matter of fact

5   that there is no allegation by the government that any of these

6   defendants have made any threats to either Mr. Mallory or his

7   family.

8           MR. BAUER:  Can you insert the word "directly" into

9   that?

10          THE COURT:  No.  Because then that would just

11  highlight the issue.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Ladies and gentlemen, as you know, I will

3     instruct you at the end of the trial.  And I've instructed you

4     at the beginning about what the actual allegations in this case

5     are.  I want to just assure you at this point or mention at

6     this point that there is no allegation in this case on the part

7     of the government that any of these defendants on trial

8     threatened either Mr. Mallory or his family.  Accordingly, I

9     will strike the last question that the government asked.

10          Okay.  Very well.

11          Mr. Bauer.

12     BY MR. BAUER:

13     Q.  Mr. Mallory, you were asked some questions about your

14     January 24, 2012 arrest with the crack residue.  Do you

15     remember those questions?

16     A.  Yes, sir.

17     Q.  And the questions were whether you received a criminal

18     conviction following that arrest.  Do you remember that?

19     A.  Yes, sir.

20     Q.  Now that was the same arrest that led to your cooperation,

21     correct?

22     A.  Yes, sir.

23     Q.  And your cooperation culminated in you pleading to a

24     cooperation agreement, correct?

25     A.  Yes, sir.

1   Q.  As part of your cooperation agreement I think you testified

2   on direct that you pled guilty to conspiring to sell crack

3   cocaine, correct?

4   A.  Yes, sir.

5   Q.  How much crack cocaine did you admit to selling?

6   A.  280 grams.

7   Q.  And, in fact, you've pled guilty or you've admitted to the

8   government you've sold far more than 280 grams, correct?

9   A.  Yes, sir.

10  Q.  So when you had said on cross-examination that that

11  January 24 arrest with the crack residue didn't result in a

12  criminal conviction, did you mean any criminal conviction or

13  just a state criminal conviction?

14  A.  State.

15  Q.  You were asked on cross-examination about a time you were

16  arrested at 20 William Street in L-1's house.  Do you remember

17  that?

18  A.  Yes, sir.

19  Q.  You were reminded on cross that that happened on July 23,

20  2010, correct?

21  A.  Yes, sir.

22  Q.  The robbery of and the murder of Jeffrey Henry, as you've

23  testified, happened on December 15, 2010, correct?

24  A.  Yes, sir.

25  Q.  Which was six months or five-and-a-half months after that,

E8e9chr5                          Mallory - redirect

1    right?

2    A.  Yes, sir.

3    Q.  So when you were asked if you cooperated on the Joker

4    murder five-and-a-half months before it happened the answer was

5    no, right?

6    A.  Yes, sir.

7           MR. GOLTZER:  Objection to the leading.

8           THE COURT:  Overruled.

9    Q.  Because it would have been impossible, right?

10   A.  Yes, sir.

11   Q.  Now, just now Mr. Goltzer showed you a photograph, a still

12   shot from the pole camera on First and Lander on December 15,

13   2010.  Do you remember when he showed you that?

14   A.  Yes, sir.

15   Q.  He showed you the still shot of when you identified Bow

16   Wow.  Do you remember that?

17   A.  Yes, sir.

18   Q.  Now, let's be very clear.  When you sat with the agents and

19   with prosecutors to look at that, did you look at just the

20   still shots or did you look at the video?

21   A.  It was the video.

22   Q.  And the still shots, where did the still shots come from?

23   A.  I don't understand that.

24   Q.  Were they printouts from the video?

25   A.  They froze it and they printed it out, yes, sir.

E8e9chr5                         Mallory - redirect

1   Q.  So they froze it as you were watching it on the screen,

2   right?

3   A.  Yes, sir.

4   Q.  Now, you testified that you looked at a picture of somebody

5   and based on how they moved you'd say that looks like Bow Wow?

6   That's what you said, right?

7   A.  Yes, sir.

8   Q.  Did you also look at those -- that video and see anybody

9   that looked like Reckless?

10  A.  Yes, sir.

11            MR. STRAZZA:  Objection.

12            THE COURT:  Overruled.

13  Q.  Yes?

14  A.  Yes, sir.

15  Q.  Did you see -- did you look at that video and see anyone

16  that looked like Gucci?

17            MR. DRATEL:  Objection, your Honor.

18            THE WITNESS:  Yes, sir.

19            THE COURT:  Overruled.

20  Q.  Did you look at that video and see anyone that looked like

21  Bash?

22  A.  Yes, sir.

23  Q.  Now as for Gucci, what about him on the video made it look

24  like it could be Gucci?

25  A.  The scarf.

1    MR. DRATEL:  Objection, your Honor.  Improper

2    redirect.  Beyond the scope.

3              THE COURT:  Overruled.

4              THE WITNESS:  The scarf he had on.

5    Q.  The scarf he had on?

6    A.  Yes, sir.

7    Q.  And what about the scarf that he had on on the video made

8    you think that it was Gucci?

9    A.  (No response).

10   Q.  Or that it could be Gucci, excuse me?

11   A.  He was like one of the only people with a scarf.

12   Q.  I'm sorry?

13   A.  He was probably -- he was like the only person they shown

14   with a scarf and with like a jacket on or a hoodie.

15   Q.  Well, you testified on direct about what Gucci was wearing

16   when you gave --

17             MR. DRATEL:  Objection to leading, your Honor.

18             THE COURT:  Overruled.

19   Q.  When you gave him the gun at 260 First Street.  Do you

20   remember testifying about that?

21   A.  Yes, sir.

22   Q.  Remind the jury what you said he was wearing when you gave

23   him the gun?

24   A.  Black leather jacket and a gray scarf.

25   Q.  And in the video when they froze it and you said that it

E8e9chr5                        Mallory - redirect

1   looked like Gucci or it could be Gucci, what was that person

2   wearing when you said it looked like it could be him?

3   A.  Scarf.

4   Q.  And what color was the jacket, light or dark?

5   A.  A dark-colored jacket and a scarf.

6   Q.  And when you -- as for Reckless, the person who you

7   identified that it could be Reckless, what about that person as

8   you watched the video made you think it could be Reckless?

9   A.  About how he moved like, walking, running, jog off.

10  Q.  You've got to speak a little louder.

11  A.  By his movements.

12  Q.  And what about his movements in particular?

13  A.  He lazy -- he walk like lazy, he run lazy.

14  Q.  Run lazy?

15  A.  Yeah.

16  Q.  And so it was how he ran?

17          MR. GREENFIELD:  I didn't hear that.  Could that be

18  read back, please.

19          THE COURT:  Yes.

20          (Record read)

21  Q.  Had you seen Reckless run before?

22  A.  Yes, sir.

23  Q.  Where had you seen Reckless run before?

24  A.  On corners, on blocks that we sell drugs on.  I seen him

25  run when he was shot from that side of the street to the other

E8e9chr5                      Mallory - redirect

1   side of the street.

2   Q.  While he was selling drugs?

3   A.  One time, yes, I seen him run selling drugs, yeah.

4   Q.  Did you also, when you were looking at that video, did you

5   recognize someone that looked like Baynes?

6   A.  Yes.

7           MR. BAUER:  Your Honor, may I approach?

8           THE COURT:  You may.

9   Q.  Showing what's been marked for identification as Government

10  Exhibit 253.  Will you take a look at this document and tell me

11  if you recognize it.

12  A.  Yeah.

13  Q.  Is it another one of those still shots?

14  A.  Another still shot, yes.

15  Q.  Is it -- do you see your handwriting on there?

16  A.  Yes, sir.

17  Q.  And who's depicted in that still shot or what does it look

18  like the person could be?

19  A.  Besheltie's son, Baynes.

20          MR. BAUER:  The government offers Exhibit 253.

21          MR. GREENFIELD:  Objection, you Honor, based on

22  improper redirect.

23          THE COURT:  Based on that objection, the exhibit will

24  be received.  Government Exhibit 253.

25          MR. BAUER:  May we show it to the jury, your Honor?

1    THE COURT:  You may.

2    (Government's Exhibit 253 received in evidence)

3  Q.  Mr. Mallory do you see that there?

4  A.  Yes, sir.

5  Q.  Do you see the arrow that I'm pointing at here on the

6  bottom right corner?

7  A.  Yes, sir.

8  Q.  There's handwriting that says, Besheltie Smith's son.  Who

9  wrote that?

10  A.  I wrote that.

11  Q.  Is this the individual who you identified could be Baynes?

12  A.  Yes, sir.

13  Q.  You were asked about why you didn't call Bow Wow on the

14  North Carolina phone number that you got.  Do you remember that

15  question?

16  A.  Yes, sir.

17  Q.  Did you make calls -- I'm sorry.  And the question was why

18  didn't you get him on the phone and talk about the murder.  Do

19  you remember that?

20  A.  Yes, sir.

21  Q.  Did you make calls like that by yourself or did you only do

22  it at the direction of law enforcement?

23  A.  Direction of law enforcement.

24  Q.  Were you supposed to make calls like that without telling

25  law enforcement first?

1    A.  No.

2    Q.  Mr. Mallory, you were asked about some of the crimes you've

3    committed like some of the robberies.  Do you remember those

4    questions?

5    A.  Yes, sir.

6    Q.  There was a robbery of Murda?  Do you remember questions

7    about that on cross?

8    A.  Yes, sir.

9    Q.  You testified on cross that you didn't remember certain

10   things about that robbery, do you remember?

11   A.  Yes, sir.

12   Q.  Like in particular which gun it was?

13   A.  Yes, sir.

14   Q.  Do you deny that you committed that robbery?

15   A.  Do I deny I commit -- no.

16   Q.  You committed it, right?

17   A.  Yes, sir.

18   Q.  Do you deny that you used a gun?

19   A.  No.

20   Q.  You used a gun, right?

21   A.  Yes, sir.

22   Q.  So even if you don't remember every single detail you still

23   admit and take responsibility for the robberies you did like

24   that of Murda, right?

25   A.  Yes, sir.

E8e9chr5                        Mallory - redirect

1   Q.  Mr. Mallory since the time that you were confronted by the

2   government about withholding information about those robberies

3   that you had done, have you lied to the government?

4   A.  No, sir.

5   Q.  Have you been truthful?

6   A.  Yes, sir.

7   Q.  Have you made anything up?

8   A.  No, sir.

9   Q.  So how about that question of who gave the guns to Bow Wow

10  and Gucci?  Have you lied about that?

11  A.  No, sir.

12  Q.  You first told the government that it was Gotti, right?

13  A.  Yes, sir.

14  Q.  Was that a lie or you just didn't remember?

15  A.  I didn't remember.

16  Q.  And you testified that part of the reason why you may not

17  remember is because of the drinking and smoking?  Is that what

18  you had said on cross?

19  A.  Yes, sir.

20  Q.  Now the drinking and smoking, has that affected your memory

21  permanently?

22  A.  No, sir.

23  Q.  Or did it only affect you when you first told the -- when

24  you first talked about it?

25  A.  When I first talked about it.

E8e9chr5                         Mallory - redirect

1    Q.  And then a couple times after, right?

2    A.  Yes, sir.

3    Q.  Did the drinking and the smoking affect how you remembered

4    everything about that day?

5    A.  No, sir.

6    Q.  Did it affect your ability to remember who you and Gotti

7    gave those guns to?

8    A.  No, sir.

9    Q.  Are you sure about who you gave those guns to?

10   A.  Yes, sir.

11   Q.  Who did you give the guns to?

12   A.  Gucci and Bow Wow.

13   Q.  Now since your very first meeting with the government in

14   January -- or with the officers in January 2012 did you tell

15   them who you guys gave those guns to?

16   A.  Yes, sir.

17   Q.  Who did you say?

18   A.  Gucci and Bow Wow.

19   Q.  Have you ever said anyone other than Bow Wow and Gucci?

20   A.  No, sir.

21   Q.  Did you ever hide that you were part of giving those guns

22   to Bow Wow and Gucci?

23   A.  Repeat that question again.

24   Q.  Did you ever hide the fact that you had gotten that

25   phonecall from L-1?

 1   A.  No, sir.

 2   Q.  Did you ever hide the fact that you were involved?

 3   A.  No, sir.

 4   Q.  Did you ever change your story at all, ever, about who you

 5   and Gotti gave the guns to?

 6   A.  No, sir.

 7   Q.  Mr. Mallory, did everything you testified about actually

 8   happen?

 9   A.  Yes, sir.

10   Q.  And did it happen the way that you testified about to the

11   best of your recollection sitting here in the courtroom today?

12   A.  Yes, sir.

13             MR. BAUER:  No further questions.

14             THE COURT:  Ladies and gentlemen, it's just a little

15   bit after 5:00 so we're going to end.  It's Thursday so we have

16   the next three days to ourselves.  So have a very good weekend.

17   Please be back here Monday morning no later than 9:25.  You

18   should know that we will be sitting next Friday if that should

19   happen, and it appears as though it will.  So do plan on being

20   here next Friday as well as Monday through Thursday.  So we'll

21   see you next Monday morning.  Have a very good weekend.  Until

22   then do not discuss the case even on social media.

23             (Jury excused)

24             (Continued on next page)

25

1          (In open court)

2          THE COURT:  Mr. Mallory, you may step down and we'll

3    see you Monday morning too.

4          (Witness excused)

5          THE COURT:  We will be e-mailing or I guess

6    e-mailing -- we have your e-mails, correct -- the jury

7    instructions tomorrow at some point, probably by midday or so.

8          Anything more?

9          MR. BAUER:  Judge, how this day played out.  I just

10   note for the record I don't know if this is an objection but my

11   general -- general acknowledgment of unfairness that

12   Mr. Mallory got crossed all day.  My redirect was concise.  It

13   was somewhere in the range of fifteen minutes.  And now they're

14   going to have three days to work on a recross.  And it's -- you

15   know Mr. Mallory is going to be sweating this out over the

16   weekend as well.  I think it's -- first of all, I think it's

17   unfair.  But obviously there's nothing really to do about it.

18   But what I will say is that I hope that -- that defense

19   counsel's recross will be extremely limited only to what I

20   redirected on.

21         THE COURT:  Well, you redirected on quite a bit.

22         MR. GOLTZER:  Hope springs eternal, Judge.

23         THE COURT:  Look, obviously I mean you're all

24   experienced trial lawyers so I don't have to tell you that you

25   have to keep the jury at the forefront of your minds at all

1    times and not impose on them any more than you need to because

2    juries have a way of attributing and ascribing blame for these

3    things.  So, obviously Mr. Mallory has been cross-examined a

4    great deal on what I have previously described as garden

5    variety impeachment.  We all know that he lied when he was

6    first talked to.  He lied probably the second time he was

7    talked to.  He lied probably the third time that he was talked

8    to.  The jury gets that.  So, accord yourselves with that in

9    mind or comport yourselves with that in mind.

10            Now where are we with respect to the rest of the

11   evidence?  Are we going to be able to finish next week?

12            MR. BAUER:  If I could answer that question in one

13   second.

14            Clarify Mr. Mallory.  Can we consider him still to be

15   on redirect in case we'd like to talk to him, if only briefly,

16   over the weekend?  I don't know if we do.

17            MR. GREENFIELD:  He said he was finished.

18            THE COURT:  Yes.  You said you were done.  No.

19   They're going to cross -- look, we've heard enough of

20   Mr. Mallory or from Mr. Mallory so let's just finish him up and

21   move on.

22            MR. BAUER:  Okay.

23            THE COURT:  So can we finish next week?

24            MR. DRATEL:  I must say I was concerned about the

25   redirect in terms of opening up the need to call police

1    officers about inconsistent statements rather than the

2    stipulation which is what I was anticipating based on the 3500.

3    But if it's the government's position that the 3500 is not

4    accurate, then we have a problem.  We're going to have to call

5    all those people.  So that's an issue and I hope the government

6    considers inviting proceeding that way.

7            THE COURT:  I don't think the government suggested

8    that the 3500 was inconsistent.  I mean it's -- and again this

9    a garden variety stuff.  He was presented with notes that he

10   did not create, that were not verbatim, that he had never seen.

11   He wasn't suggesting that it was inaccurate, simply that --

12   simply that.

13           MR. DRATEL:  I sure hope that's the case.

14           MR. GOLTZER:  They did ask him if he checked the

15   accuracy of those notes.

16           THE COURT:  Right.  To get the response that, no, he

17   did not check the accuracy of the notes, but.

18           MR. GOLTZER:  Implying that they're not accurate.

19           MR. DRATEL:  One other issue with respect to

20   Mr. Thomas.  One of my objections with respect to redirect on

21   the identification from the videos, I did not go into that on

22   cross for a specific reason; specifically avoided that.  And

23   it's one of the perils of a jury trial, not from our

24   perspective but from the government's perspective.  So I think

25   it never would have come in.  It would not have been fair game

E8e9chr5                        Mallory - redirect

1   for redirect.  Only because of a jury trial.  So I ask for a

2   severance and a mistrial based on the fact that that never

3   would have come in.

4            MR. STRAZZA:  On behalf of Mr. Christian we join in

5   the application.

6            MR. BAUER:  We don't agree.  I mean for all of the

7   obvious reasons, your Honor, and most importantly that defense

8   counsel has been operating in concert here in terms of their

9   cross-examination.  And the door was opened in any number of

10  ways into that identification.

11           MR. GOLTZER:  I've never been an accomplice in my

12  life.

13           THE COURT:  I'm sorry?

14           MR. GOLTZER:  I've never been an accomplice in my

15  life.

16           MR. BUCHWALD:  We have a motion pending.

17           THE COURT:  The motion is denied.

18           MR. GREENFIELD:  One thing strikes me also is the

19  witness testified it might be as to certain of the defendants

20  and then he was shown pictures as to other defendants.

21  Clearly -- it may well be that those photo identifications or

22  non-photo identifications could have been presented to the

23  grand jury as actual identifications of the defendants.  It

24  could be Bow Wow.  It could be Bow Wow.  It could have been

25  that an FBI agent might have gone in there or a third party and

1   say that Mr. Mallory identified Bow Wow as being present or

2   receiving a gun.  And I'd ask the court -- because that could

3   be Brady material -- that absolute identifications were made in

4   the grand jury or attributions to identifications could be

5   made -- were made in the grand jury.

6           MR. BUCHWALD:  In that respect, your Honor, we'd like

7   to see the grand jury testimony on that point of whatever agent

8   was put in.  This is a way of making sure that there is no

9   grand jury testimony to confront a witness with.  They put an

10  agent in to put in the hearsay but we'd like to see what the

11  agent said that Mallory said about these identifications, what

12  he testified under oath in the grand jury.  I think we should

13  get that under both 3500 as a matter of Brady.

14          MR. BAUER:  The word Brady is thrown out a lot.  I

15  don't see how this is Brady.  Can we, on this point of whether

16  we're willing to share grand jury testimony of a witness who is

17  not going to be testifying, can I -- I don't have -- I don't

18  know what they say off the top of my head.  Can I reserve on

19  that and look at the grand jury minutes, remind myself of who

20  actually testified, and remind what -- remind myself of what

21  actually was said.  Hopefully we'll feel comfortable just

22  turning it over but can I reserve on that?

23          THE COURT:  Sure.

24          MR. BUCHWALD:  Could you inform us of which agent it

25  was?

1      MR. BAUER:  I just said I don't remember.

2      MR. BUCHWALD:  You don't remember which agent you put

3  in the grand jury?

4      MR. BAUER:  No.  Like the witnesses, you can't ask me

5  again and again.  I don't know.

6      MR. BUCHWALD:  Maybe there's an agent in the courtroom

7  who remembers that they testified in the grand jury.

8      MR. GREENFIELD:  Can we have the batting order for

9  Monday?

10      MR. BAUER:  That was your question, Judge.

11      Things continue to take longer and whether we can be

12  done by Friday, we really hope so.  We -- Monday morning we're

13  going to have Tarrence Smith here because he has to testify on

14  Monday.  So after Mallory is done we'll go to Tarrence Smith.

15  After Tarrence Smith we'll probably do these officers who have

16  been sitting around here for days and days, that's some

17  combination of Maguire, Palermo and William Lahar.  And then

18  Danielle Williams.

19      THE COURT:  Okay.  And that's it?

20      MR. BAUER:  And then we can have Ramone McDermott?

21      THE COURT:  You mean that's it for Monday?

22      MR. BAUER:  That was just for Monday.  Then we have

23  Ramone McDermott, and then we have Akinto Boone, and Barbara

24  Morreale for sure.  We're considering cutting Marshall Williams

25  who is a potential witness and we're holding on to David Evans

1   right now.  We'd like to call him but we're also concerned

2   about how slowly this trial is taking so we're -- he's a

3   cooperator and we're going to think about that.

4          THE COURT:  Well, look, this is obviously a very

5   important trial and I am loathe to limit counsel in terms of

6   time to cross-examination because there is so much at stake.

7   And I am also loathe to instruct counsel on what they can and

8   should not go into in terms of cross-examination.  But to the

9   extent that defense counsel can coordinate their crosses in

10  terms of not going into the same areas, that would help move

11  things along.  And unfortunately for you, you know, the jury

12  likely will blame you if they start hearing the same questions

13  over and over.

14         We told this jury three weeks.  We do have four

15  alternates.  I forget whether any of the individuals that had

16  vacation plans were picked and are sitting.  But I -- and

17  they've been very good with the exception of one juror who is

18  the one that keeps us from getting started at 9:30 everyday.

19  And I have not had this conversation with you all yet but I may

20  need to.  They've been very good.  And they've been very

21  prompt.  But I am guessing that once it becomes apparent that,

22  as it may well, that we may need to go into the fourth week, we

23  may need -- we may start to hear some grumbling.  So we'll have

24  to think about that as well.

25         MR. BAUER:  To the point of defense counsel, we are

E8e9chr5                    Mallory - redirect

1    prepared and hopeful that we can agree on stipulations with

2    regards to the inconsistent statements so as to be more

3    efficient with our time.

4            THE COURT:  Okay.

5            MR. GOLTZER:  Have a nice weekend.

6            THE COURT:  Okay, folks.

7            (Adjourned to August 18, 2014 at 9:00 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1544

```
1                    INDEX OF EXAMINATION

2   Examination of:                          Page

3    JAMAR MALLORY

4   Direct By Mr. Bauer  . . . . . . . . . . . .1293

5   Cross By Mr. Dratel  . . . . . . . . . . . .1324

6   Cross By Mr. Strazza . . . . . . . . . . . .1426

7   Cross By Mr. Goltzer . . . . . . . . . . . .1467

8   Redirect By Mr. Bauer  . . . . . . . . . . .1513

9                   GOVERNMENT EXHIBITS

10  Exhibit No.                            Received

11   253   . . . . . . . . . . . . . . . . . .1531

12                   DEFENDANT EXHIBITS

13  Exhibit No.                            Received

14   Thomas M   . . . . . . . . . . . . . . .1419

15   Whitaker B   . . . . . . . . . . . . . .1501

16

17

18

19

20

21

22

23

24

25
```