E8inchr1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     UNITED STATES OF AMERICA
3              v.                              12 CR 626 (ER)
     RAYMOND CHRISTIAN a/k/a
4    "Reckless"
     GLENN THOMAS, a/k/a "Gucci"
5    TYRELL WHITAKER, a/k/a "Bow Wow"
                    Defendants
6    ------------------------------x
                                              New York, N.Y.
7                                             August 18, 2014
                                              9:30 a.m.
8

9    Before:
                        HON. EDGARDO RAMOS
10                                            District Judge

11
                          APPEARANCES
12   PREET BHARARA
          United States Attorney for the
13        Southern District of New York
     ANDREW BAUER
14   KAN M. NAWADAY
          Assistant United States Attorney
15
     DAVID S. GREENFIELD
16        and
     ANTHONY STRAZZA
17        Attorneys for Defendant Christian

18   LAW OFFICES OF DON BUCHWALD
          Attorney for Defendant Thomas
19   DON D. BUCHWALD

20   KELLEY DRYE & WARREN LLP
          Attorney for Defendant Thomas
21   LEVI DOWNING

22   GEORGE ROBERT GOLTZER
          and
23   YING STAFFORD
          Attorneys for Defendant Whitaker
24   -- also present--
     S.A. Andrei Petrov - FBI
25

E8inchr1

1          (Trial resumed)

2          (In open court; jury not present)

3          THE COURT:  The jury, or at least several members, a

4   couple of members of the jury have asked for an update on when

5   we think this thing will end.

6          Do we have an estimate?

7          MR. BAUER:  We were just talking to defense counsel

8   this morning.  Again, this all depends on their

9   cross-examination of Danielle Williams.  Our direct examination

10  of Ms. Williams will be around an hour.  If they only do a

11  couple of hours, then there is a very good chance that we would

12  rest if not the end of the day tomorrow, Wednesday morning.

13         THE COURT:  OK.

14         MR. BAUER:  We are calling McDermott.  The one caveat,

15  there is David Evans, another one of our cooperators, we are

16  going to so how Ms. Williams does on the stand.  If she does as

17  we expect, we expect we will not be calling him, which will

18  save us time.

19         THE COURT:  By way of defense case, is there anything

20  that you can share with us.

21         MR. GOLTZER:  It depends on whether or not we can

22  reach a stipulation on certain items.  We will try to get that.

23         MR. BAUER:  We are assuming that we are going to reach

24  that agreement.

25         MR. DRATEL:  I think we have two that we are working

1    on right now.

2            MR. GREENFIELD:  They may have two with us.  I haven't

3    had a chance to discuss it yet.

4            THE COURT:  OK.  If that is the case, then, and if

5    things go as the parties anticipate, we should have the

6    charging conference tomorrow.  I take it the parties received

7    the draft.  We will do that at the end of the day at 5 o'clock

8    tomorrow evening.

9            The only other issue, and I will ask the parties how

10   you wish to proceed, we do have one juror who has been

11   consistently the individual who that has kept us from starting

12   on time.  I guess two days ago, two trial days ago, he was 20

13   minutes late.  Then the following day he was approximately

14   something under 10 minutes.  It hasn't been a huge problem so

15   far, and I would not want to, unless it is necessary, sort of

16   single him out and bring him out and put him in the jury box

17   and tell him to straighten up, but do the parties have any view

18   on this one way or another?

19           MR. GREENFIELD:  I agree with your Honor.

20           MR. BAUER:  As do we, your Honor.

21           MR. DRATEL:  I agree with your Honor.  The only caveat

22   is should we have a very a tight schedule about getting the

23   summations in on the same day or something like that, it would

24   be worth a little admonition beforehand, not to him, specific

25   but to everyone, if they want to get this case the confines of

E8inchr1

1    what we expect, they need to do their part.

2              THE COURT:  Yes.  Absolutely.

3              OK.  We will see where we are then.

4      JAMAR MALLORY, resumed.

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E8inchr1

1          (Jury present)

2          THE COURT:  Good morning, ladies and gentlemen.  Good

3    to see again.  I trust you all had a pleasant weekend.  We

4    continue with the cross-examination of Mr. Mallory.

5    Mr. Mallory, you are reminded that you are still under oath and

6    that you should please keep your voice up.

7          Mr. Dratel.

8          MR. DRATEL:  Thank you, your Honor.

9    RECROSS EXAMINATION

10   BY MR. DRATEL:

11   Q.  Good morning, Mr. Mallory.

12   A.  Good morning.

13   Q.  Do you remember last week when you were questioned

14   Mr. Bauer on redirect examination -- do you know what I mean?

15   When he came back on Thursday and asked you additional

16   questions after the cross examination.  You talked about some

17   of the handwritten notes and typewritten memoranda that I had

18   shown you to try to refresh your recollection.

19          Do you remember that Mr. Bauer asked you about whether

20   or not you had seen those before and whether you had adopted

21   any of that as accurate.  Do you remember?

22   A.  Yes, sir.

23   Q.  When you met the 15 or more times with FBI agents and

24   prosecutors, assistant United States attorneys, Newburgh

25   police, any other law enforcement people they were taking

E8inchr1                    Mallory – recross

1    notes, right?

2    A.  Yes, sir.

3    Q.  If they didn't hear an answer of yours, they would ask you

4    to repeat it, right?

5    A.  I don't remember.

6    Q.  And if they didn't understand a particular answer of yours,

7    they would ask a follow-up question, right, or they would ask

8    you to explain something, right?

9    A.  Yes, sir.

10   Q.  They asked you for details, right?

11   A.  Sometimes.  I don't remember all the time.

12   Q.  Do you think when they were writing their notes -- by the

13   way, some of this stuff occurred in 2012, right?  The first

14   half of 2012 a lot of these meetings occurred, right?

15   A.  Some of them did, yes.

16   Q.  Two years ago.  Some of them occurred this year, earlier

17   this year, correct?

18   A.  Yes.

19   Q.  From two years ago if someone was going to consult their

20   notes, they are going to want them to be accurate, right?

21          MR. BAUER:  Objection, your Honor.

22   A.  I don't understand that question.

23          THE COURT:  Overruled.

24   A.  Repeat it.

25          THE COURT:  Rephrase, Mr. Dratel.

```
 1              MR. DRATEL:  Sure.

 2   Q.  If someone was going to take notes of your conversations of

 3   what you were telling them two years ago to use it in a trial

 4   this week, they would want them to be accurate, right?

 5              MR. BAUER:  Objection.

 6              THE COURT:  Sustained.

 7   Q.  Do you think that they took the notes to be accurate or

 8   inaccurate?

 9              MR. BAUER:  Objection.

10              THE COURT:  Sustained.

11              THE WITNESS:  Answer?

12              THE COURT:  Don't answer.

13   Q.  You talked about the material that you did not write on,

14   but in fact there was also material that you did write on,

15   correct?

16   A.  Yes, sir.

17   Q.  I think --

18              MR. DRATEL:  One moment, your Honor.

19              I don't think we took back the original exhibit, your

20   Honor, on Thursday, so I'm going to use the same document, but

21   it is just not marked as the same exhibit.  It's defendant

22   Thomas' Exhibit M.

23   Q.  I ask you to look at that Mr. Mallory.  Do you see that?

24   That is a photo of Mr. Thomas, correct?

25   A.  Yes, sir.
```

E8inchr1                          Mallory - recross

1    Q.  That's your handwriting, correct?

2    A.  Yes, sir.

3    Q.  This was January 25, 2012.  Do you see the date?

4    A.  Yes.

5    Q.  And those are your initials, J.M., right?

6    A.  Yes.

7    Q.  And you wrote, "If he's blood, he can be under L-1."

8    Right?

9    A.  Yes.

10   Q.  So that's nobody else writing.  That's you writing "if he's

11   blood," correct?

12   A.  Yes.

13   Q.  In fact, Mr. Thomas was someone who was cool with Bloods,

14   but took the Crips very seriously, right?

15   A.  At one time, yes.

16   Q.  Also in your redirect you were asked about whether you had

17   changed your story after you signed your cooperation agreement,

18   right?  Do you remember that on Thursday by Mr. Bauer?

19   A.  Yes.

20   Q.  Before you signed your cooperation agreement, while you

21   were cooperating, you didn't think it was OK to continue to

22   commit robberies, right?  You didn't think that was OK while

23   you were cooperating during the first half of 2012?

24   A.  You're asking me?  That's a question?

25   Q.  Yes, that's a question.  If you don't understand it, I'll

E8inchr1                        Mallory - recross

1   be happy to rephrase it?

2   A.  Yes, rephrase it.

3   Q.  During the first half of 2012, you are cooperating, right?

4   A.  Yes.

5   Q.  During the first half of 2012, before you went into jail in

6   September and before you pled guilty on August 14, 2012, you

7   had committed two robberies and planned a burglary, correct?

8   A.  Yes.

9   Q.  That was while you were cooperating, right?  Before your

10  agreement was signed, but while you were cooperating, right?

11  A.  Yes.

12  Q.  You didn't think that was OK as part of your cooperation,

13  right?

14  A.  No.

15  Q.  You knew it was in your best interest not to do that if you

16  wanted to get a cooperation agreement in the first place,

17  right?

18  A.  Yes.

19  Q.  You also knew that by failing to disclose it at the time

20  that you pleaded guilty and signed your cooperation agreement,

21  because you hadn't told them about -- withdrawn.  I'll break it

22  down.

23          When you pled guilty on August 14, you hadn't told

24  them yet about those two robberies and the planned burglary,

25  right?

E8inchr1                    Mallory - recross

1    A.  No.

2    Q.  So you knew that by not disclosing that you were putting

3    your cooperation agreement in jeopardy?

4    A.  Yes.

5    Q.  You still didn't tell them until you were confronted with

6    it by them, meaning the government, the prosecutors and agents,

7    in November of 2012, right?

8    A.  Yes.

9    Q.  That was November 2012, when you were confronted, and you

10   acknowledged the two robberies and the burglary.  Isn't it a

11   fact that it wasn't until March of 2014 that you first told the

12   government that Mr. Thomas, you alleged that Mr. Thomas came

13   back to your apartment, your apartment sometime after the

14   murder, right?

15           MR. BAUER:  Objection, your Honor.

16   Q.  The next day or a couple of days?

17           MR. BAUER:  Outside the scope of the redirect.

18           THE COURT:  Overruled.

19   Q.  Right?

20   A.  Yes.

21   Q.  And that is 40 months after the actual incident occurred,

22   right?  This is March of 2014 for an event that occurred in

23   December of 2010, right?

24   A.  I don't know the -- I don't know the dates.

25   Q.  By the way, that first session in 2014, in March of 2014,

E8inchr1                        Mallory - recross

1   you had nothing about Mr. Thomas having the .38 with him, the

2   black .38, right?

3   A.  Repeat that question.  I don't understand what you just

4   said.

5   Q.  Sure.  That first session you had in 2014, March of 2014,

6   with the government to prepare for this case, there was nothing

7   in there about Mr. Thomas coming over after the day after or

8   the night after the Henry killing with a .38, nothing about the

9   gun, the black .38 that he had with him, you didn't do that

10  until the next session, right?

11  A.  I don't remember which session it was, but I told them.  I

12  don't remember what the session was.

13  Q.  Let me see if I can refresh your recollection.  I want you

14  to look at 3502-40 and look at what I've highlighted on those

15  first two pages.  Just look at that.

16          THE COURT:  He's done, Mr. Dratel.

17          MR. DRATEL:  OK.  Thank you.

18  Q.  There's nothing in there about him bringing back the .38,

19  right?  You didn't tell the government, prosecutors and agents,

20  in that session in March of 2014, March 11, you did not tell

21  the government that Mr. Thomas brought back the .38 when he

22  came to see you with the beers the day or two after the Henry

23  killing, right?

24  A.  I told them.  I don't remember when I told them, but I told

25  them.

E8inchr1                    Mallory - recross

1   Q.  Now, I'm going to show you what's marked as 42 -- never

2   mind.  Never mind.

3          Also, by the way, it wasn't until the second session

4   in May of this year that you told the government that

5   Mr. Thomas had told you during that meeting that you claim

6   happened, that he said that he had run up Lander Street to run

7   home after the killing, right?  I should break that down.

8          You mentioned that, right?  You testified that he told

9   you during that meeting that he ran up Lander Street to run

10  home, right?

11  A.  I don't remember what street he ran up, but I did tell them

12  that he turned aways from the group and ran home.  I don't

13  remember, I don't remember saying Lander Street.

14  Q.  But the first time you told the government that was May 2,

15  2014, correct?

16  A.  I don't remember the date, but I told them.

17  Q.  Let me show you what's been marked as 3502-42 and ask you

18  to look at that bit that's highlighted right there and let me

19  know when you've finished.

20  A.  I finished.

21  Q.  Isn't it a fact that you told the government that he ran up

22  Lander Street, right?

23  A.  I told them that he ran off.

24  Q.  Did you tell --

25  A.  Can I finish talking?

E8inchr1                              Mallory - recross

1    Q.  Did you them that he ran up Lander Street?

2    A.  I don't remember telling them that.

3    Q.  You didn't tell them that.  They were taking notes, right?

4    Did they make up Lander street?

5    A.  They could have made a mistake.  I don't remember telling

6    them Lander Street.

7    Q.  But that was the first time you told them about that, that

8    Mr. Thomas had told you that, right?  That was the first time,

9    in May of this year, that you had that as part of your story?

10   A.  That's a question?

11   Q.  Yes.

12   A.  Repeat it.  I don't --

13   Q.  Sure.  You claim that Mr. Thomas told you he cut off on one

14   street, he turned off on one street and ran towards home.  I'm

15   asking you, the first time that you put that in your story to

16   the government was May 2, 2014?

17   A.  I don't remember.

18   Q.  Now, as late as June, we'll talk about -- we are still

19   talking about changing your story.  As late as June of this

20   year, June 26, 2014, you insisted to the government that you

21   didn't even receive a call from L-1, that it was a text, right?

22   A.  Repeat that again.

23   Q.  Sure.  As late as, it was in June of this year June 26,

24   2014, that you insisted to the government that you had not

25   received a phone call from L-1 the night of December 14, 2010,

E8inchr1                    Mallory - recross

1    but in fact it was a text, correct?

2    A.  No.

3    Q.  You didn't tell the government that?

4    A.  I told them that first I got a text and I told them that I

5    got a phone call.

6    Q.  Did you say that you couldn't get a phone call on your

7    phone?

8    A.  No, I could get phone calls on that phone.

9    Q.  Didn't you tell them that you couldn't get a phone call on

10   your phone?

11   A.  I got the phones mixed up.

12   Q.  I'm asking you a question for a yes or no.  Did you tell

13   them that you couldn't get phone calls on your phone, June 26,

14   2014, less than two months ago?

15   A.  I don't remember.

16   Q.  You don't remember.  Let me show you what is marked as

17   government's Exhibit 3502-44, and ask you to look at this

18   section.  Did you not tell the government June 26, 2014, less

19   than two months ago, four years after the event almost, that

20   you did not receive a call, it was a text?

21   A.  I don't remember.

22   Q.  Did you not tell them that your phone could not get calls?

23   A.  I told them I had a phone --

24   Q.  I'm asking you, did you tell them your phone could not

25   receive calls?

E8inchr1                          Mallory - recross

1    A.  That day I don't remember.  I don't think I did.

2    Q.  Did you also insist that what you had said initially that

3    they had misunderstood because you said not that I received a

4    phone call but that L-1 hit my phone?  Didn't you say that?

5    A.  I said that he hit my phone, yeah.

6    Q.  So were you trying to make an excuse as to why it wasn't a

7    phone call and why it was a text and not a phone call, and this

8    is less than two months ago, right?

9    A.  No.

10   Q.  When you make stuff up, it can only be disproved by actual

11   records, right, like phone records and things like that, right,

12   things that they we can't verify because you are just talking

13   about them?  We can't prove that you're lying, right?

14            MR. BAUER:  Objection, your Honor.

15            THE COURT:  Sustained.

16   Q.  Now, in terms of your story, you still don't know whether

17   or not, or when exactly the incident that you claim occurred

18   where Bow Wow returns and Gotti shots the gun out the window,

19   Mr. Burden, Kev Gotti shoots the gun out the window, you still

20   don't know whether that happened before or after the Henry

21   killing, right?

22   A.  Yes.

23   Q.  On redirect you were asked about smoking and drinking and

24   memory, right?

25   A.  Yes.

E8inchr1                          Mallory - recross

1   Q.  Now, December 14, 2010, when you started sometime in the

2   afternoon smoking and drinks with Kev Gotti, with Mr. Burden,

3   that was a pretty typical day for the two of you?

4   A.  What does that mean, typical?

5   Q.  That means that a few times a week you guys would get

6   together and that would be your routine, smoking, drinking

7   hanging out?

8   A.  No.

9   Q.  No?  You didn't do that often with him?

10  A.  I did it often, but it wasn't a few times every week,

11  probably like a few times every other week.

12  Q.  With other people you did it as well, right?

13  A.  No.

14  Q.  You only did it with Kev Gotti?

15  A.  A few times a week, yes.

16  Q.  But you did it with other people, too, you?  Only smoked

17  with Kev Gotti?  That was the only person you smoked marijuana

18  with?

19  A.  At that time, yes.

20  Q.  Did you smoke marijuana by yourself, too?

21  A.  Not a lot.

22  Q.  You were doing it on a daily basis you said, right?

23  A.  Yes.

24  Q.  And you were doing PCP a lot, too, right?  Yes?

25  A.  No.

E8inchr1                      Mallory - recross

1    Q.  I'm sorry?

2    A.  No.

3    Q.  You weren't doing PCP a lot?

4    A.  No.

5    Q.  You were doing cocaine, too, during this whole period,

6    right?

7    A.  At that time I wasn't doing cocaine.

8    Q.  I'm sorry?

9    A.  At that time, in 2010, I wasn't using cocaine.

10   Q.  But during the period of time that we are talking about,

11   between then and now you've done cocaine, PCP, marijuana,

12   right?

13   A.  Yes.

14   Q.  Drinking a lot, too, during that period, too, right?

15   A.  What's a lot?

16   Q.  What do you think is a lot?

17   A.  I'm asking you what is a lot.  What do you consider a lot?

18   You're saying I did it a lot.  What's a lot?

19   Q.  Every day, every other day from 3 o'clock in the afternoon

20   until you fell asleep at night?

21   A.  No.

22   Q.  You claim that doing all of these drugs, including alcohol,

23   had no impact on how you perceived events as they happened, had

24   no impact on it?  No matter how high you were, no matter what

25   drug you were doing, no matter how drunk you were, it had no

E8inchr1                         Mallory - recross

1   impact on how you perceived an event occurring, that's what you

2   are saying?

3   A.  I never said that.

4   Q.  So it did have an impact, right?

5   A.  It can have an effect on me.

6   Q.  It can, yeah.  It can have an impact on how you remember it

7   a day later, a week later, five years later, right?

8   A.  Yes.

9   Q.  In fact, you don't even know from that period of time,

10  because of your drug use, because of your alcohol use, you

11  really don't know one day from another, right?

12  A.  No.

13            MR. DRATEL:  Nothing further, your Honor.  Thank you.

14            THE COURT:  Anything further?

15            MR. GOLTZER:  Yes.

16            THE COURT:  Mr. Goltzer.

17  CROSS EXAMINATION

18  BY MR. GOLTZER:

19  Q.  Good morning.  On Thursday, in response to some questions

20  by the government, you said that you only said that some

21  picture looked like somebody, right?

22  A.  Yes, sir.

23  Q.  You were denying that you had ever identified somebody by

24  looking at a video, is that correct?

25  A.  I don't understand what you mean.

E8inchr1                     Mallory - cross

1    Q.  I showed you a picture where you wrote the name Bow Wow.

2    Do you remember that?

3    A.  I remember that, yes.

4    Q.  And it didn't say where you wrote, "It looks like Bow Wow,"

5    it said, "Bow Wow," right?

6    A.  Yes.

7    Q.  That was at 25 minutes and 6 seconds into the pole camera

8    video, OK?  That's what it said on the exhibit, all right?

9    A.  Yeah.

10   Q.  So you know the difference between saying it is somebody

11   and it looks like somebody, right?

12   A.  Yes.

13   Q.  When you looked in the book and looked at the pictures of

14   Bash or Gucci or L-1, you said to the government, "That's

15   Bash," right?

16   A.  Yes, sir.

17   Q.  You were identifying Bash, is that correct?

18   A.  Yes, sir.

19   Q.  And the reason you said you said it looked like Bow Wow and

20   you couldn't identify Bow Wow is you didn't see his face,

21   right?

22   A.  No.

23   Q.  You didn't see his face?

24   A.  No, I didn't see his face.

25   Q.  Do you recall being interviewed on January 27, 2012, by a

1   detective named Bunt?

2   A.  Can you repeat that again.

3   Q.  Do you remember a detective named Bunt?

4   A.  Yes, sir.

5   Q.  He was the detective who showed you the video on the pole

6   camera, is that correct?

7   A.  I'm not sure which one.  It was one of the detectives.

8   Q.  It was not long after you got arrested in January of 2012

9   you were shown the video, is that right?

10  A.  Yes, sir.

11  Q.  And didn't you tell Detective Bunt, That's Bow Wow because

12  I can see his face, with light skin, he turned his face to the

13  camera?  Do you remember saying that?

14  A.  I don't remember.

15          MR. GOLTZER:  May I approach the witness?

16          THE COURT:  You may.

17  Q.  Referring to 3502-6.  Please take a look at this document

18  and I'm pointing to some yellow underlining.  Please read that

19  to yourself and let me know when you're finished.

20          Have you read that to yourself?

21  A.  Yes, sir.

22  Q.  Does it now refresh your recollection that on that date of

23  that interview, you told the detective, I see his face?

24  A.  I don't remember that.

25  Q.  Do you deny it?

1   A.  I'm not denying it.  I just don't remember that.

2   Q.  Do you deny saying to the detective when you wrote the word

3   Bow Wow, "That's Bow Wow" as an identification?

4   A.  I remember saying that.

5   Q.  You said it was Bow Wow?

6   A.  That it looks like him, yes.

7   Q.  No, no, did you say "it is" or "it looks like"?

8   A.  It looks like him.

9   Q.  Can you think of any reason why a detective would say

10  "identifies"?

11  A.  I don't know.

12  Q.  Do you think he got it wrong?

13          MR. BAUER:  Objection, your Honor.

14          THE COURT:  Sustained.

15          MR. GOLTZER:  May I have the document back.

16  Q.  Is it your testimony today that the reason you only said

17  "looked liked" is that if you said "that's him" it would have

18  been a lie?

19  A.  No, that's not true.

20  Q.  Would you have been lying if you said, "I recognize him" as

21  opposed to "look like him"?

22  A.  I don't understand that question.

23  Q.  Would it have been a false identification if you said,

24  "That's definitely Bow Wow?"

25  A.  It could have been, yes.

E8inchr1                    Mallory - cross

1   Q.  Would it have been a lie if you said, "That's definitely

2   Bow Wow"?

3   A.  Yes.

4   Q.  Would it have been a lie if you said, "I'm identifying Bow

5   Wow"?

6   A.  No.

7            MR. GOLTZER:  Nothing further.

8            MR. STRAZZA:  I have no questions.

9            THE COURT:  Very well.

10            MR. BAUER:  One very quick re-redirect, your Honor.

11   REDIRECT EXAMINATION

12   BY MR. BAUER:

13   Q.  Mr. Mallory, Mr. Dratel was asking you about the time that

14   you had said that you told the government that it was a text

15   message, not a call that you received from L-1?

16   A.  Yes, sir.

17            MR. GREENFIELD:  Your Honor, I didn't say a word.  You

18   said Mr. Greenfield.

19            THE COURT:  He said Mr. Dratel.

20            MR. GREENFIELD:  Sorry.  Mistaken identity.

21            THE COURT:  The objection is overruled.

22   Q.  That was in June of this past year.  Do you remember that?

23   A.  Repeat that again, sir.

24   Q.  That was in June of this year that you said it was a text,

25   not a call?

1    A.   Yes.

2    Q.   Prior to June 2014 you said it was a call, though, right?

3    A.   Yes.

4    Q.   You were trying to explain what happened when Mr. Dratel

5    cut you off, so I want to let you explain what you meant when

6    you said you got the phones confused?  Or, I'm sorry your words

7    were you got the phone mixed up.  What do you mean?

8    A.   There were two phones that were available to me from

9    Geneva, L-1's girl.  There's the BlackBerry, the T Mobile phone

10   that I could only text on that, that I usually had, because I

11   would go on the Internet.  There was a black Verizon phone that

12   I used, the flip.  I could receive phone calls and text

13   messages on it.

14   Q.   When you said --

15            MR. BAUER:  You know what, I'm done.  No further

16   re-redirect.

17            THE COURT:  Anything further?

18            MR. DRATEL:  Nothing, your Honor.  No.  Thank you.

19            THE COURT:  Mr. Mallory, you may step down.

20            (Witness excused)

21            THE COURT:  Would the government please call its next

22   witness.

23            MR. DRATEL:  Your Honor, may I retrieve some stuff?

24            THE COURT:  Certainly.

25            MR. DRATEL:  Thank you.

1          MR. NAWADAY:  The government calls Tarrence Smith.

2     TARRENCE SMITH,

3          called as a witness by the Government,

4          having been duly sworn, testified as follows:

5          THE COURT:  Mr. Smith, please be seated.  Bring your

6     seat forward.  I want you to speak directly into the

7     microphone.  I want you to keep your voice up when you answer

8     the questions and please begin by stating your full name and

9     spelling your first and last name for the record.

10         THE WITNESS:  Tarrence Smith, T-a-r-r-e-n-c-e

11    S-m-i-t-h.

12         THE COURT:  Thank you.  Mr. Nawaday.

13    DIRECT EXAMINATION

14    BY MR. NAWADAY:

15    Q.  What state do you live in?

16    A.  Pennsylvania.

17         THE COURT:  Do you want to bring the microphone closer

18    to you.  You can move the microphone.

19    Q.  Say that again.  What state do you currently live in?

20    A.  Pennsylvania.

21    Q.  What do you currently do for a living?

22    A.  Flip pancakes.

23    Q.  You are a cook?

24    A.  Yes.

25    Q.  About how long have you been living in Pennsylvania?

E8inchr1                              T. Smith - direct

1   A.  Since May of this year.

2   Q.  Before then, what town and state did you live in?

3   A.  Newburgh, New York.

4   Q.  About how long had you lived at that point in Newburgh

5   before moving to Pennsylvania?

6   A.  All my life, 38 years, 39 years.

7           THE COURT:  I'm sorry.  What was that last part?

8           THE WITNESS:  38, 39 years, all my life.

9           THE COURT:  Please keep your voice up, OK?

10  Q.  Were you subpoenaed to testify today?

11  A.  Yes.

12  Q.  Have you previously indicated that if asked certain

13  questions on the stand today you would assert your Fifth

14  Amendment rights against self-incrimination?

15  A.  Yes.

16  Q.  Do you understand that if the government asked the judge to

17  give you immunity you would have to answer questions about your

18  conduct and you have to answer those questions truthfully?

19  A.  Yes.

20  Q.  Are you currently testifying under a court-ordered grant of

21  immunity?

22  A.  Yes.

23  Q.  What do you understand that order protects you from?

24  A.  Whatever I say won't be used against me.

25  Q.  Does that order protect you from being prosecuted for lying

E8inchr1                          T. Smith - direct

1    today?

2    A.   No.

3    Q.   Back in 2010, where were you living?

4    A.   54 Chambers Street.

5    Q.   In Newburgh, New York?

6    A.   Yes.

7    Q.   Back then what were you doing for money?

8    A.   Selling drugs.

9    Q.   What drugs were you selling in 2010?

10   A.   Crack cocaine.

11   Q.   Where were you selling those drugs?

12   A.   At 54 Chambers Street.

13   Q.   About how much crack per week were you selling from 54

14   Chambers Street?

15   A.   At least about three ounces.

16   Q.   Were you the only one selling drugs out of 54 Chambers

17   Street in 2010?

18   A.   No.

19   Q.   Who else was selling out of that address back then?

20   A.   Akinto Boone, Tyrell Cobbs, and Mike Boone.

21           THE COURT:  Mr. Smith, when you said three ounces, was

22   that three ounces a month?  Three ounces a week?  Three ounces

23   a day?

24           THE WITNESS:  Three ounces a week.

25   Q.   Can you describe the building at 54 Chambers?

E8inchr1                          T. Smith - direct

1   A.  It is a rooming house.

2   Q.  How many floors is it about?

3   A.  Three.

4   Q.  What floor did you live on?

5   A.  The first.

6   Q.  And was it an apartment?

7   A.  It was a room.

8   Q.  How many rooms on the first floor?

9   A.  Three.

10  Q.  Are you talking bedrooms or all the rooms?

11  A.  Three bedrooms.

12  Q.  In 2010, were you living there alone or with others?

13  A.  With one other guy.

14  Q.  Who was the other person who was living there at that time?

15  A.  This guy named Matos.

16  Q.  What was his name again?

17  A.  Matos.

18  Q.  Can you spell that?

19  A.  M-a-t-o-s.

20  Q.  Let me show you what's already in evidence as Government

21  Exhibit 44A.  It should come up on your screen, Mr. Smith.  Do

22  you recognize that?

23  A.  Yes.

24  Q.  Is that a diagram of the first floor of 54 Chambers?

25  A.  Yes.

E8inchr1                              T. Smith - direct

1   Q.  Can you just point out which room was your room in December

2   of 2010?  Which room was your room on that diagram?  Can you

3   describe it in words, which room you are looking at?

4   A.  The back room next to the kitchen.

5   Q.  And you mentioned another person lived there at the time

6   named Matos?

7   A.  Yes.

8   Q.  And which room was his room?

9   A.  The middle room.

10  Q.  The one where there's a bed inside of it?

11  A.  Yes.  Next to the dining room, living room -- yeah, next to

12  the dining room.

13  Q.  You said there was a third bedroom.  Where is the third

14  bedroom?

15  A.  The front room.

16  Q.  Where is that on the diagram?  Can you use words to

17  describe what you are looking at.

18  A.  Front, next to the door.

19  Q.  To the left of the door?

20  A.  Yes.

21  Q.  The front door?

22  A.  Yes.

23  Q.  Did anyone live in that room in December 2010?

24  A.  No.

25  Q.  I'm going to show you what's already in evidence Government

E8inchr1                          T. Smith - direct

1   Exhibit 95A.

2               Is that 54 Chambers Street?

3   A.  Yes.

4               MR. NAWADAY:  Then, Ms. McInerney, if you can please

5   pull up Government Exhibit 95B.

6   Q.  Mr. Smith, what are we looking at here?

7   A.  The front entrance.

8   Q.  And the door that swung open, which door is that?

9   A.  That's the front door.

10  Q.  This little foyer area, about how big was that area?

11  A.  Seven to eight feet.

12  Q.  Is that seven by eight feet?

13  A.  Seven to eight feet long.

14  Q.  And about how wide?

15  A.  About four feet wide.

16              MR. NAWADAY:  Ms. McInerney, if you can please pull up

17  Government Exhibit 95C.

18  Q.  What are we looking at here, Mr. Smith?

19  A.  Narrow hallway.

20  Q.  There is a door here.  Is that the front or another door?

21  A.  That's the second door.

22  Q.  What's directly behind you if you're facing the way that

23  the photographer is facing in this photo?

24  A.  The front door.

25  Q.  Am I right that you would be standing in the foyer area?

E8inchr1                              T. Smith - direct

1    A.   In the foyer, yes.

2            MR. NAWADAY:   Ms. McInerney, if we can please put up

3    Government Exhibit 95G.

4    Q.   What are we looking at here?

5    A.   That's the kitchen area.

6    Q.   There's a door to the left.  Do you know where that door

7    leads?

8    A.   That's my room.

9    Q.   What is straight back?

10   A.   The bathroom.

11           MR. NAWADAY:   Ms. McInerney, if you can please pull up

12   95K.

13   Q.   Which way are we looking in this photograph?

14   A.   Towards the front door.

15   Q.   Which way is your bedroom?

16   A.   To the right.

17           MR. NAWADAY:   Then, Ms. McInerney, if we can scroll

18   through Government Exhibits 95L and M.

19   Q.   Do you recognize those, Mr. Smith?

20   A.   Yes.  That's my room.

21   Q.   That was your bedroom?

22   A.   Yes.

23   Q.   Do you know who Jeffrey Henry is?

24   A.   Yes.

25   Q.   How do you know him?

E8inchr1                          T. Smith - direct

1  A.  I have been knowing Jeffrey for 20 years.

2          THE COURT:  What was the first part of that?

3          THE WITNESS:  I've known Jeffrey Henry for 20 years.

4  Q.  I am going to show you what's already in evidence as

5  Government Exhibits 215 and 221.

6          Do you know who that is?

7  A.  Me.

8  Q.  And 221?

9  A.  Jeffrey Henry.

10  Q.  Did you know Mr. Henry by any other names?

11  A.  Joker.

12  Q.  Do you know how Mr. Henry made money in 2010?

13  A.  Selling drugs.

14  Q.  What drugs did he sell?

15  A.  Crack cocaine.

16  Q.  Did he ever come visit 54 Chambers in 2010?

17  A.  Yes.

18  Q.  And about how often in 2010?

19  A.  Three times a week.

20  Q.  What did he do when he came to visit, typically?

21  A.  Hang out, sell some drugs.

22  Q.  Do you know if he worked with anyone who was living at 54

23  Chambers?

24  A.  Matos.

25  Q.  The other man who lived there?

E8inchr1                              T. Smith - direct

1   A.  Yes.

2   Q.  I want to direct your attention to December 15, 2010.

3           Did there come a time that day when you were the

4   victim of a robbery?

5   A.  Yes.

6   Q.  Please tell the jurors what happened.

7   A.  As I exited my room, I walked into a guy pointing a gun at

8   my face.

9   Q.  What happened when this person pointed a gun at your face?

10  A.  He told me to go back into my room.

11  Q.  Who else was in the apartment at that point?

12  A.  Nardy Brown, Damon, Jerome, Tyrell, Mike Boone, that's it.

13  Q.  Was Akinto there?

14  A.  Yes, Akinto.

15  Q.  These are people who were not robbers, right?

16  A.  No.

17  Q.  How many robbers were there?

18  A.  Five.

19  Q.  Do you remember how they were dressed?

20  A.  All black.

21  Q.  What kinds of clothes?

22  A.  Hoodies, pants.

23  Q.  Did they have anything on their faces?

24  A.  Masks.

25  Q.  Do you remember what the robbers said, if anything, when

1   you first saw them?

2   A.  Told me to get back in the room and get on the floor.

3   Q.  Do you know what they were looking for?

4   A.  Drugs, money, jewelry.

5   Q.  After they said to get on the floor, did they say anything

6   else?

7   A.  Yes, give me everything you got.

8   Q.  What did you do after you were told to get on the floor?

9   A.  I handed them my wallet.

10  Q.  What happened next?

11  A.  They took Akinto Boone into the bathroom and then I heard

12  somebody call police from the door area and they started

13  running back out.

14  Q.  Who started running back out?

15  A.  The robbers.

16  Q.  Where were you when you heard someone yell police?

17  A.  I was on the floor by the door area in my room.

18  Q.  Which area?

19  A.  My room door area.

20  Q.  Who was in your room at that time?

21  A.  Mike Boone, Damon, Nardy, Tyrell.

22  Q.  What happened after you heard someone shout police?

23  A.  They all started running back towards the door.

24  Q.  Who started running towards the door?

25  A.  All the robbers.

E8inchr1                              T. Smith - direct

1   Q.   What happened next?

2   A.   Akinto Boone came out the bathroom struggling with the gun

3   with one of the robbers.

4   Q.   Then what happened?

5   A.   Then I got up and grabbed one of the robbers and I stabbed

6   him.

7            MR. GREENFIELD:   Can that be repeated.

8   A.   I got up, grabbed one of the robbers, and I stabbed him.

9   Q.   Do you know what happened to Akinto?

10  A.   He took the gun from the robber.

11  Q.   What happened after that?

12  A.   I was wrestling with the robber towards the door, and then

13  when we got to the door I realized they was still standing by

14  the door, all the robbers.

15  Q.   By which door were they all still standing?

16  A.   The front door.

17  Q.   What happened when you saw that?

18  A.   That's when one of the robbers shot me.

19  Q.   Where did you get shot?

20  A.   In my upper left thigh.

21  Q.   What did you do after you got shot?

22  A.   Huh?

23  Q.   What did you do after you got shot?

24  A.   I buckled and I crawled back to my bedroom.

25  Q.   At any point did you hear any other gunfire besides the

1   shot that shot you?

2   A.   Yes.

3   Q.   Who was shooting?

4   A.   Akinto Boone and the robbers.

5   Q.   Which way was Akinto shooting?

6   A.   Towards the door.

7   Q.   Which way was the robber shooting?

8   A.   Towards the bathroom.

9   Q.   Do you know why the robbers were stuck at the door?

10         MR. BUCHWALD:   Objection.   Assumes a fact.

11         THE COURT:   Sustained.

12   Q.   What were the robbers doing at the front door, to the

13   extent you know?

14   A.   They was tugging on the doorknob.

15   Q.   Can you say that again?

16   A.   Tugging on the doorknob.

17   Q.   They were tugging on the doorknob?

18   A.   Yes.

19   Q.   What happened next?

20   A.   That's when I got shot and I crawled back to my room.

21   Q.   What happened after you crawled back into your room?

22   A.   I start hearing gunfire.

23   Q.   Then what happened?

24   A.   Akinto Boone knocked on the door and told us that the

25   robbers was gone.

E8inchr1                              T. Smith - direct

1   Q.   What did you do?

2   A.   I was escorted to my car because I couldn't walk and I was

3   taken to the hospital.

4   Q.   How did you get to the hospital?

5   A.   In my car.

6   Q.   How long were you in the hospital?

7   A.   Three days.

8   Q.   Was the bullet ever removed?

9   A.   No.

10  Q.   Was Jeffrey Henry at the apartment earlier in the night?

11  A.   Yes.

12  Q.   At some point did he leave?

13  A.   Yes.

14  Q.   Do you know if he was planning to come back?

15  A.   Yes.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

E8i9chr2                       T. Smith - direct

1    Q.  Mr. Smith, when Akinto Boone was struggling with a robber

2    over a gun.  Do you remember you said that?

3    A.  Yes.

4    Q.  Where were the other robbers?

5    A.  Running towards the door.  Front door.

6    Q.  From where?

7    A.  Out of the room.

8    Q.  Which room?

9    A.  My room.

10   Q.  Were there any robbers in the kitchen?  As far as you

11   remember?

12   A.  Yes.

13          MR. NAWADAY:  No further questions.

14          THE COURT:  Cross-examination.  Mr. Greenfield.

15          MR. GREENFIELD:  Thank you.

16   CROSS-EXAMINATION

17   BY MR. GREENFIELD:

18   Q.  Good morning, Mr. Smith.

19   A.  Good morning.

20   Q.  After this incident occurred, you testified at a grand jury

21   about three months later.  Do you recall that?

22   A.  Yes.

23   Q.  And you were asked a series of questions about what

24   happened on December -- late hours of either December 14 or the

25   early morning hours of December 15 at 54 Chambers Street; is

E8i9chr2                        T. Smith - cross

1    that right?

2    A.  Say that again.

3    Q.  Sure.  When you went to the grand jury about three months

4    after the incident occurred you were asked a lot of questions

5    about the incident itself.

6    A.  Yes.

7    Q.  And that incident occurred about -- right around midnight

8    or a couple minutes before or a couple minutes after; is that

9    right?

10   A.  Yes.

11   Q.  That's what I meant by my first question.

12   A.  All right.

13   Q.  I'd like to, if you can, go through what happens when

14   Akinto last name Boone; am I right?

15   A.  Yes.

16   Q.  When Akinto Boone exits the bathroom he's fighting or

17   wrestling with somebody; is that right?

18   A.  Yes.

19   Q.  Is that person wearing a mask, if you recall?

20   A.  I don't recall.

21   Q.  What's that?

22   A.  I don't recall.

23   Q.  Did -- were they fighting over something?  Were they

24   struggling over something?

25   A.  (No response).

E8i9chr2                          T. Smith - cross

1   Q.  If you recall?

2   A.  Were they struggling over something?

3   Q.  Were they fighting over a gun?  To gain possession of a

4   gun?

5   A.  Yes.

6   Q.  And how far from you and this individual who were fighting

7   for the -- withdrawn.

8           How far away from you was Akinto and this individual

9   he was fighting with when you stabbed that person?

10  A.  How far?

11  Q.  Were you right up next to him when you stabbed him?

12  A.  Up next to who?

13  Q.  The person you stabbed.

14  A.  I didn't stab him from laying down on the floor.

15  Q.  I'm sorry.  I didn't --

16  A.  I didn't stab him from laying down on the floor.  Of course

17  I was up on him when I stabbed him.  That's what you talking

18  about?  What you talking about?

19  Q.  Did you stab anybody that night?

20  A.  Yes.

21  Q.  Who did you stab?

22  A.  I don't know.

23  Q.  Was that the person who was wrestling with -- withdrawn.

24          The person you stabbed is the person who was wrestling

25  with Akinto; isn't that right?

E8i9chr2                          T. Smith - cross

1    A.  I don't know.

2    Q.  You did testify in the grand jury, didn't you?

3    A.  (No response).

4    Q.  On April -- withdrawn March 8, 2011?

5    A.  Yes.

6    Q.  Did you tell the grand jury on March 8, 2011 that you

7    stabbed the gunman?

8    A.  That what it says on the paper?

9    Q.  Say that again.

10   A.  Is that what it says on that paper?

11   Q.  I will show it to you.

12   A.  Then that's what it says then.  That was what, four years

13   ago.

14   Q.  Do you remember now, as you sit on the stand, that you

15   stabbed the guy with the gun?

16   A.  If it says on the paper what I did, that's what I did.

17   Q.  Show you what has been previously marked as 3506-10 and

18   direct your attention -- respectfully direct your attention to

19   lines 15 through 20.  And ask you to read it.  To yourself.

20            (Pause)

21   A.  Okay.

22   Q.  Does it refresh your recollection as to whether or not you

23   stabbed the guy with the gun?

24   A.  I stabbed the guy with the gun.

25   Q.  You did?

1    A.  Yes.

2    Q.  Yes?

3    A.  Yes.

4         We all had guns.  Hard to pick one, was it?

5    Q.  But the guy you stabbed, Mr. Smith, was the one who was

6    wrestling with Akinto; isn't that right?

7    A.  Yes.

8    Q.  Now you told this jury that there were five individuals who

9    came in with guns, do you recall that, justify a few moments

10   ago?

11   A.  Yes.

12   Q.  Isn't it a fact you told the grand jury back in March of

13   2011 that there were four men who came in with guns?

14   A.  I don't remember.

15   Q.  Isn't it a fact you told the grand jury -- withdrawn.

16        Isn't it a fact a grand juror asked you if you -- how

17   many people came in with guns and you said four?

18   A.  I don't remember.

19   Q.  I show you 3506-10, page 23, lines 6 through 12.  Read this

20   and see if it refreshes your recollection, Mr. Smith.

21        (Pause)

22        Does it refresh your recollection as to what you told

23   the grand jury back in March of 2011?

24   A.  That's what it says, yes.

25   Q.  Well, did you or did you not say that?

E8i9chr2                          T. Smith - cross

1   A.  Yes.

2   Q.  Four men with guns, not five?

3   A.  Four or five.

4   Q.  You didn't say four or five?  You said four?

5   A.  Well they should have put four or five on there.

6   Q.  Did you say four back in March?

7   A.  Yes.

8   Q.  Three months after this happened?

9   A.  Yes.

10  Q.  Do you recall as you sit on the stand now if all the men

11  who came in, the four men who came in, were armed and masked?

12  A.  Yes.

13  Q.  Everybody had a mask on?

14  A.  Yes.

15  Q.  A few moments ago you were unable to recall whether the man

16  who was wrestling with Akinto Boone had a mask on.  Do you

17  recall now that he did have a mask on?

18  A.  You said after he came out the bathroom.  That's what you

19  said.

20  Q.  I'm sorry?

21  A.  When he came in he had on -- you said after he came out the

22  bathroom did he have a mask on.  I said I don't know.

23  Q.  And you're saying when he came out of the bathroom he

24  didn't have a mask on?

25  A.  I said I don't know if he had one on.

E8i9chr2                          T. Smith - cross

1   Q.  Okay.  Now, incidentally, did you have any monies in the

2   house, in that apartment on December 15, 2010?

3   A.  Yes.

4   Q.  Approximately how much did you have?

5   A.  Approximately?

6   Q.  Approximately.

7   A.  Over four thousand, a little over four thousand.

8   Q.  And this is a drug establishment?

9   A.  Drug establishment?

10  Q.  Drug spot.

11  A.  No.

12  Q.  It was not?  It was a residence?

13  A.  Yes.

14  Q.  And didn't you say earlier that you were selling drugs out

15  of that apartment?

16  A.  No.  I was selling drugs to get buy.  I was -- it wasn't a

17  drug spot.  I lived there.

18  Q.  Were other people selling drugs in that apartment?

19  A.  Yeah.

20  Q.  And you named a bunch of people before who were selling

21  drugs in the apartment, didn't you?

22  A.  I named two other people.

23  Q.  Say that again.

24  A.  I named two other people.

25  Q.  Anybody else besides those two other people selling drugs

E8i9chr2                            T. Smith - cross

1   in the apartment?

2   A.  No.

3   Q.  But you had over $4,000 in the apartment?

4   A.  Yes.

5   Q.  And did you ever see that money again?

6   A.  Yes.

7   Q.  Under what circumstances?

8   A.  Police confiscated it and gave it back to me.

9   Q.  Drug proceeds were confiscated and they were given back to

10  you?

11  A.  Yes.

12  Q.  Who gave you the drug money back?

13  A.  Police.

14  Q.  Police.  When did they give you that money back?

15  A.  After I got out of the hospital.

16  Q.  What's that?

17  A.  After I got out of the hospital.

18          THE COURT:  After he got out of the hospital.

19  Q.  Did the police visit you in the hospital?

20  A.  (No response).

21  Q.  And talk with you?

22  A.  When I first got there?

23  Q.  Yeah.  When it first happened or maybe the next day, yes.

24  A.  Yes.  They came in when it first happened.

25  Q.  They knew you were a drug dealer back then, right, the

E8i9chr2                          T. Smith - cross

1   first minute you got into conversation with them?

2   A.   I don't know that.

3   Q.   You don't?

4   A.   Nope.

5   Q.   Did you have drug paraphernalia in the apartment that day

6   when this incident occurred?

7           You know what I'm talking about, scales, things like

8   that?

9   A.   No.

10  Q.   You didn't?

11  A.   No.

12  Q.   And are you saying as you sit on the stand now that between

13  you and the police it was never discussed that you were selling

14  drugs out of the apartment prior to the fact that they gave you

15  back over $4,000?

16  A.   Between me and the police?

17  Q.   You and the police, yes.

18  A.   When?  When?  That night?

19  Q.   Not that night.  Somewhere before the time they gave you

20  the money back?

21  A.   I don't recall.

22          MR. GREENFIELD:  Now, your Honor, if I can ask the

23  witness to step down.  I just want to show him the chart.

24          THE COURT:  Do you want to bring the chart over?

25          MR. GREENFIELD:  Yes.

E8i9chr2                          T. Smith - cross

1          Your Honor, I'd like to show Defendant Christian's

2     Exhibit A.

3          THE COURT:  Do you want him to step down?

4          MR. GREENFIELD:  Yes.

5          THE COURT:  Mr. Smith, you may step down.

6     Q.  Mr. Smith, could you show me on this diagram -- do you

7     recognize this diagram as being a diagram of the apartment at

8     54 Chambers Street?

9     A.  Yes.

10    Q.  Could you show me on this diagram where your bedroom was by

11    putting the letter S1 next to it.  And I'm giving you a red

12    marker.

13    A.  S1?

14    Q.  Letter S-1.

15         This being the entrance.  This being the bathroom.

16    A.  It's not the setup.

17    Q.  It's not the setup?

18    A.  No.  Because it's way over there should be lined up with

19    those rooms.

20    Q.  Well if I tell you this was drawn by Detective Frederick.

21    A.  I'm not Frederick.

22    Q.  You're not Frederick.  Where would your bedroom be.  Just

23    put an S1 where it would be.

24    A.  It would be in the back.  In the back by the bathroom.

25    Q.  Please put the S1 there.

E8i9chr2                              T. Smith - cross

1   A.  I'm saying this is not the setup.  You want me to do

2   something that's not the setup.  What do you want me to do?

3   Q.  You're saying this is an inaccurate diagram of the

4   apartment?

5   A.  That's not the setup.  You said that.

6   Q.  Is this an accurate diagram of the apartment?

7   A.  You asked me that question before.  You keep asking me the

8   same question.

9           MR. BUCHWALD:  Ask the witness to keep his voice up.

10          THE COURT:  Yes, please, Mr. Smith.

11          THE WITNESS:  The lineup is not right.

12  Q.  So it's inaccurate?

13  A.  The bedroom is not right.

14  Q.  You're saying this is not accurate.  Is that what you're

15  saying?

16  A.  Yes.

17  Q.  I show you now what's -- I ask be marked as the next letter

18  in our exhibit list which would be H, I believe?

19          THE COURT:  H?

20          MR. GREENFIELD:  I believe so.

21          MR. NAWADAY:  No objection.

22          I think this is already in evidence as a government

23  exhibit as well.

24          MR. GREENFIELD:  What would be it be -- whatever

25  number is that's in evidence.

1        THE COURT:  Is this chart in evidence?

2        MR. NAWADAY:  It is, your Honor.

3        THE COURT:  And what's the exhibit number?

4        MR. NAWADAY:  Government Exhibit 259.

5        THE COURT:  Government Exhibit 259.  Okay.

6  Q.  Sir, I'd ask you to look at this diagram and tell me if it

7  is an accurate diagram of your apartment at 54 Chambers Street

8  as it looked on December 15, 2010.

9  A.  Yeah.

10  Q.  Writing the letters S1, could you indicate where your

11  bedroom was -- where you were when these armed -- these four

12  armed masked men came into the apartment.

13  A.  You mean where I was?

14  Q.  Where you were standing.

15  A.  When I encountered them?  Is that what you mean?

16  Q.  When you first were aware of their presence in the

17  apartment that day.

18  A.  S1?

19  Q.  Yes.

20  A.  When I first encountered them.

21  Q.  And could you put an S2 as to where you first saw Akinto

22  Boone wrestling with the individual.

23  A.  S2 you said?

24  Q.  Yes, sir.

25        (Witness complies)

E8i9chr2                            T. Smith - cross

1   Q.  And could you put an S3 where you stabbed the guy with the

2   gun who was wrestling with Akinto.

3               (Witness complies)

4   Q.  So would it be fair to say -- and correct me if I'm

5   wrong -- that S1, S2, and S3 all were within a few feet of each

6   other when this whole incident occurred with the stabbing --

7   when you were stabbing the individual two times?

8   A.  Yes.

9   Q.  Was that a "yes"?

10  A.  Yes.

11              MR. GREENFIELD:  Please take the stand again.

12  Q.  Now, sometime specifically on March 5 of this year you were

13  interviewed with respect to the incident again by an FBI agent.

14  Do you remember that?

15  A.  Yes.

16  Q.  And you were asked to go through the incident and he was

17  taking notes as you were talking?

18  A.  Yes.

19  Q.  And did you tell him that the guy who was stabbed was the

20  guy who lost the gun to Akinto?

21  A.  I don't recall.

22  Q.  I'm going to show you 3506-16.  Ask you to read the

23  second -- the second and third full paragraphs on page two.

24  And I'll indicate where they are.

25              This paragraph and this paragraph.

E8i9chr2                              T. Smith - cross

1                (Pause)

2                THE COURT:  Okay.  Mr. Greenfield, he's done.

3      Q.  Did you read those two paragraphs?

4      A.  You want me to read both of them?

5      Q.  Did you finish reading them?

6      A.  Yes.

7      Q.  Does it refresh your recollection as to whether or not you

8      told the FBI agent on March 5, 2014 that Akinto -- you stabbed

9      the guy with the gun who was wrestling with Akinto?

10     A.  Didn't you just ask that question.  Isn't that the same

11     question you asked before?

12               MR. GREENFIELD:  Judge, I can't hear him.

13               THE COURT:  It's a slightly different question,

14     Mr. Smith.  The question now is having read those two

15     paragraphs, does reading those two paragraphs refresh your

16     recollection as to what you told the FBI agent at that time?

17               THE WITNESS:  No.

18               THE COURT:  Next question.

19     BY MR. GREENFIELD:

20     Q.  Did you tell the FBI agent:  Akinto had the handgun, that

21     he was wrestling it away from the unknown male who was stabbed

22     by you?

23               Did you tell that to the FBI agent or not?

24               MR. NAWADAY:  Objection.  Asked and answered.

25               THE COURT:  Overruled.

E8i9chr2                          T. Smith - cross

1              THE WITNESS:  I don't recall.

2              MR. GREENFIELD:  No further questions.

3              THE COURT:  Very well.

4              Any recross?

5              MR. GOLTZER:  No, thank you.

6              THE COURT:  Mr. Buchwald.

7    CROSS-EXAMINATION

8    BY MR. BUCHWALD:

9    Q.  Good morning, Mr. Smith.

10   A.  Good morning.

11   Q.  You testified in response to Mr. Greenfield's questions

12   that you remember having testified in a grand jury, a New York

13   state grand jury a few months after the incident involving the

14   robbery at 54 Chambers?  Correct?

15   A.  (No response).

16   Q.  Do you remember just answering some question about

17   testifying in a grand jury a few months after the incident at

18   54 Chambers?

19   A.  Yes.

20   Q.  All right.  And at that time when you testified -- and that

21   was a grand jury up in Orange County, correct?

22   A.  Yes.

23   Q.  New York state grand jury, correct?

24   A.  (No response).

25   Q.  It wasn't a federal grand jury?  It was a state grand jury?

E8i9chr2                    Smith - recross

1    Correct?

2    A.   Yes.

3    Q.   And it was explained to you that when you testified in the

4    grand jury that you would automatically get transactional

5    immunity about anything that you testified about as long as

6    your answers were responsive to the questions; isn't that

7    right?

8              THE COURT:  Do you understand the question, Mr. Smith?

9              THE WITNESS:  Yes.  But I don't remember.

10   BY MR. BUCHWALD:

11   Q.   You understood that you couldn't get in trouble when you

12   testified in that grand jury you couldn't get in trouble about

13   having stabbed someone, correct?

14   A.   (No response).

15   Q.   Do you understand the question, sir?

16   A.   No.

17   Q.   When you testified in the grand jury, did you believe that

18   you could get in trouble for having stabbed someone?

19   A.   Yeah, I believe I could -- did I believe I could get in

20   trouble?

21   Q.   Did you understand that when you testified in the grand

22   jury you automatically got immunity for anything having to do

23   with the stabbing of somebody?

24   A.   (No response).

25   Q.   Did you understand that?

1    A.  I don't know what you're talking about.

2    Q.  When you testified in the grand jury in March of 2011 at

3    that time you remembered, did you not, that the person you

4    stabbed was the person who Akinto had wrestled the gun away

5    from; isn't that so?

6    A.  (No response).

7    Q.  You remembered it then three months after the offense;

8    isn't that so?

9    A.  You got transcripts over there too?

10   Q.  Same transcript.

11   A.  Then you already know what I said.

12   Q.  And you agree that that's what you said under oath in that

13   grand jury, correct?  You just read it, did you not?

14   A.  Yes.

15   Q.  And a few months ago in 2014 you were interviewed by an FBI

16   Agent Strobel.  Do you recall that?

17   A.  Yes.

18   Q.  And a few months ago in 2014 when you were interviewed by

19   FBI Agent Strobel you remembered then as well that the person

20   you stabbed was the person who Akinto had wrestled the gun away

21   from; isn't that so?

22   A.  Do you got another paper down there for I could see it?

23   Q.  Sure.  I direct your attention to 3506-16, page two, the

24   third sentence of the second full paragraph.

25           MR. BUCHWALD:  May I approach, your Honor?

1            THE COURT:  You may.

2    Q.  First let me show you the first page with the date.

3            MR. NAWADAY:  Objection, your Honor.  I think these

4    are the same questions that were asked.

5            MR. BUCHWALD:  Different interrogator.

6            THE COURT:  I haven't heard a question.

7    BY MR. BUCHWALD:

8    Q.  I'm going to show you the date, the name of the agent.  Now

9    I direct your attention to the third sentence of the second

10   full paragraph which I've underlined.  Read as much of it as

11   you want for the context.

12           (Pause)

13   Q.  Have you read it, sir?

14           MR. GOLTZER:  What page, Mr. Buchwald?

15           MR. BUCHWALD:  Page 2 of 3506-16, second full --

16   second full paragraph, third sentence.

17   Q.  Have you read that, sir?

18   A.  (No response).

19   Q.  Having seen that, does that refresh your recollection that

20   you remembered when you spoke to FBI Agent Strobel earlier this

21   year that the guy who you stabbed was the guy who lost his gun

22   to Akinto Boone?  Do you recall that now?

23   A.  Yes.

24   Q.  Okay.

25   A.  Yes.

1    Q.  What was it then between the interview that you gave just a

2    few months ago to Agent Strobel where you repeated what you had

3    said under oath in the grand jury in March of 2010, what is it

4    between then and now that caused you to forget that?

5    A.  I don't understand.

6    Q.  How many times between then and now have you been

7    interviewed by the prosecutors in this case?

8    A.  A few times.

9    Q.  Have you been interviewed since the opening statement that

10   I gave in this case?

11          Have you been interviewed by the prosecutors in this

12   case since the opening statement that I made in this case?

13          MR. NAWADAY:  Objection.  He has no knowledge of when

14   this is.

15          THE COURT:  Yes.  We can hear you just fine,

16   Mr. Buchwald.

17   BY MR. BUCHWALD:

18   Q.  Have you been interviewed since August 5 by the prosecutors

19   in this case?

20   A.  Since August 5?

21   Q.  Since August 5, roughly two weeks ago.

22   A.  This morning.

23   Q.  Interviewed this morning.  And before this morning, in the

24   last two weeks were you interviewed by the prosecutors or by

25   the federal agents in this case either on the telephone or in

1    person?

2    A.  I don't know.  I don't remember if it was two weeks, three

3    weeks, I don't know.

4    Q.  Now, about that gun which was wrestled away by Akinto from

5    the guy who you stabbed, do you recall what model or make of

6    gun that was?

7    A.  No.

8    Q.  Do you remember having been asked in the past about what

9    model or make of gun that was?

10   A.  Does it include color?

11   Q.  The color, or the model, or the kind of gun.  Do you

12   remember being asked in the past about that?

13   A.  I don't recall.

14   Q.  Do you remember being interviewed shortly after you got out

15   of the hospital by a Newburgh detective by the name of Cortez?

16   A.  Yes.

17   Q.  And do you recall that interview occurring on or about

18   December 20 of 2010, just shortly after you got out of the

19   hospital?

20   A.  Yes.

21   Q.  And do you remember telling Detective Cortez that the gun

22   was an automatic, black and dark gray, an automatic?

23   A.  No.

24   Q.  Let me show you what has previously been marked as 3506-9

25   for identification, and direct your attention to the page in

1    the report that's marked one of four.

2              MR. BUCHWALD:  May I approach, your Honor?

3              THE COURT:  You may.

4    Q.  And see if that refreshes your recollection.

5              (Pause)

6    Q.  Does it refresh your recollection, sir?

7    A.  No.

8    Q.  You had a better recollection of the type of gun back in --

9    on December 20, five days after the events than you do today?

10   A.  No.

11   Q.  You remember it as well today as you did then?

12   A.  No.

13   Q.  So you remembered it better then than now?

14   A.  No.

15   Q.  Is it not a fact, sir, that you told Detective Cortez that

16   the gun was dark black and dark gray and it was an automatic?

17   A.  I don't remember saying that.

18   Q.  Do you deny that you said that, sir?

19   A.  No, I do not -- I didn't say it -- I don't remember that it

20   was an automatic.  I know it was a gun.  I know it was pointing

21   in my face.  That's all I know.  I don't know it was automatic.

22   Q.  Do you remember telling Detective Cortez that it was an

23   automatic?

24   A.  No.  I don't remember telling him that it was an automatic.

25   Q.  You do know the difference between an automatic and a

1    revolver; isn't that right?

2    A.  Yes.

3    Q.  You know that an automatic -- you know, for example, that a

4    9-millimeter would be an automatic, correct?

5    A.  Yes.

6    Q.  Now, do you recall, sir, testifying in the grand jury about

7    Akinto Boone having fired that weapon that he wrestled away

8    from the guy who you stabbed?

9    A.  (No response).

10   Q.  Do you recall that?

11   A.  Yes.

12   Q.  And did he fire that weapon before or after you were shot?

13   A.  After.

14   Q.  And did you see the direction of where he was firing or who

15   he was firing at?

16   A.  Yes.

17   Q.  And what was the direction?  Who was he firing at?

18   A.  He was firing towards the door.

19   Q.  In the direction of the people in the front or the guy who

20   had shot you?  Correct?

21   A.  The robbers?

22   Q.  Yes.

23   A.  Yes.

24   Q.  So, if you were the front door and I was Akinto Boone, I

25   was firing in this direction toward you, the front door,

E8i9chr2                          Smith - recross

1    correct?

2    A.   Yes.  He was firing at the front door.  Or towards the

3    front door.  Or whatever you want to call it.

4    Q.   And he fired a couple of shots; isn't that right?

5    A.   Yes.

6    Q.   And when he was firing at the direction of the front door

7    was the inner door, the hallway door open or closed?

8    A.   (No response).

9    Q.   If you remember.

10   A.   He was exchanging gunfire so it had to be open.

11   Q.   So you weren't -- withdrawn.

12           When you left the house that night -- withdrawn.

13           After you were shot, you were taken to the hospital,

14   correct?

15   A.   Yes.

16   Q.   And when you left the house on the way to the hospital was

17   that the first time since the robbers had come in that you left

18   the house?

19   A.   Yes.

20   Q.   So, did you or did you not see Joker there when you were

21   leaving on the way to the hospital?

22   A.   No.

23   Q.   You did not see him, correct?

24   A.   No.

25   Q.   So, do you know if Joker was shot by the robbers or by two

1    9-millimeter bullets fired by Akinto toward the front door when

2    he was firing at the people or the person who had fired at you?

3    Do you know?

4    A.  No.

5    Q.  Now I think -- I'm not sure if you testified.  Am I

6    correct, sir, that you estimated that when the guy shot you in

7    the thigh that you were about eight to ten feet from him; is

8    that correct?

9    A.  I don't recall saying that.

10   Q.  Well about how far were you from the guy who shot you?

11   A.  The first door going out, outside.

12   Q.  Say that again.

13   A.  The first door going outside, towards going out the

14   apartment.

15   Q.  In other words, the door -- the outer door, the one that

16   leads onto the street, correct?

17   A.  No.

18   Q.  Which door are you talking about?

19   A.  You got a diagram, and I will show you.

20   Q.  You just referred to a door.  I want to know which door are

21   you talking about.  Are you talking about the door that goes

22   onto the street or the inner door?

23   A.  The inner door.

24   Q.  The inner door.  All right.  The person who shot you was

25   there?

1     A.  (No response).

2     Q.  Was standing by the inner door?

3     A.  No.  He was standing by the front door.

4     Q.  He was standing by the front door?

5     A.  Yes.

6     Q.  And where were you standing?

7     A.  By the inner door.

8     Q.  By the inner door.  All right.  So that was the approximate

9     distance?

10    A.  Yes.

11    Q.  The distance between the outer door and the inner door?

12    A.  Yes.

13    Q.  And that's -- when you got shot, you were somewhere near

14    the inner door?

15    A.  Yes.

16    Q.  Okay.  And that bullet was never removed from your leg,

17    correct?

18    A.  Yes.

19    Q.  In the hospital they determined that it would be best to

20    not remove the bullet because that could cause additional

21    injury and to just leave it there and put in the rods and

22    things that they needed to put in, correct?

23    A.  Yes.

24    Q.  And it's still there, correct?

25    A.  Yes.

E8i9chr2                         Smith - recross

1    Q.  Now, in the hospital you came to understand and to realize

2    that just a few bays or beds down from you was a stabbing

3    victim, correct?

4    A.  Yes.

5    Q.  And you told the police:  Hey, the stabbing victim might be

6    one of the robbers because you knew you had stabbed somebody,

7    correct?

8    A.  Yes.

9    Q.  And the stabbing victim's father was somebody by the name

10   of -- well do you remember the name of the stabbing victim's

11   father?

12   A.  Anthony Baynes.

13   Q.  Anthony Baynes, Sr.?

14   A.  Yes.

15   Q.  And Anthony Baynes, Sr. you recognized as a cousin of

16   yours; is that right?

17   A.  Yes.

18   Q.  Now, I think you testified that you were testifying here in

19   this trial under a grant of federal immunity; is that right?

20   A.  Yes.

21   Q.  When was it that you told the prosecutors that you were

22   going to plead the Fifth Amendment?

23   A.  When?

24   Q.  Yeah.  When did you tell them you were going to plead the

25   Fifth Amendment if you didn't get federal immunity?

E8i9chr2                          Smith - recross

1   A.  When did I tell them that?

2   Q.  Yeah.  Or did you tell them that?

3   A.  I don't recall telling them that.

4   Q.  Did you write them a letter saying I'm going to plead the

5   Fifth if I don't get federal immunity?

6   A.  No.

7   Q.  Well whose idea was it that you get immunity and that you

8   say that you were going to plead the Fifth?

9   A.  Well me and my wife talked about, it and we talked about

10  it.

11  Q.  "We" meaning you and the prosecutors talked about it?

12  A.  Yes.

13  Q.  And did they suggest to you that you plead the Fifth and

14  get immunity or did you suggest to them that you plead the

15  Fifth and get immunity?

16  A.  I don't recall.

17          THE COURT:  Mr. Buchwald, it's quarter after the hour

18  so why don't we break now, take our morning break.  Fifteen

19  minutes.  Please be in the jury room no later than 11:30.

20  Please do not discuss the case.

21          (Jury excused)

22          THE COURT:  Mr. Smith, you may step down but please

23  don't go far because we need you back on the witness stand at

24  11:30, okay?

25          THE WITNESS:  Yes.

1           (Recess)

2           THE COURT:  Have we located the witness?

3     TARRENCE SMITH, resumed.

4           (Jury present)

5           THE COURT:  Everyone please be seated.

6           Mr. Buchwald.

7           MR. BUCHWALD:  Thank you, your Honor.  I have no

8     further questions.

9           THE COURT:  Okay.  Any further cross-examination?

10          MS. STAFFORD:  No questions on behalf of Mr. Whitaker.

11          THE COURT:  Very well.

12          Any redirect?

13          MR. NAWADAY:  Just briefly, your Honor.

14    REDIRECT EXAMINATION

15    BY MR. NAWADAY:

16    Q.  Now, Mr. Smith, you were asked some questions about the

17    robbers who came to that apartment that night.  Do you remember

18    those questions?

19    A.  Yes.

20    Q.  When you saw that first robber who told you to get into

21    your room, get on the floor, where was Akinto at that point?

22    A.  Akinto was out towards the door.

23    Q.  And you were asked questions about -- by the way when you

24    went into that room, you had gone to the floor; is that right?

25    A.  Yes.

E8i9chr2                              T. Smith - redirect

1    Q.  Which way were you facing?

2    A.  (No response).

3    Q.  Where were you keeping your head?

4    A.  I was by my -- my bedroom door.

5    Q.  Could you see everybody in the apartment at that point?

6    A.  Yes.

7    Q.  Could you see people in the front of the apartment at that

8    point when you were on the floor?

9    A.  In the front --

10   Q.  Of the apartment?

11   A.  No.

12   Q.  And am I right that you don't know whether other robbers

13   came in after the first robbers you saw?

14   A.  After I first -- after the first robbers, no, I don't know

15   if anything more came in.

16           MR. NAWADAY:  No further questions.

17           THE COURT:  Anything further?

18           MR. BUCHWALD:  No.

19           THE COURT:  Mr. Greenfield?

20           MR. GREENFIELD:  No.

21           THE COURT:  Very well.  Sir, you may step down.

22           (Witness excused)

23           THE COURT:  Mr. Bauer.

24           MR. BAUER:  Your Honor, the government calls its next

25   witness, William Lahar.

 1                  THE COURT:  Mr. Lahar, please watch your step.  Step

 2     into the witness box and face the court deputy.

 3                  Remain standing.

 4                  Mr. Lahar, please be seated.  Pull your seat up.

 5     Speak directly into the microphone slowly and please begin by

 6     stating your full name and spelling your first and last name

 7     for the record.

 8        WILLIAM LAHAR,

 9             called as a witness by the Government,

10             having been duly sworn, testified as follows:

11                  THE COURT:  Thank you.

12                  Mr. Bauer.

13                  MR. BAUER:  Thank you, your Honor.

14     DIRECT EXAMINATION

15     BY MR. BAUER:

16     Q.  What do you do for a living?

17     A.  Police officer.

18     Q.  Where?

19     A.  City of Newburgh.

20     Q.  What's your rank with the City of Newburgh police

21     department?

22     A.  Police officer.

23     Q.  How long have you been there?

24     A.  Approximately twelve years.

25     Q.  What did you do before working at the Newburgh police

1    department?

2    A.  I went to college.

3    Q.  Are you assigned to a particular division or unit in the

4    Newburgh police department?

5    A.  Yes, sir, I am.

6    Q.  What is that?

7    A.  Currently it's the patrol division.

8    Q.  How long have you been in patrol?

9    A.  Twelve years.

10   Q.  Have you been -- during the twelve years have you been part

11   of any other units or divisions at the Newburgh PD?

12   A.  Yes, I have.

13   Q.  What's that?

14   A.  I've been assigned to the anticrime unit, the proactive

15   arrest team, member of the SWAT team, member of the sniper

16   team.

17   Q.  And to be clear back in 2010 and 2011 what unit or division

18   were you in?

19   A.  I was assigned to the anticrime unit, ACU.

20   Q.  What were your duties and responsibilities in that unit?

21   A.  It's a plainclothes unit.  You're focusing on

22   quality-of-life issues, open-air drug dealing, proactive-type

23   crime fighting.

24   Q.  I'm sorry.  What was the last part?

25   A.  Proactive-type crime fighting.

E8i9chr2                          W. Lahar – direct

1    Q.   Proactive as opposed to what?

2    A.   Reactive.

3    Q.   As part of the anticrime unit, were you assigned to a

4    particular part of the city?

5    A.   The whole entire city was ours.

6    Q.   Are you familiar with Zone B?

7    A.   Yes.

8    Q.   Of Newburgh?

9    A.   Yes, I am.

10   Q.   And what part of the city is that?

11   A.   That's the northeast side.

12   Q.   Was Chambers Street part of that?

13   A.   Yes, it is.

14   Q.   Back in 2010 and 2011 how often each day or each week would

15   you go to Zone B of this northeast part of the city?

16   A.   It was a good amount.  I can't put a specific number on how

17   many times we were on that street but we were pretty regular

18   there.

19   Q.   Would you go at least once a day?

20   A.   More than that.

21   Q.   During all your time in the Newburgh PD both patrol or

22   anticrime did you participate in any arrests in this part of

23   the city, Zone B, the northeast part of the city?

24   A.   Yes.

25   Q.   How many, approximately?

1    A.  During the whole entire twelve-year career?

2    Q.  Yeah.

3    A.  Hundreds.

4    Q.  And for what types of crimes?

5    A.  Everything from open-container violations, driving with

6    suspended license, to drug crimes, gun-related crimes.

7    Q.  Did you participate in arrests involving the seizure of

8    guns?

9    A.  Yes.

10   Q.  Approximately how many were those?

11   A.  In the twelve years?

12   Q.  Yeah.

13   A.  Maybe a couple dozen.

14   Q.  Officer Lahar, I'm going to draw your attention to the

15   early morning hours of December 15, 2010.  Were you working

16   that night?

17   A.  Yes, I was.

18   Q.  What shift were you working?

19   A.  December 15 would have been the midnight shift.

20   Q.  Was that 12 a.m. to 8 a.m.?

21   A.  Yes.  I'm sorry.  Twelve to 8 a.m.

22   Q.  And was that part of anticrime or patrol?

23   A.  That was patrol.

24   Q.  But at that point you were in anticrime?

25   A.  Yes.

1   Q.  And what was your normal shift during that time?

2   A.  It would have been I believe 4 to 12.

3   Q.  So were you working overtime on December 15, 2010?

4   A.  Yes.

5   Q.  What was the difference, any differences with how you

6   handled your 4-to-12 shift in anticrime versus your 12-to-8

7   shift in patrol?

8   A.  Yes.  For the 4-to-12 I would have been in plainclothes and

9   unmarked car.  For the midnight shift I would have to put a

10  uniform on and drive a marked police car.

11  Q.  At the beginning of that patrol shift just after midnight

12  what were you doing?

13  A.  Just after midnight I would have been just been clearing

14  read-off and setting my car to go on the road.

15  Q.  What's read-off?

16  A.  Read-off, get together before the shift starts and they

17  give you information as to who's wanted, different crime

18  statistics, areas of focus.

19  Q.  Then you proceeded to patrol by car?

20  A.  Yes.

21  Q.  Were you by yourself or with someone else in the car?

22  A.  By myself.

23  Q.  And did there come a point in time where you responded to

24  anywhere in Zone B on December 15, 2010?

25  A.  Just after midnight, yes.

E8i9chr2                     W. Lahar - direct

1    Q.  Where did you go?

2    A.  The area of First and Grant.

3    Q.  Did you stop there or were you rerouted?

4    A.  I was rerouted.

5    Q.  And responding to First and Grant, why did you do that?

6    A.  We had gotten a report of shots fired in the area.

7    Q.  Okay.  And then you were rerouted to where?

8    A.  The area of Lander Street.

9    Q.  And when you got to Lander Street what, if anything, did

10   you see?

11   A.  I saw a man laying on the sidewalk and a vehicle parked in

12   the middle of Lander Street with the driver's side door opened

13   and a black female standing outside the car.

14   Q.  Do you know who that female was?

15   A.  I can't remember her name off the top of my head.

16   Q.  You said there was a man lying on the ground?

17   A.  Yes, there was.

18   Q.  On the sidewalk?

19   A.  Yes.

20   Q.  Were there any officers there already?

21   A.  Yes.  Officer Moore arrived just before I did.

22   Q.  And the person who was lying on the sidewalk, did you come

23   to learn his identity?

24   A.  I did.

25   Q.  Who was that?

1    A.  Jeffrey Henry.

2    Q.  And what was Mr. Henry's condition when you arrived?

3    A.  Wasn't good.  He had labored breathing.  I could see a good

4    amount of blood on his person and on the sidewalk, I believe,

5    as well.

6    Q.  But he was alive at that point?

7    A.  Yes.

8    Q.  Was he conscious?

9    A.  He was in and out of consciousness.

10   Q.  Did you speak with him?

11   A.  I did.

12   Q.  What, if anything, did you say or he say?

13   A.  I had asked him his name.

14   Q.  What did he say?

15   A.  He screamed Jeff.

16   Q.  What, if anything, else did you do after he said his name?

17   A.  I don't remember.

18   Q.  Do you remember what he was wearing that day?

19   A.  No.

20   Q.  Do you know if he was wearing a jacket?

21   A.  He was wearing some kind of outer garment but I can't

22   specify it was a jacket or a sweatshirt or what it was.

23   Q.  Did you take a look at any of his wounds?

24   A.  Yes.

25   Q.  Tell us about that.

1    A.  I can remember trying to see where the blood was coming

2    from.  I believed it to be a gunshot wound.  And I can remember

3    opening up or unzipping an outer garment and pulling it to one

4    side or the other and seeing an apparent gunshot wound.

5    Q.  And when you say you saw the apparent gunshot wound, what

6    specifically did you see?

7    A.  It was a lot of blood on the under garments and because of

8    the coldness outside I could see the steam coming from the

9    apparent wound.

10   Q.  So what did you do after that, after you saw the wound?

11   A.  I can remember using the radio because I think a mobile

12   life ambulance provider had stayed in the area before it was

13   secure.  I remember contacting communications and telling them

14   to have them come into the area to expedite.

15   Q.  Did you go anywhere else after Lander Street that day?

16   A.  Yes, I did.

17   Q.  Where did you go?

18   A.  I had left Henry and we were checking the area for a crime

19   scene or where he may have come from.  And shortly after that I

20   was directed to 54 Chambers Street.

21   Q.  And when you got to 54 Chambers what, if anything, did you

22   see?

23   A.  Sergeant Carrion had actually met us at First and Chambers

24   and then we directed our attention to 54 Chambers.  When I got

25   to that location, I could see a good amount of blood on the

1    front like doorstep by the threshold.

2    Q.  And did you go in the house at 54 Chambers?

3    A.  Yes, we did.

4    Q.  And what types of things did you see when you walked in

5    there?

6    A.  There was some blood on a wall, I remember.  There was a

7    barbecue grill that was by the front door that was pretty shot

8    up.  I can't think of much else.

9    Q.  Did you see shell casings and bullet holes and things like

10   that?

11   A.  I remember seeing bullet holes that was somewhere -- that

12   was in the barbecue grill.  I know there were shell casings

13   there.  I just can't remember where specifically I saw them.

14   Q.  Sure.  Just one more question on that.  Was anyone else in

15   the house -- besides officers, I mean.

16   A.  Besides officers, no.

17   Q.  So what did you do after you walked through the house?

18   A.  Sergeant Carrion determined that it was clear and safe and

19   he had me post up to make sure nobody came in or out.

20   Q.  Why was that?

21   A.  To preserve the scene until the crime scene unit got there.

22   Q.  Were you there when crime scene came?

23   A.  No.  I was relieved a short while later by Officer Perez.

24   Q.  Okay.  Officer Lahar, I want draw your attention to

25   February 7, 2010 approximately 12:43 a.m.  Were you working

1    that night?

2    A.  Yes, I was.

3    Q.  And did you participate in the arrest of Raymond Christian

4    on that night?

5    A.  I did.

6    Q.  What shift were you working that night?

7    A.  It was same thing, midnight shift, from 4 to 12.

8    Q.  You were in a marked car?

9    A.  Yes.

10   Q.  By yourself or with other people?

11   A.  By myself.

12   Q.  Had you ever seen Raymond Christian prior to that night?

13   A.  That specific night, yeah.

14   Q.  Before February 7, had you seen him before?

15   A.  Yep.

16   Q.  Approximately how many times?

17   A.  I don't -- maybe half dozen.

18   Q.  Where had you seen him?

19   A.  Various areas but specifically that side of the city, the

20   northeast.

21   Q.  I'm sorry?

22   A.  Specifically that side of the city, northeast.

23   Q.  The northeast part of the city?

24   A.  Yeah.

25   Q.  But did you ever participate in any other arrests of him?

E8i9chr2                        W. Lahar - direct

1    A.  I don't recall if it was actually arrests or just chance

2    encounters on the street or just seeing him passing through.

3    Q.  Okay.  So what, if anything, happened that night

4    February 7, 2010 that led to his arrest?

5    A.  We had got a radio dispatch, a man with a gun.  The

6    description, from what I recall was a black male wearing a red

7    vest.  I drove into the area where he was.  It was in the area

8    of Chambers and South.  My brother, Officer Kevin Lahar, had

9    come into the area around the same time as me.

10          At some point in time I observed Christian running

11   across South Street.  I had to throw my car in reverse.  Went

12   as far as I could to pursue him.  And I got out of the car and

13   pursued him on foot from there.

14   Q.  Walk us through the part where you put the car in reverse.

15   Where were you when you pulled up?

16   A.  I had come -- I had come westbound on South Street from I

17   think I want to say it was Liberty.  So I was going up South

18   Street to where he allegedly was, the suspect was, and the

19   other officer, Officer Kevin Lahar, was coming eastbound on

20   South Street.  We kind of arrived about the same time.

21          I didn't see the person that matched the description

22   at first.  Made the turn on Chambers Street.  And then saw

23   Kevin getting out of his car.  And then I saw Mr. Christian

24   running southbound across South Street towards Chambers.

25   Q.  So at that point before he started -- before Mr. Christian

E8i9chr2                              W. Lahar – direct

1   started running had you gotten out of the car yet?

2   A.  No.

3              (Continued on next page)

E8inchr3                          W. Lahar - direct

1    Q.  Once he started running, that's when you put the car in

2    reverse?

3    A.  He was running behind me, so I had to put the car in

4    reverse to try to join him.

5    Q.  At some point you said you got out of the car and pursued

6    him on foot?

7    A.  Yes, I got out of the car and I wanted to see if there was

8    traffic or something like that.  I had to get out of the car

9    and proceed on foot.

10   Q.  While he was running, did you observe anything that he did?

11   A.  Yes.

12   Q.  What did you see?

13   A.  He made a motion with his arm up into the air.

14   Q.  OK.  Like what?  I'm sorry.  Can you describe the motion?

15   A.  Just a toss.

16   Q.  Tossing motion?

17   A.  Yes.

18   Q.  Did you see what he had tossed?

19   A.  No, I didn't.

20   Q.  While he was running and he did the tossing motion, was

21   your brother Kevin Lahar chasing after him?

22   A.  I don't remember what he was doing.

23   Q.  At some point do you know if officer Kevin Lahar stopped

24   chasing him?

25   A.  Yes.

E8inchr3                      W. Lahar – direct

1   Q.  Why was that?

2   A.  At some point in time I remember Kevin standing on the

3   corner, just kind of standing there, and then he put over the

4   radio as I was still involved in the pursuit that he had tossed

5   the gun.

6   Q.  He meaning Raymond Christian?

7   A.  Right, the person that was running.

8   Q.  Did you eventually catch Mr. Christian?

9   A.  Yes.

10  Q.  Where was that?

11  A.  Somewhere just east of South Street on Chambers.

12  Q.  Were you by yourself or were other officers there as well?

13  A.  Officer Keith Gonzalez was there as well.

14  Q.  It was officer Kevin Lahar who saw the gun?

15  A.  Yes.

16  Q.  And do you remember who recovered it?

17  A.  No, I don't.

18  Q.  Was it you?

19  A.  I don't believe it was me, no.

20  Q.  Officer Lahar, I now want to draw your attention to one

21  more incident, February 28, 2011, approximately 6 p.m.

22          Were you working that night?

23  A.  Yes, I was.

24  Q.  Did you participate in the arrest of Glenn Thomas that

25  night?

1    A.  I did.

2    Q.  So if we are at 6 p.m., were you working the 4 p.m. to 12

3  p.m. shift?

4    A.  Yes.

5    Q.  Anticrime or patrol?

6    A.  Anticrime.

7    Q.  So unmarked and unmarked?

8    A.  Yes, I believe we were in an unmarked car.

9    Q.  You were in plainclothes?

10    A.  I believe so, yes.

11    Q.  Were you by yourself or with other people?

12    A.  Other people.

13    Q.  Who were you with?

14    A.  Detective Loscerbo and Officer Kevin Lahar.

15    Q.  Where did you arrest Mr. Thomas?

16    A.  In the area of Broadway and Lutheran Street.

17    Q.  Had you ever seen Glenn Thomas prior to that night?

18    A.  I don't recall seeing him before that night, no.

19    Q.  Why were you in this unmarked car patrolling near Broadway

20  and Lutheran that evening?

21    A.  We had been checking the area for robbery suspects from an

22  incident that occurred I want to say about 30 minutes or so

23  prior to the arrest time.

24    Q.  Was a description of the suspects aired?

25    A.  From the original call, yeah.

E8inchr3                          W. Lahar - direct

1    Q.   Then what, if anything, did you see at Broadway and

2    Lutheran?

3    A.   We observed I believe it was three males that were matching

4    the description from the earlier robbery.

5    Q.   Did you ultimately identify who those individuals were?

6    A.   Yes.

7    Q.   Did you get out of the car to talk to then?

8    A.   Yes.

9    Q.   Who were they?

10   A.   Jamar Mallory, Glenn Thomas -- I can't remember the other

11   person that was there.

12   Q.   That's fine.  Had you seen them before, Mallory and the

13   other person before?

14   A.   Specific to this incident or throughout the whole --

15   Q.   Prior to this?  Prior to February 28, 2011 had you seen

16   Mallory and the other guy before?

17   A.   I had interaction with Mallory before.  I can't remember

18   having interaction with Thomas at all, but it's possible.

19   Q.   So what happened when you got out of the car to talk to

20   these individuals?

21   A.   We all got out, and one of them, Mallory, went into the

22   store real quick, which piqued my attention, and I went in to

23   stop him.

24   Q.   Did he ultimately come out of the store?

25   A.   Yes, I escorted him back out of the store.

E8inchr3                          W. Lahar - direct

1  Q.  When you escorted him out of the store, what, if anything,

2  did you see?

3  A.  Detective Loscerbo was dealing with Thomas, and he had him

4  with his hands on the side of the bodega and he was proceeding

5  to check him for weapons.

6  Q.  What happened after that?

7  A.  At some point in time I looked over at Mike, and he was

8  checking the lower portion.

9  Q.  "Mike" is Detective Loscerbo?

10  A.  I'm sorry.  Detective Loscerbo.  Yes.  He was checking the

11  lower portion of him and all of a sudden his eyes just got real

12  wide.

13  Q.  Then what happened?

14  A.  Thomas spun away from Loscerbo and started to flee.

15  Q.  Did Loscerbo explain why his eyes got wide, why Thomas was

16  fleeing?

17  A.  He screamed gun.

18  Q.  He screamed gun.  Then what did you do?

19  A.  I started to go after Thomas.  I was able to grab him just

20  by a finger in his shirt.

21  Q.  And what happened?

22  A.  The two of us fell into a car and then we fell on to the

23  pavement.  And then Loscerbo, Kevin -- it was kind of like a

24  dog pile so to speak, and we were trying to get him in

25  handcuffs at that point.

1    Q.  Was he ultimately handcuffed?

2    A.  Yes, he was.

3    Q.  Loscerbo said there was a gun, right?

4    A.  Yes.

5    Q.  Did you eventually recover a gun?

6    A.  Yes.

7    Q.  Were you part of that?

8    A.  I was.

9    Q.  From where did you recover the gun?

10   A.  It was in, like, the groin area, like lower groin area

11   concealed inside of -- I don't know if it was a pair of long

12   underwear or a pair of shorts.

13   Q.  Who actually got the gun?  Was it you by yourself or

14   another officer there?

15   A.  Krasky was there to help me.  Officer David Krasky.

16   Q.  Do you remember what kind of gun it was?

17   A.  It was a revolver.  I can remember that.

18          MR. BAUER:  Your Honor, may I approach?

19          THE COURT:  You may.

20   Q.  Officer Lahar, I'm showing you what's been admitted already

21   as Government Exhibit 141.  Do you recognize this gun?

22   A.  I do.

23   Q.  You do.  Prior to testifying today, had you seen this gun

24   before?

25   A.  Yes.

E8inchr3                              W. Lahar – direct

1    Q.  And what gun is it?

2    A.  It appears to be the same gun I recovered from Thomas.

3    Q.  Do you remember anything else you recovered from Thomas or

     Mallory or the third guy?

5    A.  I remember there was something about a magazine.  I just

6    don't remember who it was recovered from.

7    Q.  It wasn't you who recovered the magazine?

8    A.  No.  I'm sorry, no, it wasn't.

9    Q.  After Glenn Thomas was arrested, did you speak with him?

10   A.  I don't believe I did.

11           MR. BAUER:  Your Honor, no further questions.

12           THE COURT:  Very well.  Cross-examination?

13           MR. STRAZZA:  No questions.

14           MS. STAFFORD:  No.

15           THE COURT:  Mr. Greenfield.

16           MR. GREENFIELD:  No.

17           THE COURT:  Mr. Buchwald?

18           MR. BUCHWALD:  Yes, your Honor.

19           THE COURT:  Mr. Dratel?

20           MR. DRATEL:  Yes, I do.

21   CROSS EXAMINATION

22   BY MR. DRATEL:

23   Q.  I show you what is in evidence already -- good afternoon.

24   A.  Good morning, sir.

25   Q.  Maybe not, just about.

1          I show you what's in evidence as Government's Exhibit

2      251.  That is a map of Newburgh, right?  Part of Newburgh?

3      A.  Yes.

4      Q.  So that red spot there the A that's Chambers and First

5      street, right?  Do you see where that red A is?

6      A.  Yes.

7      Q.  That's 54 Chambers basically, correct?

8      A.  It looks about right, yes.

9      Q.  If you go to the left on First Street for basically a block

10     you get to Lander, right?

11     A.  Yes, sir.

12     Q.  And 45 Lander is somewhere in that corner area.  That is

13     where Mr. Henry was, right?

14     A.  56 Lander is the corner store.  If you are going up First

15     Street from A --

16     Q.  Yes.

17     A.  -- if you make that left.

18     Q.  In other words, if we are looking at the map going left on

19     first, left meaning up First Street towards Lander is one

20     block?

21     A.  Yes.

22     Q.  And 45 Lander is kind of where you found Mr. Henry?

23     A.  Yes, sir.

24     Q.  That would be maybe a little bit to the left on Lander down

25     from First?

E8inchr3                        W. Lahar - cross

1   A.  Yes, sir.

2   Q.  And Lander runs up, so that the numbers would go higher?

3   A.  Yes, sir.

4   Q.  So 138 Lander, if you are going on First Street and you get

5   to First and Lander, 138 Lander would be to your right on this

6   map?  You would go up, you would make a right on Lander?

7   A.  138 Lander?

8   Q.  138 Lander.

9   A.  Is going to be just past Farrington street.

10  Q.  Farrington Street, you see it is one more block up, if you

11  are going on First Street and we hit Lander --

12  A.  Yes.

13  Q.  -- we make a right on Lander to get up to Farrington,

14  right?

15  A.  Yes, sir.

16          MR. DRATEL:  That is it.

17          I have nothing further, your Honor.

18          THE COURT:  All right.  Any redirect?

19          MR. BAUER:  No, your Honor.

20          THE COURT:  Mr. Lahar, you may step down.

21          THE WITNESS:  Thank you.

22          (Witness excused)

23          MR. BAUER:  Judge, before we call our next witness,

24  who is going to be Officer John Maguire, the government wanted

25  to offer --

1          MR. BUCHWALD:  Can we have a limiting instruction with

2     regard to the last witness.  There are two parts that I want to

3     an instruction on.

4          THE COURT:  I don't know specifically what testimony

5     you are referring to.

6          MR. BUCHWALD:  The arrests of the other defendants.

7          THE COURT:  You heard testimony about an arrest of

8     Mr. Christian and testimony about an arrest of Mr. Thomas.  You

9     may only use that testimony with respect to your determination

10    as to whether or not the government has proven its case against

11    either Mr. Christian or Mr. Thomas, as the case may be.  And

12    you may no use that evidence with respect to the other

13    defendants.

14          MR. BAUER:  As I was saying before I was interrupted,

15    your Honor, the government would like to offer now at this time

16    Government Exhibit 415, pursuant to Federal Rule of Evidence

17    902, I believe without the objection of defense counsel, which

18    is a transcript dated March 1, 2012, of Glenn Thomas's guilty

19    plea.

20          THE COURT:  Very well.  That exhibit will be received.

21          (Government's Exhibit 415 received in evidence)

22          MR. BAUER:  Permission to read just part of that

23    exhibit aloud now, your Honor.

24          THE COURT:  Very well.

25          MR. BAUER:  I'm pointing to the bottom of page 16

E8inchr3                          W. Lahar - cross

1    where the Court asks Mr. Thomas:  "Now, Mr. Thomas, can you

2    please tell me in your own words what you did that makes you

3    guilty of the crime to which you are pleading guilty?

4            Mr. Thomas responded where it says the defendant:  "I

5    possessed a firearm with a felony, which I broke the law, you

6    know."

7            The Court asks, "So you were convict of a felony some

8    years back?"

9            I will skip ahead a little bit, sorry.

10           The defendant says, "Yes, sir.  I did two years, sir."

11           The Court said, After you were released from prison,

12   some point thereafter did you come to be in possession of a

13   gun?"

14           "THE DEFENDANT:  Sir, yes, sir.

15           "THE COURT:  Where was that?

16           "THE DEFENDANT:  It was on me, sir."

17           His lawyer then asked, "Where?"

18           The defendant says, "Newburgh, New York, sir."

19           The Court then asked, "Approximately when was that?

20           The defendant said, "February 28."

21           The Court asked, "2011?"

22           The defendant said, "2011, sir."

23           The Court asked, "When you did that, Mr. Thomas, did

24   you know that what you were doing was wrong and against the

25   law?"

E8inchr3                         W. Lahar - cross

1        The defendant said, "Yes, sir."

2            OK.  With that, your Honor, the government calls its

3    next witness, John Maguire.

4     JOHN MAGUIRE,

5         called as a witness by the Government,

6         having been duly sworn, testified as follows:

7    DIRECT EXAMINATION

8    BY MR. BAUER:

9    Q.  Where do you work?

10   A.  I work for the City of Newburgh Police Department.

11   Q.  What is your rank with the Newburgh Police Department?

12   A.  I am a police officer.

13   Q.  How long have you been with the Newburgh PD?

14   A.  Approximately ten years.

15   Q.  What did you do before working with the Newburgh PD?

16   A.  I was a police officer in the Village of Ellenville Police

17   Department, Town of Fallsburg Police Department, and the

18   Village of Liberty Police Department.

19   Q.  With Newburgh are you assigned to a particular unit oar

20   division?

21   A.  I was.  I was assigned to the canine unit.

22   Q.  How about now?  What are you assigned to now?

23   A.  I am just a patrolman.  My dog passed away on July 1.

24   Q.  So July 1 of this year?

25   A.  Yes.

1    Q.  So I'll focus specifically on 2010.

2            What unit or division were you in then?

3    A.  I was part of the City of Newburgh's police canine unit.

4    Q.  I take it that means that day you had a canine partner?

5    A.  Yes.

6    Q.  You said the canine recently passed away?

7    A.  Yes.

8    Q.  What was the canine's name?

9    A.  His name was Ibor.

10   Q.  I-b-o-r?

11   A.  Yes, sir.

12   Q.  How long were you in the canine unit approximately?

13   A.  Approximately five years.

14   Q.  From when to when?

15   A.  From May of 2009 to July of this year.

16   Q.  While you were in the canine unit, were you doing patrol

17   type duties as well?

18   A.  Yes, sir.

19   Q.  Can you explain what your duties and responsibilities were

20   in the canine unit doing patrol?

21   A.  Just routine patrol, such as answering calls, vehicle and

22   traffic stuff, criminal stuff.

23   Q.  Officer Maguire, are you familiar with a street in Newburgh

24   known as Dubois Street?

25   A.  Yes, I am.

E8inchr3                          Maguire - direct

1   Q.  What part of the city is that?

2   A.  That is on the south side -- I'm sorry, the north side of

3   the city.

4   Q.  Have you been to Dubois Street and the surrounding area

5   before?

6   A.  Yes, I have.

7   Q.  In that part of the city, have you participated in any

8   arrests?

9   A.  Yes, I have.

10  Q.  Approximately how many?

11  A.  I would say approximately a hundred.

12  Q.  For what types of crimes?

13  A.  Everything from open container arrests to prostitution to

14  drugs and guns.

15  Q.  Focusing on the guns, approximately how many arrests have

16  you been involved in involving guns?

17  A.  In that area?

18  Q.  Yes.

19  A.  Probably five.

20  Q.  How about generally, not just that area?

21  A.  In the whole city?

22  Q.  Sure.

23  A.  In my whole time, I would say at least, at least a hundred.

24  Q.  At least a hundred?

25  A.  Yeah.

1   Q.  Drawing your attention to October 7, 2010, at approximately

2   8:45 p.m., were you working that night --

3   A.  Yes, I was.

4   Q.  -- that afternoon?

5        What shift were you working?

6   A.  I was working the 4 p.m. to midnight tour.

7   Q.  Were you working by yourself or with other people?

8   A.  I was working with somebody else.

9   Q.  Who is that?

10  A.  His name is officer Joseph Palermo.

11  Q.  At that point you are in the canine unit, right?

12  A.  Yes, sir.

13  Q.  Was your canine, Ibor, with you that day?

14  A.  Yes.

15  Q.  Were you in a car or on foot?

16  A.  I was in a marked police car.

17  Q.  Did you arrest anyone that night?

18  A.  Yes, we did.

19  Q.  Who was that?

20  A.  Raymond Christian.

21  Q.  Had you ever seen Raymond Christian prior to that night?

22  A.  Yes, I have.

23  Q.  Approximately how many times?

24  A.  Two to three times maybe.

25  Q.  And where?

E8inchr3                          Maguire - direct

1    A.  Just on routine calls that we were sent to that he was

2    there.

3    Q.  But he wasn't the subject of a prior arrest that you did,

4    right?

5    A.  No.

6    Q.  So on that night where were you when you first came across

7    Raymond Christian?

8    A.  We were on Dubois street traveling southbound.

9    Q.  What, if anything, did you see?

10   A.  We got into the area of 38 Dubois Street and we observed

11   Raymond Christian walking.  He walked westbound in front of us

12   across Dubois Street.  At that time we noticed he was holding a

13   bulge in his waistband with his left hand.  We stopped to

14   interview him.  He readjusted the bulge, and at that time you

15   could see a the butt of a handgun.

16   Q.  Let me ask you, so it was approximately 8:45 p.m., right?

17   A.  I believe so, yes, sir.

18   Q.  Was it dark out or light out?

19   A.  It was dark out.

20   Q.  But you were in a car, right?

21   A.  Yes, sir.

22   Q.  Were the headlights on?

23   A.  Yes, sir.

24   Q.  Did you get a good look at Mr. Christian as he walked in

25   front of you?

E8inchr3                          Maguire – direct

1   A.  Yes, I did.

2   Q.  You say you saw a bulge in his left pocket?  Is that what

3   you said?

4   A.  It was in his waistband.  He was holding it with his left

5   hand.

6   Q.  I think you said that you got out of the car?

7   A.  We started to get out of the car and he fled on foot.

8   Q.  When you say we tried to get out of the car, who is we?

9   A.  Myself and Joe Palermo.

10  Q.  And at that point was Ibor still in the car or out of the

11  car?

12  A.  He was still in the car.

13  Q.  Before he fled you saw him adjust the gun?

14  A.  Yes, sir.

15  Q.  And you knew it was a gun because how?

16  A.  When he adjusted the bulge in his waistband, you could see

17  the butt of what I believed to be a handgun.

18  Q.  So you didn't see the whole gun at that point?  You just

19  saw the butt?

20  A.  Yes.

21  Q.  But then he fled.  Where did he flee?

22  A.  He fled into the backyards of 38 Dubois Street.

23  Q.  Did you follow after him?

24  A.  Yes, I did.

25          THE COURT:  Did you want to shut off the exhibits.

1    They were flashing.

2              MR. BAUER:  Oh, sorry.

3    Q.  When you followed after him, did you have Ibor with you?

4    A.  No, I did not.

5    Q.  So when you were following after him, did you yell any

6    instructions to him?

7    A.  I told him stop running, police.

8    Q.  And did he stop?

9    A.  No, he did not.

10   Q.  All right.  So what happened after that?

11   A.  At that point I turned back around and I went back to get

12   my canine partner, Ibor.

13   Q.  And what did Palermo do?

14   A.  He continued chasing him.

15   Q.  When he was running, Mr. Christian, did you see him do

16   anything?

17   A.  He made a motion as if he threw something.

18   Q.  Did you see what he threw at that point?

19   A.  No, I did not.

20   Q.  Did you hear anything?

21   A.  I heard a thud.  And at that point is when I turned around

22   and went back and got my dog.

23   Q.  When you say you heard a thud, a thud of what hitting what?

24   A.  It sounded like a hard type object hitting the ground.

25   Q.  That's when you went back to get Ibor?

E8inchr3                          Maguire - direct

1    A.  Yes, I did.

2    Q.  Did you then ultimately, after you got Ibor, return to the

3    back of 38 Dubois?

4    A.  Yes, he did.

5    Q.  What happened after that?

6    A.  Officer Palermo had Mr. Christian in custody, and Officer

7    Palermo instructed me that he believed that Mr. Christian threw

8    a handgun.

9    Q.  And did Palermo direct you to where he thought the handgun

10   might be?

11   A.  Yes, it was in the northeast corner of 38 Dubois Street in

12   the backyard.

13   Q.  So what did you do?

14   A.  At that point in time I instructed my canine partner to

15   begin an article search.  Ibor indicated on the fence area of

16   the northeast corner of 38 Dubois Street, and he wanted to get

17   over the fence.

18   Q.  You say an article search.  What do you mean?

19   A.  An article search, he was trained to search for the

20   freshest human scent on any type of article.

21   Q.  Was it Mr. Christian's scent or any scent?

22   A.  It could be the fresh est human scent.  When I instruct him

23   to do an article search, he's searching for the freshest human

24   scent.

25   Q.  You say he indicated.  What does that mean?

E8inchr3                              Maguire - direct

1   A.  He started to whine and started to scratch at the fence

2   area as if he wanted to go over it.

3   Q.  So what did you do then?

4   A.  At that point we were able to find an opening more west of

5   where Ibor was, and we were able to get him into the backyard

6   of 40 Dubois Street.

7   Q.  Then what happened after that?

8   A.  Ibor then located a black handgun.

9   Q.  What did he do when he located it?

10  A.  He picked it up in his mouth.

11  Q.  OK.  After that what happened?

12  A.  I instructed him to out the handgun, which he did, and he

13  just sat there, and I instructed another officer to come over

14  and retrieve the handgun.

15  Q.  And what officer was that?

16  A.  John Thomas.

17          MR. BAUER:  Your Honor, may I approach?

18          THE COURT:  You may.

19  Q.  I'm showing you what's been marked for identification as

20  Government Exhibits 131A through 131H.

21          Can you take a look at these photographs and tell me

22  if you recognize them.

23  A.  This is the handgun that he found in the rear of 40 Dubois

24  Street.

25  Q.  There are a number of photographs there, right?

E8inchr3                         Maguire - direct

1   A.  Yes, there are.

2   Q.  Some of them have the gun?

3   A.  Yes.

4   Q.  But were these the pictures that were taken that night,

5   October 7, 2010?

6   A.  Yes.

7   Q.  Including pictures of where the gun was located?

8   A.  Yes.

9   Q.  Did you take those photographs?

10  A.  I did not.

11  Q.  You were there when they were taken?

12  A.  I don't remember.

13  Q.  Well, do they accurately reflect the area on Dubois street

14  where the gun was located?

15  A.  Yes.

16          MR. BAUER:  The government offers government Exhibits

17  131A through H into evidence.

18          MR. STRAZZA:  No objection.

19          MR. BUCHWALD:  We ask for A limiting instruction with

20  respect to all of these.

21          THE COURT:  131A through 131H will be received.

22          (Government's Exhibits 131A through 131H received in

23  evidence)

24          THE COURT:  Ladies and gentlemen, again, this

25  testimony relates solely to Mr. Christian, and you should not

E8inchr3                     Maguire - direct

1     consider this in relation to either Mr. Thomas or Mr. Whitaker.

2               MR. BAUER:  Judge, can we show the photos to the jury.

3               THE COURT:  You may.

4     Q.  Officer Maguire, just very quickly, let's run through those

5     photographs.

6               Can you explain what we are looking at.  The first one

7     is 131A.  What are we looking at there?

8     A.  That is the handgun that my police canine found.

9     Q.  Is that approximately where he had found it?

10    A.  Yes.

11    Q.  You said that Ibor picked it up in his mouth, so you

12    obviously had to either instruct him or otherwise put it back

13    down, right?

14    A.  Yes.

15    Q.  OK.  Let's do 131B.  This is just a closeup of where it

16    was?

17    A.  Yes, sir.

18    Q.  131C, another closeup, correct?

19    A.  Yes.

20    Q.  131D, 131E, 131F.  What is this here, 131F?

21    A.  That is 40 Dubois Street.  That is the front house of where

22    my canine partner found the gun.

23    Q.  OK.  And 131G, what's this?

24    A.  That is 38 Dubois Street.  That is where he ran into the

25    back of.

E8inchr3                        Maguire – direct

1   Q.  And looking in the photograph there, can you explain to the

2   jury where he actually ran?

3   A.  He ran in between the house and the fence.

4   Q.  So that's that little corridor in kind of the left middle

5   bottom of the picture?

6   A.  Yes, sir.

7   Q.  Was anything else recovered from the back of 38 and 40

8   Dubois Street?

9   A.  Officer James Cerrone recovered a loaded magazine in the

10  back of 38 Dubois Street.

11  Q.  Did you see where he had located it?

12  A.  I don't remember that.

13  Q.  Let me show you 131H.  What is that a photograph of?

14  A.  That is the magazine that he had found.

15  Q.  Going back to very briefly, 131D.  That's the gun that you

16  found, right?

17  A.  Yes, sir.

18  Q.  Was there a magazine in it?

19  A.  No, there's not.

20          MR. BAUER:  If you can just pull up 131A again.

21          Your Honor may I approach?

22          THE COURT:  You may.

23  Q.  Officer Maguire, I'm showing you what's been marked for

24  identification as Government Exhibits 132, 133 and 134.

25          Starting first with Exhibit 132, do you recognize

E8inchr3                          Maguire - direct

1   that?

2   A.  Yes, I do.

3   Q.  And what is it?

4   A.  That is the handgun that my canine partner found in the

5   rear of 40 Dubois Street.

6   Q.  Prior to testifying today, did you have an opportunity to

7   look at that gun?

8   A.  Yes, I did.

9   Q.  Were you able to confirm that it is the same gun?

10  A.  Yes.

11  Q.  Showing you what's been marked for identification as

12  Government Exhibit 133, do you recognize that?

13  A.  Yes, I do.

14  Q.  What is that?

15  A.  That is the magazine that Officer Cerrone found in the back

16  of 38 Dubois Street.

17          MR. BAUER:  OK.  You know I'm not going to do 134.

18          The government offers Exhibits 132 and 133 into

19  evidence.

20          MR. STRAZZA:  No objection.

21          THE COURT:  132 and 133 will be received.

22          (Government's Exhibits 132 and 133  received in

23  evidence)

24          MR. BAUER:  May I show them to the jury, your Honor?

25          THE COURT:  You may.

1          MR. BAUER:  I have no further questions.

2     Q.  I'm sorry.  Officer Maguire, one further question.

3          MR. BAUER:  Ms. McInerney, if you could pull up

4     Government Exhibit -- it's not in evidence.  Sorry.

5     Q.  I'm going to show you what's been marked for identification

6     as Government Exhibit 270.  Do you recognize the house there?

7     A.  That is 38 Dubois Street.

8     Q.  Obviously it's a slightly different picture than the

9     earlier one you identified as 38 Dubois?

10    A.  Yes, sir.

11    Q.  But it's still the same house?

12    A.  Yes, sir.

13         MR. BAUER:  The government offers Government Exhibit

14    270.

15         THE COURT:  Any objection?

16         MR. STRAZZA:  No.

17         MS. STAFFORD:  No.

18         THE COURT:  270 will be received.

19         (Government's Exhibit 270 received in evidence)

20         MR. BAUER:  Thank you, your Honor.  I have no further

21    questions.

22         THE COURT:  Cross-examination, Mr. Strazza.

23         MR. STRAZZA:  Thank you.

24    CROSS EXAMINATION

25    BY MR. STRAZZA:

E8inchr3                          Maguire - cross

1    Q.  Good afternoon, Officer Maguire.

2    A.  Sir.

3    Q.  In preparation for your testimony today, you have reviewed

4    the incident reports that were created with respect to the

5    October 7 incident, correct?

6    A.  Yes.

7    Q.  And so you are aware that at some point in time Detective

8    Roberto Goodman became involved with this incident, right?

9    A.  Yes.

10   Q.  Specifically, she took a statement from Raymond Christian,

11   right?

12            MR. BAUER:  Objection, your Honor.

13            THE COURT:  Overruled.

14   A.  I believe so, sir.

15   Q.  So you are aware that Mr. Christian admitted that he

16   possessed this gun, right?

17   A.  I believe so.

18   Q.  You are aware that Mr. Christian pled guilty to possesssing

19   this gun, right?

20   A.  Yes.

21            MR. STRAZZA:  No further questions.

22            THE COURT:  Any other cross-examination?

23            MR. GOLTZER:  No.  Thank you.

24            THE COURT:  Any redirect?

25            MR. BAUER:  No, your Honor.

1           THE COURT:  Sir, you may step down.

2           (Witness excused)

3           MR. NAWADAY:  The government calls Joseph Palermo.

4    JOSEPH PALERMO,

5        called as a witness by the Government,

6        having been duly sworn, testified as follows:

7    DIRECT EXAMINATION

8    BY MR. NAWADAY:

9    Q.  Where do you work?

10   A.  The City of Newburgh Police Department.

11   Q.  What is your rank there?

12   A.  Police officer canine.

13   Q.  About how long have you worked for the Newburgh police?

14   A.  It's going to be my ninth year, sir.

15   Q.  What unit are you currently assigned to?

16   A.  I am a canine officer currently.

17   Q.  Back in 2010, what unit were you in?

18   A.  The anticrime unit.

19   Q.  What types of crimes generally did that unit investigate?

20   A.  Street-level drug activity, quality of life, and we would

21   also back patrol up on violent calls.

22   Q.  Were you working on October 7, 2010?

23   A.  Yes, sir, I was.

24   Q.  Do you know a person named Raymond Christian?

25   A.  Yes, sir, I do.

E8inchr3                          Palermo - direct

1   Q.  How did you know that person at that time?

2   A.  From dealings on the street during going to calls.

3   Q.  Did there come a time when you saw Raymond Christian on

4   October 7, 2010?

5   A.  Yes, sir.

6   Q.  Where were you when you first saw him?

7   A.  I was in a marked police vehicle, 136, as a passenger.

8   Q.  Who were you with?

9   A.  Officer John Maguire.

10  Q.  What did you see when you saw Mr. Christian?

11  A.  He was coming from west to east crossing the street.  He

12  came directly in front of the police vehicle and he had a bulge

13  in his waistband, which he was coddling or holding in his left

14  hand.

15  Q.  What street were you on?

16  A.  Dubois Street, sir.

17  Q.  What happened after you first saw him?

18  A.  He looked at the vehicle and pulled it up, and I could see

19  the black portion of what I thought what is a handgun.

20  Q.  What did you do, if anything, when you saw that?

21  A.  I exited my police vehicle, I screamed police officer, and

22  I gave chase.

23  Q.  Where did you chase him?

24  A.  He went, if you look at 38 Dubois Street he went to the

25  west driveway, at which point I started catching up to him.

E8inchr3                          Palermo - direct

1    With his left arm I could see him throw something black, and he

2    immediately turned to the right, which is then heading south

3    behind the 38 Dubois Street, where he reached a fence and

4    attempted to scale the fence, and that's where I was able to

5    catch up to him.

6    Q.  What happened after you caught up to him?

7    A.  I detained him and I walked him back.  Officer Maguire was

8    coming down the driveway, and I told him I believed he threw a

9    firearm over to the northeast portion if you are looking at 38

10   Dubois Street.

11          MR. NAWADAY:  Ms. McInerney, can you please put up

12   Government Exhibit 270 which is in evidence.

13   Q.  Do you recognize that?

14   A.  Yes, sir.

15   Q.  Do you see where you chased Raymond Christian?

16   A.  Yes, sir.

17   Q.  Can you just describe where that was on Government Exhibit

18   270.

19   A.  It is in between the yellow and red building and in between

20   the two fences there down the driveway.

21   Q.  What happened after you told Officer Maguire that you

22   thought Raymond Christian had tossed a gun?

23   A.  Officer Maguire retrieved his canine and I stayed as a

24   perimeter unit to try to keep any citizens or anybody from

25   coming into the area.

1    Q.  Do you know if a gun was recovered?

2    A.  Yes, sir.

3    Q.  Were you working on July 23, 2010?

4    A.  Yes, sir.

5    Q.  Did there come a time that day when you saw Jamar Mallory?

6    A.  Yes, sir.

7    Q.  How did that happen?

8    A.  At that time I was in the anticrime unit.  I was in an

9    unmarked police vehicle accompanied by three officers, and he

10   had a menacing complaint out.

11   Q.  Where did you first see Jamar Mallory that day?

12   A.  20 William Street.

13   Q.  What did you do when you saw Jamar Mallory?

14   A.  I was a passenger, the driver obviously stopped the

15   vehicle.  We exited, confirmed the complaint, and he was

16   arrested on the spot.

17   Q.  Where was he arrested?

18   A.  He was in the stoop or the doorway area of 20 William

19   Street.

20   Q.  Describe that building that he was on the stoop of?

21   A.  It's a three-story, brick-style building on the west side

22   of William Street.

23   Q.  What did you do after Mallory was arrested?

24   A.  We noticed a gentleman sitting on the stairs leading to the

25   second floor just inside the doorway where Mallory was.  I went

1    in there to contact him and to interview him to find out if he

2    lived there or if he had any ID.

3    Q.  Did you speak with the man on the steps?

4    A.  Yes, sir, I did.

5    Q.  And did he identify himself?

6    A.  He told me his name was Supreme Williams.

7    Q.  What happened next?

8    A.  We were trying to find ID on him.  I handed him off to

9    Officer Pat Kelly, who was also in the street crimes unit with

10   myself, and I started to check the hallway.  There's like an

11   electrical box in the hallway, and right on top was a clear

12   baggy with a white rocklike substance inside.

13          MR. DRATEL:  Your Honor, objection.  Relevance.

14          THE COURT:  Overruled.

15   Q.  How far away was that baggy with the substance in it from

16   the person on the steps who initially identified himself as

17   Supreme Williams?

18   A.  I would say about two arm lengths away.

19   Q.  Do you know if that was that person's real name, Supreme

20   Williams?

21   A.  I believe his name is James Williams.

22   Q.  What happened after you found that baggy?

23   A.  Due to my experience, if you find one type of narcotic

24   somewhere, they usually hide it in other places close.  So I

25   stepped outside again.  There is a mailbox in front of the

E8inchr3                          Palermo - direct

1    building, the building's mailbox, and I looked inside and there

2    was a Newport cigarette box empty.  And upon looking inside

3    there was another clear plastic back with a white rocklike

4    substance inside of that.

5    Q.  What did you do after you found that cigarette box?

6    A.  We continued checking the building at this point to see if

7    there was more things we could find.  It led us up to the third

8    floor, where we found an open door.

9    Q.  What did you do when you got to -- by the way, who was with

10   you at that point?

11   A.  Officer Giudice and Officer Patrick Kelly.

12   Q.  What did you do when you got to the third floor?

13   A.  We made announcements, announcing ourselves as police

14   officers for somebody to come to the door.  There was no

15   response.

16   Q.  What did you do next?

17   A.  We looked into the open door area which led into the

18   kitchen and on the stove there was what appeared to be drug

19   paraphernalia.

20        MR. DRATEL:  Your Honor, may I have a continuing

21   relevance objection and an objection under 403.

22        THE COURT:  Overruled.

23        MR. DRATEL:  Thank you.

24        MR. NAWADAY:  Can I have the last response read back.

25        (Record read)

1    Q.  What did you do after that?

2    A.  We gave a few more announcements.  Seeing the drug

3    paraphernalia and also the strong odor of marijuana we entered

4    the apartment.

5    Q.  What room did you first enter?

6    A.  The kitchen.

7    Q.  What did you see in the kitchen, if anything?

8    A.  There was burnt marijuana cigarettes, like I said, there

9    was a spoon of white residue and sandwich baggies.

10   Q.  What did you do next?

11   A.  The next room to the right, I would call it a living room,

12   but there was a bed there, and there was a male laying face

13   down on the bed.

14   Q.  What did you do after you saw that there was someone there?

15   A.  We again announced ourselves as police officer, shook him,

16   and after a few minutes -- I won't say minutes, seconds, he

17   turned around.

18   Q.  And what happened?

19   A.  As he came and sat up, right in front of him there was an

20   old cast iron heater and we could see the butt of a firearm

21   there.

22   Q.  What happened when you saw the gun?

23   A.  That male was detained and we called our supervisor, who

24   began a process for a search warrant.

25   Q.  What did you do?

E8inchr3                          Palermo - direct

1   A.  I stayed with the apartment as officers took the people I

2   spoke about earlier to the station, and we just stood there

3   until the search warrant was ready.

4   Q.  Was a search conducted?

5   A.  Yes, sir.

6   Q.  Do you know what happened to James Williams?

7   A.  No, sir.  At that point I do not.

8              MR. NAWADAY:  No further questions.

9              THE COURT:  Cross-examination.

10             MS. STAFFORD:  No.

11             MR. STRAZZA:  No questions.

12             MR. DRATEL:  Nothing, your Honor.  Thank you.

13             THE COURT:  You may step down.

14             THE WITNESS:  Thank you, sir.

15             (Witness excused)

16             MR. BUCHWALD:  May we have a limiting instruction,

17  Judge.

18             THE COURT:  Concerning whom?

19             MR. BUCHWALD:  The arrest, who was arrested at that

20  time.

21             MR. DRATEL:  Mr. Christian.

22             THE COURT:  The first part of Officer Palermo's

23  testimony concerned the arrest of Raymond Christian.  Again,

24  you may only consider that in your determination as to whether

25  or not government has proved its case against him, and you may

E8inchr3                              Palermo - direct

1   not consider it against Mr. Whitaker or Mr. Thomas in any way.

2   OK.

3          Do you have another witness or shall we take our lunch

4   break?

5          MR. NAWADAY:  Your Honor, the next witness will be

6   lengthy, so it might make sense to do that.

7          THE COURT:  Let's do that.  Let's take our lunch break

8   now it a little early.  So please be back no later than 1:45 in

9   the jury room.  Until then don't discuss the case.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E8inchr3                          Palermo – direct

1

2                  (Jury not present)

3                  THE COURT:  Mr. Buchwald.

4                  MR. BUCHWALD:  Your Honor, with respect to this most

5      recent testimony about L-1 and some kind of seizure involving

6      L-1, Mr. Williams, we would move to strike it as irrelevant

7      having nothing to do with the charges against these defendants

8      in this case.

9                  MR. NAWADAY:  Your Honor, all that evidence from the

10     search was already admitted.  It is evidence of the

11     relationship between the defendants and L-1, who is part of the

12     conspiracy.  It shows L-1 was a drug dealer.  So it is wholly

13     relevant to the facts at issue in this case.

14                 THE COURT:  You said it was already admitted?

15                 MR. NAWADAY:  Yes, your Honor.

16                 THE COURT:  OK.

17                 MR. BUCHWALD:  I think it was subject to connection

18     before.

19                 MR. NAWADAY:  I think the connection, your Honor, is

20     you have heard and the jury has heard extensive testimony about

21     L-1's participation in the robbery of a stash house, his

22     relationship with these defendants.  The fact that L-1 was a

23     drug dealer was found with drugs, was there at 38 Dubois I

24     think is wholly relevant and does connect this evidence to the

25     charged conspiracy.

E8inchr3                           Palermo – direct

1              MR. BUCHWALD:  This is evidence of July 2010.  Our

2     client had been in jail for a year and a half and remained in

3     jail for another three months.  I see absolutely no connection

4     to our client whatsoever.

5              THE COURT:  I disagree.  I think it is relevant both

6     to the relationship between these defendants and Mr. Williams

7     as well as to the actual conspiracy charged in the indictment.

8              So that evidence will be admitted over the defense

9     objection.

10             Anything else?

11             MR. NAWADAY:  Not for the government.

12             THE COURT:  Who is the next witness?

13             MR. BAUER:  Danielle Williams.

14             THE COURT:  OK.

15             MR. BAUER:  Judge, we are going to start at 1:50 then?

16             THE COURT:  I'm sorry?

17             MR. BAUER:  You asked the jury to be back at 1:45?

18             THE COURT:  1:45, yes.

19             (Luncheon recess)

20

21

22

23

24

25

```
 1                        AFTERNOON SESSION
 2                           1:45 p.m.
 3          (Trial resumed; jury not present)
 4          MR. STRAZZA:  Your Honor, before you bring the jury
 5   out we would like to make an application.
 6          THE COURT:  The jury is ready so what is it that you
 7   wanted to say?
 8          MR. STRAZZA:  With respect to the testimony --
 9          THE COURT:  Can you please keep your voice up.
10          MR. STRAZZA:  With respect to the testimony of
11   Danielle Williams, we have an application to preclude the
12   government from going into an incident where they alleged or --
13   where they alleged or at least the 3500 materials indicates
14   that Mr. Christian attempted to extort her.  It's our position
15   that the prejudicial effect outweighs the probative value and
16   it's not part of the crimes that Mr. Christian is charged with.
17          THE COURT:  Do you intend to elicit such testimony,
18   Mr. Nawaday or Mr. Bauer?
19          MR. NAWADAY:  We do, your Honor.  It was our
20   understanding that your Honor had ruled on this.  This was one
21   of the incidents that was part of our motion in limine.  And
22   the relevance is that during the conspiracy period Ms. Williams
23   saw Mr. Christian with a gun and he had that gun when he was in
24   the presence of Mr. Thomas.
25          THE COURT:  I'm sorry but I don't recall extortion.
```

E8i9chr4

```
1     Did I rule on any attempted extortion?

2              MR. NAWADAY:  Yes, your Honor.  It's page three of the

3     government's July 31, 2014 submission to the Court.  It's

4     incident No. 10 which says Christian pulled a gun on a

5     cooperating witness, who is Danielle Williams, in attempt to

6     extort Danielle Williams because of a dispute regarding her son

7     who sold drugs.  After Christian -- after Danielle Williams

8     told Christian to put the gun away, he handed the gun to

9     another person and Mr. Thomas was present when that happened.

10             THE COURT:  Okay.  So I've ruled on it.

11             Are we ready?  The jury is ready.

12             MR. NAWADAY:  Bring out the witness, your Honor?

13             THE COURT:  Yes.

14             MR. BUCHWALD:  We join in the motion to keep that out.

15             THE COURT:  Okay.  So noted.

16             You may be seated for now.

17             (Continued on next page)

18

19

20

21

22

23

24

25
```

1           (Jury present)

2           THE COURT:  Everyone please be seated.

3           Will the government call its next witness.

4           MR. NAWADAY:  The government calls Danielle Williams.

5           THE COURT:  Ms. Williams please stand and face the

6    court deputy.

7           Please be seated.  Bring your seat forward.  I want

8    you to speak directly into the microphone and please begin by

9    stating your full name and spelling your first and last name

10   for the record call.

11     DANIELLE WILLIAMS,

12       called as a witness by the Government,

13       having been duly sworn, testified as follows:

14           THE COURT:  Thank you.

15           Mr. Nawaday.

16   DIRECT EXAMINATION

17   BY MR. NAWADAY:

18   Q.  How old are you?

19   A.  39.

20   Q.  Are you married?

21   A.  Yes.

22   Q.  Do you have any children?

23   A.  Yes.

24   Q.  How many?

25   A.  Three.

E8i9chr4                         D. Williams - direct

1  Q.  What are their names and nicknames?

2  A.  Gerard Perkins.  His nickname is Smoke.  Marcus Williams,

3  Junior and Joseph Williams.

4  Q.  Have you committed crimes in your life?

5  A.  Yes, I have.

6  Q.  What kind of crimes?

7  A.  I've sold drugs.  I've sold guns.  I've transported guns.

8  I have an attempted murder charge.  Murder charges.  Narcotics.

9  Q.  Have you ever pleaded guilty to participating in a

10  racketeering conspiracy?

11  A.  Yes, I have.

12  Q.  What did that involve?

13  A.  I'm sorry?

14  Q.  What did that involve, that racketeering conspiracy?

15  A.  I was involved with a gang and I received a racketeering

16  charge.

17  Q.  What gang was that?

18  A.  The Bloods.

19  Q.  Have you committed any robberies?

20  A.  Yes, I have.

21  Q.  What robberies have you committed?

22  A.  There was a robbery at 270 First Street.  It was my sister

23  who was actually robbed.

24  Q.  And you participated in that robbery?

25  A.  Yes, I did.

1    Q.  Where did you grow up?

2    A.  Newburgh, New York.

3    Q.  In 2008 through 2010 where did you live?

4    A.  Newburgh, New York.

5    Q.  And what neighborhood of Newburgh did you live in during

6    that time period?

7    A.  The City of Newburgh?  It's up by the high school.

8    Q.  What neighborhood did you live in?  What street?

9    A.  Third Street.  Third and Valley.

10   Q.  Are you familiar with Chambers Street, Dubois Street, and

11   Lander Street, Newburgh?

12   A.  Very.

13   Q.  How are you familiar with them?

14   A.  I've lived there my entire life.  And the time period that

15   you just mentioned, I hung out there all day, everyday.

16   Q.  I want you to look around the courtroom and tell me if you

17   recognize anyone you knew from Newburgh.

18   A.  Yes.

19   Q.  Who do you recognize?

20   A.  Reckless.

21   Q.  Please describe an article of clothing that Reckless is

22   wearing?

23   A.  He has a white shirt on.

24   Q.  And describe where he's sitting.

25   A.  (No response).

E8i9chr4                        D. Williams - direct

1    Q.  In the courtroom.

2    A.  At the first table.  Right there.

3            MR. NAWADAY:  May the record reflect that the witness

4    has identified the defendant Raymond Christian?

5            THE COURT:  The record will so reflect.

6    Q.  Do you know Reckless by any other names?

7    A.  Years ago Ashy Larry.

8    Q.  That's A-S-H-Y Larry?

9    A.  I guess, yes.

10   Q.  Do you know Reckless's real name?

11   A.  Raymond Christian.

12   Q.  Anyone else in the courtroom you recognize?

13   A.  Bow Wow.

14   Q.  Please describe an article of clothing that Bow Wow is

15   wearing and where Bow Wow is in the courtroom.

16   A.  I can't see him.  Can I stand up?

17           THE COURT:  Yes.

18           THE WITNESS:  He has a light blue shirt on.  He's

19   sitting in the corner.

20           MR. GOLTZER:  Forgive me, Judge, but if she couldn't

21   see him I move to strike the identification she made.

22           THE COURT:  Overruled.

23           MR. NAWADAY:  May the record reflect that the witness

24   has identified Tyrell Whitaker?

25           THE COURT:  It will so reflect.

E8i9chr4                         D. Williams - direct

1   Q.  Did you know Bow Wow by any other names?

2   A.  No.

3   Q.  Is there anyone else in the courtroom you recognize?

4   A.  Gucci.

5   Q.  Please scribe an article of clothing that Gucci is wearing

6   and where Gucci is in the courtroom.

7   A.  He's sitting at the table.  He has a gray shirt on.  With

8   glasses.

9           MR. NAWADAY:  May the record reflect that the witness

10  has identified Glenn Thomas?

11          THE COURT:  The record will so reflect.

12  Q.  Did you know Gucci by any other names?

13  A.  No.

14  Q.  I want to talk about your background.  Are you a United

15  States citizen?

16  A.  Yes.

17  Q.  About how far did you get in school?

18  A.  Twelfth grade.

19  Q.  Where do you currently live?

20  A.  MCC New York.

21  Q.  Is that a federal prison?

22  A.  Yes, it is.

23  Q.  About how long have you been in federal prison?

24  A.  Thirty-five months.

25  Q.  What led you to be at the MCC?

E8i9chr4                          D. Williams - direct

1    A.  I was arrested.

2    Q.  What were you arrested for?

3    A.  Racketeering.  Narcotics conspiracy.  Hobbs Act robbery.

4    Attempted murder on a Latin king gang member.  Firearm murder.

5    Q.  Before your arrest was there a time when you were actively

6    cooperating with the government?

7    A.  Yes.

8    Q.  And around when was that?  Around what years?

9    A.  2009, I think.

10   Q.  And what led to you actively cooperating with the

11   government?

12   A.  I was arrested for attempted murder on a Latin king gang

13   member.

14   Q.  And what did you do as part of your active cooperation back

15   then?

16   A.  They asked me questions.  I told them the answers to the

17   questions that I knew.  If something happened, the officer

18   would text me and ask me did I know.  If I knew, I told him.

19   If I didn't know, I couldn't tell him.

20   Q.  Why were you doing that at that time?

21   A.  To not have to go to prison.

22   Q.  So you were doing this while you were out on the streets of

23   Newburgh?

24   A.  Yes.

25   Q.  Who was your primary contact at that time?

E8i9chr4                          D. Williams - direct

1   A.  Steve Bunt.

2   Q.  Who is that?

3   A.  He's an officer.

4   Q.  Of Newburgh?

5   A.  I assume.  I don't know if he's Newburgh.  I always went to

6   see him in Goshen.

7   Q.  And during that period of time had you told the government

8   about all your crimes at that point?

9   A.  In the beginning, yes.

10  Q.  At that time were you -- while you were cooperating were

11  you completely honest about all of your activities?

12          MR. BUCHWALD:  Could we have what time that time is?

13          THE COURT:  Mr. Nawaday.

14  Q.  We're speaking about the time you were actively cooperating

15  while out on the streets of Newburgh.

16  A.  Okay.  What's the question?

17  Q.  The question is at that time were you completely honest

18  about all your activities of what you were doing in Newburgh

19  while providing information to the government?

20  A.  No.

21  Q.  Did there come a time when you stopped providing

22  information to the government?

23  A.  Yes.

24  Q.  And how did that come about?

25  A.  My boyfriend at the time was involved in a murder and I got

E8i9chr4                      D. Williams - direct

1    rid of clothes that I assumed he used for the murder, and the

2    prosecutor said she wasn't going to talk to me anymore.

3    Q.  But what happened?

4    A.  I never met with them again.

5    Q.  Did there come a time when you were arrested?

6    A.  Yep.  They contacted me in May and told me that they wanted

7    me to --

8              MR. BUCHWALD:  Could we get a year, your Honor?

9              THE COURT:  What year?  Do you recall May of what

10   year?

11             THE WITNESS:  2011.

12   Q.  So what happened?

13   A.  I didn't talk to anyone.  In September 2011 I was arrested.

14   Q.  Did you ever self-surrender?

15   A.  No.

16   Q.  After your arrest in September 2011 did you still try to

17   cooperate after that point?

18   A.  Yes.

19   Q.  And what did that involve?

20   A.  Telling everything that I've ever done.

21   Q.  Telling who?

22   A.  Telling the government.  Can't commit anymore crimes.

23   Q.  Who did you meet with, if anyone, to try to cooperate?

24   A.  Mr. Maimin.

25   Q.  Who is Mr. Maimin?

1   A.   The AUSA.

2   Q.   During your meetings was there anyone else present besides

3   Mr. Maimin?

4   A.   My lawyer was present.  There were agents present.

5   Q.   And what did you have to talk about in those meetings?

6   A.   Everything I've ever done.  Everything I know was done or I

7   was involved with, around.

8   Q.   And what was your understanding what you had to do to get a

9   cooperation agreement?

10  A.   Not commit anymore crimes and tell the truth.

11  Q.   Did there come a time when you eventually pleaded guilty to

12  your crimes?

13  A.   I did.

14  Q.   And before that point about how many meetings had you had

15  with the government?

16  A.   I'm unsure.  I don't know how many.  Many.

17  Q.   When you pled guilty was that to a cooperation agreement?

18  A.   Yes, it was.

19  Q.   I'm going to show you what's been marked for identification

20  as Government Exhibit 424.

21       MR. NAWADAY:  May I approach, your Honor?

22       THE COURT:  You may.

23  Q.   Ma'am, lease take a look at that, tell me if you recognize

24  it.

25  A.   Yes.

E8i9chr4                          D. Williams - direct

1    Q.   What does it appear to be?

2    A.   My cooperation agreement.

3    Q.   There are signatures on the last page.  Do you recognize

4    any of them?

5    A.   Yeah, mine and my lawyer's.

6             MR. NAWADAY:  The government offers Government Exhibit

7    424.

8             THE COURT:  Any objection?

9             MR. STRAZZA:  No objection.

10            THE COURT:  424 will be received.

11            (Government's Exhibit 424 received in evidence)

12   Q.   What's your understanding of what you have to do under your

13   agreement?

14   A.   Not commit anymore crimes.

15   Q.   You have to testify if called upon?

16   A.   Yes, if I'm -- if I need -- if any of the AUSAs want to

17   speak to me, yes, I have to speak to them, I have to testify.

18   Q.   Do you have to attend meetings if asked?

19   A.   I do, yes.

20   Q.   Are you allowed to lie?

21   A.   Absolutely not.

22   Q.   About how many people have you told the government you

23   committed crimes with?

24   A.   I can't -- I don't know a number.  Many.

25   Q.   More than ten?

1   A.  Yeah.

2   Q.  Do some of those people include members of gangs you were

3   associated with?

4   A.  I'm sorry?

5   Q.  Were some of those people members of gangs you were

6   associated with?

7   A.  A majority of them were, yes.

8   Q.  Would you have to testify against them if called upon?

9   A.  I didn't hear you.

10  Q.  Would you have to testify against those people if asked to?

11  A.  Yes, I would.

12  Q.  Did you consider some of those people friends?

13  A.  At the time I did, yes.

14  Q.  What's your understanding of what the government has to do

15  under your agreement if you do what you're supposed to do?

16  A.  Write a letter to the judge letting the judge know

17  everything I've done wrong and everything I've done to assist

18  the government.

19  Q.  Is that called a 5K letter?

20  A.  Yes.

21  Q.  And without that 5K letter what's your understanding of the

22  maximum time of imprisonment that you are facing?

23  A.  The maximum time?

24  Q.  Yes.

25  A.  Is life.

E8i9chr4                          D. Williams - direct

1   Q.  And without your 5K letter is there a mandatory minimum

2   time that you're facing?

3   A.  My mandatory minimums are 80 years.

4   Q.  And if you get that 5K letter what's the lowest sentence

5   you could get?

6   A.  Time served.

7   Q.  And even if you get that 5K letter what's the highest

8   sentence you could get?

9   A.  Life.

10  Q.  What sentence are you hoping to get?

11  A.  Time served.

12  Q.  Will that 5K letter, as far as you understand, recommend a

13  specific sentence?

14  A.  No.

15  Q.  Does your sentence, as far as you understand, depend on the

16  outcome of this trial?

17  A.  No.

18  Q.  What's your understanding of what happens if you lie under

19  this agreement?

20  A.  You lose your cooperation agreement.

21  Q.  You get your 5K letter?

22  A.  No.

23  Q.  And what's the mandatory minimum if you don't get your 5K

24  letter?

25  A.  Eighty years.

E8i9chr4                          D. Williams - direct

1   Q.  What's your understanding of what happens if you tell the

2   truth on the stand today?

3   A.  (No response).

4   Q.  Do you get your letter?

5   A.  Yes.

6   Q.  Has anyone told you what sentence you'll get?

7   A.  No.

8   Q.  And Ms. Williams, have you testified before pursuant to

9   your agreement?

10  A.  I have, yes.

11  Q.  And against whom?

12  A.  Anthony Boykin and Justin Simmons.

13  Q.  Did they have nicknames?

14  A.  Double O is Anthony Boykin.  And Justo is Justin Simmons.

15  Q.  I want to talk about some of the crimes you've committed.

16  You said you sold drugs?

17  A.  I did.

18  Q.  What drugs did you sell and when did you sell them?

19  A.  I sold crack back in 1997, '98, '99 and then from 2005

20  maybe, 2004, 2005, that area until I came to jail I sold

21  prescription pills.

22  Q.  Now with the crack were you ever arrested and convicted for

23  that?

24  A.  I was, yes.

25  Q.  When were you convicted for selling crack?

E8i9chr4                         D. Williams - direct

1   A.  1999.

2   Q.  Was that after a guilty plea?

3   A.  I pled guilty, yes.

4   Q.  What were you sentenced to?

5   A.  I was sentenced to three years probation.

6   Q.  And when you were selling crack back then were you doing

7   that alone or with others?

8   A.  I was doing it with my husband.

9   Q.  Who was that?

10  A.  Marcus Williams.

11  Q.  And you said you were selling prescription drugs?

12  A.  Yes.

13  Q.  How did that work?

14  A.  Back in 2004 or 2005 I was seeing a doctor who prescribed

15  the pills to me so I sold the pills.  My sister was then

16  diagnosed with cancer.  She started getting the pills.  I sold

17  the pills.  Over time, as the years went by, I stole the script

18  pad from the doctor's office and filled it out myself and sold

19  the pills.

20  Q.  Now you said you also pleaded guilty to a racketeering

21  conspiracy?

22  A.  I did.

23  Q.  That involved the Bloods?

24  A.  It did.

25  Q.  What did you actually do as part of that conspiracy?

1    A.  I took them to transport guns.  I took them to transport

2    drugs.  I've took them to robberies.  I took them to shootings.

3    Q.  And around what time period were you doing that?

4    A.  2009, 2010.

5    Q.  Were you paid for that?

6    A.  No.

7    Q.  Why did you do it?

8    A.  I wanted to.

9            MR. STRAZZA:  I'm sorry.  I didn't hear that.

10           THE COURT:  Madam court reporter.

11           (Record read)

12   Q.  By the way where were you doing this, what town?

13   A.  The City of Newburgh.

14   Q.  Did you ever send messages for Bloods in prison?

15   A.  A lot, yes.

16   Q.  Around when did you do that?

17   A.  2008, 2009, 2010 and 2011.

18   Q.  You said you had pled guilty to conspiracy to commit

19   murder?

20   A.  I did.

21   Q.  And what was that about?

22   A.  I was -- I was involved in a shooting that happened on

23   Lander Street in the City of Newburgh.

24           What question did you ask me?  I'm sorry.

25   Q.  Conspiracy to commit murder I think you said of a Latin

E8i9chr4                              D. Williams - direct

1    King?

2    A.   That was attempted murder.

3    Q.   So what led to that?

4    A.   I was in the car.  Me and another girl.  And two Bloods

5    were in the car.  They got out of the car and they started

6    shooting at the Latin Kings.  I was there.

7    Q.   Why were you there?

8    A.   Because that's where I hung out everyday.

9    Q.   Were you assisting them?

10   A.   I did.

11   Q.   You said there was a robbery of your sister?

12   A.   There was.

13   Q.   How did that come about?

14   A.   My niece called me and told me her father had a large

15   amount of money and drugs.

16        I went and picked my niece up.  We went to a friend of

17   her's.  We asked him did he -- would he go in there and rob

18   them.  He said yes.  We went around the corner.  We were on

19   Chambers Street in Newburgh at the time.  We went around the

20   corner on Lander Street.  I seen a guy named Fuzzy.  I asked

21   him would he go.  He said yes.  I took them both to get the

22   guns.  And I took them to the apartment to where my sister and

23   her husband lived.

24   Q.   What happened after you did that?

25   A.   I took them to the apartment.  I dropped them off in front.

E8i9chr4                          D. Williams - direct

1    I went around the corner and waited for them.  They went in the

2    apartment.  We told them where the stuff was -- where the stuff

3    was supposed to be.  It wasn't there.  They came out with

4    nothing like five minutes later.

5    Q.   Do you know if guns were used?

6    A.   They were.

7    Q.   About how old was your niece at the time?

8    A.   Ten.

9    Q.   How old was your sister at the time?

10   A.   33, 34.  I'm not sure.  I can't --

11   Q.   Did you get anything out of that robbery?

12   A.   No.

13   Q.   Why did you do it?

14   A.   I wanted to, obviously.

15   Q.   I'm going to show you what's already in evidence as

16   Government Exhibit 218.

17            MR. NAWADAY:  Ms. McInerney can you please put that

18   up.

19            Ms. Williams, it should appear on your screen.

20   Q.   Do you recognize that?

21   A.   Yes.

22   Q.   Who is that?

23   A.   Fuzzy.

24   Q.   Is that one of the people you got to rob your sister?

25   A.   It is.

E8i9chr4                              D. Williams - direct

1    Q.  Have you ever committed any crimes with family members?

2    A.  (No response).

3    Q.  Of yours?

4    A.  I've sold drugs with my sister, with my brothers before,

5    with my son.

6    Q.  And which son was that?

7    A.  That's my oldest son Gerard Perkins.  Smoke is his

8    nickname.

9    Q.  Do you know what the term 550 means?

10   A.  I'm sorry.

11   Q.  550?

12   A.  Yeah.  It's a Blood slang that you're neutral.

13   Q.  What do you mean by that?

14   A.  You're not Blood but you're also not an enemy to them

15   either.  You're somebody who is cordial with the gang.

16   Q.  Were you 550?

17   A.  Yes.

18   Q.  I want to turn to some of the people you identified.

19           Starting with Reckless.  How did you first meet

20   Reckless?

21   A.  I know Reckless's entire family, his mother, his aunts, his

22   uncles, his grandmother, his cousins.  I've known him since

23   he's been a little boy.

24   Q.  Do you know if he was a member of any gangs?

25   A.  Years ago they were in a little gang that was called Ashy

E8i9chr4                          D. Williams - direct

1   Bandits, the boys were, the younger boys were.  Before I came

2   to jail he was a Blood.

3   Q.  You said you know Bow Wow?

4   A.  I know Bow Wow.

5   Q.  How do you know him?

6   A.  I met Bow Wow through my oldest son Smoke.  Him and my son

7   used to hang out together.

8   Q.  Do you know if he was a member of any gang when you knew

9   him?

10  A.  I'm sorry.

11  Q.  Do you know if he was a member of any gang?

12  A.  I don't.

13  Q.  You said you knew Gucci?

14  A.  Yes.

15  Q.  How do you know Gucci?

16  A.  I also know Gucci's sisters.  I know his mother.  I know

17  him from the streets, you know, in the City of Newburgh.

18  Q.  Who is his sister?

19  A.  He has a sister named Princess and he has a sister named

20  Cayla.

21  Q.  Do you know if Princess was a member of any gang?

22  A.  She's a Blood.

23  Q.  Do you know if Gucci was a member of any gang?

24  A.  Gucci was a Crip for some time and when I came to jail he

25  was a Blood.

E8i9chr4                       D. Williams - direct

1          MR. NAWADAY:  Ms. McInerney can you please scroll

2     through some pictures that are already in evidence.

3     Q.  Ms. Williams, you'll see these come up on your screen I

4     just ask you if you recognize them and who they are.

5          Starting with Government Exhibit 204.  Do you know who

6     that is?

7     A.  L-1.

8     Q.  Did you know L-1 by any other names?

9     A.  His real name.

10    Q.  What was his real name?

11    A.  James Williams.

12    Q.  Do you know if he was a member of any gang?

13    A.  He was a Blood, yes.

14    Q.  Do you know what a set is?

15    A.  Do I know what a set is?  Yes.

16    Q.  What is a set?

17    A.  It's kind of like a branch-off to what -- there's a whole

18    bunch of Bloods and you're under a different name.  It's just

19    you can be Shine.  You can be Stone.  You can be -- there's a

20    whole bunch of different names.  It's just one that you're

21    under.  Whoever is over you, that's who you're under, that's

22    what you are.

23    Q.  Do you know what set L-1 was a part of?

24    A.  I don't know a hundred percent sure, no.

25         MR. NAWADAY:  Ms. McInerney can you please put up

E8i9chr4                          D. Williams - direct

1    Government Exhibit 206.

2    Q.  Do you know who that is?

3    A.  Kev Gotti.

4    Q.  Did you know Kev Gotti by any other names?

5    A.  Kevin Burden.

6    Q.  Do you know if Kev Gotti was a member of any gangs?

7    A.  He was a Blood.

8    Q.  Have you ever seen him with any guns?

9    A.  I've never seen him with a gun.

10   Q.  Do you know if he sold drugs?

11   A.  I have seen him sell drugs.

12   Q.  What drugs?

13   A.  Crack.

14   Q.  And where did you see him sell drugs?

15   A.  In the City of Newburgh, on Lander Street, Chambers Street,

16   First Street.

17   Q.  By the way, when you saw him selling drugs what were you

18   doing out there?

19   A.  I hung out there all day, everyday; all night, every night.

20   Q.  Hang out there by yourself or with another person?

21   A.  No.  I hung -- there was other females that I hung out with

22   and I hung out with any -- I hung out with a bunch of Bloods

23   all the time.

24   Q.  Who was the other female?

25   A.  Jamie Kinsley.

E8i9chr4                           D. Williams - direct

1   Q.  Are you related to her?

2   A.  We are cousins, yes.

3          MR. NAWADAY:  Ms. McInerney if you can please pull up

4   Government Exhibit 205.

5   Q.  Do you know who that is?

6   A.  Bash.

7   Q.  Did you know Bash by any other names?

8   A.  No.

9   Q.  Do you know if Bash was in any gangs?

10  A.  He was a Blood.

11         MR. NAWADAY:  Government Exhibit 212.

12  Q.  Do you know who that is?

13  A.  Quick.

14  Q.  Did you know Quick by any other names?

15  A.  Quran Nichols.

16  Q.  Do you know if he was a member of any gangs?

17  A.  He was a Blood also.

18         MR. NAWADAY:  Government Exhibit 209.

19  Q.  Do you know who that was -- is?

20  A.  Tyrik Leggette.

21  Q.  Did he have any nicknames?

22  A.  Freaky.

23  Q.  How do you know Freaky?

24  A.  I also know his mom, his aunts, his sister, his entire

25  family.  I've known him since he's been a little boy.

E8i9chr4                          D. Williams - direct

1   Q.  Do you know if he was a member of any gangs?

2   A.  He was a Blood.

3        MR. NAWADAY:  Then Government Exhibit 216.

4   Q.  Do you know who that is?

5   A.  Anthony Baynes.

6   Q.  How do you know him?

7   A.  I know his mom.  I know his dad.  I know his stepmother.

8   I've known him since he's been a little boy.  I've watched him

9   grow up.

10  Q.  Do you know him by any other names?

11  A.  Little Tony.

12  Q.  Do you know if he was a member of any other gangs?

13  A.  I don't.

14  Q.  You said you transported drugs or drove drug dealers around

15  in Newburgh; is that right?

16  A.  Many occasions, yes.

17  Q.  Are you familiar with the streets where crack is sold in

18  Newburgh?

19  A.  Yes.

20  Q.  What streets are those?

21  A.  Almost every street in the City of Newburgh.

22  Q.  Particular street names?

23  A.  Lander Street, Chambers Street, South Street, Third Street,

24  First Street, Broadway, South Miller, Lutheran Street.

25  Q.  How about Dubois Street?

E8i9chr4                          D. Williams - direct

1    A.  Dubois Street.

2    Q.  Do you know if Reckless sold drugs?

3    A.  I have seen Reckless sell drugs before, yes.

4    Q.  Please tell the jurors the times you remember seeing

5    Reckless sell drugs and what you saw.

6    A.  On one occasion I seen Reckless sell drugs on Chambers

7    Street in a hallway.  He was in the hallway to the right of me.

8    I was to the left of him.  He was serving the crackhead.  He

9    took the crack from out of the back of his pants.  He sold the

10   crackhead the crack right in front of me in the hallway.

11   Q.  About how far away were you from him when you saw that?

12   A.  A foot at the most.

13   Q.  What were you doing there, by the way?

14   A.  Hanging out there.

15   Q.  Around when was this?

16   A.  2009, 2010.  I'm unsure exactly.

17   Q.  Do you know who he sold crack to on this occasion?

18   A.  To a guy Timmy.

19   Q.  Did Timmy have any other names?

20   A.  I don't know him -- I just know him as a crackhead and

21   that's his name.

22   Q.  And about how much crack or money was exchanged, if you

23   know?

24   A.  Not much.  It was a small amount.

25   Q.  When do you mean by "small amount"?

E8i9chr4                          D. Williams - direct

1    A.  Like a -- smaller than a penny.  A small amount.

2    Q.  Do you remember how much money was exchanged?

3    A.  Not exactly, no.

4    Q.  Any other occasions you've seen Reckless sell crack?

5    A.  On Lutheran Street in a Bruman house.  He was in a

6    building.  I went there one day to see if somebody was there.

7    And he was there serving a lady crackhead in the building.

8    Q.  And what did you actually see?

9    A.  He had the crack in his pocket and he took the crack out of

10   his front pocket and he served her.

11   Q.  Do you know who he served on that occasion?

12   A.  Pussy is her name.  That's all I know her as.

13   Q.  About how much money or crack was exchanged, if you know?

14   A.  It was a small amount.  It wasn't much.

15   Q.  Any other occasions you've seen Reckless serve crack

16   customer -- oh, by -- when was the occasion you saw Reckless

17   serving Pussy?

18   A.  2009, 2010.  I'm unsure.

19   Q.  Any other occasions you've seen Reckless serving a crack

20   cocaine customer?

21   A.  South Miller and Broadway in Newburgh.  I watched him

22   serving a crackhead lady.  Her name is Brooklyn.

23   Q.  And what did you see and around when was this?

24   A.  It was 2009, 2010 timeframe.  The drugs were in his -- the

25   back of him again.  He took the drugs out.  He served her.  She

1    gave him the money.

2    Q.  What do you mean "the back of him"?

3    A.  Like in their butt crack.

4    Q.  About how much was exchanged?

5    A.  I don't know exactly.

6    Q.  Have you ever seen Reckless work with anyone else during a

7    drug sale?

8    A.  On Dubois Street one day L-1 was standing on the porch and

9    L-1 told Reckless something in regards to a drug sale on Dubois

10   Street.

11   Q.  What do you remember happening?

12   A.  L-1 told the customer to get it from Reckless, for Reckless

13   to serve the customer.

14   Q.  Around when was this?

15   A.  2010 maybe.

16   Q.  Have you ever seen Reckless work with Bow Wow in a drug

17   sale?

18   A.  On Dubois Street in front of the same building.

19   Q.  What do you remember seeing?

20   A.  The crackhead was talking to Reckless first and the

21   crackhead went to Bow Wow after he spoke to Reckless.

22         MS. STAFFORD:  Your Honor, can we have a timeframe?

23   BY MR. NAWADAY:

24   Q.  Around when was this, Ms. Williams?

25   A.  2009, 2010.  I'm unsure exactly.

1    Q.  Where was this on Dubois, if you remember?

2    A.  By Dubois and Van Ness Street.

3    Q.  Where were you when you saw Reckless direct the crackhead

4    to Bow Wow?

5    A.  Sitting on the porch two doors over.

6    Q.  On Dubois Street?

7    A.  Yes.

8    Q.  Whose house were you at at the time?

9    A.  My boyfriend at the time, his grandmother's house.

10   Q.  And who was your boyfriend at the time?

11   A.  Marco Boykin.

12   Q.  Do you know if Marco Boykin is related to Laquavious

13   Boykin?

14   A.  They have the same last names.  They're not related.

15   Q.  What kind of relationship did you have with Marco Boykin at

16   the time?

17   A.  At the time of the day I was at his grandmother's house?

18   Q.  Yes.

19   A.  I don't know -- I don't understand what you want to know,

20   what you're asking me.

21   Q.  Was he your boyfriend?

22   A.  He was my boyfriend, yes.

23          MR. NAWADAY:  Ms. McInerney if you can please pull up

24   Government Exhibit 270.

25   Q.  Ms. Williams, you're going to see something on your screen.

E8i9chr4                          D. Williams - direct

1          Do you recognize that?

2  A.   That's the house on Dubois Street.

3  Q.   What house?

4  A.   That L-1 and Reckless and Little Tony, Bow Wow, Tyrik,

5  Quick, all of them used to hang out there.  That's the house

6  that they were in front of the day I seen them make the drug

7  sales.

8  Q.   In addition to the time on Dubois Street that you saw Bow

9  Wow serve a customer, have you seen him sell crack on any other

10 occasions?

11 A.   He sold crack out of my house before.

12 Q.   Out of your house?

13 A.   Yes.

14 Q.   Where was your house?

15 A.   433 Third Street.

16 Q.   In Newburgh?

17 A.   Yes.

18 Q.   How often did you see Bow Wow deal and sell from your

19 house?

20 A.   It wasn't very often.  He came there to play the game with

21 my son.  And if he was is there and somebody called his phone,

22 they came there so he can serve them.

23 Q.   What do you remember actually seeing him do while at your

24 house relating to drug sales?

25 A.   On one or two occasions he -- somebody called him, he told

E8i9chr4                          D. Williams - direct

1    him to meet them around the corner on Valley Avenue, which is

2    around the block.

3              On another occasion there was a white man on my porch

4    that Bow Wow served on my porch.

5    Q.  And have you ever seen Bow Wow with crack in your house?

6    A.  Yes.

7    Q.  Besides Bow Wow, anyone else -- did you let anyone else

8    sell from your house?

9    A.  Yes.

10   Q.  Who?

11   A.  Kev Gotti made sales out of my house.  Quick made sales out

12   of my house.  Bash had someone meet him around the corner

13   before -- well a few different times Bash had somebody meet him

14   around the corner.

15   Q.  What time period was this when Bow Wow, Gotti, and Bash

16   were selling out of your house?

17   A.  I don't know -- I can't remember if it was the end of 2009,

18   beginning of 2010.  It was in that timeframe.

19   Q.  Do you know what re-upping is?

20   A.  I do.

21   Q.  What is that?

22   A.  When you're a drug dealer and you don't have anymore drugs

23   you have to go to a drug dealer who is higher than you to go

24   buy more drugs for you to sell.

25   Q.  Do you know who Bow Wow re-upped from in 2009 and 2010?

1   A.  L-1.

2   Q.  How do you know that?

3   A.  They were having a conversation in my house one day about

4   it and he said that he needed to go to L-1 to get more drugs.

5   Q.  Who was having this conversation?

6   A.  My son was there.  Bow Wow was there.  Kev Gotti was there.

7   I'm unsure of who else was there.

8   Q.  Have you ever driven Gotti to re-up?

9   A.  I don't remember.

10  Q.  Have you ever driven L-1 to re-up?

11  A.  I took L-1 to meet with somebody, Danny Dog, I took him to

12  buy drugs off of.

13  Q.  What did you bring L-1 to pick up, what drugs?

14  A.  I took him to pick up crack.

15  Q.  Around when was that?

16  A.  It was 2009, 2010.

17  Q.  Do you know how much -- about how much crack was involved

18  with that?

19  A.  It was between 10 grams and 14 grams.  I can't remember

20  exactly but I remember it was between 10 and 14 grams.

21  Q.  In the 2008, '9, and '10 time period have you ever seen Bow

22  Wow, Reckless, and Gucci hang out together?

23  A.  I did, yes.

24  Q.  And how often and where did you see them together?

25  A.  I seen them downtown in the City of Newburgh; Dubois

E8i9chr4                          D. Williams - direct

1   Street, Lutheran Street, City Terrace, South Miller.  It's

2   different -- I was there everyday so I can't say exactly how

3   many times I seen them together because I was outside everyday.

4   Q.  Did you see -- ever see any of them during that time period

5   with L-1?

6   A.  I have seen them all with L-1 before.

7   Q.  Again, did you ever see them at 38 -- at Government Exhibit

8   270?

9        MR. NAWADAY:  Can we put that up, Ms. McInerney?

10  Q.  Did you ever see L-1 with any of Reckless, Bow Wow, or

11  Gucci at that address?

12  A.  Yes.

13       MR. DRATEL:  Objection.  Compound.

14       THE COURT:  Why don't you break that down,

15  Mr. Nawaday.

16  BY MR. NAWADAY:

17  Q.  Who have you seen L-1 with at that address together at the

18  same time?

19  A.  Little Tony, Reckless, Gucci, Bow Wow, L-1.  I have seen

20  L-1 with just Reckless.  I have seen Reckless with Bow Wow.  I

21  have seen them all on different occasions.

22  Q.  So sometime --

23  A.  I have seen Kev Gotti there many a times also.

24  Q.  From 2008 to 2010 have you ever seen Bow Wow with a gun?

25  A.  I'm sorry.

E8i9chr4                         D. Williams - direct

1   Q.  Have you ever seen Bow Wow with a gun?

2   A.  I have to think about it.  I can't remember right this

3   second.

4   Q.  During that same time period have you ever seen Reckless

5   with a gun?

6   A.  I did see Reckless with a gun, yes.

7   Q.  On what occasions?

8   A.  I'm sorry?

9   Q.  On what occasions?

10  A.  One time I went to go meet with him because he was having

11  an issue with my son.  I went to go meet with him and he was

12  standing on the street.  I pulled up.  He had a gun right in

13  front of him.  Right in his hand.  I rolled the window down and

14  said:  You really gonna bring a gun to the car for a female?

15  And he turned around and he handed the gun to the boy that was

16  with him.  And then came and got in the car with me.

17  Q.  And who was with him at that time?

18  A.  He was with Gucci and another guy.  I don't know his name.

19  Q.  And about how close was he standing to Gucci and this other

20  guy when he came up to your car?

21  A.  All three of them were standing side by side on the

22  sidewalk.

23        All of three of them, they were on one side of the

24  street.  I parked on the other.  When he came towards me with

25  the gun, I said what I said to him.  He turned around and

1   handed it to them, and then came back to the car.

2   Q.  What happened when he came back to the car?

3   A.  When he got in the car, he told me that I had to pay him

4   four hundred dollars to leave my son alone.

5   Q.  What happened after that?

6   A.  I asked him why he was bothering my son, what was his

7   problem with my son, what was his issue.

8          He said my son was snitching.  I tried to explain.  It

9   didn't matter.  He said he wanted four hundred dollars for him

10  to leave my son alone.  I told him I go to the ATM machine and

11  get the money and bring it back to him.

12  Q.  What happened after that?

13  A.  I had my brother's car.  My brother called me, told me to

14  bring his car back.  I went home to go get my own car.  My son

15  was there.  I told him what had just happened, that I was going

16  to take the money to Reckless so Reckless will leave him alone.

17  And he said no, you're not taking the money to him.  Don't take

18  him nothing.

19  Q.  Did you ever pay him?

20  A.  No.

21         MR. NAWADAY:  Ms. McInerney if you can please put up

22  Government Exhibit 221.

23  Q.  Do you recognize that, Ms. Williams?

24  A.  Yes.

25  Q.  Who is that?

1    A.  Jeffrey Henry.

2    Q.  How long have you -- have you known Jeffrey Henry?

3    A.  Almost 20 years.

4    Q.  Is he related to you in any way?

5    A.  No.

6    Q.  Do you know his family?

7    A.  I do.

8    Q.  And how often did you see him when he was alive?

9    A.  I have seen him pretty often.  His wife is my children's

10   Godmother's sister.  I have seen him.  I have seen -- he be at

11   his mom's house, I would see him.  I would -- family functions,

12   holidays, birthdays, I would see him.

13   Q.  In 2009 and 2010 do you know how he made money?

14   A.  When I spoke to him personally, he told me he was working.

15   That's what I -- that's what he told me.

16   Q.  Have you ever seen him sell drugs?

17   A.  I have.

18   Q.  And what drugs and where?

19   A.  I have seen him sell crack before on Chambers Street.  And

20   on Lander Street I have seen him sell crack before.

21   Q.  Do you know what the dispute between Reckless and your son

22   Smoke was about?

23   A.  In the beginning I didn't know what it was over.  It had

24   went on for so long.  I didn't know why he was doing it to him.

25   I didn't know why he was bothering him.

1          In the end when I finally went and met with him that

2     day, that's the day that he told me my son was snitching.

3     Q.   Ms. Williams, prior to pleading guilty to your cooperation

4     agreement have you told the government about all your crimes?

5     A.   This cooperation agreement you're asking me?

6     Q.   Yes.

7     A.   Yes.

8     Q.   And this morning or this afternoon you told us details

9     about some of those crimes you've committed and pleaded guilty

10    to, right?

11    A.   Yes.

12    Q.   But we haven't gone through all the details of those

13    crimes, have we?

14    A.   (No response).

15    Q.   Before the jury?

16    A.   No.

17    Q.   Step back.

18          Besides this time that you saw Reckless with a gun,

19    did you see him with a gun on any other occasion?

20    A.   One other occasion he was on South Miller Street in the

21    City of Newburgh.

22    Q.   What were the circumstances of that?

23    A.   I'm sorry.

24          MR. GREENFIELD:   Time?

25    Q.   The approximate year was that -- what was the approximate

E8i9chr4                          D. Williams - direct

1   year that was and what did you actually see?

2   A.  2009, two thousand -- I am almost positive it was 2010.  He

3   was having an argument with his uncle.  He came out of the

4   store with the gun in his front pocket.  He took the gun out --

5   the girl, Jamie, that I was with, I put her in the car.  I got

6   in the car.  And we pulled off.

7   Q.  Where was this?

8   A.  The corner of South Miller and Broadway in the City of

9   Newburgh.

10  Q.  Ma'am, we haven't gone through all the details of your

11  crimes, right?

12  A.  No.

13  Q.  Just some of them?

14  A.  Yeah.

15  Q.  And are you willing to talk about the details of all those

16  crimes if defense counsel asks about them?

17  A.  I am.

18              MR. NAWADAY:  No further questions.

19              THE COURT:  Very well.  Cross-examination.

20  Mr. Strazza.

21  CROSS-EXAMINATION

22  BY MR. STRAZZA:

23  Q.  Ms. Williams, did you say that you set your sister up to be

24  robbed because you wanted to?  Is that what you said?

25  A.  I did say that.

E8i9chr4                          D. Williams - cross

1   Q.  Your sister had been diagnosed already with cancer at the

2   time, right?

3   A.  Yes, she had.  Yes.

4   Q.  And so you knew she had cancer, right?

5   A.  Yes.

6   Q.  And you had your friends go into her house with guns to rob

7   her?

8   A.  The robbery -- I'm sorry?

9   Q.  Is that what you did?

10  A.  The robbery wasn't for my sister.  The robbery was for her

11  husband.  My intentions weren't for them to go in there and rob

12  my sister and put a gun to her or to my niece.  It was for her

13  husband.  But I did set the robbery up.  Yes, I did.

14  Q.  Your ten-year-old niece, right?

15  A.  At the time she was ten, yes.

16  Q.  And you knew that they were going to go in there with guns,

17  right?

18  A.  I did know.

19  Q.  In fact, you waited for them down the block, right?

20  A.  I did.

21  Q.  Were you -- did you feel bad while you were waiting in the

22  car?

23  A.  At the time, no.

24  Q.  Did you feel bad when your sister later passed away from

25  the cancer that you had her robbed?

E8i9chr4                              D. Williams - cross

1    A.  Yes.

2    Q.  Do you feel bad now?

3    A.  I do.

4    Q.  Did you do it because you needed the money?

5    A.  Absolutely not.

6    Q.  Did you do it because you were addicted to drugs and you

7    needed drugs?

8    A.  No.

9    Q.  You just did it because you wanted to?

10   A.  Yep.

11   Q.  You mentioned that your son is Gerard or Gerald Perkins?

12   A.  Gerard.

13   Q.  Gerard Perkins?

14   A.  Mm-hmm.

15   Q.  Junior, right?

16   A.  Yes.

17   Q.  How old is he now?

18   A.  Twenty-one.

19   Q.  And he used to sell marijuana, right?

20   A.  Yes, he did.

21   Q.  And you helped him sell marijuana, right?

22   A.  I did.

23   Q.  You gave him money to buy marijuana?  Right?

24   A.  I did.

25   Q.  You took him to re-up, right?

1    A.  I did.

2    Q.  You drove him places so that he could make sales, right?

3    A.  I did.

4    Q.  You taught him how to sell drugs; isn't that right?

5    A.  I did.

6    Q.  You've been selling drugs out of your house since he was a

7    little boy, right?

8    A.  Not consistently but it started when he was younger, yes,

9    and then it picked up again as he was older.

10   Q.  And he's been present in the house during those sales,

11   right?

12   A.  He was.

13   Q.  Were you worried that something might happen to him?

14   A.  I didn't even think about it.

15   Q.  You didn't care, right?

16   A.  I didn't think about it.

17   Q.  Did you think that maybe somebody could come in with guns

18   and try and rob you and your kid?

19   A.  It could have happened.

20   Q.  So you weren't surprised that he started selling drugs when

21   he grew up because that's all he knew, right?

22   A.  Correct.

23   Q.  And you sold drugs with his father for a substantial period

24   of time, right?

25   A.  How much time are you talking about?

E8i9chr4                         D. Williams - cross

1    Q.  You tell me.

2    A.  A year or two?

3    Q.  I'm asking you.  How long did you sell drugs with his

4    father?

5    A.  Anywhere from a year to two years at the most.

6    Q.  And over the course of those year to two years you sold a

7    lot of drugs, right?

8    A.  I don't know how much drugs I sold but I sold drugs.

9    Q.  Everyday, right, during that time period?

10   A.  Not everyday, no.

11   Q.  Every other day?

12   A.  It depended if he was there to serve the customers, then I

13   didn't need to serve the customers.  If he wasn't there, then I

14   would serve the customer.  I didn't sell drugs everyday.

15   Q.  It was like a family business?

16   A.  No.  Not at all.

17   Q.  And then you started selling drugs with Marcus Williams,

18   right?

19   A.  I did.

20   Q.  And same thing.  Out of the house, right?

21   A.  Yes.

22   Q.  And if he wasn't there to make the sales you would make the

23   sales for him, right?

24   A.  Yes, I did.

25   Q.  And you sold a lot of drugs with him too, right?

E8i9chr4                         D. Williams - cross

1   A.  I sold a lot of drugs with him.  I did.  Not to.  I sold a

2   lot of drugs with him.

3   Q.  Okay.  You sold drugs with him for approximately four

4   years, right?

5   A.  (No response).

6   Q.  From 1993 to 1997?

7   A.  No.  I was arrested in -- I wasn't even with him in 1993.

8   Q.  When were you with him?

9   A.  1994.

10  Q.  How many years did you sell drugs with him?

11  A.  Two or three.

12  Q.  And you sold drugs everyday during that time period, right?

13  A.  No, I did not.

14  Q.  What happened -- why did you stop selling drugs with

15  Mr. Williams?

16  A.  We were arrested with a federal charge.

17  Q.  You guys got caught, right?

18  A.  Yes.

19  Q.  And he went to jail for five years, right?

20  A.  He did.

21  Q.  And you got probation?

22  A.  I did.

23  Q.  And then when you finished with that charge you started --

24  you moved on to prescription pills, right?

25  A.  Many years later, yeah.

E8i9chr4                      D. Williams - cross

1    Q.  You were selling Xanax?

2    A.  I've sold Xanax before.

3    Q.  Oxycontin?

4    A.  I've sold Oxycontin before.

5    Q.  Percocets?

6    A.  Yes.

7    Q.  Vicodins?

8    A.  Yes.

9    Q.  You were selling your sister's cancer medicine, right?

10   A.  At times, yes.

11   Q.  You stole prescription pads from the doctor's office and

12   wrote fake prescriptions to get some of your pills?

13   A.  Yes.

14   Q.  Did you ever get caught for any of that stuff?

15   A.  I pled guilty to it now.

16   Q.  This case?

17   A.  Yes.

18   Q.  Let's talk about that for a second.  We'll get to that

19   actually.

20           You also sold drugs with your brothers, right?

21   A.  I did, yes.

22   Q.  You sold with your brother Jason, right?

23   A.  Yes.

24   Q.  Your brother John?

25   A.  Yes.

E8i9chr4                    D. Williams - cross

1   Q.  You sold prescription pills with them?

2   A.  Yes.

3   Q.  You sold cocaine with them?

4       (Pause)

5   A.  Maybe Jason.  I'm not a hundred percent sure.  Maybe Jason.

6   I'm not positive.

7   Q.  You might have sold cocaine with Jason but you're not sure?

8   A.  I might have.

9   Q.  And both of your brothers wound up going to prison, right?

10  A.  Yes, they did.

11  Q.  But you didn't at the time, right?

12  A.  I went to prison for what?  For selling cocaine?

13  Q.  With them.  Selling drugs with them.  You didn't get caught

14  for selling drugs with them, right?

15  A.  They didn't get caught for selling drugs either.  They

16  didn't go to prison for selling drugs.

17  Q.  What did they go to prison for?

18  A.  My one brother was -- went -- Jason went to prison for

19  robbery.  Jason went to prison.  Now --

20  Q.  Did you ever commit any robberies with Jason?

21  A.  No.

22  Q.  Only Bloods, right?

23  A.  Only Bloods.

24  Q.  And how about John?  What did he go to prison for?

25  A.  He was caught with prescription pills and cocaine.  His

E8i9chr4                      D. Williams - cross

1   house was raided.  He was caught with drugs.  He wasn't selling

2   drugs.

3   Q.  He was caught with the stuff you were selling with him,

4   right?

5   A.  He was caught with pills that I sold to him?

6   Q.  No.  He was caught with the pills and the cocaine that you

7   sometimes helped him sell, right?

8   A.  At the time I may have, yes.

9   Q.  And he went to prison and you didn't, right?

10  A.  Possession is nine-tenths of the law.  I wasn't there.  He

11  possessed it.  I didn't.

12  Q.  Did you plead guilty in this case to things that you didn't

13  actually possess?

14  A.  Did I plead guilty in this case to things that I actually

15  didn't possess?

16  Q.  Right.  You just told me possession is nine-tenths of the

17  law.  Did you plead guilty in this case?

18  A.  I pled guilty, yes.

19  Q.  For things that you didn't actually have -- that you didn't

20  actually possess, right?

21  A.  I pled guilty to what I did.  That's what I pled guilty to.

22  Q.  Let's talk about what you did.  You drove Bloods around to

23  commit shootings among other things, right?

24  A.  Yes.

25  Q.  And you drove them around to pick up guns, right?

E8i9chr4                       D. Williams - cross

1   A.  Yes.

2   Q.  You drove them around to transport guns, right?

3   A.  Yes.

4   Q.  You drove them around to make drug sales, right?

5   A.  Yes.

6   Q.  You received mail from them, from prison so that you could

7   get it to other Blood members so that they wouldn't get caught,

8   right?

9   A.  Yes.

10                  (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E8inchr5                          Williams - cross

1   Q.  You passed messages along between Bloods who were

2   incarcerated, right?

3   A.  I did.

4   Q.  There was a time where you threatened a witness on one of

5   their cases, right?

6   A.  Yes.

7   Q.  Let's talk about that.  One of the Bloods had robbed a

8   woman in Newburgh, right?

9   A.  Yes.

10  Q.  Who was that blood?

11  A.  Who exactly robbed her?

12  Q.  Yes.

13  A.  I think it was Twizzy, I can't remember.

14  Q.  You don't even know who robbed her?

15  A.  I knew at the time, of course.  I mean it's years later.

16  I'm almost positive it was Twizzy and somebody else.  I think

17  there was more than one person.

18  Q.  But because it was so long ago you can't remember exactly,

19  right?

20  A.  Right.

21  Q.  But your memory is crystal clear all the times you saw

22  Raymond Christian selling drugs, right?

23  A.  Absolutely not.

24  Q.  You remember him in those hallways, right?

25  A.  Of course, I do, of course.

E8inchr5                        Williams - cross

1   Q.  Let me ask you something, over the past, I don't know, five

2   to ten years, how many drug transactions did you witness?

3   A.  Many.

4   Q.  Hundreds, right?

5   A.  It may have been.

6   Q.  Maybe even thousands, right?

7   A.  Maybe.

8   Q.  You remember those couple that you just talked about with

9   Raymond Christian.  Those stand out to you, right?

10  A.  They do.

11  Q.  They do because you need that 5K letter, right?

12  A.  Absolutely not.  That's not why.  It's because it's the

13  truth.

14  Q.  Let's talk about this 5K letter for a second.  You began

15  cooperating when?

16  A.  Which time are you talking about?

17  Q.  Let's say after you got arrested in 2011.

18  A.  I don't know exactly when.  I don't know what month exactly

19  I started talking to them.

20  Q.  You started talking to them in 2011, though, right?

21  A.  I don't know.  I came in in September 2011.  I don't know

22  if I met with them before the end of the year, was it the

23  beginning of the next year, I don't remember exactly the time.

24  Q.  Within months of you getting arrested you started

25  cooperating with the government, right?

E8inchr5                          Williams - cross

1   A.  I am unsure of how long after I was arrested that I started

2   speaking to them.

3   Q.  Was it years?

4   A.  No.

5   Q.  Within months, right?

6   A.  It may have been.

7   Q.  You have been cooperating with them ever since, right?

8   A.  I have.

9   Q.  You've testified more than once in trials for the

10  government, right?

11  A.  Yes.

12  Q.  And you still haven't gotten that 5K letter yet, right?

13  A.  No.

14  Q.  In fact, who determines whether you get that 5K letter?

15  A.  The government.

16  Q.  What do you have to do in order to get it?

17  A.  Not commit any more crimes, tell the truth.

18  Q.  You have to help them, right?

19  A.  If that's what you call telling the truth, then --

20  Q.  You have to testify at this trial, right?

21  A.  Of course, yes.

22  Q.  If you didn't have any information about Raymond Christian

23  and the other two individuals seated at that table, you

24  wouldn't be able to testify, right?

25  A.  I'm sorry?

E8inchr5                          Williams - cross

1    Q.  If you didn't have any information to provide, the

2    government wouldn't need your help, right?

3    A.  Right.

4    Q.  And you know that, right?

5    A.  Yes.

6    Q.  You loved your sister Tara, right?

7    A.  Yes.

8    Q.  But you had her robbed anyway, right?

9    A.  The robbery wasn't for my sister.

10   Q.  Well, you didn't care that you were going to have her

11   apartment robbed, right?

12   A.  No.

13   Q.  And you loved Marco, right?

14   A.  Yeah.

15   Q.  And you still provided information to the FBI anyway,

16   right?

17   A.  Yes.

18   Q.  It is fair to say you don't love Raymond Christian, right?

19   A.  No.

20   Q.  You don't even like Raymond Christian, right?

21   A.  I don't dislike him.  I don't --

22   Q.  You like him?

23   A.  I don't dislike him.  I am -- he's not -- we are not on

24   a -- we are not friends.  He's just another person.  That's it.

25   Q.  Are you saying that you don't dislike Raymond Christian?

1  A.  I have no ill feelings towards Raymond Christian, none.

2  Q.  Didn't you just tell us that he was beating up your son?

3  Didn't you say that?

4  A.  I just said that on the stand?  That he was beating up my

5  son?

6  Q.  Yeah.

7  A.  I did?

8  Q.  Didn't you say he was picking on your son?

9  A.  I never said he was beating up on my son.  I said he was

10 picking on my son is what I said.  I did.

11 Q.  OK.  You like people who pick on your son?

12 A.  Not liking him has nothing to do with what happened between

13 him and my son.  It has nothing -- whatever happened between

14 him and my son happened.  I have no ill feelings towards him.

15 None.

16 Q.  You like him?

17 A.  I don't dislike him.  I don't like him and I don't dislike

18 him.

19 Q.  Let's talk about the first time you started cooperating.

20 That was in 2009, right?

21 A.  Yes.

22 Q.  During that time period you started cooperating because you

23 got caught trying to shoot at the Latin Kings, right?

24 A.  I was with two males who were shooting at the Latin Kings.

25 Q.  You pled guilty to attempted murder on the Latin kings,

E8inchr5                         Williams - cross

1   right?

2   A.  Yes.

3   Q.  So you started cooperating after you got caught trying to

4   shoot at the Latin Kings, right?

5   A.  Yes.

6   Q.  You made this agreement with the government and you started

7   talking to the FBI, right?

8   A.  Yes.

9   Q.  And they put you up in a hotel, isn't that right?

10  A.  On an occasion, yes.

11  Q.  They put you up in the Marriott, right?

12  A.  On one occasion, yes.

13  Q.  That one occasion was for about a month, wasn't it?

14  A.  A little less than a month.

15  Q.  At that point in time you were continuing to provide the

16  FBI with information on a daily basis, right?

17  A.  I don't know if it was on a daily basis but --

18  Q.  You were keeping in touch with Detective Bunt, right?

19  A.  Yes.

20  Q.  You were also still seeing Marco Boykin, right?

21  A.  I was.

22  Q.  He was visiting you at that hotel, right?

23  A.  Yes.

24  Q.  You were sleeping with him at that hotel, right?

25  A.  Yes.

E8inchr5                    Williams - cross

1   Q.  And then were you going back and telling the FBI the things

2   that he was doing on the street, right?

3   A.  I may have.

4   Q.  You may have or you did?

5   A.  I'm unsure what I told them in that time frame.

6   Q.  You don't remember, right, because it was so long ago,

7   right.

8   A.  It may have concerned him.  It may not have concerned him.

9   If it was something that they asked me and I knew, I told them.

10  Q.  Did you tell them about the murder you thought he might

11  have been involved in?

12  A.  I did eventually, yes.

13  Q.  So you were telling the FBI about this murder that he was

14  involved in, and then you were taking his clothes that you

15  thought he might have been wearing and burning them so that he

16  couldn't get in trouble?

17  A.  No.  That's not how it happened.

18  Q.  Did you burn his clothes?

19  A.  No, I did not.

20  Q.  Did you destroy his clothes?

21  A.  I destroyed his clothes --

22  Q.  Excuse me.

23  A.  -- after the murder, and I never discussed the murder with

24  the FBI until I said what I did with the clothes.  I was

25  questioned about it, did I know something, no, I didn't know

E8inchr5                    Williams - cross

1    anything.  When I told about the clothes, that was when the

2    murder was discussed in a meeting.

3    Q.  About a week after you destroyed the clothes, right?

4    A.  Yes.

5    Q.  So that wasn't a long time, was it?

6    A.  It wasn't the same time.

7             MR. STRAZZA:  Judge, I have no further questions.

8             THE COURT:  Any further cross?

9             Mr. Dratel.

10            MR. DRATEL:  Thank you, your Honor.

11   CROSS EXAMINATION

12   BY MR. DRATEL:

13   Q.  Good afternoon, Ms. Williams.

14   A.  Good afternoon.

15   Q.  You want to see your kids again outside of jail before you

16   die, right?

17   A.  I'm sorry?

18   Q.  You want to see your kids again outside of jail before you

19   die, right?

20   A.  Yes.

21   Q.  With an 80-year mandatory minimum sentence staring you in

22   the face, the way is a 5K letter, right?

23   A.  Yes.

24   Q.  You said you knew Gucci, right?

25   A.  Yes.

E8inchr5                         Williams - cross

1    Q.  When you were being interviewed by the government -- do you

2    recall an interview on October 8, 2013 between you and several

3    representatives of the government?

4    A.  I am sure I was there.

5    Q.  Is that a yes?  I mean I can refresh your recollection if

6    you have a problem.

7    A.  Can I see it.

8    Q.  Yes.  I show you what's marked as 3513-58.  I just ask you

9    if you recall an interview on October 8, 2013.

10   A.  Yes.

11   Q.  Thank you.  You were shown photographs at that meeting,

12   correct?  Do you recall?  Were you shown photographs from time

13   to time by the government and asked about people?  In other

14   words, do you know this person, do you know that person, what

15   do you know about them, right?

16   A.  On a few occasions.

17   Q.  On that occasion weren't you shown a photo of Mr. Thomas

18   and you said, don't know his name?

19   A.  I don't remember if I was shown a picture that day and said

20   I don't know his name.  You are talking about the October 2013

21   meeting?

22   Q.  Yes.

23   A.  I can't remember exactly if it was that day that I seen a

24   picture and said I didn't know his name.

25   Q.  You were shown that photograph, right?

1  A.  In October of 2013?

2  Q.  Yes.

3  A.  I am unsure.  I very well may have been.  I don't remember.

4  Q.  Do you recall whether you said, Don't know his name?

5  A.  I don't remember the time that you are speaking about.

6  Q.  You identified other people by their nicknames, right?  You

7  weren't hesitant to do that even when you didn't know their

8  real names, correct?

9  A.  If I knew who they were, I said I knew who they were and

10  how I knew them.

11  Q.  But you would say a nickname?  If you didn't know someone's

12  name, but if you knew their nickname, you would say who it was

13  in the photograph, right, you would say a nickname, not

14  necessarily a real name?

15  A.  If I knew their nickname, I said their nickname, if I knew

16  their real name, I said their real name and most likely their

17  nickname also.

18  Q.  You said you had been cooperating with the Newburgh police,

19  correct, for a period of time before your arrest in September

20  of 2011?

21  A.  In January 2009, yes.

22  Q.  From January 2009 through essentially May of 2011?

23  A.  No.  Absolutely not.

24  Q.  Well, I am not talking about your January 2009 arrest, I am

25  talking about your September 2011 arrest.  You said you were

E8inchr5                        Williams - cross

1    arrested, right?

2    A.   What are you asking me?

3    Q.   I'm asking you what was the period of time in which you

4    were cooperating with the Newburgh police before your most

5    recent arrest?

6    A.   It started in January 2009, and I'm almost positive --

7    Q.   I will try to help you out.  Wasn't it until you refused to

8    disclose anything about the murder in which you destroyed the

9    clothes in May of 2011?

10   A.   They didn't find out about the clothes in May of 2011.

11   Q.   No, but that is when they asked you about it, and then they

12   said we are not going to talk to you anymore?

13   A.   No.

14   Q.   Didn't you testify to that?

15   A.   That's not how it happened.

16   Q.   Didn't you testify today that you were confronted by

17   someone from Newburgh who said we want to know about that, and

18   you said I don't know anything and then they said we are not

19   talking to you anymore and then a few months later you were

20   arrested.  Did you not testify to that?

21   A.   What I said was, I was arrested in January of 2009, I

22   started speaking with them.  When the murder happened, it was

23   about a week after the murder that I told them --

24   Q.   The murder was when?

25   A.   I can't remember if it was 2009 or 2010 to be exact.  I

1    can't remember honestly.  A week after the murder happened, I

2    told --

3    Q.  The murder is not important enough for you to remember

4    when --

5              MR. NAWADAY:  Objection.

6    Q.  Your boyfriend is involved in the murder.

7              THE COURT:  Mr. Dratel, you have to let her finish the

8    answer.

9              MR. DRATEL:  Thank you, your Honor.  I'm sorry.

10             THE WITNESS:  I can go?

11             THE COURT:  Yes.

12   A.  A week after the murder I told them that I got rid of the

13   clothes that I assumed Marco Boykin used for the murder.  After

14   that, they didn't speak to me anymore.  I didn't hear from them

15   until May of 2011 when I was given a phone call and I said what

16   I said.  He said what he said and it was over.  I came to jail

17   in September.

18   Q.  You knew when you destroyed those clothes that it could

19   very well damage your relationship with the police, right?  You

20   knew you were making a decision there?

21   A.  Of course, yes.

22   Q.  Because you could have called the police and said, Hey, I

23   have information about a murder, right?  You could have?

24   A.  I sent them pictures of the clothes.  They have pictures.

25   Q.  I'm asking you a question about when you destroyed them?

1    A.  Right.

2    Q.  When you had those clothes, you had already been providing

3    information on a continual basis to the Newburgh police,

4    correct?

5    A.  Yes.

6    Q.  For a considerable period of time, correct?

7    A.  Yes.

8    Q.  At least a year.  The murder you said may have been 2011.

9    It could have been two years, right?

10   A.  No, it wasn't in 2011.

11   Q.  But for at least a year?

12   A.  It wasn't even two --

13   Q.  You have been providing information for a considerable

14   period of time, correct?

15   A.  It depends on what you consider a considerable amount of

16   time.

17   Q.  Wasn't it at least a year?

18   A.  I'm not sure of exactly how long.

19   Q.  Was that roughly what it was.  Was it less than a year?

20   Can you give me an estimation?

21   A.  I can't.

22   Q.  You are providing information to the government, this

23   murder occurs.  You could have called up and said, I have

24   information about a murder, I have been helping you out, here's

25   some more help, correct?  You could have done that, right?

E8inchr5                          Williams - cross

1    A.  I could have, yes.

2    Q.  You could have preserved the clothing so that the police

3    could examine it, right?

4    A.  I could have, yes.

5    Q.  Instead you made a calculated and deliberate decision to

6    destroy that evidence, right?

7    A.  I did.

8    Q.  Despite the fact that you knew that it could have negative

9    consequences for your future and your relationship with the

10   police, right?

11   A.  Yes.

12   Q.  And that was because your boyfriend was more important to

13   you than that, right?  You were willing to take that risk for

14   your boyfriend, right?

15   A.  Absolutely not.  Because he told me not to do it and I

16   still did it.  It had nothing to do with how important he was.

17   Q.  It was an accident?

18   A.  No.  I made the decision on my own.  He told me not to do

19   it.  I did it on my own.

20   Q.  It was more important for you to do that than to tell the

21   police, right?  Even though your boyfriend didn't want you to

22   do it, it was more important for you to destroy that than have

23   him to go to jail and have you help the police, right?

24   A.  At the time that is a decision that I made.

25   Q.  Yeah.  Just like now it's more important for you to see

E8inchr5                          Williams – cross

1    your kids, right?

2    A.   It's more important than what for me to be seeing my kids?

3    Q.   Than to spend the rest of your life in jail?

4    A.   Of course.

5             MR. DRATEL:  Nothing further, your Honor.

6             THE COURT:  Ladies and gentlemen, it's ten minutes

7    after 3 now.  Let's take our break.  15 minutes.  Please be in

8    the jury room no later than 3:25.  OK.  Don't discuss the case.

9             (Continued on next page)

1           (Jury not present)

2           THE COURT:  Ms. Williams, you may step down.

3           Unless there is anything --

4           MR. BAUER:  Judge, just briefly, with regards to the

5    rest of our witnesses.  We don't have any other witnesses

6    prepared right now for today.  This has gone a lot faster today

7    than we had expected.  I think we have at least another half an

8    hour of cross and then redirect.  But I think Ms. Williams is

9    going to be done before 5.  It would be our request that we end

10   a little early today and then we have three witnesses for

11   tomorrow.  They will all be here bright and early, and we think

12   we can be done if not before lunch soon after lunch at which

13   time we are prepared to rest.  So really what it means is I'm

14   asking that we end a little early today.

15          THE COURT:  OK.

16          Who are the witnesses for tomorrow?

17          MR. BAUER:  It is Akinto Boone.

18          THE COURT:  Is he in?

19          MR. BAUER:  He is in custody, but he's in custody in

20   Orange County, so the agents are going to be picking him up at

21   like 6 and bringing him down here.  Next up is Ramone

22   McDermott.  He's in custody in GO.

23          And third would be Barbara Morreale, and the agents

24   are going to be driving her as well.  She lives up north.

25          THE COURT:  OK.

1          MR. BAUER:  So, based on how quickly everything has

2     gone today, I think we will definitely be done before around

3     lunch, either a little bit before or a little bit after, and

4     hopefully defense counsel can do their stipulations then, so I

5     guess as we are looking at it maybe Wednesday morning we can

6     start with closing.

7          THE COURT:  Very well.

8          Anything on this side?

9          MR. DRATEL:  Your Honor, can we agree also, I think if

10    we can have the rest of this time today will probably

11    facilitate a more efficient preparation of the stipulations

12    that we have been working on giving them.  We will have to

13    review today's testimony and add a few.  With that, we can keep

14    with it and not have the jury waiting around tomorrow.

15         THE COURT:  Very well.

16         MR. BUCHWALD:  Just with respect to defense witnesses,

17    if they are needed, we had been telling people Wednesday at the

18    earliest more like Thursday.  We will tell them now Wednesday

19    with the Court's permission, hopefully we are not going to need

20    these people.  Does that sound right?

21         THE COURT:  Are they police officers and government

22    agents?

23         MR. BUCHWALD:  A couple of them are.

24         THE COURT:  Then they should be told to be prepared to

25    be here tomorrow.

1    MR. BAUER:  Yes.

2    THE COURT:  OK.

3    MR. BUCHWALD:  All right.  We'll have to reach them

4  tonight then.

5    THE COURT:  Yes.  I think it's fine to finish early

6  today, because we got most of the day in and obviously there

7  are no other witnesses.  If you are going to call live

8  witnesses and the government represents that they will be done

9  as early as tomorrow at noon, I would rather that we absolutely

10  go forward and have those witnesses here.  OK.

11    MR. NAWADAY:  Thank you, your Honor.

12    THE COURT:  Obviously as soon as we're done tomorrow

13  we will have the charging conference.

14    (Recess)

15    THE COURT:  Can we get Ms. Williams.

16    I will let the jury know a little bit about what your

17  conversation was.

18    (Jury present)

19    THE COURT:  Everyone please be seated.

20    THE COURT:  Any other cross-examination?

21    MR. GOLTZER:  No.  Thank you.

22    THE COURT:  Redirect.

23    MR. NAWADAY:  Yes, your Honor.

24  REDIRECT EXAMINATION

25  BY MR. NAWADAY:

E8inchr5                    D. Williams - redirect

1  Q.  Ms. Williams, do you remember questions about whether you

2  remembered the name of Gucci when shown some photos previously?

3  A.  Yes.

4  Q.  Do you remember those questions?

5  A.  Yes.

6  Q.  Any doubt in your mind sitting here today where Gucci is

7  right now?

8  A.  Ask me again?  I'm sorry.

9  Q.  Any doubt in your mind that Gucci you know is sitting in

10  this courtroom right now?

11  A.  No, he is.

12  Q.  That is the same Gucci who was the brother of Princess?

13  A.  Yes.

14  Q.  About how long have you known Gucci?

15  A.  2009, maybe.  Maybe as early as 2008.  I'm unsure.

16  Q.  You were asked questions about your cooperation agreement,

17  right?

18  A.  Yes.

19  Q.  And the fact that you would have to testify under your

20  cooperation agreement?

21  A.  Yes.

22  Q.  And during your meetings with the government, did you only

23  talk about these defendants?

24  A.  No.

25  Q.  About how many other people did you talk about?

1    MR. DRATEL:  Beyond the scope, your Honor.

2    THE COURT:  Overruled.

3  A.  Many.  50, 60, 70, many.

4  Q.  These were other people about whom you knew you committed

5  crimes?

6  A.  It was about -- ask me again, please.

7  Q.  These other people you told the government about, these

8  were people who committed crimes?

9  A.  Yes.

10  Q.  Under your agreement would you have to testify against

11  those people?

12  A.  I would.

13  Q.  What is your understanding what happens if you lie and the

14  defendants here are found guilty.  Do you get your 5K letter?

15  A.  If I lie and they're found guilty?

16  Q.  Yes.

17  A.  Do I get my letter?  No.

18  Q.  What happens if you tell the truth and the defendants are

19  found not guilty?  Do you get your 5K letter?

20  A.  Yes.

21  Q.  As far as you understand, will the outcome of this case

22  have any effect on your sentence?

23  A.  No.

24    MR. NAWADAY:  No further questions.

25    THE COURT:  Mr. Strazza?

E8inchr5                              D. Williams – redirect

1    RECROSS EXAMINATION

2    BY MR. STRAZZA:

3    Q.  Who determines if you lie today?  Who makes that

4    determination?  The government, right?

5    A.  Yes.

6              MR. STRAZZA:  No further questions.

7              THE COURT:  Nothing more?

8              MR. NAWADAY:  No further questions.

9              THE COURT:  Ms. Williams you may step down.

10             THE WITNESS:  Thank you.

11             (Witness excused)

12             THE COURT:  Now, ladies and gentlemen, please excuse

13   me while I speak with the lawyers at sidebar.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

E8inchr5                          D. Williams - recross

1            (At sidebar)

2            THE COURT:  Mr. Buchwald?

3            MR. BUCHWALD:  Yes.  What I wanted to raise, we have

4    the three witnesses tomorrow, and I think that we are likely to

5    finish by lunchtime if I am hearing the estimate correct for

6    McDermott's direct, maybe a little, before maybe a little

7    after.

8            MR. GOLTZER:  It won't be that long.  Are you calling

9    Evans?

10           MR. BAUER:  No.

11           MR. BUCHWALD:  They are not calling David Evans.  What

12   I was going to propose for everybody's consideration --

13           MR. BAUER:  Do we need to do this with the jury

14   sitting here.

15           MR. BUCHWALD:  Yes, because depending on the

16   resolution we may adjourn at that point with the jury.  We can

17   continue then, judging from our conversations I think we're

18   likely to work out all the stipulations.

19           MR. GOLTZER:  Yes.

20           MR. BUCHWALD:  If we don't, then we will have the

21   policemen and we can proceed with the jury.

22           MR. GOLTZER:  I expect we will.

23           MR. BUCHWALD:  I think, judging from the

24   conversations, we're likely to do that.  So that we can proceed

25   with our charging conference and things like that in the

E8inchr5                              D. Williams - recross

1    afternoon.

2              MR. BUCHWALD:  Then we are able to start the

3    summations at the beginning of the morning, the following

4    morning.

5              MR. GOLTZER:  We would need to read the stips in the

6    morning first Wednesday morning.

7              MR. BUCHWALD:  That's right.  I guess we would read

8    the stips Wednesday morning.

9              MR. GOLTZER:  And then sum up.

10             MR. BUCHWALD:  Maybe if we have succeeded in working

11   out the stips tonight, we could do that.

12             MR. GOLTZER:  If we do it tonight, if we don't work it

13   out tonight, we will have to do it Wednesday morning and then

14   go right into summations.

15             MR. BUCHWALD:  And have the benefit of all of the

16   summations hopefully in one day, as opposed to breaking them

17   up.  We would all have the benefit of the charging conference

18   before the summation.

19             THE COURT:  I guess the only part of this plan that I

20   am not liking is why can't you just have the stipulations

21   either the stipulations or the witnesses tomorrow afternoon.

22   Are you not going to have them prepared in time?

23             MS. STAFFORD:  No.

24             MR. GOLTZER:  Hopefully we will.  We are going to do

25   that tonight.

1          MR. BAUER:  We have made our representation that we

2     will be available all night.

3          MR. BUCHWALD:  We discussed a number of them.  There

4     are obviously some that have to be drafted based on this

5     morning, but I don't think they are going to be controversial.

6          MR. BAUER:  Get them done tonight so we can do them

7     tomorrow.

8          MR. GOLTZER:  It is in the 3500.  There is no

9     surprises.

10         THE COURT:  Let's get as much done tomorrow as we can.

11    I'm happy to let the jury go early tomorrow with the

12    representations that we'll get in the summations on Wednesday.

13         MR. BAUER:  Right.

14         How about we do this.  Perhaps a modified version of

15    what you, your Honor, and Mr. Buchwald were saying.  Let's plan

16    on having all the stipulations done tomorrow and read tomorrow.

17    If there's one outstanding, you don't have to rest at end of

18    the day Tuesday.  If you have to read the last one Wednesday

19    morning, we can do that.  Let's try to get all the stipulations

20    in on Tuesday.

21         MR. BUCHWALD:  Let me also represent unless things

22    drastically change with McDermott, and I don't know if they

23    will or they won't, but there are going to be serious Rule 29

24    arguments with respect to at least some of the counts.  I think

25    we all know what is coming in the way of those arguments.

E8inchr5                          D. Williams - recross

1          THE COURT:  We can do that in the afternoon.

2          MR. BUCHWALD:  That's right.

3          The one other part of it is, is assuming that we are

4   starting summations Wednesday morning, either before or after a

5   couple of stips or one government policeman kind of witness,

6   obviously we have a preference for all of the summations being

7   concluded.  It sounds to me from estimates I have heard on that

8   side and I think from you folks, too, that they would be

9   concluded, but it might be prudent to suggest to the jury that

10  it's possible that they would be asked to stay until 5:30 on

11  Wednesday just so that we can -- hopefully we will avoid that

12  but maybe to alert them to that possibility.

13         THE COURT:  Have you guys talked about a schedule for

14  the summations.

15         MR. DRATEL:  Yes.

16         MR. GREENFIELD:  Yes.

17         MR. BUCHWALD:  We have added it up.  It seems

18  realistic that they would all be done in one day, but this

19  gives a little flexibility in case they are not quite done.

20         MR. DRATEL:  If we can get the government and one

21  defense summation before lunch the other two defenses' after

22  lunch and then rebuttal.  I think it's a better chance than not

23  that we will get in under the wire.

24         MR. BUCHWALD:  Just to give us the little extra

25  flexibility.

1          MR. GREENFIELD:  If they run long.

2          THE COURT:  I will sit you down, Mr. Greenfield.

3          (In open court)

4          THE COURT:  Ladies and gentlemen, a couple of

5     announcements.

6          First of all, we are done for today.

7          Secondly, I know that some of you have been inquiring

8     of Ms. Rivera.  It does appear as though we will remain on

9     schedule and get all of the evidence in.  In fact, the parties

10    anticipate that all of the evidence will be in by sometime

11    tomorrow.  At whatever time that is, we will then break again

12    because I need to have the charge conference with the parties.

13    That's where we hammer out the final jury instructions.

14         So you should know there is a very good chance that we

15    will be done early tomorrow as well.  Then the plan is to have

16    the summations, all of the parties' closing arguments to you on

17    Wednesday.

18         In order to get all of that done, it may be the case,

19    although I will work with the lawyers in this regard, that we

20    may go a little bit past 5 o'clock on Wednesday, but we will

21    see where we are.

22         It is not my intention to tax your attentiveness any

23    more than necessary so we will see where we are.  That is the

24    schedule for now.  We will meet again tomorrow morning again at

25    9:30.

E8inchr5                        D. Williams - recross

1      The parties expect all of the evidence to be before
2  you by the break, and then Wednesday we will hear the final
3  arguments, Thursday morning will be the charge, and you will
4  begin deliberations as soon as I'm done with the jury charge.
5      So that is the plan.  We'll see you tomorrow morning.
6  Until then do not discuss the case, even on social media.
7      (Jury not present)
8      MR. BUCHWALD:  Your Honor?
9      THE COURT:  Sir.
10     MR. BUCHWALD:  One other request.  If we could stay
11 here with our clients for about five minutes before they are
12 taken away so that we can discuss certain things with them,
13 which I think will speed the process up the next couple of
14 days.
15     THE COURT:  OK.  Any objection?
16     THE MARSHAL:  That's fine.
17     THE COURT:  Very well.
18     Do the parties want to work out a schedule for closing
19 arguments or will you work it out amongst yourselves?
20     MR. BAUER:  We are going to go first.
21     MR. GOLTZER:  We are going to go last.
22     THE COURT:  I can hammer something out.
23     MR. DRATEL:  We will work it out.
24     THE COURT:  Very well.  If there's nothing more, do be
25 prepared to discuss the jury charge tomorrow as soon as we are

E8inchr5                        D. Williams – recross

1    done.

2              OK, folks.

3              (Adjourned to Tuesday, August 19, 2014 at 9:30 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1734

```
 1                    INDEX OF EXAMINATION

 2    Examination of:                          Page

 3    JAMAR MALLORY

 4    Recross By Mr. Dratel . . . . . . . . . .1549

 5    Cross By Mr. Goltzer . . . . . . . . . . .1562

 6    Redirect By Mr. Bauer . . . . . . . . . .1566

 7    TARRENCE SMITH

 8    Direct By Mr. Nawaday . . . . . . . . . .1568

 9    Cross By Mr. Greenfield . . . . . . . . .1581

10    Cross By Mr. Buchwald . . . . . . . . . .1595

11    Redirect By Mr. Nawaday . . . . . . . . .1608

12     WILLIAM LAHAR

13    Direct By Mr. Bauer  . . . . . . . . . . .1610

14    Cross By Mr. Dratel . . . . . . . . . . .1628

15    JOHN MAGUIRE

16    Direct By Mr. Bauer  . . . . . . . . . . .1633

17    Cross By Mr. Strazza . . . . . . . . . . .1646

18    JOSEPH PALERMO

19    Direct By Mr. Nawaday . . . . . . . . . .1648

20     DANIELLE WILLIAMS

21    Direct By Mr. Nawaday . . . . . . . . . .1661

22    Cross By Mr. Strazza . . . . . . . . . . .1696

23    Cross By Mr. Dratel . . . . . . . . . . .1713

24    Redirect By Mr. Nawaday . . . . . . . . .1723

25
```

1   Recross By Mr. Strazza . . . . . . . . . . . .1726

2                    GOVERNMENT EXHIBITS

3   Exhibit No.                              Received

4    415   . . . . . . . . . . . . . . . . . . .1631

5    131A through 131H   . . . . . . . . . . .1642

6    132 and 133   . . . . . . . . . . . . . .1645

7    270   . . . . . . . . . . . . . . . . . .1646

8    424   . . . . . . . . . . . . . . . . . .1670

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25