E8k9chr1                          Trial

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
      UNITED STATES OF AMERICA
 3                v.                        12 CR 626 (ER)
      RAYMOND CHRISTIAN a/k/a
 4    "Reckless"
      GLENN THOMAS, a/k/a "Gucci"
 5    TYRELL WHITAKER, a/k/a "Bow Wow"
                  Defendants
 6    ------------------------------x
                                           New York, N.Y.
 7                                         August 20, 2014
                                           9:25 a.m.
 8

 9    Before:
                        HON. EDGARDO RAMOS
10                                         District Judge

11
                           APPEARANCES
12    PREET BHARARA
           United States Attorney for the
13         Southern District of New York
      ANDREW BAUER
14    KAN M. NAWADAY
           Assistant United States Attorney
15
      DAVID S. GREENFIELD
16         and
      ANTHONY STRAZZA
17         Attorneys for Defendant Christian

18    LAW OFFICES OF DON BUCHWALD
           Attorney for Defendant Thomas
19    DON D. BUCHWALD

20    KELLEY DRYE & WARREN LLP
           Attorney for Defendant Thomas
21    LEVI DOWNING

22    GEORGE ROBERT GOLTZER
           and
23    YING STAFFORD
           Attorneys for Defendant Whitaker
24    -- also present--
      S.A. Andrei Petron - FBI
25
```

E8k9chr1                          Trial

1              (In open court)

2              (Trial resumed; jury not present)

3              THE COURT:  Good morning all.

4              Anything to report?

5              DEFENDANT THOMAS:  Your Honor, I got something I want

6    to put on the record.

7              MR. BUCHWALD:  Your Honor if we could go into

8    chambers?

9              THE COURT:  In chambers?

10             MR. BUCHWALD:  Ex parte.

11             THE COURT:  Okay.

12             MR. NAWADAY:  We can leave -- the government can leave

13   the courtroom if that makes it easier, your Honor.

14             THE COURT:  Okay.  Do that.

15             Would you mind terribly making sure that no one comes

16   in.

17             MR. BAUER:  We will do that.

18             (Pages 2048-2051 SEALED by order of the Court)

19

20

21

22

23

24

25

1          THE COURT:  Can I get some sort of estimate -- well

2     some description of what's going to happen this morning or some

3     estimate as to how long it will take?

4          MR. BAUER:  I think it's defense counsel, their show.

5          THE COURT:  But there are no other issues, correct?

6          MR. NAWADAY:  That's correct, your Honor.  We expected

7     that there would be stipulations read by the defense this

8     morning and then we excuse the jurors for an early lunch while

9     we do the charge conference.  We'd also respectfully suggest

10    that at that juncture the Court advise the defendants of -- the

11    fact that its their decision whether to testify or not and then

12    when the jurors come back after lunch I assume the defense can

13    rest or they can call more witnesses, I don't know, and then we

14    can move into the government's summations.

15         THE COURT:  Okay.

16         MR. NAWADAY:  And then the defense summations.

17         MR. BUCHWALD:  With respect to the allocutions

18    concerning the decision to testify, we again ask that that be

19    ex parte.

20         THE COURT:  Okay.  We'll get to that -- I don't know

21    that that needs to be ex parte.

22         MR. GOLTZER:  He's got a reason for asking.

23         THE COURT:  Okay.

24         Are we otherwise ready for the jury?

25         MR. BAUER:  Yes, your Honor.

E8k9chr1                     Trial

1               THE COURT:  Let's see if the jury is here.  Are they

2     here.

3               THE DEPUTY CLERK:  Yes, your Honor.

4               (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Jury present)

2        THE COURT:  Good morning everyone.  Please be seated.

3        Ladies and gentlemen, let me give you a little preview

4    of what we have planned for you today.  As you know, the

5    government rested yesterday.  The defense will now put on its

6    case.  That will consist, I believe, exclusively of

7    stipulations which will be read to you.  And that will be done

8    right now, as soon as we get started.  That should not take too

9    long.  However, what we're going to do next is we're going to

10    break for a very, very early lunch and give you probably a

11    couple of hours and then have you come back at a certain point

12    and that will be determined depending on how long this morning

13    goes.  So you may have a couple of extra hours for lunch.  And

14    then when we come back in the early afternoon we'll go directly

15    to the government's summation.  So we will begin with the

16    defense case.

17        Mr. Strazza.

18        MR. STRAZZA:  Good morning.  I'm holding in my hand

19    what has been marked as Defendant Christian's Exhibit H in

20    evidence.  It's a stipulation between the parties.  Which

21    states the following.

22        It is hereby stipulated and agreed by and between the

23    United States of America, by Preet Bharara, United States

24    Attorney for the Southern District of New York, Andrew Bauer

25    and Kan M. Nawaday, Assistant United States Attorneys, of

1    counsel, and:  A. Raymond Christian, the defendant, by and

2    through the consent of his attorneys, David Greenfield and

3    Anthony Strazza, Esquires; B. Tyrell Whitaker, the defendant,

4    by and through the consent of his attorneys, George Goltzer and

5    Ying Stafford, Esquires; and C. Glenn Thomas, the defendant, by

6    and through the consent of his attorneys, Don Buchwald and

7    Joshua Dratel, Esquires that:

8            On March 5, 2014 Tarrence Smith met with government

9    agents, one of whom took notes during the meeting.  Those notes

10   were not intended to be a verbatim transcript but were intended

11   to summarize the substance of Smith's statements accurately.

12   According to those notes, Smith stated in substance and in part

13   on the night of the Henry murder Akinto Boone came out of the

14   bathroom with one of the unknown males.  Smith then got up off

15   of the floor while Boone and the unknown male were wrestling

16   and stabbed the guy in the side.  This unknown male was the

17   last one in the back of the house.  As the others had run

18   towards the front of the house, Smith stabbed the unknown male

19   twice.  The guy who was stabbed lost his gun to Akinto Boone.

20           That's dated August 19, 2014 and signed by all

21   parties.

22           I'm also holding in my hand what we submit into

23   evidence as Defendant Christian Exhibit I, with the consent of

24   the government.

25           And the parties, same parties with the previous

1    stipulation, have agreed and stipulated that if a

2    representative from the New York State Police crime laboratory

3    came here to testify, that witness would testify that what I'm

4    holding in my hand, Defendant Christian's Exhibit I, is a true

5    and accurate copy of the laboratory protocols that were in

6    effect for 2010, 2011 at the time that the articles tested by

7    this lab were tested in this case.  Thank you.

8             THE COURT:  Thank you, Mr. Strazza.

9             MR. STRAZZA:  Just so the record is clear, we're

10   offering Defendant Christian I into evidence with the consent

11   of the government.

12            THE COURT:  And H as well?

13            MR. STRAZZA:  Yes.

14            THE COURT:  Defendant Christian H and I will be

15   received.

16            (Defendant Christian's Exhibits H and I received in

17   evidence)

18            THE COURT:  Ms. Stafford.

19            MS. STAFFORD:  Thank you, your Honor.

20            Good morning.  On behalf of Mr. Whitaker we have

21   several stipulations.  And I'm going to start with Whitaker C.

22   It is hereby --

23            THE COURT:  I'm sorry, Ms. Stafford.  Can I just ask

24   you to keep your voice up.

25            MS. STAFFORD:  Oh, sure.

1           It is hereby stipulated and agreed by and between the

2    United States of America, by Preet Bharara, the United States

3    Attorney for the Southern District of New York, Andrew Bauer

4    and Kan M. Nawaday, Assistant United States Attorneys, of

5    counsel, and Raymond Christian, the defendant, by and through

6    consent of his attorneys, David Greenfield and Anthony Strazza,

7    Esquires; Tyrell Whitaker, by and through the consent of his

8    attorneys, George Goltzer and Ying Stafford; Glenn Thomas, the

9    defendant, by and through the consent of his attorneys, Don

10   Buchwald and Joshua Dratel, that on December 15, 2010 Anthony

11   Baynes was interviewed at St. Luke's Hospital in Newburgh,

12   New York by New York government agents that took notes during

13   the meeting.  Those notes were not intended to be a verbatim

14   transcript but were intended to summarize the substance of

15   Baynes' statements accurately.  According to those notes,

16   Baynes initially stated in substance and in part Bash and

17   Baby E planned on robbing the weed spot at 54 Chambers Street.

18   They planned the robbery on Dubois Street.  At 10 p.m. Bash and

19   Baby told me and Laquavious to help them rob the weed spot.

20   But we went home and then we went back out later to see if they

21   got anything.  He saw a lot of people running.  Bash and Baby E

22   were chased by the guys.  And that's when someone stabbed him.

23          According to those notes, Baynes then stated in

24   substance and in part he was walking down Lander Street, toward

25   Broadway.  Laquavious Boykin -- with Laquavious Boykin.  He saw

1    a group of black males running towards them.  The next thing he

2    knew that the unknown black males were shooting at him and

3    Laquavious and he shot back.  He walked from Lander Street to

4    the hospital.  Baynes then stated in substance and in part a

5    couple of people wanted to rob a weed spot.  One is called Baby

6    and the other is Bash from the Heights.  Laquavious, his

7    brother, Raymond, Baby, Bash, and the defendant were in a

8    hallway on Dubois Street and Farrington when this was being

9    discussed.  Baynes then stated in substance and in part Baynes,

10   Laquavious, his brother, Raymond, Baby, and Bash and a bunch of

11   unknown people walked past 54 Chambers Street and they walked

12   to Dubois Street.  They went past the weed spot at 54 Chambers

13   Street and that's when everyone started running.  He and

14   Laquavious ran both ways in the house, got shot twice at him

15   and Laquavious.  He was running.  He saw Baby and Bash with

16   guns running up First and Chambers.  Baynes then stated while

17   everyone was inside he and Laquavious could hear the older guy

18   tell someone on the phone to bring the chain because they knew

19   about the hit spot.  They went down First Street and on the

20   north side of First Street that's when they saw Bash with the

21   gun in his hand and Baby E with the gun in his hand.  He and

22   Laquavious passed Bash and Baby E.  That's when they heard

23   shots fired.  That's when he hears two to three gunshots.

24   Finally, Baynes then stated in part and in substance Bash was

25   with a group of boys running with a gun.  Baby E, I know him as

1    Baby E, and saw him running with a gun.

2              Your Honor, we'd ask that that be admitted into

3    evidence.

4              THE COURT:  What exhibit number is that?

5              MS. STAFFORD:  That's Whitaker C.

6              THE COURT:  Whitaker C will be received.

7              (Defendant Whitaker's Exhibit C received in evidence)

8              MS. STAFFORD:  I'm going to skip the preamble, if you

9    don't mind, your Honor.

10             THE COURT:  Not at all.

11             MS. STAFFORD:  It is stipulated and agreed by the

12   parties, I'm reading from Whitaker D, on August 22, 2011

13   Detective Cortez testified at a suppression hearing at the

14   Orange County Courthouse in Goshen, New York.  During this

15   testimony Detective Cortez was asked the following questions

16   and gave the following answers regarding his interview of

17   Anthony Baynes on December 15, 2010:

18   "A.  At that point I Mirandized him.

19   "Q.  And how did you do so?

20   "A.  From a preprinted form.

21   "Q.  Detective, did you read from the form itself or did you do

22   it from memory?

23              "I read it.  I read the form.

24   "Q.  Did he indicate that he understood the questions?

25   "A.  Yes.

1    "Q.  Did he indicate whether or not he is willing to speak to

2    you?

3    "A.  Yes.

4    "Q.  And did he answer all the questions in the affirmative?

5    "A.  Yes.

6    "Q.  And did he ask for an attorney?

7    "A.  No.

8    "Q.  Who signed the form?

9    "A.  I signed on the top as a witness, or the person who read

10   it; and the witness was Stan; and the defendant, Anthony

11   Baynes.

12   "Q.  After the Miranda warnings were read and he agreed to

13   speak to you and signed the form, did you ask another question?

14   "A.  We continued the conversation."

15          On August 22, 2011 Officer Loscerbo testified at a

16   suppression hearing at the Orange County Courthouse in Goshen,

17   New York.  During his testimony Detective Loscerbo was asked

18   the following questions and gave the following answers

19   regarding his interview with Anthony Baynes on December 15,

20   2010.

21   "Q.  Thank you, Detective.  Directing your attention to

22   December 15, 2010 just shortly after midnight.  Did you have

23   occasion to respond to the City of Newburgh Police Department

24   in at 55 Broadway?

25   "A.  Yes.

1    "Q.  Okay.  What else, if anything, did he tell you about

2    what -- what Mr. Baynes told you.

3          "He stated that he wanted to do a robbery of the weed

4    house.  They wanted him and Laquavious Boykin to help him and

5    they both said no.  He and Laquavious Boykin went to 75 Mill

6    Street and then came out a little while later to see if Bash

7    and Baby E completed the robbery, at which point he saw them

8    running on Chambers Street and heard some -- some kind of shots

9    and then went towards 54 Chambers."

10          And that is Whitaker D, your Honor.  We'd ask that

11    that be admitted.

12          THE COURT:  Whitaker D will be received.

13          (Defendant Whitaker's Exhibit D  received in evidence)

14          MS. STAFFORD:  I'm now reading from Whitaker E.

15          It is agreed between the parties that on January 27,

16    2012 James Mallory met with government agents, one of whom took

17    notes during the meeting.  Those notes were not intended to be

18    a verbatim transcript but were intended to summarize the

19    substance of Mallory's statements accurately.  According to

20    those notes, James Mallory was shown video recordings on

21    December 15, 2010.  The recordings were taken from cameras

22    located outside of a deli bodega at 56 Lander Street, City of

23    Newburgh, Newburgh, New York.  Those notes reflect in substance

24    and in part at 25 and 26 -- 2506 Mallory identified Bow Wow,

25    who turns and faces a camera.  Mallory notes that Bow Wow has

1    light skin which is observable in the video.

2             That's Whitaker E and I'd ask that that be admitted.

3             THE COURT:  Whitaker E will be received.

4             (Defendant Whitaker's Exhibit E received in evidence)

5             MS. STAFFORD:  Now, Whitaker F.  It is stipulated by

6    and between the parties on May 13, 2011 Anthony Baynes met with

7    an Orange County assistant district attorney and a Newburgh

8    police department detective who took notes during the meeting.

9    Those notes were not intended to be a verbatim transcript but

10   were intended to summarize the substance of Baynes' statements

11   accurately.  Below is a portion of those statements.

12            And the handwritten notes indicate:  Bow Wow.  Skinny

13   braids.  Light-skinned.  Moved to Virginia.  And there is an

14   arrow that points downward.  Family may live on City Terrace.

15   Tattoo, left arm.  In parentheses, we fought before.

16            And that's Whitaker F, your Honor.  If we may have

17   that admitted.

18            THE COURT:  Whitaker F will be received.

19            (Defendant Whitaker's Exhibit F received in evidence)

20            MS. STAFFORD:  Finally, Whitaker G.  It is stipulated

21   and agreed by and between the parties on March 15, 2012 Ramone

22   McDermott met with government agents, one of whom took notes

23   during the meeting.  Those notes were not intended to be a

24   verbatim transcript but were intended to summarize the

25   substance of McDermott's statements accurately.  According to

1    those notes, McDermott stated in substance and in part:  The

2    night of the Joker murder Bow Wow had a half-mask on.  Bow Wow

3    was wearing red and blue color Hollister brand hooded

4    sweatshirt, red Nike brand ACG boots.  Then on July 18, 2012

5    Ramone McDermott met again with the agents, one of whom was

6    taking notes during the meeting.  Those notes were not intended

7    to be a transcript but were intended to summarize the substance

8    of McDermott's statements accurately.  According to those

9    notes, the night of the Joker murder the shirt was black

10   Hollister brand.

11             And that's Whitaker G.

12             THE COURT:  Whitaker G will be received.

13             (Defendant Whitaker's Exhibit G received in evidence)

14             MS. STAFFORD:  Thank you, your Honor.

15             MR. BAUER:  Your Honor, between Ms. Stafford and

16   Mr. Buchwald, can we ask for a limiting instruction that we

17   discussed along the lines of -- say it at sidebar or say it out

18   loud?  I don't think it's controversial.  Sidebar?

19             THE COURT:  Yes.  Let's go to sidebar.

20             (Continued on next page)

21

22

23

24

25

1            (At the sidebar)

2            MR. BAUER:  It's nothing in particular.  Any of these

3    stipulations.  Just that these stipulations are being offered

4    not for the truth but rather to assist the jury in assessing

5    the witness's credibility.  I think it's in your jury

6    instruction.  I don't think it's controversial.  We ask that it

7    be reminded to the jury now.

8            MR. GOLTZER:  The ones that are under oath from

9    suppression hearing transcripts, because they are sworn, are

10    admissible for the truth.

11            MS. STAFFORD:  That's Whitaker D.

12            MR. BAUER:  Under what rule?  I'm not questioning you.

13            MS. STAFFORD:  Prior sworn testimony.

14            MR. GOLTZER:  No, it's not.  It's just -- I can't cite

15    the rule but it's --

16            MR. BAUER:  Still hearsay.

17            MR. GOLTZER:  No, no, no.

18            MR. BAUER:  It's still extrinsic evidence.

19            THE COURT:  Well I think -- I don't recall what

20    specifically the sworn testimony was, but I do know that at

21    hearings hearsay testimony is frequently allowed.  So I can't

22    speak to whether or not that particular should come in for the

23    truth or not.

24            MR. GOLTZER:  It's not hearsay at the suppression

25    hearing.  He testified I gave Miranda warnings and then he

E8k9chr1                        Trial

1  testified that's what the person told him.  So I mean obviously

2  that's what he told him is for impeachment.

3         MR. BAUER:  Right.

4         MR. GOLTZER:  But the fact that he told them that is

5  admissible for the truth and, of course, that he gave Miranda

6  warnings would be admissible for the truth.

7         MR. BAUER:  Your point is that what Cortez said is

8  offered for the truth?

9         MR. GOLTZER:  Correct.

10         MR. BAUER:  What Baynes told Cortez, you agree, still

11  falls under our limiting instruction?

12         MR. GOLTZER:  Absolutely.  And what Loscerbo testified

13  to is admissible for the truth, but what he was told by

14  somebody else is impeachment.

15         MR. BAUER:  So why don't we make this simple and say

16  since you're hearing about witnesses who testified before you,

17  their prior statements, they are not being offered for the

18  truth but rather just --

19         MR. GOLTZER:  -- to impeach credibility.

20         THE COURT:  I will do that.

21         (Continued on next page)

22

23

24

25

1           (In open court)

2           THE COURT:  Ladies and gentlemen, what I'm about to

3      say relates generally to what you've been hearing this morning

4      and what you will hear, I assume, some more of in a few

5      moments.  The defendants have presented to you statements that

6      they assert were made by certain of the witnesses that

7      testified here before you.  And they apparently are going to

8      argue that certain of those statements were inconsistent with

9      what they testified to at trial.  The statements that are being

10     put before you by the witnesses that testified are not being

11     presented to you for their truth but rather in order to help

12     you assess the credibility of the witnesses that came before

13     you.  So the statements that are being attributed to those

14     individuals now are not being offered for the truth but rather

15     to help you make a determination as to whether or not you can

16     credit the testimony that they provided here at trial.  Okay.

17     Very well.

18           Mr. Buchwald.

19           MR. BUCHWALD:  Thank you, your Honor.  Again, Your

20     Honor we have a group of stipulations.  The first we have

21     marked as Defendant Thomas' Exhibit T1.  And it reads as

22     follows.

23           It is hereby stipulated and agreed by and between the

24     parties that records made and maintained from the New York

25     State court and prison systems in the regular course of

1    business reflect the following.

2              A.  On March 16 of 2008 Glenn Thomas was arrested in

3    Newburgh, New York for offenses which had occurred in October

4    of 2007.  Mr. Thomas pled guilty to those charges and as a

5    result he remained incarcerated in either Orange County jail in

6    Goshen, New York or in other New York State prison facilities

7    in upstate New York from March 16, 2008 through and including

8    September 14, 2010 except for three days in March of 2010.

9              B.  Glenn Thomas was arrested in Newburgh, New York on

10   February 28, 2011 and charged in state court with the gun

11   possession about which police officers Kevin Lahar and William

12   Lahar testified here.  Mr. Thomas was held on those charges at

13   Orange County jail in Goshen, New York on July 3, 2012 when the

14   New York state charges were dropped and Mr. Thomas was brought

15   to the federal court and arraigned on the federal gun

16   possession charge.  The federal charge involved the same gun

17   from February 28, 2011.  It was that federal charge to which

18   Mr. Thomas pled guilty on March 1, 2012 and to which he was

19   sentenced to 37 months incarceration on July 3, 2012.  The

20   transcript of Mr. Thomas' guilty plea was received in evidence

21   at this trial as Government Exhibit 415.

22             C. Mr. Thomas was, thus, either in the custody of New

23   York state or federal prison authorities everyday from the date

24   of his February 28, 2011 arrest through the end of 2012.

25             It's further stipulated and agreed that this

1    stipulation may be received in evidence as a defense exhibit

2    during the defense case.  And we offer T1 into evidence.

3              THE COURT:  T1 will be received.

4              (Defendant Thomas' Exhibit T1 received in evidence)

5              MR. BUCHWALD:  We also offer at this time what has

6    previously been marked as Government Exhibit 416, and we're

7    happy to keep the government exhibit number, which is the

8    judgment of conviction referred to, the federal judgment of

9    conviction where the 37-month sentence was imposed.

10             THE COURT:  Very well.

11             MR. BUCHWALD:  Government Exhibit 416 received, your

12   Honor?

13             THE COURT:  I believe 416 is in evidence.

14             MR. BUCHWALD:  I think 415 had been received.  I don't

15   think 416 had been received, and we are offering it now.

16             THE COURT:  Any objection?

17             MR. BAUER:  No, your Honor.

18             THE COURT:  416 will be received.

19             (Government's Exhibit 416 received in evidence)

20             MR. BUCHWALD:  Next one is Defendants' Exhibit T2, the

21   next stipulation.

22             It is hereby stipulated and agreed by and between the

23   undersigned parties that on December 15, 2010 Glenn Thomas

24   resided at 138 Lander Street in Newburgh, New York.

25             It is further stipulated and agreed that this

1    stipulation may be received in evidence as a defense exhibit.

2    And we offer Exhibit T2.

3            THE COURT:  T2 will be received.

4            (Defendant Thomas' Exhibit T2 received in evidence)

5            MR. BUCHWALD:  We now have Defendants' Exhibit T3

6    which is another stipulation.

7            It reads as follows:  It is hereby stipulated and

8    agreed by and between the undersigned parties as follows.

9            1.  On March 1 of 2012 Anthony Baynes met with

10   government agents, one of whom took notes at the meeting.

11   Those notes were not intended to be a verbatim transcript but

12   were intended to summarize the substance of Baynes' statements

13   accurately.  According to those notes, Baynes stated in

14   substance and in part, "At another time J-Mark said that Big L

15   had something to do with the Joker homicide."

16           2.  On December 15, 2010 Anthony Baynes, while at St.

17   Luke's Hospital in Newburgh, New York met with Newburgh police

18   department detectives, one of whom took notes.  Those notes

19   were not intended to be a verbatim transcript but were intended

20   to summarize the substance of Baynes' statements accurately.

21   According to those notes, Baynes stated in substance and in

22   part:  Baynes waited on the porch with Quay Quay.  The older

23   guy told Baby E and Bash that he was calling J-Mark and spoke

24   to J-Mark on the phone.  While everyone was in the house on

25   Dubois, Baynes could hear the older guy tell someone on the

1    phone to bring the chain through because they are about to hit

2    the spot.  Baynes knows the chain to mean gun.

3              3.  On May 13 of 2011 Anthony Baynes met with an

4    Orange County assistant district attorney and a Newburgh police

5    department detective who took notes.  These notes were not

6    intended as a verbatim transcript but were intended to

7    summarize the substance of Baynes' statements accurately.

8    According to these notes Baynes said on two separate occasions

9    during the interview, "I thought Bash was the shooter.  And I

10   thought Bash did it."

11             4.  On May 13, 2011 Baynes met with the Orange County

12   assistant district attorney and Newburgh police department

13   detective who took notes.  The notes were intended -- not

14   intended to be a verbatim transcript but were intended to

15   summarize the substance of Baynes' statements accurately.

16   According to those notes, Baynes stated in substance and in

17   part, "Before we went to Crown Fried they, referring to

18   everyone who had arrived at Dubois except Baynes himself and

19   Quay Quay, had guns."

20             5.  On May 20, 2011 Anthony Baynes met with an Orange

21   County assistant district attorney and a Newburgh police

22   department detective who took notes.  The notes were not

23   intended as a verbatim transcript but were intended to

24   summarize the substance of Baynes' statements accurately.

25             According to those notes Baynes stated in substance

and in part, "One of the robbers present at 54 Chambers was a

black male Baynes knew as G who Baynes described as a dark,

skinny teenager who was 18 or 19 years old from the Heights

with Baby E."

We offer Exhibit T3 into evidence, your Honor.

THE COURT:  And T3 will be received.

(Defendant Thomas' Exhibit T3 received in evidence)

MR. BUCHWALD:  The next one, your Honor, is T4.  T4

reads as follows:

It is hereby stipulated and agreed by and between the

undersigned parties as follows:

1.  On March 11, 2014 Jamar Mallory met with

government agents, one of whom took notes at the meeting.

Those notes were not intended to be a verbatim transcript but

were intended to summarize the substance of Mallory's

statements accurately.  Those notes do not reflect Mallory's

stating at that interview that Glenn Thomas brought back a

black .38 caliber firearm after December 15, 2010.  Notes of

interviews of Mallory do not reflect Mallory having made such a

claim at any proffer session prior to May 2, 2014.

2.  On May 2, 2014 Jamar Mallory met with government

agents, one of whom took notes at the meeting.  The notes were

not intended to be a verbatim transcript but were intended to

summarize the substance of Mallory's statements accurately.

According to those notes, Mallory stated in substance and in

2072

E8k9chr1                          Trial

1    part that Glenn Thomas told him that Glenn Thomas had turned

2    off First Street and ran up Lander to his house following the

3    robbery at 54 Chambers Street.

4              3.   On June 26 of 2014 Jamar Mallory met with

5    government agents, one of whom took notes at the meeting.  The

6    notes were not intended to be a verbatim transcript but were

7    intended to summarize the substance of Mallory's statements

8    accurately.  According to those notes, Mallory stated in

9    substance and in part that on the night of the 54 Chambers

10   Street robbery he had received a text from L-1 on his phone and

11   that he could not get telephone calls on that phone.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

E8knchr2

1

2              MR. BUCHWALD:  Your Honor we offer T4 into evidence.

3              THE COURT:  T4 will be received.

4              (Defendant's Exhibit T4 received in evidence)

5              MR. BUCHWALD:  There are only two more brief ones.

6              Exhibit T5, another stipulation:

7         It is hereby stipulated and agreed by and between the

8    undersigned parties as follows:  On July 18, 2012, Ramone

9    McDermott met with government agents, one of whom took notes

10   during the meeting.  Those notes were not intended to be a

11   verbatim transcript but were intended to summarize the

12   substance of McDermott's statements accurately.  According to

13   those notes, McDermott stated in substance and in part that

14   McDermott overheard Gotti, J-Mark and Bow Wow talking about

15   robbing Joker's place weeks before it happened.  Those same

16   notes also reflect that during Ramone McDermott's July 18, 2012

17   meeting with government agents, McDermott stated in substance

18   and in part that the morning after Joker was killed McDermott

19   overheard Gucci talking with Gotti and J-Mark about the night

20   before.

21             We offer Exhibit T5, your Honor.

22             THE COURT:  T5 will be received.

23             (Defendant's Exhibit T5 received in evidence)

24             MR. BUCHWALD:  Finally, we have the last stipulation,

25   defendant Thomas Exhibit T6, which reads as follows:  It is

E8knchr2

hereby stipulated and agreed between the undersigned parties as

follows:  On October 8, 2012 Danielle Williams met with

government agents, one of whom took notes at the meeting.

Those notes were not intended to be a verbatim transcript but

were intended to summarize the substance of Williams'

statements accurately.  According to those notes, Williams was

shown a photograph of Glenn Thomas which was identical to

Government Exhibit 2002 and Williams identified Thomas as

someone she recognized and had seen before but stated, "Don't

know his name."

          We offer T6 for identification into evidence as T6.

          THE COURT:  T6 will be received.

          (Defendant's Exhibit T6 received in evidence)

          MR. BUCHWALD:  Thank you very much, your Honor.

          THE COURT:  Let me meet with the parties at sidebar

very quickly.

          (At sidebar)

          THE COURT:  I take it there is nothing else.  I won't

ask the defendants to rest just now.

          MR. BUCHWALD:  We will state that we rest in front of

the jury.

          MR. GOLTZER:  We have to wait until they talk about --

          MR. BUCHWALD:  Yes.

          THE COURT:  When should I tell the jury to come back.

          MR. BAUER:  I think the charge conference will last

E8knchr2

1    about an hour.  What about having them come back at 12:30, with

2    the idea being we will give them a little more of a break in

3    the afternoon either between me and Mr. Goltzer or some other

4    point.  With people talking to them the whole afternoon, rather

5    than a 15-minute break we give them 20 or 30 minutes.

6            THE COURT:  I do intend to have snacks for them in the

7    afternoon so they don't get too upset with us.

8            So you would go from 12:30 to when?

9            MR. BAUER:  I think 2:30-ish.

10           THE COURT:  OK.

11           MR. BAUER:  I won't mind, and I will adhere too it, if

12   it looks like they are dozing in the middle we can always call

13   a break in between.

14           MR. GOLTZER:  I will fill up the rest of the day.

15           Will you be offended if I leave the charging

16   conference and work on my summation?  Ms. Stafford will do it

17   very capably.

18           THE COURT:  I don't doubt that she will.  We will tell

19   them to come back at 12:30.

20           MR. DRATEL:  I think the charge conference will last

21   more than an hour, but 12:30 is probably OK.  It's only 10:10

22   right now.

23           THE COURT:  OK.

24           (In open court)

25           THE COURT:  Here's the plan:  You can leave now, and

E8knchr2

1    what we want to do is have you back here at 12:30, so you

2    should actually get something to eat.  We will have snacks for

3    you this afternoon as well so that you don't get too upset with

4    us.  So you can leave now and you can stay in the jury room,

5    you can go out and enjoy the day, but please, please be in the

6    jury room no later than 12:30.  At 12:30 we will begin with the

7    government's summation.  We will then take a break this

8    afternoon and then we will begin with the first of the defense

9    summations.  OK.  12:30.  Until then, please do not discuss the

10   case.  Be in the jury room at 12:30.

11          (Jury not present)

12          THE COURT:  Everyone can be seated.  OK.

13          Let's proceed with respect to the jury charge and we

14   will work off of the draft that we distributed last Friday.

15   Obviously the first few pages are fairly boilerplate.  If there

16   are any typographical errors or grammatical errors please,

17   please do point those out to the Court as well.

18          Any comments on the first three instructions or so?

19   The introductory instructions, the parties, presumption of

20   innocence, and burden of proof?

21          MR. DRATEL:  When you talk about the first

22   instructions, I don't know how far you mean into it.

23          THE COURT:  I am going through page 5.

24          MR. DRATEL:  OK.  Nothing.

25          MR. NAWADAY:  Our first comment isn't until page 36,

1    your Honor.

2              THE COURT:  Any of the defendants with respect to the

3    reasonable doubt instruction on pages 6 and 7?

4              MR. DRATEL:  No, your Honor.

5              My first comment is on page 8.

6              THE COURT:  OK.  Let's go to page 8.

7              Mr. Dratel.

8              MR. DRATEL:  At the end of the fourth paragraph it

9    says each count must be considered separately.  I would just

10   add against each defendant or as to each defendant.

11             THE COURT:  Any objection?

12             MR. NAWADAY:  No objection.

13             THE COURT:  So each count must be considered

14   separately as to each defendant.

15             Anything else on that page?

16             MR. DRATEL:  Nothing on that page.

17             THE COURT:  Page 9?

18             MR. DRATEL:  Nothing.

19             THE COURT:  Page 10?

20             MR. DRATEL:  Yes, your Honor.

21             In that first paragraph, line 3, end of the sentence,

22   carries its burden of proof with respect to that charge.  I

23   would say "and that defendant you are considering."

24             THE COURT:  I'm sorry.  Where are you again?

25             MR. DRATEL:  Line 3.

E8knchr2                         Charge Conference

1          THE COURT:  Yes.

2          MR. DRATEL:  There is a sentence that ends in the

3    middle of the line, with respect to that charge.  I would just

4    add "and that defendant you are considering."

5          MR. NAWADAY:  Your Honor, I think your Honor covers

6    that later on.

7          THE COURT:  Yes.

8          MR. NAWADAY:  Two sentences later.

9          THE COURT:  What I can do is I can move that up, or I

10   can just say it again it.

11         MR. DRATEL:  We also propose a separate instruction to

12   go right after the multiple counts, consider each defendant

13   separately.  That's the first one that we've proposed.

14         THE COURT:  So that language will be added "as to the

15   defendant you are considering," and then your first proposal is

16   a separate defendant instruction?

17         MR. DRATEL:  Yes.

18         THE COURT:  I have reviewed your proposal, and I am

19   inclined to include the final paragraph of your proposal, which

20   reads, "In addition, some of the evidence in this case was

21   limited to one defendant.  Let me emphasize that any evidence

22   admitted solely against one defendant may be considered only as

23   against that defendant and may not in any respect enter into

24   your deliberations on any other defendant."

25         MR. NAWADAY:  Your Honor.  If we can just suggest, if

1   your Honor is giving that last paragraph, including that on

2   page 10, striking "in any respect." I don't think it's

3   necessary. I think it's clear from what the instruction has

4   right there what we mean by that.

5            THE COURT: So may not enter into your deliberations

6   on any other defendant?

7            MR. NAWADAY: Yes.

8            THE COURT: OK. I will grant that. I propose to put

9   that as the second paragraph on page 10. OK.

10           Anything else on page 10?

11           MR. DRATEL: No, your Honor.

12           THE COURT: Page 11.

13           MR. DRATEL: Again, we have page 2 of our submission

14  with respect to the counts that relate to the December 14 and

15  15 robbery and homicide, we would ask for the instruction that

16  there has to be specificity of dates with respect to those

17  counts. That is an essential aspect of this case, and that

18  variance in dates would not be appropriate in this case because

19  that would be essentially a variance or an amendment even of

20  the indictment.

21           THE COURT: Mr. Dratel, you may want to keep your

22  voice up.

23           MR. DRATEL: Thank you, your Honor. I will move the

24  mic closer.

25           THE COURT: Mr. Nawaday?

1          MR. NAWADAY:  First, your Honor, I don't think that's

2     all correct.  Because the conspiracy charge charges in or about

3     December 2010 is the genesis of the robbery conspiracy.  There

4     was testimony from witnesses that they were thinking, walking

5     around Newburgh trying to find a stash house.  So the inception

6     of the conspiracy I don't think requires or even or

7     necessitates specificity about the date.

8          THE COURT:  I think certainly with respect to the

9     conspiracy charges that the request made by the defendants

10    would not be appropriate.  But even with respect to the

11    substantive charge under the Hobbs Act, I don't believe that

12    the law requires that the jury be allowed to acquit if the

13    government doesn't prove that it happened on precisely that

14    date.  All that the law requires in my reading is that there be

15    substantial similarity of the dates charged in the indictment

16    and the proof adduced at trial.

17         So what I would be willing to do is to change the

18    language in my proposed instruction, and I'm reading now from

19    the third sentence on the third line of page 11, that it is

20    sufficient if the crimes charged are shown to have been

21    committed on dates substantially similar to the dates charged

22    in the indictment.

23         I believe that is all that the law requires.

24         MR. NAWADAY:  We agree with your Honor and agree with

25    your Honor's suggestion.

1              MR. DRATEL:  Your Honor, we would obviously submit our

2      charge.  We think that allowing any fluidity or change in the

3      dates would be the kind of moving target that would violate the

4      defendants' Fifth Amendment rights with respect to a specific

5      event that the government has alleged in the indictment in the

6      case, in the evidence.  The general principles apply certainly,

7      but for the purposes of how this case has been tried and

8      charged, we don't think there's any air there that it should be

9      permitted.

10             THE COURT:  I don't know that it's such an issue

11     besides.  I don't know that there's been any testimony other

12     than that the robbery took place on December 15 of 2010.  Like

13     I said, all that the law requires, at least with the Second

14     Circuit, is that there be substantial similarity, not that

15     there be an identity of dates.  So I will use the substantial

16     similarity language.

17             Anything else on page 11?

18             MR. DRATEL:  No, your Honor.

19             THE COURT:  Page 12 or 13?

20             MR. DRATEL:  Page 13, your Honor, the second element.

21     It is really a combination of two factors that sometimes are

22     broken out into three elements, sometimes it appears as the

23     second element.  But I think it's knowingly and willfully.

24     Elsewhere in the charge willfully appears or intentionally

25     appears.  I think it needs to be harmonized.  I think the

1    proper term is willfully.  And I noted down the road where I

2    think that it appears otherwise and we can get to those as well

3    so that they are harmonized.  I think it has to be there.

4              THE COURT:  Mr. Nawaday?

5              MR. NAWADAY:  May I have a moment, your Honor.

6              THE COURT:  You do have a willful --

7              MR. DRATEL:  Yes.  We have provided a willfully

8    instruction that's standard.  I think it took it from the

9    Court's charge in the most recent trial that I have had.

10             THE COURT:  Was that before Judge Forrest?

11             MR. DRATEL:  Yes, your Honor.

12             MR. NAWADAY:  If I understand what Mr. Dratel wants to

13   do there, it is just add "willfully."

14             THE COURT:  Yes.

15             MR. NAWADAY:  That's fine.

16             THE COURT:  "Willfully" will be added at page 13.  The

17   prosecution must prove that the defendants knowingly and

18   willfully became members of the conspiracy.

19             MR. DRATEL:  Yes, your Honor.  Thank you.

20             THE COURT:  OK.

21             We will define willfully later when we discuss element

22   two or the second element.

23             Anything else on page 13, Mr. Buchwald?

24             MR. BUCHWALD:  My apologies, if we could just double

25   back to page 11 the variance in dates.

1      I am concerned, because there has been evidence before

2 the jury about his October 2007 offense, drug sales, that's

3 before the jury.  I think the government has conceded that

4 that's not part of the conspiracy charged in our legal

5 colloquy, and I think that the jury should be specifically

6 instructed that with respect to that conspiracy, with respect

7 to Count Three --

8      MR. DRATEL:  Three and six.  Six is the firearm.

9      MR. BUCHWALD:  With respect to the drug conspiracy

10 alleged here, the drug offense that he was convicted of in

11 March of 2008 that pertained to the sales in 2007 are not part

12 of the alleged conspiracy and should not be considered as part

13 of the alleged conspiracy in this case.

14      MR. NAWADAY:  Your Honor, first, your Honor ruled that

15 we could not put in the evidence 2007 narcotics transaction, so

16 we didn't do that.

17      What we did put in was the guilty plea transcript, but

18 the date of that prior drug conviction that the defendant

19 admitted to during that plea allocution, we didn't put in that

20 date.  As far as I know, Mr. Buchwald put in the conviction,

21 the judgment of conviction, which has that date, so it only

22 appears in one place.  I am not understanding why we need this

23 instruction.

24      MR. BUCHWALD:  In the guilty plea allocution

25 Mr. Thomas states he is guilty of the drug sale.  He's guilty

1    of a gun possession and a prior drug sale.  Unless we put in

2    what we are talking about, in other words, 2007 events to 2008,

3    the jury would believe that that drug sale had occurred anytime

4    between 2008 and 2012, which it didn't.  So we had to put that

5    in to make it clear which drug possession you are talking

6    about.

7           The government has conceded from the get-go in its

8    papers that that 2007 drug sale while he was a member of the

9    Crips is not part of the conspiracy which they are alleging.

10   They have made that specific concession in their legal papers.

11   The jury should not be allowed, especially by virtue of this

12   variance in dates charge, to consider that as part of the

13   alleged conspiracy.

14           THE COURT:  I'm sorry.  Someone is going to have to

15   remind me what evidence was put before the jury concerning that

16   prior drug sale.  When was it?

17           MR. BUCHWALD:  The arrest occurs in March of 2008, and

18   it pertains to his offense in October of 2007.

19           THE COURT:  What date does the indictment charge in

20   terms of the drug conspiracy?

21           MR. BUCHWALD:  2008 through 2012.

22           THE COURT:  OK.

23           Was that before the jury?  What evidence was placed

24   before the jury about that?

25           MR. BUCHWALD:  They introduced evidence of his guilty

1    plea allocution.  In the guilty plea allocution he says,

2    remember, the charge there was possession of a weapon as a

3    prior convicted felon.  In the guilty plea allocution

4    Mr. Thomas says, I possessed the weapon.  Your Honor inquires

5    about the prior felony.  He says, Yes, I sold drugs and got two

6    years I think was his response.

7              So that didn't have a date attached to it as to when

8    he sold the drugs, but that left everything totally pregnant,

9    because this guilty plea allocution is in 2012 I guess.

10             So we put in in the stipulation the fact that that

11   drug offense was in 2007 and he pled guilty to it in 2008 in

12   order to make it clear to the jury that we are not talking

13   about some drug offense that occurred in this relevant time

14   period.  We can do that safely because the government has

15   previously stipulated in its legal papers that that was not

16   part of this conspiracy.  That occurred at a time when he was a

17   member of the Crips.

18             THE COURT:  OK.  Mr. Nawaday?

19             MR. NAWADAY:  Your Honor, I'm still not understanding

20   what the confusion is.

21             THE COURT:  I guess the confusion is that now there is

22   arguably before the jury evidence that Mr. Thomas as a

23   predicate for his arms offense committed a drug trafficking

24   crime in 2007.  Mr. Buchwald wants to make sure that the jury

25   does not consider that 2007 predicate as evidence of the

1    narcotics charges in this indictment.  Did I summarize that

2    accurately, Mr. Buchwald?

3          MR. BUCHWALD:  Your Honor, it should not be considered

4    as evidence, nor should it be considered as part of the drug

5    conspiracy which the government alleges in this case.

6          MR. NAWADAY:  First off, I don't think it's in the

7    variance of dates section that that can be dealt with or should

8    be dealt with, because it's confusing.  Maybe a limiting

9    instruction where your Honor already has a limiting instruction

10   later on that certain evidence was only admitted for

11   background.  We can say that, you know, a limiting instruction,

12   to the extent that you heard evidence about a 2007 narcotics

13   conspiracy charge that Mr. Thomas pleaded guilty, you can't

14   consider that as all.

15         THE COURT:  I think that's right.  I think maybe later

16   when we are discussing the actual conspiracy, what evidence

17   they can consider in terms of establishing or not the

18   defendant's participation in the conspiracy.  In other words,

19   we'll get it in there, it is a matter of where.

20         MR. BUCHWALD:  I hear you, but I think that will do it

21   perhaps if you flash back at that point.

22         THE COURT:  I don't want to say that.

23         MR. BUCHWALD:  I'm concerned here because the variance

24   in dates seems to be a suggestion, if it's late '07 --

25         THE COURT:  Mr. Buchwald, I appreciate that it is a

 1    valid point.  It would require a very sort of --

 2              MR. BUCHWALD:  I agree, your Honor.

 3              MR. DRATEL:  Your Honor, also, if we argue that, if I

 4    put a sentence in there, the government is not going to in

 5    rebuttal suggest otherwise, right?

 6              MR. NAWADAY:  Of course not.

 7              MR. DRATEL:  If I say you can't count that?

 8              THE COURT:  Absolutely.

 9              MR. DRATEL:  I am not going to get contradicted?

10              THE COURT:  Correct.

11              MR. DRATEL:  Thank you.

12              THE COURT:  We were on page 13.

13              MR. DRATEL:  Yes.

14              THE COURT:  Anything more on 13?

15              MR. DRATEL:  No, your Honor.

16              THE COURT:  Robbery conspiracy, first element,

17    existence of the conspiracy.  Anything more on that?

18              MR. DRATEL:  Just the first paragraph, i, the last

19    sentence.  We would just ask that that last sentence be deleted

20    about a formal document or specific oral agreement.  I know

21    that this is part of a traditional conspiracy charge.  I think

22    it directs the jury in a way that is inappropriate as to what

23    the evidence ought to be or what they should consider

24    sufficient.

25              THE COURT:  Mr. Nawaday?

1          MR. NAWADAY:  Your Honor, this is a standard charge.

2     I think it's helpful to the jury.

3          THE COURT:  I am familiar with this charge going back

4     to 1993, so I'm not going to take it out.  I'm sure it was in

5     there before 1993.  I'm just familiar.

6          MR. DRATEL:  Someday.

7          THE COURT:  Page 15.

8          MR. DRATEL:  15, your Honor, the full paragraph, the

9     one beginning, "in determining whether."

10          THE COURT:  Yes.

11          MR. DRATEL:  The sentence that begins, "Often the only

12     evidence," I think this is even more so than the prior point,

13     which is I think that just suggests, it changes the

14     government's burden as to what their -- I would change it as to

15     what their evidentiary burden is, I would change it.  I would

16     delete everything up to "disconnected," and I would start with

17     the word "disconnected" and then just, "disconnected acts,"

18     delete the word, "that so it would read "disconnected acts,

19     when taken together in connection with one another," and I

20     would add the word can, "can show a conspiracy or an agreement"

21     and then continue the sentence.

22          I think that's fairer than suggesting to the jury what

23     an ordinary case would be and what they could find from.  I

24     just think it's to suggestive otherwise as to what the jury's

25     standard ought to be, and I think it changes the government's

1    burden.

2              THE COURT:  I am inclined to make that change.

3              Mr. Nawaday, any objection.

4              MR. NAWADAY:  No, your Honor.  If Mr. Dratel can

5    repeat what he just said.

6              MR. DRATEL:  That the sentence, it should start with

7    disconnected, "Disconnected acts, when taken together in

8    connection with one another, can show a conspiracy or an

9    agreement to secure a particular result just as satisfactorily

10   and conclusively as more directly."

11             MR. NAWADAY:  Thank you.

12             THE COURT:  That change will be made.

13             MR. DRATEL:  Thank you, your Honor.

14             THE COURT:  Anything else on page 15?

15             MR. DRATEL:  I don't have anything until page 18, your

16   Honor.

17             MR. GREENFIELD:  Your Honor, I have one observation on

18   page 16.  Second full paragraph, third line, robbery or

19   robberies.

20             THE COURT:  I'm sorry.  Start again and keep your

21   voice up.  Where are you?

22             MR. GREENFIELD:  This is in the second paragraph on

23   the page, the second full paragraph, third line, it says,

24   "Robbery or robberies in the manner charged in Count One."

25             There is only one robbery charged in this count.

1    That's the December 15 robbery.  So I would ask that the word

2    robberies be removed.

3              THE COURT:  Any objection?

4              MR. NAWADAY:  No objection.

5              THE COURT:  "Or robberies" will be taken out.

6              MR. DRATEL:  Page 18 then?

7              Yes.  The second paragraph, your Honor.  I think it

8    should be knowingly and willfully to harmonize it.

9              THE COURT:  The second sentence?  The second line

10   there?

11             MR. DRATEL:  Yes.  In other words, just add willfully

12   there.

13             THE COURT:  Knowingly, willfully, and intentionally?

14             MR. DRATEL:  Yes.

15             THE COURT:  OK.

16             MR. DRATEL:  I think that's where we also define

17   willfully because we define the other terms here as well.

18             THE COURT:  We'll put that willful definition that you

19   provide.  Does it makes sense to put that after the paragraph

20   defining knowingly and intentionally.

21             MR. DRATEL:  Yes, your Honor.

22             THE COURT:  OK.

23             MR. NAWADAY:  If I may suggest, your Honor, it may be

24   more efficient to just add, "An act is done knowingly and

25   intentionally and willfully, and then leave the remainder of

 1    your Honor's instruction there because what Mr. Dratel suggests

 2    is basically the same of what willfully is.

 3              THE COURT:  That appears to make sense.

 4              MR. DRATEL:  OK.

 5              THE COURT:  OK?

 6              MR. DRATEL:  Yes.

 7              THE COURT:  We will add the word "willfully" to that

 8    paragraph.

 9              MR. DRATEL:  My next comment is page 20.

10              THE COURT:  Yes.

11              MR. DRATEL:  The last paragraph, again, add

12    "willfully."

13              THE COURT:  OK.

14              MR. DRATEL:  Also in the prior paragraph, I think

15    between the prior paragraph and the last paragraph, in other

16    words, before "in sum," would be a place to add the mere

17    association instruction that we have proposed.  We think it's

18    important in this case because of a couple of factors, one of

19    which is the extensive evidence about gang activity that is not

20    the conspiracy.

21              THE COURT:  Yes.  I am inclined to include language

22    along the lines that was requested.  I think that there has

23    been substantial testimony in this case by a number of the

24    cooperating witnesses about the defendants' association with

25    one or more gangs, so I do think that it makes sense to add the

1    instruction that Mr. Dratel requests.

2              Mr. Nawaday.

3              MR. NAWADAY:  We have no objection to that.

4              THE COURT:  Very well.

5              MR. GREENFIELD:  Judge, on page 20 I have an

6    observation also.

7              THE COURT:  Let's finish up this one point unless it

8    relates to --

9              MR. GREENFIELD:  I'm sorry.

10             THE COURT:  I just want to make sure that we are all

11   agreed as to what the language is and where it should go.

12             Where did you suggest it would go?

13             MR. DRATEL:  Your Honor, just before that last

14   paragraph, in sum.  In other words, you have the kind of mere

15   presence instruction, the paragraph, and then below that.

16             THE COURT:  Very well.  We will put that there.

17             Mr. Greenfield.

18             MR. GREENFIELD:  Yes, Judge.

19             On page 20, the first full paragraph at the end,

20   following the Sand instruction 19-6, I would ask that the

21   following or similar language be added, It is important for you

22   to note that the defendant's participation in the conspiracy

23   must be established by independent evidence of his own acts or

24   statements as well as that of the alleged coconspirators.

25             That follows the language in Sand 19-6.

1          THE COURT:  Again, I want you to keep your voice up,

2    Mr. Greenfield.

3          Where are you?  You are at the paragraph that begins

4    "The duration"?

5          MR. GREENFIELD:  The duration and extent, yes, Judge.

6          THE COURT:  And did you provide language?

7          MR. GREENFIELD:  I just did.

8          THE COURT:  Are you just reading something now?

9          MR. GREENFIELD:  I am just reading something out,

10   Judge.  It's from Sand, as I said.

11         THE COURT:  What is it that you want to include and

12   where?

13         MR. GREENFIELD:  At the end of that paragraph, "It is

14   important for you to note that the defendants' participation in

15   the conspiracy must be established by an independent evidence

16   of his own acts or statements as well as any acts and

17   statements of alleged coconspirators."

18         THE COURT:  Mr. Nawaday?

19         MR. NAWADAY:  Could I could just briefly confer with

20   Mr. Greenfield.

21         Your Honor, I will defer to Sand on that one.

22         THE COURT:  OK.

23         We'll check, but would you mind reading that slowly,

24   Mr. Greenfield?

25         MR. GREENFIELD:  Yes, Judge.

1              It is important for you to note that the defendants'

2    participation in the conspiracy must be established by

3    independent evidence of his own acts or statements as well as

4    of those of the other alleged coconspirators."

5              THE COURT:  OK.  So that would be at page 20 at the

6    end of the paragraph that begins "the duration and extent."

7              MR. GREENFIELD:  Again, Judge, at the bottom of the

8    page, the next to the last line, the same as before, robbery

9    and robberies.  I would ask for the "or robberies" to be

10   deleted.

11             THE COURT:  Any objection?

12             MR. NAWADAY:  No objection.

13             THE COURT:  "Or robberies" will be deleted.

14             Anything else on page 20 or 21?

15             MR. DRATEL:  No, your Honor.

16             THE COURT:  Page 22 or 23?

17             MR. DRATEL:  With respect to page 23, I think, and the

18   Court does cover this at page 40 to some extent, but we think

19   it just needs to be reinforced here as well so that the jury

20   doesn't get the wrong impression in the sense that while this

21   is an accurate statement of the law, I think it has the

22   capacity to be misinterpreted in this sense, in that, as the

23   Court notes at page 40, whether the defendant is in fact a

24   participant in the conspiracy is based on the defendant's own

25   actions and conduct and not necessarily the statements or

E8knchr2                      Charge Conference

1     actions of the coconspirators.

2              THE COURT:  Didn't we just cover that at page 20?

3     That's what Mr. Greenfield just provided.

4              MR. DRATEL:  I think it also includes coconspirator's

5     conduct in that statement.  I think the Court may be correct,

6     though, in that regard.

7              THE COURT:  Yes.

8              MR. DRATEL:  I didn't have that in my notes.  I have

9     it here.

10             THE COURT:  OK.  Page 24 or 25?

11             MR. DRATEL:  25, just in the fourth element, it needs

12    willfully I think as well.

13             THE COURT:  Does that apply to robbery as well,

14    Mr. Nawaday?

15             MR. NAWADAY:  Yes, your Honor.  Since we have been

16    harmonizing, that's fine.

17             THE COURT:  OK.  26?

18             MR. DRATEL:  Nothing from us.

19             THE COURT:  27?

20             MR. DRATEL:  27, with respect to the first paragraph,

21    we would ask the Court to, I think the jury would have to be

22    unanimous as to the means.  In other words, force, violence or

23    fear.  Some jurors couldn't think force, some couldn't think

24    violence, some couldn't think fear.  They would have to be

25    unanimous as to the element in that regard.

E8knchr2                         Charge Conference

1            THE COURT:  I don't think that's the law.

2   Mr. Nawaday?

3            MR. NAWADAY:  I don't believe that's accurate either,

4   your Honor.

5            THE COURT:  I will not make that change.

6            MR. DRATEL:  In the last paragraph, your Honor, the

7   second-to-last line.  I think the "should" should be changed to

8   "may."

9            "But a careful consideration of the circumstances and

10  evidence may make you to decide whether" rather than "should."

11           THE COURT:  I just want to read the entire paragraph.

12           MR. DRATEL:  Sure.

13           THE COURT:  I think that is an appropriate

14  recommendation.

15           MR. DRATEL:  Thank you, your Honor.

16           MR. NAWADAY:  No objection.

17           THE COURT:  So "may enable" will be changed to "should

18  enable."

19           28?

20           MR. DRATEL:  No.  Nothing, your Honor.

21           THE COURT:  29?

22           MR. DRATEL:  Nothing.

23           THE COURT:  Attempt.

24           MR. DRATEL:  Yes, your Honor.  We have proposed some

25  additional language with respect to attempt that we think is

1   appropriate.  It comes from the Second Circuit's decision in

2   *Farhan* from a couple of years ago.  Obviously, it's based on

3   pre-existing Second Circuit precedent.

4               THE COURT:  Yes.

5               So the additional language that you are requesting

6   involves, I will read it, "A verbal agreement without more is

7   insufficient for the substantial step requirement.  The acts of

8   a person who intends to commit a crime will constitute the

9   attempt or the acts themselves indicate intent to commit the

10  crime willfully and the acts are a substantial step in the

11  course of conduct planned to culminate in the commission of the

12  crime."

13              MR. DRATEL:  Yes, your Honor.

14              THE COURT:  OK.  Go ahead.

15              MR. DRATEL:  I would put that, actually you have some

16  of that language in at the end of 31 beginning of 32.  I think

17  you have most of that last sentence as I look here.  But would

18  either begin it with that last sentence or verbal agreement,

19  put it there.

20              THE COURT:  By the last sentence, you mean the last

21  sentence in which paragraph?

22              MR. DRATEL:  It's the last sentence on page 31.

23              THE COURT:  All right.

24              MR. DRATEL:  I see here that, for some reason I missed

25  it, that you actually have the second sentence of my proposed

1   charge already in there.  In other words, clearly indicate an

2   intent to willfully, you have got that sentence.  Really all we

3   need is the verbal agreement sentence, the first sentence,

4   which I would put right before "put another way."

5            THE COURT:  OK.

6            MR. DRATEL:  Thank you, your Honor.

7            THE COURT:  Mr. Nawaday, I'm inclined to include this.

8   Do you have an objection?

9            MR. NAWADAY:  No, your Honor, I agree with Mr. Dratel

10  that your Honor's instruction has portions of it already.

11           THE COURT:  Very well.  That change will be made.  We

12  will include that first sentence and we will put it in a way

13  that flows.  OK.  33.

14           MR. DRATEL:  Your Honor, just 32.

15           THE COURT:  OK.

16           MR. DRATEL:  The very last clause, iv, I just think

17  "willfully" needs to be added there.

18           THE COURT:  Very well.

19           MR. DRATEL:  33 nothing.

20           THE COURT:  35?

21           MR. DRATEL:  Well, your Honor, somewhere in there we

22  would like our multiple conspiracies and single act instruction

23  that we have proposed.  I am not sure where the Court would

24  want to put it.  I thought between pages 34 and 35.

25           THE COURT:  Let's just take the concept generally of

1    multiple conspiracies.

2          Mr. Nawaday, does the government have a view as to

3    whether or not would be should be included?

4          MR. NAWADAY:  We don't think the multiple conspiracy

5    charge should be included here.  We think the evidence has

6    shown that we have a single conspiracy with respect to both the

7    robbery conspiracy that is charged and with respect to the

8    narcotics conspiracy that is charged.

9          I can run through that now for your Honor.  It is

10   Mr. Dratel's application of why he believes there is multiple

11   conspiracies and the charge is appropriate.

12         THE COURT:  Let's go to you Mr. Dratel.

13         MR. DRATEL:  Sure.  I think the government's

14   conspiracy is anyone selling drugs in Newburgh is a

15   coconspirator.  I think that's the way they presented the

16   evidence, just very disparate, somebody selling here, there are

17   a bunch of sellers on the corner, none of them have any

18   allegiance to each other or agreement with each other, other

19   than on a sporadic isolated going for a split or a reup or

20   something like that.  It's not definitive.  It doesn't define a

21   conspiracy.

22         There are no organizational aspects of any conspiracy,

23   while obviously not required necessarily, but what we have here

24   is a -- and time frames we don't have other than let's say,

25   Mr. McDermott doesn't necessarily have a coconspirator at all

1    selling marijuana except perhaps Pablo he pays money to for

2    that purpose.  He has money Monday and Wednesday.  Everything

3    else is completely haphazard, completely random, and in some

4    ways spontaneous.

5            So the concept of a unitary conspiracy is completely

6    belied by the evidence, which is potentially a vast number of

7    small conspiracies.  I mean, let's put it this way.  It is at

8    least as reasonable a view of the evidence that it is a vast

9    number of small conspiracies as it is the government's version

10   of a unitary conspiracy, which hasn't been established at all

11   in our view of the evidence.

12           THE COURT:  Mr. Nawaday?

13           MR. NAWADAY:  Your Honor, we presented evidence of a

14   single conspiracy.  The conspirators are L-1, Kev Gotti,

15   J-Mark, Reckless, Gucci, Bow Wow and Bash, essentially the crew

16   that robbed 54 Chambers Street.  They went there to rob that

17   stash house for drugs so they could sell the drugs.

18           In addition to that, they were working together, those

19   people, prior to that, the robbery of 54 Chambers.  You have

20   heard evidence that Jamar Mallory and L-1 were business

21   partners.  They sold out of the same house and served each of

22   their customers crack cocaine.

23           You have heard testimony from Jamar Mallory that he

24   gave drugs to Gucci to sell and that when Gucci would come up

25   to him on the street, sometimes Gucci would ask, Hey, can I

1    take your customer.  So do me that favor.  And Jamar Mallory

2    would allow him to do that.  There is an agreement right there

3    as part of a conspiracy to sell drugs together when they're out

4    there.

5              There was also testimony from Danielle Williams that

6    L-1 was supplying Bow Wow with drugs, with crack cocaine, and

7    how Danielle Williams said that she overheard Bow Wow and Bash

8    talking about how they have to go reup from L-1.

9              Also there was testimony about how Reckless directed

10   Bow Wow to sell to a customer while on that porch at 38 Dubois

11   Street where L-1 hung out and how on another occasion L-1 --

12             THE COURT:  I'm sorry.  Testimony that Reckless

13   directed who to do what?

14             MR. NAWADAY:  Bow Wow, that a crack cocaine customer

15   came to 38 Dubois Street, that white and blue house on Dubois

16   Street where L-1 has been seen hanging out with Reckless and

17   Bow Wow, and a crack cocaine customer came there and Reckless

18   directed that customer to Bow Wow for Bow Wow to serve that

19   customer.

20             So that is a conspiracy.  That's the evidence we've

21   shown.  To the extent that there was evidence of how it worked

22   on those streets, the different people selling on those

23   streets, that's just evidence to show that this conspiracy we

24   have alleged between these people, how it worked.  That goes to

25   the existence, whether we have proven the existence of the

1    conspiracy we have alleged, not whether there are multiple

2    conspiracies that have been charged.

3              MR. DRATEL:  Your Honor, that is a view of the

4    evidence that is the government's theory, and they will marshal

5    the evidence as they see fit in front of the jury.  But that is

6    not the exclusive view of the evidence.  Certainly when

7    Mr. Thomas, just taking the evidence at face value,

8    Mr. Mallory's testimony, that Mr. Thomas comes up to him and

9    says I would like to borrow some money, Mr. Mallory says, well,

10   I don't have money, but I have some crack for you to sell.

11             To the extent that proves the conspiracy charged in

12   the indictment, it is really a far flung matter all together.

13   So it may prove a very, very discrete, separate conspiracy than

14   the one charged in the indictment, but I think that a lot of

15   the evidence goes to that same context, which is sporadic,

16   isolated pieces of evidence that don't have a course of conduct

17   that would be consistent with the larger conspiracy -- and the

18   government can marshal the evidence and say otherwise, but I

19   think that the evidence fairly viewed includes both of those

20   possibilities, and I think the jury needs to be charged with

21   respect to them.

22             THE COURT:  Mr. Strazza?

23             MR. STRAZZA:  I join in Mr. Dratel's comments with

24   respect to the narcotics conspiracy charged here.  And I just

25   want to say specifically with respect to Mr. Christian there

1   was very limited testimony about isolated events, again, where

2   specifically the reference right now to the incident with Bow

3   Wow, I submit that that is certainly in no way evidence of the

4   conspiracy that Mr. Christian was involved in with all of the

5   people the government just mentioned.

6          Yesterday they mentioned an incident where

7   Mr. Christian went with Mr. Mallory or where Mr. Mallory

8   approached Mr. Christian and asked him where he could find more

9   crack and Mr. Christian took him and the two of them purchased

10  crack from the same person.

11         But the testimony with respect to that incident was

12  very clear when I went back last night and read the record.

13  They both made their own separate purchases from that same

14  individual.

15         Even if in the light viewed most favorable to the

16  government that is considered to be a conspiracy amongst

17  Mr. Mallory and Mr. Christian, I still don't see how it goes to

18  prove or how it shows the competent existence of the conspiracy

19  alleged in the indictment.

20         Again, I understand each side is entitled to their own

21  arguments, but I don't think the evidence is strong enough or

22  sufficient enough where we shouldn't argue, where the jury

23  shouldn't be charged about multiple conspiracies.

24         MR. DRATEL:  I think this very much on a smaller scale

25  is analogous to the situation in *Bertolotti*, where you had a

1   lot of competing small organizations that sometimes overlapped,

2   sometimes didn't.  Sometimes they competed with each other and

3   sometimes operated independently.  Going beyond the Rule 29

4   point right now, we are really talking about whether the

5   government's theory is the exclusive theory that gets presented

6   to the jury.

7            THE COURT:  Mr. Nawaday, did you want to respond?

8            MR. NAWADAY:  Just briefly, your Honor.  Again, it

9   sounds like Mr. Strazza is arguing, what Mr. Dratel is arguing

10  is whether we have proven the existence of a conspiracy, not,

11  you know, that there are these multiple conspiracies out there.

12           THE COURT:  I think I agree with the defense.  I think

13  that it is appropriate in this case to give a multiple

14  conspiracy instruction.

15           There was certainly a lot of evidence elicited by the

16  government actually concerning the way in which the drug

17  dealers conducted their business on the street.  There was

18  testimony I recall that at times there would be as many as five

19  or six or ten drug dealers at a time and that they would help

20  each other out.  There was a lot of testimony elicited by the

21  government concerning splits.

22           I don't recall that each of those splits or each of

23  those instances occurred with an individual that was named in

24  the conspiracy or that was alleged to have been part of the

25  conspiracy.

1              Also, there was a lot of discussion concerning how

2      this took place over a number of years and at various

3      locations.  There did not appear to be a single source of

4      narcotics for any of these participants that are alleged to

5      have participated in the conspiracy.

6              I do believe, consistent with the commentary to the

7      multiple conspiracy charge in Sand, that if a reasonable juror

8      could in light of the evidence adduced find that either one

9      common overall plan or several separate and independent

10     unlawful agreements existed, the trial court should instruct

11     the jury regarding the issue of multiple conspiracies.

12             That only takes us half of the way.  The balance of

13     the route that we need to take is what language we should use.

14     In that regard I don't believe that the language proposed by

15     the defendants is appropriate.

16             In particular, the defendants want me to charge the

17     jury "If instead you find that the government has proven

18     multiple conspiracies or a series of smaller conspiracies

19     rather than the single conspiracy alleged in the indictment,

20     you must acquit."

21             I think that what the case law requires is that once

22     the jurors are instructed on multiple conspiracies that they

23     need to find that the actual conspiracy charged in the

24     indictment was proven by the government and in that regard the

25     language in *Restrepo*; which is reported at 547 F.App'x 34,

1    which reads as follows, pages 40 to 41: "You must decide

2    whether the conspiracy charged in the indictment existed, and,

3    if it did, who were some of its members.  If you find that the

4    conspiracy charged did not exist, then you must return a

5    not-guilty verdict, even though you may find that some other

6    conspiracy existed.  Similarly, if you find that the defendant

7    was not a member of the conspiracy charged, then you must find

8    the defendant not guilty even though the defendant may have

9    been a member of some other conspiracy."

10           This is a case from 2013.

11           So I will craft language consistent with that

12   decision, which was approved by the Second Circuit, and will

13   not otherwise use the entirety of the request that was provided

14   by Mr. Thomas.

15           MR. DRATEL:  Your Honor, that leaves the single

16   transaction rule, which also is the following instruction on

17   page 7 of what we proposed.

18           MR. NAWADAY:  Your Honor, before we get there, can I

19   just confirm that that charge relating to multiple conspiracies

20   only relates to narcotics conspiracy count and does not relate

21   to the robbery conspiracy count, Count One, since the

22   defendants' proposed charge seems to indicate it applied to all

23   counts.

24           THE COURT:  Yes.

25           Seeing that we have taken the "or robberies" language

1   out, I think that is appropriate.

2            MR. DRATEL:  Yes, your Honor.

3            THE COURT:  OK.  And with respect to the single act.

4            MR. DRATEL:  Yes.

5            THE COURT:  Go ahead, Mr. Dratel.

6            MR. DRATEL:  Well, again, this is a principle from a

7   Second Circuit cases going back a long ways, that a single act

8   on its own is not sufficient to establish the defendant's

9   participation in a conspiracy.  And since a conviction of

10  conspiracy requires an intent to participate in an unlawful

11  enterprise, a single act must be such that one may reasonably

12  infer from it an intent to participate in the enterprise.  So

13  that's the essence of it.

14           I think it dovetails with what we previously

15  discussed, which is that the simple fact that two people may

16  have acted together in a single instance does not

17  necessarily -- again, the government can marshal its evidence

18  and we can marshal ours to the extent that we argue it, but

19  just that the single act does not evince an intent to be part

20  of that larger conspiracy.

21           I think they go hand in hand in this regard because

22  the evidence just shows so many disparate people, our position

23  is that a simple act on its own is not indicative of this

24  larger conspiracy or the participation in it of particular

25  individuals.

1          Obviously, the testimony doesn't include a

2     confederation by a specific defendants here in the sense of

3     some of the defendants together are not linked with respect to

4     any sales, but they are linked to other people.

5          THE COURT:  I'm sorry.  Are we talking specifically

6     about the narcotics conspiracy?

7          MR. DRATEL:  Yes.  We are talking about the narcotics

8     conspiracy.

9          THE COURT:  OK.

10          Mr. Nawaday?

11          MR. NAWADAY:  Your Honor, I don't think this

12     instruction is necessary or appropriate.  I think it's actually

13     a little confusing, and I actually think that what

14     Mr. Greenfield suggested your Honor add earlier on actually

15     takes care of this issue in some ways to the extent there is

16     one.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1            THE COURT:  Anything further?

2            MR. DRATEL:  No, your Honor.

3            THE COURT:  Not going to give this instruction.

4            MR. BUCHWALD:  Just in that respect, your Honor, I

5    don't mean to be repetitive.  The conspiracy charged we believe

6    by definition in this case is more than the drugs that are

7    involved on December 15 of 2010.  That was their original

8    charge.  They have a superseding indictment which makes it more

9    than that.  And our concern is that without a charge like this

10   they can be found guilty of that narcotics conspiracy if the

11   only thing that happened was an attempted robbery of drugs on

12   December 15, 2010.  Clearly they've indicted more.  Their

13   conspiracy is more than that.

14           THE COURT:  As I indicated, I'm not going to give this

15   charge.  I think that the consistent with Second Circuit

16   authority.  I'm speaking in particular about U.S. v. Heras, 609

17   F.3d 101 at pages 108 and 110 through '11 as well as United

18   States v. Huezo, 546 F.3d 174, at pages 179 through '80; that

19   that particular request would be inappropriate.  So I'm not

20   going to give that instruction.

21           So we will give the multiple conspiracy.  We won't

22   give the single transaction instruction.

23           Anything further on page 35?

24           MR. DRATEL:  Also, your Honor, pointed out to me by

25   cocounsel, it would have to be conformed with the government's

E8k9chr3

1    announcement yesterday that it was going to submit to the jury

2    only (b)(1)(C) and not (b)(1)(A).

3          THE COURT:  Yes.  That change will be made when we

4    read the count on page 33.

5          MR. BUCHWALD:  Page 36.

6          MR. DRATEL:  Also page 33 we get to the quantity.  But

7    before we get to quantity there's one paragraph on page 35.

8          Page 35, the last full paragraph.  "Let me note that

9    the government need prove only that a defendant conspired to

10   distribute a controlled substance but that he conspired to

11   possess a controlled substance with the intent to distribute

12   it.  The government need not do both."  But I think there needs

13   to be unanimity as to the controlled substance with respect to

14   each defendant.  I know it complicates it, but I think it's

15   necessary, given that the circuit has held that drug type is an

16   element of the offense.  So I think for drug type for each

17   defendant that's -- if eight jurors feel that Mr. Thomas sold

18   crack and four say he sold marijuana, I don't think that's a

19   sufficient verdict in that regard.  I think they have to be

20   unanimous as to each defendant as to the specific drug.

21         THE COURT:  Mr. Nawaday.

22         MR. NAWADAY:  Your Honor, I think that what Mr. Dratel

23   is suggesting is accurate.  We can, at break, send you some

24   proposed language to cover that or cover that in the verdict

25   form.

E8k9chr3

1          THE COURT:  Okay.  Very well.  But do get me that

2    language just as soon as you can because there is a logistical

3    issue that we need to address, I guess, in terms of getting it

4    altogether and copied, etc.

5          MR. NAWADAY:  Yes, your Honor.

6          THE COURT:  Now, with respect -- anything more on page

7    35?

8          MR. DRATEL:  No, your Honor.

9          MR. NAWADAY:  Your Honor, the government's first

10   comment is on page 36.

11         THE COURT:  Page 36.

12         MR. NAWADAY:  Based on the government's motion to

13   proceed just on a (b)(1)(C) the government suggests deleting

14   the last paragraph on page 36.

15         THE COURT:  The last paragraph being, "As I will

16   explain later"?

17         MR. NAWADAY:  Yes.  "You will then be asked to make a

18   finding about quantity."

19         THE COURT:  But the language otherwise in that

20   section, Section iii, is appropriate?

21         MR. NAWADAY:  Yes.

22         THE COURT:  Okay.  Defendants agree?

23         MR. DRATEL:  Well, it's a correct statement.

24         THE COURT:  Very well.  So the last paragraph on page

25   36 will be deleted.

E8k9chr3

1          Page 37.

2          MR. DRATEL:  Nothing on page 37, your Honor.  On 38.

3          THE COURT:  Page 39?

4          MR. DRATEL:  That full paragraph, your Honor, I would

5     just -- I would start it, rather than "often" I would say "it

6     may be possible."

7          THE COURT:  Any objection?

8          MR. NAWADAY:  No, your Honor.

9          MR. DRATEL:  At the end of the paragraph I would say

10    "from all of the evidence" and I would just add "or lack of

11    evidence presented in this case."

12         THE COURT:  So that paragraph will begin, "it may be

13    possible to make the determination from all of the evidence or

14    lack of evidence"?

15         MR. DRATEL:  Yes, your Honor.

16         THE COURT:  Any objection?

17         MR. NAWADAY:  No objection.

18         THE COURT:  So that change will be made as well.

19         Page 40.

20         MR. DRATEL:  Essentially summarizing the elements,

21    your Honor, that the Court has previously defined for the jury.

22    I would just add the further paragraph, line 3, and that is

23    whether the defendants participated in a conspiracy, I would

24    just add "willfully" with knowledge of its unlawful purpose.

25         MR. NAWADAY:  No objection.

E8k9chr3

1              THE COURT:  Okay.

2              MR. DRATEL:  And also the last paragraph where it says

3     "knowing and intentionally" I would add "willfully" as well.

4              THE COURT:  Okay.  Very well.

5              MR. DRATEL:  Yes.  I'm sorry, your Honor.

6              THE COURT:  Go ahead.

7              MR. DRATEL:  In that first paragraph Ms. Stafford

8     points out line 3, it says "defendants" and it should say "the

9     defendant you are considering."

10             MR. NAWADAY:  No objection.

11             THE COURT:  Okay.

12             MR. NAWADAY:  Page 41 should be deleted, your Honor.

13             THE COURT:  This entire instruction should be deleted?

14             MR. NAWADAY:  Yes, your Honor.  This is the special

15    interrogatory on drug quantity.

16             THE COURT:  Okay.

17             MR. DRATEL:  We agree, your Honor.

18             THE COURT:  Page 42.

19             MR. DRATEL:  Nothing, your Honor.

20             THE COURT:  43.

21             MR. DRATEL:  No, your Honor.

22             MR. NAWADAY:  43, your Honor.  The second element at

23    the end it says in relation to the specified crime "for"

24    violence I think it should be "of" violence.

25             THE COURT:  Yes.  I'm sorry.  Should be -- was there a

E8k9chr3

1    change?

2              MR. NAWADAY:  Yes, your Honor.  The version I had it

3    says during and in relation to the specified crime "for"

4    violence.

5              MR. DRATEL:  I have "of."

6              THE COURT:  You mean the second line?

7              MR. NAWADAY:  Where it says, "Second, that the

8    defendants used or carried firearms during and in relation to

9    the specified crime," should be "of" violence.

10             THE COURT:  Got it.  Was this the second element, the

11   second line, the last -- the word before violence should be

12   "of" violence not "or" violence.

13             Anything else on 43?

14             MR. NAWADAY:  Not from the government.

15             MR. DRATEL:  Nothing, your Honor.

16             THE COURT:  44.

17             MR. DRATEL:  No, your Honor.

18             MR. NAWADAY:  The third line after the section labeled

19   "use."

20             THE COURT:  Yes.

21             MR. NAWADAY:  The third line reads, "In relation to

22   the commission of the," it says "drug trafficking crime."  It

23   should be "crime of violence" since this count relates to the

24   robbery.

25             THE COURT:  Okay.  So "drug trafficking crime" will be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  removed and "crime of violence" will be put in its place.

2         Anything else on 44?

3         MR. NAWADAY:  Not from the government.

4         MR. DRATEL:  No, your Honor.

5         THE COURT:  45.

6         MR. NAWADAY:  Similar change in the section labeled

7  "carry," the one, two, three, four, five, six, seven, eighth

8  line should be "commission of the crime of violence" not "drug

9  trafficking crime."

10        THE COURT:  That change will be made as well.

11        MR. NAWADAY:  Same change further down the page in the

12 section labeled "possess."  The one, two, three, fourth line,

13 should be "possession of a firearm in furtherance of a crime of

14 violence."

15        THE COURT:  Anything else on 45, Mr. Dratel?

16        MR. DRATEL:  Just the last sentence that carries over

17 onto 46, which is a preview, a foreshadowing of the aiding and

18 abetting instruction.  I would just ask that the Court just say

19 that you'll define aiding and abetting later on rather than

20 give them sort of one sentence that -- I'm just afraid that

21 it's just -- it's too much of a summary and then the charge

22 itself is more complex.  Around rather than -- just have the

23 whole charge in one spot.  I would just say, "I will shortly

24 explain to you the concept of aiding and abetting," and just

25 leave it at that.

E8k9chr3

1          THE COURT:  Where do we thereafter define it?

2          MR. DRATEL:  Aiding and abetting?  It comes up -- 56.

3          MR. NAWADAY:  It's on page 56.

4          THE COURT:  I think I'm happy to take that last

5     sentence out.

6          MR. DRATEL:  I'm sorry.  I didn't hear the court.

7          THE COURT:  I'm going to take that sentence out, that

8     last sentence.

9          MR. DRATEL:  Thank you.

10         THE COURT:  47.

11         MR. NAWADAY:  Nothing from the government.

12         MR. DRATEL:  I think there's a missing -- the close of

13    quotation in paragraph three after crime of violence.  I think

14    just need to close the quote there.

15         THE COURT:  Just take that quote out.

16         MR. DRATEL:  Okay.

17         THE COURT:  Since we're not quoting anything.

18         So we'll just take that out.

19         MR. DRATEL:  Also, your Honor, on that last paragraph

20    where it says "I instruct you that the robbery conspiracy

21    alleged in Count One of the indictment," and then would add the

22    following clause, "If you find beyond a reasonable doubt that

23    the defendant you are considering is guilty of participating in

24    that conspiracy," and then continue.

25         THE COURT:  So you would propose to include the

E8k9chr3

1   following clause, and I'll read the entire sentence as

2   proposed, "I instruct you that the robbery conspiracy alleged

3   in Count One of the indictment, if you find beyond a reasonable

4   doubt that the defendant you are considering participated in

5   that conspiracy, qualifies under the law as a crime of violence

6   for which Raymond Christian and Glenn Thomas may be prosecuted

7   in a Court of the United States."

8           MR. DRATEL:  Yes, sir.

9           MR. NAWADAY:  No objection.

10          THE COURT:  Very well.  That change will be made.

11          48.

12          MR. DRATEL:  Nothing, your Honor.

13          THE COURT:  49.

14          MR. DRATEL:  49 we have, after 49 we have proposed an

15   instruction with respect to felony murder.  Actually two

16   things.  One is that I think that -- the felony murder

17   instruction that we propose is that, "If you have a reasonable

18   doubt as to whether Jeffrey Henry was killed by two bullets

19   from the gun fired by Akinto Boone or two bullets fired from a

20   gun -- fired by one of the robbers, as a matter of law you must

21   vote to acquit on Count Four" based on the authority that we

22   propose to the Court from the majority of U.S. jurisdictions

23   with respect to the agency approach with respect to felony

24   murder.

25          THE COURT:  Mr. Nawaday.

E8k9chr3

1          MR. NAWADAY:  Your Honor, we don't think this

2     instruction is appropriate at all.  And we think the

3     instruction your Honor has is the standard instruction that's

4     given in this court and just object to this instruction.

5          THE COURT:  I do note for the record that as the

6     defendants correctly note, there is no Second Circuit opinion

7     which supports the instruction that they request.  Counsel cite

8     to numerous state jurisdictions and perhaps even a First

9     Circuit jurisdiction, if I'm remembering correctly.

10          MR. BUCHWALD:  I think the First Circuit goes against

11     us.

12          THE COURT:  Okay.  So I am going to keep the

13     instruction that I have in my proposed charge and will not

14     follow the authority that's been cited by the defendants.

15          MR. DRATEL:  Thank you, your Honor.

16          THE COURT:  Any other comments on page 49?

17          MR. DRATEL:  No, your Honor.

18          MR. NAWADAY:  No, your Honor.  The government's next

19     comment isn't until page 64.

20          THE COURT:  Page 50.

21          MR. DRATEL:  Nothing.  I think our next comment is

22     page 57.  So the government said 54?

23          MR. NAWADAY:  No.  Our next one is 64.

24          THE COURT:  So let's go to page 57.

25          MS. STAFFORD:  I'm sorry, your Honor, page 50.

E8k9chr3

```
 1          I was wondering what you had planned to put in there
 2   because Mr. Whitaker is no longer charged with Count Six.
 3          THE COURT:  We don't intend to have him convicted of
 4   Count Six.
 5          MS. STAFFORD:  That's very good.
 6          MR. NAWADAY:  Your Honor, while we're on page 50.  Is
 7   it your Honor's practice to send back the indictment?  If so,
 8   we can prepare redacted --
 9          THE COURT:  Yes.  You should prepare a redacted
10   indictment.  It is my practice, assuming that it doesn't
11   involve any undue burden on the parties or the court to prepare
12   an indictment for the jury to have.
13          MR. NAWADAY:  We'll do that.
14          THE COURT:  During its deliberations.
15          MR. BAUER:  Just to be clear -- because I can have
16   somebody start working on it -- do we want the actual one
17   redacted or can we just redo one and it will be unsigned?  I
18   think the latter is the wiser way to go.
19          THE COURT:  I'm happy to have one that's a new one.
20          MR. BAUER:  Because it will erase Mr. Whitaker from
21   Count Six.  It will erase James Williams, who is also on the
22   indictment.  I guess we could also redact the two --
23          THE COURT:  I'm happy to have a clean one.  Does the
24   defense have any objection to that?
25          MR. DRATEL:  Clean.
```

E8k9chr3

1          MR. BAUER:  We will prepare a clean one.  Thank you,

2     your Honor.

3          MR. BUCHWALD:  Make the changes on the quantity issue?

4          MR. NAWADAY:  Yes.

5          THE COURT:  So we will omit Mr. Whitaker from Count

6     Six.

7          Now to page 57, correct?

8          MR. DRATEL:  Yes.  The last paragraph.  I would just

9     ask for -- I would just add "the government proves beyond a

10    reasonable doubt that."

11         THE COURT:  I'm sorry.  Where are we?

12         MR. DRATEL:  Page 57, last paragraph it says, "If the

13    defendant you are considering did all three of these things," I

14    would just add after "if" so it should read, "If the government

15    proves beyond a reasonable doubt that the defendant."

16         MR. NAWADAY:  No objection.

17         THE COURT:  So, "If the government proves beyond a

18    reasonable doubt that the defendant you are considering," okay.

19         58.

20         MR. DRATEL:  I think with respect to 58, your Honor,

21    the third sentence, the one that starts "While you are to

22    carefully consider the evidence adduced by the government," I

23    would delete everything on the rest of that line, the next

24    line, and then the rest of that sentence.  And just have it

25    read "While you are carefully -- you are to carefully consider

E8k9chr3

1    the evidence adduced by the government," then just continue

2    "your concern is to determine whether on the evidence or lack

3    of evidence each defendant's guilt has been proven beyond a

4    reasonable doubt." I think the question of speculating why

5    techniques were used or not is a fair -- is a fair exercise for

6    the jury not so much in terms of why the government did one

7    thing or another but whether the government, in terms of the

8    completeness or -- what the investigation produced based on the

9    techniques used as a concept of lack of evidence.  This would

10   suggest that the jury can't -- that couldn't take into account

11   whether certain forensic investigative techniques, which either

12   weren't used or were used and yielded results or didn't yield

13   results, that that wouldn't be relevant.  And I think it is

14   relevant.  It's not a question of whether or not the government

15   is obligated but I think it's a question of just for the jury

16   to determine whether there's sufficient evidence or there's a

17   lack of evidence, that this goes too far with that statement in

18   it.

19          I agree with the concept, as I've said, with the

20   initial statement.  And as I've amended it, we have no problem

21   with it, just that it just goes too far with all that in it.

22          THE COURT:  Mr. Nawaday.

23          MR. NAWADAY:  Just to make sure, Mr. Dratel.  Are you

24   suggesting deleting the clauses "the government is not on

25   trial; law enforcement techniques are not your concern"?

1             MR. DRATEL:  Starting with, "You are not to speculate

2    to why they used the techniques they did or why they did not

3    use other techniques."  Just so that sentence would read,

4    "While you are to carefully consider the evidence adduced by

5    the government, your concern is to determine whether on the

6    evidence or lack of evidence each defendant's guilt has been

7    proven beyond a reasonable doubt."

8             Again, it states "There is no legal requirement that

9    the government prove its case through any particular means."

10            MR. NAWADAY:  Your Honor, there's been, through

11   cross-examination it's clear that part of the defense is that

12   certain techniques were not used.  So I think it is appropriate

13   that there is an instruction that the jurors aren't supposed to

14   speculate about whether certain techniques were used or not.  I

15   don't have a problem with striking the sentences: "The

16   government is not on trial.  Law enforcement techniques are not

17   your concern" since that is somewhat redundant of our point

18   which is, "You are not to speculate as to why they used the

19   techniques they did or why they did not use other techniques"

20   as long as that clause is still in there, I'm fine striking the

21   two sentences that follow.

22            THE COURT:  I agree with that.  So I'll do that.  I'll

23   remove only the following two sentences, "The government is not

24   on trial.  Law enforcement techniques are not your concern."

25   Otherwise, I think the instruction is appropriate because of

E8k9chr3

1    the cross-examination that was conducted particularly with --

2    particularly with respect to DNA, but also with respect to why

3    certain phonecalls were not made, why certain phonecalls with

4    the use of cooperating witnesses.  So I think it is

5    appropriate.

6             MR. BUCHWALD:  Your Honor, would you consider saying

7    "While you may consider law enforcement's failure to utilize

8    certain techniques, you may not speculate as to why it did or

9    did not use them"?

10            THE COURT:  No.

11            MR. BUCHWALD:  Because they certainly can consider it

12   in their deliberations.

13            THE COURT:  No.  I will not make that change.

14            Anything else on page 58?

15            MR. DRATEL:  No, your Honor.

16            THE COURT:  59 -- is there a need for 59?  Uncalled

17   witnesses?

18            MR. BUCHWALD:  We don't know yet.  I think you can

19   wait to see after summation.

20            THE COURT:  How could we possibly not know yet?

21            MR. DRATEL:  I just don't know whether people are

22   going to sum up on it or not.

23            THE COURT:  Okay.  So let's leave it in.

24            Page 60.

25            MR. DRATEL:  Yes, your Honor, that last paragraph that

E8k9chr3

1  begins, "In evaluating the testimony of cooperating immunized

2  witnesses."  We think it should read as follows, "You should

3  ask yourselves whether the witness" and then add the following

4  and replace some of the language but add the following.  So,

5  it's "whether the witness," and then "perceives himself or

6  herself to benefit" and then go back to "more by lying or

7  telling the truth."  And then the next sentence, "Was his or

8  her testimony made up in any way because he or she believed or

9  hoped that he or she would somehow receive favorable

10 treatment."

11        I'm sorry.  Let me start again with that sentence.

12 "Was his or her testimony made up in any way because he or she

13 believed or hoped that he or she would somehow receive

14 favorable treatment," and then by testifying, and then we would

15 add "In a way he or she perceives to be helpful to the

16 government."

17        THE COURT:  Mr. Nawaday.

18        MR. NAWADAY:  Your Honor, one, I think what your Honor

19 has in this charge is -- covers what I think Mr. Dratel is

20 going for.  I don't think adding the words "perceives or doing

21 that wordsmithing really changes or adds anything; if anything,

22 it confuses things.

23        And also I object to interposing, you know, "trying to

24 please the government" into this instruction.  I think it's, as

25 written, it talks about the witness's own motivations for their

E8k9chr3

1    own benefit and for those reasons I don't think Mr. Dratel's

2    suggestions are appropriate.

3           THE COURT:  I'm sorry.  Did you want to say something?

4           MR. DRATEL:  No.  Just we think that there's a

5    prospect for -- for the jury misapprehending what is in the

6    mind of the cooperating witness in terms of incentives and

7    motivations and what they think will help themselves.

8           THE COURT:  I don't think there's any chance of that.

9    I think they know very well what cooperating witnesses hope to

10   obtain and what their various motivations can be.  I'm not

11   going to make that change.  I think the way it is states

12   clearly what the witness -- what the jury may consider.

13          Anything else on page 60?

14          MR. DRATEL:  No, your Honor.

15          THE COURT:  61.

16          MR. DRATEL:  The only thing on 61 is that in the

17   second full paragraph when you have "Even if you find that a

18   witness testified falsely in one part you may still accept his

19   or her testimony in other parts or you may disregard all of

20   it."

21          We think that the Court's expression of that on page

22   79 is better and ought to be put here and then repeated on 79.

23   But we think it's just -- it's just a better expression of that

24   principle, the way the Court has it on 79, carries over from

25   78, but it begins with the first sentence on 79, "If you find

E8k9chr3

1    that any witness has willfully testified falsely as to any

2    material fact."  We just think that's a better expression.

3              THE COURT:  So put that paragraph --

4              MR. DRATEL:  Yes.  Instead of -- after "all or nothing

5    fashion."  So it would take out that last two sentences of the

6    paragraph on 61 and substitute what's on page 79.

7              THE COURT:  I'm happy to do that.

8              MR. DRATEL:  Thank you, your Honor.

9              THE COURT:  I agree that it's better stated on 78 and

10   79.

11             Anything more on 61?

12             MR. DRATEL:  No, your Honor.

13             THE COURT:  62.

14             MR. DRATEL:  62, the instruction as given -- as

15   presented is fine.  We just think there's a potential for

16   confusion on the part of the jury that there's some other

17   evidence or something that informants have contributed that the

18   jury perhaps has not heard and we think that there has to be

19   some way to eliminate that prospect, the danger that the jury

20   might do that.  So we would just propose a sentence at the end.

21   "You have heard the entirety of the evidence furnished by

22   informants or other witnesses in this case."

23             MR. NAWADAY:  Your Honor, I don't know if that's a

24   proper jury instruction.

25             THE COURT:  Let me just -- it may not be right as a

E8k9chr3

1    factual matter but I just want to see if I can discern what the

2    concern is.

3          I really don't see what the concern is, Mr. Dratel.  I

4    don't know that it's appropriate to give that instruction.  So

5    I'm going to deny that request.

6          MR. DRATEL:  Your Honor, there is also --

7    Mr. Greenfield has handed me a Sand charge on informants for

8    the purpose of cautionary instruction similar to cooperating

9    witnesses that -- that has to be examined with greater scrutiny

10   than the testimony of an ordinary witness.  So if the Court

11   could include or either refer back to the admonition with

12   respect to cooperating witnesses and then apply it to

13   informants as well, we think that would be appropriate.

14         THE COURT:  Except that we talk about the -- the

15   previous section deals with cooperating witnesses.  So I'm not

16   going to pile on here.

17         Anything else on page 62?

18         MR. DRATEL:  No, your Honor.

19         THE COURT:  63?

20         MR. DRATEL:  No.

21         THE COURT:  Do we need to include -- there's a

22   highlighted section there.  Do we need to include specific

23   places?

24         MR. NAWADAY:  I don't think we do, your Honor.

25         THE COURT:  Okay.  So we'll take out the clause

E8k9chr3

1      "including the search of."

2            Were there searches -- there were searches at the time

3      of the arrest, correct?  There was at least one gun that was

4      taken from Mr. Thomas when he was arrested.

5            MR. NAWADAY:  Yes.  There was testimony of searches

6      conducted by law enforcement.

7            THE COURT:  Very well.  Mr. Greenfield.

8            MR. GREENFIELD:  Can we take a few minutes?

9            THE COURT:  Yes.  Let's take ten minutes.  Ten

10     minutes.

11            (Recess)

12            THE COURT:  Let's move forward.  I just noted with

13     some alarm that I might not have an opportunity to eat.

14            Page 63.

15            MR. BUCHWALD:  Page 63.  We would ask that the second

16     full paragraph, "Evidence obtained from these searches was

17     properly admitted in this case and may be properly considered

18     by you."  We would take out the second "properly."  It was

19     properly admitted; it may be considered by you.  Otherwise it's

20     suggestive that maybe this should be given greater

21     consideration.

22            THE COURT:  Well I don't know about that but I will

23     take out the second "properly."

24            Anything else on 63?

25            MR. DRATEL:  No, your Honor.

E8k9chr3

1          THE COURT:  64?

2          MR. DRATEL:  64.  I think that it needs a sentence

3   about what weight you ascribe to this evidence for the jury to

4   determine.

5          MR. NAWADAY:  I'm sorry.  I missed that.

6          MR. DRATEL:  There's -- it doesn't have a -- the

7   instruction needs something about that the jury can ascribe to

8   it whatever weight it wants.  We have some language, actually.

9          MR. NAWADAY:  What page are we on?

10          MR. DRATEL:  64.

11          I also think 64 and 65 may be combined but I don't

12   know if that's more efficient or less efficient at this point

13   in the sense that the court mentions on 64 that the tapes --

14   that the transcripts are not evidence.

15          I'm sorry.  The transcript as an aid.  And whether you

16   just want to put the rest of 65 in there.  But we would just,

17   for the weight part, the second paragraph, "You must therefore,

18   regardless of the personal opinions," and then we have agreed

19   "consider such evidence, make your determination both as to its

20   meaning and significance, if any, to the charge and the

21   defendant you are considering" and then just continue, "along

22   with all of the other evidence in the case in determining

23   whether the government has proven."

24          MR. NAWADAY:  So you're just adding "if any"?

25          MR. DRATEL:  I'm sorry?

E8k9chr3

　　　　　　　MR. NAWADAY:  You're just adding "if any"?

　　　　　　　MR. DRATEL:  We're adding the whole clause, because
we're taking out everything after "personal opinions," and
taking out that whole clause, "give this evidence full
consideration."

　　　　　　　THE COURT:  Oh, you are, are you?

　　　　　　　MR. DRATEL:  I'm sorry?

　　　　　　　THE COURT:  You are, are you?  You said that you're
taking it all out?

　　　　　　　MR. DRATEL:  Yes.  Taking that out until you get to
"along with."

　　　　　　　So, "give this evidence full consideration," is what
we'd take out and substitute, instead, "Consider such evidence,
make your determination both as to its meaning and
significance, if any, to the charge and the defendant you are
considering," and then continue with "along with all of the
other evidence in the case."

　　　　　　　THE COURT:  I don't want to take out the charge and
the defendant you are considering because that just makes it
unwieldy.

　　　　　　　MR. NAWADAY:  What Mr. Dratel suggests is fine with
your Honor's caveat.

　　　　　　　THE LAW CLERK:  "Consider such evidence, make your
determination as to its meaning and significance, if any"?

　　　　　　　MR. DRATEL:  Yes.

E8k9chr3

1          THE LAW CLERK:  Correct?

2          MR. DRATEL:  Yes.

3          THE LAW CLERK:  Thank you.

4          MR. NAWADAY:  Your Honor, we had comments to the first

5    paragraph.

6          THE COURT:  Okay.

7          MR. NAWADAY:  Because it's just one video recording.

8          THE COURT:  Okay.

9          MR. NAWADAY:  So just to harmonize it, we suggest

10   paragraph one read --

11         THE COURT:  Well actually there's more than one video

12   recording.

13         MR. NAWADAY:  Oh, that's right.  There is the pole

14   camera.  So really the -- our comment would just be to the

15   third sentence, "Whether you approve or disapprove of the

16   recording" and then delete "or interception of."

17         THE COURT:  Okay.

18         MR. NAWADAY:  So it would read "disapprove of the

19   recording may not enter into your deliberations."

20         That's all.

21         THE COURT:  So we're just taking out what?

22         MR. DRATEL:  "Or interception of."

23         MR. NAWADAY:  "Or interception of those

24   conversations."

25         THE COURT:  So we're taking out "those conversations"

E8k9chr3

1    also?

2            MR. NAWADAY:  Yes, your Honor.

3            MR. DRATEL:  No.  We need that for the recording.

4            MR. NAWADAY:  Right.

5            MR. DRATEL:  Just before -- "or interception" I think.

6            MR. NAWADAY:  Right.  Just "or interception" because

7    there is no --

8            MR. DRATEL:  Interception.

9            It's just "or interception" that needs to be taken

10   out.

11           THE COURT:  So "whether you approve or disapprove of

12   the recording of those conversations."

13           MR. NAWADAY:  Yes.

14           THE COURT:  Okay.

15           65.

16           MR. DRATEL:  We would add -- I'm trying to see

17   where -- just one second, your Honor.

18           We're okay, your Honor.  There's nothing.

19           THE COURT:  66.

20           MR. DRATEL:  I think there are some redactions.

21           THE COURT:  67.

22           MR. NAWADAY:  I think 67 is inapplicable.  All the

23   charging tables that were -- except for the transcripts of the

24   Burden recording, everything else, we did that in evidence.

25           MR. DRATEL:  There are no summary charts or anything

E8k9chr3

1    like that.

2                THE COURT:  No.  So that comes out.

3                MR. DRATEL:  Yes.

4                THE COURT:  68 comes out.

5                MR. DRATEL:  Right.

6                THE COURT:  69.

7                MR. DRATEL:  I couple things on 69, your Honor.  One

8    is that -- I don't think the questions of mistake, accident,

9    other reasons really applies.  I think the government has to --

10   404(b) has to be articulated for a specific reason not for sort

11   of all the reasons in 404(b).  And with respect to the next

12   paragraph, the one that begins "initially," to us that is

13   really just a definition -- is really a propensity in the sense

14   that it's sort of if you find that the defendant engaged in

15   earlier acts, similar characteristics that are charged in the

16   indictment.  That sounds like propensity.  The government

17   hasn't made a modus operandi argument or anything like that.

18               THE COURT:  So we do need this charge?

19               MR. DRATEL:  I think we need for the court to -- what

20   I thought the court would do would be to -- certainly the first

21   paragraph and also maybe repetition of the essence of the

22   limiting instructions that the court had been giving during the

23   trial, which is not only with respect to --

24               THE COURT:  Except I've already given that.

25               MR. GREENFIELD:  Not as to prior acts, Judge.  I agree

E8k9chr3

```
1    with what Mr. Dratel said, at least the first paragraph and

2    maybe the last.

3              MR. DRATEL:  The last sentence, yes.  The last

4    paragraph.

5              THE COURT:  I'm sorry.  For this charge.

6              MR. GREENFIELD:  I'm sorry, Judge.  Paragraph one,

7    paragraph five.  Paragraph four.  Excuse me.

8              THE COURT:  Mr. Nawaday.

9              MR. NAWADAY:  I think there needs to be something in

10   there about what they are allowed to consider it for.  And I

11   think we have shown that the reason we offered those other acts

12   was to show the relationship and that -- there was no mistake

13   or accident with these people knowing each other.  But I don't

14   have disagreement with cutting further down -- cutting parts of

15   paragraphs two and three if defense counsel have a

16   suggestion -- it sounds like they want to cut the entirety of

17   those two paragraphs.

18             MR. GREENFIELD:  Paragraph three is pure propensity.

19             (Continued on next page)

20

21

22

23

24

25
```

1          THE COURT:  By the way there is a blank on line one.

2     Does this relate to only one defendant or multiple defendants?

3          MR. DRATEL:  I think the --

4          THE COURT:  To each of them?

5          MR. DRATEL:  Well, the government, I mean in the sense

6     of how it views -- I mean we view it as all.

7          MR. NAWADAY:  I think it's safer to say there was

8     evidence pertaining to each of the defendants, so it should be

9     defendants.

10         THE COURT:  Okay.  So the defendants.

11         I'm keeping the second paragraph, by the way.  I think

12    it's appropriate and I think it's a correct statement of the

13    law.

14         MR. BUCHWALD:  Are you keeping it or deleting?

15         THE COURT:  Yes, keeping the second paragraph.  I'm

16    happy to consider changes to paragraph three.

17         MR. GREENFIELD:  I request that it be deleted, yes.

18         MR. BUCHWALD:  Number two, I think all of the

19    defendants have said that there is no issue of mistake or

20    accident or anything.  I mean it's paragraph two just says, if

21    you find that they robbed 54 Commerce and that they did other

22    things as well, you can consider those other things as to

23    whether they robbed Commerce, 54 Commerce knowingly,

24    intentionally or by some mistake.  Nobody's claiming that they

25    were there and did it unknowingly or by mistake.

1          THE COURT:  Well, then we could end the sentence at

2     the fourth line when we say, "the defendants acted knowingly

3     and intentionally, period."

4          MR. NAWADAY:  Okay.

5          THE COURT:  Do that?

6          MR. BUCHWALD:  But still the fact that they did

7     something earlier, to the extent that it's suggesting they did

8     it knowingly and intentionally, that's just the way of talking

9     propensity, when there is no defense here that they, that if

10    they did it, it wasn't knowing or intentionally.  There is no

11    defense here that somehow we did this, but there is another

12    explanation for it other than guilt or mens rea.  That isn't

13    the defense of any of the defendants here.

14         MR. NAWADAY:  Your Honor, as your Honor's aware with

15    404(b) it sets forth a non-exhaustive list of how 404(b)

16    evidence comes in.  It can come in to show motive, knowledge

17    and intent.  It's not an exhaustive list, so long as it's not

18    coming in for propensity, for bad character.  And so I think

19    your Honor's suggestion satisfies what the defendants' concerns

20    are and is what the law requires.

21         THE COURT:  The evidence was admitted.  I think that

22    the jury's --

23         MR. BUCHWALD:  The evidence was admitted as I

24    understood in some cases to show relationship between people.

25    Okay.  To the extent it did that, it did that.

1              MR. NAWADAY:  That evidence did come in, and our view

2      has always been that it was direct evidence of background

3      concern as well.

4              MR. BUCHWALD:  Well, that's background.  If you want

5      to say offered as evidence of background, okay, background.

6      But it's not to show that people acted knowingly and

7      intentionally, when there is no claim that they did it but

8      somehow with mens rea.

9              MR. NAWADAY:  Your Honor, I don't know if this moves

10     the ball forward or not, but this is a limiting instruction

11     that is given on the request of the defendants.  I don't know

12     if the defense was saying they don't even want this

13     instruction?

14             THE COURT:  That's my, that was my initial question,

15     do you even want this instruction?

16             MR. BUCHWALD:  Well --

17             MR. GREENFIELD:  Yes, Judge, I do.

18             MR. BUCHWALD:  Having come in in some cases, we don't

19     think properly, but that was made, having come in I think it's

20     important that they be told it was for a very narrow purpose --

21     not to show guilt, not to show mens rea, not to show modus

22     operandi, not to --

23             THE COURT:  Okay, so I'll take out the paragraphs two

24     and three.

25             MR. BUCHWALD:  With respect to paragraph one, your

1   Honor, you've heard evidence that on earlier occasion -- and I

2   think defendants engaged in conduct similar in nature -- I

3   think you should say, similar in nature to certain of the

4   conduct charged in the indictment.

5            THE COURT:  No.

6            MR. BUCHWALD:  Because there is no evidence, for

7   example, that when Thomas engaged in robberies of drug dealers.

8            THE COURT:  I'm going to leave it as it is.

9            MR. GREENFIELD:  I'm sorry, Judge?

10           THE COURT:  I said I'm going to leave it as it is,

11  that first paragraph and the last paragraph, except the first

12  paragraph the first line will read, you have heard evidence

13  that on an earlier occasion the defendants engaged in conduct.

14           MR. GREENFIELD:  Thank you, sir.

15           THE COURT:  Okay.  Page 70?

16           MR. DRATEL:  Nothing, your Honor.

17           THE COURT:  71 we don't need, correct?

18           MR. DRATEL:  No.

19           MR. NAWADAY:  I believe that's correct.

20           MR. DRATEL:  Correct.

21           THE COURT:  72, venue.

22           MR. DRATEL:  Your Honor, we propose eliminating the

23  venue, just because I think it's confusing with respect to the

24  standard of proof.  I don't think there is any question of

25  venue here.  So we don't have an objection with respect to

1    venue.

2              I've been in cases where the Court has just said, if

3    it occurred in the Southern District of New York, there's

4    venue.  We wouldn't have an objection to that.

5              In a case like this, we waive that argument because,

6    you know, this is not case where venue is, in any way, in

7    dispute, and I would rather not have the prospect of separate

8    standard of proof that the jury could somehow get confused, and

9    leave it the way, you know, leave it with one consistent burden

10   of proof.

11             MR. NAWADAY:  Your Honor, I think venue's waiveable.

12   If all defense counsel on behalf of their clients will now say

13   that they are waiving any issue with venue or they're admitting

14   to venue on the record, I think it should be fine that the jury

15   doesn't return a venue finding.  I just need to confirm it with

16   my superiors.  But to the extent it's possible, I don't

17   think --

18             THE COURT:  Or we could also just tell the jury it is

19   not disputed that venue is appropriately in the Southern

20   District of New York.

21             MR. NAWADAY:  Venue having shown.

22             MR. DRATEL:  Okay.

23             MR. GREENFIELD:  That's fine.

24             MR. DRATEL:  Yes, your Honor.

25             MR. NAWADAY:  I just need to make sure that, not

1     having done this before, that that will work, that we have a --

2     whatever verdict comes out, should it come out as conviction,

3     that the fact that a jury didn't find venue is okay, and that

4     we've papered in or said it orally.

5              THE COURT:  Okay.  But what I would propose to do is

6     to read the first sentence:  "Which, in addition to all of the

7     elements that I have described for you for each of the six

8     counts, you must also find whether the crimes charged in the

9     indictment took place at least in part within the Southern

10    District of New York, which includes Newberg, New York, and in

11    this regard you are instructed that there is no dispute in this

12    case that venue is appropriate in the Southern District of New

13    York."

14             MR. NAWADAY:  We would still have it on the verdict

15    form, a check mark for venue?

16             THE COURT:  I don't know that I've ever seen venue --

17             MR. DRATEL:  No --

18             THE COURT:  -- on a verdict form.

19             MR. DRATEL:  I don't either.

20             MR. NAWADAY:  I think that's actually -- that's right,

21    your Honor.  So I think that should probably work.

22             THE COURT:  Okay.  Then the rest of the stuff is

23    absolute pure boiler plate.

24             Mr. Dratel, I have considered your instruction on

25    circumstantial evidence.  I like mine better, so I'm going to

1    go with that.  Not that yours is also similarly invocative, but

2    I'll go with mine.

3           Anything on pages 73 through the balance of the

4    instructions?

5           MR. DRATEL:  One thing, your Honor, is, and I think

6    there's some -- I'm just looking to see whether there is some

7    that aren't necessary any more, but I think they all are in

8    here.

9           I think we've gone past necessary or not necessary.

10   But on page 73, what is and what is not evidence.  And last

11   paragraph says, you are not to consider as evidence questions

12   asked by the lawyers.  It's witnesses answers that are

13   evidence, not the questions.

14          I think, though, that there is problem with,

15   particularly with respect to cross-examination where all the

16   fact questions were answered yes or no.  So I would propose

17   this sentence, which is, if a witness affirms the facts in a

18   question by answering yes, you may consider the facts in that

19   question to be evidence.

20          THE COURT:  No.  I will not do that.

21          MR. GREENFIELD:  I have one last, Judge.

22          THE COURT:  Yes?

23          MR. GREENFIELD:  Page 81, law enforcement witnesses,

24   line four.  After the word witness, I would add, at the same

25   time it is quite legitimate that defense counsel to try to

1    attack the credibility of a law enforcement witness on the

2    grounds that his testimony may be colored by personal or

3    professional interest in the outcome of the case.  And that's

4    out of Sand, instruction 7-16.

5              MR. NAWADAY:  No objection.

6              THE COURT:  Okay.  Sand instruction what?

7              MR. GREENFIELD:  7-16.

8              THE COURT:  7-16.

9              MR. GREENFIELD:  I will hand up my handwritten notes

10   to you, if that's okay.

11             THE COURT:  You may as well give us something,

12   Mr. Greenfield.

13             THE DEPUTY CLERK:  Thank you.

14             THE COURT:  Anything else?

15             MR. DRATEL:  Just, your Honor, on impeachment by prior

16   inconsistent statement.

17             THE COURT:  Yeah.

18             MR. DRATEL:  Page 82, second sentence, evidence of a

19   prior inconsistent statement is not to be considered by you as

20   affirmative evidence bearing on -- it says the guilt of the

21   defendant.  I would just ask to change that to whether or not,

22   you know, the defendant is guilty or whether the government has

23   proved the defendant's guilt beyond a reasonable doubt.

24             THE COURT:  Bearing on whether the government has

25   proved the defendant's guilt beyond a reasonable doubt?

E8kzchr4                       Charge conference

1              MR. DRATEL:  Yes.  Yes, your Honor.

2              THE COURT:  Okay.

3              MR. DRATEL:  And in the second paragraph, in terms of

4    what the jury should evaluate, in terms of, you may consider

5    whether a witness, and then there is a couple of examples.  I

6    would also say a number of inconsistencies would also be a

7    factor?

8              THE COURT:  I'm sorry, you are where?

9              MR. DRATEL:  In paragraph two says, in making this

10   determination you may consider whether a witness purposely made

11   false statement or whether it was an innocent mistake, whether

12   the inconsistency concerned an important fact or whether it had

13   to do with small detail.  I would just add also whether, I

14   would just say also the number of inconsistencies in a

15   defendant's testimony -- I mean, rather, in a witness'

16   testimony.

17             THE COURT:  That application is denied.

18             MR. DRATEL:  Thank you, your Honor.

19             I think that may be everything I have.

20             MR. NAWADAY:  Your Honor, the Government's next

21   comment is on page 86, expert testimony.

22             THE COURT:  Okay.

23             MR. NAWADAY:  And there were two experts, so we'd

24   suggest adding first sentence.

25             THE COURT:  I'm sorry.

E8kzchr4                         Charge conference

1          MR. NAWADAY:  At the end, you heard expert testimony

2     from Mr. Meyers, forensic scientist and Dr. Ely, Medical

3     Examiner.

4          THE COURT:  Medical Examiner?

5          MR. NAWADAY:  Medical Examiner.

6          THE COURT:  Okay.

7          MR. DRATEL:  Oh, your Honor just 95, second, third

8     sentence, if the government has succeeded on a particular

9     count, I would just say with respect to the defendant you are

10    considering.

11         THE COURT:  Okay.

12         MR. DRATEL:  And then on the next page, 96, with your

13    admonition, do not listen, watch, I would also add the social

14    media admonition the Court has been using during the trial.

15         THE COURT:  I'm sorry, where precisely?

16         MR. DRATEL:  96, the third paragraph, do not listen or

17    watch or read.  And I know the Court has been incorporating a

18    social media admonition, and I think it's appropriate

19    because --

20         THE COURT:  Very well.

21         MR. DRATEL:  To add that.

22         THE COURT:  Okay.

23         MR. NAWADAY:  Your Honor --

24         MR. BUCHWALD:  I think we left hanging where you were

25    going to put some language about the 2007 drug activity, it's

1    not part of this in conspiracy.  Did we decide where that was

2    going?

3               THE COURT:  Where are we putting that?

4               MR. NAWADAY:  Your Honor, I suggested the prior acts

5    instruction.

6               MR. BUCHWALD:  Okay.

7               MR. NAWADAY:  Or right after it.

8               THE COURT:  Okay.  I guess we can either put it there

9    or in the conspiracy drug conspiracy charge.

10              MR. NAWADAY:  That might be more appropriate.  It's

11   Mr. Buchwald's application so.

12              MR. BUCHWALD:  Better in the conspiracy charge.

13              THE COURT:  Okay, so we'll put it in drug conspiracy

14   charge section.

15              I see Ms. Stafford standing up.  We have considered

16   the request made by Mr. Whitaker, and rather than give a

17   general instruction in that regard, what we propose to do is as

18   we discuss each count, identify specifically which defendant is

19   charged in that count.  So, you know, count one, the following

20   defendants are charged in this count, then list the defendants.

21              MS. STAFFORD:  The only thing, your Honor, that I

22   would like to point out is page 11, since we have the unique

23   situation that Mr. Whitaker is not charged in the conspiracy,

24   the dates actually do matter with regard to him, meaning that

25   he's only involved in the robbery and that he's only involved

1   in the possession of the gun charge in connection with that --

2   I'm sorry -- he's also charged in count two.  So just to make

3   the record complete, I would just make the argument that it

4   would need to be the way that particular instruction stands

5   right now, I don't know if that's going to sufficiently cover

6   the fact that the jury is not to consider Mr. Whitaker's, any

7   other crimes except what happened on that particular date.

8            THE COURT:  Well, again, I mean the jury is going to

9   be directed to consider each count and each defendant

10  separately, and this instruction I think properly directs them

11  that they should consider that they, you know, any -- as long

12  as they the are substantially similar, that they can consider

13  the dates that were introduced at trial.

14           MS. STAFFORD:  However, just because he's not in the

15  conspiracy on or about does not, you know, pertain to

16  Mr. Whitaker and, therefore, that would be, we would argue, a

17  variance of the indictment.

18           THE COURT:  Well, no -- again, I don't have the

19  indictment in front of me, but as I understand any indictment

20  that I've ever seen, each count has on or about a particular

21  date or on or about a particular range, and I assume that with

22  respect to Mr. Whitaker the counts in which he remains include

23  similar language.  Am I wrong about that, Mr. Nawaday?

24           MR. NAWADAY:  That is correct, your Honor.  And I

25  think the fact that your Honor's giving an instruction that

1   they can only consider each defendant as to each count he's

2   charged in, it's going to be clear to the jurors that he's not

3   charged in the robbery conspiracy, so they won't consider it on

4   that count.

5           THE COURT:  Right, okay.

6           Now, we do have the jury coming back in a couple of

7   minutes.  Did the parties wish me to make any record

8   concerning, well --

9           MR. NAWADAY:  I still --

10          THE COURT:  Let's to go Mr. Nawaday first.

11          MR. NAWADAY:  I still have one more comment on the

12  charge.  I'm sorry, your Honor.  I think it's not

13  controversial.  Page 92, your Honor states that the exhibits

14  will be sent to you in the jury room.  I just want to confirm

15  that the exhibits the jurors will have back there are only the

16  documents, not the physical evidence which includes guns,

17  drugs.  So your Honor can --

18          THE COURT:  Gloves.

19          MR. NAWADAY:  If they want to see the physical

20  evidence or the video recording or any other video recordings,

21  they can always ask and we can do it out in court.

22          THE COURT:  We will make that notation.

23          MR. BUCHWALD:  I guess I didn't -- all of the other

24  evidence is going to go in right at the beginning as opposed

25  they can have --

1          THE COURT:  We're not sending in the guns or the

2     bullets or the bloodied clothes or anything like that.

3          MR. BUCHWALD:  But everything else will.

4          THE COURT:  Yes, all the documents will go in.  The

5     pictures.

6          MR. GREENFIELD:  Shell casings?

7          THE COURT:  No.

8          MR. GREENFIELD:  I'm teasing you.

9          THE COURT:  No.  Anything further, Mr. Nawaday?

10         MR. NAWADAY:  Not from the government.

11         THE COURT:  Anything further from the defense on the

12    jury instructions?

13         MR. DRATEL:  No, your Honor.

14         THE COURT:  Very well.  What did the parties wish me

15    to do with respect to the allocution as to the defendants'

16    right to testify?

17         MR. DRATEL:  We'd like to do it ex parte, your Honor,

18    if we could.

19         THE COURT:  Okay.  Mr. Nawaday, would you mind

20    terribly?  And please make sure that no one comes in.

21         MR. NAWADAY:  Maybe I can go get some lunch, your

22    Honor.  I'll stand guard.

23         THE COURT:  You can get lunch when Bauer starts to

24    talk.

25         (The following pages 2149 TO 2151 are filed under

E8kzchr4                              Charge conference

1    seal)

E8kzchr4                       Charge conference

 1              (In open court; government present)

 2              THE COURT:  We have ten minutes before the jury's

 3    back.  If you guys need to run to the bathroom for any reason,

 4    do so, but please be back by no later than 12:30, okay.

 5              Please be ready at 12:30.

 6              (Recess)

 7              THE COURT:  Okay, let's get the jury.

 8              THE DEPUTY CLERK:  All rise.

 9              (Jury present)

10              THE COURT:  Everyone please be seated.

11              Mr. Greenfield, on behalf of Mr. Christian, do you

12    have any further evidence?

13              MR. GREENFIELD:  Your Honor, at this time the

14    defendant Raymond Christian rests.

15              THE COURT:  Thank you.

16              Mr. Goltzer, on behalf of Mr. Whitaker?

17              MR. GOLTZER:  Your Honor, the defense rests.

18              THE COURT:  Thank you.

19              Mr. Buchwald.

20              MR. BUCHWALD:  Yes, your Honor.  The defendant Thomas

21    rests.

22              THE COURT:  Thank you.

23              Ladies and gentlemen, all the parties have now rested

24    we will now proceed to closing arguments.  Because it is the

25    Government's burden, they will have the first opening argument,

E8kzchr4                       Charge conference

1    and they will also present rebuttal to any defense arguments

2    that may be made.  Mr. Bauer.

3              MR. BAUER:  Thank you, your Honor.

4              Your Honor, may I?

5              THE COURT:  You may.

6              MR. BAUER:  54 Chambers; seven guys, five guns, masks,

7    a robbery; victims who are drug dealers; robbers who are drug

8    dealers; victims who were criminals and were not going to

9    accept being robbed.  A crack spot robbery turns into a botched

10   robbery when victims and robbers are trapped together in the

11   same apartment.  A recipe for disaster.  The robbers were

12   trapped.  They had to get out.  They were being shot at and

13   needed to do whatever it took to get out of that house,

14   eliminate whatever was in their way.  And what was in their

15   way, ladies and gentlemen, you know, Jeffrey Henry, and they

16   needed to he eliminate him.  That's why we're here, ladies and

17   gentlemen, pure and simple.

18             These men, Raymond Christian, Tyrell Whitaker, Glen

19   Thomas entered 54 Chambers Street.  They went there thirsty,

20   thirsty for money, thirsty for drugs.  Then they ran into

21   Jeffrey Henry and their priorities changed.  At that point

22   their thirst was different.  Their thirst was for life, to

23   preserve their lives at the cost of Jeffrey Henry's.  When

24   Jeffrey Henry got in their way, they shot him.  They shot him

25   twice and they killed him.

1              This case, ladies and gentlemen, is about a lot of

2      things.  It's about greed, it's about drug dealing and the

3      violence that's associated with it.  It's about Newburgh and

4      the gangs that co-exist in the northeast corner of that city.

5      And this case, ladies and gentlemen, is about Jeffrey Henry,

6      who tragically lost his life on December 15th, 2010.

7              This case is not, ladies and gentlemen, all about

8      Anthony Baynes.  It's not about Jamar Mallory, Ramone

9      McDermott.  No.  They're not a trial.  These men are on trial,

10     Raymond Christian, Tyrell Whitaker, Glen Thomas.  They're on

11     trial.  It's their actions, it's their decisions, them,

12     together with the other four guys, seven guys who went to 54

13     Chambers looking to rob, and they robbed Jeffrey Henry of his

14     life.

15             Defense counsel has repeatedly throughout this trial

16     tried to make this case about Anthony Baynes and the rest of

17     the cooperators.  They're doing that to shift the focus.

18     They're doing that to skewer what really happened, to distract

19     from the facts from the overwhelming evidence that proves that

20     their clients are guilty.

21             Is Anthony Baynes an important witness?  Of course he

22     is.  Jamar Mallory?  Of course.  Baynes is what a lot of murder

23     cases don't have, an eyewitness to the murder.  He's an

24     accomplice who was involved in planning the robbery, and

25     involved in the murder.  He's clearly an important witness.

E8kzchr4                    Summation - Mr. Bauer

1    But is he the only witness?  Absolutely not.

2           Defense counsel has tried to make this case about

3    cooperators.  And you know what?  We embrace it, we welcome it.

4    I submit we're going to walk through here today how you will

5    know that all the cooperators were telling you the truth and

6    what they said and how it happened is actually how it played

7    out.  And I'm going to ask you to look at a bunch of things

8    like their demeanor on the witness stand, their incentives,

9    their incentives to tell the truth versus to lie as they've

10   done in the past, and they wore it their sleeves.

11          But I'm also going to ask you to look at all the other

12   evidence.  Forget about the cooperators.  Look at all the other

13   evidence that corroborates, which means it matches up with

14   everything they said that's going to give you the comfort to

15   know that they were telling you the truth.

16          This case is not complicated, ladies and gentlemen.

17   You boil it down and it's a group of drug dealing, gun slinging

18   young men using the streets of Newburgh as their own battle

19   field.  It's about the crack, it's about the guns, it's about

20   the robberies, and it's about Jeffrey Henry and when his life

21   was taken.

22          Okay, let's step back.  There has been a lot of

23   evidence here.  You've been here for almost three weeks.

24   You've heard a lot of evidence, but it hasn't come in

25   chronological order.  You have heard piece by piece, witness by

E8kzchr4                          Summation - Mr. Bauer

witness.  You've heard from the cooperators.  You've also seen

guns, drugs, bullets, shell casings, bloodstains, masks,

videos, Facebook.

I'm now going to turn to put all of those pieces of

evidence together for you.  I'm going to try to do it

coherently.  But I'll note up front that if I were to tell you

or go through every single piece of evidence we heard here,

we'd be here through the night.  It's not my intention.  I'm

going to focus on what is important to prove the defendants are

guilty of the crimes charged in the indictment.

So I'm going to start by running through the charges

in the indictment, and then I'm going to run through the

evidence.  I'm going to run through the evidence based on the

charges, and you'll see piece by piece how the evidence

corroborates or supports the charges.

I do want to say one other thing up front.  As you

know, the defendants do not have a burden of proof in this

case.  That burden is always with the government.  What that

means that defense counsel did not have to put on a case,

didn't have to make opening statements, didn't have to do those

stipulations, didn't need to question our witnesses.  But they

did.  And because of that, we can discuss what they've done.

So throughout this closing argument I'm going to make reference

to arguments that they brought forth during their questions or

during their stipulations.  I'm not going to address all of

E8kzchr4                    Summation - Mr. Bauer

1    them.  I'm going to only address the ones that I think warrant

2    being addressed, frankly, but that's what I'm going to do.  And

3    it's important to realize that even if I do that, it never

4    shifts the burden away from this table to that table.  So it's

5    always here.  We know it, we embrace it.

6            So let's talk about the indictment.  As you recall,

7    the indictment brought, came in six counts.  Count one was the

8    robbery conspiracy, and count two was the actual robbery of the

9    narcotics dealers at 54 Chambers Street.

10           Conspiracy, you're going to hear from Judge Ramos, is

11   simply an agreement between two or more people, in this case

12   for count one to commit the robbery; count two is the actual

13   robbery of the narcotics dealers at 54 Chambers Street.

14           The way I see the indictment, it breaks out into

15   basically two parts.  Count one and two that are along with

16   counts four and five that all relate to the robbery and the

17   murder of December 15th.

18           The second part is counts three and six, and those

19   relate to the defendants' drug dealing and the defendants'

20   usage of guns in furtherance of that.

21           I also want to point out here up front that Thomas and

22   Christian are charged in all six counts, but Tyrell Whitaker is

23   only charged in counts two, four and five.  Those are the only

24   ones you're going to be asked to deliberate on as relates to

25   Mr. Whitaker.

1          So as I said, counts one and two relate to the

2     robbery.  In my mind I skipped count three for the moment and

3     focus on counts four and five.  Count four essentially says

4     that during that robbery, the defendants used and discharged

5     firearms that caused the death of Jeffrey Henry -- that's the

6     murder count -- and count five is related count; it's that they

7     discharged the firearm in the robbery.

8          So counts one, two, four and five are all related.

9     Count three is that Thomas and Christian and others conspired

10    to sell drugs, namely, crack cocaine on the streets of

11    Newburgh.  Then count six is part of that, being a drug dealer

12    during and in relation to those drug deals they possessed

13    firearms.

14         So I'm going to first talk about what I've called the

15    first part, the robbery and murder, counts one, two, four and

16    five.  So what I'd like to do is I'd like to go through the

17    story of the robbery from beginning to end, piece by piece,

18    fact by fact.  And for each piece we'll discuss all the

19    evidence, not just what Baynes or Mallory told you, but all the

20    evidence that shows that the robbery and murder happened as you

21    heard it did.

22         Let me say two quick things before we jump into the

23    murder.  First about the charges.  These defendants are charged

24    with committing a Hobbs Act robbery, which really just means as

25    Judge Ramos will tell you, a robbery that affected interstate

E8kzchr4                        Summation - Mr. Bauer

1    commerce.  And they're charged with that during the course of

2    that robbery to discharge a firearm causing the death of

3    Jeffrey Henry.  I don't anticipate there is much question as to

4    whether the technical elements, the legal elements of those

5    laws are actually met.  I think what's in dispute here and

6    that's what I'm going to address, is who committed those

7    robberies, who discharged the firearm, and the question is

8    whether it's these three men.

9              So I'm not going to focus on the elements of these

10   charges because I'm not -- I'm not really sure that they're in

11   dispute.  But what I do want to say before we start is I want

12   you to keep a few questions in mind, questions that I'm going

13   to return to after we talk about the murder, questions about

14   the witnesses.  Is it just -- ask yourself, is it just a

15   coincidence that all the evidence matches up; that all the

16   facts, big or little lineup with one another?  It's just a

17   fluke?  Are those defendants the unluckiest people in the

18   world?  Is that really what's going on here?  Or maybe could it

19   be a big conspiracy that all these cooperators got together in

20   different jails, found the other witnesses who are not in jail,

21   they got their hands on the 911 call and the pole camera and

22   everything else, and made sure their stories lined up, is that

23   really what happened, ladies and gentlemen?  Of course it

24   didn't.

25             You heard a lot of evidence during this trial.  It

E8kzchr4                         Summation - Mr. Bauer

1    wasn't just about Baynes, it wasn't just about Mallory.  It was

2    a mountain, piece of evidence after piece of evidence, brick

3    after brick.  It's a wall of evidence, ladies and gentlemen,

4    built up around these defendants, and no amount of argument, no

5    amount of calling the government witnesses liars is going to

6    help these defendants escape that, not when evidence is so

7    plentiful, and not when it matches up brick by brick, mortar by

8    mortar, they are all connected, ladies and gentlemen.

9           Let's start with what's not in dispute about the

10   facts, ladies and gentlemen.  Where did the robbery take place?

11   54 Chambers.  When?  December 15th, 2010.  Why?  To get crack,

12   to get money.  None of that is in serious dispute.  What

13   happened?  An armed rubbery.  When?  Just after midnight.  And

14   who?  In this case when I ask who, who got killed, Jeffrey

15   Henry.  None of that is in serious dispute, ladies and

16   gentlemen.  What is in dispute is how it all went down.  So

17   let's jump in.

18          And what I've done is I've broken up the murder and

19   the robbery into steps along the way.

20          Step one, what you heard from Anthony Baynes,

21   Christian, Raymond Christian, Reckless and Baynes along with

22   others, walked around Newburgh looking for a spot to rob.

23          Now, ladies and gentlemen, you don't have to rely on

24   Anthony Baynes for this.  Let's start with what he said, but

25   let's move on after that.

1          What did Baynes tell you?  He said, but he and

2     Reckless were talking about the robbery for a couple of weeks

3     before December 15th, 2010.  And on that day, December 15th, he

4     told you that they walked around Newburgh looking at a bunch of

5     crack spots, one on City Center Terrace, one on Johnson, one on

6     South Street.  That is until they chose 54 Chambers.  And

7     Baynes told you what they were doing looking for these crack

8     spots.  Looking for drugs, looking for money because they

9     wanted to build their drug business on Dubois Street.  You

10    heard it from Baynes, and it makes sense, ladies and gentlemen,

11    based on the other evidence.  You heard they're walking around

12    with Lou, some guy named Lou from the beginning on

13    December 14th, and then at some point they drop Lou off and

14    then, Quay Quay, Reckless' brother joined them, and together

15    they were looking around for drug spots.  That was what Baynes

16    told you giving the background to the robbery, showing the time

17    relationship, close criminal relationship that he had with

18    Raymond Christian.

19         And how do you know this is true?  How do you know

20    that they were such close friends?  You've seen ample evidence

21    of that.  First, you heard from other cooperators who said

22    they've seen Baynes and Reckless together walking the streets

23    of Newburgh.  But, second, you don't have to take Baynes word

24    for it, because you heard from Reckless himself.  Now remember

25    these are the Facebook postings that he, Reckless, made around

E8kzchr4                    Summation - Mr. Bauer

the same time, March 2010.  He says chillin with my shun

Baynes.  Shun is son.  It shows you how close they were.  Makin

and Light House with Brazy Baynes.  I'll get back to that in a

minute.  But remember Brazy, what Baynes told you it's really

crazy, but Bloods, or people who are affiliated with the Bloods

can't write that C for crazy, so we have to make it Brazy, B.

           And remember July 30th, 2010, he wrote Makin with my

left hand, Baynes.  We asked what was left hand?  He said my

right hand, just another way of saying right hand.  That's how

close they were, ladies and gentlemen.  That's what makes

sense, that they were walking around conspiring to figure out

what crime to commit.

           You also heard from Reckless in those letters that he

wrote to Anthony Baynes in jail.  Remember those letters he

wrote, loyalty to the bone, love is love, loyalty is

everything, loyalty above all.  And remember he also wrote, I

love you like a brother -- actually, he wrote bother, but let's

assume he meant brother.

           Who else, ladies and gentlemen, would be in a better

position to tell you about Reckless than Anthony Baynes?  His

best friends were Quay Quay and Reckless, and he told you that.

How about the fact that Reckless was walking around Newburgh

looking for a place to rob.  Again, you don't just need to hear

from Baynes, because you heard from Reckless himself.  Remember

on Facebook, star status; I got them goons on deck.  Baynes

1    told you what that meant.  Star status is his gang, goons, as

2    he defined goons, he said a person that's like, like that's the

3    person that put in work, that does shootings and sorts of

4    stuff.  That's what Baynes told you.  And on deck he said like

5    that I got him on standby, like right here ready to go.

6    Reckless is telling you here on this posting that he's got guys

7    that are ready to commit crimes, ready to go.

8            Then, ladies and gentlemen, there is the last piece,

9    which is they're going to rob a crack spot.  You know that that

10   is what Raymond Christian was all about.  He sold crack for a

11   living.  We know that.  How did we know that?  Facebook again,

12   ladies and gentlemen.  Makin on Dubois getting money.  We know

13   what getting money means on Dubois.  There is only one thing,

14   because he never had any other job to make money.  We know

15   that.  Getting money means hustling, selling crack.  That's

16   what he was about, that's what Baynes told you.  The other

17   evidence supports what Baynes told you.

18           So what's the next step in the robbery?  After they

19   picked 54 Chambers, Baynes, Quay Quay and Reckless went to 54

20   or, sorry, to 38 Dubois Street.  They went to Dubois Street to

21   find L-1.  Now you heard all about L-1 during this trial.  L-1

22   was the highest ranking member of the G-Shine stat, of the

23   Bloods back then.  And they went there to pitch him on

24   participating in the robbery.

25           Now, again, you do not need to rely just on Baynes for

1   this fact.  You heard it from multiple cooperators that L-1 was

2   one of the, what the leading member of the Bloods.

3          You heard from Danielle Williams.  She had seen

4   Reckless at that same house, at 38 Dubois Street, the same one

5   where Baynes said they went.  They had seen Reckless there.

6   That's where they saw L-1 tell Reckless to serve a crack

7   customer.  And that's where Reckless told Bow Wow to sell a

8   crack customer.  He was there at 38 Dubois before, he was there

9   again on December 15th.  Mallory's also seen him there at 38

10  Dubois Street.  And then October 7th, 2010, remember Raymond

11  Christian was arrested with a gun.  The cops saw him with a

12  bulge in his shorts.  They chased him.  Where did they chase

13  him to?  38 Dubois Street.  This gun, ladies and gentlemen,

14  government Exhibit 132.  He ran to the back of 38 Dubois

15  Street, threw it.  And remember that dog, the dog Ibor, had to

16  go get this dog, get this gun, excuse me.  It was in his mouth

17  when he came out.

18         Baynes didn't just choose a random house.  He chose a

19  house where all the evidence points that Reckless went; again,

20  corroboration across the board.

21         Let's talk about L-1 for a second.  Like I said, he

22  was the high, the big homie for the Bloods there in Newburgh.

23  And you know that's true, ladies and gentlemen.  You know that

24  he had access to guns and he had access to soldiers, people he

25  could tell to go commit a robbery.  And you saw this because of

1    the search warrant that was executed at L-1's house, just a few

2    short months before the robbery.  Remember what they found

3    there.  Government Exhibit 102, 357 magnum L-1's house, L-1's

4    gun, right here.  Ladies and gentlemen, what else did they

5    find?  Government Exhibit 104.  Remember, this is the crack

6    they found at L-1's house.  Is there any doubt that L-1 was a

7    crack dealer who had guns?

8           You also heard they participated the robbery because

9    of what Jamar Mallory told you.  Jamar Mallory told you after

10   he got that call from L-1 and after the robbery took place,

11   after Jeffrey Henry was killed, he confronted L-1.  They

12   confronted L-1 and he said that he was pissed off about being

13   questioned by the police.  And what did L-1 say?  Did he deny

14   being part of it?  No.  L-1 said, I sent them down there to do

15   a robbery, not to do a shooting.  Puts himself right there.

16   Ladies and gentlemen, he just keeps building upon itself, not

17   that you need any more.  But remember what Barbara Morreale

18   told you just yesterday, she knew L-1 pretty well.  He'd

19   stopped by her house to hang out, smoke weed back in the late

20   2000s.  He'd stop coming around so much around December 2010.

21   But who showed up at her house December 14th just a few hours

22   before the robbery?  L-1.  He said he had some business to take

23   care of there in the apartment.  Remember Barbara said that she

24   didn't let him do it because she was putting down her kids.

25   But there was L-1 right there across the street from 54

1    Chambers.  Coincidence, ladies and gentlemen?  You know not.

2    You know.  And further evidence L-1 staking out the target of

3    the robbery 54 Chambers Street.

4         So L-1 agrees.  Reckless pitches him, L-1 agrees, I'm

5    in, starts making phone calls.  First thing he does starts

6    making phone calls to recruit other robbers.  And who came

7    through, as Baynes told you?  Reckless -- I'm sorry.  Again you

8    don't have to rely just on Baynes for this.  And who came

9    through, ladies and gentlemen?  Reckless, Quay Quay and Baynes

10   were already there, Bash, Bow Wow, and Gucci came right behind,

11   Quay Quay joined later.

12        Now, how do you know that these seven guys were the

13   robbery crew?  I'm going to go each of these defendants in some

14   detail a little later as to how the evidence shows that these

15   three defendants were on this robbery crew.  So for now let's

16   just talk about one particular thing.  Bash, Baby e, Bow Wow,

17   Gucci, L-1, Kev Gotti, they were all Bloods.  This case is not

18   about the Bloods.  You're not guilty of a crime simply by being

19   a member of the Bloods.  That's not what the government is

20   arguing.  But the fact these guys were all Bloods, is a

21   critical piece of the puzzle here.  They're all part of that

22   G-Shine set.  Remember L-1 was the high ranking member, and you

23   heard evidence that Gucci came up, switched from Crips to Blood

24   under L-1.  You heard Kev Gotti also had status in the Bloods.

25   And who was under him?  Bow Wow.

1        Because L-1 and Kev Gotti had that status, they could

2   recruit people under them to do things, to make them do

3   robberies.

4        You heard all this from Baynes, from Mallory, from

5   McDermott and from Kev Gotti on that video.  It just makes

6   sense, ladies and gentlemen.  They were all Bloods, they're all

7   part of the same group with a hierarchy.

8        Next, L-1 agrees, makes some more phone calls.  This

9   time to get the chains.  Remember what Baynes says?  Baynes

10  says they're standing on the porch outside 38 Dubois Street,

11  and L-1 makes a call to somebody to get the chains.  Five

12  minutes later a woman shows up with a purse.  L-1 says go put

13  it in the mailbox or gestures to go put it in the mailbox, and

14  there was the first gun.

15       We also know he made other calls, don't we?  We know

16  it from Jamar Mallory, and we know it from Kevin Burden.

17       We know it because we know that L-1 called Mallory and

18  used that same word, I'm gonna bring some young boys, send some

19  young boys over to get the chains.

20       Now, again, how do you know this is true?  L-1 had

21  guns.  He stored then all around Newburgh.  This was one of his

22  guns.  You saw it.  Government Exhibit 102.  He had access to

23  guns.  And you heard what Mallory told you.  Mallory said that

24  L-1, because he was dealing drugs all throughout the city,

25  liked to store his guns throughout the city.  And that's why he

E8kzchr4                    Summation - Mr. Bauer

1    stored at least one of his guns at 260 First Street, where

2    Mallory and Burden lived.  Mallory also told you that at 260

3    First Street where L-1 stored his guns, he would send people

4    there, not just the young boys, Gucci and Bow Wow, but he would

5    send young boys.  He would send other people to come get guns.

6    Who did he say?  Women, Geneva, that's his baby's mother, and

7    Christian, that's another woman, a drug customer, that's who he

8    would send to get the guns.  Lines up with what Baynes told

9    about the woman dropping the gun in the mailbox

10          Now on the point about the how we all know, because

11   you saw it in the video that L-1 called Jamar for the gun,

12   let's address the points that defense counsel brought out,

13   which is that Anthony Baynes did not recall on the witness

14   stand telling the Newburgh cops three years ago that he -- that

15   he had heard that L-1 called Jamar.  We know that's true,

16   ladies and gentlemen, L-1 did call, did call Jamar, but Baynes

17   didn't remember saying that.  And just this morning you heard a

18   stipulation.  The stipulation said that on that day, I think it

19   was May 2011, he, Baynes, told the cops that Jamar was called.

20          Now, defense counsel has made a lot about Baynes and

21   what he remembered about the lies that he told after he got

22   arrested, and how he denied memory of some of the things.

23   Ladies and gentlemen, ask yourselves, did he hide from you that

24   he had lied to the cops?  Did he hide from you the fact that he

25   tried to protect himself and protect his friends?  Absolutely

1    not.  He wore that on his sleeve, ladies and gentlemen.  So

2    what, he couldn't remember some of the lies he told three and a

3    half years ago.  That doesn't mean he was lying to you now, not

4    when all the other evidence supports exactly that.

5         Now, let's think about the one thing, this one thing

6    that he did remember; that he had called or that he had heard

7    that L-1 called Jamar.  I'll ask you this.  If he was trying to

8    lie in order to get some benefit out of the government, why

9    would he not remember that point?  If he and Mallory are

10   concocting a big story, a conspiracy to frame these defendants,

11   then why on earth would he leave that out, that one piece of

12   direct overlap of their two stories?  Because he didn't lie to

13   you.  He told you what it was, he told you like he remembered

14   it, nothing more, nothing less.

15        He just didn't remember telling the cops that.  That's

16   all it is.  And the fact that he didn't remember, ladies and

17   gentlemen, shows you how credible a witness he was and not the

18   other way around, as defense counsel has suggested.

19        What next?  Now, remember, remember that on that porch

20   there, after Bash and Bow Wow and Gucci came by, they all went

21   inside 38 Dubois Street to talk about the plan.  Remember

22   Baynes wanted to go in with them, Baynes and Quay Quay.  Bash

23   said no.  Remember Bash was Bash, it was not Bow Wow.  Bash had

24   fought with Baynes in the past, said I'm not going inside if

25   Baynes is going inside, so Baynes stayed out.  And actually

E8kzchr4                        Summation - Mr. Bauer

1    then Baynes and Quay Quay went back to Baynes' house to play

2    video games for a little bit.

3            So Baynes drops out of the story for a little bit,

4    another thing where we do not have to rely on Baynes, because

5    we know what happened next.  Bow Wow and Gucci went over to 260

6    First Street to pick up the guns.

7            And what did Mallory tell you?  Mallory told you they

8    get the phone call from L-1, sends the young boys to pick up

9    the chains.  Mallory goes upstairs where a gun is hidden in the

10   garbage, old stroller in that garbage he told you.  And he got

11   that black gun, a 38 revolver, brought it downstairs.  He told

12   Kev Gotti, hey, these guys are coming over to get the guns.

13   Gotti said my gun's not here.  So he called his baby's mother

14   to have his baby's mother bring it over wrapped in a shirt in a

15   plastic bag.  This is what Mallory told you.  Then Mallory says

16   that Gucci and Bow Wow show up; not anybody but Gucci and Bow

17   Wow; that they show up, and when they show up they walk in,

18   Mallory gives Gucci the black gun, then Gucci, Bow Wow and

19   Gotti go downstairs to the basement where Kev Gotti gives Bow

20   Wow the silver, the chrome revolver

21           (Continued on next page)

22

23

24

25

1          MR. BAUER:  (Continuing)  They come back upstairs and

2     Mallory saw the butts of their guns in their waistband

3     adjusting them before they walked out.  That's what Mallory

4     told you.

5          Now, before we get to the video of Kevin Burden let me

6     say a couple of things.  First, Mallory made it clear to you

7     that this was consistent with prior behavior.  Bow Wow had

8     borrowed guns from Kev Gotti before.  Remember the story that

9     he told you, that Mallory told you about how Bow Wow had come

10    back to the house -- remember he was a little confused, was it

11    right before the murder or right after, but I think he arrived

12    right before -- that he came back with that same silver chrome

13    gun and said this doesn't work.

14          And remember what Kev Gotti said?  He said if that

15    doesn't work put it to your hand and shoot it.  They didn't do

16    that.  But what Kev Gotti did do is put the bullets in the

17    barrel and shoot it out the window, pow, pow, a couple times.

18    That's what he told you.  That's a pretty detailed story.

19          He also told you about how Gucci had been borrowing

20    things from him, from Mallory, namely crack cocaine.  He'd come

21    by and ask for money.  Mallory wouldn't give him money but he

22    would give him crack instead.  This is Bow Wow and Gucci

23    borrowing stuff from Gotti and Mallory, consistent with the

24    testimony.

25          But then, again, you do not need to take Mallory's

 1    word for it because you heard from a witness.  A witness who

 2    was not a cooperator.  A witness who had know incentive to lie.

 3    No incentive to say anything other than what was true.  You

 4    heard from one of their coconspirators.  You heard from Kev

 5    Gotti.

 6          Now I'm going to play a part of the video in a little

 7    bit.  Let's go through some of the things that were said.  Now

 8    remember at the beginning of that video, Mallory says remember

 9    those guys with the Joker, he starts naming Bow Wow, Gucci.

10    Listen that was Mallory saying it at the beginning.  It wasn't

11    Burden.  You can't hide from that.  He was the one saying the

12    names.

13          But Burden joins the conversation.  He says, um,

14    Baynes also, that's Besheltie's son.  Then Mallory says, yeah,

15    Baynes, Baby E and Gucci.  And then Burden says, yeah, they all

16    came in a cab and some shit.

17          So he's actively participating in this conversation.

18    This is not him not believing that these guys were involved.

19    And of course we know later on in the video he starts saying

20    their names too.  But to suggest that somehow Mallory fed these

21    names to Burden.  Think about the real world.  Think about how

22    conversations work.  Think about this conversation in

23    particular.  When Kev Gotti pushed back.  There was a little

24    back-and-forth with Kev Gotti about who gave Bow Wow that gun.

25    Mallory told you that it was Gotti.  And in the video Gotti

 1   says:  No, it was you.  I gave you, Mallory, the gun.  Mallory,

 2   you gave it to Bow Wow.  There was a back-and-forth there.

 3   Burden is not some passive participant in this conversation.

 4   He's not adopting things simply because Mallory said it.

 5        This is Burden -- this is Burden telling you exactly

 6   what happened.  Mallory says:  Hey, do you remember how Gucci

 7   was acting?

 8        Burden says:  Come on.  Gucci was bragging about that.

 9        Then Burden says:  Gucci was basically what, exactly

10   what L-1 wanted him to be, a kamikaze mission.  He knew Gucci

11   was going to be the one to go down.  Cause he knew Gucci can't

12   hold water.  Burden talking about Gucci.

13        Now they're talking about Reckless.  And Burden says:

14   He just got knocked two weeks ago for like a robbery situation.

15        Now, then Mallory says:  After those guys knocked that

16   shit up, L-1 called and they came through.  When we was down at

17   the weed spot.  Remember that?

18        Burden:  Yeah, I remember exactly.

19        This is Burden remembering -- I don't have to say

20   anything.  He remembers exactly, ladies and gentlemen.

21        Now, Mallory says:  I feel like Bow Wow didn't get

22   questioned for nothing.  Gucci probably got questioned.  But he

23   didn't say shit.

24        Burden says:  Bow Wow smart bro.  Right after that

25   happened he disengaged from everybody.  He stopped fucking with

1    them.

2              And then Burden says:  Gucci, Gucci came, basically

3    Gucci came to see who was up there and L-1 came right behind

4    him.  Got to do the math, bro.

5              Then they both agree that they wasn't on point.

6              So when Mallory said he didn't know exactly what was

7    going to a happen, this is Burden agreeing with him.  This is

8    not saying that they were completely oblivious.  You heard in

9    the video that they thought that there was something going on,

10   there might be a jux -- which you heard was a robbery -- but

11   they didn't know exactly where these robbers were going.  And

12   they certainly didn't know that they were going to shoot a gun

13   and kill a man that day.

14             Now, finally, this is the part -- I won't dwell on it

15   too much.  Remember Burden said:  We got the black joint.  I

16   had this chrome joint.

17             The black joint.  That's Mallory's black .38 that he

18   had.  The chrome joint, that's Burden gun.  That's his baby's

19   mother's brother's gun.

20             They came later on.  They started hunting around for

21   the scats.  Scats are guns.

22             You gave the scat to Bow Wow.  Bow Wow went.  They

23   came straight upstairs.

24             And then remember what he says.  He asks the group,

25   who got up on my scat?  Know what I'm saying?  Then you like oh

1    Gucci or somebody like that.

2           And Burden says:  Hell, no.  If it ain't my drop I'm

3    not giving them my scat out there.

4           And Bow Wow was like all right I'll take your scat.

5           Your heard what a drop is.  That is somebody who comes

6    up under you in the Bloods.

7           Corroboration of exactly the relationship between Bow

8    Wow and Gotti.

9           Ladies and gentlemen, you don't have to overthink it

10   when you have another participant in the robbery telling you

11   exactly what happened.

12          And then he says:  All I knew was Bow Wow and Gucci.

13          "Bow Wow and Gucci."  That's what he says.

14          We'll play that video later so I won't go through it

15   here again.

16          Next, after Bow Wow and Gucci pick up those guns.  You

17   fast forward to where Baynes next sees them.  He and Quay Quay

18   went back and played video games for about an hour.  And then

19   they decided to look and see where everybody was.

20          They said they went to Dubois Street, back to where he

21   saw them last.  They weren't there.  So then they went to South

22   Miller.  They weren't there.

23          So where did they meet up with them?  On First Street

24   between South Miller and Johnston.  Who did he meet up with?

25   Again, the same names.  He said the name names over and over

1     again.  Reckless, Bow Wow, Gucci, Baby E, Bash.  They all had

2     dark clothes on.  They all had masks.  Bandannas or half-ski

3     masks.

4            He said at that point, he only knew that some of them

5     had guns.  He didn't know they all had guns.  He saw much

6     later, obviously, they all had guns.  But at that point he

7     didn't know which people had guns.  But most importantly he

8     said that he and Quay Quay were the people who didn't have

9     masks or guns.  And that's why Bow Wow said:  Why don't you be

10    lookouts then.

11           Now let's talk about the number of robbers.  Because

12    you heard from Baynes that there's seven, right?  He names the

13    seven -- same seven people time and again.

14           Mallory told you six.  He named everybody but

15    Quay Quay.

16           Barbara yesterday told you somewhere between six and

17    eight.

18           Akinto.  Akinto Boone.  He told you seven.  There was

19    Marshall Williams who spoke to Sergeant Carrion.  He said more

20    like five.  And Tarrence said five or that's all he saw when

21    they first came in the apartment.

22           So there's a little variance in numbers there.  Is

23    there any real question, ladies and gentlemen?

24           Ms. McInerney, can you cue up Government Exhibit 252.

25           And this is the pole camera, ladies and gentlemen.

E8k9chr5                      Summation - Mr. Bauer

1   We're not going to watch them all again.  Don't worry.

2              We're just going to look at the west-facing view.

3   Could you it up to the 17:10, mark.

4              What do you see during this video?  You're going to

5   see seven people walking down the street.  I will give you a

6   little preview about five minutes from now.  You're going to

7   see seven people running right back up.

8              There's really no question, ladies and gentlemen.

9   There is no question that there were seven robbers.  And

10  there's really no question that they met up on First Street,

11  just like Baynes told you, because this pole camera was

12  situated right at the corner of Lander and First.

13             One, two, three, four, five, six, seven, ladies and

14  gentlemen.  Seven robbers.

15             We can stop it, Ms. McInerney.

16             Here's a still shot, again, of the robbers.  Here's

17  the first four.  Here are the last three.  Again, seven.

18             Now, ladies and gentlemen, Mr. Baynes was shown some

19  of the video, shown some of the pole camera.  And he told you,

20  he said -- that's not seven there, but I don't know exactly who

21  is who.  It's kind of hard to tell in the video.  I know which

22  one I am because I remember what I was wearing and I didn't

23  have a mask on.  And he pointed himself out here on this slide

24  on 252N.  He's the guy on the right.

25             And then on the video coming back, he points himself

1  out again, again.  It's 252O.  He's on the right.

2          Now, ladies and gentlemen, that is the exact person

3  who Jamar Mallory picked out and said that is Besheltie's son.

4  That's Government Exhibit 253.

5          Now remember what Jamar Mallory said about seeing this

6  video.  He got a lot of questions from defense counsel.  Did

7  you identify each of these people?  He said no I simply --

8  maybe he did say identify.  He didn't understand the word

9  "identify."  But what he said was that it looked like them,

10 based on the clothes they were wearing, or how they were

11 running, because I know these guys from Newburgh.  He didn't

12 oversell what he knew here.  He just credibly told you that

13 there were similarities between the people on the video and the

14 people he knew, Reckless, Bow Wow, Gucci, other people.  And

15 particularly think about the Gucci one.  He said that he picked

16 out Gucci, or he said that could be Gucci because he was

17 wearing a black leather jacket and a gray scarf.  The same

18 exact outfit that Bow Wow -- I'm sorry -- that Gucci was

19 wearing when he picked up the guns, not more than an hour

20 before.

21          Okay.  They walked down First Street.  They hit

22 Chambers.  Remember Akinto says they stay at the corner for a

23 minute.  And they actually walk a little bit past Chambers,

24 then come back.  Akinto sees this little huddle of what he says

25 were young-looking kids because they are all in a pack dressed

1    like younger kids.  And originally Akinto thought they might be

2    robbing the weed spot next door, 56 Chambers.  But then they

3    walked past and they walked up to them, 54 Chambers.

4           Again, that's exactly what Baynes told you.  You don't

5    have to rely just on Baynes because Akinto told you that and

6    Barbara, from her window, up there on 53 Chambers Street, she

7    saw this group of six to eight robbers make a right on Chambers

8    and approach the men standing out in front of the house.

9           Who was in front of the house?  You heard it was

10   Akinto and you heard it was that guy Marshall Williams, a crack

11   customer, MA, they were out there.  Now Barbara, if you

12   remember, she also said she thought she saw Joker out there.  I

13   think we all know that that's not true.  But she also said she

14   don't know who Joker was.  Akinto said he wasn't there at the

15   time when -- Akinto said that Joker wasn't there at the time

16   that Akinto was there.  But she saw people out there and I mean

17   who can really blame Barbara for a situation like that,

18   conflating exactly when Joker came to the scene.

19          Now who had the guns, ladies and gentlemen?  Step

20   eight.  Who had the guns?  Baynes was clear on this.  When they

21   pulled out their guns at 54 Chambers Street and Akinto and

22   Marshall Williams, all five of the people that Baynes and

23   Quay Quay met up with, had guns:  Reckless, Bow Wow, Gucci,

24   Bash and Baby E.

25          That's what Akinto told you too.  Akinto said that

1    they all had guns.  Now, when he clarified, he said he didn't

2    get a great look at everybody.  But he said basically -- or

3    maybe he didn't say basically -- he said they all had guns but

4    he didn't get a great look at everybody.  Would you it surprise

5    you to think when you get semicircled, or he used the term

6    half-moon around you, and there's at least five guns being

7    pointed at you and seven guys in total that maybe you think

8    everybody has a gun?

9            Ladies and gentlemen, the evidence is clear, that at

10   least five people had guns.  And the evidence is clear that at

11   least those three guys had guns.

12           Now, what guns did they have?  We know that there was

13   a black .38 revolver.  We know there was a chrome revolver.

14   But, unfortunately, we don't know the other guns.  We can't

15   pretend that we do.  We know those two guns.

16           We also heard from Akinto that the person who first

17   pulled out the gun on him, when he said, when he realized it

18   was a robbery, he goes "oh damn" and he -- and the person who

19   pulls out the gun goes "that's right" that was a chrome gun as

20   well.

21           Now, ladies and gentlemen, we don't know what the

22   other guns were in the case.  What we also don't know is if

23   they traded guns beforehand.  We don't know if Bow Wow and

24   Gucci switched or they switched with Bash.  We don't know.

25           MR. GOLTZER:  Objection.  Improper argument.  Based on

 1    nothing in the record.

 2              THE COURT:  Overruled.

 3              MR. BAUER:  I'll get back to that in a moment anyway.

 4         So what happened?  They all pull out their guns.

 5    Again, there is ample evidence in this record to show you that

 6    these guys, these three defendants had guns.

 7              Next.  They enter 54 Chambers.  They force Akinto into

 8    the house.  Barbara told you how it happened.  Baynes told you

 9    how it happened.  Akinto told you how it happened.  And

10    Tarrence told you.  Tarrence told you he was cooking in the

11    kitchen when they came in.  When they forced Akinto, through

12    the hallway, into the back living area, through the kitchen

13    towards the bathroom.

14         Let's walk through here.  So this picture is taken at

15    the interior door.  After they've already entered the house.

16    They march Akinto straight to the back, into this kitchen area

17    where Tarrence was cooking.  And in the back there, that's the

18    bathroom where they tried to get Akinto to go.

19         Remember, what Akinto and Tarrence were telling you.

20    Not just Baynes.  But what Akinto and Tarrence were telling you

21    about where all the robbers were.

22         First of all, they said it was chaos in there.  People

23    screaming to get down, to give it up.  And they said that --

24    some robbers stayed in that living room kitchen area.  Akinto

25    used the number three or four in that area.  Others went in the

1   bedroom, Tarrence's bedroom, where Tarrence's brother and the

2   other people were.  That's how many robbers were there.  And

3   what Baynes says is that he and Quay Quay stayed by the door

4   until they heard a commotion.  That's when they peeked out and

5   they saw what was going on.

6        What did they say what was going on?  Their buddy,

7   Quay Quay's brother, Baynes' left-hand, Reckless, struggling

8   with Akinto over his gun.

9        Now Baynes tells you that he ran to Reckless' aid, he

10  and others.  He used the pronoun "we."  We trying to pull them

11  away from one another.  They were trying to grab the man.  He

12  said -- he said they had a gun in the air, fighting for the

13  gun.  And then Reckless lost his gun.

14        Now, remember, what did they do with Tarrence?  They

15  took Tarrence and they said lie down.  Put your face against

16  your bedroom wall on the left.

17        He doesn't see exactly what's going on here because

18  his head is facing that way.  And they try to put Akinto into

19  that bathroom.  Then he gives Tarrence a look, he says.  And

20  then he sees that guy in the bathroom, where the guy says shh.

21  He says, come on, they're right behind me.  And then he makes

22  his move.  And he grabs Christian.  And they're struggling with

23  the gun in the air, just like this.

24        Now what does he say is happening?  First of all, he

25  says the guy he's struggling with has a mask on.  What kind of

1    mask?  A half-mask?  What kind of half-mask?  One made of

2    Gortex.  One that straps in the back.  One, ladies and

3    gentlemen, I submit, looks a lot like this, Government Exhibit

4    3.

5         During the fight what does Akinto tell you happens?

6    They're fighting.  They're struggling.  He says the guy he's

7    wrestling with is skinny.  He says the guy he's wrestling with

8    is weaker than him.

9         Ladies and gentlemen, use your common sense.  You saw

10   Anthony Baynes.  Everyday you've seen Reckless.  Anthony Baynes

11   was stocky, ladies and gentlemen.  Reckless, not so much.  Keep

12   it in mind, ladies and gentlemen.

13        What does he do to the person he's wrestling with?

14   What does he do to Reckless?  Headbutts him.  Never headbutt

15   anybody in his life.  But he headbutt him in his cheek.

16        We'll obviously talk about the mask in a minute but

17   let's just remember what they found on that mask.  They found

18   blood.  Whose blood?  Reckless' blood.

19        Now, the gun is lost.  Chaos.  Chaos ensues.  Because

20   Akinto has the gun and he starts shooting back at the robbers.

21   At that point all amidst the chaos Baynes gets stabbed and then

22   Tarrence Smith gets shot.  You remember hearing all about that

23   because you heard from Baynes and you heard from Smith.  You

24   also heard from Akinto.  You heard from Barbara that she heard

25   all the gunshots.  And you saw the shell casings, ladies and

1    gentlemen, you saw the bullets, everything that was at the

2    crime scene that supports the fact that there was a shootout

3    there.  You also saw the knife, the same knife that was used to

4    stab Anthony Baynes.  And Tarrence Smith told you he stabbed

5    Anthony Baynes.

6            Now, along the way Reckless lost his mask.  If you

7    remember what Baynes said, he said that at some point, and he

8    only really registered with it when they were in that hallway,

9    after his fight with Akinto, that's when he saw Reckless

10   without a mask.  Keep that in mind.

11           Now, what does Akinto say actually happens?  He's got

12   the gun.  He starts firing.  They start running this way, into

13   the hallway, towards the front door and then he and Tarrence

14   hide behind this wall here.  Government Exhibit 95K.  They're

15   hiding behind that wall.

16           Now, you heard from Tarrence Smith that he thinks he

17   stabbed the robber who was struggling with Akinto.  That's what

18   he said.  That's what he thought.  He didn't waiver from that.

19   Defense counsel, through their questions, will undoubtedly

20   point to that and say that it was Baynes, the guy he stabbed,

21   who was wrestling with Akinto and not Reckless.

22           Don't be distracted, ladies and gentlemen.  As I said,

23   Tarrence said there were a number of other robbers running

24   around that house.  He said he was lying down facing away from

25   where Akinto was.

1           Baynes told you he came to Reckless' aid.  Baynes

2  didn't hide from the fact that he was right there, in there

3  coming to Reckless' aid.  And he said "we."  Multiple people

4  did that.

5           Remember what Tarrence said about the mask.  Tarrence

6  said the guy who Akinto fought with had a mask on when he went

7  into the bathroom.  But the guy he stabbed, he wasn't sure if

8  he had a mask on.

9           But then there's Akinto, ladies and gentlemen.  Akinto

10  says the same thing that Baynes tells you, which is why you

11  should not be distracted.  Don't be distracted from the DNA.

12  But don't be distracted from the facts as you've heard him.

13           Akinto says that he was fighting with one guy over the

14  gun and then other people came to his aid.  In particular, he

15  remembered somebody with that same silver chrome revolver

16  that's pulled out on him in front of that house, he remembered

17  that chrome revolver hitting him in the head.  Remember he was

18  pointing to those scars on his head.

19           The point being, ladies and gentlemen, it was chaos.

20  There were robbers everywhere.  And what Akinto said is that he

21  was arm's length basically from Tarrence when he was lying

22  down.  Tarrence said the same thing.  Very close to Akinto.

23           And just use your common sense about what's happening

24  here.  This is not a huge -- it's not a palace.  There's seven

25  robbers and a number of victims in a very small space.

1    Tarrence, Akinto, they weren't accounting for every single

2    robber.  They were just trying to survive.  So don't be

3    distracted.  Don't be distracted from the DNA that shows you

4    exactly what happened.

5             What happens next?  The robbers are in the hallway

6    trying to get out and they struggle with Jeffrey Henry at the

7    door.

8             Remember what Baynes says.  They're all huddled inside

9    the hallway, Bash and Bow Wow, and then Gucci.  And they're all

10   taking turns shooting around the door, as the other one pulls

11   the door opened.

12            Remember, from the inside the doorknob was on the

13   left.  So it opened into the house to the right.  Remember what

14   Baynes showed you.  He gestured.  This is how they were

15   shooting.  Whenever they had a opportunity.  Reach around.

16   Just matches with the physical door.  He was there.  He

17   explained exactly what was happening.

18            Again, you do not have to rely on Baynes for this part

19   of the story.  Barbara told you how the door was struggling

20   back and forth.  Akinto and Tarrence is telling you exactly

21   where these guys are.  This isn't just Baynes.  Mallory also

22   told you what Gucci told you about the struggle at the door.

23   It's not just Baynes.

24            Here is Baynes' diagram, though, Government Exhibit

25   259.  And you know this is what he did back in 2011.  Remember

what he said about this.  The bottom, Bash and Bow Wow, right

by the door.  There's Jeffrey right on the other side of the

door.  There's Baynes next.  Quay Quay and Gucci.  Then

Reckless.  And then Baby E.  He said Baby E was shooting back.

Akinto was shooting in one direction.  Baby E was shooting

back.  He said that Gucci started where he drew, right here.

But that at some point he came to help Bash and Bow Wow, to

help them because they were struggling with Jeffrey Henry.

They weren't able to get the door opened.  So Gucci moved and

changed positions.

          Now, remember about this hallway.  What Akinto told

you.  What Baynes told you.  It was a small hallway.  Akinto

said it was seven to eight feet deep.

          There's seven robbers in that small little hallway.

Bumping up against one another, according to Baynes.  It was a

tight space.

          Baynes was bleeding so much from that stab, the stab

in his back.  He was bleeding down his legs so much that he

thought somebody was peeing on his leg.

          Is there any wonder that Bow Wow was covered in blood

after this?  It wasn't Jeffrey Henry's blood on him.  There is

no evidence in the record here to support that.  But there's

every piece of evidence to show a very fair, very reasonable,

very fact-based inference that it was Baynes' blood on

Whitaker.

1          Let's look at -- I'm sorry.  Let's look at 95D.

2     Remember he said he was stabbed in the back.  They're facing

3     the door obviously trying to get out.  Where is that blood

4     smear?  It's on the right.  Meaning he's swiveling his body in

5     there.

6          What do you think is going on in this small tight

7     space?  They're trying to get out.  They're moving all over the

8     place, ladies and gentlemen.

9          So the fact that his blood is on the right side of

10    that wall shows you they weren't standing perfectly still.

11    They were bumping up against each other.

12         What was Jeffrey Henry doing during all of this?  He

13    was holding that door on the other side.  Holding it with one

14    hand and using the other hand to call 911.  How do you know

15    that?  Based on the 911 call and based on the fact that Barbara

16    Morreale told you exactly that.

17         Now at some point Baynes says that they're able to get

18    the door opened enough to get a shot out.  Baynes says he hears

19    a scream.  The door frees up.  And when they get out -- when

20    they get outside, there's a man huddled against the wall,

21    having been shot.

22         Remember, again, he said Bow Wow, Bash and Gucci

23    taking turns trying to do this.

24         So now what I'd like to do is show you how Baynes is

25    telling the truth there too.  You heard it from Barbara.

1   Barbara described it, right?  Barbara said she saw -- she saw

2   the smoke from the gun in Jeffrey Henry's face while he was on

3   911.  So at this time what I'd like to do is play Government

4   Exhibit 281 again, which is Jeffrey Henry's 911 call.

5           (Audio recording played)

6           You heard the screams there.  And you heard what

7   Barbara said.  Wouldn't be my words.  Barbara's words.  She

8   said the screams sounded like -- like a squealing pig.  Let's

9   face it, ladies and gentlemen, that's what it sounds like.

10          The facts line up across the board.  Something like

11  this.  That's why you don't have to believe just Anthony

12  Baynes.

13          What did Dr. Ely tell you, the medical expert, about

14  how Jeffrey Henry died?  Remember, she said there were two

15  shots.  One shot traveled right to left.  The other one

16  basically straight down.  Both of them, though, downward.

17          The right to left makes sense.  The doorknob was right

18  here.  He -- on the right side of his body.  So if they're

19  reaching around, that's how -- the first shot would come.

20          And the downward.  Again, let's look at -- now, look

21  at Government Exhibit 92B as to where Jeffrey Henry was

22  standing.  Look at the front of that door.  It's two steps.  So

23  he -- and Barbara said he was leaning up against one of those

24  steps for leverage.  So, what you have here is Jeffrey Henry

25  beneath the shooters.  It makes perfect sense that this is how

1    he was shot.  Downward from right to left.

2              Now the robbers flee the scene.  I won't play the 911

3    call again.  But you heard at the very end of that 911 call

4    after the screaming, after that second shot, the second shot

5    that stopped the screaming, you heard two voices.  The first

6    one said something like, "let's get the hell out of here" and

7    the second one said something like "check his pockets."

8              And you know that once Jeffrey Henry let go of that

9    door everybody fled out.  Baynes said he didn't remember which

10   one the actual shooter was.  The first one would be out.  The

11   other two who were helping him open the door were kind of stuck

12   behind the door.  So Baynes was the second one out.  And he saw

13   a man huddled by the side of the door, having just been shot.

14             What -- and then what happened?  You heard it from

15   everybody.  You heard Barbara told you, Baynes told you, and

16   the pole camera told you.  That they ran back on Chambers

17   Street toward First and then up First Street.  Remember what

18   Mallory told you.  Mallory told you the same thing -- then

19   Gucci turned on Lander Street back towards his house.

20             So let's play briefly, Ms. McInerney, Government

21   Exhibit 252 again.  That is the east view of the pole camera.

22   We'll start it at the 25-second mark.

23             (Video recording played)

24             One, two, three, four, five, six.

25             Did I miss the seventh?  I think the first one might

1    have -- can we start it again.

2              (Video recording played)

3              Well from this angle I think there are six but we did

4    see the other angles where you saw the seventh one as well.

5    Ladies and gentlemen, I don't think there's any question about

6    it.

7              Now, on that 911 call you heard "check his pockets."

8    And then don't forget what you heard after that.  You heard

9    "check his pockets" and then you heard the phone hang up.  Was

10   Jeffrey Henry in the condition to be hanging up a phone, a

11   phone that he called 911 for?  Use your common sense, ladies

12   and gentlemen.  What happened?  A robber took that phone out of

13   his hand and hung it up.  Took his phone.  Did they get his

14   crack?  No.  They just shot the man.  They're fleeing from a

15   botched robbery.  Did they have time to go through his pockets?

16   No.  But the phone was right there and they grabbed it.

17             And lastly, ladies and gentlemen, Jeffrey Henry dies.

18   You heard that Elena Gardner saw Jeffrey Henry lying on the

19   street in front of 45 Lander Street.  He said he had been shot.

20             You heard William Lahar say he showed up there.  The

21   man was still alive at that point.  He said his name was Jeff.

22             And you heard from Dr. Ely exactly how he died.

23             And when he was found, ladies and gentlemen, just in

24   case there was any question as to what this robbery was about.

25   What was in his pocket?  Government Exhibit 57, crack cocaine.

E8k9chr5                    Summation - Mr. Bauer

1   Jeffrey Henry sold crack at 54 Chambers.  Just like Akinto

2   Boone.  Just like Tarrence Smith.  That's what the robbery was

3   about.  I don't think there's any serious dispute about that.

4           So, ladies and gentlemen, here we are with this wall

5   of evidence.

6           What was the point of the brick wall?  What was the

7   point of all those red circles.  To show you this isn't a case

8   that's just on Anthony Baynes or just on Jamar Mallory.  Brick

9   and mortar.  Brick and mortar.  All of the evidence comes

10  together, ladies and gentlemen, to show you exactly what

11  happened.  This isn't Jenga.  You can try and attack one brick

12  here or there but that wall will not crumble.  Not when there's

13  so many other bricks.  Not when those bricks are credible and

14  they are stuck together with the mortar of corroboration.  The

15  wall is strong.  The wall is too high for these people to

16  overcome.

17          So that's the story, ladies and gentlemen.  What

18  Baynes told you, what Mallory told you, what everyone tells

19  you.

20          Now I want to dig into the big question, the ultimate

21  question, were these three defendants part of the crew that

22  robbed 54 Chambers and Jeffrey Henry.  The answer,

23  unquestionably yes.  So let's go one by one.

24          Left start with Raymond Christian, Reckless.  How can

25  you know beyond a reasonable doubt that he was there?  Starting

1    point has to be with Anthony Baynes, Reckless' good friend.

2    And he told you exactly what Reckless did that day.  The

3    robbery was Reckless' brainchild.  Reckless is the one leading

4    the charge to find a crack spot to rob.  It was Reckless who

5    approached L-1, the highest ranking member of the Bloods.  It

6    was Reckless who was one of those seven robbers that pulled a

7    gun on Akinto and Marshall.  It was Reckless who had his gun

8    taken from Akinto.  And that's when Baynes came to his aid only

9    to get stabbed himself.  And it was Reckless who had that

10   half-mask on.

11          Now, but then again you also heard directly from

12   Reckless.  He didn't have to take the witness stand here, of

13   course, ladies and gentlemen.  That was his right.  No adverse

14   inference can be drawn against him because he didn't take the

15   witness stand.  But you heard from him in other ways.  You saw

16   what he said on Facebook.  He said "goons on deck."  You heard

17   what that means.  You also heard exactly what his gang

18   situation was.  No doubt, he was Star Status.  He wasn't a

19   Blood.  But he was a 550.  You heard that.  550, you heard,

20   meant that he was neutral but affiliated, associated, friendly

21   with the Bloods.

22          You saw what he wrote on Facebook.  Brazy Baynes.

23   Because you can't write a C for Crips if you're connected with

24   the Bloods.  You saw another Facebook where he used the term

25   peter-rolled.  You heard what that meant.  That's a Blood term

1    for killing somebody.  He may not have been a Blood, but you

2    heard from his mouth, or in this case his fingertips what his

3    gang affiliation was.

4            You also heard that he loves guns.  You saw posting

5    after posting about how he loves them gun sounds.  He wrote

6    that one post, we'll talk about later, where he listed the .22

7    and the 9-millimeter; that he changed the lyrics of a rap song,

8    the rap song that says desert eagle and chopper.  But Reckless

9    didn't have a desert eagle or a chopper.  He had a .22 and a

10   9-millimeter.  So he switched them to match his guns.

11           That really can't be in dispute, right?  Reckless

12   loved guns.  He carried them regularly.  We'll talk about it in

13   a bit, what all the cooperators said about that.  Cooperator

14   after cooperator telling you that he saw them -- that they saw

15   him with guns.

16           But how else do you know that?  Because back in 2010

17   alone, the same year as the robbery, Raymond Christian was

18   arrested, not once, but twice with a gun.  You saw those guns,

19   ladies and gentlemen.  There was a little two-shot Derringer,

20   here, Government Exhibit 121.  And you saw the other gun,

21   Government Exhibit 132, the one that he threw behind L-1's at

22   38 Dubois Street.

23           There's another way that you heard from Reckless.  Not

24   directly.  But Jamar Mallory told you what he heard Reckless

25   say after the murder.  It was one or two days later.  After he

1    had been questioned by the police.  And he stopped by 260 First

2    Street to talk to Kev Gotti.  He said he thought someone was

3    snitching.  And he said that he had told the robbers, told his

4    goons that there was a chance someone was going to die that

5    night, the night that Joker was killed.

6            So he wasn't wrong.  Someone did die.  But he's

7    putting himself, that is Reckless putting Reckless right in the

8    middle of that robbery, ladies and gentlemen.

9            Let's talk about the mask.  Baynes told you -- I'm

10   actually going to take the mask out.

11           Baynes told you that he was wearing a half-mask.  He

12   said some of the robbers had masks to go over their heads and

13   others have masks that strapped in the back.  Reckless was

14   wearing the half-mask that tied in the back.  Here's the mask.

15   Baynes was spot on, ladies and gentlemen.

16           How about Akinto?  Akinto.  It was a velcro mask,

17   Gortex, he said.  I'm feeling it, you're not.  I don't know

18   exactly what Gortex is but this is pretty close, ladies and

19   gentlemen.

20           Now Baynes testified that as far as he can remember

21   the mask only went over his nose.  And as you saw during the

22   trial when Daniel Myers opened it up, it goes above the nose,

23   obviously it does.  Can't hide from that.

24           I submit to you, ladies and gentlemen, that is a

25   minor, minor inaccuracy.

1          It's those types of inaccuracies that, again, show you

2     that Anthony Baynes wasn't trying to overreach here.  He was

3     trying to tell you what he remembered.

4          We didn't put the mask in front of him first and say:

5     Is this Reckless' mask?  He just told you what he remembered it

6     to be, exactly how high it went up on his face.  He got it

7     right.  It was a half-mask strapped in the back.  That's the

8     big point.

9          By the way, if Baynes is wearing this mask, as defense

10    counsel has tried to suggest, wouldn't you think he might know

11    a little more exactly how high up it went on his face.

12         But, again, you do not need to take Anthony Baynes or

13    Akinto Boone's word for who was wearing that mask that night.

14    You heard from the DNA expert, Daniel Myers, Raymond

15    Christian's DNA was on the inside of this mask; this mask found

16    at the crime scene, with the blood, a

17    one-in-three-hundred-billion chance that it was anything other

18    than that he, Raymond Christian, was the major contributor to

19    this mask.

20         Ladies and gentlemen, I only ask that you use your

21    common sense when it comes to this mask.  The evidence against

22    Raymond Christian is overwhelming.  And why?  If for no other

23    reason because his DNA was on a mask at 54 Chambers Street.

24    Pure and simple.  We can talk about the technical analyses done

25    by Daniel Myers to conclude that it was his DNA on there, but

E8k9chr5                    Summation - Mr. Bauer

1    all you need to know is that it is within a certainty of one in

2    three hundred billion that Raymond Christian wore this mask.

3            Defense cannot escape this.  This is his mask.

4    They've already tried to distract you with the theory that

5    maybe he loaned the mask and it was Baynes or his brother

6    Quay Quay who wore the mask that night.  But ask yourselves,

7    ladies and gentlemen, does that make any sense?

8            First of all, as you heard, Baynes' DNA was on this

9    mask too.  Part of the mask.  Don't be distracted by this,

10   ladies and gentlemen.

11           Let's look at 95D where this mask was recovered.  You

12   see it on the ground there.  You see it on the ground right

13   below where Baynes' blood is smeared all over the wall,

14   dripping down.  You see Baynes' blood dripping right next to --

15   right next to the mask.  Is there -- is it any surprise that

16   there's a little DNA of Baynes' on here?

17           Now, it was on the outside.  Baynes' DNA was on the

18   outside.  Not on the inside.  Only one person was on the

19   inside, ladies and gentlemen.  Only one major contributor and

20   that was Reckless.

21           Mr. Greenfield also asked a number of questions of

22   Mr. Myers inferring that it's Quay Quay, not Reckless, was

23   wearing that mask.  Quay Quay could have been a minor

24   contributor.  And that his DNA had been degraded off the mask

25   during the whole two months that it was sitting around before

1    it had been analyzed.

2            Or maybe it was Quay Quay's mask all along.  It's not

3    really clear.  Just throwing it up there.  That it was not

4    Reckless.

5            They were grasping ladies and gentlemen.  First of

6    all, Daniel Myers rejected this theory out of hand.  He's your

7    expert.  He rejected it out of hand.  He said, and I quote,

8    that Reckless was the major contributor and any similarities

9    between the DNA on the mask and that of Quay Quay's was

10   inconclusive at best.

11           Mr. Greenfield worked very hard to get Mr. Myers to

12   say that you can't rule out the possibility of Quay Quay's DNA

13   being on the mask.  Yet, he had Mr. Myers come down and circle

14   all those things in red pen; that he can't exclude the

15   possibility that maybe Quay Quay's DNA was also on the mask.

16   Mr. Myers, again, rejected it out of hand.  Those numbers he

17   was circling, meaningless.  It was a

18   one-in-three-hundred-billion chance that it wasn't Reckless on

19   that mask.  That's all you need to know.

20           Finally, I'll remind you that Daniel Myers said that

21   his swab of DNA from the inside of the mask had blood on it, on

22   the cheek area.  Remember, again, what Akinto Boone told you.

23   He had just headbutted the guy wearing the mask.  Now there's

24   blood on the inside.  If not Reckless, how did blood get on the

25   inside of the mask?  Common sense.

1              Ladies and gentlemen, defense counsel wants it both

2      ways.  DNA expert Myers was wrong; wrong about Reckless' DNA on

3      that mask.  But about Baynes?  How about that?  Was he right or

4      wrong about that?  They're perfectly fine with his expertise

5      when it comes to testing Anthony Baynes, but not about their

6      client.  And that just doesn't hold water, ladies and

7      gentlemen.  Use your common sense.  If you do that, you'll know

8      beyond a reasonable doubt that it was Raymond Christian who was

9      there at 54 Chambers that night trying to rob those drug

10     dealers with this mask on.

11             Let's talk about Glenn Thomas, Gucci.  Again, we'll

12     start with Baynes.  Baynes is clear, crystal clear that Gucci

13     and Bow Wow were right in the thick of that robbery.  They are

14     at L-1's house at Dubois, inside 54 Chambers, first behind

15     Baynes in the hallway, and then up in front of Baynes, with

16     Bash and Bow Wow.

17             Now, much has been made by defense counsel about

18     Anthony Baynes' inconsistent statements regarding lies that he

19     told the police when he was first arrested.  Defense counsel

20     spent almost an hour with you this morning reading you some of

21     those lies, of which he denied remembering or denied saying on

22     the witness stand.  Now I'll address those lies and defense's

23     strategy to hang their hats on those lies in a moment.

24             For now let's talk about the delay in Baynes naming

25     Bow Wow and Gucci.  Because Baynes told you in no uncertain

1    terms that it wasn't until his fourth or fifth meeting with

2    police that he named Guch and Bow Wow.  Was he lying when he

3    finally named them?

4           Think about who he originally named.  He named Bash

5    and Baby E, two people he barely knew.  One who he didn't get

6    along with.  You heard.  He fought with Bash.  He named

7    Quay Quay and Reckless originally but didn't put them in the

8    robbery right away.  Trying to protect himself.  Trying to

9    protect his friends.  And no mention of Bow Wow and Gucci.

10          But by the time he gave that full list of robbers in

11   May of 2011, he filled it in with all seven robbers.  Had to be

12   seven.  Were Bow Wow and Gucci random?  Was it just a haphazard

13   name out of a hat, ladies and gentlemen?  Of course not.

14   There's a mountain of evidence showing you exactly, exactly

15   what their role was.

16          Ms. McInerney, can we pull up the part of the

17   Burden/Mallory video -- we're only going to do one excerpt,

18   ladies and gentlemen.  We're going to do excerpt 4.  It starts

19   at the 20:50 mark.  We went through a little bit of what they

20   said but it's important to hear and to see Kevin Burden talking

21   throughout this about what he -- what he and Jamar Mallory say

22   about what Bow Wow and Gucci were doing at that robbery.

23          (Audiovisual recording played)

24          Ladies and gentlemen, all the questions about the

25   incentives that our cooperators, our witnesses had to lie, they

1    don't apply to Kevin Burden, ladies and gentlemen.  Ask

2    yourselves why would he lie in this video?  There is no answer

3    to that.

4            So just in case you felt uncomfortable relying on

5    Jamar Mallory, which you shouldn't because everything he said

6    is corroborated, you have Kevin Burden.

7            Now what else do you know, though?  You did hear from

8    Jamar Mallory about what Gucci did the night after the robbery.

9    He came over with beers and he came over with that black .38

10   revolver, again.  And he told J-Mark what happened.  He ran

11   through all the people that were down there at the robbery.

12   Remember, he didn't name Quay Quay.  That's why J-Mark only

13   knew six of the seven robbers.  But he said that he went down

14   there with the robbers, that the robbers didn't respect what

15   was going on, didn't respect the robbery, then a shootout

16   happened.  Joker died.  That was Gucci putting Gucci in that

17   robbery.

18           You also have a pole camera.  J-Mark showed you who he

19   thought could be Gucci, again, because of the clothes he was

20   wearing.  Don't forget about that.

21           And then don't forget about Ramone McDermott,

22   testified just yesterday, about the day after the robbery, he,

23   Gucci, came back, was talking to Gotti.  And what he said, what

24   he said there was that he was at the robbery, and he told

25   Reckless not to shoot, but Reckless did anyway.

1              Now the evidence doesn't really support that Reckless

2      did the shooting.  Let's be clear about that.  But what's Gucci

3      doing with that statement?  He's trying to push the

4      responsibility of the shooting off of him.  But in the process

5      he's putting himself right in there in that robbery.  Ladies

6      and gentlemen, beyond a reasonable doubt Glenn Thomas was

7      involved in this robbery.

8              Much of that same evidence applies to Tyrell Whitaker,

9      the video, that we just watched.  Everything that Jamar Mallory

10     told you about what happened applies to Tyrell Whitaker.  The

11     pole camera applies to Tyrell Whitaker because remember

12     Mr. Mallory said that that could be -- that could be Bow Wow.

13     And he had said when he was first interviewed by the police

14     that it was based on his light skin.  He didn't say it was

15     definitely him.  Just what it could have been.

16             Mallory had seen him with that robbery before -- I'm

17     sorry -- with the robbery, with the gun before, that same

18     silver revolver.  He came by and borrowed it, or brought it

19     back to Kev Gotti.  That's the story that you just heard out of

20     Kev Gotti's mouth too.  That the gun didn't work.  He said

21     point it to your hand, shoot it out the window.  That's a very

22     specific story to hear from Mallory when you know you can

23     believe him because Kev Gotti, not a cooperator, no cooperation

24     agreement, told you.

25             Then there's Ramone McDermott.  Ramone McDermott

1    testified yesterday that after the robbery Bow Wow ran to the

2    house at 260 First Street with blood on him.  He had used the

3    word "covered" in the past.  Before you he was using the word

4    "splatter" like if you threw water off the wall and it bounced

5    back.  He said it was here, the bottom part of his sweatshirt

6    and his legs.

7         Now that's about where Baynes was stabbed, ladies and

8    gentlemen, right there in the back, right here.  It makes

9    sense, ladies and gentlemen.

10        And McDermott, everything else he told you lined up

11   with exactly what Mallory had told you and lined up with things

12   that Gotti told you.

13        Now, there was one small inconsistency between

14   McDermott and Mallory, and that was the brand of the sweatshirt

15   that Bow Wow was wearing.

16        Now, they both told you black hoodie.  Both.  Little

17   red writing here.  One remembered Hollister.  One remembered

18   Champion.  I ask you ladies and gentlemen, evaluate the

19   consistency of that versus the small inconsistency of the brand

20   three-and-a-half years later.  It's pretty close, ladies and

21   gentlemen.  And McDermott said very clear, he had said time and

22   again, it was a dark sweatshirt.  He had said he never said

23   blue.  He had said black.

24        So rather than focusing on a small inconsistency,

25   focus on how similar their stories are.  And I think that small

E8k9chr5                    Summation - Mr. Bauer

1    inconsistency, again, shows you how credible the witnesses are.

2    If they were together in the GEO jail, as the questions were

3    asked, and getting their stories straight, wouldn't they talk

4    about what brand?  But they didn't.  And it shows you that

5    they're just telling you like it is, how they remembered it

6    three-and-a-half years later.

7            Now, before I move on or off of Tyrell Whitaker, since

8    he's not charged with the drugs and the other guns, let me just

9    talk for a moment and say that you heard that he was part of

10   this crew selling drugs.  You heard that he sold crack.  You

11   heard that he sold heroin.  You saw the heroin in the brown

12   rice, the Goya rice, that he was arrested with on August 12,

13   2010.  You heard that he sold drugs from Baynes, Mallory,

14   McDermott, Williams.

15           Danielle Williams, in particular, told you about Bow

16   Wow's drug sales.  She saw him at 38 Dubois Street serving a

17   customer because Reckless told him to.  And she told you about

18   how he sold drugs with other people like Bash in her house with

19   her son, Smoke.

20           Ladies and gentlemen, beyond a reasonable doubt Tyrell

21   Whitaker was part of this crew, part of this robbery.  Part of

22   the murder of Jeffrey Henry.

23           Two final points on the murder.  First, as you know,

24   the defendants are charged with murder.  Now, some cases the

25   government has to prove that the defendants intended to kill

E8k9chr5                        Summation - Mr. Bauer

1    the victim to prove murder.  Not here.  As Judge Ramos will

2    explain to you, what the government has to show is that the

3    defendants intended on committing a robbery -- not a murder, a

4    robbery -- and that during that robbery, during that felony

5    somebody was killed.  That's all.  It's an important point and

6    one that I think you need to keep in mind as you listen to all

7    of the evidence here.

8           Now what about the big question?  Who shot and killed

9    Jeffrey Henry?  Was it Bash, Bow Wow, Gucci, Akinto Boone?

10   Ladies and gentlemen, I'm just going to dismiss that out of

11   hand.  Akinto Boone told you that the hallway curved.  It would

12   take a magic curving bullet for Akinto Boone to shoot around

13   that hallway.  You saw that door.  It didn't have any bullets

14   in it.  And as you heard from every witness, the door was

15   barely opened.  Let's forget about that Akinto Boone, those

16   questions.  That's ridiculous.

17          Now, it's a distraction.  But the question is --

18   because if I were you, I would have been sitting here through

19   this trial wondering who was the shooter?  Which robber shot

20   Mr. Henry?  And the fact is we don't know.

21          You heard that Bow Wow, Gucci, and Bash were taking

22   turns firing at Mr. Henry.  But you heard no evidence as to

23   which of the robbers fired those fatal shots.

24          But here's the bottomline.  It doesn't matter.  It

25   doesn't matter.  As I said earlier, each of the defendants is

1   charged not only with committing the robbery and murder but

2   also aiding and abetting those crimes as well.  I expect that

3   Judge Ramos' instruction will make clear to you that if you aid

4   or abet the shooter, you are just as guilty as if you pulled

5   the trigger.

6           What does aiding and abetting mean?  I expect Judge

7   Ramos to give you examples.  But what does it include?  Being

8   part of the robbery crew.  Having your own gun at the robbery.

9   Pulling it out during the robbery.  You don't have to be the

10  shooter, ladies and gentlemen.

11          Let me be perfectly clear.  Baynes and Quay Quay.

12  They were lookouts.  Didn't have guns.  They are guilty of the

13  robbery, of aiding and abetting the robbery and aiding and

14  abetting the murder.

15          L-1, who wasn't even there but set it all up, guilty

16  of aiding and abetting the robbery and the murder.

17          So these guys in the house with their own guns, guilty

18  of either the murder or aiding and abetting the murder.  There

19  is no difference.

20          So all those points about how it was a 9-millimeter

21  bullet that killed Mr. Henry.  So what?  It's interesting.  It

22  would be nice to know who shot that particular bullet.  But it

23  is legally irrelevant.

24          Bow Wow and Gucci were given revolvers by Mallory and

25  Kev Gotti.  They were not 9-millimeters.  But you don't know

E8k9chr5                    Summation - Mr. Bauer

1    what caliber gun Bash had.  Maybe it was a 9.  Maybe he's the

2    one who shot Mr. Henry.  Maybe the robbers traded guns before

3    the robbery.

4              And even though Bow Wow and Gucci had the .38

5    revolvers from Mallory and Gotti, maybe they swapped them with

6    Bash and Baby E.  We don't know.  Anthony Baynes didn't know.

7    Jamar Mallory didn't know.  But it's besides the point.

8              As defense counsel speaks to you, and if they focus on

9    this 9-millimeter defense, I suggest to you that it's a

10   distraction.  It's interesting, but it's a distraction.  You

11   need to focus on the evidence.  And you need to focus on the

12   law.  And if you do that you'll see that the defendants are

13   guilty of the charged murder.

14             Now before I move on to those other counts of the

15   drugs and the guns I want to talk to you a little more about

16   the cooperators.  As you know, we called four witnesses,

17   Baynes, Mallory, Danielle Williams, David Evans, who pled

18   guilty to cooperation agreements.  There were two other

19   witnesses, Ramone McDermott and Akinto Boone who are hoping to

20   get a letter from the government -- they didn't have an

21   agreement -- who are hoping for a letter.

22             Ladies and gentlemen, it would be great if we could

23   call fine, upstanding citizens here to the witness stand to

24   talk about the interworkings of a robbery crew or crack sales

25   on Chambers Street.  But you know that's not possible.  Can't

1   be done.  People who know about these things are the other

2   criminals who did them with the defendants or who were selling

3   crack inside 54 Chambers.

4           There is no question that these people committed

5   terrible crimes.  But it doesn't follow that simply because

6   someone has committed crimes that they can't be telling you the

7   truth about the crimes that they participated in or saw other

8   people do.

9           Again, let me remind you the defendants did not have

10  to put a case on.  But they did.  They did by questioning our

11  witnesses and attacking their credibility.  So, we're going to

12  scrutinize some of those attacks.

13          Let's get this straight from the beginning.  There is

14  no question that the cooperators didn't testify out of the

15  goodness of their hearts.  Each of them has committed serious

16  crimes.  Each of them got caught by the government.  And they

17  are hoping for a break in their sentence.  Absolutely.

18          The government didn't call these witnesses in the

19  hopes that you'd like them.  It's not a popularity contest

20  though, ladies and gentlemen.  The issue is not whether you

21  like them.  Jamar Mallory, for instance, did some stuff that's

22  really unlikeable.  While he was out on the street working for

23  the government.  He was playing both sides.  He was snitching

24  on people and then doing robberies with those same people.

25          It's hard to like someone like Danielle Williams who

1    testified about setting up a robbery where a gun was put at her

2    sister's head and her ten-year-old niece's head.

3          Danielle Williams also participated in a murder, as

4    did David Evans.  But you know who else did that?  You know who

5    else participated in a murder as well as commit other crimes?

6    These guys.  These three defendants.  But unlike the

7    defendants, Danielle Williams, Baynes, Mallory, Evans, they all

8    came in here and let it all hang out for you.  Unlike these

9    defendants, they accepted responsibility for what they did.

10   They told you everything they knew and they told you everything

11   they did.  Even the worst things.

12         You've got to remember this, ladies and gentlemen.

13   Defense counsel want it both ways.  When it comes to their

14   clients, they scream outrage.  These snitches must be lying.

15   But what about the other side they talked about?  What about

16   Baynes admitting his involvement in the robbery and the murder?

17   Or that of Quay Quay's?  Oh, for that, you can believe them.

18   You can believe them about the stuff they did.  Or you can

19   believe them about the stuff that other people were involved

20   in.  But when their clients get involved:  Oh, no, no, they

21   must be lying.

22         That's not right, ladies and gentlemen.  They can't

23   have it both ways.

24         Defense counsel has also sprinkled this examination of

25   witnesses, the idea of mixing truth and lies, implying that

1    that's what the cooperators are doing or that's what they did

2    in the past.  Again, it's the same problem, ladies and

3    gentlemen.  Defense counsel are picking and choosing what the

4    truth is to satisfy their own arguments, the truth about the

5    cooperators lying about their clients.  Simply makes no sense,

6    ladies and gentlemen.  The question is whether they told you

7    the truth.

8            Let's talk about their demeanor on the witness stand.

9    Each of them got up there and they told you about every crime

10   they committed, crimes they were convicted of, and crimes that

11   they were never caught doing.  The government never would have

12   known about if they hadn't admitted them.  Like the robberies

13   that Baynes told you about or Mallory told you about.  Think

14   about how hard this was for some of them on the witness stand.

15           Think back to Jamar Mallory who said that he hated

16   cooperating against his good friend, Kev Gotti.  And then think

17   about his demeanor on the witness stand.  He didn't remember

18   certain things.  Small things.  He didn't remember things when

19   I asked him.  He didn't remember things when defense counsel

20   asked him.  He was steady.  He was consistent.  Just answering

21   the questions to the best that he remembered.

22           How about Baynes?  How about that mumbling?  It's been

23   a long time ago.  But remember how hard it was to understand

24   him.  It's painful.  But then also think about how he carried

25   himself.  Did his voice change from direct to

E8k9chr5                    Summation - Mr. Bauer

1    cross-examination?  Did his posture change?  Or did he just

2    steadily answer the questions?  Owning up to his lies.

3    Explaining why he had lied.  And then explaining why he was

4    telling the truth now.

5           Same for Evans, for Williams, for McDermott.

6           No one is saying that these cooperators were the

7    smartest people in the world.  They most certainly are not.

8    But, again, it's not about their brains.  It's about whether

9    they told the truth.

10          I suggested earlier to ask you -- for you to ask

11   yourselves, as you ran through the proof in this case, whether

12   it was some big conspiracy, a big setup by each of these

13   witnesses to get these defendants convicted.  Ask if there was

14   a big plan for these cooperators to get together in all these

15   different jails, to get ahold of all the other evidence, the

16   other witnesses who are out on the street to make sure that

17   their stories line up.  Think about that.  That would be

18   really -- that would be really hard.  Like something out of the

19   movies.

20          Now think about Anthony Baynes.  Think about Jamar

21   Mallory, Akinto Boone, Ramone McDermott.  Think about their

22   demeanors.

23          Those guys.  Could it possibly be that those guys who

24   could barely answer some of the questions that were asked of

25   them, could barely understand what some of the questions were,

1    they're capable of that?

2            Of course not.  Just to say it out loud sounds

3    ridiculous, ladies and gentlemen.  The safer thing, the easier

4    thing, the only thing for them to do was to tell the truth,

5    which is exactly what they did.

6            Now, ladies and gentlemen, again let me just reiterate

7    for you that the burden is with us.  It's not with defense

8    counsel.  It never shifts even if they attack our witnesses.

9    We are analyzing some of the arguments and some of the

10   questions that were asked, but that does not shift the burden

11   from here to there.  It's still here.  Those defendants are

12   still presumed innocent until you go in there and deliberate.

13   Just want to make that clear.

14           Now getting back to the cooperators generally, besides

15   thinking about their demeanor, think about their motivation and

16   their incentive to lie to you.  Or to tell the truth.  If they

17   cooperate and tell the truth, then they get a letter to the

18   judge and the power to get a lower sentence.  But if they lie,

19   their agreement gets ripped up and they are looking at

20   mandatory sentencing of 17, 80, life.

21           Here is the kicker, and don't let this go unnoticed.

22   They get the letter whether or not these defendants are

23   convicted.  As long as they fulfill the obligations of their

24   agreement, as long as they tell the truth on the witness stand,

25   they get the letter.  So ask yourselves -- many of them had

1   screwed up before.  But now as they sit here today, after they

2   screwed up and after they got caught.  And someone like Jamar

3   Mallory, his agreement, he didn't even know if he was going to

4   get that 5K letter.  Ask yourself what his incentive was.  The

5   downside consequence is so high, facing that mandatory minimum,

6   should he lie or should he tell the truth and try to get that

7   letter from the government.  They don't need to sink these

8   defendants to get a break.  They need only to tell the truth.

9          Now Baynes and Mallory were exposed as being bad liars

10   when they first talked to the government.  Some of their lies

11   made no sense.  That's why Baynes kept changing his story in

12   the hospital.  Saying he wasn't in the house.  Then saying he

13   was.  Then saying he was checking on Reckless.  He's a bad

14   liar.

15          Ladies and gentlemen, it's hard to remember your lies,

16   especially when they are bad and they crumble all around you,

17   especially for somebody like Anthony Baynes.

18          But you know what's a lot easier to do?  To remember

19   the truth.  When you get rid of the lies, there's nothing left

20   to keep straight.  All you got to do is tell the truth.

21          Now think about what the cooperators said and didn't

22   say.  Did they blame everything on the defendants?  Somehow try

23   to frame them all?  Did they minimize their own conduct?  Did

24   they testify as if they knew everything about this case?

25          Absolutely not.  There are so many of those examples.

1    Danielle Williams arranging a robbery of her sister.  The

2    defendants didn't do that.  Mallory shooting Kev Gotti in the

3    foot.  Defendants didn't do that.  Baynes committing six or ten

4    robberies.  Not the defendants.  McDermott's robbery.  Not the

5    defendants.

6           These witnesses didn't exaggerate or make things up to

7    frame the defendants.  They didn't say that Reckless, Bow Wow,

8    Gucci did those things.  It wouldn't have been true and they

9    didn't say it.

10          And if they were so intent on lying, why not make

11   better lies?  Mallory didn't profess to know everything that

12   happened during the robbery.  He only knew what the defendants

13   told him, which was not everything.

14          McDermott didn't tell you that Bow Wow marched into

15   260 First Street with the blood all over his clothes and give

16   him a full confession.  He just said he asked for a bag.  If he

17   told you more, he would have been lying.  Ask yourselves why,

18   if they were lying, they wouldn't give you more.

19          Baynes didn't even profess to be part of the whole

20   story.  Remember he told you that Bash wouldn't let him go in

21   that house.  If he wanted to be the person who knew everything,

22   and he wanted to lie about it, he would have put himself in

23   that house.  But he didn't because it wasn't true.

24          Now, on a related note, think about the level of

25   detail that they went into, in talking about their crimes.

1   They told you minute details about what they did and what the

2   defendants did.  Not because they were necessarily important,

3   but because that's how they remembered them.  Like the brand of

4   sweatshirt that Bow Wow was wearing, or the scarf that Gucci

5   was wearing, like the beers in that Gucci brought over to

6   Mallory's when he playing with the gun as they talked, and like

7   that Bash was wearing white gloves the night of the robbery.

8   That's what small detail.  But Baynes remembered it so he told

9   you about it.

10          Now, let's look at what we found at the crime scene,

11  ladies and gentlemen, Government Exhibit 94H.  That's a white

12  glove on the ground.  Exhibit No. 8.  And it was in the

13  hallway.

14          And now here are the still shots of the people -- of

15  the person Baynes identified as Bash at the top.  This is

16  walking down.  Let's zoom in.  What are on his hands, ladies

17  and gentlemen?  White gloves.  At the bottom, on the far left,

18  that is Bash running back.  I don't see any white gloves there,

19  ladies and gentlemen.  It's a small detail that Baynes gave you

20  but the video corroborates what he said.

21          Which brings me to the ultimate point that I've said

22  again and again.  Corroboration.  How what the cooperators said

23  was consistent with and corroborated by the rest of the

24  evidence in this case.  Again and again different witnesses'

25  accounts of the same events consistent with each other and with

E8k9chr5                          Summation - Mr. Bauer

1    the other evidence in the case.  Not a hundred percent.  Not

2    all the time.  But pretty darn close.

3           We already went through the murder, how the witnesses

4    corroborated each other.  And corroborated by the other

5    evidence.  I won't do it again.  I'll just remind you how

6    powerful, how strong that wall of bricks is because the

7    evidence supports itself.

8           On this point, let me say one final thing.  Baynes and

9    Mallory both told you that Reckless was present at that

10   robbery.  54 Chambers that night.  They did so credibly.  And

11   you can rely on them to convict Christian alone.

12          But there was more.  There was a mask.  There was the

13   DNA on the mask.  It corroborates what they said, that Reckless

14   was part of that robbery.  So what that means is it shows you

15   how credible the cooperators are.  Don't forget that.

16          When Baynes and Mallory tell you that Reckless was

17   there.  And then the DNA with a one-in-three-hundred-billion

18   certainty shows you that Reckless was there, it supports that

19   they're credible; that they told you the truth.  And you can

20   use that evaluation of their credibility for all the other

21   evidence and everything else they told you in the case, even

22   beyond Reckless' participation.  Keep that in mind, ladies and

23   gentlemen.

24          Okay.  I want to move briefly to Counts Three and Six.

25   It's the drugs and it's the guns.  I spent most of my time

1    talking about the murder, and rightfully so.  Now let's talk to

2    how we know that Raymond Christian and Glenn Thomas conspired

3    to sell drugs and in furtherance of that conspiracy carried

4    guns.

5         Remember, again, Tyrell Whitaker is not charged in

6    these counts.

7         Now let me be clear up front about Reckless and Gucci

8    as drug dealers.  They were not drug kingpins, and the evidence

9    didn't bear that out.  These guys sold street-level amounts of

10   crack.  You hurt from cooperators like Mallory and Evans who

11   sold much more than that.  The evidence was clear on that.  But

12   nevertheless Raymond Christian and Glenn Thomas sold crack.

13   They sold crack side by side, in concert with others in

14   Newburgh.  And for that they are guilty of the drug charge.

15        Now very little of what needs to be proven for these

16   counts is in dispute.  In their opening Raymond Christian's

17   lawyers admitted to you that Christian sold drugs.  And he

18   didn't have to make an opening statement, but he did.  So let's

19   look at what he said.  Mr. Strazza said he is no angel.  He has

20   possessed guns in the past.  He has sold drugs in the past.  He

21   was part of a group that was called Star Status on the street.

22   So you know that the drug dealing of Raymond Christian actually

23   happened.

24        And, again, bring you back to Facebook.  Getting money

25   on Dubois.  We know what that means.  Raymond Christian telling

1    you he sells crack on Dubois.

2            And how about this photograph of Raymond Christian on

3    Facebook.  All that money fanned out on his thigh.

4            He didn't have any legitimate jobs, ladies and

5    gentlemen.  He made money in one of two ways.  That's what you

6    heard from the cooperators.  Robberies and guns.

7            What else is not in dispute?  Raymond Christian and

8    Glenn Thomas were carrying guns back in 2010 and 2011.  For

9    Christian, speaking about the Facebook -- remember his

10   postings.  Remember his postings "From the .22 to the

11   9-millimeter.  Love those gun sounds."  I already told you that

12   he substituted the lyrics out to match his guns.

13           But how else do you know that Reckless and Gucci were

14   carrying guns back then?  Because Christian was arrested twice

15   in 2010.  Thomas once in 2011.  All three arrests with guns.

16   And they both pled guilty to possessing guns.

17           I think I'm out of order.  I'm giving you guys a free

18   preview.  I didn't mean to.  I'm out of order.

19           Christian admitted to possessing that gun on

20   October 7, 2010.  The one where he was chased by the cops in

21   back of L-1's house.  Remember he spoke to Detective Goodman.

22   Remember he said it was a -- the .22 -- I'm sorry.  It was a

23   .380 Kel Tec.  I'm sorry.  It was a 380 Kel Tec.  And remember

24   what he said.  He kept one in the head and seven in the clip.

25           And remember what he said.  Why do you have this

 1   handgun on your person?  I was protecting myself.  I'll get to

 2   that in a moment.

 3          But then what did he do after he made this statement?

 4   He walked into a courtroom just like this, took an oath just

 5   like all the witnesses have before you, and he admitted to

 6   possessing a gun.

 7          Glenn Thomas did the same thing after he was arrested

 8   February 28, 2011.  Reckless with this gun.

 9          MR. BUCHWALD:  Your Honor, objection.  This is simply

10   propensity.  We'll have motions later.

11          THE COURT:  Overruled.

12          MR. BAUER:  Reckless with this gun.  Gucci with this

13   gun, ladies and gentlemen.

14          The guns of the defendants.  This one is Reckless.

15   This one is Gucci.

16          So what's left -- I'm sorry.  Just one quick thing on

17   the law here.  You heard some evidence that Gucci's gun was

18   inoperable.  As Judge Ramos will explain to you, doesn't

19   matter.  It might have mattered in the state.  It does not

20   matter here.  Distraction.

21          Okay.  So what is left in dispute?  How do you know

22   that these guys conspired to sell crack?

23          I expect that Judge Ramos will tell you that to be

24   part of a conspiracy that you don't need to know what every

25   other coconspirator is doing or even who every other

1   coconspirator is to be part of that conspiracy.

2          Now, Mallory and Evans, they explained to you how

3   people sold crack in Newburgh.  You heard that the defendants

4   and the other Bloods and the affiliates were out on the streets

5   of Newburgh at all hours hustling, selling crack.  They do it

6   at the same time.

7          Now, to be clear, a drug conspiracy does not need to

8   be run like a Fortune 500 company.  All that's required is that

9   the conspirators help each other sell drugs in some way.  That

10  way could be big like selling on a team regularly sharing

11  profits.  They could be small like letting others bag up in

12  your apartment, or letting someone serve your customer; or it

13  could be huge by doing something really bag like joining

14  together to do an armed robbery of a crack spot on Chambers

15  Street on December 15.  You heard about all of these types of

16  things that the defendants did.

17         Now let's hone in on what the conspiracy is, ladies

18  and gentlemen.  Because a lot of people were selling crack in

19  Newburgh.  There were a lot of different people maybe doing

20  their own conspiracies.  What we are talking about is the

21  robbery crew, the extent of the robbery crew; include L-1,

22  Gotti, Reckless, Gucci -- even Bow Wow, even though he's not

23  charged with it -- J-Mark, Bash.  They are all connected,

24  ladies and gentlemen.  Mallory and L-1 were business partners.

25  You heard that.  They sold out of the same house.  They served

1    each others customers.  One with crack, one with heroin.  Then

2    you heard that Mallory there gave drugs to Gucci and then sent

3    him for customers.  Gucci -- you heard Gucci -- so Mallory

4    giving drugs to Gucci.  Gucci is under L-1.  L-1 was also

5    supplying Bow Wow.  L-1 also gave customers to Reckless.

6    Reckless gave customers to Bow Wow.  Bow Wow and Bash sold

7    together out of Danielle Williams' house.  Bow Wow and Gotti

8    sold together.  Gotti and J-Mark sold crack together out of 260

9    First.  Mallory and Reckless got crack together from the same

10   supplier.  Whole host of ways, ladies and gentlemen, of how

11   these individuals worked together.

12          From Mallory you heard that people who sell crack

13   together, like Mallory, using the same apartment, like 260

14   First Street, to bag up their crack, to store their crack.  Not

15   just like 260 First but also the houses that he shared with

16   L-1.  Remember there was a crack customer -- actually I think

17   it was a heroin customer named Sissy.  They were at her house.

18   And then Geneva's house, L-1's girl.

19          They also shared sales.  Remember Mallory was telling

20   you about splits.  A customer comes, wants a hundred dollars

21   worth of crack.  Mallory gives 50.  The other person gives 50.

22   They split it.  They do that for one of two reasons:  So they

23   both can profit, as Evans says respect, that's something they

24   do respect for the boys.  But you also do it if you don't have

25   the full hundred dollars worth of crack.  You don't want to

 1    disappoint your customer so you go to your buddy and say let me

 2    get that crack so that customer will come back.

 3          They gave each other drugs.  You heard, ladies and

 4    gentlemen, that Jamar Mallory gave Gucci drugs.  They would go

 5    to common suppliers together, just like Mallory and Reckless

 6    did.  They worked together to avoid law enforcement.  As

 7    Mallory told you, when they were on the street, cops were there

 8    all the time -- you heard from the cops, they were there all

 9    the time -- they came by, they would say "boys," they would say

10    "one time."  And then everybody would scatter.

11          They would also hide their drugs in various places.

12    Not on their person.  Don't need to go into what Mallory told

13    you, but he gave you some explicit detail about how he made

14    sure to not have drugs on him when the cops came.

15          They also talked about how they shared guns.  And you

16    heard why, ladies and gentlemen.  They used them for two

17    reasons, to do a robbery or shooting; but also cooperators told

18    you that it was to protect themselves and their product while

19    they were selling drugs, in case someone came and gave them

20    trouble, in case someone came to rob them.  And they stashed

21    them in hidden but easily accessible places in case they needed

22    them.

23          They also told you about their turf.  It wasn't --

24    there weren't any specific rules about who could sell and who

25    could not sell in the northeast part of the city.  But as Evans

1    told you yesterday, you've got to be a Blood or affiliated with

2    the Bloods or 550 in order to sell there.  You can't just --

3    not just anybody can show up in that part of the city and sell.

4            Now, ladies and gentlemen, the cooperators told you

5    about all the times that they saw Reckless and Gucci with

6    crack.  They also told you about the other people, Kev Gotti,

7    Freaky, Geo, Quick, Snelly, all these other names, about how

8    they sold crack.

9            Now, I'm not going to go through every time that they

10   saw each one of these sell crack.  But I'll say -- I'll just

11   remind you that Mallory said that he saw Gucci sell crack five

12   or six times.  He would give him the crack -- not that much but

13   he would give him the crack.  And they would be on the street,

14   like on Lutheran or William.  And when they'd be out there,

15   Gucci would have the crack, he would say:  J-Mark can I serve

16   your customer?  J-Mark would say yes.

17           Fuzzy said he saw Gucci with J-Mark on Lutheran.  Same

18   thing that J-Mark said.  He saw him sell a couple times.

19           Fuzzy said he saw Reckless sell on Dubois 2009 or

20   2010.

21           Danielle Williams said she saw Reckless selling out

22   there even at 38 Dubois.  Remember, she said that L-1 gave

23   Reckless a sale at 38 Dubois.  That was 2010.

24           She saw Reckless do the same thing for Bow Wow.  Same

25   place.

1         And then she saw L-1, Reckless, Bow Wow, Gucci,

2    Baynes, all together at that same house.

3         Mallory.  Mallory told you that he and Reckless went

4    to a supplier named Wil.  They both got seven grams.  And then

5    he saw Reckless selling on the same streets.  While J-Mark was

6    selling, Reckless was selling.  City Terrace, Lutheran, Dubois.

7         And then there's Baynes.  Baynes saw Reckless sell.

8    He would sell for months at time.  Take some months off and

9    then go back to selling.  On Dubois.  On Broadway.  On Lander.

10   He saw him during those months alongside guys like L-1, Bow

11   Wow, Freaky.  And just remember the detail, that Bow Wow said

12   he saw that jar of crack with the rice in Reckless's apartment

13   storing -- stored in the rice to keep it fresh.

14        Without exaggeration, ladies and gentlemen, that's

15   cooperator after cooperator telling you the same thing about

16   Reckless and Gucci about how they sold drugs.  Not a lot, but

17   they sold drugs.

18        Speaking of this conspiracy.  Here's the real kicker

19   about how you know these defendants are guilty of the drug

20   conspiracy.  Because on December 15, 2010 they conspired to

21   obtain crack cocaine so they could resell it.  And they

22   conspired to get money so they could go buy more crack and

23   resell it.  What I mean, of course, is the robbery at 54

24   Chambers Street.  So which is why, when you're considering

25   Counts Three and Six you should consider that robbery too.

1  Raymond Christian, Glenn Thomas, five other people, they

2  conspired together that day to sell crack cocaine.  And that

3  alone, alone, that act would make them guilty of Count Three.

4  But, of course, we know that they were doing more than that.

5  You heard evidence after evidence showing that they were

6  selling crack on the streets.

7          Now, very quickly, my last piece before I sit down, is

8  the guns.  They are also guilty of the firearm charge.  The

9  charge is that they possessed guns during and in relation to

10 their drug sales.

11         Now, you heard from all the cooperators that you

12 possessed guns to either rob people or to protect yourself

13 while you're committing crimes.  What crimes were the

14 defendants committing?  Selling drugs.

15         Now, what did we hear about Gucci with the guns?

16 Again, I can't -- I'm not going to go through every single

17 thing that the cooperators said.  But remember Mallory says he

18 saw Gucci with three guns.  An antique gun.  He saw him with

19 the .22 that he got arrested with.  And he saw him with a .357.

20         McDermott saw Gucci with a gun, that same gun he was

21 arrested with, February 2011.  260 First Street.  The same

22 place Mallory saw him with it.

23         And Danielle Williams saw Gucci not with a gun but

24 around a gun.  Remember that story.  It was the incident

25 involving her son Smoke.  There was a beef with Reckless.

1   Reckless came to the meeting where he demanded that she pay

2   four hundred dollars in order for him to leave her son alone.

3   And he brought a gun to that meeting.  She said:  You're going

4   to bring a gun to a meeting with a female?  And what did

5   Reckless do?  He was with two guys and he handed the gun off.

6   I think he said to the other guy, but there was Gucci right

7   there.  Three cooperators.  Gucci with guns or around guns.

8          So besides that story with Smoke, what did you hear

9   about Reckless?  Again, you saw the Facebook.  You saw the gun

10  he was arrested with -- the guns -- the guns that he was

11  arrested with.

12         But you heard Danielle Williams saw him with a gun on

13  Lutheran in 2010 on another occasion.  Evans saw him with a gun

14  on Lander Street in 2010.  Mallory saw him with a gun twice.

15  In early 2010, including a .380.  He was showing it around.

16  And then after a party on South Miller when he shot it in the

17  air.  That story matches up with what Baynes told you.  Baynes

18  saw Reckless with guns every couple of days back in '09 and

19  2010.  He saw him with a long .22, a small black .380 and a big

20  .45.  Guns he stored at Freaky's house because Reckless and

21  Freaky, they sold crack together.  And they shared guns

22  together.  Why?  For protection, of course, to protect

23  themselves and their drugs.  And Baynes told you about times

24  Reckless shotguns, like the story at a party -- actually there

25  were two stories where he shot guns at party and after one of

1     those shootings he got caught with a gun.  You know that's true

2     because we got the gun.  Reckless also talked about how he shot

3     Little Homey, how he shot him seven times back in 2010.

4              Ladies and gentlemen, again, you have cooperator after

5     cooperator talking about how they guys carry guns, how they

6     sold drugs, and during the same time period carried guns.

7              How do you know the guns were related to the drugs?

8     Sure would be nice if the police had found the defendants'

9     drugs and guns together.  That would put it to rest for sure.

10    Kind of as they did for L-1.  But no matter, you just need to

11    look at what Reckless's words said.  And then use your common

12    sense.

13             Here he is -- here he is, Reckless.  He's saying,

14    "From the .22 to the 9, love those gun sounds."  And what else

15    is he saying, "I get money and it don't cost a thing to get

16    popped."

17             "I get money."  That means selling drugs.  To "get

18    popped" that means shooting.  The guns and the drugs are

19    connected, ladies and gentlemen.

20             Use your common sense.  As the cooperators told you,

21    it's precisely why members of the Bloods, members of Star

22    Status, members of this robbery crew kept guns on other

23    occasions:  To protect themselves while they were committing

24    their crimes.  And that includes Reckless and Gucci.

25             The evidence is plentiful that they carried guns.

E8k9chr5                    Summation – Mr. Bauer

1            And the evidence is plentiful that those guns were in

2    connection with their criminal lives which included selling

3    drugs.

4            I'm now done going through the evidence.  But before I

5    sit down I want to leave you with two thoughts.

6            (Continued on next page)

1           MR. BAUER:  First, don't go numb, and second, use your

2    common sense.  By don't go numb, what I mean is that you've

3    heard a lot of terrible things, a lot of shooting and a lot of

4    violence.  And, frankly, as you sat here throughout the trial

5    you could have become numb to it.  It's really a serious

6    violence involving a lot of people.  I want you to stop and

7    think about what it represents, what actually happened.  When

8    these robbers each pick up a gun and made the decision to point

9    it at these victims, what happened, decided the only way to get

10   Jeffrey Henry out of the way of that door was to fire their gun

11   at him, what happened?  Jeffrey Henry was, is a real person,

12   ladies and gentlemen.  The guns were real, the bullets that

13   came out of those real guns, real bullets.  Those screams you

14   heard, these are very very real screams.  Let's not lose sight

15   of how truly horrific and significant this robbery was that

16   caused the end of someone's life.  It's easy to forget that

17   when you do what we do for a living or what you guys have had

18   to do for the last three weeks; hear evidence about senseless

19   violence.  But remember each story of these defendants with

20   guns tell a tale about a life in Newburgh that carried deathly

21   consequences.

22           Taken together, all of these incidents tell a tale of

23   a live lived by these three defendants, a life of selling

24   drugs, carrying guns and robbing people, robbing people that

25   led to the death of another person, Jeffrey Henry.

1          So don't go cold, ladies and gentlemen.  These things

2    really happened.  54 Chambers Street was really robbed, robbed

3    by people with guns.  Jeffrey Henry was really killed.  Guns

4    were really carried all around Newburgh.  Remember that.  And

5    remember it was these three guys who did it.

6          Second, remember what Mr. Nawaday asked you at the

7    start of this trial, use your common sense.  As you are about

8    to hear from defense, I urge you to again use your common

9    sense.  Keep in mind the difference between evidence on the one

10   hand, and argument and speculation on the other.  And when you

11   go back into that room to deliberate, at that time most

12   especially, I ask you to use your common sense, your common

13   sense about what people's words really mean, about what

14   people's action really mean, and your common sense about how

15   things really work in the world.  If you do that, if you use

16   your common sense when you deliberate, then I'm confident that

17   you will return the only verdict that is consistent with the

18   evidence and consistent with the truth, these three men are

19   guilty as charged; that these three men are guilty of the

20   murder of Jeffrey Henry and all of the other charges that they

21   were brought against them in the indictment.

22         Thank you, your Honor.

23         THE COURT:  Thank you, Mr. Baer.

24         Ladies and gentlemen, before we have our first defense

25   closing, let's take a break.  Let's take a 20 minute break.

E8KZCHR6

1    It's about 20, 30, 35 after, so please be in the jury room no

2    later than five minutes prior to the hour, 2:55 p.m. okay.

3              (In open court; jury not present)

4              THE COURT:  So counsel is aware, we received a phone

5    call from -- people can be seated -- from the jury department.

6    We received a call from the wife of one of the jurors that she

7    has fallen and is being taken to the hospital.  So he's just

8    being informed now, and I ask that he be allowed to call her to

9    see what the situation is.  And depending on what he tells

10   us -- obviously, if he has to leave, my inclination would be to

11   relieve him and replace him with one of the alternate jurors.

12   Okay.

13             MR. BAUER:  Sure.

14             MR. GREENFIELD:  You know which juror it is, Judge?

15             THE COURT:  I do.

16             MR. GREENFIELD:  Could we know?

17             MR. BUCHWALD:  Your Honor, could I proceed with

18   motions if --

19             THE COURT:  Okay, sure.

20             MR. DRATEL:  First I think each of the defendants

21   wants to make the motion at the end of the case.

22             THE COURT:  Okay.

23             MR. BUCHWALD:  If I can move.  Rule 29, I have

24   specific motions directed toward the summation and a mistrial

25   if I can address that at this point.

E8KZCHR6

1          THE COURT:  Okay.

2          MR. GOLTZER:  Do you mind if I go first?  I have to

3     run out.  Forgive me.

4          I renew the Rule 29 motion based upon the same

5     records.  With respect to the Government's summation, the

6     parade of errors oars that we anticipated would happen in terms

7     of guilt by association, gang membership, propensity evidence

8     and the like came true.  I think that the Government's

9     summation used that limited evidence far beyond its intended

10     and proffered purpose.  It was unduly prejudicial violating

11     Mr. Whitaker's right to a fair trial within the meaning of the

12     due process clause of the Fifth Amendment.  I respectfully move

13     for mistrial.

14          THE COURT:  Application is denied.

15          MR. GOLTZER:  May I be excused?

16          THE COURT:  You may.

17          Mr. Buchwald.

18          MR. BUCHWALD:  We renew our overall evidence, our

19     overall motion at the end of the case.  We believe all of the,

20     with respect to each of the counts, reasonable jurors could not

21     conclude beyond a reasonable doubt that the defendant Thomas is

22     guilty, and so we renew our motion at the end based on the

23     totality of the record.

24          With respect to the summation, my brother, Mr. Bauer,

25     kept referring to the gun conviction before your Honor.  The

E8KZCHR6

1    undisputed record is that that had -- well, first of all there

2    is no indication whatsoever that that gun had any relationship

3    to drugs.  There is no indication that that gun had any

4    relationship to robberies.  As a matter of fact, Mr. Mallory

5    himself testified that they were not -- that they were not

6    connected with the robbery that gave the basis of the probable

7    cause for the stop of Mr. Thomas, that there had been a robbery

8    down the street involving a prostitute, and that there was no

9    involvement with that.

10           What was being done is simply an argument that he had

11   a gun in 2011 and that that somehow is proof.  And the only way

12   that that can be interpreted is as propensity evidence.

13           We move for mistrial on that basis and on the basis

14   that Mr. Goltzer outlined.

15           We would also ask for a specific instruction to the

16   jury that they may not consider his possession of that gun,

17   Mr. Thomas' possession of that gun, as evidence of, in any way,

18   shape or form of guilt with respect to counts three or six or

19   indeed any of the counts against him.

20           THE COURT:  Okay.

21           Mr. Bauer, do you -- well, just to address that

22   specific point on the --

23           MR. BAUER:  I don't know if you required a response.

24   Judge, first of all, you already ruled on the admissibility of

25   the evidence of that gun arrest.  The elements of 924(c) is

1   possessing a gun during the conspiracy.  So of course it's

2   probative to the charge to the gun charge.

3           Also, there was evidence, I have discussed it, and it

4   came out during trial that why do people have guns?  They have

5   guns to protect themselves while they're either doing robberies

6   or selling drugs.  It did occur to me, and I thank Mr. Buchwald

7   for reminding us so Mr. Nawaday can put it in his rebuttal,

8   that one other piece of evidence that was that when, when Jamar

9   Mallory gave Gucci drugs, he had the gun with him, so there is

10  a direct correlation.  I think I might have skipped over that

11  when I was trying to speed up my end there, but Mr. Nawaday

12  will be sure to hit that.  But for a variety of reasons we

13  oppose everything he's saying.

14          THE COURT:  I'm sorry, Mr. Dratel did you wish to

15  reply?

16          MR. DRATEL:  Well, I think that couple things.  One is

17  that I think with respect to counts one and two, I think the

18  jury needs to be instructed, based on the Government's

19  summation, the jury needs to be instructed that that gun, 22,

20  cannot be -- because the government had not made an allegation

21  that gun is involved, the gun Mr. Thomas was found with in

22  2011, that they cannot use that for counts one and two or four,

23  because it cannot be relation to that.

24          With respect to count six, I agree with everything Mr.

25  Buchwald said.  But in addition I think what the government,

E8KZCHR6

1    what Mr. Bauer did and, you know, you hear it once and he's got

2    a visual of it at the same time, so -- but my recollection is,

3    and I don't know precisely what the language is -- my

4    recollection is that Mr. Bauer at one point said that the gun

5    possession, in the context of the robberies, could be used, and

6    that the robberies were a basis for the drug count and for

7    count six.  He had them all up at the same time.  It cannot be

8    the basis for count six.  Count six has to be in relation to a

9    narcotics crime, not a robbery.  And I think that has to be

10   made clear to the jury, the Court's instructions are including

11   the abstract in the context of this particular summation.  I

12   think they have to be made more clear as to what the limits

13   are.  And also that the, that even the -- and that the mere

14   possession of that 22 is not sufficient, on February 28, 2011

15   is not sufficient for any count, for any weapons count.

16   Because the Court's instructions made clear -- but again I

17   think this because of the summation has to be more clear, but

18   that there is simply having a gun in the course of a drug

19   transaction is not sufficient.  It has to be used in some way.

20   The case law is pretty clear on, that I think it is crystal

21   clear on that.  So I think that in light of the summation I

22   think we have to have it brought to the jury's attention in a

23   way that eliminates the possibility that they're influenced by

24   that in a way that is contrary to what the law is.

25            THE COURT:  Mr. Bauer?

E8KZCHR6

1              MR. DRATEL:  Judge, I think your instructions are

2      pretty clear that possession of a gun simply alone does not

3      satisfy the elements of 924(c).  It's during and in relation

4      to, and your instruction are very clear, this is just one part

5      of it.  Mr. Dratel is right.  Possession of that gun alone does

6      not make him guilty of the crime.  It's the other evidence that

7      makes him guilty of the crime in concert with that.

8              To the extent that Mr. Dratel or Mr. Buchwald are

9      asking that you clarify for the jury that it can't be the same

10     gun for the 924(c) charges, I believe that's legally accurate.

11     I don't -- I was not fully paying attention to the jury charge,

12     focusing my closing.  So I don't remember.  But to the extent

13     it's not in there, I think that is legally appropriate.  So

14     perhaps we can look at that.  I think everything else, though,

15     they're saying is, it's argument.  And with regard to the

16     instructions your instructions are adequate.

17             THE COURT:  Well, why don't you take a look at the

18     instructions here, Mr. Nawaday and tell me whether you believe

19     that a further amendment is appropriate.

20             MR. BAUER:  Okay.  To be clear, the only thing that I

21     think is even necessary to look at is whether you're clear that

22     it needs to be a different gun for counts five and six.

23             THE COURT:  Okay.  And we're also expecting a further

24     instruction from you concerning the type of narcotics.

25             MR. BAUER:  Yes.

E8KZCHR6

1           THE COURT:  Mr. Strazza.

2           MR. STRAZZA:  I just wanted to make a record that on

3   behalf of Mr. Christian we are also renewing our Rule 29

4   application at this time based upon the record, and we join in

5   co-counsel's arguments with respect to the motion for a

6   mistrial.

7           THE COURT:  Okay.  Again I believe I denied the motion

8   for mistrial.  The Rule 29 motions are also denied for the

9   reasons stated prior.

10          Okay, so we have about 12 minutes.  Don't be late.

11          MR. BAUER:  Till when, 2:55?

12          THE COURT:  55.

13          (Recess)

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

E8knchr7

|     |                                                                         |
|-----|-------------------------------------------------------------------------|
| 1   | THE COURT:  The juror has communicated with his wife.                   |
| 2   | She is not in the hospital, but they do have a newborn.  I               |
| 3   | still don't know what he wants to do, but she is home with the          |
| 4   | baby.                                                                    |
| 5   | MR. GOLTZER:  Whatever you think.                                        |
| 6   | THE COURT:  I am going to leave it up to him.                            |
| 7   | We are going to release him if he wants to go and be                     |
| 8   | with his wife.  It is Mr. Demas.                                         |
| 9   | MR. GOLTZER:  He would be distracted anyway.                             |
| 10  | THE COURT:  Yes.  Absolutely.                                            |
| 11  | (Jury present)                                                           |
| 12  | THE COURT:  Ladies and gentlemen, everyone can be                        |
| 13  | seated.  If we can have a sidebar with Mr. Demas.                        |
| 14  | (At sidebar)                                                             |
| 15  | THE COURT:  Mr. Demas, I understand that you have had                    |
| 16  | a family emergency that you need to deal with?                           |
| 17  | JUROR:  Yes.                                                             |
| 18  | THE COURT:  I have discussed it with the parties, and                    |
| 19  | we agree that we are going to go ahead and excuse you.  You              |
| 20  | will be excused from the jury.  I want to thank you for showing          |
| 21  | up every day and being prompt and paying attention as you have.         |
| 22  | But we are close to the end and I think what we need to do is            |
| 23  | continue with the trial and let you take care of your family.           |
| 24  | OK?                                                                      |
| 25  | JUROR:  All right.                                                       |

1          THE COURT:  With the thanks of all of the parties,

2     thank you so much for showing up and doing your duty.  I hope

3     that everything is well with your family.  OK?

4          JUROR:  Thank you.

5          THE COURT:  Yes, sir.  You have a good day.

6          (In open court)

7          THE COURT:  Ladies and gentlemen, unfortunately,

8     Mr. Demas had to deal with a family situation.  With the

9     consent of the parties he has been released from the jury.

10         Ms. Yul, would you please take seat No. 10.

11         THE COURT:  With that I believe Mr. Goltzer on behalf

12    of Mr. Whitaker will make the first closing on behalf of the

13    defendants, for the defendants.

14         MR. GOLTZER:  Thank you, Judge.

15         May it please the Court, ladies and gentlemen of the

16    jury, good afternoon.  I listened with great interest to my

17    learned adversary's summation, as I'm sure you did.

18         As he was describing the scene in the apartment what

19    popped into my mind was a moment when Mr. Baynes was on the

20    witness stand and the government after its opening statement

21    and after my opening statement had started to change its theory

22    about the fable of blood being on Mr. Whitaker.  And the

23    government said to Mr. Baynes, I forget which prosecutor it

24    was, Tell us, Mr. Baynes, as you were running out of the

25    apartment trying to get away from the scene of this terrible

1    chaos and this terrible robbery, did you happen to brush up

2    against Mr. Whitaker so he could get blood on himself?

3           And Mr. Baynes said, No, it never happened.

4           Why is that significant?

5           I spent a lot of time questioning Mr. Frederick, who

6    wears many hats up in Newburgh, about the outer clothing and

7    the blood, and I spent a fair amount of time questioning the

8    medical examiner about the internal bleeding of the unfortunate

9    Mr. Henry.

10          The reason I did it, and I think you will understand

11   it, is that it's clear that if you believe Mr. McDermott, you

12   believe for a minute that he's telling you the truth about

13   Tyrell Whitaker being covered, as he said, with blood from his

14   solar plexus to his thighs, then you will likely believe that

15   Tyrell Whitaker is guilty of taking part in the robbery on

16   December 15, 2010, and being guilty not only of the robbery,

17   but of the possession of a weapon under circumstances involving

18   murder in the first degree.

19          If you believe that, it would be a terrible tragedy,

20   because he's not guilty.  And the government changed its

21   theory.  As they opened they said somebody said, Go through his

22   pockets.  Now we know and the government now concedes in its

23   closing statement that that could not have happened.  There was

24   no blood on the outer clothing.  There wasn't enough blood on

25   that red jacket to take a swab of it.  When they went to the

E8knchr7                          Summation - Mr. Goltzer

1    unfortunate Mr. Henry at the second location, his clothing was

2    closed.  There was no blood trail between the first and the

3    second location, and when they went through his pockets later

4    on they found crack and a wallet.

5           It never happened.  If anybody said that on a tape, it

6    never happened.  No robber went through his pockets.

7           How, then, does Mr. McDermott come up with Tyrell

8    Whitaker being covered with blood?  He says it happened.  Could

9    he be lying?

10          Well, of course he's lying.

11          Number one being Tyrell Whitaker wasn't even there.

12          Number two, if you listen to the testimony of the

13   witnesses in the case that they claim are telling the truth,

14   primarily Mr. Baynes, and you look at the diagram that

15   Mr. Baynes put on the board, if it was him, and it wasn't, he

16   couldn't have come in contact with blood.

17          So what they do after my opening statement is they

18   take McDermott into the back room two weeks ago, and now they

19   change things around.  He wasn't covered with blood as I told

20   them so long ago from his solar plexus to his thighs, no.

21   Actually, it was little polka dots.  Do you remember that?

22   Little polka dots, as if somebody had splashed water on the

23   wall.

24          The government says, Don't worry.  Everything's fine.

25   The evidence is overwhelming.

1           I have the greatest respect for my learned adversaries

2      at this table.  They are employees of the United States

3      government.  They went to law school, as we did; they get paid

4      a salary, as we do; and, like most of us, with the exception of

5      Ms. Stafford, they put their pants on one leg at a time.  She

6      wears a skirt most often.

7           Anybody who can tell you with a straight face that the

8      case against Tyrell Whitaker is overwhelming has been smoking

9      too much of the product that Mr. McDermott was selling in

10     Newburgh, and that's the truth of it.

11          We are here because Tyrell Whitaker pled not guilty.

12     We are here because, unlike the witnesses they called, he chose

13     not to put faith in the government.  He chose to put faith in

14     you.  He said, I want a jury trial.  I plead not guilty.  I am

15     not guilty.  They have to prove the case beyond a reasonable

16     doubt, and I tell you they've not done it.

17          The case against Tyrell Whitaker when the icing is

18     scraped from the cake comes down to Baynes, Mallory and

19     McDermott.  I will demonstrate to you that every one of those

20     three witnesses has perjured himself in this courtroom.  They

21     did it in front of you.  I will show you what it is and I will

22     show you it is material and significant lies that they have

23     told.

24          One of the things I am afraid of is that you will say,

25     How can you say that about people?  I mean, they took an oath.

E8knchr7                    Summation - Mr. Goltzer

1    Why would they lie if they took an oath?

2         You have not been exposed to this variety of creature

3    in your normal lives.  This is not the common experience that

4    you have gone through over the last months or years.  You have

5    not met and dealt with people like this.

6         You have to suspend the common ideas you have about

7    the human condition to understand who these people are and how

8    they are prepared and what's been going on.

9         They say there are two things in this life that you

10   don't want to be a part of:

11        Number one, you don't want to be in the back of a

12   butcher shop when they are making the sausage, because you

13   don't want to know what goes into it; and,

14        Number two, you don't want to be in the back room when

15   these guys are being prepared for 50 hours to testify in front

16   of a jury.

17        So they've got three witnesses against Tyrell Whitaker

18   and a tape, and we're going to talk about that tape at length.

19        Before I do that, I want to let you know that the two

20   hardest working people in this courtroom are the court

21   reporters.  They have taken down every word that's been

22   uttered, and taking down the words of those couple of witnesses

23   had to be the toughest job that they have ever had.

24   Impossible.

25        I have read the 2,000 pages or so of this transcript

E8knchr7                    Summation - Mr. Goltzer

 1    more than once.  So have the other lawyers in the case.  It is

 2    a tremendous responsibility trying a murder case when you are

 3    representing a young man who is presumed innocent in a federal

 4    court of law.  You really need to work hard.  You need to read

 5    the record; you need to read the prior statements; you need to

 6    stay up real late at night.

 7           We all make mistakes.  We all miss things.  That

 8    record is available to you.  Every word of this trial has been

 9    preserved accurately by these hard-working reporters.  I

10    encourage you, if there's something we say that you think is

11    wrong, and your notes don't reflect it, go back to the

12    transcript.  Take your time.  It's too important not to.

13           Before I talk to you about the witnesses, I want to go

14    through some general principles.

15           Number one, my folks always told me it was impolite to

16    point a finger at somebody.  Prosecutors like to point fingers.

17    These three men.

18           No, no, no.  I don't represent three men.  I represent

19    one young man.  His name is Tyrell Whitaker, and I represent

20    him along with Ying Stafford.  There are three separate trials

21    going on here, as the judge will tell you.  Each of these

22    trials represents one of these young men.

23           I am going to talk to you about the case such as it is

24    against Tyrell Whitaker.  I am not going to say anything to

25    step on my colleagues' toes.  I'm not going to comment about

E8knchr7                        Summation - Mr. Goltzer

1    their clients.  That's not my place.  I will talk to you about

2    Tyrell Whitaker.

3              You have heard a lot of evidence in this case about

4    guns, drugs, gangs, Lord knows, Newburgh, New York.

5              Part of the psychology of a trial in the effort to win

6    a trial is to get you to be afraid of the man on trial.  It is

7    to get you to dislike the man on trial.

8              MR. BAUER:  Objection, your Honor.

9              THE COURT:  Overruled.

10             MR. GOLTZER:  They will deny it.

11             THE COURT:  I overruled the objection.

12             MR. GOLTZER:  They will deny it, but that's the way it

13   works.

14             I hope and I pray that you will be strong enough to

15   follow the Court's instructions and to follow your oath.  If

16   you believe that Tyrell Whitaker sold some drugs out there on

17   the streets of Newburgh to make a couple of extra bucks because

18   he grew up on the hardscrabble streets and didn't have a real

19   job for a while, so be it.

20             But you are not going to solve the problems of the

21   world by convicting an innocent man of a murder he didn't

22   commit because you don't like the way he made a few extra

23   dollars.  That's not the way it works.

24             If you believe that a couple of days before this

25   tragedy he brought back a gun from a robbery that he didn't

1    commit as reflected on the Burden tape, that's not a reason to

2    convict him of a murder that he didn't commit.  That is nothing

3    that I would justify if it were true, but he's not charged with

4    possesssing a gun two days before on a robbery that never

5    happened.  He's not charged in this indictment with reaching an

6    agreement with anybody or conspiring to commit other robberies,

7    and he's not charged in a drug conspiracy.

8            He is charged with one simple event, the December 15,

9    2010 robbery.  If you are not convinced beyond a reasonable

10   doubt that he took part in that particular narrow crime, he is

11   absolutely entitled to your verdict of not guilty, and it

12   doesn't matter what you think about the life he used to lead,

13   his lifestyle, or who his friends are.

14           Gangs.  You have heard so much about gangs, and,

15   again, it's hard for me to understand why.  No one suggests

16   that Mr. Christian was in a gang with the other two gentlemen.

17           They called Mr. Evans to the stand.  I didn't.

18   Mr. Evans was the best of friends with Burden.  You heard him

19   say it, their witness.

20           Was Mr. Whitaker a Blood?

21           No, he was not.

22           Was Mr. Whitaker obliged to take orders from anybody

23   in the Bloods, be it L-1 or Mr. Kevin Gotti, Burden?

24           No.

25           There were associates or hangers on who were permitted

1    to sell a couple of decks of heroin or a little bit of crack on

2    the street?

3              Yes.

4              You were a Blood for a number of years.  You were

5    involved in a case out of this very office where they indicted

6    and arrested 72 or 73 alleged members of the Bloods as part of

7    an enterprise, weren't you, Mr. Evans?

8              Yes, I was.

9              Was he part of that enterprise?

10             No.

11             Was he part of that indictment?

12             No.

13             Were they part of that indictment?

14             No.

15             Were they part of that enterprise?

16             No.

17             Yet with a straight face my learned adversary stood up

18   before you and said it was all about the Bloods.  He was a

19   Blood.

20             If that wasn't enough, they called Danielle

21   Williams, the charming lady who arranged for the robbery of her

22   sister's husband while her sister was suffering from cancer.

23             One, of course, needs to understand Ms. Williams.  She

24   wasn't arranging for the robbery of her sister.  She was

25   arranging the robbery of her sister's husband.  That's her

1    rationalization.  God bless her.  She was cooperating with the

2    government while she was still intimate with Double O,

3    Mr. Boykin, the head Blood, the head of the enterprise.

4              Did I say something wrong?

5              (Counsel conferred)

6              MR. GOLTZER:  Some Boykin, the head of the Bloods,

7    right?

8              MR. BAUER:  Yes.

9              MR. GOLTZER:  I said something wrong.  It happens.

10   We're human.  So she's intimate with this guy who's the head of

11   the Bloods.  The king of the enterprise, the man who keeps the

12   books.  She's taking messages to and from the Bloods.

13             She knows Tyrell Whitaker, who is affectionately

14   called Bow Wow by everybody, and she knows him as a kid who

15   hangs out with her son who she affectionately called Smoke.

16   You can't make it up.

17             They said to her, was he a Blood?

18             What was her answer?  Not that I know of.

19             Well, who would know?  McDermott?  The fly on the

20   wall, who hears all the meetings when he's not supposed to be

21   there?  Baynes, who we will talk about in a little while?

22             Mallory.  That creature.  They say he is a blood.

23             The two people who knew most about the Bloods in this

24   courtroom told you he wasn't a blood.

25             This fellow Evans got together with their absent

1   witness, Burden, twice a week for years.  And he sat down with

2   Burden over drinks, to say the least.  And when the sun went

3   down Burden would begin to drink.  Burden would drink three

4   bottles in a night, Hennessy, vodka, God knows what else.

5        Burden was an alcoholic.  Burden's brain was likely

6   fried.  He didn't see him on Monday through Friday according to

7   his testimony.

8        But do you think an alcoholic like that didn't drink

9   during the week, and he only drink six bottles of booze on the

10  weekends?

11       Out of all the things that Evans told you about

12  Burden, he never told you that Burden told him that he was a

13  Blood.  Quite the contrary.

14       Of all the things that Burden may have confided in

15  him, he never told him that Bow Wow was involved in a killing.

16  The only person who claims to be able to tell you that he was

17  covered with blood and was involved in a killing was McDermott

18  and Mallory.

19       Let's spend a couple of minutes talking about

20  Mr. McDermott.  Interesting fellow.  He claims that Bow Wow

21  came to the house covered with blood -- or sprinkled with

22  blood.  Now it's different.

23       Is he a credible person?  Is he on honest person?  Is

24  he someone you would trust in your own affairs?

25       Let's see how reasonable his testimony was.

1          He told you a story about a guy named Snelly.  The

2    reason I'm telling you this is if you find that a witness lied

3    about one thing, that's important.  The judge will tell you

4    that you are entitled to throw out all of the witness'

5    testimony, because if somebody is willing to lie about

6    something that's important in a courtroom, they can lie about

7    everything, and you don't have to believe anything they say.

8    You can take part of it if you like, but you don't have to.

9          So, here I am.  My name is McDermott.  I am a dancer.

10   He came here on a workman's visa, with my manager at the age of

11   15.  A wonderful country, the United States.  It gave me a

12   chance to go to the place of my dreams, Schenectady, New York.

13         After I went to Schenectady, I decided to go to the

14   garden spot of New York, Newburgh New York.  There I decided

15   that I could make $10,000 a week until that crafty defense

16   lawyer reminded me how much money I wasn't paying taxes on, and

17   then it occurred to me that most weeks I was losing money.  But

18   that's OK.  I was making $10,000 a week.  And I used to sell

19   out of this little spot at 260 First Street or First Avenue in

20   Newburgh.

21         I was hearing everything that went on.  It was

22   convenient.  It really was.  I was there when they talked about

23   planning a robbery.  I was there when he came back with blood.

24   I was there later on when people were confessing.  I'm a lucky

25   guy because it gives me something to sell to the government to

1    avoid being deported so I don't get killed.

2            And this guy Snelly, I don't know, he comes up to me,

3    and he's ten feet away, and he pulls out a .357 magnum, right?

4    A gun that Dirty Harry would be proud of.  And he points the

5    gun at me and he pulls the trigger and he says, You better not

6    talk.  It wasn't very close because it only went through my

7    shirt on the left side.

8            Did you think he was trying to hit you?

9            No.

10           Did you think it was a charitable act on his part?

11           No.

12           Did you think he was like Anne Oakley and he was such

13   a good shot that he could put the bullet through your shirt?

14           Objection.

15           Overruled.

16           No.

17           Did you get the idea that the Bloods were trying to

18   kill you?

19           Could be.

20           Did you hire a bodyguard with the $10,000 that you

21   were earning?

22           No.

23           Did you buy a bulletproof vest with the $10,000 that

24   you were earning?

25           No.

1        Did you take any efforts to protect yourself?

2        No.

3        Did you run away?

4        Well, I stayed away.

5        For how long?

6        Two months.  Wait, wait, excuse me.  Let me change my

7   answer.  Two days.

8        There were a lot of Bloods in Newburgh?

9        Yes.

10        You thought they might want to kill you?

11        Yes.

12        Are you brave or crazy or both?

13        No.

14        And then I asked him a simple question:  Why didn't

15   you run away?  Do you remember that?

16        And he sat there.  He looked like the deer in the

17   headlights.

18        There is a rule among lawyers.  It is a very good

19   rule.  Judges will tell you it's the same rule too.  Never ask

20   a witness why.  Because if you ask a witness why, they could

21   say anything in the world and they can just destroy you.

22   There's only one time you can break that rule, and that's when

23   you know the witness can't answer the question.

24        Why didn't you run away?

25        And he sat there shaking his head.

1              I don't know, no reason, or words to that effect.  I'm

2      not quoting him verbatim.

3              That's Mr. McDermott.

4              Let me ask you a question.  Do you think that this

5      fellow Snelly actually fired the .357 magnum at Mr. McDermott?

6              Do you think that ever happened?

7              If someone from the Bloods had fired a gun at

8      Mr. McDermott and came within a half an inch of putting a .357

9      bullet into his torso, where would he have gone?  California?

10     Cleveland?  Syracuse?

11             Would you have stayed in Newburgh?  Would anybody have

12     stayed in Newburgh?

13             He didn't have a wife and child here.  He didn't have

14     a business that he couldn't move to Colorado where they don't

15     arrest people for selling $10,000 worth of weed a week.

16             What's that about?

17             The government says it's an overwhelming case.  These

18     guys are wonderful witnesses.  They have every reason to tell

19     the truth.  Maybe the government thinks they have every reason

20     to tell the truth, but you have to know they are lying.

21             The government says, yeah, they told lies back in the

22     day, but they don't lie now, because they want the letter.

23             That is a whole other topic that I'm going to talk to

24     you about now.

25             If you think that what I'm telling you is damaged

1    goods, don't accept it.  Don't tell me to sit down because I'm
2    not done yet.  But just don't accept it.

3           You don't have to listen to me.  I'm just a lawyer.
4    And you don't have to listen to them, because they are just
5    lawyers.

6           They like to say we represent the United States of
7    America.  If they put Lois Lerner on the stand, they would tell
8    you she was telling you the truth about the e-mails, that the
9    seven computers just happened to die.  That is your government,
10   too.  Don't buy into it.

11          By the way, this government has technology that is so
12   fantastic that they can read your license plate probably from
13   the other side of the moon.  That is how good it is.  They can
14   get phone records.  They have cell sites that can tell you
15   where the telephones have been.  They can trace your movements
16   and the movements of your friends.

17          They haven't done it in this case.  If everybody had a
18   cell phone, why don't we have cell phone records.

19          The judge will tell you they don't have to do
20   anything.  They are not required to do things.  That is true.
21   They are not legally required to do it, but you are entitled to
22   consider its absence if you wish.

23          We have this notion that their witnesses are supposed
24   to tell the truth.  Here you have this character McDermott, who
25   gets involved in a robbery and says to the police, I was just

1   going to buy a bag of weed.  Three people were giving me a ride

2   to buy a bag of weed.  I went into the store.  I don't know

3   what happened.

4           I mean, these guys pulled guns.  What was that about?

5           I started to leave, somebody stabbed me, I stabbed

6   him.  I don't know where I stabbed him, although I did tell

7   them back then that I stabbed him in the head, though he

8   doesn't president to admit that to you.

9           He seems to remember that one of the guys was wearing

10  a certain kind of shirt that happens to match the shirt that he

11  was wearing and sneakers that happened to match, and the guys

12  had blood on them.  It is not a big deal.  It is just that New

13  York is a remarkable environment for coincidence.

14          Probably the best question in the trial was asked by

15  Mr. Dratel:  Didn't you just take that description and transfer

16  it to this case?

17          I wouldn't do that.

18          He keeps his mouth shut about all this stuff until he

19  gets picked up for the assault, and he realizes he didn't beat

20  it, and he takes a plea in front of a state court judge and he

21  gets a promise of seven years -- not 25, seven.  But that is

22  not good enough for him.  So now he comes forward and says, I

23  can help you on this case.

24          He's been in the Orange County jail with another one

25  of their witnesses, and after he's been in another jail with

1    the third witness against this man, who happened to tell him,

2    Baynes happened to tell him who was involved in the case, and

3    you don't think Mr. McDermott was smart enough to figure out

4    what he was supposed to say?

5         They were friends and they were close and there's no

6    tape and you don't know what they talked about or how they

7    talked about it.

8         The government says, You think there was a conspiracy,

9    as if to mock the argument.  You better believe there was a

10   conspiracy.  Every one of their witnesses knew what they had to

11   sell, and they did their best to sell it.  Of that there is no

12   doubt.

13        He is going to be deported.  Now they call it removal.

14   He is going to be sent back to Jamaica after he serves the

15   better part of seven years in the penitentiary.  As far as he's

16   concerned, he is going to die when he gets there because of

17   some situation involving his father.  He was asked pointblank,

18   Would you lie to save your life?

19        His answer, after a great deal of pause and

20   reflection:  Anybody would.

21        He lied to the police back in the day.  He's willing

22   to lie to save his life.  He's lying to you about Snelly.  He's

23   lying to you about the blood.

24        If you accept my argument, you have to take him and

25   throw him out of the case.  By the way, I don't have to prove

1    to you that he's lying.  They have to prove to you that he's

2    good and telling the truth.  How does that sound for an

3    assignment for my learned counsel, for the government?

4           If a lawyer stood up and told you their witnesses got

5    together and talked about this case before they cooperated you

6    would say, You're paranoid.  But it's true.

7           To show you what a remarkable environment for

8    coincidence New York State is, isn't it strange that both of

9    these men began to cooperate in January of 2012?

10          Yes, Mr. Mallory and Mr. McDermott, both began to

11   cooperate in January of 2012 after they had spoken to each

12   other in jail.  Baynes knew that he had to get support for his

13   story to get his deal.  He knew Mallory, he knew McDermott, and

14   they talked.

15          Who is dealing more in speculation, me or Mr. Bauer?

16          If I tell you they talked and you can't trust it and

17   you don't know what they talked about, so you can't assume they

18   didn't talk about this case and conspire, am I speculating more

19   than Mr. Bauer when he says they must have traded guns or they

20   could have traded guns?

21          When Mr. Nawaday gets up in his rebuttal summation, I

22   challenge him to show you one syllable in this evidence that

23   anybody traded a gun.

24          Why does Mr. Bauer have to suggest to you that

25   somebody could have traded a gun?

1          It's not complicated.  It goes back to Mr. Baynes.

2     Speaking of Mr. Baynes, I read this record so closely.  Yet, as

3     I was listening to the closing statement, I heard Mr. Bauer say

4     according to Baynes, Baynes didn't have a mask.  Remember?  He

5     goes to the scene at Chambers Street and tells you that the

6     men, the victims are robbed outside.  And Bow Wow said to him,

7     Mr. Baynes was told by Bow Wow, stay outside, you don't have a

8     mask, you will be the lookout.

9          And I recalled, don't ask me why, page 481 of the

10    transcript.  If you are going to take a note of the page of a

11    transcript, take a note of page 481, because it is on that page

12    where he says that.

13         He says, Bow Wow said to me, you don't have a mask,

14    you stay outside.  You be the lookout.  It's on the same page

15    where he says those guys pulled their guns and outside of the

16    building robbed those people before they went in.

17         And my dear colleague, Mr. Bauer, states it as if it

18    was holy writ etched in stone brought down from the mountain by

19    Moses, because it was said under oath:  It's got to be true,

20    because he's got every reason to tell the truth and he's got no

21    reason to lie.

22         But it occurred to me, there is a minor problem with

23    that premise, Mr. Bauer.  You see you called a guy named Boone,

24    who didn't want to be here.  He was the well-built fellow who

25    claims he was brought into the bathroom because nobody wanted

1   to fool with him.  That you can believe.  I wouldn't want to

2   get into a fight with him either.

3        And Mr. Greenfield said to him three or four times,

4   Listen, I want to make sure:  You are a victim.  You don't want

5   to be here.  You are getting home in six weeks.  You want a

6   letter.  Maybe you'll get home a week earlier, who knows.  But

7   you are going to get a letter.  You are not looking at life in

8   the penitentiary.  You are getting immunity for other crimes.

9   You're here because you have to be here.  Their witness.

10       Did anybody pull a gun on you and rob the guys who

11  were standing outside?

12       Never happened.

13       Right?

14       Are you sure it never happened?

15       I was there.  It never happened.  Stop asking me the

16  question.  I told you that already.

17       Never happened, their witness.

18       They called Smith?

19       Smith was another victim.  He's inside, and he's

20  inside with Boone.  He is another guy.  I don't want to be

21  here.  I don't need to be here.  The government:  Here's an

22  order; you got to be here.  The Court:  Here's an order, you

23  got to be here.

24       You stabbed somebody?

25       I did.  I stabbed the son of a bitch twice.  He tried

 1    to rob me, pulled a gun on me, wrestled the gun away.

 2              Did he have a mask?

 3              They all had masks.

 4              Who did he stab?  Baynes.

 5              Their two witness:  Baynes had a mask.  Baynes was

 6    inside.  Baynes was a robber.  Baynes swore under oath.  Bow

 7    Wow told Baynes because I don't have a mask you stay outside

 8    and be a lookout.

 9              If the two witnesses called by the government who were

10    victims of the crime, who were involved in a struggle with a

11    masked robber who was stabbed and who was Baynes, who are

12    corroborated by the blood, the real blood in this case, if

13    those two witnesses or even one of them are telling the truth,

14    then Baynes lied about him about something important, about

15    something material, and that's just the beginning of

16    Mr. Baynes.

17              I asked a couple of witnesses whether they ever

18    falsely accused somebody of a crime, a serious crime.

19              We will get to Mallory in a minute, a few minutes.

20              I asked Mr. Baynes if he had been provided with

21    Miranda warnings.  Do you remember that?

22              We introduced into evidence a very simple piece of

23    paper.  It is a Miranda warnings form with Mr. Baynes'

24    signature on it.

25              I asked Mr. Baynes whether that was his signature on

1    it.  He said it looked like his signature.  It was his

2    signature.

3              I asked him if he signed it.

4              His response was telling, not only was it telling, it

5    was stunning.

6              Well, there are computer-generated signatures you

7    know.

8              Did you ever get Miranda warnings?

9              Never happened.

10             You see the names of two detectives on here.

11   Detective Cortez and Detective Staton.  They signed it.  By

12   signing it, they were saying that they gave you these warnings

13   and these were your answers and they had this conversation.

14             Never happened.  Could be a forgery.  False, lies.

15             We have a stipulation that was read to you by

16   Ms. Stafford today.  It says that there was a hearing up in

17   Orange County called a suppression hearing.  She read you the

18   Cortez testimony which he gave under oath.  He said, I gave him

19   his Miranda warnings.  I had the sheet and I read off of the

20   sheet.

21             I said to the man, do you know you have a right to

22   remain silent and anything can be used against you?

23             Yes.

24             Do you understand?

25             Yes.

1            You have a right to a lawyer?

2            Yes.  It's all on here.

3            And what did he say to you?

4            He said, I understand.  I'll talk to you.

5            Don't you understand that Mr. Baynes is either

6     suffering from a terrible mental disability in terms of his

7     memory, or else he is falsely accusing police officers of

8     perjuring themselves under oath at a hearing up in Orange

9     County when they swore on a bible that they gave him the

10    warnings and he signed it.

11           What the heck is that about?

12           Another reliable witness, Mr. Bauer.  Someone else we

13    can readily believe, Mr. Nawaday.

14           Folks, please, this is too important for that kind of

15    thinking.

16           So Baynes, who is not a lookout, Baynes who is a

17    robber, Baynes who's got a mask, Baynes who's got a gun, goes

18    into the premises, and he gets stabbed.  Of that there is no

19    dispute.

20           And he goes to the hospital, and he's sitting there at

21    around 12:30 in the morning.  And he decides that he's going to

22    lie his way out of it.  As he said in response to my questions,

23    I was going to mix truth and lies.

24           There is a new program on TV.  It's called Legends.  I

25    haven't seen it yet.  It starts probably tonight.  Maybe I can

E8knchr7                          Summation - Mr. Goltzer

 1    see it because I will be done with my summation tonight.  It's

 2    about a spy who's like an undercover guy for the CIA.  He makes

 3    believe he's somebody else, and he gets involved in these

 4    undercover roles.

 5              What he says, at least in the trailer, You got to make

 6    the lie as close to the truth as possible, because then it's

 7    easier to tell.

 8              If you think about it, that's probably true.  If you

 9    make the lie close to the truth, it's easier to remember.  It's

10    easier to keep straight.

11              So, what does he tell the police?

12              Loscerbo, he basically says to Loscerbo at about 1

13    o'clock in the morning, there are four of us.  It's me, it's

14    Quay Quay, Bash, and Baby E, who happens to be dead.  And those

15    two guys decided they wanted to commit a robbery, not me and

16    Quay Quay.  No, no, no.

17              Heaven forbid that we should be involved in a robbery.

18    We were walking down -- no, first he says I was walking down

19    the street, and I saw a group of guys and they shot me.

20              That wasn't going to work.  Then he says, They wanted

21    to do a robbery, and we left.  And then we went back to see if

22    they were going to do the robber, and then I got shot.  One of

23    them had a silver revolver, a chrome revolver.  The other one

24    had a gun, too.

25              The government said in its opening statement he lied

1   to protect his friends.  Well, he wasn't lying to protect Bash

2   and he wasn't lying to protect Baby E.  He was lying to protect

3   himself, and he was lying to protect his best friend, Quay

4   Quay.  He told any number of lies that he mixed with the truth.

5   He must have given three or four different versions to the

6   police.

7          He told them.  Some of them are in the stipulation,

8   others he admitted on the witness stand.  I can't keep them

9   straight.  But we know that he told any number of lies, and we

10  know that the police confronted him with it.

11         We know you were inside.  Oh, yeah, yeah, yeah.  I'll

12  tell you the truth now.  I did go inside because I wanted to

13  make sure that Quay Quay's brother was OK.

14         So he came up with that excuse.  He came up with

15  excuse after excuse.

16         But there was one constant throughout everything that

17  he said.  He never mentioned Bow Wow.  He never mentioned

18  Tyrell Whitaker.

19         They can't think of and you won't be able to think of

20  any reason that he wouldn't have given him up if he was there,

21  because he didn't have the kind of relationship with Tyrell

22  Whitaker that he had with Quay Quay.

23         And through all the lies and all the evasions, he

24  never mentioned Tyrell Whitaker in the hospital through the

25  hours and hours, as he said, that he was questioned.

1          On direct examination, when asked by the prosecutor

2     what he remembered telling them during the hours and hours that

3     he was questioned, all that he could recall was telling the

4     police, I went into a weed spot to buy weed and I got stabbed.

5     I walked in on a robbery and I got stabbed.  That's all I

6     remember.

7          Do you remember anything else of the hours and hours

8     of questioning?

9          No.

10         Nonsense.  That's under oath here.  Nonsense.

11         Either his brain is fried or he's lying.  In either

12    case, you can't depend on him.

13         Why does the government in its closing statement have

14    to suggest to you, without any support in the record, that

15    these folks traded guns?

16         It is a little complicated.  I beg you, follow me.  I

17    know it's getting late, but his future is on the line, and I

18    need for you to understand this.

19         It has always been the government's contention through

20    the tapes, the Burden/Mallory tape, Tyrell Whitaker on the

21    night of the robbery, and I tell you he wasn't there, had the

22    chrome gun with the wheel, the .38.

23         A weapon that parenthetically, although it is of some

24    interest, could not have killed anyone.

25         MR. BAUER:  Objection.

1           MR. GOLTZER:  That night.

2           THE COURT:  Overruled.

3           MR. GOLTZER:  Because the bullets that came out of him

4   were two semiautomatic bullets.  Obviously, the gun could have

5   killed somebody, but it didn't that night.

6           There's no dispute about that.  In fact, their own

7   expert, Mr. Frederick, was asked by one of these lawyers when

8   he came back the next day:  Do you know now whether you can

9   fire a semiautomatic .380 or a nine-millimeter from a .38?

10          He says, yes.

11          How do you know?

12          I tried it last night, and it doesn't work.

13          So we know that that particular gun didn't kill

14  Mr. Henry.

15          But we also know that Baynes was saying that Baby E

16  had that gun.  If Baby E had that gun on the night of the

17  robbery, he didn't.  No one said there were two silver

18  revolvers.  Quite the contrary.  So to get that gun into Baby

19  E's hands, the only thing they can ask you to assume is that

20  Whitaker gave it to him.

21          But we don't convict people of murder on assumptions.

22  There's no evidence in the case that anybody traded guns.  Why

23  he said it, perhaps Mr. Nawaday will explain to you in the

24  rebuttal submission, but it won't fly.

25          Do you think Baynes, who was mixing truth and fiction,

1   was lying about the silver revolver?  Why would he?

2          He had to give them something.  He had to give up a

3   couple of people.  On the day it happened, in the hospital, he

4   told the police again and again, They both had guns.  One of

5   them had a silver or chrome revolver.  That's the only silver

6   or chrome revolver in the case.

7          They are relying on an absent witness who I'll never

8   get to cross-examine by the name of Burden, an uncurable

9   alcoholic whose brain is probably fried as bad as Baynes.

10         Something interesting happened during that tape, and

11  I'm not for a minute telling you to believe any of it.  It is

12  just an unreliable tape, and we will talk about that.

13         What they can't get over and what Mallory couldn't get

14  over was Mallory says:  Listen let me refresh your

15  recollection.  He thought he was a courtroom lawyer.  Let me

16  refresh your recollection.  It was Bow Wow and Gucci.

17         He didn't give the guy a chance to say hello and

18  finish his drink before he said, Let me refresh your

19  recollection.  It's Bow Wow and Gucci.

20         He knew what his agenda was.  You gave the gun to Bow

21  Wow.

22         What did Burden say?

23         No, I gave the gun to you.

24         Were you happy to hear that, Mr. Mallory?

25         No, no, no.

1          Were you surprised to hear that, Mr. Mallory?

2          Yes, yes, yes.

3          If it's true, if they were talking about the night of

4     the robbery, and if Burden gave that gun to Mallory, Mallory

5     gave it to Baby E.  He never had it.

6          Mallory was talking about him bringing the gun back

7     two days after the robbery.  Do you remember that?

8          On direct examination:  Did you ever see the guns

9     again?

10         Yes.

11         When?

12         Two days after the robbery Bow Wow brought the gun

13    back, complained it didn't work.  Burden said put the gun into

14    your hand and shoot yourself.  No way.  He shot it out the

15    window, put the bullets in it and shot it out the winnow.  If

16    there were no bullets in the gun, how do you know it didn't

17    work.  What do you have, an unloaded gun, and you knew it

18    didn't work?  But put that aside.

19         Then, knowing that on the tape Burden says it was two

20    days before and it involved a robbery that never happened,

21    Mallory says again on direct:  It happened twice.

22         The odds of that particular thing happening twice

23    where he complained about a gun not working two days before the

24    robbery and two days after the robbery seems somewhat far

25    fetched.

1              Was it before or after?

2              I think it was before.

3              Did you see a gun after the robbery?

4              I did.

5              Question on cross-examination:  Did you happen to tell

6    police a long time ago in these proffer sessions when you were

7    supposed to tell the truth, I never saw the guns again after

8    the robbery?

9              I don't remember what he said.  Quite frankly, it just

10   slipped my mind.  But I do remember that under my

11   cross-examination he said, when I told him that I was trying to

12   tell him the truth and he ultimately said, you know what, I

13   never saw the guns after the robbery.

14             So here's Mallory in a court of law in a murder case,

15   being told on a tape, I gave you the gun, I saw the gun before

16   the robbery, I saw the gun after the robbery, now I remember I

17   never saw the guns again.

18             It's the government's position that this is an

19   overwhelming case.

20             It's the government's position that you have nothing

21   to be concerned about.

22             It's the government's position that they have a brick

23   piled on top of a brick amounting to a wall of evidence.  Well,

24   folks if you know the Old Testament Joshua fit the battle of

25   Jericho and the wall came tumbling down.

1          Mallory.  I'm going to go back to Burden.  I will jump

2     back and forth.  You might notice that I'm not using notes.  I

3     have some notes, but I'm not using them.

4          I don't know why.  I just like to talk to folks and

5     look them in the eyes.  Unlike the government lawyers, who have

6     less gray hair than me, I'm probably a creature of the 20th

7     century and not the 21st, and I don't have these multimedia

8     presentations with things going back and forth.  If I wanted to

9     use that, I would have to have my kids come in here and do it

10    for me.

11         It reminds me in a sense, this multimedia presentation

12    by the government -- and I have the highest regard for it.  I

13    wish I could do it.  She has been working really hard,

14    Ms. McInerney, and I want to thank her for her help during the

15    trial.

16         Some of you may know Oliver Stone.  He was a director.

17    He's kind of a little bit to the left of Mao Tse-Tung.  He puts

18    together these wonderful multimedia presentations.  I remember

19    a movie about JFK and everybody conspired, but it was a

20    fabulous movie.  The direction was fabulous.  The special

21    effects were fabulous.  The only problem with the movie is the

22    same problem they had with their movie, the facts are all

23    wrong.  The facts are all wrong.

24         You cannot blithely accept his wall of evidence

25    without looking at the cross-examination.  I understand that we

1  defense lawyers are nothing more than a necessary

2  inconvenience, that we have the temerity to question the

3  reliability of some of the people that they have put on the

4  witness stand, that we have the nerve to question the process

5  by which they sign them up.

6          You know they always say the same thing:  We didn't

7  pick them, they did.

8          And they always present them the same way:  They have

9  every reason to tell the truth.

10         We lawyers have a name for those cooperation

11 agreements.  You know what it is, jury food.  They're feeding

12 you jury food.

13         There's only one problem with the plate that they're

14 putting in front of you.  Did you ever read those stories about

15 the picnic where everybody brings food to the picnic and 150

16 people suddenly double up and they're sick as a dog because

17 something was tainted?

18         It's like they are bringing you this stew and they

19 went out and knot the best vegetables, but they got tainted

20 meat, and they want you to pull the tainted meat out of the

21 stew and eat it.  What we're telling you is, if it is tainted,

22 throw it out.  Don't accept it.

23         A word about Mr. Mallory.

24         Would you falsely accuse somebody of committing a

25 serious crime?

1          Uh-uh, not me.  Wouldn't do it.  Wouldn't consider it.

2     Wouldn't dream of it.

3          Is that, Mr. Mallory, because falsely accusing

4     somebody of a serious crime is an evil thing to do?

5          It is.

6          A vicious thing to do?

7          It is.

8          A cruel thing to do?

9          That's right.

10          What did you do to L-1 when you claimed he shot

11     Burden?

12          What?

13          Well, weren't you accusing somebody of a serious crime

14     that he didn't commit knowing it was a lie?

15          Oh, yeah, I guess I did.

16          Is what you did to him cruel?

17          It was.

18          Vicious?

19          It was.

20          Evil?

21          Indeed.

22          Would you make a false identification in a murder

23     case?

24          Absolutely not.

25          Do you agree, having looked at the pole camera, that

E8knchr7                    Summation - Mr. Goltzer

1    in order to make an accurate identification of a human being,

2    you would need to see their face, and I used myself as an

3    example, eyes, hair nose chin or chins, depending.

4              Remember?  He absolutely agreed.

5              So if you said that you could identify somebody from

6    that videotape by their face, that would be a lie?

7              It would.

8              Not my answer, his.

9              Didn't you identify that man as being on that street?

10             It never happened.  I said it looked like him.

11             It never happened.  Well, let me ask you this:  Take a

12   look at Whitaker's B in evidence.

13             Is that your handwriting?

14             Oh, yeah.

15             Does it is say Bow Wow, January 27, 2012?

16             It does.

17             Is that your initial there?

18             It is.

19             Is that your handwriting?

20             Yes.

21             By putting this on this piece of paper, were you

22   saying that that was Bow Wow on the tape?

23             Absolutely not.  Absolutely not.

24             I mean you do agree that you can't see anybody's face?

25             I do.

1          You do agree that you can't make an identification?

2          I do.

3          Somewhere, not in this courtroom, but somewhere there

4     is a policeman, whether he is an officer or detective I don't

5     recall, his name is Bunt.  Bunt showed him the video.

6          There was a stipulation read into evidence today by my

7     cocounsel from that particular policeman, somebody who was

8     presumably conversant in the English language, somebody who

9     presumably by training and experience knows how to ask a

10    question, somebody presumably who by training and experience

11    knows how to record an answer, and someone presumably by

12    training and experience who when he doesn't understand an

13    ambiguity knows to ask the question again.

14         You have his notes.  His notes are not ambiguous.  He

15    identified Bow Wow by the light skin on his face, when he

16    turned to the camera.

17         Perhaps in his rebuttal summation Mr. Nawaday will

18    suggest to you that there was more than one conspiracy in this

19    case, that there was a conspiracy by the police officers to

20    fabricate documents, that that was forged in the same way, that

21    Baynes' Miranda warning form was forged.

22         You know I'm kidding, right?

23         I mean, if the cop wrote he identified him by his

24    face, by the color of his skin, which he turned to the camera

25    that's what happened.

1              Why did he make that statement?

2              Why did Mallory say that, when he admitted that if

3       that had happened it would have been a lie?

4              It is not complicated.  Mallory knew in January of

5       2012 what they were looking for.  Mallory knew who they were

6       looking for, and he was going to give it to them.  Mallory knew

7       or was smart enough or crafty enough to guess that they had a

8       certain number of people on that video, and he had to give them

9       names.

10             What he did was he looked at that video, and he

11      started to give them the names that he knew they were looking

12      for.  It was an absolute fabrication, it was an absolute lie in

13      a murder case.

14             You know, because you were here when it happened, that

15      what I'm telling you about this record is a hundred percent

16      accurate.

17             You were here when Mallory denied making an

18      identification.

19             You were here when McDermott couldn't explain why he

20      didn't run away.

21             You were here when it was explained to you by their

22      witnesses that there was no way blood could have gone on to

23      that person.

24             You were here when Baynes was asked, Did you brush up

25      against the guy?  And he said no.

1          You have pictures that show not a lot of blood in that

2     apartment.  You have testimony there was no blood on his outer

3     clothing.  You have Baynes the day it happened putting the

4     silver gun in somebody else's hand.

5               (Continued on next page)

1        MR. GOLTZER:  (Continuing)  You have many reasons to

2   doubt whether they've proven a case against him beyond a

3   reasonable doubt.  I don't think there's much question about

4   it, that they haven't proven their case.

5        They have the nerve -- I know I'm being harsh, but

6   they deserve it -- they have the nerve to ask you to convict a

7   young man of murder based upon the words of an alcoholic on a

8   tape when they never called the witness or couldn't call the

9   witness and we couldn't call the witness for whatever reason.

10       MR. BAUER:  Objection, your Honor.

11       MR. GOLTZER:  I'll withdraw that.

12       They have the nerve to tell you that Burden is a

13  reliable witness.

14       MR. BAUER:  Objection.

15       THE COURT:  Overruled.

16       MR. GOLTZER:  A reliable declarant.  Understand that

17  the tape that they played for you was made 20 months after the

18  fact.  Understand that when Mallory was on cross-examination he

19  blurted out that he was too drunk to remember what accurately

20  happened way back when.

21       Remember that Baynes and Mallory couldn't remember

22  what happened in the courtroom the day before they were asked

23  the question.

24       Remember that those witnesses claimed the ability to

25  recall what people wore two years ago.  And the government's

1    reason for him remembering that is he used to sell stolen

2    clothing and was interested in people's wardrobes.  Maybe we'll

3    put him to work for Brooks Brothers when he gets out.

4         We need to understand this process to fairly evaluate

5    the arguments put forth by the government about their

6    witnesses.  One would think that the government approaches

7    people or people approach the government and say:  Listen, you

8    know, I'm facing a thousand years in the penitentiary and I'd

9    like to be your witness.  The government says:  Fine, here's a

10   cooperation agreement.  Now, I want you to tell the truth.

11   Then they come in and they tell the truth and the government

12   says:  Thank you very much.  And they get time served.  That's

13   not the way it works.

14        These folks, agents, prosecutors, sit down with people

15   for hours and hours and hours.  And they decide what the truth

16   is.  And then they give them the agreement.  And then they have

17   them take a plea to everything they did.  So that you, the

18   jury, think that if they breach the agreement, if they do the

19   slightest thing wrong you'll hear the sound of paper tearing

20   and Danielle Williams will go to prison for 80 years minimum

21   and the other guy will go to prison for life and all is well

22   with the world.

23        And, yet, you know that witnesses in this case have

24   breached the agreement, violated the conditions of their

25   release; used drugs when they weren't supposed to; committed

1    robberies while they were cooperating; lied to the government

2    about it.  And they're still hoping to go home.

3              Evans, who pled guilty to 17 serious crimes, facing

4    life with no parole for possession of a gun during a robbery

5    resulting in death.  Same thing they're charged with.

6              MR. BAUER:  Objection.

7              THE COURT:  Overruled.

8              MR. GOLTZER:  Evans pled guilty to conspiracy to

9    murder.  Actually murdering people.  Drugs.  Guns.  Robberies.

10   Seventeen counts.  Kept track in the jail of what happened to

11   people who had committed multiple murders.  Single murders.

12   Dealt drugs all their life.

13             I saw people walk out the door.  I hope to walk out

14   the door.  I think that's fair.  I think that's enough for what

15   I did.  Because I'm a good person now.

16             McDermott.  Keep me in your country.  I lied to get in

17   here.  I assaulted somebody.  I stabbed somebody in the head.

18   I'm facing 25 years in the penitentiary.  Write me a letter.

19   Let me give you him.  Write me a letter.

20             Mallory.  What's he facing?  Seventeen years to life?

21             Pled guilty to giving somebody a gun.  How do you know

22   Mallory wasn't there?  How do you know Mallory wasn't in it up

23   to his neck?  Because he said so?

24             And the government says it's an overwhelming case.

25   How do you know when Burden, who probably has no liver left and

Eik9chr8                    Summation - Mr. Goltzer

1   was pickled, how do you know he was talking about the same day

2   as the robbery?  How do you know he wasn't fed stories by this

3   guy?  You never saw him cross-examined.  Do you think he would

4   have been any better on cross-examination than Mallory?  Do you

5   think he would have been better on cross-examination than

6   Baynes?  Do you think he would have been better on

7   cross-examination than McDermott?

8           The greatest engine, according to a learned judge, for

9   finding the truth is cross-examination.  And Burden was never

10  cross-examined.

11          They take what they want from the tape and reject what

12  they don't want from the tape.

13          Why didn't Mallory admit that he got the silver gun?

14  He can't.

15          They say they have a wall of bricks.  I say they have

16  a house of cards.  All you got to do is pull one out and the

17  whole thing falls down.  And that's what's happening here in

18  the case against Tyrell Whitaker.

19          Really can't make it up.  The government thinks it can

20  put in what God left out.  The government thinks that they can

21  sign up these people and give them a soul.  The government

22  thinks they can sign up these people and give them a

23  conscience.  The government thinks they can motivate them to

24  tell the truth by writing these agreements that they've been

25  writing for years.

1           Of all the burglaries to be committed, why would you

2     pick the mother of your friend's girlfriend?  I don't -- can

3     you understand that?  Why would you take her -- I mean you like

4     the girl, you're dating the girl -- young woman.  I'm showing

5     my generation.  Forgive me.

6           Why would you pick that young woman's mother to

7     ripoff, and to add insult to injury, steal her car and leave it

8     somewhere so she can't get to work or can't pick up a child?

9     Why would you do that?

10          Why would you claim that somebody committed a robbery

11    where he lived, where he sold drugs, of an ecstasy dealer?  Why

12    would you claim that you got 40 out of a hundred pills and the

13    other guy got whatever he got and put him into it?  Why would

14    you say that?  Why would you do that?

15          Why would you commit six or ten robberies?  Why would

16    you commit 30 assaults?  Why would you do those things?

17          Why would you gratuitously hurt people?  Why would you

18    lie?

19          Why would you lie about having a GED?  Have you no

20    shame?  Yes.  I have shame.  I was ashamed of not having a

21    diploma.  I was ashamed of being in jail.

22          Were you ashamed of the crimes you committed everyday

23    of your life?  Oh, yeah, that too.

24          Do you think they change?  Because they've gone to bed

25    with the government?  Do you think they've changed because they

1    put their hand on a Bible in a court of law?

2           I have demonstrated to you that each of the three

3    witnesses lied about material facts in this case and that they

4    spoke to each other before they tried to implicate him in a

5    crime he didn't commit.

6           We have a problem in this country at the border.  We

7    have a lot of people trying to get in here any way they can.

8    They're not just coming from Guatemala.  They're not just

9    coming from somewhere south of the border, Mexico.

10          MR. BAUER:  Objection, your Honor.

11          THE COURT:  Overruled.

12          MR. GOLTZER:  They're coming from all over the world.

13   And they have always come from all over the world legally,

14   illegally, it doesn't matter.  They've come, true, for a better

15   life, for opportunity, economic opportunity.

16          But that's not the only reason they've come to this

17   country.  They have come to this country because there are

18   rooms like this one, with judges like him, with lawyers like

19   them, who can take somebody from the streets of Newburgh,

20   New York and give him what you're entitled to, which is a fair

21   trial where you put the government of the United States to its

22   burden of proof and where, if a lawyer can stand up and raise

23   reasonable doubts, you find him not guilty.  That's the oath

24   you took.  And I have a right, and Ms. Stafford has a right, as

25   Tyrell Whitaker's lawyer, to hold you to it.

1          I'd like to share with the jury a story which explains

2     what this is really about and who you are.  As I look out over

3     the jury, I see men, women, people from obviously different

4     background, different countries, originally.  But you are

5     united by a common heritage.  It goes back to an English man,

6     someone who came here to get religious freedom, who founded the

7     State of Pennsylvania.  His name was William Penn.  I'm sure

8     all of you have heard of William Penn.  You may not all know

9     the story of his background.

10          William Penn was of a certain denomination of the

11     Christian faith who didn't abide by the teachings of the church

12     of England.  And the king at that time had passed a law that

13     required that everybody pray in the same way.

14          William Penn, one of his coreligionists went to a town

15     square.  They got down on their knees.  They looked up to their

16     God and they prayed as they would, but not as the king wished.

17          So they were arrested.  And they were brought before

18     an English jury.  And the English judge, having heard the

19     evidence, did something that Judge Ramos could and would never

20     do.  He looked at the jury and he said I have an opinion.  I've

21     heard the evidence.  Go back into your room.  Come back out and

22     find him guilty.

23          Up until that time that's how it worked in England.

24     The jury went into the back room.  They came back out sometime

25     later.  They looked up at the king's judge and they said no,

1  we're not going to do it.

2          The king's judge said that's not the way it works.

3  I'm the king's judge.  I want you to go back in that room and

4  find him guilty.  They came back out again and they said no,

5  we're not going to do it.  And the king's judge told them I'm

6  not going to give you fire, I'm not going to give you food, I'm

7  not going to give you water, and I'm not going to give you

8  comfort.  I'm going to hold you back in that back room until

9  you come back and do what I want you to do, which is to find

10  William Penn guilty.

11          They came back again and again and they said no.  And

12  finally the king's judge got tired and William Penn went to

13  Pennsylvania, a free man.

14          Since that day, no prosecutor, no government, no

15  judge, no king, no queen in England or here, or in any country

16  in the world that follows our rules can tell you what to do.

17          You're not just here as a collective body.  You're

18  here as individuals.

19          Let me put it to you this way.  It's six months from

20  now.  You're home.  You're minding your business.  You're

21  feeding your kids.  You're reading a newspaper or a book.

22  You're watching television.  It doesn't matter.  Suddenly you

23  hear the following.

24          Get up, walk over to the door, who is at the door?

25  Mallory, Baynes, and McDermott.  And you look up.  And you say,

1   Gentlemen, what are you doing here?  They say, Remember us?  We

2   were the guys who testified against Tyrell Whitaker.  Now, you

3   know we're honest people because you convicted him.  So we

4   thought we'd come to you.  We don't live in Newburgh, New York,

5   anymore.  We live down in Philadelphia.  And we're a little

6   short on cash.  So what we'd like you to do is take a check

7   from one of us for two hundred dollars, go to your piggy bank,

8   take out the two hundred dollars, give it to us, we'll go down

9   to Philadelphia.  We'll work for a couple of weeks.  We'll put

10  the money in the bank and we'll pay you back.  You know you

11  could trust us because you believed us enough to convict Tyrell

12  Whitaker, so give us the money.

13          Would any of you cash that check?  What any of you

14  take a quarter out of your pocket on their promise to pay you

15  back?

16          What you need to understand is that they're writing a

17  check in this courtroom but it's not for a couple of hundred

18  bucks.  It's payable to the prosecution for the sum of his

19  life.

20          MR. BAUER:  Objection.

21          MR. GOLTZER:  For the sum of his future.

22          Do not let them cash that check.  Because that would

23  be wrong.  You know it.  It wouldn't be just.

24          He's not guilty.  They haven't proved him guilty.  The

25  only verdict you can reach in this case for the two crimes he's

Eik9chr8                    Summation - Mr. Goltzer

1    charged with is not guilty, not proven.

2              Thank you.

3              THE COURT:  Thank you, Mr. Goltzer.

4              Ladies and gentlemen, it's 4:30.  We're not going to

5    begin another summation.  So we're going to stop today and ask

6    you to be back here tomorrow morning no later than 9:25 so we

7    can get started at 9:30.  Have a very pleasant evening.  Until

8    then do not discuss the case, including on social media.

9              (Jury excused)

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Eik9chr8                    Summation – Mr. Goltzer

1            (In open court)

2            THE COURT:  Anything for me?

3            MR. BAUER:  Just we still owe you a verdict sheet, we

4   still owe you now a clean copy of an indictment, we owe you

5   some jury instructions.

6            THE COURT:  Correct.

7            MR. BAUER:  What I propose to do on the verdict sheet

8   and the indictment is to send it to defense counsel this

9   evening to have a look, so that way the parties will have, as

10  best we can in these, before we send it to you all tonight.

11  That way it won't be objectionable tomorrow.

12           THE COURT:  Again, I just want to make sure that we

13  have it in time to make whatever changes we need and to make

14  the appropriate copies so we have it in a binder for the jury

15  presumably tomorrow afternoon.

16           MR. BAUER:  So in our order of priority we'll do the

17  instructions first.

18           THE COURT:  Yes, please.  Okay.  Anything more?

19           Okay, ladies and gentlemen, see you tomorrow.

20           (Adjourned to August 21, 2014, 9:00 a.m.)

21                       GOVERNMENT EXHIBITS

22  Exhibit No.                               Received

23   416  . . . . . . . . . . . . . . . . . . .2068

24                       DEFENDANT EXHIBITS

25  Exhibit No.                               Received

Eik9chr8                    Summation - Mr. Goltzer

1    H and I  . . . . . . . . . . . . . . .2056

2    C   . . . . . . . . . . . . . . . . . .2059

3    D   . . . . . . . . . . . . . . . . . .2061

4    E  . . . . . . . . . . . . . . . . . .2062

5    F  . . . . . . . . . . . . . . . . . .2062

6    G  . . . . . . . . . . . . . . . . . .2063

7    T1  . . . . . . . . . . . . . . . . . .2068

8    T2  . . . . . . . . . . . . . . . . . .2069

9    T3  . . . . . . . . . . . . . . . . . .2071

10   T4  . . . . . . . . . . . . . . . . . .2073

11   T5  . . . . . . . . . . . . . . . . . .2073

12   T6  . . . . . . . . . . . . . . . . . .2074

13

14

15

16

17

18

19

20

21

22

23

24

25