E81nchr1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA
3               v.                          12 CR 626 (ER)
    RAYMOND CHRISTIAN a/k/a
4   "Reckless"
    GLENN THOMAS, a/k/a "Gucci"
5   TYRELL WHITAKER, a/k/a "Bow Wow"
                Defendants
6   ------------------------------x
                                    New York, N.Y.
7                                   August 21, 2014
                                    9:20 a.m.
8

9   Before:
                    HON. EDGARDO RAMOS
10                                  District Judge

11

                        APPEARANCES
12  PREET BHARARA
         United States Attorney for the
13       Southern District of New York
    ANDREW BAUER
14  KAN M. NAWADAY
         Assistant United States Attorney
15
    DAVID S. GREENFIELD
16       and
    ANTHONY STRAZZA
17       Attorneys for Defendant Christian

18  LAW OFFICES OF DON BUCHWALD
         Attorney for Defendant Thomas
19  DON D. BUCHWALD

20  KELLEY DRYE & WARREN LLP
         Attorney for Defendant Thomas
21  LEVI DOWNING

22  GEORGE ROBERT GOLTZER
         and
23  YING STAFFORD
         Attorneys for Defendant Whitaker
24  -- also present--
    S.A. Andrei Petrov - FBI

25

E8lnchr1

1          (Trial resumed)

2          (In open court; jury not present)

3          THE COURT:  Good morning, Mr. Buchwald.

4          I understand you have an application.

5          MR. BUCHWALD:  I do.  The discussion yesterday

6  concerning the need to have separate firearms for the two

7  firearm counts, I think it is important from our perspective

8  before our summation that we understand the firearm that is

9  allegedly involved on December 15, 2010.  What is the other

10  firearm that Mr. Thomas is charged with?  I think we should

11  know that before the summation.

12          MR. BAUER:  Three weeks of trial, your Honor, lots of

13  evidence about a lot of other guns.

14          MR. BUCHWALD:  I think we are entitled to know which

15  one, particularly to know which one the grand jury indicted on.

16          What was presented to the grand jury in the way of the

17  second weapon, what was the basis for that indictment, because

18  otherwise there has been a violation of the constitutional

19  requirement that we be tried upon the basis of a valid

20  indictment.

21          The grand jury must have charged on a particular

22  basis, and we would like to know what that is.  Otherwise,

23  there is a fatal variance here.  We would request to know what

24  that is, have your Honor inspect the grand jury minutes, if

25  necessary, to see if the grand jury was presented with the

E81nchr1

1      second firearm upon which Mr. Thomas is charged.

2                THE COURT:  What other evidence concerning whether

3      Mr. Thomas specifically had guns?  He was arrested with a gun,

4      wasn't he?

5                MR. BAUER:  Yes.  February 28, 2011, in the middle of

6      the narcotics conspiracy.  We had the cooperator come on and

7      say that he possessed guns on other occasions.  We oppose the

8      request, your Honor.  I mean, the record here is very clear

9      that there is at least enough evidence to go back to the jury.

10     If Mr. Buchwald wants us to reargue that count for him now on

11     the record, we oppose it.

12               MR. BUCHWALD:  With respect to that, your Honor, so I

13     that I can make my record --

14               THE COURT:  Sure.

15               MR. BUCHWALD:  -- part of our application is to

16     dismiss the second count if there was not presented to the

17     grand jury a basis for the second firearm.

18               Number two, is, as a matter of law, on this record,

19     our position is that the February 28 firearm, there was no

20     connection of that February 28 firearm to a Hobbs Act robbery

21     or to narcotics.  The evidence is clear what happened.  He

22     walks out of a store.  He has a gun in his underwear.  There is

23     no connection to that.

24               While there was talk about the police having arrested

25     because there was probable cause and a robbery in the

E8lnchr1

 1    neighborhood, their witness, Mallory testified unequivocally

 2    that Mr. Thomas had not been involved in that robbery.

 3              So, as a matter of law, that gun cannot be the basis

 4    of the firearm charge here.  But, in any event, we are entitled

 5    to know what the grand jury was presented with.  Otherwise we

 6    have violated the grand jury oath.

 7              THE COURT:  Mr. Bauer.

 8              MR. BAUER:  Judge, I feel like we have talked about

 9    this five times now with Mr. Buchwald.  One of the elements of

10    924(c) is possession of a firearm during the narcotics

11    conspiracy.

12              MR. BUCHWALD:  It is during and in relation to.  The

13    fact that you have a firearm within a four-year period doesn't

14    make you guilty of that offense.

15              MR. BAUER:  Good luck with that argument in front of

16    the jury.  You are wrong about this, Mr. Buchwald.  Besides the

17    fact that Mr. Mallory said that just earlier that day that very

18    gun, Mr. Thomas had it with him he went to a drug program.

19    Before he went to the drug program he said he was looking for a

20    joke.  Who do they rob?  They rob drug dealers.  There is

21    direct evidence about that particular gun, not that it is

22    necessary.

23              Mr. McDermott said he saw Mr. Thomas with that gun on

24    a number of occasions.  Mr. Mallory said he saw him with that

25    gun on a number of occasions.  On some of those occasions he

E8lnchr1

1    had drugs with him, too.  This is enough about this argument.

2    I don't know why I have to keep defending this, your Honor.

3              THE COURT:  The application is denied.

4              Mr. Bauer, Mr. Nawaday, have you shared with the

5    defendants your proposed change to the multiple conspiracy

6    charge?

7              MR. STRAZZA:  I am sorry, your Honor, on behalf of

8    Mr. Christian we just want to preserve the record and join in

9    Mr. Buchwald's application on the grand jury point.

10             THE COURT:  Very well.

11             MS. STAFFORD:  Mr. Whitaker made that argument

12   yesterday with respect to our specific request.

13             THE COURT:  Very well.

14             MS. STAFFORD:  Thank you.

15             MR. BAUER:  My only comment -- no, I did not share it

16   with them -- the multiple conspiracy charge at the bottom of

17   page 26, the first sentence is an introductory sentence that

18   refers to the conspiracy charged, and we would like it to be

19   clear that the conspiracy charged, we can either call it the

20   narcotics conspiracy or the conspiracy charged in Count Three

21   just to be clear that the multiple conspiracy charge does not

22   apply to Count One.

23             THE COURT:  I think that is an appropriate change,

24   since there is no question that there is only one Hobbs act

25   conspiracy here, so we will make that change.

E8lnchr1

1          So it will read, "You must decide whether the

2    narcotics conspiracy charged in Count Three of the indictment

3    existed" will be the first line.

4          MR. BAUER:  Thank you, your Honor.

5          THE COURT:  Are we otherwise ready to begin.

6          Mr. Buchwald?

7          MR. BUCHWALD:  Can I just inquire of where this is.

8          THE COURT:  It is page 36.

9          MR. BUCHWALD:  I understand that.  There was one place

10   where we had to search something -- I think I did see it about

11   the 2007 drugs.

12         THE COURT:  Yes, that is in there.

13         MR. BAUER:  Judge, I will put on the record that last

14   night I circulated a proposed verdict form.  I did not hear

15   from defense counsel last night about the verdict form, but I

16   polled them this morning.  As far as I know, they have no

17   requested changes to it.  I'm sorry.  Mr. Dratel did have one.

18         MR. DRATEL:  I think that not guilty should be before

19   guilty.  There is a presumption of innocence that exists until

20   the jury finds the evidence sufficient beyond a reasonable

21   doubt.  I believe not guilty should be the first choice rather

22   than guilty.  I think that it is the government's burden.

23         THE COURT:  Any objection?

24         MR. BAUER:  Yes, your Honor.  I followed the verdict

25   forms -- we have a verdict form library.  I looked at about 20

E81nchr1

of them, of recent ones used by our office.  Every single one

says guilty before not guilty.  I think we should stick with

the practice here.

        THE COURT:  I have not had this issue raised, but as I

think about any verdict that I have ever heard taken, the

question is always, How do you find the defendant?  Guilty or

not guilty.

        MR. DRATEL:  It's just -- it wasn't me.

        THE COURT:  OK.  I won't make that change.

        Mr. Buchwald.

        MR. BUCHWALD:  Finally, your Honor, last night we

asked that a sentence be added, additional language to the

effect that, I remind you in your consideration of Mr. Thomas

you may not consider Mr. Thomas' possession of the firearm on

February 28, 2011, that is, Government Exhibit whatever that

firearm is, as evidence of any firearms charge against

Mr. Thomas.

        I take it that your Honor has denied that request?  We

did want to make it clear for the record that we made such a

request.

        THE COURT:  OK.

        MR. DRATEL:  Your Honor, we don't have to restate our

objections to the charge as it is right now?  All the ones we

made yesterday are considered to be made?  In other words they

are incorporated from yesterday?

E8lnchr1

```
 1              THE COURT:  Correct.
 2              MR. BUCHWALD:  We will incorporate by reference at the
 3    sidebar here all of the arguments made yesterday?
 4              THE COURT:  Yes.
 5              MR. GOLTZER:  On behalf of all of the defendants?
 6              THE COURT:  Yes.
 7              Anything further.
 8              MR. BAUER:  Finally, your Honor, the government sent
 9    around a cleaned up indictment to send back to the jury.  I
10    have heard no objections about that as well.
11              THE COURT:  Did Ms. Miller tell you we did make one
12    change to your verdict form.
13              THE LAW CLERK:  The numbering under Count Five had
14    read 3A, etc.  We changed it to 5A.
15              MR. BAUER:  That makes sense.  If there's nothing
16    further, we have about five minutes for the jury.  So we'll see
17    where they are and get started.
18              Who is going to be first?
19              MR. DRATEL:  I am.
20              THE COURT:  Mr. Dratel.
21              MR. DRATEL:  Yes.
22              THE COURT:  Your time estimate is still about the
23    same?
24              MR. DRATEL:  Yes.
25              THE COURT:  For you, Mr. Greenfield, what say you.
```

E81nchr1

| | |
|---|---|
| 1 | MR. GREENFIELD:  Same as I said before.  About an hour |
| 2 | and a half.  I could cut it as I go along.  I'm really never |
| 3 | very good with time, Judge. |
| 4 | THE COURT:  OK. |
| 5 | The jury is all here.  Do you guys want to get |
| 6 | started? |
| 7 | MR. DRATEL:  I just need Ms. McInerney. |
| 8 | THE COURT:  We need Ms. McInerney? |
| 9 | MR. NAWADAY:  Yes, your Honor.  She also a getting |
| 10 | some of the exhibits for defense counsel. |
| 11 | MR. BUCHWALD:  She's indispensable. |
| 12 | MR. BAUER:  Judge, I did have one other note to raise |
| 13 | with the Court this morning.  It was with regards to something |
| 14 | that Mr. Goltzer had focused on in his closing, that was he had |
| 15 | questioned why the jury was only shown parts of the Burden |
| 16 | video.  I thought that was misleading to the jury, and I would |
| 17 | have proposed that you either verbally or, probably a little |
| 18 | too late, to add it to your jury instructions.  Maybe verbally |
| 19 | then instruct them something along the lines of that they were |
| 20 | only shown the portions of the video that you deemed |
| 21 | admissible. |
| 22 | MR. GOLTZER:  That's fine.  If I said it, I don't even |
| 23 | realize it.  I don't remember saying it. |
| 24 | THE COURT:  I remember it.  I was surprised that there |
| 25 | wasn't an objection at the time actually, but I do remember it. |

E8lnchr1

1          MR. GOLTZER:  Probably a subconscious slip.

2          THE COURT:  I will just mention that, because I think

3    we have hit the print button on the charges.

4          MR. BAUER:  That's fine.

5          Thank you, your Honor.

6          THE COURT:  Any ETA?

7          MR. BAUER:  Mr. Nawaday just called her and she was

8    loading her cart with the guns requested and she was on her

9    way.

10          Here we go.

11          THE COURT:  OK.  Can we get the jury.

12          (Jury present)

13          THE COURT:  Good morning, everyone.  Please be seated.

14    Ladies and gentlemen, before we continue with the closing

15    arguments, just one minor thing from yesterday.  You may recall

16    that during his summation, Mr. Goltzer made reference to the

17    Burden tape and that only certain parts of it were shown to

18    you.  Well, that's actually on me.  The only parts that were

19    shown to you were the parts that I determined to be admissible.

20          With that, we will continue with the summations.  On

21    behalf of Mr. Thomas, Mr. Dratel.

22          MR. DRATEL:  Thank you, your Honor.

23          Good morning, ladies and gentlemen.

24          Mr. Buchwald, Mr. Downing and myself have the

25    privilege of representing Glenn Thomas at this trial.

1          May it please the Court, I want to thank you for your

2     service, for your attention during the trial.  I know it is a

3     task to sit for hours listening to testimony over a three-week

4     period.  We all appreciate it.  Mr. Thomas appreciates it as

5     well.

6          Mr. Thomas has committed crimes, and you have heard

7     about them already, possession of a gun in February of 2011.

8     He pled guilty in federal court.  It was an inoperable gun so

9     the state could not prosecute it.  He had a prior drug offense

10    from 2007, which is not part of this case, but he didn't commit

11    the crimes charged in this indictment.

12          He admitted the crimes that he's committed, and he's

13    been punished for them already.

14          But what was interesting about Mr. Thomas going to

15    jail, he was in jail for a significant period during the whole

16    course of this case in terms of what the time frame of this

17    case is.  I will talk about that in detail more.

18          But what is interesting about him being in jail in

19    February of 2011 for that gun that he was found with by the

20    Newburgh police is that he became an easy target for others who

21    were responsible for the events in this case who you heard from

22    the witness stand.  He became an easy target to name as someone

23    who was there, someone who wasn't there, but who they could

24    name, as he was already in jail.  He was already gone.  He

25    wasn't someone out on the street to protect.

E8lnchr1                    Summation - Mr. Dratel

1          I thought about how this case could be characterized.

2   I kept coming up with words beginning with the letter C.  One

3   was that what the government's case lacks.  It lacks

4   credibility, it lacks consistency, it lacks corroboration.  All

5   words that the government in its summation contended it has,

6   but I will review the evidence with you and you will see it

7   lacks all of those.

8          Instead what this case is about is cooperators, the

9   witnesses on the stand and the collusion among them that

10  created and generated their testimony that you heard this

11  month.

12         There is one more word beginning with a C, it is

13  important for all of you:  Common sense.  Common sense is

14  critical, your life experience.

15         I won't be able to cover everything obviously.  There

16  is too much detail, too much testimony to cover everything.

17  Mr. Goltzer has already summed up, Mr. Greenfield will sum up

18  after me, and they will cover a lot as well.

19         I know many of you or all of you have taken notes at

20  one time or another, so I am not going to go chapter and verse

21  with a lot of this, but essentially review it and summarize it

22  in some detail because I want to illustrate the points and

23  issues and conclusions about the evidence.  All the evidence

24  and the testimony is available to you.  You can have it read

25  back.  You will have the exhibits.  You can review what you

1     need to review in the course of your deliberations.  Once we go

2     through this, the only conclusion you will be able to draw I

3     submit to you is that Mr. Thomas is not guilty of each and

4     every count charged against him in this indictment.

5              Now, you have in evidence Mr. Thomas' plea allocution,

6     his guilty plea proceeding in federal court where he admitted

7     his guilt to the Court.  It refers to that prior drug

8     conviction in 2007, again, not part of this conspiracy.

9              I want to first talk about some of the evidence from

10    the people who weren't cooperating witnesses necessarily:

11    Police officers, some of the victims of the robbery, although

12    they were in a sense cooperating on a certain level.  They had

13    expectations from the government, some of them, but not to the

14    participants in the robbery themselves who testified.

15             The factual inconsistencies, the government says the

16    facts match up and line up here, and they really don't.  They

17    lack the consistency and detail.

18             This is something about common sense and life

19    experience, and the hallmarks of candor is consistency in

20    detail; not consistency in a general allegation, but

21    consistency in detail.  That's the way lies are found.  It is

22    not so much in the sense that two people tell two different

23    stories that somehow match up at the top, but they match up at

24    the bottom.  Lies are detected by inconsistency, by the fact

25    that people can't tell the same false story over and over again

E8lnchr1                    Summation - Mr. Dratel

1    when it didn't happen.  It's easy to tell it when you live it

2    and tell it consistently.  It's hard when you have to take it

3    from your mind where it was created.

4           So ask yourself when you are reviewing the testimony,

5    when you think about the government's case, what details are

6    corroborated among these cooperators, the important witnesses.

7           The government made the argument, it's the only

8    argument they can make in this case given the nature of the

9    testimony, that somehow not remembering is more credible than

10   remembering.  I submit to you you know the difference between

11   remembering and not remembering, what that means as far as

12   whether someone is credible or not credible.  The wall of

13   evidence that the government displayed is really based on a

14   foundation that is crumbled, which is the testimony of those

15   cooperators.

16          Let's talk about the forensics.  Forensics don't match

17   the government's case with respect to Mr. Thomas.  There's

18   nothing linking Mr. Thomas to 54 Chambers Street.

19          Mr. Henry was killed by a 9-millimeter bullet.  The

20   government tries to make it seem like we are arguing who

21   actually shot the weapon that killed Mr. Henry.  That's not

22   what this is about, because that doesn't make a legal or

23   factual difference, as the judge will tell you, but it's about

24   Mr. Thomas.  They are trying to put a .38 in his hands.  There

25   is no .38 bullet that killed Mr. Henry.  There are in fact

1    shell casings from .380s and from 9-millimeters.  They wouldn't

2    find shell casing from revolvers necessarily, but they don't

3    have any projectiles there are eight projectiles and there are

4    none that are from a .38.  There are two in the. 38 class.

5    Those could have been from the .380, they could have been from

6    a .357, they could have been from a .32 or a 9-millimeter.  And

7    you know that you can't put a 9-millimeter bullet in a 38

8    because Sergeant Frederick tried it himself and he couldn't do

9    it.

10              Where were these .38 slugs if Mr. Thomas was there

11    firing?  They weren't there.  You didn't see them.  They

12    weren't recovered because they were never there because he was

13    never there.

14              Sergeant Carrion testified that he was told by

15    Marshall Williams, an eyewitness that night -- right then, not

16    four years later, not 18 months later, not after he was

17    cooperating, not after he got in trouble and had to work out a

18    deal -- that night Marshall Williams had four or five people

19    running away, not seven.  The people running down the street,

20    who knows who they were.  They could have been some of the

21    people from the apartment running away.

22              You have the testimony of Mr. Smith and Mr. Boone,

23    which I will get into in more detail as I compare it to the

24    testimony of the cooperating witnesses.  But none of that puts

25    Mr. Thomas there at all.

1            Collusion among those cooperators.

2            The government made a lot of, and probably will on its

3    rebuttal, of the tape that Mr. Mallory made with respect

4    Mr. Burden.  They call it the Burden tape.  It's really the

5    Mallory tape, because he's the architect of it.

6            I think it's important not so much what the government

7    thinks of this but for what it shows you about Mr. Mallory,

8    that he orchestrated so much of this.  He feeds Mr. Burden all

9    the lines.  He preys on a hapless, nearly incoherent alcoholic

10   and has him parrot back what he feeds him.  I'll go into that

11   in a little more detail.

12           The government argued that these people couldn't have

13   colluded.  They are not capable of it, that you saw them.  I

14   think it's somewhat the arrogance of those of us maybe with too

15   much education to think that people like Jamar Mallory and

16   Anthony Baynes and Ramone McDermott and Danielle Williams

17   somehow don't have the capacity to do it.

18           Look at their skills.  Look at Jamar Mallory's skills.

19   This is a guy who was on the street, cooperating, reporting to

20   detectives and FBI agents on a daily basis, meeting with them a

21   couple of times a week; at the same time, smoking PCP, smoking

22   pot, robbing people at the same time taping down his good

23   friends 15 different times.  Not a single person was aware of

24   what he was doing.  He was that good.  Ninety minutes, two-hour

25   sessions, he was that good.

1          He was not discovered by anyone on either side what he
2     was doing.  The government didn't even know what he was doing
3     until after he was already in jail for testing positive two
4     months after his plea, two months after he signed his
5     cooperation agreement.
6          Think about that deal.  The most extraordinary part is
7     that he does a robbery with this guy quick, and then he tapes
8     the guy, gets him arrested, and he's going to get credit for
9     putting him in jail and he doesn't get charged with it.  That's
10    sweet.  That is someone with skill.
11         Danielle Williams same thing.  She operates as an
12    informant on the street while she's leading her criminal
13    lifestyle at the same time, right under their noses.
14         Mr. McDermott comes here with a work permit to the
15    United States.  I don't think the work permit said sell
16    marijuana and commit armed robbery.  But, yet, within a year
17    and a half, maybe less, he's making $10,000 a week for two days
18    of work.  Not prosecuted for the marijuana, only for that
19    robbery that he was involved in.  All that money, forget taxes,
20    he's not even prosecuted for selling it.
21         He knew how to collect information that was valuable
22    to the time during his time in jail so that he could increase
23    his value and make his deal and stay here, because to him it is
24    a matter of life and death.
25         These people have survival skills when a lot is at

E8lnchr1                       Summation - Mr. Dratel

1    stake for them.

2            The government said, why don't they have more, lies

3    more intricate lies, more elaborate lies.  But that is not the

4    nature of what these lies are.  They didn't have all the time

5    in the world.  They don't have that kind of sophistication.

6    You keep it simple and vague so you avoid contradicting each

7    other.  But what you also lack is consistency among the

8    stories.  That's why they are vague and general, and there's no

9    consistency in the detail that you would find in stories that

10   are true, with accounts are true.

11           Let's talk about the contacts among these cooperators

12   and how it proves to you that they had the opportunity -- by

13   the way, we don't have the burden to prove any of this.  It's

14   always the government's burden.  They've accepted it.

15           But the point is, if it raises a doubt in your mind

16   about their credibility, if it raises a doubt in your mind, a

17   reasonable doubt, you must acquit Mr. Thomas.  It's that

18   simple.  Those are the rules.

19           Major players, Baynes, Mallory, McDermott, they all

20   met and spoke in prison and they had a chance to discuss this

21   case, the Jeffrey Henry homicide.

22           Even before he went to jail Baynes had seen the

23   Facebook posts that Mr. Thomas had been arrested.  Fair game.

24   He's out of the picture.  He's a lost cause already.  Let's pin

25   it on him.

E8lnchr1                    Summation - Mr. Dratel

1           But, you know, Baynes doesn't even mention Thomas

2     initially.  Mr. Mallory first goes to jail.  Mr. Baynes is

3     arrested April 6, 2011; Mallory, July 15, 2011.  Baynes admits

4     that he spoke to Mallory at the Orange County jail.  The first

5     time Mr. Baynes includes Mr. Thomas as a participant is not

6     until March of 2012, which is well after Mr. Baynes has had

7     this opportunity to talk to Mr. Mallory.

8           Baynes spoke with Mallory, Baynes spoke with stacks,

9     another person who Mr. Mallory says was involved in the

10    homicide.  They spoke at Orange County jail.  That is at

11    transcript 756 to 758.  I will make cites to the transcript,

12    but you can have it read back.  I will cite it just for

13    convenience.

14          Baynes and McDermott met at the Orange County jail,

15    and McDermott -- by the way, Baynes said, oh, I never spoke to

16    him.  He was in protective custody.  But you heard McDermott

17    say, yes, I did speak to Baynes.  In fact, Baynes told him who

18    was involved in the homicide.  So Baynes is clearly trying to

19    avoid letting you know that they've all gotten together and

20    discussed this case.

21          McDermott and Mallory met at the Geo facility.

22    Transcript at 2000 is where Mr. McDermott confirms that he and

23    Baynes spoke, and Baynes denied the contact at 760.

24          This is the third quarter of 2011, which is when

25    Mr. McDermott says he spoke to Mr. Baynes.  So it's after

1   Mallory has already gotten to Baynes, it's before Baynes puts

2   Mr. Thomas in the mix.

3           This is like a game of telephone, where each guy tells

4   a story and it comes out differently at the end, because it's

5   not the real story.  It's just a story that's been retold and

6   recast by each of them in their own way.

7           Mallory even said that his memory about something was

8   refreshed by Snelly, that Stacks was there.  Imagine he says

9   refreshed, which means he knew it at another time.  I also ask

10  you why does Snelly know this.  Snelly said he provided a gun.

11  That's what he told Mallory.  We don't know precisely what his

12  involvement was.  He could have been there, too.

13          Also, notice how these witnesses, two witnesses in

14  particular try to take Mallory out of the equation in terms of

15  what happened around the time of the December 14 and December

16  15.

17          Baynes adamantly denied it, if you look at transcript

18  705, adamantly denies that he mentioned Mallory in some of his

19  early sessions with the government.

20          Yet one of the stipulations read yesterday, T3, talks

21  about December 15, 2010 before he's had a chance to talk to

22  Mallory.  He talked about the older guy.  It sounds like L-1

23  calling to have a chain brought, not picked up, brought.  And

24  another time he was told that J-Mark said that Big L had

25  something to do with the Joker homicide, but he denied that,

1    but we showed that he did say it.  Withdrawn.  Yes, we showed

2    that he did say it in the stipulation, that the police took

3    notes, the agents, the prosecutors, law enforcement took notes,

4    and that's what he said.

5              MR. BAUER:  Objection.

6              THE COURT:  Overruled.

7              MR. DRATEL:  If the government wants to contest what

8    their own people wrote down, that's fine.  If you don't think

9    that is a reasonable doubt in itself --

10             McDermott does the same thing.  He takes Mallory out

11   of two different conversations that he initially tells the

12   government.  One was he said that in sum and substance in part

13   that he overheard Gotti and J-Mark talking about robbing

14   Joker's place weeks before it happened.  This is T5, Thomas

15   Exhibit T5.  Then he denied it at trial.  He denied even saying

16   it at trial.

17             Also, that he had a meeting on July 18, 2012 where

18   McDermott stated in sum and substance and in part that the

19   morning after Joker was killed, McDermott overheard Gotti

20   talking with Gotti and J-Mark with about the night before --

21   I'm sorry overheard Gucci talking about Gotti and J-Mark about

22   the night before.

23             But when he's here he takes Mallory out of it

24   entirely.  Why do you think that is?  What do you think the

25   deals are among them about who's going to take the fall for

E8lnchr1                    Summation - Mr. Dratel

1    what they have done?  How they are going to get their deals?

2    How they are going to walk out?

3         Credibility.

4         You have witnesses -- I am talking about the

5    cooperating witnesses -- with a history of criminal activity,

6    extensive, violent criminal activity, a history of lying, a

7    history of persistent drug use.  We don't have a baseline for

8    them as to what it's done to their memory, what it did to their

9    perception at the time that events occurred that they are now

10   claiming that they saw, that they heard, that they claim they

11   remember.  They even have a history of crimes and lying while

12   they are cooperating.  They have a history really of doing

13   anything.

14        The government talked about their demeanor.  I think

15   the government had to because their demeanor was so

16   inappropriate.  They were surly, they were sullen, they were at

17   times combative, they were at times unintelligible.  Some of

18   you have sat on juries before can compare them to other

19   witnesses, and other witnesses at trial here.  Compare them to

20   Mr. Boone:  Long pauses for simple questions.

21        Incentives.  Mr. McDermott, you heard staying in this

22   country is a matter of life and death for him, for what he

23   fears he faces back in Jamaica.

24        Danielle Williams, 80-year mandatory minimum, and her

25   three kids.

1              Mr. Mallory, seven-year mandatory minimum sentence.

2    Baynes, a 17-year sentence.  Incentives to try to be valuable

3    to the government in this case so that they can reduce their

4    own punishment substantially.

5              They are all talking about time served here.  Think

6    about it.  The government says these are not upstanding

7    citizens and you have to take your witnesses as you find them.

8    True enough.  But if you rely on a parade of lifetime liars,

9    what do you think you are going to get today?  Anything

10   different?

11             They all knew it was in their best interest to tell

12   the truth from the beginning.  They all knew it was in their

13   best interest not to commit crimes while they were cooperating.

14   They did it anyway, even though it's in their best interest to

15   tell the truth here.  They don't think so.

16             They think so, because they are lawyers and they work

17   for the government, and they have a job to do.

18             MR. NAWADAY:  Objection.  "Work for the government."

19             MR. DRATEL:  No, I'm saying the prosecutors.  I just

20   meant the prosecutors.

21             THE COURT:  Overruled.

22             MR. DRATEL:  I was pointing.

23             The prosecutors work for the government and they have

24   a job to do.  Their job is getting out.

25             They have always thought differently about what their

1    best interests are their whole lives.  They don't see the truth

2    as their best interest.  Truth is a random act for them,

3    fortuitous perhaps, it just coincides with their interests.

4    They have never done it.  Even when they knew that cooperation

5    agreements were in jeopardy they lied and committed crimes.

6         They changed their stories dramatically over time.

7    We'll go into that a little bit, too.  We'll start with Baynes.

8         Mr. Buchwald opened and talked about Perry Mason and

9    realized that perhaps no one on the jury is old enough to have

10   seen Perry Mason.  I'm old enough to have seen it on reruns

11   when I was a kid, not the original.  But Mr. Buchwald had a

12   Perry Mason moment here when he talks about something so

13   dramatic that it really dispenses with the person's testimony

14   categorically, which is that Mallory, musing in that way of

15   liars, when did you hang out with Mr. Thomas --

16        MR. BUCHWALD:  Baynes.  It is not Mallory.

17        MR. DRATEL:  When did Baynes hang out with Mr. Thomas.

18   I'm sorry.  Mr. Baynes.  Asking Mr. Baynes, when did you hang

19   out with Mr. Thomas?  2008 a little bit, a couple of times a

20   week; 2009, a couple of times a week.

21        OK.  Mr. Thomas was in jail the entire period of time.

22   He couldn't have been hanging out with Mr. Baynes.

23        Look at T1.  That's the stipulation read yesterday.

24   Mr. Thomas was incarcerated either in Orange County jail in

25   Goshen, New York, or in other New York State prison facilities

1    in Upstate New York from March 16, 2008 through and including

2    September 14, 2010 except for three days in March of 2010.

3    Then he was back in jail in February 2011 through the end of

4    2012 on the gun charge.

5            That's what happens when you don't live it, when you

6    make it up.  Those kinds of details you get caught on.

7    Mr. Baynes was caught flatfooted.

8            Now if you look at Whitaker F, that is another

9    stipulation.  Mr. Baynes does not put Mr. Thomas in 54 Chambers

10   when he first starts talking to the government in May of 2011.

11   He says, I thought Bash was the shooter.  I thought Bash did

12   it.  That is in the stipulation.  He also said that he thought

13   the other person at the robbery who he didn't know was an 18 or

14   19-year-old.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          MR. DRATEL:  (Continuing) Baynes also acknowledged

2     that he knows that Mr. Thomas appears older than Baynes.  So it

3     can't be an 18- or 19-year-old.  That's in T3.  That's Thomas'

4     stipulation.

5          Baynes also said he knew someone as G.  He described

6     as a dark, skinny teenager an 18- or 19-year-old from the

7     Heights.  That's the same person.  That's at 801 and 802 of the

8     transcript.  By the way, Mr. Mallory, in his phone contact, he

9     said that was someone named G-Mo.  Not Mr. Thomas.

10          Mr. Baynes initially said everyone had guns before

11     they left for the robbery.  Then he changed the story and said

12     I didn't have a gun.  I never had a gun.  But, T3, before he

13     went to Crown Fried, and he was referring here to everyone who

14     had arrived at the Dubois Street address except for Baynes and

15     Quay Quay, he said everyone had guns.  If you look at Whitaker

16     C, Baynes said Bash and Baby E planned the robbery.  That was

17     his initial story.  But all these things change over time.

18          Baynes had to have had a gun at Chambers despite his

19     denial.  He had to have had a gun.  How do you know?  Because

20     both Mr. Smith and Mr. Boone said that the person who helped --

21     because the person who Mr. Smith stabbed had a gun.  And we

22     know that Baynes was the person stabbed at 54 Chambers; that he

23     was the person helping the robber who was wrestling with

24     Mr. Boone.  And that person had a gun.  He hit Mr. Boone over

25     the head with the gun.  1598, 1797.

1              Boone even mentioned that it was a chrome gun.  He saw

2      it twice.  Outside initially and the gun that hit him on the

3      head inside when he's fighting with the robber trying to get

4      the weapon.  The dude with the chrome gun hit him while he was

5      wrestling with the robber.

6              Even Baynes on direct said he was the one who was

7      trying to grab the guy who was wrestling with the robber.

8              Baynes also on direct said that L-1 called someone for

9      a gun and then later a lady showed up and left a purse in a

10     mailbox.  Nothing about going somewhere else to get the guns.

11     The guns were brought to L-1.

12             Mr. Baynes also testified that three people were

13     robbed in front of Chambers before they even got inside.  You

14     heard Mr. Boone make the comparison.  Who do you believe,

15     Mr. Boone or Mr. Baynes?  It's really not a contest, is it?

16             Ms. Morreale also, she never saw people get robbed in

17     front.  She's watching out her window.  He claims that he and

18     Quay Quay stayed by the door, Baynes does.  Again, contradicted

19     by all of the independent evidence.

20             Now who was at 54 Chambers?  Again, we don't have to

21     prove that.  But the government has to prove it.  The

22     government hasn't proved at all that Mr. Thomas was there.  You

23     have Bash, you have Baby, you have Baynes, you have Stacks,

24     according to Mallory.  I don't know why L-1 is not included in

25     there.  Talk about a heavyset guy, an older guy.  He's casing

1    the joint a couple hours before at Ms. Morreale's house.  He's

2    the boss.  If you look at T3 Mallory says the older guy.  At

3    least Baynes said that Mallory told him that.  Gangsta Lou,

4    someone we heard about.  Snelly.  It's easy even to get to

5    seven without Mr. Thomas.  Whether there were four or five or

6    even seven.

7          Mr. Baynes testified initially early on that he lied

8    because he didn't want to do to jail.  Really, nothing's

9    changed.  He doesn't want to go to jail.  He'll do anything.

10   He doesn't want to stay in jail at this point.  He wants to get

11   out.  And the government will get up and say but he has to tell

12   the truth to get out.  We'll talk about telling the truth and

13   keeping your deal.

14         By the way, Mr. Baynes is someone who has a history of

15   robbing drug dealers, has a history of drug abuse.  Five joints

16   a day he averaged.

17         Now, Daniel Williams we'll dispense with rather

18   quickly because I don't think she's significant in the context

19   of Mr. Thomas.  She doesn't say he sold any drugs.  She doesn't

20   put any drugs in his hands.  Listened to that testimony very

21   carefully.  And she has him hanging out again during the 2008

22   2009 period.  Oops.  He's in prison.

23         Her information is clearly derivative of others.  She

24   was on the street.  She's picking up information.  She picks up

25   information in the prison.  She claims she met Mr. Thompson

1    2009, maybe 2008.  Impossible.  Another Perry Mason moment.  I

2    can't take credit for it.  The government brought that out on

3    redirect.

4            Also when she said "I see Gucci."  She stood up here

5    and said "I see Gucci over there."  Interesting.  Because when

6    she was shown a photo of Mr. Thomas back in 2012, October 2012,

7    shown a photo of him -- this is T6, another stipulation we put

8    in yesterday -- she identified him as someone she recognized

9    and had seen before but said I don't know his name.  But she

10   comes in here and has the audacity to make it seem to you that

11   she knows him, that she knows his family, information she can

12   pick up off the streets of Newburgh in five minutes.

13           She had been an informant, picking up information for

14   the police for a year.  This is her job.  Eighty year mandatory

15   minimum sentence.  What do you think she's capable of doing to

16   get out from under that.  She, again, with an extensive

17   criminal history, extensive drug use, ripped off her own sister

18   with cancer.  Her respect for the judicial process.  Her

19   concept of truth being in her best interests.  She's gamed the

20   system over and over again.  She's played both sides.  She was

21   an informant leading a criminal lifestyle at the same time.

22   She destroyed evidence of a murder.  She was aware of the

23   negative consequences it could have for her relationship with

24   the police.  She did it anyway.  She was aware what lying could

25   have as a negative consequence for her cooperation agreement.

 1    But you know what?  She did it anyway.  Here.  She intimidated

 2    a witness.  And she was caught again.  She signed another

 3    cooperation agreement.  Just plan B, plan B.

 4            Same is true with Mallory.  That's a guy with a

 5    history of armed robberies of drug dealers.  Do you think he

 6    was really home that night when they were robbing the drug

 7    spot?  Nine different robberies.  I think seven of them are

 8    drug dealers.  Six armed.  This is a guy who shoots at people.

 9    His drug history, PCP, marijuana, on a regular, regular basis.

10    Think about the ability to perceive and the ability to

11    remember, leaving aside the deliberate lying.

12            This is a guy who tested positive -- the day he

13    pleaded guilty he tested positive for PCP and marijuana.  The

14    magistrate judge said okay we understand you're going to test

15    positive today but stay away from drugs from now on.  So ten

16    days later, PCP, positive; marijuana, positive.  And if that

17    wasn't enough, he added cocaine in the interim too.  So he

18    tested positive now for cocaine as well.  This is a guy who

19    understands what's in his best interests?  No.

20            He knew that it was in his best interests to tell

21    everything that he did so it could be covered in his

22    cooperation agreement, so he couldn't be prosecuted for it

23    afterwards.  He knew it was in his best interests to make

24    complete disclosure about what happened to Mr. Henry because

25    otherwise he could lose his deal.  He knew it was in his best

1   interests not to continue to use drugs because if he tested

2   positive he could lose his deal.  And he went to jail for it.

3   They let him get out on bail without even a dollar of security.

4          He knew it was in his best interests once he was

5   cooperating not to commit more crimes on the street.  He knew

6   that was in his best interests.  He knew that was going to

7   jeopardize his deal.  He did them all anyway.  Just like he

8   lied here.  Even though, on an objective level, it was in his

9   best interests to tell the truth.  He doesn't think that.

10  That's not the way he thinks.  That's not the way he's lived

11  his life.

12         Let's talk about his testimony.  And in a stipulation

13  that we put in yesterday I think at some point during his

14  testimony he said that Mr. Thomas had told him the night after

15  that Mr. Thomas comes back, he claims that Mr. Thomas comes

16  back the night after; the night of the 15th or the morning of

17  the 16th, after midnight, on December 2010 and tells him that

18  Mr. Thomas says that Mr. Thomas had peeled off on Lander Street

19  to go home.  So let's look at the pole camera video, if we

20  might, please, from -- this is camera two on the corner.  This

21  is an exit essentially from 54 Chambers.  If we could run it

22  for a few seconds.  Starting at 24:51.

23         (Video recording played)

24         See that person going on the left.  And everybody else

25  going up First Street.  This is First Street.  That's Lander.

 1    Now, let's look at the camera five, first east.  Starting at

 2    about 24:52.

 3                    (Video recording played)

 4            That left turn onto Lander, the only problem with

 5    Mr. Mallory's story is it's the wrong direction.  There's a

 6    stipulation, T2, establishes Mr. Thomas lives in the opposite

 7    direction on Lander.

 8            Now, he had seen the video already by the time he told

 9    the government that because he doesn't tell the government that

10    until 2014, Mr. Mallory.  So he's trying to create evidence

11    here.

12            You can look at Officer Lahar's testimony, Government

13    Exhibit 251, as well as the stipulation about the directions on

14    Lander, where 138 Lander is, which is where Mr. Thomas lived.

15            Now, Mr. Mallory's memory, it's not really a memory.

16    It's just self-generated because somehow it took him 18 months

17    rather -- rather 18 months after the events.  He can't remember

18    certain things that should be remembered by someone involved at

19    that level, like whether he gave the gun or Kev Gotti,

20    Mr. Burden gave the gun.  First he has -- his hands are off it

21    completely.  It's all Gotti.  And he says he didn't remember.

22    Then all of a sudden it changes again in 2014.

23            Now he doesn't remember that.  He doesn't remember --

24    even within a month of this trial he doesn't -- claims not to

25    remember whether it was a text or a phonecall he got from L-1

1   that night.  He doesn't remember whether he or Kev Gotti gave

2   the gun.  He doesn't remember when people came back and shot

3   out the window.  He doesn't remember whether that was before or

4   after.  None of that he remembers.  But somehow he remembers

5   fifteen months after the event that Mr. Thomas is wearing a

6   white scarf.  Maybe he got that off the video too.

7              On the 14th of December 2010 he's involved in a

8   marathon smoking and drinking session, Mr. Mallory is, with

9   Mr. Burden.  Mr. Burden, who the government said yesterday,

10  Mr. Mallory hated cooperating against.  Just hated.  He

11  probably hated it just as much when he taped him for two hours

12  to get him to make all these incriminating admissions.

13  Probably hated it just as much when he shot him in the foot.

14  I'm sure he hated it.

15             This is a guy, Mallory, is really capable of anything.

16  And he's proved it over and over again in his life.  No matter

17  how cold, no matter what it takes.  His objective, pretty

18  clear.  He shot at people because he had an idea that they were

19  responsible for shooting at him.  That was the level of proof

20  he had.  He had an idea.  Do you think he has a problem

21  throwing Mr. Thomas under the bus in this case?

22             Let's look at some other things that he changed his

23  story on, Mr. Mallory.  He comes here and says -- talks

24  about -- starting in the middle of 2014 all of a sudden now

25  Mr. Thomas has come back to him the next day.  He doesn't talk

E819chr2                    Summation - Mr. Dratel

 1   about that conversation, that meeting afterwards until 2014 is

 2   when he first brings this up.  And he says that he came back

 3   with the .38.  But he had previously said he never saw those

 4   guns again.  He talks about the other gun coming back at -- on

 5   the tape itself Mr. Burden says I never saw that chrome again.

 6   That's in section one -- excerpt one that the government played

 7   during trial.

 8          Again, Mallory can't say whether Kevin Burden shot the

 9   gun out the window to test it a few days before or a few days

10   after.

11          Reasonable doubt.  All you need is one.

12          He says Mr. Thomas came back the next day to try to

13   get rid of the gun, looking for L-1.  It's as if L-1 can't be

14   found.  Everybody seems to find L-1 all the time.  That's a

15   preposterous explanation for a meeting that never occurred.

16          This is a -- Mr. Mallory, this is a flawless liar,

17   with a history of lying.  He has been, for most of his life

18   undetectable.  Think about him out on the street playing both

19   sides flawlessly.  Think about him with his friends, taping

20   them down.  They spent a lot more time with him than you have.

21   They know his tells a lot better than we do.  Undetectable.

22   Cross-examination helps.  But it only helps to a degree.  But

23   it gives you reasonable doubt.

24          Now, the Mallory tape that Mr. Burden.  Again, feeds

25   him all the information.  Feeds him the chrome .38.  Feeds him

1    who was involved in the homicide.  He feeds him all that

2    information to get it back from the hapless Mr. Burden.

3            Who knows what Mr. Burden would have answered if

4    allowed to?  Mr. Mallory couldn't take the chance of letting

5    Mr. Burden answer independently.  He had to give him those

6    names.  That's corroboration somehow?

7            Mr. Burden at one point says everybody came up in a

8    cab.  But I thought it was just two people came, Mr. Thomas and

9    Mr. Whitaker.  The stories don't match.  The details don't

10   match.  Small details should match.  They don't.

11           Again, Mr. Burden says he never saw the chrome .38

12   again.

13           There's nothing from Mr. Burden about the

14   December 15 -- supposedly the posthomicide meetings with

15   Mr. Thomas back at 260 First Street.  Do you think if it

16   occurred Mr. Mallory would have talked about that too?  Or

17   Mr. Thomas trying to return the gun?

18           Some other things about Mr. Mallory.  That he blamed

19   L-1 initially in his -- in his conversations with the

20   government for shooting Mr. Burden he blamed L-1.  He's quite

21   capable of putting the blame on others without any basis.  And

22   he layered with all sorts of detail.  He's sitting there.  We

23   have it during cross.  You can see it in the transcript.  He

24   was there with a three-year-old.  He heard shots.  He saw holes

25   in the wall.  Complete fabrication.  It's not until 2014 that

1    the truth comes out.  That he shot Mr. Burden.

2          He says he turned himself in.  Remember, first

3    thing -- well, then, I turned myself.  Turned myself in?  He

4    tested positive and they revoked his bail.  Do you think he

5    thought maybe that he won't get caught in a lie?  That -- it

6    doesn't register with people like him that the truth matters.

7          Kept committing crimes while he was cooperating.

8    Robberies.  Attempted burglary.  Drug use.  He said I didn't

9    disclose it because I didn't want to lose my deal.  That's what

10   he said on the stand.

11         So if he's willing to commit crimes not to lose his

12   deal, do you think he's willing to lie because he perceives

13   that's how not to lose his deal, even though the opposite might

14   be true on an objective level.  This is not an objective

15   determination by these witnesses.

16         A month before the trial June 26, 2014 he's claiming

17   it's a text, not a phonecall.  He's making the excuse:  L-1 hid

18   my phone.  He says his phone couldn't accept calls.

19         He talks about on the stand, Mr. Thomas, he says

20   definitively, he's a Blood.  Yet in January of 2012 his very

21   first session cooperating, it's in evidence as Defendant

22   Thomas' M, it's a photo of Mr. Thomas with Mr. Mallory's

23   handwriting on it.  It says "If blood."

24         "If Blood."  Did you hear that kind of equivocation or

25   hesitation when he answered it on direct?  No.  Why?  Because

1    he's lying and he thinks he can get away it; not just with you,

2    but with them

3            You know what, he was pretty good at it, for most of

4    the time, and he's continued to be good at it because he still

5    has his deal.

6            Don't be distracted by this Bloods evidence.  That's

7    not what this case is about.  It's not the conspiracy.  This is

8    finite.  This is a piece in time.

9            And also with respect to Mr. Thomas.  You heard a lot

10   about formal Blood stuff inductions and all the other things

11   that Mr. Mallory -- nothing about that with Mr. Thomas.

12   Nothing.  You heard he was a Crip.

13           Now, Mr. Mallory's deal.  Seventeen year mandatory

14   minimum if he doesn't get his deal.  But he can go all the way

15   down to time served.  That's the objective.  He says they're

16   going to rip up my deal if I lie here.  Well, he committed two

17   robberies and an attempted burglary.  They found out about it

18   after he signed.  He's supposed to have disclosed.  That's a

19   condition of his deal.  Ripped up?  No.  Tested positive for

20   drugs right after.  Supposed to not commit anymore crimes.

21   Ripped his deal?  No.

22           He didn't volunteer this stuff.  He was confronted by

23   the government about the two robberies and the burglary.  He

24   didn't voluntary.  He didn't say, by the way, I left some stuff

25   out, I'm going to come clean.  Ripped up his deal?  No

1           Changed his story dramatically.  Comes up with things

2     in 2014 about Mr. Thomas coming back with the drugs.  Oh, yes I

3     gave him one of the guns.  Did they say, hey, you lied to us?

4     No.  Ripped up his deal?  No.

5           He robbed people.  They didn't rip up his deal.

6           It's been two years since the government learned in

7     November 2012 about the other robberies and the drug use.  Deal

8     is still there.  You saw it.  It's on paper.  You saw the

9     signatures.

10          He violated two of the three fundamentals of his

11    cooperation agreement.  Tell everything.  Don't commit more

12    crimes.  The third one is testify.  For him that's the one

13    that's going to take him home.

14          What's the lesson, by the way, if someone does what he

15    did and keeps his cooperation agreement?  What do you think the

16    lesson is about telling the truth here in court?  That it's

17    necessary?  For someone like him?

18          He is a survivor with a long and violate criminal

19    history.  He says on the tape.  "I'm hustle not muscle."  He's

20    both.  And with a bias against Mr. Thomas.  He says Mr. Thomas

21    robbed him twice.  You think this is not some payback?

22          Talked about his relationship to the government in

23    2012.  If February of 2012 when asked about his relationship

24    with Mr. Thomas.  And by the way on the stand he didn't say

25    they were friends.  He resisted that.  He talked about it with

Mr. Thomas.  He said, yeah, I know his brother.  We grew up

together.  I've stayed at his house.  Left out the fact that

two weeks earlier Mr. Thomas' sister had had his child.  Left

that out.  Ask yourself why.

         Think of what he did to Mr. Burden.  Close friend.

Fellow Blood.  Taped him to incriminate him.  Shot him in the

leg.  And he likes Mr. Burden.  He does not like Mr. Thomas.

         Then Mr. McDermott, again.  He said he agreed it's a

matter of life and death for him.  To stay in this country.

Now, when he's arrested on the robbery, he admitted, he knew it

was trouble.  He knew it would jeopardize his ability to stay

in the United States.  He knew the stakes.

         This is January 31, 2011.  The murder occurred six

weeks earlier.  Do you think if he had witnessed all this stuff

he would say, hey, I got stuff to trade?  I can be valuable to

you.  I know stuff about this murder that everyone wants to

know about because it's big news on the streets of Newburgh, as

you can tell.

         Does he do that?  No.  It's only after he spent some

time in Orange County jail talking to Baynes, talking to

Mallory -- he talks to Mallory later but talking to Baynes,

talking to others in the Orange County jail.  Then all of a

sudden, a year later, in January of 2012 the same time that

Mallory begins cooperating, all of a sudden Mr. McDermott comes

forward to the prosecutors and says:  Hey, I've got stuff to

1    trade.  But he does meet up with Mallory at GEO.  And then all

2    of a sudden Mallory vanishes from those conversations.  And

3    Mr. McDermott talks about it.

4          There's a certain illogic in Mr. McDermott's testimony

5    as well.  Not just in the fact that it was created later.  But

6    he says that he -- when asked by the government about this

7    claim of overhearing a conversation between Mr. Burden and

8    Mr. Thomas the day after the Henry homicide, he's asked:  Did

9    they know that you were overhearing it?  He says no.  But then

10   somehow later he gets shot at by someone, Snelly, apparently

11   allegedly shoots at him to keep him quiet.  Why?  When no one

12   knew he was overhearing?  Why does Gotti warn him later,

13   Burden, according to his direct testimony, why does Gotti warn

14   him later if nobody knew he was overhearing it?  Doesn't make

15   sense.  Does doesn't match an important detail that is the

16   hallmark of candor.

17         Also, Burden lived downstairs.  Mallory lived

18   upstairs.  They're having conversation with Mr. Thomas.  They

19   know how to get privacy if it's an important conversation about

20   a homicide.  They don't have to have it out in the open where

21   people can overhear it.

22         The Court is going to give you an instruction about

23   cooperating witnesses.  Listen to it carefully.  You'll be able

24   to have it read to you.  You may have it with you in the jury

25   room when you deliberate.  I'm not going to invade the Court's

1    province and tell you what it is.  It's also legalistic

2    language.  I think it's better if you're reading it when you're

3    hearing it at the same time.  It's more understandable

4           That's the testimony of the cooperators.  Where does

5    it match?  Where does anybody say the same thing about

6    anything?  Because it's all self-generated, generated through

7    their illusion

8           The government talked about corroboration.  Remember

9    all those words I talked about at the beginning.  The

10   government said corroboration.

11          Okay.  They had Mallory corroborating himself in the

12   closing argument.  Where's the corroboration?  So let's ask

13   these questions, these important questions about Mr. Thomas and

14   the case against Mr. Thomas.

15          Where's the corroboration for Mr. Thomas getting a .38

16   from Mr. Mallory the night of the homicide?  Corroboration is

17   nothing.

18          Where is the corroboration for Mr. Thomas coming back

19   the next night with the gun to meet with Mr. Mallory?

20   Corroboration is nothing.

21          Where is the corroboration of Mr. Thomas rather than

22   someone on a video who you can't recognize wearing a white

23   scarf?  Nothing.  There is no evidence he even owned a white

24   scarf much less wore one that night.  Do you think you could

25   find testimony about a white scarf from someone in the entire

1    City of Newburgh?

2                Mr. McDermott's testimony about Mr. Thomas coming back

3    the next day, midday.  He was clear.  He said it was midday.

4    Where's the corroboration for that?  Nothing.  Not even from

5    Mr. Mallory, doesn't even corroborate that.  No corroboration.

6                By the way, how many times do you have to come back to

7    260 First Street after the robbery?  It's ridiculous.

8    Everybody just wants him back because they want to create this

9    story.

10               Where's the corroboration for Mr. Thomas being at 54

11   Chambers at all that entire evening?  Nothing.

12               They can't corroborate each other with different

13   stories about different events.  There is no corroboration for

14   the essentials of the government's case against Mr. Thomas.

15               Talk a little bit about the other counts now.  Kind of

16   grouped together in a certain way.  One, Two, Four, and Five is

17   really about the robbery homicide and use the gun and the

18   homicide itself.  Three and Six are about a separate drug

19   conspiracy that's been charged.  Let's talk about that.

20               The length of these conspiracies, the robbery

21   conspiracy and the drug conspiracy, Mr. Thomas, as I noted is

22   in jail for almost the entire period of both conspiracies.

23   Before and after.

24               Let's talk about the drug conspiracy.  You heard the

25   testimony.  There is no organization involved in drug dealing

1    in Newburgh.  You do your thing.  I'll do my thing.  You may do

2    your thing fifteen feet away from me and I'll do my thing and

3    occasionally we swap out something.  Whole group of separate

4    sellers.  Not a conspiracy.  Mr. Mallory didn't have partners,

5    didn't share profits.  None of that.

6            The court is going to instruct you on conspiracy,

7    something called multiple conspiracies as well.  Listen

8    carefully.  See how it applies to this case.

9            This conspiracy is not the whole City of Newburgh.

10   They have to prove to you an agreement among people to do

11   something illegal.  Not haphazard, sporadic, isolated events.

12           Experienced Newburgh cops.  You heard thousands of

13   arrests.  The Lahars.  Were they familiar with Mr. Thomas?  No.

14   They watched these open-air drug marts, surveilling.  They

15   weren't familiar with Mr. Thomas out there.  Because he wasn't

16   involved in a conspiracy to sell drugs.

17           Mr. McDermott said he never saw Mr. Thomas selling

18   crack.  Nothing from Danielle Williams either about that.  No

19   sales.  No surveillance.  No nothing.  Except for an ancient

20   one in 2007 that, again, is not part of this conspiracy.

21           Mr. Mallory testified that Mr. Thomas would ask for

22   money, to borrow money and then Mr. Mallory would give him

23   crack to sell instead.  First, corroboration?  Zero.  Second

24   is, even if that's the case, I submit to you that's not

25   conspiracy to sell narcotics as alleged in the indictment.

E819chr2                      Summation - Mr. Dratel

1            Robbery conspiracy.  You heard from the officers.  You

2       heard from Mallory that Mr. Thomas' arrest in 2011, even though

3       it was a robbery call, was a separate incident not involving

4       him.  Nothing to do with him.  There is no conspiracy to rob.

5       Really the only thing at issue is the Henry homicide and the

6       robbery that went along with it.  And we've talked about that.

7            That weapon, again, inoperable.  A generic description

8       of six black men in dark clothing.  Nothing about Mr. Thomas.

9            Talk about guns.  Mr. Thomas with a gun.  If he always

10      had the gun, why would he need one from Mr. Mallory on the

11      14th?  The only thing that anybody has with it is a .22

12      that's not operable.  That's the only gun that's put in his

13      hand in the entire case.

14           Certainly can't find that for Count Four, which is the

15      Henry homicide.  Nothing even alleges that that weapon is

16      involved.

17           Again, listen to the instructions.  Possession versus

18      what it takes to actually be guilty of a firearms offense as

19      charged in this case.

20           Come back to common sense and life experience which

21      each of you have.  Apply it.

22           The government said something yesterday that I agree

23      with.  Don't go numb.  I agree.  I have a different take on it.

24      Jeffrey Henry was murdered.  That is a terrible thing.

25      Violence is terrible.  Newburgh sounds like a place where

E819chr2                    Summation - Mr. Dratel

1    there's too much of it.  Too much crime.  Too much drug use.

2    Too much drug selling.  Too much Bloods influence and activity.

3    Too much of all of that.

4          Don't go numb, throw up your hands, and say someone

5    has to pay for Jeffrey Henry's murder.  And all you've got to

6    fulfill that is Mr. Thomas.  Don't do that.  Don't go numb from

7    this.

8          Don't go numb about the conditions in Newburgh, that

9    you take it out on Mr. Thomas because he's the only person, as

10   far as I'm concerned, here for you to do that.  He's a real

11   person too.  Don't forget that.

12         Don't go numb.  The consequences for him are as

13   important and life-changing as anyone can face.

14         The evidence is what counts.  Not the emotion,

15   legitimate emotion that wants to hold someone, anyone

16   accountable for Jeffrey Henry, for Newburgh, for the whole

17   mess.  Two wrongs do not make a right here.  Do not convict

18   someone who did not commit a crime.

19         The judge will instruct you about reasonable doubt.

20   Take the judge's instruction, obviously, if it's any different

21   than what I'm saying.  But it's a doubt that would reasonably

22   cause a prudent person to hesitate in acting in matters of

23   importance in his or her own affairs.  Think about that.

24   Something that makes you hesitate before acting in a matter of

25   importance in your affairs.  Think of it in your loved ones

E819chr2                    Summation – Mr. Dratel

too.  Sometimes we're maybe more incautious, less cautious with
ourselves than we are for those we care about.  Think about
that one too for your loved ones.

          There are many reasonable doubts.  There are a lot of
reasonable doubts in this case.  You only need one.  I'm not
going to go back through all of them

          I just want to talk about the cooperators a little bit
in terms of reasonable doubt and acting at something important
in your own life or the life of a loved one.  If you were in a
dark room with the curtains drawn, closed and Mallory or
Baynes, and you had something you were wearing, something that
was an outfit that you didn't want to get ruined.  And you said
is it raining outside?  And they said no, it's not raining.
Mallory said no, it's not raining.  You would go draw back
those curtains and check even on something of that little
importance.  And if Baynes said no, no, no, he's right, it's
not raining, you'd still go.  You could throw in Williams.  You
could throw in McDermott.  You'd still go check

          Imagine if it was something really important.  What if
you needed -- what if you had a condition and you went to a
doctor, Dr. Mallory, and he said you need surgery and it was
Jamar Mallory.  Would you get a second opinion?  And if the
second opinion was from Baynes, you'd get a third opinion.  You
would not trust these people in something of importance in your
life.  Throw in McDermott.  Throw in Williams.  You'd want a

1    fifth opinion.  There's a reasonable doubt as to each of them

2    and all of them.

3              Would you want to be judged on the basis of their

4    testimony?  Would you want a loved one to be judged on the

5    basis of their testimony?

6              I won't be able to speak to you again.  So I've tried

7    to anticipate some of the arguments the government will make in

8    rebuttal.  I won't have the opportunity to respond.  But I'm

9    asking you to do that for yourselves, for the integrity of this

10   critically important process that we're in.  Not just for

11   Mr. Thomas but to the whole system of justice we have, so that

12   when you hear the government's arguments in rebuttal, test them

13   against the evidence.  Test them against the lack of evidence.

14   The lack of corroboration.  The lack of credibility.  The lack

15   of consistency.  Test them against your common sense and your

16   life experience.  And ask yourself and ask the government the

17   hard questions to yourself and in the jury room, whether the

18   government has proved this case, each element of each offense

19   against Mr. Thomas beyond a reasonable doubt.

20             As I mentioned, consider this as carefully as you need

21   to.  Because everything is available to you, exhibits,

22   testimony, jury instructions.  Use your common sense in

23   recognizing what's accurate and what's not, what's true and

24   what's not, what's reliable and what's not, what makes sense

25   and what's not.  I submit to you that when you've done that you

E819chr2                    Summation - Mr. Dratel

1    cannot determine beyond a reasonable doubt that Mr. Thomas

2    committed any of the crimes that he's charged with here.  I

3    submit to you the only verdict that the evidence compels is

4    that Mr. Thomas is not guilty on each and every count.

5              Thank you.

6              THE COURT:  Thank you, Mr. Dratel.

7              Ladies and gentlemen, let's take our morning break.

8    It's 40 after.  So please be in the jury room no later than

9    10:55?

10             (Jury excused)

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  You can be seated.  Nothing for me?

3          MR. NAWADAY:  Your Honor, can we just confirm timing.

4    Will the government be after lunch or are we going to try to

5    push through?

6          THE COURT:  Well if Mr. Greenfield is correct I think

7    we'll go about an hour and 45 minutes or so, give or take, and

8    we'll break for lunch.

9          MR. NAWADAY:  Thank you.

10         THE COURT:  We'll break for lunch in any event.

11         (Recess)

12         THE COURT:  We're going to get the jury.

13         MR. BAUER:  One question.  You're going to send the

14   exhibits back -- not the guns and drugs?

15         THE COURT:  Correct.

16         MR. BAUER:  So not physical evidence?  All those bags

17   of clothes?

18         THE COURT:  No.  None of the bloody clothes.  None of

19   the swabs.  Only documents.  Pictures, documents.

20         MR. BAUER:  We were going to prepare a modified

21   exhibit list, the one that we've been using, but delete all of

22   the entries for the things that weren't admitted.

23         THE COURT:  That's fine.

24         MR. BUCHWALD:  If I can just, in that respect, there

25   are a few of your exhibits that are misidentified.  There are

E819chr2                    Summation - Mr. Greenfield

1    things that you called projectiles instead of casings.  You

2    remember a few of those?

3              MR. BAUER:  Why don't we talk about it outside of

4    the --

5              THE COURT:  We won't be giving them that until after

6    lunch so maybe you guys can figure all that out after lunch.

7              Let's get the jury.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E819chr2                        Summation - Mr. Greenfield

1          (Jury present)

2          THE COURT:  Everyone please be seated.

3          On behalf of Mr. Christian, Mr. Greenfield.

4          MR. GREENFIELD:  Thank you, Judge.

5          Members of the Jury, as you know I represent Raymond

6     Christian and I'm here to present our closing arguments during

7     the course of this case to you.  I want to make an assurance or

8     two before I begin my presentation to you.  I will make every

9     effort during the course of my comments to you to be true to

10    the record, which you now are aware of, every word that's been

11    said during the course of the trial has been reduced to

12    writing.  I will be true to that record.  I will make,

13    hopefully, reasonable arguments to you.

14         I ask you to do this.  If you agree what I'm saying,

15    write it down and argue it for me, or more importantly for

16    Mr. Christian, when you go back into the jury room because this

17    is the last chance that I'm going to have to speak with you.

18    And I'm not going to be able to rebut whatever the government

19    says in their reply summation.  So, please, take notes.  Make

20    points if you thought I made a significant or important point,

21    make a note of it.

22         I'd like to start right at the heart of the

23    government's case and that is Raymond Christian is accused of

24    being present at 54 Chambers Street during the course of a

25    robbery on December 15, 2010.  And the accuser is Anthony

1    Baynes.  Let's look at what was said.

2           The government said it was an overwhelming case.

3    Let's examine an overwhelming case.  Baynes testifies that as

4    he is walking back or to the scene at 54 Chambers Street he

5    sees five men on the street being "his friends" with masks on

6    and three men being robbed.  One of the victims of the robbery,

7    alleged robbery, was Akinto Boone.  He said I wasn't robbed.

8           I asked him a couple or three times.  I think the

9    third time he said what the hell is wrong with you, I wasn't

10   robbed.

11          And there was another witness to this alleged robbery.

12   Looking out a window from across the street is Barbara

13   Morreale.  She didn't say she saw a robbery.  So right away you

14   have to ask yourself what was the government talking about

15   yesterday when they said they had an overwhelming case against

16   Raymond Christian?  What is overwhelming about the fact that a

17   key witness against my client is saying something that never

18   happened, and he said it under oath.

19          Was he mistaken?  Was he confused?  Or was he the

20   L-word, lying?

21          Then he said that he was assigned the role of a

22   lookout.  He was assigned the role of lookout across the street

23   facing toward the door at 54 Chambers Street.  And then came a

24   time when he was so curious about what might be happening at 54

25   Chambers Street he crosses the street and he starts peering in

E819chr2                     Summation - Mr. Greenfield

1    the door.  And alas, he sees Raymond Christian being set upon

2    by somebody in the apartment and that they're wrestling for a

3    gun.

4           What did Barbara Morreale say about that?  She was

5    looking out her window at the same time.  She was concentrating

6    on that door.

7           What did she see?  She didn't see any two lookouts

8    crossing the street, two kids peering in the door, two kids

9    with curiosity looking in the door.  Neither one masked.

10   Neither one with a gun.

11          All she said she saw was Joker with his arm -- hand on

12   the door leaning in, one leg against the door, and the

13   telephone in his hand.  Never once did she say she saw two kids

14   peering in the door.

15          Proof beyond a reasonable doubt?  Or is the witness

16   mistaken again?  Was he confused?  Was he just making it up as

17   he was going along?

18          The next thing that happens in the apartment.  Baynes

19   says he sees Raymond Christian wrestling for a gun with a man

20   in the apartment; that the man he was wrestling with was about

21   the same size as Mr. Christian.  That's what Baynes says.

22          What do the witnesses inside the apartment say?

23   People in the apartment say the first one is Tarrence Smith.

24   He was near the bedroom and he saw four masked men come in;

25   that they were -- at one point Akinto Boone was going toward

1    the bathroom and at another point Akinto Boone comes out of the

2    bathroom and he's wrestling with a man for a gun.

3                  (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        That he went to Akinto Boone's aid and I stabbed him

2   twice in the side.  If that is Raymond Christian who was

3   fighting for a gun with Akinto Boone, he certainly didn't bleed

4   out of his side.

5        Who was bleeding in that apartment that day?

6        Baynes.  That is who was bleeding in the apartment.

7   So he wasn't wrestling Raymond Christian for a gun.  He was

8   wrestling the masked, armed Anthony Baynes.

9        You have heard talk about the DNA.  I will establish

10  for you beyond any doubt that that DNA that was in that mask on

11  that day was not, not inconsistent with the DNA of Quay Quay

12  Boykin, his brother.

13        It's not forty hundred gazillion to one that it was

14  his DNA.  It's almost one to one that neither is inconsistent

15  with the other, and each of them could have worn that mask in

16  that apartment on that day.

17        We will get to that later.  The first part of my

18  presentation to you is what happened that day and under what

19  circumstances did it happen.  Why would Baynes come to you, get

20  on that witness stand, and say that he went to the aid of

21  Raymond Christian in the apartment that day?

22        We will get to that in a few moments.  But Akinto

23  Boone certainly corroborates what Tarrence Smith said.  He was

24  fighting a guy for a gun.  He wasn't watching what was going on

25  around him, but clearly somebody got stabbed and it all

1   happened in the kitchen area.

2            What does the government's star witness say,

3   Mr. Baynes?

4            He and Quay Quay were outside.  He and Quay Quay were

5   not wearing masks.  He and Quay Quay were unarmed.  They

6   entered the apartment unarmed and without masks, which neither

7   of the two witnesses, Boone or Smith, say happened, that

8   everybody was armed is what they say, everybody had guns is

9   what they say, and everybody was masked is what they say.

10           So it was proven through the testimony of Mr. Baynes

11  and through Akinto Boone and through Tarrence Smith.  Somebody

12  got stabbed in that apartment and the person who got stabbed in

13  that apartment was armed and masked.

14           Now it could be Raymond Christian who was stabbed.  It

15  could be Anthony Baynes who was stabbed.  But we have

16  corroboration of who was stabbed.  That's real corroboration.

17  Anthony Baynes bled like a pig in that apartment.  His blood

18  was all over that apartment.  So we know who got stabbed, so we

19  well may know who was fighting for the gun with Akinto Boone.

20           But the government says they have an overwhelming

21  case.  Don't be distracted by these nonissues that I'm raising.

22  Am I raising a nonissue here, ladies and gentlemen, or am I

23  talking about a sensible argument to you?  If the man was

24  fighting for a gun and he had a mask on and he bled, this man

25  would have been in the hospital that night.

1          He was not the man in the hospital.  The man in the

2     hospital that night was Anthony Baynes.  They consider their

3     case a solid brick wall.  I start with you are down the golden

4     brick road whatever it was from Alice in Wonderland.  It is a

5     start.  But let's see where we go.

6          Is Smith mistaken as to who he stabbed?  He knows that

7     he stabbed a guy and he stabbed him twice.  He may not have

8     seen the face, but he knows blood came out.  Boone knows that

9     he was fighting for a gun and some guy got stabbed.  The guy he

10    was fighting with had a gun and he also was wearing a mask.

11    Why would Anthony Baynes deny wearing a mask, really deny

12    wearing a mask and possesssing a gun?  Because he created a

13    role for himself.  He created the role of being a lookout

14    across the street with Quay Quay.

15         He said nobody saw these lookouts.  These lookouts saw

16    Baynes and no one else saw.  Robberies of three grown men that

17    no one else saw.  Somebody peering through the door 54 Chambers

18    Street that no one saw.

19         They are allegedly peering into 54 Chambers to see

20    what is going on.  Barbara Morreale told you that Joker was at

21    the door trying to keep the people inside.  It's not

22    reconcilable.  There is a reasonable doubt as to their story.

23         In their rebuttal summation have the government stand

24    up before you, stand here and say this is how I reconcile that,

25    and have them prove it to you beyond a reasonable doubt,

1    because that's the standard that the judge will provide you

2    with during the course of his instruction.

3            Don't make a mistake about this.  Baynes is the

4    foundation of that brick wall that they say they produced for

5    you.  Baynes is not one brick of that wall.  As far as Raymond

6    Christian's case is concerned, Baynes is every brick in that

7    wall.

8            Because without Baynes there is no testimony as to

9    what occurred, how Raymond Christian was there, if he was

10   there, and what happened with Raymond Christian during the

11   course of that day and on other days.  He is the case.

12           Again, put the DNA aside.  I will address that toward

13   the end of my summation.  But put the DNA aside and ask

14   yourself, without Baynes placing Raymond Christian in that

15   apartment, what proof have they brought before you?  I could

16   tell you, other than two sentences out of Mallory's mouth that

17   he was told something, zilch, nada, gornisht, nothing.

18           The government has told you that Tarrence Smith,

19   Akinto Boone, and Barbara Morreale are bricks in that wall.

20   You have to pull those bricks out, because they disagree with

21   everything that Raymond Christian allegedly did, and they

22   absolutely fly in the face of anything that Anthony Baynes said

23   Raymond Christian did.

24           So it's either you accept the testimony of Terry

25   Smith, Akinto Boone, and Barbara Morreale, or you disregard

E8lnchr3                         Summation - Mr. Greenfield

1    their testimony and accept only the testimony of Anthony

2    Baynes.  You can't have it both ways tell the government.  You

3    can't say they were mistaken.  You can't tell us, well, maybe

4    he got something wrong.  It is either he got stabbed in the

5    apartment with a mask or a gun in his hand or it is all a lie.

6          I come down to -- there's that old joke, but it is

7    important here.  Who are you going to believe?  Your lying eyes

8    or the lying lips of Anthony Baynes?

9          This will be the most difficult part of my summation,

10   getting this glove on.  I am going to make a mitten out of it

11   with your approval because I'll never get it on.  Here we go, I

12   have two mittens and a mask.  All we need is a cold day.

13         Here we go.  The government says this is a half mask

14   maybe.  Where does this become a half mask, ladies and

15   gentlemen?  You heard the testimony of Myers.  He said he

16   circled the inside of this mask from the top of the forehead to

17   the bottom of the chin.  Is that a half mask?  Why does it need

18   eye holes if it is a half mask?  This is a full mask.

19         Baynes said my client was wearing a half mask that

20   day.  How do they reconcile that?  Was he wrong about that

21   also?

22         Now, I asked both Mr. Smith and Boone where the

23   incident occurred, where the stabbing occurred, and actually at

24   one point I had asked, I had shown another diagram of the

25   apartment to Mr. Smith, I don't know if you recall this, and he

1    looked at it.  He said, That is not the apartment.  I said, It

2    is a diagram drawn by the police department of Newburgh.  Are

3    you saying that is not your apartment?

4              Finally we got him one that he was happy with.  This

5    is the one.  It's 259 in evidence.  It's the government's

6    exhibit.

7              Just to give you have a little background as to how

8    this exhibit was drawn, there was a diagram created by the

9    police department of Newburgh.  You are going to see a whole

10   bunch of names written down here.  Among the names that are

11   written here are Baby E, Reckless, Gucci, Quay Quay, Baynes,

12   Bash, Jeffreys and Bow Wow.

13             I had asked Mr. Baynes where the stabbing occurred.

14   And on the other diagram, which is back there -- if I can have

15   it, the other diagram.

16             Thank you.

17             Mr. Baynes came down, stood here.  He said this is

18   where it happened, with the X and the X2 are written.

19             Then in the same area, or nearby, Mr. Smith after our

20   little conversation that he was looking at the right diagram,

21   said nearby was where it happened and Boone testified about the

22   same, without looking at the mask.

23             But the importance of this, ladies and gentlemen, is

24   that I had asked him if he had ever told anybody previous to

25   this that the stabbing occurred somewhere else.

1           He said, Yeah.

2           I asked him, When?

3           He said when he spoke to Detective Cortez and an

4    assistant district attorney from Orange County.

5           And I said, Where did you tell them the incident

6    occurred?

7           And he said, About here, five or ten feet from the

8    entranceway.

9           So if it occurred five or ten feet from the

10   entranceway, he is now moving it deep into the apartment.  On

11   its face maybe he was wrong, but we know all the blood was here

12   or most of the blood was there.

13          I asked him, Why would you change that?

14          He says because the detective told him he was wrong.

15          I asked him, Was the detective there on December 15,

16   2010?

17          He said, No.

18          I said, So why did you change your testimony and move

19   it from the doorway all the way into the apartment?

20          He said because the detective told him so.

21          This is an independent witness.  They want you to rely

22   on who was told basically change your story because it matches

23   up with the story of the two witnesses.  They want you to rely

24   on that unhesitatingly.

25          Again, who are you to believe and believe beyond a

1    reasonable doubt?  Three independent witnesses, two of them

2    victims and a woman who likes to look out her window at night.

3    No interest in the outcome here, no desire to be favorable to

4    one side or the other.

5           You've got three street witnesses who told you this is

6    what happened, this is the way it happened, versus the word of

7    Mr. Baynes or the lying lips of Mr. Baynes.  You make that

8    determination, but certainly it is not reconcilable.  This is a

9    short point, but I think important to discuss.

10          Detective Loscerbo questioned Anthony Baynes within an

11   hour or two of the incident in St. Luke's Hospital on December

12   15, 2010, between 1 a.m. and 2 a.m.  Anthony Baynes told

13   Detective Loscerbo that four people were involved.  It was Quay

14   Quay, it was Baby E, it was Bash and it was he.

15          Baby E and Bash went inside, but he and Quay Quay

16   stayed outside.  That was basically two variations of the same

17   story he told Detective Loscerbo.  Detective Loscerbo leaves,

18   and I guess Anthony Baynes started to think:  I told them I was

19   outside, but a lot of my blood is inside.  So I guess I am

20   going to have to come up with another story.  So when the cops

21   come I will make another story.  It's easy.

22          So what's the story he tells when the cops come?

23          You know, it wasn't four of us.  It was five of us.

24   Raymond Christian was there, and I went inside to help him, and

25   I got stabbed trying to help him.  I wasn't wearing a mask.  I

1    didn't have a gun, but I was in there trying to help them.

2            Is that true?  We just went over what happened in

3    there.  Is that true or is it just the next story?

4            So he created a role for Raymond Christian, and he

5    placed Raymond Christian inside the apartment and put himself

6    outside the apartment.

7            The only problem is his blood was still inside the

8    apartment.  So he comes up with the stabbing story about coming

9    to the aid of Raymond Christian.  Well, again, Smith puts the

10   lie to that story.  Akinto Boone puts the lie to that story.

11           They say their case is overwhelming?  They say don't

12   be distracted by the arguments of the defense.  What kind of

13   distraction are the arguments I have made to you today?  Is one

14   of them unreasonable?  Is one of them wrong?

15           You are not being distracted.  I am telling you the

16   way I see it happened.  Let's go to what happened before the

17   robbery and ultimate murder of Joker.

18           Baynes says the day starts at about noon; that he and

19   his godbrother/friend, best friend Lou, leave his house and

20   cross town to the vicinity of 54 Chambers and then he and Lou

21   are checking spots.

22           Then along comes Quay Quay, along comes my client.

23   Don't forget this is the next day that he's telling the story,

24   but the important point is his best friend, this godbrother of

25   his, Lou, is along checking out spots.  Incidentally he was

E81nchr3                    Summation - Mr. Greenfield

1   asked the description of Lou and it was basically the

2   description of my client, age, height, similar weight.

3          Some cross-examination and guess what, it turns out

4   that his friend Lou, his godbrother, the guy he's with every

5   day almost his whole life, and Quay Quay are a trio.

6          And his name really isn't Lou, his street name is

7   Gangsta Lou and Gangsta Lou is walking around with he and Quay

8   Quay checking out spots.

9          Then, for whatever reason, unexplained, that day,

10  somewhere in the afternoon Gangsta Lou takes his leave, adieu,

11  and walks out, never to be seen again.

12         I asked him, You said every day of your life or just

13  about every day of your life you are with Gangsta Lou, your

14  buddy, your godbrother?  When is the last time you saw him that

15  day?  You haven't spoken to him since that day.

16         I haven't spoken to him that day.  He went home.

17  Baynes left the hospital, went home, and wasn't arrested for

18  four months.  And he didn't spend a day talking to Gangsta Lou.

19  Or did Gangsta Lou head to spots unknown?

20         After they are walking around checking out spots, they

21  end up hanging out on a porch somewhere near, on Dubois Street

22  I think it was, and from there they go to a, I think he said to

23  a restaurant of some kind.  Then they went to his mother's

24  house, and then he says they are trying to catch up with the

25  guys in front of them, and that's when he sees the robberies

E81nchr3                    Summation - Mr. Greenfield

occur on the street.  That's the date, December 14 into

December 15, about a half hour into the 15th from the day, the

hours he wakes up and hangs out with Gangsta Lou until the

murder occurs.

         After he gets stabbed, he says he goes to the home of

Quay Quay, which also happens to be the home of my client.  And

who was home when he gets there?  Quay Quay and Raymond's

mother, Quay Quay and Raymond's grandmother, and Raymond.

         Let me take a quick aside.  The government showed you

a series of letters that my client wrote to Baynes when he was

incarcerated asking him to be loyal, to stand up, to try to

help him.

         The government wants you to read those letters as

meaning he's guilty of something and he wants him to protect

Raymond from any prosecution.  That's what they want you to

read those letters to mean.  Now, Raymond is the older brother

of Quay Quay.  Raymond probably knows Quay Quay did something

was involved in something that night, because they came home

and one guy was bleeding.

         You could read it the way the government wants you to

read it, or you can read it, hey, don't hurt my brother.  If I

can, I'll help you, and I'll send you a few dollars.  And he

did.

         What else did Baynes say?  He said my client and he

were involved in robberies, and there was always a word that he

E81nchr3                        Summation - Mr. Greenfield

1    would put in there:  I was standing right next to him.  We did

2    two or three robberies, and every time I was standing right

3    next to him when it happened?

4            The same thing when there were guns.  I was standing

5    right next to him when I saw the gun.  I was standing right

6    next to him when he put three shots into the air, maybe two,

7    but three shots into the air.

8            We got him on that, ladies and gentlemen, and we got

9    him good.  You heard words of corroboration.

10           Well, look at this.  This is the gun that Raymond

11   Christian allegedly shot into the air that night.  It is a

12   two-shot Derringer.  It can't fire three shots, but it can fire

13   two shot.

14           You heard that Mr. Christian was arrested that night

15   for possession of this gun, even though it was inoperable.  But

16   you know what.  It had two bullets in it.  The gun wasn't

17   fired.

18           Then I went up to him.  I said you shot -- you're sure

19   you were there?

20           I was standing right next to him.

21           And how many shots did he put up?

22           I don't know, two or three.  Let me think, two or

23   three.  Maybe two.

24           Because he knew it was a Derringer.  It was loaded.

25           That's corroboration.  They want you to believe this

E8lnchr3                    Summation - Mr. Greenfield

1    guy.  It had two bullets in it.

2             Overwhelming?  You can rely on him unhesitatingly?

3             He's got an agreement with the government.  Therefore,

4    when Anthony Baynes gives his word, you can go to the bank on

5    it.  If you bumped into him on the street today, you probably

6    would run the other way.

7             I mean, but putting that aside, if he came up to you

8    and you didn't recognize him at first he said remember me, can

9    you lend me 25 bucks, would you consider it?  Would you take

10   the chance of paying him a few dollars and expect to get paid

11   back?  Would you buy a used car from him?

12            The answer is no.  Clearly no.

13            But his life, his existence, his freedom is worth a

14   whole lot more than $25 or whatever a used car would be.

15            Mallory.  Let me talk about him for a bit.  He says on

16   direct examination that on an unknown date in an unknown

17   location with no one else there, Raymond Christian told him or

18   said to him that he was involved in the incident, in the

19   robbery murder.

20            What do you do with that?  You've got a guy who

21   isolates himself, he says I was alone, there was nobody else

22   there.  What was it, 2009.  2010.  They all said the same

23   thing.  I mean, he could have been in school.  The day he was

24   arrested that could have happened, but what do we do with it?

25            You can't get behind those lies.  When a person

1    isolates himself, when there's no one there, just the two of

2    us, he said the following.  That should not be acceptable to

3    you as jurors.

4            Now I would like to address my attention, OK, to the

5    DNA evidence.

6            First, one last piece.  Mr. Mallory.

7            He was played a videotape.  This is classic.  And he

8    said, Stop the videotape, and they stopped the videotape at 25

9    minutes and 9 seconds after the hour on December 15, 2010,

10   Jamar Mallory told the government in -- what exhibit number is

11   it?

12           MR. BAUER:  It is not in evidence.

13           MR. GREENFIELD:  It is not in evidence.  He testified

14   that he saw somebody who looked like my client because he

15   recognized him by the way he was walking down the street on a

16   videotape which was played for you.  You couldn't make out a

17   face.  You couldn't even make out a color.  He walked the way

18   Raymond walked.  It was likely him.  Go to the bank on it.

19           Now I would like to go to the DNA.  No issue that

20   Raymond Christian's DNA is on the mask as a major contributor.

21   But the questions for you, that you should have for the

22   government of are these:  How did it get there?  When did it

23   get there?  Under what circumstances did it get there?  Who was

24   wearing the mask in 54 Chambers Street on December 15, 2010.

25           Why wasn't Quay Quay's blood compared to 3E, which is

1    the blood on the inside of the mask.  Why wasn't the crime lab

2    told that Laquavious Boykin, Quay Quay, was a half brother to

3    my client?

4           These are significant questions.  And I don't think

5    the government answered any of them.  This is what their expert

6    forensic scientist, Myers, testified to.

7           There was a mixture of three DNAs on the mask, 3E,

8    where they say the only spot in the whole crime scene with

9    respect to my client is the inside of that mask that day and

10   that it was a mixture of at least three people's DNA, the major

11   source of it being attributable to Raymond Christian.

12          But DNA has very significant limitations.  When DNA is

13   left behind on an item like a mask or on a lectern, like I'm

14   holding now, it's not time stamped.  It doesn't say David

15   Greenfield put his hands on the lectern at 11:35 a.m. on August

16   21, 2014.  It says, his DNA is on the lectern.  It could have

17   been there for days, months or years, and Myers told you so.

18          It could have even been transferred from somewhere

19   else to here.  I sat at the table and I put my hands on the

20   sides of the chair to get up.  I came over here, maybe I put my

21   hands here or didn't.

22          If somebody is going to sit in that chair sometime in

23   the near future, they will get my DNA on their hands, and they

24   are going to come here and they place it on the lectern, and my

25   DNA will be on the lectern whether as a major contributor or a

1    minor contributor, but it will be here.  So there is no time

2    stamp and it lasts for a long time in the appropriate

3    conditions.

4         Now this mask was seized by the police within hours.

5    We know they didn't do the most appropriate thing with

6    evidence.  On some cases they decided to open up the evidence

7    envelope and do a favor for the people up in Albany and take

8    cuttings and swabs.  They are totally untrained for it.

9         Myers told you it took him six months of training in

10   the police lab to do it correctly, and Detective Frederick told

11   you no big whoop.  I had a four-hour course back in 2002.  I

12   can do it.  15 to 20 times in his career he did that.

13        In this case he did that.  He admitted doing it with

14   Baynes' clothing.  You think he's going to get up there and say

15   I did it with the mask?

16        Here's another point and a more significant point.

17   The crime lab and the Newburgh Police Department failed to

18   consider who the minor contributors might have been in the

19   mixture of DNA.  They had made the determination that my client

20   was a major contributor, and therefore they never bothered to

21   check to see if anybody else in the case might have been a

22   contributor.

23        The police never bothered or the DA never bothered to

24   tell the crime lab that Laquavious Boykin was my client's half

25   brother.  There is a known suspect to the police and the crime

E8lnchr3                    Summation - Mr. Greenfield

1    lab, and they never bothered to check the DNA which they had of

2    Laquavious Boykin's to the blood swab on 3E.

3         You heard him on the stand when I told him Boykin was

4    the half brother of my client.  He was surprised.  He was taken

5    aback.  No one had ever told him.

6         My last question to him, it is on page 1113 of the

7    transcript:

8    "Q.  Assuming that Raymond Christian wore No. 3, which is the

9    mask, the mask in evidence a number of times in the past --

10   "A.  OK.

11   "Q.  -- and that Laquavious Boykin took it and wore it one

12   night, the night of the murder, would Laquavious Boykin still

13   be a minor contributor to the mask?

14   "A.  He could be."

15        So the odds now go from 400 gazillion or whatever they

16   said the odds were to one, to Laquavious Boykin being a minor

17   contributor, which we will go over in a bit, and never tested

18   appropriately in the lab.

19        What are the odds now?  You have one major and at

20   least two minors.  Three to one?  Four to one?  Six to one?

21   That beyond a reasonable doubt they haven't explained why no

22   one in the lab was told that Boykin was a half brother, why no

23   one in the lab on its own decided to check Boykin, a known

24   suspect, against 3E, why the police decided, whatever reason

25   they decided it for, not to have comparisons done.  No matter

E8lnchr3                    Summation - Mr. Greenfield

1    what the reasons are, you can't put the burden on him.

2           You can't stick it on his back.  The government has

3    the burden.  They told you that at least two times yesterday,

4    and they dropped the ball, dropped the rock.  However heavy

5    that burden is, they dropped it.

6           Don't forget, on this, on this diagram, where Baynes

7    and Quay Quay are standing, you know what was found at their

8    feet?  Right at their feet?  The mask.  Have Frederick's

9    testimony read back to you where the mask was found.

10          On cross-examination I was asking forensic scientist

11   Myers about where certain loci -- rather than talking about it

12   without showing it to you, I think it is a better to do it this

13   way.  This is an extract from the March 4, 2011, police lab

14   report on Laquavious Boykin's DNA.

15          You will see circled in red one, two, three, four,

16   five, six, seven times what are called loci, or the singular

17   for it is locus, that each of those loci on several occasions

18   matched up with the blood in 3E seven different times.

19          The police lab has certain protocols, which means

20   procedures that they must follow.  These procedures are laid

21   out, and they have been introduced in evidence by us for your

22   perusal.  But the one that I am referring to now is on the top,

23   DNA Section D6.4.  I'm referring to pages 7 and 8.  Pages 7 and

24   8 talk about mixtures like we have here, mixtures of blood

25   where you have major and minor contributors.

1          And the protocol on page 8 reads as follows:  "When

2     the minor component is attributable completely to an individual

3     at six to nine loci and a plausible explanation can justify any

4     missing alleles, the following conclusion can be reported."

5          And then the conclusion is there.  You can put the

6     name of the individual who is a minor contributor into your

7     report, but it was never done here, because no one ever asked

8     for it to be done.

9          If it had been done and there are seven loci

10    identifiable, and you were told that by the witness Myers, then

11    that name, Quay Quay, Laquavious Boykin should have appeared as

12    a minor contributor.

13         I read to you before, and I'm not intending to read it

14    again, but Myers told you as a minor contributor his DNA could

15    have been on that mask.  So that four gazillion quadrillion now

16    to one or is it maybe one against one.

17         I can't overstate the importance of the failure of

18    that Boykin blood being compared to 3E.  The cops should have

19    asked for it.  The DA should have asked for it.  The lab should

20    have done it on its own if they were truly a lab that is not to

21    do the work of the police but to independently decide the

22    issues.

23         Maybe the lab does require it, but I don't think Myers

24    was the energetic guy in the world.  The last article that he

25    read out of the journals was 2009.  He takes eight hours of

E8lnchr3                    Summation - Mr. Greenfield

mandatory scientific education a year.  He went to a community

college to learn statistics after he graduated from college.

He's definitely not a member of the Swifton Committee for the

Advancement of Forensic Science.

He's getting paid by a police lab to help police so we

come full circle.  Baynes' testimony puts him in the jackpot.

I think I've exposed Baynes' testimony about his role.

The testimony of Myers takes him out of the jackpot.

It's hard, a man died.  But your job as jurors is not to avenge

the death of the Joker.  That is not your job.  Your job as

jurors is to decide whether the government, the United States

of America has proved its allegations beyond a reasonable

doubt.  Require them when they come back up here and say, How

did you do that?  The DNA is not what you said.  The DNA is one

to one, one to two, one to three.  Those aren't odds that I

call beyond a reasonable doubt.

How do you want us to swallow the testimony of Baynes

being a lookout peering into the door at the same time Joker is

standing in front of the door and ultimately gets murdered.

How do you reconcile that?  You just accept it and let him go?

How do you reconcile Smith and Boone?  Smith and Boone saying

what they said happened in the apartment, a masked man carrying

a gun was stabbed.  The lookout was unmasked and ungunned.  It

can't be.

I believe I said it, but I think it's worth saying

1   again.  Baynes puts Raymond in the role of the guy fighting for

2   the gun.  Why does he do that?  Because then he can explain the

3   presence of his blood in the apartment.  He got stabbed trying

4   to save Raymond rather than being the armed gunman that Smith

5   and Boone said he was.  Plain and simple.  Have them reconcile

6   that beyond a reasonable doubt.

7           The wall that the government built for you, first of

8   all, it is a computer-generated wall.  Imagine if I would have

9   had a Lego set at home.  I could have built a wall for you if I

10  came in today, if I showed you where you just take Baynes out

11  of every piece of important evidence like I just said.

12          Baynes is only one brick in there.  Baynes is the

13  wall.  The mortar, the cement should have been Boone, should

14  have been Smith, should have been Morreale.  But they didn't

15  cement his testimony.  They sunk it.  They caused the wall to

16  crumble.  The cement, the mortar was either too watery to set

17  or too dry to even try to set.  If this was a real wall of

18  brick, one push would knock it down, one kick would knock it

19  down.

20          The wall they have to build for you is a wall that you

21  have to live with for a lifetime in this case, rely

22  unhesitatingly on in this case.  If you want bind that wall to

23  keep an enemy away, you want to be sure it was a strong and

24  lasting wall, not a wall built on the testimony of Anthony

25  Baynes.  A wall that when tested in any way begins to crumble,

E81nchr3                    Summation - Mr. Greenfield

1    the foundation is Baynes, and if you build it on a bad

2    foundation, it must fall.

3            There are a couple of other counts in the indictment

4    dealing with my client, and they are just as important.

5            Mr. Dratel mentioned the concept of multiple

6    conspiracies in the sale of narcotics.

7            I am not going to repeat the concept of multiple

8    conspiracy, but the point is with respect to the quote-unquote

9    conspiracy to sell narcotics, all you heard was that everybody

10   in Newburgh sells drugs on the corner.  There are no

11   conspiracies.  They buy and they sell.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MR. GREENFIELD:  (Continuing) Anthony Strazza in his

2      opening statement told you, look, our client was arrested for a

3      gun, was convicted of possession of a gun.  But he sold drugs.

4      But he didn't tell you he was involved in a conspiracy because

5      these were street sales.  Maybe on occasion the same person

6      sold to two different people that knew each other.  That's not

7      a conspiracy.

8              The fact that you're carrying a gun to protect

9      yourselves in Newburgh is a smart thing, most probably, but

10     it's not a conspiracy to use a weapon during the course of the

11     sale of narcotics.

12             The bottomline is that on one occasion he was arrested

13     with a gun, the two-shot Derringer at a party.  He wasn't

14     selling drugs.  He wasn't carrying drugs.  He was arrested that

15     day.  The other time he was arrested, you didn't hear a word

16     from the people who took the stand.  They used five witnesses,

17     five witnesses to prove to you that on October 7, 2010 Raymond

18     Christian carried a gun.  Well, he pled guilty.  All they had

19     to do was put the plea in.  But you heard that he had the gun,

20     he had the gun, he had the gun.  What you didn't hear is he had

21     narcotics on him.  You didn't hear that at all.

22             Was he carrying a gun or was he carrying it to protect

23     his narcotics?  It's an important difference.  And there is no

24     proof in the record that on either occasion when he had those

25     guns that he did it to protect his narcotics.  He sold $20.  He

1    sold $40.  You don't need a gun to protect yourself on that.

2    He told you that happened in the opening, but it does not make

3    him a conspirator.

4            My remarks are basically to a close.  And whenever I

5    sum up in a case and I'm talking to the jury my mind, I'm

6    racing through some thoughts.  What have I missed?  What

7    haven't I said?  What could be helpful that I didn't say to

8    help Raymond Christian in this case?

9            And I can guarantee it for you, when I sit down,

10   within five minutes, damn, I forgot to say this or that.  Well

11   there's a prelude to say to you:  I may have forgotten

12   something.  But if you think that there's something I should

13   have said that you should require the government to address and

14   answer, require them to do it.  I've made the suggestions that

15   I think are important.

16           You don't know Raymond Christian from a hole in the

17   wall.  You never saw him before this case started on August 5.

18   But because you don't know him and you never saw him and he

19   comes from that far-away place called Newburgh, is he entitled

20   to anything less than what you'd want if you were sitting in

21   that audience and somebody you cared about, somebody you loved,

22   was sitting at that table?  Would you not give him the

23   presumption of innocence that he's entitled to?  Would you not

24   give him the fact that the burden never leaves this table, it's

25   never put on the back of the defendant?  Would you not give him

1    the fact that the government must prove its case beyond a

2    reasonable doubt?  Would you hold it against him because I

3    chose not put him on the witness stand?

4            I'm sure the answer is no.  But, we listened to you

5    when you took your oaths as jurors the day you got here.  And

6    we listened to your answers.  And we relied on your answers.

7    And we chose you as jurors based on your answers.  So just

8    because he's a stranger, someone you'll never see again in your

9    life, live your oath as jurors and if you do you'll find

10   Raymond Christian not guilty of every count in the indictment.

11           Thank you.

12           THE COURT:  Thank you, Mr. Greenfield.

13           Ladies and gentlemen, it's now noon.  We're going to

14   go ahead and take our lunch break now.  So please be in the

15   jury room no later than 1:15.  Until then please do not discuss

16   the case.

17           (Jury excused)

18           (Continued on next page)

19

20

21

22

23

24

25

E819chr4

1            (In open court)

2            THE COURT:  Anything for me?

3            MR. NAWADAY:  Not from the government, your Honor.

4            (Luncheon recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E819chr4

AFTERNOON SESSION

1:15 p.m.

(Trial resumed; jury not present)

THE COURT:  We're bringing out the jury.

(Jury present)

THE COURT:  Everyone please be seated.

Ladies and gentlemen, at this time the government will present its rebuttal summation.

Mr. Nawaday.

MR. NAWADAY:  Mr. Greenfield said that he was going to recite the record accurately to you.  He said he was going to do his best to tell you exactly what you heard at this trial, what was written down by the court reporters.  He failed.  He didn't do that.

What am I talking about?  Well let's talk about the DNA.  Mr. Greenfield came up here and he said:  Oh, Laquavious Boykin, his DNA should have been tested.  He could have been a minor contributor.  And that's what the expert said.  And what did Mr. Greenfield do?  He pointed you to three sentences of Mr. Myers' testimony.

You heard Mr. Myers testify.  He testified for a while.  What did Mr. Myers say?  Something that Mr. Greenfield conveniently didn't put before you in his summation.  Of course, defense counsel have no burden, but we can address their arguments.

1          Page 1089 of the transcript.  Ms. McInerney, please

2    pull that up.

3          Mr. Greenfield confronts Mr. Myers and says:  Oh, they

4    never asked you to test Laquavious Boykin's DNA.

5          What did Mr. Myers say?  He said it doesn't matter.

6    It wouldn't matter.  That's line 10 of page 1089.

7          Why wouldn't it have mattered?  Because later on, on

8    page 1103, what does Mr. Myers say?

9          He says, quote, anybody that wouldn't be the main

10   contributor here is inconclusive.  Saying ruling somebody out

11   or saying not excluded is an exclusionary statement.  It's the

12   same thing as saying they're included.  It's the same thing as

13   saying consistent with.  And that's not true.

14         Anybody here that isn't a major contributor is

15   inconclusive.  Not ruled out.  Not included.  Not excluded.

16   None of that.  It's inconclusive in regard to anything, but

17   what?  But the major contributor, who defense counsel has

18   conceded is Raymond Christian.

19         What's that an example of?  That's an example of admit

20   what you can't deny and deny what you can't admit.

21         And then what does Mr. Greenfield do?  He points you

22   to a protocol that says, oh, well minor contributor should have

23   been put there.  But you already know that Mr. Myers says he

24   can't do that.  Because it's inconclusive.  And Mr. Greenfield

25   didn't point you to another part of the protocol.  And we'll

1    pull up that Defense Exhibit, the protocol from -- started with

2    DNA section D6.4, and page 5.  Page 5 of 13.  If we can.  Page

3    5.

4              What does it say numeral 3 on the bottom?  It says

5    making no conclusion.  In some instances, it may not be

6    possible to discern whether an individual is included or

7    excluded from a profile.

8              That's exactly what Mr. Myers did.  He couldn't tell

9    who a minor contributor was.  So, basically, what

10   Mr. Greenfield is hanging his hat on is on the point that

11   Laquavious Boykin can't be excluded as a minor contributor.

12   You know who else can't be excluded?  Anyone in this room.

13   There's not enough DNA out there.  This whole exercise of

14   circling numbers that match?  Again, you heard from Mr. Myers.

15   Doesn't mean a thing.

16             Yet, why did Mr. Greenfield do that?  Well, it's a

17   distraction.  That's a word they used and it's a word I'm going

18   to use.  It is to distract you.  Distract you and only point

19   you to certain pieces of evidence that helps them.  That's

20   called agree with what helps you, disagree with what doesn't

21   help you.

22             What's the point?  The point is, something I'd like

23   you to keep in mind, something that defense counsel said, which

24   it's true.  Defense counsel aren't witnesses.  They're lawyers.

25   The prosecution, we're lawyers.  We're not witnesses.  What

1   they say is not evidence.

2           Evidence?  What is evidence?  It's the testimony of

3   the witnesses you heard.  Anthony Baynes, Jamar Mallory,

4   Danielle Williams, David Evans, Daniel Myers.  All the police

5   officers.  That's evidence.  And the exhibits you saw.  Let's

6   talk a second about some of those exhibits briefly.

7           Again, this is another example of Mr. Greenfield

8   picking and choosing.  Remember, he came out here he said,

9   whoa, Raymond Christian, there's testimony he fired two, three

10  shots.  But this is a two-shot gun.  So Anthony Baynes must be

11  lying.

12          There was another gun that Raymond Christian was

13  arrested with, I believe, on October 7, 2010.  And Raymond

14  Christian said when he made a statement to police after being

15  arrested on this gun that there was one in the chamber, seven

16  in the magazine -- we have the magazine too -- and there are

17  only four bullets left in this magazine.

18          So did anyone ever say it was this gun he shot off at

19  the party?  No.  That's the only one Mr. Greenfield showed you.

20  But you have the evidence of another gun that Raymond Christian

21  admitted to possessing.  So, defense counsel aren't witnesses.

22  The lawyers aren't witnesses.

23          So, that brings me to my next point, which is saying

24  something because you want it to be true doesn't make it true.

25  It doesn't make it evidence.

1          So why does defense counsel do it?  And this is

2     something else I'd like you to do.  Ask yourself when a lawyer

3     makes an argument, whether the government makes the argument or

4     the arguments you've already heard, are they pointing you to

5     evidence in the case or asking you to speculate?  And if

6     they're asking you to speculate, it's up to you, but I submit

7     you should reject it.

8          And then ask yourself why did they do that?  Again,

9     it's a distraction.  I will give another example.

10          Mr. Goltzer came up here -- this was yesterday -- and

11     he said ladies and gentlemen, you know what's happened here,

12     the prosecution has gone into some back room and fed these

13     witnesses a story.  They fed them a story.  That's what

14     happened.  Whoa.  Besides accusing the prosecution of

15     misconduct, is there any evidence that happened here?

16     Decidedly not.

17          Why does Mr. Goltzer do that?  Again, to distract you.

18     Why does Mr. Goltzer talk, take time with you in his summation

19     to talk about:  Oh, ladies and gentlemen, you know this happens

20     in every case, the government makes the same arguments.  What

21     does the government do or anybody does in some other case have

22     anything to do with anything?  We are trying this case.  It's

23     the evidence in this case that's important.

24          So, ask yourself is somebody pointing you to evidence

25     or only parts of evidence, picking and choosing, or not.  We

 1    submit to you if you look at all of the evidence you'll come to

 2    the conclusion that the defendants are guilty.

 3            There's another thing I want you to keep in mind.  And

 4    you've heard the word common sense.  Everyone is absolutely

 5    right about that.  Use your common sense when you analyze the

 6    testimony that you've heard.  And use your common sense to bear

 7    on whether someone is telling the truth or not.  And I submit

 8    to you that you'll ask yourself and you'll know when something

 9    makes sense and when something doesn't make sense.

10            I submit to you when something sounds like the truth,

11    the closer you get to it, the closer it matches with everything

12    else, it makes sense.  And lies, the closer you get to it, they

13    fall apart.  They don't make sense.

14            Now, I'm going to turn to the main part of the defense

15    summations.  And it's a simple one.  It's an obvious one.

16    Every single cooperating witness is lying.  They're all liars.

17    Lies, lies, lies.  And part of the reason you know that is

18    they're criminals.  These are terrible people.  Danielle

19    Williams set up her sick sister to get robbed.  David Evans, he

20    participated in the murder of Freaky's dad.  It was a stabbing

21    murder.  These people are terrible people.  Anthony Baynes

22    participated in 30 assaults, robberies.

23            Of course they're criminals.  But, it's not about

24    whether you like them.  You shouldn't.  No one is expecting you

25    to like them.  It's about whether they were in a position to

1    know what they're talking about.  And what has this case been

2    about?  A drug stash house robbery.

3            So, who would know about it?  Who would know about it?

4    Would an accountant know about it?  Would a registered nurse

5    know about it?  Would a retired youth counselor know about it?

6    No.  Decidedly not.  People who know about a stash house

7    robbery are criminals.  Of course.

8            And it's the defendants who made those people

9    witnesses.  It's the defendants who made Anthony Baynes a

10   witness when they decide to participate in a robbery with him.

11   It's Bow Wow and Gucci who made Jamar Mallory a witness when

12   they went on the directions of L-1 to pick up guns from Kev

13   Gotti and J-Mark.  They made those people witnesses.

14           So it's not about whether you cash a check for these

15   people.  It's not about whether you go to them for medical

16   advice.  They're not doctors.  Is Anthony Baynes a doctor?  Of

17   course not.  You wouldn't trust him with that.  But he knows

18   about robberies.  Jamar Mallory knows about a drug deal.

19   Danielle Williams knows about the Bloods.

20           There's another interesting point about this premise

21   that you can't trust the government's witnesses because they're

22   criminals.  And it's a point Mr. Bauer made in passing.  I'm

23   going to make it again.  How do you know they're criminals?

24   How do you know they lied before?  Who told you?  They did.

25   They told you.

1              It's kind of funny.  Defense counsel actually wants

2     you to believe these witnesses.  They want you to believe that

3     Anthony Baynes is a serial truth-teller.  When he says I

4     committed three assaults.  Yes, you did.  When Daniel Williams

5     says I set up somebody to rob my sister.  Yes, you did.

6     Truth-teller.  And when did they call them a liar?  The second

7     any witness says:  Oh, I saw Reckless dealing some drugs.

8     Liar.  Oh, I saw Bow Wow at the porch at L-1's.  Liar.

9              It doesn't work like that.  You saw them testify.

10    Were they forthcoming when asked difficult questions about

11    their own conduct as they were about the conduct of others?

12             Also ask yourselves did they only talk about those

13    three defendants?  No.  They talked about a lot of people.

14    They talked about a lot of people's crimes.  In the same way

15    that they spoke about these defendants.

16             And there's been a lot of discussion about the

17    incentive to tell the truth, the incentive to lie, and about

18    the cooperating witnesses' cooperation agreements.  We submit

19    to you those agreements give incentive, they're a big incentive

20    to tell the truth.  You have those agreements.  Read them.  See

21    what they say.

22             When you boil it down, it's pretty simple.  You heard

23    these defendants -- these cooperating witnesses' understanding

24    about what those agreements mean.  They meet with the

25    government.  They're honest.  They don't lie.  They testify.

1   They get their 5K letter.  They also told you the outcome of

2   this case doesn't matter to their sentence.

3           So if that's the case, why in the world do they risk

4   everything to lie?  They don't get any upside.  It's all

5   downside.  They can't take their plea agreements away.  And

6   then they're stuck with very lengthy sentences.

7           Take David Evans, for example.  He's got mandatory

8   life.  Is he going to lie to put the chance of getting time

9   served or anything less than mandatory life in jeopardy?

10          By the way, were they honest with you about what they

11  hoped to get?  Yeah, they all hoped to get time served.  Will

12  they?  They have no idea.  But they do know that the judge who

13  sentences them is going to know about every bad thing they've

14  done.  They'll know about the good things too.

15          So, is it honest to say, yeah, I'm hoping for time

16  served?  Who wouldn't?  That's their hope.  And they're honest

17  about that.  Doesn't mean they're going to get it.  So there is

18  no free pass.  Like defense counsel seems to want to suggest.

19          Also think about what they had to do get an agreement.

20  They had to divulge crimes that the government didn't even know

21  about and plead guilty to them.  With no guarantee that they'd

22  get an agreement.

23          Now, I want to give another example of what I call

24  picking and choosing from the testimony.  And, again -- and

25  from the evidence.  Again, you have the entire record.  So you

1    should look at it.  You should ask for it.

2         But, I believe Mr. Dratel and Mr. Greenfield, they

3    quoted or cited to Akinto Boone's testimony.  And they used

4    that testimony to say Baynes was the guy with the gun, with the

5    chrome gun, he came and helped, it was Baynes.  And Baynes was

6    the guy who got stabbed.

7         Is that what happened?  Let's look at page 1782, line

8    9 of the testimony.  What does Akinto Boone say?

9         I'm going to read it to you.  Page 1782, line 9.  This

10   is an answer from Akinto Boone, "There was other people in

11   there wrestling with Tarrence at the time."

12        Does defense counsel point that statement out to you?

13   No.  But what does that statement mean?  It means Tarrence

14   Smith was fighting with someone else.  And who was Akinto Boone

15   fighting with?  A guy with a gun.

16        This is page 1789 of Akinto Boone's testimony.

17   "Q.  Do you know if Tarrence did anything to any of the

18   robbers?

19   "A.  I heard he stabbed one of them.

20   "A.  I didn't see nothing doing to his fight.  You know what I

21   mean.  I wasn't even paying attention to his fight."

22        So who would know if the robber that he was fighting

23   with for the gun was stabbed other than Akinto Boone?  Akinto

24   Boone.  He wasn't paying attention to Tarrence Smith's fight.

25   And Tarrence Smith, he stabbed -- we know who he stabbed.

E819chr4                    Rebuttal Summation – Mr. Nawaday

1   Anthony Baynes.  He did not stab the guy who Akinto Boone was

2   fighting.  And we know who that guy is.  Raymond Christian.

3   That was Reckless.

4            There is another interesting point about that, about

5   Reckless and Mr. Greenfield's insinuation that somehow Reckless

6   is being set up by Anthony Baynes.  Well, first off, why not

7   give Reckless a bigger role than the shooting?  Why not say

8   Reckless was one of the shooters?  Anthony Baynes didn't say

9   that.

10           And here is a point about agreeing with something when

11  you like it and disagreeing when you don't.  Mr. Greenfield

12  pointed out:  Oh, after the robbery Anthony Baynes and

13  Quay Quay go to Raymond Christian's grandma's house.  That's

14  where Raymond Christian lives.  And they saw him there.

15           Are you supposed to believe Anthony Baynes about that?

16  According to Mr. Greenfield, you are.  Because he wants you to

17  believe that Raymond Christian wasn't even at the robbery

18  location.  But he was.  So believe Anthony Baynes on that part

19  but not on this other part.  And it doesn't work like that.

20           Now, there was this other theme from all of defense

21  counsel and that theme was the conspiracy theory.  That the

22  defendants -- that the defendants were setup by cooperating

23  witnesses, that cooperating witnesses set the defendants up.

24           Now, first off, look at the cooperating witnesses.

25  They -- defense tries to portray them as these criminal

E819chr4                    Rebuttal Summation - Mr. Nawaday

1    masterminds.  Anthony Baynes was 17 years old, 17 years old

2    when he committed this terrible crime.  You saw him testify.

3    Is he someone who could come up with some complex setup of

4    these three defendants?  I submit to you the answer is no, they

5    cannot.

6           And then think about this other one.  Think about the

7    time log of how this would have to play out.  Baynes is in

8    prison since April 2011.  Mallory is in prison, that's J-Mark,

9    since September 2012.  Over one year later.  Danielle Williams,

10   David Evans they're in prison since September 2011.  And

11   McDermott goes to prison January 2011.

12          So, how would this conspiracy have to come about?  And

13   what I submit to you is that if you play it out, the events are

14   ridiculous.  Because this would assume that Anthony Baynes,

15   while in prison, starting April 2011, somehow gets in touch

16   with Jamar Mallory and -- J-Mark.  And he says J-Mark, listen,

17   listen, J-Mark, you're going to get arrested maybe six months

18   later or whatever it is.  When the cops come to you, you should

19   cooperate.  And when you cooperate, you should tell them that

20   Bow Wow and Gucci came to you and Kev Gotti to get guns.  Okay.

21   I'm not sure if that happened because I didn't see that

22   happened, but just say that.  Because that's going to help me

23   out.  And once you tell them that, you're going to have to also

24   tell them about all your other crimes.  And you'll have to

25   admit to them, you'll have to plead to them, and actually there

1    is no guarantee you're going to get a cooperation agreement.

2    But then you'll plead to everything, you'll have a mandatory

3    minimum of 17 years with a maximum of life, and then perhaps

4    may be called for a trial with just those guys, and maybe get a

5    5K letter, and maybe get time served.  Is that what happened?

6    Of course not.  Of course not.  It's a ridiculous insinuation.

7            And also if they were colluding or conspiring wouldn't

8    their lies be better?  Wouldn't the story be better?  Why does

9    Anthony Baynes not say he was inside that hallway on the porch?

10   But he says he's on the porch.  Right.

11           Why doesn't Ramone McDermott say Bow Wow told him

12   everything when he came with blood on his clothes?  Because

13   it's not what happened.

14           And there's another point related to that.  Why these

15   guys?  Why these defendants?  Didn't Anthony Baynes, David

16   Evans, Danielle Williams, J-Mark, Ramone McDermott, didn't they

17   tell you about so many people?  Why not set up Freaky or say

18   Geo was one of the people there, or Snelly, or Quick?  Aren't

19   those easy targets too?

20           And then how is it that all these people say things

21   that match with other evidence in the case?  How can that be?

22   Four or five people can't get the same lie right.  Anthony

23   Baynes is really lucky if he came up with this plan and it all

24   just matched together.

25           Now, there is a lot of time spent on how Anthony

1    Baynes, J-Mark, they've said lies before and they told

2    different stories before.  And that's true.  They have.  Ask

3    yourself again:  How do you know that?  You know that because

4    they told you.  They admitted to it.

5            Anthony Baynes said that on the night of the robbery,

6    a lot of stories, he just can't remember what the lies were.

7    Spent eight hours talking to police, coming up with a tale to

8    protect himself, absolutely, and to protect his friends:

9    Reckless, Gucci, Bow Wow.  And then there's an insinuation well

10   he didn't protect Bash and Baby E.  What did he tell you?  He

11   told you he got into a fight with Bash.  That's why he was

12   stuck on the porch.

13           So you know they lied because they told you and

14   defense counsel wants you to believe them when they tell you

15   that they've lied.  But they don't want you to believe them

16   when there's that one moment they say, those witnesses say:

17   Oh, I was with Reckless.  Oh, now, you're a liar.  And, again,

18   that's called agreeing with what helps you and disagreeing with

19   what hurts you.

20           Now, there was this other moment or argument raised by

21   Mr. Thomas' defense counsel to try to show Anthony Baynes must

22   be lying about having seen Gucci out on the streets during

23   certain years.  And this is going to be another example of

24   distracting you and picking and choosing things out of the

25   record.

1          Defense counsel told you you can't believe Anthony

2     Baynes because Gucci was in jail from 2008 to 2010, 2011.

3     Well, they missed some months.  They missed some months.  They

4     missed about three months in 2008 and about four months in

5     2010.

6          It's kind of like what happened to -- I don't know if

7     you remember this, Mr. Strazza was questioning Jamar Mallory

8     about when he decided to cooperate about the Jeffrey Henry

9     murder.  And he made the point, Jamar Mallory, you were

10    arrested 2010, that first time, in July 2010 and you didn't

11    come in and cooperate about the murder.  Jamar Mallory said

12    basically I'm not a time-traveler because the murder didn't

13    happen yet.  That's why I didn't come in and cooperate right

14    away.  Again, focus on what defense counsel is trying to do.

15    Trying to distract you from the evidence.  The things in this

16    case that show the defendants' guilt.

17         Now, Mr. Whitaker's lawyer pointed out and argued

18    that, well, Bow Wow could not have gotten blood on his clothes

19    from Jeffrey Henry and that the government told you that in the

20    opening.  I submit to you we didn't.  We didn't say that at all

21    actually.

22         And what we have argued and what we've shown you is

23    evidence showing that Bow Wow got that blood on him when he was

24    in that small room, that small foyer, rubbing up against

25    Anthony Baynes who was bleeding, bleeding someone said like it

E819chr4                      Rebuttal Summation - Mr. Nawaday

1   was dripping all over the place.

2          MR. GOLTZER:  Objection.  Misstating the testimony,

3   Judge.

4          THE COURT:  Overruled.  The jury will recall what the

5   testimony was.

6          MR. NAWADAY:  Again, that's an example of

7   misdirection.  Taking your focus away from all the evidence in

8   the case that points to the defendants.

9          There was also a lot said about how the Kevin Burden

10  tape, that's the tape of Kev Gotti, the tape with Jamar

11  Mallory.  We submit to you that is unvarnished evidence of what

12  happened.  That is Kev Gotti saying what he remembered happened

13  when Bow Wow and Gucci came.  And defense counsel talks about:

14  Oh, we didn't get a chance to cross-examine him.  That video is

15  in evidence.

16         And the judge is going to instruct you that

17  witnesses -- you've heard witnesses, and you're not supposed to

18  speculate why some people were called or not called, and that

19  those people are equally available or unavailable to other

20  parties.  So you can consider and should consider that video.

21  And that video is devastating.  Absolutely devastating.  And

22  defense counsel talked about there is no corroboration.  Look

23  at that video.

24         For example, Mr. Thomas' lawyers say well there is no

25  evidence that Gucci was a Blood.  Yes, there was.  One,

1    multiple witnesses told you that he was.  That he used to be

2    Crip and then he turned Blood.  And then there's Kevin Burden's

3    unvarnished statement remembering that night when Gucci and Bow

4    Wow came for the guns to use in the robbery.

5            Ms. McInerney if you can play that.  Thank you.

6            It's right here.  This is from the transcript which is

7    only used as an aid but you can have that tape played.  What

8    does he say.  Gucci was basically what, exactly what L-1 wanted

9    him to be.  Because he knew Gucci can't hold water so he was

10   like okay you want to be Blood let's go do some other shit.

11   What shit are they talking about?  Robbing.

12           And, yes, Jamar Mallory was there.  And you have that

13   video.  Was Jamar Mallory feeding Gotti what to say?  No.

14   Those were two people having a conversation.  Kevin Burden was

15   saying what he remembered happened that night.

16           Just speak briefly about Jamar Mallory.  I think it

17   was Mr. Dratel, Gucci's lawyer, who said:  Oh, Jamar Mallory,

18   he's biased.  He's biased against Gucci.  That's why he's

19   trying to set him up.  He was robbed by Gucci twice.  So I

20   guess at that moment we're supposed to believe Jamar Mallory?

21   Because the only way you get to bias is if you believe Jamar

22   Mallory on that.  Again, picking and choosing things.  That's

23   what the defense counsel is doing.  What we submit to you you

24   should do is look at all the evidence in the case and see how

25   it matches and is consistent with each other and says the same

1     story.

2              And look at the types of details that match.  I'm

3     going to just use one.  Anthony Baynes says he's on the porch.

4     He hears L-1 calling people for chains.  We've heard that word

5     quite often in this trial.  We've also heard that there are a

6     lot of words for gun in Newburgh.  There's scat, there's

7     hammer, there's joint, and there's chain.  And how is it that

8     Jamar Mallory remembers that call from L-1 that same night and

9     L-1 says I'm sending them young boys for the chains.  He

10    doesn't say scat.  He doesn't say joint.  He doesn't say

11    hammer.  I guess Anthony Baynes is really lucky that somehow

12    the details of this conspiracy he's come up with make sense and

13    match other testimony and evidence in the case.  And you know

14    that's not true.  You know that it's not a conspiracy.  It's

15    because that's what happened.

16             Now, Mr. Thomas' lawyer spent a lot of time during the

17    trial and in their summation talking about who had the chrome

18    .38, who had the black gun, which bullets killed Jeffrey Henry.

19             First off, it doesn't matter who had what gun.  We

20    expect that Judge Ramos will instruct you that you can find the

21    defendants guilty of the murder charge if you determine that

22    they set out to commit the robbery and the death of Jeffrey

23    Henry occurred during that robbery.  So what does it matter who

24    had which gun?  It doesn't.  It doesn't matter at all.

25             Reckless lost his gun.  But if you find that he set

1    out to commit that robbery and during that robbery Jeffrey

2    Henry was killed, he's guilty of murder.

3             Also, Mr. Thomas' lawyer and lawyers tried to focus on

4    well there is no forensic evidence of a .38 caliber bullet.

5    Again, why does that matter?  It doesn't.  One, you've heard

6    testimony from Mr. Fredericks, the detective from Newburgh PD,

7    that a .38 caliber revolver doesn't leave shell casings.  So

8    there wouldn't have been shell casings in any event.

9             And there was another line of questioning and argument

10   about that shootout.  And the theme was pretty simple.  Akinto

11   Boone is the one who killed Jeffrey Henry.  Well, one, you know

12   the facts done bear that out.  There are no bullets through

13   that door.  Akinto Boone is all the way in the back of the

14   room.  Two, doesn't matter under the law even if that did

15   happen, but you know it didn't happen, it didn't happen at all.

16           But why make that argument?  Ask yourselves:  What are

17   they trying to do?  Are they pointing to evidence in the case?

18   Are they picking and choosing or not?

19           And then Mr. Dratel kept saying and many of the

20   defense attorneys kept saying there's no corroboration.

21   There's nothing.

22           You've seen the evidence.  I'm not going to go through

23   it again.  There is corroboration.  And plus you have the tape

24   from Kevin Burden.  I'm just going to play a quick part of it.

25           This is excerpt four.

1          (Audiovisual recording played)

2          What is Kevin Burden there saying?  All I knew was Bow

3     Wow and Gucci.  That's all I knew.  Was he drunk?  Look at the

4     timestamp.  It's not that far in.  Was Jamar Mallory -- was

5     J-Mark feeding him what to say?  Actually, earlier Kevin Burden

6     is telling J-Mark no, no, you're remembering wrong about

7     certain things.

8          So the insinuation that Kevin Burden is completely

9     drunk and just making up some tale fed to him by Jamar Mallory

10    is ridiculous.  You heard Kevin Burden's words:  All I knew was

11    Bow Wow and Gucci.  So, is there corroboration?  Of course

12    there is.

13         Is there corroboration that Reckless was there?  Yes.

14    He was there too.  You've heard the testimony.  You've heard

15    he's a major contributor to the blood inside of that mask.

16         This brings me to my last point.  I started with the

17    concept, which is true, that defense counsel aren't witnesses.

18    It's something else that they're not.  They're not magicians.

19    They can't make things disappear.

20         They can't make the testimony of Anthony Baynes

21    disappear when he identifies the people he committed this crime

22    with.

23         They can't make Jamar Mallory disappear when he tells

24    you that it was Bow Wow and Gotti who came and got those

25    chains.

1          They can't make the fact that the stories match up go

2    away.

3          They can't make Danielle Williams go away when she

4    says:  Yes, I have seen Bow Wow selling.  I have seen L-1

5    supplying or L-1 -- Bow Wow talking about re-upping from L-1.

6          They can't make it go away that she's seen Reckless

7    with guns.

8          They can't make the officers who arrested Reckless

9    with guns go away.

10          They can't make David Evans go away.

11          They can't make bloodstains on that foyer wall go away

12    of Anthony Baynes and the fact that that foyer is so small and

13    seven people were crammed in there.

14          They can't make Ramone McDermott go away when he says:

15    Yes, Bow Wow came to 260 First Street and he's clothes were

16    bloody just around here.

17          And they can't make the DNA on the ski mask go away.

18          They can't make the pole camera video go away that

19    shows the robbers going to 54 Chambers and running back from 54

20    Chambers.

21          And they can't make Kevin Burden and this tape go

22    away.

23          They can't make Barbara Morreale go away.

24          They can't make Akinto Boone go away.

25          And they can't bring Jeffrey Henry back.  Remember

1    that.  Jeffrey Henry is dead because of a botched robbery

2    committed by the defendants.

3            Defense counsel can't make the evidence that proves

4    their guilt go away as simply and as easily as a puff of smoke

5    from a gunshot that killed Jeffrey Henry that night.

6            THE COURT:  Thank you, Mr. Nawaday.

7            Ladies and gentlemen, we're going to take a ten-minute

8    break while we set up for the final jury instructions.  Ten

9    minutes.  Don't discuss the case.

10            (Jury excused)

11            (Continued on next page)

1          (In open court)

2          THE COURT:  Mr. Buchwald.

3          MR. BUCHWALD:  Yes.  Your Honor, during Mr. Nawaday's

4     rebuttal he specifically alluded to Kevin Burden and the

5     defense having mentioned that he can't be cross-examined and he

6     then went into an argument about Kevin Burden being equally

7     available to both sides.  That was, on this record, wholly

8     improper.  Kevin Burden was certainly not equally available to

9     both sides.  He is available to them if they immunize him, as

10    they did with other witnesses in this case.  This is not

11    something that we can do, as your Honor has ruled.  And to have

12    made that argument on this record is improper.  We believe that

13    either your Honor should alter the instruction about equally

14    available witnesses or declare a mistrial.

15         MR. GOLTZER:  I join in those remarks and would ask

16    the court to instruct the jury that Mr. Burden was more

17    available to the prosecution than the defense because we have

18    no authority to even ask your Honor to direct them to provide

19    him.

20         MR. STRAZZA:  We join in that application as well.

21         THE COURT:  Mr. Nawaday.

22         MR. NAWADAY:  Your Honor, the instruction is valid.

23    It should be given.  Mr. Burden was equally unavailable to us

24    because we cannot control whether DOJ will allow us to immunize

25    somebody.  We cannot be made to immunize somebody, especially

E819chr4

```
1    somebody like Mr. Burden.  So he is somebody who we knew, who

2    asserted the Fifth Amendment, and who ultimately it's not our

3    decision of whether he's going to get immunity or not.

4              MR. DRATEL:  Your Honor, the Department of Justice is

5    not separate from the United States Attorney's Office.  That is

6    a fallacious argument.

7              MR. GOLTZER:  Or are we aware that there was an

8    application made to Washington to get approval for a 6002

9    order.

10             By the way, they reversed the burden by commenting on

11   our failure to present a defense in violation of the Sixth

12   Amendment there.

13             THE COURT:  I don't know what you're talking about

14   there.

15             MR. GOLTZER:  By suggesting that we could have called

16   him, they're putting the burden on us.  That's not true.

17             THE COURT:  First of all, I agree that the Department

18   of Justice is one entity.  But that aside, I believe -- and I

19   could be wrong, the record will bear this out -- that

20   Mr. Nawaday said that Mr. Burden was equally available and

21   equally unavailable to all sides.

22             MR. GOLTZER:  He said equally available.

23             MR. BAUER:  I said equally available and equally

24   unavailable.

25             THE COURT:  In any event, I don't believe that that
```

E819chr4

1    comment is untrue as matter of law, nor am I going to instruct

2    the jury that he is more available to the government than not.

3    So, the application for a mistrial is denied.

4           Anything further?

5           Aside from all of the objections, all counsel did a

6    very good job on their summations.

7           MR. BUCHWALD:  Thank you, your Honor.  Do we still

8    have ten minutes?

9           THE COURT:  No.  You have less than ten minutes.

10          (Recess)

11          Okay.  We're bringing the jury back.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

E8l9chr4

1              (In open court)

2              THE COURT:  Ladies and gentlemen, you'll note before

3      you sit down that there are binders on your seat so please pick

4      those up and everyone please be seated and if you open your

5      binders there are three documents in there.  One is in the

6      pocket.  It's the verdict form that your foreperson will fill

7      out when you reach a verdict.  And in the rings themselves the

8      first document is a copy of the indictment, which is about four

9      pages.  And if you go four pages in is the copy of the jury

10     charge.

11             Now, this is a document.  It's about 60 pages.  It is

12     what I will read to you now.  And if history is any guide it

13     will take me about an hour-and-a-half or so to get through the

14     charge.  You have a copy of exactly what I'm going to read.

15     You can either read along with me, if that helps you, or you

16     can simply have it with you and listen to me as I read.  You

17     should know that you will have this booklet with you as you

18     deliberate.  So I will leave it up to you as to whether you

19     want to read along or just listen or whatnot.

20             The other thing is, again, it's going to take

21     approximately an hour-and-a-half.  I don't intend to break

22     before I get to the end.  If at any point you feel as though

23     you need to stand up and stretch, feel free to do so.  I will

24     not take offense.  And we'll get through it.

25             So, again it is the tradition in all courts because

E819chr4

1    the charge is such an important part of a criminal trial that

2    the charge, the words are very important and the charge is

3    read.  This is not a time for judges to be ad-libbing what the

4    law is.  So with that, let's begin.

5         Members of the Jury, we have almost reached the point

6    where you are about to begin your final function as jurors,

7    which, as you all appreciate, is the most important -- one of

8    the most important duties of citizenship in this country.

9         My instructions to you will be in four parts.  First,

10   I will give some introductory instructions about the role of

11   the court and of the jury and about the presumption of

12   innocence and the government's burden of proof.  Second, I will

13   describe the charges and the law governing those charges, which

14   you will apply to the facts as you find them to be established

15   by the proof.  Third, I will give you instructions concerning

16   the evaluation of the evidence.  And the fourth, the final

17   section of these instructions will relate to your

18   deliberations.

19        I will first describe the role of the court and the

20   jury.

21        It is my duty to instruct you as to the law, and it is

22   your duty to accept these instructions of law and apply them to

23   the facts as you determine them.  If an attorney stated a legal

24   principle different from any that I state to you in my

25   instructions, it is my instructions you must follow.  You

E8l9chr4

should not single out any instruction as alone stating the law,
but you should consider my instructions as a whole when you
retire to deliberate.  You should not be concerned about the
wisdom of any rule that I state.  Regardless of any opinion you
may have about what the law may be or ought to be, it would be
a violation of your oath to base your verdict on any view of
the law other than that which I give you.

You, the members of the jury, are the sole and
exclusive judges of the facts.  You pass on the evidence,
determine the credibility of witnesses, resolve such conflicts
as there may be in the testimony, draw whatever reasonable
inferences you decide to draw from the facts as you determine
them, and determine the weight of the evidence.  In doing so,
remember that you took an oath to render judgment impartially
and fairly, without prejudice or sympathy or fear, based solely
on the evidence and the applicable law.

The fact that the prosecution is brought in the name
of the United States of America entitles the government to no
greater consideration than that given to any other party to
this litigation.  By the same token, the government is entitled
to no less consideration.

There are three defendants in this case:  Raymond
Christian, Tyrell Whitaker, and Glenn Thomas.  The defendants
have pleaded not guilty to the charges against them.  As a
result of their pleas of not guilty, the burden is on the

E819chr4

1     government to prove guilt beyond a reasonable doubt.  This

2     burden never shifts to the defendants for the simple reason

3     that the law never imposes upon a defendant in a criminal case

4     the burden or duty of testifying, or calling any witness, or

5     locating or producing any evidence.

6           The law presumes each defendant to be innocent of each

7     charge against him.  This presumption of innocence alone is

8     sufficient to acquit each defendant.  This presumption was with

9     each defendant when the trial began and remains with each

10    defendant unless and until you are convinced that the

11    government has proven the defendant's guilt beyond a reasonable

12    doubt.

13          The question that naturally arises is:  What is a

14    reasonable doubt?  What does that term mean?  The words almost

15    define themselves.  It is a doubt based on reason and arising

16    out of the evidence in the case or the lack of evidence.  It is

17    a doubt that a reasonable person has after carefully weighing

18    all of the evidence in the case.

19          Reasonable doubt is a doubt that appeals to your

20    reason, your judgment, your experience, and your common sense.

21    If, after a fair and impartial consideration of all of the

22    evidence you can candidly and honestly say that you are not

23    satisfied with the guilt of a defendant, that you do not have

24    an abiding and firm belief of the defendant's guilt -- in other

25    words, if you have such a doubt as would reasonably cause a

E819chr4

prudent person to hesitate in acting in matters of importance

in his or her own affairs -- then you have a reasonable doubt,

and in that circumstance it is your duty to acquit the

defendant.

On the other hand, if after a fair and impartial

consideration of all of the evidence you can candidly and

honestly say that you do have an abiding belief of the

defendant's guilt -- such a belief as a prudent person would be

willing to act upon in important matters in the personal

affairs of his or her own life -- then you have no reasonable

doubt and under such circumstances it is your duty to convict

the defendant.

One final word on this subject:  Reasonable doubt is

not whim or speculation.  It is not an excuse to avoid the

performance of an unpleasant duty.  Nor is it sympathy for the

defendant.  Beyond a reasonable doubt does not mean a positive

certainty or beyond all possible doubt.  After all, it is

virtually impossible for a person to be absolutely and

completely convinced of any contested fact that by its nature

is not subject to mathematical proof and certainty.  As a

result, the law in a criminal case is that it is sufficient

that the guilt of a defendant is established beyond a

reasonable doubt not beyond all possible doubt.

(Continued on next page)

1              Summary of the charges.

2              The defendants in this case are Raymond Christian,

3    also known as Reckless; Tyrell Whitaker, also known as Bow Wow;

4    and Glenn Thomas, also known as Gucci.

5              Let us now turn to the charges against the defendants

6    in the indictment.  I remind you that the indictment itself is

7    not evidence.  It merely describes the charges made against the

8    defendants.  It is an accusation.  It may not be considered by

9    you as any evidence of the guilt of the defendants.

10             Before you begin your deliberations, you will be

11   provided with a copy of the indictment.  I will not read the

12   indictment to you at this time.  Rather, I will summarize the

13   offenses charged in the indictment and then explain in detail

14   the elements of each offense.

15             You are being asked to deliberate on six counts.  I

16   instruct you that you should not speculate as to why that is.

17   Each count must be considered separately as to each defendant.

18

19             Count One charges that in or about December 2010,

20   Raymond Christian, and Glenn Thomas, together with others,

21   conspired to commit a robbery in Newburgh, New York, of persons

22   they believed to be in possession of narcotics and proceeds of

23   narcotics sales.

24             Count Two charges that on or about December 15, 2010,

25   Raymond Christian, Tyrell Whitaker, and Glenn Thomas, together

1    with others, committed and attempted to commit a robbery of

2    individuals they believed to be in possession of narcotics and

3    proceeds of narcotics sales in the vicinity of 54 Chambers

4    Street, Newburgh, New York.

5              Count Three charges that from in or about 2008 through

6    in or about September 2012, Raymond Christian and Glenn

7    Thomas, together with others, intentionally knowingly conspired

8    to distribute and to possess with intent to distribute cocaine

9    base in a form commonly known as crack, heroin, and marijuana.

10             Count Four charges that on or about December 15, 2010,

11   Raymond Christian, Tyrell Whitaker, and Glenn Thomas, and

12   others, used and possessed firearms, and aided and abetted the

13   use and possession of firearms and in the course thereof caused

14   the death of Jeffrey Henry.

15             Count Five charges that on or about December 15, 2010,

16   Raymond Christian, Tyrell Whitaker, Glenn Thomas, and others,

17   used, carried, possessed and discharged firearms and aided and

18   abetted the use, carrying, possession and discharge of firearms

19   during and in relation to the robbery conspiracy and robbery

20   charged in in Counts One and two.

21             Count Six charges that in on about 2008 through

22   September 2012, Raymond Christian and Glenn Thomas, and others,

23   used, carried, and possessed firearms and aided and abetted the

24   use, carrying, and possession of firearms during and in

25   relation to the drug conspiracy charged in Count Three.

1

2          As you know, the indictment contains six charges.  You

3     will need to consider each charge against each charged

4     defendant and determine whether the government has carried its

5     burden of proof with respect to that charge and the defendant

6     you are considering.  Your verdict on any single count should

7     not control your decision on any other count.  I will provide

8     you with a verdict form, and you will need to report the

9     results of your deliberations on each count and defendant on

10    the verdict form.  To do so, you will need to keep track during

11    your deliberations of which defendant you are considering,

12    which charges you are considering, and even more specifically

13    the legal elements applicable to the charge.  I make these

14    observations to ensure that you understand the structure of the

15    charges against the defendants and your obligation to consider

16    the charges against each defendant separately and under each

17    statute and theory of liability alleged in the indictment.

18         In addition, some of the evidence in this case was

19    limited to one defendant.  Let me emphasize that any evidence

20    admitted solely against one defendant may be considered only as

21    against that defendant and may not enter into your

22    deliberations on any other defendant.

23         In a few moments, I will instruct you on the elements

24    of each of the charged offenses.  I will provide you with all

25    the instructions you need to decide whether the government has

E81nchr5                    Charge

proven beyond a reasonable doubt each of the necessary elements
on each of the charges in the indictment.  During your
deliberations you will have a copy of the indictment to
reference as you deem necessary.  You will have also a copy of
my instructions.

         The indictment alleges that certain acts occurred on
or about various dates.  It is not necessary, however, for the
government to prove that the alleged crimes were committed on
exactly those dates.  The law requires only that the government
prove beyond a reasonable doubt a substantial similarity
between the dates and months alleged in the indictment and the
dates and months established by the evidence.  Further, it is
not required that any defendant committed a charged crime
throughout the entire time period charged in a particular
count; it is sufficient for the government to prove beyond a
reasonable doubt that at some time during the period charged in
the indictment, the defendant participated in the charged
crime.


         Count One, robbery conspiracy.

         First, note that the Count One only charges defendants
Christian and Thomas.  Specifically, Count One of the
indictment charges that Raymond Christian and Glenn Thomas
violated Section 1951 of Title 18 of the United States Code.

         That section provides as follows:

E81nchr5                    Charge

1              Whoever in any way or degree obstructs, delays, or

2     affects commerce of the movement of any article or commodity in

3     commerce, by robbery or extortion, or attempts or conspires so

4     to do, or commits or threatens physical violence to any person

5     or property in furtherance of a plan or purpose to do anything

6     in violation of this section shall be guilty of a crime.

7              Specifically, Count One charges that:

8              In or about December 2010, in the Southern District of

9     New York, and elsewhere, Raymond Christian, also known as

10    Reckless, and Glenn Thomas, also known as Gucci, the

11    defendants, and others known and unknown, unlawfully and

12    knowingly did combine, conspire, confederate, and agree

13    together and with each other to commit robbery, as that term is

14    defined in Title 18, United States Code, Section 1951(b)(1),

15    and would and did thereby obstruct, delay, and affect commerce

16    and the movement of articles and commodities in commerce, as

17    that term is defined in Title 18, United States Code, Section

18    1951(b)(3), to wit, the defendants and others agreed to commit

19    an armed robbery of individuals they believed to be in

20    possession of narcotics and narcotics proceeds in Newburgh, New

21    York.

22             I will now instruct you on the law of conspiracy.  A

23    conspiracy is a kind of criminal partnership -- an agreement of

24    two or more persons to join together to accomplish some

25    unlawful purpose.  The crime of conspiracy to commit robbery is

1   an independent offense, separate and distinct from an actual

2   robbery offense.  Indeed, you may find the defendants charged

3   in Count One guilty of the crime of conspiracy to commit

4   robbery even if you find that there was no actual robbery.

5   Congress has deemed it appropriate to make conspiracy, standing

6   alone, a separate crime, even if the conspiracy is not

7   successful.

8           In order to prove the defendants guilty of the robbery

9   conspiracy charged in Count One of the indictment, the

10  government must establish the following two elements beyond a

11  reasonable doubt:

12          First, the prosecution must prove the existence of the

13  robbery conspiracy charged in Count One; and,

14          Second, the prosecution must prove that the defendants

15  knowingly and willfully became members of the conspiracy.

16          I will now separately instruct you on each of these

17  elements.

18          First element -- the existence of a conspiracy.

19          The first element that the prosecution must prove

20  beyond a reasonable doubt to establish the offense of

21  conspiracy is that two or more persons entered the unlawful

22  agreement charged in the indictment.  A conspiracy is a

23  combination, agreement, or understanding of two or more persons

24  to accomplish, by concerted action, a criminal or unlawful

25  purpose.  The unlawful purpose alleged to have been the object

1    of the conspiracy charged in Count One is the commission of a

2    robbery.

3              The gist, or the essence, of the crime of conspiracy

4    is an unlawful agreement between two or more people to violate

5    the law.  The first element of the crime of conspiracy thus has

6    two parts, one, an agreement and, two, an illegal object of the

7    conspiracy.  I am now going to describe both parts of this

8    element to you.

9              An agreement.

10             To meet met its burden of proof on this element, the

11   government must prove that there was an agreement.  However,

12   the prosecution is not required to show that two or more people

13   sat down around a table and entered into a solemn pact, orally

14   or in writing, stating that they had formed a conspiracy to

15   violate the law and spelling out all of the details of the

16   plans and the means by which the unlawful project was to be

17   carried out or the part that each of the persons who is a party

18   to the conspiracy is going to play.  Indeed, it would be quite

19   extraordinary if there were ever such a formal document or

20   specific oral agreement in a conspiracy.

21             Common sense will tell you that when people in fact

22   undertake to enter into a criminal conspiracy, much is left to

23   the unexpressed understanding.  Conspirators do not usually

24   reduce their agreements to writing.  They don't typically

25   publicly broadcast their plans.  By its very nature, a

1    conspiracy is almost always secret in its origin and execution.

2    It is enough if two or more people in some way or manner,

3    impliedly or tacitly, come to an understanding to violate the

4    law.  Express language or specific words are not required to

5    indicate assent or agreement to form the conspiracy.  You need

6    only find that two or more people entered into the unlawful

7    agreement alleged in the indictment in order to find that a

8    conspiracy existed.

9          In determining whether there has been an unlawful

10   agreement as alleged in Count One, you may judge the proven

11   acts and conduct of the alleged coconspirators that were taken

12   to carry out the apparent criminal purpose.  The old adage,

13   "actions speak louder than words", is applicable here.

14   Disconnected acts, when taken together in connection with one

15   another, can show a conspiracy or an agreement to secure a

16   particular result just as satisfactorily and conclusively as

17   more direct proof.

18         When people enter into a conspiracy to accomplish an

19   unlawful end, they become agents or partners of one another in

20   carrying out the conspiracy.  In determining the factual issues

21   before you, you may take into account any acts done or

22   statements made by any of the alleged coconspirators during the

23   course of the conspiracy, even though such acts or statements

24   were not made in the presence of the defendant or were made

25   without his knowledge.

E8lnchr5                          Charge

            Of course, proof concerning the accomplishment of the

object of a conspiracy may be the most persuasive evidence that

the conspiracy itself existed, but it is not necessary, as I

have said, that the conspiracy actually succeeded for you to

conclude that it existed.  In deciding whether the conspiracy

charged in Count One existed, you may consider all the evidence

of the acts, conduct, and statements of the alleged

conspirators and the reasonable inferences to be drawn from

that evidence.  It is sufficient to establish the existence of

the conspiracy if, after considering all of the relevant

evidence, you find beyond a reasonable doubt that the minds of

at least two alleged conspirators met in an understanding way,

and that they agreed, as I have explained, to work together to

accomplish the object or objective of the conspiracy charged in

Count One.

            In short, the prosecution must prove beyond a

reasonable doubt that at least two alleged conspirators came to

a mutual understanding, either spoken or unspoken, to commit

the robbery in the manner charged in Count One.

            Object of the conspiracy.

            The second part of the first element relates to the

object, or goal, of the conspiracy.

            According to the indictment, the goal of the

conspiracy alleged in Count One was to commit an armed robbery

of individuals believed to be in possession of narcotics and

1    narcotics proceeds in Newburgh, New York.  Specifically, the

2    defendants are charged with agreeing with others to commit the

3    robbery of individuals selling crack cocaine and marijuana from

4    a house located at 54 Chambers Street in Newburgh, New York.

5              A robbery is the unlawful taking of personal property

6    from another against his or her will.  This is done by

7    threatening or actually using force violence or fear of injury

8    immediately or in the future to a person or property.

9              In order to find that a defendant conspired to commit

10   robbery, you must find that the government proved beyond a

11   reasonable doubt that the defendant unlawfully agreed with at

12   least one other person to, one, obtain or take the personal

13   property of another, or from the presence of another, or

14   attempted to do so; two, did so against the intended victim's

15   will by actual or threatened force violence or fear of injury,

16   whether immediate or in the future; and, three, that the

17   defendant's actions would have in any way or degree obstructed,

18   delayed or affected interstate commerce.  I will discuss these

19   concepts in greater detail in a few minutes.

20             One must conspire to take property, and I instruct you

21   that the "property" as used in these instructions means

22   anything of value, including cash, jewelry and other items of

23   value, such as illegal narcotics.

24             Second element, knowing participation in the

25   conspiracy.  If you conclude that the government has proven

E8lnchr5                         Charge

beyond a reasonable doubt that the conspiracy charged in Count

One of the indictment existed and that the conspiracy had as

its object the illegal purpose charged in the indictment, then

you must next determine the second question:  Whether the

defendant participated in the conspiracy with knowledge of its

unlawful purpose and in furtherance of its unlawful objective.

In relation to the conspiracy charged in Count One,

the government must prove beyond a reasonable doubt that the

defendant unlawfully, knowingly, willfully and intentionally

entered into the conspiracy and that the defendant agreed to

take part in the conspiracy to promote and cooperate in its

unlawful objective.

The terms "unlawfully" and "knowingly" are used

because if you find that the defendants did join the

conspiracy, you must also consider whether the prosecution has

proven beyond a reasonable doubt that in doing so the

defendants knew what they were doing.  In other words, the

government must prove beyond a reasonable doubt that the

defendants joined the conspiracy deliberately and voluntarily.

"Unlawfully" simply means contrary to law.  A

defendant need not have known that he was breaking any

particular law, but he must have been aware of the generally

unlawful nature of his acts.

An act is done "knowingly," "willfully," and

"intentionally" if it is done deliberately and purposely; that

1    is, a defendant's acts must have been the product of that

2    defendant's conscious objective, rather than the product of a

3    mistake or accident or mere negligence or some other innocent

4    reason.

5         A defendant's knowledge is a matter of inference from

6    the facts proved.  The ultimate facts of knowledge and criminal

7    intent, though subjective, may be established by circumstantial

8    evidence, based upon a person's outward manifestations, his

9    words, his conduct, his acts, and all the surrounding

10   circumstances disclosed by the evidence and the rational or

11   logical inferences that may be drawn there from.  The process

12   of drawing inferences from facts in evidence is not a matter of

13   guesswork or speculation.  An inference is a deduction or

14   conclusion which you, the jury, are permitted to draw -- but

15   not required to draw -- from the facts which have been

16   established by either direct or circumstantial evidence.  In

17   drawing inferences, you should exercise your common sense.

18        When you come to decide, for example, whether a

19   defendant agreed with others to commit a robbery, you need not

20   limit yourself to just what he said, but you may also look at

21   what he did and what others did in relation to him, and, in

22   general, everything that occurred.  Circumstantial evidence, if

23   believed, is of no less value than direct evidence.  In either

24   case, the essential elements of the crime charged must be

25   established beyond a reasonable doubt.  The government contends

1   that evidence of acts alleged to have taken place by or with

2   each defendant or in his presence show beyond a reasonable

3   doubt each defendant's knowledge of the unlawful purpose of the

4   conspiracy.  By pleading not guilty, each defendant denies that

5   he was a member of this conspiracy.  It is for you to determine

6   whether the government has established to your satisfaction and

7   beyond a reasonable doubt that the defendants possessed such

8   knowledge and intent.

9         It is not necessary for the government to show that a

10  defendant was fully informed as to all the details of the

11  conspiracy in order for you to infer knowledge and intent on

12  the part of the defendant.  To have guilty knowledge, a

13  defendant need not have known the full extent of the conspiracy

14  or all of the activities of all the conspiracy's participants.

15        Similarly, it is not necessary for a defendant to have

16  known every other member of the conspiracy.  In fact, a

17  defendant may know only one other member of the conspiracy and

18  may still be considered a coconspirator.  Nor is it necessary

19  for a defendant to have received any monetary benefit from his

20  participation in the conspiracy or to have a financial stake in

21  the outcome of the alleged joint venture.  It is enough if a

22  defendant participated in the conspiracy unlawfully and

23  knowingly, as I have defined those terms.

24        The duration and extent of a defendant's participation

25  has no bearing on the issue of that defendant's guilt.  A

1    defendant need not have joined the conspiracy at the outset.  A

2    defendant may have joined the conspiracy at any time in its

3    progress, and a defendant will be held responsible for all that

4    was done before he joined and all that was done during the

5    conspiracy's existence while he was a member.  Each member of a

6    conspiracy may perform separate and distinct acts.  Some

7    conspirators play major roles, while others play minor roles in

8    the scheme.  An equal role is not what the law requires.  In

9    fact, even a single act may be sufficient to draw a defendant

10   within the scope of the conspiracy.

11       It is important for you to note that the defendant's

12   participation in the conspiracy must be established by

13   independent evidence of his own acts or statements as well as

14   those of the other alleged coconspirators, and the reasonable

15   inferences which may be drawn from them.

16       However, I want to caution you that a person's mere

17   association with a member of the conspiracy does not make that

18   person a member of the conspiracy, even when that association

19   is coupled with knowledge that a conspiracy is taking place.

20   In that context, membership in a gang such as the Bloods is not

21   the same as membership in a conspiracy.  Nor is attendance at

22   gang meetings or functions.  Nor is informal association with

23   others, even if on a regular basis.  Mere presence at the scene

24   of a crime, even coupled with knowledge that a crime is taking

25   place, is not sufficient to support a conviction.  In other

1    words, knowledge without agreement and participation is not

2    sufficient.  What is necessary is that the defendant joined in

3    the conspiracy with knowledge of its unlawful purposes and with

4    an intent to aid in the accomplishment of its unlawful

5    objectives.

6            In sum, the prosecution must prove beyond a reasonable

7    doubt that the defendant -- with an understanding of the

8    unlawful character of the conspiracy -- knowingly and

9    intentionally engaged, advised or assisted in the conspiracy

10   for the purpose of committing a robbery.  The defendants

11   thereby become knowing and willing participants in the unlawful

12   agreement -- that is to say, each became a coconspirator.

13           Once a conspiracy is formed, it is presumed to

14   continue until either its objective is accomplished or there is

15   some affirmative act of termination by the members.  So, too,

16   once a person is found to be a member of a conspiracy, he or

17   she is presumed to continue as a member in the conspiracy until

18   a conspiracy is terminated or achieves its objective, unless it

19   is shown by some affirmative proof that the person withdrew and

20   disassociated himself or herself from it.

21           Count One of the indictment contains a section

22   entitled "Overt Acts."  You will have a copy of the indictment

23   with you while you deliberate.  Although the indictment lists

24   overt acts, the prosecution need not prove that a defendant or

25   any accomplice committed any overt act.  As I have told you, to

E81nchr5                    Charge

1      prove a conspiracy, the prosecution need only prove the

2      unlawful agreement, and the defendants' knowing participation

3      in the conspiracy.

4              Liability for acts and declarations of coconspirators.

5              When considering the robbery conspiracy charged in

6      Count One, I instruct you that when people enter into a

7      conspiracy to accomplish an unlawful end, they become agents or

8      partners of one another in carrying out the conspiracy.  In

9      determining the factual issues before you, you may consider

10     against defendants any acts or statements made by any of the

11     people that you find, under the standards I have already

12     described, to have been their coconspirators, even though such

13     acts or statements were not made in his presence or were made

14     without their knowledge.

15             Now to Count Two, robbery.

16             I will now turn to Count Two, which names all three

17     defendants.  Specifically, Count Two alleges that Raymond

18     Christian, Tyrell Whitaker, and Glenn Thomas, committed a

19     robbery and attempted to commit a robbery in Newburgh on or

20     about December 15, 2010.

21             This count reads as follows:

22             On or about December 15, 2010, in the Southern

23     District of New York and elsewhere, Raymond Christian, also

24     known as Reckless, Tyrell Whitaker, also known as Bow Wow, and

25     Glenn Thomas, also known as Gucci, the defendants, and others

2415

E81nchr5                          Charge

1    known and unknown, unlawfully and knowingly did commit and

2    attempt to commit robbery, as that term is defined in Title 18

3    United States Code, Section 1951(b)(1), and did thereby

4    obstruct, delay and affect commerce and the movement of

5    articles and commodities in commerce, as that term is defined

6    in Title 18, United States Code, Section 1951(b)(3), to wit,

7    the defendants committed and attempted to commit an armed

8    robbery of individuals they believed to be in possession of

9    narcotics and narcotics proceeds in the vicinity of 54 Chambers

10   Street, Newburgh, New York.

11          The allegation contained in Count Two is brought under

12   the law that prohibits robbery and also under a provision of

13   the Federal Criminal Code that makes it a crime for anyone to

14   aid, abet, counsel, command, induce, or procure the commission

15   of another crime.  I will provide instructions on those

16   concepts in a few minutes.

17          In order to meet its burden of proof on Count Two, the

18   government must prove beyond a reasonable doubt each of the

19   following elements:

20          First, that the defendants knowingly, obtained or took

21   or attempted to take, the property of another;

22          Second, that the defendants did so against the

23   victim's will, by actual or threatened force, violence or fear

24   of injury, whether immediately or in the future;

25          Third, that as a result of the defendant's actions

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    interstate commerce, or an item moving in interstate commerce,

2    was delayed obstructed, or affected in any way or degree;

3           Fourth, the government must also establish beyond a

4    reasonable doubt that the defendants acted knowingly,

5    willfully, and unlawfully.

6           I have already explained the concepts of "knowingly"

7    "willfully" and "unlawfully" in connection with the charge

8    contained in Count One, and you should follow my previous

9    instructions on this point.

10          The first element the government must prove beyond a

11   reasonable doubt is that the defendant knowingly obtained and

12   attempted to obtain the personal property of another or from

13   the presence of another.  The term property includes tangible

14   and intangible things of value.  In this case the government

15   alleges that the object of the robbery charged in Count Two was

16   narcotics and narcotics proceeds.

17          The second element that the government must prove

18   beyond a reasonable doubt is that the defendants took, and

19   attempted to take, the personal property against the victim's

20   will, by actual or threatened force, violence, or fear of

21   injury, whether immediate or in the future.  It is not

22   necessary that the government prove that force, violence, and

23   fear were all used or threatened.  The government satisfies its

24   burden in this regard if it proves beyond a reasonable doubt

25   that any of these methods were employed.

1             In considering whether a defendant has used or

2    threatened to use force, violence or fear, you should give

3    those words their common and ordinary meaning and understand

4    them as you normally would.  The violence does not have to be

5    directed at the person whose property was taken.  The use of a

6    threat of force or violence might be aimed the at a third

7    perpendicular.  A threat may be made verbally or by a physical

8    gesture.  Whether a statement or physical gesture by a

9    defendant actually was a threat depends upon the surrounding

10   facts.

11            Fear exists if at least one victim experiences

12   anxiety, concern, or worry over expected personal harm.  The

13   existence of fear must be determined by the facts existing at

14   the time of a defendant's actions.

15            Your decision whether a defendant used or threatened

16   fear of injury involves a decision about the victim's state of

17   mind at the time of the defendant's actions.  It is obviously

18   impossible to ascertain or prove directly a person's subjective

19   feeling.  You cannot look into a person's mind to see what

20   hills or her state of mind is or was.  But a careful

21   consideration of the circumstances and the evidence may enable

22   you to decide whether fear would reasonably have been the

23   victim's state of mind.

24            Looking at the situation and the action of people

25   involved may help you determine what their state of mind was.

E81nchr5                    Charge

You can consider this kind of evidence -- known as

"circumstantial evidence" -- in deciding whether property was

obtained by a defendant through the use or threat of fear.

It is not necessary that the fear be a consequence of

a direct threat; it is sufficient that the surrounding

circumstances render the victim's fear reasonable.  You must

find that a reasonable personal would have been fearful in the

circumstances.

The third element that the government must prove is

that the robbery affected interstate or foreign commerce, even

if the effect would have been slight or minor.

The requirement of showing an effect on commerce

involves only a minimal burden of proving a connection to

interstate commerce, and is satisfied by conduct that affects

commerce in any way or degree.  The requirement may be

satisfied by a showing of a very slight effect on interstate

commerce.  Even a potential or subtle effect on commerce will

suffice.

With regard to this element, it is not necessary for

the government to prove that a defendant's conduct actually

affected commerce.  It is sufficient if the alleged robbery

possibly or potentially would have affected interstate or

foreign commerce.

It is not necessary for you to find that a defendant

intended or anticipated that the effect of his own acts, or the

1    acts of his coconspirators, would be to affect interstate

2    commerce or that the defendant or his coconspirators had or

3    shared a purpose to affect commerce.  All that is necessary is

4    that the natural effect of the acts he conspired to commit

5    would either actually or potentially affect interstate or

6    foreign commerce.

7            Nor do you have to decide whether the effect on

8    interstate commerce was or would have been harmful or

9    beneficial to a particular business or to commerce in general.

10   The government satisfies its burden of proving an effect on

11   commerce if it proves beyond a reasonable doubt any effect,

12   whether harmful or not.

13           When considering this element, it is important for you

14   to know that commerce affected or potentially affected need not

15   be lawful.  Activities affecting or potentially affecting

16   unlawful interstate active, such as trafficking in illegal

17   narcotics that have traveled in interstate commerce, fall

18   within the purview of the statute.

19           As I have stated, the defendants are charged in Count

20   Two with committing the robbery alleged or "attempting" to

21   commit that robbery on December 15, 2010.  So let me say a few

22   words about the meaning of a"attempt."  An attempt is similar

23   to the crime of conspiracy if that there is no requirement that

24   the attempt be successful or that a defendant actually carried

25   out the crime he was trying to commit.

 1            In order to prove the charge of attempting to commit

 2   the robbery charged in Count Two, the government must establish

 3   beyond a reasonable doubt, one, that the defendant you are

 4   considering intended to commit the crime charged and, two, that

 5   the defendant willfully took some action that was a substantial

 6   step in an effort to bring about or accomplish the crime.

 7            Mere intention to commit a specific crime does not

 8   amount to an attempt.  In order to convict the defendant of an

 9   attempt, you must find beyond a reasonable doubt that the

10   defendant intended to commit the crime charged and that he took

11   some action which was a substantial step toward the commission

12   of the crime.

13            In determining whether the defendant's actions

14   amounted to a substantial step toward the commission of the

15   crime charged, you must distinguish between mere preparation on

16   the one hand and the actual doing of the criminal deed on the

17   other.  Mere preparation, which may consist of planning the

18   offense or of devising, obtaining, or arranging a means for its

19   commission, is not an attempt, although some preparations may

20   amount to an attempt.  Conduct shall be held to constitute a

21   substantial step if it is strongly corroborative of the actor's

22   criminal purpose.  A verbal agreement, without more, is

23   insufficient for the substantial step requirement.  Put another

24   way, the acts of a person who intends to commit a crime will

25   constitute an attempt where the acts themselves clearly

E8lnchr5                        Charge

1   indicate an intent to willfully commit the crime and the acts

2   are a substantial step in a course of conduct planned to

3   culminate in the commission of the crime.

4          In order to sustain its burden of proof on the charge

5   of attempted robbery, the government must prove that the

6   defendant you are considering, one, attempted to obtain, or

7   take, the property of another, two, he did so against the

8   victim's will, by actual or threatened force, violence or fear

9   of injury, whether immediate or in the future, three, that the

10  defendant's actions actually or potentially in any way or

11  degree, obstructed, delayed or affected interstate commerce,

12  and, four, that the defendant acted unlawfully, knowingly and

13  willfully.

14         Now to Count Three.  Count Three of the indictment

15  charges that Raymond Christian and Glenn Thomas participated in

16  a conspiracy to violate the narcotics laws of the United

17  States.  This count only charges defendants Christian and

18  Thomas.

19         Specifically, Count Three charges that:

20         From in or about 2008 through in or about September

21  2012, in the Southern District of New York and elsewhere,

22  Raymond Christian, also known as Reckless, and Glenn Thomas,

23  also known as Gucci, the defendants, and others known and

24  unknown intentionally and knowingly did combine, conspire,

25  confederate and agree together and with each other to violate

1    the narcotics laws of the United States.

2            It was a part and an object of the conspiracy that

3    from in or about 2008 to in or about September 2012 in the

4    Southern District of New York and elsewhere, Raymond Christian,

5    also known as Reckless, and Glenn Thomas, also known as Gucci,

6    the defendants, and others known and unknown, would and did

7    distribute and possess with intent to distribute controlled

8    substances in violation of Title 21, United States Code,

9    Section 841(a)(1).

10           The controlled substances involved in the offense

11   were, one, mixtures and substances containing a detectable

12   amount of cocaine base in a form commonly known as crack, in

13   violation of Title 21, United States Code, Section

14   841(b)(1)(C), two, mixtures and substances containing a

15   detectable amount of heroin, in violation of Title 21, United

16   States Code, Section 841(b)(1)(c), and, three, a quantity of

17   marijuana, in violation of Title 21, United States Code,

18   Section 841(b)(1)(D).

19           As I told you earlier when we discussed the robbery

20   conspiracy charged in Count One, to sustain its burden of proof

21   with respect to a charge of a conspiracy, the government must

22   prove beyond a reasonable doubt the following two elements:

23           First, the existence of the conspiracy charged -- that

24   is, that there was, in fact, an agreement or understanding to

25   violate those provisions of the law that make it illegal to

1   distribute narcotics or to possess narcotics with the intent to

2   distribute them.

3          Therefore, the first question for you is, Did the

4   conspiracy alleged in Count Three exist?  Was there such a

5   conspiracy to distribute illegal narcotics, or to possess

6   narcotics with the intent to distribute them?

7          Second, the government must prove beyond a reasonable

8   doubt that the defendants knowingly became members of the

9   conspiracy charged; that is, that they knowingly associated

10  themselves with the conspiracy, and participated in the

11  conspiracy to distribute or possess with the intent to

12  distribute narcotics.

13         The first element, existence of the conspiracy.

14         As I mentioned earlier a conspiracy is a combination,

15  an agreement, or an understanding of two or more persons to

16  accomplish by concerted action a criminal or unlawful purpose.

17  I explained federal conspiracy law in connection with Count

18  One.  You should apply those same instructions in considering

19  Count Three.

20         Remember, the conspiracy alleged in Count Three is the

21  agreement to distribute or possess with the intent to

22  distribute a controlled substance, and it is an entirely

23  distinct and separate offense from the actual distribution or

24  possession of a controlled substance.

25         Object of the conspiracy.

1          The objects of a conspiracy are the illegal goals the

2     coconspirators agree or hope to achieve.  Again, the indictment

3     here alleges the existence of three objects, relating, as I

4     stated a moment ago, to the distribution of three distinct

5     controlled substances:  Crack cocaine, marijuana, and heroin.

6          The government need not prove all three of the objects

7     charged beyond a reasonable doubt.  In other words, an

8     agreement to accomplish any of the objects of the conspiracy is

9     sufficient.

10         Nevertheless, if you do find beyond a reasonable doubt

11    that all three of the objects were proven, you must be

12    unanimous as to the object you do find.  That is, in order to

13    find either defendant guilty, you must all be in agreement with

14    respect to at least one of the alleged objects of the

15    conspiracy.

16         If the government fails to prove beyond a reasonable

17    doubt that at least one of the objects charged in the

18    indictment was, in fact, an object of the conspiracy, then you

19    must find the defendants not guilty.  If, on the other hand,

20    you find that the government has proved beyond a reasonable

21    doubt reasonable doubt that there was a conspiracy with one or

22    other of the objects charged, then the illegal object element

23    is satisfied.

24         I will define the terms "distribution" and

25    "possession" for you in a moment.  As I will explain, to

1    "distribute" means simply to transfer to another.  It does not

2    require a sale. "Possession with intent to distribute" simply

3    means the possession of a controlled substance with the

4    intention, or purpose, to distribute it to another person or

5    persons.

6          Let me note that the government need prove only that a

7    defendant conspired to distribute the controlled substance or

8    that he conspired to possess the controlled substance with the

9    intent to distribute it.  The government need not prove both.

10         Let me also note something regarding the quantity of

11   the drugs involved.  I instruct you that the actual quantity of

12   the controlled substance involved in the conspiracy charged in

13   Count Three is not an element of this crime, so you need not be

14   concerned with quantity in determining whether a defendant is

15   guilty or not guilty.  In order to determine whether a

16   defendant is guilty you need only find beyond a reasonable

17   doubt that a conspiracy exited to distribute or possess with

18   the intent to distribute some amount of a controlled substance.

19         As I have just described, the prosecution must prove

20   beyond a reasonable doubt that at least two alleged

21   conspirators came to a mutual understanding, either spoken or

22   unspoken, to possess and distribute a controlled substance in

23   the manner charged in Count Three.  Now, the second part of the

24   first element relates to the object, or the objective, of the

25   conspiracy.  Count Three charges that the objects of the

conspiracy were to the distribution of crack cocaine, heroin,
and marijuana, and the possession of crack cocaine, heroin and
marijuana with the intent to distribute it.

        In that regard, the government has presented evidence
that the defendant Thomas admitted to the crime of distributing
narcotics in 2007.  I instruct you that you cannot consider
that evidence in determining whether the government has proved
Mr. Thomas's involvement in the conspiracy charged in Count
Three.

        Now I will instruct you about the objects of the
conspiracy charged in Count Three by defining the terms
"distribution" and "possession with intent to distribute"

        Distribution.

        The word "distribution" means the actual, constructive
or attempted transfer of the drug.  To distribute simply means
to deliver, to pass over, to hand over something to another
person, or to cause it is it to be delivered, passed on or
handed over to another.  Distribution does not require a sale.

        What does "possession with intent to distribute" mean?
I will first discuss the concept of "possession" and then
discuss the concept of "intent to distribute."

        We begin with the concept of "possession."  The legal
concept of possession may differ from the everyday usage of the
terms.  Actual possession is what most of us think of as
possession; that is, having physical custody or control of an

1   object, as I possess this BlackBerry.  However, a person need

2   not have actual physical possession, that is, physical custody

3   of an object, in order to be in legal possession of it.  If an

4   individual has the ability to exercise substantial control over

5   an object that he does not have in his custody, and the intent

6   to exercise such control, then he is in possession of that

7   article.  This is called constructive possession.

8           Control over an object may be demonstrated by the

9   existence of a working relationship between the person having

10  such control and the person with actual physical custody.  The

11  person having control possesses them because he has an

12  effective working relationship with the people who have actual

13  physical custody of them and because he can direct the movement

14  or transfer or disposition of those things.  In this manner,

15  for example, a businessman may possess things that are

16  scattered you throughout a number of stores or offices around

17  and about a city or country.

18          More than one person can have control over the same

19  narcotics.  The law recognizes that possession may be sole or

20  joint.  If one person alone has actual or constructive

21  possession of a thing, possession is sole.  If more than one

22  person has possession of it, as I have defined possession for

23  you, then possession is joint.  That is what is meant by

24  "possession.

25          "Potential with intent to distribute" means that a

 1    defendant possessed the substances with a state of mind or

 2    purpose to transfer them to another person.

 3              Since no one can read a defendant's mind, the

 4    determination as to a defendant's intent is inferred from his

 5    behavior.  Basically the question with regard to the intent

 6    aspect of the underlying offense is whether any drugs in a

 7    defendant's possession, that is, subject to his control in the

 8    manner I have indicated, were for his personal use or for the

 9    purpose of distribution or delivery to another.

10              It may be possible to make the determination as to

11    whether drugs were possessed "with intent to distribute," from

12    the quantity of drugs that a defendant may have possessed,

13    although the possession of a large quantity of narcotics does

14    not necessarily mean that the defendant intended to distribute

15    them.  On the other hand, a defendant may have intended to

16    distribute a controlled substance even if he did not possess a

17    large amount of it.  Other physical evidence, such as

18    paraphernalia for the packaging and processing of drugs, can

19    show an intent to distribute.  It might also be evidence of a

20    plan or a scheme to distribute.  You should make your decision

21    whether the government has proved beyond a reasonable doubt

22    that the defendants committed the offense charged in Count

23    Three of the indictment from all of the evidence, or the lack

24    of evidence, presented in this case.

25              Multiple conspiracies.

1          You must decide whether narcotics conspiracy charged

2     in Count Three of the indictment existed, and if it did, who

3     were some of its members.  If you find that the conspiracy

4     charged did not exist, then you must return a not guilty

5     verdict, even though you may find some other conspiracy

6     existed.  Similarly, if you find that the defendant was not a

7     member of the conspiracy charged, then you must find the

8     defendant not guilty, even though that defendant may have been

9     a member of some other conspiracy.

10          If you conclude that the government has proven beyond

11    a reasonable doubt that the conspiracy charged in Count Three

12    of the indictment existed, then you must next determine the

13    second question:  Whether the defendants participated in the

14    conspiracy with knowledge of its unlawful purpose and in

15    furtherance of its unlawful objectives.

16          If you conclude that the government has proven beyond

17    a reasonable doubt that the conspiracy charged in Count Three

18    existed, you must next determine the second question, and that

19    is whether the defendant you are considering participated in

20    the conspiracy willfully, with knowledge of its unlawful

21    purposes and in furtherance of its unlawful objectives.  I

22    previously instructed you in my instructions to Count One about

23    determining whether a defendant knowingly became a member of

24    the conspiracy charged.  You should apply my instructions from

25    Count One in considering a defendant's membership in the

conspiracy.

In summary, I remind you that on this point, the government must prove by evidence of a defendant's own actions and conduct beyond a reasonable doubt that he knowingly and intentionally entered into the conspiracy, the agreement, with a criminal intent, that is, with a purpose to violate the law, and agreed to take part in the conspiracy to promote and cooperate in one of its unlawful objectives.

I also remind you that the terms "knowingly" and "intentionally" mean that you must be satisfied beyond a reasonable doubt that in joining the conspiracy -- if you find that a defendant did join the conspiracy -- the defendant knew what he was doing -- that he took the actions in question deliberately and voluntarily.

Count Four.

Count Four of the indictment charges all three defendants, specifically, it charges that Raymond Christian, Glenn Thomas and Tyrell Whitaker violated Section 924(j) of Title 18 of the United States Code.

That provision makes it a crime for any person, "In the course of a violation of Section 924(c) to cause the death of a person through the use of the firearm."

As I told you previously, Section 924(c) makes it a crime for any person "during and in relation to any crime of violence or drug trafficking crime to use or carry a firearm or

E8lnchr5                        Charge

1    in furtherance of any such crime to possess a firearm.  In

2    particular, Count Four charges that:

3            "On or about December 15, 2010, in the Southern

4    District of New York, Raymond Christian, also known as

5    Reckless, Tyrell Whitaker, also known as Bow Wow, and Glenn

6    Thomas, also known as Gucci, the defendants, and others known

7    and unknown, willfully and knowingly, during and in relation to

8    a crime of violence for which they may be prosecuted in a court

9    of the United States, namely, the robbery conspiracy, robbery,

10   and attempted robbery charged in Counts One and Two above, did

11   use and carry firearms, and in furtherance of such crimes, did

12   possess firearms and did aid and abet the use, carrying, and

13   possession of firearms, and in the course thereof did cause the

14   death of a person through the use of a firearm, which killing

15   is murder as defined in Title 18, United States Code, Section

16   1111(a), to wit, the defendants caused the death of Jeffrey

17   Henry, by discharging a firearm at Jeffrey Henry in the

18   vicinity of 54 Chambers Street, Newburgh, New York."

19           To convict Raymond Christian, Tyrell Whitaker and

20   Glenn Thomas of Count Four, the government must prove each of

21   the following five elements beyond a reasonable doubt:

22           First, that on or about the dates alleged in the

23   indictment, the charged defendants used or carried or possessed

24   a firearm, or any combination of those acts, or aided and

25   abetted the use carrying or possession of a firearm by another;

1              Second, that the defendants used or carried the

2      firearm, or aided and abetted the use and carrying of the

3      firearm, during and in relation to the specified crime of

4      violence, or that the defendants possessed a firearm in

5      furtherance of the specified crime of violence;

6              Third, that the defendants caused the death of a

7      person through the use of a firearm;

8              Fourth, that the death of that person qualifies as a

9      murder, as I will define that term for you in a moment; and

10             Fifth, that the defendants acted knowingly and

11     willfully as I have previously defined those formation for you

12     and you should apply those instructions here.

13             The first element that the government must prove

14     beyond a reasonable doubt on Count Four is that on or about the

15     date set forth in the indictment, the defendants used, carried,

16     or possessed a firearm or aided and abetted the use, carrying,

17     or possession of a firearm.

18             A firearm under the statute means "any weapon which

19     will or is designed to or may readily be converted to expel a

20     projectile by the action of an explosive.  In considering the

21     specific element of whether the defendants used or carried or

22     possessed a firearm, it does not matter whether the firearm was

23     loaded or operable at the time of the crime.  Operability is

24     not relevant to your determination of whether a weapon

25     qualifies as a firearm.  I instruct you that a gun is a

firearm.

In order to prove that a defendant used a firearm, the government must prove beyond a reasonable doubt an active employment of a firearm by the defendants during and in relation to the commission of the crime of violence.  This does not mean that the defendants must actually fire or attempt to fire the weapon, although those would obviously constitute use of the weapon.  Brandishing, displaying, or even referring to the weapon so that others present knew that the defendant had the firearm available if needed all constitute use of the firearm.  The mere possession of a firearm at or near the site of the crime without active employment as I just described it is not, however, sufficient to constitute use of the firearm.

In order to prove that a defendant carried a firearm, the government must prove beyond a reasonable doubt that the defendant had the weapon within his control so that it was available in such a way that it furthered the commission of the crime.  The defendants need not have held the firearm physically, that is, have had actual possession of it on his person.  If you find that the defendants had dominion and control over the place where the firearm was located and had the power and intention to exercise control over the firearm, and that the firearm was immediately available to him in such a way that it furthered the commission of the crime of violence, you may find that the government has proven that the defendant

1    carried the weapon.

2              Possess.

3              I have previously instructed you on the meaning of

4    possession, and you should follow those instructions here.  To

5    reiterate, neither actual physical custody nor ownership is

6    required to show that a person possesses an object.

7              Possession of a firearm in furtherance of a crime of

8    violence requires that the defendant possess a firearm and that

9    the possession advance or move forward the crime.  The mere

10   presence of a firearm is not enough.  Possession in furtherance

11   requires that the possession be incident to and an essential

12   part of the crime.  The firearm must have played some part in

13   furthering the crime in order for this element to be satisfied.

14             The defendants are also charged in Count Four pursuant

15   to the aiding and abetting theory of liability.  Accordingly,

16   it would be sufficient for this element if the defendants aided

17   and abetted another person in the use, carrying, or possession

18   of a firearm.  I will shortly explain to you the concept of

19   aiding and abetting.

20             The second element that the prosecution must prove

21   beyond a reasonable doubt that the defendants act used or

22   carried a firearm during and in relation to a crime of

23   violence, or possessed a firearm in furtherance of such a

24   crime.

25             "In relation to" means that the firearm must have had

some purpose, role, or effect with respect to the crime of

violence.

The possession of a firearm in furtherance of a crime

of violence requires that the defendants possessed a firearm

and that it advanced or moved forward the crime.  The mere

presence of a firearm is not enough.  The possession in

furtherance requires that the use, carrying, or possession was

incident to and an essential part of the crime.  The firearm

must have played some part in furthering the crime in order for

this element to be satisfied.

I instruct you that, if you find beyond a reasonable

doubt that the defendant you are considering participated in

the robbery conspiracy alleged in Count One of the indictment,

then it qualifies under the law as a crime of violence for

which Raymond Christian and Glenn Thomas may be prosecuted in a

court of the United States.  I additionally instruct you that

the attempted robbery charged in Count Two of the indictment

qualifies under the law as a crime of violence for which

Raymond Christian, Tyrell Whitaker, and Glenn Thomas may be

prosecuted in a court of the United States.

As to the third element -- whether the defendants'

conduct caused the deaths of the victim -- the defendants'

conduct may be found to cause the death of another individual

if it such an effect in producing that individual's death as to

lead a reasonable person to regard the defendants conduct as a

1    cause of death.  The death of a person may have one or more

2    than one cause.  You need not find that a defendant shot the

3    victim or that he committed the final, fatal act.  The

4    government need only prove that the conduct of the defendants

5    was a substantial factor in causing the victim's death.

6            The fourth element of Count Four that the government

7    must prove beyond a reasonable doubt is that the death of the

8    person qualifies as a murder.  In considering Count Four, you

9    should apply the following definition of murder, which comes

10   from Section 1111 of the Federal Criminal Code:  "Murder is the

11   unlawful killing of a human being, with malice aforethought.

12   Every murder perpetrated by poison, lying in wait, or any other

13   kind of willful, deliberate, malicious, and premeditated

14   killing, or committed in the perpetration of or attempt to

15   perpetrate certain crimes, including robbery, qualifies as

16   murder."

17           In this case, the government is proceeding on the last

18   theory of murder, which is also known as felony murder -- that

19   is, that the killing took place while the defendants were

20   perpetrating, or attempting to perpetrate, the robbery on

21   December 15, 2010.  To be guilty of felony murder, the

22   defendants, Christian, Thomas and Whitaker, do not have to have

23   set out to commit a murder.  It is enough if you determine that

24   the defendants set out to commit the robbery and that the death

25   of the victim occurred during the course of that robbery.

1          Counts Five and Six, possession of firearm during and

2     in relation to a drug trafficking crime and a crime of

3     violence.

4          I now want to turn to the firearms offenses charged in

5     the indictment.  Note first that Count Five charges all three

6     defendants, whereas Count Six only charges defendants Christian

7     and Thomas, not defendant Whitaker.

8          Count Five and Six both allege violations of Section

9     924(c) of the Federal Criminal Code.  That provision makes it a

10    crime for any person "during and in relation to any crime of

11    violence or drug trafficking crime, to use or carry a firearm

12    or in furtherance of any such crime to possess a firearm.

13         Count Five is a firearms count connected to the crimes

14    of violence; namely, the robbery conspiracy or the robbery

15    charged in Counts One and Two, and it charges Raymond

16    Christian, Tyrell Whitaker, and Glenn Thomas as follows:

17         On or about December 15, 2010, in the Southern

18    District of New York, Raymond Christian, also known as

19    Reckless, Tyrell Whitaker, also known as Bow Wow, Glenn Thomas,

20    also known as Gucci, the defendants, and others known and

21    unknown, during and in relation to a crime of violence for

22    which they may be prosecuted in any court of the United States,

23    namely, the robbery conspiracy, robbery, and attempted robbery

24    charged in Counts One and Two above, knowingly did use and

25    carry firearms and in furtherance of such crimes did possess

E81nchr5                    Charge

firearms and did aid and abet the use and carrying and

possession of firearms, which firearms were brandished and

discharged.

You have just heard that Count Five by its terms is

connected to Counts One and Two in the indictment.  This means

that you cannot consider Count Five unless you first determine

that the defendant in question is guilty of either or both the

robbery conspiracy charged in Count One or the robbery charged

in Count Two.

Count Six is a firearms count connected to the

narcotics conspiracy charged in Count Three of this indictment,

and it charges Raymond Christian and Glenn Thomas as follows:

From in or about 2008, through in or about September

2012, in the Southern District of New York, Raymond Christian,

also known as Reckless, and Glenn Thomas, also known as Gucci,

the defendants, and others known and unknown, during and in

relation to a drug trafficking crime for which they may be

prosecuted in a court of the United States, namely, the

narcotics conspiracy charged in Count Three of this indictment,

knowingly did use and carry firearms and in furtherance of such

crime did possess firearms and did aid and abet the use and

carrying and possession of firearms.

You just heard that Count Six by its terms is

connected to Count Three in the indictment.  This means that

with respect to Raymond Christian and Glenn Thomas, you should

not consider Count Six unless you first determine that the

defendant in question is guilty of Count Three.

To be clear, Count Six pertains to the use of a

firearm between 2008 and September 2012, but on an occasion

other than in connection with the December 15, 2010 robbery at

54 Chambers Street.  In short, you may consider the December

15, 2010 robbery only in connection with Counts Three, Four,

and Five, but not as evidence of the firearms offense charged

in Count Six.  In other words, to convict defendants Christian

and Thomas on Count Six, you must find, among the other

elements I am about to describe, that the defendants possessed

a firearm on an occasion other than the December 15, 2010

robbery.

In order to convict the defendants you are considering

of the firearms count you are considering, the government must

prove the following three elements beyond a reasonable doubt:

First, that on or about the dates alleged in the

indictment, the charged defendants used or carried or possessed

a firearm or any combination of these acts, or aided and

abetted the use, carrying, or possession of a firearm by

another.

Second, that the defendants used or carried the

firearm or aided and abetted the use and carrying of the

firearm during and in relation to the specified crime of

violence or the specified drug trafficking crime or that the

E81nchr5                        Charge

1    defendants possessed a firearm in furtherance of the specified

2    crime of violence or specified drug trafficking crime.

3              (Continued on next page)

1          THE COURT:  (Continuing)  Third, that the defendants

2     acted willfully an knowingly.  Again, you should apply the

3     definitions for those terms that I've previously provided to

4     you, pages 13 and 14.

5          The first element the government must prove beyond a

6     reasonable doubt is that on or about the dates set forth in the

7     indictment the defendants you are considering used, carried or

8     possessed a firearm.  I have already instruct you as to the

9     elements and definitions applicable here for the words firearm

10    use, carry, and possess.  You should follow my previous

11    instructions on these points.

12         I remind you that each charged defendant is also

13    charged with aiding and abetting in the firearm count in which

14    he or she is charged; accordingly, it would be sufficient for

15    this element if the defendant you are considering aided and

16    abetted another person in the use, carrying, and possession of

17    a firearm, as I earlier defined those terms for you.  I do

18    want, however, to give you an additional instruction that

19    applies to aiding and abetting the use, carrying of, or the

20    possession of a firearm.  In order to convict the defendant you

21    are considering of aiding and abetting another's using,

22    carrying out, or possession of a firearm, it is not enough to

23    find that the defendant performed an act to facilitate or

24    encourage the commission of the underlying drug trafficking

25    crime with the knowledge that the firearm would be used or

E819chr6                    Charge

1    carried in the commission of that crime.  Instead, you must

2    find that the defendant performed some act that facilitated or

3    encouraged the actual using, carrying of, or possession of the

4    firearm in relation to the underlying crime.

5              For example, if you find that the defendant directed

6    another person to use, carry, or possess a gun in the

7    commission of the underlying crime, or made such a gun

8    available to the other person, then the defendant aided and

9    abetted the other person's use of a firearm.  Or, if you find

10   that the defendant was present at the scene during the

11   commission of the underlying drug trafficking crime, you may

12   consider whether that defendant's use -- whether that

13   defendant's conduct at the scene facilitated or promoted the

14   carrying of a gun and thereby aided and abetted the other

15   person's carrying of a firearm.  These examples are only

16   offered by way of illustration and are not meant to be

17   exhaustive.

18             The second element that the government must prove

19   beyond a reasonable doubt with respect to Counts Five and Six

20   is that the defendants used or carried a firearm during and in

21   relation to either (a) a crime of violence or possessed a

22   firearm in furtherance of such crimes as charged in Count Five,

23   or (b) a drug trafficking crime, or possessed the firearm in

24   furtherance of such crimes as such charged in Count Six.

25             With respect to Count Five, the government must prove

 1   beyond a reasonable doubt that the defendant you are

 2   considering used or carried a firearm during and in relation to

 3   a crime of violence, or possessed a firearm in furtherance of

 4   such crimes.  With respect to Count Six, the government must

 5   prove beyond a reasonable doubt that the defendant you are

 6   considering used or carried a firearm during and in relation to

 7   a drug trafficking crime, or possessed a firearm in furtherance

 8   of such crimes.  Possess in furtherance, as I indicated,

 9   requires that the possession be incident to and an essential

10   part of the crime.  The firearm must have played some part in

11   furthering the crime in order for this element to be satisfied.

12            I instruct you that the crimes charged in Count One,

13   the robbery conspiracy charge, and Count Two, the attempted

14   robbery charge, qualify as crimes of violence.  I further

15   instruct you that the narcotics conspiracy alleged in Count

16   Three qualifies as a drug trafficking crime.

17            Special interrogatory.

18            If, and only if, you find a defendant guilty of one of

19   the enumerated firearms counts I have just explained to you,

20   then you must determine special findings for that defendant on

21   that count.  Specifically, you must determine whether during a

22   defendant's use, carrying, or possession of the firearm, he

23   brandished or discharged that firearm, or aided and abetted the

24   same, or whether he did not.  You will be provided with a

25   verdict form that will include spaces for you to indicate your

1    determinations with respect to these issues.

2            Brandish means that all or part of the weapon was

3    displayed, or the presence of the weapon was otherwise made

4    known to another person, to intimidate that person, regardless

5    of whether the weapon was directly visible to that person.  The

6    weapon does not have to be directly visible, but it must be

7    present.

8            Discharge means to fire or shoot.

9            Your finding as to brandishing or discharging must be

10   beyond a reasonable doubt.  In addition, it must be unanimous

11   in that all of you must agree that the firearm was brandished

12   or discharged.  Thus, for example, if all of you agree that a

13   defendant discharged the firearm during the crime, you should

14   indicate "yes" to that question on the verdict sheet.  And if

15   you also believe that a defendant brandished the firearm during

16   the crime, you should indicate "yes" to that question as well.

17   If, however, some jurors conclude that the defendant brandished

18   the firearm and the rest of the jurors conclude that he

19   discharged it, you would indicate "no" on both questions

20   because your finding on each determination would not be

21   unanimous.

22           I want to now instruct you on the concept of aiding

23   and abetting, which you have heard me refer to earlier in my

24   instructions.

25           In connection with the charges contained in Counts

1    Two, Four, Five, and Six of the indictment, the defendants are

2    charged with committing certain criminal acts, and also with

3    aiding and abetting the commission of these acts, in violation

4    of Title 18, United States Code, Section 2.  As to each of

5    those crimes, the defendant you are considering can be

6    convicted either if he committed the crime himself or if he

7    aided and abetted the commission of the crime by one or more

8    people.  It is not necessary for the government to show that

9    the defendant himself physically committed a crime in order for

10   you to find him guilty.  If you do not find beyond a reasonable

11   doubt that the defendant physically committed a crime, you may,

12   under certain circumstances, still find him guilty of the crime

13   as an aider and abettor.

14        A person who aids and abets another to commit an

15   offense is just as guilty of that offense as if he had

16   committed it himself.  Therefore, if you find that the

17   government has proven beyond a reasonable doubt that another

18   person actually committed a crime, and that the defendant you

19   are considering aided and abetted that person in the commission

20   of the offense, then you may find the defendant guilty of that

21   crime.

22        As you can see, the first requirement is that another

23   person has committed the crime charged.  Obviously, no one can

24   be convicted of aiding and abetting the criminal acts of

25   another if no crime was committed by another person.  But if

1    you do find that a crime was committed, then you must consider

2    whether the defendant aided or abetted the commission of the

3    crime.  In order to aid and abet another to commit a crime, it

4    is necessary that the defendant you are considering willfully

5    and knowingly associated himself in some way with the crime,

6    and that he willfully and knowingly sought by some act to help

7    make the crime succeed.

8           To determine whether the defendant aided and abetted

9    the commission of the crime with which he is charged, ask

10   yourself these questions.  Did he participate in the crime

11   charged as something he wished to bring about?

12          Did he associate himself with the criminal venture

13   knowingly and willfully?

14          Did he seek by his actions to make the criminal

15   venture succeed?

16          If the government proves beyond a reasonable doubt

17   that the defendant you are considering did all three of these

18   things, then the defendant is an aider and abettor, and

19   therefore guilty of the offense.  If he did not, then the

20   defendant is not an aider and abettor and he is not guilty of

21   the offense.

22          Now you have heard reference, in the arguments and

23   cross-examination of the defense counsel in this case, to the

24   fact that certain investigative techniques were not used by the

25   government.  There is no legal requirement, however, for the

E819chr6                      Charge

1    government to prove its case through any particular means.

2    While you are to carefully consider the evidence adduced by the

3    government, you are not to speculate as to why they used the

4    techniques they did or why they did not use other techniques.

5    Your concern is to determine whether, on the evidence or lack

6    of evidence, each defendant's guilt has been proven beyond a

7    reasonable doubt.

8         Now, there are people whose names you have heard

9    during the course of the trial but did not appear to testify.

10   One or more of the attorneys has referred to their absence from

11   the trial.  I instruct you that each party had an equal

12   opportunity or lack of opportunity to call any of these

13   witnesses.  Therefore, you should not draw any inferences or

14   reach any conclusions as to what they would have testified to

15   had they been called.  Their absence should not affect your

16   judgment in any way.

17        You should remember my instructions, however, that the

18   law does not impose on a defendant in a criminal case the

19   burden or duty of calling any witnesses or producing any

20   evidence.

21        Accomplice or cooperating witness testimony.

22        You have heard from witnesses who testified that they

23   committed crimes.  Some of these witnesses testified pursuant

24   to a cooperation agreement with the government, while other

25   witnesses testified at this trial pursuant to a grant of

immunity, which in this case means that the government cannot

use their testimony against them in a future prosecution.  Let

me say a few things that you should consider during your

deliberations on the subject of the testimony of cooperating

and immunized witnesses.

The government argues, as it is permitted to do, that

it must take the witnesses as it finds them.  It argues that

only people who themselves take part in criminal activity have

the knowledge required to show criminal behavior by others.

For those very reasons, the law allows the use of accomplice

testimony.  Indeed, it is the law in federal courts that the

testimony of even one accomplice may be enough in itself for

conviction, if the jury finds that the testimony establishes

guilt beyond a reasonable doubt.

On the other hand, it is also the case that testimony

from cooperating witnesses or witnesses who have been immunized

is of such nature that it must be scrutinized with great care

and viewed with particular caution when you decide how much, if

any, of the testimony to believe.

In evaluating the testimony of cooperating and

immunized witnesses, you should ask yourselves whether the

witness would benefit more by lying, or by telling the truth.

Was his or her testimony made up in any way because he or she

believed or hoped that he or she would somehow receive

favorable treatment by testifying falsely?  Or did he or she

believe that his or her interests would be best served by

testifying truthfully?  If you believe that the witness was

motivated by hopes of personal gain, was the motivation one

that would cause him or her to lie, or was it one that would

cause him or her to tell the truth?  Did this motivation color

his or her testimony?

          If you find that the testimony was false, you should

reject it.  However, if, after a cautious and careful

examination of the cooperating witness's testimony and demeanor

upon the witness stand, you are satisfied that the witness told

the truth, you should accept it as credible and act upon it

accordingly.

          If you find that a witness is intentionally telling a

falsehood, that is always a matter of great importance you

should weigh carefully.  If you find that any witness has

willfully testified falsely as to any material fact -- that is,

as to an important matter -- the law permits you to disregard

completely the entire testimony of that witness upon the

principle that one who testifies falsely about one material

fact is likely to testify falsely about everything.  You are

not required, however, to consider such a witness as totally

unbelievable.  You may accept so much of his or her testimony

as you deem true and disregard what you feel is false.

          You have also heard testimony that one of the

witnesses pled guilty to charges arising out of the same facts

E819chr6                    Charge

 1    that are at issue in this case.  You are instructed that you

 2    are to draw no conclusions or inferences of any kind about the

 3    guilt of the defendants on trial from the fact that a

 4    government witness pled guilty to similar charges.  The

 5    decision of that witness to plead guilty was a personal

 6    decision that the witness made about his own guilt.  It may not

 7    be used by you in any way as evidence against or unfavorable to

 8    the defendants on trial here.

 9              Additionally, I must caution you that it is no concern

10    of yours why the government made an agreement with a witness or

11    why a witness was granted immunity.  Your sole concern is

12    whether a witness has given truthful testimony here in this

13    courtroom before you.

14              Use of informants.

15              There has been testimony before you about the use of

16    informants.  Informants are frequently used by the government

17    to obtain leads and to gain introduction to people suspected of

18    violating the law.  There are certain types of crimes where,

19    without the use of informants, detection would be extremely

20    difficult.  Because this law enforcement technique is entirely

21    lawful, your personal view on its use -- whether you approve or

22    disapprove -- is beside the point and must not affect your

23    evaluation of the evidence in the case.

24              Let me put it another way.  If you are satisfied

25    beyond a reasonable doubt that the defendant you are

E8l9chr6                          Charge

1    considering committed the charged offense that you are

2    considering, you should find him guilty even though you believe

3    that his arrest came about in some measure by the government's

4    use of informants.

5             Use of evidence obtained pursuant to searches.

6             You have heard testimony about evidence seized in

7    various searches, and searches at the time of arrest.

8             Evidence obtained from those searches was properly

9    admitted in this case, and may be considered by you.  Indeed,

10   such searches are entirely appropriate law enforcement actions.

11   Whether you approve or disapprove of how the evidence was

12   obtained should not enter into your deliberations, because I

13   instruct you that the government's use of the evidence is

14   entirely lawful.

15            You must, therefore, regardless of your personal

16   opinions, consider such evidence as you would any other

17   evidence in this case, and make your determination as to its

18   meaning and significance, if any, in evaluating whether the

19   government has proven each defendant's guilt beyond a

20   reasonable doubt.

21            Use of recordings.

22            Audio and video recordings of various telephone

23   conversations and meetings and transcripts of those recordings

24   have been admitted into evidence.  You were also provided with

25   transcripts as an aid, but it is the recordings that are in

E819chr6                    Charge

1    evidence.  Whether you approve or disapprove of the recording

2    of those conversations may not enter into your deliberations.

3    I instruct you that these recordings were made in a lawful

4    manner and that no one's rights were violated, and that the

5    government's use of this evidence is entirely lawful and it was

6    properly admitted into evidence at this trial.

7            You must, therefore, regardless of any personal

8    opinions, consider such evidence as you would any other

9    evidence in the case, and make your determination as to its

10   meaning and significance, if any, in evaluating whether the

11   government has proved beyond a reasonable doubt the guilt of

12   the defendants.  If you wish to hear any of the tapes again or

13   see any of the transcripts of those recordings, they will be

14   made available to you during your deliberations.

15           Transcripts of tape recordings.

16           The government has been permitted to hand out typed

17   documents that it prepared containing the government's

18   interpretation of what appears on the tape recordings which

19   have been received as evidence.  Those were given to you as an

20   aid or guide to assist you in listening to the tapes.  However,

21   they are not in and of themselves evidence.  Therefore, when

22   the tapes were played I advised you to listen carefully to the

23   tapes themselves.  You alone should make your own

24   interpretation of what appears on the tapes based on what you

25   heard.  If you think you heard something differently than

E819chr6                          Charge

 1  appeared on the transcript, then what you heard is controlling.

 2              Let me say, again, you the jury are the sole judges of

 3  the facts.

 4              Redaction of evidentiary items.

 5              We have, among the exhibits received in evidence, some

 6  documents, recordings and transcripts that are redacted.

 7  Redacted means that a part of the document or tape was blacked

 8  out or removed.  Certain redactions have been made in the

 9  documents, transcripts, and from some recordings at the

10  direction of the court.  You should draw no adverse inference

11  against either party as a result of these redactions, nor

12  should you speculate on what may have been redacted.  You are

13  to concern yourself only with the part of the items that has

14  been admitted into evidence, that is, the nonredacted portions.

15              Similar acts and prior act evidence.

16              You have heard evidence that on an earlier occasion

17  the defendants engaged in conduct similar in nature to the

18  conduct charged in the indictment.  Let me remind that the

19  defendant is only on trial for committing the acts alleged in

20  the indictment.  Accordingly, you may not consider this

21  evidence of similar acts as a substitute for proof that a

22  defendant committed the crime charged.  Nor may you consider

23  this evidence as proof that a defendant has a criminal

24  propensity or bad character.  This evidence was admitted for a

25  more limited purpose, and you may consider it for that purpose

E819chr6                          Charge

1       only.

2               Nevertheless, the evidence of similar conduct is to be

3       considered by you only on the issues I have just mentioned, and

4       not on any other issues.  You may not consider such evidence

5       for any other purpose.  Specifically, you may not consider it

6       as evidence that the defendant you are considering is of bad

7       character or has a propensity to commit a crime.

8               Persons not on trial.

9               You may not draw any inference, favorable or

10      unfavorable, towards the government or any defendant from the

11      fact that any person was not named as a defendant in this case,

12      and you may not speculate as to the reasons why other people

13      are not on trial before you now.  Those matters are wholly

14      outside your concern and have no bearing on your function as

15      jurors in deciding the case before you.

16              Venue.

17              In addition to all of the elements that I have

18      described for you for each of the six counts, you must also

19      find whether the crimes charged in the indictment took place at

20      least in part within the Southern District of New York, which

21      includes Newburgh, New York.  In this regard, I instruct you

22      that it is undisputed in this case that venue is proper in the

23      Southern District of New York.

24              Now to part three, the evaluation of the evidence.

25              What is and is not evidence?

1        You are to consider only the evidence in the case.

2   The evidence in this case is the sworn testimony of the

3   witnesses, the exhibits received in evidence, and the

4   stipulations to which the parties have agreed.

5        In this case you have heard evidence in the form of

6   two types of stipulations.

7        A testimonial stipulation is an agreement upon the

8   parties that, if called, a witness would give certain

9   testimony.  You must accept as true that had the witness

10  testified, he or she would have given the stipulated testimony.

11  However, it is for you to determine the effect or weight to be

12  given to that testimony.

13       You also heard evidence in the form of fact

14  stipulations.  A fact stipulation is an agreement between the

15  parties that the stipulated facts are true.  You must accept as

16  true the facts contained in these stipulation.  However, it is

17  for you to determine the weight to be given to those facts.

18       It is for you alone to decide the weight, if any, to

19  be given to the testimony and stipulations you have heard and

20  the exhibits you have seen.  Testimony that I have excluded or

21  stricken is not evidence and may not be considered by you in

22  rendering your verdict.

23       You are not to consider as evidence the questions

24  asked by the lawyers.  It is the witnesses' answers that are

25  evidence, not the questions.  Arguments by the attorneys are

1   not evidence because the attorneys are not witnesses.  What

2   they have said to you in their opening statements and their

3   summations is intended to help you understand the evidence to

4   reach your verdict.  If, however, your recollection of the

5   evidence differs from the statements made by the advocates in

6   their opening statements or summations, it is your recollection

7   that controls.

8           Finally, any statements or rulings that I may have

9   made do not constitute evidence.  Because you are the sole and

10  exclusive judges of the facts, I do not mean to indicate any

11  opinion as to what the facts are or what the verdict should be.

12  The rulings I have made during the trial are not any indication

13  of my views.  Also, you should draw no inference from the fact

14  that I may on occasion have asked certain questions of

15  witnesses.  Those questions were intended only to clarify or

16  expedite, and are not an indication of my view of the evidence.

17  In short, if anything I have said or done seemed to you to

18  indicate an opinion relating to any matter you need to --

19  relating to any matter you need to consider, you must disregard

20  it.  Let me read that again.  In short, if anything I have said

21  or done seemed to you to indicate an opinion relating to any

22  matter you need to consider, you must disregard it.

23          Direct and circumstantial evidence.

24          There are two types of evidence that you may properly

25  consider in reaching your verdict.  One type of evidence is

E8l9chr6                        Charge

1    direct evidence.  One kind of direct evidence is a witness's

2    testimony about something he knows by virtue of his or her own

3    senses -- something the witness has seen, felt, touched, or

4    heard.  Direct evidence may also be in the form of an exhibit.

5            The other type of evidence is circumstantial evidence.

6    Circumstantial evidence is evidence that tends to prove one

7    fact by proof of other facts.  Here is a simple example of

8    circumstantial evidence:

9            Assume that when you came into the courthouse this

10   morning the sun was shining and it was a nice day.  Assume that

11   the courtroom blinds are drawn and you cannot look outside.  As

12   you were sitting here, someone walks in with an umbrella that

13   is dripping wet.  Somebody else then walks in with a raincoat

14   that is also dripping wet.

15           You cannot look outside the courtroom and you cannot

16   see whether or not it is raining.  So you have no direct

17   evidence of that fact.  But on the combination of the facts

18   that I have asked you to assume, it would be reasonable and

19   logical for you to conclude that between the time you arrived

20   at the courthouse and the time those people walked in, it had

21   started to rain.

22           That is all there is to circumstantial evidence.  You

23   infer on the basis of reason and experience and common sense

24   from an established fact the existence or nonexistence of some

25   other fact.

1          Many facts, such as person's state of mind, can only

2     rarely be proved by direct evidence.  Circumstantial evidence

3     is of no less value than direct evidence.  The law makes no

4     distinction between the two, but simply requires that before

5     convicting a defendant you, the jury, must be satisfied of the

6     defendant's guilt beyond a reasonable doubt from all of the

7     evidence in the case.

8          Inferences.

9          I have used the term infer, and the lawyers in their

10    arguments have asked you to draw inferences.  When you draw an

11    inference, you conclude, from one or more established facts,

12    that another fact exists, and you do so on the basis of your

13    reason, experience, and common sense.  The process of drawing

14    inferences from facts in evidence is not a matter of guesswork,

15    suspicion, or speculation.  An inference is a reasoned, logical

16    deduction or conclusion that you, the jury, may draw -- but are

17    not required to draw -- from the facts which have been

18    established by either direct or circumstantial evidence.  In

19    considering inferences, you should use your common sense and

20    draw from the facts which you find to be proven whatever

21    reasonable inferences you find to be justified in light of your

22    experience.

23          Credibility of witnesses.

24          Now for the important subject of evaluating testimony.

25    How do you evaluate the credibility or believability of the

witnesses?  The answer is that you use your plain common sense.

There is no magic formula by which you can evaluate testimony.

You should use the same tests for truthfulness that you would

use in determining matters of importance in your everyday

lives.  You should ask yourselves.  Did the witness impress you

as honest, open, and candid, or was the witness evasive and

edgy as if hiding something?  How did he or she appear -- that

is, his or her bearing, behavior, manner and appearance --

while testifying?  How responsive was the witness to the

questions asked on direct examination and on cross-examination?

You should consider the opportunity the witness had to see,

hear, and know about the things which he or she testified, the

accuracy of his or her memory, his or her candor or lack of

candor, his or her intelligence; the reasonableness and

probability of his or her testimony; its consistency or lack of

consistency with other credible evidence; and its corroboration

or lack of corroboration by other credible evidence.

        In short, in deciding credibility you should size up

the witness in light of his or her demeanor, the explanations

given, and all of the other evidence in the case.  Always

remember to use your common sense, good judgment, and life

experience.

        Few people recall every detail of every event

precisely the same way.  A witness may be inaccurate,

contradictory, or even untruthful in some respects, and yet

E819chr6                    Charge

1    entirely believable and truthful in other respects.  It is for

2    you to determine whether such inconsistencies are significant

3    or inconsequential.

4          If you find that a witness is intentionally telling a

5    falsehood, that is always a matter of importance and you should

6    weigh it carefully.  If you find that a witness has willfully

7    testified falsely as to any material fact -- that is, as to an

8    important matter -- the law permits you to disregard completely

9    the entire testimony of that witness upon the principle that

10   one who testifies falsely about one material fact is likely to

11   testify falsely about everything.  You are not required,

12   however, to consider such a witness as totally unbelievable.

13   You may accept so much of his or her testimony as you deem true

14   and disregard what you feel is false.

15         You are not required to accept testimony even though

16   the testimony is uncontradicted and the witness's testimony is

17   not challenged.  You may decide because of the witness's

18   bearing or demeanor, or because of the inherent improbability

19   of that testimony, or for other reasons sufficient to

20   yourselves that the testimony is not worthy of belief.  On the

21   other hand, you may find, because of a witness's bearing and

22   demeanor and based upon your consideration of all of the other

23   evidence in the case, that the witness is truthful.

24         By the processes which I have just described to you,

25   you, as the sole judges of the facts, decide which of the

1    witnesses you will believe, what portion of the testimony you

2    will accept, and what weight you will give to it.

3              Bias of witnesses.

4              In deciding whether to believe a witness, you should

5    also specifically note any evidence of bias, hostility, or

6    affection that the witness may have towards one of the parties.

7    Likewise, you should consider evidence of any other interest or

8    motive that the witness may have in cooperating or not

9    cooperating with a particular party.  If you find any such

10   bias, hostility, affection, interest, or motive, you must then

11   consider whether or not it affected or colored the witness's

12   testimony.

13             You should also take into account any evidence that a

14   witness may benefit or suffer in some way from the outcome of

15   the case.  Such interest in the outcome may create a motive to

16   testify falsely, and may sway a witness to testify in a way

17   that advances his or her own interests.  Therefore, if you find

18   that any witness whose testimony you are considering may have

19   an interest in the outcome of this trial, then you should bear

20   that factor in mind when evaluating the credibility of his or

21   her testimony, and accept it with great care.

22             Keep in mind, though, that it does not automatically

23   follow that testimony given by an interested witness is to be

24   disbelieved.  There are many people who, no matter what their

25   interest in the outcome of the case may be, would not testify

E819chr6                    Charge

1    falsely.  It is for you to decide, based on your own

2    perceptions and common sense, to what extent, if at all, the

3    witness's bias or interest has affected his or her testimony.

4    You are not required to disbelieve an interested witness; you

5    may accept as much of his or her testimony as you deem reliable

6    and reject as much as you deem unworthy of acceptance.

7                Law enforcement witnesses.

8                You have heard testimony of some witnesses who were

9    law enforcement officers during the events at issue in this

10   trial.  The fact that a witness is or was employed by the

11   government does not mean that his or her testimony is deserving

12   of more or less consideration or greater or lesser weight than

13   that of any other witness.  At the same time, it is quite

14   legitimate for a defense counsel to try to attack the

15   credibility of a law enforcement witness on the grounds that

16   his testimony may be colored by a personal or professional

17   interest in the outcome of the case.  It is your decision,

18   after reviewing all the evidence, whether to accept or reject

19   the testimony of the witness and to give to that testimony

20   whatever weight you find it deserves.

21               Impeachment by prior inconsistent statement.

22               You have heard evidence that a witness made a

23   statement on an earlier occasion which counsel argues is

24   inconsistent with the witness's trial testimony.  Evidence of a

25   prior inconsistent statement is not to be considered by you as

1   affirmative evidence bearing on whether the government has

2   proven the defendant guilty beyond a reasonable doubt.

3   Evidence of a prior inconsistent statement was placed before

4   you for the more limited purpose of helping you to decide

5   whether to believe the trial testimony of the witness who

6   contradicted himself or herself.  If you find that the witness

7   made an earlier statement that conflicts with his or her trial

8   testimony, you may consider that fact in deciding how much of

9   his trial testimony, if any, to believe.

10          In making this determination, you may consider whether

11  the witness purposely made a false statement or whether it was

12  an innocent mistake; whether the inconsistency concerns an

13  important fact, or whether it had to do with a small detail;

14  whether the witness has an explanation for the inconsistency;

15  and whether that explanation appealed to your common sense.

16          It is exclusively your duty, based on all the evidence

17  and your good judgment, to determine whether the prior

18  statement was inconsistent and if so how much, if any, weight

19  to be given to the inconsistent statement in determining

20  whether to believe all or part of the witness's testimony.

21          Defendants' right not to testify.

22          As you know, the defendants did not testify in this

23  case.  Under our constitution, a defendant has no obligation to

24  testify or to present any evidence, because it is the

25  government's burden to prove the defendant guilty beyond a

1    reasonable doubt.  That burden remains with the government

2    throughout the entire trial and never shifts to the defendant.

3    A defendant is never required to prove that he is innocent.

4            You may not attach any significance to the fact that

5    the defendants did not testify.  No adverse inference against

6    the defendant may be drawn by you because he did not take the

7    witness stand.  You may not consider this against the

8    defendants in any way in your deliberations in the jury room.

9    There are many reasons why an innocent person may choose not to

10   testify.

11           Preparation of witnesses.

12           You have heard evidence during the trial that

13   witnesses have discussed the facts of the case and their

14   testimony with the lawyers before the witness appeared in

15   court.

16           Although you may consider that fact when you are

17   evaluating a witness's credibility, I should tell you that

18   there is nothing either unusual or improper about a witness

19   meeting with lawyers before testifying so that the witness can

20   be aware of the subjects he will be questioned about, focus on

21   those subjects, and have the opportunity to review relevant

22   exhibits before being questioned about them.  Such consultation

23   helps to conserve your time and the court's time.  In fact, it

24   would be unusual for a lawyer to call a witness without such

25   consultations.

1          Again, the weight you give to the fact or the nature

2     of the witness's preparation for his or her testimony and what

3     inferences you draw from such preparation are matters

4     completely within your discretion.

5          Rulings on evidence and objections.

6          It is the duty of the attorney for each side of a case

7     to object when the other side offers testimony or other

8     evidence which the attorney believes is not admissible.

9     Counsel also have the right and duty to ask the court to make

10    rulings of law.  All those questions of law must be decided by

11    me.  You should not show any prejudice against an attorney, or

12    his or her client, because the attorney objected to the

13    admissibility of evidence, or asked for a conference out of the

14    hearing of the jury, or asked the court for a ruling on the

15    law.

16         As I have already indicated, my rulings on the

17    admissibility of evidence does not indicate any opinion about

18    the weight or effect of such evidence.  You are the sole judges

19    of the credibility of all of the witnesses and the weight and

20    effect of all evidence; if, however, I sustained an objection

21    to any evidence or ordered evidence stricken, that evidence

22    must be entirely ignored.

23         Expert testimony.

24         You have heard what is called expert testimony from

25    Mr. Myers, a forensic scientist, and Dr. Ely, a medical

1   examiner.  An expert is allowed to express an opinion on those

2   matters about which he or she has special knowledge and

3   training.  Expert testimony is presented to you on the theory

4   that someone who is experienced in the field can assist you in

5   understanding the evidence or in reaching an independent

6   decision on the facts.

7         In weighing an expert's testimony, you may consider

8   the expert's qualifications, opinions, reasons for testifying,

9   as well as all of the other considerations that ordinarily

10  apply when you are deciding whether or not to believe a

11  witness's testimony.  You may give the expert testimony

12  whatever weight, if any, you find it deserves in light of all

13  the evidence in this case.  You should not, however, accept a

14  witness's testimony merely because he or she is an expert.  Nor

15  should you substitute your own reason, judgment, and common

16  sense.  The determination of the facts in this case rests

17  solely with you.

18         Sympathy or bias.

19         Under your oath as jurors you are to evaluate the

20  evidence calmly and objectively, without sympathy or prejudice.

21  You are to be completely fair and impartial.  You are to be

22  guided solely by the evidence in this case, and the crucial,

23  bottomline question that you must ask yourselves as you sift

24  through the evidence is:  Has the government proven the

25  elements of the crimes charged beyond a reasonable doubt?

E8l9chr6                    Charge

It would be improper for you to consider, in deciding the facts of the case, any personal feelings you may have about the race, national origin, sex, disability, or age, of any party or witness, or any other such irrelevant factor.  It would be equally improper for you to allow any feelings you might have about the nature of the crimes charged to interfere with your decision-making process.  All parties are entitled to the same fair trial at your hands.  They stand equal before the law, and are to be dealt with as equals in this court.  If you let fear or prejudice or bias or sympathy interfere with your thinking, there is a risk that you will not arrive at a true and just verdict.

Punishment.

The question of possible punishment of the defendants must not enter into or influence your deliberations.  The duty of imposing a sentence rests exclusively upon the court.  Your function is to weigh the evidence in the case and to determine whether or not each defendant is guilty beyond a reasonable doubt, solely upon the basis of each evidence.  Under your oath as jurors, you cannot allow a consideration of the punishment which may be imposed upon a defendant, if he is convicted, to influence your verdict in any way, or in any sense enter into your deliberations.

Now for the final section concerning deliberations.

The duty to deliberate.  Unanimous verdict.

1           You will now retire to decide the case.  It is your

2    duty as jurors to consult with one another and to deliberate

3    with a view to reaching an agreement.  Each of you must decide

4    the case for yourself, but you should do so only after

5    consideration of the case with your fellow jurors.  Your

6    verdict, and the answers to each question on the verdict form,

7    must be unanimous.

8           Discuss and weigh your respective opinions

9    dispassionately, without sympathy, prejudice, or favor toward

10   either party, and adopt that conclusion which in your good

11   conscience appears to be in accordance with the truth.

12          As you deliberate, please listen to the opinions of

13   your fellow jurors and ask for an opportunity to express your

14   own views.  Every juror should be heard.  No one juror should

15   hold center stage in the jury room, and no one juror should

16   control or monopolize the deliberations.  You should all listen

17   to one another with courtesy and respect.  If, after stating

18   your own view, and if after listening to your fellow jurors,

19   you become convinced that your view is wrong, do not hesitate

20   because of stubbornness or pride to change your view.  On the

21   other hand, do not surrender your honest convictions and

22   beliefs concerning the weight or effect of the evidence solely

23   because of the opinions of your fellow jurors or because you

24   are outnumbered or for the mere purpose of returning a verdict.

25   Your final vote must reflect the conscientious belief as to how

1    the issues should be decided.  Your verdict must be unanimous.

2              You are not to discuss the case until all the jurors

3    are present.  Nine or ten or even eleven jurors together is

4    only a gathering of individuals.  Only when all jurors are

5    present do you constitute a jury, and only then may you

6    deliberate.

7              If you took any notes during the course of the trial,

8    you should not show you notes to others or discuss your notes

9    with any other juror during your deliberations.  Any notes you

10   have taken are to be used solely to assist you.  The fact that

11   a particular juror has taken notes entitles that juror's views

12   to no greater weight than those of any other juror.  Further,

13   your notes are not to substitute for your recollection of the

14   evidence in the case.

15             Right to see exhibits and hear testimony and

16   communications with the court.

17             The documentary, but not the physical or audio visual

18   exhibits, will be sent to you in the jury room.  If you want

19   any of the testimony read back to you, that can be arranged.

20   Please appreciate that it is not always easy to locate the

21   testimony that you might want, so be as specific as you

22   possibly can as to what witness and what portion of that

23   witness's testimony you would like to hear.

24             Any communication with the court should be made in

25   writing, signed by your foreperson, and given to the marshal

E819chr6                    Charge

1    who will be outside the jury room door while you deliberate.  I

2    will respond to any questions or requests you have as promptly

3    as possible, either in writing, or by having you return to the

4    courtroom so that I can speak with you in person.  In any

5    event, do not tell me or anyone else how the jury stands on any

6    issue until after a unanimous verdict is reached.  So do not

7    ever indicate, in a note or otherwise, what the vote is or

8    which way the majority is leaning or anything like that.

9               Duties of the foreperson.

10              Your first task when you retire to deliberate is to

11   select by your own vote one of you to sit as your foreperson.

12   The foreperson does not have anymore power or authority than

13   any other juror, and his or her vote or opinion does not count

14   for anymore than any other juror's vote or opinion.  The

15   foreperson is merely your spokesperson to the court.  He or she

16   will send out any notes, and when the jury has reached a

17   verdict, he or she will notify the marshal that the jury has

18   reached a verdict, and he or she will come into open court and

19   give the verdict.

20              Verdict form.

21              The foreperson will receive a verdict form on which to

22   record your verdict.  It lists the questions that you must

23   resolve based on the evidence and the instructions that I have

24   given you.  When the foreperson has completed the form, he or

25   she must sign his or her name and the form will be marked as a

E819chr6                    Charge

1   court exhibit.

2              I do note that each of you has a copy of the verdict

3   form.  Only one should be filled out and signed by the

4   foreperson.

5              Now, closing comments.

6              The most important part of this case, Members of the

7   Jury, is the part you as jurors are about to play as you

8   deliberate on the issues of fact.  It is for you and you alone

9   to decide whether the government has proved beyond a reasonable

10  doubt each of the essential elements of the crimes to which the

11  defendants are charged.  If the government has succeeded on a

12  particular count with regard to a defendant you are

13  considering, your verdict should be guilty as to that count.

14  If it has failed, your verdict should be not guilty.

15             I know you will try the issues that have been

16  presented to you according the oath you have taken as jurors.

17  In that oath you promised that you would well and truly try the

18  issues in this case and render a true verdict according to the

19  law and the evidence, impartially and fairly without prejudice

20  or sympathy.  Your function is to weigh the evidence in the

21  case and determine whether the government has proved beyond a

22  reasonable doubt the guilt of the defendants of the crimes

23  charged in the indictment.

24             As I have previously stated, your verdict must be

25  unanimous.  Again, if at any time you are not in agreement, you

E819chr6                    Charge

1    are not to reveal the standing of the jurors -- that is the

2    split of the vote -- to anyone, including me, at any time

3    during your deliberations.

4            Members of the Jury, I ask for your patience for a few

5    moments longer because I do need to speak with the lawyers at

6    sidebar.  I ask you to remain in the jury box without speaking

7    to one another and I will return in just a moment.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E819chr6                          Charge

1           (At the sidebar)

2           THE COURT:  Any objections or misstatements?

3           MR. BUCHWALD:  Yes, your Honor.

4           Incorporating by reference all of the arguments made

5    yesterday with respect to our rejected proposed charges or

6    objections, we do incorporate those by reference.  Two

7    additional comments.

8           With respect to Count Six the firearms charge relating

9    to the narcotics conspiracy.  It is our belief that your Honor

10   should instruct that the jury in order to convict any charged

11   defendant with that count must be unanimous as to the

12   particular firearm which it believes was possessed in

13   relationship to the narcotics offense.  There can't be a

14   situation where six of them believe it was one firearm on one

15   occasion and six others believe it was a different firearm on

16   another occasion.  They must be unanimous as to the particular

17   event.

18           THE COURT:  Mr. Bauer.

19           MR. BAUER:  I think the charge is adequate as is.

20           THE COURT:  I agree.

21           MR. BUCHWALD:  I'm sorry.

22           THE COURT:  He says he believes the charge is adequate

23   and I agree so I will not further instruct the jury in that

24   regard.

25           MR. BUCHWALD:  One other comment.  The last sentence

 1    on page 14 states, in fact, even a single act may be sufficient

 2    to draw a defendant within the scope of the conspiracy.

 3             To the extent that this sentence is then incorporated

 4    into the subsequent conspiracy charge as it is, the narcotics

 5    conspiracy, we believe it is in error or at least misleading

 6    and should be balanced with the statement that should occur

 7    only if the single instance gives rise to a proper inference

 8    that the larger conspiracy existed.

 9             THE COURT:  That I take it to be a restatement of the

10    challenges previously made.

11             MR. BUCHWALD:  I think so.

12             MR. GOLTZER:  And those prior challenges are made on

13    behalf of all defendants with respect to counts that relate to

14    them and we respectfully except to the present failure to

15    include.

16             THE COURT:  Very well.  So noted.  Anything further?

17             (Continued on next page)

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  At this time, the regular jurors, that is

3    to say jurors numbers one through twelve, will begin their

4    deliberations in this case.  Nevertheless, the alternate jurors

5    are not quite excused.  While the jury conducts its

6    deliberations you do not have to be in court, but you should

7    give Ms. Rivera your phone numbers where you can be reached

8    because it is possible that one or more of you could be needed

9    to deliberate if a regular juror is unable to continue.

10          Ms. Rivera will call you if deliberations are

11   completed without our needing you so that you will know that

12   you are completely finished.  Between now and that time,

13   however, you must continue to observe all restrictions I have

14   instructed you on throughout the trial; that is, you must not

15   discuss the case with anyone, including your fellow alternate

16   jurors, the regular jurors, other people involved in the trial,

17   members of your family, friends, coworkers, or anyone else.

18   You may not communicate with anyone about the case on your

19   cellphone, through e-mail, BlackBerry, iPhone, text messaging

20   or on Twitter, through any blog or website, through any

21   internet chatroom, or by way of any other social networking

22   websites, including Facebook, MySpace, LinkedIn and YouTube.

23   Do not speak at all with any of the parties, the witnesses, or

24   the attorneys.  Do not permit anyone to discuss the case with

25   you.  Do not friend or follow one another or any participant in

1    this trial on Facebook, Twitter, LinkedIn, MySpace, Pinterest,

2    Friendster, or any other social networking website.  Do not

3    even remain in the presence of anyone discussing the case.  If

4    anyone approaches you or tries to talk to you about the case,

5    please report that to me through Ms. Riviera immediately.

6         Do not listen to or watch or read any news reports

7    concerning this trial, if there were to be any.  Do not do any

8    research on the internet or otherwise; do not visit any places

9    mentioned during the course of the trial or conduct any kind of

10   investigation on your own, including on social media, such as

11   Facebook, LinkedIn, MySpace and the like.  Should you be asked

12   to participate in reaching a verdict in this case, the only

13   information you will be allowed to consider in deciding this

14   case is what you learned in this courtroom during the trial.

15        I am sorry that you will probably miss the experience

16   of deliberating with the jury, but the law provides for a jury

17   of twelve persons in this case.  So before the rest of the jury

18   retires into the jury room, if you have any clothing or objects

19   there, you are asked to pick them up and to withdraw and come

20   back into the courtroom before any the deliberations start.

21        So do either of you three gentlemen have anything in

22   the jury room?  Then can you please go and get that now.

23        While that is happening, ladies and gentlemen, my

24   intention so to maintain our regular workday, which means that

25   you can deliberate until 5:00; or if you let us know, we can

E8l9chr6                         Charge

1    stay long as you'd like.  You're not sequestered in a federal

2    trial.  So my intent is that we meet again, that we stop at

3    5:00, unless you say otherwise, meeting tomorrow morning at

4    9:30 or work until 5:00 or as long as you'd like tomorrow.

5    Okay.

6              Will the court security officer please step forward.

7              (Court security officer sworn)

8              THE COURT:  Ladies and gentlemen, you should now begin

9    to deliberate.  You may now discuss the case.

10             (At 4:06 p.m. the jury retired to deliberate)

11             THE COURT:  Gentlemen, thank you for your service so

12   far.  And we will be in contact with you one way or the other.

13   Have a good day.

14             (Alternates excused)

15             (Recess pending verdict)

16             (At 5:02 p.m., a note was received from the jury)

17             THE COURT:  We have a note.  It will be marked Court

18   Exhibit 1.  It reads as follows:  All going home.  5:00.

19             All going home 5:00.

20             Request 8-7, Anthony Baynes' testimony.

21             He testified over a number of days, correct?

22             MR. BAUER:  He did.

23             THE COURT:  What was 8-7?

24             MR. DRATEL:  Part of the cross.

25             MS. STAFFORD:  He was taken out of order.

1            THE COURT:  So that was the Thursday?

2            MR. GOLTZER:  That's direct and part of the cross.

3            THE COURT:  So I guess I would want to know what they

4    mean by 8-7.  Do the they want just the testimony for that day,

5    so the entire testimony for that day?  That seems a bit

6    preposterous.

7            MR. GOLTZER:  Not if it's my cross.

8            THE COURT:  Correct.

9            So I'll ask for some clarification and then obviously

10   we'll tell them that they can go home.

11           MR. BAUER:  He started 8-7.

12           THE COURT:  He did.  He was after Fredericks.

13           MR. GOLTZER:  A lot of direct.

14           MR. BAUER:  Mostly the direct.

15           (Jury present)

16           THE COURT:  Please be seated afternoon.

17           Ladies and gentlemen, we have received your note.  It

18   will be labeled Court Exhibit No. 1.  It reads in its entirety

19   as follows:  All going home.  5:00.  Request 8-7, Anthony

20   Baynes' testimony.

21           So, a question about that.  On 8-7 Anthony Baynes

22   provided his direct examination.  And the cross-examination was

23   begun by Mr. Goltzer.  It was not finished on that day.  So the

24   question for you is what do you want -- well, do you want

25   exactly what you said, which is everything that he testified to

1    on the 7th?  Or do you want something less than that?  Or do

2    you want something more than that?

3          And you don't have to -- you don't have to decide it

4    here.  You can go back and quickly let us know, but I just want

5    to make sure that you get what you asked for.

6          The other thing that I wanted to tell you was, again,

7    we'll start tomorrow morning at 9:30.  We won't necessarily

8    bring you out to get you started but you should absolutely wait

9    until all twelve of you are in the jury room before you begin

10   to deliberate because you're not a jury unless you're twelve.

11   And what that means, in addition, if one of you wants to take a

12   break and go outside and smoke a cigarette, make a call, the

13   rest of you can't deliberate while that person is outside of

14   the jury room.

15         Also be aware that in addition to the breakfast you

16   will also be provided with lunch.  So you will be in the room

17   through lunch as well.  And that I will give the lawyers an

18   opportunity to have lunch.  So likely between 12:30 and 1:30

19   I'll let them go have lunch.  And I say that to you because in

20   the event have you a note during that period of time we may not

21   get back to you as quickly we would want.  So do be aware of

22   that.

23         So why don't you just retire for just a second to let

24   us know whether we should give you precisely what you asked for

25   in this note or whether you were meaning something else.  Okay.

E819chr6                          Deliberations

1          (Jury excused)

2          THE COURT:  Also, I was speaking with the court

3    reporter concerning in the event -- whatever it is they wanted

4    it sounds like they want a good chunk.  I would propose that

5    the parties get together, prepare the transcript, that is to

6    say give them a form of the transcript that has redacted out

7    the objections and the sidebars so that we can give it to them

8    rather than bring them out and have the court reporter read it

9    to them.  It's faster for them.  It's more efficient for us,

10   obviously.  Any objection to that?

11         MR. BUCHWALD:  How many copies if it's going in there,

12   several copies?

13         MR. GOLTZER:  Give them twelve copies?

14         THE COURT:  I was thinking we'd give them one copy

15   but, again, I have not done this in the past so I'm happy to

16   take --

17         MR. BAUER:  I think twelve copies is environmentally

18   wasteful.  Some number -- somewhere between one and twelve,

19   maybe kind of arbitrary, but I think twelve is a little much.

20         By the way, Judge, just so you know.  We anticipated a

21   note about Baynes' testimony.  So we already have a version of

22   his entire testimony redacted.  So we can make this very

23   efficient.  We can actually e-mail it to defense counsel

24   tonight and they can review it and give us any comments so it

25   will be ready by 9:30 tomorrow.  Or whatever portion they ask

E8l9chr6                          Deliberations

```
 1    for.
 2                THE COURT:  Okay.  Perfect.
 3                And you'll make the copies?
 4                MR. BAUER:  We will make the copies.  But I would
 5    propose that we do three.  That's, admittedly, a random number.
 6    But three.  If they ask for more, then we'll do more.  But I
 7    don't want to do twelve unless they ask for it, also the court
 8    tells us to do it.
 9                MR. GREENFIELD:  If there was a read back they'd have
10    twelve.  I don't want one juror hogging it in there.  Every
11    juror should have the same access.  It should be twelve.
12                THE COURT:  Well we only give them one set of the
13    exhibits for example.  So I don't know if there's any magic
14    necessarily -- I don't think we need to give them twelve.
15    Let's see what they ask for.
16                (At 5:20 p.m., a note was received from the jury)
17                THE COURT:  Okay.
18                Court Exhibit No. 2.  Evidence request.  I'll read it.
19                Evidence request.  8-7, Anthony Baynes' testimony as
20    recorded by court reporter.
21                8-11.  Cross-exam.  Baynes (two parts)
22                8-12.  Cross-exam.  Baynes.
23                8-12.  Jamar Mallory testimony.
24                8-13.  Jamar Mallory testimony continued.
25                Transcripts Kevin Gotti video.
```

E8l9chr6                          Deliberations

1              8-14.  Mallory testimony continued.

2              8-18.  Jamar Mallory cross-exam.

3              8-18.  Tarrence Smith testimony.

4              8-18.  Danielle Williams.

5              8-19.  Akinto Boone testimony.

6              8-19.  David Evans/Fuzzy testimony.

7              8-19.  Ramone McDermott testimony.

8              12-15-10.  911 call.  Joker.

9              MR. GOLTZER:  Aren't you glad we asked for

10   clarification.

11             MR. BUCHWALD:  One thing.  The transcript isn't

12   evidence, the transcript of the Mallory/Burden tape is not

13   evidence.

14             MR. NAWADAY:  That's correct.  They can only come out

15   and have the portions of the video played for them and have the

16   transcripts there I guess as an aid.

17             THE COURT:  I don't understand what they mean when

18   they say -- apparently they're working off of someone's notes.

19   So that 8-11 cross-exam Baynes two parts.

20             MR. GOLTZER:  They may have taken a witness out of

21   order.

22             THE COURT:  So it sounds like they want the entirety

23   of Baynes, Mallory, Smith, Williams, Boone, Evans, and

24   McDermott.

25             Correct?

E8l9chr6                    Deliberations

1              MR. GOLTZER:  Correct.

2              THE COURT:  Have you anticipated this request?

3              MR. BAUER:  We have Baynes and Mallory.  We were

4      close.

5              THE COURT:  So let's bring them out, ask them if this

6      is really -- I'm not sending twelve.

7              MR. GOLTZER:  Don't ask again they might ask for

8      Daniel Myers.

9              THE COURT:  So let's bring them out.

10             MR. BUCHWALD:  Do you want to ask them how many

11     copies?

12             (Jury present)

13             THE COURT:  Everyone can be seated.

14             The way that I and the parties interpret this note is

15     that you want the entirety of the testimony of Mr. Baynes,

16     Mr. Mallory, Tarrence Smith, Ms. Williams, Mr. Boone,

17     Mr. Evans, and Mr. McDermott.

18             Did I read that correctly?

19             THE JURY:  Yes.

20             THE COURT:  If that's what you want we will provide

21     you with these transcripts.  We may do that on a rolling basis

22     so that you're not waiting while we -- because this has to be

23     prepared for you.  So, for example, what we would need to do --

24     any time that there was a sidebar or an objection that was

25     sustained, that stuff has to be redacted so that you only have

E819chr6                    Deliberations

1    before you in the transcript what's in evidence.  And then

2    there's just the logistical matter of making copies.  We

3    propose to send in less than twelve copies, say four sets of

4    each one of these, so that the jury can work with that.  And if

5    there's a request for more, please let us know.

6            The other thing is with respect to two of your

7    requests, the Kev -- the transcripts of the Kevin Gotti video.

8    Those transcripts are not in evidence.  So if you want to

9    review those and if you want to see the 911 -- if you want to

10   hear the 911 call again, we can do that first thing in the

11   morning.  So we would have to bring you out to show you -- we

12   can show you the video with the transcripts and we can play the

13   911 -- the 911 call again for you.  But that doesn't go back

14   into the jury room.  In the meantime we'll work on getting

15   these transcripts for you.

16           You should also, again, because -- again there's just

17   a logistical issue of getting all of this done, continue to

18   deliberate as well as you can, as much as you can while we get

19   all this for you.  Okay.

20           Very well.  So, bright and early tomorrow morning at

21   9:30.

22           Have a wonderful evening.

23           And you may still not discuss this unless you are in

24   the jury room.

25           (Jury excused)

1          THE COURT:  I guess I'm looking at the government's

2     table.  Do you have the transcripts in a manner that can be --

3     do the parties have the transcripts electronically that you can

4     work through and printout versions that are acceptable?

5          MR. BUCHWALD:  I think we're going to need to rely on

6     you folks to get out the colloquy so we'll just go through it.

7          MR. BAUER:  What we would propose is that we take the

8     first crack at this this evening, at least have Baynes and

9     Mallory ready to go at 9:30 in the morning.  So we'll have

10    Baynes and Mallory ready and we can e-mail you Baynes and

11    Mallory so you can look at it.  If you have any comments let us

12    know before 9:30 so at 9:30 they'll have them.

13         THE COURT:  So also since they're asking for the

14    entirety of the transcript the only thing that needs to do is

15    have the stricken testimony and the objections taken out and

16    that's it so there should be fairly no controversy.

17         MR. GOLTZER:  Nothing.

18         MR. DRATEL:  Nothing about subject matter.

19         THE COURT:  Exactly.

20         Thank you in advance.  This appears -- I can't imagine

21    what else they'll ask for after this.

22         (Adjourned to August 22, 2014 at 9:30 a.m.)

23

24

25