UNITEDSTATES DISTRICT COURT
SOUTHERN DISTICT OF NEW YORK
--------------------------------------------------------x

UNITED STATES OF AMERICA     :

     :

    -against-     :         No. 12 Cr. 626 (ER)

     :

     :

TYRELL WHITAKER,     :

     Defendant. :

--------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT
## OF POST TRIAL MOTIONS FOR DEFENDANT TYRELL WHITAKER

### Preliminary Statement

This memorandum of law is respectfully submitted on behalf of defendant Tyrell Whitaker, in support of his motion for an order setting aside the jury verdict and granting a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure on the grounds that Mr. Whitaker was denied a fair trial and Due Process within the meaning of the Fifth Amendment to the United States Constitution by virtue of unreliable and prejudicial hearsay, the Mallory/Burden tape, and the prosecution's improper summation.

Defendant Whitaker reserves the right to briefly reply to the prosecution, should counsel deem it necessary. He also joins in the arguments of his co-defendants to the extent that they do not conflict with his own.

## INTRODUCTION TO ARGUMENT

Prior to trial, Whitaker argued that the Mallory/Burden tape was inadmissible hearsay that did not fall within any of the exceptions to that rule. Although the issue was litigated pre-trial, the additional evidence adduced at trial made clear that the Mallory/Burden tape should not have been received into evidence. The evidence and circumstances surrounding the allegedly incriminating [as to Whitaker] portion of the Mallory/Burden tape are flagrantly at odds with the Second Circuit's requirements for admitting a statement against penal interest that inculpates a third party defendant.  The defense renews and reiterates all of the factual and legal arguments previously submitted in memoranda and orally before and during trial.  By this memorandum we supplement them with pertinent portions of the trial record, which clearly demonstrate that circumstantial guarantees of trustworthiness were absent, thus precluding inculpation of third party Whitaker by the unavailable Burden.  It was this inadmissible tape that became an improper centerpiece of the government's summation and was requested by the jury before it rendered its guilty verdict, a verdict that cannot in fairness stand.

As will be demonstrated below, any statements by the cooperating witnesses at trial were self-serving, highly unreliable, and seriously impeached. Burden was a chronic alcoholic and drug abuser that was drinking and smoking marijuana for the duration of the videotaped conversation. Mallory was a government cooperator who was able to take advantage of Burden's diminished capacity to direct the pace and substance of the conversation. Mallory's only incentive was to gain favor with the government in order to reduce his own criminal sentence and not elicit the truth of what happened on December 15, 2010.

The sole evidence at trial against Whitaker was the testimony of the cooperators and the Mallory/Burden tape. There was no DNA linking Whitaker to charged crimes, no fingerprints, no cell site evidence – only the testimony of witnesses with a high motivation to lie. Given the extremely dubious credibility of the government's witnesses and the absence of any corroboration for the Mallory/Burden tape, there is a real possibility that the erroneously admitted hearsay led to an innocent person being convicted. It would be a manifest injustice to allow the guilty verdicts to stand when there is such a strong chance that they were premised on inadmissible and prejudicial hearsay. See United States v. Mcourty, 562 F.3d 458 (2d Cir. 209); United States v. Sanchez, 969 F.2d 1409 (2d Cir. 1992).

## ARGUMENT

### I.   THE ADMISSION OF MALLORY/BURDEN VIDEO TAPE VIOLATED WHITAKERS'S FIFTH AMENDMENT DUE PROCESS RIGHTS BY VIRTUE OF THE TAPE DOING VIOLENCE TO THE INTERESTS PROTECTED BY THE SIXTH AMENDMENT RIGHT TO CONFRONTATION

Whitaker's conviction rests upon the hearsay statements of an uncross-examined alleged accomplice and a government cooperator who purportedly implicated Whitaker under circumstances which the Second Circuit and the Supreme Court have repeatedly held are highly suspect and render such statements presumptively unreliable. The statements were entirely contradictory to the evidence adduced at trial. Cooperating witness Mallory had every possible incentive to wrongfully inject Whitaker into the discussion, while a drunk and drug induced Burden, tried to follow the conversation. These circumstances confirmed the presumptive unreliability of the hearsay. Admitting the Mallory/Burden tape into evidence violated Whitaker's constitutional confrontation rights and compromised his right to a fair trial and due process within the meaning of the Fifth Amendment.

Mr. Whitaker raises the confrontation claim in tandem with and as part of his due process claim even in the wake of Crawford v. Washington, 541 U.S. 36 (2004) and United States v. Saget, 377 F.3d 223 (2d Cir. 2004), where the Second Circuit held that tape recorded statements made of a defendant's coconspirator's statements by a government informant were not testimonial. It was the non-testimonial nature of the statements that preclude the confrontation attack. Nevertheless, we urge that the very treatment of the absent Burden as a prosecution witness during summation so subverted the interests protected by the confrontation clause that it should be grafted onto a due process claim at the least. We also raise it to avoid waiver in the event that subsequent decisions revisit and reverse on facts such as those at bar.

The Sixth Amendment's Confrontation Clause guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him. The main essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." Davis v. Alaska, 415 U.S. 308, 315-16 (1974) (quoting 5 J. Wigmore, Evidence § 1395 at 123 (3d ed. 1940)). "…the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of a fair trial which is this country's constitutional goal." Pointer v. Texas, 380 U.S. 400, 405 (1965).

The right to confront and cross-examine adverse witnesses serves symbolic and functional goals. First, the Confrontation Clause advances the perception of fairness by "ensuring that convictions will not be based on the charges of unseen and unknown - and hence unchallengeable - individuals." Lee v. Illinois, 476 U.S. 530, 540 (1986). Second, it promotes reliability in criminal trials. As the Supreme Court observed in California v. Green, 399 U.S. 149 (1970), confrontation

(1) insures that the witness will give his statements under oath - thus impressing him with the seriousness of the matter and guarding against the lie by the possibility

of a penalty for perjury; (2) forces the witness to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth"; [and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.

Id. at 158 (footnote omitted).

When the government first proffered to the Court the basis for the reliability of the Mallory/Burden tape it boldly asserted that their witnesses and the evidence presented at trial would corroborate the Mallory/Burden tape. The government averred that the evidence would establish that (1) Whitaker was covered in blood the night of the Henry murder and (2) that Whitaker possessed a gun the night of the Henry murder. The portions of the tape that were pertinent to Whitaker are the following:

<u>Pertinent Excerpts of The Mallory/Burden tape</u>

CW:  Bash nigga, I'm a keep it funky with you bro. And, this from me to you, bro – Bash nigger. I think there's somethin funny with that nigger, bro, because I want like, I gonna keep it funky with you, remember when them niggers that jukes with the Joker?

B:  Bash was there?

CW:  Like, Think about it. You remember who was there. Think about was it - **Bow Wow** – **I'm gone refresh your memory** – it was Bow Wow, Gucci, Reckless – some fucking Selkie son …..

B:  Baynes

CW:  Bayness, Baby E, and Gucci. Know what I'm saying. Remember that night we was chillin out at the weed spot nigger and fucking Omar……

B:  Yeah. They all came in a cab and some shit.

CW:  Niggas came in a cab

B  Yeah, Yeah, Yeah, Yeah…… Word. That's all I said ……..

CW:  It's just cause, It was just cause L1 wrote that up. He tried to sneak his son, but the nigger -- **Bow Wow and them niggers came. It was Bow Wow and Gucci. That's when you had the chrome 38.**

B:  **The chrome 38.**

CW:  Niggas came and snatched up the joints – And we wasn't even on point.

B:  Nah. Nigger ain't even put me up on nothing. I was with the babies for the night, remember

CW:  For the night. I shutted it down. I went upstairs – I went downstairs. **Remember?**

\*       \*       \*

B:  Know what I'm sayin. All of us was together. Me, you Ruvu and Shoals were together that whole day. We didn't go nowhere. And in the nighttime, we shut it down wild early. Next day I wake up – well the Jamaican nigger woke up on the ….. Yo son, your boy Bow Wow came; he was lookin for you. He alright man, he was all bloody and shit

CW:  He was bloody?

B:  The Jamaican nigger Spongebob said he came in. He ain't say too much. He asked where I was at, looked at me. He went downstairs for a while, but he was like it was too quiet down there. He knew I was asleep so he got – snuck behind Bow Wow. Said Bow Wow was like sitting, looking at him like he said, like he wanted to

Soon after the trial started, it became clear that the government was not able to provide trustworthy corroborating evidence. Indeed, it was indisputable that the evidence adduced at trial contradicted the Mallory/Burden tapes. The defendant immediately brought this to the attention of the Court. In response the government conceded that the evidence established that Whitaker had not been covered in the blood of the victim as they first represented to the Court.

> As to Mr. Goltzer's first point about the blood. I did say before you two Fridays ago that one of the theories might have been that Mr. Whitaker came in contact with Mr. Henry when he was grabbing his phone and maybe looking through his pockets. But honestly we're not sure how he got the blood on him. And I agree with Mr. Goltzer. It appears as though it wouldn't have come from Jeffrey Henry. We think it came from Anthony Baynes. (812)

The government continued to represent that the Mallory/Burden tape was corroborated because of the anticipated testimony of Ramone McDermot.

> More importantly this is now -- we have evidence of them in very close proximity with Mr. Baynes bleeding excessively. We also have the tape. But then we also have **Ramone McDermott who is going to testify that Mr. Whitaker came into the house covered in blood. So the corroborating circumstances are still there on that point.** (813)

Moreover the government attested to Burden's reliability that ultimately had no foundation in the record.

> And let's not lose the forest from the trees here. Kev Gotti tells the same story here. So Mr. Mallory, whether it's two days before or two days after, it's still credibly corroborated by a witness who has every reason to be trustworthy and that's Kevin Burden. (814)

Yet, when McDermot testified regarding the blood he allegedly saw on Whitaker it was incredible, unreliable and fabricated.

> <u>Cross examination of McDermott</u>
> Q.One of the words that you used was splatter, wasn't it?
> A.Yes.
> Q.Can you help explain for the jury what you meant by the word splatter?
> A.It looked like, more like small polka dots. (2018)
>
> *        *        *
>
> Q.Was it two days ago or two months ago if you remember? The last couple of days?
> A.No, not the last couple of days.
> Q.When was it?
> A.Weeks.
> Q.How many weeks?
> A.I'm not sure exactly how many, but I think it's two.
> Q.Two weeks ago?
> A.Yeah.
> Q.Who was there?
> A.Mr. Bauer (2019-2020)
>
> *        *        *
>
> Q.Did they tell you you were going to be asked about the blood by the defense lawyers?
> A.Maybe I think at one point they probably did.
> Q.At one point they probably did. Didn't they tell you the defense lawyers were going to ask you what you meant by the word covered when you used that in an interview so long ago?
> A.I don't remember.

7

Q.Didn't they ask you what you meant by the word splattered?
A.Yes, they asked me about the word splattered.
Q.Didn't you go over the answer about the bottle of water against the wall?
A.Yes, I did say about the bottle of water against the wall.
Q.You first said that a couple of weeks ago?
A.Yes.
Q.In preparation for your testimony before this jury?
A.I'm not sure.
Q.But a couple of years ago you said it was covered in blood?
A.I said covered in splatter.
Q.You don't know how that happened because he wouldn't tell you?
A.Can you repeat the question.
Q.You don't know whether he walked out of the house wearing the garbage bag or without underwear, without pants on, do you?
A.No. (2021-2022)

Unlike what the government proffered to the Court, the evidence further adduced at trial completely contradicted any notion that Tyrell was covered in blood by Banes. Banes testified that he did not come in contact with Whitaker

Direct examination of Baynes

Q.Do you remember if at any point you were bumping up against Bow Wow?

A.No. He was in front of me.

Q.What happened after Bash and Bow Wow were trying to kick the door? (486)

More importantly, the fact that Whitaker was covered in blood was contradicted by the forensic evidence presented by the government.

Cross examination of Officer Federicks

Q. Had you observed any indication that anybody else had gone through the pockets before Burns?
A.No (266)

*          *          *
A.There was multiple layers of clothing, I believe there was pants, underwear, socks, shoes.
Q.With respect to the maroon coat, the outside of the maroon coat didn't appear to be covered with blood?
A.That is correct.
Q.Did you see any blood on the outside of the coat, if you recall?
A.I do not recall seeing it.

8

Q. Did you take any swabs from the outside of the coat?
A. I did not.
Q. If you had seen what appeared to be any biological fluids (267)

Q. And you took some blood from 54 Chambers?
A. That's correct.
Q. You also sent that along for analysis?
A. Yes, sir.
Q. Again, there was no blood between the two areas?
A. I did not locate it.
Q. So you had no reason to believe that Mr. Henry had been bleeding out of his clothing between those two areas in the absence of visible blood?
A. That is correct. (268)

<u>Direct examination of Medical Examiner Dr. Ely</u>

Q. What effect, if any, did the bullet have by passing through the body in such a manner?
A. It went through tissues and blood vessels and it caused internal bleeding. (732)
Cross examination of Dr. Ely
Q. I just have a couple of questions for you. Would it be fair to say that the cause of death was really internal bleeding?
A. That's the mechanism of death. The cause of death is gunshot wound.
Q. Of course. But the gunshot wounds in combination caused internal bleeding?
A. The results of the gunshot wounds were internal bleeding and that's what led -- primarily what led to his death. (749)

Ultimately, the government conceded that Baynes was the only person that would have come in

contact with Whitaker the night of the Henry murder.

GOVERNMENT: Two of which sustained injuries, as far as we know, both of who will be testifying, Tarrence Smith and Akinto Boone, neither of whom -- there won't be evidence that

Tyrell Whitaker came in contact with any of the victims who were inside. So in terms of the potential that it was their blood, I don't think there will be any evidence to that. (819)

The government's evidence ultimately contradicted Mallory and Burden's statements on the

tape regarding the Chrome .38 the alleged weapon used to kill Henry.

<u>Cross examination of Mallory</u>

Q. So Bow Wow never brought the gun back?

A.I don't know if he did or not.
Q.You do understand the seriousness of this case?
A.Yes (1505)


## II.   THE STATEMENTS IMPLICATING WHITAKER ON THE MALLORY/BURDEN TAPE WERE HIGHLY PREJUDICIAL INADMISSIBLE HEARSAY

The factual setting of Mallory/Burden tape also gave rise to the strongest motivation to misrepresent the truth in order "to shift or spread blame, curry favor, or divert attention to another....." Lee v. Illinois, 476 U.S. at 545. Mallory was a cooperating witness at the time attempting to convince the federal government of his ability to provide substantial assistance – hardly a motivation to provide trustworthy statements. Thus, the portions of the Mallory/Burden tape statements implicating Whitaker were entirely self-serving. And therefore, not at all against Mallory's or Burden's penal interest and since the information was fed to Burden during the secret taping there was no guarantee of trustworthiness. The circumstances of the Mallory/Burden tape are also dubious given that Mallory had the opportunity to tape several of the alleged participants to the Henry homicide including, Whitaker, but he did not.

Cross examination of Mallory
Q.The July 2012 conversation that you have with Mr. Burden is 20 months after Jeffrey Henry, Joker, was killed?
A.Around 20 months, yeah (1335)

Q.How many people did you wire up on?
A.Under five, around five people.
Q.One of the people you never wired up on was Tyrell Whitaker, right?
A.Who?
Q.Do you know who I am talking about when I mention Tyrell Whitaker?
14A.No. (1486)

There is no per se rule sanctioning the admission of a statement against penal interest that implicates a third party merely because the declarant is speaking to an alleged friend or ally.

10

<u>Mingo v. Artuz</u>, 174 F.3d 73, 77 (2d Cir. 1999) stresses that there is no "conceivable justification" for such a rule or presumption. Habitual criminals are not an element of society that is particularly committed to truthfulness.... [and] a criminal may have many motivations to lie while naming accomplices in a conversation with a friend or ally....." Id.

Because there are many reasons why a criminal might lie to a friend about another's role in his own crimes, "a court must carefully examine each instance of incriminating hearsay in the light of all the circumstances, taking care to consider all reasonable motivations of the defendant to lie, before concluding that such evidence is so reliable that the defendant had no constitutional right of confrontation." <u>Mingo</u> at 77. Thus, the Second Circuit requires that before admitting a statement against penal interest that inculpates a third party, the government must show both that " the statement was made to a person whom the declarant believes is an *ally,* not a law enforcement official, *and* (b) **the circumstances surrounding the portion of the statement that incriminates the defendant provides *no reason* to suspect that the portion is any less reliable than the part that directly incriminates the declarant."** <u>United States v. Sasso,</u> 59 F.3d 341, 349 (2d Cir. 1995), emphases added; <u>United States v. Saget,</u> 377 F.3d 223, 230 (2d Cir. 2004). In this case, the party seeking to curry favor was Mallory – a cooperating witness – that purposefully sought to elicit statements against Whitaker. As stated previously, it was Mallory not Burden that injected the name Whitaker. Mallory at the beginning of the conversation stated with "I'm gonna refresh your memory," and continued with statements by Mallory with "remember."

## A. THE STATEMENTS ON THE MALLORY/BURDEN TAPE DID NOT BEAR ADEQUATE INDICIA OF RELIABILITY TO RENDER THEM ADMISSIBLE.

In a solid line of cases, the Supreme Court has recognized that the "truth finding function of the Confrontation Clause is uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross-examination." Lee, 476 U.S. at 541 (emphasis added). In Douglas v. Alabama, 380 U.S. 415 (1965), the Supreme Court reversed the defendant's conviction because a confession purportedly made by the non-testifying accomplice, which implicated the defendant, was read to the jury by the prosecutor. The Court held that the defendant's "inability to cross examine [the accomplice] as to the alleged confession plainly denied him the right of cross-examination secured by the Confrontation Clause." Id. at 419. The holding was premised on the understanding that "when one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, the accusation is presumptively suspect and must be subjected to the scrutiny of cross-examination." Lee, 476 U.S. at 451.

Likewise, in Bruton v. United States, 391 U.S. 123 (1968), this Court reversed the defendant's conviction because the jury heard his non-testifying co-defendant's confession which implicated him. Despite an instruction limiting consideration of this statement to the co-defendant, this Court concluded that the introduction of the co-defendant's uncross-examined confession violated the defendant's right of confrontation. Id. at 135. After noting the "inevitably suspect" credibility of an accomplice's inculpatory statements about his alleged co-conspirator, this Court declared that the unreliability of such a confession is "intolerably compounded" when the alleged accomplice "does not testify and cannot be tested by cross-examination." Id. at 136.

The Supreme Court held in Lee v. Illinois that the trial judge's reliance upon the post-arrest confession of a non-testifying accomplice in sustaining the defendant's conviction was reversible

error. In a murder case in which only one bullet had been fired, the accomplice fingered the defendant as the triggerman. The Court recognized that due to a co-conspirator's "strong motivation to implicate the defendant" in order "to shift or spread blame, curry favor, avenge himself, or divert attention to another," a co-conspirator's post-arrest statements about the defendant's involvement in the crime must be viewed with "special suspicion." Id., 476 U.S. at 541, 545. "[O]nce partners in crime recognize that the 'jig is up,' they tend to lose any identity of interest and immediately become antagonists, rather than accomplices." Id. at 544-45. Cf. Chambers v. Mississippi, 410 U.S. 284, 299-300 (1973) (confessions of criminal activity often motivated by extraneous considerations and, thus, not as reliable as statements against pecuniary or proprietary interest).

Nor are the statements admissible as a declaration against penal interest within the meaning of Federal Rule of Evidence 804(b)(3). Prosecutors occasionally seek to introduce an unavailable declarant's statement against a defendant on trial as part of a declaration against penal interest, an exception to the hearsay rule. In Williamson v. United States, 512 U.S. 594, 599 - 600 (1994) the Supreme Court addressed this situation and noted that the fact that a person is making a broadly, self inculpatory confession does not make more credible a confession's non-self inculpatory parts. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its' inculpatory nature. The court concluded that before any portion of the accomplice's statement may be introduced under this hearsay exception, the trial court must examine each part of the statement in light of all the surrounding circumstances. When that is done, only those parts that are truly self inculpatory fall within this exception. The portion of the statement of declarant to be admitted must be supported by corroborating circumstances that clearly indicate its trustworthiness.

13

Turning to the facts of the instant case, not only did the government fail to demonstrate that Burden's hearsay statements had particularized guarantees of trustworthiness, but the circumstances affirmatively established their untrustworthiness. Foremost, Mallory was a cooperating witness whose sole motivation is to curry favor with the government. Second, Burden's statements were most certainly not spontaneous, but instead were in response to a self-interested cooperating witness. Clearly, these were not the type of "spontaneous" statements made without conscious thought or deliberation that might partially support a ruling admitting them. See White, 112 S.Ct. at 742-43 (spontaneous out-of-court declaration may carry more weight with jury than in-court statement under oath); Chambers v. Mississippi, 410 U.S. 284, 300 (1973) (spontaneity of statement provided indicia of reliability); Dutton, 400 U.S. at 88-89 (spontaneity of statement provided indicia of reliability).

A third significant factor tending to negate the reliability of Burden's statements is that they were made under circumstances in which Mallory had a strong incentive to "shift or spread blame, curry favor, or divert attention to another." Lee, 476 U.S. at 545. Thus, Mallory had a tremendous incentive to minimize his own role and shift blame to someone else.  Cf. United States v. Flores, 985 F.2d 770, 782 (5th Cir. 1993) ("Taking on the full blame for a minor role in an offense, such as claiming to be a mere courier in a drug conspiracy, does little to demonstrate trustworthiness because the declarant still has the motive to shift the blame to others so as to receive a lesser penalty."). Statements made under these circumstances fail to justify any reasonable belief in their trustworthiness.

Other circumstances surrounding the Mallory/Burden tape further undermined their trustworthiness. During the drug and alcohol induced taping, Mallory continually fed names places and things that occurred during the robbery of Henry that the listener cannot even be certain if

Burden understood the subject of the conversation.  Although each of these statements tended to implicate Whitaker, the material contradictions between them and the evidence at trial negated their trustworthiness. See United States v. Cuthel, 903 F.2d 1381, 1384 (11th Cir. 1990) (district court excluded out-of-court statements on ground statements were not sufficiently trustworthy in light of, inter alia, pattern of material inconsistency).

The erroneous admission of the unreliable hearsay had a devastatingly unfair impact upon the fairness of the trial. Burden's hearsay allegation turned out to be the only evidence that actually corroborated the cooperating witnesses' accusations against Whitaker. Viewed in the light most favorable to the government, the remainder of the evidence served only to corroborate their circumstantial case.  However, the government produced no witnesses nor physical evidence to show that Whitaker, himself, played a role in these crimes.

The incriminating hearsay was critically important to the government's case because its cooperating witnesses suffered from enormous credibility issues. On both direct and cross-examination, the cooperating witnesses either admitted to or were shown to have told numerous, material lies. They acknowledged to having repeatedly lied to both the police and federal prosecutors about their own crimes and those committed by others.

The government's summation erases any doubt that the admission of the Mallory/Burden tape fatally prejudiced Whitaker. Over and over again, the government invoked the Mallory/Burden tape as a guarantee that Mallory was telling the truth about the crime in general and Whitaker in particular.

Neither the DNA evidence, fingerprints, nor the telephone records established Whitakers' participation in the Hobbs Act Robbery of Henry.

**B.  THE GOVERNMENT'S COMMENTS DURING SUMMATION CONSTITUTED IMPROPER PROSECUTORIAL MISCONDUCT**

The government so heavily relied upon the Mallory/Burden tape because it was by far the most [unfairly] persuasive means of bolstering an otherwise weak case against Whitaker. Unlike Mallory, Burden could not be cross-examined. The government used Burden' words to convince the jury that there was real corroboration for the cooperators' otherwise highly questionable testimony.

> But then, again, you do not need to take Mallory's word for it because you heard from a witness. A witness who was not a cooperator. A witness who had know incentive to lie. No incentive to say anything other than what was true. You heard from one of their coconspirators. **You heard from Kev Gotti**.
>
> *       *       *
>
> Now I'm going to play a part of the video in a little bit. Let's go through some of the things that were said.
>
> Now remember at the beginning of that video, Mallory says remember those guys with the Joker, he starts naming Bow Wow, Gucci. Listen that was Mallory saying it at the beginning. It wasn't Burden. You can't hide from that. He was the one saying the names. **But Burden joins the conversation**. He says, um, Baynes also, that's Besheltie's son. Then Mallory says, yeah, Baynes, Baby E and Gucci. And then Burden says, yeah, they all came in a cab and some shit. **So he's actively participating in this conversation.**

The government improperly asked the jury to infer the state of mind of Burden at the time of the recording.

> This is not him not believing that these guys were involved. **And of course we know later on in the video he starts saying their names too. But to suggest that somehow Mallory fed these names to Burden.** Think about the real world. Think about how conversations work. Think about this conversation in particular. When Kev Gotti pushed back.
>
> There was a little back-and-forth with Kev Gotti about who gave Bow Wow that gun. **Mallory told you that it was Gotti. And in the video Gotti says: No, it was you. I gave you, Mallory, the gun. Mallory, you gave it to Bow Wow. There was a back-and-forth there.**

16

**Burden is not some passive participant in this conversation. He's not adopting things simply because Mallory said it. This is Burden -- this is Burden telling you exactly what happened.** Mallory says: Hey, do you remember how Gucci was acting? Burden says: Come on. Gucci was bragging about that. Then Burden says: Gucci was basically what, exactly what L-1 wanted him to be, a kamikaze mission. He knew Gucci was going to be the one to go down. Cause he knew Gucci can't hold water. Burden talking about Gucci. Now they're talking about Reckless. And Burden says: He just got knocked two weeks ago for like a robbery situation. Now, then Mallory says: After those guys knocked that shit up, L-1 called and they came through. When we was down at the weed spot. Remember that? Burden: Yeah, I remember exactly. This is Burden remembering -- I don't have to say anything. He remembers exactly, ladies and gentlemen.  Now, Mallory says: I feel like Bow Wow didn't get questioned for nothing. Gucci probably got questioned. But he didn't say shit. Burden says: Bow Wow smart bro. Right after that happened he disengaged from everybody. He stopped fucking with them. And then Burden says: Gucci, Gucci came, basically Gucci came to see who was up there and L-1 came right behind him. Got to do the math, bro. Then they both agree that they wasn't on point.

So when Mallory said he didn't know exactly what was going to a happen, this is Burden agreeing with him. This is not saying that they were completely oblivious. You heard in the video that they thought that there was something going on, there might be a jux -- which you heard was a robbery – but they didn't know exactly where these robbers were going. And they certainly didn't know that they were going to shoot a gun and kill a man that day.

Now, finally, this is the part -- I won't dwell on it too much. Remember Burden said: We got the black joint. I had this chrome joint. The black joint. That's Mallory's black .38 that he had. The chrome joint, that's Burden gun. That's his baby's mother's brother's gun. They came later on. They started hunting around for the scats. Scats are guns. You gave the scat to Bow Wow. Bow Wow went. They came straight upstairs. And then remember what he says. He asks the group, who got up on my scat? Know what I'm saying? Then you like oh Gucci or somebody like that. And Burden says: Hell, no. If it ain't my drop I'm not giving them my scat out there. And Bow Wow was like all right I'll take your scat. Your heard what a drop is. That is somebody who comes up under you in the Bloods. Corroboration of exactly the relationship between Bow Wow and Gotti.

The government squarely placed Burden in the witness stand and urges the jury to believe that

Burden told them exactly what happened the night of the Henry murder, as if he were sworn under

oath and subject to cross examination. But, Burden didn't take the stand, he was not subject to

cross-examination. His words were twisted and mischaracterized in order to lend credibility to

otherwise uncreditable witnesses. And that is the true prejudice that Whitaker suffered.

> Ladies and gentlemen, you don't have to overthink it when you have another participant in the robbery telling you exactly what happened. And then he says: All I knew was Bow Wow and Gucci." Bow Wow and Gucci." That's what he says. We'll play that video later so I won't go through it here again. (2171-2175)

> *        *        *

> Is there any wonder that Bow Wow was covered in blood after this? It wasn't Jeffrey Henry's blood on him. There is no evidence in the record here to support that. But there's every piece of evidence to show a very fair, very reasonable, very fact-based inference that it was Baynes' blood on Whitaker. (2187)

> We also know he made other calls, don't we? We know it from Jamar Mallory, and we know it from Kevin Burden. (2167)

> (Audiovisual recording played)

> **Ladies and gentlemen, all the questions about the incentives that our cooperators, our witnesses had to lie, they don't apply to Kevin Burden, ladies and gentlemen. Ask yourselves why would he lie in this video? There is no answer to that. So just in case you felt uncomfortable relying on Jamar Mallory, which you shouldn't because everything he said is corroborated** (2200-2201)

> **That's a very specific story to hear from Mallory when you know you can believe him because Kev Gotti, not a cooperator, no cooperation agreement, told you.** (2202)

> MR. GOLTZER: Objection. Improper argument. Based on nothing in the record (2181)

> But what's Gucci doing with that statement? He's trying to push the responsibility of the shooting off of him. But in the process he's putting himself right in there in that robbery. (2202).

The defendant was well aware at the time of the government's improper comments during

summation and properly objected to it.

> MR. GOLTZER: …With respect to the Government's summation, the parade of errors oars that we anticipated would happen in terms of guilt by association, gang membership, propensity evidence and the like came true. I think that the Government's summation used that limited evidence far beyond its intended and

proffered purpose. It was unduly prejudicial violating Mr. Whitaker's right to a fair trial within the meaning of the due process clause of the Fifth Amendment. I respectfully move for mistrial. (2232)

Finally, we know that after the jury requested to listen to Mallory/Burden tape and shortly came back with a verdict of guilty on all counts regarding Whitaker. (2481-2482)

Because the unreliable hearsay should never have been presented to the jury, Whitaker was denied a fair trial and the interests of justice require that he be provided a new one.

The Sixth Amendment of the United States Constitution guarantees a defendant the right to present a defense. It is improper "conduct for the prosecutor intentionally to... mislead the jury as to the inferences it may draw." United States v. Young, 470 U.S. 1, 8 n.5 (1985) (citation and internal quotation marks omitted); see also United States v. Mendoza, 522 F.3d 482, 491 (5th Cir. 2008); United States v. George, 201 F.3d 370, 373-74 (5th Cir. 2000). Thus it was improper for the government to ask the jury to infer that Mallory/Burden tape was reliable without any foundation in the record. See United States v. Gray, 876 F.2d 1411, 1417 (9th Cir. 1989)(noting that "it is improper to base closing arguments upon evidence not in the record"). The Court has created a bright-line rule against exactly this misconduct. See, e.g., United States v. Russo, 74 F.3d 1383, 1396 (2d Cir. 1996); United States v. Gleason, 616 F.2d 2, 25-26 (2d Cir. 1979). See United States v. Universita, 298 F.2d 365, 367 (2d Cir.1962) ("The prosecution has a special duty not to mislead; the government should, of course, never make affirmative [688 F.3d 144] statements contrary to what it knows to be the truth."). It is a reality that prosecutors continually remind jurors in opening statements, that they are the "people," the "state," or "the United States," and claim the mantle of the community in a way that tends to make jurors believe that prosecutors come to the case solely to do justice. The trier of fact is thus likely to discount even the most credible and reliable exculpatory testimony offered by the accused. See Donald A. Dripps, *The Constitutional*

*Status of the Reasonable Doubt Rule*, 75 Calif. L. Rev. 1665, 1695(Oct. 1987). This reality caused Whitaker substantial harm.

Thus, the closing arguments by the government violated its "special duty not to mislead." United States v. Richter, 826 F.2d 206, 209 (2d Cir. 1987); see also United States v. Rosa, 17 F.3d 1531, 1548-49 (2d Cir. 1994) ("[I]t is improper for a prosecutor to mischaracterize the evidence or refer in summation to facts not in evidence."). Misrepresenting facts in evidence can amount to substantial error because doing so "may profoundly impress a jury and may have a significant impact on the jury's deliberations.". . . This is particularly true in the case of prosecutorial misrepresentation because a jury generally has confidence that the prosecuting attorney is faithfully observing his obligation as a representative of a sovereignty, whose interest "in a criminal prosecution is not to win a case, but that justice will be done." Gall v. Parker, 231 F.3d 265, 313 (6th Cir. 2000)(quoting Donnelly v. De Christoforo, 416 U.S. 637, 646 (1974), and Berger v. United States, 295 U.S. 78, 88 (1935)).

It is generally acceptable to argue to the jury that to believe one witness means to disbelieve other witnesses, United States v. Shareef, 190 F.3d 71, 79 (2d Cir.1999); see also United States v. Durrani, 835 F.2d 410, 424 (2d Cir.1987), provided that in doing so a party does not mischaracterize trial evidence or rely on a witness's evaluation of the credibility of another, see United States v. Scanio, 900 F.2d 485, 493 (2d Cir.1990), abrogated on other grounds by Ratzlaf v. United States, 510 U.S. 135, 136 n. 1, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994). It is without a doubt that government's reliance and mischaracterization of the evidence at trial violated their special duty not to mislead. See United States v. Universita, 298 F.2d 365, 367 (2d Cir.1962) ("The prosecution has a special duty not to mislead; the government should, of course, never make affirmative [688 F.3d 144] statements contrary to what it knows to be the truth.").

Id at 144.

In determining whether the Government's misconduct so substantially prejudiced Whitaker to deprive him of a fair trial, the Court considers "[(1) ] the severity of the misconduct, [ (2) ] the measures adopted to cure the misconduct, and [ (3) ] the certainty of conviction absent the misconduct." United States v. Elias, 285 F.3d 183, 190 (2d Cir.2002). In Whitaker's case the misconduct was certainly substantial. The case turned on whether Whitaker's witnesses were deemed credible by the jury. When a case comes "down to a battle over credibility," improper arguments are more likely to have an effect on the fundamental fairness of the trial. See United States v. Sanchez, 659 F.3d at 1260 ("Because the sole issue in Sanchez's case centered on witness credibility, the [improper prosecutorial] statement likely affected the jury's ability to decide the case fairly."). Therefore, it was likely, but for, the defects at trial the government's misconduct did "cause the defendant substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process," United States v. Parkes, 497 F.3d 220, 233 (2d Cir.2007) (quoting Elias, 285 F.3d at 190).

## CONCLUSION

Wherefore the following reasons, the defendant's request for a new trial should be granted.


Dated: January 22, 2015
          New York, New York

                                        Respectfully submitted,


                                        _/S/_____
                                        George Goltzer
                                        Ying Stafford
                                        *Attorneys for Tyrell Whitaker*

*All Counsel by ECF*


                                        George Goltzer
                                        600 Fifth Avenue
                                        10th Floor
                                        New York, NY 10019
                                        grgoltzer@gmail.com


                                        Ying Stafford
                                        276 Fifth Avenue
                                        Suite 501
                                        New York, New York 10001
                                        ying@staffordesq.com