

750 Third Avenue
New York, NY 10017-2703
(212) 687-8181
Fax: (212) 972-9432
www.kreindler.com

March 9, 2021

<u>Via ECF/CM</u>
Hon. Edgardo Ramos
United States District Court for the
 Southern District of New York
40 Foley Square
New York, NY 10007

Re:    *United States v. Christian*, *et al.* (Raymond Christian) 12 Cr. 626

Dear Judge Ramos:

This second sentencing letter is submitted to: provide updated information about Raymond Christian; address certain issues in the pre-sentence investigation report ("PSR"); supplement the arguments and materials set forth in his initial sentencing submission (ECF No. 271 and exhibits); and explain his request for a sentence within the Sentencing Guidelines range calculated herein, which, absent the inapplicable murder cross-reference, is no more than 147-months in prison. *See infra* at 5-10.  Of the several individuals involved in the botched robbery that tragically led to Jeffery Henry's death, this Court has sentenced all but one of Raymond's co-defendants, with no sentence exceeding 204-months in prison.

In December 2016, we filed a sentencing submission that addressed Raymond's social and emotional history, included video-recorded interviews with his family, described what life was like for young men in Newburgh, New York and presented evidence on the nature of the juvenile brain and its development, given that Raymond was barely 19 years old at the time of the underlying acts. ECF No. 271 and exhibits. We now supplement that initial filing and provide additional details about Raymond's development over the past four years.  This supplemental defense letter-motion also raises additional objections to the most recent PSR's calculation of the Sentencing Guideline and addresses the need to avoid unwarranted sentencing disparities.

I.    **Raymond Christian's History and Characteristics**

As this Court knows, the Newburgh, New York where Raymond Christian and his co-defendants were born and raised was a place where drugs were peddled openly, violence was endemic and role models were few.  Raymond's young life was chaotic and unstable.  Both of his parents were, at best, inconsistent in his life.  As social worker and mitigation specialist Elba Torres-Perez documented, Raymond was forced into a parental role from the time he was ten years-old. ECF No. 271-1 at 1-2 (Torres-Perez Mitigation Report); ECF No. 271-3 (Video Recording of Family Interviews).  He lived through homelessness and hunger, abuse and neglect. Torres-Perez Mitigation Report at 2-3.  Social worker and mitigation specialist Maggie Murphy

California Office
707 Wilshire Boulevard, Los Angeles, CA 90017-3613
Tel: (213) 622-6469  Fax: (213) 622-6019

Massachusetts Office
855 Boylston Street, Boston, MA 02116-2688
Tel: (617) 424-9100  Fax: (617) 424-9120

describes the lasting emotional and psychological impact of Raymond's feeling that he alone could care for his seven siblings. *See* Exhibit 1 hereto (Murphy Mitigation Addendum). Raymond Christian often was scared on the streets of Newburgh and to cope with the violence surrounding him he advanced quickly – too quickly – through childhood.[1]

Despite the substantial difficulties attendant to life in Newburgh, Raymond was an engaged and community-oriented young man. One of his younger siblings describes him as "a great protector" who was always looking out for his sisters and brothers. *See* Exhibit 2 hereto, Letters of Support at 5. Heavenly Rayford, whose father coached Raymond on the non-profit basketball program "Newburgh Zion Lions," reflects on the leadership that Raymond showed in that program. *Id.* at 1. Ms. Rayford describes how Raymond participated in food drives for the homeless, volunteered as a coach with the youngest players and tried to recruit "troubled kids or teens" to join the program. *Id.* She describes Raymond as always going "above and beyond" to help in the after-school component of that program. *Id.* She recalls his generosity and kindness, describing one time when a child in her father's program did not have basketball shoes and Raymond brought the child a pair of his own new sneakers. *Id.* Likewise, Newburgh City Councilman Omari Shakur describes Raymond as someone who, even when young, "always wanted to help" with the summer program that Shakur ran in 2004 and 2005. *Id.* at 2. Councilman Shakur recalls Raymond as "one of the kids who was there from the beginning to end." *Id.*

Though physically from his friends and family over the past over-eight years, Raymond has worked hard to keep up with his community, and he is surrounded by loved ones who look forward to welcoming him home from custody. *See generally* Exh. 2. As his aunt Wilma, a missionary with her church heavily involved in homeless outreach, explains, Raymond is always available by phone and quick to get on a call with those he believes might be getting off track. Exh. 2 at 9. Before he was incarcerated and even now, for example, Raymond helps Wilma with her disabled son and can help lift her son's spirits just through their phone calls. *Id.*

Friend and former teammate Donchevall Nugent, currently a college student playing NCAA Division I basketball in Maryland, explains that Raymond "is a well-known and loved person in our community." *Id.* at 6. Even while incarcerated, Raymond helped Donchevall as he returned from incarceration himself, and Donchevall credits Raymond, among others, with providing the support to help him get back into school. *Id.* at 6-7. Raymond did the same for a homeless youth that he met through his aunt Wilma. Wilma introduced Raymond to the young man, with whom Raymond would speak on the phone, helping him reconnect with his family and enroll in college. *Id.* at 9. As Wilma explains, "Raymond helped this young man to know that [the] sky is the limit." *Id.*

Learning how to hold onto optimism and hope through the challenges in his childhood (evictions, insect-infested apartments, parental abandonment, untreated attention deficit and

---

[1] As other defendants in this case have described, often the first time a young man in Newburgh came into contact with a firearm was to protect himself from other, older, more heavily armed individuals in the community – a tragic and senseless cycle.

12 Cr. 626 *United States v. Raymond Christian*
Supplemental Defense Sentencing Submission
March 9, 2021
Page 3 of 14

hyper-activity disorder) has provided Raymond the baseline resilience to get through the past nearly nine years he has spent in the Metropolitan Correctional Center (MCC), though it has been a struggle. As social worker Maggie Murphy explains, "the environmental factors in Raymond's community and home life that exacerbated trauma symptoms and chronic stress … have been compounded at the MCC." Exh. 1 at 1.

Raymond has kept both his mind and his body active while at the MCC, despite the very limited options at the detention facility. Raymond was chosen to participate in the highly-selective inmate companion program to assist MCC inmates on suicide watch. *See* Exhibit 4 at 2 (MCC Work Records). Raymond was noted as a punctual and respectful worker who earned high marks for initiative, dependability and eagerness while with the inmate companion program. *Id.* at 3. He has also been employed for several long stretches in food services at the MCC, happy to keep busy while feeding his fellow inmates. *Id.* at 2. Raymond has also spent much time participating in the limited educational offerings at the MCC. *Id.* at 1. As Ms. Murphy explains, Raymond has been particularly focused on gaining the skills and information to develop a community-based fiscal-responsibility plan for residents of places like the Newburgh where he was raised. *See* Exh. 1 at 4.

After waiting for several cycles to join the Focus Forward Project, Raymond finally in early 2020 was placed in the 12-week course. *See* Exhibit 3 (Focus Forward Project Letter). Focus Forward is an intensive intellectual and emotional exploration that is designed to assist pre-sentenced individuals gain practical tools such as resume-writing, interviewing techniques, public-speaking and goal-setting. *Id.* It has restricted registration and Raymond was eager to finally embark on its curriculum. Unfortunately, the covid-19 health crisis interrupted the program and none of the participants in Raymond's cohort was able to complete it. *Id.* at 2. Nevertheless, the class facilitators recognize the credit due to Raymond for "focusing on his future" and "making this serious commitment to helping himself and helping his classmates and using his time awaiting sentencing in such a positive and productive way." *Id.* During just the short time they worked with Raymond, the facilitators found it "clear that he had a great deal to offer and would have been an integral part of our classroom community." *Id.*

While Raymond has had several disciplinary infractions, corrections expert Cameron Lindsay opines about the circumstances that contribute to such infractions and provides perspective on the nature of the incidents. As Mr. Lindsay notes, the MCC is not designed to house a young offender like Raymond for a long period of time. *See* Exhibit 5 hereto (Lindsay Report) at 2. Raymond, like all inmates at the MCC, has been put in a general population where all are treated as though they are in the highest custody classification. *Id.* As a result, even before the current covid-19 pandemic, Raymond has been primarily restricted to his cell – which has been only exacerbated by the public health crisis, during which Raymond has been, essentially, in solitary confinement for the past year. *Id.* Raymond's exceedingly long tenure at the MCC has corresponded with his entire 20s – indeed, he entered the MCC at age 19 and will leave it nearing 30. The MCC simply does not have rehabilitative offerings that can serve a relatively young person like Raymond. *Id.*

12 Cr. 626 *United States v. Raymond Christian*
Supplemental Defense Sentencing Submission
March 9, 2021
Page 4 of 14

Mr. Lindsay opines that Raymond's age combined with the particularly difficult conditions of confinement provide important context for his disciplinary record, which shows about 16 incidents over the last nearly nine years (or fewer than two per year). *See* PSR at ¶ 9. Mr. Lindsay explains that only one of those infractions fell into the most serious severity classification, and even that one did not result in any injuries. *See* Exh. 4 at 4. According to Mr. Lindsay, the number and severity of the disciplinary history does not cause "undue concern" and does not appear to be "particularly surprising or unusual." *Id.*[2]

This is confirmed by the unusual letter of support volunteered by a current MCC correctional officer. Lieutenant West writes that Raymond is "often misunderstood," which surely contributes to some of the disciplinary infractions (especially those for insubordination), but "once you sit down and ACTUALLY have a conversation with him, his point of view is often well taken." Exh. 2 at 10.

Further, Raymond's substantial engagement with work and educational programming, as well as his voluntarily seeking out treatment for depression, provides expert Cameron Lindsay with "optimism" that Mr. Christian will continue to be "heavily engaged" in the enhanced offerings he will find at a prison. Exh. 4 at 5. Any prison to which Raymond will be designated "will have a more robust selection of programming (educational, vocational and social-emotional)" and, based on his experience and expertise with prison populations, Mr. Lindsay believes that Raymond's conduct to date demonstrate that Raymond will "be even more active in these activities than he has been at the MCC." *Id.*

Raymond Christian is well-poised to emerge from incarceration with the tools, training and support that are critical to avoiding recidivism. Councilman Shakur has volunteered to "work with" and "mentor" Raymond. Exh. 2 at 2. Wilma Patrick is ready to welcome Raymond home, housing him and helping "with his transition into the community," locate "job opportunities" and provide him with "life skills." *Id.* at 9. Raymond Christian is ready to return from incarceration as a contributing member of his community as soon as he is given the chance to do so.

## II.    Objections to the PSR and Sentencing Guidelines Calculation

The Probation Department prepared an initial presentence investigation report on September 30, 2015 with several revisions, the final one completed on May 27, 2020. In addition to previously lodged objections, Raymond Christian has the following objections to the factual recitation and guidelines calculation.

**Paragraph 19**: We object to the sentence "RAYMOND CHRISTIAN was a member of 'Star Status,' a spin-off street gang." While there was trial testimony that Raymond and others were part of a group that called itself "Star Status," (Tr. Trans. at 411, 413), the few young men

---

[2] At least one infraction appears to be related to an assault on Raymond. Defense counsel put the BOP on notice of the need to preserve all recordings and reports relating to that assault and requested copies of the same, but, to date, the BOP has not responded to that demand.

12 Cr. 626 *United States v. Raymond Christian*
Supplemental Defense Sentencing Submission
March 9, 2021
Page 5 of 14

who considered themselves part of it primarily "partied, [drank], went to school together." Tr. Trans at 414.  Unlike another group about which the government elicited testimony, the Ashy Bandits (*see* Tr. Trans. at 940), "Star Status" did not exist outside of Newburgh. Tr. Trans. at 939.  "Star Status" appears to have consisted of a mere handful of young individuals in Newburgh. Tr. Trans 939.  It had no conflicts with gangs such as the Bloods or the Ashy Bandits. Tr. Trans 941.  Indeed, how a group like "Star Status" differed substantially from an organization such as the Bloods was the topic of sidebar discussions during the trial, during which defense trial counsel objected to gang testimony about the Bloods, but did not need to raise such objections about "Star Status," because testimony on the latter simply did not establish that it had the markings of any sort of gang. *See* Tr. Trans. at 944-49.  The government introduced no evidence that "Star Status" was, in fact, a group that could reasonably be called a "street gang" and including this information which is not relevant to sentencing in the PSR would be error.  This error would substantially prejudice Raymond, as his BOP security classification and designation will be impacted by any gang affiliation set forth in the PSR.

**Paragraphs 19, 23**: We object to the clause in the second sentence that describes James Williams as "a member of the 'G-Shine' set of the Bloods" and in the sixth that states that James Williams sent two individuals "from his Bloods set," for the same reason as above.  The government has never alleged that Raymond was a member of any set of the Bloods, but by including information about a co-defendant's gang affiliation that is not relevant to this sentencing, Raymond's designation and / or classification could be negatively impacted.

**Offense Level Computation.**  Raymond Christian objects to two enhancements in the PSR: the murder guideline, which takes the base offense level from 20 to 43, and the offense role guideline, which adds another two points. *See* PSR at ¶¶ 38, 41.

### The Murder Cross-Reference in U.S.S.G. § 2B3.1(c) Does Not Apply Here

The Murder Guideline does not apply to the robbery, as the shooting death of Jeffrey Henry is not "relevant conduct" under the Sentencing Guidelines.  U.S.S.G. § 1B1.3.  Even if the death was foreseeable given the guns carried by various co-defendants,[3] killing Mr. Henry was not "within the scope of the jointly undertaken criminal activity."  § 1B1.3(a)(1)(B)(i).  Nor was it "in furtherance of" the robbery, § 1B1.3(a)(1)(B)(ii), which had already been foiled by the time a firearm was discharged, with the residents of the stash house effectively barring the co-defendants from entering.

The trial evidence did not demonstrate that Raymond Christian fired a weapon – to the contrary, as the jury did not find sufficient evidence that he discharged a weapon – and the death of Mr. Henry is not otherwise attributable to Raymond for purposes of the Sentencing Guidelines calculation.  Indeed, as the government noted at trial and as the jury agreed, it was simply not

---

[3] Though, as counsel for one of Raymond's co-defendants recently noted, the gun that killed Jeffrey Henry was not one that the co-defendants brought to the robbery. *See* ECF No. 440 at 2.

12 Cr. 626 *United States v. Raymond Christian*
Supplemental Defense Sentencing Submission
March 9, 2021
Page 6 of 14

possible to know who discharged the weapon that killed Mr. Henry. Tr. Trans. at 2204-07;
Verdict Sheet.

The first step in calculating a range is to "[d]etermine the offense guideline section in
Chapter Two (Offense Conduct) applicable to the offense of conviction (*i.e.*, the offense conduct
charged in the count of the indictment or information of which the defendant was convicted)."
U.S.S.G. § 1B1.2(a).

For Raymond Christian's robbery convictions, the applicable Sentencing Guideline is
U.S.S.G. § 2B3.1 (robbery).  The PSR has employed the "Cross Reference" which provides that
"If a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111
had such killing taken place within the territorial or maritime jurisdiction of the United States,
apply §2A1.1 (First Degree Murder)."  Even, however, if the 18 U.S.C. § 924(j) count falls
within the scope of 18 U.S.C. § 1111 (which, as discussed below, it should not), the cross-
reference for first-degree murder still does not apply here.

That is so because a sentencing court, "after determining the appropriate offense
guideline section" must also and always "determine the applicable guideline range **in
accordance with §1B1.3 (Relevant Conduct)**."  U.S.S.G. § 1B1.2(b) (emphasis added).  In
other words, a court must use the "relevant conduct" definition of U.S.S.G. § 1B1.3 to determine
what base offense level to employ. *Id.*, App. Note 2.  This is also true for application of a cross-
reference in the Guidelines. U.S.G.G. § 1B1.3(a).  Application of

cross references . . . shall be determined on the basis of the following:

(A)   all acts and omissions committed, aided, abetted, counseled, commanded,
induced, procured, or willfully caused by the defendant; and
(B)   in the case of a jointly undertaken criminal activity (a criminal plan, scheme,
endeavor, or enterprise undertaken by the defendant in concert with others,
whether or not charged as a conspiracy), all acts and omissions of others that
were—
(i)   within the scope of the jointly undertaken criminal activity,
(ii)   in furtherance of that criminal activity, and
(iii)   reasonably foreseeable in connection with that criminal activity.

U.S.S.G. § 1B1.3(a)(1).

The trial record does not establish that Raymond Christian "aided, abetted, counseled,
commanded, induced, procured, or willfully caused," § 1B1.3(a)(1)(A), Mr. Henry's murder – as
the government itself argued at trial, it was impossible to know in the chaos of the botched
robbery who shot Mr. Henry, and his death could have been the result of one of his fellow stash
house residents discharging a weapon.  In fact, one trial witness testified that he saw a resident
with a gun, wrestling with Raymond. Tr. Trans. at 482-84.

12 Cr. 626 *United States v. Raymond Christian*
Supplemental Defense Sentencing Submission
March 9, 2021
Page 7 of 14

And though the December 2010 robbery was "a jointly undertaken criminal activity" – charged both as an attempted robbery (Count Two) and a conspiracy (Count One) – Mr. Henry's death was not "within the scope of the jointly undertaken criminal activity." § 1B1.3(a)(1)(B)(i).

The "'scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy.'" *United States v. Getto*, 729 F.3d 221, 234 n.11 (2d Cir. 2013) (quoting *United States v. Perrone*, 936 F.2d 1403, 1416 (2d Cir. 1991)). The "focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principal, accomplice, or conspirator." U.S.S.G. § 1B1.3, App. Note 1.

Thus, even if Raymond Christian knew that guns were involved in the robbery conspiracy, and even if he understood that they might be fired or someone might be injured, without evidence that Raymond Christian himself intended, agreed or undertook to kill Mr. Henry, the death was not "within the scope of the jointly undertaken criminal activity" on December 15, 2010.

This is so because "[a]cts of others that were not within the scope of the defendant's agreement, **even if those acts were known or reasonably foreseeable to the defendant**, are not relevant conduct." § 1B1.3, App. Note 3(B) (emphasis added). *See also, e.g., United States v. Enix*, 2019 WL 4010599, at *5 (W.D.N.Y. Aug. 26, 2019) ("[E]ven if an act of a co-conspirator was known or reasonably foreseeable to a defendant, if it was not within the scope of the defendant's agreement, then it cannot be considered relevant conduct.") (citing App. Note 3(B)).

As the Second Circuit has explained in ruling that a co-defendant's commission of murder during an extortion scheme was wrongly attributed to the defendant at sentencing, there must be evidence that the murder itself was within the scope of the criminal plan's specific conduct and objectives – absent such evidence, the murder cannot be attributed to a defendant at sentencing. *United States v. Johnson*, 378 F.3d 230, 238 (2d Cir. 2004).

There is also no such evidence here, as there is no sign that Mr. Henry's death was specifically within the scope of the December 2010 robbery plot. *See also Enix*, 2019 WL 4010599, at *6 ("The [crew's] conduct was risky, dangerous, and threatening, and the murders . . . were foreseeable. However, the Court is not able to make particularized findings that Defendant participated in an agreement to murder . . . , or that he planned for [another] murder . . . prior to September 6, 2014. As a result, those predicate acts will not be included within Defendant's relevant conduct for purposes of the Sentencing Guidelines calculation.").

This is different than an assault, which is "within the scope" of a robbery plot as robbery requires "actual or threatened force, or violence, or fear of injury," § 1951(b)(1), and thus "has as an element the use, attempted use, or threatened use of physical force." *United States v. Hill*, 890 F.3d 51, 60 (2d Cir. 2018). *See also* U.S.S.G. § 1B1.3, App. Note 3(D) (one defendant "is accountable for [another's] assault and injury to [a robbery] victim," if the assault was "in furtherance of" the robbery, as the "assaultive conduct was within the scope of the jointly

undertaken criminal activity (the robbery)").  Murder is, simply, different: robbery does not require killing anyone, and thus an agreement to rob does not itself necessitate or foretell any homicidal – as opposed to assaultive – conduct.  The Second Circuit's ruling in *Johnson* proves this point, as the defendants there committed "extortion by use of actual or threatened force," 378 F.3d at 233, and, "during the course of the conspiracy," one of them "killed Erick Riddick, a member of a rival 'labor coalition.'"  *Id*. at 234.  Despite Mr. Riddick's death during the commission of the extortion, the Circuit held it was error to attribute that murder to the other defendants at sentencing: there was no evidence "the murder was within 'the scope of the **specific** conduct and objectives embraced by the . . . agreement'" to extort.  *Id*. at 238 (emphasis in *Johnson*), quoting *United States v. Studley*, 47 F.3d 569, 575 (2d Cir. 1995) (emphasis in *Johnson*); *see also Enix*, 2019 WL 4010599, at *6 (same as to murders committed during RICO conspiracy).  Likewise, there is no evidence here that murder was "within the scope" of the December 2010 robbery as it was not one of the co-defendants' objectives.

Even if there were, however, Mr. Henry's death was not "in furtherance of" the robbery. U.S.S.G. § 1B1.3(a)(1)(B)(ii).  Mr. Henry's death happened only after the attempted robbery had been thwarted when the stash house residents took a firearm from the co-defendants and barred them from leaving 54 Chambers Street.  No firearm was discharged until after the co-defendants had abandoned their plans and were attempting to flee from the location. Tr. Trans. at 486-88. Mr. Henry's shooting death, though cruel and senseless, did nothing to further the already-foiled robbery.  The murder, while "deplorable and criminal, [is] not 'relevant conduct'" as to Raymond Christian "in the sense contemplated by the Guidelines."  *United States v. Wernick*, 691 F.3d 108, 116-17 (2d Cir. 2012).

## The Aggravating Role Enhancement in U.S.S.G. § 3B1.1(c) Does Not Apply Here

A two-point enhancement applies when a defendant was "an organizer, leader, manager, or supervisor… ." U.S.S.G. § 3B1.1(c).  The adjustment "does not apply to a defendant who merely suggests committing the offense." *Id.*, App. Note. 4.  When determining if points should be added to the offense conduct, courts are told to consider:

the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*Id.*

Here, while the government introduced evidence at trial that Raymond Christian took steps in planning the attempted robbery at 54 Chambers Street, he did not lead, organize, manage or supervise the effort.  Anthony Baynes, for example, testified that in December 2010, he, Raymond and others, while walking around Newburgh, came up with the idea of robbing 54 Chambers. Tr. Trans. at 470-74.  It was James Williams (also known as "L-1") who brought the

gun into the plan. Tr. Trans. at 475-76.[4]  Likewise, it was James Williams who got the information that 54 Chambers had recently "re-upped," meaning that the spot would be "a good robbery." Tr. Trans. at 478.  According to a government witness, it was not only Raymond who met with James Williams to discuss the robbery or obtain the weapon – co-defendants Glenn Thomas and Tyrell Whittaker were there as well. Tr. Trans. at 825.

   With respect to the December 15, 2010 attempted robbery and robbery conspiracy, the trial evidence is simply insufficient to establish that Raymond exercised the sort of organizational, managerial or leadership authority to warrant the two-point enhancement.

   **Criminal History Category (CHC) Objections**.  Raymond Christian objects to the inclusion of three criminal history points for juvenile offenses and three criminal history points for youthful offender adjudications. *See* PSR at ¶¶ 47-49 and 50-52.  The legal and factual basis for these objections are set forth in the first Defense Sentencing Submission. *See* ECF No. 271 at 3-5.  If this Court were to adopt those defense objections, then Raymond would be in CHC I.

   **Raymond Christian's Sentencing Guidelines Range.**  Applying the robbery guideline to the December 15, 2010 attempted robbery and robbery conspiracy results in a base offense level of 20. *See* U.S.S.G. § 2B3.1.  Though this section has enhancements for injuries, because none were sustained "in furtherance of" the robbery, they do not apply.  As discussed above, any injuries occurred after the robbery had been thwarted and during the course of the efforts by Raymond and others to escape from 54 Chambers.  Further, while this guideline also has an enhancement for gun use (*see* U.S.S.G. § 2B3.1(b)(2)), the convictions on Counts Four and Five (under 18 U.S.C. §§ 924(c) and (j)) preclude applying any firearm enhancement here. *See United States v. Campbell*, 300 F.3d 202, 216 (2d Cir. 2002) (Where convicted of both a "§ 924(c) offense" and an "underlying offense, [one's] sentence on the underlying offense cannot be enhanced for the possession or use of a firearm.").[5]

   If no role enhancement is applied, the offense level for the robbery counts is 20.  At CHC I (absent the juvenile and youthful offender adjudications), the corresponding sentencing range would be 33-41 months for the Hobbs Act conspiracy and attempt counts.  At the criminal history category calculated in the PSR (CHC III), the robbery guideline range would be 41-51 months.  With the role enhancement, the offense level would be 22 and at CHC I the corresponding sentence would be 41-51 months and at CHC III would be 51-63 months.

   The remaining convictions for Counts Four and Five both fall within U.S.S.G. § 2K2.4(b) because they both rest on violations of 18 U.S.C. § 924(c), and, as the Second Circuit has stated,

---

[4] The government argued, in fact, that it was James Williams who was the individual "instrumental in the planning" of the botched robbery; the one who "recruited members" and "cased the house on Chambers Street." Williams Sentencing Trans. at 10.

[5] Should this Court grant the defense motion to vacate Counts Four and Five, then a firearm enhancement under this guideline may be appropriate.

a § 924(j) conviction incorporates the § 924(c) penalty enhancements. *United States v. Ventura*, 742 Fed.Appx. 575, 578–79 (2d Cir. 2018); *United States v. Nina*, 734 F. App'x 27, 36 (2d Cir. 2018); *United States v. Young*, 561 F. App'x 85, 93–94 (2d Cir. 2014). It follows that the same Sentencing Guidelines provisions should thus apply to both a § 924(j) and a § 924(c) count.[6]

Accordingly, the Sentencing Guideline's recommendation for Counts Four and Five "is the minimum term of imprisonment required by statute," which is seven years (or 84 months). U.S.S.G. § 2K2.4(b); 18 U.S.C. § 924(c)(1)(A)(ii). Adding that 84-month term to run consecutively to the period of imprisonment imposed for the robbery counts, the recommended range under the Guidelines is between 117-125 months (without a role enhancement and with Raymond in CHC I) to 135-147 months (with the role enhancement and with Raymond in CHC III). In short, absent the murder cross-reference, which does not apply here, the longest recommended sentence under the Guidelines is 147 months.

### III.    Avoiding Unwarranted Sentencing Disparities

This Court recently sentenced co-defendant Tyrell Whitaker to 204-months in custody. Whittaker Sentencing Tr. at 24. In doing so, the Court recognized the gravity of the offense conduct, noting that "Mr. Whitaker willingly took an active part in an apparently dangerous crime that resulted in the death of Jeffery Henry" as well as the stabbing of another individual. *Id.* at 25. This Court described the offense as "extraordinarily serious" and observed that Tyrell Whitaker "willingly took part in the activities that led to Mr. Henry's death." *Id.* Considering the other 18 U.S.C. § 3553(a) factors, the Court gave mitigating weight to: (1) Tyrell Whitaker's age at the time of the offense; (2) his difficult family background; (3) the fact that he was "raised in Newburgh, and Newburgh was once known as the murder capital of the world"; and (4) "the very compelling submissions" by the defense team. *Id.* at 26- 27.

The same factors that this Court found weighed in favor of mitigation for Tyrell Whitaker apply to the sentencing analysis for Raymond Christian. While Raymond was not, as a technical matter, a minor at the time of the offense, that is only because he had turned 18 years old not a month before the botched robbery. As described in detail in the original sentencing submission for Raymond, the social science and medical research around neurobiology that forms a substantial part of the Supreme Court's radical changes to juvenile sentencing applies just as much to someone three weeks past his eighteenth birthday as it does to someone three weeks before his eighteenth birthday. *See* ECF No. 271 at 8 – 12. Raymond, like Tyrell, grew up without a father and with a mother who could not provide for his needs. *See* ECF No. 271-1

---

[6] Under no circumstances should the 43-level first-degree murder guideline apply here. Jeffrey Henry's death was not premeditated and thus U.S.S.G.§ 2A1.1 cannot apply. Were this Court to reject the argument that a § 924(j) conviction is to be treated under the Sentencing Guidelines the same way a § 924(c) conviction is treated, then, at most, it would be the 38-point offense level of U.S.S.G. § 2A1.2 that would apply. The Guidelines recommendation for Counts Four and Five (because based on the identical set of facts) would thus be 235-293 months if Raymond were in CHC I or 292-365 if in CHC III. It would not, however, be a recommended sentence of life in prison.

(Torres-Perez Mitigation Report), Exh. 1 hereto (Murphy Mitigation Addendum).  Raymond, like Tyrell, was raised in a city where the violence "was almost not real." Whitaker Sentencing Tr. at 27; ECF No. 271-2 ("In Newburgh, Gangs and Violence Reign" and "Welcome to Newburgh, Murder Capital of New York.")  Raymond, too, has done what he can to improve not only himself during these long years at the MCC (with his work and his classes) but also to improve others – be it working as an inmate companion, helping a stranger introduced to him by his aunt reconnect with his family or providing the support to an old friend and teammate necessary to help that young man make it to college.  The same factors that convinced this Court that Tyrell Whitaker would not revert to criminal activity should provide assurance that Raymond, too, does not need a substantial sentence to accomplish the goal of personal deterrence.[7]

To impose a greater sentence on Raymond Christian, who was convicted of the very same acts and who shares so many key characteristics with Tyrell Whitaker, would be an unwarranted sentencing disparity.[8]

## IV.    Adjustment for Harsh Conditions at the MCC

For over eight years, Raymond has been detained at a facility designed for temporary pre-trial holding. *See* Exh. 5 (Lindsay Report).  Not only is the MCC not intended for long-term incarceration, it has been, even prior to the current public health crisis, a particularly heinous place. *See* Exhibit 6 hereto, Aviva Stahl, *Prisoners Endure a Nightmare "Gulag" in Lower Manhattan, Hidden in Plain Sight*, GOTHAMIST, June 19, 2018.)  The jail is filthy, rodents run rampant, competent medical care is nearly impossible to obtain and guards have been accused of graft and violence. *See* Exhibit 6 hereto, Ali Watkins, Danielle Ivory and Christina Goldbaum, *Inmate 76318-054: the Last Days of Jeffrey Epstein*, THE NEW YORK TIMES, August 17, 2019 (describing an environment that was "so poorly managed and chronically short-staffed that workers who were not correctional officers were regularly pressed into guard duty.")  A video that the Daily News published last year shows some of those horrific conditions, including rodents, mold and overcrowding in tight quarters. See Stephen Rex Brown, SEE IT: Contraband Video Gives Rare Look at 'Disgusting' Conditions Inside Manhattan Federal Jail, THE DAILY NEWS, Apr. 27, 2020; available at nydailynews.com/new-york/ny-mcc-video-disgusting-conditions-20200427-7jnmpcbnovasphw32cm3pj677q-story.html, last viewed March 9, 2021.

Even before the start of this year, a number of judges in this district had recognized the horrendous conditions at the MCC and provided downward departures at sentencing for

---

[7] To the extent that the two co-defendants have different disciplinary records, defense correctional expert Cameron Lindsay's report explains the nature and severity of Raymond's BOP history (with an average of fewer than two incidents per year), which he describes as ordinary and not concerning. *See* Exh. 5 (Lindsay Report).

[8] This Court sentenced co-defendants Rashawn Vassell to 227-months in prison, James Burden to 120-months in prison and James Williams, who provided the gun for the robbery, to 120-months in prison (and following a post-*Davis* remand, lowered that to 60-months).

12 Cr. 626 *United States v. Raymond Christian*
Supplemental Defense Sentencing Submission
March 9, 2021
Page 12 of 14

defendants who have been detained there. *See, e.g., United States v. Saldana*, 17Cr. 512 (KMW), Dkt. No. 535 at 16-17 (S.D.N.Y. Sept. 10, 2019) ("I am aware the conditions at the MCC are very dreadful, and it is my intention to give every defendant who has suffered in that way a break because of that."); *United States v. Behr*, 2006 WL 1586563, *5 (S.D.N.Y. June 9, 2006) (Sweet, J) (recognizing harsh conditions at MCC were unacceptable pretrial punishment and sentencing defendant below Guidelines).

Conditions at the MCC have only worsened over the past twelve months. First, there was an investigation in early 2020 into a firearm that a correctional officer purportedly brought into the jail, which led to many non-culpable detainees (including Raymond) being temporarily and unexpectedly moved from the MCC to other detention locations. During that time, Raymond was allowed no social or legal visits. Soon after his return to the MCC, when visits were to resume, the covid-19 pandemic put the facility essentially on lock-down, where it remained for much of the past twelve months.

As for many prisoners during covid, living in an overcrowded congregate setting with inadequate medical care, poor ventilation and inadequate physical distancing has been harrowing. *See* Liliana Segura, As Virus Spreads in Federal Prisons, People Inside Describe Chaos, While Families Are Left In The Dark, The Intercept (Apr. 15, 2020), available at theintercept.com/2020/04/15/federal-prisons-coronavirus/ ("The attempts at social distancing [at FCI Otisville] were futile. In the medium-security facility where Carrillo was housed, men were double-bunked, with more than 100 people per unit."), last accessed March 9, 2021. Predictably, federal prisons became hotspots for the spread of covid. *See* Keegan Hamilton & Keri Blakinger, *'Con Air' Is Spreading COVID-19 All Over the Federal Prison System*, The Marshall Project (Aug. 13, 2020), available at themarshallproject.org/2020/08/13/con-air-isspreading-covid-19-all-over-the-federal-prison-system ("[P]artly due to federal courts and law enforcement agencies pumping thousands of new people into the system" throughout the pandemic, COVID-19 has "wreak[ed] havoc across the Bureau of Prisons, . . . America's largest network of prisons and jails."), last accessed March 9, 2021.

In the class-action lawsuit filed against the MCC, plaintiffs detailed the jail's egregious response to the covid crisis. *See* Exhibit 7 hereto, *Fernandez-Rodriguez et al. v. Licon-Vitale*, Class Action Petition. The MCC had inadequate testing, failed to reduce extreme overcrowding and simply ignored the hygiene measures called for during this crisis. *Id.* These same types of institutional failures were identified in the MCC's sister institution in Brooklyn in the facility evaluation of the Metropolitan Detention Center that epidemiologist Dr. Craig Venters submitted in connection with a challenge to the conditions of confinement during covid there. *See id.*, Dr. Venters Facility Evaluation. The MCC has responded to covid by, essentially, operating the entire facility as it were on a security lockdown for the last year. Raymond (and others) are confined to their cells for 22 to 23 hours a day. They have no outdoor access. Social visits were non-existent.

These sorts of substandard pretrial housing conditions have long been considered relevant to determine a sentence. It has been established, particularly in this Circuit, that courts can grant sentencing relief in the form of downward departures and variances based upon unduly harsh

12 Cr. 626 *United States v. Raymond Christian*
Supplemental Defense Sentencing Submission
March 9, 2021
Page 13 of 14

treatment in custody.  The rationale behind this has been to, one, provide some form of equitable compensation for excessive hardship by treating both suffering and time as components of punishment and reducing the time component of a defendant's sentence accordingly; and, two, deter authorities within the courts' jurisdiction from causing or tolerating the abhorrent conditions that produced such excessive punishment in the first place.  The latter is especially necessary now, when courts must express their institutional condemnation of the gross negligence and wanton indifference to human life demonstrated by officials at the MCC, including its efforts to cover-up its misdeeds.

Because the conditions in which Raymond has been detained at the MCC for the past eight-plus years (especially over the past twelve months) have been substantially more punitive than reasonable (and more punitive than he would have experienced had he not been in notoriously poorly managed and dangerous temporary detention facility), this Court should confer on him some sentencing credit because of his confinement at the MCC before and through the covid crisis. *See, e.g., United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (in the context of a downward departure, "presentence confinement conditions may in appropriate cases be a permissible basis for" a below Guidelines sentence).

## V.  Conclusion

This case has involved a cascading series of tragedies: the endemic gun violence and open air drug trade that plagued Raymond's hometown; the parentless children of Newburgh; the senseless death of Jeffrey Henry.  Raymond has spent the past decade reflecting on the intersection of those events, doing all he can in limited circumstances to put his energy toward improving his life and the lives of others.  He is a young man who has shown himself capable of rehabilitation.  The federal sentencing regime demands a sentence "sufficient, **but not greater than necessary**" to accomplish its goals. 18 U.S.C. § 3553(a).  The critical question for this Court is how much more than the eight-plus years that Raymond has spent at the MCC is necessary to do so.  The PSR recommends a sentence of life in prison – a sentence that would resign Raymond to die behind bars.  As this Court has recognized when sentencing Raymond's co-defendants, that is simply more than is necessary to adequately punish for the crime here, to avoid recidivism or to generally deter criminal conduct.  For the reasons set forth herein as well on the basis of the arguments set forth in his prior sentencing submission and exhibits, Raymond Christian respectfully asks this Court to impose a sentence reflecting his calculation of the Sentencing Guidelines range or, in the alternative, commensurate with the sentence imposed on Tyrell Whitaker.

Respectfully submitted,

            /s/
_____
MEGAN WOLFE BENETT, Esq.
Attorney for defendant Raymond Christian
750 Third Avenue, 32nd Floor
New York, New York 10017
Tel.:   (212) 973-3406

12 Cr. 626 *United States v. Raymond Christian*
Supplemental Defense Sentencing Submission
March 9, 2021
Page 14 of 14

                                          Fax:    (212) 972-9432
                                          Email: mbenett@kreindler.com

CC:    All counsel of record via ECF/CM